WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Proposed Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                              :
**In re**                                     :
                                              :          **Chapter 11**
**ALL YEAR HOLDINGS LIMITED,**                :
                                              :          **Case No. 21-12051 (MG)**
          **Debtor.**                         :
                                              :
-------------------------------------------------------x

### NOTICE OF HEARING ON PARENT DEBTOR'S MOTION PURSUANT TO BANKRUPTCY CODE §§ 105(a) AND 363 AND BANKRUPTCY RULE 9019 FOR APPROVAL OF SETTLEMENT PROVIDING FOR RECAPITALIZATION OF NON-DEBTOR ALL YEAR EQUITY PARTNERS LLC

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**")[1] of All Year Holdings Limited, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Parent Debtor**"), for entry of an order pursuant to sections 105(a) and 363 of chapter 11 of title 11 of the United States Code and rule 9019(a) of the Federal Rules of Bankruptcy Procedure, will be held before the Honorable Martin Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 523, One Bowling Green, New York, New York, 10004 (the "**Bankruptcy Court**")

---

[1] Capitalized terms used but not herein defined have the meanings ascribed to them in the Motion.

on **January 25, 2022 at 10:00 a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and shall be served in accordance with General Order M-399, dated May 17, 2010, so as to be filed and received no later than **January 21, 2022 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Motion, the Parent Debtor may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

**PLEASE TAKE FURTHER NOTICE that due to the COVID-19 pandemic, the Hearing will be conducted using Zoom for Government. Parties should not appear in person and those wishing to appear or participate at the Hearing (whether "live" or "listen only") must make an electronic appearance prior to 4:00 p.m. (Eastern Time) on January 24, 2022 by using the following link: https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl. Instructions for making an eCourtAppearance and additional information on the Court's**

**Zoom procedures can be found at http://www.nysb.uscourts.gov/content/judge-martin-glenn.**

Dated: January 13, 2022
     New York, New York

                     /s/ *Jacqueline Marcus*
                     WEIL, GOTSHAL & MANGES LLP
                     767 Fifth Avenue
                     New York, New York 10153
                     Telephone: (212) 310-8000
                     Facsimile: (212) 310-8007
                     Gary T. Holtzer
                     Jacqueline Marcus
                     Matthew P. Goren

                     *Proposed Attorneys for the Parent Debtor*

WEIL:\98456063\3\12817.0005

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Proposed Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                    :

**In re**                            :

                                   :           **Chapter 11**

**ALL YEAR HOLDINGS LIMITED,**   :

                                   :           **Case No. 21-12051 (MG)**

    **Debtor.**                 :

                                   :
-------------------------------------------------------x

**PARENT DEBTOR'S MOTION PURSUANT TO**
**BANKRUPTCY CODE §§ 105(a) AND 363 AND BANKRUPTCY RULE 9019**
**FOR APPROVAL OF SETTLEMENT PROVIDING FOR**
**RECAPITALIZATION OF NON-DEBTOR ALL YEAR EQUITY PARTNERS LLC**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

        All Year Holdings Ltd., as a debtor and debtor in possession in the above-captioned

chapter 11 case (the "**Parent Debtor**"), respectfully represents as follows in support of this motion

(the "**Motion**"):

**Preliminary Statement**

        1.    For several months prior to the commencement of its chapter 11 case, the

Parent Debtor was engaged in negotiations with its various stakeholders, including its bondholders,

to identify a strategy for maximizing the value of the assets and reducing liabilities of the Parent

Debtor and its various non-debtor affiliates.  Particular focus, time, and effort was devoted to

negotiations with (i) DCP All Year Pref Equity LLC (the "**Preferred Investor**") regarding a

dispute relating to purported defaults and breaches of investment documents governing the

Preferred Investor's investment in All Year Equity Partners LLC (the "**Company**"), an indirect

subsidiary of the Parent Debtor, and (ii) DCP Kings Point LLC ("**DCP Kings**"), an affiliate of the

Preferred Investor, in its capacity as a lender to Chester Holdings NY LLC ("**Chester**"), the

majority of whose equity is directly owned by the Parent Debtor.  As execution of a comprehensive

agreement designed to resolve these disputes was nearing, the Parent Debtor became aware that a

$37 million judgment was entered against it on December 9, 2021. The threat that this judgment

could be levied against the Parent Debtor's assets prompted the Parent Debtor to commence its

chapter 11 case on December 14, 2021 (the "**Commencement Date**").

2.     Following the Commencement Date, the parties re-engaged to finalize their

negotiations. The Parent Debtor, the Company, the Preferred Investor, DCP Kings, and Chester

have now reached agreement – which is supported by the Parent Debtor's key creditor

constituency, the BVI Bondholders (defined below) – on the terms of a comprehensive

restructuring of the Company, as well as the terms for a sale of Chester's equity interest in Greens

at Chester LLC (together, the "**Restructuring**"). The Restructuring is memorialized in the

following agreements: (i) the Recapitalization Agreement, dated January 13, 2022, a copy of which

is attached hereto as **Exhibit A**  (the "**Recapitalization Agreement**"), (ii) the Second Amended

& Restated Limited Liability Company Agreement, a substantially final form of which is attached

hereto as **Exhibit B**  (the "**Second A&R LLCA**" )[1], and (iii) the Membership Interest Purchase

---

[1] The Recapitalization Agreement and the Second A&R LLCA are attached hereto in redacted form.  Unredacted copies will be made available to the Court and the Office of the United States Trustee prior to the hearing on the Motion.

and Sale Agreement, dated January 13, 2022, a copy of which is attached hereto as **Exhibit C** (the "**MIPA**" and, collectively with the Recapitalization Agreement and the Second A&R LLCA, the "**Agreements**").  Although the Parent Debtor is a party to the Recapitalization Agreement and the MIPA, the remainder of the key parties to the Restructuring are non-debtor parties, which have requisite corporate authority to proceed with the terms of the Restructuring.  Given that the Parent Debtor is granting releases of certain claims and providing a limited indemnity in connection with the Restructuring, and that the Parent Debtor will execute the Agreements on behalf of itself and the non-debtor entities, however, the Parent Debtor has determined that this Court's approval of the Restructuring is appropriate.

3.     The Restructuring represents a significant step forward in the Parent Debtor's restructuring initiative.  It will relieve the Parent Debtor of certain large guaranty claims. Moreover, it will fix the amount of the Preferred Investor's claim against the Company at a significantly reduced amount and establish a process for disposition of certain real property indirectly owned by the Parent Debtor which, in turn, will provide an opportunity for the Parent Debtor to share in the sale proceeds as such properties are monetized.  Approval of the Agreements, and consummation of the Restructuring, will position the Parent Debtor to continue its progress toward emergence from chapter 11 at an efficient and deliberate pace.  For these reasons, and as set forth more fully below, the Agreements are fair and reasonable, constitute an appropriate exercise of the Parent Debtor's business judgment, and should be approved.

## Jurisdiction

4.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

WEIL:\98370094\22\12817.0005

<u>**Relief Requested**</u>

5.      By this Motion, pursuant to sections 105(a) and 363 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rule 9019**"), the Parent Debtor requests approval of the Agreements, to the extent that they require action by the Parent Debtor.  A proposed form of order granting the relief requested herein (the "**Proposed Order**") is annexed hereto as <u>**Annex 1**</u>.

<u>**Background**</u>

**A.    General Background**

6.      On the Commencement Date, the Parent Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").[2]  The Parent Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in this Chapter 11 Case.

7.      Prior to the Commencement Date, the Parent Debtor issued a single voting share (the "**Class A Share**") to the Parent Debtor's Chief Restructuring Officer and Associate Restructuring Officer entitling them to vote on the appointment or removal of the directors of the Parent Debtor but conferring no other voting rights.  The Class A Share was set to expire at 11:59 pm (British Virgin Islands Time) on January 4, 2022 unless Mr. Yoel Goldman, the Parent

---

[2] On February 22, 2021, Evergreen Gardens Mezz LLC (the "**Initial Debtor**") commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  On September 14, 2021, Evergreen Gardens I LLC and Evergreen Gardens II LLC (the "**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Evergreen Debtors**") commenced their own voluntary cases with the Court under chapter 11 of the Bankruptcy Code.  The Evergreen Debtors are each wholly-owned, indirect subsidiaries of the Parent Debtor.  The Evergreen Debtors' chapter 11 cases are being jointly administered for procedural purposes only under the lead case, *In re Evergreen Gardens Mezz LLC, et al.,* Case No., 21-10335 (MG).  On November 5, 2021, the Court entered an order confirming a joint chapter 11 plan for the Evergreen Debtors [ECF No. 222], which chapter 11 plan became effective and was substantially consummated on December 2, 2021.  The Parent Debtor's Chapter 11 Case is being separately administered from the Evergreen Debtors' chapter 11 cases.

WEIL:\98370094\22\12817.0005

Debtor's sole economic shareholder, agreed to further amend the Parent Debtor's organizational documents. The Parent Debtor was unable to obtain an extension of the January 4th date from Mr. Goldman. Therefore, on December 16, 2021, the Parent Debtor determined that it was necessary to file an application under the laws of the British Virgin Islands ("**BVI**") with the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division Virgin Islands (the "**BVI Court**") seeking the appointment of Paul Pretlove and Charlotte Caulfield of Kalo (BVI) Limited as the joint provisional liquidators (the "**JPLs**") under the applicable provisions of the BVI Insolvency Act 2003. On December 20, 2021, the BVI Court entered the *Order for Joint Appointment of Joint Provisional Liquidators* which, *inter alia*, provides for appointment of the JPLs (the "**JPL Order**").[3]

8.     Additional information regarding the Parent Debtor's business, capital structure, and the circumstances leading to the commencement of this Chapter 11 Case is set forth in the *Declaration of Assaf Ravid Pursuant to Local Bankruptcy Rule 1007-2 in Support of All Year Holdings Limited's Chapter 11 Petition and Related Relief*, dated December 14, 2021 (the "**Ravid Declaration**"), which is incorporated herein by reference.

B.     **The Company**

9.     The common equity in the Company is owned by All Year Holdings Common LLC ("**All Year Holdings Common**"), a subsidiary of All Year Holdings LLC, which itself is a direct subsidiary of the Parent Debtor. The preferred equity in the Company is owned by the Preferred Investor. In late 2018, the Preferred Investor invested $35 million in the Company to support its real property holdings in exchange for a perpetual, participating preferred instrument

---

[3] For additional information on the JPLs' appointment see the *Letter to the Honorable Martin Glenn*, dated December 21, 2021 (ECF No. 13).

WEIL:\98370094\22\12817.0005

with redemption rights that entitle the Preferred Investor to certain payments pursuant to that

certain *Amended and Restated Limited Liability Company Agreement of All Year Equity Partners

LLC*, dated as of December 5, 2018.  At the time that the Preferred Investor made its investment

in the Company, the Parent Debtor entered into the BVI Inducement Agreement, the Completion

Guaranty, and the Environmental Indemnity (each as defined in the Recapitalization Agreement),

pursuant to which the Parent Debtor guaranteed the obligations of the Company to the Preferred

Investor.

          10.     The Company is (i) the sole member of six limited liability companies and

(ii) the holder of 90% of the membership interests in two other limited liability companies, each

of which either directly or indirectly owns interests in various properties located in Brooklyn, New

York.  From time to time over the past several years, the Parent Debtor has made advances to the

property level entities to enable them to pay operating expenses, debt service, and real estate taxes.

As of the date hereof, the Parent Debtor estimates that it has intercompany claims against such

entities in the aggregate amount of approximately $2.3 million (the "**Intercompany

Receivables**").  Nevertheless, following extensive delays on certain development projects, the

Company lacked the liquidity to continue making payments to the Preferred Investor and was faced

with addressing certain purported defaults.  The Company and the Preferred Investor entered into

a series of forbearance agreements and in early 2021 began discussing a complete restructuring of

the Company.  At the outset of these negotiations, the Company and the Preferred Investor had

vastly different calculations as to the Preferred Investor's claims based on the following issues,

among others: (i) purported unpaid cash distributions, (ii) paid in kind distributions, (iii) preferred

distribution defaults, and (iv) late payment charges.  Specifically, the Preferred Investor alleged

that the Company owed the Preferred Investor approximately $85 million on account of its

preferred equity interest, while the Company's calculations indicated that it owed the Preferred

Investor approximately $57 million. As of December 31, 2021, the Preferred Investor contends

that it is owed in excess of $100 million.

11.    Despite this delta, the Company and the Preferred Investor engaged in

lengthy, good-faith negotiations regarding a consensual path forward.  On December 15, 2021,

following the commencement of the Chapter 11 Case, the Preferred Investor sent the Company a

"control shift notice" and, purportedly in accordance with its rights under the Company's operating

agreement, the Preferred Investor appointed DFA Prop Manager, LLC (the "**Manager**"), an

affiliate of the Preferred Investor, as manager of the Company.[4]

### C.    Chester

12.    The Parent Debtor holds an 86.5% ownership interest in Chester which, in

turn, holds a 43.75% ownership interest in Greens at Chester LLC (the "**Greens**").

13.    In October 2017, Greens entered into an agreement to purchase land in

upstate New York to develop single family and semi-detached housing units.  DCP Kings lent $3.6

million to Chester (the "**Chester Loan**") and was granted a security interest in the Company's

100% membership interest in 141 Spencer LLC, the owner of a residential building in Brooklyn.

In or around December 2019, following substantial delays in the project due to extensive litigation

seeking to prevent the development from moving forward, Chester ceased making interest

payments to DCP Kings.  Chester believes that DCP Kings is owed in excess of $5 million on

account of the Chester Loan, including accrued and unpaid interest.  Given current estimates of

---

[4] In the event the Restructuring is not consummated, the Parent Debtor and the Initial Company Manager (as defined in the Second A&R LLCA) reserve their right to contend that the Preferred Investor did not properly invoke the control shift.

WEIL:\98370094\22\12817.0005

the value of Chester's assets, and the lack of capital needed to complete the project, the Parent

Debtor believes that its equity in Chester and, therefore, the Greens, is negligible, at best.

### The Restructuring

14.     In the broadest terms, the Restructuring: (a) fully and finally resolves the

disputes among the Parent Debtor, the Company, the Preferred Investor, and DCP Kings, (b) grants

the Parent Debtor releases that will materially reduce the claims against it, and (c) provides a basis

upon which All Year Holdings Common and, ultimately, the Parent Debtor, may share in the

certain proceeds of the sale of properties owned by the Company's direct and indirect non-debtor

subsidiaries through the Preferred Investor's agreement  to significantly reduce its preferred equity

claim against the Company and to modify the proceeds waterfall, as set forth in the Second A&R

LLCA and described below.

15.     The salient terms of the Restructuring are set forth below: [5]

(i)     <u>Relief from Obligations</u>.  The Parent Debtor will be relieved
of its obligations under the (a) BVI Inducement Agreement,
the Completion Guaranty, and the Environmental Indemnity
with respect to the Company, and (b) guarantee of the Chester
Loan.

(ii)    <u>Distributions</u>. The Preferred Investor is entitled to receive
$50 million of preferred distributions in the first step of the
Waterfall (as defined below). The Manager shall have sole
discretion to determine the amount and timing of all
distributions from the Company.  However, the proceeds
from the dispositions of the AY Properties (as defined below)
will be distributed in accordance with the following agreed
upon waterfall (the "**Waterfall**"):[6]

---

[5] The descriptions of the Agreements contained herein are intended to provide a summary of the key terms thereof
and are qualified in their entirety by reference to the Agreements themselves.

[6] Unless otherwise defined, capitalized terms used in this description of the Waterfall shall have the meanings
ascribed to such terms in the Second A&R LLCA.

First, 100% to the Preferred Members pro rata based upon the number of Class B Units held until the Preferred Members have received cumulative distributions equal to $50 million.

Second, 100% to Members who have made Member Loans, pro rata based on the outstanding principal balance of such Member Loans held by such Members until each such Member has received cumulative distributions equal to the outstanding principal balance of such Member Loans.

Third, 100% to the Members who have made Member Loans and the Preferred Members, pro rata based on each such Member's Return Sharing Percentage until each such Member has received cumulative distributions pursuant thereto equal to such Member's Return Amount.

Fourth, 70% to the Common Members and 30% to the Preferred Members until the cumulative distributions equal the sum of (A) $17 million and (B) reasonable Common Member out of pocket expenses arising from the negotiation and documentation of the Recapitalization Agreement and related agreements (including term sheets); provided, that such expenses are not to exceed $250,000.

Fifth, 50% to the Common Members and 50% to the Preferred Members until cumulative distributions under this step of the Waterfall equal $4 million.

Thereafter, 100% to the Preferred Members.

See Second A&R LLCA, Section 6.1(a).

(iii)     Sale of Properties. The Manager, as manager of the Company, will be responsible for endeavoring to dispose of the properties (the "**AY Properties**") owned by the Company or its subsidiaries (each, an "**AY Entity**") within a five-year period. See Second A&R LLCA, Section 5.1(f).

(iv)     Releases. The Company, the Preferred Investor, the AY Entities, the BVI Bondholders, and the Parent Debtor will exchange mutual releases (collectively, the "**Releases**"). Specifically, the Parent Debtor will receive releases from the AY Entities and the Preferred Investor. Notably, the releases to be granted to the Parent Debtor will relieve the Parent Debtor from liability under, *inter alia*, the BVI Inducement Agreement, the Completion Guaranty and the Environmental Indemnity. The Parent Debtor, in turn, will grant releases to the Preferred Investor and the AY Entities, with customary

9

exceptions (e.g., for claims arising for willful misconduct, bad faith, or fraud). See Recapitalization Agreement, Sections 3.2; 3.3; 3.4; 3.5. The claims to be released by the Parent Debtor include the Intercompany Receivables.

(v)    <u>Management of the Company</u>. The Manager will manage the Company but shall not take, on behalf of the Company, or permit any of the Company's subsidiaries to take, any action which constitutes a Major Decision, as set forth on Schedule II of the Second A&R LLCA without certain consents. See Second A&R LLCA, Section 4.2. Among the Major Decisions that require the consent of, among others, a majority-in-interest held by the Common Members are certain investments, related party transactions, changes in the Company's line of business, dispositions of AY Properties within three (3) years after entry into the Second A&R LLCA for prices that are less than 95% of the agreed upon release prices, capital expenditures over a certain level with respect to any AY Property, and further amendments of the Second A&R LLCA that would alter the Waterfall or change the consent rights of the Common Members.

(vi)    <u>Sale of Equity Interest in the Greens</u>. Chester will sell its 43.75% equity interest in the Greens to DCP Kings, in exchange for the following consideration: (a) forgiveness of the $3.6 million in principal, as well as accrued and unpaid interest and fees, on the Chester Loan, (b) release of the Parent Debtor from its guarantee of the Chester Loan, (c) payment to Chester of $500,000, and (d) release of the security interest granted to DCP Kings on the Company's 100% membership interest in 141 Spencer LLC.

(vii)    <u>Indemnification</u>. Each of the Parent Debtor and Chester shall indemnify and hold DCP Kings harmless from and against any and all demands, liabilities, costs and expenses, including, but not limited to, reasonable attorney's fees, costs and expenses, incurred by DCP Kings to which it is exposed from (a) any breach of Chester's representations and warranties in the MIPA, (b) any claims with respect to Chester's equity interest in the Greens, or (c) any claims by creditors of the Parent Debtor, Chester, or Mr. Goldman, provided that the total amount of indemnification under clauses (b) and (c) shall not exceed $500,000. The indemnification to be provided by the Parent Debtor shall be referred to hereinafter as the "**Parent Indemnity.**" DCP Kings has agreed that any claims against the Parent Debtor arising under the Parent Indemnity shall be treated as general

10

unsecured claims against the Parent Debtor. See MIPA, Section 5(a).

(viii)    <u>Conditions Precedent</u>. Entry of the Proposed Order and the approval of the Restructuring by the BVI Court are conditions precedent to the closing of the Restructuring. See Recapitalization Agreement, Sections 5.2(d), 5.2(e), 5.3(b), and 5.3(c). In addition, the Recapitalization Agreement includes a representation and warranty by, *inter alia*, the Parent Debtor that the BVI Bondholders have approved the Restructuring. See Recapitalization Agreement, Section 4.2(f).

## The Restructuring Should Be Approved

### A.    The Restructuring Meets the Standard for Approval Under Bankruptcy Rule 9019

16.    The Restructuring is in the best interests of the Parent Debtor and its estate and should be approved. Bankruptcy Rule 9019(a) provides that on motion and after notice and a hearing, "the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In granting a motion pursuant to Bankruptcy Rule 9019(a), a Court must find that the proposed settlement is fair and equitable and is in the best interests of the debtor's estate. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re 47-49 Charles St., Inc.*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

17.    Although a court must "evaluate … all … factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *TMT Trailer Ferry*, 390 U.S. at 424, a court need not conduct a "mini-trial" of the merits of the claims being settled, *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993), or conduct a full independent investigation. *See In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991). "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact . . . . The court need only canvas the settlement to determine whether it is within the accepted range of

WEIL:\98370094\22\12817.0005

reasonableness." *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (internal citations omitted).

18.    The Court may give weight to the informed judgment of a debtor that a compromise is fair and equitable. *See Purofied*, 150 B.R. at 522; *In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that [the Court] substitute [its] judgment for the Trustee's, but only that [the Court] test [its] choice for reasonableness . . . . If the Trustee chooses one of two reasonable choices, [the Court] must approve that choice, even if, all things being equal, [the Court] would have selected the other.").

19.    Relying on the guiding language of *TMT Trailer Ferry*, Courts consider the following factors in evaluating the reasonableness of settlements:

> (a) the probability of success in litigation, with due consideration for the uncertainty in fact and law;
>
> (b) the difficulties of collecting any litigated judgment;
>
> (c) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay;
>
> (d) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement;
>
> (e) the competence and experience of counsel who support the settlement;
>
> (f) the relative benefits to be received by members of any affected class;
>
> (g) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and
>
> (h) the debtor's informed judgment that the settlement is fair and reasonable.

*See TMT Trailer Ferry*, 390 U.S. at 424; *In re Ashford Hotels, Ltd.*, 226 B.R. at 804; *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994). The decision to approve a particular settlement lies within the sound discretion of the Court. *See Nellis*, 165 B.R. at 123. It is the

WEIL:\98370094\22\12817.0005

responsibility of the Court to examine a settlement and determine whether it "falls below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Cousins*, No. 9-civ-1190 (RJS), 2010 WL 5298172 at *3 (S.D.N.Y. Dec. 22, 2010). The Court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

20.    As noted, the essence of the Restructuring is a series of agreements made by non-debtor subsidiaries of the Parent Debtor acting at the direction and with the authority of the Parent Debtor. The *TMT Trailer Ferry* analysis is particularly straightforward here, where the only terms that implicate the Parent Debtor are (i) the releases of potentially significant guarantee claims held by the Preferred Investor *against the Parent Debtor*, (ii) the corresponding release of claims against the AY Entities and the Preferred Investor by the Parent Debtor, (iii) the Parent Indemnity, which will be limited and, if invoked, will be a general unsecured claim in the Chapter 11 Case, and (iv) the modification of the Waterfall. Viewed from this perspective, the Restructuring is consistent with the objectives of chapter 11 and satisfies the requirements of *TMT Trailer Ferry*. The Parent Debtor's execution of, and performance under, the Agreements (including the Parent Debtor's actions on behalf of its non-debtor subsidiaries), therefore, should be approved.

21.    Absent the Restructuring, the Parent Debtor and the Company would likely engage in litigation with the Preferred Investor over the existence of purported defaults, the date that any alleged defaults occurred, the value of the Preferred Investor's claim against the Company, and the propriety of the Parent Debtor's guaranty of the obligations of the respective non-debtor subsidiaries, and the amounts of such obligations. Such litigation would be costly, and the outcome is uncertain.

WEIL:\98370094\22\12817.0005

22.     Moreover, the Parent Debtor would be liable to the Preferred Investor for potentially significant amounts under its guarantees, if the validity of those guarantees were upheld.  Under the Restructuring, the Parent Debtor will benefit directly from a release of the Preferred Investor's multi-million guarantee claims against it.

23.     Additionally, the Parent Debtor will benefit indirectly from negotiated and agreed upon priority of distributions set forth in the Waterfall.  There is no dispute that, currently, any economic value available to the Parent Debtor on account of its indirect interest in the Company comes after all obligations owed to the Preferred Investor.  The revised terms of the Waterfall will allow the Company, and its direct and indirect owners, to make distributions of asset sale proceeds to the Parent Debtor which, absent the Restructuring, might be substantially less or not be available at all depending on the ultimate adjudicated size of the Preferred Member's claim. The Parent Debtor may then use such funds to make distributions to its creditors.  The mid-point of the estimated amount available for distribution to the Parent Debtor is approximately $5 million. That potential value outweighs the cost to the Parent Debtor of releasing the Intercompany Receivables, which, if collectable, aggregate approximately $2.3 million.  When coupled with the value of the Releases to be provided by the Class B Member and the AY Entities, the benefit of this settlement to the Parent Debtor's estate and its creditors is indisputable.

24.     Another substantial benefit of the Restructuring is that the Manager has agreed, subject to the terms of the Second A&R LLCA, not to undertake any Major Decisions without the consent of the Common Member, which is indirectly controlled by the Parent Debtor. Absent the Restructuring, and assuming that the control shift was properly invoked, the Manager would have the unfettered right to manage the Company and the AY Entities.

14

25.     With respect to Chester, the Parent Debtor will be getting a release of DCP King's claim arising from the Parent Debtor's guarantee of the Chester Loan, which claim is in excess of $5 million, including accrued and unpaid interest.  Further, the Parent Debtor's direct subsidiary, Chester, will receive $500,000 for an equity interest that is of questionable value.  It is expected that Chester will make a distribution of the Parent Debtor's share of such funds, $432,500, to the Parent Debtor shortly after the closing of the Restructuring.

26.     The settlement embodied in the Restructuring also passes muster under the other *TMT Trailer Ferry* factors.  Throughout the negotiation of the Restructuring, each party was advised by competent counsel and other professionals familiar with the issues. Based on the record of vigorous negotiations, there is no question that the Restructuring has been agreed upon in good faith after arm's length bargaining.

27.     The Parent Debtor is well aware of the liabilities of all of the entities involved in the Restructuring, as well as the value of the properties owned directly or indirectly by each of such entities.  It has determined that the Restructuring is in the best interests, not only of the Parent Debtor, but of its non-debtor affiliates as well.  Moreover, holders of the Parent Debtor's Series B, C, D, and E bonds (the "**BVI Bondholders**") – the Parent Debtor's key creditor constituency – have been involved in the negotiation and documentation of the Restructuring. Both the Parent Debtor and its professionals and the BVI Bondholders and their professionals carefully analyzed all alternatives to the Restructuring and determined that the Agreements are in the best interest of the Parent Debtor and its estate.

28.     In fact, a condition to consummation of the Restructuring is the BVI Bondholders' consent.  On November 29, 2021, the Trustee published to each series of notes a voting notice (which was amended on December 2, 2021). The voting notice contained a legal

summary of the recapitalization transaction prepared by the Trustee's counsel (and was reviewed by the BVI and the Preferred Investor's Israeli counsel) and a financial summary prepared by the Trustee's financial advisor. On December 8, 2021, each of the notes series approved a resolution that materially: (a) instructed the Trustee to give its consent to BVI and its subsidiaries to engage and act according to the Agreements, subject to there being no material changes to the documents from what was presented in the summaries; (b) authorized the Trustee to give the waivers required as part of the Recapitalization Agreement; (c) authorized the Trustee to sign documents confirming the Trustee's consent to transaction and to sign the Recapitalization Agreement.

29.    The Parent Debtor's sole shareholder, Mr. Goldman, has been provided with copies of the Agreements.  The Parent Debtor has been advised by Mr. Goldman that he does not object to the terms of the Restructuring or the relief requested in the Motion.

30.    The Parent Debtor's entry into the Restructuring, and its delivery of releases and a limited indemnity in exchange therefor, clearly fall well within the lowest range of reasonableness and should be approved.

**B.    Section 105(a) of the Bankruptcy Code Provides an Additional Basis for Approval of the Restructuring**

31.    Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Courts have interpreted section 105(a) as providing Bankruptcy Courts with broad equitable powers to issue orders that facilitate a debtor's restructuring.  *See Adelphia Bus. Solutions, Inc. v. Abnos*, 482 F.3d 602, 609 (2d Cir. 2007) ("Section 105(a) grants broad equitable power to the bankruptcy courts to carry out the provisions of the Bankruptcy Code so long as that power is exercised within the confines of the Bankruptcy Code."); *see also In re Casse*, 198 F.3d 327, 336 (2d Cir. 1999) (explaining that section 105 is intended to be the "basis for a

broad exercise of power in the administration of a bankruptcy case" to allow Bankruptcy Court

the ability to "police their dockets and afford appropriate relief.").

32.    In the instant case, implementation of the Restructuring will facilitate the

Parent Debtor's restructuring because it will materially reduce the amount of claims against the

Parent Debtor and provide a potential distribution to the Parent Debtor from the sale proceeds of

the AY Properties and the $432,500 from the Chester sale.  In addition, the Manager's agreement

to sell the AY Properties over a five year period will increase the likelihood that the non-debtor

subsidiaries will be able to derive significant value from the AY Properties as the real estate market

recovers from the pandemic, thereby increasing the value of the Parent Debtor's assets.

Accordingly, approval of the Restructuring pursuant to section 105(a) of the Bankruptcy Code is

appropriate.

**C.    The Release of the Intercompany Receivables and the Parent
Indemnity Should be Approved Under Bankruptcy Code Section 363**

33.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate."  11 U.S.C. § 363(b)(1).  The release of the Intercompany

Receivables constitutes a use of the Parent Debtor's property.  While, arguably, the grant of the

Parent Indemnity is in the ordinary course of business for a real estate developer that purchases,

sells, and develops real estate projects, DCP Kings has requested that the Parent Debtor obtain

approval of the terms of the Parent Indemnity.

34.    To approve the use of property outside the ordinary course of business, the

Court must "find from the evidence presented before [it] at the hearing a good business reason to

grant such an application."  *In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re*

*Borders Grp., Inc.*, 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011) ("[A] debtor often satisfies the

17

business judgment standard if 'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'") (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)); *In re MF Glob. Ltd.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) ("The business judgment of a trustee is entitled to great deference."). If "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted). Courts in this District consistently have declined to interfere with corporate decisions absent a showing a bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions are attributable to any "rational business purpose." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. Oct. 28, 1992) (quoting *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 436 (S.D.N.Y. 1988)).

35.     Given all of the benefits of the Restructuring, the Parent Debtor's release of the Intercompany Receivables and issuance of the Parent Indemnity satisfy the business judgment standard and constitute a proper use of the Parent Debtor's property.   With respect to the Intercompany Receivable, the tangible benefits of the Restructuring to the Parent Debtor outweigh the costs of foregoing the Intercompany Receivables.  Moreover, the AY Entities themselves will be providing releases of certain payables owed to them by the Parent Debtor, which aggregate approximately $1.6 million.  As to the Parent Indemnity, other than claims arising from breach of the MIPA, any potential liability under the Parent Indemnity is limited to $500,000, a sum equivalent to the payment that Chester will receive for the sale of its membership interest in the Greens and distribute to the Parent Debtor.  Importantly, any claim under the Parent Guaranty will

be treated as an unsecured claim in the Chapter 11 Case. Thus, the downside risk to the Parent Debtor is capped and is not very material in the context of the Chapter 11 Case.

36. Furthermore, although the Restructuring is comprised of two transactions, the Restructuring is contingent on both parts proceeding. If the Parent Indemnity were not approved, and the Chester part of the Restructuring could not proceed, the Parent Debtor would lose the benefit of the Releases and the other economic benefits it is receiving as part of the Company's Restructuring. Finally, the scope of the Parent Indemnity is rather limited, making it unlikely that the Parent Debtor would actually be called upon to make a payment thereunder.

37. In light of all of the benefits of the Restructuring, the Parent Debtor's decision to release the Intercompany Receivables and grant the Parent Indemnity satisfies the business judgment standard and, therefore, should be approved under section 363(b) of the Bankruptcy Code.

## BVI Court Approval

38. The JPLs are aware of the terms of the Restructuring and have authorized Mr. Ravid to execute the necessary documents in connection therewith, subject to the approval of the BVI Court. Shortly hereafter, the Parent Debtor intends to file an application containing any necessary affidavits, affirmations, draft orders or other required submissions in substantially similar form and substance as this Motion for approval in the BVI Court. Upon filing the application, the Parent Debtor will use commercially reasonably efforts to cause an order of the BVI Court authorizing the Restructuring to be entered. The Parent Debtor anticipates that within one to two weeks of filing an application with the BVI Court, a hearing will be held on the application and an order will be entered shortly thereafter.

WEIL:\98370094\22\12817.0005

## Notice

39.    Notice of this Motion will be provided to (i) William K. Harrington, the

U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York,

NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shara Cornell, Esq.), (ii) the Parent Debtor's top

twenty (20) unsecured creditors, (iii) the Internal Revenue Service, (iv) the United States

Attorney's Office for the Southern District of New York, (v) counsel to the Preferred Investor and

DCP Kings, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York

10036 (Attn: David Antheil, Esq. and Jason Rubin, Esq.), (vi) counsel to  Mishmeret Trust

Company Ltd., as Trustee for the BVI Bondholders, Chapman & Cutler LLP, 1270 Sixth Avenue,

New York, New York 10020 (Attn: Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron

Krieger, Esq.), (vii) the JPLs, (viii) counsel to Mr. Goldman, Davis, Polk & Wardwell,

450 Lexington Avenue, New York, New York 10017 (Attn: Elliot Moskowitz, Esq. and Brian M.

Resnick, Esq.), and (ix) all parties that have requested notice pursuant to Federal Rule of

Bankruptcy Procedure 2002.  The Parent Debtor respectfully submits that such notice complies

with the requirements of Bankruptcy Rule 6004(a) and that no further notice is required.

## Waiver of Bankruptcy Rule 6004(h) Requirement

40.    To implement the foregoing successfully, the Parent Debtor requests that

the Court waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property

under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to

expeditiously execute the Restructuring.  Accordingly, ample cause exists to justify granting a

waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## No Previous Request

41.    No previous request for the relief sought herein has been made by the Parent

Debtor to this or any other Court.

WEIL:\98370094\22\12817.0005

## Conclusion

42.    The Restructuring constitutes a valid exercise of the Parent Debtor's reasonable business judgment and is in the best interests of the Parent Debtor's estate and its creditors and should be approved.

WHEREFORE the Parent Debtor respectfully requests entry of the Proposed Order and such other and further relief as the Court may deem just and appropriate.

