WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Proposed Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                                        :

**In re**                                                :        Chapter 11

**ALL YEAR HOLDINGS LIMITED**       :        Case No. 21-12051 (MG)

                 **Debtor**                      :

------------------------------------------------------------X

**DECLARATION OF EPHRAIM DIAMOND**
**IN SUPPORT OF PARENT DEBTOR'S MOTION**
**PURSUANT BANKRUPTCY CODE §§ 105(a) AND 363**
**AND BANKRUPTCY RULE 9019 FOR APPROVAL OF SETTLEMENT PROVIDING**
**FOR RECAPITALIZATION OF NON-DEBTOR ALL YEAR EQUITY PARTNERS LLC**

       I, Ephraim Diamond, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

       1.    I am over the age of 18 and competent to testify. The Parent Debtor maintains its office at 12 Spencer Street, 3rd Floor in Brooklyn, NY 11205. I submit this declaration (the "**Declaration**") in support of the *Parent Debtor's Motion Pursuant to Bankruptcy*

*Code §§ 105(a) and 363 and Bankruptcy Rule 9019 for Approval of Settlement Providing for Recapitalization of Non-Debtor All Year Equity Partners LLC* (the "**Motion**").[1]

### Qualifications

2. On December 30, 2020, I was retained as the Associate Restructuring Officer (the "**ARO**") of All Year Holdings Limited (the "**Parent Debtor**"). On December 16, 2021, the Parent Debtor filed an application under the laws of the British Virgin Islands ("**BVI**") with the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division Virgin Islands (the "**BVI Court**") seeking the appointment of Paul Pretlove and Charlotte Caulfield of Kalo (BVI) Limited as the joint provisional liquidators (the "**JPLs**") under the applicable provisions of the BVI Insolvency Act 2003. Pursuant to the Order for Appointment of Joint Provisional Liquidators, dated December 20, 2021 (the "**BVI Court Order**"), I was appointed as an Authorized Manager of the Parent Debtor. The BVI Court Order granted me the authority to assist the other Authorized Managers with overseeing the day-to-day operations of the Parent Debtor and assisting with the overall administration of the Parent Debtor's chapter 11 case (including negotiations with creditors and potential investors). The BVI Court Order also granted me authority to execute and deliver documents as required in furtherance of my duties, as instructed by Assaf Ravid or Shaul Schneider.

3. In September, 2018, I founded Arbel Capital Advisors, which is an advisory firm providing restructuring, bankruptcy, and independent fiduciary related services. In addition to my role at All Year, I am currently serving as the associate restructuring officer of Brookland

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2

Upreal Limited, a Brooklyn based real estate development company and public issuer of Israeli bonds, similar to All Year. In this capacity, I manage Brookland's operations and legal functions as it undergoes a cross-border liquidation. Furthermore, I serve as the chief restructuring officer of an 11 Building Multi-Family Portfolio, overseeing the prepackaged bankruptcy for a portfolio of buildings in New York City.

4. Currently, I continue to serve as an independent director of the Nine West Litigation Trust established to provide for creditors' recoveries following its emergence from bankruptcy. I also was appointed as the sole independent director of Ford Models, Inc. in connection with a sale by the majority shareholder. Before opening Arbel Capital, I worked for over ten years as a director and senior legal analyst at Davidson Kempner Capital Management, LP and, before that, for 6 years as a corporate bankruptcy associate at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, LLP.

5. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of the relevant documents, including information provided by other parties; (c) discussions and negotiations I have participated in since my appointment as ARO through the present; (d) information provided to me by members of the professional teams who advised on the Restructuring; and (e) my opinions based upon my experience. If called upon to testify, I could and would testify competently to the facts set forth herein.

