Presentment Date and Time:  January 28, 2022 at 10:00 a.m. (Prevailing Eastern Time)
Objection Deadline:  January 27, 2022 at 4:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time (Only if Objections Filed):  To Be Determined

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Proposed Attorneys for the Parent Debtor*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | |
| **ALL YEAR HOLDINGS LIMITED,** | : | **Chapter 11** |
| | : | |
| **Debtor.** | : | **Case No. 21-12051 (MG)** |
| | : | |
| **Fed. Tax Id. No. 98-1220822** | : | |

------------------------------------------------------x


**NOTICE OF PRESENTMENT OF APPLICATION PURSUANT
TO 11 U.S.C. §§ 327(a) AND 328, FED. R. BANKR. P. 2014(a) AND 2016,
AND L.B.R. 2014-1 AND 2016-1 FOR AUTHORITY TO
RETAIN AND EMPLOY MERIDIAN CAPITAL GROUP LLC
AS EXCLUSIVE REAL ESTATE FINANCE BROKER FOR THE
PARENT DEBTOR *NUNC PRO TUNC* TO THE PETITION DATE**

       **PLEASE TAKE NOTICE** that All Year Holdings Ltd.  (the "**Parent Debtor**"),

as debtor and debtor in possession in the above-captioned chapter 11 case, will present the annexed

application (the "**Application**"),[1] pursuant to sections 327(a) and 328 of title 11 of the United

States Code (the "**Bankruptcy Code**"), Rules 2014(a) and 2016 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2014-1 and 2016-1 of the Local

---

[1]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Application.

Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), for

entry of an order authorizing the Parent Debtor to retain and employ Meridian Capital Group LLC

and its broker-dealer affiliate, Tigerbridge Capital LLC d/b/a/ Meridian Securities (collectively,

"**Meridian**"), as exclusive real estate finance broker for the Parent Debtor, *nunc pro tunc* to

December 14, 2021, all as more fully set forth in the Application, to the Honorable Martin Glenn,

United States Bankruptcy Judge for the Southern District of New York, for signature on **January**

**28, 2022 at 10:00 a.m. (Prevailing Eastern Time)**.

> **PLEASE TAKE FURTHER NOTICE** that any responses or objections

(the "**Objections**") to the Application shall be in writing, shall conform to the Bankruptcy Rules

and the Local Bankruptcy Rules, shall be filed with the Bankruptcy Court (i) by attorneys

practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in

accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and

(ii) by all other parties in interest, on a CD-ROM, in text-searchable portable document format

(PDF) (with two single-sided hard copies delivered to the Judge's Chambers), in accordance with

the customary practices of the Bankruptcy Court and General Order M-399, to the extent

applicable, and shall be served in accordance with General Order M-399, the Bankruptcy Rules,

and the Local Bankruptcy Rules, so as to be filed and served upon (a) the proposed attorneys for

the Parent Debtor, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153

(Attn:  Gary T. Holtzer, Esq., Jacqueline Marcus, Esq., and Matthew P. Goren, Esq.); (b) the Office

of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, NY 10014

(Attn:  Andrea B. Schwartz, Esq. and Shara Cornell, Esq.); (c) counsel to Mishmeret Trust

Company Ltd., as Trustee for the BVI Bondholders, Chapman & Cutler LLP, 1270  Sixth Avenue,

New York, New York 10020 (Attn: Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron

Krieger, Esq.); and (d) counsel to Meridian, Morrison Cohen LLP, 909 Third Avenue, New York, New York 10022 (Attn: Sally Siconolfi, Esq.) by no later than **January 27, 2022 at 4:00 p.m. (Prevailing Eastern Time)** (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the above referenced Application, the Parent Debtor may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Application, which order may be entered without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that, if an objection is timely filed and served with respect to the Application, a hearing (the "**Hearing**") will be held to consider the Application before the Honorable Martin Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 523, One Bowling Green, New York, NY 10004-1408 on a date to be announced.

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

**PLEASE TAKE FURTHER NOTICE that, due to the COVID-19 pandemic, the Hearing, if held, will be conducted using Zoom for Government. Parties should not appear in person and those wishing to appear or participate at the Hearing (whether "live" or "listen only") must make an electronic appearance through the Court's website prior to 4:00 p.m. (Prevailing Eastern Time) on the day prior to the Hearing. Instructions for making an eCourtAppearance and additional information on the Court's Zoom procedures can be found at http://www.nysb.uscourts.gov/content/judge-martin-glenn.**

WEIL:\98456684\2\12817.0005

Dated: January 14, 2022
New York, New York

 /s/ *Matthew P. Goren*
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary Holtzer
Jacqueline Marcus
Matthew P. Goren

*Proposed Attorneys for the Parent Debtor*

4

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Proposed Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                       :

**In re**                                :

                                 :          **Chapter 11**

**ALL YEAR HOLDINGS LIMITED,**    :

                                 :          **Case No. 21-12051 (MG)**

    **Debtor.**                    :

                                 :

**Fed. Tax Id. No. 98-1220822**     :
-------------------------------------------------------x

**APPLICATION PURSUANT TO 11 U.S.C. §§ 327(a) AND 328,**
**FED. R. BANKR. P. 2014(a) AND 2016, AND L.B.R. 2014-1 AND 2016-1 FOR**
**AUTHORITY TO RETAIN AND EMPLOY MERIDIAN CAPITAL GROUP LLC**
**AS EXCLUSIVE REAL ESTATE FINANCE BROKER FOR THE**
**PARENT DEBTOR *NUNC PRO TUNC* TO THE PETITION DATE**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

          All Year Holdings Ltd. (the "**Parent Debtor**"), as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), respectfully represents as follows in support of this application (the "**Application**"):

<u>**Relief Requested**</u>

          1.     The Parent Debtor submits this application (the "**Application**"), pursuant to sections 327(a) and 328 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules

1

2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2014-1 and 2016-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), for authority to retain and employ Meridian Capital Group LLC and its broker-dealer affiliate, Tigerbridge Capital LLC d/b/a/ Meridian Securities (collectively, "**Meridian**"), as its exclusive real estate finance broker, in accordance with the terms and conditions set forth in (i) that certain engagement letter, dated as of April 13, 2021 (as amended by that certain first amendment, dated August 10, 2021, that certain second amendment dated September 24, 2021, that certain third amendment dated November 9, 2021, and as may be further modified, amended, or supplemented from time to time, the "**Recapitalization Engagement Letter**"), and (ii) that certain engagement letter, dated as of April 13, 2021 (as amended by that certain first amendment, dated August 10, 2021, that certain second amendment dated September 24, 2021, that certain third amendment dated November 9, 2021, and as may be further modified, amended, or supplemented from time to time, the "**Financing Engagement Letter**" and together with the Recapitalization Engagement Letter, the "**Engagement Letters**[1]"), *nunc pro tunc* to the Petition Date (as defined below), which engagements pursuant to the Engagement Letters shall be extended through the pendency of the Chapter 11 Case.

2.      A proposed form of order approving the Application is annexed hereto as **Exhibit A**.   Copies of the Recapitalization Engagement Letter and Financing Engagement Letter are annexed to the proposed form of order as **Exhibit 1** and **Exhibit 2**, respectively.   A declaration of Tamir Kazaz of Meridian in support of the Application (the "**Kazaz Declaration**") is annexed hereto as **Exhibit B**.

---

[1] Capitalized terms used but not defined herein have the respective meanings ascribed to such terms in the Recapitalization Engagement Letter or Financing Engagement Letter, as applicable.

2

**Jurisdiction**

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

4.      On December 14, 2021 (the "**Petition Date**"), the Parent Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.[2]  The Parent Debtor is authorized to continue to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in this Chapter 11 Case.

5.      Information regarding the Parent Debtor's business, capital structure, and the circumstances leading to the commencement of this Chapter 11 Case is set forth in the *Declaration of Assaf Ravid Pursuant to Local Bankruptcy Rule 1007-2 in Support of All Year Holdings Limited's Chapter 11 Petition and Related Relief*, sworn to on the date hereof, which has been filed with the Court contemporaneously herewith and is incorporated herein by reference.

---

[2] On February 22, 2021, Evergreen Gardens Mezz LLC (the "**Initial Debtor**") commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  On September 14, 2021, Evergreen Gardens I LLC and Evergreen Gardens II LLC (the "**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Evergreen Debtors**") commenced their own voluntary cases with the Court under chapter 11 of the Bankruptcy Code.  The Evergreen Debtors are each wholly-owned, indirect subsidiaries of the Parent Debtor.  The Evergreen Debtors' chapter 11 cases are being jointly administered for procedural purposes only under the lead case, *In re Evergreen Gardens Mezz LLC, et al.,* Case No., 21-10335 (MG).  On November 5, 2021, the Court entered an order confirming a joint chapter 11 plan for the Evergreen Debtors [ECF No. 222], which chapter 11 plan became effective and was substantially consummated on December 2, 2021.  The Parent Debtor's Chapter 11 Case is being separately administered from the Evergreen Debtors' chapter 11 cases.

WEIL:\98426493\7\12817.0005

### **Meridian's Qualifications**

6.      Founded in 1991, Meridian is the country's most active dealmaker and one of the nation's leading commercial real estate finance, investment sales and retail leasing advisors.  Since its inception, the company has closed more than $425 billion in transactions with the full complement of capital providers, including local, regional and national banks, CMBS lenders, agency lenders, mortgage REITs, life insurance companies, credit unions and private equity funds.  Meridian represents many of the world's leading real estate investors and developers and the company's expansive platform has specialized practices for a broad array of property types including office, retail, multifamily, hotel, mixed-use, industrial, and healthcare and senior housing properties.  In 2020, Meridian closed approximately $40 billion in financing across more than 250 unique lenders.  Meridian is headquartered in New York City, has approximately 305 employees, and offices in New Jersey, Maryland, Illinois, Ohio, Florida, and California.

7.      Prior to the Petition Date, the Parent Debtor engaged Meridian to serve as the exclusive broker to procure an equity recapitalization on behalf of the Parent Debtor and its affiliates on the terms set forth in the Recapitalization Engagement Letter.  Accordingly, on or around April 13, 2021, Meridian commenced a robust and wide-ranging, public process to solicit interest and offers from potential third-party investors to either recapitalize the Parent Debtor or undertake an outright purchase of the Parent Debtor (the "**Marketing Process**").  As a result, Meridian has ample knowledge of the Parent Debtor and the Marketing Process.

WEIL:\98426493\7\12817.0005

8.      Furthermore, Meridian was engaged and retained as the exclusive broker for the Subsidiary Debtors in the Evergreen Debtors' chapter 11 cases.[3]    Throughout this retention, Meridian worked closely with the Subsidiary Debtors and their team of professionals to consummate the sale of the Subsidiary Debtors' real property pursuant to a chapter 11 plan of reorganization.    Because the Subsidiary Debtors were part of the Parent Debtor's wider real estate portfolio at that time, Meridian became familiar with the Parent Debtor's operations, holdings, and corporate structure, thereby making Meridian uniquely qualified to serve as the exclusive real estate finance broker for the Parent Debtor in this Chapter 11 Case.

## Scope of Services[4]

### A.  The Recapitalization Engagement Letter

9.      Pursuant to the terms of the Recapitalization Engagement Letter, in consideration for the compensation contemplated thereby, Meridian has agreed to serve as the Parent Debtor's exclusive broker to procure an equity recapitalization of the Parent Debtor (the "**Recapitalization Services**"), including, without limitation, preferred equity, a joint venture opportunity, exchange, assignment or other transfer and/or other similar forms of equity investment or transaction (a "**Recapitalization**").

10.     The Parent Debtor and Meridian are working to ensure that the Marketing Process is broad, transparent, inclusive, efficient, and value-maximizing.  Meridian commenced the Marketing Process by identifying potential third party bidders with the financial wherewithal

---

[3] *See Order Pursuant to 11 U.S.C. 327(a), Fed. R. Bankr. P. 2014(a) and 2016 and L.B.R. 2014-1 and 2016-1 Authorizing the Retention and Employment of Meridian Capital Group LLC as Exclusive Broker for the Subsidiary Debtors Nunc Pro Tunc to the Petition Dates*, Case No. 21-10335 (ECF No.29).

[4] The summaries of the Engagement Letters contained in this Application are provided for the purposes of convenience only.  To the extent that the Application and the terms of the Engagement Letters are inconsistent, unless specifically enumerated herein, the terms of the Engagement Letters shall control.

WEIL:\98426493\7\12817.0005

to invest capital in the Parent Debtor and the sophistication required for a transaction involving cross-border bond issuances. To enhance the Marketing Process, Meridian compiled a due diligence library consisting of various materials and proprietary information, including, but not limited to, property level and parent level financial information. Further, Meridian prepared an offering memorandum containing detailed information on the Parent Debtor's real estate portfolio by breaking down information including real estate taxes and income and expenses for each individual property. These efforts resulted in Meridian procuring a significant pool of potential third party bidders and ongoing efforts to work daily with the Parent Debtor's Chief Restructuring Officer to progress negotiations among these interested parties.

