WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
:
In re                              :      **Chapter 11**
:
**ALL YEAR HOLDINGS LIMITED,**      :      **Case No. 21-12051 (MG)**
:
**Debtor.**[1]              :
:
Fed. Tax Id. No. 98-1220822      :
---------------------------------------------------------------X

### NOTICE OF HEARING ON MOTION OF PARENT DEBTOR PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 503(b) AND FED. R. BANKR. P. 2002, 6004, AND 9014 FOR ENTRY OF ORDER <u>(I) APPROVING BID PROTECTIONS AND (II) GRANTING RELATED RELIEF</u>

           **PLEASE TAKE NOTICE** that a hearing on the annexed Motion (the "**Motion**")[2]

of All Year Holdings Limited, as debtor and debtor in possession (the "**Parent Debtor**") in the

above captioned chapter 11 case, pursuant to sections 105(a), 363, and 503(b) of title 11 of the

United States Code, Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), and Rule 9014-2 of the Local Bankruptcy Rules for the Southern

District of New York (the "**Local Bankruptcy Rules**"), for entry of an order (a) approving the

---

[1]    The Parent Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

Break-Up Fee and Expense Reimbursement as set forth in that certain Investment Agreement, dated March 11, 2022, by and among the Parent Debtor, the Plan Investor, and, with respect to Sections 7.02(b), 8.01(b), 8.01(c), and 8.02(c) thereof, the Trustee, solely as trustee for the various series of bonds issued by the Parent Debtor, and (b) granting related relief, all as more fully set forth in the Motion, will be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge for the Southern District of New York, on **April 20, 2022 at 11:00 a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Bankruptcy Rules, shall be filed with the Bankruptcy Court (i) by attorneys practicing in the Bankruptcy Court, including attorneys admitted pro hac vice, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (ii) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with two single-sided hard copies delivered to the Judge's Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with General Order M-399, the Bankruptcy Rules, and the Local Bankruptcy Rules, so as to be filed and served upon (a) the attorneys for the Parent Debtor, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer, Esq., Jacqueline Marcus, Esq., and Matthew P. Goren, Esq.); (b) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shara Cornell, Esq.); (c) counsel to Mishmeret Trust Company Ltd., as Trustee for the Bondholders, Chapman and Cutler LLP, 1270 Sixth Avenue, New York, New York 10020 (Attn: Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron Krieger, Esq.); and (d) counsel to

WEIL:\98554564\1\12817.0007

the Plan Investor, Gissin & Co., Habarzel 38B, Tel Aviv 6971054, Israel (Attn: Yael Hershkovitz, Esq.), Locke Lord LLP, 200 Vesey Street, 20th Floor, New York, NY 10281 (Attn: Shalom Jacob, Esq.), Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (Attn: Avi D. Feinberg, Esq.), by no later than **April 13, 2022 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

   **PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Parent Debtor may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion as **Exhibit B**, which order may be entered without further notice or opportunity to be heard.

   **PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

*[Remainder of Page Intentionally Left Blank]*

WEIL:\98554564\1\12817.0007

**PLEASE TAKE FURTHER NOTICE** that, due to the COVID-19 pandemic, the Hearing will be conducted using Zoom for Government.  Parties should not appear in person and those wishing to appear or participate at the Hearing (whether "live" or "listen only") must make an electronic appearance through the Court's website prior to 4:00 p.m. (Prevailing Eastern Time) on the day before the Hearing.  Instructions for making an eCourtAppearance and additional information on the Court's Zoom procedures can be found at http://www.nysb.uscourts.gov/content/judge-martin-glenn.

Dated: March 25, 2022
      New York, New York

                    */s/  Jacqueline Marcus*
                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York  10153
                    Telephone:  (212) 310-8000
                    Facsimile:  (212) 310-8007
                    Gary T. Holtzer
                    Jacqueline Marcus
                    Matthew P. Goren

                    *Attorneys for the Parent Debtor*

**Hearing Date and Time: April 20, 2022 at 11:00 a.m. (Eastern Time)**
**Objection Date and Time: April 13, 2022 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
                            :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **ALL YEAR HOLDINGS LIMITED,** | : | **Case No. 21-12051 (MG)** |
| | : | |
| **Debtor.**[1] | : | |
| | : | |
| **Fed. Tax Id. No. 98-1220822** | : | |

-----------------------------------------------------------X

## MOTION OF PARENT DEBTOR
### PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 503(b) AND
### FED. R. BANKR. P. 2002, 6004, AND 9014 FOR ENTRY OF ORDER
### (I) APPROVING BID PROTECTIONS AND (II) GRANTING RELATED RELIEF

TO THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE:

        All Year Holdings Limited, as debtor and debtor in possession (the "**Parent Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), respectfully represents as follows in support of this motion (the "**Motion**"):

### Preliminary Statement

        1.    Following months of extensive negotiations with stakeholders and the completion of a robust and comprehensive marketing process, on March 11, 2022, the Parent

---

[1] The Parent Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

Debtor, with the approval of the JPLs (as defined below), entered into a definitive investment agreement (the "**Investment Agreement**") with Paragraph Partners LLC (the "**Plan Investor**") that provides for the Plan Investor to fund cash and issue promissory notes in exchange for one hundred percent of the equity of the reorganized Parent Debtor (as reorganized, the "**Reorganized Parent Debtor**"). A copy of the Investment Agreement without the accompanying schedules is attached hereto as **Exhibit A**.

2. Under the Investment Agreement, the Plan Investor will contribute $60,000,000 to the Parent Debtor, which is comprised of $40,000,000 in cash and promissory notes in the aggregate amount of $20,000,000.[2] Mishmeret Trust Company Ltd., as trustee (the "**Trustee**") for the Parent Debtor's various series of bonds (the "**Bondholders**"), is a party to certain provisions of the Investment Agreement and has preliminarily consented to the Parent Debtor's entry into the Investment Agreement. The Investment Agreement, which is to be implemented pursuant to a chapter 11 plan, represents the cornerstone of the Parent Debtor's chapter 11 exit strategy.

3. As described in greater detail below, after a comprehensive marketing process that commenced prior to the Petition Date (as defined herein), the Parent Debtor selected the Plan Investor's bid as the best and most actionable bid from a credible investor capable of consummating a transaction at a fair and reasonable price. In particular, and as described below, the Investment Agreement (a) provides for the assumption of all unsecured claims against the Parent Debtor other than those of the Bondholders and certain other discrete categories of claims,

---

[2] The amount of the promissory notes may increase to $22,000,000 if the Plan Investor or an affiliate purchases substantially all of the rights of the Trustee for the Series C Notes in and to that certain Amended and Restated Promissory Note, dated February 28, 2017, originally between the Parent Debtor and the Borrower (as defined therein) and that certain loan originally made by the Parent Debtor to the Borrower in the original principal amount of $166,320,000, secured by the William Vale Hotel, a property owned by a non-debtor affiliate of the Parent Debtor (the "**William Vale Purchase**").

2

(b) provides that the Plan Investor will furnish a material, good-faith deposit and guaranty to secure the closing of the transaction, and (c) is not subject to any further due diligence conditions.  Key terms of the Investment Agreement also received the initial approval of the Bondholders, subject to a final Bondholder vote on the contents of the Plan.  Accordingly, having adequately tested the market, the Parent Debtor has determined, in the exercise of its sound business judgment, that the best opportunity to consummate a value-maximizing transaction is to proceed with the transaction reflected in the Investment Agreement.

4.      The Investment Agreement provides for the payment of a break-up fee or expense reimbursement in certain circumstances (collectively, the "**Bid Protections**").  The Bid Protections represent a material inducement for, and were a condition of, the Plan Investor's firm commitment to proceed with the transaction reflected in the Investment Agreement.  Critically, the Investment Agreement provides the Parent Debtor with a "fiduciary out" if the Parent Debtor determines, in the exercise of its fiduciary duties, to proceed with an Alternative Transaction (as defined below).  The Parent Debtor is not subject to a "no shop" or any other provision restricting its ability to consider any alternative offers that may be presented during the Chapter 11 Case.

5.      Accordingly, to secure the Plan Investor's firm commitment to the transaction reflected in the Investment Agreement, which sets a floor for any proposed Alternative Transaction, and to compensate the Plan Investor for the substantial benefits the Parent Debtor's estate will receive from such floor and commitment (including the extended time commitment that may be necessary to obtain the requisite approvals for the transaction in the United States, the British Virgin Islands (the "**BVI**"), and Israel), the Parent Debtor is seeking approval of the Bid Protections.  The Parent Debtor believes that providing the Plan Investor with the Bid Protections

WEIL:\98554564\1\12817.0007

is reasonable, is a prudent exercise of the Parent Debtor's sound business judgment, and will facilitate a value-maximizing transaction for the benefit of all of the Parent Debtor's stakeholders.

## Relief Requested

6.      By this Motion, pursuant to sections 105(a), 363, and 503(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9014-2 of the Local Bankruptcy Rules for the Southern District of New York, the Parent Debtor requests entry of an order (a) approving the Break-Up Fee and Expense Reimbursement (each as defined below) as set forth in the Investment Agreement, and (b) granting related relief.

7.      A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit B** (the "**Proposed Order**").  In support of the Motion, the Parent Debtor submits the declaration of David B. Schechtman, a Senior Executive Managing Director and the Head of Investment Sales at Meridian Investment Sales, annexed hereto as **Exhibit C** (the "**Schechtman Declaration**").

## Jurisdiction

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. § 1408 and 1409.

## Background

9.      On December 14, 2021 (the "**Petition Date**"), the Parent Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Parent Debtor is authorized to continue to operate its business and manage its properties as debtor in

WEIL:\98554564\1\12817.0007

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in the Chapter 11 Case.

10.     On December 16, 2021, the Parent Debtor determined that it was necessary to file an application under the laws of the BVI with the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division Virgin Islands (the "**BVI Court**") seeking the appointment of Paul Pretlove and Charlotte Caulfield of Kalo (BVI) Limited as joint provisional liquidators (the "**JPLs**") under the applicable provisions of the BVI Insolvency Act 2003.  On December 20, 2021, the BVI Court entered an order appointing the JPLs.

11.     Information regarding the Parent Debtor's business, capital structure, and the circumstances leading to the commencement of the Chapter 11 Case is set forth in the *Declaration of Assaf Ravid Pursuant to Local Bankruptcy Rule 1007-2 in Support of All Year Holdings Limited Chapter 11 Petition* [ECF No. 4] and is incorporated herein by reference.

## Marketing Process

12.     Prior to the Petition Date, the Parent Debtor engaged Meridian Investment Sales, a segment of Meridian Capital Group, LLC, and its broker-dealer affiliate, Tigerbridge Capital LLC d/b/a Meridian Securities (collectively, "**Meridian**"), one of the nation's leading real estate finance advisory firms, to serve as its exclusive real estate finance broker.[3]  The Parent Debtor, with the assistance of professionals at Meridian, led a robust, wide-ranging public process to solicit interest and offers from potential third-party investors to either recapitalize the Parent Debtor or undertake an outright purchase of the Parent Debtor (the "**Marketing Process**").

---

[3]   The Parent Debtor filed an application to retain Meridian, as its exclusive real estate finance broker, on January 14, 2022 [ECF No. 30].  The Parent Debtor and Meridian are working with the Office of the United States Trustee to finalize a supplemental declaration with respect to Meridian's retention application and hope to be in a position to submit a consensual retention order to the Court shortly.

WEIL:\98554564\1\12817.0007

Meridian, on behalf of the Parent Debtor, devoted months to marketing the Parent Debtor. Throughout the Marketing Process, the Parent Debtor and Meridian diligently worked to ensure that the process was broad, transparent, inclusive, efficient, and value-maximizing.

13.     In March 2021, Meridian began working closely with the Parent Debtor to compile various materials and proprietary information about the Parent Debtor and its direct and indirect non-debtor subsidiaries (collectively, the "**Company**") for the purpose of establishing a virtual data room and due diligence library to enhance and facilitate the Marketing Process. At the Parent Debtor's direction, Meridian conducted site visits of all of the Company's properties and prepared a comprehensive offering memorandum. At the outset of the Marketing Process, Meridian tapped its institutional knowledge and experience to identify a pool of approximately forty potential third-party investors, including family offices and private equity firms, that possessed the sophistication, financial wherewithal, and operational expertise necessary to consummate a transaction for the Parent Debtor.

14.     On or around April 13, 2021, Meridian, in consultation with the Parent Debtor, invited each of the potential third-party investors to participate in the Marketing Process. Of the initial pool of potential investors, thirty-seven executed confidentiality agreements to gain access to the data room, which contained, among other things, the offering memorandum, detailed financial information, and property-level information regarding real estate taxes, income, and expenses. Thereafter, Meridian arranged more than 125 discussions with interested parties, many of which included the Parent Debtor, to, among other things, answer diligence questions, discuss potential deal structures, and assist investors in formulating their bids.

15.     Following an approximately two-month diligence period, the Parent Debtor, in consultation with Meridian, requested that interested parties submit initial bids. The Parent

6

Debtor received six written bids (the "**Initial Bids**"). The Parent Debtor, in consultation with Meridian, evaluated the Initial Bids, focusing on several criteria, including, but not limited to: (a) the proposed purchase price and forms of consideration; (b) the proposed deal structure; (c) any proposed percentage ownership to be left with the Bondholders and other general unsecured creditors; (d) any diligence contingencies; and (e) the proposed amount of any deposit.

16.     Negotiations regarding the Initial Bids occurred between May and June 2021. Following extensive negotiations and the opportunity to conduct further diligence, the Parent Debtor received six refined bids (the "**Refined Bids**"). The Parent Debtor, in consultation with Meridian, evaluated the Refined Bids based on the criteria used to evaluate the Initial Bids and sought input from the Trustee so as to better understand which proposed transactions were likely to be supported by the Bondholders.

17.     After initially engaging on an exclusive basis with one potential investor which ultimately did not lead to a definitive agreement, the Parent Debtor received three revised bids for potential transactions (the "**Revised Bids**"). After reviewing the Revised Bids based on the criteria used throughout the Marketing Process, the Parent Debtor, in consultation with Meridian, determined that two of the bids, including the bid submitted by the Plan Investor, contained materially better economic terms and thus were more likely to result in a value-maximizing transaction.

18.     Following the Petition Date, the Parent Debtor continued engaging in discussions with the Trustee and the bidders who had submitted the Revised Bids. After extensive parallel track negotiations, the Parent Debtor, in consultation with Meridian, thoroughly reviewed the near-finalized investment agreements, focusing on, among other things, the following criteria: (a) the proposed purchase price, (b) the bidder's willingness to assume potential liabilities of the

WEIL:\98554564\1\12817.0007

Parent Debtor; (c) the bidder's willingness to submit a cash deposit; (d) any limitation on the Parent Debtor's ability to pursue Alternative Transactions; and (e) any diligence exclusivity. Based on this criteria and review, for several reasons, it was clear to the Parent Debtor that the Plan Investor's bid and related Investment Agreement provided the best actionable transaction to maximize value.

19.     On or around March 6, 2022, the Parent Debtor published the Investment Agreement on the Tel Aviv Stock Exchange (the "**TASE**").  On the same date, the Trustee also published its intent to consent to the Parent Debtor's entry into the Investment Agreement on the TASE.  Accordingly, with the consent of the Trustee and the approval of the JPLs, the Parent Debtor entered into the Investment Agreement on March 11, 2022.

### The Investment Agreement and Bid Protections

20.     The Investment Agreement represents a binding contract to acquire one hundred percent of the equity of the Reorganized Parent Debtor, in exchange for the following consideration: (a) the Plan Investor's contribution of $60,000,000 to the Parent Debtor, which is comprised of $40,000,000 in cash and promissory notes in the aggregate amount of $20,000,000; and (b) the Plan Investor's assumption of all unsecured claims against the Parent Debtor, other than the Bondholders' claims and certain other discrete categories of claims, all as more fully set forth in the Investment Agreement.

21.     The Investment Agreement includes various customary representations, warranties, and covenants by and from the parties, as well as certain closing conditions and rights of termination related to the Chapter 11 Case.  The transactions contemplated by the Investment Agreement are subject to approval by the Bankruptcy Court, entry of an order confirming a

8

chapter 11 plan that effectuates the transaction, and, to the extent applicable, any necessary

approvals in the BVI and Israel.[4]

22. The following chart summarizes certain of the material terms in the

Investment Agreement:[5]

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
| --- | --- |
| **Plan Investor** | Paragraph Partners, LLC |
| **Issuance of Reorganized Equity Interests and Purchase Price (Agreement §§ 2.01, 3.01)** | In exchange for 100% of the Reorganized Equity Interests in the Reorganized Parent Debtor, the Plan Investor will contribute (collectively, the "**Plan Consideration**"):<br><br>(a) a cash payment in the amount of $40 million (the "**Cash Payment**");<br><br>(b) promissory notes to be issued by the Reorganized Parent Debtor (the "**New Notes**") in the aggregate principal amount of $20 million or, if the Plan Investor or an affiliate thereof effects the William Vale Purchase, $22 million (subject to a Purchase Price Adjustment); and<br><br>(c) the Reorganized Debtor will assume all claims against the Parent Debtor, other than:<br><br>(i) the claims of the Noteholders;<br><br>(ii) claims either subject to subordination pursuant to section 510(b) of the Bankruptcy Code or that arise out of a purchase, sale, or issuance or offer of a security of the Parent Debtor, including any claims asserted in any class action lawsuits in Israel;<br><br>(iii) claims brought by any plan administrator in connection with prior chapter 11 cases of the Parent Debtor's former direct or indirect subsidiaries; and<br><br>(iv) claims of the Company's current or former directors and officers for indemnification. |
| **Purchase Price Adjustments (Agreement § 2.02)** | If the Plan Investor or an affiliate thereof effects the William Vale Purchase, the aggregate principal amount of the New Notes will be increased from $20 million to $22 million. |

---

[4] The Parent Debtor anticipates seeking approval of various aspects of the proposed transaction from courts in both the BVI and Israel. Specifically, the Parent Debtor understands that it will be necessary to obtain court approval in Israel in order to, among other things, commence solicitation of the Bondholders' votes on any chapter 11 plan to implement the Investment Agreement. The issuance of the new equity in the Reorganized Parent Debtor will likely require BVI Court approval, as well.

[5] All capitalized terms set forth in this table have the meanings ascribed to them in the Investment Agreement unless otherwise defined herein. As utilized in this table, the term "**Noteholders**" is synonymous with the term "**Bondholders**," as defined in paragraph 2 above. In the event of any inconsistencies between the provisions of the Investment Agreement and the general description of such agreement set forth in this Motion, the Schechtman Declaration, or the Proposed Order, the Investment Agreement shall control.

