

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

Jacqueline Marcus
+1 (212) 310-8130
Jacqueline.marcus@weil.com

March 29, 2022

**Via Email and ECF**

Honorable Martin Glenn
Chief United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Courtroom 523
New York, NY 10004-1408

**Re:** ***In re All Year Holdings Limited, Chapter 11 Case No. 21-12051 (MG)***

Dear Judge Glenn:

      We represent All Year Holdings Limited (the "**Parent Debtor**"), as debtor and debtor in possession in the above-referenced chapter 11 case. As discussed on the record at today's Status Conference, attached hereto as **Annex 1** is a copy of the report published by the Parent Debtor on the Tel Aviv Stock Exchange website on March 27, 2022 (the "**TASE Report**"). The final form of the Mortgage Loan Purchase and Sale Agreement, dated March 24, 2022, by and between WB Debt Acquisition LLC and Mishmeret Trust Company Ltd., in its capacity as trustee for the holders of the Parent Debtors' Series C bonds, without exhibits, is attached to the TASE Report.

Respectfully submitted,

/s/ *Jacqueline Marcus*
    Jacqueline Marcus

## <u>Annex 1</u>

**TASE Report**

<div dir="rtl">

טיוטה מיום 27.3.2022

ביום 24.3.2022 חתמה חברת WB Debt Acquisition LLC, חברה המוחזקת במלואה על ידי מר זליג וייס ("**הרוכשת**"), על הסכם לרכישת זכויות הנאמן למחזיקי אגרות החוב מסדרה ג' ("**הנאמן**" ו-"**המחזיקים**") כלפי חברת Wythe Berry Fee Owner LLC ("**הסכם המכר**" ו-"**חברת הנכס**" בהתאמה), על פי שטר חוב מיום 28.2.2017 של חברת Wythe Berry Fee Owner LLC שכרתיתו Amended and Restated Promissory Note המובטח במשכנתא ושעבודים שונים על קומפלקס הידוע בשם The William Vale Complex ("**שטר החוב המובטח**", ו-"**הנכס**" בהתאמה), וזאת בתמורה לסך של 157,312,112 דולר ארה"ב שישולם לנאמן במועד השלמת הסכם המכר כל שטר חוב המובטח.

התחייבויותיה של הרוכשת על פי הסכם המכר תפקענה בהתקיימותם של מספר אירועים, ובין היתר: (א) אם לא יפורסם כתב הצבעה לאישור הסכם המכר על ידי המחזיקים בתוך 14 ימים ממועד חתימת הסכם המכר על ידי הרוכשת; (ב) אם אסיפת מחזיקים לאישור הסכם המכר לא תכונס בתוך 35 ימים ממועד חתימת הסכם המכר על ידי הרוכשת; (ג) אם הסכם המכר לא יאושר באסיפת המחזיקים ברב הנדרש על פי הוראות שטר הנאמנות; (ד) אם הנאמן לא יחתום על הסכם המכר בתוך 45 ימים ממועד חתימת ההסכם על ידי הרוכשת. **יובהר כי טרם חתימת הנאמן על הסכם המכר  לא תהיינה לנאמן ו/או למחזיקים כל מחויבות מכוח הסכם המכר.**

הרוכשת התנתה את רכישת שטר חוב המובטח ברכישת מניות בחברת Wythe Berry Fee Member LLC שמוחזקות על ידי YG WV LLC ("**בעלת המניות**"), חברה המוחזקת במלואה על ידי.Ltd All Year Holdings ("**All Year**"), תמורת 200,000 דולר ארה"ב ("**הסכם מכירת המניות**").
בהסכם המכר נקבעו בין היתר התנאות, כדלקמן: (א) אם המחזיקים יאשרו את הסכם המכר ו בעלת המניות תחתום על הסכם מכירת המניות, תפקיד הרוכשת פיקדון בסך של 7.5 מיליוני דולר אצל נאמן אמריקאי (Citizens Bank) ("**הפקדון**"), והנאמן יחתום על הסכם המכר; (ב) הסכם מכירת המניות מותנה באישורו על ידי בתי המשפט לחדלות פירעון בארה"ב ו-BVI בהם מתנהלים הליכי חדלות הפירעון של All Year ("**בתי המשפט המוסמכים**"); (ג) אם All Year לא תגיש לבית המשפט הרלוונטי בארה"ב בקשה לאישור הסכם מכירת המניות ("**בקשת האישור**") בתוך 10 ימים ממועד הפקדת הפיקדון, יהיו רשאים הצדדים לבטל את הסכם המכר; (ד) ככל שבתי המשפט המוסמכים לא יאשרו לבעלת המניות להתקשר בהסכם מכירת המניות בתוך 60 ימים ממועד הגשת בקשת האישור יהיו רשאים הצדדים לבטל את הסכם המכר; (ה) לאחר קבלת אישור בתי המשפט המוסמכים להסכם מכר המניות, יועבר הפיקדון מנאמן אמריקאי לנאמן ישראלי (IBI Trust Management); (ו) השלמת הסכם המכר תתקיים בתוך 60 ימים מהמועד שבו יאשרו בתי המשפט המוסמכים לבעלת המניות להתקשר בהסכם מכר המניות.

בהתאם להוראות הסכם המכר, במועד ההשלמה יתבצעו, בין היתר, הפעולות הבאות: (א) הנאמן ימחה וייעבר לרוכשת את זכויותיו בשטר חוב המובטח והבטוחות הנלוות, והנאמן יעביר לרוכשת את כל התשלומים שיתקבלו אצלו לאחר חתימת הסכם המכר מכוח שטר חוב המובטח והבטוחות הנלוות. הנאמן יעביר וימחה לרוכשת את כל התביעות שיש לנאמן כלפי חברת הנכס, וכן יוותר על כתב ערבות שנחתם על ידי חברת הנכס לטובתם ביום 28 בפברואר 2017 ועל כל הטענות כלפי הרוכשת וצדדים קשורים בקשר לנכס. **יובהר כי הנאמן לא ימכור ו/או יעביר לרוכשת תביעות או זכויות כלפי All Year מכוח חובה כלפי המחזיקים וכן לא ימחה ו/או יעברו זכויות ו/או תביעות הקיימות לנאמן או המחזיקים כלפי נושאי המשרה ב-All Year ובעלי מניותיה.** (ב) הנאמן ימסור לרוכשת את כל המסמכים הרלוונטיים למכירת הנכס; (ג) הרוכשת תעביר לידי הנאמן את תמורת העסקה (למעט הפיקדון); (ד) הנאמן הישראלי יעביר לידי הנאמן את הפיקדון; ו-(ה) הצדדים להסכם המכר יחתמו על טופס ויתור הדדי על טענות ו/או תביעות.

הסכם המכר כולל מצגים סטנדרטיים מטעם הנאמן והרוכשת, כגון מצגים על התאגדותן של החברות אשר חתומות על ההסכם, כי יש לצדדים להסכם סמכות לחתום עליו מטעם החברה הרלוונטית, וכי לא נדרש כל אישור נוסף בכדי לבצע את המכירה.