Dated: January 13, 2022
New York, New York

 _/s/ Jacqueline Marcus_
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren


_Proposed Attorneys for the Parent Debtor_

WEIL:\98370094\22\12817.0005

## **Annex 1**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                                           :
In re                                                      :
                                                           :          Chapter 11
ALL YEAR HOLDINGS LIMITED,                                 :
                                                           :          Case No. 21-12051 (MG)
        Debtor.                                            :
                                                           :
                                                           :
-----------------------------------------------------------x

## ORDER APPROVING SETTLEMENT PROVIDING FOR
## RECAPITALIZATION OF ALL YEAR EQUITY PARTNERS LLC

Upon the motion, dated January 13, 2021 (ECF No. ___) (the "**Motion**")[1] of All

Year Holdings Ltd. as debtor and debtor in possession in the above-captioned chapter 11 case (the

"**Parent Debtor**"), pursuant to sections 105(a) and 363 of chapter 11 of title 11 of the United

States Code (the "**Bankruptcy Code**"), and Rule 9019 of the Federal Rules of Bankruptcy

Procedure, seeking approval of (i) the Recapitalization Agreement, (ii) the MIPA, and (iii) the

Second A&R LLCA, all as more fully set forth in the Motion; and the Court having jurisdiction to

decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b),

and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the relief sought in the Motion having been provided, and such notice

having been adequate and appropriate under the circumstances, and it appearing that no other or

further notice need be provided; and the Court having held a hearing on January __, 2022 to

---

[1] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms
in the Motion.

consider the relief requested in the Motion (the "**Hearing**"); and upon the Declaration of Ephraim Diamond, sworn to on January 13, 2022 in support of the Motion; and upon the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the compromise and settlement reflected in the Agreements is in the best interests of the Parent Debtor, its estate, its creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT

1.      The Motion is granted to the extent set forth herein.

2.      The Parent Debtor's entry into the Agreements, and any ancillary agreements or documents required in connection therewith, is authorized and approved, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a).

3.      The Parent Debtor is authorized to take all actions necessary to effectuate the Restructuring including, without limitation, executing the Agreements and related documents on behalf of the non-debtor subsidiaries of the Parent Debtor, and all such actions are approved.

4.      The Agreements confer substantial benefits on the Parent Debtor's estate by, among other things, providing for: (a) resolution of the disputes among the Parent Debtor, the Company, the Preferred Investor, and DCP Kings, (b) the grant of releases to the Parent Debtor that will materially reduce the claims against the Parent Debtor, (c) a modified Waterfall, as a result of which the Parent Debtor may share in the certain proceeds of the sale of properties owned by the Company's direct and indirect subsidiaries, and (d) the payment of $500,000 to Chester.

5.      Given the facts and circumstances of this case and the nature of the claims and causes of action that may be asserted by the AY Releasing Parties against the Parent Debtor,

2

including but not limited to certain significant guarantee claims, and the defenses that may be asserted by the Parent Debtor in respect of any such claims or causes of action, the Releases by the Parent Debtor contained in the Recapitalization Agreement, including but not limited to the Parent Debtor's release of the Intercompany Receivables, are fair, reasonable and adequate, and in the best interests of the Parent Debtor's estate and its creditors, and represent a valid and proper exercise of the business judgment of the Parent Debtor.

6.      The compromise and settlement of claims set forth in the Recapitalization Agreement and the Second A&R LLCA substantially exceeds, from the Parent Debtor's perspective, the lowest point in the range of reasonable outcomes and the consideration provided by the Parent Debtor under the Recapitalization Agreement and the Second A&R LLCA, including the Parent Debtor's release of the Intercompany Receivables, therefore, satisfies the business judgment standard and constitutes a proper use of the Parent Debtor's property.

7.      In light of the facts and circumstances of this case, the consideration received by the Parent Debtor pursuant to the Recapitalization Agreement and, indirectly under the  Second A&R LLCA, represents reasonably equivalent value for the claims against the AY Released Parties that the Parent Debtor is releasing, including the release of the Intercompany Receivables and the Parent Debtor's agreement to the modified Waterfall.

8.      The consideration provided by the Parent Debtor's estate under the MIPA, including the Parent Debtor's issuance of the Parent Indemnity, satisfies the business judgment standard and constitutes a proper use of the Parent Debtor's property.

9.      In light of the facts and circumstances of this case, the consideration received by the Parent Debtor pursuant to the MIPA, including but not limited to the $432,500 cash payment to Chester and the release of the Parent Debtor from its guarantee of the Chester

3

Loan, represents reasonably equivalent value for the transfer of Chester's equity interests in the Greens.

          10.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated  _____, 2022
      New York, New York

                                      _____

                                      THE HONORABLE MARTIN GLENN
                                      UNITED STATES BANKRUPTCY JUDGE

WEIL:\98370094\22\12817.0005

## Exhibit A

**Recapitalization Agreement**

*Execution Version*

# RECAPITALIZATION AGREEMENT

This RECAPITALIZATION AGREEMENT (as may be amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of January 13, 2022 (the "***Effective Date***"), is entered into by and among: (i) All Year Equity Partners LLC, a Delaware limited liability company (the "***Company***"); (ii) All Year Holdings Limited, a company organized in the Territory of the British Virgin Islands ("***BVI***"); (iii) All Year Holdings LLC, a New York limited liability company (the "***Initial Company Manager***"); (iv) All Year Holdings Common LLC, a New York limited liability company (the "***Class A Member***"); (v) DCP All Year Pref Equity LLC, a Delaware limited liability company (the "***Class B Member***"); and (vi) Mishmeret Trust Services Company Ltd., in its capacity as Trustee for those certain Series B, C, D, and E Bonds issued by BVI (the "***BVI Bondholder Trustee/Representative***").  This Agreement collectively refers to the Company, BVI, the Initial Company Manager, the Class A Member, the Class B Member and the Bondholder Trustee/Representative as the "***Parties***" and each individually as a "***Party***".

## RECITALS

**WHEREAS**, the Company, the Class A Member and the Class B Member are parties to that certain Equity Drawdown Facility Agreement, dated as of December 5, 2018 (as amended, restated, modified, or supplemented from time to time in accordance with its terms, the "***Equity Drawdown Facility Agreement***");

**WHEREAS**, the Company, the Initial Company Manager, the Class A Member, the Class B Member and the independent directors referred to therein are parties to that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of December 5, 2018 (as amended, restated, modified, or supplemented from time to time in accordance with its terms, the "***A&R Company Operating Agreement***");

**WHEREAS**, BVI executed and delivered that certain Inducement Agreement, dated as of December 5, 2018, in favor of the Class B Member (as amended, restated, modified, or supplemented from time to time in accordance with its terms, the "***BVI Inducement Agreement***");

**WHEREAS**, under the A&R Company Operating Agreement, the Class B Member has the right to assume control of the Company by removing and replacing the Initial Company Manager upon the occurrence of a breach of the Equity Drawdown Facility Documents;

**WHEREAS**, on December 15, 2021, the Class B Member delivered a "Control Shift Notice," which, *inter alia,* removed the Initial Company Manager as Manager of the Company and appointed DFA Prop Manager, LLC as Manager of the Company;

**WHEREAS**, in December 2020, the Class B Member asserted claims against BVI under the BVI Inducement Agreement involving a demand for payment of then-current Redemption Price (as defined in the A&R Company Operating Agreement) in an estimated amount equal $66,254,621.08, which Redemption Price has continued to accrue pursuant to the A&R Company Operating Agreement (the "***Inducement Agreement Claim***");

**WHEREAS**, in connection with the occurrence of a breach of the Equity Drawdown Facility Documents, the Parties have engaged in good faith, arm's-length negotiations and agreed to restructure and effect a recapitalization of the equity interests in, and certain indebtedness obligations of, the AY Entities contemplated in the Equity Drawdown Facility Documents (the "***Recapitalization***") pursuant to the terms and on the conditions set forth in this Agreement;

**WHEREAS**, in connection with the Recapitalization and the agreement to enter into the Second A&R Company Operating Agreement and other Definitive Documents pursuant to the terms and on the conditions set forth in this Agreement, the Class B Member has agreed to, *inter alia*, release the Inducement Agreement Claim against BVI effective as of the Closing as contemplated herein;

**WHEREAS**, concurrently with the effectiveness of the Recapitalization at the Closing, Chester Holdings shall consummate the sale of its entire interest in Greens at Chester LLC ("***Greens at Chester***") to DCP Kings Point in exchange for (i) the payment by DCP Kings Point to Chester Holdings of purchase price in cash equal to $500,000 *plus* the forgiveness of loan principal by DCP Kings Point in the original principal amount of $3,600,000 owed by Chester Holdings to DCP Kings Point pursuant to that certain loan transaction on or about of April 23, 2018, as amended ("***Chester Indebtedness***"), (ii) the release by DCP Kings Point of (A) its security interest in the equity interests in 141 Spencer LLC and (B) the guaranty of the Chester Indebtedness by BVI for the benefit of DCP Kings Point (the "***Chester Sale Transaction***");

**WHEREAS**, on December 14, 2021, BVI commenced a voluntary reorganization case (the "***Chapter 11 Case***") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"); and

**WHEREAS**, on December 20, 2021, the BVI Commercial Court (the "***BVI Commercial Court***") made an order (the "***PL Order***"), on BVI's own application, placing BVI into provisional liquidation pursuant to the provisions of the BVI Insolvency Act 2003.

**NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

<u>**AGREEMENT**</u>

**ARTICLE I**
**DEFINITIONS; EXHIBITS AND SCHEDULES**

Section 1.1    For purposes of this Agreement, the following terms have the meanings set forth below:

"***2021 Net Working Capital***" has the meaning set forth in <u>**Section 4.3(c)**</u>.

"***A&R Company Operating Agreement***" has the meaning set forth in the recitals.

2

"***Action***" means any claim, action, suit, arbitration or proceeding by or before any Governmental Authority.

"***Affiliate***" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person. For purposes of this Agreement, (a) no AY Entity shall be deemed an Affiliate of the All Year Parties, the Class B Member, Y. Goldman or T. Goldman; (b) no All Year Party shall be deemed an Affiliate of the AY Entities, Y. Goldman or T. Goldman; and (c) the Class B Member shall not be deemed an Affiliate of the AY Entities.

"***Agreement***" has the meaning set forth in the preamble.

"***All Year Claims***" has the meaning set forth in **Section 3.4**.

"***All Year Parties***" means BVI, the Initial Company Manager and the Class A Member.

"***All Year Property Manager***" means All Year Management LLC, All Year Management NY Inc. and any Affiliate of All Year Management LLC, All Year Management NY Inc., any All Year Parties, Y. Goldman or T. Goldman that is providing management or other related services with respect to any real property or any improvement thereon that is directly or indirectly owned by an AY Entity.

"***All Year Related Parties***" means, (i) equity holders of BVI or the Class A Member (regardless of whether such interests are held directly or indirectly), (ii) all predecessors, successors, and assigns, subsidiaries and Affiliates of BVI or the Class A Member, (iii) Charlotte Caulfield and Paul Pretlove, the joint provisional liquidators of BVI, who were appointed pursuant to the PL Order, and (iv) with respect to each Person described in clauses (i) and (ii) hereof, (A) each of the current or former officers, managers, directors, principals, members, employees, holders of participations, agents, managed accounts or funds, and management companies of such Person, and (B) each of the fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals of engaged by such Person; provided, that in no event shall All Year Related Parties include any of the AY Entities, the BVI Bondholders, the Class B Member and, for avoidance of doubt, Y. Goldman, T. Goldman, Israel David Friedman, All Year Management NY Inc. and any Affiliate of Y. Goldman, T. Goldman, Israel David Friedman or All Year Management NY Inc.

"***All Year Released Claims***" has the meaning set forth in **Section 3.4**.

"***All Year Released Parties***" has the meaning set forth in **Section 3.4**.

"***All Year Releasing Parties***" has the meaning set forth in **Section 3.4**. For the avoidance of doubt, All Year Releasing Parties shall not include Y. Goldman or T. Goldman.

"***All Year Reorganization Documents***" means those certain documents set forth on Schedule I attached hereto.

"***AY Claims***" has the meaning set forth in **Section 3.2**.

3

"***AY Entities***" means the entities set forth on <u>Schedule II</u> attached hereto.

"***AY Entity Related Parties***" means, (i) each of the current or former officers, managers, directors, principals, members and employees of the AY Entities, and (ii) each of the attorneys, accountants, investment bankers, consultants, representatives, and other professionals engaged by the AY Entities; <u>provided</u>, that in no event shall AY Entity Related Parties include Y. Goldman, T. Goldman or any Affiliate of Y. Goldman or T. Goldman.

"***AY Released Claims***" has the meaning set forth in **<u>Section 3.2</u>**.

"***AY Released Parties***" has the meaning set forth in **<u>Section 3.2</u>**.

"***AY Releasing Parties***" has the meaning set forth in **<u>Section 3.2</u>**. For the avoidance of doubt, AY Releasing Parties shall not include Y. Goldman or T. Goldman.

"***Bankruptcy Code***" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereinafter in effect, or any successor statute.

"***Bankruptcy Court***" has the meaning set forth in the recitals.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075 and the general, local and chambers rules of the Bankruptcy Court.

"***Business Day***" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York.

"***BVI***" has the meaning set forth in the preamble.

"***BVI Bond Documents***" means those certain Contracts set forth on <u>Schedule III</u> attached hereto and all Contracts executed in connection with the foregoing.

"***BVI Bondholder Claims***" has the meaning set forth in **<u>Section 3.5</u>**.

"***BVI Bondholder Released Claims***" has the meaning set forth in **<u>Section 3.5</u>**.

"***BVI Bondholder Released Parties***" has the meaning set forth in **<u>Section 3.5</u>**.

"***BVI Bondholder Releasing Parties***" has the meaning set forth in **<u>Section 3.5</u>**.

"***BVI Bondholders***" means the holders of those certain Series B, C, D, and E Bonds issued by BVI, together with the BVI Bondholder Trustee/Representative.

"***BVI Commercial Court***" has the meaning set forth in the recitals.

"***BVI Inducement Agreement***" has the meaning set forth in the recitals.

"***BVI Transaction Approval Order***" means an order of the BVI Commercial Court pursuant to the terms of the PL Order authorizing and approving, *inter alia*, the execution, delivery

4

and performance of the Definitive Documents by BVI and the taking of any and all actions by BVI necessary or appropriate to effectuate the Recapitalization, including the release of All Year Released Claims by BVI as contemplated herein, which order shall be in form and substance, including in respect of all finding of facts and conclusions of law, acceptable to the Class B Member and BVI.

"***Chapter 11 Case***" has the meaning set forth in the recitals.

"***Chester Holdings***" means Chester Holdings NY LLC, a New York limited liability company.

"***Chester Sale Transaction***" has the meaning set forth in the recitals.

"***Claims***" means any and all claims (including cross-claims, counterclaims, rights of setoff and recoupment), demands, actions, causes of action, suits, debts, liabilities, obligations, sums of money, costs, demands, expenses, accounts, covenants, contracts, controversies, agreements, promises, damages (including reimbursement of costs or expenses, including attorney's fees), judgments, and executions.

"***Class A Member***" has the meaning set forth in the preamble.

"***Class B Claims***" has the meaning set forth in **Section 3.3**.

"***Class B Member***" has the meaning set forth in the preamble. "***Class B Related Parties***" means, (i) equity holders of the Class B Member (regardless of whether such interests are held directly or indirectly), (ii) all predecessors, successors, and assigns, subsidiaries and Affiliates of the Class B Member, and (iii) with respect to each Person described in clauses (i) and (ii) hereof, (A) each of the current or former officers, managers, directors, principals, members, employees, holders of participations, agents, managed accounts or funds, and management companies of such Person, and (B) each of the fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals of engaged by such Person; underlined provided, that in no event shall Class B Related Parties include any of the AY Entities, the BVI Bondholders, the All Year Parties and, for avoidance of doubt, Y. Goldman, T. Goldman or any Affiliate of Y. Goldman or T. Goldman.

"***Class B Released Claims***" has the meaning set forth in **Section 3.3**.

"***Class B Released Parties***" has the meaning set forth in **Section 3.3**.

"***Class B Releasing Parties***" has the meaning set forth in **Section 3.3**.

"***Closing***" has the meaning set forth in **Section 2.1**.

"***Closing Date***" has the meaning set forth in **Section 2.1**.

"***Company***" has the meaning set forth in the preamble.

"***Company Account Control Agreement***" means that certain Control Account Agreement, dated as of May 21, 2019, by and among the Company, the Class B Member and Signature Bank.

"***Completion Guaranty***" means that certain Completion Guaranty, dated as of December 5, 2018, by Y. Goldman and BVI for the benefit of the Class B Member, as consented to by T. Goldman, as may be amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with its terms.

"***Contract***" means any agreement, contract, subcontract, lease, binding understanding, obligation, promise, instrument, indenture, mortgage, note, option, warranty, purchase order, license, sublicense, commitment or undertaking of any nature.

"***control***," including the terms "***controlled by***" and "***under common control with***," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by Contract or otherwise.

"***DCP Kings Point***" means DCP Kings Point, LLC, a Delaware limited liability company.

"***Definitive Documents***" shall mean this Agreement, the Second A&R Company Operating Agreement and all other documents, instruments, letters and agreements entered into in connection with the Recapitalization.

"***Encumbrance***" means any charge, mortgage, lien, option, pledge, security interest or other ownership restriction of any kind (other than those created under applicable securities laws).

"***Environmental Indemnity***" means that certain Hazardous Materials Indemnity Agreement, dated as of December 5, 2018, by Y. Goldman and BVI for the benefit of the Class B Member, as consented to by T. Goldman, as may be amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with its terms.

"***Equity Drawdown Facility Agreement***" has the meaning set forth in the recitals.

"***Equity Drawdown Facility Documents***" means, collectively, the Equity Drawdown Facility Agreement, A&R Company Operating Agreement, the BVI Inducement Agreement, the Goldman Inducement Agreement, the Completion Guaranty, the Environmental Indemnity, the Put Option Agreement, the Fee Letter, Y. Goldman Pledge Agreement, the Company Account Control Agreement and all other documents, instruments, letters and agreements executed or delivered prior to the Closing Date in connection with the Equity Drawdown Facility Agreement; provided, that the Equity Drawdown Facility Documents shall exclude the All Year Reorganization Documents.

"***Equity Interest***" means, with respect to any Person, any share, capital stock, partnership interest, limited liability company interest, trust interest or similar interest or other indicia of equity or equity-like ownership (including any option, warrant, profits interests, purchase rights, subscription rights, conversion rights, exchange rights or other similar right or security convertible, exchangeable or exercisable therefor, any Contract that could require the issuance or sale of, or

otherwise cause to become outstanding, any of the foregoing or other instrument or right the value of which is based on any of the foregoing, including any phantom interest) in such Person.

"*Event of Default*" has the meaning set forth in the A&R Company Operating Agreement.

"*Fee Letter*" means that certain letter agreement re: closing fee letter agreement; $35,000,000 preferred equity investment by and between the Class B Member and the Company.

"*Final Order*" means a judgment or order of the Bankruptcy Court (or any other court of competent jurisdiction) entered on the docket in the Chapter 11 Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

"*Franklin Intercompany Note*" means that certain Promissory Note, dated as of August 30, 2018, with an initial principal sum of $3,300,000, by 608 Franklin LLC, as borrower, in favor of Franklin AY LLC, as lender.

"*Goldman Inducement Agreement*" means that certain Inducement Agreement, dated as of December 5, 2018, by and among Y. Goldman, T. Goldman and the Class B Member, as may be amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with its terms.

"*Governmental Authority*" means any (a) nation, state, commonwealth, province, territory, county, municipality, district, or other jurisdiction of any nature, or any political subdivision thereof, (b) federal, state, local, municipal, non-U.S., or other government, or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, contractor, regulatory body, or other entity and any court, arbitrator, or other tribunal).

"*Law*" means any statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order of any Governmental Authority.

"*Liability*" means, with respect to any Person, any liability or obligation of that Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, asserted or unasserted, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of that Person in accordance with United States generally accepted accounting principles consistently applied.

7

"***Organizational Documents***" means, as to any Person, its certificate or articles of incorporation, its regulations or by-laws or any equivalent documents under the Law of such Person's jurisdiction of organization.

"***Outside Date***" means February 1, 2022.

"***Party***" has the meaning set forth in the preamble.

"***Person***" means a natural person, a trust, a corporation, a partnership, an association, a joint venture, a limited liability company, a joint stock company, an unincorporated organization or a Governmental Authority.

"***PL Order***" has the meaning set forth in the recitals.

"***Preferred Return***" has the meaning set forth in the A&R Company Operating Agreement.

"***Preferred Distribution Default Rate***" has the meaning set forth in the A&R Company Operating Agreement.

"***Property Management Agreements***" means those certain property management agreements by and between any AY Entity, on the one hand, and any All Year Property Manager, on the other hand, with respect to any real property or any improvement thereon that is directly or indirectly owned by an AY Entity, in each case, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"***Put Option Agreement***" means that certain Put Option Agreement, dated as of December 5, 2018, by and among Y. Goldman, T. Goldman and the Class B Member, as may be amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with its terms.

"***Recapitalization***" has the meaning set forth in the recitals.

"***Released Equity Drawdown Facility Documents***" means, collectively, (a) the Equity Drawdown Facility Agreement, A&R Company Operating Agreement, the BVI Inducement Agreement and the Fee Letter; and (b) solely with respect to BVI (but not with respect to Y. Goldman, T. Goldman or their respective Affiliates), the Completion Guaranty and the Environmental Indemnity.

"***Senior Lender/Co-Investor Exception***" means any breach or default (or an event that, with notice or lapse of time or both, would become a default) that has arisen as a result of the entry into the Equity Drawdown Facility Documents or would arise out of or the consummation of the Recapitalization, in each case, due to the failure to obtain approval or consent from (i) any senior lender under any financings or loans to any AY Entity or (ii) any direct or indirect equity holder of any AY Entity that is not a Party hereto or any Affiliate or investor thereof.

"***Termination Date***" has the meaning set forth in **Section 6.3**.

"***T. Goldman***" means Tzipporah Goldman, a natural person.

"***Terminated Equity Drawdown Facility Documents***" means, collectively, the Equity Drawdown Facility Agreement, the BVI Inducement Agreement and the Fee Letter.

"***Transaction Approval Motion***" means the motion filed on behalf of BVI pursuant to, *inter alia*, Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Code seeking entry of the Transaction Approval Order and approval of the transactions contemplated by this Agreement, which shall be in form and substance acceptable to BVI and the Class B Member.

"***Transaction Approval Order***" means an order of the Bankruptcy Court pursuant to Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Code authorizing and approving, *inter alia*, the execution, delivery and performance of the Definitive Documents by BVI and the taking of any and all actions by BVI necessary or appropriate to effectuate the Recapitalization, including the release of All Year Released Claims by BVI as contemplated herein, which order shall be in form and substance, including in respect of all finding of facts and conclusions of law, acceptable to the Class B Member and BVI.

"***Transaction Expenses***" means all out-of-pocket fees, costs, disbursements and expenses (including attorney's fees) incurred by or on behalf of the Class B Member, DCP Kings Point, the AY Entities and any Affiliate of any of the foregoing, in connection with (i) the evaluation, negotiation, diligence, documentation and consummation of the Recapitalization, including all term sheets, diligence review and the Definitive Documents, (ii) the enforcement by the Class B Member of its rights under the Equity Drawdown Facility Documents, and (iii) the evaluation, negotiation, diligence, documentation and consummation of the Chester Sale Transaction and the direct or indirect sale of the real property located at 455-479 Smith Street, Brooklyn, New York.

"***Y. Goldman***" means Yoel Goldman, a natural person.

"***Y. Goldman Pledge Agreement***" means that certain Pledge Agreement (Limited Liability Company), dated as of January 31, 2019 but effective as of December 5, 2018, by Y. Goldman for the benefit of the Class B Member, as amended by that certain Amendment No. 1 to Pledge Agreement, dated as of November 8, 2019, by and between Y. Goldman and the Class B Member, as may be further amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with its terms.

Section 1.2    <u>Rules of Construction</u>.  The title of and the section and paragraph headings in this Agreement are for convenience of reference only and shall not govern or affect the interpretation of any of the terms or provisions of this Agreement.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.  The language used in this Agreement has been chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed

as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Agreement), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) unless otherwise specified, all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and Contract rights.

## ARTICLE II
## RECAPITALIZATION

Section 2.1    <u>Closing</u>.  The closing of the Recapitalization (the "***Closing***") shall take place remotely by electronic exchange of documents and signatures (i) at 9:00 a.m. Pacific time, no later than the third (3rd) Business Day after the last of the conditions to the obligations of the Parties set forth in **<u>Article V</u>** (Conditions to Closing) are satisfied or, to the extent permitted by Law, waived (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver thereof), or (ii) at such other time as the Parties may mutually agree in writing.  The date on which the Closing actually takes place is referred to as the "***Closing Date***".

Section 2.2    <u>Recapitalization Deliverables</u>.  At the Closing, each of the Parties shall, execute (where applicable) and deliver, or shall cause its Subsidiaries to execute (where applicable) and deliver:

(a)    the Second Amended and Restated Limited Liability Company Agreement of the Company in the form attached hereto as **<u>Exhibit A</u>** (the "***Second A&R Company Operating Agreement***"), executed by duly authorized signatories of all parties thereto, together with all documents contemplated to be delivered thereunder at the Closing;

(b)    a certificate executed by a duly authorized signatory of each of BVI, the Initial Company Manager and the Class A Member, dated as of the Closing Date, certifying to the Class B Member that (i) attached thereto is a true and complete copy of the by-laws, limited liability company agreement, operating agreement, limited partnership agreement, or other equivalent organizational documents of each AY Entity, as in effect on the Closing Date, (ii) attached thereto is a true and complete copy of the certificate of formation or articles of incorporation or other equivalent organizational documents of each AY Entity, as certified by the appropriate Governmental Authority where such AY Entity is formed or organized, as applicable, (iii) attached thereto is a true and complete set of incumbency and specimen signature of each duly authorized signatory executing any Definitive Document or any other document delivered in connection herewith on behalf of such AY Entity, and (iv) attached thereto is a true and correct copy of the certificate from the appropriate Governmental Authority certifying as to the good standing, status, existence, and authority of each AY Entity, as applicable, in all

10

jurisdictions where such AY Entity is formed or organized, as applicable, or qualified to do business.

(c)    one or more certificate(s) executed by a duly authorized signatory of each of BVI, the Initial Company Manager and the Class A Member, dated as of the Closing Date, certifying to the Class B Member that (i) attached thereto for each of BVI, the Initial Company Manager and the Class A Member is a true and complete copy of resolutions duly adopted by the shareholders, equityholders, managers, members, board of directors, or other applicable governing body of such Person authorizing the execution, delivery, and performance by such Person of the Definitive Documents to which such Person is a party and that such resolutions have not been modified, rescinded, or amended and are in full force and effect as of the Closing Date, (ii) attached thereto is a true and complete set of incumbency and specimen signature of each duly authorized signatory executing any Definitive Document or any other document delivered in connection herewith on behalf of BVI, the Initial Company Manager and the Class A Member, and (iii) attached thereto is a true and correct copy of the certificate from the appropriate Governmental Authority certifying as to the good standing, status, existence, and authority of each of BVI, the Initial Company Manager and the Class A Member, as applicable, in all jurisdictions where such Person is formed or organized, as applicable, or qualified to do business;

(d)    evidence satisfactory to the Class B Member that all accounting and financial records, tax records (other than income tax records), litigation files, and other books and records of the AY Entities in possession of the Class A Member or the Initial Company Manager has been delivered to the Company;

(e)    fully executed versions of all documentation relating to the consummation of the Chester Sale Transaction, together with any other evidence requested by the Class B Member that (i) the Chester Sale Transaction has been consummated concurrently with or prior to the Closing upon the terms and subject to conditions reasonably satisfactory to the Class B Member, and (ii) the documentation for the Chester Sale Transaction has been duly authorized, executed and delivered by each of the parties thereto and shall be in full force and effect as of the Closing; and

(f)    evidence satisfactory to the Class B Member that the Bankruptcy Court has entered the Transaction Approval Order and the BVI Commercial Court has made the BVI Transaction Approval Order.

Section 2.3    Bankruptcy Filing.  From and after the Effective Date and until the Closing Date, BVI shall (a) deliver to the Class B Member, at least two (2) Business Days in advance, where practicable, drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed with or submitted to the Bankruptcy Court  in connection with this Agreement for the Class B Member's prior review and comment, including any tax motions, and such filings shall be reasonably acceptable to the Class B Member; and (b) fully cooperate with the Class B Member and its attorneys with respect to any Action that arises out of, relates to, or is in any way connected with or impacts, this Agreement, the Definitive Documents or the Recapitalization. BVI agrees to diligently prosecute the Transaction Approval Motion and seek entry of the Transaction Approval Order. In the event the entry of the Transaction

Approval Order shall be appealed, BVI shall use commercially reasonable efforts to defend such appeal. BVI shall comply with all applicable notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Transaction Approval Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. BVI shall use commercially reasonable efforts to cause the Transaction Approval Order to be entered and become a Final Order as soon as practicable after entry. Notwithstanding the foregoing, nothing in this Agreement precludes the Parties from consummating the transactions contemplated by this Agreement if the Transaction Approval Order has been entered and has not been stayed and the Class B Member, in its sole discretion, elects to waive in writing the condition set forth in **Section 5.2(d)** that the Transaction Approval Order be a Final Order.

Section 2.4    BVI Commercial Court Filing.  From and after the Effective Date and until the Closing Date, BVI shall (a) deliver to the Class B Member, at least two (2) Business Days in advance, where practicable, drafts of any and all material applications, affidavits or affirmations, draft orders, skeleton arguments, and other papers to be filed with or submitted to the BVI Commercial Court in connection with this Agreement for the Class B Member's prior review and comment, including any tax motions, and such filings shall be reasonably acceptable to the Class B Member; and (b) fully cooperate with the Class B Member and its attorneys with respect to any Action that arises out of, relates to, or is in any way connected with or impacts, this Agreement, the Definitive Documents or the Recapitalization. BVI agrees to diligently prosecute the application seeking the BVI Transaction Approval Order. In the event the BVI Transaction Approval Order shall be appealed, BVI shall use commercially reasonable efforts to defend such appeal. BVI shall comply with all applicable notice requirements (i) of the ECSC Civil Procedure Rules and the BVI Insolvency Rules or (ii) imposed by the BVI Transaction Approval Order, in each case, in connection with any applications, affidavits or affirmations, draft orders, skeleton arguments to be filed in connection herewith. BVI shall use commercially reasonable efforts to cause the BVI Transaction Approval Order to be made.

## ARTICLE III
## TERMINATIONS AND RELEASES

Section 3.1    Termination of Terminated Equity Drawdown Facility Documents. Effective as of the Closing and subject to **Section 3.6**, each of the Parties to the Terminated Equity Drawdown Facility Documents hereby forever, fully and completely (a) terminates each of the Terminated Equity Drawdown Facility Documents and any and all rights, duties, interests and obligations it has thereunder, (b) waives any and all of their rights under the Terminated Equity Drawdown Facility Documents and (c) agrees that none of the Parties to the Terminated Equity Drawdown Facility Documents, nor any of their successors or assigns, has any further rights, duties, interests, or obligations under the Terminated Equity Drawdown Facility Documents of any kind or any nature whatsoever.

Section 3.2    AY Entities Releases.    Effective as of the Closing and subject to **Section 3.6**, each of the AY Entities, on behalf of itself and the AY Entity Related Parties (collectively, the "*AY Releasing Parties*"), hereby absolutely, unconditionally and irrevocably releases, waives, and forever discharges each of the Class B Member, the Class B Related Parties, the BVI Bondholders, the All Year Parties and the All Year Related Parties, each in their capacity as such (the foregoing, collectively, the "*AY Released Parties*"), from and against all Claims of

12

any kind or nature arising out of, relating to, or in any way connected with the Released Equity Drawdown Facility Documents, the BVI Bond Documents and/or any Claims, amounts, payables, loans or other similar Liabilities due or owed by any of the AY Released Parties, whether known or unknown (including a waiver of any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to Claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party), whether suspected or unsuspected, whether liquidated or unliquidated whether matured or unmatured, whether fixed, absolute or contingent, whether secured or unsecured, whether direct, indirect, or derivative, or nominally or beneficially possessed or claimed by the AY Releasing Parties or any of them (collectively, "*AY Claims*"), which the AY Releasing Parties or any of them ever had, now has, or hereafter can, shall or may have against the AY Released Parties, in respect of any and all agreements, contracts and other obligations incurred on or prior to the Closing, or in respect of any action, inaction or event occurring or circumstances existing on or prior to the Closing Date, whether or not relating to Claims pending on, or asserted after, the Closing Date (collectively, the "*AY Released Claims*"), and further agrees to refrain from commencing, instituting or prosecuting, or supporting any Person that commences, institutes, or prosecutes any Action or other proceeding against any and all AY Released Parties with respect to any and all AY Released Claims; provided, however, that the AY Released Claims shall not include, and the AY Releasing Parties do not release the AY Released Parties for, any AY Claims arising out of, or in connection with (w) any willful misconduct, bad faith or fraud on the part of any AY Released Party, (x) the Chester Sale Transaction and all documents, instruments, letters and agreements entered into in connection therewith, (y) the direct or indirect sale of the real property located at 455-479 Smith Street, Brooklyn, New York and all documents, instruments, letters and agreements entered into in connection therewith, or (z) this Agreement, any other Definitive Documents or any other documents entered into in connection with this Agreement, the Definitive Documents or the Recapitalization; provided, further that in no event shall the AY Released Parties include Y. Goldman, T. Goldman or their respective Affiliates.