**Background**

6. Immediately upon my appointment as the Parent Debtor's ARO, I became engaged in discussions with DCP All Year Pref Equity LLC (the "**Preferred Investor**") regarding

resolution of disputes pertaining to its $35 million investment in All Year Equity Partners LLC (the "**Company**"), an indirect subsidiary of the Parent Debtor. This investment was intended to support the Company's real property holdings in exchange for a perpetual, participating preferred instrument with redemption rights that entitle the Preferred Investor to certain payments pursuant to that certain Amended and Restated Limited Liability Company Agreement of All Year Equity Partners LLC, dated as of December 5, 2018. At the time that the Preferred Investor made its investment, the Parent Debtor entered into the BVI Inducement Agreement, the Completion Guaranty, and the Environmental Indemnity (each as defined in the Recapitalization Agreement), pursuant to which the Parent Debtor guaranteed the obligations of the Company to the Preferred Investor.

7. The Company is (i) the sole member of six limited liability companies and (ii) the holder of 90% of the membership interests in two other limited liability companies, each of which either directly or indirectly own interests in certain real properties located in Brooklyn, New York. The common equity in the Company is owned by All Year Holdings Common, a subsidiary of All Year Holdings LLC, which itself is a direct subsidiary of the Parent Debtor. The preferred equity in the Company is owned by the Preferred Investor. From time to time over the past several years, the Parent Debtor has made advances to the property level entities to enable them to pay operating expenses, debt service, and real estate taxes. As of the date hereof, the Parent Debtor estimates that it has intercompany claims against such entities in the aggregate amount of approximately $2.3 million (the "**Intercompany Receivables**").

8. Following extensive delays on certain development projects, the Company lacked the liquidity to continue making payments to the Preferred Investor and was faced with

4

addressing certain purported defaults. The Company and Preferred Investor entered into a series of forbearance agreements, and, in early 2021, began discussing a restructuring of the Company. At the outset of the Restructuring's negotiations, the Company and the Preferred Investor had vastly different calculations as to the Preferred Investor's claims based on the following issues, among others: (i) purported unpaid cash distributions, (ii) paid in kind distributions, (iii) preferred distribution defaults, and (iv) late payment charges. Specifically, the Preferred Investor alleged that the Company owed the Preferred Investor approximately $85 million on account of its preferred equity interest, while the Company's calculations indicated that it owed the Preferred Investor approximately $57 million. As of December 31, 2021, the Preferred Investor contends that it is owed in excess of $100 million.

9. Despite this delta, the Company and the Preferred Investor engaged in lengthy, good-faith negotiations regarding a consensual path forward. The Parties have been negotiating the terms of the Restructuring for many months and, if the Chapter 11 Case had not been filed on an emergency basis, it is likely that the Restructuring would have been consummated already. On December 15, 2021, following the commencement of the Chapter 11 Case, the Preferred Investor sent the Company a "control shift notice" and, purportedly, in accordance with its rights under the Company's operating agreement, the Preferred Investor appointed DFA Prop Manager, LLC (the "**Manager**"), an affiliate of the Preferred Investor, as manager of the Company.

10. In addition to the Parent Debtor's interest in the Company, the Parent Debtor holds an 86.5% ownership interest in Chester which, in turn, holds a 43.75% ownership interest in Greens at Chester LLC (the "**Greens**").

11. In October 2017, Greens entered into an agreement to purchase land in upstate New York to develop single family and semi-detached housing units. DCP Kings lent $3.6 million to Chester (the "**Chester Loan**") and was granted a security interest in the Company's 100% membership interest in 141 Spencer LLC, the owner of a residential building in Brooklyn. In or around December 2019, following substantial delays in the project due to extensive litigation seeking to prevent the development from moving forward, Chester ceased making interest payments to DCP Kings. Chester believes that DCP Kings is owed in excess of $5 million on account of the Chester Loan, including accrued and unpaid interest. Given current estimates of the value of Chester's assets, and the lack of capital needed to complete the project, the Parent Debtor believes that its equity in Chester and, therefore, the Greens, is negligible, at best.