11. In connection with the Recapitalization Services, Meridian may be called on during the Chapter 11 Case to, among other things: (i) advise the Parent Debtor on any questions or issues regarding the Marketing Process; (ii) continue engaging with potential third party bidders as a Recapitalization transaction is further negotiated and ultimately executed; (iii) advise the Parent Debtor on strategies for negotiating with potential bidders; (iv) participate in meetings or negotiations with the Parent Debtor and potential bidders and other stakeholders in connection with a potential Recapitalization transaction; (v) advise and assist the Parent Debtor in evaluating and comparing potential bids; and (vi) provide testimony, as necessary, with respect to matters on which Meridian has been engaged to advise hereunder in any proceeding before the Court.

12. The original term of the Recapitalization Engagement Letter was 120-days, however, the parties agreed to several extensions. For the avoidance of doubt, and notwithstanding anything to the contrary in the Engagement Letters, the Parent Debtor seeks

6

pursuant to this Application to extend the exclusive period under the Recapitalization Engagement Letter for the duration of the Chapter 11 Case.

**B.  The Financing Engagement Letter**

13.    Pursuant to the Financing Engagement Letter, in consideration for the compensation contemplated thereby, Meridian has agreed to serve as the Parent Debtor's exclusive broker to (collectively, the "**Financing Services**"): (i) procure mortgage and/or mezzanine financing for the Parent Debtor's non-debtor subsidiaries set forth on Exhibit A thereto (the "**PropCos**"), including, without limitation, any form of debt, funds provided by or through a secured or unsecured loan, preferred equity and any form of construction or bridge financing (a "**Financing**"), and/or (ii) negotiate modifications, amendments, extensions, or other similar transactions relating to any of the existing financing of the PropCos (a "**Modification**"). The terms of Meridian's engagement under the Financing Engagement Letter apply only to entities and/or properties in which the Parent Debtor holds a 100% interest.  For the avoidance of doubt, a Financing or Modification does not include any transaction involving the Parent Debtor's Israeli-issued bonds nor do the terms of the engagement apply to any direct and indirect assets of All Year Equity Partners LLC.

14.    In connection with the Financing Services, Meridian may be called on during the Chapter 11 Case to, among other things: (i) negotiate Financing and/or Modification proposals for the PropCos with financial institutions or other financing sources that may include, but shall not be limited to, term sheets, letters of intent, applications, indications of interest, or other financing arrangements from such financial institutions for Financing or Modifications; (ii) advise the Parent Debtor on strategies for negotiating with the PropCos' lenders and other stakeholders; (iii) render financial advice to the Parent Debtor and participate in meetings or

negotiations with the Parent Debtor's stakeholders; (iv) advise and assist the Parent Debtor in evaluating any potential Financing or Modification; (v) assist the Parent Debtor in identifying and evaluating candidates for any potential Financing or Modification; (vi) participate in meetings or negotiations with the Parent Debtor and existing and potential lenders regarding any Financing or Modification; and (vii) provide testimony, as necessary, with respect to matters on which Meridian has been engaged to advise hereunder in any proceeding before the Court.

15.    As was the case with the Recapitalization Engagement Letter, the original term of the Financing Engagement Letter was 120-days, however, the parties agreed to several extensions.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Engagement Letters, the Parent Debtor seeks pursuant to this Application to extend the exclusive period under the Financing Engagement Letter for the duration of the Chapter 11 Case.

## **Professional Compensation**

16.    The commissions and compensation structure under each of the Engagement Letters is set forth below (collectively, the "**Compensation Structure**").

### A.  Compensation for Recapitalization Services

17.    In consideration of the Recapitalization Services, upon the closing of a Recapitalization, Meridian will seek to be compensated from the amount of any equity commitments or obligations of the applicable counterparty pursuant to the following graduated scale (the "**Recapitalization Brokerage Fee**"):

- three percent (3.00%) of the maximum amount of the equity commitments or obligations (provided, that in the event any proceeds are deferred, such amounts shall be payable upon receipt by Client of such proceeds) (the "**Equity Obligation**") of applicable Counterparty for all amounts up to and including $25,000,000.00;

WEIL:\98426493\7\12817.0005

- two and one-half percent (2.50%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $25,000,000.00 and up to and including $50,000,000.00;

- two percent (2.0%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $50,000,000.00 and up to and including $75,000,000.00;

- one and one-half percent (1.50%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $75,000,000.00 and up to and including $100,000,000.00;

- one percent (1.00%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $100,000,000.00 and up to and including $150,000,000.00; and

- one-half of one percent (0.50%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $150,000,000.00.

18.     Any obligation to pay any Recapitalization Brokerage Fee is conditioned on the closing of a Recapitalization.  Notwithstanding the foregoing, in the event that a Recapitalization transaction is completed with any Carveout Counterparty (as defined below), the Brokerage Fee payable with respect to the Equity Obligation of such Carveout Counterparty shall be reduced to 50% of the Brokerage Fee as set forth above.  "Carveout Counterparty" shall mean each of: (i) Churchill/ Fleishman/Philipson Family/Paragraph, (ii) Meadow Partners/ Madison, (iii) Tabak, (iv) York/Jeremy Blank, (v) Apollo, (vi) Silverstein, (vii) OW Partners, (viii) Blue Arch Capital, and (iv) Downtown Capital.

19.     To the extent any Prospective Counterparty (as defined in the Recapitalization Engagement Letter) (which for the avoidance of doubt, shall include any Carveout Counterparty) provides an Engagement Proposal (as defined in the Recapitalization

9

Engagement Letter) during the Exclusive Period and/or the Protection Period[5] resulting in a Recapitalization that, thereafter, closes no later than three (3) months after the expiration of the Protection Period, Meridian shall be entitled to receive its Recapitalization Brokerage Fee.

20.    Further, at the end of the Exclusive Period, if no Recapitalization Brokerage Fee has been paid to Meridian, the Parent Debtor shall pay to Meridian, as consideration for its costs, expenses and services related to preparing the diligence materials in connection with the Recapitalization Services, an amount equal to $200,000 (the "**Service Fee**"). In the event that a Brokerage Fee is subsequently earned and paid to Meridian, the Service Fee previously paid will be credited to the Brokerage Fee.

### B. Compensation for Financing Services

21.    In consideration of the Financing Services, upon a closing of a Financing or Modification, Meridian shall be paid a fee pursuant to the Financing Services Engagement Letter, as set forth below:

- If, prior to the end of the Exclusivity Period, the Parent Debtor receives a Loan Engagement (as defined in the Financing Engagement Letter), through Meridian's efforts or otherwise, then upon the closing of such Financing, Meridian shall be paid a fee equal to, (i) in the case of a refinancing, eighty basis points (0.80%) of the maximum amount of proceeds available pursuant to such Financing, including without limitation , reserves, holdbacks and future funding obligations (a "**Financing Fee**") **or** (ii) in the case of a Modification, Meridian shall be paid a fee equal to thirty basis points (0.30%) of the maximum commitment amount of the loan modified, including, without limitation, reserves, holdbacks and future funding obligations (a "**Modification Fee**" and together with the Financing Fee, a "**Financing Brokerage Fee**").

---

[5] For purposes of the Recapitalization Engagement Letter, the terms (1) "Protection Period" shall mean the first twelve (12) months following the expiration of the Exclusive Period, and (2) Prospective Counterparty" shall mean any party to whom Meridian actively negotiated with during the Exclusive Period.

WEIL:\98426493\7\12817.0005

22.    The Parent Debtor has agreed to pay Meridian any Financing Fee upon the closing of the Financing, if within one (1) year after the expiration of the Exclusivity Term then in effect or the termination of the Financing Engagement Letter, the Parent Debtor enters into a Loan Engagement with a financial institution (or an affiliate thereof) with whom Meridian was actively negotiating during the Exclusivity Term.

### Indemnification Related Provisions

23.    As part of the Compensation Structure payable to Meridian under the terms of the Engagement Letters, the Parent Debtor has agreed to certain indemnification and related obligations, which provide, among other things, that the Parent Debtor will indemnify and hold harmless Meridian and its affiliates and their respective directors, officers, agents, employees, and controlling persons subject to customary carve outs for gross negligence and willful misconduct. Both the Parent Debtor and Meridian believe that such provisions are customary and reasonable for exclusive brokerage engagements, both out-of-court and in chapter 11 cases. In connection with the Chapter 11 Case, Meridian has agreed to certain modifications to the indemnification provisions, as set forth in the proposed order.

24.    The terms and conditions of the Engagement Letters were negotiated between the Parent Debtor and Meridian and reflect the parties' mutual agreement as to the substantial efforts that would be required in connection with the engagements. The Parent Debtor believes that the Compensation Structure is comparable to the commissions generally charged by brokers of similar stature to Meridian for comparable engagements, both in and out of bankruptcy proceedings. The Compensation Structure discussed above and described fully in the Engagement Letters is consistent with Meridian's normal and customary billing practices for comparably sized and complex engagements and transactions, both in and out-of-court,

WEIL:\98426493\7\12817.0005

involving the services to be provided in connection with the Chapter 11 Case. Moreover, the Compensation Structure is consistent with and typical of arrangements entered into by Meridian and other residential real estate brokers in connection with the rendering of comparable services to clients such as the Parent Debtor. Meridian and the Parent Debtor believe that the Compensation Structure is both reasonable and market-based.

25.     As of the Petition Date, Meridian had no fees outstanding other than fees arising under the Engagement Letters upon closing of a recapitalization. Meridian did not receive any payments from the Parent Debtor in the 90 days prior to the Petition Date.

26.     In light of the foregoing and Meridian's commitment to the variable level of time and effort required by the Services, and the market prices for Meridian's services for engagements of this nature both for in and out-of-court contexts, the Parent Debtor believes that the Compensation Structure is fair and reasonable and market-based under the standards set forth in section 328(a) of the Bankruptcy Code. Accordingly, the Parent Debtor believes that the Court should approve Meridian's retention subject to the standard of review set forth in section 328(a) of the Bankruptcy Code and that Meridian's compensation should not be subject to any additional standard of review under section 328 or 330 of the Bankruptcy Code.

27.     Upon the closing of a recapitalization, Meridian will seek to prepare and file a fee application for payment of its compensation as a distribution to Meridian which shall be paid pursuant to any confirmed chapter 11 plan of reorganization and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, any orders of the Court governing the allowance of interim or final compensation for professionals, and the General Order M-412 (Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals, dated December 21, 2010 (Gonzalez, C.J.)), Administrative Order M-

12

447 (Amended Guidelines for Fees and Disbursements for Professionals in Southern District of
New York Bankruptcy Cases, dated January 29, 2013 (Morris, C.J.)), and the U.S. Trustee
Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed
Under 11 U.S.C. § 330 (Appendix A to 28 C.F.R. § 58) (collectively, the "**Fee Guidelines**").

28.    The Parent Debtor has been informed by Meridian that it is not the general
practice of real estate brokerage firms to keep detailed time records similar to those customarily
kept by attorneys or to keep time records on a "project category" basis. To the extent Meridian
would be required to submit detailed time records for its professionals by the Fee Guidelines, the
Debtor requests that such requirement be waived.

### Meridian's Disinterestedness

29.    To the best of the Parent Debtor's knowledge and except to the extent
disclosed herein and in the Kazaz Declaration: (i) Meridian is a "disinterested person" within the
meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) and
referenced by section 328(c) of the Bankruptcy Code and does not hold or represent an interest
materially adverse to the Parent Debtor's estate; and (ii) Meridian has no connection to the
Parent Debtor, its creditors or other parties in interest in the Chapter 11 Case.

30.    To the extent that any new relevant facts or relationships bearing on the
matters described herein during the period of Meridian's retention are discovered or arise,
Meridian will use reasonable efforts to promptly file a supplemental declaration, as required by
Bankruptcy Rule 2014(a).

### Basis for Relief

31.    The Parent Debtor seeks authority to employ and retain Meridian as its
exclusive broker under section 327 of the Bankruptcy Code, which provides that a debtor is

13

authorized to employ professional persons "that do not hold or represent an interest adverse to

the estate, and that are disinterested persons, to represent or assist the debtor in carrying out the

debtor's duties under this title." 11 U.S.C. § 327(a).  Section 1107(b) of the Bankruptcy Code

elaborates upon sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11

of the Bankruptcy Code and provides that "a person is not disqualified for employment under

section 327 of the Bankruptcy Code by a debtor in possession solely because of such person's

employment by or representation of the debtor before the commencement of the case."  11

U.S.C. §1107(b).

32.    The Parent Debtor seeks approval of the Compensation Structure pursuant

to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that a debtor "with

the court's approval, may employ or authorize the employment of a professional person under

section 327 . . . on any reasonable terms and conditions of employment, including on a retainer,

on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C.