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| | Between March 2, 2022 and nine months following the Closing, if the Plan Investor discovers that the actual percentage of the Parent Debtor's direct or indirect equity interest or ownership interest in a Subsidiary or any Owned Real Property, as applicable, is less than as stated in the Investment Agreement, the aggregate principal amount of the New Notes will be reduced in accordance with a specified formula.  In the worst case, if the aggregate Subsidiary Value Reduction exceeds $7.25 million, the aggregate principal amount of the New Notes will be reduced on a dollar-for-dollar basis up to the total value of the New Notes. To the extent the Subsidiary Value Reductions are equal to or lesser than $4.25 million, no adjustment will be made to the aggregate principal amount of the New Notes. |
| **Excluded Assets (Agreement § 2.01, Annex A)** | Under the Investment Agreement, the Plan Investor is not purchasing or receiving, directly or indirectly, any "Excluded Assets," which include, but are not limited to: <br><br> (a) the Parent Debtor's right in and to: <br><br>   (i) collateral securing the Series C Notes and Series E Notes; <br><br>   (ii) the membership interests in YG WV LLC; and <br><br>   (iii) the assets set forth in the DCP-All Year Recapitalization Agreement; <br><br> (b) any and all claims that the Parent Debtor or the Noteholders may have against third-parties, including any current or former officer, director, or shareholder of the Parent Debtor (subject to certain releases); and <br><br> (c) the assets vested in Wind Down Co pursuant to a chapter 11 plan. |
| **Escrowed Funds and Guaranty (Agreement § 3.02)** | Within five business days of the later of the date upon which (a) the Bankruptcy Court approves the Break-Up Fee and (b) a chapter 11 plan that is reasonably satisfactory to the Plan Investor and otherwise complies with the terms of the Investment Agreement is annexed thereto, the Plan Investor will (i) transfer $4.5 million to an Escrow Agent (the "**Escrowed Funds**") and (ii) deliver a limited corporate guaranty to such Escrow Agent (the "**Guaranty**"). <br><br> The Escrowed Funds will be either: <br><br> (a) applied at Closing towards the Cash Payment if the Closing occurs; <br><br> (b) delivered to the Parent Debtor if the Investment Agreement is terminated by the Parent Debtor due to the Plan Investor's failure to close the transaction; or <br><br> (c) returned to the Plan Investor if the Investment Agreement is terminated for any reason other than the Plan Investor's failure to close the transaction. |
| **Indemnification, Exculpation and Release (Agreement § 7.02(b), (c))** | Effective as of the Closing and, with respect to the Trustee and the Noteholders only if Noteholder Plan Approval (as defined below) is obtained: <br><br> (a) the Plan Investor and its affiliates will grant customary releases to, and indemnify and hold harmless, Wind Down Co, the Trustee, the Noteholders, their affiliates, and any current or former officer, director, manager, employee, counsel, financial advisor, agent or representative of the Parent Debtor, Wind Down Co, the Trustee, the Noteholders, and their affiliates. |

10

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| | (b) Wind Down Co, the Trustee, and the Noteholders and their affiliates will grant customary releases to, and indemnify and hold harmless, the Plan Investor, its affiliates, the Transferred Entities, and any current or former officer, director, manager, employee, counsel, financial advisor, agent or representative thereof. |
| | (c) For the avoidance of doubt, neither Yoel Goldman, Tzipporah Goldman, nor any entity under their control or ownership (other than the Transferred Entities) will be granted a release and all rights and remedies are preserved. |
| **Noteholder Plan Approval and Bankruptcy Milestones (Agreement §§ 8.01(c), 8.03)** | Within 60 days of the date upon which the Escrowed Funds and the Guaranty are delivered to the Escrow Agent (the "**Escrow Date**"), the Trustee will convene a meeting of the Noteholders to vote on the approval the transactions contemplated by the Investment Agreement (such meeting, the "**Noteholder Meeting**," and in the event that such vote is affirmative, the "**Noteholder Plan Approval**"); *provided that*, if (a) the Parent Debtor has filed a motion to approve a disclosure statement pertaining to an agreed upon chapter 11 plan within 14 days of the Escrow Date and (b) the Parent Debtor seeks approval of disclosure materials in an Israeli proceeding within 7 days following the entry of an order approving such disclosure statement, then such period will be automatically extended by up to 90 days.  If the Noteholder Plan Approval is not obtained on a final basis at such meeting, the Investment Agreement will automatically terminate. |
| | The Parent Debtor will use commercially reasonable efforts to comply with the following Bankruptcy Milestones: |
| | (a) by August 8, 2022, have a hearing to consider confirmation of an agreed upon chapter 11 plan; and |
| | (b) by August 23, 2022, obtain entry of an order confirming an agreed upon chapter 11 plan. |
| | The Bankruptcy Milestones are subject to any extension of the time in which the Noteholder Meeting must be held, and may be extended: |
| | (a) upon mutual agreement of the parties; or |
| | (b) to accommodate the availability of the Bankruptcy Court. |
| **Conditions to Closing (Agreement § 10.01)** | The Closing is conditioned on, among other things: |
| | (a) the Bankruptcy Court's entry of an order confirming an agreed upon chapter 11 plan and the absence of a stay of such order; |
| | (b) Israeli Court approval of the Investment Agreement under applicable provisions of the Israeli Insolvency Law 2018; |
| | (c) BVI Court approval of the Investment Agreement, as reflected in a confirmed chapter 11 plan and an order confirming same; and |
| | (d) the Plan Investor's receipt of the release set forth in the Investment Agreement (as described above) from or on behalf of the Trustee and the Noteholders. |
| **Termination and "Fiduciary Out" (Agreement § 11.01)** | The Investment Agreement may be terminated before the Closing: |
| | (a) by the mutual written consent of the Parent Debtor and the Plan Investor; |

11

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| | (b) by the Parent Debtor, if its fiduciaries determine in good faith that continued performance under the Investment Agreement would be inconsistent with the exercise of their fiduciary duties under applicable Law; |
| | (c) by either party, if the Closing shall not have occurred by September 23, 2022, *provided that*: |
| | (i) if Closing has not occurred due to unsatisfied Closing Conditions relating to obtaining government approvals, entry of an order confirming an agreed upon chapter 11 plan, Israeli Court approval, or BVI court approval, then no party may terminate the Investment Agreement prior to December 31, 2022; and |
| | (ii) if Closing has not occurred on or before September 23, 2022 or December 31, 2022, as applicable, due to a material breach of the Investment Agreement, then the breaching party may not terminate the Investment Agreement; |
| | (d) by either party, in the event that: |
| | (i) any governmental authority has issued a final, non-appealable order permanently enjoining the transaction; |
| | (ii) the Bankruptcy Court does not approve the Break-Up Fee by April 25, 2022; or |
| | (iii) a mutually acceptable chapter 11 plan is not annexed to the Investment Agreement by April 25, 2022. |

23.    In addition, the Investment Agreement provides the Plan Investor with the following Bid Protections:

a.  <u>Break-Up Fee</u>.  In the event that (A) the Investment Agreement is terminated (I) by the Parent Debtor in exercising its "fiduciary out" under Section 11.01(b) or (II) by the Plan Investor under Section 11.01(c) due to Parent Debtor's breach of a representation or warranty or failure to comply with a covenant or agreement that would prevent the satisfaction of a closing condition, and (B) within six (6) months of such termination, the Parent Debtor engages in an alternative transaction, through a chapter 11 plan or otherwise (an "**Alternative Transaction**"), whereby a purchaser purchases substantially all of the Transferred Entities through one or a series of substantially contemporaneous transactions, then the Plan Investor shall be entitled to a break-up fee in the amount of $1,800,000; *provided that*, if the Parent Debtor does not engage in an Alternative Transaction during such 6-month period, but still confirms a chapter 11 plan that is expected to provide a recovery to the Bondholders in an amount equal to or greater than $30,000,000 within twelve (12) months of confirmation thereof, then the Plan Investor shall instead be entitled to a Break-Up Fee in the amount of $900,000 (the "**Break-Up Fee**").

b.  <u>Expense Reimbursement</u>.  In the event that the Investment Agreement is terminated (A) by the Parent Debtor in exercising its "fiduciary out" under Section 11.01(b) or (B) by the Plan Investor pursuant to Section 11.01(c) due to Parent Debtor's breach

WEIL:\98554564\1\12817.0007

of a representation or warranty or failure to comply with a covenant or agreement that would prevent the satisfaction of a closing condition, and no Break-Up Fee could be due and owing under the terms of Section 8.01(a) of the Investment Agreement, then the Plan Investor shall be entitled to an expense reimbursement (the "**Expense Reimbursement**") in the amount of up to $300,000 for reasonable and documented fees and expenses incurred by the Plan Investor in connection with the documentation and negotiation of the Investment Agreement and the transactions contemplated thereunder.

24.     Further, if either the Break-Up Fee or Expense Reimbursement become due and owing, the Parent Debtor has agreed to grant the Plan Investor an allowed administrative claim in the Chapter 11 Case in the amount of the Break-Up Fee or Expense Reimbursement, as applicable, pursuant to section 503(b)(1) of the Bankruptcy Code.  Any Break-Up Fee owed by the Parent Debtor under the Investment Agreement will be payable in full upon the consummation of an Alternative Transaction.

**The Relief Requested Is Warranted
and In the Best Interests of the Parent Debtor and Its Economic Stakeholders**

25.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  In this district, "[t]he standard used for judicial approval of the use of estate property outside of the ordinary course of business is [] the business judgment of the debtor."  *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (citing *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003)).  Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  For the reasons set forth below, the Court should approve the Bid Protections.

WEIL:\98554564\1\12817.0007

A.      **The Bid Protections Are Reasonable and Appropriate**

26.      The Parent Debtor, with the assistance of Meridian, ran an exhaustive Marketing Process to locate the highest and best offer for a restructuring transaction for the Parent Debtor over the course of approximately twelve months.  The Marketing Process concluded successfully with the execution of the Investment Agreement, which represents an actionable transaction from a credible investor that has the indicative support of the Trustee, on behalf of the Bondholders, and is capable of consummating a value-maximizing transaction in an efficient manner.  In exercising its sound business judgment, the Parent Debtor selected the Plan Investor's bid and concluded that the execution of the Investment Agreement would best serve the interests of the estate and all stakeholders.  The Plan Investor, however, would not agree to enter into the Investment Agreement absent the Bid Protections and the Parent Debtor's commitment to seek approval of those protections, as required therein.

27.      The Break-Up Fee will be payable to the Plan Investor in certain limited circumstances generally relating to the consummation of an Alternative Transaction.  On the other hand, the Expense Reimbursement will be payable to the Plan Investor generally if the Investment Agreement is terminated, but no Break-Up Fee is due and owing.  As set forth in the Schechtman Declaration, the Break-Up Fee is within the range customarily approved in chapter 11 cases, the Expense Reimbursement is appropriate in light of the complexity of the transaction reflected in the Investment Agreement, and the Bid Protections are fair and reasonable, and will maximize value for the Parent Debtor's estate, its creditors, and other stakeholders.  Accordingly, the Parent Debtor's agreement to the Bid Protections represents a proper exercise of the Parent Debtor's business judgment and they should be approved.

28.      Courts have recognized that the paramount goal of any proposed sale of property of a debtor's estate is maximizing value.  *In re Metaldyne Corp.*, 409 B.R. 661, 667–68

(Bankr. S.D.N.Y. 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate."); *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'") (alterations in original).  Break-up fee arrangements, which have been described as "an incentive payment to a prospective purchaser with which a company fails to consummate a transaction," are a common feature of many sale processes—whether conducted inside or outside of a bankruptcy court.  *See Integrated Resources*, 147 B.R. at 653 ("Break-up fee arrangements outside of bankruptcy are presumptively valid under the business judgment rule."); *see also In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approving bidding protections in form of break-up fee and expense reimbursement).  This is because "[b]reak up fees are important tools to encourage bidding and to maximize the value of the debtor's assets." *Integrated Resources*, 147 B.R. at 659.

29.    When considering approval of bid protections, such as the Break-Up Fee, "there are 'three questions for courts to consider … (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?'" *Genco Shipping*, 509 B.R. at 465 (quoting *Integrated Resources*, 147 B.R. at 657) (citing *Metaldyne*, 409 B.R. at 670).

30.    The Bid Protections set forth in the Investment Agreement meet the "business judgment rule" standard.  <u>First</u>, to the best of the Parent Debtor's knowledge and belief, the Parent Debtor and the Plan Investor are wholly unrelated, and share no officers, directors, shareholders, incorporators, employees or economic interests—other than as embodied in the

transactions contemplated by the Investment Agreement. Nor is the Plan Investor an "insider" as

that term is defined in the Bankruptcy Code. 11 U.S.C. § 101(31).[6] The Bid Protections are the

product of good faith, arm's length negotiations among (a) the Plan Investor, (b) the Parent Debtor,

and (c) representatives of the Bondholders, who constitute the Parent Debtor's primary creditor

constituency. The Bid Protections, individually and collectively, were a material inducement for,

and condition of, the Plan Investor's entry into the Investment Agreement. The Plan Investor was

unwilling to hold open its bid or enter into the Investment Agreement without assurance of

payment of the Break-Up Fee and Expense Reimbursement as provided in the Investment

Agreement.

        31.    <u>Second</u>, approval of the Bid Protections will enhance the value of the Parent

Debtor's estate. The transaction embodied in the Investment Agreement lays a foundation for the

Parent Debtor's restructuring and provides the Parent Debtor with an opportunity to move forward

with a transaction that has a high likelihood of consummation with a contractually committed party

at a fair and reasonable price. Additionally, the Break-Up Fee enhances the estate's value by

ensuring that a fair market value offer from a credible investor (who will furnish a $4.5 million

deposit and $4.5 million limited corporate guaranty) remains viable for the Parent Debtor and that

the Plan Investor remains committed to the transaction. Further, although the Parent Debtor has

already run a comprehensive and robust Marketing Process and concluded that the Plan Investor's

bid represents the best credible and actionable offer available, the Investment Agreement contains

a "fiduciary out" and does not restrict the Parent Debtor's ability to pursue an Alternative

Transaction. Accordingly, the Break-Up Fee will encourage—and not "unduly hamper"—bidding

on the Parent Debtor's assets by establishing a floor for any Alternative Transaction. Thus, the

---

[6]    Taz Partners LLC, a creditor of the Parent Debtor, is an affiliate of the Plan Investor.

Bid Protections were designed to induce the Plan Investor to enter into the Investment Agreement

and provide the Parent Debtor with the certainty and benefits of the value-maximizing transaction

reflected therein, while simultaneously establishing a floor such that interested parties may still

submit proposals for an Alternative Transaction that represents a higher or better offer.

Accordingly, the approval of the Bid Protections will enhance, rather than hamper, competitive

bidding.

32.    Third, the amount of the Bid Protections is fair and reasonable under the

circumstances in relation to the purchase price.  The Break-Up Fee, which  is capped at $1,800,000

but in certain circumstances may be reduced to $900,000, amounts to at most 3% (or as little as

1.5%) of the $60,000,000 purchase price to be provided under the Investment Agreement, without

regard to the significant additional value resulting from the Plan Investor's assumption of

liabilities.  The Expense Reimbursement of $300,000, which the Plan Investor can receive only in

certain circumstances where it is not otherwise entitled to the Break-Up Fee, amounts to 0.5% of

the purchase price.  Numerous courts have approved similar break-up fees and bid protections in

this and other districts, including this Court with respect to certain of the Parent Debtor's

subsidiaries.  *See, e.g.*, *In re Evergreen Gardens Mezz LLC*, Case No. 21-10335 (MG) (Bankr.

S.D.N.Y. Oct. 4, 2021) [ECF No. 129] (approving $20 million break-up fee equal to approximately

3.95% of $506 million bid and expense reimbursement of up to $150,000); *In re George*

*Washington Bridge Bus Station Development Venture, LLC*, Case No. 19-13196 (DSJ) (Bankr.

S.D.N.Y. July 8, 2021) [ECF No. 557] (approving break-up fee equal to approximately 3% of

closing payment, credit bid, and ground lease escrow, as well as expense reimbursement of up to

$350,000, payable only in the event of cash bid in excess of $45 million); *In re KB US Holdings,*

*Inc.*, Case No. 20-22962 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2020) [ECF No. 184] (approving

$2.625 million termination fee equal to approximately 3.5% of $75 million bid and expense reimbursement of up to $750,000); *In re Fairway Group Holdings Corp.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Feb. 21, 2020) [ECF No. 202] (approving break-up fee of $2.1 million equal to approximately 3% of $70 million bid); *In re Aralez Pharmaceuticals US Inc.*, Case No. 18-12425 (MG) (Bankr. S.D.N.Y. Oct. 11, 2018) [ECF No. 171] (approving $1.6625 million break-up fee equal to approximately 3.5% of $47.5 million bid and expense reimbursement of up to $425,000); *In re Synergy Pharmaceuticals Inc.*, Case No. 18-14010 (LGB) (Bankr. S.D.N.Y. Jan. 7, 2019) [ECF No. 181] (approving $7 million break-up fee equal to approximately 3.7% of $185 million bid and expense reimbursement of up to $1.95 million); *In re Hooper Holmes, Inc. d/b/a Provant Health*, Case No. 18-23302 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2018) [ECF No. 119] (approving $810,000 break-up fee equal to approximately 3% of $27 million bid and expense reimbursement of up to $300,000); *In re Bozel, S.A.*, Case No. 10-11802 (AJG) (Bankr. S.D.N.Y Dec. 30, 2010) [ECF No. 120] (approving break-up fee of $1 million equal to approximately 3.33% of $30 million bid); *In re Eagle Pipe, LLC*, Case No. 20-34879 (MI) (Bankr. S.D. Tex. Oct. 30, 2020) [ECF No. 97] (authorizing debtor to select stalking horse bidder and provide bid protections, including break-up fee of up to 4% of bid and expense reimbursement of up to $200,000).

33.     The Bid Protections are also fair and reasonable in light of the complexities of the transaction and the applicable timing considerations.  Given the Parent Debtor's liquidity position it was imperative that any transaction move forward expeditiously so as not to further reduce recoveries to the Parent Debtor's creditors and other stakeholders.  Accordingly, the Plan Investor has agreed to assume all unsecured claims against the Parent Debtor other than the Bondholders' claims and certain other discrete categories set forth in the Investment Agreement. In addition, the Investment Agreement contemplates that the Plan Investor will take ownership of

the Reorganized Parent Debtor and its approximately 108 direct and indirect non-debtor property owning subsidiaries, each of which has its own complicated ownership and capital structure. Under the Investment Agreement, the Plan Investor has agreed to take on those responsibilities without the benefit of an exclusive period to conduct further diligence with respect to the subsidiaries or engage with the subsidiary level partners or mortgage lenders.

34.    Moreover, under the Investment Agreement, closing on the transaction is conditioned upon, among other things, entry of an order confirming a chapter 11 plan and obtaining court-approval of certain aspects of the transaction in the BVI and in Israel. Although the Plan Investor is committed to moving forward, the international implications of the Chapter 11 Case may require a substantial period between execution of the Investment Agreement and consummation of a chapter 11 plan that will effectuate the restructuring. Specifically, obtaining the necessary approvals in the BVI and Israel may extend the timeline for the Chapter 11 Case by several months. During this time, the Plan Investor's Escrowed Funds would be held on deposit and not available for the Plan Investor to otherwise deploy and put to use in the marketplace. In addition, the Plan Investor would also remain subject to the Guaranty during this potentially extended time period.

35.    Further, many third-party investors have participated in the Marketing Process and have submitted competitive offers. Because the Parent Debtor is not prohibited from pursuing an Alternative Transaction, the Plan Investor is bearing a risk that a third-party investor may materialize and submit a higher or better offer. This is precisely the type of risk for which bid protections are generally designed. In light of these circumstances, the Bid Protections are fair and reasonable.

WEIL:\98554564\1\12817.0007

36.     Courts in this jurisdiction have routinely provided administrative priority status to break-up fees and expense reimbursements in the event that the applicable bidder becomes entitled to them.  *See, e.g.*, *In re Evergreen Gardens Mezz LLC*, Case No. 21-10335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) [ECF No. 129] (approving treatment of break-up fee and expense reimbursement as administrative expenses); *In re KB US Holdings, Inc.*, Case No. 20-22962 (SHL) (Bankr. S.D.N.Y. Sep. 17, 2020) [ECF No. 164] (approving treatment of break-up fee and expense reimbursement as administrative expenses); *In re Hooper Holmes, Inc. d/b/a Provant Health*, Case No. 18-23303 (Bankr. S.D.N.Y. Sept. 20, 2018) [ECF No. 119] (same); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) [ECF No. 223] (same); *In re Fairway Group Holdings Corp.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Feb. 21, 2020) [ECF No. 202] (approving treatment of break-up fee as administrative expense).

37.     Here, approval of the Bid Protections is necessary to assure the Parent Debtor of a transaction with a contractually committed investor at a price the Parent Debtor believes is fair and reasonable in its sound business judgment.  Accordingly, the Break-Up Fee and the Expense Reimbursement should be treated as an allowed administrative expense in the event the Plan Investor becomes entitled to either of them.

38.     Based on the foregoing, the Bid Protections represent a reasonable exercise of the Parent Debtor's prudent business judgment and should be approved.

**Bankruptcy Rule 6004(h)**

39.     To implement the foregoing successfully, the Parent Debtor requests that the Court waive the fourteen day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  The relief requested herein is central to the Parent Debtor's efforts to preserve and maximize the value of its estate.  To minimize administrative expenses and proceed with steps required in this Court, as well as in the BVI and Israel, the Parent Debtor must

be able to proceed in an expeditious manner.  Accordingly, the Parent Debtor submits that a waiver of the fourteen day stay period is appropriate under Bankruptcy Rule 6004(h), to the extent such stay applies.

## Notice

40.     Notice of this Motion will be provided to (i) William K. Harrington, the U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shara Cornell, Esq.); (ii) the Parent Debtor's top twenty (20) unsecured creditors; (iii) the Internal Revenue Service; (iv) the United States Attorney's Office for the Southern District of New York; (v) counsel to Mishmeret Trust Company Ltd., as Trustee for the Bondholders, Chapman and Cutler LLP, 1270 Sixth Avenue, New York, New York 10020 (Attn: Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron Krieger, Esq.); (vi) counsel to the Plan Investor, Gissin & Co., Habarzel 38B, Tel Aviv 6971054, Israel (Attn: Yael Hershkovitz, Esq.), Locke Lord LLP, 200 Vesey Street, 20th Floor, New York, NY 10281 (Attn: Shalom Jacob, Esq.), Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (Attn: Avi D. Feinberg, Esq.), and (vii) all other persons and entities that have requested service in this Chapter 11 Case pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  The Parent Debtor respectfully submits that no further notice is required.

*[Remainder of Page Intentionally Left Blank]*

41.     No previous request for the relief sought herein has been made by the Parent

Debtor to this or any other Court.

WHEREFORE the Parent Debtor respectfully requested entry of the Proposed

Order and such other and further relief as the Court may deem just and appropriate.

Dated: March 25, 2022
        New York, New York

/s/  Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Parent Debtor*

WEIL:\98554564\1\12817.0007

**<u>Exhibit A</u>**

**Investment Agreement**

WEIL:\98554564\1\12817.0007

**INVESTMENT AGREEMENT**

dated as of March, 11, 2022

by and among

**All Year Holdings Limited, as the Company**

and

**Paragraph Partners LLC, as Plan Investor**

and

**Mishmeret Trust Company Ltd.**, solely in its capacity as Trustee
and in respect of Sections 7.02(b), 8.01(b), 8.01(c) and 8.02(c)

This INVESTMENT AGREEMENT, dated as of March 11, 2022 (the "***Agreement Date***"), is made by and between All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands (the "***Company***") and Paragraph Partners LLC, a US a special purpose entity ("***Plan Investor***").  Mishmeret Trust Company Ltd. ("***Mishmeret***"), solely in its capacity as Trustee for the Series B Notes and Series D Notes issued by the Company (the "***Unsecured Notes***") and the Series C Notes and Series E Notes issued by the Company (the "***Secured Notes***" and, together with the Unsecured Notes, the "***Notes***" and the holders of such Notes, the "***Noteholders***") pursuant those deeds of trust for each of the Notes (the "***Deeds of Trust***") by and between the Company and Mishmeret, is executing this agreement solely in respect of <u>Sections 7.02(b)</u>, <u>8.01(b)</u>, <u>8.01(c)</u> and <u>8.02(c)</u> hereof.