</div>

- 2 -

במקרה של אי התקיימות התנאים המתלים או במקרה שהרוכשת תבטל את הסכם המכר בשל כך שקמה לה עילה לביטול
ההסכם לפי הוראותיו, יושב הפיקדון לרוכשת. במידה שיתקיימו התנאים המתלים להסכם המכר יועבר הפיקדון לנאמן
במסגרת השלמת ההסכם. ככל שהרוכשת לא תשלים את הסכם המכר (על אף התקיימות התנאים המתלים) או שלא
התקיימו איזה מהתנאים המתלים בשל פעולה שנקטה הרוכשת או שהתקיימה עילת ביטול להסכם המכר בשל פעולה
שנקטה הרוכשת, יועבר הפיקדון לנאמן. במקרה כזה, 50% מסכום הפיקדון ייזקף על חשבון שטר החוב המובטח לפי
הוראותיו ו-50% מסכום הפיקדון ישמש כפיצויים מוסכמים על נזקים שנגרמו לנאמן ולמחזיקים כתוצאה מהסכם המכר
בלבד.


הדין החל על הסכם המכר הוא דין ישראלי וסמכות השיפוט הבלעדית מוקנית לבתי המשפט המחוזיים בתל אביב יפו.

Final Execution Copy

---

MORTGAGE LOAN PURCHASE AND SALE AGREEMENT


Between


WB DEBT ACQUISITION LLC


PURCHASER


and


MISHMERET TRUST COMPANY LTD., AN ISRAELI COMPANY,
AS TRUSTEE FOR THE HOLDERS OF THE DEBENTURES (SERIES C)
UNDER THAT CERTAIN DEED OF TRUST (AS DEFINED HEREIN)


SELLER


Dated March 24, 2022

---

This Mortgage Loan Purchase and Sale Agreement, dated March 24, 2022 (this "Agreement"), is between WB Debt Acquisition LLC, as purchaser (together with its successors and assigns, the "Purchaser"), and Mishmeret Trust Company Ltd., an Israeli company, solely, in its capacity as Trustee for the holders of the Debentures (Series C) of All Year Holdings Ltd. (the "Series C Bonds") under that certain deed of trust of the Debentures (Series C) (the "Deed of Trust"), as seller (together with its successors and assigns, the "Seller" or the "Trustee").

<p align="center">W I T N E S S E T H:[1]</p>

WHEREAS, pursuant to that certain Amended and Restated Promissory Note, dated February 28, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Note"), between All Year Holdings Ltd. ("All Year Holdings") and Wythe Berry Fee Owner LLC (the "Borrower"), All Year Holdings made a loan (the "Mortgage Loan") to the Borrower in the original principal amount of USD166,320,000.00;

WHEREAS, the Mortgage Loan is secured by, among other things, a first lien mortgage on the Borrower's fee simple interest in real property located in Brooklyn, New York (the "Mortgage"), having an address of 55 Wythe Avenue, Brooklyn, NY (the "Property");

WHEREAS, All Year Holdings assigned the Mortgage Loan and the Mortgage detailed in Items 1-9 of Schedule 1 of the Assignment of Loan Documents (as defined herein) (collectively, the "Assigned Loan Documents") to the Seller (the "2021 Assignment") pursuant to that certain Mortgage Loan Purchase and Sale Agreement, dated as of March 16, 2021 between the Seller and All Year Holdings (the "MPSA"), a true and correct copy of which is annexed hereto as **Exhibit A**;

WHEREAS, the 2021 Assignment caused Mishmeret to become owner of the Transferred Assets (as defined below) and the Lender (as such term is defined under the Assigned Loan Documents);

WHEREAS, in consideration for the Purchase Price (as defined below), the Seller has agreed to sell the Transferred Assets (as defined below), and the Purchaser has agreed to purchase from the Seller, pursuant to the terms of this Agreement, the Transferred Assets;

NOW, THEREFORE, in consideration of these premises and the mutual agreements hereinafter set forth, the parties hereto agree as follows:

1.    Consideration.  In consideration of the transfer of the Transferred Assets, the Purchaser shall pay to Seller (in USD) USD157,312,112 (the "Purchase Price").  The Purchase Price shall be paid on the Closing Date (as defined below), by a wire transfer of the following amounts to the Seller: (a) USD149,812,112 (the "Cash Payment") payable by the Purchaser in immediately available funds, and (b) USD7,500,000 (the "Deposit Amount") by way of release of

---

[1] The summary of the relevant agreements are provided herein for convenience purposes only. In case of a conflict between the description provided herein and the applicable agreement, the applicable agreement shall govern.

the Deposit (as defined herein) in accordance with this Agreement.  The Cash Payment shall be reduced, dollar for dollar, by all and any amounts received by Seller on account of the Assigned Loan Documents during the period commencing on the execution of this agreement by the Purchaser and through the date of Closing. The wire of the Purchase Price shall be made on Closing (as defined below) to such bank account in accordance with the instructions to be provided by the Seller to the Purchaser, such instruction to be provided to the Purchaser not less than two (2) days in advance of the Closing Date (the "Wire Instructions").

2.   Closing.

a.   The Closing.  The closing of the transactions contemplated under this Agreement (the "Closing") shall take place on the 60th day following receipt by Seller and Purchaser of a written notice from Shares Seller(as defined below, it being understood that Shares Seller has no obligation hereunder to provide such notice) attaching a copy of a court order (the "Share PSA Approval Order") in the All Year BVI Bankruptcy (as defined in the Share PSA) granting the application of All Year Holdings for approval of the transaction contemplated in the Share PSA (as defined below) (such 60th day, the "Closing Date").  The parties hereto agree that time is of the essence with respect to this Agreement.  Notwithstanding anything to the contrary set forth in this Agreement, the acquisition by YG WV MI Acquisition LLC (the "Shares Purchaser") from YG WV LLC ("Shares Seller") of 99.8% of Shares Seller's membership interests in Wythe Berry Member LLC (the "Shares"), the Shares being 49.9% of all membership interests in Wythe Berry Member LLC, pursuant to that certain Agreement to Transfer Membership Interest in the form identical to the one annexed hereto as **Exhibit B** (the "Share PSA") shall be an express condition precedent to the obligation of Purchaser to proceed with the Closing (the "Share Purchase Condition"), provided however that, in the event Shares Seller is ready, willing and able to sell the Shares to Shares Purchaser in accordance with the Share PSA but the Shares Purchaser refuses to close on such agreement (a "Share Purchase Breach"), the Share Purchase Condition shall no longer be a condition precedent of the obligation of Purchaser to proceed with the Closing. For the avoidance of doubt, it is understood, accepted, and agreed that, for purposes of this Section 2.a. and also Section 10.d of this Agreement, the acquisition by Shares Purchaser of the Shares is not and shall not be deemed complete unless and until the Shares are released from escrow and delivered to Shares Purchaser pursuant to the Share PSA (the "Shares Release").

b.   Transactions at the Closing.  At the Closing, the following transactions shall occur simultaneously:

i.   The Seller shall sell, transfer, and assign, set over and otherwise convey to the Purchaser, without recourse and the Purchaser shall purchase and acquire from the Seller, all of the Transferred Assets, as detailed in section 6 below, free and clear of any Encumbrances (as defined below).

ii.   The Seller shall deliver to the Purchaser all deliverables, as detailed in section 8 below.

iii.    The parties shall sign and exchange mutual General Releases, in the form attached as **Exhibit C**.  The General Release by Seller be made also on behalf of the holders of the Series C Bonds.

iv.    The Purchaser shall pay, or cause to be paid, by wire transfer of immediately available funds, the Cash Payment.

v.    The IL Escrow Agent shall transfer to the Seller the Deposit Amount and shall provide a confirmation to both parties of such transfer, and the Deposit shall be credited against the Purchase Price.