Section 3.3    Class B Member Releases.    Effective of the Closing and subject to **Section 3.6**, the Class B Member, on behalf of itself and the Class B Related Parties (collectively, the "*Class B Releasing Parties*"), hereby absolutely, unconditionally, and irrevocably releases, waives, and forever discharges each of the All Year Parties, the All Year Related Parties, the AY Entities, the AY Entity Related Parties and the BVI Bondholders, each in their capacity as such (the foregoing, collectively, the "*Class B Released Parties*"), from and against all Claims of any kind or nature arising out of, relating to or in any way connected with the Released Equity Drawdown Facility Documents (including the Inducement Agreement Claims) and/or the BVI Bond Documents, whether known or unknown (including a waiver of any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to Claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party), whether suspected or unsuspected, whether liquidated or unliquidated, whether matured or unmatured, whether fixed, absolute, or contingent, whether secured or unsecured, whether direct, indirect, or derivative, or nominally or beneficially possessed or claimed by the Class B Releasing Parties or any of them (collectively, "*Class B Claims*"), which the Class B Releasing Parties or any of them ever had, now has, or hereafter can, shall, or may have against the Class B Released Parties, in respect of any and all agreements, contracts, and other obligations incurred on or prior to the

13

Closing, or in respect of any action, inaction, or event occurring or circumstances existing on or prior to the Closing Date, whether or not relating to Claims pending on, or asserted after, the Closing Date (collectively, the "***Class B Released Claims***"), and further agrees to refrain from commencing, instituting, or prosecuting, or supporting any Person that commences, institutes, or prosecutes any Action or other proceeding against any and all Class B Released Parties with respect to any and all Class B Released Claims; ***provided***, ***however***, that (A) the Class B Released Claims shall not include, and the Class B Releasing Parties do not release any of the Class B Released Parties from, (a) any Claims representing the obligations, rights, remedies, or interests under the Equity Drawdown Facility Documents (other than the Released Equity Drawdown Facility Documents) or (b) Class B Claims arising out of, or in connection with, (i) any willful misconduct, bad faith or fraud on the part of any Class B Released Party, (ii) this Agreement, any other Definitive Documents or any other documents entered into in connection with this Agreement, the Definitive Documents or the Recapitalization, (iii) any transaction or agreement unrelated to the AY Entities, the Definitive Documents, the Equity Drawdown Facility Documents, the Recapitalization or any other documents related thereto, (iv) an Action asserted prior to or after the date hereof by a third party (including any AY Entity Related Parties, other than the Class B Member and its Affiliates, the All Year Parties and their respective Affiliates and the AY Entities), (v) any Property Management Agreement and any property management and related service that is provided by an All Year Property Manager to any real property or any improvement thereon that is directly or indirectly owned by an AY Entity, (vi) the Chester Sale Transaction and all documents, instruments, letters and agreements entered into in connection therewith, (vii) any loans due or owed by Greens at Chester to Pilgrim Chester Lender, LLC, (viii) any rights of any Class B Related Party as a common or preferred equity holder of Greens at Chester, other than any such rights against BVI or Chester Holdings that exist on the Closing Date, (ix) the real property located at 455-479 Smith Street, Brooklyn, New York (including the direct or indirect sale of such real property, any direct or indirect ownership interests, any loans and any documents, instruments, letters and agreements entered into in connection with any of the foregoing) or (x) any Claims that may be asserted against Y. Goldman, T. Goldman or their respective Affiliates, whether arising under the Equity Drawdown Facility Documents or otherwise; <u>provided</u>, <u>further</u> that in no event shall the Class B Released Parties include Y. Goldman, T. Goldman or their respective Affiliates.

Section 3.4    All Year Parties Releases.  Effective as of the Closing, each All Year Party, on behalf of itself and its All Year Related Parties (collectively, the "***All Year Releasing Parties***"), hereby absolutely, unconditionally, and irrevocably releases, waives, and forever discharges each of the Class B Member, the Class B Related Parties, the AY Entities and the AY Entity Related Parties, each in their capacity as such (the foregoing, collectively, the "***All Year Released Parties***"), from and against all Claims of any kind or nature arising out of, relating to, or in any way connected with the Released Equity Drawdown Facility Documents and/or any Claims, amounts, payables, loans or other similar Liabilities due or owed by any of the All Year Released Parties, whether known or unknown (including a waiver of any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to Claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party), whether suspected or unsuspected, whether liquidated or unliquidated whether matured or unmatured, whether fixed, absolute, or contingent, whether secured or unsecured, whether direct, indirect, or derivative, or nominally or beneficially possessed or claimed by the All Year Releasing Parties or any of them (collectively, the "***All Year Claims***"), which the All Year Releasing Parties or any of

14

them ever had, now has, or hereafter can, shall, or may have against the All Year Released Parties, in respect of any and all agreements, contracts, and other obligations incurred on or prior to the Closing, or in respect of any action, inaction, or event occurring or circumstances existing on or prior to the Closing Date, whether or not relating to claims pending on, or asserted after, the Closing Date (collectively, the "*All Year Released Claims*"), and further agrees to refrain from commencing, instituting or prosecuting, or supporting any Person that commences, institutes, or prosecutes any Action or other proceeding against any and all All Year Released Parties with respect to any and all All Year Released Claims; provided, however, that the All Year Released Claims shall not include, and the All Year Releasing Parties do not release any of the All Year Released Parties for, any All Year Claims arising out of, or in connection with (a) any willful misconduct, bad faith, or fraud on the part of any All Year Released Party, (b) this Agreement, any other Definitive Documents or any other documents entered into in connection with this Agreement, the Definitive Documents or the Recapitalization, (c) the Chester Sale Transaction and all documents, instruments, letters and agreements entered into in connection therewith, (d) the direct or indirect sale of the real property located at 455-479 Smith Street, Brooklyn, New York and all documents, instruments, letters and agreements entered into in connection therewith, or (e) any transaction or agreement unrelated to the AY Entities, the Definitive Documents, the Equity Drawdown Facility Documents, the Recapitalization or any other documents related thereto.

Section 3.5     BVI Bondholder Releases.  Effective as of the Closing, the BVI Bondholder Trustee/Representative, on behalf of the BVI Bondholders (collectively, the "*BVI Bondholder Releasing Parties*"), hereby absolutely, unconditionally and irrevocably releases, waives, and forever discharges each of the Class B Member, the Class B Related Parties, the AY Entities and the AY Entity Related Parties, each in their capacity as such (the foregoing, collectively, the "*BVI Bondholder Released Parties*"), from and against all Claims arising out of, relating to, or in any way connected with the Released Equity Drawdown Facility Documents and the BVI Bond Documents, of any kind or nature, whether known or unknown (including a waiver of any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to Claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party), whether suspected or unsuspected, whether liquidated or unliquidated whether matured or unmatured, whether fixed, absolute or contingent, whether secured or unsecured, whether direct, indirect, or derivative, or nominally or beneficially possessed or claimed by the BVI Bondholder Releasing Parties or any of them (collectively, "*BVI Bondholder Claims*"), which the BVI Bondholder Releasing Parties or any of them ever had, now has, or hereafter can, shall or may have against the BVI Bondholder Released Parties, in respect of any and all agreements, contracts and other obligations incurred on or prior to the Closing, or in respect of any action, inaction or event occurring or circumstances existing on or prior to the Closing Date, whether or not relating to Claims pending on, or asserted after, the Closing Date (collectively, the "*BVI Bondholder Released Claims*"), and further agrees to refrain from commencing, instituting or prosecuting, or supporting any Person that commences, institutes, or prosecutes any Action or other proceeding against any and all BVI Bondholder Released Parties with respect to any and all BVI Bondholder Released Claims; provided, however, that the BVI Bondholder Released Claims shall not include, and the BVI Bondholder Releasing Parties do not release the BVI Bondholder Released Parties for, any BVI Bondholder Claims arising out of, or in connection with (x) any willful misconduct, bad faith or fraud on the part of any BVI Bondholder Released Party, (y) this Agreement, any other Definitive Documents or any other documents entered into in connection with this Agreement, the

15

Definitive Documents or the Recapitalization or (z) any rights the BVI Bondholder Releasing Parties may have in respect of the All Year Parties.

Section 3.6    Limitations of Releases.  The releases made in favor of any All Year Related Party and/or any AY Entity Related Party pursuant to **Section 3.2** and/or **Section 3.3** (as applicable) shall be of no further force or effect upon the occurrence of any of the following:

(a)    any All Year Related Party and/or AY Entity Related Party files an Action, threatens to file an Action or otherwise makes an assertion, in each case, challenging the validity, binding nature or enforceability of the releases made by the AY Entities and/or the All Year Parties (as applicable), on behalf of such All Year Related Party or AY Entity Related Party, pursuant to **Section 3.2** and/or **Section 3.4**, respectively, or otherwise files an Action against the Class B Member and/or any of its Affiliates; or

(b)    any All Year Related Party and/or AY Entity Related Party breaches such All Year Related Party's or AY Entity Related Party's obligations set forth in **Section 3.7**.

Section 3.7    Cooperation.  Each of the All Year Parties and the AY Entities, on behalf of its respective All Year Related Parties and AY Entity Related Parties, respectively, covenants and agrees that each such All Year Related Party and AY Entity Related Party shall cooperate with the Class B Member or any AY Entity after the Effective Date in connection with (a) any matters arising out of any Class B Claims (other than the Class B Released Claims) or any AY Claims (other than the AY Released Claims) or (b) any matters arising out of the Recapitalization (including to amend or modify any limited liability company agreements or other agreements or to obtain any consents, approvals, waivers or ratifications) that involve (i) financings or loans to any AY Entity or (ii) any direct or indirect equity holder of any AY Entity that is not a Party hereto or any Affiliate thereof.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of the AY Entities.  Each All Year Party hereby represents and warrants (jointly and severally) to the Class B Member and the BVI Bondholder Trustee/Representative (for the benefit of the BVI Bondholders) as of December 15, 2021:

(a)    Each AY Entity is duly organized, validly existing, and in good standing under the Laws of its jurisdiction of organization, and has all necessary corporate, limited liability company, limited partnership, or other similar power and authority to own, and operate its properties and to carry on its business as it is now being conducted.  Each AY Entity is qualified to do business and is in good standing (or its equivalent), to the extent applicable, in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify.

(b)    Each AY Entity has the requisite corporate, limited liability company, limited partnership, or other similar power and authority to execute and deliver this Agreement and each other Definitive Document to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby

(other than as it relates to the Senior Lender/Co-Investor Exception). The execution, delivery, and performance by each AY Entity of this Agreement and each other Definitive Document to which it is a party and the consummation by each AY Entity of the transactions contemplated hereby and thereby has been duly and validly authorized by its board of directors, managers, general partner, or similar governing body and all other necessary corporate, limited liability company, limited partnership or other similar action on behalf of such AY Entity (other than as it relates to the Senior Lender/Co-Investor Exception). No other corporate, limited liability company, limited partnership or other similar proceedings on the part of any AY Entity are necessary to authorize the execution, delivery, or performance of this Agreement and each other Definitive Document to which it is a party or to consummate the transactions contemplated hereby and thereby (other than as it relates to the Senior Lender/Co-Investor Exception). This Agreement has been and each other Definitive Document to which each AY Entity is a party will be duly and validly executed and delivered by each AY Entity party hereto or thereto and, assuming due execution and delivery by each of the other parties hereto or thereto, this Agreement and each other Definitive Document to which each AY Entity is a party constitute legal, valid, and binding obligation of the applicable AY Entity, enforceable against the applicable AY Entity in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(c)     The execution, delivery, and performance by each AY Entity of each of this Agreement and each other Definitive Document to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) conflict with or violate the Organizational Documents of each AY Entity (other than as it relates to the Senior Lender/Co-Investor Exception); (ii) conflict with or violate in any material respect any Law applicable to each AY Entity or by which any property or asset of each AY Entity is bound or affected; or (iii) conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) in any material respect under, or require any consent of any Person pursuant to, any Contract to which each AY Entity is a party or any other of their respective properties, rights or assets may be bound (including triggering any change of control provisions thereof) (other than as it relates to the Senior Lender/Co-Investor Exception); or (iv) result in the imposition or creation of any material Encumbrance upon or with respect to any material assets of each AY Entity, other than in the cases of (ii) through (iv), as would not materially and adversely affect the ability of each AY Entity to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement or any other Definitive Document, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business of the AY Entities.

(d)     No AY Entity is required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by any AY Entity of this Agreement or any other Definitive Documents to which it is a party or the consummation of the transactions contemplated hereby or thereby, except for such filings as may be required by any applicable federal or state securities or "blue sky" Laws.

17

(e)        Each AY Entity has sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and each other Definitive Document to which it is a party, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement and each other Definitive Document to which it is a party, and it has made its own analysis and decision to enter into this Agreement and each other Definitive Document to which it is a party and otherwise investigated this matter to its full satisfaction.

(f)        Except as set forth on <u>Schedule IV</u>, all issued and outstanding Equity Interests in each of the AY Entities (other than the Company) are owned of record and beneficially by another AY Entity, free and clear of all Encumbrances.  All of the Equity Interests in each of the AY Entities have been duly authorized, are validly issued, fully paid and non-assessable. All of the Equity Interests in each of the AY Entities were issued in compliance with applicable Laws. None of the Equity Interests in any of the AY Entities was issued in violation of any Contract to which any AY Entity is a party or is subject to or in violation of any preemptive or similar rights of any Person.  There are no outstanding or authorized options, warrants, convertible securities or other rights or Contract of any character relating to the capital stock of any AY Entity or obligating any AY Entity to issue or sell any Equity Interests in any of the AY Entities. No AY Entity has outstanding or authorized any stock appreciation, phantom stock, profit participation or similar rights. Except as set forth in any Organizational Documents of any AY Entity, there are no voting trusts, stockholder agreements, proxies or other Contracts in effect with respect to the voting or transfer of any of the Equity Interests in any of the AY Entities. Franklin AY LLC owns no less than 54.9375% of the outstanding Equity Interests in 608 Franklin LLC.

Section 4.2        <u>Representations and Warranties of the All Year Parties</u>.  Each All Year Party hereby represents and warrants (jointly and severally) to the Class B Member, the AY Entities and the BVI Bondholder Trustee/Representative (for the benefit of the BVI Bondholders) as of the Effective Date and as of the Closing Date:

(a)        Each All Year Party is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, and has all necessary corporate, limited liability company, limited partnership or other similar power and authority to own, and operate its properties and to carry on its business as it is now being conducted.  Each such All Year Party is qualified to do business and is in good standing (or its equivalent), to the extent applicable, in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify.

(b)        Subject to, solely with respect to BVI, the entry of the Transaction Approval Order and the BVI Transaction Approval Order, each All Year Party has the requisite corporate, limited liability company, limited partnership or other similar power and authority to execute and deliver this Agreement and each other Definitive Document to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to, solely with respect to BVI, the entry of the Transaction Approval Order and the BVI Transaction Approval Order, the execution, delivery, and performance by each such All Year Party of this Agreement and each other Definitive Document to which it is a party and the consummation by each such All Year Party of the

18

transactions contemplated hereby and thereby has been duly and validly authorized by its board of directors, managers, general partner, or similar governing body and all other necessary corporate, limited liability company, limited partnership or other similar action on behalf of each such All Year Party.  Subject to, solely with respect to BVI, the entry of the Transaction Approval Order and the BVI Transaction Approval Order, no other corporate, limited liability company, limited partnership or other similar proceedings on the part of any such All Year Party are necessary to authorize the execution, delivery, or performance of this Agreement and each other Definitive Document to which it is a party or to consummate the transactions contemplated hereby and thereby.  Subject to, solely with respect to BVI, the entry of the Transaction Approval Order and the BVI Transaction Approval Order, this Agreement has been and each other Definitive Document to which each All Year Party is a party will be duly and validly executed and delivered by each All Year Party hereto or thereto and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement and each other Definitive Document to which each All Year Party is a party constitute legal, valid and binding obligation of the applicable All Year Party, enforceable against the applicable All Year Party in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(c)    Subject to, solely with respect to BVI, the entry of the Transaction Approval Order and the BVI Transaction Approval Order, the execution, delivery and performance by each All Year Party of this Agreement and each other Definitive Document to which each All Year Party is a party and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) conflict with or violate the Organizational Documents of each All Year Party; (ii) conflict with or violate in any material respect any Law applicable to each All Year Party or by which any property or asset of each All Year Party is bound or affected; or (iii) conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) in any material respect under, or require any consent of any Person pursuant to, any Contract to which each All Year Party is a party or any other of their respective properties, rights or assets may be bound (including triggering any change of control provisions thereof) (other than as it relates to the Senior Lender/Co-Investor Exception); or (iv) result in the imposition or creation of any material Encumbrance upon or with respect to any material assets of each All Year Party.

(d)    Subject to, solely with respect to BVI, the entry of the Transaction Approval Order and the BVI Transaction Approval Order, no All Year Party is required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery, and performance by any All Year Party of this Agreement and each other Definitive Document to which any All Year Party is a party or the consummation of the transactions contemplated hereby or thereby, except for such filings as may be required by any applicable federal or state securities or "blue sky" Laws.

(e)    Each All Year Party has sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and each other Definitive Document to which each All Year Party is a party, and has been afforded the opportunity to consult with each All Year Party's legal and financial advisors with respect to such All Year Party's decision to execute this Agreement and each other Definitive Document to which such All Year Party is a

19

party, and each All Year Party has made such All Year Party's own analysis and decision to enter into this Agreement and each other Definitive Document to which such All Year Party is a party and otherwise investigated this matter to such All Year Party's full satisfaction.

(f)     BVI Bondholders have approved this Agreement, the other Definitive Documents, the Recapitalization and the transactions contemplated by the foregoing, at a general meeting of the bondholders.

Section 4.3     <u>Additional Representations and Warranties of the All Year Parties</u>.  Each All Year Party, on behalf of such All Year Party and each of such All Year Party's Affiliates, hereby represents and warrants (jointly and severally) to the Class B Member as of the Effective Date and as of immediately prior to the Closing Date:

(a)     The Equity Drawdown Facility Documents constitute the valid, legally binding obligations of the AY Entities, enforceable against the AY Entities in accordance with their terms.  All of the terms, representations, warranties, covenants, agreements, indemnifications and provisions of each Equity Drawdown Facility Document applicable to each AY Entity are and shall remain in full force and effect, and are true and correct without change.  Each AY Entity shall be bound by terms, representations, warranties, covenants, agreements, indemnifications and provisions of each Equity Drawdown Facility Document.

(b)     The accrued and unpaid Preferred Return (taking into account the Preferred Distribution Default Rate during any period during which an Event of Default shall have occurred and been continuing) under the A&R Company Operating Agreement, Equity Drawdown Facility Agreement and/or any of the other Equity Drawdown Facility Documents is materially in excess of $70,000,000.

(c)     <u>Schedule V</u> attached hereto contains an accurate and complete list of the net working capital of each of the AY Entities as determined as of December 31, 2021 (including cash, security deposits, accounts payables and partnership advances of the AY Entities) (the "***2021 Net Working Capital***").  Since December 31, 2021, the total "Propco Net Working Capital" shall not have been reduced by greater than $50,000, in the aggregate. There is no pending or threatened Action involving any accounts payable disclosed on <u>Schedule V</u> attached hereto.

(d)     Per the books and records of the Company, the Franklin Note has not been repaid or cancelled.  Further, per its terms, as of the Effective Date, the outstanding balance of the Franklin Note is approximately $5,600,000.

Section 4.4     <u>Representations and Warranties of the Class B Member</u>.  The Class B Member hereby represents and warrants to the AY Entities, the All Year Parties and the BVI Bondholder Trustee/Representation (for the benefit of the BVI Bondholders) as of the Effective Date and as of the Closing Date:

(a)     The Class B Member is duly organized, validly existing, and in good standing under the Laws of its jurisdiction of organization, and has all necessary corporate, limited liability company, limited partnership or other similar power and authority to own, and operate its properties and to carry on its business as it is now being conducted.  The Class B

20

Member is qualified to do business and is in good standing (or its equivalent), to the extent applicable, in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify.

(b)     The Class B Member has the requisite corporate, limited liability company, limited partnership or other similar power and authority to execute and deliver this Agreement and each other Definitive Document to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery, and performance by the Class B Member of this Agreement and each other Definitive Document to which it is a party and the consummation by the Class B Member of the transactions contemplated hereby and thereby has been duly and validly authorized by its board of directors, managers, general partner, or similar governing body and all other necessary corporate, limited liability company, limited partnership or other similar action on behalf of the Class B Member.  No other corporate, limited liability company, limited partnership or other similar proceedings on the part of the Class B Member are necessary to authorize the execution, delivery, or performance of this Agreement and each other Definitive Document to which it is a party or to consummate the transactions contemplated hereby and thereby.  This Agreement has been and each other Definitive Document to which the Class B Member is a party will be duly and validly executed and delivered by the Class B Member and, assuming due execution and delivery by each of the other parties hereto or thereto, this Agreement and each other Definitive Document to which it is a party constitute legal, valid and binding obligation of the Class B Member, enforceable against the Class B Member in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(c)     The execution, delivery and performance by the Class B Member of this Agreement and each other Definitive Document to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) conflict with or violate the Organizational Documents of the Class B Member; (ii) conflict with or violate in any material respect any Law applicable to such Party or by which any property or asset of the Class B Member is bound or affected; or (iii) conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) in any material respect under, or require any consent of any Person pursuant to, any Contract to which the Class B Member is a party or any other of their respective properties, rights or assets may be bound (including triggering any change of control provisions thereof); or (iv) result in the imposition or creation of any material Encumbrance upon or with respect to any material assets of the Class B Member, other than in the cases of (ii) through (iv), as would not materially and adversely affect the ability of the Class B Member to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business of the Class B Member.

(d)     The Class B Member is not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Class B Member of this Agreement and each other Definitive Document to which it is a party or the consummation of

the transactions contemplated hereby or thereby, except for such filings as may be required by any applicable federal or state securities or "blue sky" Laws.

(e)    The Class B Member has sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and each other Definitive Document to which it is a party, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement and each other Definitive Document to which it is a party, and it has made its own analysis and decision to enter into this Agreement and each other Definitive Document to which it is a party and otherwise investigated this matter to its full satisfaction.

Section 4.5    Representations    and    Warranties    of    the    BVI    Bondholder Trustee/Representative.  The BVI Bondholder Trustee/Representative hereby represents and warrants to the Class B Member, the AY Entities and the All Year Parties as of the Effective Date and as of the Closing Date:

(a)    It is a company duly incorporated, validly existing and in good standing under the laws of Israel and has the power and authority to own its property and to carry on its business as now conducted.

(b)    The BVI Bondholder Trustee/Representative has the requisite corporate, limited liability company, limited partnership or other similar power and authority to execute and deliver this Agreement and each other Definitive Document to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, after having received the requisite approval from the BVI Bondholders to bind the BVI Bondholders in respect of such transactions. The BVI Bondholder Trustee/Representative has received all requisite approvals needed to bind the BVI Bondholders in respect of such transactions. The execution, delivery, and performance by the BVI Bondholder Trustee/Representative of this Agreement and each other Definitive Document to which it is a party and the consummation by the BVI Bondholder Trustee/Representative of the transactions contemplated hereby and thereby has been duly and validly authorized by its board of directors, managers, general partner, or similar governing body, the BVI Bondholders and all other necessary corporate, limited liability company, limited partnership or other similar action on behalf of the BVI Bondholders.  As a result of having received the requisite approval from the BVI Bondholders, no other corporate, limited liability company, limited partnership or other similar proceedings on the part of the BVI Bondholders are necessary to authorize the execution, delivery, or performance by the BVI Bondholder Trustee/Representative of this Agreement and each other Definitive Document to which the BVI Bondholder Trustee/Representative is a party or to consummate the transactions contemplated hereby and thereby.  This Agreement has been and each other Definitive Document to which the BVI Bondholder Trustee/Representative is a party will be duly and validly executed and delivered by the BVI Bondholder Trustee/Representative and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement and each other Definitive Document to which the BVI Bondholder Trustee/Representative is a party constitute legal, valid and binding obligation of the BVI Bondholder Trustee/Representative, enforceable against the BVI Bondholder Trustee/Representative and, having received the requisite approval from the BVI Bondholders, the BVI Bondholders (which consent the BVI Bondholder Trustee/Representative has received),

in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(c)     The execution, delivery and performance by the BVI Bondholder Trustee/Representative of this Agreement and each other Definitive Document to which the BVI Bondholder Trustee/Representative is a party and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) conflict with or violate the Organizational Documents of the BVI Bondholder Trustee/Representative; or (ii) conflict with or violate in any material respect any Law applicable to the BVI Bondholder Trustee/Representative.

(d)     Other than approvals that have been received from the BVI Bondholders and any notice requirements applicable to the BVI Bondholder Trustee/Representative under Israeli law (which approvals have been received, and notices duly provided, by the BVI Bondholder Trustee/Representative), the BVI Bondholder Trustee/Representative is not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with its execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby, except for such filings as may be required by any applicable federal or state securities or "blue sky" Laws.

Section 4.6     Remedies for Breach of Representations.  Notwithstanding anything to the contrary contained herein, in the event that any of the representations given by any of the All Year Parties or the AY Entities in this Agreement are inaccurate or misleading in any material respect, the recovery of the Class B Member in connection with any damages that it may incur in connection with any such breach shall in all events be limited to the amount of Distributions (as defined in the Second A&R Company Operating Agreement) that the Class A Member is entitled to under the Second A&R Company Operating Agreement and shall only be payable as and when such Distributions would be payable to the Class A Member pursuant to the Second A&R Company Operating Agreement; provided however, if, pursuant to the actual (not implied) knowledge of Ephraim Diamond and Asaf Ravid as of the Effective Date, the representations made in **Section 4.1(b)**, **Section 4.1(f)** or **Section 4.2(b)** are inaccurate or misleading in any material respect, then the foregoing limitation on recovery by the Class B Member shall not apply and the Class B Member may pursue the applicable AY Entity or All Year Party for any damages that it may incur in connection with any such breach. Notwithstanding anything to the contrary contained in this Agreement, it is understood and agreed that neither Ephraim Diamond nor Asaf Ravid shall have any personal liability or obligation whatsoever for any obligations under this Agreement or under any documents delivered at Closing. Notwithstanding anything to the contrary elsewhere in this Agreement or provided for under any applicable law, no Party shall, in any event, be liable to any other person, either in contract, tort or otherwise, for any consequential, incidental, indirect, special or punitive damages or such other person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof, whether or not the possibility of such damages has been disclosed to the other party in advance or could have been reasonably foreseen by such other Party.

**ARTICLE V**
**CONDITIONS TO CLOSING**

Section 5.1    <u>General Conditions</u>.  The respective obligations of each of the Parties hereto to effect the Recapitalization and the other transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (<u>provided</u>, that such waiver shall only be effective as to the obligations of such Party):

(a)    no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement; and

(b)    each Party party to any Definitive Document shall have executed and delivered to the other Parties party to such Definitive Document duly executed copies of such Definitive Document and all of the conditions precedent to the effectiveness set forth in each Definitive Document shall have been fulfilled or waived in writing by the party entitled to waive such condition, in each case, pursuant to and in accordance with the terms and conditions of such Definitive Document.

Section 5.2    <u>Conditions to Obligations of the Class B Member</u>.  The obligations of the Class B Member to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by the Class B Member:

(a)    the representations and warranties set forth in **Section 4.1**, **Section 4.2** and **Section 4.3** shall be true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material")) in all respects both when made and as of the Closing Date, except that in the case of any of such representations and warranties that are made as of a specified date, such representations and warranties shall have been true and correct in all material respects as of such specified date;

(b)    the representations and warranties set forth in **Section 4.5** shall be true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material")) in all respects both when made and as of the Closing Date, except that in the case of any of such representations and warranties that are made as of a specified date, such representations and warranties shall have been true and correct in all material respects as of such specified date;

(c)    each of the All Year Parties shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants and conditions required by this Agreement to be performed or complied with by such All Year Party prior to or at the Closing Date;

(d)    the Bankruptcy Court shall have entered the Transaction Approval Order and the Transaction Approval Order shall have become a Final Order; and

24

(e)    the BVI Commercial Court shall have made the BVI Transaction Approval Order.

Section 5.3    <u>Conditions to Obligations of the All Year Parties</u>.  The obligations of the All Year Parties to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of the following conditions, which may, to the extent permitted by applicable Law, be waived in writing by the All Year Parties:

(a)    the representations and warranties set forth in **Section 4.4** shall be true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material")) in all respects both when made and as of the Closing Date, except that in the case of any of such representations and warranties that are made as of a specified date, such representations and warranties shall have been true and correct in all material respects as of such specified date;

(b)    the Bankruptcy Court shall have entered the Transaction Approval Order; and

(c)    the BVI Commercial Court shall have made the BVI Transaction Approval Order.

Section 5.4    <u>Conditions to Obligations of the BVI Bondholder Trustee/Representative</u>. The obligations of the BVI Bondholder Trustee/Representative to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of the following condition, which may be waived in writing by the BVI Bondholder Trustee/Representative: the representations and warranties set forth in **Section 4.1, Section 4.2** and **Section 4.4** shall be true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material")) in all respects both when made and as of the Closing Date, except that in the case of any of such representations and warranties that are made as of a specified date, such representations and warranties shall have been true and correct in all material respects as of such specified date.

**ARTICLE VI**
**TERMINATION**

Section 6.1    <u>Termination Events</u>.  At any time prior to the Closing, the applicable Party as set forth below shall have the right, but not the obligation, upon written notice to the other Parties, to terminate this Agreement prior to the Closing:

(a)    by the Class B Member, in the event that there is any issuance by any Governmental Authority of any ruling or order enjoining the consummation of the Recapitalization that is not vacated or reversed prior to the Outside Date; or

(b)    by the Class B Member, in the event that there is any failure to obtain entry of the Transaction Approval Order by the Outside Date (subject to automatic extension solely to the minimum extent required by the Bankruptcy Court availability);

(c)      by the Class B Member, in the event that there is any failure to obtain entry of the BVI Transaction Approval Order by the Outside Date (subject to automatic extension solely to the minimum extent required by the BVI Commercial Court availability);

(d)      by the Class B Member, if the Closing shall not have occurred on or before February 28, 2022; provided, that the right to terminate this Agreement under this **Section 6.1(d)** shall not be available to the Class B Member, if the breach of this Agreement by the Class B Member has proximately contributed to the failure of the Closing to occur on or before February 28, 2022;

(e)      by the Class A Member, if the Closing shall not have occurred on or before March 18, 2022; provided, that the right to terminate this Agreement under this **Section 6.1(e)** shall not be available to the Class A Member, if the breach of this Agreement by the Class A Member has proximately contributed to the failure of the Closing to occur on or before March 18, 2022; or

(f)      by the Class A Member or the Class B Member, if the Bankruptcy Court denies with prejudice entry of the Transaction Approval Order or the BVI Commercial Court denies with prejudice entry of the BVI Transaction Approval Order.

Section 6.2      Mutual Termination.  This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among the Parties.

Section 6.3      Effect of Termination.

(a)      The date on which any termination of this Agreement under **Section 6.1** or **Section 6.2** occurs shall be referred to as a "***Termination Date***".

(b)      On the Termination Date, all Parties' obligations under this Agreement shall be terminated effective immediately, and each Party and each Class B Related Party shall be released from its commitments, undertakings, and agreements hereunder and restored in each and every respect to its, rights, claims, positions, and defenses as they existed prior to the execution of this Agreement (subject to any intervening court order or judgment that is not vacated or any intervening written agreement that is not rescinded); provided, that (i) any claim for breach of this Agreement that occurs prior to such Termination Date shall survive and all rights and remedies with respect to such claims shall not be prejudiced in any way, (ii) this **Section 6.3**, and **Article VII** shall survive and (iii) the Company shall pay in full all Transaction Expenses within five (5) Business Days after the Termination Date and deliver evidence satisfactory to the Class B Member that all Transaction Expenses have been paid in full. This Agreement, and all statements, pleadings or motions made or filed by any Party on or after the Effective Date in furtherance of the transactions contemplated by this Agreement, shall be deemed settlement communications and protected from use in future litigation under applicable federal or state law. For the avoidance of any doubt, under no circumstances may the willingness of the Class B Member to quantify its claim against the All Year Parties for purposes of this Agreement ever be cited or used in any way against the Class B Member or any of the Class B Related Parties and the terms of this Agreement and the transactions contemplated hereby shall

26

not adversely affect the right of the Company and BVI to contest the amount of the Class B Member's claim and the Inducement Agreement Claim.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1    <u>Waiver</u>.  Except for the releases set forth in **Article III**, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights.  The Parties acknowledge that this Agreement, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, non-U.S. or U.S., the Summary of Terms dated June 18, 2021, this Agreement, any related documents, and all negotiations relating thereto shall not be construed as or deemed to be an admission of any kind or be admissible into evidence in any Action other than an Action to enforce its terms.

Section 7.2    <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint; (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the AY Entities and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; (v) the Class B Member shall have no fiduciary duty, duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to the AY Entities, the All Year Parties or any of their respective Affiliates, lenders or stakeholders, including as a result of this Agreement or the transactions contemplated hereby; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group".

Section 7.3    <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including an order of any court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

Section 7.4    <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any Action against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such Action, may be brought in the United States District Court for the Southern District of New York, or if the foregoing federal courts lack jurisdiction, any state court located in New York,

New York and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such Action.

Section 7.5    Waiver of Right to Trial by Jury.  EACH OF THE PARTIES WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATING TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT.  INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 7.6    Successors and Assigns.  Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

Section 7.7    No Third-Party Beneficiaries.    Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other Person shall be a third-party beneficiary of this Agreement.

Section 7.8    Notices.    All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by e mail, upon written confirmation of receipt by e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt and the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(a)    If to any AY Entity:

Downtown Capital Partners, LLC
360 Hamilton Ave., Suite 1110
White Plains, NY 10601
Attention: Gary Katz
Email: gkatz@downtownlp.com

With a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld, LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA  90067-6022
Attention: C.N. Franklin Reddick III
E-mail: freddick@akingump.com

With a copy to (which shall not constitute notice):

28

Westerman Ball Ederer Miller Zucker and Sharfstein, LLP
1201 RXR Plaza
Uniondale, NY 11556
Attention: Jeffrey A. Miller
E-mail: jmiller@westermanllp.com

(b)    If to any All Year Party:

All Year Holdings Limited
12 Spencer Street
3rd Floor
Brooklyn, New York 11205
Attn: Asaf Ravid and Ephraim Diamond
Email:  ravidasaf@gmail.com
            ephraim@arbelcapital.com

*With a copy to (which shall not constitute notice):*

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn.:   David Herman
David.Herman@Weil.com

*With a copy to (which shall not constitute notice):*

Kalo (BVI) Limited,
PO Box 4571,
4th Floor, LM Business Centre,
Fish Lock Road,
Road Town, Tortola,
British Virgin Islands VG1110
Attn: Charlotte Caulfield and Paul Pretlove
Email: CCaulfield@kaloadvisors.com
            PPretlove@kaloadvisors.com

*With a copy to (which shall not constitute notice):*

Conyers Dill & Pearman
Commerce House,
Wickhams Cay 1,
PO Box 3140,
Road Town, Tortola,
British Virgin Islands VG1110
Attn: Richard Evans and Charles Goldblatt
Email: Richard.Evans@conyers.com
            Charles.Goldblatt@conyers.com

29

(c)    If to the Class B Member:

Downtown Capital Partners, LLC
360 Hamilton Ave., Suite 1110
White Plains, NY 10601
Attention: Gary Katz
Email: gkatz@downtownlp.com

*With a copy to (which shall not constitute notice):*

Akin Gump Strauss Hauer & Feld, LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA  90067-6022
Attention: C.N. Franklin Reddick III
E-mail: freddick@akingump.com

*With a copy to (which shall not constitute notice):*

Westerman Ball Ederer Miller Zucker and Sharfstein, LLP
1201 RXR Plaza
Uniondale, NY 11556
Attention: Jeffrey A. Miller
E-mail: jmiller@westermanllp.com

(d)    If to BVI Bondholder Trustee/Representative:

Mishmeret Trust Company Ltd.
Amot House Building B
48 Menachem Begin Road
Tel-Aviv 661800
ISRAEL
Attention: Rami Katzav, Vice President
            Shlomy Ilany, General Counsel
E-mail: ramik@mtrust.co.il
        ShlomyI@mtrust.co.il

*With a copy to (which shall not constitute notice):*

Chapman and Cutler LLP
1270 Avenue of the Americas, 30th Floor
New York, New York 10020
Email:  friedman@chapman.com
Attention:  Michael Friedman

Section 7.9    <u>Entire Agreement</u>.  This Agreement (including the Exhibits and Schedules hereto), the other Definitive Documents and the Equity Drawdown Facility Documents (other than

30

the Released Equity Drawdown Facility Documents) constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings among the Parties with respect to the subject matter hereof and thereof. This Agreement shall not be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby other than those expressly set forth herein or in any document required to be delivered hereunder or thereunder, including any implied covenants regarding noncompetition or nonsolicitation, and none shall be deemed to exist or be inferred with respect to the subject matter hereof. Notwithstanding any oral agreement or course of conduct of the Parties or their representatives to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the parties.