12. The Parent Debtor, the Company, the Preferred Investor, DCP Kings, and Chester have now reached agreement – which is supported by the Parent Debtor's key creditor constituency, the BVI Bondholders – on the terms of a comprehensive restructuring of the Company, as well as the terms for a sale of Chester's equity interest in the Greens (together, the "**Restructuring**"). Furthermore, Yoel Goldman, the Parent Debtor's sole economic shareholder, has been provided with the Agreements and has advised the Parent Debtor that he does not object to the terms of the Restructuring or the relief being requested in the Motion. The Restructuring is memorialized in the following agreements: (i) the Recapitalization Agreement, dated January 13, 2022, a copy of which is attached to the Motion as **Exhibit A** (the "**Recapitalization Agreement**"), (ii) the Second Amended & Restated Limited Liability Company Agreement, a substantially final form of which is attached to the Motion as **Exhibit B** (the "**Second A&R LLCA**" ), and (iii) the Membership Interest Purchase and Sale Agreement,

6

dated January 13, 2022, a copy of which is attached to the Motion as **Exhibit C** (the "**MIPA**" and, collectively with the Recapitalization Agreement and the Second A&R LLCA, the "**Agreements**").

### The Restructuring

13. In the broadest terms, the Restructuring: (a) fully and finally resolves the disputes among the Parent Debtor, the Company, the Preferred Investor, and DCP Kings, (b) grants the Parent Debtor releases that will materially reduce the claims against it, and (c) provides a basis upon which All Year Holdings Common and, ultimately, the Parent Debtor, may share in the certain proceeds of the sale of properties owned by the Company's direct and indirect non-debtor subsidiaries through the Preferred Investor's agreement to significantly reduce its preferred equity claim against the Company and to modify the proceeds waterfall, as set forth in the Second A&R LLCA and described below.

14. The salient terms of the Restructuring are set forth below:[2]

   i. <u>Relief from Obligations</u>. The Parent Debtor will be relieved of its obligations under the (a) BVI Inducement Agreement, the Completion Guaranty, and the Environmental Indemnity with respect to the Company, and (b) guarantee of the Chester Loan.

   ii. <u>Distributions</u>. The Preferred Investor is entitled to receive $50 million of preferred distributions in the first step of the Waterfall (as defined below). The Manager shall have sole discretion to determine the amount and timing of all distributions from the Company. However, the proceeds from the dispositions of the AY Properties (as defined below) will be distributed in

---

[2] The descriptions of the Agreements contained herein are intended to provide a summary of the key terms thereof and are qualified in their entirety by reference to the Agreements themselves.

accordance with the following agreed upon waterfall (the "**Waterfall**"):[3]

First, 100% to the Preferred Members pro rata based upon the number of Class B Units held until the Preferred Members have received cumulative distributions equal to $50 million.

Second, 100% to Members who have made Member Loans, pro rata based on the outstanding principal balance of such Member Loans held by such Members until each such Member has received cumulative distributions equal to the outstanding principal balance of such Member Loans.

Third, 100% to the Members who have made Member Loans and the Preferred Members, pro rata based on each such Member's Return Sharing Percentage until each such Member has received cumulative distributions pursuant thereto equal to such Member's Return Amount.

Fourth, 70% to the Common Members and 30% to the Preferred Members until the cumulative distributions equal the sum of (A) $17 million and (B) reasonable Common Member out of pocket expenses arising from the negotiation and documentation of the Recapitalization Agreement and related agreements (including term sheets); provided, that such expenses are not to exceed $250,000.

Fifth, 50% to the Common Members and 50% to the Preferred Members until cumulative distributions under this step of the Waterfall equal $4 million.

Thereafter, 100% to the Preferred Members.

See Second A&R LLCA, Section 6.1(a).

iii. Sale of Properties. The Manager, as manager of the Company, will be responsible for endeavoring to dispose of the properties (the "**AY Properties**") owned by the Company or its subsidiaries (each, an "**AY Entity**") within a five-year period. See Second A&R LLCA, Section 5.1(f).