§328(a).  Accordingly, section 328 of the Bankruptcy Code permits the compensation of

professionals, including consultants, on flexible terms that reflect the nature of their services and

market conditions.  Thus, section 328 is a significant departure from prior bankruptcy practice

relating to the compensation of professionals.  Indeed as the United States Court of Appeals for

the Fifth Circuit recognized in *Donaldson Lufkin & Jenrette Securities Corp. v. National*

*Gypsum (In re National Gypsum Co.)*, 123 F.3d 861, 862 (5th Cir. 1997):

> Prior to 1978 the most able professionals were often unwilling to
> work for bankruptcy estates where their compensation would be
> subject to the uncertainties of what a judge thought the work was
> worth after it had been done.  That uncertainty continues under the
> present §330 of the Bankruptcy Code, which provides that the court
> award to professional consultants "reasonable compensation" based
> on relevant factors of time and comparable costs, etc.  Under present

§ 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee) (internal citations omitted).

33.    Furthermore, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended section 328(a) of the Bankruptcy Code as follows:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, *on a fixed or percentage fee* basis, or on a contingent fee basis.

11 U.S.C. § 328(a) (emphasis added).    This change makes clear that debtors may retain a professional on a fixed or percentage fee basis with Court approval, such as the Compensation Structure for Meridian in the Engagement Letters.

34.    The Parent Debtor believes that the Compensation Structure is reasonable and should be approved under section 328(a) of the Bankruptcy Code.    The Compensation Structure adequately reflects (a) the nature of the services provided by Meridian and (b) commission structures typically utilized by Meridian and other leading real estate brokers, which do not bill their time on an hourly basis and generally are compensated on a transactional basis.

### Notice

35.    Notice of this Application will be provided to (i) William K. Harrington, the U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shara Cornell, Esq.), (ii) the Parent Debtor's top twenty (20) unsecured creditors, (iii) the Internal Revenue Service, (iv) the United States Attorney's Office for the Southern District of New York, (v) counsel to  Mishmeret Trust Company Ltd., as Trustee for the BVI Bondholders, Chapman & Cutler LLP, 1270 Sixth

15

Avenue, New York, New York 10020 (Attn: Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron Krieger, Esq.), (vi) counsel to Meridian, Morrison Cohen LLP, 909 Third Avenue, New York, New York 10022 (Attn: Sally Siconolfi, Esq.), and (vii) all parties that have requested notice pursuant to Bankruptcy Rule 2002.  The Parent Debtor respectfully submits that no further notice is required.

36.     No previous request for the relief sought herein has been made by the Parent Debtor to this or any other Court.

WHEREFORE the Parent Debtor respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
       January 14, 2022

*/s/ Matthew P. Goren*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Proposed Attorneys for the Parent Debtor*

WEIL:\98426493\7\12817.0005

**Exhibit A**
**Proposed Order**

WEIL:\98426493\7\12817.0005

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                              :

In re                                 :

                                      :               **Chapter 11**

ALL YEAR HOLDINGS LIMITED,     :

                                      :               **Case No. 21-12051 (MG)**

      Debtor.                :

                                        :

Fed. Tax Id. No. 98-1220822      :

-------------------------------------------------------x

#### ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328, FED. R. BANKR. P. 2014(a) AND 2016 AND L.B.R. 2014-1 AND 2016-1 FOR AUTHORITY TO RETAIN AND EMPLOY MERIDIAN CAPITAL GROUP LLC AS EXCLUSIVE REAL ESTATE FINANCE BROKER FOR THE PARENT DEBTOR *NUNC PRO TUNC* TO THE PETITION DATE

Upon the Application, dated January 14, 2022 (ECF No. [___]) (the "**Application**"),[1] of All Year Holdings Limited (the "**Parent Debtor**"), as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), pursuant to sections 327(a) and 328 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2014-1 and 2016-1 of the Local Bankruptcy Rules of the Southern District of New York (the "**Local Bankruptcy Rules**"), for entry of an order authorizing the Parent Debtor to retain and employ Meridian Capital Group, LLC and its broker-dealer affiliate Tigerbridge Capital LLC d/b/a/ Meridian Securities (collectively, "**Meridian**"), as its exclusive real estate finance broker, in accordance with the terms and conditions set forth in those certain engagement letters annexed hereto as **Exhibit 1** and **Exhibit 2** (collectively, the "**Engagement Letters**"), *nunc pro tunc* to

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

the Petition Date and extended through the pendency of this Chapter 11 Case; and upon the

Declaration of Tamir Kazaz in support of the Application (the "**Kazaz Declaration**"); and the

Court having jurisdiction to consider the Application and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and Amended Standing Order of Reference M-431,

dated January 31, 2012 (Preska, C.J.); and consideration of the Application and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Application and the deadline for filing objections to the relief requested in the Application

(the "**Objection Deadline**") having been provided; and no objections to the relief requested in

the Application having been filed prior to the expiration of the Objection Deadline; and upon the

Kazaz Declaration and all of the proceedings had before the Court; and the Court being satisfied,

based on the representations made in the Application and the Kazaz Declaration, that Meridian is

a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as

modified by section 1107(b) of the Bankruptcy Code, and, as required by section 327(a) and

referenced by section 328(c) of the Bankruptcy Code, neither represents nor holds an interest

adverse to the Parent Debtor and its estate; and the Court having found and determined that the

terms and conditions of Meridian's employment, including but not limited to the Compensation

Structure set forth in the Engagement Letters and summarized in the Application, are reasonable

as required by section 328(a) of the Bankruptcy Code; and the Court having found and

determined that the relief sought in the Application is in the best interests of the Parent Debtor,

its estate, creditors, and all parties in interest, and that the legal and factual bases set forth in the

Application establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Application is granted as set forth herein.

2. The Parent Debtor is authorized, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016 and Local Bankruptcy Rules 2014-1 and 2016-1, to retain and employ Meridian as exclusive real estate finance broker in accordance with the terms and conditions set forth in the Engagement Letters annexed hereto as **Exhibit 1** and **Exhibit 2**, respectively, and as modified herein, *nunc pro tunc* to the Petition Date and extended through the pendency of this Chapter 11 Case.

3. The Compensation Structure set forth in the Engagement Letters is approved pursuant to section 328(a) of the Bankruptcy Code and Meridian shall be compensated by the Parent Debtors in the Chapter 11 Case in accordance with the terms of the Engagement Letters, subject to the applicable procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Fee Guidelines; provided that the U.S. Trustee shall retain all rights to object or otherwise respond to Meridian's interim and final applications for allowance of its compensation and reimbursement of its expenses on all grounds, including, but not limited to, reasonableness pursuant to section 330 of the Bankruptcy Code.

4. Meridian shall file interim and final fee applications for allowance of its compensation and reimbursement of its expenses with respect to services rendered in the Chapter 11 Case with this Court in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Fee Guidelines; provided, however, that Meridian shall be excused from submitting individual time keeping records as set forth in the Fee Guidelines.

5.      All requests by Meridian for the payment of indemnification as set forth in the Engagement Letters during the pendency of this Chapter 11 Case shall be made by means of an application to this Court and shall be subject to review by this Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letters and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought, provided, that in no event shall Meridian be indemnified in the case of its own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

6.      In no event shall Meridian be indemnified if the Parent Debtor or a representative of its estate assert a claim for, and a court determines by final order that such claim arose out of Meridian's own bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct.

7.      In the event that Meridian seeks reimbursement from the Parent Debtor for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to the Engagement Letters, the invoices and supporting time records from such attorneys shall be included in Meridian's own applications, both interim and final, and such invoices and time records shall be subject to the Fee Guidelines, and the approval of the Bankruptcy Court pursuant to sections 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code.

8.      To the extent that there may be any inconsistency between the terms of the Application, the Engagement Letters, and this Order, the terms of this Order shall govern.

9.      The Parent Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

10.      Notice of the Application as provided therein shall be deemed good and sufficient notice of such application and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

11.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12.      The relief granted herein shall be binding upon any chapter 11 trustee appointed in the Chapter 11 Case, or upon any chapter 7 trustee appointed in the event of a subsequent conversion of the Chapter 11 Case to a case under chapter 7.

13.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
            _____, 2022

                                          _____
                                          HONORABLE MARTIN GLENN
                                          UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**
**Recapitalization Engagement Letter**

WEIL:\98426493\7\12817.0005



April 13, 2021

All Year Holdings Limited
Attn: Asaf Ravid, Chief Restructuring Officer

**Re: Exclusive Agreement (the "Agreement") regarding the recapitalization of All Year Holdings Limited**

Mr. Ravid:

The purpose of this letter is to describe the terms and conditions under which Meridian Capital Group, LLC (the "Broker") is authorized to, on behalf of All Year Holdings Limited and affiliates thereof (collectively, the "Client"), procure an equity recapitalization, including, without limitation, preferred equity, a joint venture opportunity, exchange, assignment or other transfer and/or other similar forms of equity investment or transaction (a "Recapitalization") in connection with the recapitalization of the Client at the holding company level. For the avoidance of doubt, a Recapitalization shall include any equity transaction, regardless of the use of proceeds of such equity financing.  Broker shall use its commercially reasonable efforts to obtain and negotiate Recapitalization proposals from financial institutions, equity investors and joint venture investment prospects (each, a "Counterparty") which shall include, without limitation, term sheets, letters of intent, applications, indications of interest or other arrangements (each, which shall include emails, an "Engagement Proposal").  During the Exclusive Period, Client shall forward to Broker any Engagement Proposal, inquiries or other communications in connection therewith or in connection with the Bonds received by it from any source other than Broker upon receipt. Broker does not guarantee that a Recapitalization can or will be obtained.  Client agrees that Broker will not be liable to it for any losses or damages whatsoever in the event a Recapitalization is not obtained. "Bonds" shall mean the bonds as described on Schedule II.

 **1.  <u>Grant</u>**.  The Client hereby grants to Broker the exclusive right to procure the Recapitalization for a period commencing on the date hereof and continue for a period of 120 days (the "Exclusive Period") on the terms and conditions set forth in this Agreement.  The Client represents that it has the full power and authority to enter into this Agreement.  In the event that, during the Exclusive Period, Client determines that it will seek to sell any real property assets wholly owned by Client (individually or collectively, the "Property"), Client agrees to advise Broker in advance of any marketing or sale efforts in connection with such real property, in order to allow Broker to coordinate such sale, inter alia, in a manner consistent with the Exclusive Brokerage Agreement between the Client and Broker being entered into contemporaneously herewith.

 **2.  <u>Performance of Services</u>.**  Broker hereby accepts the appointment and agrees to enlist its efforts to secure a satisfactory counterparty(ies) to provide the Recapitalization, and, if Broker deems it necessary, Broker may seek the cooperation of other licensed real estate Brokers representing potential counterparties. In the event Broker cooperates with another licensed real estate broker,

1

before working with such broker, Broker will inform such broker that it must look to its client for any and all compensation which may become due to it for the proposed transaction. It is acknowledged that Broker shall not be required to share its commission payable hereunder with any cooperating broker. In no event shall Broker be liable for the failure to obtain such other broker's agreement to look solely to its client for payment of any compensation in connection with the proposed transaction.

### 3. <u>Compensation</u>.

If, prior to the end of the Exclusive Period, Client receives an Engagement Proposal, through Broker's efforts or otherwise, then upon the closing of such Recapitalization, Broker shall be paid a fee (as further described on Schedule I attached hereto, the "Brokerage Fee"). The Brokerage Fee will be deemed earned upon Client's acceptance of an Engagement Proposal and the closing of the Recapitalization. For the avoidance of doubt, any obligation to pay any Brokerage Fee shall be conditioned on the closing of a Recapitalization that is the subject of an Engagement Proposal.

At the end of the Exclusive Period, if no Brokerage Fee has been paid to Broker, Client shall pay to Broker, as consideration for its costs, expenses and services related to preparing the diligence materials in connection with the services to be performed hereunder, an amount equal to $200,000.00 (the "Service Fee"). In the event a Brokerage Fee is subsequently earned and paid to Broker, any Service Fee previously paid shall be credited to the amount of the Brokerage Fee.

To the extent practicable, the Brokerage Fee will be paid to Broker directly from the proceeds of such Recapitalization. In the event any of the proceeds from such Recapitalization shall be deferred, then the Brokerage Fee with respect to such deferred amount shall be payable only upon receipt by Client of such proceeds. In the event Client secures a Recapitalization during the Exclusive Period or the Protection Period in violation of this Agreement, Client shall pay to Broker the Brokerage Fee as set forth in this Agreement. For the purposes hereof, the terms (1) "Protection Period" shall mean the first twelve (12) months following the expiration of the Exclusive Period, and (2) "Prospective Counterparty" shall mean any party with whom Broker actively negotiated with during the Exclusive Period. Broker shall submit to Client no later than 14 days after expiration or termination of this Agreement a list of Prospective Counterparties. For purposes of this provision, "actively negotiating" shall mean engaging in substantive communications regarding the Recapitalization, including, but not limited to, the circulation of offering memoranda or other similar information.