## PRELIMINARY STATEMENTS

A.      WHEREAS, on December 14, 2021 (the "***Petition Date***"), the Company (in such capacity, the "***Debtor***") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") (the case filed with the Bankruptcy Court, the "***Bankruptcy Case***").

B.      WHEREAS, on December 16, 2021, the Company voluntarily sought the appointment of joint provisional liquidators (the "***JPLs***") from the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division, Virgin Islands (the "***BVI Court***").  An order appointing the JPLs was entered by the BVI Court on December 20, 2021 (the voluntary liquidation proceeding filed with the BVI Court, the "***BVI Proceedings***").

C.      WHEREAS, the Debtor and Plan Investor wish to execute this agreement to set forth certain terms and conditions related to a proposed transaction that would be effected in the Bankruptcy Case pursuant to a Plan (as defined in <u>Annex A</u>), and a disclosure statement prepared by the Debtor in form and substance reasonably acceptable to the Plan Investor.

D.      WHEREAS, following the execution of this Agreement, the Debtor shall commence Israeli proceedings (the "***Israeli Proceedings***").

E.      WHEREAS, to the Knowledge of the Company, the Company owns, directly or indirectly, Equity Interests in the entities in the percentages set forth on <u>Schedule A-1</u> (each such entity, a "***Transferred Entity***" and collectively with the Company, the "***Transferred Entities***") and, to the Knowledge of the Company, the Transferred Entities directly or indirectly own certain real properties as depicted on the chart attached hereto as <u>Schedule A-2</u>.

F.      WHEREAS, to implement the Transactions and the reorganization of the Debtor, Plan Investor desires to provide funding for the Plan in exchange for acquiring, as provided in the Plan, upon the terms and subject to the conditions set forth herein and therein, newly issued shares or Equity Interests in the Reorganized Debtor (as defined below) ("***New Shares***"), which will represent one hundred percent (100%) of the aggregate number of New Shares issued and outstanding as of the Effective Time (as defined below) (such shares or Equity Interests to be acquired by Plan Investor hereunder, the "***Reorganized Equity Interests***").

G.      WHEREAS, in exchange for receipt of the Reorganized Equity Interests, (a) the Plan Investor will pay to the Debtor's estate, for distribution in accordance with the Plan, a cash payment in the amount of $40,000,000 (the "***Cash Payment***"), (b) the Reorganized Debtor will deliver promissory notes, in the form attached hereto as Exhibit B in the aggregate amount of $20,000,000, or, in the event that the Plan Investor effects the William Vale Purchase (as defined below), $22,000,000, and subject to the adjustment provisions set forth in Section 2.02 (the "***Purchase Price Adjustment***") hereof, to the Recovering Creditors (as defined below) or their nominees (the "***New Notes***") in accordance with the Plan, with such New Notes to be subject to personal or corporate guarantees acceptable in form and substance to the Debtor and the Noteholders (the "***New Guarantees***") and (c) the Reorganized Debtor will assume the Assumed Claims (as defined below) in accordance with the Plan (the Cash Payment, the New Notes, the New Guarantees, the assumption of the Assumed Claims, collectively, the "***Plan Consideration***").

H.      WHEREAS, immediately prior to the Closing, Wind Down Co (as defined below) will execute and deliver to the Company and Plan Investor a Joinder Agreement in substantially the form attached as Exhibit C to join as a Party to this Agreement and a Joinder Agreement in the form attached to the Escrow Agreement to join as a Party to the Escrow Agreement.

I.      NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement and in the Confirmation Order, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.  Certain Defined Terms.  Capitalized terms used in this Agreement have the meanings specified in Annex A.

## ARTICLE II

## PURCHASE AND SALE; CLOSING

Section 2.01.  Issuance and Sale of the Reorganized Equity Interests.  On the terms and subject to the conditions set forth in this Agreement, the Plan, and the Confirmation Order, at the Closing, the Company shall issue, sell, convey, assign, transfer and deliver to Plan Investor, and Plan Investor shall purchase, acquire and accept from the Company, the Reorganized Equity Interests, free and clear of all Liens (other than any Assumed Claims, restrictions under the Securities Act or any other applicable securities Laws or the Company's governing documents).  Notwithstanding the foregoing, the Plan Investor shall not, as part of the Transactions, purchase or receive, directly or indirectly, any Excluded Assets.

Section 2.02.  Purchase Price Adjustments

(a)     William Vale Purchase.  In the event that the Plan Investor or an Affiliate thereof purchases substantially all of the rights of the Trustee for the Series C Notes in and to the William Vale Hotel (the "***William Vale Purchase***"), including, but not limited to, the Trustee's rights in and to that certain Amended and Restated Promissory Note, dated February 28,

2

2017, originally between the Company and Wythe Berry Fee Owner LLC (the "Borrower") and that certain loan originally made by the Company to the Borrower in the original principal amount of $166,320,000.00, the aggregate principal amount of the New Notes provided as part of the Purchase Price for these Transactions shall be increased from $20,000,000 to $22,000,000.

(b)   Value Adjustment.

(i)   From the Investor Signing Date until the date that is nine (9) months following the Closing (the "*Adjustment Period*"), to the extent that the Plan Investor discovers by Reasonable Evidence that the actual percentage of the Company's direct or indirect Equity Interest in a Subsidiary is less than the Stated Percentage or that the actual percentage of the Company's direct or indirect ownership interest in any Owned Real Property is less than as set forth under "*Stated Percentage*" on Schedule A-1, then the Subsidiary Value of each applicable Subsidiary shall be deemed to be reduced by a proportionate amount (a "*Subsidiary Value Reduction*"). For purposes of this Agreement, "*Reasonable Evidence*" shall be any evidence presented by the Plan Investor to the appointed administrator of the assets of Wind Down Co (the "*Wind Down Administrator*") or, prior to the Effective Time, to the Company, in each case that a court of competent jurisdiction would reasonably be expected to consider sufficient to rule in favor of the claimant, *provided that* if the Plan Investor and the Wind Down Administrator or the Company, as applicable, are not able to agree on whether or not any presented evidence constitutes Reasonable Evidence hereunder, then such matter shall be submitted for binding resolution by arbitration in New York, New York, upon the appointment of a retired judge to serve as arbitrator, and in accordance with the Comprehensive Arbitration Rules & Procedures of JAMS.

(ii)   To the extent that the aggregate Subsidiary Value Reductions exceed $4,250,000, the aggregate principal amount of the New Notes provided as part of the Purchase Price for these Transactions shall be reduced by 50 cents for each dollar of Subsidiary Value Reduction between $4,250,000 and $7,250,000 and for any Subsidiary Value Reduction above $7,250,000, on a dollar-for-dollar basis, up to the total value of the New Notes. For the avoidance of doubt, to the extent the Subsidiary Value Reductions are equal to or lesser than $4,250,000, no adjustment will be made to the aggregate principal amount of the New Notes.

Section 2.03.   Closing.   The closing of the Transactions (the "*Closing*") shall take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical Closing, at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153), at 9:00 a.m. (New York City time) on the second (2nd) Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with ARTICLE X (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing. The date on which the Closing occurs is referred to in this Agreement as the "*Closing Date*." For all purposes under this Agreement and each other

3

Transaction Agreement, (a) except as otherwise provided in this Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.

## ARTICLE III

## PURCHASE PRICE AND CERTAIN CLOSING MATTERS

Section 3.01.  Purchase Price.  The aggregate consideration to be paid by Plan Investor to the Company for the issuance and sale of the Reorganized Equity Interests set forth in this Agreement (the "***Purchase Price***") shall be the Plan Consideration, which shall be distributable by the Debtor or its disbursing agent in accordance with the Plan.

Section 3.02.  Escrowed Funds.  Within five (5) business days of the later to occur of (i) the Court Break-Up Fee Approval Date and (ii) the date on which a Plan is annexed hereto as Exhibit A  that is reasonably satisfactory to the Plan Investor and otherwise complies with the terms hereof, pursuant to the terms of the Escrow Agreement, Plan Investor shall (A) transfer the amount of $4,500,000 to [●], in its capacity as escrow agent (the "***Escrow Agent***"), by wire transfer of immediately available funds (the "***Escrowed Funds***"), and (B) deliver to the Escrow Agent a duly executed signature page to that certain limited corporate guaranty annexed hereto as Exhibit D (the "***Guaranty***," and the date on which the Escrowed Funds are transferred and the Guaranty is delivered being referred to herein as the "***Escrow Date***").  Pursuant to the terms of the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

> (a)    if the Closing shall occur, the Escrowed Funds and all accrued investment income thereon shall be applied at the Closing towards the Cash Payment portion of the Purchase Price payable to the Company by Plan Investor and the Guaranty shall, by its terms, cease to be effective;

> (b)    if this Agreement is terminated by the Company pursuant to Section 11.01(c) (including due to the failure of the Plan Investor to close the Transaction), (1) the Escrowed Funds, together with all accrued investment income thereon (if any), shall be delivered to the Company and (2) the signature page to the Guaranty shall be delivered and released to the Company and the Guaranty shall then become immediately effective, in each case in accordance with and subject to the terms of Section 11.03(b); or

> (c)    if this Agreement is terminated for any reason other than as set forth in Section 3.02(b) above, the Escrowed Funds, together with all accrued investment income thereon (if any), shall be promptly returned to Plan Investor, together with the Plan Investor's signature page to the Guaranty.

Section 3.03.  Certain Closing Deliverables.  At the Closing:

(a)    The Company shall deliver or cause to be delivered to Plan Investor (or with respect to clause (iii), to the Escrow Agent) the following:

> (i)    the Reorganized Equity Interests and to the extent the Reorganized Equity

4

Interests are certificated, certificates evidencing the Reorganized Equity Interests;

(ii)     the officer's certificate required to be delivered to Plan Investor pursuant to Section 10.02(a)(iii);

(iii)    a counterpart of the Joint Written Instructions, duly executed by the Company, directing the Escrow Agent to deliver to Wind Down Co the Escrowed Funds in accordance with Section 3.02(a);

(iv)     all other documents, instruments of conveyance and transfer, in form and substance reasonably acceptable to Plan Investor and the other parties thereto, as may be necessary to convey the Reorganized Equity Interests to Plan Investor;

(v)      the positive cash balance of the Company, it being clarified that the Investor shall not be obligated to close if the Company will not have a positive cash balance upon consummation of the Closing;

(vi)     resignation letters of all officers of the Company and confirmation that all payments to such officers were made on or prior to the Closing in accordance with the Plan and no court appointed liquidators or similar representatives (including, but not limited to, the JPLs) will, from and after the Closing, exercise any authority or control over the Company; and

(vii)    all books and records of the Company and each Subsidiary (including, without limitation, all outstanding contracts and agreements); *provided, however,* that failure of the Company to deliver or cause to be delivered such books and records to the Plan Investor shall not constitute a default under this Agreement and shall not constitute a basis for the Plan Investor to terminate this Agreement or to delay or avoid Closing hereunder.

(b)     Plan Investor shall deliver or cause to be delivered the following:

(i)      to the Debtor, the Cash Payment, (*less* the Escrowed Funds) by wire transfer of immediately available funds to an account or accounts as directed by the Company at least two (2) Business Days prior to the Closing Date;

(ii)     to the Recovering Creditors or their nominees, the New Notes and New Guarantees;

(iii)    to Wind Down Co, a receipt for the Reorganized Equity Interests, duly executed by Plan Investor;

(iv)     the officer's certificate required to be delivered to the Company pursuant to Section 10.01(a)(iii);

(v)      a counterpart of the Joint Written Instructions, duly executed by Plan Investor, directing the Escrow Agent to deliver to Wind Down Co the Escrowed Funds in accordance with Section 3.02(a); and

5

(vi)    all other documents, instruments of conveyance and transfer, in form and substance reasonably acceptable to the Company and the other parties thereto, as may be necessary to convey the Reorganized Equity Interests to Plan Investor.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to Plan Investor that, to the Knowledge of the Company, except as set forth in the Disclosure Schedules and subject to the Company's right to update such representations and warranties set forth in Section 6.07:

Section 4.01.    Formation and Qualification of the Transferred Entities.    Each Transferred Entity is a corporation or other organization duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization, as set forth on Schedule A-1, and has the requisite corporate or other appropriate power and authority to operate its business as now conducted, all except as would not reasonably be expected to have a Material Adverse Effect.

Section 4.02.    Capital Structure of the Transferred Entities.    The percentage ownership of the Equity Interests of each Transferred Entity, and (except in the case of the Company) each registered and direct owner thereof, is set forth on Schedule A-1.    Except for such authorization required by the Bankruptcy Court and, to the extent applicable, in connection with the Ancillary Proceedings, at the Closing, the Reorganized Debtor will issue to Plan Investor the Reorganized Equity Interests (which shall represent one hundred percent (100%) of the aggregate number of issued and outstanding New Shares as of the Effective Time), free and clear of all Liens, except (i) any Assumed Claim, (ii) any Lien under the Securities Act or any other applicable securities Laws or (iii) any Lien arising out of, under or in connection with this Agreement, the Company's governing documents, or any other Transaction Agreement, (iv) any Lien created by or through, or resulting from any facts or circumstances relating to, Plan Investor or its Affiliates or (v) any other Permitted Lien.    All such Reorganized Equity Interests will be, as of the Effective Time, duly authorized and validly issued, and if applicable, fully paid and nonassessable.

Section 4.03.    Authority of the Company; Enforceability.    Except for such authorizations required by the Bankruptcy Court and, to the extent applicable, in connection with the Ancillary Proceedings, the Company has the requisite corporate or other appropriate power to execute, deliver and perform its obligations under the Company Transaction Agreements (including the consummation of the Company Transactions) to which it is a party.    The execution, delivery and performance by the Company of the Company Transaction Agreements (including the consummation of the Company Transactions) to which it is a party have been (or will be prior to the Closing) duly authorized by all requisite corporate or similar action on the part of the Company. This Agreement has been duly executed and delivered by the Company, and upon execution and delivery thereof, the other Company Transaction Agreements will be duly executed and delivered by the Company, and (assuming due authorization, execution and delivery thereof by the other parties hereto and thereto (other than the Company)) this Agreement constitutes, and upon execution and delivery thereof, the other Company Transaction Agreements will constitute, legal, valid and binding obligations of the Company, enforceable against the Company in accordance

6

with their respective terms, subject to entry by the Bankruptcy Court of the Confirmation Order and the Bankruptcy and Equity Exception, and, to the extent applicable, any necessary approvals in connection with the Ancillary Proceedings.

Section 4.04.   No Conflict.   Provided that all Consents listed on Schedules 4.04 and 4.05 have been obtained, except as may result from any facts or circumstances relating directly to Plan Investor or its Affiliates (as opposed to any other third-party or its Affiliates), the execution, delivery and performance by the Company of the Company Transaction Agreements do not and will not:

(a)     violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of the Company;

(b)     violate, conflict with, result in a breach of or constitute a violation or default (or any event that, with notice or lapse of time or both would constitute a default) under or give rise to any right of termination, cancellation, modification or acceleration of, or loss of a benefit under, any Material Contract, except, in each case, that would not reasonably be expected to have a Material Adverse Effect; or

(c)     violate any Law or Order applicable to the Company, except as would not reasonably be expected to have a Material Adverse Effect.

Section 4.05.   Consents and Approvals.   Except (a) for such authorizations required by the Bankruptcy Court and, to the extent applicable, any necessary approvals in connection with the Ancillary Proceedings and any required Noteholder approvals, (b) where the failure to obtain such Consent, or take such action or make such filing or notification, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, (c) as may be necessary as a result of any facts or circumstances relating to Plan Investor or Plan Investor's Affiliates (as opposed to any other third-party or its Affiliates), and (d) for the filing, or receipt of, any Consents or notices listed on Schedule 4.05, no Consents by or actions of, or filings with or notifications to any Government Authority are necessary in connection with (i) the execution, delivery and performance by the Company of the Company Transaction Agreements or (ii) the consummation by the Company of the Company Transactions.

Section 4.06.   Financial Information.   Schedule 4.06 sets forth the unaudited balance sheet and income statement for each of the property-owning entities for the fiscal year ended December 31, 2021, (the "*Financial Statements*").

Section 4.07.   Absence of Litigation.   Other than as set forth on Schedule 4.07, no Actions are pending or, to the Knowledge of the Company, are threatened against the Company or the other Transferred Entities, in each case except as would not reasonably be expected to be material to the Company and the Transferred Entities taken as a whole.

Section 4.08.   Brokers.   Without derogating from 3.03(a)(v) above, except for fees and expenses of Meridian Capital Group, LLC (the "*Company's Financial Advisor*"), no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Company or the other Transferred Entities, or, following the Closing Date, Wind Down Co, in connection with the Transactions.

7

Section 4.09.   <u>Material Contracts</u>.

(a)     <u>Schedule 4.09(a)</u> lists the following Contracts to which, to the Knowledge of the Company, the Company is a party, in each case that is in effect on the Investor Signing Date (collectively, the "***Material Contracts***") (other than any purchase orders issued under any such Contracts):

> (i)      a joint-venture, partnership or limited liability company agreement or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any joint venture, partnership or limited liability company, other than any such agreement or arrangement solely between or among any of the Transferred Entities;

> (ii)      an acquisition agreement that contains "earn-out" or other contingent payment obligations that would reasonably be expected to result in future payments by the Company in excess of $250,000.00;

> (iii)      an agreement relating to indebtedness for borrowed money or any financial guaranty including any pledge or charge involving an amount in excess of $1,000,000.00 or any settlement with respect thereof;

> (iv)      Contracts with any Affiliate or current officer or director of either the Company or any of the other Transferred Entities (other than Contracts made in the ordinary course of business on terms generally available to similarly situated non-affiliated parties); or

> (v)      Contracts to acquire, receive or dispose of any operating business or the capital stock of any other Person, in each case for consideration in excess of $250,000.000.

(b)     The Company has made available to Plan Investor in a data room administered by the Company true and complete copies of each Material Contract, or, to the extent such Material Contracts could not be disclosed in whole or part as a result of any confidentiality or other legal restriction, the Company has made available to Plan Investor such portions of those Material Contracts as it could lawfully disclose and has informed Plan Investor of any materials withheld on the basis of any confidentiality or other legal restriction.  Each Material Contract is a legal, valid and binding obligation of the Company and, to the Knowledge of the Company, each other party to such Material Contract, and is enforceable against the Company and, to the Knowledge of the Company, each other party to such Material Contract, in accordance with its terms, subject, in each case, to the Bankruptcy and Equity Exception.

Section 4.10.   <u>Insurance</u>.   The Transferred Entities maintain insurance in such amounts and against such risks as the Company believes to be customary for the Business in which it and the Transferred Entities operate.  To the Knowledge of the Company, neither the Company nor any of the other Transferred Entities have received notice of any pending or threatened cancellation with respect to any material insurance policy, and each of the Transferred Entities is in compliance in all material respects with all conditions contained in its material insurance policies.

8

Section 4.11.    Real Property.

(a)     Schedule 4.11(a) sets forth the rent roll of the leases or subleases of real property, in effect as of the date set forth in such schedule, with respect to which any Transferred Entity is the lessor, tenant or lessee (each individually, a "***Real Property Lease***" and, collectively, the "***Real Property Leases***").    Subject to the Bankruptcy and Equity Exception, the applicable Transferred Entity has a valid, binding and enforceable leasehold interest under each of the Real Property Leases under which it is tenant or lessee.    To the Knowledge of the Company, no event has occurred in the last twelve (12) months or condition exists that with notice or lapse of time, or both, would constitute a material default by a Transferred Entity under any of the Real Property Leases, other than defaults that have been cured or waived in writing.

(b)     To the Knowledge of the Company, Schedule A-2 sets forth all real property directly or indirectly owned in whole or in part by the Transferred Entities ("***Owned Real Property***"). Each Transferred Entity owns good and valid title in fee simple to the Owned Real Property.    The ownership of each parcel of Owned Real Property is listed on Schedule A-2.

Section 4.12.    Tax Matters.

(a)     The Company is classified as a disregarded entity for U.S. federal income tax purposes and has had such classification at all times since its formation.

(b)     Except as set forth on Schedule 4.12(b), each Transferred Entity is classified as either a partnership or a disregarded entity for U.S. federal income tax purposes and has been so classified at all times since its formation.

(c)     All income and other material Tax Returns required to be filed by the Company or the Transferred Entities have been timely filed, and all material Taxes due (whether or not shown on any Tax Returns) by the Company or the Transferred Entities have been paid, unless payment was precluded by reason of the Bankruptcy Case.

(d)     All Tax Returns described in Section 4.12(c) are true, correct, and complete in all material respects.

(e)     There are no Tax audits or other Tax examinations that are pending or have been threatened in writing, nor any Tax deficiencies that have been assessed or proposed, with respect to the Company or the Transferred Entities (other than to the extent disclosed in any proof of Claim for Taxes filed in the Bankruptcy Case).

(f)     Other than customary provisions in commercial agreements the principal purposes of which do not relate to Taxes, neither the Company nor any Transferred Entity is a party or has liability under any Tax sharing agreement, Tax indemnity agreement or similar agreement, understanding or arrangement, nor any liability for the Taxes of any other person under Treasury Regulations § 1.1502-6 (or similar provision under state, local, or non-U.S. Tax law), as a transferee or successor, by contract or otherwise.