3.    Signing Procedure.

The signing of this Agreement shall be as follows:

a.  This Agreement shall be signed first by the Purchaser, unilaterally, and shall be immediately binding upon the Purchaser (the date on which this Agreement is signed, the "Effective Date").

b.  No later than thirty-five (35) days following the Effective Date, a meeting of Series C Bondholders of All Year Holdings (the "Bondholders") shall be convened and the Bondholders shall vote on whether to enter into this Agreement (the "Bondholders' Meeting").  Nevertheless, the Purchaser shall not have any claim in the event the Bondholders' Meeting is not convened, as set forth herein.  Within one business day following the later of (i) Purchaser's receipt of written notice of the Bondholders' approval with the Required Majority (as defined below) in the Bondholders' Meeting to enter into this Agreement (the "Bondholders' Approval"), and (ii) Purchaser's receipt of the Share PSA executed by Shares Seller, Purchaser shall deposit the Deposit Amount with the US Escrow Agent (as defined below) in accordance with Section 5 hereof.  Within one business day following Seller's receipt of written notice that the Deposit Amount was deposited with the US Escrow Agent, Seller shall sign this Agreement, and shall provide the executed original to the Purchaser.  Prior to signing this Agreement by the Trustee, this Agreement shall not be binding upon the Trustee or the Bondholders in any way.  The term "Required Majority" means the required majority in accordance with the Deed of Trust and applicable law, as the Trustee shall determine.

c.  Notwithstanding anything to the contrary contained herein, the Purchaser shall, *ipso facto*, no longer be bound by this Agreement upon the earliest to occur of any of the following events (each and all an "Event of Expiration"): (i) the Seller does not deliver to Purchaser a fully-executed original of this Agreement upon the date that is forty-five (45) days following the Effective Date; (ii) the results of the Bondholders' Meeting do not provide for the Bondholders' Approval; (iii) the Bondholders' Meeting is not convened upon the date that is thirty-five (35) days following the Effective Date; (iv) within fourteen (14) days following the Effective Date, a notice to convene the Bondholders' Meeting in which the Bondholders shall vote on whether to enter into this Agreement is not published and/or (v) Seller and/or Bondholders commence any action or proceeding (including any arbitration) against Purchaser, Wythe Berry Member LLC, Wythe Berry Fee Owner LLC, Wythe Berry LLC, Espresso Hospitality Management LLC, and/or all and any

sub-lessees under the Ground Lease between Wythe Berry Fee Owner LLC and Wythe Berry LLC (collectively, "Purchaser Related Parties"). For the avoidance of doubt, any of the above-mentioned events numbered (i) through (v) shall not be considered as an "Event of Expiration" if such event was caused due to any written motion, submission, request, or joinder made by the Purchaser (or an entity majority owned and/or controlled by Mr. Zelig Weiss ("Weiss")) (hereinafter, a "Purchaser Intervention"), provided however, that, for the avoidance of doubt, the filing of any motion, submission, request, or joinder by any Purchaser Related Party in connection with any action pending or commenced against any of the Purchaser Related Parties shall not be considered a Purchaser Intervention under this Agreement unless such motion, submission, request, or joinder supports the occurrence of an Event of Expiration.

4. Covenants.

From and after the date both parties sign this Agreement and until the earlier of the Closing or the termination of this Agreement in accordance with section 10 (the "Interim Period"), each of the parties shall act in a commercially reasonable manner in good faith in order to consummate the transaction contemplated herein.

5. Deposit.

a. Upon the later of (i) Purchaser's receipt of written notice of the Bondholders' Approval and (ii) Purchaser's receipt of the Share PSA executed by Shares Seller, the Purchaser shall deposit the Deposit Amount in escrow with Citizens Bank, which shall serve as the US escrow agent (the "US Escrow Agent"). The date on which the Deposit is made is referred to as the "Deposit Date" herein.

b. An escrow agreement substantially similar in form to the one to be attached hereto prior to the Deposit Date as **Exhibit D** (the "US Escrow Agreement") shall provide that the Deposit Amount shall be held by the US Escrow Agent in accordance with the terms thereof and shall provide, inter alia, for the delivery of written notice by US Escrow Agent to Seller and Purchaser, via electronic mail, of confirmation of receipt of the Deposit Amount, and for the release or transfer of the Deposit Amount upon the earlier of:

i. The earliest occurrence of any Event of Expiration – to the Purchaser.

ii. Upon receipt by US Escrow Agent of a copy of the Share Purchase Approval Order (as provided by Shares Seller to Seller and Purchaser) – to IBI Trust Management (the "IL Escrow Agent"), who shall hold and release the Deposit in accordance with an escrow agreement substantially similar in form to the one to be attached hereto prior to the Deposit Date as **Exhibit E** (the "IL Escrow Agreement").

6. Sale and Conveyance of the Transferred Assets.

a. Effective as of the Closing Date (as defined below), the Seller does hereby sell, transfer, assign, set over and otherwise convey to the Purchaser, without recourse, and the Purchaser does hereby purchase and acquire from the Seller, free and clear of any Encumbrances,

-4-

the Note, the Mortgage, and all Seller's right, title, and interest in and to the following, free and clear of any Encumbrances (collectively, the "Transferred Assets"):

    i.   that certain Assignment of Loan Documents, dated as of March 16, 2021, between All Year Holdings and Seller, including all of Seller's right, title, and interest in and to the documents listed on Schedule 1 thereto, reproduced as Items 1-9 on Schedule 1 hereto, which include, but are not limited to, the Note and the Mortgage (the "Assignment of Loan Documents");

    ii.   that certain Assignment of Consolidated Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of March 16, 2021, between All Year Holdings and Seller (the "Assignment of Mortgage");

    iii.   that certain Allonge, dated as of March 16, 2021 to the Note, between All Year Holdings and Seller;

    iv.   All and any claims and causes of action, guarantees or other rights of Seller, the Bondholders or their representatives, related to the Assigned Loan Documents or the Property, including without limitation any claims that Seller, the Bondholders or their representatives may have against the Purchaser, Borrower, or Wythe Berry LLC (the "Lessee") under the Assigned Loan Documents and all and any claims or causes of action against the Borrower in connection with that certain Guaranty of Payment, dated as of February 28, 2017, made by the Borrower to Seller and/or the Bondholders (the "Guaranty Claims").  For the sake of clarity, Purchaser is purchasing, and the Transferred Assets include, all and any claims and/or causes of action Seller and/or Bondholders may have against all and any Purchaser Related Parties.