Section 7.10    Amendments.    This Agreement and the provisions hereof may not be modified, amended, or supplemented without the prior written consent of all Parties.

Section 7.11    Reservation of Rights.    Except as expressly provided in this Agreement or any of the Definitive Documents, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties and its rights, remedies, interests and claims under the Equity Drawdown Facility Documents.

Section 7.12    Counterparts.    This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties and the counterparts may be delivered by facsimile transmission, electronic mail in portable document format (.pdf) or other electronic transmission.

Section 7.13    Time of Essence.    Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

[*Remainder of page intentionally left blank; signature pages follow.*]

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement as of the date first above written.

**COMPANY:**

**ALL YEAR EQUITY PARTNERS LLC**, a Delaware limited liability company

By:   DFA Prop Manager, LLC, a New York limited liability company, its Manager

By: _____
Name: Gary Katz
Title: Authorized Signatory

**BVI:**

**ALL YEAR HOLDINGS LIMITED**,
a company organized in the Territory of the British
Virgin Islands

By: _____
Name: Assaf Ravid
Title:  Authorized Manager

**INITIAL COMPANY MANAGER:**

**ALL YEAR HOLDINGS LLC**,
a Delaware limited liability company

By: _____
Name:  Assaf Ravid
Title:   Authorized Manager

**CLASS A MEMBER:**

**ALL YEAR HOLDINGS COMMON LLC**,
a New York limited liability company

By: _____
Name:  Assaf Ravid
Title:   Authorized Manager

*Signature Page to Recapitalization Agreement*

**CLASS B MEMBER:**

**DCP ALL YEAR PREF EQUITY LLC,**
a Delaware limited liability company

By: _____

Name:    Gary Katz
Title:    Authorized Representative

**BVI BONDHOLDER**
**TRUSTEE/REPRESENTATIVE, signing only in**
**respect of Section 3 and Section 4.5:**

**MISHMERET TRUST COMPANY LTD.**, in its
capacity as Trustee for those certain Series
B, C, D, and E Bonds issued by All Year
Holdings Limited

By: _____

Name: Ram Sebty          Giyora Lyftig
Title: partner           partner

*Signature Page to Recapitalization Agreement*

**<u>Exhibit A</u>**

Second A&R Company Operating Agreement

[See attached.]

## <u>Schedule I</u>

List of All Year Reorganization Documents

1. Contribution Agreement, dated as of January 4, 2019, by and among BVI, the Initial Company Manager, the Class A Member and the Company, pursuant to which 100% of the managing membership units of Franklin AY LLC were contributed, transferred, assigned and delivered to the Company.

2. Contribution Agreement, dated as of December 5, 2018, by and among BVI, the Initial Company Manager, the Class A Member and the Company, pursuant to which 100% of the non-managing membership units of Franklin AY LLC were contributed, transferred, assigned and delivered to the Company.

3. Contribution Agreement, dated as of December 5, 2018, by and among BVI, the Initial Company Manager, the Class A Member and the Company, pursuant to which 100% of the interests of Smith Street Holdings NY LLC were contributed, transferred, assigned and delivered to the Company.

4. Contribution Agreement, dated as of November 8, 2019, by and among the Initial Company Manager, the Class A Member and the Company, pursuant to which 100% of the interests of 169 Graham LLC were contributed, transferred, assigned and delivered to the Company.

5. Contribution Agreement, dated as of November 8, 2019, by and among the Initial Company Manager, the Class A Member and the Company, pursuant to which 100% of the interests of 141 Spencer LLC were contributed, transferred, assigned and delivered to the Company.

6. Contribution Agreement, dated as of February 15, 2020, by and among BVI, the Initial Company Manager, the Class A Member and the Company, pursuant to which 90% of the interests of 188 South 3rd Street LLC were contributed, transferred, assigned and delivered to the Company.

7. Contribution Agreement, dated as of February 15, 2020, by and among BVI, the Initial Company Manager, the Class A Member and the Company, pursuant to which 100% of the interests of 234-236 North 11th LLC were contributed, transferred, assigned and delivered to the Company.

8. Contribution Agreement, dated as of February 15, 2020, by and among BVI, the Initial Company Manager, the Class A Member and the Company, pursuant to which 90% of the interests of 1000 Broadway LLC were contributed, transferred, assigned and delivered to the Company.

9. Contribution Agreement, dated as of February 4, 2019, by and among BVI, the Initial Company Manager, the Class A Member and the Company, pursuant to which 100% of the interests of TG 28 Street LLC were contributed, transferred, assigned and delivered to the Company.

10. Assignment and Assumption Agreement, dated as of November 8, 2019, by and between PMG Smith Street Venture LLC and Smith Street Holdings NY LLC, pursuant to which 49.9% of the membership interests in Smith Street Mez LLC were assigned, conveyed, transferred and set over unto Smith Street Holdings NY LLC.

11. Assignment of Contract, dated as of November 6, 2019, between Smith Street Investor LLC and Smith Street Holdings NY LLC, pursuant to which all the rights, title, interest, duties and liabilities of Smith Street Investor LLC under a Purchase and Sale of Membership Interest Agreement were assigned to and assumed by Smith Street Holdings NY LLC.

**Schedule II**

List of AY Entities

| No. | Name | Jurisdiction | Entity Type | Notes |
|-----|------|--------------|-------------|-------|
| 1. | All Year Equity Partners LLC | Delaware | LLC | N/A |
| 2. | Franklin AY LLC | Delaware | LLC | Related to real property located at 608 Franklin Avenue, Brooklyn, New York/1040 Dean Street, Brooklyn, New York. |
| 3. | 608 Franklin LLC | New York | LLC | Related to real property located at 608 Franklin Avenue, Brooklyn, New York/1040 Dean Street, Brooklyn, New York. |
| 4. | 608 Franklin Owner LLC | Delaware | LLC | Related to real property located at 608 Franklin Avenue, Brooklyn, New York/1040 Dean Street, Brooklyn, New York. |
| 5. | TG 28 Street LLC | New York | LLC | Related to real property located at 41-21 28th Street, Long Island City, New York. |
| 6. | 41-2128th Street Development LLC | New York | LLC | Related to real property located at 41-21 28th Street, Long Island City, New York. |
| 7. | 41-2128th Street Acquisition LLC | New York | LLC | Related to real property located at 41-21 28th Street, Long Island City, New York. |
| 8. | The Delmar Owner LLC | Delaware | LLC | Related to real property located at 41-21 28th Street, Long Island City, New York. |
| 9. | Smith St Holdings NY LLC | New York | LLC | Related to real property located at 455-479 Smith Street, Brooklyn, New York. |
| 10. | Smith Street Mezz LLC | New York | LLC | Related to real property located at 455-479 Smith Street, Brooklyn, New York. |
| 11. | Smith Street Owner LLC | New York | LLC | Related to real property located at 455-479 Smith Street, Brooklyn, New York. |
| 12. | 141 Spencer LLC | New York | LLC | Related to real property located at 141 Spencer Street, Brooklyn, New York. |
| 13. | 169 Graham LLC | New York | LLC | Related to real property located at 169 Graham Avenue, Brooklyn, New York. |

| 14. | 1000 Broadway LLC | New York | LLC | Related to real property located at 1000 Broadway, Brooklyn, New York. |
| 15. | 188 South 3rd Street LLC | New York | LLC | Related to real property located at 188 S. 3rd Street, Brooklyn, New York. |
| 16. | 234-236 North 11th LLC | New York | LLC | Related to real property located at 234-236 North 11th Street, Brooklyn, New York. |

**<u>Schedule III</u>**

List of BVI Bond Documents

1.  Series B Deed of Trust by and between BVI and the BVI Bondholder Trustee/Representative dated as of December 25, 2016;

2.  Series C Deed of Trust by and between BVI and the BVI Bondholder Trustee/Representative dated as of February 19, 2017;

3.  Series D Deed of Trust by and between BVI and the BVI Bondholder Trustee/Representative dated as of June 29, 2017; and

4.  Series E Deed of Trust by and between BVI and the BVI Bondholder Trustee/Representative dated as of February 4, 2018.

**Schedule IV**

Capitalization[1]

| No. | Name | Equityholder | Equity Interests Owned of Record and Beneficially by Equityholder |
|---|---|---|---|
| 1. | 608 Franklin LLC[2] | | 15% |
| | | | 12.5% |
| | | | 7.5625% |
| | | | 10.0% |
| 2. | 41-2128th Street Development LLC | | 50% |
| 3. | 1000 Broadway LLC | | 10% |
| 4. | 188 South 3rd Street LLC | | 10% |

---

[1] **Note**: Each of the following AY Entities is wholly-owned by another AY Entity and, accordingly, is not owned by any third-party co-investor: (i) Franklin AY LLC; (ii) 608 Franklin Owner LLC; (iii) TG 28 Street LLC; (iv) 41-2128th Street Acquisition LLC; (v) The Delmar Owner LLC; (vi) Smith St Holdings NY LLC; (vii) Smith Street Mezz LLC; (viii) Smith Street Owner LLC; (ix) 141 Spencer LLC; (x) 169 Graham LLC; and (xi) 234-236 North 11th LLC.

[2] **Note**: The All Year Parties have been informed that there may be certain additional parties that assert ownership of equity interests in 608 Franklin LLC which do not, in the aggregate, exceed 1% of the issued and outstanding equity interests in 608 Franklin LLC.

**<u>Schedule V</u>**

2021 Net Working Capital



**Exhibit B**

**Second A&R LLCA**

WEIL:\98370094\22\12817.0005

*Execution Version*

# SECOND AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# ALL YEAR EQUITY PARTNERS LLC

_____

Dated as of [●], 2022

THE MEMBERSHIP INTERESTS EVIDENCED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION.  SUCH MEMBERSHIP INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND THE APPLICABLE STATE OR FOREIGN SECURITIES LAWS, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM.  IN ADDITION, TRANSFER OR OTHER DISPOSITION OF SUCH MEMBERSHIP INTERESTS IS FURTHER RESTRICTED AS PROVIDED IN THIS AGREEMENT.

## <u>TABLE OF CONTENTS</u>

**Page**

ARTICLE 1 ORGANIZATION ........................................................................................................2
    1.1       Formation and Continuation of the Company ....................................................2
    1.2       Limited Liability Company Agreement ...............................................................2
    1.3       Name .....................................................................................................................3
    1.4       Principal Place of Business; Registered Office and Agent .................................3
    1.5       Purposes and Powers............................................................................................3
    1.6       Term .....................................................................................................................3

ARTICLE 2 CAPITAL CONTRIBUTIONS AND ACCOUNTS ..................................................3
    2.1       Units .....................................................................................................................4
    2.2       Members ...............................................................................................................4
    2.3       Ownership Ledger.................................................................................................4
    2.4       Capital Contributions...........................................................................................4
    2.5       Member Loans ......................................................................................................4
    2.6       Company Expenses ...............................................................................................5
    2.7       Asset Management Fee .........................................................................................5
    2.8       Negative Capital Accounts...................................................................................5
    2.9       No Interest............................................................................................................5
    2.10     No Withdrawal .....................................................................................................5

ARTICLE 3 CAPITAL ACCOUNTS AND ALLOCATIONS .....................................................5
    3.1       Allocations ...........................................................................................................6

ARTICLE 4 MANAGEMENT OF THE COMPANY; MAJOR DECISIONS ..............................6
    4.1       Manager ...............................................................................................................6
    4.2       Major Decisions...................................................................................................7
    4.3       Limitations on the Company's Activities ............................................................7
    4.4       Reserved...............................................................................................................7
    4.5       Limitation of Liability.........................................................................................7
    4.6       Indemnification ....................................................................................................8
    4.7       Lack of Authority of Individual Members ...........................................................9
    4.8       No Right of Partition..........................................................................................10
    4.9       Conflicts of Interest...........................................................................................10
    4.10     Affiliate Agreements..........................................................................................10

ARTICLE 5 COVENANTS OF THE COMPANY .....................................................................10
    5.1       Financial Statements and Other Reports............................................................11
    5.2       Appraisal Process...............................................................................................12
    5.3       Budget ................................................................................................................14
    5.4       Books and Records .............................................................................................14
    5.5       Auditors..............................................................................................................14
    5.6       Further Assurances.............................................................................................14

ARTICLE 6 DISTRIBUTIONS....................................................................................................15
    6.1       Distributions.......................................................................................................15

i

6.2        Withholding Taxes. .................................................................................16

ARTICLE 7 SENIOR LOANS ........................................................................................17
7.1        Reserved ....................................................................................................17
7.2        Reserved ....................................................................................................17
7.3        Reserved ....................................................................................................17
7.4        Reserved ....................................................................................................17
7.5        Reserved ....................................................................................................17
7.6        Loan Guaranties and Indemnities ..............................................................17
7.7        Acquisition of Senior Loan ........................................................................17

ARTICLE 8 DISSOLUTION AND TERMINATION....................................................18
8.1        Dissolution of Company .............................................................................18
8.2        Winding Up ................................................................................................18

ARTICLE 9 BOOKS OF ACCOUNT .............................................................................20
9.1        Records and Accounting .............................................................................20
9.2        Bank Accounts ...........................................................................................20
9.3        Fiscal Year .................................................................................................20
9.4        Tax Information ..........................................................................................20
9.5        Tax Elections ..............................................................................................20
9.6        Company Representative .............................................................................20

ARTICLE 10 POWER OF ATTORNEY .........................................................................22

ARTICLE 11 TRANSFERS .............................................................................................22
11.1       Dispositions of Preferred Units..................................................................22
11.2       Permitted Transfers ....................................................................................22
11.3       Dispositions of Common Units...................................................................23
11.4       Admission of Transferee ............................................................................23

ARTICLE 12 COMMON MEMBER REDEMPTION OF PREFERRED UNITS .....................24

ARTICLE 13 MISCELLANEOUS...................................................................................24
13.1       Further Assurances .....................................................................................24
13.2       Entire Agreement; Amendments .................................................................25
13.3       Notices and Addresses ................................................................................25
13.4       Governing Law ...........................................................................................25
13.5       WAIVER OF JURY TRIAL........................................................................25
13.6       Successors and Assigns...............................................................................26
13.7       Counterparts ...............................................................................................26
13.8       Captions ......................................................................................................26
13.9       Statutory References ...................................................................................26
13.10      Preferences .................................................................................................26
13.11      Waiver ........................................................................................................26
13.12      Severability ................................................................................................27
13.13      Ownership of Assets ...................................................................................27
13.14      Limitation of Liability.................................................................................27
13.15      Remedies of Company and Class A Members .............................................27
13.16      Remedies.....................................................................................................27

13.17    Specific Performance ........................................................................................27
13.18    Survival ...........................................................................................................28
Section 1.1    Investments ..............................................................................................1
Section 1.2    Related Party Transactions.......................................................................1
Section 1.3    Line of Business........................................................................................1
Section 1.4    Amendments .............................................................................................1
Section 1.5    Common Member Liability .......................................................................1
Section 1.6    Merger; Consolidation .............................................................................2
Section 1.7    Partnership; Joint Venture .......................................................................2
Section 1.8    Additional Members .................................................................................2
Section 1.9    Capital Expenditures................................................................................2
Section 1.10   Disposition of Properties..........................................................................2
Section 1.11   Distributions in Kind.................................................................................2
Section 1.12   Subsidiary Actions ...................................................................................2

## SECOND AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT
### OF
## ALL YEAR EQUITY PARTNERS LLC

This Second Amended and Restated Limited Liability Company Agreement (this "*Agreement*") of ALL YEAR EQUITY PARTNERS LLC, a Delaware limited liability company (the "*Company*"), effective as of January 13, 2022 (the "*Restatement Date*"), is made and entered into by and among the Manager and each of the Members (as such terms are hereinafter defined).

### RECITALS

**WHEREAS**, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on November 16, 2018 (the "*Certificate of Formation*");

**WHEREAS,** the Company, the Class A Member and the Initial Class B Member entered into the Amended and Restated Limited Liability Agreement of the Company on December 5, 2018 ("*A&R LLCA*");

**WHEREAS**, the Class A Member and the Initial Class B Member entered into that certain Recapitalization Agreement on January 13, 2022 ("*Recapitalization Agreement*"); and

**WHEREAS,** as contemplated by the Recapitalization Agreement the parties hereto desire to amend and restate the A&R LLCA in its entirety on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby amend and restate the A&R LLCA in its entirety as follows:

### Definitions and Accounting Terms:

1.     <u>Defined Terms</u>.  Unless otherwise defined herein, capitalized terms used herein shall have the meaning set forth on <u>Appendix A</u> hereto.

2.     <u>Construction</u>.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All accounting terms not specifically defined herein shall be construed in accordance with an accepted accounting method consistently applied.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  The parties hereby acknowledge and agree that, as to any clauses or provisions contained in this Agreement to the effect that the Company (a) represents or warrants on behalf of, or covenants on behalf of  an Affiliate thereof, (b) shall cause any Affiliate thereof to act or refrain from acting, to comply with, to permit, to perform, to pay, to furnish, to cure, to remove, to observe, to deliver, to suffer, to initiate, to provide, to make available, to furnish in any manner, or (c) shall

1

cause to occur or not to occur, or otherwise be obligated in any manner with respect to, any matters pertaining to an Affiliate thereof, such clause or provision is intended to mean, and shall be construed as meaning, that the Company shall cause such Affiliate to take such action. Unless otherwise specified, the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Subject to Sections 4.5(a) and 4.5(b) of this Agreement, unless otherwise expressly provided for herein, any determination, approval, consent or action required or permitted to be taken by the Preferred Members or the Class A Members, as applicable, pursuant to this Agreement may be exercised, made or withheld in the sole discretion of the Preferred Members or the Class A Members, as applicable.

3.      Time Periods.   In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". Periods of days referred to in this Agreement shall be counted in calendar days unless Business Days are expressly prescribed. Any period determined hereunder by reference to a month or months or year or years shall end on the day in the relevant calendar month in the relevant year, if applicable, immediately preceding the date numerically corresponding to the first day of such period, provided, that if such period commences on the last day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month during which such period is to end), such period shall, unless otherwise expressly required by the other provisions of this Agreement, end on the last day of the calendar month. Unless otherwise specified, all references to specific times shall mean and be a reference to such time in New York, New York.

# ARTICLE 1

# ORGANIZATION

1.1     Formation and Continuation of the Company.   The Company was formed on November 16, 2018 as a Delaware limited liability company by the execution and filing of the Certificate of Formation. The Members hereby agree to continue the Company as a limited liability company in accordance with the terms and provisions of this Agreement. The Manager shall cause to be executed all necessary certificates and documents, and shall make all such filings and recordings, and shall cause to be done all other acts as may be necessary or appropriate from time to time to comply with all requirements for the continued existence and operation of a limited liability company in the State of Delaware.

1.2     Limited Liability Company Agreement.   The Members have entered into this Agreement for the purpose of establishing the affairs of the Company and the conduct of its business in accordance with the provisions of the Act. The Members hereby agree that the rights and obligations of the Members with respect to the Company will be determined in accordance with the terms and conditions of this Agreement and, except where the Act provides that such rights and obligations specified in the Act shall apply "unless otherwise provided in a Limited Liability Company Agreement" or words of similar effect and such rights and obligations are set forth in this Agreement, the Act.

1.3     Name.  The name of the Company is "All Year Equity Partners LLC" or such other name or names as the Manager may from time to time designate and upon such change an appropriate amendment to the Certificate of Formation shall be filed as required by the Act.

1.4     Principal Place of Business; Registered Office and Agent.

(a)     The principal place of business of the Company shall be 360 Hamilton Ave., Suite 1110, White Plains NY 10601 or such other place as the Manager may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain its books and records at such principal place of business.  The Company may have such other offices (within or without the State of Delaware) as the Manager may designate from time to time.

(b)     The registered office of the Company in the State of Delaware is located at 1201 N Orange Street, Suite 7140, Wilmington, DE 19801.  The registered agent of the Company for service of process at such address is File Right Corporate Services LLC.  The Manager may, in its discretion, change the registered office and/or registered agent from time to time by (i) filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of the State of Delaware pursuant to the Act and (ii) giving notice of such change to each of the Members.

1.5     Purposes and Powers.

(a)     The Company is formed for the object and purpose of , and the nature of the business to be conducted and promoted by the Company is to (a) to conduct and cause its Subsidiaries to conduct the Core Business, (b) to own and hold all of the Equity Interests in the HoldCo Companies and (c) subject to the restrictions and limitations provided for in this Agreement, to engage in any other activities necessary, appropriate, proper, advisable, incidental or convenient to carry out the provisions of this Agreement.  Subject to the limitations set forth in this Agreement, the Company shall possess and may engage in any lawful business, purpose or activity permitted under the Act and exercise all of the powers and privileges granted to it by the Act, by any other Law or this Agreement, together with all powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the purposes of the Company set forth in this Section.

(b)     The Company is hereby authorized to execute, deliver and perform and the Manager, or any officer of the Company, on behalf of the Company is hereby authorized to execute, deliver and perform all documents, agreements, certificates, or financing statements to which the Company is a party. The foregoing authorization shall not be deemed a restriction on the powers of the Member or any officer to enter into other agreements on behalf of the Company.

1.6     Term.  The term of the Company shall be perpetual, unless the Company is dissolved in accordance with the provisions of this Agreement.

## ARTICLE 2

## CAPITAL CONTRIBUTIONS AND ACCOUNTS

3

2.1     Units.  The Company's Units shall be divided into two separate and distinct classes of Units in the Company (each, a "**Class**" of Units), Class A Units ("**Class A Units**") and Class B Units (the "**Class B Units**"). Each Class shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such Class. Unless otherwise requested by a Member, all Units and other limited liability company interests issued hereunder shall be uncertificated.

2.2     Members.  The sole initial Members of the Company are the Class A Member and the Initial Class B Member.  Subject to the approval rights of the Members pursuant to Section 4.2, the Manager shall be authorized to admit additional Members to the Company from time to time on such terms and conditions, including such equity interests as it may determine in its sole discretion.

2.3     Ownership Ledger.  The Company's Ownership Ledger (the "**Ownership Ledger**") setting forth the name of each Member, the Capital Contributions of each Member and the number of Units of each Class or other interest held by each such Member as of the Restatement Date is attached hereto as Schedule I.  Upon any change in the number or ownership of outstanding Units in accordance with this Agreement (whether upon an issuance of Units, a Transfer of Units, a cancellation of Units, a forfeiture of Units or otherwise), the Manager shall amend and update the Ownership Ledger and shall deliver a copy of such updated ledger to each Member upon request. The failure of the Manager to update the Ownership Ledger upon a change in the number or ownership of outstanding Units or the ownership thereof shall not affect the number of outstanding Units or the ownership thereof.  Any reference in this Agreement to the Ownership Ledger shall be deemed to be a reference to the Ownership Ledger as amended in effect from time to time.

2.4     Capital Contributions.  No Member shall be required to make additional Capital Contributions to the Company without such Member's consent.

2.5     Member Loans.  Upon the request of the Manager, Members may loan funds to the Company from time to time in such amounts and at such times as deemed appropriate by the Manager (each a "**Member Loan**").  Member Loans will bear interest at a rate of interest equal to 15% per annum, compounding monthly; provided, however, at any time the outstanding balance of all Member Loans from a Member is greater than $2 million, the amount outstanding in excess of $2 million will bear interest at a rate of 18% per annum, compounding monthly for the duration of such Member Loan.  Member Loans may be structured as demand loans.  In the event that the Manager approves of a Member Loan, the Company shall provide reasonable notice (of not less than 5 calendar days) to the other Members of the principal amount of such Member Loan and the material terms thereof, and shall provide each Member with a reasonable opportunity to participate in such Member Loan; provided, that for a period of six (6) months following the Restatement Date, no Class A Member shall be entitled to participate in any Member Loan made during such period.  Subject to the immediately preceding sentence, Class A Members will be provided with the opportunity to participate in up to 75% of each Member Loan and Class B Members will be entitled to participate in up to 25% of each Member Loan (plus any portion that the Class A Members do not elect to fund).  Each Member will have fifteen Business Days following notice of a Member Loan to confirm its interest in participating in such Member Loan and, unless otherwise agreed by the Manager, shall fund such participation no later than five Business Days after receipt of written notice from the Company of the closing date for the funding of such Member Loan.  If

4

a Member shall make a Member Loan to the Company, the amount of any such Member Loan shall not be treated as a Capital Contribution but shall be a debt due from the Company. No Member shall be obligated to make a Member Loan to the Company or any of its Subsidiaries. To the extent that the Manager makes a request of the Members to fund a Member Loan and such Member Loan is not fully funded in accordance with this <u>Section 2.5</u>, the Manager may offer participation in such Member Loans to non-Member third parties on the same terms and conditions offered to the Members.

2.6    <u>Company Expenses</u>. The Company will bear all expenses of the ownership, and management of the Company and its Subsidiaries and the Properties, including, taxes, costs and expenses relating to ownership, disposition, development, construction, improvements, maintenance, property management and outside advisors, attorneys, accountants and consultants (including construction consultants) and the Asset Management Fee (collectively, "***Company Expenses***"). The Company will bear all reasonable actual out-of-pocket expenses of the Class B Member in connection with the negotiation and documentation of this Agreement, the Recapitalization Agreement and the transactions contemplated thereby, including costs and expenses in connection obtaining any consents from lenders, co-investors and other parties negotiated after the date hereof, and costs and expenses to be reimbursed pursuant to the Recapitalization Agreement, provided however that to the extent the amounts owed hereunder are duplicative of the amounts paid under the Recapitalization Agreement, such amounts shall only be paid once.

2.7    <u>Asset Management Fee</u>.  In addition to any fee payable in respect of property managers, the Company shall pay to Manager an asset management fee equal to two percent (2%) of the aggregate gross rent collected in respect of the Properties ("***Asset Management Fee***").  Such Asset Management Fee shall be payable to the Manager monthly in arrears no later than the last business day of each month.  No internal (i.e. expenses that are not third party out-of-pocket) general or administrative expenses of the Manager or Preferred Investor will be charged to the Company by Manager or Preferred Investor other than the Asset Management Fee.

2.8    <u>Negative Capital Accounts</u>.  No Member shall be required to pay to any other Member or the Company any deficit or negative balance that may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company).

2.9    <u>No Interest</u>.  Except as otherwise expressly provided herein, no Member shall be entitled to receive interest from the Company in respect of any positive balance in its Capital Account, and no Member shall be liable to pay interest to the Company in respect of any negative balance in its Capital Account.

2.10    <u>No Withdrawal</u>.  No Person shall be entitled to withdraw any part of such Person's Capital Contributions or Capital Account or to receive any Distribution from the Company, except as expressly provided in this Agreement.

## ARTICLE 3

## CAPITAL ACCOUNTS AND ALLOCATIONS

5

3.1    <u>Allocations</u>.  For purposes of adjusting the Capital Accounts of the Members, Net Profits, Net Losses and, to the extent necessary, individual items of income, gain, loss, credit and deduction, for any Fiscal Year shall be allocated among the Members as provided for in Appendix B hereto.

## ARTICLE 4

## MANAGEMENT OF THE COMPANY; MAJOR DECISIONS

4.1    <u>Manager</u>.

(a)    As of the Restatement Date, DFA Prop Manager, LLC is the Manager. Following the Restatement Date a Majority-in-Interest of the Preferred Members shall appoint the Manager.

(b)    The Manager shall manage the affairs of the Company and make all decisions with regard thereto, except where (i) the Member's express approval is required pursuant to <u>Section 4.2</u>, or (ii) the approval of the Members is expressly required by a non-waivable provision of the Act.

(c)    The business and affairs of the Company will be managed by the Manager in accordance with this Agreement, subject to the limitations set forth herein.  The Manager shall have all powers, statutory or otherwise, possessed by managers of a limited liability company under the Act and that are necessary and advisable to enable the Manager to carry out the duties of the Manager enumerated herein, as well as any other powers specifically granted to the Manager in this Agreement.  The Manager shall possess and enjoy all of the rights and powers of a manager of a limited liability company to the extent permitted by the Act and shall be authorized and empowered on behalf and in the name of the Company and its Subsidiaries to carry out any and all of the objects and purposes of the Company, to exercise all powers necessary or convenient or incidental to carrying out the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings that it may in its discretion deem necessary or advisable or incidental thereto.  The Manager is authorized to bind the Company and, acting on behalf of the Company's Subsidiaries, to enter into agreements binding upon the Company's Subsidiaries, and the signature of the Manager is sufficient to bind the Company and, acting on behalf of the Company's Subsidiaries, the Company's Subsidiaries, including with respect to the Transfer of the real or personal property of the Company and its Subsidiaries.  Parties dealing with the Company shall be entitled to rely upon the authority of the Manager to execute such documents on behalf of the Company and its Subsidiaries.

(d)    Without limiting the generality of the scope of the Manager's authority hereunder and subject to <u>Section 4.2</u>, the Manager shall be expressly authorized to exercise exclusive control over all Company and Subsidiary matters, including:

(i)    All of the Company's and each Subsidiary's rights as an investor and participant in each of its Subsidiaries;

(ii)      All decisions and actions with respect to the Properties, property management (including appointment and removal of property managers); provided, that any appointed property manager shall be reputable and regularly engaged in the management of real properties located in New York City of a similar type as those directly or indirectly owned by the Company),

(iii)      Financings (and refinancings) of the Properties;

(iv)      Selecting of accountants (so long as such accountant is reputable and regularly engaged in the rendering of accounting services for property owners that directly or indirectly own real properties located in New York City of a similar type as those directly or indirectly owned by the Company), brokers (so long as such broker is reputable and regularly engaged in the rendering of brokering services for property acquirers that directly or indirectly acquire real properties located in New York City of a similar type as those directly or indirectly acquired or to be acquired by the Company) and other outside advisors; and

(v)      The process, timing, negotiations, terms and conditions for sales, transfers or other dispositions of all assets of the Company, including the Properties, whether direct or indirect, or through sale of Equity Interests, merger, consolidation, recapitalization or other business combination.

4.2      Major Decisions.  Notwithstanding anything to the contrary contained in this Agreement, the Manager shall not take, on behalf of the Company, or permit any of the Company's Subsidiaries to take (including actions directing the Company or any of its Subsidiaries), any of the actions set forth on Schedule II (each a, "*Major Decision*") without the written consent of the Manager, a Majority-in-Interest of the Common Members and a Majority-in-Interest of the Class B Members.

4.3      Limitations on the Company's Activities. The Members shall not have any authority to perform (a) any act in violation of any applicable law or regulation, (b) any act in contravention of this Agreement or fail to do any act required by this Agreement, or (c) any act which would make it impossible to carry on the ordinary business of the Company.

4.4      Reserved.

4.5      Limitation of Liability.

(a)      The Preferred Members, the Common Member, and  the Manager shall not have any fiduciary duties to any other Member, the Company, or any other Person; provided, however, the foregoing shall not eliminate (i) the implied contractual covenant of good faith and fair dealing or any duties that are otherwise non-waivable in accordance with the Act and (ii) fiduciary duties of the Common Member set forth in Section 4.5(b).  To the fullest extent permitted by law, including Section 18-1101(e) of the Act, and notwithstanding any other provision of this Agreement to the contrary, none of the Manager, any Preferred Member or the Common Member shall be liable to the Company, any Member, or any other Person bound by this Agreement; provided, that, in the case of the Common Member, the Common Member shall be responsible for

7

liabilities arising from any breach of fiduciary duties of the Common Member in connection with its exercise of rights pursuant to Section 4.10. In furtherance of the foregoing (but subject to the provisos in the foregoing) and notwithstanding any other provision of this Agreement to the contrary, when the Manager, any Preferred Member or the Common Member takes any action under this Agreement to exercise discretion or give or withhold its consent (other than any exercise of rights by the Common Member pursuant to Section 4.10), the Manager, such Preferred Member or such Common Member shall have no duty (fiduciary or other) to consider the interests of the Company, the other Members, the Manager, or any other Person, and shall be entitled to consider only such interests and factors as it desires, including its own interests. The Manager may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents. The Manager shall be entitled to rely upon the advice of legal counsel, independent public accountants, and other experts, including financial advisors, and any act or failure to act by the Manager in good faith reliance on such advice shall in no event subject the Manager or any Indemnified Person to liability to the Company, any Member, or any other Person bound by this Agreement.

(b)　　In connection with the exercise of rights under Section 4.10 by the Common Member, the Common Member shall have all fiduciary duties to the Preferred Members as are applicable to officers and directors of a corporation organized under the laws of the State of Delaware.

(c)　　Notwithstanding any other provision of this Agreement, to the extent that any provision of this Agreement purports or is interpreted (i) to have the effect of replacing, restricting or eliminating the duties that might otherwise, as a result of Delaware or other applicable law, be owed by the Manager to the Company, the Members, any other Person who acquires an interest in a Unit or any other Person who is bound by this Agreement, or (ii) to constitute a waiver or consent by the Company, the Members, any other Person who acquires an interest in a Unit or any other Person who is bound by this Agreement to any such replacement, restriction or elimination, such provision shall be deemed to have been approved by the Company, all the Members, each other Person who acquires an interest in a Unit and each other Person who is bound by this Agreement.

4.6　　Indemnification.

(a)　　The Company shall indemnify and hold harmless the Manager, the officers, and employees of the Company and any predecessor entity thereof and the Subsidiaries of the Company, in each case in such individual's capacity as such and for their entire service in such position, and each other present or former Member, partner or equityholder of the Company on or after the date hereof (each, an "***Indemnified Person***"), from and against any and all losses, claims, damages, liabilities, expenses (including reasonable legal fees and expenses), judgments, fines, settlements and other amounts relating to any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, that relate to (i) the Manager's status or activities as the Manager or (ii) the Company's property, business or affairs, in each case, to the maximum extent permitted by law, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Company is providing immediately

8

prior to such amendment), provided that no Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered if there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter in question, the Indemnified Person's acts or omissions constituted bad faith, fraud or willful misconduct or, in the case of a criminal matter, the Indemnified Person acted with knowledge that his, her or its conduct was criminal or, in the case of the Class A Members or the Initial Manager, that such Person's acts constituted a breach of its fiduciary duties or its obligations under this Agreement. Expenses, including attorney fees, incurred by any such Indemnified Person in defending a proceeding shall to the extent of available funds and as otherwise determined by the Manager, be paid by the Company in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking satisfactory to the Manager by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company.