---

[3] Unless otherwise defined, capitalized terms used in this description of the Waterfall shall have the meanings ascribed to such terms in the Second A&R LLCA.

8

    iv. <u>Releases</u>. The Company, the Preferred Investor, the AY Entities, the BVI Bondholders, and the Parent Debtor will exchange mutual releases (collectively, the "**Releases**"). Specifically, the Parent Debtor will receive releases from the AY Entities and the Preferred Investor. Notably, the releases to be granted to the Parent Debtor will relieve the Parent Debtor from liability under, *inter alia*, the BVI Inducement Agreement, the Completion Guaranty and the Environmental Indemnity. The Parent Debtor, in turn, will grant releases to the Preferred Investor and the AY Entities, with customary exceptions (e.g., for claims arising for willful misconduct, bad faith, or fraud). See Recapitalization Agreement, Sections 3.2; 3.3; 3.4; 3.5. The claims to be released by the Parent Debtor include the Intercompany Receivables.

    v. <u>Management of the Company</u>. The Manager will manage the Company but shall not take, on behalf of the Company, or permit any of the Company's subsidiaries to take, any action which constitutes a Major Decision, as set forth on Schedule II of the Second A&R LLCA without certain consents. See Second A&R LLCA, Section 4.2. Among the Major Decisions that require the consent of, among others, a majority-in-interest held by the Common Members are certain investments, related party transactions, changes in the Company's line of business, dispositions of AY Properties within three (3) years after entry into the Second A&R LLCA for prices that are less than 95% of the agreed upon release prices, capital expenditures over a certain level with respect to any AY Property, and further amendments of the Second A&R LLCA that would alter the Waterfall or change the consent rights of the Common Members.

    vi. <u>Sale of Equity Interest in the Greens</u>. Chester will sell its 43.75% equity interest in the Greens to DCP Kings, in exchange for the following consideration: (a) forgiveness of the $3.6 million in principal, as well as accrued and unpaid interest and fees, on the Chester Loan, (b) release of the Parent Debtor from its guarantee of the Chester Loan, (c) payment to Chester of $500,000, and (d) release of the security interest granted to DCP Kings on the Company's 100% membership interest in 141 Spencer LLC.

    vii. <u>Indemnification</u>. Each of the Parent Debtor and Chester shall indemnify and hold DCP Kings harmless from and against any and all demands, liabilities, costs and expenses, including, but not limited to, reasonable attorney's fees, costs and expenses, incurred by DCP Kings to which it is exposed from (a) any

9

        breach of Chester's representations and warranties in the MIPA, (b) any claims with respect to Chester's equity interest in the Greens, or (c) any claims by creditors of the Parent Debtor, Chester, or Mr. Goldman, provided that the total amount of indemnification under clauses (b) and (c) shall not exceed $500,000. The indemnification to be provided by the Parent Debtor shall be referred to hereinafter as the "**Parent Indemnity**." DCP Kings has agreed that any claims against the Parent Debtor arising under the Parent Indemnity shall be treated as general unsecured claims against the Parent Debtor. See MIPA, Section 5(a).

    viii.    <u>Conditions Precedent</u>. Entry of the Proposed Order and the approval of the Restructuring by the BVI Court are conditions precedent to the closing of the Restructuring. See Recapitalization Agreement, Sections 5.2(d), 5.2(e), 5.3(b), and 5.3(c). In addition, the Recapitalization Agreement includes a representation and warranty by, *inter alia*, the Parent Debtor that the BVI Bondholders have approved the Restructuring. See Recapitalization Agreement, Section 4.2(f).

### The Restructuring is in the Best Interest of the Parent Debtor's Estate

15. Based on my professional experience and the lengthy negotiations regarding the Restructuring that I have personally participated in from inception, the Restructuring is a value-maximizing transaction that will benefit the Parent Debtor's estate by freeing up value for the benefit of all parties in interest and providing the Company with managerial stability.