### 4. <u>Related Agreements.</u> Broker and Client have entered into that Exclusive Brokerage Agreement dated on or about the date hereof (the "Brokerage Agreement") and Broker and Client have entered into that Exclusive Agreement Regarding 54 Noll Street, Brooklyn, NY 11206 and 123 Melrose Street, Brooklyn, NY 11726 dated February 24, 2021 (the "Real Property Brokerage Agreement"). Any Brokerage Fee earned by Broker pursuant to the terms of this Agreement shall be deemed earned without any right by Client to offset or reduce the amount of Brokerage Fee due because of Broker earning any compensation or fees pursuant to the Brokerage Agreement or the Real Property Brokerage Agreement.

**5. <u>Information</u>.**

Client shall make available to Broker the documents and other information which in the reasonable judgment of Broker are necessary or appropriate for the fulfillment of its assignment hereunder and the proper marketing of the Recapitalization. All documents and information supplied to Broker by the Client shall, to the best of the Client's knowledge, be complete and accurate and the Client shall correct any information which it learns is incomplete or inaccurate. Client may designate certain information as confidential, and Broker will so treat such information. Client understands that the information provided to Broker that Client deems as non-confidential, may be used in the preparation of marketing materials that will be distributed to prospective purchasers. The Client will be asked to approve all marketing materials in advance of their use. Such marketing materials shall disclaim the accuracy or completeness of the information contained therein and that any prospective lender or investor is responsible to conduct its own due diligence. The Client acknowledges and agrees that, as between Broker and Client, Client is responsible for the accuracy and completeness of all information regarding the Property that is provided by or at the direction of Client.  Broker acknowledges and agrees that none of Client's, or any of its affiliates', respective directors, officers, employees, or advisors is making any representation or warranty in a personal capacity with respect to any information, including with respect to the accuracy and completeness of such information.  Additionally, Client agrees to provide to Broker a copy of the final form of the executed asset purchase agreement, equity investment agreement, or other agreement and the closing or settlement statement(s) prepared in connection with the closing and settlement of such transaction(s), which Broker agrees to treat as confidential.

Nothing in this agreement shall be deemed or construed so as to require Broker to perform the services of architects, engineers, contractors, accountants, legal counsel or other professionals requiring special licenses (other than a real estate broker) or make Broker responsible for the failure of the various professionals retained by Client to properly perform their services.  Client hereby agrees (i) to disclose to Broker and all prospective purchasers all third party written information in Client's possession regarding the presence of toxic, contaminated or hazardous substances or conditions at the Property; (ii) to make available to Broker and all prospective purchasers all inspection reports in Client's possession pertaining to the presence of such substances or conditions; and (iii) that Broker is hereby authorized to disclose to any prospective purchaser any information in Client's possession regarding the presence of such substances or conditions.

**6. <u>Analysis</u>.** To the extent that Broker prepares any analysis, valuation, appraisal or other report ("Analysis") regarding the economic value of the Client or the Property, such Analysis shall be promptly provided to Client.  Client acknowledges and agrees that any such Analysis will be an estimate only and will not constitute a representation, warranty, covenant or guaranty, either expressed or implied, regarding future events or performance. Client agrees that any such Analysis will be used for its internal purposes only, and will not be disseminated to any third party without the written consent of Broker.  Client agrees that in the event Client approves the analysis for distribution to investors or potential purchasers as part of the marketing of the Property, Broker can share such Analysis as part of the Property's due diligence information.

**7. <u>Reporting</u>.** Broker shall keep Client current as to the progress of its marketing efforts, in no event less frequently than weekly. During the Exclusive Period, Client will provide notice to Broker all meaningful inquiries and offerings received by Client with respect to the Recapitalization,

regardless of the source of such inquiries or offerings, and all negotiations shall be conducted solely by Broker or under Broker's direction and Client will provide notice to Broker of any meaningful negotiations. Broker shall maintain and from time to time, no less frequently than weekly, provide to Client a list identifying each prospective Counterparty with whom Broker has communicated in furtherance of a possible Recapitalization.

**8. <u>Client's Authority</u>**.

Client, in its sole discretion, reserves its right to accept or reject any offer for a Recapitalization.

Client and the Broker acknowledge and agree that the fees and expenses payable to the Broker hereunder are reasonable. Client and the Broker acknowledge and agree that the time worked, results achieved and ultimate benefit to Client of the work performed in connection with this engagement may be variable, all of which has been fully considered and factored into establishing the fees hereunder.

In the event approval of this Agreement or the fees payable hereunder becomes necessary by the United States Bankruptcy Court, the Israeli courts or any other judicial or regulatory authority, Client shall use commercially reasonable efforts to obtain such approval and Broker shall cooperate in all respects with Client's requests so as to seek and obtain such approval.

**9. <u>Purchaser Representation</u>**. Client acknowledges that Broker is a national financial intermediary and may represent, through listing agreements, debt placement engagements, correspondent production and servicing contracts or otherwise, (a) Prospective Purchasers and/or tenants of the Property, (b) current tenants of the Property, (c) owners, mortgagees or tenants of property that have the same or similar qualities and characteristics as the Property and which may compete with the Property and/or (d) parties having a security interest in the Property. In some cases, potential purchasers may request the Broker's assistance in placing debt on the Property to consummate the purchase of the Property. In such cases where a potential purchaser requests Broker's assistance in placing debt on the Property to consummate the purchase, Broker will, in all cases, fully disclose all potential relationships (including any and all potential fee arrangements) to Client; provided, however, that to the extent a Potential Purchaser approaches Broker's "Debt Placement" professionals to arrange debt with respect to the purchase of the Property and (i) all fees and costs payable in connection with such debt are payable by the Potential Purchaser, and (ii) Broker's professionals in the Broker's "Investment Sales" and "Equity Placement" lines of business are not involved in such debt placement, then Client's consent shall not be required. Client further acknowledges that Broker may reach out to potential lenders in order to obtain general debt terms during the course of this assignment. In addition, Client acknowledges that Broker may also represent potential purchasers and investor prospects regarding the sale of the Property and Client hereby consents to such dual representation.

**10. <u>Limitations on Scope of Services</u>**. Client also understands that Broker will not advise it as to the legal or tax effects of any transaction, and that Client should, if it has not done so already, promptly engage legal and tax professionals to advise it as to all such matters during the course of this engagement and any transaction that may result. Broker shall have no obligation to investigate conditions on or the condition of the Property, nor the financial stability or capability of any prospective purchaser. Client should engage technical staff and other analytical personnel to advise and assist it in each of these areas.

**11. <u>Assignment</u>**. In no event shall either party have the right to assign this Agreement without the consent of the other party, except that, notwithstanding the foregoing, Broker shall have the right to assign this Agreement to an entity into which or with which Broker is merged or consolidated or to which all or substantially all of the assets of or interests in Broker are being transferred whereupon this agency shall be binding upon the parties hereto such permitted successors and assigns.

**12. <u>Advertisement</u>**. Client hereby consents to Broker publicizing its role in any transaction Client enters into, including using its name and logo in any "tombstone" or other advertisement announcing the successful consummation of any of the transactions contemplated hereunder, provided, however, that all such disclosures shall be subject to Client's publication limitation according to the Israeli Security Authority. No publication will be done either of this Agreement or of a potential transaction without Client's written approval in advance.

**13. <u>Bankruptcy Provisions</u>**. Client covenants and agrees that in the event it seeks protection or otherwise becomes a debtor(s) under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code"), it shall use its best efforts to promptly apply to the bankruptcy court having jurisdiction of the Chapter 11 case(s) ("Bankruptcy Court") for approval pursuant to sections 327, 328, 363 or such other provisions in the Bankruptcy Code as may be applicable, of (i) this Agreement, the Real Property Brokerage Agreement, and the Brokerage Agreement (collectively, the "Agreements") and (ii) Broker's retention by the Client under the terms of the Agreements and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to the standard of review provided in section 330 of the Bankruptcy Code. Client shall provide Broker with a draft of such application and any proposed order authorizing Broker's retention sufficiently in advance of the filing of such application and proposed order to enable Broker and its counsel to review and comment thereon and such retention application shall be acceptable to Broker in all respects. The Client agrees that, subject to court approval, all fees, compensation, and any payments made pursuant to the indemnification, reimbursement, and contribution and expense reimbursement provisions of the Agreements, shall be entitled to priority (pari passu with similarly situated professionals and creditors) as expenses of administration under sections 503 and 507 of the Bankruptcy Code and any fee payable under the Agreements shall be entitled to the benefit of a "carve-out" from the proceeds of any transaction and in addition, all such fees shall be entitled to the benefits of any carve-outs for professional fees and expenses in effect in the Chapter 11 cases(s) pursuant to any financing order entered in the Chapter 11 cases(s). The Client agrees to promptly seek such carve-outs from any financing or cash collateral orders of any of its secured lenders.

The Brokerage Fee will be paid to Broker directly from the proceeds of any Recapitalization. Client and Broker agree that upon entry by Client into a definitive agreement for the Recapitalization, as part of any such agreement, Client shall (if requested by Broker) provide an irrevocable instruction for the counterparty to such definitive agreement to directly pay Broker the Brokerage Fee earned upon the closing of such Recapitalization, which irrevocable instruction shall be in a form to be specified by Broker.

14. **Miscellaneous**.

(a) Nothing contained in this Agreement or in the relationship of Client and Broker shall be deemed or construed as a partnership, joint venture or any other similar relationship, and Broker shall at all times be deemed an independent contractor and not an employee of Client.

(b) The parties intend that the terms of this Agreement shall be the final expression of their agreement with respect to the Property hereof and may not be contradicted by evidence of any prior or contemporaneous agreement. This Agreement supersedes any prior representations or agreements regarding the Property, whether written or oral by either or both parties. No amendments to or modifications of this Agreement shall be valid or binding unless made in writing and signed by both Client and Broker.

(c) This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Copies of this Agreement exchanged by facsimile or other electronic image shall be valid and binding on the party that has executed the same.

(d) This Agreement shall be deemed to have been made under and be construed in accordance with the laws of the State of New York. The parties consent to the exclusive jurisdiction of the Supreme Court of the State of New York, County of New York, for the resolution of any disputes that arise under this Agreement.

(e) In the event that any action, suit or other proceeding in law or in equity is brought in connection with any term or provision in this agreement, and such action results in the award of a judgment for money damages or in the granting of any injunction or restraining order, all expenses (including reasonable attorneys' fees) of the prevailing party in such action, suit or other proceeding shall be paid promptly by the non-prevailing party.

(f) To the fullest extent permitted by applicable law, Client shall indemnify and hold Broker and its employees, agents, successors, and assigns (each a "Covered Person") from and against any and all losses, claims, demands, liabilities, expenses, judgements, fines, settlements and other amounts arising from any and all claims, demands, actions, suits, proceedings, civil, criminal, administrative or investigative in which the Covered Person may be involved, or threatened to be involved; as a party or otherwise, relating to or arising out of this Agreement, except that no Covered Person shall be entitled to such indemnification with respect to any loss, damage or claim incurred by such Covered Person by reason of any Covered Person's gross negligence, willful misconduct or willful breach of this Agreement.

(g) Broker shall not be liable for incidental, punitive, exemplary, indirect or consequential damages, or lost profits arising under or relating to this Agreement. Broker's liability for any damages or other monetary amounts relating to this Agreement shall not exceed the total fees received by Broker under this Agreement.

(h) Broker (i) represents and warrants that it is duly licensed under the laws of the State of New York as a real estate broker and agrees that it shall maintain in good standing and renew such license(s) throughout the term of this Agreement.

(i) Notwithstanding anything contained in this Agreement to the contrary, in the event that, in Broker's sole discretion, the provision of certain services described herein in connection with any Recapitalization shall require a United States Securities and Exchange Commission-registered broker-dealer or similar securities intermediary registration of any other jurisdiction where such registration is required, Broker shall have the right to assign this Agreement (or any portion hereof, including, without limitation, the right to receive certain Fee(s)) to TigerBridge Capital LLC d/b/a Meridian Securities (the "BD Advisor"), and BD Advisor shall become a party to this Agreement by the execution and delivery of a joinder (and acceptance thereof by Broker and Client) at such time.  In such an event, the term "Broker", as used in this Agreement, shall refer, collectively, to Broker and the BD Advisor, as the context may require.

(j) The headings and captions of various sections of this Agreement are for convenience of reference only and are not to be construed as defined or limiting, in any way, the scope or intent of the provisions hereof.

Provided the terms and conditions of this agreement meet with your approval, please evidence your agreement by executing this letter on behalf of the Client, and return it to me.

Sincerely,

Meridian Capital Group LLC

By: _____

Name: Peter Leung
Title:  Managing Director, Legal Dept.

**AGREED AND ACCEPTED:**

All Year Holdings Limited

By: _____
Name: _____
Title: _____

7

(h) Broker (i) represents and warrants that it is duly licensed under the laws of the State of New York as a real estate broker and agrees that it shall maintain in good standing and renew such license(s) throughout the term of this Agreement.