9

(g)     There are no material Tax Liens on any assets of the Company or of any Transferred Entity other than for Taxes not yet due.

(h)     None of the Company or the Transferred Entities has been granted any extension of a period for the filing of any Tax Returns outside the ordinary course of business, and neither the Company nor any Transferred Entity has granted any waiver of any statute of limitations for the assessment of any Tax.

(i)     All material withholding Taxes with respect to the Company or any Transferred Entity have been properly withheld and remitted.

Section 4.13.    No Other Representations or Warranties.

(a)     Except for the representations and warranties expressly set forth in this <u>ARTICLE IV</u> (as modified by the Disclosure Schedules, as may be updated according to the terms hereof), the certificate to be delivered pursuant to <u>Section 10.02(a)(iii)</u> and the information provided under <u>Section 4.09(b)</u>, neither the Company nor any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at Law or in equity, on behalf of the Company, the other Transferred Entities or any of their respective Affiliates, including any representation or warranty regarding the Company, any other Transferred Entity or any other Person, the Reorganized Equity Interests, the Business (including any assets of the business), the Transactions, any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements or any other matter, and the Company hereby disclaims all other representations and warranties of any kind whatsoever, express or implied, written or oral, at Law or in equity, whether made by or on behalf of the Company, any other Transferred Entity or any other Person, including any of their respective Representatives.  Except for the representations and warranties expressly set forth in this <u>ARTICLE IV</u>, the Company hereby (i) disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Assets or the Business, and (ii) disclaims all Liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) to Plan Investor or any of Plan Investor's Affiliates or any Representatives of Plan Investor or any of Plan Investor's Affiliates (including any opinion, information, projection, or advice that may have been or may be provided to Plan Investor by the Company's Financial Advisor or other Representative of the Company or the other Transferred Entities, respectively), including omissions therefrom.    Without limiting the foregoing, the Company makes no representation or warranty of any kind whatsoever, express or implied, written or oral, at Law or in equity, to Plan Investor or any of its Affiliates or any Representatives of Plan Investor of any of its Affiliates regarding the probable success, profitability or value of the Transferred Entities or the Business.

(b)     EXCEPT AS EXPRESSLY STATED HEREIN, THE COMPANY SPECIFICALLY DISCLAIMS, AND EXCLUDES HEREFROM, WITH RESPECT TO THE BUSINESS AND THE TRANSFERRED ENTITIES: (I) ANY WARRANTY AS TO THE VALUE,

10

DESIGN, QUALITY, OR CONDITION OF ANY PROPERTIES OWNED OR OPERATED BY THE TRANSFERRED ENTITIES, (II) ANY IMPLIED REPRESENTATION OR WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE OR FOR A PARTICULAR PURPOSE, (III) ANY IMPLIED REPRESENTATION OR WARRANTY OF FREEDOM FROM ANY RIGHTFUL CLAIM BY WAY OF INFRINGEMENT OF ANY PATENT, TRADEMARK, COPYRIGHT, OR PROPRIETARY RIGHTS OR THE LIKE, (IV) ANY IMPLIED REPRESENTATION OR WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, (V) ANY EXPRESS OR IMPLIED WARRANTY REGARDING THE CONDITION OF THE BUSINESS AND (VI) ANY OBLIGATION OR LIABILITY ON ITS PART ARISING IN CONTRACT OR IN TORT, ACTUAL OR IMPUTED, OR IN STRICT LIABILITY, INCLUDING ANY OBLIGATION OR LIABILITY FOR LOSS OF USE, REVENUE OR PROFIT WITH RESPECT TO THE BUSINESS OR FOR ANY LIABILITY OF THE TRANSFERRED ENTITIES OR THE TRANSFERRED ENTITIES TO ANY THIRD-PARTY OR ANY OTHER DIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGE WHATSOEVER.

(c)     NOTWITHSTANDING THE FOREGOING, NOTHING IN THIS SECTION 4.13 SHALL LIMIT PLAN INVESTOR'S ABILITY TO RELY ON THE EXPRESS REPRESENTATIONS AND WARRANTIES IN ARTICLE IV (AS MODIFIED BY THE DISCLOSURE SCHEDULES).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PLAN INVESTOR

Plan Investor hereby represents and warrants to the Company that upon the signing of this Agreement and on the Closing Date, except as set forth in the Disclosure Schedules:

Section 5.01.   Formation and Authority of Plan Investor; Enforceability.   Plan Investor is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Plan Investor Transaction Agreements (including the consummation of the Plan Investor Transactions).   The execution, delivery and performance of the Plan Investor Transaction Agreements by Plan Investor (including the consummation of the Plan Investor Transactions) have been duly authorized by all requisite corporate or organizational action on the part of Plan Investor, and no shareholder or other similar approval is required in connection with Plan Investor's execution, delivery and performance of the Plan Investor Transaction Agreements.   This Agreement has been, and upon execution and delivery thereof, the other Plan Investor Transaction Agreements will be, duly executed and delivered by Plan Investor, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Plan Investor Transaction Agreements will constitute, legal, valid and binding obligations of Plan Investor enforceable against Plan Investor in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

11

Section 5.02.   No Conflict.  Provided that all Consents and other actions described in Section 5.03 have been obtained, except as may result from any facts or circumstances relating to the Company, the Transferred Entities or their respective Affiliates (as opposed to any other third-party or its Affiliates), the execution, delivery and performance by Plan Investor of the Plan Investor Transaction Agreements do not and will not:

(a)      violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of Plan Investor;

(b)      violate or conflict with in any material respect any Law or Order applicable to Plan Investor; or

(c)      result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to any Person any right to terminate, amend, accelerate or cancel, or result in the creation of any Lien (other than a Permitted Lien) on any assets or properties of Plan Investor pursuant to, any Contract to which Plan Investor or any of its Subsidiaries or Affiliates is a party or by which any of such assets or properties is bound, except for any such conflicts, violations, terminations, cancellations, breaches, defaults, rights or Liens as would not materially impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements.

Section 5.03.   Consents and Approvals.   Except (a) for such authorizations required by the Bankruptcy Court and, to the extent applicable, any necessary approvals in connection with the Ancillary Proceedings and any required Noteholder approvals, (b) where the failure to obtain such Consent, or take such action or make such filing or notification, would not materially impair or delay the ability of Plan Investor to consummate the Transaction or otherwise perform its obligations under the Agreement, (c) as may be necessary as a result of any facts or circumstances relating to the Company, the Transferred Entities or their respective Affiliates (as opposed to any other third-party or its Affiliates), and (d) for the filing, or receipt of, any Consents or notices listed on Schedule 5.03, no material Consents by or actions of, or filings with or notifications to any Government Authority are necessary in connection with (i) the execution, delivery and performance by Plan Investor of the Transaction Agreements or (ii) the consummation by Plan Investor of the Transactions.

Section 5.04.   Absence of Restraints; Compliance with Laws.

(a)      To the knowledge of Plan Investor, no facts or circumstances exist that would reasonably be expected to impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements.

(b)      Plan Investor is not in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to materially impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements.

12

(c)      As of the Investor Signing Date, there are no Actions pending or, to the knowledge of Plan Investor, threatened, that would affect in any material respect Plan Investor's ability to perform its obligations under the Plan Investor Transaction Agreements or to consummate the Transactions contemplated by the Plan Investor Transaction Agreements.

Section 5.05.    Securities Matters.  Plan Investor is an "institutional accredited investor" (as such term is defined in Rule 501 of Regulation D under the Securities Act).  The Reorganized Equity Interests are being acquired by Plan Investor for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Reorganized Equity Interests or any interest in them.  Plan Investor has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its investment in the Reorganized Equity Interests, and Plan Investor is capable of bearing the economic risks of such investment.  Plan Investor acknowledges that the Reorganized Equity Interests have not been registered under the Securities Act, or any securities Laws or any state or other jurisdiction (U.S. or non-U.S.), and understands and agrees that it may not sell or dispose of any Reorganized Equity Interests except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable securities Laws of any state or other jurisdiction (U.S. or non-U.S.).

Section 5.06.    Financial Ability.  Plan Investor has, and will have at the Closing, (a) sufficient immediately available funds and the financial ability to pay the Purchase Price and any other amounts required to be paid by Plan Investor hereunder and (b) the resources and capabilities (financial and otherwise) to perform its obligations under the Plan Investor Transaction Agreements and the Plan, including all financial obligations thereunder.  Plan Investor has not incurred, and is not contemplating or aware of, any obligation, commitment, restriction or other Liability of any kind, in each case that would impair or adversely affect such resources, funds or capabilities.

Section 5.07.    Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Plan Investor or any of Plan Investor's Affiliates in connection with any Transaction.

Section 5.08.    Absence of Litigation.  No Actions are pending or, to the knowledge of Plan Investor, threatened against Plan Investor that would reasonably be expected to materially and adversely affect Plan Investor's ability to perform its obligations under the Plan Investor Transaction Agreements or to consummate the Transactions contemplated by the Plan Investor Transaction Agreements.

Section 5.09.    Solvency.  Immediately after giving effect to the consummation of the Transactions (including any financings being entered into in connection therewith) and taking into account all obligations of Plan Investor pursuant to the Transaction Agreements:

(a)      the fair saleable value (determined on a going concern basis) of the assets of Plan Investor will be greater than the total amount of its Liabilities;

(b)      Plan Investor will be solvent and able to pay its debts and obligations in the ordinary course of business as they become due; and

13

(c)     Plan Investor will have adequate capital to carry on its business and all businesses in which they are about to engage.

Section 5.10.   <u>Investigation</u>.  Without limiting, reducing or otherwise modifying the effectiveness of the representations and warranties provided by the Company hereunder, Plan Investor acknowledges and agrees that it:

(a)     has completed such inquiries and investigations as it has deemed appropriate into, and, based thereon, has formed an independent judgment concerning, the Transferred Entities, the Reorganized Equity Interests, the Assets and the Liabilities of the Transferred Entities, the Business and the Transactions, and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements; and

(b)     has been granted access to a data room administered by the Company that has been populated with projections, forecasts, estimates, appraisals, statements, promises, advice, data or information about the Company, the other Transferred Entities, the Reorganized Equity Interests, the Assets and the Liabilities of the Transferred Entities, the Business and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements responsive to its requests.  Plan Investor further acknowledges and agrees that (x) the only representations and warranties made by the Company are the representations and warranties expressly set forth in <u>ARTICLE IV</u> (as modified by the Disclosure Schedules, as may be updated according to the terms hereof), the certificate delivered pursuant to <u>Section 10.02(a)(iii)</u> and the information provided under <u>Section 4.09(b)</u>, and Plan Investor has not relied upon any other representations or warranties of any kind whatsoever, express or implied, written or oral, at Law or in equity, including any representation or warranty regarding the Company, any other Transferred Entity or any other Person, the Reorganized Equity Interests, any Assets or Liabilities of the Transferred Entities, the Business, the Transactions, any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements or any other matter, or other projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) by or on behalf of the Company or any of its Affiliates, any Representatives of the Company or any of its Affiliates, or any other Person, including any projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through the Company's Financial Advisor, or management presentations, data rooms (electronic or otherwise) or other due diligence information (including any opinion, information, projection, or advance that may have been or may be provided to Plan Investor by any of the Company's Financial Advisor or other Representative of the Company or the other Transferred Entities, respectively), other than as expressly set forth herein, and that Plan Investor will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information and (y) any claims Plan Investor may have for breach of any representation or warranty shall be based solely on the representations and warranties of the Company expressly set forth in <u>ARTICLE IV</u> (as modified by the Disclosure Schedules, as may be updated according to the terms hereof) and the certificate delivered

14

pursuant to Section 10.02(a)(iii).    Except as otherwise expressly set forth in this Agreement, Plan Investor understands and agrees that the Transferred Entities, the Reorganized Equity Interests, the Assets and Liabilities of the Transferred Entities, and the Business, are being transferred, directly or indirectly, on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in ARTICLE IV (as modified by the Disclosure Schedules, as may be updated according to the terms hereof) without any other representations or warranties of any nature whatsoever.  Without limiting the foregoing, Plan Investor further acknowledges and agrees that Plan Investor has relied on its own inspection and knowledge of the Business in determining if the Business is acceptable and satisfactory to Plan Investor and acknowledges that in no event shall the Company have any liability to the Plan Investor, and the Plan Investor shall have no termination rights, with respect to a breach of representation, warranty or covenant under this Agreement to the extent that the Plan Investor knew of such breach as of the Investor Signing Date or as of the Closing, *provided that* nothing in this Section 5.10(b) shall limit the effectiveness of the adjustment set forth in Section 2.02(b).  Furthermore, Plan Investor hereby acknowledges the disclaimer set forth in Section 4.13.

Section 5.11.  The Plan Investor is not aware of any information that constitutes Reasonable Evidence for purposes of Section 2.02(b) hereof.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

Section 6.01.  Conduct of Business Before the Closing.  Plan Investor acknowledges that the Debtor will operate its Business in the context of the Bankruptcy Case and the Ancillary Proceedings.  Subject to the foregoing, the Company shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause (solely to the extent under its control, including in light of not being the manager of certain Transferred Entities), the other Transferred Entities to, maintain the Assets in their current condition (in all material respects) and, preserve in all material respects the present business operations, organization and goodwill of the Business, and the present relationships with Persons having significant business relationships with the Business, and the parties to this Agreement shall cooperate with one another and shall take commercially reasonable steps to stabilize the Company's assets, work with mortgage lenders to lower debt service payments, resolve all open litigation, and pay all outstanding debts to facilitate securing a more stable cash flow, all consistent with recent past practice.  Except (i) as required by applicable Law or by Order of the Bankruptcy Court or the courts in the Ancillary Proceedings, or as otherwise expressly contemplated by the Transaction Agreements or (ii) for matters identified on Schedule 6.01, during the Pre-Closing Period, unless Plan Investor otherwise consents in writing (which consent shall not be unreasonably withheld, conditioned or delayed), the Company will, and will use commercially reasonable efforts to cause (solely to the extent under its control, including in light of not being the manager of certain Transferred Entities), the other Transferred Entities to, conduct the Business in the ordinary course of business and shall not do any of the following, all without derogating from the Investor's right to receive the Company with a positive cash balance:

15

(a)  Grant any Lien on the Reorganized Equity Interests or any material Assets (in each case, whether tangible or intangible), in each case, other than a Permitted Lien or in connection with any DIP Loan Agreement (*provided*, that any Lien granted in connection with a DIP Loan Agreement shall be released at or prior to the Closing and shall be repaid at or prior to the Closing from the Cash Payment);

(b)  acquire (by merger, consolidation, acquisition of stock or assets or otherwise) any corporation, partnership or other business organization, business or division;

(c)  transfer or provide any Person with the right to acquire any Transferred Entity having a net equity value to the Company in excess of $250,000.00 or any direct or indirect ownership interest therein;

(d)  incur or issue any Debt or assume, grant, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any Person, or make any loans or advances, in each case, other than (x) in connection with a DIP Loan Agreement (*provided*, that any Lien granted in connection with a DIP Loan Agreement shall be released at or prior to the Closing and shall be repaid at or prior to the Closing from the Cash Payment) or (y) Debt incurred in the ordinary course of business consistent with past practice in an aggregate amount less than $250,000.00;

(e)  redeem, repurchase, issue or sell any Transferred Equity Interests, or securities convertible into or exchangeable for such Transferred Equity Interests, or issue or grant any options, warrants, calls, subscription rights or other rights of any kind to acquire such Transferred Equity Interests or securities;

(f)  (i) declare or set aside any dividends or distributions on any capital stock of or other Equity Interest in any Transferred Entity (in cash or in kind),other than dividends or distributions payable by one wholly-owned Transferred Entity to another wholly-owned Transferred Entity or payable to any holders of Equity Interests of a Transferred Entity on a pari passu basis (including the Company, which, for the avoidance of doubt, shall not include Yoel Goldman or Tzipporah Goldman), (ii) amend any organizational documents or (iii) commence any additional bankruptcy or insolvency proceeding with respect to any Transferred Entity;

(g)  (i) settle any claim with respect to a material Tax Liability, (ii) surrender any right to claim a refund of a material amount of Taxes, (iii) file any amended Tax Return making a material change, or (iv) enter into any closing agreement in respect of a material amount of Taxes;

(h)  make any material change in its accounting practices unless required by GAAP or applicable Law;

(i)  enter into any settlement or release with respect to any Action relating to the Business, other than any settlement or release that (i) contemplates only the payment of money without ongoing limits on the conduct or operation of the Business and which payment is not, individually or in the aggregate, in excess of $250,000.00, or (ii) involves a settlement

16

of any claim(s) listed on Schedule 6.01 hereto or having a value below $250,000.00 individually and $1,000,000.00 in the aggregate;

(j)      enter into any legally binding commitment with respect to any of the foregoing;

(k)      share any confidential or proprietary information with any outside parties, unless required by law, court order or applicable regulation.

Notwithstanding anything to the contrary contained herein, nothing herein shall prevent any Transferred Entity from taking or failing to take any action for the establishment of any policy, procedure or protocol required to be taken under law or instruction of Government Authorities in response to COVID-19 or any other reasonably required COVID-19 Measures and (x) no actions taken or any failure to take such actions shall be deemed to violate or breach this Agreement in any way, (y) all such actions or failure to take such actions shall be deemed to constitute an action taken in the ordinary course of business and (z) no such actions taken to satisfy legal or regulatory requirements shall serve as a basis for the Plan Investor to terminate this Agreement or assert that any of the conditions to the Closing contained herein have not been satisfied.

For the avoidance of doubt, the Company makes no representations, warranties, or covenants in connection with any action that may or may not be taken by third-party holders of Equity Interests in, or third-party managers or managing members of, any Transferred Entity and any action taken or not taken by such Person that would otherwise result in a violation of any prohibition of this Section 6.01 shall not be deemed a breach of this Section 6.01 by the Company or the Transferred Entities.

Section 6.02.    Access to Information.

(a)      During the Pre-Closing Period, to the extent in the control of the Company, upon reasonable prior notice, the Company shall, and shall cause each of the other Transferred Entities to, afford the Representatives of Plan Investor reasonable access, during normal business hours, to the properties, books and records of the Business and Transferred Entities, for purposes of consummating the Transactions, in each case, at the sole cost and expense of Plan Investor.

(b)      Notwithstanding anything in this Agreement to the contrary, during the Pre-Closing Period:

(i)      (A) in no event shall the Company, the other Transferred Entities or their respective Affiliates be obligated to provide any (1) access or information in violation of any applicable Law, (2) information the disclosure of which could reasonably be expected to jeopardize any applicable privilege (including the attorney-client privilege) available to the Company, the other Transferred Entities or any of their respective Affiliates relating to such information, or (3) information the disclosure of which would cause the Company, any other Transferred Entity or any of their respective Affiliates to breach a confidentiality obligation to which it is bound; provided, that, in the event that the Company withholds access or information in reliance on the foregoing clause (A), the Company shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Plan Investor that such access or information is being so withheld

17

and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law, and (B) any access or investigation contemplated by Section 6.02(a) shall not unreasonably interfere with any of the businesses, personnel or operations of the Company, the other Transferred Entities or any of their respective Affiliates or the Business; and

(ii)    the auditors and accountants of the Company, the other Transferred Entities or any of their respective Affiliates or the Business shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants.

Section 6.03.   Confidentiality.  Plan Investor acknowledges that the Confidential Information and Transaction Information (as defined in the Confidentiality Agreement) provided to it in connection with this Agreement, including information provided under Section 6.02, is subject to the Confidentiality Agreement and the terms of the Confidentiality Agreement are incorporated into this Agreement by reference and shall continue in full force and effect (and all obligations thereunder shall be binding upon Plan Investor and its Representatives (as defined in the Confidentiality Agreement) until the Closing).

Section 6.04.   Regulatory Approvals.

(a)    Each of Plan Investor and the Company shall take any and all steps to make all required filings and shall act in a reasonably commercial manner to promptly obtain all Consents, Permits and Orders of all Government Authorities (other than any required approvals or actions of the Bankruptcy Court or the courts in the Ancillary Proceedings, which are governed exclusively by ARTICLE VIII) that may be, or become, necessary for the execution and delivery of and performance of its obligations pursuant to, the Transaction Agreements (including the consummation of the Transactions) (collectively, the "**Government Approvals**").

(b)    Each Party shall promptly notify the other Party of any material oral or written communication it or any of its Representatives receives from any Government Authority relating to the matters that are the subject of this Section 6.04, permit the other Party and its respective Representatives to review in advance any communication relating to the matters that are the subject of this Section 6.04 proposed to be made by such Party to any Government Authority and provide the other Parties with copies of all substantive correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Government Authority or members of its staff, on the other hand, relating to the matters that are the subject of this Section 6.04, provided, however, that materials proposed to be submitted in response to any such Government Authority communication may be redacted: (i) as necessary to comply with Contractual arrangements, applicable Law or by Order of the Bankruptcy Court or the Courts in the Ancillary Proceedings; and (ii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns to the extent not governed by a common interest

18

privilege or doctrine.  No Party shall agree to participate in any meeting or substantive discussion with any Government Authority in respect of any such filings, investigation or other inquiry unless it consults with the other Party in advance and, to the extent permitted by such Government Authority, gives the other Party the opportunity to attend and participate at such meeting.  Subject to the Confidentiality Agreement, the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods.  The Parties shall share the right to control and direct the process by which the Parties seek to avoid or eliminate impediments under any antitrust, competition, trade regulation or foreign investment regulation Law, including by directing the strategy and making final determinations related to the review or investigation of the Transactions by any Government Authority and attending all meetings, substantive discussions, and communications with any Government Authority related to the review or investigation of the Transactions except to the extent that such Government Authority may request to communicate exclusively with one Party.  Nothing in this Section 6.04(b) shall be applicable to Tax matters.