    v.   all claims of Seller against All Year Holdings in connection with the MPSA, but, for the avoidance of doubt, excluding, any Excluded Claims (as defined below); and

    vi.   any other asset, right or interest relating to the Property, the Note or the Mortgage that the Seller owns, including without limitation, all certificates, legal opinions or other documents related to, or evidencing, the Mortgage Loan, as obtained at the time of its origination and any subsequent modification or assignment; all of Seller's rights to principal, interest, fees, costs and expenses payable under the Mortgage after the Closing Date, all books and records related to the Mortgage, the Note, the Assignment of Mortgage and the Assignment of the Loan Documents, in each case to the extent they are in the possession of the Seller; *provided, however, that*

failure of Seller to deliver any such assets, rights or interests to the Purchaser shall not constitute a default under this Agreement.

b.      The Purchaser is not acquiring, and the Transferred Assets shall not include, any claims or causes of action the Seller and/or Bondholders may have against All Year Holdings, its directors, officers, shareholders or managers (the "Excluded Claims").

c.      Upon the sale of the Transferred Assets as of the Closing Date, the ownership of the Transferred Assets will be vested in the Purchaser.  As of the Closing Date, the Seller's records shall accurately reflect the sale of the Transferred Assets to the Purchaser.

d.      The Purchaser shall be entitled to, as of the Closing Date, among other things, (i) all scheduled payments of principal due on the Mortgage Loan whether before or after the Closing Date, provided that Purchaser shall not be entitled to any amounts actually paid by the Borrower prior to Closing, (ii) all payments of principal related to the Mortgage Loan collected after the Closing Date, and (iii) all payments of interest related to the Mortgage Loan collected after the Closing Date, whether accrued on, before or after the Closing Date.

e.      The parties hereto intend that the provisions of this section 6 serve as an assignment and assumption agreement between the Seller as the assignor, and the Purchaser, as the assignee.

7.      Books and Records; Certain Funds Received on or After the Closing Date.

a.      From and after the sale of the Transferred Assets to the Purchaser as of the Closing Date, record title to the Mortgage and the Note shall be transferred to the Purchaser.  Any funds received on or after the Closing Date by the Seller in connection with the Transferred Assets shall be held in trust for the benefit of the Purchaser as the owner of the Transferred Assets and shall be transferred promptly to the Purchaser.  All such payments received by the Seller in respect of the Mortgage Loan or any other Transferred Asset on or after the Closing Date shall belong to, and shall be promptly remitted to, the Purchaser.

b.      Seller intends to treat the transfer of the Transferred Assets to the Purchaser as a sale for tax purposes.

c.      The transfer of the Transferred Assets as of the Closing Date shall be reflected on the Purchaser's balance sheet and other financial statements as the purchase of the Transferred Assets by the Purchaser from the Seller.  The Purchaser intends to treat the transfer of the Transferred Assets from the Seller as a purchase for tax purposes.

8.      Assignment and Assumption Documents; Originals of Certain Loan Documents; Estoppel.

a.      In connection with the sale of the Transferred Assets, the Seller shall deliver or cause to be delivered to the Purchaser or its designee on the Closing Date (to the extent not previously delivered): (i) the original Note or if such Note has been lost, a lost document affidavit,

-6-

including all amendments thereto, endorsed, in the case of the Note, without recourse under an Allonge dated as of the Closing Date from Seller to Purchaser, (ii) the original or a certified copy of the recorded Mortgage; and (iii) the following documents or instruments with respect to the Mortgage Loan (collectively with the documents described in clauses (i) and (ii) above, the "Mortgage File"), in each case executed by the parties thereto:

  i. An original Assignment of Mortgage in favor of the Purchaser and in a form that is complete and suitable for recording in the jurisdiction in which the Property is located;

  ii. an original Assignment of Loan Documents in favor of the Purchaser and copies of all documents being assigned thereunder;

  iii. An assignment of each UCC-1 financing statement to Purchaser to be filed in the appropriate filing offices or record depositories shall be delivered by the Seller to the Purchaser or its designee for filing or recording, as applicable, by the Purchaser or its designee, on or promptly following the Closing Date,

  iv. A Termination of Assignment of Leases and Rents recorded 03/06/2017 in CRFN #2017000087419.

  v. A Termination of Collateral Assignment of Mortgage dated February 28, 2017, and recorded March 6, 2017 as CRFN 2017000087412.

  vi. A Termination of Collateral Assignment of Assignment of Leases and Rents recorded 03/06/2017 in CRFN #2017000087420.

  vii. A UCC-3 Termination for that certain UCC-1 recorded in the county's clerk as 201700087421.

  viii. A Correction Assignment of Mortgage for the following Assignment of Modification Agreement from ALL Year Holdings Limited to Mishmeret Trust Company LTD dated March 16, 2021 and recorded March 22, 2021 as CRFN 2021000104024, which will correct the following:  Add reference to missing consolidation agreement recorded in CRFN 2017000087411.  Correct CRFN for Modification Agreement recorded in CRFN 2017000121032.

  ix. All other documents listed on Schedule 1.

 b. In connection with the sale of the Transferred Assets, the Seller shall also deliver or cause to be delivered to the Purchaser or its designee on the Closing Date (to the extent not previously delivered)

  i. a written estoppel certificate delivered to Seller and Purchaser executed by the Borrower setting forth (i) the amount of the original principal amount of the Note and the unpaid principal amount of the Note, (ii) the current rate of interest of the

Note, (iii) the date payments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment of the Debt (as defined in the Mortgage), and if any are alleged, the nature thereof and (v) that the Note, the Security Instrument and the other Loan Documents (each as defined in the Mortgage) have not been modified or if modified, giving particulars of such modification.

       ii.      a written and signed confirmation of the closing of the transaction contemplated by this Agreement address to Koffsky Schwalb LLC, 500 Seventh Avenue, 8th Floor, New York, New York 10018 Attn: Efrem Schwalb, Esq. Email: eschwalb@koffskyschwalb.com

9.    <u>Representations and Warranties</u>.