(b)     The right to indemnification and the advancement of expenses conferred in this Section 4.6 shall not be exclusive of any other right that any Person may have or hereafter acquire under any statute or agreement.

(c)     The Company may maintain insurance, at its expense, to protect any Indemnified Person against any expense, liability or loss described in paragraph (a) above whether or not the Company would have the power to indemnify such Indemnified Person against such expense, liability or loss under the provisions of this Section 4.6.

(d)     Notwithstanding anything contained herein to the contrary (including in this Section 4.6) any indemnity by the Company relating to the matters covered in this Section 4.6 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing or is found in a final decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or be required to make additional Capital Contributions to help satisfy such indemnity of the Company.

(e)     If this Section 4.6 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this Section 4.6 to the fullest extent permitted by any applicable portion of this Section 4.6 that shall not have been invalidated and to the fullest extent permitted by applicable law.

(f)     Notwithstanding anything to the contrary set forth herein, no provision of this Agreement, including this Section 4.6, shall provide Goldman, Tzipporah Goldman or their respective Affiliates with any rights of indemnification by the Company or its Subsidiaries.

4.7     Lack of Authority of Individual Members.  No Member (other than the Manager) shall in its capacity as such have the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company, or to make any expenditures on behalf of the Company, and the Members hereby consent to the exercise by the Manager of the powers and rights conferred upon it by law and this Agreement.  Without limiting the foregoing, no Member (in its capacity as such) (other than the Manager) shall take part in the operation, management or control of the Company's business or transact any business in the

9

Company's name, unless such Member is a Person employed or engaged to transact any such business by or on behalf of the Manager or the Company. The transaction of any such business by a Member employed or engaged to do so by or on behalf of the Manager or the Company shall not be deemed to constitute participation in control or management of the Company and shall not affect, impair or eliminate the limitations on the liability of a Member under this Agreement. Furthermore, neither the lending of money to the Company by a Member or any Affiliate thereof, the ownership of equity interests by a Member, nor the resulting operation, management or control of the Manager by such Member, shall (i) be deemed to constitute participation in control or management of the Company, (ii) affect, impair or eliminate the limitations on the liability of a Member under this Agreement or (iii) otherwise cause a Member to become a Manager.

4.8    No Right of Partition. No current or former Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

4.9    Conflicts of Interest. The Members expressly acknowledge that, (i) the Members and the Manager are permitted to have, and may presently and in the future have, investments or other business relationships other than through the Company or any of its Subsidiaries (an "*Other Business*"), (ii) each of the Members, the Manager and their respective Affiliates have and may develop a strategic relationship with businesses that are and may be competitive with the Company or any of its Subsidiaries, (iii) no Manager, Member nor any of their respective Affiliates will be prohibited by virtue of its investments in the Company or its Subsidiaries or its service, or any Subsidiary from pursuing and engaging in any such activities, (iv) no Member, Manager, or any of their respective Affiliates will be obligated to inform the Company of any such opportunity, relationship or investment, (v) the other Members will not acquire or be entitled to any interest or participation in any Other Business as a result of the participation therein of any Member, Manager or their respective Affiliates, and (vi) the involvement of any Member or any of their respective Affiliates in any Other Business will not constitute a conflict of interest by such Persons with respect to the Company, any of its Subsidiaries, any of its Members or any of their respective Affiliates; *provided, however*, the foregoing shall not modify or limit the Class A Members' and the Initial Manager's fiduciary duties to the Company and the Preferred Members.

4.10    Affiliate Agreements. Notwithstanding the Manager's rights pursuant to this Section 4, in the event that the Common Member believes in good faith that the Manager is not appropriately enforcing the rights of the Company or a Subsidiary with respect to any agreements or Transactions between the Company or a Subsidiary on the one hand and any Affiliates of (i) the Company and its Subsidiaries or (ii) the Manager on the other hand, then the Common Member, shall have the right to direct the Manager by written notice to use commercially reasonable efforts to enforce such Company or Subsidiary rights.

## ARTICLE 5

## COVENANTS OF THE COMPANY

So long as there are any Preferred Units outstanding, the Company and each Subsidiary shall (and the Manager shall cause the Company and each Subsidiary to):

10

5.1    <u>Financial Statements and Other Reports</u>.    Provide the following financial information and statements to the Members:

(a)    <u>Financial Reports</u>.    As soon as available, but not later than 120 days after the end of each Fiscal Year commencing with the Fiscal Year ending after the Restatement Date, provide to the Members the unaudited annual balance sheet of the Company and the Subsidiaries as at the end of, and the related consolidated statements of income, retained earnings and cash flows for, such Fiscal Year, and the corresponding figures as at the end of, and for, the preceding Fiscal Year; <u>provided</u>, that if the Company prepares audited annual financial statements it will provide a copy to each Member.

(b)    <u>Quarterly Reports</u>.    As soon as available, and in any event within 90 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending on the first fiscal quarter following the Restatement Date, the consolidated unaudited balance sheet of the Company as of the close of such Fiscal Quarter and related unaudited consolidated statements of income, retained earnings and cash flow for such Fiscal Quarter.

(c)    <u>Monthly Reports</u>.    Within 30 days of the end of each calendar month, commencing with the first full month following the Restatement Date, (i) consolidated monthly unaudited financial statements of the Company (which shall include a balance sheet, income statement, statement of retained earnings and cash flow statement).

(d)    The Company shall cause each Subsidiary to deliver to the Members, to the extent not otherwise provided to the Member pursuant to the terms of this Agreement, (i) promptly following the delivery to such Subsidiary's Senior Lender, copies of all draw requests, lien waivers, financial statements, budgets, formal certificates and other reports delivered by such Subsidiary to its Senior Lender under the Senior Loan Documents, in each case, which are not immaterial, and (ii) within three (3) days after the same are sent, written notices of material events sent pursuant to the Senior Loan Documents.

(e)    The Company shall and shall cause each Subsidiary to deliver to the Members, to the extent not otherwise provided to the Member pursuant to the terms of this Agreement, (i) promptly following the delivery to the Company's or such Subsidiary's partner, copies of all financial statements, budgets, formal certificates and other reports delivered by the Company or such Subsidiary to any co-investor or joint venture partner in such Subsidiary under the applicable operating agreement, in each case, which are not immaterial, and (ii) within ten (10) Business Days after the same are sent, written notices of material events sent pursuant to the applicable operating agreement.

(f)    In connection with any formal disposition process for a Property, including, without limitation Section 5.1(h), the Common Members shall be entitled to weekly updates from the Manager regarding such formal disposition process (which may be conducted by telephonic means or provided by electronic mail) and shall be provided with copies of (i) all final marketing materials relating to such formal disposition process and (ii) written bids received in connection with such formal disposition process; provided the Common Members' right to receive updates pursuant to this <u>Section 5.1(f)</u> shall not be interpreted in any way to limit Manager's right to exercise exclusive control over such disposition process as contemplated by <u>Section 4.1(c)</u>.  The

11

Company shall endeavor to dispose of all Properties within five (5) years from the Restatement Date ("*Sale Period*"); provided that failure of the Company to dispose of such Properties within the Sale Period shall not be deemed a breach of any obligations of the Manager or the Company under this Agreement. If the Company has not disposed of all Properties within the Sale Period, each of the Common Member and the Preferred Member (such Member that triggers the appraisal process, the "*Appraisal Triggering Member*") shall have the right to trigger the appraisal process detailed in Section 5.2.

(g)       In the case of a breach or non-compliance with any provision set forth in Sections 5.1(a)-(f), any Member may provide notice to the Company requesting that the Company cure such breach or non-compliance.  Upon the Company's receipt of such notice, the Company shall cure such breach or non-compliance within thirty (30) days following receipt of such notice; provided, that so long as the Company is making a bona fide and diligent effort to cure such breach or non-compliance, the cure period shall be automatically be extended for one additional thirty (30) day period.  Notwithstanding anything to contrary contained herein, the provisions of this Section 5.1(f) shall constitute the exclusive remedy for any and all breach or non-compliance with any provision set forth in Sections 5.1(a)-(f).

(h)       The Company shall use reasonable good faith efforts to market and sell 141 Spencer Street (the "*Restatement Date Sale Property*") within one (1) year from the Restatement Date ("*Restatement Date Member Loan Sale Period*"); provided that failure of the Company to sell such Property within the Restatement Date Member Loan Sale Period shall not be deemed a breach of any obligations of the Manager or the Company under this Agreement. To the extent the Restatement Date Sale Property is sold during the Restatement Date Member Loan Sale Period, notwithstanding anything to the contrary contained herein including Section 6.1(a)(i), the sale proceeds from such sale shall be applied first to satisfy all ordinary course obligations of the Company, then to satisfy any Member Loans made during the first six months subsequent to Closing. To the extent there are additional proceeds after such application, such proceeds shall then be applied pursuant to Section 6.1.

5.2     Appraisal Process.  At any time following the expiration of the Sale Period, each Appraisal Triggering Member shall have the one time right to commence the appraisal process detailed in this Section 5.2 by providing written notice to the non-Appraisal Triggering Member setting forth the Appraisal Triggering Member's desire to commence the appraisal process (such date on which the non-Appraisal Triggering Member received such notice, the "*Appraisal Date*"). Within sixty (60) days following the Appraisal Date (the "*Appraisal Period*"), each of the Appraisal Triggering Member and the non-Appraisal Triggering Member, as applicable, shall obtain an appraisal for each remaining Property from an Appraiser, in each case, determined based on the Fair Market Value of each Property (each, an "*Appraisal*") and provide to the other Member Appraisals for all remaining Properties and the aggregate Fair Market Value based on all of its Appraisals (the "*Appraisal Package*").

(a)       In the event that the Appraisal Triggering Member or the non-Appraisal Triggering Member, as applicable, fails to provide the Appraisal Package to the other Member, the Fair Market Value as determined pursuant to the Appraisal Package of the performing Member shall be deemed to be the Fair Market Value.  In the event that each Member timely delivers an Appraisal Package and the Crystallization Percentage between the two Appraisal Packages is ten percent

12

(10%) or less, the Fair Market Value shall be deemed to be the average of the Fair Market Values of the two Appraisal Packages.

(b)      In the event that the Crystallization Percentage is greater than ten percent (10%) (a "*FMV Deadlock*"), then the Fair Market Value shall be determined in accordance with this <u>Section 5.2(b)</u>. Within ten (10) Business Days following the end of the Appraisal Period, each of the Appraisal Triggering Member and the non-Appraisal Triggering Member shall submit to the other Member the names of three (3) Appraisers (each an "*Independent Appraiser Submission*"). Within five (5) Business Days after each of the Appraisal Triggering Member and the non-Appraisal Triggering Member has made its Independent Appraiser Submission, the Appraisal Triggering Member and the non-Appraisal Triggering Member shall jointly choose an independent third party Appraiser from the Independent Appraiser Submissions who has no direct or indirect financial interest in any Member and is not controlled by a Member or an Affiliate of a Member (the "*Independent Appraiser*") (provided, the Independent Appraiser shall automatically be any Person that is listed as an Appraiser on both Members' Independent Appraiser Submission (using the Appraiser with the lowest alphabetical letter if there is more than one Appraiser in common)). If the Appraisal Triggering Member and the non-Appraisal Triggering Member are unable to agree on the selection of the Independent Appraiser within such five (5) Business Day period, each of the Appraisal Triggering Member and the non-Appraisal Triggering Member shall submit an additional three (3) Appraisers to the other Member (and shall continue to do so until the Appraisal Triggering Member and the non-Appraisal Triggering Member appoint the Independent Appraiser).  Within ten (10) Business Days after the appointments of the Independent Appraiser, each of the Appraisal Triggering Member and the non-Appraisal Triggering Member shall submit to the Independent Appraiser its Appraisals for all remaining Properties and the Fair Market Value based on all of its Appraisals, along with an explanation of such Member's methodology (including supporting data, calculations, assumptions and qualifications that were used by such Member in preparation of the Fair Market Value based on all of its Appraisals) (each, a "*FMV Submission*"). Within ten (10) Business Days after receipt of both FMV Submissions, the Independent Appraiser shall meet together with the appraisers who prepared the Appraisal Packages and provide them with an opportunity to support their work product.  Within five (5) Business Days thereafter, the Independent Appraiser shall choose the FMV Submission which sets forth the fair market value of all remaining Properties which is closest to the fair market value of all remaining Properties determined as of the Appraisal Date based on the Independent Appraiser's professional opinion and such choice shall establish the Fair Market Value of all remaining Properties.  The Independent Appraiser must select the Fair Market Value set forth in one of the FMV Submissions and may not select any other amount. The Independent Appraiser shall provide written notice to the Members regarding its decision (which notice is not required to set forth any details describing the basis or reasoning for its decision).  Each of (i) the Appraisal Triggering Member and (ii) the non-Appraisal Triggering Member, shall be responsible for one half of the fees and expenses of the Independent Appraiser.)

(c)      The determination of the Fair Market Value pursuant to Section 5.2(a) or Section 5.2(b), as applicable, shall be non-appealable, conclusive and binding upon the Appraisal Triggering Member and the non-Appraisal Triggering Member.

(d)     The Crystallization Amount shall be determined based on the non-appealable, conclusive and binding Fair Market Value. If the Crystallization Amount is zero (0), then promptly after the Fair Market Value becomes non-appealable, conclusive and binding, the Common Member shall transfer its interest in the Company to the Preferred Member and shall be removed as a Member of the Company. If the Crystallization Amount is more than zero (0) dollars, then within thirty (30) days after the Fair Market Value becomes non-appealable, conclusive and binding, at the Preferred Member's election in its sole discretion, the Preferred Member shall elect to (x) pay the Common Member the Crystallization Amount or (y) direct the Manager to use reasonable efforts to dissolve and wind up the Company in accordance with Article 8 within two (2) years following the Preferred Member's election.  If the Preferred Member elects to pay the Common Member in accordance with clause (x) of the immediately preceding sentence, the Preferred Member shall make payment within ninety (90) days after such election and, upon such payment, the Common Member shall transfer its interest in the Company to the Preferred Member and shall no longer be a Member of the Company.

5.3     Budget.  No later than November 1 of each Fiscal Year, the Company shall deliver to the Members an updated operating budget for the following Fiscal Year which shall be subject to the approval of the Majority-in-Interest of the Preferred Members.

5.4     Books and Records.  Maintain proper books of record and account, in which full, true and correct entries in conformity with an accepted accounting method is consistently applied. Common Member shall have the right to inspect the books and records during business hours, up to two times per calendar year, upon reasonable notice to Preferred Member

5.5     Auditors.  If the Company decides to appoint one or more auditors for the Company and its Subsidiaries, the Company shall only appoint auditors that are reputable and regularly engaged in the rendering of audit services for property owners that directly or indirectly own real properties located in New York City of a similar type as those directly or indirectly owned by the Company.

5.6     Further Assurances.  At any time and from time to time, each Member shall execute, acknowledge and deliver such further documents, agreements and instruments and take such further action as may reasonably be requested by any Preferred Member, in each case further and more perfectly to effect the purposes of this Agreement and the Recapitalization Agreement.

5.7     Smith Street Lien Settlement.  Until such time the Company incurs costs and expenses greater than $65,000, in the aggregate, in connection with the defense, contesting, negotiation or settlement of any claim or demand involving the Smith Street Lien (the "***Smith Street Expense Threshold***"), the Company shall not settle any such claim or demand without the prior written consent of the Class A Member (which consent shall not be unreasonably withheld, conditioned or delayed); provided, that from any after such time that the Smith Street Expense Threshold is achieved, the Company shall have the right (but not the obligation) to settle any such claim or demand without the prior written consent of the Class A Member and, provided further, that if (i) the Class A Member agrees in writing to bear the costs and expenses that exceed the Smith Street Expense Threshold, and (ii) pre-funds and maintains at all times a retainer to satisfy costs and expenses incurred in excess of such Smith Street Expense Threshold in amounts reasonably satisfactory to the Company and such counsel, then the consent of the Class A Member

14

(not to be unreasonably withheld, conditioned or delayed) shall still be required to settle any claim or demand involving the Smith Street Lien, subject to and in accordance with this Section 5.7.

## ARTICLE 6

## DISTRIBUTIONS

6.1    Distributions.

(a)    From and after the Restatement Date, all Distributions shall be made at such times and in such amounts as is determined by the Manager in its sole discretion.  All Distributions of the Company (including payments of Member Loans) shall be made in the following order of priority:

(i)    First, 100% to the Preferred Members pro rata based upon the number of Class B Units held until the Preferred Members have received cumulative distributions pursuant to this Section 6.1(a)(i) equal to $50 million (the "*Restatement Amount*");

(ii)    Second, 100% to Members who have made Member Loans, pro rata based on the outstanding principal balance of such Member Loans held by such Members until each such Member has received cumulative distributions pursuant to this Section 6.1(a)(ii) equal to the outstanding principal balance of such Member Loans;

(iii)    Third, 100% to the Members who have made Member Loans and the Preferred Members, pro rata based on each such Member's Return Sharing Percentage until each such Member has received cumulative distributions pursuant to this Section 6.1(a)(iii) equal to such Member's Return Amount;

(iv)    Fourth, 70% to the Common Members and 30% to the Preferred Members until the cumulative distributions pursuant to this Section 6.1(a)(iv) equal the sum of (A) $17 million and (B) reasonable Common Member out of pocket expenses arising from the negotiation and documentation of the Recapitalization Agreement and related agreements (including term sheets); provided, that such expenses are not to exceed $250,000;

(v)    Fifth, 50% to the Common Members and 50% to the Preferred Members until cumulative distributions pursuant to this Section 6.1(a)(v) equal $4 million; and

(vi)    Thereafter, 100% to the Preferred Members.

(b)    Distributions in respect of Units shall be made only to the Members who, according to the books and records of the Company, are the holders of record of the Units in respect of which such distributions are made on the actual date of distribution.  The amount of any non-cash distribution shall be determined by reference to the fair market value of the assets to be distributed as determined by the Manager, subject to the provisions of Section 4.2 and Major

15

Decision.  Any Distributions to a Class pursuant to this <u>Section 6.1</u> shall be divided among the Members of such Class pro rata based on the number of Units held by such Member of such Class.

(c)     For purposes of this <u>Section 6.1</u>, the Common Member shall be deemed to have received Distributions in an amount equal to the Class A Deemed Distributions as of the Restatement Date.

(d)     Notwithstanding anything to the contrary contained herein including <u>Section 6.1(a)(i)</u>, prior to applying any sales proceeds from the sale of the Smith Street Project pursuant to <u>Section 6.1</u>, such proceeds shall first be applied to satisfy any Member Loans made during the first six months subsequent to Closing, in each case, until the aggregate outstanding Member Loans is reduced to zero; provided, that the Manager (in its sole discretion) may apply any portion or all of such proceeds to satisfy any outstanding obligations of the Company.

6.2     <u>Withholding Taxes</u>.

(a)     Each Member will (A) provide the Company with a completed and duly executed tax identification forms IRS Form W-9 certifying each Members status as a "United States person" within the meaning of Section 7701(a)(30) of the Code, (B) provide such documentation prescribed by applicable law (including, without limitation, as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company as may be necessary for the Company to comply with its obligations under FATCA and (C) provide the Company with the completed and signed updated or renewal forms or other documentation promptly upon the obsolescence, inaccuracy or invalidity of any such forms previously provided.

(b)     To the extent the Manager or the Company is required by law (including under circumstances where the Manager or the Company is unable to rely conclusively on any withholding certification provided by a Member) to withhold or to make tax payments on behalf of or with respect to any Member or Members (including, but not limited to, (A) withholding taxes, (B) any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, and (C) any interest or penalties associated with the nonpayment or late payment of any of the foregoing taxes or amounts), the Manager or the Company may withhold such amounts and make such tax payments as so required.  If the Company directly or indirectly pays or incurs any withholding tax or other tax obligation (including, but not limited to, (A) withholding taxes, (B) any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, and (C) any interest or penalties associated with the nonpayment or late payment of any of the foregoing taxes or amounts) with respect to the income allocable or distributable to one or more Members, then the amount of such withholding tax or tax obligation will be treated as a distribution to such Member or Members, as applicable, pursuant to the terms of this Agreement.  Such amount will be debited against the Capital Account(s) of such Member or Members as of the close of the applicable period during which the Company directly or indirectly so withholds, pays or incurs such obligation. Each Member will, to the fullest extent permitted by applicable law, indemnify and hold harmless the Manager (or any affiliate thereof) and the Company against all claims, liabilities and expenses of whatever nature relating to such Manager's (or any affiliate thereof) or the Company's obligation to withhold and to pay over, or otherwise pay, any withholding or other

taxes payable by the Company or any of its Affiliates with respect to such Member or as a result of such Member's participation in the Company.

(c)     Except as otherwise provided for in this Agreement, any expenditures payable by the Company, to the extent determined by the Manager to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Members, will be specially allocated only to the Capital Accounts of those Members on whose behalf such payments are made or whose particular circumstances gave rise to such payments. Such allocations will be debited from the relevant Capital Accounts of such Members as of the close of the accounting period during which any such items were accrued by the Company.

## ARTICLE 7

## SENIOR LOANS

7.1     <u>Reserved</u>.

7.2     <u>Reserved</u>.

7.3     <u>Reserved</u>.

7.4     <u>Reserved</u>.

7.5     <u>Reserved</u>.

7.6     <u>Loan Guaranties and Indemnities</u>. No Preferred Members nor any or their Affiliates or any of the Company or any of its Subsidiaries (other than the borrower(s) under any refinancing) shall be obligated to provide any guarantees or indemnities in connection with any Senior Loan. Notwithstanding the foregoing, in the event that a Preferred Member or any of its Affiliates provides any guarantees or indemnities in connection with any Senior Loan, the Company shall indemnify, defend and hold such Preferred Member and its Affiliates harmless from and against all liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including attorneys' and other professional fees, whether or not suit is brought and settlement costs) and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Preferred Member and its Affiliates based in whole or in part upon any fact, event, condition, or circumstances relating to such guaranty or indemnity.

7.7     <u>Acquisition of Senior Loan</u>. Any of the Preferred Members or any affiliate or designee of any Preferred Member (collectively, the "***Preferred Member Parties***") may negotiate to obtain and/or obtain the right at any time to acquire all or any portion of any Senior Loan or any interest in any holder of, or participant in, the Senior Loan without notice or consent of the Company, the Class A Members, any Subsidiary, and, if any Preferred Member Party effects such an acquisition, such Preferred Member Party may have and may exercise all rights of the Senior Lender thereunder (to the extent of their interest), including the right, in accordance with the terms thereof, (i) to declare that a default or event of default has occurred under the Senior Loan

17

Document, (ii) to accelerate the Senior Loan indebtedness and (iii) to pursue all remedies against any obligor under the Loan Documents.

## ARTICLE 8

## DISSOLUTION AND TERMINATION

8.1     Dissolution of Company.  The Company shall be dissolved and its affairs shall be wound up upon a determination by the Manager and the Preferred Members to wind up and dissolve the Company at any time, provided that if the Preferred Member does not elect to pay the Crystallization Amount to the Common Member in accordance with Section 5.2(d)(x), the Manager shall use reasonable efforts to dispose of all remaining Properties and dissolve and wind up the Company prior to the 2nd anniversary of such Preferred Member election.  The death, termination, retirement, dissolution, resignation, expulsion or Bankruptcy Action of any Member shall not, in and of itself, cause the dissolution of the Company, and following any such event the remaining Members shall continue the business of the Company.  The Company shall not be dissolved as result of there no longer being any Members if the Company is continued in accordance with Section 18-801(a)(4) of the Act.  The Members (in their capacity as such) hereby waive any rights to, and shall not petition for, judicial winding up or dissolution of the Company under Section 18-802 of the Act and any rights to petition or apply for the appointment of a liquidator, receiver or trustee under the Act or otherwise.

8.2     Winding Up.

(a)     Upon dissolution, the Company shall be liquidated in an orderly manner. The Manager shall act (or it may appoint one or more representatives, officers, or other Persons to act) as a liquidating trustee (in such capacity referred to herein as "liquidators") to wind up the affairs of the Company pursuant to this Agreement and terminate the Company, and the Manager (or its appointed representatives, officers, or other Persons) shall have the full right and discretion to manage such process, including, without limitation, the power to prosecute and defend suits, collect debts, dispose of property, settle and close the business of the Company, discharge the liabilities of the Company in accordance with the requirements of the Act, pay reasonable costs and expenses incurred in the winding up, distribute remaining assets to Members (in accordance with this Section 8.2), and execute and file a certificate of cancellation under the Act.  The costs of liquidation shall be borne by the Company.  Prior to final distribution and termination, the liquidators shall continue to operate the Company and its assets with all of the power and authority of the Manager.  The steps to be accomplished by the liquidators are as follows: (i) the liquidators shall cause the Company to pay, satisfy and discharge all debts, obligations, and other liabilities of the Company to its creditors (including, without limitation, all sales commissions or other expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, establishing cash reserves to be held in escrow for contingent or unforeseen liabilities of the Company, in such amounts and for such holding periods as the liquidators may reasonably determine), to the extent the Company has assets sufficient for such purposes; (ii) after payment or provision for payment of all of the Company's liabilities has been made in accordance with clause (i) the liquidator may sell any or all of the Company property; and (iii) the Company property shall be distributed to the Members in accordance with Section 8.2(b);

18

(b)      The Company shall make Distributions in the event of any liquidation, dissolution and winding up of the Company to the Members in accordance with Article 6.

(c)      In making such distributions, the liquidators shall distribute each type of liquidation asset (i.e., cash or cash equivalents, stock, preferred stock, etc.) among the Members ratably based upon the aggregate amounts to be distributed to each Member.

(d)      The distribution of cash and/or property to a Member in accordance with the provisions of this Section 8.2 constitutes a complete return to such Member of its Capital Contribution and a complete distribution to the Member of its interest in the Company and the Company's property.   This paragraph constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act.

(e)      Upon completion of the distribution of the Company's assets as provided herein, and the Manager (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled and take all such other actions as may be necessary to terminate the Company, and the Company shall be terminated as of the effectiveness of such filings (and the Company shall not be terminated prior to such time).   The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 8.2(e).

(f)      A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to this Section 8.2 in order to minimize any losses otherwise attendant upon such winding up; provided that liquidating distributions shall be made by the end of the taxable year in which the liquidation occurs (or, if later, 90 days after liquidation).

(g)      The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to any Member (it being understood that any such return shall be made solely from Company assets to the extent assets are available for such purpose).

(h)      In the event that immediately prior to its dissolution the Company holds stock or other equity interests in any direct Subsidiary of the Company with over 50% of the then outstanding ordinary voting power to elect members of such Subsidiary's board of directors or general partner, the Company will cause such Subsidiary, prior to and in contemplation of such dissolution and the distribution to Members of the stock or equity interests of such Subsidiary, to offer to enter into an agreement with the holders of Units granting to such holders directly the same rights, subject to substantially the same obligations, with respect to such Subsidiary as they shall possess indirectly, through the Company, immediately prior to such dissolution.   Such governance rights with respect to such Subsidiary shall be allocated to the Manager consistent with the governance rights of the Manager contained in this Agreement.   All Members hereby agree to (i) accept such offer and enter into such agreement with such Subsidiary, and (ii) enter into a stockholders or similar agreement with respect to the stock or equity interests of such Subsidiary to be distributed in such dissolution, in which they agree (A) to vote such stock or equity interests as provided in this Agreement (but with such Subsidiary's board of directors or manager substituted for the Manager), and (B) to the same restrictions on Transfer of such Subsidiary's

19

stock or equity interests distributed in connection with such dissolution as apply immediately prior to such dissolution to a Transfer of the Class in respect of which such stock or equity interest is to be distributed.

# ARTICLE 9

# BOOKS OF ACCOUNT

9.1     <u>Records and Accounting</u>.  The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business.  All matters concerning (i) the determination of the relative amount of allocations and Distributions among the Members as set forth under this Agreement, and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Manager, whose determination shall be final and conclusive as to all of the Members absent manifest clerical error.

9.2     <u>Bank Accounts</u>.  The Company may establish accounts for the deposit of Company funds, in such types and at such institutions, as shall be determined from time to time by the Manager.

9.3     <u>Fiscal Year</u>.  The Fiscal Year of the Company shall be the twelve-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Manager.

9.4     <u>Tax Information</u>.  The Company shall deliver or cause to be delivered, as soon as available, and in any event before August 15 of each year, to each Person who was a Member at any time during the previous year, all information reasonably necessary for the preparation of such Person's United States federal income tax returns and any state, local and foreign income tax returns which such Person is required to file as a result of the Company being engaged in a trade or business within such state, local or foreign jurisdiction, including a statement showing such Person's share of income, gains, losses, deductions and credits for such year for United States federal income tax purposes (and, if applicable, state, local or foreign income tax purposes).

9.5     <u>Tax Elections</u>.  The Manager may cause the Company to make all elections for federal income and all other tax purposes (including, without limitation, pursuant to Section 754 of the Code).

9.6     <u>Company Representative</u>.

(a)     The Manager shall serve as the "partnership representative" for purposes of Section 6223 of the Code (as amended by the Bipartisan Budget Act of 2015 (Pub. L. 114-74) (the "**BBA**") (such designation, the "**Company Representative**").  If the Company Representative is an entity, the Manager shall have the exclusive authority to appoint and designate the individual through whom such Company Representative will act for all purposes under subchapter C of chapter 63 of the Code and, if applicable, any similar state, local or non-U.S. law (the "**Designated Individual**"). The Company Representative and the Designated Individual shall have any powers necessary to perform fully in such capacity, and shall be permitted to take any and all actions, to

20

the extent permitted by law, in consultation with the Manager. The Manager shall have the exclusive authority to appoint and designate an Affiliate of the Manager as a successor Company Representative. The Company Representative and/or the Designated Individual shall be reimbursed by the Company for all costs and expenses incurred by it, and to be indemnified by the Company with respect to any action brought against it, in its capacity as the Company Representative or Designated Individual, as applicable.

(b)     The Members agree that any and all actions taken by the Company Representative and/or the Designated Individual will be binding on the Company and the Members and the Members will reasonably cooperate with the Company or the Manager, and undertake any action reasonably requested by the Company or the Manager, in connection with any elections made by the Company Representative and/or the Designated Individual or as determined to be reasonably necessary by the Company Representative and/or the Designated Individual.

(c)     The Members further agree not to (i) treat any Company item inconsistently on its U.S. Federal, state, local and/or non-U.S. tax returns or in any claim for a refund with the treatment of the item on the Company's tax returns or (ii) independently act with respect to tax audits or tax litigation affecting the Company, unless the prior written consent of the Manager has been obtained.

(d)     To the fullest extent permitted by law, each Member agrees to (i) provide such cooperation and assistance, including executing and filing forms or other statements and providing information about each Member, as is reasonably requested by the Company Representative and/or the Designated Individual, to enable the Company to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Member was admitted to the Company, (ii) amend the Member's tax returns and pay any resulting taxes, interest and penalties in connection with the Company's electing under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from the Company's electing under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Company from and against any liability with respect to the Member's share of any tax deficiency (including any interest and penalties associated therewith) paid or payable by the Company that is (a) allocable to such Member (as reasonably determined by the Manager in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Member was a Member of the Company or (b) attributable (as reasonably determined by the Manager) to the failure of such Member to cooperate with or provide any such forms, statements, or other information as requested by the Company Representative and/or the Designated Individual pursuant to clause (i) above.  For the avoidance of doubt, this Section 9.6(d), along with Sections 9.6(b) and 9.6(c), will survive the Transfer or withdrawal by any Member of the whole or any portion of its Interest, the death or legal disability of any Member and the dissolution or termination of the Company.

(e)     <u>Income Tax Return</u>. Income tax returns of the Company shall be prepared by such certified public accountant(s) as the Manager shall retain at the expense of the Company.

## ARTICLE 10

## POWER OF ATTORNEY

Each of the undersigned Members does hereby constitute and appoint the Manager and liquidator (if appointed pursuant to <u>Section 8.2</u>) with all power to act (subject to the provisions of <u>Article 4</u> hereof), as such Member's true and lawful representative and attorney-in-fact, in such Member's name, place and stead, to make, execute, sign, acknowledge and deliver or file in such form and substance as is approved by the Manager (a) all instruments, documents and certificates that may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Company, or to qualify or continue the qualification of the Company in the State of Delaware and in all jurisdictions in which the Company may conduct business or own property, and any amendment to, modification to, restatement of or cancellation of any such instrument, document or certificate; (b) all instruments that the Manager deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement adopted in accordance with its terms; (c) all conveyances and other agreements, instruments or documents which the Manager deems appropriate or necessary to reflect or implement provisions of, and matters contemplated by, this Agreement, including the dissolution and liquidation of the Company pursuant to the terms of this Agreement, including a certificate of cancellation; and (d) all instruments relating to the admission, withdrawal or substitution of any Member pursuant to the terms of this Agreement.  The powers of attorney granted herein shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive the death, disability, incompetency, bankruptcy, insolvency or termination of any Member and the Transfer of all or any portion of such Member's limited liability company interest, and shall extend to such Member's heirs, successors, assigns, and personal representatives.

## ARTICLE 11

## TRANSFERS

11.1    <u>Dispositions of Preferred Units</u>.  Except for Permitted Transfers, the Preferred Members shall not, without the consent of the Majority-in-Interest of the Common Members (which consent shall not be unreasonably withheld, conditioned or delayed), directly or indirectly at any tier of direct or indirect legal or beneficial ownership, make or permit an assignment, transfer, or other disposition (voluntarily, involuntarily or by operation of law) ("***Transfer***") of all or any portion of its beneficial interest in the Preferred Units.  Any attempted Transfer of all or any portion of the Preferred Units, other than in strict accordance with this <u>Section 11.1</u>, shall be void. No Person who is the recipient of a Transfer of Preferred Units may be admitted as a Member except as provided in <u>Section 11.2</u> below.