16. The Restructuring represents a significant step forward in the Parent Debtor's restructuring initiative. Specifically, the Restructuring will relieve the Parent Debtor of certain large guaranty claims. Moreover, it will fix the amount of the Preferred Investor's claim against the Company at a significantly reduced amount and establish a process for disposition of certain real property indirectly owned by the Parent Debtor, which, in turn, will provide an opportunity for the Parent Debtor to share in the sale proceeds as such properties are monetized. Approval of the Agreements, and consummation of the Restructuring, will position the Parent

10

Debtor to continue its progress toward emergence from chapter 11 at an efficient and deliberate pace.

17. Absent the Restructuring, the Parent Debtor and the Company would likely engage in litigation with the Preferred Investor over the existence of purported defaults, the date that any alleged defaults occurred, the value of the Preferred Investor's claim against the Company, and the propriety of the Parent Debtor's guaranty of the obligations of the respective non-debtor subsidiaries, and the amounts of such obligations. Such litigation would be costly, and the outcome is uncertain. Moreover, the Parent Debtor would be liable to the Preferred Investor for potentially significant amounts under its guarantees, if the validity of those guarantees were upheld. Under the Restructuring, the Parent Debtor will benefit directly from a release of the Preferred Investor's multi-million guarantee claims against it.

18. Additionally, the Parent Debtor will benefit indirectly from the negotiated and agreed upon priority of distributions set forth in the Waterfall. The revised terms of the Waterfall will allow the Company, and its direct and indirect owners, to make distributions of asset sale proceeds to the Parent Debtor which, absent the Restructuring, might be substantially less or not be available at all depending on the ultimate adjudicated size of the Preferred Member's claim. The Parent Debtor may then use such funds to make distributions to its creditors. The mid-point of the estimated amount available for distribution to the Parent Debtor under the modified Waterfall is approximately $5 million. That potential value outweighs the cost to the Parent Debtor of releasing the Intercompany Receivables which, if collectable, would aggregate approximately $2.3 million. Moreover, the AY Entities themselves will be providing releases of certain payables owed to them by the Parent Debtor, which aggregate approximately $1.6 million. When coupled

11

with the value of the Releases to be provided by the Class B Member and the AY Entities, the benefit of this settlement to the Parent Debtor's estate and its creditors is indisputable.

19. Another substantial benefit of the Restructuring is that the Manager has agreed, subject to the terms of the Second A&R LLCA, not to undertake any Major Decisions without the consent of the Common Member, which is indirectly controlled by the Parent Debtor. Absent the Restructuring, and assuming that the control shift was properly invoked, the Manager, would have the unfettered right to manage the Company and the AY Entities.

20. With respect to Chester, the Parent Debtor will be getting a release of DCP King's claim arising from the Parent Debtor's guarantee of the Chester Loan, which claim is in excess of $5 million, including accrued and unpaid interest. Further, the Parent Debtor's direct subsidiary, Chester, will receive $500,000 for an equity interest that is of questionable value. It is expected that Chester will make a distribution of the Parent Debtor's share of such funds, $432,500, to the Parent Debtor shortly after the closing of the Restructuring.

21. Given all of the benefits of the Restructuring, the Parent Debtor's release of the Intercompany Receivables and issuance of the Parent Indemnity satisfy the business judgment standard and constitute a proper use of the Parent Debtor's property. With respect to the Intercompany Receivable, the tangible benefits of the Restructuring to the Parent Debtor outweigh the costs of foregoing the Intercompany Receivables. Moreover, the AY Entities themselves will be providing releases of certain payables owed to them by the Parent Debtor, which aggregate approximately $1.6 million. As to the Parent Indemnity, other than claims arising from breach of the MIPA, any potential liability under the Parent Indemnity is limited to $500,000, a sum equivalent to the payment that Chester will receive for the sale of its membership interest in the

Greens and distribute to the Parent Debtor. Importantly, any claim under the Parent Guaranty will be treated as an unsecured claim in the Chapter 11 Case. Thus, the downside risk to the Parent Debtor is capped and is not very material in the context of the Chapter 11 Case.