(i) Notwithstanding anything contained in this Agreement to the contrary, in the event that, in Broker's sole discretion, the provision of certain services described herein in connection with any Recapitalization shall require a United States Securities and Exchange Commission-registered broker-dealer or similar securities intermediary registration of any other jurisdiction where such registration is required, Broker shall have the right to assign this Agreement (or any portion hereof, including, without limitation, the right to receive certain Fee(s)) to TigerBridge Capital LLC d/b/a Meridian Securities (the "BD Advisor"), and BD Advisor shall become a party to this Agreement by the execution and delivery of a joinder (and acceptance thereof by Broker and Client) at such time.  In such an event, the term "Broker", as used in this Agreement, shall refer, collectively, to Broker and the BD Advisor, as the context may require.

(j) The headings and captions of various sections of this Agreement are for convenience of reference only and are not to be construed as defined or limiting, in any way, the scope or intent of the provisions hereof.

Provided the terms and conditions of this agreement meet with your approval, please evidence your agreement by executing this letter on behalf of the Client, and return it to me.

Sincerely,

Meridian Capital Group LLC

By: _____
Name:
Title:

**AGREED AND ACCEPTED:**

All Year Holdings Limited

By: _____
Name: _____
          Asaf Ravid
Title: _____
          CRO

7

## **Schedule I**

### Brokerage Fee Schedule

A.       If Client receives an Engagement Proposal during the Exclusive Period, through Broker's efforts or otherwise, upon the closing of a Recapitalization, Broker shall be paid a Fee (the "***Brokerage Fee***") in an amount equal to:

(i)       three percent (3.00%) of the maximum amount of the equity commitments or obligations (provided, that in the event any proceeds are deferred, such amounts shall be payable upon receipt by Client of such proceeds) (the "Equity Obligation") of applicable Counterparty for all amounts up to and including $25,000,000.00;

(ii)      two and one-half percent (2.50%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $25,000,000.00 and up to and including $50,000,000.00;

(iii)     two percent (2.0%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $50,000,000.00 and up to and including $75,000,000.00;

(iv)     one and one-half percent (1.50%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $75,000,000.00 and up to and including $100,000,000.00;

(v)      one percent (1.00%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $100,000,000.00 and up to and including $150,000,000.00; and

(vi)     one-half of one percent (0.50%) of the maximum amount of the Equity Obligation of applicable Counterparty for the portion that exceeds $150,000,000.00.

B.       To the extent any Prospective Counterparty (which for the avoidance of doubt, shall include any Carveout Counterparty) provides an Engagement Proposal during the Exclusive Period and/or Protection Period resulting in a Recapitalization that, thereafter, closes no later than three (3) months after the expiration of the Protection Period, Broker shall be paid the Brokerage Fee as set forth in Section A of this Schedule I.

C.       Notwithstanding the foregoing, in the event that a Recapitalization transaction is completed pursuant to Section A or B of this Schedule I with any Carveout Counterparty (as defined below), the Brokerage Fee payable with respect to the Equity Obligation of such Carveout Counterparty shall be reduced to 50% of the Brokerage Fee as set forth in Section A of this Schedule I.

D.       Client acknowledges that, notwithstanding the fact that Broker is not being engaged to procure any transaction involving the Bonds, a Prospective Counterparty may enter into a transaction involving the Bonds.  In the event that, during the Exclusive Period and/or Protection Period, any Prospective Counterparty enters into a transaction to purchase, pay off, assume,

assign the Bonds (or any other similar transaction) (a "Bonds Transaction"), which directly results in a reduction in principal, conversion to equity or similar event with respect to such Bonds, whether in one or more related transactions, and which is approved by Client, Client shall pay to Broker a fee equal to four-tenths of one percent (0.40%) of the gross purchase price of such Bonds Transaction; *provided*, however, that in the event that such Bonds Transaction is entered into by a Carveout Counterparty, such fee shall be reduced to one-quarter of one percent (0.25%) of the gross purchase price of such Bonds Transaction.

"Carveout Counterparty" shall mean each of:
1. Churchill/ Fleishman/ Philipson Family/ Paragraph
2. Meadow Partners/ Madison
3. Tabak
4. York / Jeremy Blank
5. Apollo
6. Silverstein
7. DW Partners
8. Blue Arch Capital
9. Downtown Capital

## **Schedule II**

### Bonds

Collectively:

| | | |
|---|---|---|
| ALL YEAR B2 | ALYR.B2 | IL0011397812 |
| ALL YEAR B4 | ALYR.B4 | IL0011412744 |
| ALL YEAR B5 | ALYR.B5 | IL0011433047 |

For the avoidance of doubt, the definition of Bonds excludes the bonds designated ALL YEAR B3 ALYR.B3 IL0011401366

220999816v1

# AMENDMENT TO EXCLUSIVE AGREEMENT

THIS AMENDMENT TO EXCLUSIVE AGREEMENT (this "Amendment"), dated as of August 10, 2021, is by and among All Year Holdings Limited ("Client") and Meridian Capital Group LLC ("Broker").

## RECITALS

A.    Client and Broker entered into that certain Exclusive Agreement dated April, 13, 2021, ("Recapitalization Agreement") regarding the recapitalization of Client.

B.    Client and Broker have determined that it is in the best interest of parties to the Agreement that certain terms and conditions of the Agreement are amended and modified as set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein the parties hereby agree as follows:

1.    **Defined Terms**. All capitalized terms used in this Amendment shall have the respective meanings given to them in the Agreements unless otherwise defined herein.

2.    **Exclusive Period**. The Exclusive Period of the Recapitalization Agreement is hereby extended for a period of 45 days to (September 25, 2021).

3.    **Successors and Assigns**. This Amendment shall be binding upon and inure to the benefit of Client and Broker and their respective successors and assigns.

4.    The terms and conditions of this Amendment shall amend, supersede, replace, govern and control over any conflicting or inconsistent terms and conditions in the Agreement, but except as modified in this Amendment, all other terms and conditions of the Agreement shall remain unmodified and in full force and effect.

5.    **Governing Law**. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

6.    **Counterparts**. This Amendment may be executed in multiple counterparts and delivered by facsimile or pdf, each of which shall be an original but all of which together shall constitute but one and the same Amendment.

[Signatures begin on next page]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CLIENT:

ALL YEAR HOLDINGS LIMITED

By: _____
    Name: Assaf Ravid
    Title: CRO

BROKER:

MERIDIAN CAPITAL GROUP LLC

By: _____
    Name:  Peter Leung
    Title:   Managing Director, Legal Dept.

## SECOND AMENDMENT TO EXCLUSIVE AGREEMENT

THIS SECOND AMENDMENT TO EXCLUSIVE AGREEMENT (this "Amendment"), dated as of September __, 2021, is by and among All Year Holdings Limited ("Client") and Meridian Capital Group LLC ("Broker").

## RECITALS

A.     Client and Broker entered into that certain Exclusive Agreement dated April, 13, 2021, as amended by that certain Amendment to Exclusive Agreement dated August 10, 2021, (as amended, "Recapitalization Agreement") regarding the recapitalization of Client.

B.     Client and Broker have determined that it is in the best interest of parties to the Agreement that certain terms and conditions of the Agreement are amended and modified as set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein the parties hereby agree as follows:

1.     **Defined Terms**. All capitalized terms used in this Amendment shall have the respective meanings given to them in the Agreements unless otherwise defined herein.

2.     **Exclusive Period**. The Exclusive Period of the Recapitalization Agreement is hereby extended for a period of 45 days to (November 9, 2021).

3.     **Successors and Assigns**. This Amendment shall be binding upon and inure to the benefit of Client and Broker and their respective successors and assigns.

4.     The terms and conditions of this Amendment shall amend, supersede, replace, govern and control over any conflicting or inconsistent terms and conditions in the Agreement, but except as modified in this Amendment, all other terms and conditions of the Agreement shall remain unmodified and in full force and effect.

5.     **Governing Law**. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

6.     **Counterparts**. This Amendment may be executed in multiple counterparts and delivered by facsimile or pdf, each of which shall be an original but all of which together shall constitute but one and the same Amendment.

[Signatures begin on next page]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CLIENT:

ALL YEAR HOLDINGS LIMITED

By: _____
    Name: Asaf Ravid
Title:CRO

BROKER:

MERIDIAN CAPITAL GROUP LLC

By: _____
    Name:  Peter Leung
    Title:  Managing Director, Legal Dept.

# THIRD AMENDMENT TO EXCLUSIVE AGREEMENT

THIS THIRD AMENDMENT TO EXCLUSIVE AGREEMENT (this "Amendment"), dated as of November 9, 2021, is by and among All Year Holdings Limited ("Client") and Meridian Capital Group LLC ("Broker").

## RECITALS

A.      Client and Broker entered into that certain Exclusive Agreement dated April 13, 2021, as amended by that certain Amendment to Exclusive Agreement dated August 10, 2021, and that certain Second Amendment to Exclusive Agreement dated September 24, 2021 (as amended, "Recapitalization Agreement") regarding the recapitalization of Client.

B.      Client and Broker have determined that it is in the best interest of parties to the Agreement that certain terms and conditions of the Agreement are amended and modified as set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein the parties hereby agree as follows:

1.      **Defined Terms**. All capitalized terms used in this Amendment shall have the respective meanings given to them in the Agreements unless otherwise defined herein.

2.      **Exclusive Period**. The Exclusive Period of the Recapitalization Agreement is hereby extended for a period of 45 days to (December 24, 2021).

3.      **Successors and Assigns**. This Amendment shall be binding upon and inure to the benefit of Client and Broker and their respective successors and assigns.

4.      The terms and conditions of this Amendment shall amend, supersede, replace, govern and control over any conflicting or inconsistent terms and conditions in the Agreement, but except as modified in this Amendment, all other terms and conditions of the Agreement shall remain unmodified and in full force and effect.

5.      **Governing Law**. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

6.      **Counterparts**. This Amendment may be executed in multiple counterparts and delivered by facsimile or pdf, each of which shall be an original but all of which together shall constitute but one and the same Amendment.

[Signatures begin on next page]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CLIENT:

ALL YEAR HOLDINGS LIMITED

By: _____

Name: Asaf Ravid T Ephraim Dramond

Title: CEO    ARO

BROKER:

MERIDIAN CAPITAL GROUP LLC

By: _____

Name: Peter Leung

Title: Managing Director, Legal Dept.

**Exhibit 2**
**Financing Engagement Letter**



<u>**EXCLUSIVE BROKERAGE AGREEMENT**</u>

This brokerage agreement (the "***Agreement***") is being entered into as of April 13, 2021 by and between All Year Holdings Limited, having an address at 12 Spencer Street, 3rd Floor, Brooklyn, New York 11205 (on behalf of itself, and its Affiliates, as defined herein, collectively, "***Client***"), and Meridian Capital Group, LLC having an address at 1 Battery Park Plaza, 26th Floor, New York, NY 10004 ("***Meridian***").  As used herein, "***Affiliates***" shall mean those entities that are controlled by or are under common control with Client, including, without limitation, the funds, subsidiaries and/or entities managed by Client or its Affiliates. In consideration of the mutual covenants and undertakings to be performed under this Agreement, the parties hereto agree as follows:

1.  Client hereby grants Meridian the sole and exclusive right during the Exclusivity Term (defined herein) to (i) procure mortgage and/or mezzanine financing for the real property described on Exhibit A attached hereto (individually or collectively as the context may require, the "***Premises***"), which may include, without limitation, any form of debt, funds provided by or through a secured or unsecured loan, preferred equity and any form of construction or bridge financing (a "***Financing***") and/or (ii) negotiate modifications, amendments, extensions, or other similar transactions relating to any of the existing financings of the Premises (a "***Modification***").  For the avoidance of doubt, a Financing or Modification shall not include the Bonds.  "***Bonds***" shall mean the bonds as described on Exhibit B.  Meridian shall use its commercially reasonable efforts to negotiate Financing and/or Modification proposals for the Premises with financial institutions or other financing sources that may include, but shall not be limited to, term sheets, letters of intent, applications, indications of interest or other financing arrangements from such financial institutions for Financings or Modifications (each, which, for the avoidance of doubt, includes emails, a "***Loan Engagement***").  During the Exclusivity Term, Client shall forward to Meridian any Loan Engagement or proposal therefor, inquiry, or other communication relating to a Financing received by it from any source other than Meridian upon receipt.  Meridian does not guarantee that a Financing can or will be obtained.  Client agrees that Meridian will not be liable to it for any losses or damages whatsoever in the event a Financing is not obtained. The Client represents that it has the full power and authority to enter into this Agreement and execute a Financing or Modification.

2.  The term of this Agreement shall commence on the date hereof and continue for a period of 120 days (the "***Exclusivity Term***").  For the avoidance of doubt, the Agreement will only apply to entities and/or properties in which Client holds a 100% interest. Client will use commercially reasonable efforts to bring the partially owned properties into this Agreement.