(c)    Actions or agreements required of Plan Investor pursuant to this Section 6.04 shall under no circumstances be considered a Material Adverse Effect.

Section 6.05.    Third-Party Consents.  Each Party agrees to reasonably cooperate to obtain any other Consents from any third person other than a Government Authority that may be required in connection with the Transactions (the "***Third-Party Consents***").  Notwithstanding anything in this Agreement to the contrary, the Company and its Affiliates shall not be required to compensate any third-party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to remain primarily, secondarily or contingently liable for any Liability) to any third-party to obtain any such Third-Party Consent.  For the avoidance of doubt, no representation, warranty or covenant of the Company contained in the Transaction Agreements shall be breached or deemed breached, and no condition shall be deemed not satisfied, based on (a) the failure to obtain any Third-Party Consents or (b) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Third-Party Consents.

Section 6.06.    Cooperation.  During the Pre-Closing Period, (a) the Company and Plan Investor shall, and shall cause their respective controlled Affiliates to, (i) refrain from taking any actions that would reasonably be expected to impair, delay or impede the Closing and (ii) without limiting the foregoing, use reasonable best efforts to cause all Closing Conditions and covenants of the other Party to be met as promptly as practicable and in any event on or before the Outside Date and (b) each Party shall keep the other Party reasonably apprised of the status of the matters relating to the completion of the Transactions, including with respect to the negotiations relating to the satisfaction of the Closing Conditions and covenants of the other Party.

Section 6.07.    Schedule Updates.  During the Pre-Closing Period, the Company shall advise Plan Investor in writing if, in the Company's Knowledge, any of the representations or warranties contained in ARTICLE IV hereof become incorrect in any manner that could reasonably be expected to cause any closing condition not to be satisfied.  If any such matter requires any change

19

to the Disclosure Schedules, the Company may promptly deliver to Plan Investor a supplement to such Disclosure Schedules specifying such change (each a "**_Schedule Update_**").    Upon the delivery of a Schedule Update, (i) the specified representations and warranties made by the Company will be modified as described in the Schedule Update and (ii) Plan Investor will not have the right to terminate this Agreement or prevent the consummation of the transactions contemplated by this Agreement on account of any modification contained in a Schedule Update _provided_ that if any Schedule Update shows a Subsidiary Value Reduction then the adjustment mechanism set forth in Section 2.02(b) shall apply.

## ARTICLE VII

## POST-CLOSING COVENANTS

Section 7.01.   Access.

(a)      From and after the Closing Date for a period of three (3) years, in connection with any reasonable business purpose, including the preparation or amendment of Tax Returns, financial statements, or the determination of any matter relating to the rights or obligations of Wind Down Co or any of its Affiliates under any Transaction Agreement, or as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Case or the Ancillary Proceedings, upon reasonable prior notice, and except to the extent necessary to (i) ensure compliance with any applicable Law or an order of the Bankruptcy Court or the courts in the Ancillary Proceedings, (ii) preserve any applicable privilege (including the attorney-client privilege) or (iii) comply with any Contractual confidentiality obligations, Plan Investor shall, and shall cause each of the Transferred Entities, their respective Affiliates and their respective Representatives to (A) afford Wind Down Co and its Representatives and their respective Affiliates reasonable access, during normal business hours, to the properties, books and records of Plan Investor and its Affiliates in respect of any of the Transferred Entities and the Business, (B) furnish to Wind Down Co and its Representatives or their respective Affiliates such additional financial and other information regarding the Transferred Entities and the Business as Wind Down Co or its Representatives may from time to time reasonably request and (C) make available to Wind Down Co and its Representatives and their respective Affiliates those employees of Plan Investor or its Affiliates whose assistance, expertise, testimony, notes or recollections or presence may be necessary to assist Wind Down Co or its Representatives or their respective Affiliates in connection with its inquiries for any purpose referred to above, including the presence of such Persons for interviews and depositions and as witnesses in hearings or trials for such purposes; provided, however, that, unless the Plan Investor agrees otherwise in writing, such information (including information described in testimony) shall, unless reasonably necessary, be limited solely to information pertaining to the Pre-Closing Period, and such investigation shall not unreasonably interfere with the business or operations of Plan Investor or any of its Affiliates; and provided further, that the auditors and accountants of Plan Investor or its Affiliates shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants.   Notwithstanding anything to the

contrary herein, Wind Down Co shall have continued access to all books and records of the Transferred Entities as is necessary to administer the Bankruptcy Case and the Ancillary Proceedings and Wind Down Co and its Representatives may retain copies of such books and records, as necessary or appropriate in connection with such purpose.

(b)     If so requested by Plan Investor, on the one hand, or Wind Down Co or any of its Affiliates, on the other hand, Wind Down Co or one of its Affiliates, or Plan Investor and Wind Down Co shall, and shall cause its applicable Affiliates to enter, into a customary joint defense agreement or common interest agreement with Plan Investor and its Affiliates, or Wind Down Co and its Affiliates, as applicable, with respect to any information to be provided to Wind Down Co or its Affiliates pursuant to Section 7.01(a).

Section 7.02.   Directors' and Officers' Indemnification and Exculpation; Release.

(a)     [Reserved]

(b)     Effective as of the Closing and, with respect to Mishmeret and the Noteholders (in each case for itself and on behalf of its Affiliates and each of its and their respective successors, assigns, heirs and executors) solely provided that Noteholder Plan Approval has been received:

(i)     Plan Investor, for itself and on behalf of its Affiliates and each of its and their respective successors, assigns, heirs and executors (the "***Plan Investor Releasors***"), hereby irrevocably, knowingly and voluntarily releases, covenants not to sue, discharges and forever waives and relinquishes all claims, demands, liabilities, defenses, affirmative defenses, setoffs, counterclaims, actions and causes of action of whatever kind or nature, whether known or unknown (each a "***Claim***"), which any such releasing Plan Investor Releasor has, may have or may assert now or in the future, in his, her or its capacity as a purchaser, creditor or equityholder, of the Company against Wind Down Co, Mishmeret, the Noteholders, their Affiliates, any current or former officer, director, manager, employee, counsel, financial advisor, agent or other Representative of the Company Wind Down Co, Mishmeret, the Noteholders, or their Affiliates, or any of their respective successors, assigns, heirs and executors (the "***Company and Noteholder Releasees***"), arising out of, based upon or resulting from any contract, transaction, event, circumstance, action, failure to act, occurrence or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken or permitted prior to the Closing (each a "***First-Party Plan Investor Claim***");

(ii)     each of the Plan Investor Releasors hereby further agrees to indemnify and hold harmless each of the Company and Noteholder Releasee against any losses arising out of or in connection with any indemnification or contribution Claim asserted by a third-party against any Company and Noteholder Releasee resulting from a Claim asserted by any such Plan Investor Releasor against such third-party in his, her or its capacity as a purchaser, creditor or equityholder, of the Company;

(iii)     Wind Down Co, Mishmeret and the Noteholders, in each case for itself and on behalf of its Affiliates and each of its and their respective successors, assigns, heirs and

21

executors (the "***Company and Noteholder Releasors***") hereby irrevocably, knowingly and voluntarily releases, covenants not to sue, discharges and forever waives and relinquishes all Claims, which any such releasing Company and Noteholder Releasor has, may have or may assert now or in the future against Plan Investor, its Affiliates, the Transferred Entities, any current or former officer, director, manager, employee, attorney, agent or other Representative of the Plan Investor or its Affiliates, or any of their respective successors, assigns, heirs and executors, in each case in their capacity as such (the "***Plan Investor Releasees***"), arising out of, based upon or resulting from any contract, transaction, event, circumstance, action, failure to act, occurrence or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken or permitted prior to the Closing (each a "***First-Party Company and Noteholder Claim***"); and

(iv)      each of the Company and Noteholder Releasors hereby further agrees to indemnify and hold harmless each Plan Investor Releasee against any losses arising out of or in connection with any indemnification or contribution Claim asserted by a third-party including any current or prior officer, director or shareholder of the Company against any Plan Investor Releasee resulting from a Claim asserted by any Company and Noteholder Releasor against such third-party.

(c)      Notwithstanding the foregoing, nothing in this <u>Section 7.02</u> shall be deemed to release or waive any rights or remedies of any releasor (i) under this Agreement or any other Transaction Agreement or (ii) against Yoel Goldman or Tzipporah Goldman, or any entity which is under control or ownership of Yoel Goldman or Tzipporah Goldman other than the Transferred Entities.

Section 7.03.   <u>Preservation of Books and Records</u>.  The Company and its Affiliates shall have the right to transfer to Wind Down Co at Closing copies of all books and records of the Business relating to periods ending on or before the Closing Date.  Plan Investor agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Plan Investor or its Affiliates for a period of three (3) years from the Closing Date.  After such three (3) year period before Plan Investor or any Affiliate shall dispose of any of such books and records, Plan Investor shall give at least thirty (30) days' prior written notice to Wind Down Co of its such intention to dispose such books and records, and Wind Down Co, and/or any of its Affiliates shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect.

Section 7.04.   <u>Further Assurances; Cooperation</u>.

(a)      From time to time following the Closing, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and such instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the Transactions as may be reasonably requested by the other Party.

(b)      Effective as of the Closing Date, Plan Investor hereby grants to Wind Down Co and its Affiliates a royalty-free, fully paid-up, irrevocable, worldwide, non-exclusive license to use the Business Names and Business Marks, solely (a) in accordance with substantially

22

the same, but in no event less than, the standards observed by Wind Down Co and its Affiliates, and (b) in connection with the winding down and cessation of Wind Down Co and its Affiliates. The foregoing license will expire twelve (12) months from the Closing Date.

## ARTICLE VIII

## BANKRUPTCY PROVISIONS

Section 8.01.   Break-Up Fee; Noteholder Approval.

(a)    Subject to Noteholder and Bankruptcy Court approval, in the event that (i) this Agreement is terminated by the Company pursuant to Section 11.01(b) or by the Plan Investor pursuant to Section 11.01(c) and (ii) within six (6) months of such termination, the Company engages in an alternative transaction (an "***Alternative Transaction***") (through a chapter 11 plan of reorganization or otherwise) whereby a purchaser purchases all or substantially all of the Transferred Entities through one or a series of substantially contemporaneous transactions, then the Plan Investor shall be entitled to a break-up fee (the "***Break-Up Fee***") in the amount of $1,800,000 *provided that* if the Company does not engage in an Alternative Transaction during such 6-month period, but still confirms a chapter 11 plan of reorganization that is expected to provide a recovery to the Noteholders in an amount equal to or greater than $30,000,000 within twelve (12) months of confirmation thereof, then the Plan Investor shall instead be entitled to a Break-Up Fee in the amount of $900,000. In the event that this Agreement is terminated pursuant to Section 11.01(b) or by the Plan Investor pursuant to Section 11.01(c) and no Break-Up Fee could be due and owing under the terms of this Section 8.01(a), then the Plan Investor shall be entitled to an expense reimbursement (the "***Expense Reimbursement***") in an amount of up to $300,000 for reasonable and documented fees and expenses of the Plan Investor incurred in connection with the documentation and negotiation of this Agreement and the Transactions contemplated hereby. If due under the terms hereof, the Plan Investor shall be granted an allowed administrative claim against the Company in the amount of the Break-Up Fee or the Expense Reimbursement, as applicable, in accordance with Section 503(b)(l) of the Bankruptcy Code without further act, notice, deed or court order and shall not be subject to any challenge, objection, setoff or counterclaim. If owing hereunder in connection with an Alternative Transaction, the Break-Up Fee shall be payable in full upon the consummation of such Alternative Transaction. The Plan Investor acknowledges and agrees that the amounts payable under this Section 8.01(a) (x) shall constitute liquidated damages and not penalties and (y) shall, together with the right to seek the payment of such amounts (if and when due in accordance with the terms of this Section 8.01(a)), constitute the Plan Investor's sole recourse and sole remedy for any reason under this Agreement.

(b)    Within 14 days following the Agreement Date, the Company shall file a motion with the Bankruptcy Court reasonably satisfactory to the Plan Investor seeking approval by the Bankruptcy Court of the Company's entry into this Agreement and its undertakings hereunder, including the Break-Up Fee (the date on which such approval is received by the Bankruptcy Court being referred to herein as the "***Court Break-Up Fee Approval Date***"). Mishmeret shall support such motion and shall take all actions reasonably necessary to

23

support, and shall not oppose in any way, the approval of such motion, the Break-Up Fee and the Expense Reimbursement, and shall not oppose the payment thereof, unless Mishmeret shall have reasonable grounds to assert that the Break-Up Fee or the Expense Reimbursement is not payable hereunder.

(c)     Within 60 days of the Escrow Date, Mishmeret shall convene a meeting of the Noteholders to vote whether to approve or not approve the Transactions contemplated hereby (an affirmative vote to approve such Transactions, including directing the Trustee to act pursuant to Sections 7.02(b), Section 8.01(b), this Section 8.01(c) and Section 8.02(c), by the applicable requisite majority of Noteholders under the Deeds of Trust being referred to herein as the "***Noteholder Plan Approval***"), *provided that* if (i) the Company has filed a motion with the Bankruptcy Court seeking approval of a disclosure statement in respect of the Plan within 14 days of the Escrow Date and (ii) the Company seeks approval of disclosure materials in respect of the Plan in the Israeli Proceedings within 7 days of the entry of an order by the Bankruptcy Court approving a disclosure statement in support of the plan, then such period shall be extended automatically, as needed, to a maximum of up to an additional 90 days.  If at such meeting, Noteholder Plan Approval is not obtained on a final basis, then this Agreement shall automatically terminate and be of no continuing force and effect and the Plan Investor and the Company shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver to the Plan Investor the Escrowed Funds plus any accrued investment income or interest thereon.

(d)     Notwithstanding anything to the contrary contained in this Section 8.01, no Break-Up Fee or Expense Reimbursement will be due and owing to the Plan Investor if this Agreement is terminated as a result of a breach by the Plan Investor of its obligation to consummate the Closing when required pursuant to the terms of this Agreement or as a result of a material breach of any other of its covenants or agreements herein.

Section 8.02.   Confirmation Order.

(a)     The Company and Plan Investor acknowledge and agree that this Agreement and the Transactions are subject to entry of the Confirmation Order and the Ancillary Approval Orders that embodies the terms of this Agreement.  Notwithstanding the aforesaid, in the event of any discrepancy between this Agreement and the Confirmation Order, the Confirmation Order shall govern.

(b)     The Company shall use commercially reasonable efforts to give notice under the Bankruptcy Code and Israeli Insolvency Law and BVI laws of the request for a hearing with respect to the approval of the Transactions to all Persons entitled to such notice and other appropriate notice as required by the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court and corresponding rules in the Ancillary Proceedings, including such additional notice as the Bankruptcy Court or the Courts in the Ancillary Proceedings shall direct or as Plan Investor may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court or the Courts in the Ancillary Proceedings relating to this Agreement or the Transactions.

24

(c)    The Plan Investor and, subject in all respects to the receipt of Noteholder Plan Approval, Mishmeret on behalf of itself and the Noteholders, agrees that it shall support and take all actions necessary or reasonably requested by the Company to support, and shall not oppose in any way, the Plan and the Ancillary Approval Orders, the solicitation of votes with respect thereto, approval of a disclosure statement in support of the Plan, and, subject to Bankruptcy Court approval of such disclosure statement, confirmation and consummation of the Plan (and, for the avoidance of doubt, to not take any actions inconsistent with such obligations), including to promptly take such actions as are reasonably requested by the Company to assist in obtaining entry of the Confirmation Order and the Ancillary Approval Orders and a finding of adequate assurance of future performance, to the extent applicable, including furnishing witnesses, affidavits or other documents or information for filing with the Bankruptcy Court, and the courts in the Ancillary Proceedings, for the purposes, among others, of providing necessary assurances of performance by Plan Investor under this Agreement.

(d)    Without derogating from Section 8.02(a) above, the Company shall be responsible for making all necessary filings with the Bankruptcy Court and the courts in the Ancillary Proceedings, shall provide all necessary notices in connection therewith and shall bear any and all of its own expenses with respect thereof. The Company and Plan Investor shall consult with one another regarding substantive pleadings that any of them intends to file with the Bankruptcy Court or the courts in the Ancillary Proceedings in connection with, or which might reasonably affect the Bankruptcy Court's (or the courts' in the Ancillary Proceedings) approval or modification of, as applicable, the Plan and the Confirmation Order. The Company shall provide (or shall cause their Representatives to provide) Plan Investor with an advance draft of, and a reasonable opportunity to review and comment upon, the Confirmation Order (and the motion seeking approval of same) as soon as reasonably practicable prior to the date the Company intends to file such motion or proposed order and the Company shall consider any reasonable modifications of such documents requested by Plan Investor. Unless (i) this Agreement has been terminated in accordance with Article XI or (ii) the Company has breached any representation or warranty or failed to comply with any covenant or agreement applicable to the Company that would cause any Closing Condition not to be satisfied (provided such breach or failure has not been waived or cured) and Plan Investor is seeking to enforce its rights under this Agreement with respect to such breach or failure, Plan Investor shall not, without the prior written consent of the Company (which consent may not be unreasonably withheld or delayed), file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Reorganized Equity Interests or any other assets of the Company or any of its Affiliates. Plan Investor shall provide (or shall cause its Representatives to provide) the Company with advance drafts of, and a reasonable opportunity to review and comment upon substantive pleadings, motions, and supporting papers prepared by Plan Investor to be filed with the Bankruptcy Court or the courts in the Ancillary Proceedings in connection with the Transaction as soon as reasonably practicable prior to the date Plan Investor intends to file such motion, pleading or court filing, and Plan Investor shall make any reasonable modifications of such documents requested by the Company. In the event the entry of the Confirmation Order or any other Order of the Bankruptcy Court or the courts in the Ancillary Proceedings relating to this Agreement or the Transactions shall be appealed (or if any petition for certiorari or motion for

25

reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Confirmation Order or other such Order), the Company and Plan Investor shall use their respective commercially reasonable efforts to defend such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(e)      For the avoidance of doubt, the Plan Investor shall not be liable for administrative fees and expenses of the Company.

(f)      The Company shall request that the Confirmation Order entered by the Bankruptcy Court exempt the sale of the Reorganized Equity Interests to Plan Investor from any Transfer Taxes.

(g)      The Debtor shall propose and pursue confirmation of a Plan that embodies the terms of this Agreement and the Plan Investor shall support such Plan subject to receipt of a court-approved Disclosure Schedule.

Section 8.03.    Bankruptcy Milestones.    The Company shall use commercially reasonable efforts to:

(a)      have a hearing scheduled to consider confirmation of the Plan and the approval of the Confirmation Order for no later than 150 days from the Agreement Date; and

(b)      obtain entry of the Confirmation Order by no later than 165 days from the Agreement Date (collectively, the "***Bankruptcy Milestones***").

The Bankruptcy Milestones may be extended upon mutual agreement between the Company and Plan Investor or as necessary to accommodate the availability of the Bankruptcy Court and shall be subject to any extension provided for in Section 8.01(c).

## ARTICLE IX

## TAX MATTERS

Section 9.01.    Transfer Taxes.    The Parties acknowledge and agree that all Transactions shall occur pursuant to the Plan and accordingly, the Plan shall seek approval from Bankruptcy Court to consummate the Transactions with an exemption from Transfer Taxes pursuant to Section 1146(a) of the Bankruptcy Code to the maximum extent permitted thereby.

Section 9.02.    Income Tax Treatment.    The Parties agree that for all U.S. federal, state, and local income tax purposes, the Transactions shall be treated as a purchase by the Plan Investor of all of the assets of the Company for an amount equal to the Purchase Price, plus all liabilities to which the assets are subject (as determined for applicable Tax purposes) immediately following consummation of the Plan, and the Parties shall report consistently with such treatment for all U.S. federal, state, and local income tax reporting purposes.

# ARTICLE X

# CONDITIONS TO CLOSING

Section 10.01. <u>Conditions to Obligations of the Company</u>.  The obligation of the Company to consummate the Closing shall be subject to the satisfaction or waiver by the Company in its sole discretion, at or before the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties; Covenants</u>.

(i)    all representations and warranties of Plan Investor contained in this Agreement shall be true and correct as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, that, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Plan Investor's ability to perform its obligations under this Agreement and consummate the Transactions; <u>provided</u>, however, that for purposes of determining the satisfaction of the condition in this clause (i), no effect shall be given to the exceptions of "material" in such representations and warranties;

(ii)    the covenants contained in this Agreement required to be complied with by Plan Investor on or before the Closing shall have been complied with in all material respects, and

(iii)    the Company shall have received a certificate signed by an authorized officer of Plan Investor, dated as of the Closing Date, certifying as to the matters set forth in the foregoing clauses (i) and (ii).

(b)    <u>Governmental Approvals</u>.  All Required Approvals shall have been obtained or, if applicable, shall have expired, shall have been waived by the applicable Government Authority or shall have been terminated.