       a.      The Seller represents and warrants to the Purchaser as of the date of execution of this Agreement by the Seller, and as of the Closing Date, as if made on the Closing Date:

       i.      it is a company duly incorporated, validly existing and in good standing under the laws of Israel;

       ii.      it has the power and authority to own its property and to carry on its business as now conducted;

       iii.      it has the power to execute, deliver and perform this Agreement, and neither the execution and delivery by the Seller of this Agreement, nor the consummation by the Seller of the transactions herein contemplated, nor the compliance by the Seller with the provisions hereof, will (A) conflict with or result in a breach of, or constitute a default under, any of the provisions of the organizational documents of the Seller or any of the provisions of any US, Israel or foreign law, governmental rule, regulation, judgment, decree or order binding on the Seller or any of its properties, or any indenture, mortgage, contract or other instrument to which the Seller is a party or by which it is bound, except, in each of the foregoing cases, for conflicts, breaches or defaults that individually or in the aggregate would not reasonably be expected to have a material adverse effect on (1) the condition (financial or other) or operations of the Seller or its properties or (2) the consummation of the transactions contemplated in, or the enforceability against the Seller of, this Agreement, or (B) result in the creation or imposition of any lien, charge or encumbrance upon any of the Seller's property pursuant to the terms of any such indenture, mortgage, contract or other instrument;

       iv.      the execution, delivery and performance of this Agreement by the Seller have been duly authorized by all requisite action by the Seller and the Bondholders and will not violate or result in a material breach of any provision of its organizational documents;

       v.      assuming the due authorization, execution and delivery of this Agreement by the Purchaser, this Agreement constitutes a legal, valid and binding

obligation of the Seller, enforceable against it in accordance with its terms subject to (A) applicable bankruptcy, insolvency, reorganization, receivership, conservatorship, liquidation, moratorium and other laws affecting the enforcement of creditors' rights generally, (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law, and (C) public policy considerations underlying the securities laws, to the extent that such public policy considerations limit the enforceability of the provisions of this Agreement that purport to provide indemnification or contribution for securities laws liabilities;

      vi.     the Seller is the sole holder and sole record, legal and beneficial owner of the Transferred Assets and has good, valid and marketable title to the Transferred Assets and the Transferred Assets are, and upon Closing shall be transferred to the Purchaser, free and clear of all Encumbrances.  For purposes of this Agreement, the term "Encumbrance" means any encumbrance, lien, mortgage, charge, option, purchase right, pledge, hypothecation, preemption right, security interest, right of first refusal, transfer restriction, or other rights of third parties;

      vii.     there are no legal or governmental proceedings pending to which the Seller is a party or of which any property of the Seller is the subject which, if determined adversely to the Seller, would interfere with or materially adversely affect the consummation of the transactions contemplated herein, and to the Seller's knowledge, no such proceedings are threatened by governmental authorities or by others;

      viii.     no consent, approval, authorization (including by the Bondholders), order, license, registration or qualification of or with any such court or governmental agency or body is required for the consummation by the Seller of the transactions contemplated by this Agreement, other than any consent, approval, authorization, order, license, registration or qualification that has been obtained;

      ix.     the sale of the Transferred Assets hereunder is undertaken by the Seller for good and valid consideration and is not undertaken with the intent to hinder, delay or defraud any of the Seller's creditors;

      x.     it has not dealt with any broker, investment banker, agent or other person, other than the Purchaser and its respective affiliates, that may be entitled to any commission or compensation in connection with the sale of the Transferred Assets or the consummation of any of the transactions contemplated hereby;

      xi.     except as set forth in the Mortgage File, the Assigned Loan Documents have not been modified since the Seller became the lender under the Mortgage Loan, and since such time the Property has not been released from the lien of the Mortgage;

      b.     The Purchaser represents and warrants to the Seller as of the date of execution of this Agreement by the Purchaser, and if Purchaser assigns this Agreement at or prior to Closing to a company controlled by Weiss pursuant to section 15 of this Agreement, upon said assignment and as of the Closing Date as if made on the Closing Date:

       i.       it is a company duly organized, validly existing, and in good standing under the place of its establishment;

       ii.       Weiss owns 100% of the membership interests of Purchaser and controls Purchaser.

       iii.       Purchaser is a newly formed entity and does not have, and has not at any time prior the date hereof had, any operations or liabilities.

       iv.       it has the power and authority to own its property and to carry on its business as now conducted;

       v.       it has the power to execute, deliver and perform this Agreement, and neither the execution and delivery by the Purchaser of this Agreement, nor the consummation by the Purchaser of the transactions herein contemplated, nor the compliance by the Purchaser with the provisions hereof, will (A) conflict with or result in a breach of, or constitute a default under, any of the provisions of the organizational documents of the Purchaser or any of the provisions of any US or foreign law, governmental rule, regulation, judgment, decree or order binding on the Purchaser or any of its properties, or any indenture, mortgage, contract or other instrument to which the Purchaser is a party or by which it is bound, except, in each of the foregoing cases, for conflicts, breaches or defaults that individually or in the aggregate would not reasonably be expected to have a material adverse effect on (1) the condition (financial or other) or operations of the Purchaser or its properties or (2) the consummation of the transactions contemplated in, or the enforceability against the Purchaser of, this Agreement, or (B) result in the creation or imposition of any lien, charge or encumbrance upon any of the Purchaser's property pursuant to the terms of any such indenture, mortgage, contract or other instrument;

       vi.       it has the financial capability to execute, deliver and perform this Agreement (including by way of external financing);

       vii.       the execution, delivery and performance of this Agreement by Purchaser have been duly authorized by all requisite action by the Purchaser and will not violate or result in a material breach of any provision of its organizational documents;

       viii.       assuming the due authorization, execution and delivery of this Agreement by the Seller, this Agreement constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms subject to (A) applicable bankruptcy, insolvency, reorganization, receivership, conservatorship, liquidation, moratorium and other laws affecting the enforcement of creditors' rights generally, (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law, and (C) public policy considerations underlying the securities laws, to the extent that such public policy considerations limit the enforceability of the provisions of this Agreement that purport to provide indemnification or contribution for securities laws liabilities;

-10-

ix.        there are no legal or governmental proceedings pending to which the Purchaser is a party or of which any property of the Purchaser is the subject, other than the Lease Action, which, if determined adversely to the Purchaser, would interfere with or materially adversely affect the consummation of the transactions contemplated herein, and to the Purchaser's knowledge, no such proceedings are threatened by governmental authorities or by others;

x.        it is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default would have consequences that would materially adversely affect the condition (financial or other) or operations of the Purchaser or its properties or would have consequences that would materially adversely affect its performance hereunder;

xi.        it has not dealt with any broker, investment banker, agent or other person, other than the Seller and its respective affiliates, that may be entitled to any commission or compensation in connection with the sale of the Transferred Assets or the consummation of any of the transactions contemplated hereby;

xii.        no consent, approval, authorization, order, license, registration or qualification of or with any such court or governmental agency or body is required for the consummation by the Purchaser of the transactions contemplated by this Agreement, other than any consent, approval, authorization, order, license, registration or qualification that has been obtained or made or the lack of which would not individually or in the aggregate reasonably be expected to have a material adverse effect on the transactions contemplated herein; and

xiii.        the purchase of the Transferred Assets hereunder is undertaken by the Purchaser for good and valid consideration and is not undertaken with the intent to hinder, delay or defraud any of the Purchaser's creditors.

c.        The representations and warranties of the Seller as set forth in section 9(a) and elsewhere in this Agreement shall not survive the Closing.

d.        The representations and warranties of the Purchaser as set forth in section 9(b) and elsewhere in this Agreement shall not survive the Closing.

e.        Each party hereby agrees to promptly notify the other party of any breach of a representation or warranty contained in this section 9 of which it has knowledge.