11.2    <u>Permitted Transfers</u>.  Each of the following shall constitute a "***Permitted Transfer***" so long as the terms and conditions of this <u>Section 11.2</u> are satisfied in respect of any such Transfer or Encumbrance:

(a)    Transfer by any Preferred Member to an Affiliate of such Preferred Member; <u>provided</u>, that following such Transfer, the Katz Family and the Katz Family's Affiliates

22

retain Control (subject to the approval rights of the Common Members set forth in Section 4.2) of the Company;

(b)    Transfer by a Preferred Member to an existing investor or a new investor in such Preferred Member or its Affiliates; provided, that following such Transfer, the Katz Family and the Katz Family's Affiliates retain Control (subject to the approval rights of the Common Members set forth in Section 4.2) of the Company; and

(c)    Transfer by the Preferred Members to any third party; provided, that following such Transfer, the Katz Family and its Affiliates retain Control (subject to the approval rights of the Common Members set forth in Section 4.2) of the Company and hold at least 51% of the Preferred Units beneficially held by the Katz Family as of the Restatement Date (determined based on right to participate in economics rather than based upon legal title).

(d)    The Preferred Members shall bear any and all costs associated with such Transfer permitted under this Section 11.2.  The Company and the Class A Members each agree to cooperate with any such Permitted Transfer, including the restructuring of this Agreement and other appropriate documents to facilitate the same.

11.3    Dispositions of Common Units.

(a)    No Common Member may Transfer nor pledge, mortgage, hypothecate, grant a security interest in, or otherwise encumber (an "*Encumbrance*") all or any portion of its Common Units unless (i) the Company receives 5 days prior written notice of such Transfer, (ii) such Transfer is made on the books of the Company and is not in violation of the provisions of this Article 11, (iii) the transferee of such Common Units agrees to become a party to this Agreement pursuant to Section 11.4 and executes such further documents as may be necessary, in the reasonable judgment of the Company, to make such transferee, including, to the extent such transferee is a resident in a community property jurisdiction, a consent of spouse, duly authorized, executed and delivered by such transferee's spouse, if any. Any attempted Transfer of, or granting of an Encumbrance on, all or any portion of the Common Units, other than in strict accordance with this Section 11.3, shall be void.  No Person who is the recipient of a Transfer of Common Units may be admitted as a Member except as provided in Section 11.4 below.

(b)    Notwithstanding the foregoing, the Common Members shall not be permitted to Transfer or grant an Encumbrance on any Common Units if such Transfer would constitute a breach under any Senior Loan Document.

(c)    The Common Members shall bear any and all costs associated with such Transfer permitted under this Section 11.3.  The Company and the Class B Members each agree to cooperate with any such Transfer, including the restructuring of this Agreement and other appropriate documents to facilitate the same.

11.4    Admission of Transferee.  No direct transferee of all or any portion of any Units shall be admitted as a Member unless (i) such Units are transferred in compliance with the applicable provisions of this Agreement, (ii) in the event of a Transfer of Preferred Units, such transferee shall have furnished evidence that the direct Transfer of the Preferred Units to such

23

transferee constitutes a Permitted Transfer, and (iii) such transferee shall have executed and delivered to the Company a binding instrument confirming the agreement of such transferee to be bound by all of the terms and provisions of this Agreement with respect to the Units transferred to it.

## ARTICLE 12

## COMMON MEMBER REDEMPTION OF PREFERRED UNITS

At any time on or before the first anniversary of the Restatement Date, the Majority-in-Interest of the Common Members may redeem (a "*Redemption*") all, but not less than all of the outstanding Preferred Units for an amount in cash equal to the Redemption Price, calculated through and including the date of Redemption.  Any Redemption pursuant to this Article 12 shall be effected by providing the Preferred Members not less than fifteen (15) and not more than sixty (60) days' irrevocable prior written notice (or such shorter time period expressly approved by the Majority-in-Interest of the Preferred Members) that the Common Members elect to make such redemption (the "*Redemption Notice*").  Such Redemption Notice shall be irrevocable and shall provide an acknowledgement and reaffirmation of the Common Member's payment obligations set forth in the immediately following sentence. In connection with any Redemption, the Common Members will pay the Preferred Members, in cash, (a) the Redemption Price; plus (b) all costs and expenses (including reasonable attorney's fees and disbursements) incurred by or on behalf of the Preferred Members in connection with the Redemption (including the evaluation, negotiation, diligence, documentation and/or consummation thereof); provided, that, in the case of attorney's fees incurred for the documentation of the Redemption, so long as no claim (including cross claim, counterclaim, right of setoff and recoupment), dispute, demand, action, suit, or other controversy arises after the date hereof in connection with or relating to this Agreement involving the Common Member and the Preferred Member, the Common Member shall be responsible for paying an amount up to $200,000; plus (c) all Recapitalization Transaction Expenses.  Amounts required to be paid pursuant to the immediately preceding sentence shall be paid on the earlier of (i) the closing of the Redemption, or (ii) within thirty (30) days after the Preferred Member's delivery to the Common Member of any invoice.

## ARTICLE 13

## MISCELLANEOUS

13.1    Further Assurances.    Each Member hereby agrees that, promptly upon the reasonable request of any other Member, it will do, execute, acknowledge, deliver, record, file and register any and all such further acts, agreements, notices, certificates, assurances and other instruments as any other Member may reasonably require from time to time in order to carry out more effectively the purposes of this Agreement.  The Common Member and Initial Manager will (a) exercise bona fide and diligent efforts to locate and provide books and records of the Company and its Subsidiaries (including financial and tax records) as the Preferred Member or the Manager may request from time to time relating to events that occurred during the period prior to the Restatement Date, including using diligent and bona fide efforts to obtain such books and records from the Common Member's direct and indirect equityholders, any former manager of the Company or any of its Subsidiaries or any former property managers of the Properties; (b)

24

cooperate with the Preferred Member or the Manager from time to time in connection with any matters arising out of the Recapitalization Agreement (including to amend or modify any limited liability company agreements or other agreements or to obtain any consents, approvals, waivers or ratifications) that involve (i) financings or loans to any Holding Company or Project Company or (ii) any direct or indirect equity holder of any Holding Company or Project Company; and (c) cooperate with the Preferred Member or the Manager from time to time in order to facilitate the ownership, development, maintenance, operations, improvement and/or sale of the AY Properties.

13.2    Entire Agreement; Amendments.  This Agreement and the documents expressly referred to herein embody the complete agreement and understanding among the applicable parties hereto and thereto and terminate, supersede and preempt any prior understandings, agreements or representations by or among such parties, written or oral, which may have related to the subject matter hereof in any way.  Subject to any modification, waiver or amendment that would constitute a Major Decision, this Agreement and any provisions hereof may be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of any Member upon consent of a Majority-in-Interest of the Preferred Members.

13.3    Notices and Addresses.  All notices required to be given under this Agreement shall be in writing and may be delivered by certified or registered mail, postage prepaid, by hand, by electronic mail or by any nationally recognized private courier.  Such notices shall be mailed or delivered to the Members at the addresses set forth after the signature of such Members or such other address as a Member may notify the other Members of in writing.  Any notices to be sent to the Company shall be delivered to the principal place of business of the Company or at such other address as the Member may specify in a notice sent to all of the Members.  Notices shall be effective: (a) if mailed, on the date three calendar days after the date of mailing, (b) if hand delivered or delivered by private courier, on the date of delivery or (c) if transmitted by electronic mail, on the date of transmission; provided, that any notices transmitted by electronic mail shall also be delivered by certified or registered mail.

13.4    Governing Law.  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  In furtherance of the foregoing, the internal law of the State of Delaware shall control the interpretation and construction of this Agreement (and all schedules and exhibits hereto), even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

13.5    WAIVER OF JURY TRIAL.  EACH PARTY TO THIS AGREEMENT HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR ANY ANCILLARY AGREEMENT OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF.

13.6 <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Members, their successors and assignees and their respective legal representatives and successors.

13.7 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission or electronic mail transmission (e.g., in .PDF format) will constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or electronic mail (e.g., in .PDF format) will be deemed to be their original signatures for any purpose whatsoever.

13.8 <u>Captions</u>. The Section headings have been inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement. Wherever the context so requires, pronouns in the masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. The use of the words "or," "either" and "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

13.9 <u>Statutory References</u>. Each reference in this Agreement to a particular statute or regulation, or a provision thereof, shall be deemed to refer to such statute or regulation, or provision thereof, or to any similar or superseding statute or regulation, or provision thereof, as is from time to time in effect.

13.10 <u>Preferences</u>. Subject to the terms and conditions of this Agreement, each Preferred Member shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by the Company to any portion of the obligations of the Company hereunder. To the extent the Company makes a payment or payments to any Preferred Member, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by such Preferred Member.

13.11 <u>Waiver</u>. The waiver by any party to this Agreement (each a "***Party***" and collectively the "***Parties***") of the breach of any term, covenant, agreement or condition herein contained shall not be deemed a waiver of any subsequent breach of the same or any other term, covenant, agreement or condition herein, nor shall any custom, practice or course of dealings arising among the Parties in the administration hereof be construed as a waiver or diminution of

26

the right of any Party to insist upon the strict performance by any other Party of the terms, covenants, agreements and conditions herein contained.

13.12   Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, and such invalidity or unenforceability does not destroy the basis of the bargain between the parties, then the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

13.13   Ownership of Assets.  The Company's assets will be deemed to be owned by the Company as an entity, and no Member or Manager, individually or collectively, will have any ownership interest in any Company asset or any portion thereof.

13.14   Limitation of Liability.  No claim may be made by any Class A Member or any other Person against any Preferred Member or the affiliates, directors, officers, employees, attorneys of any of them for any special, consequential, treble or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Class A Members hereby waive, release and agree not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

13.15   Remedies of Company and Class A Members.  In the event that a claim or adjudication is made that Preferred Members or any of their respective agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement, any Preferred Member or such agent, as the case may be, has an obligation to act reasonably or promptly, the Company and Class A Members agree that no Preferred Member nor any of their respective agents shall be liable for any monetary damages, and the Company's and Class A Members' sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether any Preferred Member has acted reasonably shall be determined by an action seeking declaratory judgment.

13.16   Remedies.  Each Member shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any applicable law. Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

13.17   Specific Performance.  In the event of any breach by any Party of the terms of this Agreement that would cause any nonbreaching Party to be irreparably harmed or for which such nonbreaching Party could not be made whole by monetary damages, then in either such

27

circumstances such nonbreaching Party, in addition to any other remedy to which it may be entitled at law or in equity, shall be entitled to compel specific performance of this Agreement.

13.18   Survival.  Section 4.5, Section 4.6, Section 8.2, and this Article 13 shall survive and continue in full force in accordance with their terms notwithstanding any termination of this Agreement or the dissolution of the Company.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**MANAGER:**                                    **DFA PROP MANAGER, LLC**
                                                a New York limited liability company


                                                By:_____
                                                Name: Gary Katz
                                                Title: Authorized Signatory

                                                Address for Notices:

                                                Downtown Capital Partners LLC
                                                360 Hamilton Ave., Suite 1110
                                                White Plains, NY 10601
                                                Attention: Gary Katz
                                                Fax: 646-349-3289
                                                Email: gkatz@downtownlp.com

                                                with a copy to:

                                                Akin Gump Strauss Hauer & Feld LLP
                                                1999 Avenue of the Stars, Suite 1600
                                                Los Angeles, CA 90067-6022
                                                Attention: Frank Reddick
                                                Fax: (310) 229-1001
                                                Email: freddick@akingump.com

**CLASS A MEMBER:**                    **ALL YEAR HOLDINGS COMMON LLC,**
a New York limited liability company

By:_____
Name:
Title:


Address for Notices:

All Year Holdings Limited
12 Spencer Street
3rd Floor
Brooklyn, New York 11205
Attn: Asaf Ravid, Ephraim Diamond
Email:  ravidasaf@gmail.com
         ephraim@arbelcapital.com


With a copy to:

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn.:   David Herman
David.Herman@Weil.com


Signature Page to
Second Amended and Restated Limited Liability Company Agreement of
All Year Equity Partners LLC

**CLASS B MEMBER:**

**DCP ALL YEAR PREF EQUITY LLC,**
a Delaware limited liability company


By:_____
Name: Gary Katz
Title: Authorized Signatory

Address for Notices:

Downtown Capital Partners LLC
360 Hamilton Ave., Suite 1110
White Plains, NY 10601
Attention: Gary Katz
Fax: 646-349-3289
Email: gkatz@downtownlp.com

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
1999 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067-6022
Attention: Frank Reddick
Fax: (310) 229-1001
Email: freddick@akingump.com

**COMPANY:**                                **ALL YEAR EQUITY PARTNERS LLC**
a Delaware limited liability company

By:    DFA Prop Manager, LLC,
a New York limited liability company,
its Manager

By:_____
Name: Gary Katz
Title: Authorized Signatory


Address for Notices:

Downtown Capital Partners, LLC
360 Hamilton Ave., Suite 1110
White Plains, NY 10601
Attention: Gary Katz
Email: gkatz@downtownlp.com

With a copy to:

Akin Gump Strauss Hauer & Feld, LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA  90067-6022
Attention: C.N. Franklin Reddick III
E-mail: freddick@akingump.com

# Appendix A

## Definitions

"A&R LLCA" has the meaning set forth in the recitals of the Agreement.

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. §§ 18 101, *et seq.*, and any successor statute, as it may be amended from time to time.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  Notwithstanding the foregoing, under no circumstance shall any Class B Member or any Affiliate thereof be deemed to be an Affiliate of any of the Transaction Parties.

"Agreement" means that certain Second Amended and Restated Limited Liability Company Agreement of the Company dated as of the Restatement Date, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"All Year BVI" means All Year Holdings Limited, a company organized in the Territory of the British Virgin Islands.

"All Year Holdings" means All Year Holdings LLC, a New York limited liability company.

"Appraiser" shall mean a duly licensed MAI appraiser having at least fifteen (15) years' experience appraising properties similar to the Properties in the locations where the Properties are located.

"Asset Management Fee" has the meaning set forth in Section 2.7 of the Agreement.

"AY Property" means the Properties set forth on Schedule III to the Agreement.

"Bankruptcy Action" means with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, assignee, sequestrator (or similar official), liquidator, or examiner for such Person or any portion of any Property; (e) the filing of a petition against a Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any other applicable law; (f) under the provisions

of any other law for the relief or aid of debtors, an action taken by any court of competent jurisdiction that allows such court to assume custody or Control of a Person or of the whole or any substantial part of its property or assets; (g) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; or (h) to take action in furtherance of any of the foregoing.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereinafter in effect, or any successor statute.

"BBA" has the meaning set forth in Section 9.6 of the Agreement

"Business Day" means any day other than (i) a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York and (ii) the following Jewish holidays: Passover (including intermediate days), Sukkot, Shemini Atzeret (including intermediate days), Shavuot, Purim, Tisha B'Av, Rosh Hashana, and Yom Kippur.

"BVI Bondholders" means the holders of those certain Series B, C, D, and E Bonds issued by All Year BVI.

"Capital Account" has the meaning set forth in Appendix B of the Agreement.

"Capital Contribution" means, in the case of a Member, any cash or other property contributed from time to time to the capital of the Company by such Member in accordance with the Agreement.

"Cash Equivalents" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) and (d) above shall not exceed 365 days.

Appendix A-2

"Certificate of Formation" has the meaning set forth in the recitals of the Agreement.

"Class" has the meaning set forth in Section 2.1 of the Agreement.

"Class A Deemed Distributions" means, as of any date, (a) $1,750,000, plus (b) an amount, if any, by which the aggregate amounts actually paid by the Company or any of its Subsidiaries in respect of "Construction Payable" line item of accounts payable for the Property located at 169 Graham Avenue, Brooklyn, New York (i.e., based on aggregate construction costs of such Property), exceeds $952,068, plus (c) an amount, if any, by which the Company or any Subsidiary has made any distribution to any co-investor or joint venture partner in any of the Company's Subsidiaries, to off-set any partnership advances directly or indirectly paid to any other Person, other than to any Affiliates of the Class B Member, prior to the date hereof (including All Year BVI, Yoel Goldman or any Subsidiary or Affiliate of any of them), minus (d) any real estate tax credit received by the Company (or its Subsidiaries) after the date hereof in respect of real estate taxes paid prior to the date hereof pursuant to the 421a and Industrial and Commercial Abatement Programs, plus (e) an amount, if any, by which all Recapitalization Transaction Expenses exceed $1,350,000, minus (f) any amounts received by Franklin AY LLC from 608 Franklin LLC as payment of the Franklin Intercompany Note, solely to the extent that such amounts would otherwise have been distributable to the Franklin Minority Partners if such amounts were not paid on account of the Franklin Intercompany Note; provided that the prior written consent of the Class A Member shall be required before any portion of the principal or non-default interest under the Franklin Intercompany Note may be compromised by the Company. In no event shall the Class A Deemed Distributions be less than zero, plus (g) any amounts paid in connection with the termination and/or release of any Smith Street Lien.

"Class A Member" means All Year Holdings Common LLC, a New York limited liability company, and any subsequent Member who holds Class A Units.

"Class A Unit" has the meaning set forth in Section 2.1 of the Agreement.

"Class B Members" means Initial Class B Member and any subsequent Member who holds Class B Units.

"Class B Unit" has the meaning set forth in Section 2.1 of the Agreement.

"Closing" means the closing of the purchase and sale of Class B Units on the Closing Date.

"Closing Date" means December 5, 2018.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Member" means a Member who holds Common Units.

"Common Units" means Class A Units that are not Preferred Units.

"Company" has the meaning set forth in the preamble to the Agreement.

Appendix A-3

"Company Expenses" has the meaning set forth in Section 2.6 of the Agreement.

"Company Representative" has the meaning set forth in Section 9.6 of the Agreement.

"Control" (including the correlative meanings, the terms, "controlling", "controlled by" and "under common control with") of any specified Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"Core Business" means acquiring, holding, developing, and/or construction of Projects.

"Crystallization Amount" means an amount equal to the portion of the Fair Market Value that the Common Member would have received under a hypothetical Distribution from the Company in accordance with the provisions of Section 6.1, based on the assumptions that (a) all of the remaining Properties were sold ninety (90) days after the Appraisal Date at Fair Market Value, (b) all distributable proceeds of such sales (along with other assets of the Company and its Subsidiaries) were distributed through all Subsidiaries to the Company, and (c) the Distribution will be made by the Company ninety (90) days after the Appraisal Date.

"Crystallization Percentage" means the percentage derived from the product of (a) 100, multiplied by (b) the number obtained by subtracting (i) the quotient of (A) the Fair Market Value as determined by the Appraisal Triggering Member or the non-Appraisal Triggering Member based on the applicable Appraisals (whichever is higher), divided by (B) the Fair Market Value as determined by the Appraisal Triggering Member or the non-Appraisal Triggering Member based on the applicable Appraisals (whichever is lower), by (ii) 1.  For example, if the higher Fair Market Value is $120 million and the lower Fair Market Value is $105 million, the Crystallization Percentage is equal to 100 x (120 million/105 million - 1) = 14.286%.

"Designated Individual" has the meaning set forth in Section 9.6 of the Agreement.

"Distribution" means, after the payment of costs and expenses and the establishment by the Manager of reasonable reserves for future Company Expenses, costs, obligations and liabilities, each distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, dividend or otherwise; provided that a Distribution shall not include any recapitalization or exchange of securities of the Company, any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units.

"Early Release Properties" means the following AY Properties (i) 141 Spencer Street, Brooklyn, New York, (ii) 234-236 North 11th Street Brooklyn, New York, (iii) 1000 Broadway, Brooklyn, New York, (iv) 169 Graham Avenue, Brooklyn, New York, and (v) 188 S. 3rd Street, Brooklyn, New York.

"Encumbrance" has the meaning specified in Section 11.1 of the Agreement.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants or options for the

Appendix A-4

purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, membership or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Fair Market Value" means the fair market value of all the remaining Properties as determined as of the Appraisal Date; provided, that for the purpose calculating the Fair Market Value, the following shall be deducted: (a) customary and reasonable transaction expenses which would be incurred if the Properties were sold in an arm's length transaction, including transfer taxes, sales taxes, prepayment penalties, defeasance fees, and brokerage commissions, and (b) all liabilities of the Company and its Subsidiaries, as reasonably determined by Preferred Member in consultation with Common Member.

"FATCA" means Sections 1471 through 1474 of the Code, as amended, and any Regulations thereunder or official interpretations or other official guidance thereof, including any successor Regulations or interpretations, and any intergovernmental agreement and any regulations with respect thereto or official interpretations or other official guidance thereof implementing the foregoing.

"Fiscal Quarter" means each of the calendar quarters during any Fiscal Year, except that the first Fiscal Quarter following the Closing Date shall commence on the Closing Date and end on December, 31, 2018 and the last Fiscal Quarter during the term of this Agreement shall begin on the first day following the end of the immediately preceding Fiscal Quarter and end on the date of termination.

"Fiscal Year" means any period of twelve (12) consecutive months ending on December 31st of any calendar year, except that the first Fiscal Year following the Closing Date shall commence on the Closing Date and end on December 31, 2018.

"Franklin Intercompany Note" means that certain Promissory Note, dated as of August 30, 2018, with an initial principal sum of $3,300,000, by 608 Franklin LLC, as borrower, in favor of Franklin AY LLC, as lender.

"Franklin Minority Partners" means Franklin BM LLC, The Gross Family Trust, Alex Engelman and Abe Lipshitz.

"Goldman" means Yoel Goldman, an individual.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

Appendix A-5

"HoldCo Companies" means the entities identified as a HoldCo Company under the column titled "Entity Designation" on Schedule V attached hereto.

"Immediate Family" means, as of any time, with respect to an individual, the current spouse or registered domestic partner of such individual, any parent, sibling, current spouse or registered domestic partner of a sibling, lineal descendant of such a Person or the current spouse or registered domestic partner of any such lineal descendant.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with an accepted accounting method consistently applied:

(i)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(i)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(ii)    net obligations of such Person under any rate protection agreement;

(iii)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(iv)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(v)    the aggregate amount of all capital lease obligations of such Person which, in accordance with an accepted accounting method consistently applied, is required to be shown on the balance sheet of such Person;

(vi)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends or distributions; and

(vii)    all guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any rate

protection agreement on any date shall be deemed to be the swap termination value thereof determined at "mid-market" as of such date. Indebtedness shall not include any trade account payables arising from the acquisition of goods, supplies or merchandise, paid within 60 days of the incurrence of such trade account payables, each in the ordinary course of such Person's business.

"Indemnified Person" has the meaning set forth in Section 4.6 of the Agreement.

"Initial Class B Member" means DCP All Year Pref Equity LLC, a Delaware limited liability company.

"Initial Manager" means All Year Holdings LLC, a New York limited liability company.

"Investment" means, with respect to any Person, all direct or indirect investments by that Person in other Persons (including Affiliates) in the forms of loans (including guarantees or other obligations), advances, extensions of credit or capital contributions, purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with an accepted accounting method consistently applied. The acquisition by the Company or any Subsidiary of a Person that holds an Investment in any third Person shall be deemed to be an Investment by the Company or its Subsidiary, as applicable, in that third Person in an amount equal to the fair market value of the Investment held by the acquired Person in that third Person.

"Katz Family" means Gary Katz and the Immediate Family of Gary Katz or any trust or estate planning vehicle established for the benefit Gary Katz or any Immediate Family of Gary Katz.

"Laws" means, collectively, each international, foreign, Federal, state, provincial, territorial, municipal and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directive, decree, policies, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law..

"Lien" means any recorded or unrecorded, express or implied, written or oral mortgage, pledge, deed of trust, hypothecation, assignment, deposit arrangement, encumbrance, Preemptive Purchase or Lease Right, lien (statutory or other), charge, preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, capital lease obligations, synthetic lease obligations or other title retention agreement, any covenant, condition, restriction, lease, easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"<u>Loan Commitment Amount</u>" means, as of any date of determination, an amount equal to (a) $1,500,000, *minus* (b) any amount paid after the Restatement Date to the BVI Bondholders in satisfaction of any claims or obligations in respect of the unsecured claims of the BVI Bondholders.

"<u>Major Decision</u>" has the meaning set forth in <u>Section 4.2</u> of the Agreement.

"<u>Majority-in-Interest of the Class B Members</u>" means, as of the date of determination, the Class B Members holding a majority of the outstanding Class B Units on such date.

"<u>Majority-in-Interest of the Common Members</u>" means, as of the date of determination, the Common Members holding a majority of the outstanding Common Units on such date.

"<u>Majority-in-Interest of the Preferred Members</u>" means, as of the date of determination, the Preferred Members holding a majority of the outstanding Preferred Units on such date.

"<u>Manager</u>" means the manager of the Company as appointed by a Majority-in-Interest of the Preferred Members. As of the Restatement Date, the Manager is DFA Prop Manager, LLC.

"<u>Member</u>" and "<u>Members</u>" means the Class A Members and Class B Members and each of the other Persons who shall admitted to the Company as a Member in accordance with the terms of the Agreement.

"<u>Member Loan</u>" has the meaning set forth in <u>Section 2.5</u> of the Agreement.

"<u>Membership Interest</u>" means the entire interest of a Member in the Company, including the right of such Member to any and all benefits to which a Member may be entitled as provided in the Agreement, together with the obligations of such Member to comply with all of the terms and conditions of the Agreement.

"<u>Net Profits</u>" and "<u>Net Losses</u>" have the meanings set forth on <u>Appendix B</u> to the Agreement.

"<u>Other Business</u>" has the meaning set forth in <u>Section 4.9</u> of the Agreement.

"<u>Ownership Ledger</u>" has the meaning set forth in <u>Section 2.3</u> of the Agreement.

"<u>Party</u>" or "<u>Parties</u>" have the meanings set forth in <u>Section 13.11</u> of the Agreement.

"<u>Permitted Transfer</u>" has the meaning specified in <u>Section 11.2</u> of the Agreement.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Plans and Specifications</u>" means the plans, drawings and specifications for the construction of the Improvements on a Property that have been approved by the Majority-in-Interest of the Class B Members.

Appendix A-8

"<u>Preemptive Purchase or Lease Right</u>" means any option, put, right of first or last refusal, right of first or last offer, right of first or last negotiation, or any other preemptive rights to purchase, sell or lease any Property.

"<u>Preferred Member</u>" means a Member that holds Preferred Units.

"<u>Preferred Member Parties</u>" has the meaning set forth in <u>Section 7.7</u> of the Agreement.

"<u>Preferred Units</u>" means the Class B Units.

"<u>Preferred Rate</u>" means 6% per annum, compounding quarterly.

"<u>Project</u>" means the projects of the Company and its Subsidiaries located on the AY Properties.

"<u>Project Company</u>" means the entities identified as a Project Company under the column titled "Entity Designation" on <u>Schedule V</u> attached hereto.

"<u>Property</u>" shall mean the AY Property and the improvements located thereon owned by a Project Company.

"<u>Recapitalization Agreement</u>" has the meaning set forth in the recitals of the Agreement.

"<u>Recapitalization Transaction Expenses</u>" has the meaning assigned to "Transaction Expenses" in the Recapitalization Agreement

"<u>Redemption</u>" has the meaning set forth in <u>Article 12</u> of the Agreement.

"<u>Redemption Notice</u>" has the meaning set forth in <u>Article 12</u> of the Agreement.

"<u>Redemption Price</u>" means an amount equal to the sum of $57.5 million, plus interest on such amount from March 31, 2021 at the Preferred Rate.

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"<u>Restatement Amount</u>" has the meaning set forth in <u>Section 6.1(a)(i)</u> of the Agreement.

"<u>Restatement Date</u>" has the meaning set forth in the preamble to the Agreement.

"<u>Return Amount</u>" means, for each Member, the sum of (i) in the case of Preferred Members, rate of return on such Preferred Member's pro rata share (based upon Class B Units held) of the Unreturned Restatement Amount from March 31, 2021 at the Preferred Rate; plus (ii) accrued and unpaid interest on any Member Loan made by such Member.  The Return Amount shall be reduced by any distributions received by a Member pursuant to <u>Section 6.1(a)(iii)</u> of the

Appendix A-9

Agreement; provided, that any such distributions received shall be applied first toward reducing amounts in the above clause (i).

"Return Sharing Percentage" means for each Member an amount equal to a fraction, the (i) numerator of which is such Member's Return Amount and (ii) the denominator of which is the aggregate Return Amounts of all Members.

"Rule 144" means Rule 144 under the Securities Act or any similar provision then in force under the Securities Act.

"S&P" means Standard & Poor's Financial Services LLC, a division of McGraw-Hill Financial Inc., and any successor thereto.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Lender" means a third party lender providing a Senior Loan to a Project Company.

"Senior Loan" means, with respect to each Project, a senior loan from a Senior Lender to a Project Company for the purpose of financing acquisition and/or the construction of the applicable Project on terms approved by the Majority-in-Interest of the Class B Members.

"Senior Loan Documents" means, with respect to each Senior Loan, the applicable loan agreement, promissory note and all other documents, instruments, letters and agreements executed or delivered in connection with such Senior Loan.

"Smith Street Lien" means any Lien in favor of Elite Expediting NY LLC and any other mechanics Liens against the real property located at 455-479 Smith Street, Brooklyn, New York that has been filed as of the Restatement Date.

"Smith Street Project" means the Project located at 459 Smith Street, Brooklyn, NY 11231.

"Sponsors" means, collectively, Goldman and All Year BVI.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which at least 10% of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise Controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Company.

"Taxes" shall mean all taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against (a) a Property or part thereof, together with all interest and penalties thereon and (b) against the rents, issues, income or profits thereof, whether any or all of said taxes, assessments or charges be levied directly or indirectly or as excise taxes or ad valorem real estate or personal property taxes or as income taxes.

Appendix A-10

"<u>Transaction Parties</u>" means the Company, Goldman, Tzipporah Goldman, All Year BVI, All Year Holdings, the Class A Member, Manager, the HoldCo Companies, the Project Companies and any other Subsidiary of the Company.

"<u>Transfer</u>" has the meaning specified in <u>Section 11.1</u> of the Agreement.

"<u>Treasury Regulations</u>" shall mean regulations promulgated pursuant to the Code.

"<u>United States</u>" means the United States of America.

"<u>Units</u>" means any units in the Company (including the Class A Units and the Class B Units).

"<u>Unreturned Restatement Amount</u>" means the Restatement Amount less any amounts distributed to Preferred Members pursuant to <u>Section 6.1(a)(i)</u> of the Agreement.

## Appendix B

### Capital Accounts; Allocations

References to sections refer to sections of this Appendix B, unless otherwise indicated.

1.      **Definitions.**   As used in this Appendix B, the following terms shall have the following meanings.  All other capitalized terms used in this Appendix B shall have the same meanings as in the Agreement.

"Capital Account" is defined in Section 2.

"Book Item" is defined in Section 6(a).

"Company Minimum Gain" has the meaning ascribed to the term "partnership minimum gain" in Section 1.704-2(b)(2) and Section 1.704-2(d) of the Treasury Regulations.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that with respect to any other asset whose Gross Asset Value differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation will be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Company.

"Economic Risk of Loss" shall have the meaning provided by Sections 1.704-2(b)(4) and 1.752-2 of the Treasury Regulations.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)      the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset;

(b)      the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values (taking Section 7701(g) of the Code into account), as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; (iii) the grant of an interest in the Company as consideration for the provision of services to or for the benefit of the Company; and (iv) the liquidation of the Company within the meaning of Treasury Regulations Article 1.704-1(b)(2)(ii)(g); provided, however that adjustments pursuant to  (i), (ii) or (iii) of this paragraph (b) will only be made if the Members reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company within the meaning of Section 1.704-1(b)(2)(iv)(g) of the Treasury Regulations;

Appendix A-1

(c)    the Gross Asset Value of any Company asset distributed to any Member shall be the gross Fair Market Value (taking Section 7701(g) of the Code into account) of such asset on the date of distribution;

(d)    the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 732(d), Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); and

(e)    if the Gross Asset Value of any asset has been determined or adjusted pursuant to paragraph (a), (b) or (d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Losses.

"Member Nonrecourse Debt" means liabilities of the Company treated as "partner nonrecourse debt" under Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount of gain characterized as "partner nonrecourse debt minimum gain" under Treasury Regulations Section 1.704-2(i)(2) and 1.704-2(i)(3).

"Member Nonrecourse Deductions" in any year means the Company deductions that are characterized as "partner nonrecourse deductions" under Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Net Income" and "Net Losses" mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss, as the case may be for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Losses pursuant to this Article shall be added to such taxable income or loss; (b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Losses pursuant to this Article shall be subtracted from such taxable income or loss; (c) in the event the Gross Asset Value of any Company asset is adjusted pursuant to the definition thereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Losses; (d) gain or loss resulting from the disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value; (e) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition thereof; (f) to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Net Income or Net Losses.

Appendix A-2

"Nonrecourse Deductions" in any year means the Company deductions that are characterized as "nonrecourse deductions" under Sections 1.704-2(b)(1) and 1.704-2(c) of the Treasury Regulations.

"Nonrecourse Liabilities" means liabilities of the Company treated as "nonrecourse liabilities" under Section 1.704-2(b)(3) and 1.752-1(a)(2) of the Treasury Regulations.

2.    **Capital Accounts**.

(a)    **Capital Account Maintenance**.  A separate capital account shall be maintained in accordance Treasury Regulations Section 1.704-1(b)(2)(iv) for each Member and, pursuant thereto, the following provisions will apply (each a "Capital Account"):

(i)    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocated share of Net Income and any items in the nature of income or gain that are specially allocated to such Member pursuant to this Appendix B and the amount of any Company liabilities assumed by such Member or that are secured by any property distributed to such Member.

(ii)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocated share of Net Losses and items thereof, any items in the nature of expenses or losses that are specially allocated to such Member pursuant to this Appendix B and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company;

(iii)    In the event all or a portion of a Member's Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and

(iv)    In determining the amount of any liability for purposes of Article 2(a)(i) and Article 2(a)(ii), Code Section 752(c) and any other applicable provisions of the Code and the Treasury Regulations will be taken into account.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event the Members determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the Members may make such modification.

(b)    **Certain Adjustments of Capital Accounts**.  In the event that assets of the Company other than money are distributed to a Member in liquidation of the Company, or in the event that assets of the Company other than money are distributed to a Member in kind, in order to reflect unrealized gain or loss, Capital Accounts for the Members shall be adjusted for the hypothetical "book" gain or loss that would have been realized by the Company if the distributed assets had been sold for their Gross Asset Values in a cash sale.  In the event of the liquidation of a Member's interest in the Company, in order to reflect unrealized gain or loss, Capital Accounts for the Members shall be adjusted for the hypothetical "book" gain or loss that would have been realized by the Company if all Company assets had been sold for their Gross Asset Values in a cash sale.