22. Furthermore, although the Restructuring is comprised of two transactions, the Restructuring is contingent on both parts proceeding. If the Parent Indemnity were not approved, and the Chester part of the Restructuring could not proceed, the Parent Debtor would lose the benefit of the Releases and the other economic benefits it is receiving as part of the Company's Restructuring. Finally, the scope of the Parent Indemnity is rather limited, making it unlikely that the Parent Debtor would actually be called upon to make a payment thereunder.

23. The Parent Debtor is well aware of the liabilities of all of the entities involved in the Restructuring, as well as the value of the properties owned directly or indirectly by each of such entities. It has determined that the Restructuring is in the best interests, not only of the Parent Debtor, but of its non-debtor affiliates as well. Moreover, holders of the Parent Debtor's Series B, C, D, and E bonds (the "**BVI Bondholders**") – the Parent Debtor's key creditor constituency – have been involved in the negotiation and documentation of the Restructuring. Both the Parent Debtor and its professionals and the BVI Bondholders and their professionals carefully analyzed all alternatives to the Restructuring and determined that the Agreements are in the best interest of the Parent Debtor and its estate.

24. In order to build consensus, the parties to the Restructuring agreed that the consent of the BVI Bondholders, who are key stakeholders in the Parent Debtor, would be a condition to consummation of the Restructuring. On November 29, 2021, the Trustee published to each series of notes a voting notice (which was amended on December 2, 2021). The voting

13

notice contained a legal summary of the recapitalization transaction prepared by the Trustee's counsel (and was reviewed by the BVI and the Preferred Investor's Israeli counsel) and a financial summary prepared by the Trustee's financial advisor. On December 8, 2021, each of the notes series approved a resolution that materially: (a) instructed the Trustee to give its consent to BVI and its subsidiaries to engage and act according to the Agreements, subject to there being no material changes to the documents from what was presented in the summaries; (b) authorized the Trustee to give the waivers required as part of the Recapitalization Agreement; and (c) authorized the Trustee to sign documents confirming the Trustee's consent to transaction and to sign the Recapitalization Agreement.

25. Overall, it is my belief that approval of the Restructuring will facilitate the Parent Debtor's restructuring because it will materially reduce the amount of claims against the Parent Debtor, provide a potential distribution to the Parent Debtor from the sale proceeds of the AY Properties and provide for a distribution of $432,500 from the Chester sale. In addition, the Manager's agreement to sell the AY Properties over a five year period will increase the likelihood that the non-debtor subsidiaries will be able to derive significant value from the AY Properties as the real estate market recovers from the pandemic, thereby increasing the value of the Parent Debtor's assets. Furthermore, completion of the Restructuring as soon as possible inures to the benefit of the Company and, indirectly to the Parent Debtor, because providing the Manager with managerial rights over the Company as contemplated under the Second A&R LLCA will provide stability to the Company's operations and ultimate disposition of the AY Properties which only serves to benefit the Parent Debtor. Specifically, completion of the Restructuring assuages concerns of the lenders and tenants about the potential fallout of the Parent Debtor's chapter 11

WEIL:\98437478\8\12817.0005

case. In short, prompt completion of the Restructuring will enhance the value of the AY Properties, thereby increasing the estimated amount of sale proceeds available for distribution to the Parent Debtor.

26. Overall, the Restructuring is the result of a hard fought and good-faith negotiations, and I believe it is in the best interest of the Parent Debtor's estate.

[*Remainder of Page Intentionally Left Blank*]

15

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  January 13, 2022
        New York, New York

_____
Ephraim Diamond
Associate Restructuring Officer,
All Year Holdings Limited