3.  If, prior to the end of the Exclusivity Term, Client receives a Loan Engagement, through Meridian's efforts or otherwise, then upon the closing of such Financing, Meridian shall be paid a fee equal to eighty basis points (0.8%) of the maximum amount of proceeds available pursuant to such Financing, including, without limitation, reserves, holdbacks and future funding obligations (the "***Financing Fee***"), or in the case of a Modification, Meridian shall be paid a fee equal to thirty basis points (0.3%) of the maximum commitment amount of the loan modified, including, without limitation, reserves, holdbacks and future funding obligations (the "***Modification Fee***" together with a Financing Fee, a "***Brokerage Fee***").  In the event any of the proceeds or loan modification amount from such Financing or Modification shall be deferred, then the Brokerage Fee with respect to such deferred amount shall be payable only upon receipt by Client of such proceeds or loan modification.

4.  Meridian and Client are contemporaneously entering into an Exclusive Agreement Regarding the Recapitalization of All Year Holdings Limited dated on or about the date hereof (the "***Recapitalization Agreement***"), and Meridian and Client have entered into that Exclusive Agreement Regarding 54 Noll

Exclusive Brokerage Agreement
April 13, 2021
Page 2 of 8

Street, Brooklyn, NY 11206 and 123 Melrose Street, Brooklyn, NY 11726 dated February 24, 2021 (the "**Real Property Brokerage Agreement**"). Any Brokerage Fee earned by Meridian pursuant to the terms of this Agreement shall be deemed earned without any right by Client to offset or reduce the amount of Brokerage Fee due because of Meridian earning any compensation or fees pursuant to the Recapitalization Agreement or the Real Property Brokerage Agreement.

5. Client agrees to pay Meridian the Financing Fee upon the closing of the Financing, if within one (1) year after the expiration of the Exclusivity Term then in effect or the termination of this Agreement (the "**Tail Period**"), Client enters into a Loan Engagement with a financial institution (or an affiliate thereof) with whom Meridian was actively negotiating during the Exclusivity Term (including any financial institution from whom a Loan Engagement was obtained during the Exclusivity Term) and set forth on a list to be submitted by Meridian to Client no later than 14 days after expiration or termination of this Agreement (a "**Protected Investor**"), and thereafter obtains and closes a corresponding Financing. For purposes of this provision, "actively negotiating" shall mean engaging in substantive communications regarding the Financing or Modification, including, but not limited to, the circulation of offering memoranda or other similar information.

6. In each case set forth herein, the Brokerage Fee is deemed earned and shall be due and payable upon the closing of any Financing or Modification. Client shall have no obligation to accept any Loan Engagement. The Brokerage Fee will be paid to Meridian directly from the proceeds of the applicable Financing or Modification (if applicable). Meridian and Client agree that upon entry by Client into a definitive agreement for the Financing or Modification, Client shall provide an irrevocable instruction for the counterparty to such definitive agreement to directly pay Meridian the Brokerage Fee earned upon the closing of such Financing or Modification, which irrevocable instruction shall be in a form to be specified by Meridian.

7. To the extent that Client asks Meridian to perform services on other engagements not specified herein, the terms and conditions of this Agreement shall apply to such services unless the parties hereto execute a separate written agreement governing such separate engagement.

8. Client acknowledges and agrees that, to the extent Meridian prepares any analysis, valuation, appraisal or other report ("**Analysis**") regarding the economic value of the Premises or Client's interest therein, such Analysis shall be promptly provided to Client. Client acknowledges and agrees that any such Analysis will be an estimate only and will not constitute a representation, warranty, covenant or guaranty, either expressed or implied, regarding future events or performance. Client covenants that the Analysis will be used for its internal purposes only and will not be disseminated to any third party without the prior written consent of Meridian. Client also understands that Meridian will not advise it as to the legal or tax effects of any transaction, and that Client should, if it has not done so already, promptly engage legal and tax professionals to advise it as to all such matters. In addition, neither party shall assign this agreement or any right or obligation hereunder without the prior written consent of the other party.

9. Client and Meridian acknowledge and agree that the fees and expenses payable to Meridian hereunder are reasonable. Client and Meridian acknowledge and agree that the time worked, results achieved and ultimate benefit to Client of the work performed in connection with this engagement may be variable, all of which has been fully considered and factored into establishing the fees hereunder.

10. In the event approval of this Agreement or the fees payable hereunder becomes necessary by the United States Bankruptcy Court, the Israeli courts or any other judicial or regulatory authority, Client shall use commercially reasonable efforts to obtain such approval and Meridian shall cooperate in all respects with Client's requests so as to seek and obtain such approval.

Exclusive Brokerage Agreement
April 13, 2021
Page **3** of **8**

11. Any notice, demand or request required or permitted to be given or made under this Agreement will be in writing and will be deemed given or made when delivered in person, when sent by United States registered or certified mail, or postage prepaid, or when telecopied to the applicable party at the above listed address, and if to Meridian, to the attention of Peter T. Leung, Director of Legal, and if to Client, to the attention of the Chief Restructuring Officer.  The parties to this Agreement may change their addresses for notice by notifying the other parties in the manner provided in this Section 11.

12. This Agreement incorporates the entire understanding of the parties with respect to this engagement of Meridian by Client and supersedes all previous agreements regarding such engagement, should they exist, and shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without regard to conflicts of law principles). If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

13. Client covenants and agrees that (i) if Client secures a Loan Engagement during the Exclusivity Term or, from a Protected Investor during the Tail Period described herein in violation of this Agreement and subsequently closes the corresponding Financing, Client shall pay to Meridian the Financing Fee as set forth above and (ii) Client will not directly, or in conjunction with any other person, take any actions intended to circumvent Meridian's rights hereunder or to the Brokerage Fee in connection with a Financing or Modification.

14. Each party consents to the exclusive jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York as well as the jurisdiction of any court from which an appeal may be taken from such courts, for the purpose of any litigation, proceeding, or other action arising out of such party's obligations under or with respect to this agreement, and expressly waives any and all objections such person may have to venue in such courts.

15. If any action or proceeding is instituted by a party arising out of or to enforce this Agreement, the prevailing party in such action or proceeding (as determined by the arbitrator, court, agency or other authority before which such action or proceeding is adjudicated), shall be entitled to such reasonable attorney fees, costs and expenses as may be fixed by the decision maker, including the costs of collection.

16. Each party acknowledges that the person executing this Agreement on behalf of such party has full power and authority to do so and this Agreement is a valid and binding obligation of such party.  This Agreement shall be binding upon Client and its successors and assigns and any subsequent owner of the Premises.

17. Client hereby authorizes Meridian to take any and all actions reasonably necessary in order to carry out its obligations hereunder in accordance with the terms and provisions hereof.  Client further agrees to cooperate with Meridian and undertakes to commit its commercially reasonable efforts to supply Meridian with all documents and information necessary to act on behalf of Client. Client acknowledges and agrees that, as between Meridian and Client, Client is responsible for the accuracy and completeness of all information regarding the Premises that is provided by or at the direction of Client.  Client represents and warrants that the information and documents that it provides, to the best of Client's knowledge, is true, correct and complete and no material information has been withheld. Without limiting the generality of the foregoing, Client agrees to supply Meridian with updated and current documents and financial information as Meridian deems necessary.  Meridian acknowledges and agrees that none of Client's, or any of its affiliates', respective directors, officers, employees, or advisors is making any representation or warranty in a personal capacity with respect to any information, including with respect to the accuracy and completeness of such information.  Client will be asked to approve all marketing

Exclusive Brokerage Agreement
April 13, 2021
Page 4 of 8

materials in advance of their use. Such marketing materials shall disclaim the accuracy or completeness of the information contained therein and that any prospective lender or investor is responsible to conduct its own due diligence.

18. Meridian shall keep Client current as to the progress of its marketing efforts, in no event less frequently than weekly. Meridian shall maintain and from time to time, no less frequently than weekly, provide to Client a list identifying each prospective financing institution that Meridian has communicated in furtherance of a possible Financing or Modification.

19. To the fullest extent permitted by applicable law, Client shall indemnify and hold harmless Meridian and its employees, agents, successors, and assigns (each a "**Covered Person**") from and against any and all losses, claims, demands, liabilities, expenses, judgements, fines, settlements and other amounts arising from any and all claims, demands, actions, suits, proceedings, civil, criminal, administrative or investigative in which the Covered Person may be involved, or threatened to be involved; as a party or otherwise (including, without limitation, subpoenas and/or information requests), relating to or arising out of this Agreement, except that no Covered Person shall be entitled to such indemnification with respect to any loss, damage or claim incurred by such Covered Person by reason of any Covered Person's gross negligence, willful misconduct or willful breach of this Agreement. Meridian shall not be liable for incidental, punitive, exemplary, indirect or consequential damages, or lost profits arising under or relating to this Agreement. Meridian's liability for any damages or other monetary amounts relating to this Agreement shall not exceed the total amount of all fees actually received by Meridian under this Agreement.

20. Client covenants and agrees that in the event it seeks protection or otherwise becomes a debtor(s) under Chapter 11 of the United States Bankruptcy Code ("**Bankruptcy Code**"), it shall use its best efforts to promptly apply to the bankruptcy court having jurisdiction of the Chapter 11 case(s) ("**Bankruptcy Court**") for approval pursuant to sections 327, 328, 363 or such other provisions in the Bankruptcy Code as may be applicable, of (i) this Agreement, the Real Property Brokerage Agreement, and the Recapitalization Agreement (collectively, the "**Agreements**") and (ii) Meridian's retention by the Client under the terms of the Agreements and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to the standard of review provided in section 330 of the Bankruptcy Code. Client shall provide Meridian with a draft of such application and any proposed order authorizing Meridian's retention sufficiently in advance of the filing of such application and proposed order to enable Meridian and its counsel to review and comment thereon and such retention application shall be acceptable to Meridian in all respects. The Client agrees that, subject to court approval, all fees, compensation, and any payments made pursuant to the indemnification, reimbursement, and contribution and expense reimbursement provisions of the Agreements, shall be entitled to priority (pari passu with similarly situated professionals and creditors) as expenses of administration under sections 503 and 507 of the Bankruptcy Code and any fee payable under the Agreements shall be entitled to the benefit of a "carve-out" from the proceeds of any transaction and in addition, all such fees shall be entitled to the benefits of any carve-outs for professional fees and expenses in effect in the Chapter 11 cases(s) pursuant to any financing order entered in the Chapter 11 cases(s). The Client agrees to promptly seek such carve-outs from any financing or cash collateral orders of any of its secured lenders.

21. Notwithstanding anything contained in this Agreement to the contrary, in the event that, in Meridian's sole discretion, the provision of certain services described herein in connection with any Financing or Modification shall require a duly registered broker-dealer or similar securities intermediary registration of any other jurisdiction where such registration is required, Meridian shall have the right to assign this Agreement (or any portion hereof, including, without limitation, the right to receive certain Fee(s)) to to TigerBridge Capital LLC d/b/a Meridian Securities (the "**BD Advisor**"), and such BD Advisor shall become a party to this Agreement by the execution and delivery of a joinder (and acceptance thereof by

4

Exclusive Brokerage Agreement
April 13, 2021
Page **5** of **8**

Meridian and Client) at such time.  In such an event, the term "Meridian," as used in this Agreement, shall refer, collectively, to Meridian and the BD Advisor, as the context may require.

22. This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.  Facsimile and portable document format (PDF) signatures are acceptable to effectuate the terms of this Agreement.

[End of Brokerage Agreement]

Exclusive Brokerage Agreement
April 13, 2021
Page **6** of **8**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**MERIDIAN CAPITAL GROUP, LLC**

By:_____

Name:   Peter Leung

Title:    Managing Director, Legal Dept.

ACCEPTED AND AGREED:

All Year Holdings Limited

By:_____

Name:   Asaf Ravid              4.12.2021

Title:    CRO

Exclusive Brokerage Agreement
April 13, 2021
Page 7 of 8

Exhibit A

Properties

All real properties wholly-owned (directly or indirectly) or controlled by Client. Notwithstanding any other provision herein, Properties shall exclude all direct and indirect assets of All Year Equity Partners LLC.