(c)    <u>No Order</u>.  There shall be no Order in existence that enjoins or otherwise prohibits the sale of the Reorganized Equity Interests pursuant to this Agreement or the other Transactions.

(d)    <u>Transaction Agreements</u>.  Plan Investor shall have executed and delivered to the Company all Plan Investor Transaction Agreements and the other deliverables contemplated by <u>Section 3.03(b)</u>.

(e)    <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order shall not be subject to any stay.

(f)    <u>Israeli Proceedings</u>.  Approval by the Israeli Court of the terms of this Agreement and all annexes thereto under Section 320 or Chapter C to the Israeli Insolvency law 2018 including without limitation the Plan, on terms reasonably acceptable to the Company.

(g)    <u>BVI Proceedings.</u>  Approval by the BVI Court of the terms of this Agreement, as approved pursuant to the Plan and Confirmation Order, and all annexes thereto, on terms reasonably acceptable to the Company.

Section 10.02. <u>Conditions to Obligations of Plan Investor</u>.  The obligations of Plan Investor to consummate the Closing shall be subject to the satisfaction or waiver by Plan Investor in its sole discretion, at or before the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties; Covenants</u>.

      (i)    all representations and warranties of the Company contained in this Agreement shall be true and correct as of the Closing as if made on the Closing Date, except as would not reasonably be expected to have a Material Adverse Effect;

      (ii)    the covenants contained in this Agreement required to be complied with by the Company on or before the Closing shall have been complied with in all material respects; and

      (iii)    Plan Investor shall have received a certificate signed by an authorized officer of the Company, dated as of the Closing Date, with respect to the matters set forth in the foregoing clause (i).

(b)    <u>Governmental Approvals</u>.  All Required Approvals shall have been obtained or, if applicable, shall have expired or been waived by the applicable Government Authority, have been terminated.

(c)    <u>No Order</u>.  There shall be no Order in existence that enjoins or otherwise prohibits the sale of the Reorganized Equity Interests pursuant to this Agreement or the other Transactions.

(d)    <u>The Company Transaction Agreements</u>.  The Company shall have executed and delivered, or caused to be executed and delivered, to Plan Investor all of the Company Transaction Agreements and the other deliverables contemplated by <u>Section 3.03(a)</u>; *provided that* failure of the Company to deliver any books or records of the Company or any Subsidiary shall not be a condition to closing hereunder.

(e)    <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order shall not be subject to any stay.

(f)    <u>Israeli Proceedings</u>.  Approval by the Israeli Court of the terms of this Agreement and all annexes thereto under Section 320 or Chapter C to the Israeli Insolvency law 2018 including without limitation the Plan, on terms reasonably acceptable to Plan Investor.

(g)    <u>BVI Proceedings.</u>  Approval by the BVI Court of the terms of this Agreement, as approved pursuant to the Plan and Confirmation Order, and all annexes thereto, in accordance with the terms of this Agreement.

(h)  <u>Noteholder Release</u>.  The Plan Investor shall have received a release from or on behalf of Mishmeret and the Noteholders as set forth in <u>Section 7.02(b)</u> hereof.

Section 10.03. <u>Frustration of Closing Conditions</u>.  Neither the Company nor Plan Investor may rely on the failure of any condition set forth in this <u>ARTICLE X</u> to be satisfied if such failure was caused by such Party's failure to act in good faith or to use reasonable best efforts to cause the Closing Conditions of each such other Party to be satisfied, including as required by <u>Section 6.04</u>.

Section 10.04. <u>Waiver of Closing Conditions</u>.  Upon the occurrence of the Closing, any condition set forth in this <u>ARTICLE X</u> that was not satisfied as of the Closing shall be deemed to have been waived as of and from the Closing.

## ARTICLE XI

## TERMINATION

Section 11.01. <u>Termination</u>.  Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing:

(a)  by the mutual written consent of the Company and Plan Investor;

(b)  by the Company, if the fiduciaries of the Company determine in good faith (after consultation with legal counsel) that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable Law (and, for the avoidance of doubt, a termination resulting from the Company's exercise of its fiduciary duty hereunder may give rise to payment of a Break-Up Fee in accordance with <u>Section 8.01(a)</u> hereof);

(c)  by either party, if the other party shall have breached any representation or warranty or failed to comply with any covenant or agreement that would cause any Closing Condition set forth in <u>Section 10.01(a)</u> or <u>Section 10.02(a)</u> not to be satisfied, and (i) such breach is not waived or (ii) if such breach is curable and is not cured by the breaching party prior to the earlier of (A) ten (10) Business Days after receipt of notice of the other party's intent to terminate and (B) the Outside Date; <u>provided</u>, <u>however</u>, that the terminating party is not then in material breach of this Agreement;

(d)  by either the Company or Plan Investor, if the Closing shall not have occurred by September 23, 2022 (the "***Outside Date***"); <u>provided</u>, <u>however</u>, that (i) if the Closing shall not have occurred due to the Closing Conditions set forth in <u>Section 10.01(b), (e), (f) or (g)</u> and <u>Section 10.02(b), (e), (f) or (g)</u> remaining unsatisfied or not waived and (ii) if all other Closing Conditions of the respective Parties shall have been fulfilled or waived (other than such Closing Conditions as are to be satisfied only at the Closing but subject to such conditions being capable of being satisfied as of the Outside Date), then no Party may terminate this Agreement pursuant to this <u>Section 11.01(d)</u> prior to December 31, 2022; <u>provided further</u>, that if the Closing shall not have occurred on or before the Outside Date or December 31, 2022, as applicable, due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Plan Investor or the

29

Company, then the breaching Party may not terminate this Agreement pursuant to this Section 11.01(d); or

(e)  by either the Company or Plan Investor, in the event that (i) any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the Transactions and such Order shall have become final and non-appealable (*provided*, *however*, that the right to terminate this Agreement under this Section 11.01(e)(i) shall not be available to the Company or Plan Investor whose action or failure to fulfill any obligation under this Agreement has been the cause of the issuance of such Order or other action), (ii) the Break-Up Fee is not approved by the Bankruptcy Court by 45 days from the Agreement Date, or (iii) a mutually acceptable Plan has not been annexed hereto as Exhibit A by 45 days from the Agreement Date.

Section 11.02. Notice of Termination.  If either the Company or Plan Investor desires to terminate this Agreement pursuant to Section 11.01, such Party shall give written notice of such termination to the other Party.

Section 11.03. Effect of Termination.

(a)  If this Agreement is terminated pursuant to Section 11.01, this Agreement shall thereupon become null and void and of no further force and effect, except for the provisions of (i) Section 3.02,  (ii) Section 6.03,  (iii) Section 8.01,  (iv) this  Section 11.03  and (v) Article XII.  Nothing in this Section 11.03 shall be deemed to release any Party from any Liability for any breach by such Party of any term of this Agreement or impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement; provided, however, that, if this Agreement is validly terminated pursuant to this Article XI, no Party shall have any remedy or right to recover for any Liabilities resulting from any breach of this Agreement unless the breaching Party willfully and knowingly committed fraud against the non-breaching Party with the specific intent to deceive and mislead the non-breaching Party regarding the representations and warranties made in this Agreement or if the Plan Investor failed to consummate the Closing when required pursuant to the terms of this Agreement, provided notwithstanding anything to the contrary contained in this Agreement, in no event shall the Plan Investor's liability hereunder exceed the aggregate amount of the Escrowed Funds and the Guaranty.

(b)  Notwithstanding Section 11.03(a), in the event of a termination of this Agreement after Plan Investor's deposit of Escrowed Funds only pursuant to Section 3.02(b) above, then Plan Investor and the Company shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver to the Company the Escrowed Funds plus any accrued investment income or interest thereon.  In any other event of Termination after Plan Investor's deposit of Escrowed Funds the Plan Investor and the Company shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver to the Plan Investor the Escrowed Funds plus any accrued investment income or interest thereon.

30

(c)     the parties acknowledge that the agreements contained in Section 11.03(b) are an integral part of the Transaction, and that without these agreements, the parties would not have entered into this Agreement; accordingly, if any party fails to deliver such Joint Written Instructions or timely pay any amount due pursuant to Section 11.03(b) and, in order to obtain the payment, the other party commences an Action which results in a judgement against such breaching party for any payment set forth in Section 11.03(b), and such breaching party shall pay the other party its costs and expenses (including attorney's fees and disbursements) in connection with such Action, together with interest on such payment at the Interest Rate through the date such payment was actually received.  Further, each party agrees that the other party may seek any other remedies at law or equity arising from such breach of this Agreement, pursuant to Section 12.17.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01. Rules of Construction.    The following rules of construction shall govern the interpretation of this Agreement:

(a)     references to "applicable" Law or Laws with respect to a particular Person, thing or matter means only such Law or Laws as to which the Government Authority that enacted or promulgated such Law or Laws has jurisdiction over such Person, thing or matter as determined under the Laws of the State of New York as required to be applied thereunder by the Bankruptcy Court; references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(b)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two (2) days after a triggering event and such event occurs on a Tuesday, then the action must be taken by Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(c)     whenever the context requires, words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender;

(d)     (i) the provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement and (ii) references to the terms "Article," "Section," "subsection," "subclause," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, subsections, subclauses, clauses, Schedules and Exhibits to this Agreement unless otherwise specified;

31

(e)    (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits thereto, (ii) the terms "thereof," "therein," "thereby," "thereto" and derivative or similar words refer to this Agreement to which the context refers, including the Schedules and Exhibits thereto, (iii) the terms "include," "includes," "including" and words of similar import when used in this Agreement mean "including, without limitation" unless otherwise specified, (iv) the term "any" means "any and all" and (v) where the context permits, the term "or" shall not be exclusive and shall mean "and/or";

(f)    (i) references to "days" means calendar days unless Business Days are expressly specified, (ii) references to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)) and (iii) references to "$" mean U.S. dollars;

(g)    accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control;

(h)    references to any Person includes such Person's successors and permitted assigns;

(i)    whenever this Agreement requires the Company or Plan Investor, as applicable, to take any action, such requirement shall be deemed to involve an undertaking to take such action or, to the extent possible, to cause any Transferred Entity to take such action on the part of (x) prior to Closing, the Company or (y) following Closing, Plan Investor, as applicable;

(j)    unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if";

(k)    references to "ordinary course of business" shall be deemed to refer to an action taken, or omitted to be taken, in the ordinary and usual course of the Company's and its Subsidiaries' business, consistent with past practice (including, for the avoidance of doubt, recent past practice in light of COVID-19); and

(l)    each Party has participated in the negotiation and drafting of this Agreement, and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision in this Agreement; the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.  Further, prior drafts of this Agreement or any ancillary agreements, schedules or exhibits thereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements, schedules or exhibits hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the Parties; and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of such prior drafts.

32

Section 12.02. <u>Expenses</u>.    Except as otherwise specified in the Transaction Agreements with respect to legal or other administrative fees or expenses payable by the Company in connection with any Plan, each Party will pay its own costs and expenses, including legal, consulting, financial advisor and accounting fees and expenses, incurred in connection with the Transaction Agreements and the Transactions, irrespective of when incurred or whether or not the Closing occurs.

Section 12.03. <u>Notices</u>.    All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed, or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this <u>Section 12.03</u>):

| If to the Company, to: | All Year Holdings Limited<br>12 Spencer Street, 3rd Floor<br>Brooklyn, NY 11211<br>Attn: Mr. Asaf Ravid and Mr. Ephraim Diamond<br>Email: ravidasaf@gmail.com<br>          ephraim@arbelcapital.com |
|---|---|
| with a copy (which will not constitute notice) to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention:  Gary Holtzer<br>                 Gavin Westerman<br>E-mails:    gary.holtzer@weil.com<br>                 gavin.westerman@weil.com |
| If to Plan Investor, to: | Paragraph Partners LLC Attention: Avi Philipson<br>E-mail: <u>aphilipson@graphgroup.com</u> |
| with a copy (which will not constitute notice) to: | Gissin & Co., Locke Lord LLP, Fried, Frank, Harris, Shriver & Jacobson LLP<br>Attention: Yael Hershkovitz, Shalom Jacob, Avi Feinberg<br>E-mail: <u>yael@gissinlaw.co.il</u>; <u>SJacob@lockelord.com</u>;<br>Avi.Feinberg@friedfrank.com |

Section 12.04. <u>Survival</u>.  Except to the extent that any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Effective Time.

Section 12.05. <u>Limitation on Liability</u>.    Notwithstanding anything in this Agreement or in any

other Transaction Agreement to the contrary, the sole recourse and sole remedy of the Plan Sponsor for any breach or other claim under this Agreement (whether against the Company or Wind Down Co.) shall be the right to seek the amounts payable under Section 8.01(a), in accordance with, and subject to the terms thereof. For the avoidance of doubt, the foregoing sentence shall not impact the application of (i) Section 2.02(b) or (ii) the Conditions to Closing provisions of Article X, in each case in accordance with its terms.

Section 12.06. Public Announcements. The initial press release with respect to the execution of this Agreement shall be a joint press release to be reasonably agreed upon by the Parties. Neither Party nor any Affiliate or Representative of such Party shall issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of the Transaction Agreements or the Transactions without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), except as a Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by order of the Bankruptcy Court or the courts in the Ancillary Proceedings, in which case Plan Investor and the Company, as applicable, will have the right to review and comment on such press release or announcement prior to publication.

Section 12.07. Severability. If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 12.08. Assignment. This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties. Neither Party may assign (whether by operation of Law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Parties; provided, however, that any Party may assign this Agreement and any or all rights and obligations under this Agreement to any of its controlled Affiliates; provided further, that, no such assignment shall release the assigning Party from any Liability under this Agreement. Any attempted assignment in violation of this Section 12.08 shall be void *ab initio*.

Section 12.09. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and, except with respect to the non-Contracting Parties pursuant to Section 12.18, or as expressly set forth in this Agreement, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party. Notwithstanding anything to the contrary in this Agreement, all rights and obligations of the Company or Wind Down Co, as applicable, shall vest in Wind Down Co, effective as of the Closing, upon the execution by Wind Down Co of a joinder to this Agreement.

Section 12.10. <u>Entire Agreement</u>.  This Agreement (including the Disclosure Schedules) and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.  To the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other Transaction Agreement (which, for the avoidance of doubt, excludes the Confirmation Order and any other Order of the Bankruptcy Court), this Agreement will govern and control.

Section 12.11. <u>Amendments</u>.  This Agreement (including all Exhibits and Schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

Section 12.12. <u>Waiver</u>.  At any time before the Closing, either the Company or Plan Investor may (a) extend the time for the performance of any obligation or other acts of the other Party, (b) waive any breaches or inaccuracies in the representations and warranties of the other Party contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance with any covenant, agreement or condition contained in this Agreement but such waiver of compliance with any such covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Any such waiver shall be in a written instrument duly executed by the waiving Party.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.13. <u>Governing Law</u>.  This Agreement, and any Action that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "***Transaction Dispute***"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York to be applied.

Section 12.14. <u>Dispute Resolution; Consent to Jurisdiction</u>.

(a)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12.03</u>; <u>provided</u>, <u>however</u>, upon the closing of the Bankruptcy Case, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S.

35

District Court for the Southern District of New York sitting in New York County or the Commercial Division of the Courts of the State of New York sitting in the County of New York and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

(i)      submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

(ii)      agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

(iii)      agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in <u>Section 12.03</u> of any process required by any such court, will be effective service of process; <u>provided</u>, <u>however</u>, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of New York.

(b)      The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of New York for any purpose except with respect to any Transaction Dispute.

Section 12.15. <u>Waiver of Jury Trial</u>.  To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.  Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement upon which such Party is relying and will rely in entering into this Agreement.  Each Party may file an original counterpart or a copy of this <u>Section 12.15</u> with any court as written evidence of the consent of each Party to the waiver of its right to trial by jury.

Section 12.16. <u>Admissibility into Evidence</u>.  All offers of compromise or settlement among the Parties or their Representatives in connection with the attempted resolution of any Transaction Dispute (a) shall be deemed to have been delivered in furtherance of a Transaction Dispute settlement, (b) shall be exempt from discovery and production and (c) shall not be admissible into evidence (whether as an admission or otherwise) in any proceeding for the resolution of the Transaction Dispute.

Section 12.17. <u>Remedies; Specific Performance</u>.

(a)      Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and

36

the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)     Each Party agrees that irreparable damage would occur, and the Parties would not have an adequate remedy at law, if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the other Party will be entitled to injunctive relief from time to time to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at Law or in equity.  Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement.  Each Party expressly disclaims that it is owed any duty not expressly set forth in this Agreement, and waives and releases all tort claims and tort causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

Section 12.18. <u>Non-Recourse</u>.  All claims, obligations, Liabilities, or causes of action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their permitted assignees ("***Contracting Parties***").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or Representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or Representative of, and any financial advisor or lender to any of the foregoing ("***Nonparty Affiliates***"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach thereof; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates.  Except as set forth in <u>Section 7.02</u>, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person or entity not a party to this Agreement (it being expressly agreed that the Nonparty Affiliates to whom this <u>Section 12.18</u> applies shall be third-party beneficiaries of this <u>Section 12.18</u>).

Section 12.19. <u>Interest</u>.  If any payment required to be made to a Party under this Agreement is made after the date on which such payment is due, interest shall accrue at the Interest Rate on such amount from (but not including) the due date of the payment to (and including) the date such payment is actually made.  All computations of interest pursuant to this Agreement shall be made on the basis of a year of three hundred sixty-five (365) days, in each case for the actual number of

days from (but not including) the first day to (and including) the last day occurring in the period for which such interest is payable.

Section 12.20. <u>Disclosure Schedules and Exhibits</u>.    The Disclosure Schedules, Schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.  Any capitalized terms used in any Exhibit or Schedule or in the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement.  The representations and warranties of the Company set forth in this Agreement are made and given subject to the disclosures contained in the Disclosure Schedules.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item. Any matter, information or item disclosed in the Disclosure Schedules, under any specific representation or warranty or Schedule or section thereof shall be deemed to be disclosed and incorporated by reference in any other Schedule or section of the Disclosure Schedules to the extent it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other Schedule(s) or section(s).  The inclusion of any matter, information or item in the Disclosure Schedules as an exception to a representation or warranty shall not be deemed to constitute (a) an admission of any Liability by the Company to any third-party, (b) an admission that any breach or violation of applicable Laws or any contract or agreement to which the Company is a party exists or has actually occurred, (c) an admission that such item is outside the ordinary course of business or not consistent with past practice, or (d) otherwise imply an admission that such item represents a material exception or material fact, event, circumstance or that such item has had, or would reasonably be expected to have a Material Adverse Effect.  The Disclosure Schedules have been arranged for purposes of convenience in separately titled Schedules corresponding to the Sections of this Agreement.

Section 12.21. <u>Provision Respecting Legal Representation</u>.  Each Party to this Agreement agrees, on its own behalf and on behalf of its Affiliates and Representatives, that Weil, Gotshal & Manges LLP may serve as counsel to Transferred Entities, on the one hand, and Wind Down Co, on the other hand, in connection with the negotiation, preparation, execution and delivery of the Transaction Agreements and the consummation of the Transactions, and that, following consummation of the Transactions, Weil, Gotshal & Manges LLP may serve as counsel to Wind Down Co or any Affiliate or Representative of Wind Down Co, in connection with any litigation, claim or obligation arising out of or relating to the Transactions and the Transaction Agreements notwithstanding such prior representation of any Transferred Entity and each Party consents thereto and waives any conflict of interest arising therefrom, and each Party shall cause its Affiliates to consent to waive any conflict of interest arising from such representation.

Section 12.22. <u>Privilege</u>.  Plan Investor, for itself and its Affiliates, and its and its Affiliates' respective successors and assigns, hereby irrevocably and unconditionally acknowledges and agrees that, other than in the case of potential willfully and knowingly committed fraud with the specific intent to deceive and mislead (such potential claims to be reasonably determined upon the advice of counsel), all attorney-client privileged communications between or among the Company, any other Transferred Entity and their respective current or former Affiliates or Representatives and their counsel, including Weil, Gotshal & Manges LLP and such other counsel provided on <u>Schedule 12.22</u>, made before the consummation of the Closing in connection with the negotiation,

38

preparation, execution, delivery and Closing under any Transaction Agreement, any Transaction Dispute or, before the Closing, any other matter, shall continue after the Closing to be privileged communications with such counsel and neither Plan Investor nor any of its former or current Affiliates nor any Person purporting to act on behalf of or through Plan Investor or any of its current of former Affiliates, shall seek to obtain the same by any process on the grounds that the privilege attaching to such communications belongs to Plan Investor, any of its Subsidiaries (including the Transferred Entities) or the Business.  Notwithstanding the foregoing, in the event that a dispute arises after the Closing between Plan Investor or any of its Subsidiaries (including the Transferred Entities), on the one hand, and a third-party other than Wind Down Co and its Affiliates, on the other hand, the Transferred Entities may assert the attorney-client privilege with respect to such communications to prevent disclosure of confidential communications to such third-party; provided, however, that the Transferred Entities may not waive such privilege without the prior written consent of, prior to the Closing, the Company or, following the Closing, Wind Down Co.  Furthermore, notwithstanding the foregoing, the Company shall provide such privileged communications to the Plan Investor to the extent such communications relate to both (i) the Transferred Entities or their Owned Real Property *and* (ii) matters which occurred prior to December 31, 2020.