10.        <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

a.  by the mutual written consent of Seller and Purchaser;

b.  by Purchaser by written notice to Seller if on the Closing Date the Purchaser is ready, willing, and able to consummate the closing of the transaction

-11-

contemplated herein but the Seller breaches its obligation to consummate the closing of the transaction contemplated herein;

c. by Seller by written notice to Purchaser if on the Closing Date the Seller is ready, willing, and able to consummate the closing of the transaction contemplated herein but the Purchaser breaches its obligation to consummate the closing of the transaction contemplated herein;

d. by Purchaser in the event that, on the Closing Date, the Share Purchase Condition has not been satisfied; provided however, that, in the event of a Share Purchase Breach, Purchaser shall not have any right to terminate the Agreement under this section 10.d;

e. by Seller, in the event Purchaser has the right to terminate the Agreement pursuant to Section 10.d but has not provided notice of such termination in accordance with Section 11 hereof on or before the third business day following the Closing Date; and

f. by Purchaser or Seller in the event that:

    i. there shall be any law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or

    ii. any governmental authority shall have issued an order restraining or enjoining the transactions contemplated by this Agreement, and such order shall have become final and non-appealable; or

    iii. by the 10th day following the Deposit Date, All Year Holdings has not filed a motion in the All Year US Bankruptcy (as defined in the Share PSA) for authorization to enter into the transaction contemplated in the Share PSA (the "Share PSA Approval Motion"); or

    iv. (A) either (1) the court presiding over the All Year US Bankruptcy enters an order denying the relief sought in the Share PSA Approval Motion or (2) the court presiding over the All Year BVI Bankruptcy enters an order denying All Year Holdings' application to authorize its entry into the Share PSA or (B) by the date that is the sixty-first (61st day) following the date on which All Year Holdings files the Share PSA Approval Motion, the court presiding over the All Year BVI Bankruptcy (as defined in the Share PSA) has not issued the Share PSA Approval Order.

11.    Notice of Termination; Effect of Termination.

a.  A party desiring to terminate this Agreement pursuant to section 10 shall give written notice of such termination to the other party, specifying the provision pursuant to which such termination is effective.

b.  Each party's right of termination under section 10 is in addition to the specific performance rights under applicable law.

c.  If this Agreement is validly terminated pursuant to section 10, all further obligations of the parties under this Agreement will terminate and there shall be no liability on the part of any party.

d.  In the event of the termination of this Agreement in accordance with section 10 hereof, the US Escrow Agent or the IL Escrow Agent, as applicable, shall release the Deposit Amount in accordance with the US Escrow Agreement or IL Escrow Agreement, which shall provide that:

   i.  to the extent such termination is pursuant to section 10.a – to the Seller or Purchaser, as will be set forth in the mutual written consent.

   ii.  to the extent such termination is pursuant to section 10.b, 10.d, 10.e and/or 10.f – to the Purchaser; provided, however, in the event such termination is pursuant to section 10.f.ii, iii or iv and the circumstances described in section 10.f.ii, iii or iv were caused by Purchaser Intervention, then the US Escrow Agent or the IL Escrow Agent shall release the Deposit Amount to the Seller.

   iii.  to the extent such termination is pursuant to section 10.c – to the Seller.

e.  In the event the Deposit Amount is released to the Seller pursuant to section 11.d.ii or 11.d.iii, then the Deposit shall be applied by Seller as follows: (i) 50% of the Deposit shall be applied by Seller as, a dollar-for-dollar partial repayment of the outstanding balance of the Mortgage Loan, in accordance with its terms, and (ii) 50% shall be accepted by Seller and Bondholders as the entire amount of liquidated damages for all and any claims Seller and/or the Bondholders may have arising only under this Agreement.

   Other than as set forth expressly herein, each of Purchaser and Seller reserves all its rights with respect to the nature or characterization of such payment by Purchaser and whether or not such payment would result in any claim against Borrower, provided however that Purchaser agrees that in any event, any such resulting claim shall be fully subordinated to all claims of the Seller and the Series C Bonds against Borrower, including without limitation, the Guaranty Claims, the Note and Mortgage.

-13-

12.    Severability of Provisions.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.  Furthermore, the parties shall in good faith endeavor to replace any provision held to be invalid or unenforceable with a valid and enforceable provision which most closely resembles, and which has the same economic effect as, the provision held to be invalid or unenforceable.

13.    Governing Law. THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT, AND/OR THE INTERPRETATION AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS AND DECISIONS OF THE STATE OF ISRAEL, WITHOUT REGARD TO THE CHOICE OF LAW RULES THEREOF.

14.    SUBMISSION TO JURISDICTION.  EACH OF THE PARTIES HERETO IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DISTRICT COURT OF TEL AVIV – JAFFA FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT; (III) AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (IV) CONSENTS TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER.  THE ABOVE MENTIONED WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY ASSIGNMENT.

15.    Assignment.  No party may assign any of its rights under this Agreement without the prior consent of the other party; provided, however, that Purchaser may assign its rights and obligations hereunder (in whole or in part) effective no earlier than the Closing to (1) a special purpose vehicle (i.e., a bankruptcy remote entity without any prior assets, operations, obligations or debt) controlled by Weiss; or (2) to any other entity with the consent of the Seller, which shall not be unreasonably withheld, delayed or conditioned, provided with respect of (1) and (2) that the Purchaser provides the Seller with the documents to effectuate any assignment, and any assignment of the Purchaser's rights hereunder occurs no less than five (5) business days prior to Closing.  Notwithstanding the foregoing, the Purchaser shall remain jointly liable under this Agreement with any assignee of the Purchaser's rights hereunder. Upon the reasonable request of Purchaser, Seller shall cooperate in a commercially reasonable manner, and at the sole cost and expense of Purchaser, to assign the Mortgage Loan and the Assigned Loan Documents directly to a third-party lender in connection with a refinance of the Property.

-14-

16.   <u>No Third-Party Beneficiaries</u>.   The parties do not intend the benefits of this Agreement to inure to any third party.

17.    <u>Amendment</u>.  This Agreement may be amended only by a written instrument that specifically refers to this Agreement and is executed by the Purchaser and the Seller.  This Agreement shall not be deemed to be amended orally or by virtue of any continuing custom or practice.

18.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, and by the parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement in Portable Document Format (PDF) or by facsimile transmission shall be as effective as delivery of a manually executed original counterpart of this Agreement.

19.   <u>Exercise of Rights</u>.  No failure or delay on the part of any party to exercise any right, power or privilege under this Agreement and no course of dealing between the Seller and the Purchaser shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which any party would otherwise have pursuant to law or equity.  No notice to or demand on any party in any case shall entitle such party to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of other party to any other or further action in any circumstances without notice or demand.