3.    **Book Allocations of Net Income and Net Losses.**

Net Income, Net Losses and, to the extent necessary, individual items of income, gain, loss or deduction of the Company shall be allocated among the Members in a manner such that the Capital Account of each Member is, as nearly as possible, equal (proportionately) to the excess of:

(i)    the distributions that would be made to that Member pursuant to Article 6.5 of the Agreement if:

(A)    the Company were dissolved, its affairs wound up and its assets sold for an amount of cash equal to their Gross Asset Values,

(B)    all liabilities of the Company were satisfied (limited with respect to each non-recourse liability to the Gross Asset Value of the assets securing such liability), and

(C)    the net assets of the Company were distributed to the Members in accordance with Article 11of the Agreement immediately after making such allocation; over

(ii)    the sum of (i) the Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, and (ii) the amount, if any, that such Member is obligated (or deemed obligated) to contribute, in its capacity as a Member, to the Company, computed immediately prior to the hypothetical sale of assets described in Article XI of the Agreement.  The Company shall make allocations pursuant to this Section 3 in such a manner so as to minimize the amount of any "guaranteed payment" (as defined in Section 707(c) of the Code) to the Preferred Members including through allocations of gross items of income, loss, gain and deduction.

4.    **Compliance With Treasury Regulations**.  If the Company determines, after consultation with the Company's accountant, that the manner in which the Members' Capital Accounts are maintained should be modified, or that any particular item of income, gain, loss, deduction or credit should be allocated in a manner other than as provided in this Appendix B in order to comply with the Treasury Regulations, the Company may make the modification or the allocation, notwithstanding any other provision herein.

5.    **Special Allocations**.  The following special allocations shall be made in the following order:

(a)    **Minimum Gain Chargeback**.  Subject to the exceptions set forth in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Appendix B, if there is a net decrease in Company Minimum Gain during a Fiscal Year, each Member shall be specially allocated items of income and gain for Capital Account purposes for such year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain during such year (which share of such net decrease shall be determined under Treasury Regulations Section 1.704-2(g)(2)).  It is intended that this paragraph 5(a) shall constitute a "minimum gain chargeback" as provided by Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    **Member Nonrecourse Debt Minimum Gain Chargeback**.  Subject to the exceptions contained in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Appendix B, if there is a net decrease in Member Nonrecourse Debt Minimum Gain during a Fiscal Year, any Member with a share of such Member Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of such year shall be specially allocated items of income and gain for Capital Account purposes for such year (and, if

Appendix A-4

necessary, for subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (which share of such net decrease shall be determined under Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2)).  It is intended that this paragraph 5(b) shall constitute a "partner nonrecourse debt minimum gain chargeback" as provided by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    **Qualified Income Offset**.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) (modified as appropriate, by Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5)), items of Company income and gain for Capital Account purposes for such Fiscal Year shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, any deficit in the Capital Account of the Member as quickly as possible; <u>provided</u> that an allocation pursuant to this paragraph  5(c) shall be made if and only to the extent that the Member would have a Capital Account deficit after all other allocations provided for in this Appendix B have been tentatively made as if this paragraph  5(c) were not in the Agreement.

(d)    **Gross Income Allocation**.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year that is in excess of the amount such Member is obligated to restore pursuant to the penultimate sentences of  Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member will be specially allocated items of the Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this <u>paragraph 5(d)</u> shall be made only if and to the extent that such Member would have a Capital Account deficit in excess of such sum after all other allocations provided for in this Appendix B have been made as if paragraph 5(c) and this paragraph 5(d) were not in this Appendix B.

(e)    **Nonrecourse Deductions Referable to Liabilities Owed to Non-Members**.  Any Nonrecourse Deductions for any Fiscal Year and any other deductions or losses for any Fiscal Year referable to a liability owed by the Company to a Person other than a Member to the extent that no Member bears the economic risk of loss shall be specially allocated as determined by the Manager, provided that (i) such allocations are in accordance with Section 704(b) of the Code, the Regulations promulgated thereunder and the economic entitlement of the Members and (ii) the Manager consults with All Year Holdings in good faith regarding the methodology used for purposes of allocating any Nonrecourse Deductions. Notwithstanding the Manager's obligation to consult with All Year Holdings under (ii) of this Paragraph 5(e), the Manager shall have full discretion to determine the methodology used for purposes of allocating any Nonrecourse Deductions and shall not be limited in making such a determination.

(f)    **Member Nonrecourse Deductions**.  Any Member Nonrecourse Deductions shall be allocated to the Member that bears the Economic Risk of Loss for the Member Nonrecourse Debt to which such deductions relate as provided in Treasury Regulations Section 1.704-2(i)(1).  If more than one Member bears the Economic Risk of Loss, such deduction shall be allocated between or among such Members in accordance with the ratios in which such Members share such Economic Risk of Loss.

(g)    **Certain Section 754 Adjustments**.  To the extent any adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 732(d), Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company as determined under Treasury Regulations

Section 1.704-1(b)(3) in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

6.    **Tax Allocations**.  Allocations pursuant to this paragraph 6 are solely for purposes of United States federal, state and local taxes and will neither affect nor be taken in account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions or other items pursuant to any provision of this Agreement.

(a)    **General Tax Allocations**.  Except as otherwise provided in this paragraph 6, each item of income, gain, loss or deduction of the Company for federal income tax purposes that corresponds with an item of income, gain, loss or expenses that is taken into account in computing Net Income and Net Losses (each, a "Book Item") shall be allocated among the Members in the same proportion as the corresponding Book Item is allocated among them pursuant to this Appendix B.

(b)    **Code Section 704(c) Allocations**.

(i)    **Allocations with Respect to Property Contributions**.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and the initial Gross Asset Value thereof (computed in accordance with Article (a) of the definition of Gross Asset Value).

(ii)    **Allocation Following Gross Asset Value Adjustments**.  In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (b) or paragraph (d) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(iii)    **Section 704(c) Allocation Method**.  The Manager shall determine the method utilized by the Company for making allocations described in paragraph 6(b)(i) and paragraph 6(b)(ii) of this Appendix B, provided that the Manager consults with All Year Holdings in good faith regarding the determination of the methodology used. Notwithstanding the Manager's obligation to consult with All Year Holdings under this Paragraph 6(b)(iii), the Manager shall have full discretion to determine the methodology used for this purpose and shall not be limited in making such a determination.

(c)    **Section 754 Election**.  In the event the Company has in effect an election under Section 754 of the Code, allocations of income, gain, loss or deduction to affected Members for federal, state and local tax purposes shall take into account the effect of such election pursuant to applicable provisions of the Code.

7.    **Allocations Between Assignor and Assignee**.  The portion of the income, gain, losses, credits, and deductions of the Company for any Fiscal Year during which a Membership Interest is assigned by a Member (or by an assignee or successor in interest to a Member), that is allocable with respect to such Membership Interest shall be apportioned between the assignor and the assignee of the Membership Interest on the basis of an interim closing of the books, unless the Members agree to some other reasonable, consistently applied basis permitted by the applicable Treasury Regulations under Section 706 of the Code; provided, however, that any adjustments to the Gross Asset Value of a Company asset treated as gains or

Appendix A-6

losses under Article (c) of the definition of "Net Income" and "Net Losses" shall be allocated only to those Persons who were Members immediately before the event giving rise to such adjustment.

**8.** **Tax Treatment of Preferred Units**. The parties hereto agree to treat the Preferred Units as entirely an equity investment in the Company and to treat distributions from the Company to the Preferred Members as distributions made to a partner in a partnership for U.S. federal and state income tax purposes. No party shall take any contrary position or make any contrary representation without the prior written consent of the other party.

**9.** **Transfers to Non-US Persons.** The Class A Member agrees that notwithstanding anything in the Agreement (including in Section 16.2), the Class A Member shall not make a Transfer to a person that is not United States persons for purposes of the Code as defined in Code Section 7701(a)(30) without the prior consent of either the Initial Class B Member or the Majority-in-Interest of the Preferred Members.

## Schedule I

**Ownership Ledger (As of Restatement Date)**

| Class A Members | Class A Units | Class A Percentage Interest |
|---|---|---|
| All Year Holdings Common LLC | 100,000 | 100% |

| Class B Members | Class B Units | Class B Percentage Interest |
|---|---|---|
| DCP All Year Preferred Equity LLC | 29,000,000 | 100% |

Schedule I-1

## **Schedule II**

### **Major Decisions**

Section 1.1     Investments.  Entering into any Investment other than Investments in (a) a Subsidiary by the Company or another Subsidiary, (b) Cash Equivalents, (c) accounts and notes receivable if created or acquired in ordinary course and which are payable or dischargeable in accordance with customary trade terms; and (d) debt or equity instruments issued by an unaffiliated third party buyer of an AY Property in a disposition permitted under this Agreement.

Section 1.2     Related Party Transactions.  Entering into any transactions between the Company or a Subsidiary on the one hand and any Affiliates of the Company and its Subsidiaries or the Manager on the other hand, other than (a) as contemplated by this Agreement or the Recapitalization Agreement, (b) transactions contemplated in Section 7.7 or (c) transactions completed on an arm's length basis and on market terms, provided, that this clause (c) shall not apply to any sales, financing or refinancing transactions (including amendments, modification, forbearances or any similar transaction related to existing debt) that involve any Affiliates of the Company and its Subsidiaries or the Manager; provided, however, that the Common Members shall not unreasonably withhold or delay consent relating to any such sales, financing or refinancing transaction.

Section 1.3     Line of Business.  Causing the Company to engage in any business other than the ownership of the Subsidiaries and the ownership, development, maintenance, operations, improvement and sale of the AY Properties, including the exercise of any right accorded to the Company and its Subsidiaries under applicable agreements relating to the AY Properties and the acquisition of rights and other assets related to or for the purpose of enhancing the value of the AY Properties.

Section 1.4     Amendments.  Modify, amend, or waive this Agreement or any provision of this Agreement which (a) results in a reduction of the percentage allocation or priority of the distributions as between the Common Members and the Preferred Members pursuant to Article 6, (b) materially and adversely affects rights to indemnification under Article 4, (c) amends or modifies the Majority-in-Interest of the Common Members' consent rights over Transfers as contemplated by Article 11, (d) amends or modifies any Major Decision, (e) amends or modifies the terms of Member Loans set forth in Section 2.5 in a manner which is less favorable to the Company when taken as a whole, (f) modifies the right of Members to the information and reporting rights described in Sections 5.1, 5.2, or 5.5, or (g) results in any material increase of the obligations or material decrease of the rights of any Member which is adverse to such Member; provided, however, that in no event shall any Common Member unreasonably withhold or delay its consent to any amendment, modification or waiver described in this Section 1.4(g).

Section 1.5     Common Member Liability.  Causing the Company or its Subsidiaries to enter into any transaction or act in any manner that would subject the Common Members to personal liability.

Schedule II-1

Section 1.6    <u>Merger; Consolidation</u>.  Entering into any merger or consolidation of the Company with any other Person other than a transaction occurring after the third anniversary of the Restatement Date which results in a disposition of all of the Common Members' and Preferred Members' interest in the Company for cash consideration.

Section 1.7    <u>Partnership; Joint Venture</u>.  Entering into a partnership or joint venture with any other Person, or acquiring the Equity Interests in any Person other than at a Subsidiary with Persons who own (directly or indirectly) an Equity Interest in the HoldCo Companies that own (directly or indirectly) an AY Property.

Section 1.8    <u>Additional Members</u>.  Admit any additional Member or Members to the Company or any Subsidiary other than as a result of a Permitted Transfer or a Transfer by the Preferred Members in accordance with Article 11.

Section 1.9    <u>Capital Expenditures</u>.  Make any expenditure or series of related expenditures in an amount greater than $500,000 with respect to any individual AY Property during a single twelve month period other than (a) expenditures incurred in the ordinary course of the business of the Company, including Company Expenses, (b) maintenance and repair expenditures, (c) any expenditures required under any lease or loan agreement applicable to an AY Property, (d) expenditures required to comply with any applicable law or regulation, (e) expenditures related to the buy-out of tenants paying below market rents, and (f) any expenditures in connection with the development of the Smith Street Project, so long as at the time of such expenditure, the Company or its Subsidiary is (i) not subject to a binding agreement involving the disposition of the Smith Street Project (unless such binding agreement expressly requires such expenditures) and (ii) such binding agreement involving the disposition of the Smith Street Project is not in default.

Section 1.10    <u>Disposition of Properties</u>.  Transfer, dispose or sell any AY Property prior to the third anniversary of the Restatement Date other than sales in connection with (a) a transfer, disposition or sale with gross proceeds in excess of the release price for such Property set forth on <u>Schedule IV</u>, other than with respect to any sale pursuant to Section 5.1(h), provided that such amounts are in excess of 95% of the release price for such Property set forth on <u>Schedule IV</u>, (b) a Transfer, disposition or sale in contemplation of the maturity (but in no event prior to 90 days of any such maturity) of, or an event of default under, any Senior Loan secured by such AY Property or (c) a Transfer, disposition or sale during the 12 months following the Restatement Date of one or more of the Early Release Properties in a single transaction or in a series of transactions that close simultaneously if the aggregate net proceeds (after payment of all expenses relating to such Transfer, disposition or sales) from such Early Release Properties plus net proceeds from all Early Release Properties previously Transferred, disposed of or sold in accordance with this Agreement (including in transactions in accordance with preceding clauses (a) or (b) or pursuant to a Class A Member consent or waiver) is at least $15 million.

Section 1.11    <u>Distributions in Kind</u>.  Make any distribution in-kind to the Members.

Section 1.12    <u>Subsidiary Actions</u>.  Permit any Subsidiary to take any action that would otherwise qualify as a Major Decision if taken by the Company.

Schedule II-2

## Schedule III

**AY Properties**

| No. | AY Property Address |
|-----|---------------------|
| 1. | 608 Franklin Avenue, Brooklyn, New York/1040 Dean Street, Brooklyn, New York |
| 2. | 41-21 28th Street, Long Island City, New York |
| 3. | 455-479 Smith Street, Brooklyn, New York |
| 4. | 141 Spencer Street, Brooklyn, New York |
| 5. | 169 Graham Avenue, Brooklyn, New York |
| 6. | 1000 Broadway, Brooklyn, New York |
| 7. | 188 S. 3rd Street, Brooklyn, New York |
| 8. | 234-236 North 11th Street, Brooklyn, New York |

## **Schedule IV**

### **Release Prices**

41-21 28th Street (28th Street Project): ███████

1040 Dean: ██████

141 Spencer: ██████

169 Graham: ██████

1000 Broadway: ██████

188 S. 3rd: No Common Member approval required so long as sale process is run by currently engaged broker.

234-236 N. 11th: ██████

**Schedule V**

**HoldCo Companies & Project Companies**

| No. | Name | Jurisdiction | Entity Type | Entity Designation | Notes |
|-----|------|--------------|-------------|--------------------|-------|
| 1. | All Year Equity Partners LLC | Delaware | LLC | HoldCo Company | N/A |
| 2. | Franklin AY LLC | Delaware | LLC | HoldCo Company | Related to real property located at 608 Franklin Avenue, Brooklyn, New York/1040 Dean Street, Brooklyn, New York. |
| 3. | 608 Franklin LLC | New York | LLC | HoldCo Company | Related to real property located at 608 Franklin Avenue, Brooklyn, New York/1040 Dean Street, Brooklyn, New York. |
| 4. | 608 Franklin Owner LLC | Delaware | LLC | Project Company | Related to real property located at 608 Franklin Avenue, Brooklyn, New York/1040 Dean Street, Brooklyn, New York. |
| 5. | TG 28 Street LLC | New York | LLC | HoldCo Company | Related to real property located at 41-21 28th Street, Long Island City, New York. |
| 6. | 41-2128th Street Development LLC | New York | LLC | HoldCo Company | Related to real property located at 41-21 28th Street, Long Island City, New York. |
| 7. | 41-2128th Street Acquisition LLC | New York | LLC | HoldCo Company | Related to real property located at 41-21 28th Street, Long Island City, New York. |
| 8. | The Delmar Owner LLC | Delaware | LLC | Project Company | Related to real property located at 41-21 28th Street, Long Island City, New York. |
| 9. | Smith St Holdings NY LLC | New York | LLC | HoldCo Company | Related to real property located at 455-479 Smith Street, Brooklyn, New York. |

Schedule V-1

| 10. | Smith Street Mezz LLC | New York | LLC | HoldCo Company | Related to real property located at 455-479 Smith Street, Brooklyn, New York. |
| 11. | Smith Street Owner LLC | New York | LLC | Project Company | Related to real property located at 455-479 Smith Street, Brooklyn, New York. |
| 12. | 141 Spencer LLC | New York | LLC | Project Company | Related to real property located at 141 Spencer Street, Brooklyn, New York. |
| 13. | 169 Graham LLC | New York | LLC | Project Company | Related to real property located at 169 Graham Avenue, Brooklyn, New York. |
| 14. | 1000 Broadway LLC | New York | LLC | Project Company | Related to real property located at 1000 Broadway, Brooklyn, New York. |
| 15. | 188 South 3rd Street LLC | New York | LLC | Project Company | Related to real property located at 188 S. 3rd Street, Brooklyn, New York. |
| 16. | 234-236 North 11th LLC | New York | LLC | Project Company | Related to real property located at 234-236 North 11th Street, Brooklyn, New York. |

Schedule V-2

## Exhibit C

**MIPA**

*Execution Version*

# MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT

**THIS MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT** (this "Agreement"), dated as of January 13, 2022 (the "Effective Date"), by and between CHESTER HOLDINGS NY LLC, a New York limited liability company having an address at 12 Spencer Street, Suite 3, Brooklyn, New York 11205 ("Seller"), and DCP KINGS POINT, LLC, having an address at 360 Hamilton Avenue, Suite 1110, White Plains, NY 10601 ("Purchaser"). Each of Seller and Purchaser being sometimes hereinafter referred to individually as a "Party" and collectively as the "Parties".

**WHEREAS**, Seller purchased a minority, non-controlling common equity interest in Greens at Chester LLC having an address at 65 Steuben Street, Brooklyn, NY 11205 (the "Company"), formed in 2017 to develop houses on a 117-acre parcel of land in the Town of Chester, County of Orange NY (the "Project"); and

**WHEREAS**, prior to the Company's acquisition of the Project, it had been the subject of multiple lawsuits under the previous ownership, including contentious municipal litigation with the Town over entitlements (the "Entitlement Litigation") and contract and title litigation with a putative buyer of the Project ("Title Action"); and

**WHEREAS**, prior to the Company's acquisition of the Project, the previous ownership entered into a settlement agreement with the Town of Chester regarding the Entitlement Litigation, which settlement approved the subdivision of the Project and purported to resolve any and all other entitlement issues; and

**WHEREAS**, prior to the Company's acquisition of the Project, the Title Action had been dismissed and was pending appeal, the potential success of which would, according to advice from the Company's counsel, based on controlling NY Court of Appeals precedent, under no circumstances interfere with the Company's good title; and

**WHEREAS**, following the acquisition by the Company, when it became apparent that many of the ultimate owners and control parties of the Company were members of the Hasidic Jewish community, the Town of Chester reneged on its settlement agreement and attempted to thwart the development of the Project by, inter alia, denying building permits, refusing to allow infrastructure to be bonded, and deploying other strategies to (in the words of the Town Supervisor) "keep the Hasidic out"; and

**WHEREAS**, the Executive of Orange County also announced his forceful opposition to the Project and enumerated various ways his office would, and ultimately did, contribute to the effort to thwart the development; and

**WHEREAS**, also shortly following the acquisition of the Project by the Company, the Appellate Division of the Second Department reversed the dismissal of the Title Action, following which the plaintiff added the Company and its mortgage lender as defendants in its revived lawsuit, thus rendering the Project uninsurable and unfinanceable; and

**WHEREAS**, theCompany was forced to engage in costly and time consuming litigation with the Town of Chester and County of Orange (the "Discrimination Litigation"), as well as costly and time consuming title litigation (the "Title Litigation"), all in an effort to preserve the viability of the Project; and

**WHEREAS**, the Discrimination Litigation has recently been settled in a manner that is expected to allow construction on the Project to resume with appropriate Town and County approvals, but the Title Litigation is still pending; and

**WHEREAS**, in order to avoid bankruptcy during the pendency of the Discrimination Litigation and the Title Litigation the Company made a common equity capital call to its investors and raised in excess of $19,000,000.00 of preferred equity, which in addition to $10,000,000.00 of senior secured debt, currently encumbers the Project, the Company, and Seller's interests therein; and

**WHEREAS**, in order to proceed with the Project, the Company anticipates that not less than $35,000,000.00 of additional debt plus additional equity for infrastructure will need to be raised; and

**WHEREAS**, because Seller owns a material portion of the equity of the Company, Yoel Goldman ("Goldman"), as the ultimate beneficial owner of Seller, was required to personally guaranty the senior secured debt of the Company; and

**WHEREAS**, on or about April 23, 2018, Seller entered into that certain Promissory Note with Purchaser (as Lender) in the original principal amount of $3,600,000.00 (the "Loan"), which amount along with all interest and fees was and is guaranteed by Goldman personally as well as by All Year Holdings Limited, a British Virgin Islands entity ("All Year"), which Loan was modified in November in 2019; and

**WHEREAS**, the Loan has been in continuous payment default since January 1, 2020 and maturity default since January 31, 2020, and has accrued to an amount in excess of $1,750,000.00 in unpaid interest, fees, and reimbursable lender expenses (the "Non-Principal Loan Claims") as of the date of this Agreement; and

**WHEREAS**, due to the financial crisis and certain pending and threatened litigation related thereto affecting All Year and its affiliates, including, but not limited to, Goldman, Seller lacks the resources to meet any further capital calls and/or provide guarantees of additional Company indebtedness from a creditworthy source; and

**WHEREAS**, due to all of the facts and circumstances surrounding Seller, the Company and the Project, including, but not limited to, those facts and circumstances set forth herein, Seller in its business judgement has determined that any value of Seller's Interest (as hereinafter defined) in the Company in excess of the amount encumbered by the Loan is speculative; and

2

**WHEREAS**, in order to avoid costly litigation by and among the parties to this Agreement and their affiliates with respect to certain other assets, and to reduce economic uncertainty for all parties involved, the parties desire to resolve their claims with respect to the Loan as well as All Year's guaranty of the Loan; and

**WHEREAS**, Seller currently owns a forty-three and three-quarters percent (43.75%) membership interest ("Seller Interest"), in the Company, which Seller Interest's share of profit from the project is reduced to thirty-five percent (35%) of profits in accordance with the operating agreement of the Company; and

**WHEREAS**, Seller desires to sell, convey transfer and assign to Purchaser all of the Seller Interest and Purchaser desires to purchase and acquire the Seller Interest from Seller; and

**WHEREAS**, on December 14, 2021, All Year commenced a voluntary reorganization case (the "Chapter 11 Case") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

**WHEREAS**, on December 20, 2021, the BVI Commercial Court (the "BVI Commercial Court") made an order (the "PL Order"), on All Year's own application, placing All Year into provisional liquidation pursuant to the provisions of the BVI Insolvency Act 2003.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements contained in this Agreement and for other good and valuable consideration, the Parties agree as follows:

1.    Sale of the Interest.  As of the Closing, Seller, in consideration of the following (collectively, the "Consideration"): (i) forgiveness of the Loan principal in the amount of Three Million Six Hundred Thousand and 00/100 Dollars ($3,600,000.00) (the "Original Principal Amount"); plus (ii) payment to Seller of Five Hundred Thousand and 00/100 Dollars ($500,000.00) cash simultaneously with the Closing (the "Closing Payment", together with the Original Principal Amount, the "Purchase Price"); plus (iii) Purchaser's settlement and release of the Non-Principal Loan Claims; plus (iv) release of certain guarantees and security collateral granted by Seller and Seller-related parties to Purchaser (including the termination by Purchaser of the guaranty of the Loan by All Year) in accordance with the release documents annexed hereto as ***Exhibit A*** (the "Release Documents"); hereby sells, conveys, transfers, sets over, delivers and assigns unto Purchaser, and Purchaser's successors and assigns, all of Seller's legal and equitable rights, privileges, interests, duties and obligations in, to and under the Seller Interest. At the Closing, Seller shall execute and deliver to the Company an Assignment of Membership Interest, dated as of the Closing Date, in the form annexed hereto as ***Exhibit B***.

2.    Purchase of the Seller Interest.  As of the Closing, Purchaser hereby purchases the Seller Interest from Seller for the Purchase Price and other good and valuable consideration.

3.    <u>Representations of Seller</u>.  Seller represents and warrants to Purchaser, which representations and warranties shall be true and correct as of the Effective Date and the Closing Date, that subject to any rights Purchaser may have against Seller:

(a)    Seller has good and marketable title to the Seller Interest and that the Seller Interest is free and clear of all liabilities, obligations, security interests, claims, liens, mortgages, encumbrances, rights and restrictions, and Seller has not conveyed or pledged all or any part of the Seller Interest to any third-party other than Purchaser.

(b)    Seller has the full and unqualified right, power and authority to enter into this Agreement and to sell, convey, transfer and assign complete and absolute legal and equitable ownership of the Seller Interest to Purchaser. This Agreement and all documents executed by Seller have been authorized and create legal, valid and binding obligations of Seller. Seller's execution and delivery of this Agreement and performance of its obligations hereunder does not violate or conflict with Seller's organizational documents, any judgment, decree or order of any court applicable to or affecting Seller, breach the provisions of or constitute a default under any contract to which Seller is a party or by which Seller is bound, violate or conflict with any law applicable to Seller or require the approval, consent or action of, waiver or filing of or with or notice to any third party, or governmental body, agency or instrumentality.

(c)    Seller has no other equity ownership, profit participation, equitable claim or other interest in the Company or any other member of the Company. No other Person (as hereinafter defined) has any rights to acquire or otherwise holds any interest in, or has any rights or claims with respect to, any part of the Seller Interest. Seller is not a party to, or beneficiary of, any other contracts, agreements, commitments, options, warrants, proxies, claims or rights with respect to any part of the Seller Interest. The term "<u>Person</u>", as used in this Agreement, includes, without limitation, a natural person, joint venture, corporation, limited liability company, sole proprietorship, trust, estate, partnership, cooperative, association, governmental entity, agency or subdivision or other entity.

(d)    Each of this Agreement and the other agreements being entered into by Seller pursuant to this Agreement has been duly executed and delivered by Seller and, assuming the due execution and delivery by Purchaser, constitutes Seller's legal, valid and binding obligation, enforceable against Seller in accordance with its respective terms.

(e)    The execution and delivery of this Agreement (and the other agreements being entered into pursuant hereto) and the consummation of the transactions contemplated hereby (with or without notice or lapse of time) do not: (i) contravene, conflict with or result in the violation or breach of, or give any Person the right to declare a default or exercise any remedy under, any license, franchise, permit, instrument, lease, loan, or other agreement to which Seller is a party or by which Seller's properties or assets are bound, or result in the imposition or creation of any encumbrance upon or with respect to any part of the Seller Interest; or (ii) contravene, conflict with or result in the violation or breach of any applicable law or regulation.

(f)    There are no demands, claims, suits, actions, litigation (excepting the Title Action, Title Litigation, and Discrimination Litigation), investigations, arbitration, administrative hearings or any other proceedings of any nature that are pending or, to the knowledge of Seller, threatened against Seller: (i) involving or relating to the business of Seller or the Seller Interest; or (ii) that challenge, or that have the effect of preventing, delaying, making illegal, rendering fraudulent or otherwise interfering with, the transactions contemplated by this Agreement, nor are there any outstanding orders, writs, injunctions, rulings, citations, awards, decrees, assessments or other judgments of any nature by or with any court, tribunal, arbitrator, or other governmental authority involving or related to any part of the Seller Interest.

(g)    Seller has not engaged in any negligent, willful, intentional, illegal or tortious conduct, outside the ordinary course of business that will result in any Material Adverse Effect (as hereinafter defined) on the Seller Interest or the Company. For purposes of this Agreement, the term "Material Adverse Effect" means any event, occurrence, fact, condition or change that is materially adverse to (i) the business, results of operations, financial condition, assets or liabilities of the Company, or (ii) the ability of Seller to timely perform its respective obligations hereunder or consummate the transactions contemplated hereby.

(h)    Seller is a sophisticated Party and is familiar with the financial condition and business of the Company and prospects for the Project. Seller has had the opportunity to discuss the transactions contemplated hereby with Seller's attorney, accountant and other advisers. The Purchase Price was agreed upon by Seller of Seller's own free will and volition and is fair and acceptable to and binding upon Seller, who has no objection thereto and acknowledges that the same is not based on any representations or warranties of Purchaser or any of Purchaser's respective affiliates or subsidiaries or their respective officers, directors, members, managers, shareholders, employees, attorneys or agents other than as specifically set forth herein.

(i)    Seller has not taken any action which would give rise to a claim by any Person for a brokerage commission, finder's fee or other similar payment with respect to the transactions contemplated by this Agreement.

(j)    Each of the Closing documents set forth in Section 6 below executed and/or delivered by Seller is true, accurate, and complete.

(k)    Seller has no creditors other than Purchaser and immediately after giving effect to the transactions contemplated by this Agreement: (i) the fair value of the Seller's assets would exceed its liabilities (including contingent liabilities); (ii) the present fair saleable value of Seller's assets would be greater than the amount required to pay its probable liabilities on its existing debts (including contingent liabilities) as such debts become absolute and mature; (iii) Seller would be able to pay its liabilities (including contingent liabilities) as they mature; (iv) Seller is "solvent" (within the meaning of applicable laws relating to fraudulent transfers) and would not have unreasonably small capital for the business in which it is engaged and in which it is proposed to be engaged following consummation of the transactions contemplated by this Agreement. Seller does not intend to incur, and Seller does not believe

that it has incurred or will incur as a result of the transactions contemplated by this Agreement, debts beyond Seller's ability to pay such debts as such debts mature.

4.    <u>Representations of Purchaser</u>.    Purchaser represents and warrants to Seller, which representations and warranties shall be true and correct as of the Effective Date and the Closing Date, that:

(a)    Purchaser has the legal capacity and full power to enter into this Agreement and to consummate the transactions contemplated hereby and that it has the full right and authority to purchase the Seller Interest from Seller and release the Loan principal and Non-Principal Loan Claims.  Purchaser has good and marketable title to the Loan and the Non-Principal Loan Claims and the Loan and the Non-Principal Loan Claims are free and clear of all liabilities, obligations, security interests, claims, liens, mortgages, encumbrances, rights and restrictions, and Purchaser has not conveyed or pledged all or any part of the Loan or the Non-Principal Loan Claims to any third-party.

(b)    This Agreement has been duly executed and delivered by Purchaser, and, assuming due authorization, execution and delivery by Purchaser, constitutes a legal, valid and binding obligation enforceable against Purchaser in accordance with its terms.

(c)    Purchaser is not relying on any representation or warranty made by Seller except as expressly set forth in this Agreement and is satisfied that the Purchase Price consideration being paid is fair and just.

(d)    Purchaser is a sophisticated Party and is familiar with the financial condition and business of the Company and prospects for the Project. Purchaser has had the opportunity to discuss the transactions contemplated hereby with Purchaser's attorney, accountant and other advisers. The Purchase Price was agreed upon by Purchaser of Purchaser's own free will and volition and is fair and acceptable to and binding upon Purchaser, who has no objection thereto and acknowledges that the same is not based on any representations or warranties of Seller or any of Seller's respective affiliates or subsidiaries or their respective officers, directors, members, managers, shareholders, employees, attorneys or agents other than as specifically set forth herein.

5.    <u>Indemnification</u>.

(a)    Each of Seller and All Year (collectively, "<u>Indemnitors</u>"), hereby indemnifies and holds Purchaser harmless from and against any and all claims, demands, liabilities, costs and expenses, including, but not limited to, reasonable attorneys' fees, costs and expenses, incurred by Purchaser, or to which Purchaser is exposed, resulting from: (i) any breach by Seller of any of Seller's representations, warranties, covenants or agreements set forth in this Agreement; (ii) any claims with respect to any of the Seller Interest; or (iii) any claims by any creditors of Seller, Goldman or All Year; <u>provided</u>, that the aggregate limitation amount of required indemnification under clauses (ii) and (iii) shall not exceed the amount of the Closing Payment, and Purchaser expressly acknowledges and agrees that any claims against All Year for indemnification shall be treated as general unsecured claims in the Chapter

6

11 Case.  Notwithstanding anything contained in this Agreement, Charlotte Caulfield and Paul Pretlove, the joint provisional liquidators of All Year, who were appointed pursuant to the PL Order, are not liable for the indemnification obligations of the Indemnitors under this Section 5(a).

(b)    Purchaser hereby indemnifies and holds Seller harmless from and against any and all claims, demands, liabilities, costs and expenses, including, but not limited to, reasonable attorneys' fees, costs and expenses, incurred by Seller, or to which Seller is exposed, resulting from any breach by Purchaser of any of Purchaser's representations, warranties, covenants or agreements set forth in this Agreement.

6.    Closing Documents.

(a)    The closing of the transactions contemplated by this Agreement (the "Closing") shall be conducted remotely by electronic mail, PDF and/or facsimile (i) at 9:00 a.m. Eastern time, no later than the third (3rd) business day after the last of the conditions to the obligations of the Parties set forth in Section 7 (Conditions to Closing) are satisfied or, to the extent permitted by law, waived (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver thereof), or (ii) at such other time as the Parties may mutually agree in writing. The date on which the Closing occurs is referred to as the "Closing Date". All proceedings to be taken and all documents to be executed at the Closing shall be deemed to have been taken, delivered and executed simultaneously, and no proceeding shall be deemed taken nor documents deemed executed or delivered until all have been taken, delivered and executed.

(b)    At the Closing, Seller shall execute and/or deliver a true and accurate copy of the following executed documents to Purchaser:

(i)    this Agreement;

(ii)    Assignment of Membership Interest;

(iii)    opinion of counsel for Seller, as to due formation, good standing and due authority pertaining to the execution and delivery of this Agreement, in the form annexed hereto as ***Exhibit C***;

(iv)    a resolution of members holding a majority interest in Seller and managers of Seller authorizing the transactions contemplated under this Agreement, in the form annexed hereto as ***Exhibit D***;

(v)    a properly completed and validly executed IRS Form W-9;

(vi)    a resolution of all members and managers of the Company acknowledging and confirming acceptance of the transactions contemplated under this Agreement, in the form annexed hereto as ***Exhibit E***;

(vii)     [Intentionally Omitted]; and

(viii)    evidence satisfactory to Purchaser that the Bankruptcy Court has entered the Transaction Approval Order and the BVI Commercial Court has made the BVI Transaction Approval Order.

(c)     At the Closing, Purchaser shall execute and deliver to Seller:

(i)      this Agreement;

(ii)     the Closing Payment;

(iii)    the Release Documents; and

(iv)     a resolution of all members and managers of Purchaser authorizing the transactions contemplated under this Agreement, in the form annexed hereto as ***Exhibit G***.

7.     <u>Conditions to Closing</u>.

(a)     <u>General Conditions</u>.  The respective obligations of each of the Parties hereto to effect the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the conditions, any of which may, to the extent permitted by applicable law, be waived in writing by any Party in its sole discretion (<u>provided</u>, that such waiver shall only be effective as to the obligations of such Party):

(i)      no court, tribunal, arbitrator, or other governmental authority shall have enacted, issued, promulgated, enforced or entered any law or any judgment, injunction, order or other determination (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement; and

(iii)    each party that is party to any Closing document set forth in Section 6 shall have executed and delivered to each other party to such Closing document duly executed copies of such Closing document and all of the conditions precedent to the effectiveness set forth in each Closing document set forth in Section 6 shall have been fulfilled or waived in writing by the party entitled to waive such condition, in each case, pursuant to and in accordance with the terms and conditions of such Closing document.