AYH Properties

| | Assets |
|---|---|
| 1 | 17 Devoe Street |
| 2 | 165 Central Avenue |
| 3 | 198 Scholes Street |
| 4 | 11 Gunther Place |
| 5 | 194 Ralph Avenue |
| 6 | 1055 Dean Street |
| 7 | 401 Suydam Street |
| 8 | 716 Jefferson Avenue |
| 9 | 215 Himrod Street |
| 10 | 132 Havemeyer Street |
| 11 | 160 Havemeyer Street |
| 12 | 79 South 6 Street |
| 13 | 22 Dodworth Street |
| 14 | 1044 Flushing Avenue |
| 15 | 3609 15th Avenue |
| 16 | 3611 15th Avenue |
| 17 | 419 Classon Avenue |
| 18 | 778 Lincoln Place |
| 19 | 360 Decatur Street |
| 20 | 136 Kingsland Avenue |
| 21 | 574 Broadway |
| 22 | 271 Metropolitan Avenue |
| 23 | 591 Franklin Avenue |
| 24 | 648 Myrtle Avenue |
| 25 | 57-59 Grand Street |
| 26 | 28 Wilson Avenue |
| 27 | 473 Park Place |
| 28 | 254 Palmetto Street |
| 29 | 311 Melrose Street |
| 30 | 291 Metropolitan Avenue |
| 31 | 65 Kent Avenue |
| 32 | 125 & 133 Leonard Street |
| 33 | 305 Grand Street |
| 34 | 527 Knickerbocker Avenue |
| 35 | 533 Knickerbocker Avenue |
| 36 | 735 Bedford Avenue |
| 37 | 871 Grand Street |
| 38 | 82 Jefferson Street |
| 39 | 69 Stockholm Street |
| 40 | 273 Skillman Street |
| 41 | 506 Dekalb Avenue |
| 42 | 89 North 4th Street |
| 43 | 300 Nassau Avenue |
| 44 | 161 Troutman Street |

| | |
|---|---|
| 45 | 191 Troutman Street |
| 46 | 300 Troutman Street |
| 47 | 189 Menahan Street |
| 48 | 679 - 681 Classon Avenue |
| 49 | 378 Lewis Avenue |
| 50 | 497 Prospect Place |
| 51 | 166 Harman Street |
| 52 | 167 Harman Street |
| 53 | 135 Rogers Avenue |
| 54 | 163 Troutman Street |
| 55 | 226 Troutman Street |
| 56 | 238 Troutman Street |
| 57 | 242 Troutman Street |
| 58 | 247 Troutman Street |
| 59 | 239 Troutman Street |
| 60 | 222 Stanhope Street |
| 61 | 1418 Putnam Avenue |
| 62 | 1420 Putnam Avenue |
| 63 | 90 Wilson Avenue |
| 64 | 48 Wilson Avenue |
| 65 | 170 Knickerbocker Avenue |
| 66 | 101 Quincy Street |
| 67 | 1159 Dean Street |
| 68 | 654 Park Place |
| 69 | 461 Park Place |
| 70 | 469 Park Place |
| 71 | 600 Park Place |
| 72 | 694 Franklin Avenue |
| 73 | 1221 Atlantic - 52 Herkimer Place |
| 74 | 1058 Bergen Street |
| 75 | 916 Madison Street |
| 76 | 150 Grove Street |
| 77 | 192 Jefferson Street |
| 78 | 233 Jefferson Street |
| 79 | 231 Jefferson Street |
| 80 | 161 Meserole Street |
| 81 | 212 & 214 Grand Street |
| 82 | 145 Driggs Avenue |
| 83 | 30 Driggs Avenue |
| 84 | 1012 Willoughby Avenue |
| 85 | 1136 Willoughby Avenue |
| 86 | 54 Lewis Avenue |
| 87 | 1323 Bedford Avenue |
| 88 | 1358 Dekalb Avenue |
| 89 | 1426 Bedford Avenue-690 prospect |
| 90 | 892 Myrtle Avenue |
| 91 | 143 North 8 Street |

| | |
|---|---|
| 92 | 392 St Marks Avenue |
| 93 | 283 Nostrand Avenue |
| 94 | 71 Wilson Avenue |
| 95 | 1088 Bedford Avenue |
| 96 | 697 Prospect Place |
| 97 | 274 Jefferson Street |
| 98 | 307 Devoe Street |
| 99 | 273 Driggs Avenue |
| 100 | 1397 Greene Avenue |
| 101 | 381 Metropolitan Avenue |
| 102 | 1361 Greene Avenue |
| 103 | 277 Classon Avenue |
| 104 | 199 Weirfield Street |
| 105 | 252 Grand Street |
| 106 | 259 Evergreen Avenue |
| 107 | 335-337 St. Nicholas Avenue |
| 108 | 132A Stanhope Street |
| 109 | 268 Metropolitan Avenue |
| 110 | 236 Meserole Street |
| | **Joint Control** |
| 111 | 430 Albee |
| 112 | North Flats |
| | **Financial Assets** |
| 113 | 227 Grand Street |

Exclusive Brokerage Agreement
April 13, 2021
Page **8** of **8**

Exhibit B

Description of Bonds

| ALL YEAR | B2 | ALYR.B2 | IL0011397812 |
| ALL YEAR | B3 | ALYR.B3 | IL0011401366 |
| ALL YEAR | B4 | ALYR.B4 | IL0011412744 |
| ALL YEAR | B5 | ALYR.B5 | IL0011433047 |

## AMENDMENT TO EXCLUSIVE AGREEMENT

THIS AMENDMENT TO EXCLUSIVE AGREEMENT (this "Amendment"), dated as of August 10, 2021, is by and among All Year Holdings Limited ("Client") and Meridian Capital Group LLC ("Broker").

### RECITALS

A.     Client and Broker entered into that certain Exclusive Brokerage Agreement dated April, 13, 2021, ("Financing Agreement") regarding the financing and modification of certain properties owned by Client.

B.     Client and Broker have determined that it is in the best interest of parties to the Agreement that certain terms and conditions of the Agreement are amended and modified as set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein the parties hereby agree as follows:

1.     **Defined Terms**. All capitalized terms used in this Amendment shall have the respective meanings given to them in the Agreements unless otherwise defined herein.

2.     **Exclusive Period**. The Exclusivity Term of the Financing Agreement is hereby extended for a period of 45 days to (September 25, 2021).

3.     **Successors and Assigns**. This Amendment shall be binding upon and inure to the benefit of Client and Broker and their respective successors and assigns.

4.     The terms and conditions of this Amendment shall amend, supersede, replace, govern and control over any conflicting or inconsistent terms and conditions in the Agreement, but except as modified in this Amendment, all other terms and conditions of the Agreement shall remain unmodified and in full force and effect.

5.     **Governing Law**. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

6.     **Counterparts**. This Amendment may be executed in multiple counterparts and delivered by facsimile or pdf, each of which shall be an original but all of which together shall constitute but one and the same Amendment.

[Signatures begin on next page]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CLIENT:

ALL YEAR HOLDINGS LIMITED

By: _____
      Name: Assaf Ravid
      Title: CRO

BROKER:

MERIDIAN CAPITAL GROUP LLC

By: _____
      Name: Peter Leung
      Title: Managing Director, Legal Dept.

## AMENDMENT TO EXCLUSIVE AGREEMENT

THIS AMENDMENT TO EXCLUSIVE AGREEMENT (this "<u>Amendment</u>"), dated as of September __, 2021, is by and among All Year Holdings Limited ("Client") and Meridian Capital Group LLC ("Broker").

## RECITALS

A.    Client and Broker entered into that certain Exclusive Brokerage Agreement dated April, 13, 2021, as amended by that certain Amendment to Exclusive Agreement dated August 10, 2021 (as amended, "Financing Agreement") regarding the financing and modification of certain properties owned by Client.

B.    Client and Broker have determined that it is in the best interest of parties to the Agreement that certain terms and conditions of the Agreement are amended and modified as set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein the parties hereby agree as follows:

1.    **<u>Defined Terms</u>**. All capitalized terms used in this Amendment shall have the respective meanings given to them in the Agreements unless otherwise defined herein.

2.    **<u>Exclusive Period</u>**. The Exclusivity Term of the Financing Agreement is hereby extended for a period of 45 days to (November 9, 2021).

3.    **<u>Successors and Assigns</u>**. This Amendment shall be binding upon and inure to the benefit of Client and Broker and their respective successors and assigns.

4.    The terms and conditions of this Amendment shall amend, supersede, replace, govern and control over any conflicting or inconsistent terms and conditions in the Agreement, but except as modified in this Amendment, all other terms and conditions of the Agreement shall remain unmodified and in full force and effect.

5.    **<u>Governing Law</u>**. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

6.    **<u>Counterparts</u>**. This Amendment may be executed in multiple counterparts and delivered by facsimile or pdf, each of which shall be an original but all of which together shall constitute but one and the same Amendment.

[Signatures begin on next page]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CLIENT:

ALL YEAR HOLDINGS LIMITED

By: _____
    Name: Asaf Ravid
Title: CRO

BROKER:

MERIDIAN CAPITAL GROUP LLC

By: _____
    Name:  Peter Leung
    Title:   Managing Director, Legal Dept.

## THIRD AMENDMENT TO EXCLUSIVE AGREEMENT

THIS THIRD AMENDMENT TO EXCLUSIVE AGREEMENT (this "Amendment"), dated as of November 9, 2021, is by and among All Year Holdings Limited ("Client") and Meridian Capital Group LLC ("Broker").

## RECITALS

A.      Client and Broker entered into that certain Exclusive Brokerage Agreement dated April, 13, 2021, as amended by that certain Amendment to Exclusive Agreement dated August 10, 2021  and that certain Amendment to Exclusive Agreement dated September 25, 2021  (as amended, "Financing Agreement") regarding the financing and modification of certain properties owned by Client.

B.      Client and Broker have determined that it is in the best interest of parties to the Agreement that certain terms and conditions of the Agreement are amended and modified as set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein the parties hereby agree as follows:

1.      **Defined Terms**. All capitalized terms used in this Amendment shall have the respective meanings given to them in the Agreements unless otherwise defined herein.

2.      **Exclusive Period**. The Exclusivity Term of the Financing Agreement is hereby extended for a period of 45 days to (December 24, 2021).

3.      **Successors and Assigns**. This Amendment shall be binding upon and inure to the benefit of Client and Broker and their respective successors and assigns.

4.      The terms and conditions of this Amendment shall amend, supersede, replace, govern and control over any conflicting or inconsistent terms and conditions in the Agreement, but except as modified in this Amendment, all other terms and conditions of the Agreement shall remain unmodified and in full force and effect.

5.      **Governing Law**. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

6.      **Counterparts**. This Amendment may be executed in multiple counterparts and delivered by facsimile or pdf, each of which shall be an original but all of which together shall constitute but one and the same Amendment.

[Signatures begin on next page]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CLIENT:

ALL YEAR HOLDINGS LIMITED

By:

Name: Asaf Dawid & Ephraim Dweimans

Title: CEO                  ATO

BROKER:

MERIDIAN CAPITAL GROUP LLC

By:

Name: Peter Leung

Title: Managing Director, Legal Dept.

**Exhibit B**
**Kazaz Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **ALL YEAR HOLDINGS LIMITED,** | : | |
| | : | **Case No. 21-12051 (MG)** |
| Debtor. | : | |
| | : | |
| Fed. Tax Id. No. 98-1220822 | : | |

----------------------------------------------------------x

**DECLARATION OF TAMIR KAZAZ IN SUPPORT OF THE APPLICATION
PURSUANT TO 11 U.S.C. §§ 327(a) AND 328, FED. R. BANKR. P. 2014 AND 2016,
AND L.B.R. 2014-1 AND 2016-1 FOR AUTHORITY TO RETAIN AND EMPLOY
MERIDIAN INVESTMENT CAPITAL GROUP AS EXCLUSIVE REAL ESTATE
FINANCE BROKER *NUNC PRO TUNC* TO THE PETITION DATE**

I, Tamir Kazaz, pursuant to section 1746 of title 28 of the United States Code, hereby

declare that the following is true and correct to the best of my knowledge, information, and

belief:

1.     My name is Tamir Kazaz.   I am over the age of 18 and competent to

testify.

2.     I am Head of the Israel division of Meridian Capital Group, LLC, one of

the nation's leading real estate finance advisory firms (together with Meridian Securities, its

broker-dealer affiliate, "**Meridian**").   In my capacity as Head of Israel, I represent real estate

owners and operators in various types of real estate financing and capital raising transactions.   In

April of 2021, All Year Holdings Limited (the "**Parent Debtor**") engaged Meridian to serve as

the exclusive real estate finance broker to procure interest and offers from potential third-party

investors to either recapitalize the Parent Debtor or undertake an outright purchase of the Parent

Debtor (the "**Recapitalization**").   Also in April of 2021, the Parent Debtor engaged Meridian to

serve as the exclusive broker to (i) procure mortgage and/or mezzanine financing for certain of

9

the Parent Debtor's non-debtor subsidiaries (the "**PropCos**"), including, without limitation, any form of debt, funds provided by or through a secured or unsecured loan, preferred equity and any form of construction or bridge financing (a "**Financing**"), and/or (ii) negotiate modifications, amendments, extensions, or other similar transactions relating to any of the existing financing of the PropCos (a "**Modification**" and together with the Financing, the "**Financing Services**"). I submit this declaration in support of the *Motion of the Application of the Parent Debtor Pursuant to 11 U.S.C. §§327(a) and 328 and Fed. R. Bankr. P. 2014 and 2016 for Authority to Retain and Employ Meridian Capital Group as Exclusive Real Estate Finance Broker Nunc Pro Tunc to the Petition Date* (the "**Application**") filed by the Parent Debtor, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

## **Meridian's Qualifications and Services Already Provided**

3.      The Parent Debtor engaged Meridian on April 13, 2021 to commence the Recapitalization.  Accordingly, shortly thereafter, Meridian commenced a robust and wide-ranging marketing process to solicit interest and offers from potential third-party investors. Among the criteria Meridian focused on was the financial wherewithal to invest capital in the Parent Debtor and sophistication to be a party to a potential new bond issuance in Israel as part of an exit transaction.