Section 12.23. Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Company and Plan Investor have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**COMPANY:**

**ALL YEAR HOLDINGS LIMITED**

By: _____

Name:   Assaf Ravid
Title:    CRO

By: _____

Name: Ephraim Diamond
Title:  ARO

**PLAN INVESTOR:**

Paragraph Partners LLC

By: _____

Name:  Avi Philipson
Title: CEO

**Mishmeret:**

**Mishmeret Trust Company Ltd.,** as Trustee
solely in respect of Sections 7.02(b), 8.01(b), 8.01(c) and
8.02(c)

By: _____

     Name:

     Title:

## ANNEX A

## DEFINITIONS

"***Action***" means any action, suit, arbitration, audit, investigation or proceeding by or before any Government Authority.

"***Affiliate***" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; provided, however, that for the purposes of this Agreement (a) prior to the Closing, the Company and the other Transferred Entities shall not be deemed an Affiliate of Plan Investor and (b) after the Closing, Plan Investor shall be deemed an Affiliate of each of the Transferred Entities.

"***Agreement***" means this Investment Agreement, dated as of the Agreement Date, by and between the Company and Plan Investor, including the Disclosure Schedules and the Schedules, Exhibits, and all amendments to such agreement made in accordance with Section 12.11.

"***Agreement Date***" shall have the meaning as set forth in the Preamble.

"***Ancillary Proceedings***" means, as applicable, the BVI Proceedings and the Israeli Proceedings.

"***Assets***" means the assets, properties and rights (including tangible and intangible) that are owned, leased or licensed by any Transferred Entity.

"***Assumed Claims***" means all unsecured claims, whether liquidated or unliquidated, contingent or noncontingent, disputed or undisputed, and regardless of when arising, against the Company other than (a) the claims of the Noteholders, (b) Subordinated Claims, (c) claims brought by any plan administrator in connection with prior chapter 11 cases of former direct or indirect subsidiaries of the Company, and (d) contingent unliquidated damages in connection with potential indemnification claims from current or former directors or officers of the Company.

"***Bankruptcy and Equity Exception***" means the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Law relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"***Bankruptcy Case***" shall have the meaning as set forth in the Recitals.

"***Bankruptcy Code***" shall have the meaning as set forth in the Recitals.

"***Bankruptcy Court***" shall have the meaning as set forth in the Recitals.

"***Bankruptcy Milestones***" shall have the meaning as set forth in Section 8.02(b).

"***Business***" means the ordinary course business of the Company purchasing, owning, managing, maintaining, renting, and selling real property.

"***Business Day***" means any day that is not a Saturday, a Sunday or other day on which commercial banks in Israel or in the City of New York, New York are required or authorized by Law to be closed.

"***Business Names and Business Marks***" means the Trademarks of the Transferred Entities and Internet domain names embodying any of the foregoing.

"***BVI Proceedings***" shall have the meaning as set forth in the Recitals.

"***Closing***" shall have the meaning as set forth in Section 2.03.

"***Closing Conditions***" means conditions to the respective obligations of the Parties to consummate the Transactions, as set forth in ARTICLE X.

"***Closing Date***" shall have the meaning as set forth in Section 2.03.

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended.

"***Company***" shall have the meaning as set forth in the Preamble.

"***Company Knowledge Parties***" means Asaf Ravid and Ephraim Diamond.

"***Company Transaction Agreements***" means this Agreement and each other Transaction Agreement to which the Company is named as a party on the signature pages thereto.

"***Company Transactions***" means the transactions contemplated by the Company Transaction Agreements.

"***Confidentiality Agreement***" means the Confidentiality Agreement dated as of February 4, 2022, by and between Paragraph Partners LLC and the Company, as the same may be amended from time to time in accordance with its terms.

"***Confirmation Order***" shall be an order or orders of the Bankruptcy Court approving this Agreement and the terms and conditions hereof, and approving and authorizing the Company to consummate the Transactions, including to provide for the issuance of the Reorganized Equity Interests to the Plan Investor free and clear of all Liens (other than any restrictions under the Securities Act or any other applicable securities Laws or the Company's governing documents) and claims (other than the Assumed Claims), and any terms of such order or orders implicating these approvals or authorizations shall be in form and substance reasonably acceptable to the Plan Investor.

"***Consent***" means any consent, approval, signature, novation, waiver of rights or authorization.

"***Contract***" or "***Contractual***" means any written contract, agreement, undertaking,

indenture, note, bond, mortgage, lease, sublease, license, sublicense, sales order, purchase order or other instrument or commitment that purports to be binding on any Person or any part of its property (or subjects any such assets or property to a Lien).

"***Contracting Parties***" shall have the meaning as set forth in <u>Section 12.18</u>.

"***Control***" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.  The terms "Controlled by," "Controlled," "under common Control with" and "Controlling" shall have correlative meanings.

"***COVID-19***" means SARS-CoV-2 or COVID-19, and any evolutions or variants thereof or related or associated epidemics, pandemic or disease outbreaks.

"***COVID-19 Measures***" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester or any other Law, Order, Legal Action, directive, guideline or recommendation by any Governmental Body in connection with or in response to COVID-19, including the Coronavirus Aid, relief, and Economic Security Act (CARES).

"***Debt***" means, without duplication, (i) indebtedness or other obligations for borrowed money or in respect of loans or advances or issued in substitution for or exchange of indebtedness for borrowed money or loans or advances, whether short-term or long-term, secured or unsecured, (ii) any indebtedness or other obligations evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness or other obligations guaranteed, including guarantees in the form of an agreement to repurchase or reimburse or that assures a creditor against loss, (iv) any indebtedness or other obligations secured by a Lien on the Company's interest in any assets, and (v) all accrued interest, premiums, penalties (including any prepayment penalties or premiums) and other obligations related to any of the foregoing.

"***Debtor***" means the Company as debtor and debtor-in-possession under the Bankruptcy Code in the Bankruptcy Case.

"***DIP Loan Agreement***" means an agreement providing for debtor-in-possession financing to the Debtor, which financing will be paid in full at or prior to Closing pursuant to the Plan from the Cash Payment.

"***Disclosure Schedules***" means the disclosure schedules dated as of the Investor Signing Date delivered by the Company to Plan Investor, which form a part of this Agreement.

"***Effective Time***" means 11:59 p.m. (local time) on the last calendar day immediately preceding the Closing Date.

"***Equity Interest***" means any share, capital stock, partnership, limited liability company, membership or similar interest in any Person.

"***Escrow Agent***" shall have the meaning as set forth in <u>Section 3.02</u>.

"***Escrow Agreement***" means that certain Escrow Agreement to be entered into by and among the Escrow Agent, the Company and Plan Investor.

"***Escrowed Funds***" shall have the meaning as set forth in <u>Section 3.02</u>.

"***Excluded Assets***" means (a) any and all of the Company's direct or indirect rights (including the right to receive any income or proceeds) in and to (i) any collateral securing the Secured Notes, (ii) the Company's membership interests in YG WV LLC, and (iii) the assets described in the settlement agreements among the Company, DCP All Year Pref Equity LLC and DCP Kings Point LLC, (b) any and all claims, whether known or unknown, contingent, liquidated or disputed, that the Company or the Noteholders may have against any third-parties, including any current or prior officer, director or shareholder of the Company (subject to the releases provided in <u>Section 7.02</u> above), (c) such other assets listed on Schedule B hereto and (d) those assets vested in Wind Down Co pursuant to the Plan.  It being clarified that the rights and claims in (i) the Settlement agreement with regard to MY 2011 Grand LLC et al as approved by US Bankruptcy court on October 25, 2021 (case No. 19-23957 (RDD)), and (ii) the Lofts on Devoe LLC shall not be Excluded Assets.

"***Exhibits***" means the exhibits dated as of the Agreement Date (and as may be amended from time to time) which form a part of this Agreement.

"***Financial Statements***" shall have the meaning as set forth in Section 4.06.

"***GAAP***" means U.S. generally accepted accounting principles.

"***Government Approvals***" shall have the meaning as set forth in <u>Section 6.04(a)</u>.

"***Government Authority***" means any U.S. federal, state or local or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, ministry, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body.

"***Interest Rate***" means the rate designated from time to time in Section 6621(a)(2) of the Code, compounded on a daily basis.

"***Investor Signing Date***" means March 2, 2022.

"***Israeli Proceedings***" shall have the meaning as set forth in the Recitals.

"***IRS***" means the U.S. Internal Revenue Service.

"***Joint Written Instructions***" means written instructions executed by each of Plan Investor and prior to the Closing, the Company, or following the Closing, Wind Down Co, a form of which is attached to the Escrow Agreement as an exhibit thereto.

"***Knowledge of the Company***" or "***Company Knowledge***" means the actual knowledge, as of the Investor Signing Date of the Company Knowledge Parties.

"***Law***" means any U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, Order or other requirement or rule of law (including common law) promulgated by a Government Authority.

"***Liabilities***" means any liability, Debt, guarantee, claim, demand, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or known or unknown, due or to become due) of any kind, nature or and description, including all costs and expenses related thereto, regardless of whether or not required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether or not immediately due and payable.

"***Lien***" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien (as defined in Section 101(37) of the Bankruptcy Code) or charge of any kind.

"***Material Adverse Effect***" means any fact, event, change, effect, development, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (A) the ability of the Company to perform its obligations hereunder and consummate the Transactions or (B) the business, operations, properties, Assets, Liabilities or financial condition of the Business; provided, that none of the following, either alone or in combination, will constitute a Material Adverse Effect: (i) any change in the United States or foreign economies or securities or financial markets in general (including any decline in the price of securities generally or any market or index); (ii) any change that generally affects any industry in which the Business operates; (iii) general business or economic conditions in any of the geographical areas in which the Business operates; (iv) national or international political or social conditions, including any change arising in connection with, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions, whether commenced before or after the Investor Signing Date and whether or not pursuant to the declaration of a national emergency or war; (v) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any pandemic, epidemic, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (vi) any actions specifically required to be taken or omitted pursuant to this Agreement or any other Transaction Agreement or actions taken or omitted to be taken at the express written request, or with the expressly written consent, of Plan Investor; (vii) any changes in applicable Laws or GAAP; (viii) the pendency of the Bankruptcy Case or the Ancillary Proceedings, any Order of the Bankruptcy Court and any actions or omissions of the Company or any other Transferred Entity in compliance with such Orders; (ix) any change resulting from (A) the public announcement of the entry into this Agreement or (B) the consummation of the Transactions; (x) any internet or "cyber" attack or hacking; (xi) any effects or changes arising from or related to the breach of this Agreement by Plan Investor; or (xii) any effects or changes arising from or related to COVID-19 or any COVID-19 Measure that relates to, or arises out of, an epidemic, pandemic or disease outbreak (including the COVID-19 pandemic) or any change in such COVID-19 Measure following the Investor Signing Date or any Transferred Entity's compliance therewith; provided, that that the exceptions set forth in clauses (i) through (v) of this definition shall not be regarded as exceptions solely to the extent that any such described event has a disproportionately adverse impact on the Business, as compared to other companies in the industries in which the Business

operates.

"***Material Contracts***" shall have the meaning set forth in Section 4.10(a).

"***New Shares***" shall have the meaning as set forth in the Recitals.

"***Nonparty Affiliates***" shall have the meaning as set forth in Section 12.18.

"***Order***" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Government Authority.

"***Outside Date***" shall have the meaning set forth in Section 11.01(e).

"***Party***" or "***Parties***" means, individually or collectively, Plan Investor and the Company.

"***Permits***" means all permits, licenses, approvals, authorizations, registrations, concessions, grants, franchises, certificates (other than aviation-related certificates) and waivers issued or required by any Government Authority under applicable Law.

"***Permitted Liens***" means (a) Liens in respect of any liabilities and obligations reflected in the Company Financial Statements, (b) with respect to the Owned Real Property and leased real property of the Company and the Company Subsidiaries, (i) defects, exceptions, restrictions, rights of way, easements, covenants, encroachments and other imperfections of title, none of which materially impair or interfere with the present users of such property, and (ii) zoning, entitlement, land use, environmental regulations, and building restrictions, none of which materially impair or interfere with the present uses of such property, (c) Liens for current Taxes not yet delinquent or being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP on the Company Financial Statements, (d) mechanics', carriers', workmen's, repairmen's or other like Liens that arise or are incurred in the ordinary course of business for amounts not yet due and payable; (e) Liens to be released on or prior to the Closing Date, solely to the extent actually so released, and (f) any other Liens that, individually or in the aggregate, do not materially impair the continued use and operation, or materially detract from the value, of the assets or properties to which they relate.

"***Person***" means any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association or organization or other legal entity.

"***Plan***" means the chapter 11 plan of reorganization to be filed in the Bankruptcy Case with respect to the Debtor (including all exhibits, supplements, appendices and schedules thereto), in substantially the form to be attached hereto as Exhibit A or, in connection with material terms in the Plan related to this Agreement or the consummation of Plan Investor Transactions, reasonably acceptable to Plan Investor and Mishmeret, as such may be amended, supplemented or modified from time to time in accordance with the terms and conditions herein.

"***Plan Investor***" shall have the meaning as set forth in the Preamble.

"***Plan Investor Transaction Agreements***" means this Agreement and each other Transaction Agreement to which Plan Investor is named as a party on the signature pages thereto.

"***Plan Investor Transactions***" means the transactions contemplated by the Plan Investor Transaction Agreements.

"***Pre-Closing Period***" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is terminated in accordance with its terms.

"***Purchase Price***" shall have the meaning as set forth in Section 3.01.

"***Recovering Creditors***" means the holders of unsecured claims against the Debtor, allowed by the Bankruptcy Court as required pursuant to the Plan, other than the holders of Assumed Claims and the holders of Subordinated Claims.

"***Reorganized Debtor***" means the Debtor as reorganized pursuant to the Plan and Confirmation Order upon the Effective Date.

"***Reorganized Equity Interests***" shall have the meaning as set forth in the Recitals.

"***Representative***" of a Person means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, investment bankers or other representatives of such Person.

"***Required Approvals***" means the approvals of the Government Authorities set forth on Schedules 10.01(b) and 10.02(b).

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Subordinated Claims***" means any claims against the Debtor subject to subordination pursuant to Section 510(b) of the Bankruptcy Code, and any claim for or that arises from the rescission of a purchase, sale, issuance or offer of a security of the Debtor, or for damages arising from the purchase of sale of such a security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such claim and including class action (CA 20-04-15257) or other similar class action lawsuits brought in Israel

"***Subsidiary***" of any specified Person means any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding equity securities or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such Person.

"***Subsidiary Value***" means the allocation of the Purchase Price for a Subsidiary as set forth on Schedule 4.02.

"***Tax***" or "***Taxes***" means all U.S. federal, state, local, foreign and other income, excise, gross receipts, ad valorem, value-added, sales, use, production, employment, unemployment, severance, franchise, profits, registration, license, lease, service, service use,

environmental, recording, documentary, filing, permit or authorization, stamp, business and occupation, gains, property, leasing, transfer, payroll, intangibles or other taxes, duties, levies or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"*Tax Returns*" means all returns, reports and other filings (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates, claims (including claims for refunds) and information returns) supplied or required to be supplied to a Taxing Authority relating to Taxes or otherwise appropriate, including any amendments thereof.

"*Taxing Authority*" means any U.S. federal, state, local or non-U.S. jurisdiction (including any subdivision and any revenue agency of a jurisdiction) imposing Taxes and the agencies, if any, charged with the collection, administration or enforcement of such Taxes for such jurisdiction.

"*Third-Party Consents*" shall have the meaning as set forth in <u>Section 6.05</u>.

"*Transaction Agreements*" means this Agreement, the Escrow Agreement and any other agreements, instruments or documents required to be delivered at the Closing, in each case including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"*Transaction Dispute*" shall have the meaning as set forth in <u>Section 12.13</u>.

"*Transactions*" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"*Transfer Taxes*" means all sales, harmonized use, excise, ad valorem, direct or indirect real property, transfer, intangible, stamp, business and occupation, value added, recording, documentary, filing, permit or authorization, leasing, license, lease, service, service use, severance Taxes together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"*Transferred Entities*" shall have the meaning as set forth in the Recitals.

"*Transferred Equity Interests*" shall mean the Equity Interests in the Transferred Entities (other than the Company).

"*Tenant*" means any Person who holds or possesses any property (or portion of any property) that is directly or indirectly owned by any of the Transferred Entities.

"*U.S.*" means the United States of America.

"*William Vale Hotel*" means that certain real property located in Brooklyn, New York having an address of 55 Wythe Avenue, Brooklyn, NY and all rights related thereto.

"*Wind Down Co*" means a liquidating trust or other entity formed for the primary

purpose of liquidating the estate of the Debtor and distributing the proceeds thereof and the proceeds from the sale of the Reorganized Equity Interests in accordance with the Plan.

## **Exhibit B**

**Proposed Order**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X
                                                        :
**In re**                                               :    **Chapter 11**
                                                        :
**ALL YEAR HOLDINGS LIMITED,**                          :    **Case No. 21-12051 (MG)**
                                                        :
              **Debtor.**[1]                            :
                                                        :
**Fed. Tax Id. No. 98-1220822**                         :
---------------------------------------------------------X

**ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363,**
**AND 503(b) AND FED. R. BANKR. P. 2002, 6004, AND 9014**
**(I) APPROVING BID PROTECTIONS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**"),[2] dated March 25, 2022 [ECF No. [__]], of

All Year Holdings Limited, as debtor and debtor in possession (the "**Parent Debtor**") in the

above-captioned chapter 11 case (the "**Chapter 11 Case**"), pursuant to sections 105(a), 363

and 503(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004,

and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

Rule 9014-2 of the Local Bankruptcy Rules for the Southern District of New York, for entry of an

order (a) authorizing and approving the terms for the proposed payment of the Break-Up Fee and

---

[1]    The Parent Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such
       terms in the Motion or the Investment Agreement, as applicable.

Expense Reimbursement (each as defined below) as set forth in that certain investment agreement

dated March 11, 2022 (the "**Investment Agreement**"), annexed as **Exhibit A** to the Motion, by

and among the Parent Debtor, Paragraph Partners LLC (the "**Plan Investor**"), and, with respect to

Sections 7.02(b), 8.01(b), 8.01(c), and 8.02(c) thereof, Mishmeret Trust Company Ltd.

(the "**Trustee**"), solely as trustee for the various series of bonds issued by the Parent Debtor, and

(b) granting related relief, all as more fully set forth in the Motion; and upon the Schechtman

Declaration (annexed as **Exhibit C** to the Motion); and the Court having held a hearing to consider

the relief requested in the Motion (the "**Hearing**"); and upon the record of the Hearing; and all

objections, if any, to the Motion having been withdrawn, resolved, or overruled; and upon all of

the proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor,

<strong>IT IS HEREBY FOUND AND DETERMINED THAT:[3]</strong>

A.    <u>Jurisdiction and Venue</u>.    Consideration of the Motion and the relief

requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court has jurisdiction to consider the relief

requested in accordance with 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of

Reference M-431, dated January 31, 2012 (Preska, C.J.).

B.    <u>Bid Protections</u>.  The Investment Agreement provides for the following bid

protections (collectively, the "**Bid Protections**"):

a.    <u>Break-Up Fee</u>:  In the event that (A) the Investment Agreement is terminated (I) by
the Parent Debtor in exercising its "fiduciary out" under Section 11.01(b) or (II) by
the Plan Investor under Section 11.01(c) due to Parent Debtor's breach of a
representation or warranty or failure to comply with a covenant or agreement that

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To
the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the
extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

WEIL:\98554564\1\12817.0007

would prevent the satisfaction of a closing condition, and (B) within six (6) months of such termination, the Parent Debtor engages in an alternative transaction, through a chapter 11 plan or otherwise (an "**Alternative Transaction**"), whereby a purchaser purchases substantially all of the Transferred Entities through a or a series of substantially contemporaneous transactions, then the Plan Investor shall be entitled to a break-up fee in the amount of $1,800,000; *provided that*, if the Parent Debtor does not engage in an Alternative Transaction during such 6-month period, but still confirms a chapter 11 plan that is expected to provide a recovery to the Bondholders in an amount equal to or greater than $30,000,000 within twelve (12) months of confirmation thereof, then the Plan Investor shall instead be entitled to a Break-Up Fee in the amount of $900,000 (the "**Break-Up Fee**").

b.  Expense Reimbursement.  In the event that the Investment Agreement is terminated (A) by the Parent Debtor in exercising its "fiduciary out" under Section 11.01(b) or (B) by the Plan Investor pursuant to Section 11.01(c) due to Parent Debtor's breach of a representation or warranty or failure to comply with a covenant or agreement that would prevent the satisfaction of a closing condition, and no Break-Up Fee could be due and owing under the terms of Section 8.01(a) of the Investment Agreement, then the Plan Investor shall be entitled to an expense reimbursement (the "**Expense Reimbursement**") in the amount of up to $300,000 for reasonable and documented fees and expenses incurred by the Plan Investor in connection with the documentation and negotiation of the Investment Agreement and the transactions contemplated thereunder.

The Bid Protections are reasonable and appropriate, will encourage, and not "unduly hamper," bidding on the Parent Debtor's assets, and represent the best method for maximizing the value of the Parent Debtor's estate.

C.  Adequate Notice.  Due and proper notice of the relief requested in the Motion and a reasonable opportunity to object or be heard regarding the relief granted herein has been afforded to all parties in interest in this Chapter 11 Case.

D.  Relief is Warranted.  The Parent Debtor has articulated good and sufficient reasons for approving the Bid Protections, and the legal and factual bases set forth in the Motion and the Schechtman Declaration establish just and sufficient cause to grant the relief requested therein.