20.   <u>No Partnership</u>.  Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto.  Nothing herein contained shall be deemed or construed as creating an agency relationship between the Purchaser and the Seller and neither party shall take any action which could reasonably lead a third party to assume that it has the authority to bind the other party or make commitments on such party's behalf.

21.   <u>Integration</u>.  This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof.

22.   <u>Further Assurances</u>.  From and after the Closing, the parties hereto shall execute such other and further documents, instruments and certificates and shall take or cause to be taken such further actions as may reasonably be necessary to carry out, evidence or effectuate the intent of this Agreement and the transactions contemplated hereby.  Each party hereto shall cooperate with the other parties, to the extent reasonably requested by such other parties, to enforce rights and obligations herein provided.

23.     <u>Allocation of Fees and Expenses</u>.  The fees and expenses of the US Escrow Agent and the IL Escrow Agent shall be allocated equally to the Seller and the Purchaser, who shall each pay fifty percent (50%) of such fees and expenses.

\*        \*        \*        \*        \*        \*

IN WITNESS WHEREOF, the Purchaser and the Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year detailed herein.

MISHMERET TRUST COMPANY LTD.,
  AN ISRAELI COMPANY, AS TRUSTEE
  (SERIES C)


By: _____
     Name: _____
     Title: _____

Date: _____

WB DEBT ACQUISITION LLC

By:
Name: Zelig Weiss
Title:
Date: 3/23/22

## SCHEDULE 1

Documents are dated as of February 28, 2017 unless otherwise indicated and include all amendments, supplements and restatements thereof and any other agreements entered into by the parties thereto in connection therewith:

1. Amended and Restated Promissory Note in the original principal amount of $166,320,000.00 made by Borrower to All Year Holdings

2. Assignment of Leases and Rents and Security Deposits from Borrower to All Year Holdings

3. Assignment of Agreements from Borrower to All Year Holdings

4. UCC-1 State Filing (Debtor) (Delaware)

5. UCC-1 Fixture Filing (Kings County)

6. That certain Subordination, Non-Disturbance and Attornment Agreement entered into by and among All Year Holdings, Wythe Berry LLC and The William Vale Hotel LLC

7. That certain Subordination, Non-Disturbance and Attornment Agreement entered into by and among All Year Holdings, Borrower and Wythe Berry LLC

8. That certain Subordination, Non-Disturbance and Attornment Agreement entered into by and among All Year Holdings, Wythe Berry LLC and North 12 Parking LLC

9. That certain Subordination, Non-Disturbance and Attornment Agreement entered into by and among All Year Holdings, Wythe Berry LLC and The William Vale FNB LLC

10. Original Note dated 4/29/2014 in original principal amount of $8,500,000.00 given to Wythe Berry Debt Holdings LLC
    a. Original Allonge for this Note from Wythe Berry Debt Holdings LLC to SDF93 Wythe Avenue 1 LLC.

11. Certified True Copy or Original of the following Assignment of Mortgage:

    Assignor: Wythe Berry Debt Holdings LLC
    Assignee: SDF93 Wythe Avenue 1 LLC
    Dated: 06/06/2014
    Recorded: 06/19/2014
    CRFN 2014000210612

12. Original (GAP) Note dated 06/06/2014 in original principal amount of $8,050,000.00 given to SDF93 Wythe Avenue 1 LLC

*Mortgage Loan Purchase and Sale Agreement – Schedule 1*

13. Certified True Copy or Original of the following (GAP) Mortgage:

        Mortgagor: Wythe Berry LLC
        Mortgagee: SDF93 Wythe Avenue 1 LLC
        Amount: $8,050,000.00
        Dated: 06/06/2014
        Recorded: 06/19/2014
        CRFN# 2014000210613
        Tax Paid: $225,400.00

14. Original Consolidated Note dated 06/06/2014 in original principal amount of $16,550,000.00 given to SDF93 Wythe Avenue 1 LLC

15. Certified True Copy or Original of the following CEMA/Consolidated Mortgage:

        Mortgagor: Wythe Berry LLC
        Mortgagee: SDF93 Wythe Avenue 1 LLC
        Dated: 06/06/2014
        Recorded: 06/19/2014
        CRFN# 2014000210614
        Amount: $16,550,000.00

16. Original GAP Note dated 06/06/2014 in original principal amount of $17,236,000.00 given to SDF93 Wythe Avenue 1 LLC.
    a. Original Allonge for this Note from SDF93 Wythe Avenue 1 LLC to ALL Year Holdings Limited.

17. Certified True Copy or Original of the following (GAP) Mortgage

        Mortgagor: Wythe Berry LLC
        Mortgagee: SDF93 Wythe Avenue 1 LLC
        Amount: $17,236,000.00
        Dated: 12/04/2014
        Recorded: 01/14/2015
        CRFN: 2015000016216

18. Original Consolidated Note dated 06/06/2014 in original principal amount of $33,786,000.00 given to SDF93 Wythe Avenue 1 LLC
    a. Original Allonge for this Note from SDF93 Wythe Avenue 1 LLC to ALL Year Holdings Limited.

19. Certified True Copy or Original of the following CEMA/Consolidated Mortgage:

        Mortgagor: Wythe Berry LLC

Mortgagee: SDF93 Wythe Avenue 1 LLC
Dated: 12/04/2014
Recorded: 01/14/2015
CRFN: 2015000016217
Amount: 33,786,000.00

20. Certified True Copy or Original of the following Collateral Assignment of Mortgage:

Assignor: SDF93 Wythe Avenue 1 LLC
Assignee: Emigrant Realty Finance, LLC
Dated: 12/17/2014
Recorded: 01/14/2015
CRFN: 2015000016220

21. Certified True Copy or Original of the following Modification:

Mortgagor: Wythe Berry LLC
Mortgagee: SDF93 Wythe Avenue 1 LLC
Dated: 07/01/2016
Recorded: 10/28/2016
CRFN: 2016000380648

22. Certified True Copy or Original of the following Re-Assignment Collateral Assignment of Mortgage:

Assignor: Emigrant Realty Finance, LLC
Assignee: SDF93 Wythe Avenue 1 LLC
Dated: 11/02/2016
Recorded: 01/04/2017
CRFN: 2017000003991

23. Certified True Copy or Original of the following Assignment of Mortgage:

Assignor: SDF93 Wythe Avenue 1 LLC
Assignee: ALL Year Holdings Limited
Dated: 02/28/2017
Recorded: 03/06/2017
CRFN: 2017000087405

24. Original Note dated 06/06/2014 in original principal amount of $1,800,000.00 given to SDF93 Wythe Avenue 2 LLC

25. Certified True Copy or Original of the following Mortgage:

Mortgagor: Wythe Berry LLC
Mortgagee: SDF93 Wythe Avenue 2 LLC

        Amount: $1,800,000.00
        Dated: 06/06/2014
        Recorded: 06/19/2014
        CRFN: 2014000210617
        Tax Paid: $50,400.0

26. Original GAP Note dated 12/4/2014 in original principal amount of $1,934,000.00 given to SDF93 Wythe Avenue 2 LLC.

27. Certified True Copy or Original of the following GAP Mortgage:

        Mortgagor: Wythe Berry LLC
        Mortgagee: SDF93 Wythe Avenue 2 LLC
        Amount: $1,934,000.00
        Dated: 12/04/2014
        Recorded: 01/14/2015
        CRFN: 2015000016222
        Tax Paid: $54,152.00

28. Original Consolidated Note dated 12/4/2014 in original principal amount of $3,734,000.00 given to SDF93 Wythe Avenue 2 LLC.
    a. Original Allonge for this Note from SDF93 Wythe Avenue 2 LLC to ALL Year Holdings Limited.