(b)     <u>Conditions to Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Purchaser:

(i)      the representations and warranties set forth in Section 3 shall be true and correct in all respects both when made and as of the Closing Date;

(ii)    each of the Seller and All Year shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants and conditions required by this Agreement to be performed or complied with by each of the Seller and All Year prior to or on the Closing Date;

(iii)    the Bankruptcy Court shall have entered the Transaction Approval Order and the Transaction Approval Order shall have become a Final Order; and

(iv)    the BVI Commercial Court shall have made the BVI Transaction Approval Order.

(c)    <u>Conditions to Obligations of Seller</u>.    The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of the following conditions, which may, to the extent permitted by applicable law, be waived in writing by Seller:

(i)    the representations and warranties set forth in Section 4 shall be true and correct in all respects both when made and as of the Closing Date;

(ii)    the Bankruptcy Court shall have entered the Transaction Approval Order; and

(iii)    the BVI Commercial Court shall have made the BVI Transaction Approval Order.

8.    <u>Termination</u>.

(a)    <u>Termination Events</u>.    At any time prior to the Closing, the applicable Party as set forth below shall have the right, but not the obligation, upon written notice to the other Parties, to terminate this Agreement prior to the Closing:

(i)    by Purchaser, in the event that there is any issuance by any court, tribunal, arbitrator, or other governmental authority of any ruling or order enjoining the consummation of the transactions contemplated hereby that is not vacated or reversed prior to February 1, 2022 (the "<u>Outside Date</u>");

(ii)    by Purchaser, in the event that there is any failure to obtain entry of the Transaction Approval Order by the Outside Date (subject to automatic extension solely to the minimum extent required by the Bankruptcy Court's availability);

(iii)    by Purchaser, in the event that there is any failure to obtain entry of the BVI Transaction Approval Order by the Outside Date (subject to automatic extension solely to the minimum extent required by the BVI Commercial Court's availability);

(iv)    by Purchaser, if the Closing shall not have occurred on or before February 28, 2022; <u>provided</u>, that the right to terminate this Agreement under this Section

9

8(a)(iv) shall not be available to Purchaser, if the breach of this Agreement by Purchaser has proximately contributed to the failure of the Closing to occur on or before February 28, 2022;

(v) by Seller, if the Closing shall not have occurred on or before March 18, 2022; provided, that the right to terminate this Agreement under this Section 8(a)(v) shall not be available to Seller, if the breach of this Agreement by Seller or All Year has proximately contributed to the failure of the Closing to occur on or before March 18, 2022;

(vi) by Seller or Purchaser, if the Bankruptcy Court denies with prejudice entry of the Transaction Approval Order or the BVI Commercial Court denies with prejudice entry of the BVI Transaction Approval Order.

(b)     Mutual Termination.  This Agreement and the obligations of the Parties hereunder may be terminated by mutual written agreement by and between the Parties.

(c)     Effect of Termination.

(i)     The date on which any termination of this Agreement under Section 8(a) or Section 8(b) occurs shall be referred to as a "Termination Date".

(ii)     On the Termination Date, all Parties' obligations under this Agreement shall be terminated effective immediately, and each Party and its affiliates shall be released from its commitments, undertakings, and agreements hereunder and restored in each and every respect to its, rights, claims, positions, and defenses as they existed prior to the execution of this Agreement (subject to any intervening court order or judgment that is not vacated or any intervening written agreement that is not rescinded); provided, that (A) any claim for breach of this Agreement that occurs prior to such Termination Date shall survive and all rights and remedies with respect to such claims shall not be prejudiced in any way, and (B) this Section 8(c) and Section 10 shall survive. This Agreement, and all statements, pleadings or motions made or filed by any Party on or after the Effective Date in furtherance of the transactions contemplated by this Agreement, shall be deemed settlement communications and protected from use in future litigation under applicable federal or state law. For the avoidance of any doubt, under no circumstances may the willingness of Purchaser to quantify its claim against the Seller, All Year, Goldman or any other person or entity for purposes of this Agreement ever be cited or used in any way against Purchaser or any of its affiliates and the terms of this Agreement and the transactions contemplated hereby shall not adversely affect the right of All Year to contest the amount of any claim in respect of the Loan.

9.     Confidentiality.  The terms and conditions of this Agreement are and shall be treated as confidential and shall not hereafter be disclosed by any Person, except (a) to accountants, attorneys, tax advisors and those who need to know them to effectuate the purposes of this Agreement, (b) as may be required by law, or (c) as may be required in connection with approval of this Agreement by the Bankruptcy Court and/or the BVI Commercial Court. Any Person to whom the terms and conditions of this Agreement have been disclosed will be advised of and shall abide by the confidentiality provisions of this Section.

10.   <u>Miscellaneous</u>.  This Agreement sets forth the entire agreement between the Parties hereto relating to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith. This Agreement shall not be amended or modified in any respect, and none of the provisions of this Agreement shall be waived, except by an instrument in writing signed by all Parties. Any notice, report, demand, waiver or consent required or permitted hereunder shall be in writing and shall be delivered in person, or by prepaid, first class, registered or certified mail, with return receipt requested, or by overnight courier, addressed at the address set forth on the first page hereof, or by electronic mail with confirmation of receipt. Such notice shall be deemed to have been duly given and received when delivered in person or one (1) day after dispatch by overnight courier or three (3) days after dispatch by registered or certified mail, properly addressed postage prepaid. Any Party may change its address for the purpose of notice by giving notice in accordance with the provisions of this Section. This Agreement and any modification, amendment or waiver shall be binding upon each of the Parties hereto and their respective representatives, heirs, successors and permitted assigns. No failure on the part of any Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof. No waiver of any breach by any Party of any of the terms and conditions hereof shall operate as a waiver of any other and further breach of any of the terms and conditions hereof. The remedies herein provided are cumulative and not exclusive of any remedies provided by law. This Agreement shall be governed by and construed in accordance with the law of the State of New York without regard to the conflict of laws provisions thereof. Each of the Parties hereby expressly and irrevocably submit to the jurisdiction and venue of a court sitting in the State of New York in any action or proceeding arising out of or relating to this Agreement and expressly and irrevocably waives any immunity from jurisdiction thereof and any claim of improper venue, forum non conveniens or any similar basis to which it might otherwise be entitled in any such action or proceeding. All Parties agree to execute, acknowledge and deliver in proper form, such additional documents and to perform such further actions as may be necessary or appropriate to effectuate the provisions of this Agreement. The representations, warranties, covenants and agreements contained in the Agreement shall survive the execution and delivery of this Agreement and the termination of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one Agreement. The Parties hereto agree that facsimile transmission or scanned PDF files of original or electronic signatures shall constitute and be accepted as original signatures. If any provision of this Agreement shall be held by a court to be unenforceable, it shall be deemed modified to the extent necessary to make it enforceable, and any such unenforceability shall not affect the enforceability of any other provision of this Agreement. This Agreement has been extensively negotiated by counsel to all Parties hereto and shall be deemed prepared by all such counsel. Any ambiguities shall not be deemed to be construed against any Party hereto.

11.   <u>Bankruptcy Filing</u>.

(a)   From and after the Effective Date and until the Closing Date, All Year shall (i) deliver to Purchaser, at least two (2) business days in advance, where practicable, drafts of any

11

and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed with or submitted to the Bankruptcy Court in connection with this Agreement for Purchaser's prior review and comment, including any tax motions, and such filings shall be reasonably acceptable to Purchaser; and (ii) fully cooperate with Purchaser and its attorneys with respect to any claim, action, suit, arbitration or proceeding by or before any court, tribunal, arbitrator, or other governmental authority that arises out of, relates to, or is in any way connected with or impacts, this Agreement, the Closing documents set forth in Section 6 or the transactions contemplated hereby. All Year agrees to diligently prosecute the Transaction Approval Motion and seek entry of the Transaction Approval Order. In the event the entry of the Transaction Approval Order shall be appealed, All Year shall use commercially reasonable efforts to defend such appeal. All Year shall comply with all applicable notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Transaction Approval Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. All Year shall use commercially reasonable efforts to cause the Transaction Approval Order to be entered and become a Final Order as soon as practicable after entry. Notwithstanding the foregoing, nothing in this Agreement precludes the Parties from consummating the transactions contemplated by this Agreement if the Transaction Approval Order has been entered and has not been stayed and Purchaser, in its sole discretion, elects to waive in writing the condition set forth in Section 7(b)(iii) that the Transaction Approval Order be a Final Order.

(b)    From and after the Effective Date and until the Closing Date, All Year shall (i) deliver to Purchaser, at least two (2) Business Days in advance, where practicable, drafts of any and all material applications, affidavits or affirmations, draft orders, skeleton arguments, and other papers to be filed with  or submitted to the BVI Commercial Court in connection with this Agreement for the Purchaser's prior review and comment, including any tax motions, and such filings shall be reasonably acceptable to the Purchaser; and (ii) fully cooperate with the Purchaser and its attorneys with respect to any claim, action, suit, arbitration or proceeding by or before any court, tribunal, arbitrator, or other governmental authority that arises out of, relates to, or is in any way connected with or impacts, this Agreement, the Closing documents set forth in Section 6 or the transactions contemplated hereby. All Year agrees to diligently prosecute the application seeking the BVI Transaction Approval Order. In the event the BVI Transaction Approval Order shall be appealed, All Year shall use commercially reasonable efforts to defend such appeal. All Year shall comply with all applicable notice requirements (i) of the ECSC Civil Procedure Rules and the BVI Insolvency Rules or (ii) imposed by the BVI Transaction Approval Order, in each case, in connection with any applications, affidavits or affirmations, draft orders, skeleton arguments to be filed in connection herewith. All Year shall use commercially reasonable efforts to cause the BVI Transaction Approval Order to be made.

(c)    The following terms shall have the meanings set forth below:

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereinafter in effect, or any successor statute.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075 and the general, local and chambers rules of the Bankruptcy Court.

"BVI Transaction Approval Order" means an order of the BVI Commercial Court pursuant to the terms of the PL Order authorizing and approving, *inter alia*, the execution, delivery and performance of any and all Closing documents set forth in Section 6 by All Year and the taking of any and all actions by All Year necessary or appropriate to effectuate the transactions contemplated hereby, which order shall be in form and substance, including in respect of all finding of facts and conclusions of law, acceptable to Purchaser and All Year.

"Final Order" means a judgment or order of the Bankruptcy Court (or any other court of competent jurisdiction) entered on the docket in the Chapter 11 Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such claim, action, suit, arbitration or proceeding or order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

"Transaction Approval Motion" means the motion filed on behalf of All Year pursuant to, *inter alia*, Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Code seeking entry of the Transaction Approval Order and approval the transactions contemplated by this Agreement, which shall be in form and substance acceptable to All Year and Purchaser.

"Transaction Approval Order" means an order of the Bankruptcy Court pursuant to Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Code authorizing and approving, *inter alia*, the execution, delivery and performance of any and all Closing documents set forth in Section 6 by All Year and the taking of any and all actions by All Year necessary or appropriate to effectuate the transactions contemplated hereby, which order shall be in form and substance, including in respect of all finding of facts and conclusions of law, acceptable to Purchaser and All Year.

***"Signature page follows"***

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the day and year first above written.

SELLER:                                           INDEMNITORS:

CHESTER HOLDINGS NY LLC,                          CHESTER HOLDINGS NY LLC,
a New York limited liability company              a New York limited liability company

By:_____             By:_____
All Year Holdings Limited, majority Member        All Year Holdings Limited, majority Member
By: Assaf Ravid                                   By: Assaf Ravid
Title: Authorized Manager                         Title: Authorized Manager

By:_____             By:_____
Name: Assaf Ravid                                 Name: Assaf Ravid
Title: Manager                                    Title: Manager

                                                  All Year Holdings Limited

                                                  By:_____
                                                  By: Assaf Ravid, Authorized Manager

PURCHASER:
DCP KINGS POINT, LLC

By:_____
Name:
Title:

14

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the day and year first above written.

SELLER:                                          INDEMNITORS:

CHESTER HOLDINGS NY LLC,                          CHESTER HOLDINGS NY LLC,
a New York limited liability company              a New York limited liability company

By:_____                      By:_____
All Year Holdings Limited, majority Member        All Year Holdings Limited, majority Member
By: Assaf Ravid                                   By: Assaf Ravid
Title: Authorized Manager                         Title: Authorized Manager

By:_____                      By:_____
Name: Assaf Ravid                                 Name: Assaf Ravid
Title: Manager                                    Title: Manager

                                                  All Year Holdings Limited

                                                  By:_____
                                                  By: Assaf Ravid, Authorized Manager

PURCHASER:
DCP KINGS POINT, LLC

By: DCP Managing Member, LLC,
    a Delaware limited liability company

By:_____
Name: Gary Katz
Title: Managing Member

14

## EXHIBIT A

## FORMS OF RELEASE DOCUMENTS

## SEE ATTACHED

## <u>TERMINATION OF GUARANTY</u>

KNOW ALL MEN BY THESE PRESENTS

THAT DCP KINGS POINT, LLC, having an address at 360 Hamilton Avenue, Suite 1110, White Plains, NY 10601,

DOES HEREBY CERTIFY that that certain GUARANTY, made as of April 23, 2018, by YOEL GOLDMAN, having an address at 199 Lee Avenue, #693, Brooklyn, New York 11211 ("<u>Guarantor</u>"), to DCP KINGS POINT, LLC and its successors and/or assigns, having an address at 360 Hamilton Avenue, Suite 1110, White Plains, NY 10601 ("<u>Lender</u>"), in connection with that certain Three Million Six Hundred Thousand and 00/100 Dollar ($3,600,000.00) loan made by Lender to CHESTER HOLDINGS NY LLC, IS TERMINATED.

DCP KINGS POINT, LLC


By:_____
Name:
Title:

16

## TERMINATION OF GUARANTY

KNOW ALL MEN BY THESE PRESENTS

THAT DCP KINGS POINT, LLC, having an address at 360 Hamilton Avenue, Suite 1110, White Plains, NY 10601,

DOES HEREBY CERTIFY that that certain GUARANTY, made as of April 23, 2018, by ALL YEAR HOLDINGS LIMITED, having an address at 199 Lee Avenue, #693, Brooklyn, New York 11211 ("Guarantor"), to DCP KINGS POINT, LLC and its successors and/or assigns, having an address at 360 Hamilton Avenue, Suite 1110, White Plains, NY 10601 ("Lender"), in connection with that certain Three Million Six Hundred Thousand and 00/100 Dollar ($3,600,000.00) loan made by Lender to CHESTER HOLDINGS NY LLC, IS TERMINATED.

DCP KINGS POINT, LLC


By:_____
Name:
Title:

**TERMINATION OF PLEDGE AND SECURITY AGREEMENT**

KNOW ALL MEN BY THESE PRESENTS

THAT DCP KINGS POINT, LLC, having an address at 360 Hamilton Avenue, Suite 1110, White Plains, NY 10601,

DOES HEREBY CERTIFY that that certain PLEDGE AND SECURITY AGREEMENT, made as of April 23, 2018, by ALL YEAR EQUITY PARTNERS LLC, having an address at 199 Lee Avenue, #693, Brooklyn, New York 11211 ("Pledgor"), to DCP KINGS POINT, LLC and its successors and/or assigns, having an address at 360 Hamilton Avenue, Suite 1110, White Plains, NY 10601 ('Lender'), of all of Pledgor's direct and beneficial membership interests as the sole member of 141 SPENCER LLC, in connection with, and as collateral security for, that certain Three Million Six Hundred Thousand and 00/100 Dollar ($3,600,000.00) loan made by Lender to CHESTER HOLDINGS NY LLC, IS TERMINATED and Lender hereby consents to the same being discharged of record with the filing of the UCC-3 Termination Statement annexed hereto.

DCP KINGS POINT, LLC


By:_____
Name:
Title:

18

## EXHIBIT B

## FORM OF ASSIGNMENT OF MEMBERSHIP INTEREST

## SEE ATTACHED

## <u>ASSIGNMENT OF MEMBERSHIP INTEREST</u>

**KNOW THAT,** effective as of _____, 2022 (the '<u>Effective Date</u>'), CHESTER HOLDINGS NY LLC, a New York limited liability company having an address at _____ ("<u>Assignor</u>"), in consideration of Four Million One Hundred Thousand and 00/100 Dollars ($4,100,000.00) and other good and valuable consideration paid by DCP KINGS POINT, LLC, having an address at 360 Hamilton Avenue, Suite 1110, White Plains, NY 10601 ("<u>Assignee</u>"), hereby assigns unto Assignee one hundred (100%) percent of Assignor's right, title and membership interest in and to GREENS AT CHESTER LLC, a New York limited liability company having an address at 65 Steuben Street, Brooklyn, NY 11205.

**TO HAVE AND TO HOLD** the same unto Assignee and its successors and assigns forever.

**IN WITNESS WHEREOF**, Assignor has duly executed this Assignment as of the Effective Date.

CHESTER HOLDINGS NY LLC,
a New York limited liability company


By:_____
All Year Holdings Limited, majority Member
By: Assaf Ravid
Title: Authorized Manager




By:_____
Name: Assaf Ravid
Title: Manager

20

**EXHIBIT C**

**FORM OF OPINION OF COUNSEL**

**SEE ATTACHED**

_____, 2022

DCP KINGS POINT, LLC
360 Hamilton Avenue, Suite 1110
White Plains, NY 10601

Re:   **Membership Interest Purchase and Sale Agreement between Chester Holdings NY
       LLC, and DCP Kings Point, LLC,  concerning a membership interest in Greens at
       Chester LLC**

Ladies and Gentlemen:

We are special counsel to Chester Holdings NY LLC, a New York limited liability company (the "**Company**"), in connection with the Company's entry into the Membership Interest Purchase and Sale Agreement, dated on or about the date hereof, between the Company and DCP Kings Point, LLC ("**DCP**"), having an address at 360 Hamilton Avenue, Suite 1110, White Plains, NY 10601 (the "**Agreement**").

In addition to any other conditions or limitations set forth herein, you are advised that All Year Holdings Limited, a British Virgin Islands entity which owns the majority of the Company's equity ("**AYH BVI**"), has filed for bankruptcy protection and is subject to proceedings in the bankruptcy courts in the British Virgin Islands and the United States Bankruptcy Court Southern District of New York (such proceedings being the "**Bankruptcy Proceedings**").

In our capacity as counsel to the Company, we have examined and relied upon the following documents and agreements in connection with the Agreement (collectively, the "**Group Documents**"):

1. The Agreement and the exhibits thereto (collectively, together with the Agreement, the "**Transaction Documents**").

2. Court Order of the Eastern Caribbean Supreme Court in the High Court of Justice Commercial Division Virgin Islands, In the Matter of All Your Holdings Limited and in the Matter of the BVI Insolvency Act, 2003 (as Amended) Claim No. BVIHC (COM) 0220 of 2021 Order for Appointment of Joint Provisional Liquidators, approved December 20, 2021 (the "**BVI Order**").

3. Court Order of the United States Bankruptcy Court Southern District of New York: In re All Year Holdings Limited, Debtor, Chapter 11 Case No 21-12051 ("**MG**"), approved January __, 2022 ("**US Order**").

4. Letters from Mishmeret Trust Service Company Ltd, dated as of December 9, 2021 certifying as to the approval of the holders of the Series B, C, D and E bondholders of

AYH BVI of various transactions and settlements between AYH BVI with DCP and its affiliates (the "**Bondholder Consents**").

5. Resolutions of the majority member of the Company, signed by the Joint Provision Liquidators of the Company, dated as of _____.

6. The Limited Liability Company Operating Agreement of the Company, dated as of October 23, 2017.

7. The Limited Liability Company Operating Agreement of Greens at Chester LLC.

In rendering our opinion we have also examined such certificates of public officials, operating agreements, partnership agreements, and other organizational documents and records and other certificates and instruments as we have deemed necessary for the purposes of the opinion herein expressed, including, but not limited to certificates and written statements of officers, managers, and/or members of the Company and/or its affiliates.

We have further assumed, (i) the genuineness of the signatures of persons signing any Group Documents on behalf of all parties; (ii) the genuineness of all signatures and the authenticity and completeness of all records, certificates, instruments and documents submitted to us as originals; and (iii) the conformity to authentic originals of all records; certificates, instruments and documents submitted to us as certified, conformed, photostatic or facsimile copies thereof.

Subject to the assumptions, qualifications, exclusions and other limitations which are identified in this opinion letter and in the schedules attached to this opinion letter, we advise you as follows:

1. Based solely on our review of the good standing certificate for the Company, the Company is duly formed, validly existing and in good standing under the laws of the State of New York.

2. The Company has the power and authority to execute, deliver and perform its obligations under the Transaction Documents to which the Company is a party.

3. The execution and delivery of the Transaction Documents by the Company and the performance of the Company's obligations under the Transaction Documents have been duly authorized by all requisite action of the Company, and the Transaction Documents to which the Company is a party have been duly executed and delivered by the Company.

4. No authorization, consent, approval or other action by the Company or filing by the Company with New York State or the federal court or United States governmental authorities is required in connection with the execution and delivery by the Company of

the Transaction Documents to which it is a party, except to the extent which may be required pursuant to the Bankruptcy Proceedings.

5. Subject to any determination under the Bankruptcy Proceedings, the execution and delivery by the Company of the Transaction Documents to which it is a party and performance by the Company of its respective obligations under such Transaction Documents, will not (i) conflict with the Company's organizational documents, (ii) conflict with or violate any order, decree or judgment of any New York State or federal court binding on the Company or (iii) cause the creation of any lien upon any of the property of the Company, except as specifically contemplated by the Transaction Documents.

In rendering this opinion, we have assumed the validity of authorizations by and on behalf of AYH BVI in reliance on the BVI Order and the US Order, and that the Bondholder Consents, approve, if and to the extent necessary, the transactions contemplated by the Agreement. We have also assumed the validity of the jurisdiction and authority of the courts involved in the Bankruptcy Proceedings.

This opinion is limited to the matters expressly opined on herein, and no opinion may be implied or inferred beyond those expressly stated.

Our opinions above are subject to the following additional information, limitations, exceptions and qualifications:

(i) applicable United States federal or state bankruptcy, insolvency, fraudulent transfer or conveyance, reorganization, receivership, moratorium, arrangement or assignment for the benefit of creditors or similar laws from time to time in effect affecting generally the enforcement of creditors' rights and remedies, including, without limitation, judicially developed doctrines in these areas, such as substantive consolidation and equitable subordination;

(ii) general principles of equity (regardless of whether enforcement is sought in equity or at law), including, without limitation, principles (A) governing the availability of specific performance, injunctive relief or other equitable remedies which may make such remedies unavailable, (B) of reasonableness, good faith and fair dealing in the performance and enforcement of an agreement by the party seeking enforcement, (C) affording equitable defenses (g., waiver, laches and estoppel), or the defense of impossibility, against a party seeking enforcement, (D) affording defenses based upon the unconscionability of the enforcing party's conduct, or (E) requiring consideration of the materiality of a breach and the consequences of the breach to the party seeking enforcement;

(iii) rules of law or court decisions that (A) limit or affect the enforcement of provisions of a contract that purport to waive, or to require waiver of, the obligations of good faith, fair dealing, diligence and reasonableness, (B) provide that forum selection clauses in contracts are not necessarily binding on the court in the forum selected, (C) limit the availability of a remedy under certain

circumstances where another remedy has been elected, (D) provide a time limitation after which a remedy may not be enforced, (E) limit the right of a creditor to use force or cause a breach of the peace in enforcing rights, (F) relate to the sale or disposition of collateral or the requirements of a commercially reasonable sale, (G) impose a fiduciary duty on a person or entity, or (H) limit the enforceability of provisions releasing, exculpating or exempting a party from, or requiring indemnification of a party for, liability for its own action or inaction, to the extent the action or inaction involves negligence, recklessness, willful misconduct, unlawful conduct, violation of public policy or litigation against another party determined adversely to such party;

(iv)     generally applicable rules of law that govern and afford judicial discretion regarding the determination of damages and entitlement to attorneys' fees and other costs; and

the further information, limitations, exceptions and qualifications set forth here

This opinion is rendered on the date hereof and we do not undertake and expressly disclaim any duty to supplement or update such opinion, if, after the date hereof, facts or circumstances come to our attention of which we are presently unaware and that are materially inconsistent with any of the facts and assumptions set forth herein, changes in the law material to the opinions set forth herein occur, or the Transaction Documents are amended in any respect material to the opinions set forth herein.

We are members of the bar of the State of New York. We express no opinion as to any matter other than those of the State of New York or federal laws of the United States.

This opinion letter is based upon currently existing laws, statutes, rules, ordinances and regulations and judicial decisions. We disclaim any obligation to advise you of any changes of any of these sources of law or subsequent developments in law or changes in facts or circumstances which might affect any matters or opinions set forth in this opinion letter. We express no opinion concerning the effect of pending or other legislation, temporary or final rules or regulations, or other authoritative guidance, which is hereafter enacted, adopted or issued. Such legislation, rules, regulations, or guidance could alter the conclusions stated herein.

This opinion letter is being furnished to you, at the request of the Company pursuant to the Agreement, is solely for your benefit and has been rendered solely in connection with the Agreement, and may not be used for any other purpose, or furnished to, quoted to or relied upon by any other person or entity without our prior written consent, except that this opinion may be relied upon by your successors and assigns.

Very truly yours,

## **EXHIBIT D**

## **SELLER RESOLUTION**

## **SEE ATTACHED**

### WRITTEN CONSENT OF THE
### MEMBERS OF CHESTER HOLDINGS NY LLC
### IN LIEU OF MEETING

**THE UNDERSIGNED**, constituting the holders of all of the membership interests of Chester Holdings NY LLC, a New York limited liability company, (the "**Company**"), do hereby consent, pursuant to Sections 402 and 407 of the New York limited liability company law, to the adoption of the following resolutions as of _____, 2022:

**WHEREAS**, in consideration of various pending matters, the members of the Company (the "**Members**") wish to replace the manager of the Company (the "**Manager**");

**WHEREAS**, the Company owns a minority, non-controlling common equity interest in Greens at Chester LLC, having an address at 65 Steuben Street, Brooklyn, NY 11205, an entity formed in 2017 to develop houses on a 117-acre parcel of land in the Town of Chester, Orange County NY (such minority interest being the "**Greens Interest**");

**WHEREAS**, the Company received a loan from DCP Kings Point LLC (the "**Lender**") in the amount of $3,600,000 (the "**Loan**");

**WHEREAS**, the Company is currently in default on the Loan;

**WHEREAS,** the Company has the opportunity to sell the Greens Interest to the Lender pursuant a Membership Interest Purchase and Sale Agreement substantially in the form of Exhibit A hereto (the "**Purchase Agreement**") for aggregate consideration equal to (i) forgiveness of the principal of the Loan, (ii) a cash payment to the Company of $500,000, and (iii) settlement and release of certain claims and collateral as set forth in the Purchase Agreement; and

**WHEREAS**, the Members have determined that the Company's execution and delivery of the Purchase Agreement and performance of the Company's obligations thereunder (the "**Sale Transaction**") is in the best interests of the Company:

**NOW, THEREFORE, IT IS HEREBY:**

**RESOLVED**, that the Members remove Yoel Goldman as Manager of the Company;

**RESOLVED**, that the Members appoints Ephraim Diamond and Assaf Ravid, acting jointly, as the Manager of the Company;

**RESOLVED**, the undersigned Members hereby approve and authorize the Sale Transaction;

**RESOLVED**, that in connection with the matter contemplated in the preceding resolutions, the Manager is hereby authorized and directed, in the name and on behalf of the Company, to undertake any and all actions the Manager may deem necessary, appropriate or desirable to effectuate the Sale Transaction; and it is further

**RESOLVED**, that in connection with the matters contemplated in the preceding resolutions, the Manager hereby is, authorized and directed, in the name and on behalf of the

Company, to make any filings with a governmental agency necessary, appropriate or desirable in order to carry out fully the intent and accomplish the purposes of the foregoing resolutions;

**RESOLVED**, that all actions were previously taken by the Manager of the Company in connection with or in order to carry out the purposes and intent of, the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Company; and it is further

**RESOLVED**, that the Manager hereby is authorized, directed and empowered, in the name and on behalf of the Company, to take any action (including, without limitation, the payment of expenses) and to execute (by manual or facsimile signature) and deliver all such further documents, contracts, letters, agreements, instruments, drafts, receipts or other writings that such officer or officers may in their sole discretion deem necessary, appropriate or desirable to carry out, comply with and effectuate the purposes of the foregoing resolutions and the transactions contemplated thereby and that the authority of the Manager to execute and deliver any of such documents and instruments, and to take any such other action, shall be conclusively evidenced by its execution and delivery thereof or their taking thereof.

[REMAINDER INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, the undersigned have executed this instrument as of the date set forth above.

ALL YEAR HOLDINGS LIMITED, MEMBER


By: _____
Name: Assaf Ravid
Title: Authorized Manager


_____
Yankie Rochlitz, Member


Manager:


By: _____
Name: Assaf Ravid


By: _____
Name: Ephraim Diamond

## **EXHIBIT E**

## **RESOLUTION OF GREENS AT CHESTER LLC**

## **SEE ATTACHED**

## MEMBERS AND MANAGING MEMBER CONSENT

The undersigned, being all of the Members and Managing Member of GREENS AT CHESTER LLC a New York limited liability company (the "Company"), DO HEREBY CERTIFY that the following resolutions were duly adopted at a properly called meeting (pursuant to waiver of notice) in connection with the sale and transfer of all of the membership interest in the Company (the "Seller Interest"), owned by CHESTER HOLDINGS NY LLC ("Seller"), to DCP KINGS POINT, LLC ("Purchaser"), for the aggregate purchase price of Four Million One Hundred Thousand and 00/100 Dollars ($4,100,000.00) and other good and valuable consideration (collectively, the "Purchase Price"); and that such resolutions remain in full force and effect, without amendment, on the date hereof:

**BE IT RESOLVED**, that the Members and Managing Member hereby consent to Seller selling and transferring the Seller Interest to Purchaser for the Purchase Price (the "Sale"); and be it

**FURTHER RESOLVED**, that the Members and Managing Member hereby consent to registering the Seller Interest in the name of Purchaser in its books and records, and confirm that Purchaser may further assign the Seller Interest, without requiring the Company's consent, to any affiliate entities in which Gary Katz and/or David Billet have an ultimate beneficial interest; and be it

**FURTHER RESOLVED**, that the Members and Managing Member hereby consent to all of the terms, conditions and obligations of that certain Membership Interest Purchase and Sale Agreement between Seller and Purchaser; and be it

**FURTHER RESOLVED**, that, in accordance with the operating agreement of the Company, the Managing Member of the Company be, and hereby is, authorized and directed to execute and deliver, in the name of the Company, any and all agreements and documents, with such additions or deletions thereto as the Managing Member executing the same may approve, such approval to be conclusively evidenced by such Managing Member's execution and delivery thereof; and be it

**FURTHER RESOLVED**, that the Managing Member of the Company, on behalf of the Company, be and hereby is authorized and directed to take such additional actions, execute and deliver such additional documents, instruments and agreements, and make such further determinations as may be necessary or appropriate to carry into effect the foregoing resolutions; and be it

**FURTHER RESOLVED**, that this Resolution may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one Resolution and that facsimile transmission, PDF files or electronic signatures shall constitute and be accepted as original signatures.

***"Signature page follows"***

27

**<u>Signature Page to Resolution</u>**

GREENS AT CHESTER LLC


By:_____

Name: Jehuda Landau
      Title:   Managing Member

_____
Gary Katz, Individually and on behalf of
DRH Chester LLC and Chester Pref Equity,
LLC


_____
Jehuda Landau, Individually and on behalf
of Greens at Chester Operating LLC

_____
David Billet, Individually and on behalf of
DRH Chester LLC and Chester Pref Equity,
LLC


_____
Samuel Landau, Individually and on behalf
of Chester Hills Development LLC
and Greens at Chester Operating LLC

_____
Alter Bittman, Individually


_____
Chaim Schwartz, Individually and on behalf
of Greens at Chester Operating LLC

_____
Joel Grunfeld, Individually and on behalf of
Rolling Hills Chester LLC


_____
Lipa Meisels, Individually and on behalf
of Dreamwoods LLC

_____
Dov Tratner, Individually and on behalf of
Rolling Hills Chester LLC


29

# **EXHIBIT F**

## **[INTENTIONALLY OMITTED]**

## **EXHIBIT G**

## **PURCHASER RESOLUTION**

### **SEE ATTACHED**

## <u>MEMBERS AND MANAGER CONSENT</u>

The undersigned, being all of the Members and Manager of DCP KINGS POINT, LLC (the "<u>Company</u>"), DO HEREBY CERTIFY that the following resolutions were duly adopted at a properly called meeting (pursuant to waiver of notice) in connection with the purchase of all of the membership interest owned by CHESTER HOLDINGS NY LLC in GREENS AT CHESTER LLC (the "<u>Seller Interest</u>"), for the aggregate purchase price of Four Million One Hundred Thousand and 00/100 Dollars ($4,100,000.00) and other good and valuable consideration (collectively, the "<u>Purchase Price</u>"); and that such resolutions remain in full force and effect, without amendment, on the date hereof:

**BE IT RESOLVED**, that the Members and Manager hereby consent to the Company Purchasing the Interest from Seller for the Purchase Price (the "<u>Sale</u>"); and be it

**FURTHER RESOLVED**, that the Members and Manager hereby consent to all of the terms, conditions and obligations of that certain Membership Interest Purchase and Sale Agreement, the terms of which are hereby ratified and approved; and be it

**FURTHER RESOLVED**, that, in accordance with the operating agreement of the Company, the Manager of the Company be, and hereby is, authorized and directed to execute and deliver, in the name of the Company, any and all agreements and documents, with such additions or deletions thereto as the Manager executing the same may approve, such approval to be conclusively evidenced by such Manager's execution and delivery thereof; and be it

**FURTHER RESOLVED**, that the Manager of the Company, on behalf of the Company, be and hereby is authorized and directed to take such additional actions, execute and deliver such additional documents, instruments and agreements, and make such further determinations as may be necessary or appropriate to carry into effect the foregoing resolutions; and be it

**FURTHER RESOLVED**, that this Resolution may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one Resolution and that facsimile transmission, PDF files or electronic signatures shall constitute and be accepted as original signatures.

*"Signature page follows"*

32

**Signature Page to Resolution**

**MEMBER AND MANAGER**:

DCP Managing Member, LLC,
a Delaware limited liability company


By:_____
Name: Gary Katz
Title: Managing Member