4.      Through this campaign, Meridian compiled a due diligence library consisting of various materials and proprietary information, including, but not limited to property level and holding company level financial data.  Further, Meridian prepared an offering memorandum containing detailed information on the Parent Debtor's real estate portfolio by breaking down information including real estate taxes and income and expenses for each individual property.  These efforts resulted in the procurement of a significant pool of potential

10

third party bidders and ongoing daily conversations with the Parent Debtor's Chief Restructuring

Officer to progress negotiations among these interested parties.

## Engagement Letters

5.      In connection with the Parent Debtor's proposed retention of Meridian,

and subject to approval by the Court, Meridian and the Parent Debtor entered into that certain

Recapitalization Engagement Letter and Financing Engagement Letter, copies of which are

attached as **Exhibit 1** and **Exhibit 2** to the proposed form of order annexed to the Application as

**Exhibit A**.   The Recapitalization Engagement Letter and Financing Engagement Letter are

generally similar in form to agreements used by Meridian in similar engagements.

6.      Pursuant to the terms of the Recapitalization Engagement Letter, in

consideration for the compensation contemplated thereby, Meridian has agreed to serve as the

Parent Debtor's exclusive broker to procure an equity recapitalization of the Parent Debtor (the

"**Recapitalization Services**"), including, without limitation, preferred equity, a joint venture

opportunity, exchange, assignment or other transfer and/or other similar forms of equity

investment or transaction (a "**Recapitalization**").

7.      Under the Recapitalization Engagement Letter, the Parent Debtor granted

Meridian the exclusive right to procure the Recapitalization for a period of one hundred twenty

(120) days commencing on the date of the Recapitalization Engagement Letter, as subsequently

amended and modified.   Under the Recapitalization Engagement Letter, Meridian would be

eligible to receive a commission for procuring and consummating the Recapitalization based on

a graduated scale hinging on the amount of the equity commitments or obligations of the

applicable counterparty to the Recapitalization.   Accordingly, as more fully set forth in the

Recapitalization Engagement Letter, subject to applicable provisions of the Bankruptcy Code,

11

Meridian will be compensated for the professional services rendered to the Parent Debtor by payment of a commission from the Recapitalization rather than hourly compensation. The original term of the Recapitalization Engagement Letter was 120-days, however, the parties agreed to several extensions.

8.     Pursuant to the Financing Engagement Letter, in consideration for the compensation contemplated thereby, Meridian has agreed to serve as the Parent Debtor's exclusive broker to (collectively, the "**Financing Services**"): (i) procure mortgage and/or mezzanine financing for the Parent Debtor's non-debtor subsidiaries set forth on Exhibit A thereto (the "**PropCos**"), including, without limitation, any form of debt, funds provided by or through a secured or unsecured loan, preferred equity and any form of construction or bridge financing (a "**Financing**"), and/or (ii) negotiate modifications, amendments, extensions, or other similar transactions relating to any of the existing financing of the PropCos (a "**Modification**"). The terms of Meridian's engagement under the Financing Engagement Letter apply only to entities and/or properties in which the Parent Debtor holds a 100% interest. For the avoidance of doubt, a Financing or Modification does not include any transaction involving the Parent Debtor's Israeli-issued bonds nor do the terms of the engagement apply to any direct and indirect assets of All Year Equity Partners LLC. As with the Recapitalization Engagement Letter, the original term of the Financing Engagement Letter was 120-days, however, the parties agreed to several extensions.

9.     The commissions under the Recapitalization Engagement Letter and Financing Engagement Letter are consistent with the commissions charged by Meridian in similar engagements. Except as set forth above, Meridian has not shared or agreed to share its compensation with any entity except as among its professionals and shareholders.

12

## Meridian's Disinterestedness Investigation

10.    I have made the following investigation of disinterestedness prior to submitting this Declaration.  From time to time, Meridian is approached in the ordinary course of business by entities to represent them in various capacities. Meridian does not keep a record of all such contacts unless Meridian is ultimately retained by the contact. Under Bankruptcy Rule 2014(a), these contacts are not "connections" and therefore are not included in Meridian's conflict and connections search.  I have undertaken a full and thorough review of Meridian's records from the last two years, which contain the names of clients and other parties interested in particular matters during that time period.  Under my direction, Meridian conducted a search for the names of the Parent Debtor and various parties in interest.  The categories of the parties for which I searched to conduct my disinterestedness investigation in this case is set forth on **Schedule A**, attached hereto.  Based on my review, it appears that, subject to the disclosures set forth below, Meridian does not hold or represent any interest adverse to and has no connection, with the Parent Debtor, its creditors, the U.S. Trustee, or any party in interest herein, and is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

11.    Meridian, together with its affiliates, provides real-estate advisory services to entities throughout the United States and in many foreign countries.  From among the creditors, shareholders, landlords, utilities, regulatory agencies, and other parties in interest listed on **Schedule A**, Meridian has identified several entities with whom Meridian has been involved in real estate transactions over the past two years.  A list of these entities and their connection not otherwise disclosed herein is set forth on **Schedule B** attached hereto.

12.    Meridian appears in cases, proceedings, and transactions involving a substantial number of different attorneys, accountants, financial consultants, investment bankers,

13

and other professionals, some of whom now, or may in the future, represent creditors or parties in interest in this case. Meridian, in the ordinary course of business but not related to any particular case or transaction, deals with various utility providers, banking institutions, and taxing authorities. Apart from this and any disclosures in **Schedule B**, there are no known connections to the utility providers, banking institutions, and taxing authorities listed in **Schedule A**. The Office of the United States Trustee appears in every bankruptcy matter in which Meridian appears. Aside from this, there is no known connection with the Office of the United States Trustee or any of its attorneys. Also, from time to time, Meridian appears before various bankruptcy judges, but otherwise there are no known connections to any judges or their chambers staff.

13.    In order to provide the broadest possible disclosure, I have included, among the entities listed on **Schedule B**, not only those parties in interest to whom Meridian has provided professional services, but also the entities with whom Meridian's clients have entered into real estate transactions.  In commercial financing, leasing and sale transactions, Meridian's commissions are sometimes paid by the parties with whom Meridian's clients contract, rather than Meridian's clients themselves.  In addition, individuals and corporations sometimes set up single-purpose entities to own or lease commercial properties.  To the extent that Meridian has been involved in real estate transactions involving single-purpose entities that Meridian knows are affiliates or subsidiaries of parties in interest listed in **Schedule A**, Meridian has included those parties in interest among the parties listed in **Schedule B**.  I have confirmed that Meridian's involvement with the entities listed in **Schedule B** has been completely unrelated to the Parent Debtor.

WEIL:\98426493\7\12817.0005

14.     I do not anticipate that any of the entities listed on **Schedule B** will have any involvement with the services Meridian rendered to the Parent Debtor with respect to financing, sales or leasing transactions or that these representations will impact the services rendered by Meridian to the Parent Debtor in any way.  To the extent that Meridian identifies any additional connections with other entities that become involved with this case, I will supplement this Declaration accordingly.

15.     In addition, Meridian may have represented, currently represents, and in the future may represent, other creditors of the Parent Debtor that were not included in **Schedule A**, in connection with matters unrelated to the Parent Debtor and its bankruptcy case.  At this time, I am not aware of any such representations except as noted herein.  If I identify any further such representations, I will make further disclosures as may be appropriate at that time.

16.     I and Meridian are each a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code in that Meridian and I:

    i.    are not creditors, equity security holders or insiders of the Parent Debtor;

    ii.    are not and were not, within two (2) years before the Petition Date, a director, officer, or employee of the Parent Debtor;

    iii.    are not and were not, within three (3) years before the Petition Date, an investment banker for a security of the Parent Debtor, or an attorney for such investment banker in connection with the offer, sale or issuance of any security of the Parent Debtor; and

    iv.    do not have an interest materially adverse to the interests of the Parent Debtor's estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Parent Debtor, or for any other reason, except as disclosed herein.

23.     During the one-year period prior to the Petition Date, Meridian has not received a retainer from the Parent Debtor, nor has Meridian received any payment or promise of

15

payment from the Parent Debtor for the services to be rendered under the Engagement Letters.

No compensation has been paid or promised to be paid to me or Meridian with respect to the

Engagement Letters from a source other than as set forth in the Engagement Letters.  Meridian

has not received any promises as to compensation in connection with this case other than in

accordance with the provisions of the Bankruptcy Code.  Meridian does not have any agreement

with any other entity to share with such entity compensation received in connection with

Meridian's retention by the Parent Debtor.  Insofar as I have been able to ascertain, Meridian

does not have any connection with the Parent Debtor, its creditors or any other parties-in-interest

herein, their respective attorneys, advisors and accountants, the U.S. Trustee, or any person

employed in the office of the U.S. Trustee, except as set forth herein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: January 14, 2022
          New York, New York

/s/ Tamir Kazaz
Tamir Kazaz

### SCHEDULE A
Categories of Parties on the Parent Debtor's Retention Checklist

- Debtors
- Debtors' Trade Names and Aliases
- Non Debtor Affiliates and Subsidiaries
- Bank Accounts
- Bankruptcy Judges and Staff
- Benefit Providers
- Bondholders/Noteholders/ Indenture Trustees
- Committee Members and Professionals
- Contract Counterparties
- Current Officers and Directors
- Affiliations of Current Officers and Directors
- Debtors Professionals
- 5 Largest Secured Claims
- Former Officers and Directors
- Insurance/Insurance Provider/Surety Bonds
- Landlords and parties to leases
- Lenders
- List of the Creditors Holding 20 Largest Unsecured Claims
- Litigation Counterparties/Litigation Pending Lawsuits
- Members of Any Ad Hoc Committee
- Non-Debtors Professionals
- Ordinary Course Professionals
- Other Secured Parties
- Other Parties in Interest
- Regulatory and Government
- Significant Competitors
- Significant Customers
- Significant Shareholders
- Taxing Authorities
- UCC Search Results/UCC Lien Search Results
- Unions
- United States Trustee and Staff
- Utility Providers/Utility Brokers
- Vendors/Suppliers

WEIL:\98426493\7\12817.0005

## SCHEDULE B
List of Entities with Whom Meridian has had Business
Dealings Unrelated to the Parent Debtor

| **Connection Party** | **Meridian Relationship** |
|---|---|
| Bank Leumi | Meridian has represented borrowers in financing transactions with Bank Leumi that are unrelated to this chapter 11 proceeding. |
| Black Spruce Management LLC | Meridian has represented Black Spruce Management LLC in real estate transactions unrelated to this chapter 11 proceeding. |
| Broad SPV I LLC | Meridian has represented Broad SPV I LLC in real estate transactions unrelated to this chapter 11 proceeding. |
| DCP Kings Point, LLC | Meridian has represented an affiliate of DCP Kings Point, LLC in real estate transactions unrelated to this chapter 11 proceeding. |
| Downtown Capital Partners, LLC | Meridian has represented Downtown Capital Partners, LLC in real estate transactions unrelated to this chapter 11 proceeding. |
| GL Merger Partner, LLC | Meridian has represented GL Merger Partner, LLC in real estate transactions unrelated to this chapter 11 proceeding. |
| Grand Living II, LLC | Meridian has represented Grand Living II, LLC in real estate transactions unrelated to this chapter 11 proceeding. |
| Israel Discount Bank | Meridian has represented borrowers in financing transactions with Israel Discount Bank that are unrelated to this chapter 11 proceeding. |
| Meyer Chetrit | Meridian has represented Meyer Chetrit in real estate transactions unrelated to this chapter 11 proceeding. |
| MREF REIT Lender 9 LLC | Meridian, through its debt financing division, has represented borrowers in financing transactions with Mack Real Estate Group (which we understand to be an affiliate of MREF REIT Lender 9 LLC) that are unrelated to this chapter 11 proceeding. |
| Pilgrim Chester Lender, LLC | Meridian has represented Pilgrim Chester Lender LLC in real estate transactions unrelated to this chapter 11 proceeding. |

18

| USC 94 Walworth, LLC | Meridian has represented USC 94 Walworth, LLC in real estate transactions unrelated to this chapter 11 proceeding. |
|---|---|
| W Financial Fund LP | Meridian, through its debt financing division, has represented borrowers in financing transactions with W Financial that are unrelated to this chapter 11 proceeding. |
| Cammbeys International Group | Meridian has represented Cammbeys International Group in real estate transactions unrelated to this chapter 11 proceeding. |

WEIL:\98426493\7\12817.0005