**IT IS HEREBY ORDERED THAT**

1.      The Motion is granted to the extent set forth herein.

2.      The Bid Protections, on the terms set forth in the Investment Agreement, are approved. To the extent that either the Break-Up Fee or Expense Reimbursement become due and owing, the Parent Debtor is hereby authorized to pay in cash any amounts owed to the Plan Investor on account of the Break-Up Fee or the Expense Reimbursement, as applicable, in accordance with the terms of the Investment Agreement without further action or order by the Court.

3.      If payable, the Break-Up Fee or the Expense Reimbursement, as applicable, shall constitute an allowed administrative expense pursuant to section 503(b)(1) of the Bankruptcy Code.

4.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

5.      The Parent Debtor is authorized to take all action necessary to effectuate the relief granted in this Order.

6.      This Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2022
      New York, New York

                                   _____
                                   HONORABLE MARTIN GLENN
                                   CHIEF UNITED STATES BANKRUPTCY JUDGE

## **Exhibit C**

**Schechtman Declaration**

WEIL:\98554564\1\12817.0007

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                             :
**In re**                                                    :    **Chapter 11**
                                                             :
**ALL YEAR HOLDINGS LIMITED,**                               :    **Case No. 21-12051 (MG)**
                                                             :
                        **Debtor.**[1]                       :
                                                             :
**Fed. Tax Id. No. 98-1220822**                              :
-------------------------------------------------------------X

**DECLARATION OF DAVID B. SCHECHTMAN**
**IN SUPPORT OF MOTION OF PARENT DEBTOR**
**PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 503(b) AND**
**FED. R. BANKR. P. 2002, 6004, AND 9014 FOR ENTRY OF ORDER**
**(I) APPROVING BID PROTECTIONS AND (II) GRANTING RELATED RELIEF**

I, David B. Schechtman, pursuant to section 1746 of title 28 of the United States

Code, hereby declare that the following is true and correct to the best of my knowledge,

information, and belief:

1.      I am a Senior Executive Managing Director with Meridian Investment Sales

("**MIS**"), a leading investment sales firm based in New York City, which is a segment of Meridian

Capital Group, LLC, one of the nation's leading real estate finance advisory firms ("**Meridian**

**Capital**" and, collectively with MIS and Meridian Capital's broker-dealer affiliate Tigerbridge

---

[1]      The Parent Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

Capital LLC d/b/a Meridian Securities, "**Meridian**"). I am over the age of 18 and competent to testify.

2.    I submit this declaration (this "**Declaration**") in support of the *Motion of Parent Debtor Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(b) and Fed. R. Bankr. P. 2002, 6004, and 9014 for Entry of Order (I) Approving Bid Protections and (II) Granting Related Relief* (the "**Motion**"),[2] filed contemporaneously herewith.

3.    Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the operations and finances of All Year Holdings Limited (the "**Parent Debtor**") and its direct and indirect non-debtor subsidiaries (collectively, the "**Company**"), personal knowledge gleaned during the course of my engagement, personal knowledge based on my restructuring asset sale experience, my discussions with the Parent Debtor's senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Company's operations and financial affairs. I am authorized to submit this Declaration on behalf of the Parent Debtor. If called upon to testify, I could and would testify competently to the facts set forth herein.

## Qualifications

4.    Founded in 1991, Meridian is the country's most active dealmaker and one of the nation's leading commercial real estate finance, investment sales and retail leasing advisors. Since its inception, Meridian has closed more than $425 billion in transactions with a full complement of capital providers, including local, regional and national banks, CMBS lenders, agency lenders, mortgage REITs, life insurance companies, credit unions and private equity funds.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion or the Investment Agreement, as applicable.

WEIL:\98545001\10\12817.0007

Meridian represents many of the world's leading real estate investors and developers and its expansive platform has specialized practices for a broad array of property types including office, retail, multifamily, hotel, mixed-use, industrial, and healthcare and senior housing properties. In 2020, Meridian closed approximately $40 billion in financing across more than 250 unique lenders. Meridian is headquartered in New York City, has approximately 305 employees, and has offices in New Jersey, Maryland, Illinois, Ohio, Florida, and California.

5.     I have over fifteen years of real estate brokerage, sales, advisory, valuation, and appraisal experience. I joined MIS as Senior Executive Managing Director and the Head of Investment Sales in August 2015 shortly after the firm formalized its investment sales division. In my capacity as Senior Executive Managing Director, I lead Meridian's Middle Market Group, which focuses on complex, middle market transactions and advisory assignments primarily in New York City, and oversee a team of thirty-two originators, analysts, and other professionals.

6.     I spent the first six years of my career as an associate at Piper Marbury Rudnick & Wolfe LLP and then at DLA Piper in the restructuring practice group, focusing primarily on real estate-related chapter 7 and chapter 11 cases. Prior to joining MIS, I was a Principal and Executive Managing Director at Eastern Consolidated, a real estate brokerage firm. I received my Bachelor of Arts degree from the University of Delaware and my juris doctor from the Benjamin Cardozo School of Law, where I graduated *magna cum laude*. I am an active member of the New York Bar.

7.     I have executed more than 806 sales and recapitalization transactions exceeding $8.2 billion in value, concentrated primarily in the five boroughs of New York and have an extensive track record for closing complex transactions. I am regularly engaged by institutions, private investors, family offices, lenders, and bankruptcy estates and their advisors, to value,

3

market, and sell multifamily properties, development sites, and other real estate in New York City and elsewhere.

8.      I have frequently been called upon by The Wall Street Journal, The Real Deal, The Stoler Report, and other media outlets to comment on the state of the New York real estate market.  I am a member of the Board of Directors of the Commercial Committee of the Real Estate Board of New York and am a New York State licensed real estate educator.  I have been invited to speak as a guest lecturer at Columbia University, the Real Estate Board of New York, law firms, and other fora, where I have presented on foreclosure and bankruptcy asset sales.  I have served as an expert witness on New York real estate matters in testifying and non-testifying roles.

9.      Over the course of my real estate brokerage career, I have been exclusively engaged in more than fifteen chapter 11 cases and have appeared or been retained in more than thirty bankruptcy cases by debtors, creditors, and trustees to value and market for sale various properties in New York City.  Representative bankruptcy engagements include, but are not limited to, the following chapter 11 cases:  *In re Borda Products, Inc.*, Case No. 07-11908 (RDD) (Bankr. S.D.N.Y. 2007); *In re Saint Vincents Catholic Medical Centers of New York*, Case No. 10-11963 (CGM) (Bankr. S.D.N.Y 2010); *In re Congregation Achpretvia Tal Chaim Shar Hayushor, Inc.*, Case No. 16-10092 (MEW) (Bankr. S.D.N.Y. 2016); *In re The Arc Building LP*, Case No. 11-46388 (NHL) (Bankr. E.D.N.Y. 2012); *In re Nevada Star, LLC*, Case No. 10-26188 (PC) (Bankr. C.D. Cal. 2010); *In re Greenwich Street Developers, LLC*, Case No. 09-15440 (ALG) (Bankr. S.D.N.Y 2009); *In re Direct Realty, LLC*, Case No. 12-11483 (MG) (Bankr. S.D.N.Y. 2012); *In re 74 Grand St. Equities, LLC*, Case No. 17-13295 (SCC) (Bankr. S.D.N.Y. 2017); *In re Hampton Bay Manor, LLC*, Case No. 19-40749 (JMM) (Bankr. E.D.N.Y 2019).

4

### Background

10.    In March 2021, Meridian was engaged by the Parent Debtor to serve as its exclusive real estate finance broker to procure an equity recapitalization on behalf of the Parent Debtor and its subsidiaries.  The terms of Meridian's recapitalization engagement are set forth in that certain *Exclusive Agreement Regarding the Recapitalization of All Year Holdings Limited*, dated April 13, 2021 (as amended by that certain first amendment, dated August 10, 2021, that certain second amendment dated September 24, 2021, that certain third amendment dated November 9, 2021, and as may be further modified, amended, or supplemented from time to time, the "**Recapitalization Engagement Letter**").

11.    On December 14, 2021, the Parent Debtor commenced a voluntary case (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Parent Debtor filed an application to retain Meridian, as its exclusive real estate finance broker in the Chapter 11 Case, on January 14, 2022 [ECF No. 30] (the "**Retention Application**").   A copy of the Recapitalization Engagement Letter was annexed as an exhibit to the Retention Application.[3]

### The Marketing Process

12.    The Parent Debtor engaged Meridian to solicit interest and offers from potential third-party investors to either recapitalize the Parent Debtor or undertake an outright purchase of the Parent Debtor (the "**Marketing Process**").  The Company owns and operates an extensive portfolio of properties comprised of more than one hundred buildings located throughout Brooklyn, New York, and Meridian devoted months to marketing the Parent Debtor.  Throughout

---

[3]    The Parent Debtor and Meridian are working with the Office of the United States Trustee to finalize a supplemental declaration with respect to Meridian's retention application and hope to be in a position to submit a consensual retention order to the Court shortly.

WEIL:\98545001\10\12817.0007

the Marketing Process, the Parent Debtor and Meridian undertook extensive efforts to ensure that

the process was broad, transparent, inclusive, efficient, and value-maximizing.

13.     In March 2021, Meridian began working closely with the Parent Debtor to

compile various materials and proprietary information about the Company for the purpose of

establishing a virtual data room and due diligence library to enhance and facilitate the Marketing

Process, which Meridian regularly updated throughout the process.  Meridian conducted site visits

of all of the Company's properties and prepared a comprehensive offering memorandum.

Additionally, at the outset of the Marketing Process, Meridian tapped its institutional knowledge

and experience to identify a pool of approximately forty potential third-party investors, including

family offices and private equity firms, which possessed the sophistication, financial wherewithal,

and operational expertise necessary to consummate a transaction for the Parent Debtor.  The

investors comprising this initial pool were identified because, among other reasons, they are active

participants in the Brooklyn real estate market, are known for having extensive resources and

equity partners, and are capable of navigating the complexities inherent in any transaction

involving the Parent Debtor.

14.     On or around April 13, 2021, Meridian invited each of the third-party

investors to participate in the Marketing Process.  Of this initial pool of potential investors,

thirty-seven executed confidentiality agreements.  Each interested party that executed a

confidentiality agreement was given access to the data room, which contained, among other things,

the offering memorandum, detailed financial information, and property-level information

regarding real estate taxes, income, and expenses.  Thereafter, Meridian arranged more than 125

discussions with interested parties, many of which included the Parent Debtor, to, among other

things, answer diligence questions, discuss potential deal structures, and assist investors in formulating their bids.

15.     Following an approximately two-month due diligence and review period, the Parent Debtor, through Meridian, requested that interested parties submit initial bids. Six written bids were submitted (the "**Initial Bids**").  The Parent Debtor, in consultation with Meridian, evaluated the Initial Bids, focusing on several criteria, including, but not limited to: (a) the proposed purchase price and forms of consideration; (b) the proposed deal structure; (c) any proposed percentage ownership to be left with the holders of the Parent Debtor's various series of bonds (the "**Bondholders**") and other general unsecured creditors; (d) any diligence contingencies; and (e) the proposed amount of any deposit.

16.     Negotiations regarding the Initial Bids occurred between May and June 2021, and included, among other things, several Zoom sessions among the bidders and the Parent Debtor and its advisors.  Following extensive negotiations and the opportunity to conduct further diligence, the Parent Debtor received six refined bids (the "**Refined Bids**"), which the Parent Debtor, in consultation with Meridian, evaluated based on the criteria used to evaluate the Initial Bids.  The Parent Debtor and Meridian also sought input from Mishmeret Trust Company Ltd., as trustee (the "**Trustee**") for the Bondholders, so as to better understand which proposed transactions were likely to be supported by the Bondholders.

17.     After initially engaging on an exclusive basis with one potential investor which ultimately did not lead to a definitive agreement, the Parent Debtor received three revised bids for potential transactions (the "**Revised Bids**").  Following a thorough review and analysis of the Revised Bids based on the criteria used throughout the Marketing Process, as well as scores of conversations among the Parent Debtor, Meridian, and the bidders which drove the bidders to

7

augment their offers, the Parent Debtor, in consultation with Meridian, determined that two of the bids, including the bid submitted by Paragraph Partners LLC ("**Plan Investor**"), contained materially better economic terms and thus were more likely to result in a value-maximizing transaction.

18.     Following the commencement of the Chapter 11 Case, Meridian continued facilitating discussions among the Parent Debtor, the Trustee, and the bidders who had submitted the Revised Bids.  After extensive parallel track negotiations, the Parent Debtor, in consultation with Meridian, thoroughly reviewed the near-finalized investment agreements, focusing on, among other things, the following criteria: (a) the proposed purchase price, (b) the bidder's willingness to assume potential liabilities of the Parent Debtor; (c) the bidder's willingness to submit a cash deposit; (d) any limitation on the Parent Debtor's ability to pursue Alternative Transactions; and (e) any diligence exclusivity.

19.     Based on this criteria and review, Meridian advised the Parent Debtor that the Plan Investor's bid and related investment agreement represented the best actionable transaction to maximize value.  Accordingly, with the consent of the Trustee and the approval of the Parent Debtor's joint provisional liquidators, the Parent Debtor entered into the investment agreement with the Plan Investor on March 11, 2022, a copy of which, excluding the accompanying schedules, is attached to the Motion as **Exhibit A** (the "**Investment Agreement**").

### Reasonableness of the Bid Protections

20.     Based on my professional experiences as both a real estate broker and a restructuring attorney, bid protections, including break-up fees and expense reimbursements, are an essential and common tool used in real estate transactions implemented through a bankruptcy process to induce prospective purchasers to make a firm commitment to the transaction, given the fiduciary duties imposed on debtors in possession to maximize value for the benefit of

WEIL:\98545001\10\12817.0007

stakeholders, and are broadly accepted by bankruptcy courts.  I believe that, by providing bid protections in exchange for a prospective purchaser's firm commitment, a prospective seller receives a level of certainty that may be otherwise unavailable absent such protections due to the unique challenges and uncertainty inherent in bankruptcy transactions.

21.     In addition to certainty, I believe that bid protections provide a prospective seller with flexibility to consider alternative transaction proposals that exceed the sum of the prospective purchaser's bid and that the protections are especially important in a competitive bidding situation because the prospective purchaser's committed bid sets the floor for other interested parties.  Accordingly, in my professional experience, bid protections are a standard and customary means to provide tremendous value to a prospective seller and to facilitate a value-maximizing transaction.

22.     In my experience, after reaching agreement on the terms of a value-maximizing transaction, a debtor often seeks the approval of bid protections to, among other things, (a) induce the proposed purchaser to firmly commit to such transaction; and (b) compensate the proposed purchaser for the time, risk, and expense associated with (i) moving forward with a transaction in a potentially uncertain bankruptcy process and (ii) setting a floor for other potential purchasers who seek to propose an alternative transaction.  By implementing bid protections, which may be a condition to a purchaser's firm commitment, I believe that a debtor is able to demonstrate to critical stakeholders that the enterprise will be able to survive and emerge from chapter 11.  Accordingly, when serving as a debtor's real estate broker, I regularly advise such debtor to consent to providing bid protections when requested by a prospective purchaser.

23.     Based on my professional experience, I believe that the facts and circumstances of the specific transaction largely influences the amount of bid protections a debtor

WEIL:\98545001\10\12817.0007

should reasonably provide, and the following factors are typically relevant: (a) the timeline for consummating a transaction; (b) the need for certainty; (c) the purchase price; (d) whether "credible" alternatives exist; (e) whether an adequate "market-test" has occurred following comprehensive and professional marketing process; (f) whether the prospective buyer has the sophistication and financial wherewithal to close the transaction; and (g) whether the prospective buyer requires bid protections to proceed with a transaction.

24.      In the instant case, over the course of approximately twelve months, the Parent Debtor, with assistance from my team of advisors at Meridian, conducted a broad, transparent, inclusive, efficient, and comprehensive Marketing Process that adequately tested the market.  The Marketing Process resulted in the Parent Debtor's entry into the Investment Agreement with the Plan Investor, which the Parent Debtor determined, in its business judgment, represented the best actionable transaction to maximize value.

25.      Based on my participation in negotiations with the Plan Investor, it was unwilling to hold open its bid or enter into the Investment Agreement without the assurance provided by the Bid Protections, including the Break-Up Fee and Expense Reimbursement, as set forth in the Investment Agreement.   It is my professional opinion, given the facts and circumstances of the Chapter 11 Case as I understand them, that the Bid Protections are reasonable, designed to maximize value, and in the best interests of the Parent Debtor's estate for the reasons set forth herein.

26.      First, the Bid Protections provide the certainty of a transaction that the Parent Debtor has determined, in its business judgment, will maximize value for its estate in a timely manner.  Notably, that transaction also has the preliminary consent of the Trustee on behalf of the Bondholders, the Parent Debtor's largest creditor constituency.  The Plan Investor, however,

WEIL:\98545001\10\12817.0007

was unwilling to proceed without the Parent Debtor's agreement to the Bid Protections. Accordingly, if the Bid Protections are approved by the Court, the Parent Debtor will be able to "lock in" the Plan Investor's firm commitment to consummate a restructuring transaction that has been negotiated over several months. If unable to do so, the Parent Debtor risks the Plan Investor walking away from the transaction, which could adversely impact the Parent Debtor's estate. Given the Parent Debtor's need to consummate a value-maximizing transaction, its determination that the Investment Agreement represents such transaction following the Marketing Process, and its need to provide the Bid Protections to induce the Plan Investor's ongoing commitment to the restructuring transaction embodied in the Investment Agreement, I believe that providing the Bid Protections in exchange for the certainty of the Plan Investor's firm commitment is reasonable.

27.    Second, the Bid Protections will provide a floor for any Alternative Transaction. The Investment Agreement contains a "fiduciary out" and the Parent Debtor is not subject to a "no shop" or any other provision restricting its ability to consider any alternative offers that may be presented during the Chapter 11 Case. The Bid Protections will serve to set a floor for any Alternative Transaction because such proposal will necessarily have to exceed the value of the Plan Consideration. Thus, the Bid Protections will provide the Parent Debtor with the certainty and benefits of the value-maximizing transaction reflected therein, while simultaneously establishing a floor so that interested parties may still submit proposals for an Alternative Transaction that represents a higher or better offer.

28.    Third, it is my professional opinion that the amount of the Break-Up Fee is within the range of break-up fees offered in other cases I have seen throughout my career, and the Expense Reimbursement is appropriate in light of the complexity of the transaction reflected in Investment Agreement. The Break-Up Fee, which is capped at $1,800,000 but in certain

circumstances may be reduced to $900,000, amounts to at most 3% (or as little as 1.5%) of the $60,000,000 purchase price provided under the Investment Agreement, without regard to the significant additional value resulting from the Plan Investor's agreement to assume the Assumed Claims.  The Expense Reimbursement of $300,000, which the Plan Investor is entitled to receive only in certain circumstances where it is not otherwise entitled to the Break-Up Fee, amounts to 0.5% of the purchase price.  During my career, I have generally seen break-up fees offered in the range of 1% to 3%.  The Break-Up Fee is within this range and is consistent with similarly complex transactions I have seen.

29.      Additionally, the transaction embodied in the Investment Agreement is highly-complex and may take substantial time to consummate.  Given the Parent Debtor's liquidity position, it is imperative that any transaction move forward expeditiously so as not to further reduce recoveries to the Parent Debtor's creditors and other stakeholders.  Accordingly, the Plan Investor has agreed to assume all unsecured claims against the Parent Debtor other than the Bondholders' claims and certain other discrete categories set forth in the Investment Agreement. In addition, the Investment Agreement contemplates that the Plan Investor will take ownership of the Reorganized Parent Debtor and its approximately 108 direct and indirect non-debtor property owning subsidiaries, each of which has its own complicated ownership and capital structure. Under the Investment Agreement, the Plan Investor has agreed to take on those responsibilities without the benefit of an exclusive period to conduct further diligence with respect to the subsidiaries or engage with the subsidiary level partners or mortgage lenders.

30.      Moreover, under the Investment Agreement, closing on the transaction is conditioned upon, among other things, entry of an order confirming a chapter 11 plan and court approval of certain aspects of the transaction in the BVI and in Israel.  Although the Plan Investor

is committed to moving forward, the international implications of the Chapter 11 Case may require a substantial period between execution of the Investment Agreement and consummation of a chapter 11 plan that will effectuate the restructuring. Specifically, I understand that obtaining the necessary approvals in the BVI and Israel may extend the timeline for the Chapter 11 Case by several months. During this time, the Plan Investor's Escrowed Funds would be held on deposit and not available for the Plan Investor to otherwise deploy and put to use in the marketplace. In addition, the Plan Investor would also remain subject to the Guaranty during this potentially extended time period.

31.    Further, many third-party investors already have participated in the Marketing Process and have submitted competitive offers. Because the Parent Debtor is not prohibited from pursuing an Alternative Transaction, the Plan Investor is bearing a risk that any one of such investors may materialize and submit a higher or better offer. I believe this is precisely the type of risk for which bid protections are generally designed.

32.    For these reasons, I believe that the Bid Protections are reasonable, are designed to maximize value, and are in the best interests of the Parent Debtor's estate.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: March 25, 2022
     New York, New York              */s/    David B. Schechtman*
                                      David B. Schechtman
                                      Senior Executive Managing Director
                                      Meridian Investment Sales

WEIL:\98545001\10\12817.0007