29. Certified True Copy or Original of the following CEMA/Consolidated Mortgage:

        Mortgagor: Wythe Berry LLC
        Mortgagee: SDF93 Wythe Avenue 2 LLC
        Dated: 12/04/2014
        Recorded: 01/14/2015
        CRFN: 2015000016223
        Amount: $3,734,000.00.

30. Certified True Copy or Original of the following Collateral Assignment of Mortgage:

        Assignor: SDF93 Wythe Avenue 2 LLC
        Assignee: Emigrant Realty Finance, LLC
        Dated: 12/17/2014
        Recorded: 01/14/2015
        CRFN: 2015000016226

31. Certified True Copy or Original of the following Modification:

        Mortgagor: Wythe Berry LLC
        Mortgagee: SDF93 Wythe Avenue 2 LLC
        Dated: 07/01/2016

Recorded: 10/28/2016
CRFN: 2016000380649

32. Certified True Copy or Original of the following Re-Assignment Collateral Assignment of Mortgage:

 Assignor: Emigrant Realty Finance, LLC
 Assignee: SDF93 Wythe Avenue 2 LLC
 Dated: 11/02/2016
 Recorded: 01/04/2017
 CRFN: 2017000003990

33. Certified True Copy or Original of the following Assignment of Mortgage:

 Assignor: SDF93 Wythe Avenue 2 LLC
 Assignee: ALL Year Holdings Limited
 Dated: 02/28/2017
 Recorded: 03/06/2017
 CRFN: 2017000087409

34. Original Building Loan Note dated 12/4/2014 in original principal amount of $38,543,816.00 given to SDF93 Wythe Avenue 1 LLC.
 a. Original Allonge for this Note from SDF93 Wythe Avenue 1 LLC to ALL Year Holdings Limited.

35. Certified True Copy or Original of the following Building Loan Mortgage:

 Mortgagor: Wythe Berry LLC
 Mortgagee: SDF93 Wythe Avenue 1 LLC
 Amount: $38,543,816.00
 Dated: 12/04/2014 Recorded: 01/14/2015
 CRFN: 2015000016233
 Tax Paid: $1,079,226.40

36. Certified True Copy or Original of the following Collateral Assignment of Mortgage:
 Assignor: SDF93 Wythe Avenue 1 LLC
 Assignee: Emigrant Realty Finance, LLC
 Dated: 12/17/2014
 Recorded: 01/14/2015
 CRFN: 2015000016236

37. Certified True Copy or Original of the following Modification:

 Mortgagor: Wythe Berry LLC
 Mortgagee: SDF93 Wythe Avenue 1 LLC
 Dated: 07/01/2016

Recorded: 10/28/2016
CRFN: 2016000380651

38. Certified True Copy or Original of the following Re-Assignment Collateral Assignment of Mortgage:

   Assignor: SDF93 Wythe Avenue 1 LLC
   Assignee: ALL Year Holdings Limited
   Dated: 02/28/2017
   Recorded: 03/06/2017
   CRFN: 2017000087408

39. Original Project Loan Note dated 12/4/2014 in original principal amount of $5,195,254.00 given to SDF93 Wythe Avenue 1 LLC.
   a. Original Allonge for this Note from SDF93 Wythe Avenue 1 LLC to ALL Year Holdings Limited.

40. Certified True Copy or Original of the following Project Loan Mortgage:

   Mortgagor: Wythe Berry LLC
   Mortgagee: SDF93 Wythe Avenue 1 LLC
   Amount: $5,195,254.00
   Dated: 09/08/2016
   Recorded: 10/28/2016
   CRFN: 2016000380655
   Tax Paid: $145.468.41

41. Certified True Copy or Original of the following Assignment of Mortgage:

   Assignor: SDF93 Wythe Avenue 1 LLC
   Assignee: ALL Year Holdings Limited
   Dated: 02/28/2017
   Recorded: 03/06/2017
   CRFN: 2017000087406

42. Original Building Loan Note dated 12/4/2014 in original principal amount of $9,804,746.00 given to SDF93 Wythe Avenue 1 LLC.
   a. Original Allonge for this Note from SDF93 Wythe Avenue 1 LLC to ALL Year Holdings Limited.

43. Certified True Copy or Original of the following Building Loan Mortgage:

   Mortgagor: Wythe Berry LLC
   Mortgagee: SDF93 Wythe Avenue 1 LLC
   Amount: $9,804,746.00
   Dated: 09/08/2016

Recorded: 10/28/2016
CRFN: 2016000380652
Tax Paid: $274,531.61

44. Certified True Copy or Original of the following Assignment of Mortgage:

Assignor: SDF93 Wythe Avenue 1 LLC
Assignee: ALL Year Holdings Limited
Dated: 02/28/2017
Recorded: 03/06/2017
CRFN: 2017000087407

45. Original GAP Note dated 2/28/17 in original principal amount of $70,320,000.00 given to ALL Year Holdings Limited.
   a. Original Allonge for this Note from ALL Year Holdings Limited to Mishmeret Trust Company LTD.

46. Certified True Copy or Original of the following GAP Mortgage:

Mortgagor: Wythe Berry Fee Owner LLC
Mortgagee: ALL Year Holdings Ltd
Amount: $70,320,000.00
Dated: 02/28/2017
Recorded: 03/06/2017
CRFN: 2017000087404
Mortgage Tax Paid: $1,968,960.00

47. Certified True Copy or Original of the following CEMA/Consolidated Mortgage:

Mortgagor: Wythe Berry Fee Owner LLC
Mortgagee: ALL Year Holdings Limited
Dated: 02/28/2017
Recorded: 03/06/2017
CRFN: 2017000087411
Amount: $166,320,000.00

48. Certified True Copy or Original of the following Collateral Assignment of Mortgage:

Assignor: ALL Year Holdings Limited
Assignee: Mishmeret Trust Company LTD.
Dated: 02/28/2017
Recorded: 03/06/2017
CRFN: 2017000087412
Collateral Assignment of Assignment of Leases and Rents recorded 03/06/2017 in CRFN #2017000087420

49. Certified True Copy or Original of the following Modification:

      Mortgagor: Wythe Berry Fee Owner LLC
      Mortgagee: ALL Year Holdings Limited
      Dated: 02/28/2017
      Recorded: 03/29/2017
      CRFN: 2017000121032