Hearing Date and Time: May 26, 2022 at 2:00 p.m. (Eastern Time)
Objection Date and Time: May 19, 2022 at 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------X
                                                         :
In re                                                    :    **Chapter 11**
                                                         :
**ALL YEAR HOLDINGS LIMITED,**                           :    **Case No. 21-12051 (MG)**
                                                         :
                      **Debtor.**[1]                     :
                                                         :
**Fed. Tax Id. No. 98-1220822**                          :
----------------------------------------------------------X

**NOTICE OF HEARING ON**
**MOTION OF PARENT DEBTOR FOR ENTRY OF AN**
**ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 364, AND 507**
**(I) AUTHORIZING PARENT DEBTOR TO USE ESCROWED**
**FUNDS, (II) PROVIDING SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE CLAIM STATUS, AND (III) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**")[2]

of All Year Holdings Limited, as debtor and debtor in possession (the "**Parent Debtor**") in the

above-captioned chapter 11 case, pursuant to sections 105(a), 363, 364, and 507 of title 11 of the

United States Code, Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the

---

[1]    The Parent Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion.

United States Bankruptcy Court for the Southern District of New York (the "**Local Bankruptcy Rules**"), for entry of an order (i) authorizing the Parent Debtor to enter into a multiple draw debtor-in-possession term loan in an aggregate principal amount of up to $4,500,000.00 (the "**DIP Loan**") made available to the Parent Debtor and funded with "Escrowed Funds," as defined in that certain Investment Agreement, dated March 11, 2022 (as amended on April 21, 2022, and as may be further amended, modified, or supplemented from time to time in accordance with the terms thereof), by and among, *inter alia*, the Parent Debtor and Paragraph Partners, LLC (the "**Plan Investor**"), (ii) authorizing the Parent Debtor to borrow under the DIP Loan and to incur all obligations owing thereunder and under the DIP Documents to the Plan Investor (the "**DIP Obligations**"), (iii) authorizing the Parent Debtor to, subject to the Carve-Out, grant a superpriority administrative expense claim to the Plan Investor for all DIP Obligations, (iv) authorizing and directing the Parent Debtor to pay the principal, interest, fees, and expenses payable under and in accordance with the DIP Documents, and (v) granting related relief, all as more fully set forth in the Motion, will be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge for the Southern District of New York, on **May 26, 2022 at 2:00 p.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Bankruptcy Rules  and the Local Bankruptcy Rules, shall be filed with the Bankruptcy Court (i) by attorneys practicing in the Bankruptcy Court, including attorneys admitted pro hac vice, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (ii) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with two single-sided hard copies delivered to the Judge's Chambers), in accordance with the customary

2

practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be

served in accordance with General Order M-399, the Bankruptcy Rules, and the Local Bankruptcy

Rules, so as to be filed and served upon (i) William K. Harrington, the U.S. Department of Justice,

Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea

B. Schwartz, Esq. and Shara Cornell, Esq.); (ii) the Parent Debtor's top twenty (20) unsecured

creditors; (iii) the Internal Revenue Service; (iv) the United States Attorney's Office for the

Southern District of New York; (v) counsel to Mishmeret Trust Company Ltd., as Notes Trustee,

Chapman and Cutler LLP, 1270 Sixth Avenue, New York, New York 10020 (Attn: Michael

Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron Krieger, Esq.); and (vi) counsel to the Plan

Investor (a) Gissin & Co., Habarzel 38B, Tel Aviv 6971054, Israel (Attn: Yael Hershkovitz, Esq.),

(b) Locke Lord LLP, 200 Vesey Street, 20th Floor, New York, NY 10281 (Attn: Shalom Jacob,

Esq.), and (c) Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York,

NY 10004 (Attn: Avi D. Feinberg, Esq.), by no later than **May 19, 2022 at 4:00 p.m. (Eastern

Time)** (the "**Objection Deadline**").

      **PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and

served with respect to the Motion, the Parent Debtor may, on or after the Objection Deadline,

submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed

to the Motion as **Exhibit A**, which order may be entered without further notice or opportunity to

be heard.

      **PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

      **PLEASE TAKE FURTHER NOTICE that, due to the COVID-19 pandemic,

the Hearing will be conducted using Zoom for Government.  Parties should not appear in**

3

**person and those wishing to appear or participate at the Hearing (whether "live" or "listen only") must make an electronic appearance through the Court's website prior to 4:00 p.m. (Prevailing Eastern Time) on the day before the Hearing. Instructions for making an eCourtAppearance and additional information on the Court's Zoom procedures can be found at http://www.nysb.uscourts.gov/content/judge-martin-glenn.**

Dated: May 5, 2022
      New York, New York

                        /s/  *Matthew P. Goren*
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York  10153
                        Telephone:  (212) 310-8000
                        Facsimile:  (212) 310-8007
                        Gary T. Holtzer
                        Jacqueline Marcus
                        Matthew P. Goren

                        *Attorneys for the Parent Debtor*

WEIL:\98605972\12\12817.0007

**Hearing Date and Time: May 26, 2022 at 2:00 p.m. (Eastern Time)**
**Objection Date and Time: May 19, 2022 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X
                                                         :
In re                                                    :    **Chapter 11**
                                                         :
**ALL YEAR HOLDINGS LIMITED,**                           :    **Case No. 21-12051 (MG)**
                                                         :
                        Debtor.[1]                       :
                                                         :
Fed. Tax Id. No. 98-1220822                              :
---------------------------------------------------------X

## MOTION OF PARENT DEBTOR FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 364, AND 507 (I) AUTHORIZING PARENT DEBTOR TO USE ESCROWED FUNDS, (II) PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM STATUS, AND (III) GRANTING RELATED RELIEF

TO THE HONORABLE MARTIN GLENN,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

              All Year Holdings Limited, as debtor and debtor in possession (the "**Parent**

**Debtor**" or the "**Borrower**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"),

respectfully represents as follows in support of this motion (the "**Motion**"):

---

[1]    The Parent Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

## Relief Requested

1.      Since commencing its case on December 14, 2021 (the "**Petition Date**"), the Parent Debtor has funded the costs of administering its Chapter 11 Case and maintaining its operations and the operations of its direct and indirect non-debtor subsidiaries (the "**PropCos**") utilizing only its unencumbered cash on hand.  During this time, the Parent Debtor has continued negotiations with its creditors and conducted a robust and wide-ranging sale and marketing process to identify a potential transaction that will facilitate a successful reorganization and emergence from chapter 11.  This process resulted in the Parent Debtor entering into that certain Investment Agreement, dated March 11, 2022, by and among the Parent Debtor, Paragraph Partners, LLC (the "**Plan Investor**"), and Mishmeret Trust Company Ltd. (the "**Notes Trustee**"), solely in its capacity as trustee for the Parent Debtor's various series of notes (such holders, the "**Noteholders**") and in respect of Sections 7.02(b), 8.01(b), 8.01(c), and 8.02(c) thereof (as amended on April 21, 2022, and as may be further amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Investment Agreement**")[2] that will result in, among other things, (i) an approximately $60 million investment in the Parent Debtor in the form of cash and new notes and (ii) the assumption by the Plan Investor of all unsecured claims against the Parent Debtor other than the Noteholders' claims and certain other discrete categories set forth in the Investment Agreement.

2.      The transactions represented by the Investment Agreement represent a real and achievable path towards the Parent Debtor's successful emergence from chapter 11 and the parties are working diligently to finalize and file a chapter 11 plan to implement the terms of the

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Investment Agreement or the DIP Term Sheet (as defined below), as applicable.

2

Investment Agreement (a "**Plan**") together with a supporting disclosure statement (a "**Disclosure Statement**") and a solicitation procedures motion.

3.       The path forward to emergence, however, is likely to take longer than originally anticipated when the Parent Debtor commenced its case on the Petition Date. This is, in part, due to the approvals that will be necessary in connection with confirmation and consummation of the Plan. Specifically, additional time will be required (i) to commence solicitation of the Noteholders' votes on a Plan in order to comply with Israeli securities law, and (ii) to implement the terms of the Plan and the Investment Agreement in the British Virgin Islands (the "**BVI**"), and (iii) to seek recognition of the Plan and Confirmation Order in Israel.

4.       The Parent Debtor projects that it will have nearly exhausted its operating cash within the next 60 days and that, absent additional funding, it will be unable to sustain its operations on a go-forward basis. The Parent Debtor, therefore, has an immediate need for additional liquidity to fund its operations and to continue the administration of the Chapter 11 Case while it progresses towards implementation of the Investment Agreement and consummation of the Plan. After extensive discussions and negotiations, the Plan Investor has agreed to allow the Parent Debtor to utilize the $4,500,000.00 in Escrowed Funds (as defined below) that are to be funded in accordance with the Investment Agreement on the "Escrow Date"[3] once the parties have agreed upon a form of Plan. The Parties anticipate finalizing their negotiations and filing an agreed upon Plan shortly.[4]

---

[3]      Pursuant to the terms of the Investment Agreement, "**Escrow Date**" means the date that is within five (5) business days of the later to occur of (i) Court approval of the motion approving the bid protections under the Investment Agreement [ECF No. 66] (the "**Bid Protections Motion**") and (ii) the date on which a Plan that is reasonably acceptable to the Plan Investor is annexed to the Investment Agreement. An order approving the Bid Protections Motion was entered by the Court on April 19, 2022 [ECF No. 85].

[4]      The current deadline for the parties to annex an agreed upon form of Plan to the Investment Agreement is May 10, 2022.

3

5.       As set forth below, the Plan Investor has agreed to permit the Parent Debtor to draw upon the Escrowed Funds to, among other things, fund its general corporate working capital needs in accordance with the DIP Budget.  This will allow the Parent Debtor to avoid running an expensive process to seek out additional third-party financing that, even if available, would undoubtedly be more costly and further deplete recoveries to impaired creditors.  The Plan Investor has agreed to provide the DIP Loan (as defined below) to the Parent Debtor on very favorable terms and is not seeking payment of any commitment or closing fees or requiring the provision of any postpetition liens to secure the financing, terms that are customary in debtor-in-possession financing.  In addition, the Plan Investor has agreed to forego the costly and lengthy process of negotiating a formal credit agreement and has agreed to permit the DIP Loan to be provided based upon (i) the DIP Term Sheet, (ii) a simple form of amendment to the Investment Agreement to permit the borrowing, and (iii) the annexed form of Proposed Order (each as defined below).  Accordingly, the Parent Debtor believes that utilizing the Escrowed Funds on the terms set forth herein to maintain the Parent Debtor's operations, preserve the value of its subsidiaries, and to provide sufficient liquidity to enable the Parent Debtor to confirm and consummate a Plan is a sound exercise of the Parent Debtor's business judgement.

6.       Accordingly, by this Motion, pursuant to sections 105(a), 363, 364, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Bankruptcy Rules**"), the Parent Debtor requests entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "**Proposed Order**"), granting the following relief:

a.       authorizing the Parent Debtor to enter into a multiple draw debtor-in-possession term loan (the "**DIP Loan**") in the aggregate principal amount of up to

4

$4,500,000.00 (the "**DIP Loan Proceeds**") made available to the Parent Debtor and funded with the "Escrowed Funds" pursuant to the terms and conditions set forth in (a) the Proposed Order, (b) the term sheet, dated May 5, 2022, executed by the Parent Debtor and the Plan Investor, a copy of which is annexed to the Proposed Order as **Exhibit 1** (the "**DIP Term Sheet**"), (c) the Investment Agreement (as amended in accordance with the DIP Term Sheet, a substantially final form of such amendment is annexed hereto as **Exhibit C**), and (d) the Escrow Agreement (as defined in the Investment Agreement) (the foregoing (a)–(d) collectively, the "**DIP Documents**"), and in accordance with the budget, annexed to the DIP Term Sheet as **Schedule A** (the "**DIP Budget**");

b.      authorizing the Parent Debtor to borrow under the DIP Loan and to incur all obligations owing thereunder and under the DIP Documents to the Plan Investor (collectively,  the "**DIP Obligations**");

c.      authorization the Parent Debtor, subject to the Carve-Out (as defined below), to grant a superpriority administrative expense claim, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, to the Plan Investor for all DIP Obligations with priority over any and all allowed administrative expenses and unsecured claims against the Parent Debtor or its estate, now existing or hereafter arising (a "**Superpriority Claim**");

d.      authorizing and directing the Parent Debtor to pay the principal, interest, fees, and expenses payable under the DIP Documents, including, without limitation, the reasonable and documented fees and out-of-pocket disbursements of the Parent Debtor's attorneys, as and to the extent provided in, and in accordance with, the applicable DIP Documents; and

e.      granting related relief.

7.      In support of the Motion, the Parent Debtor submits the declaration of Joseph Baum, a Certified Public Accountant and a partner at CFGI, LLC, the Parent Debtor's proposed financial advisor, which is annexed hereto as **Exhibit B** (the "**Baum Declaration**").  The Notes Trustee, on behalf of the Noteholders, supports entry of the relief set forth herein.

## **Jurisdiction**

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. § 1408 and 1409.

5

## Background

9.       On the Petition Date, the Parent Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Parent Debtor is authorized to continue to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in the Chapter 11 Case.

10.       On December 16, 2021, the Parent Debtor determined that it was necessary to file an application under the laws of the BVI with the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division Virgin Islands (the "**BVI Court**") seeking the appointment of Paul Pretlove and Charlotte Caulfield of Kalo (BVI) Limited as joint provisional liquidators (the "**JPLs**") under the applicable provisions of the BVI Insolvency Act 2003.  On December 20, 2021, the BVI Court entered an order appointing the JPLs.

11.       On April 14, 2022, with the consent of the JPLs and the approval and direction of the BVI Court, the Parent Debtor commenced a proceeding in the Israeli Court for recognition of the Chapter 11 Case as a foreign main proceeding under the applicable provisions of Chapter I, Part C of the Insolvency and Rehabilitation Law of Israel 5778-2018 (the "**Israeli Recognition Proceeding**").  An order recognizing the Chapter 11 Case was entered by the Israeli Court on May 4, 2022.

12.       Information regarding the Parent Debtor's business, capital structure, and the circumstances leading to the commencement of the Chapter 11 Case is set forth in the *Declaration of Assaf Ravid Pursuant to Local Bankruptcy Rule 1007-2 in Support of All Year Holdings Limited Chapter 11 Petition* [ECF No. 4] and is incorporated herein by reference.

## Concise Statements Regarding the DIP Loan
## Pursuant to Bankruptcy Rule 4001(c) and Local Bankruptcy Rule 4001-2[5]

13.    The following chart contains a summary of the material terms of the Parent

Debtor's proposed DIP Loan pursuant to the DIP Documents, together with references to the

applicable sections of the relevant source document, as required by Bankruptcy Rule 4001(c)(1)(B)

and Local Bankruptcy Rule 4001-2:

| SUMMARY OF THE DIP LOAN | |
| --- | --- |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | The Parent Debtor (***See*** **Term Sheet, at 1; DIP Order ¶ (i)**) |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Paragraph Partners, LLC (***See*** **Term Sheet, at 1; DIP Order ¶ (i)**) |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B); Local<br>Bankruptcy Rule 4001-2(a)(1) | A multiple draw debtor-in-possession term loan (the "**DIP Loan**") in the aggregate principal amount of up to $4,500,000.00 (the "**DIP Loan Proceeds**") to be made available to the Borrower and funded with the "Escrowed Funds." (***See*** **Term Sheet, at 1, 2; DIP Order ¶¶ (i), 1**) |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Interest Rate</u>: 5% per annum, accruing monthly and payable on the Maturity Date (as defined below). (***See*** **Term Sheet, at 3**)<br><br><u>Default Interest Rate</u>: 7% per annum, accruing monthly and payable on the Maturity Date. (***See*** **Term Sheet, at 3**) |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B); Local<br>Bankruptcy Rule 4001-2(3) | <u>Commitment / Closing Fees</u>:  None. (***See*** **Term Sheet, at 3**)<br><br><u>DIP Loan Costs</u>:  The Plan Investor shall be entitled to reimbursement of its reasonable and documented, out-of-pocket fees and expenses for its legal counsel arising from or related to the negotiation of the DIP Loan to be paid by the Borrower out of the DIP Loan Proceeds within seven (7) business days following the entry of the DIP Order and funding of the DIP Loan in accordance with the terms of the DIP Term Sheet and in the DIP Order.  In the event of an Event of Default or termination by the Plan Investor of the Investment Agreement, the Plan Investor shall be entitled to reimbursement of its reasonable and documented out-of-pocket fees and expenses for its legal counsel relating to the enforcement of the DIP Loan and repayment of the DIP Loan Proceeds by the Borrower. (***See*** **Term Sheet, at 5; DIP Order ¶ 10**) |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B); Local<br>Bankruptcy Rule 4001-2(2) | Compliance with a DIP Budget, in form and substance reasonably acceptable to the Plan Investor, with a permitted negative cash disbursements variance not greater than 15%, tested on a rolling four week period basis beginning in the third week following entry of the DIP Order; <u>provided</u>, <u>however</u>, testing with respect to disbursements for |

---

[5]    The following summary of the DIP Loan is qualified in its entirety by reference to the applicable provisions of the relevant DIP Documents.  To the extent there are any inconsistencies between this summary and the provisions of the DIP Documents, the terms of the DIP Documents shall control.  Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP Documents.  The Parent Debtor reserves the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2 herein.

| SUMMARY OF THE DIP LOAN | |
|---|---|
| | professionals and advisors of the Debtor shall be tested on a cumulative basis during the term of the DIP Loan) (*See* **Term Sheet, at 4–5, Sch. A; DIP Order ¶ 6)** |
| **DIP Liens; Effect on Existing Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(i)<br>Local Bankruptcy Rule 4001-2(a)(4) | Not applicable. |
| **Superpriority Claim**<br>Bankruptcy Rule 4001(c)(1)(B)(i)<br>Local Bankruptcy Rule 4001-2(a)(4) | The obligations of the Borrower with respect to the DIP Loan and the DIP Loan Proceeds shall at all times constitute a claim against the Borrower and its estate in the Bankruptcy Case, which is an administrative expense claim having priority, pursuant to section 364(c)(1) and 507(b) of the Bankruptcy Code, and seniority (in each case, subject to the Carve-Out (as defined below)), over any and all allowed administrative expenses and unsecured claims against the Borrower or its estate, now existing or hereafter arising, including, without limitation, administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(b) and (c), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (such claim, a "**Superpriority Claim**"). Subject to the Carve-Out, any such Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition property and assets of the Borrower and its estate, and all proceeds thereof, including for the avoidance of doubt, (i) any deposit in connection with any Alternative Transaction (whether terminated or otherwise) that becomes property of the Borrower's estate, (ii) claims against the Borrower's directors and officers (if any), and (iii) the proceeds of any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551, and 553(b) of the Bankruptcy Code. (*See* **Term Sheet, at 3–4; DIP Order ¶¶ (iii), 3)** |
| **Carve-Out**<br>Local Bankruptcy Rule 4001-2(a)(5) | The "**Carve-Out**" shall be the sum of:<br><br>(i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee for Region 2 under 28 U.S.C. § 1930(a) plus interest at the statutory rate;<br><br>(ii) all reasonable and documented fees and expenses, in an aggregate not to exceed $25,000, incurred by a trustee under section 726(b) of the Bankruptcy Code;<br><br>(iii) to the extent allowed at any time, whether by interim or final compensation or other order, all accrued and unpaid claims for fees, costs and expenses incurred by the Parent Debtor Professionals or any Committee Professionals pursuant to sections 327, 328, or 1103 of the Bankruptcy Code, which were incurred at any time on or prior to the first business day after the Carve-Out Trigger Date, whether allowed before or after the Carve-Out Trigger Date and without regard to whether such fees, costs and expenses are provided for in the DIP Budget or were invoiced after the Carve-Out Trigger Date; and<br><br>(iv) any Professional Fees of the Professional Persons incurred after the first business day following the Carve-Out Trigger Date, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, in an aggregate amount not to exceed $250,000. |

WEIL:\98605972\12\12817.0007

| SUMMARY OF THE DIP LOAN | |
|---|---|
| | (*See* **Term Sheet, at 4; DIP Order ¶ 9**) |
| **Use of DIP Loan Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Bankruptcy Rule 4001-2(a)(3),<br>(a)(15) | The DIP Loan Proceeds shall be used by the Borrower:<br><br>(i) to fund general corporate working capital needs in accordance with the DIP Budget, including, without limitation, to be used to fund the operations and otherwise make payments on account of the Borrower's non-debtor direct and indirect subsidiaries;<br><br>(ii) for the payment of interest and DIP Loan Costs (as defined below) under the DIP Loan; and<br><br>(iii) to pay the allowed and approved fees and expenses of the Borrower's professionals (and the professionals of any official committee appointed in the Bankruptcy Case).<br><br>For the avoidance of doubt, the DIP Loan Proceeds shall not be used in a manner inconsistent with the Investment Agreement. (*See* **Term Sheet, at 5; DIP Order ¶¶ C, 10**) |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001(a)(2) | The funding of the initial draw, and each subsequent draw, under the DIP Loan shall be subject to the following conditions precedent:<br><br>(i) the Investment Agreement shall be in full force and effect, as amended by the Investment Agreement Amendment;<br><br>(ii) the Escrow Agreement shall have been revised to be consistent with the Term Sheet and shall be in full force and effect;<br><br>(iii) entry of the DIP Order, which shall be in full force and effect;<br><br>(iv) delivery of the initial DIP Budget; and<br><br>(v) no trustee, examiner with expanded powers, or receiver shall have been appointed or designated with respect to the Borrower (other than the JPLs)<br><br>(*See* **Term Sheet, at 4**) |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Bankruptcy Rule 4001-2(a)(3),<br>(a)(10) | The DIP Loan shall mature (the "**Maturity Date**") upon the earliest to occur of:<br><br>(i) December 31, 2022;<br><br>(ii) the effective date of a confirmed chapter 11 plan for the Borrower implementing the terms of the Investment Agreement (as may be amended, modified, or supplemented in accordance with the terms of the Investment Agreement, an "**Approved Plan**");<br><br>(iii) 90 days following termination of the Investment Agreement;<br><br>(iv) the closing of a sale of all or substantially all of the Borrower's assets to the Plan Investor other than pursuant to the Approved Plan; |

WEIL:\98605972\12\12817.0007

| SUMMARY OF THE DIP LOAN | |
|---|---|
| | (v) a closing of sale of all or substantially all of Borrower's assets to a purchaser other than the Plan Investor; and<br><br>(vi) the effective date of a confirmed chapter 11 plan of reorganization for the Borrower other than the Approved Plan (the aforementioned (v) and (vi), collectively, an "**Alternative Transaction**").<br><br>(*See* Term Sheet, at 2) |
| **Financial Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Compliance with the DIP Budget, subject to permitted negative variances set forth in the Term Sheet. (*See* **Term Sheet, at 4–5**) |
| **Events of Default; Rights and Remedies Upon Event of Default**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Bankruptcy Rule 4001-2(a)(10) | Events of Default:  The DIP Loan shall be subject to the following Events of Default, which can be waived by the Plan Investor:<br><br>(i) the Bankruptcy Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;<br><br>(ii) a default, subject to any applicable grace and/or cure periods, by the Borrower under the terms of the DIP Documents;<br><br>(iii) termination of the Investment Agreement or the failure by the Borrower to meet or comply with any deadline or milestone set forth therein; and<br><br>(iv) the use or application of proceeds in a manner not provided for in the DIP Budget.<br><br>Rights and Remedies Upon Event of Default:  Upon the occurrence and during the continuation of an Event of Default, all ability of the Parent Debtor to borrow under the DIP Loan shall be terminated without further order of the Bankruptcy Court and, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Bankruptcy Court:<br><br>(a) the Plan Investor may send a written notice, which may be given through electronic mail or other electronic means, to the Parent Debtor and the U.S. Trustee (any such declaration shall be referred to herein as a "**Termination Declaration**") declaring (1) the DIP Obligations under the DIP Loan to be due and payable in accordance with the DIP Documents, (2) the DIP Loan terminated and the termination of the Parent Debtor's ability to use any remaining Escrow Funds to fund loans under the DIP Loan, (3) the application of the Carve-Out has occurred following the delivery of the Termination Declaration; and<br><br>(b) interest, including applicable default interest, shall accrue until the DIP Obligations are repaid in full.<br><br>The Parent Debtor may seek an emergency hearing during the three (3) business days following the date a Termination Declaration for the sole purpose of determining whether an Event of Default has in fact occurred or is continuing. (*See* **Term Sheet, at 5; DIP Order ¶¶ 4, 11, 12.**) |

WEIL:\98605972\12\12817.0007

## The Parent Debtor's Immediate Need for the DIP Loan

14.     As set forth in the Baum Declaration, the Parent Debtor requires immediate access to postpetition financing to ensure that it has sufficient general corporate working capital to sustain its operations (and the operations of the PropCos) and administer this Chapter 11 Case while continuing on its path towards a successful reorganization.  Prior to the date hereof, the Parent Debtor, in consultation with its advisors, analyzed and reviewed the Parent Debtor's projected cash needs and prepared an initial DIP Budget reflecting its ongoing cash needs through the anticipated effective date of the Plan.  Because the PropCos do not generate sufficient cash flows to sustain the Parent Debtor's ordinary course operations, the Parent Debtor will be unable to consummate the value-maximizing transaction embodied in the Investment Agreement without the DIP Loan.  This would result in irreparable harm to the Parent Debtor and the value of the Parent Debtor's estate.

15.     The DIP Loan will provide the necessary liquidity to allow the Parent Debtor to file, submit, solicit, and, hopefully, confirm and consummate a Plan that implements the terms of the Investment Agreement.  Accordingly, accessing the DIP Proceeds provided under the DIP Loan is necessary to enable the Parent Debtor to continue on its path towards a comprehensive restructuring and ultimate emergence from chapter 11.

## Relief Requested Should Be Granted

## I.     The Parent Debtor's Entry into the DIP Documents is an Exercise of the Parent Debtor's Sound Business Judgment

16.     The Court should authorize the Parent Debtor to enter into the DIP Documents and borrow under the DIP Loan.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment

11

in obtaining postpetition credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

17.     Additionally, section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). In this District, "[t]he standard used for judicial approval of the use of estate property outside of the ordinary course of business is [] the business judgment of the debtor." *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (citing *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003)).

18.     Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah.  Oct 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto.  Sys.  Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

19.     The Parent Debtor's decision to utilize the DIP Loan and enter into the DIP Documents is an exercise of its sound business judgment.  As further discussed in the Baum Declaration, the DIP Loan set forth in the DIP Documents was negotiated in good faith and at arm's length.  The Parent Debtor engaged in extensive back-and-forth negotiations with the Plan Investor and was able to achieve very favorable terms for the DIP Loan as set forth in the DIP Documents.  Significantly, the DIP Loan presented by the Plan Investor will allow the Parent Debtor to access the Escrowed Funds to be provided under the Investment Agreement rather than to go through the process of seeking out additional third-party financing that would be more costly and further diminish recoveries to impaired creditors.  If the Plan is consummated, the DIP Loan will be repaid by application of a credit towards the Plan Consideration (as defined in the Investment Agreement) to be paid by the Plan Investor.  To provide the Plan Investor with a source for repayment of the DIP Obligations if the transaction contemplated by the Investment Agreement

13

is not consummated, the Parent Debtor has agreed to provide the Plan Investor with a Superpriority

Claim, subject to the Carve-Out, on account of any DIP Obligations.

20.     In addition, advances under the DIP Loan will bear interest at a below

market rate of 5% per annum, accruing monthly and payable upon the Maturity Date.  Aside from

such interest, the only fees that the Plan Investor will receive are for the reimbursement of its

reasonable professional fees and expenses in connection with the DIP Loan.  The Plan Investor is

not seeking payment of any commitment or closing fees or requiring the provision of any

postpetition liens to secure the financing, terms that are customary in debtor-in-possession

financing.  Further, the Plan Investor has agreed to forego the costly and lengthy process of

negotiating a formal credit agreement and has agreed to permit the DIP Loan to be provided based

upon (i) the DIP Term Sheet, (ii) a simple form of amendment to the Investment Agreement to

permit the borrowing, and (iii) the annexed form of Proposed Order.  Ultimately, the DIP Loan

reflects a compromise and is designed to allow the Parent Debtor to continue on its path towards

a successful reorganization without having to incur unreasonable and unnecessary expenses.

21.     For these reasons, the Parent Debtor determined, in the exercise of its sound

business judgment, that the DIP Loan represents the best financing available and that entry into

the DIP Documents is reasonable and is in the best interests of the Parent Debtor and its estate.

Accordingly, the Court should authorize the Parent Debtor's entry into the DIP Documents as a

reasonable exercise of its business judgment.

## II.     The Parent Debtor Should Be Authorized to Grant the Superpriority Claim

22.     The Parent Debtor proposes to obtain the DIP Loan by providing the Plan

Investor with a Superpriority Claim, as set forth in the DIP Documents and described above.  The

Parent Debtor satisfies the requirements for relief under section 364 of the Bankruptcy Code,

WEIL:\98605972\12\12817.0007

which authorizes a debtor to incur superpriority debt under certain circumstances. Specifically,

section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee is unable to obtain unsecured credit allowable under
> section 503(b)(1) of this title as an administrative expense, the court,
> after notice and a hearing, may authorize the obtaining of credit or
> the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind
> specified in section 503(b) or 507(b) of this title;

11 U.S.C. § 364(c)(1).

23.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a

debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor

on an unsecured or administrative expense basis. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr.

E.D. Pa. 1987). "The statute imposes no duty to seek credit from every possible lender before

concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re

Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v.

Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative

expenses should be authorized where debtor could not obtain credit as an administrative expense).

When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be

unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for

financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re

Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien

because the debtor had made unsuccessful contact with other financial institutions in the relevant

geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact

that two national banks refused to grant unsecured loans was sufficient to support the conclusion

that the requirements of section 364 were met).

WEIL:\98605972\12\12817.0007

24.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing a lender only an administrative claim);

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

25.     Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code.]"  As set forth in the Baum Declaration, it is unlikely that the Parent Debtor would be able to obtain postpetition financing from any third-party lender, let alone on an unsecured basis.  Even if the Parent Debtor was able to locate another potential lending source that was willing to provide financing to the Parent Debtor on an unsecured basis, it is unlikely that the terms provided by any such third-party source would be as favorable as the terms represented by the DIP Loan, which is being provided without any commitment or closing fees.  Accordingly, the Parent Debtor determined that the DIP Loan represented the best opportunity available under the circumstances to fund its operations for the remainder of the Chapter 11 Case.  Therefore, granting a Superpriority Claim in favor of the Plan Investor is reasonable and appropriate.

16

## III.    The Carve-Out is Appropriate

26.    The Superpriority Claim granted by the Parent Debtor pursuant to the DIP Documents is subject to the Carve-Out.  The Carve-Out contains similar terms to others that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See In re Evergreen Gardens Mezz LLC*, Case No. 21-10335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) [ECF No. 128]; *In re Avaya,* Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) [ECF No. 61]; *In re Ames Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr.  D. Del. Aug. 19, 2016) [ECF No. 130]; *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 6, 2016) [ECF No. 99]; *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr.  D. Del. Nov. 2, 2015) [ECF No. 248]; *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) [ECF No. 54]; *In re Bear Island Paper Co., LLC*, No. 10-31202 (DOT) (Bankr.  E.D. Va. Feb. 26, 2010) [ECF No. 66]; *In re The Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) [ECF No. 43].

27.    Without the Carve-Out, the Parent Debtor's estate may be deprived of possible rights and powers because the services for which professionals may be paid in these cases is restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the course of the case by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of the Superpriority Claim.

WEIL:\98605972\12\12817.0007

## IV.    The Parent Debtor Should Be Authorized to Pay the DIP Loan Costs Under the DIP Documents

28.    As described herein, the Parent Debtor has agreed, subject to this Court's approval, to pay the DIP Loan Costs, which are comprised of the Plan Investor's reasonable and documented, out-of-pocket fees and expenses for its legal counsel arising from or related to the DIP Loan.  The DIP Loan Costs incurred in connection with the negotiation of the DIP Loan are proposed to be paid by the Parent Debtor out of the DIP Loan Proceeds within seven (7) business days following the entry of the Proposed Order and funding of the DIP Loan.  Other than the DIP Loan Costs and the reasonable rate of interest payable on the Maturity Date, the Plan Investor agreed to forego any other fees in connection with providing the DIP Loan.  As set forth in the Baum Declaration, the terms of the DIP Documents, including the fees imposed thereunder, represent the best terms on which the Parent Debtor can obtain the postpetition financing necessary to maintain its ongoing operations and fund the Chapter 11 Case.  Moreover, the DIP Loan Costs are customary and in line with debtor-in-possession financings of this kind.  The Parent Debtor considered the DIP Loan Costs when determining in its sound business judgment whether the DIP Documents constituted the best terms on which it could obtain sufficient postpetition financing.  The Parent Debtor believes that paying the DIP Loan Costs in order to obtain the DIP Loan is reasonable and is in the best interests of the Parent Debtor's estate.  Accordingly, the Court should authorize the Parent Debtor to pay the DIP Loan Costs.

## V.    The Plan Investor Should Be Deemed a Good Faith Lender Under Section 364(e).

29.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or the grant of such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

30.    Here, the Parent Debtor believes that the DIP Loan embodies the most favorable terms on which the Parent Debtor could obtain postpetition financing.  As described in the Baum Declaration, the extensive back-and-forth negotiations of the DIP Documents with the Plan Investor were conducted in good faith and at arm's length.  The terms and conditions of the DIP Documents are fair and reasonable, and the DIP Loan Proceeds will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Documents and the DIP Budget.  Accordingly, the Court should find that the Plan Investor is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and that the Plan Investor is, therefore, entitled to all of the protections afforded by that section.

**Bankruptcy Rule 6004(a) Has Been Satisfied and 6004(h) Should Be Waived**

31.    To implement the foregoing successfully, the Parent Debtor requests that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a), and waive the 14-day stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 6004(h).  As explained herein, access to the DIP Loan is essential to prevent irreparable damage to the Parent Debtor's estate.  The relief requested herein is critical to the Parent Debtor's efforts to preserve and maximize the value of its estate.  Accordingly, the Parent Debtor submits that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and that a waiver of the

14-day stay period is appropriate under Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## Reservation of Rights

32.     Nothing contained herein is intended, or shall be construed, as (i) an admission as to the validity of any claim against the Parent Debtor; (ii) a waiver of the Parent Debtor's or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Parent Debtor; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Parent Debtor and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Parent Debtor's rights to dispute such claim subsequently.

## BVI Court Approval

33.     The JPLs support approval of the DIP Loan and have consented to the Parent Debtor's entry into the DIP Documents, subject to the approval of the BVI Court. Accordingly, the Parent Debtor intends to file an application shortly requesting the BVI Court approve the Parent Debtor's entry into the DIP Loan, subject to this Court's approval of the DIP Documents and the relief requested in the Motion.

## Notice

34.     Notice of this Motion will be provided to (i) William K. Harrington, the U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shara Cornell, Esq.); (ii) the Debtor's top twenty (20) unsecured creditors; (iii) the Internal Revenue Service; (iv) the United States Attorney's

20

Office for the Southern District of New York; (v) counsel to Mishmeret Trust Company Ltd., as

Notes Trustee, Chapman and Cutler LLP, 1270 Sixth Avenue, New York, New York 10020 (Attn:

Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron Krieger, Esq.); (vi) counsel to the

Plan Investor, (a) Gissin & Co., Habarzel 38B, Tel Aviv 6971054, Israel (Attn: Yael Hershkovitz,

Esq.), (b) Locke Lord LLP, 200 Vesey Street, 20th Floor, New York, NY 10281 (Attn: Shalom

Jacob, Esq.), and (c) Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New

York, NY 10004 (Attn: Avi D. Feinberg, Esq.), and (vii) all other persons and entities that have

requested service in this Chapter 11 Case pursuant to Bankruptcy Rule 2002 (collectively,

the "**Notice Parties**").  The Parent Debtor respectfully submits that no further notice is required.

35.    No previous request for the relief sought herein has been made by the Parent

Debtor to this or any other Court.

WHEREFORE the Parent Debtor respectfully request entry of the Proposed Order

granting the relief requested herein and such other and further relief as the Court may deem just

and appropriate.

Dated:  May 5, 2022
          New York, New York

/s/  Matthew P. Goren
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Parent Debtor*

21

**<u>Exhibit A</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                                              :
In re                                                         :    **Chapter 11**
                                                              :
**ALL YEAR HOLDINGS LIMITED,**                                :    **Case No. 21-12051 (MG)**
                                                              :
                    Debtor.[1]                                :
                                                              :
Fed. Tax Id. No. 98-1220822                                   :
---------------------------------------------------------------X

### ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 364, AND 507 (I) AUTHORIZING PARENT DEBTOR TO USE ESCROWED FUNDS, (II) PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM STATUS, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**"),[2] dated May 5, 2022 [ECF No. [●], of All Year

Holdings Limited, as debtor and debtor in possession (the "**Parent Debtor**") in the

above-captioned chapter 11 case (the "**Chapter 11 Case**"), pursuant to sections 105(a), 363, 364,

and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"),  Rules 2002, 4001, 6004,

and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local**

**Bankruptcy Rules**"), for entry of an order (this "**Order**"):

    i.        authorizing the Parent Debtor to enter into a multiple draw debtor-in-possession term loan (the "**DIP Loan**") in the aggregate principal amount of up to $4,500,000.00 (the "**DIP Loan Proceeds**") made available to the Parent Debtor and funded with the "Escrowed Funds," as defined in that certain Investment Agreement, dated March 11, 2022 (as amended on April 21, 2022, and as may be further amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Investment Agreement**"), by and among, *inter alia*, the Parent Debtor and Paragraph Partners, LLC (the "**Plan Investor**," and together with the Parent Debtor, the "**Parties**"), pursuant to the terms and conditions set forth in (a) this Order, (b) the term sheet, dated May 5, 2022, executed by the Parent

---

[1]    The Parent Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or the DIP Term Sheet (as defined below), as applicable.

Debtor and the Plan Investor, a copy of which is annexed hereto as **Exhibit 1** (the "**DIP Term Sheet**"), (c) the Investment Agreement (as amended in accordance with the DIP Term Sheet, a substantially final form of such amendment is annexed to Motion as **Exhibit C**), and (d) the Escrow Agreement (as defined in the Investment Agreement) (the foregoing (a)–(d) collectively, the "**DIP Documents**"), and in accordance with the budget, annexed to the DIP Term Sheet as **Schedule A** (the "**DIP Budget**");

ii.    authorizing the Parent Debtor to borrow under the DIP Loan and to incur all obligations owing thereunder and under the DIP Documents to the Plan Investor (collectively, the "**DIP Obligations**");

iii.    authorizing the Parent Debtor, subject to the Carve-Out (as defined below), to grant a superpriority administrative expense claim, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, to the Plan Investor for all DIP Obligations with priority over any and all allowed administrative expenses and unsecured claims against the Parent Debtor or its estate, now existing or hereafter arising (a "**Superpriority Claim**");

iv.    authorizing and directing the Parent Debtor to pay the principal, interest, fees, and expenses payable under the DIP Documents, including, without limitation, the reasonable and documented fees and out-of-pocket disbursements of the Plan Investor's attorneys, as and to the extent provided in, and in accordance with, the applicable DIP Documents; and

v.    granting related relief.

and upon the Baum Declaration; and the Court having held a hearing on the Motion (the "**Hearing**"); and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    <u>Jurisdiction and Venue</u>.    Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court has jurisdiction to consider the relief

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

WEIL:\98605664\15\12817.0007

requested in accordance with 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of

Reference M-431, dated January 31, 2012 (Preska, C.J.).

      B.    <u>Notice</u>.  Given the nature of the relief sought in the Motion, the Court

concludes that the form, scope, and timing of notice of the Motion were adequate and sufficient

under the circumstances, that the notice of the Motion and Hearing complied with all applicable

Bankruptcy Rules and Local Bankruptcy Rules, and that no further notice is necessary.

      C.    <u>Need for Post-Petition Financing</u>.  The Parent Debtor has an immediate and

critical need to obtain postpetition financing under the DIP Documents and to use the DIP Loan

Proceeds, among other things, (i) to pay the costs and expenses of administering the Chapter 11

Case in accordance with the DIP Budget; (ii) to fund the Parent Debtor's general corporate

working capital needs in accordance with the DIP Budget, including, without limitation, to fund

the operations and otherwise make payments on account of the Parent Debtor's direct and indirect

non-debtor subsidiaries; (iii) to pay interest and DIP Loan Costs under the DIP Loan; and (iv) to

pay the allowed and approved fees and expenses of the Parent Debtor's professionals (and the

professionals of any official committee appointed in the Chapter 11 Case), in each case, with

respect to the foregoing (i)–(iv), consistent with the Investment Agreement.  The Parent Debtor's

access to sufficient working capital and liquidity through the incurrence of postpetition financing

under the DIP Documents and the use of the DIP Loan Proceeds is vital to (a) satisfy the Parent

Debtor's postpetition liquidity needs, and (b) preserve and maintain the going concern value of the

Parent Debtor's estate and to protect and preserve the operations and value of the Parent Debtor's

non-debtor subsidiaries.  Consequently, without access to the DIP Loan, made available to the

Parent Debtor and funded with the Escrowed Funds, and use of the DIP Loan Proceeds pursuant

to the DIP Documents, the Parent Debtor and its estate would suffer irreparable loss or damage.

WEIL:\98605664\15\12817.0007

D.    <u>No Credit Available on More Favorable Terms</u>.    In light of the facts and circumstances, the Parent Debtor is unable to obtain adequate credit allowable under sections 364(b), 364(c)(1), and 503(b)(1) of the Bankruptcy Code from sources other than the Plan Investor on terms more favorable than the terms provided for in the DIP Documents.

E.    <u>Willingness to Provide DIP Loan</u>.    The Plan Investor has indicated a willingness to provide the Parent Debtor with the DIP Loan, but solely on the terms and conditions set forth in the DIP Documents.    Accordingly, after considering all of its practical alternatives, the Parent Debtor has concluded, in an exercise of its sound business judgment, that the DIP Loan to be provided by the Plan Investor, pursuant to the terms of the DIP Documents, represents the best financing currently available to the Parent Debtor.

F.    <u>Business Judgment</u>.    Entry of this Order is in the best interests of the Parent Debtor, its estate, and its creditors.    The terms of the DIP Documents are fair and reasonable under the circumstances, reflect the Parent Debtor's exercise of prudent business judgment with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration for the Plan Investor's consent thereto.

G.    <u>Good Faith Pursuant to Section 364(e)</u>.    The Parent Debtor and the Plan Investor have negotiated the terms and conditions of the DIP Documents and this Order in good faith and at arm's length, and any credit extended and loans made to the Parent Debtor pursuant to this Order shall be, and hereby are, deemed to have been extended, issued, or made, as the case may be, in "good faith" within the meanings of sections 363(m) and 364(e) of the Bankruptcy Code.

WEIL:\98605664\15\12817.0007

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      <u>DIP Loan Approved</u>.  The Motion is granted to the extent set forth herein. The Parent Debtor is authorized to enter into and perform the transactions contemplated in the DIP Documents and to borrow under the DIP Loan up to the aggregate principal amount of $4,500,000.00, which shall be made available to the Parent Debtor and funded with the Escrowed Funds, in accordance with the DIP Documents.  The DIP Loan is authorized and approved, subject to the terms and conditions set forth in the DIP Documents. All objections to this Order, to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled. This Order shall become effective immediately upon its entry.

2.      <u>DIP Obligations</u>. The DIP Documents shall constitute and evidence the validity and binding effect of the Parent Debtor's DIP Obligations, which DIP Obligations shall be enforceable against the Parent Debtor, its estate, and any successors thereto, including, without limitation, any trustee appointed in the Parent Debtor's Chapter 11 Case or in any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (the "**Successor Case**").

3.      <u>The Superpriority Claim</u>.  The Plan Investor is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed Superpriority Claim for all DIP Obligations (a) except as set forth in paragraph 9 below, with priority over any and all administrative expense claims and unsecured claims against the Parent Debtor or its estate in the Chapter 11 Case and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, as provided

5

under section 364(c)(1) of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Parent Debtor and its estate and any successor trustee or other estate representative to the extent permitted by law.

4.    <u>Events of Defaults</u>. The DIP Loan shall be subject to the following Events of Default (which can be waived by the Plan Investor): (i) the Chapter 11 Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (ii) a default, subject to any applicable grace and/or cure periods, by the Parent Debtor under the terms of the DIP Documents; (iii) termination of the Investment Agreement or the failure by the Parent Debtor to meet or comply with any deadline or milestone set forth therein; and (iv) the use or application of proceeds in a manner not provided for in the DIP Budget

5.    <u>Amendment of the DIP Documents</u>. The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto without further order of the Court in accordance with the DIP Documents if (a) the amendment, modification, or supplement does not prejudice the rights of the Parent Debtor or its estate; and (b) notice of the amendment, modification or supplement is filed with the Court with reasonable promptness after effectiveness thereof.

6.    <u>DIP Budget</u>.  The use of the DIP Loan Proceeds shall be in accordance with the terms and conditions set forth in the DIP Documents, including, without limitation, the DIP Budget (subject to any permitted variances).

7.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>.  The Plan Investor has acted in good faith in connection with this Order and is entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code. Based on the findings set forth in this Order and the record made before the Court, and in

WEIL:\98605664\15\12817.0007

accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions

of this Order are hereafter modified, amended, or vacated by a subsequent order of this Court or

any other court, the Plan Investor is entitled to the protections provided in Bankruptcy Code

section 364(e).  Any such modification, amendment, or vacatur shall not affect the validity and

enforceability of any advances previously made hereunder or any claim or priority authorized or

created hereby.

8.      <u>Proofs of Claim; Master Proof of Claim</u>. The Plan Investor will not be

required to file proofs of claim in the Chapter 11 Case or any Successor Case for any claim allowed

herein.  Any order entered by the Court in relation to the establishment of a bar date in the

Chapter 11 Case or any Successor Case shall not apply to any claim of the Plan Investor allowed

herein.

9.      <u>Carve-Out</u>:  The Superpriority Claim shall be subject to the payment of the

fees and expenses set forth below (the amounts set forth below, the "**Carve-Out**"):

a.      all fees required to be paid to the clerk of the Bankruptcy Court and

to the Office of the United States Trustee for Region 2 under 28 U.S.C. § 1930(a)

plus interest at the statutory rate;

b.      in the event of a conversion of  the Chapter 11 Case to a case under

chapter 7 of the Bankruptcy Code, all reasonable and documented fees and

expenses, in an aggregate not to exceed $25,000, incurred by a trustee under section

726(b) of the Bankruptcy Code;

c.      to the extent allowed at any time, whether by interim or final

compensation or other order, all accrued and unpaid claims for fees, costs and

expenses incurred by persons or firms retained by the Parent Debtor pursuant to

sections 327, 328, or 363 of the Bankruptcy Code (such professionals, collectively, the "**Parent Debtor Professionals**") or any statutory committee appointed pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (such professionals, collectively, the "**Committee Professionals**," and, together with the Parent Debtor Professionals, the "**Professional Persons**," and such fees, costs, and expenses of Professional Persons, the "**Professional Fees**") which were incurred at any time on or prior to the first business day after the Carve-Out Trigger Date (as defined herein), whether allowed before or after the Carve-Out Trigger Date and without regard to whether such fees, costs and expenses are provided for in the DIP Budget or were invoiced after the Carve-Out Trigger Date; and

d.      any Professional Fees of the Professional Persons incurred after the first business day following the Carve-Out Trigger Date, to the extent allowed at any time, in an aggregate amount not to exceed $250,000; <u>provided</u>, that nothing herein shall be construed to impair the ability of any party to object to the allowance of the fees, expenses, reimbursement or compensation described herein on any grounds.

As used herein, the term "**Carve-Out Trigger Date**" shall mean the date on which the Plan Investor provides a Termination Declaration (a defined below).

10.     <u>DIP Loan Costs</u>. The Plan Investor shall be entitled to reimbursement of its reasonable and documented out-of-pocket fees and expenses for its legal counsel arising from or related to the negotiation of the DIP Loan, to be paid by the Parent Debtor out of the DIP Loan Proceeds within seven (7) business days following the entry of this Order and funding of the DIP Loan in accordance with the terms of the DIP Term Sheet and this Order.  In the event of an Event

WEIL:\98605664\15\12817.0007

of Default or a termination by the Plan Investor of the Investment Agreement, the Plan Investor shall be entitled to reimbursement of its reasonable and documented out-of-pocket fees and expenses for its legal counsel relating to the enforcement of the DIP Loan and repayment of the DIP Loan Proceeds by the Parent Debtor.[4]

11.    <u>Rights and Remedies Upon Event of Default</u>.    Upon the occurrence and during the continuation of an Event of Default, all ability of the Parent Debtor to borrow under the DIP Loan shall be terminated without further order of the Bankruptcy Court and, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Bankruptcy Court, (a) the Plan Investor may send a written notice to the Parent Debtor and the U.S. Trustee (any such declaration shall be referred to herein as a "**Termination Declaration**") declaring  (1) the DIP Obligations under the DIP Loan to be due and payable in accordance with the DIP Documents, (2) the DIP Loan terminated and the termination of the Parent Debtor's ability to use any remaining Escrow Funds to fund loans under the DIP Loan, (3) the application of the Carve-Out has occurred following the delivery of the Termination Declaration; and (b) interest, including applicable default interest, shall accrue until the DIP Obligations are repaid in full.

---

[4] For the avoidance of doubt, the fees provided for in this Order must be reasonable.  Although the U.S. Trustee fee guidelines do not specifically apply, professionals shall submit time and expense detail entries to the U.S. Trustee, as well as any further information or back up documentation requested by the U.S. Trustee to determine the reasonableness of the invoiced amount. Invoices for such fees and expenses provided to any party other than the U.S. Trustee shall not be required to include any information subject to the attorney-client privilege or any information constituting attorney work product, and time and expense detail entries and other information provided solely to the U.S. Trustee shall be returned or destroyed after the U.S. Trustee has reviewed such material and any objections to the applicable fees and expenses have been resolved upon request of the applicable professional. Furthermore, the provision of invoices, time entries or other information pursuant to the terms hereof shall in no event constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.

WEIL:\98605664\15\12817.0007

12.     The Parent Debtor may seek an emergency hearing during the three (3) business days following the date a Termination Declaration is delivered for the sole purpose of determining whether an Event of Default has in fact occurred or is continuing.

13.     <u>Rights Preserved</u>.  Except as provided in the DIP Documents, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, (a) the Plan Investor's right to seek any other or supplemental relief in respect of the Parent Debtor; (b) any of the rights of the Plan Investor under the Bankruptcy Code or under non-bankruptcy law; or (c) any rights, claims, or privileges (whether legal, equitable, or otherwise) of the Plan Investor. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Parent Debtor's or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Order.  Entry of this Order is without prejudice to any and all rights of the Parent Debtor and any party in interest with respect to any position which the Parent Debtor or any party in interest deems appropriate to raise in the Chapter 11 Case.

14.     <u>Notices</u>. All notices provided in connection with the DIP Loan shall be provided in accordance with <u>Section 12.03</u> of the Investment Agreement.

15.     <u>Order Controls</u>.  In the event of any conflict between the provisions of this Order and the Term Sheet, the Investment Agreement Amendment, or the Escrow Agreement, this Order shall control.

16.     <u>Immediate Binding Effect</u>. This Order shall take effect immediately upon execution hereof, and, notwithstanding anything to the contrary contained in the Bankruptcy Rules, including Bankruptcy Rule 4001(a)(3), there shall be no stay of execution of effectiveness of this Order.

WEIL:\98605664\15\12817.0007

17.     The Parent Debtor is authorized to take all action necessary to effectuate the

relief granted in this Order.

18.     This Court retains jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2022
          New York, New York

_____
HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

11

**<u>Exhibit 1</u>**

**DIP Term Sheet**

**SUMMARY OF TERMS AND CONDITIONS OF
$4,500,000.00 DIP LOAN**

**MAY 5, 2022**

| | |
|---|---|
| <u>Borrower</u>: | All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands ("<u>All Year</u>" or the "<u>Borrower</u>"), as debtor and debtor in possession in Chapter 11 Case No. 21-12051 (MG) (the "<u>Bankruptcy Case</u>") filed in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"). |
| <u>DIP Lender</u>: | Paragraph Partners, LLC, a limited liability company organized under the laws of the State of Delaware (the "<u>Plan Investor</u>" and together with the Borrower, the "<u>Parties</u>"). |
| Amount and Form of <u>DIP Loan</u>: | A multiple draw debtor-in-possession term loan (the "<u>DIP Loan</u>") in an aggregate principal amount of up to $4,500,000.00 (the "<u>DIP Loan Proceeds</u>") to be made available to the Borrower and funded with "Escrowed Funds" (as defined in that certain investment agreement, dated March 11, 2022, by and among the Borrower, the Plan Investor, and Mishmeret Trust Company Ltd., solely in its capacity as trustee for the Borrower's various series of bonds and in respect of <u>Sections 7.02(b)</u>, <u>8.01(b)</u>, <u>8.01(c)</u> and <u>8.02(c)</u> thereof (as amended on April 21, 2022, and as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "<u>Investment Agreement</u>")).[1] The DIP Loan shall be documented in the form of: (i) this term sheet (this "<u>Term Sheet</u>"), duly executed by the Parties and annexed as an exhibit to the DIP Order (as defined below), (ii) a duly authorized amendment to the Investment Agreement (as discussed below) and revised form of Escrow Agreement (as defined in the Investment Agreement), and (iii) a final order approving the terms of the DIP Loan, in form and substance reasonably acceptable to the Plan Investor, to be submitted to the Bankruptcy Court for approval in the Bankruptcy Case (the "<u>DIP Order</u>"). |
| | This Term Sheet (together with all schedules and exhibits hereto), the Investment Agreement Amendment, the Escrow Agreement, and the DIP Order shall collectively be referred to herein as the "<u>DIP Documents</u>". |

---

[1] Capitalized terms used but not otherwise defined shall have the meanings ascribed to such terms in the Investment Agreement.

| | |
|---|---|
| <u>Use of Proceeds</u>: | The DIP Loan Proceeds shall be used by the Borrower (i) to fund general corporate working capital needs in accordance with the DIP Budget (as defined below), including, without limitation, to be used to fund the operations and otherwise make payments on account of the Borrower's non-debtor direct and indirect subsidiaries, (ii) for the payment of interest and DIP Loan Costs (as defined below) under the DIP Loan, and (iii) to pay the allowed and approved fees and expenses of the Borrower's professionals (and the professionals of any official committee appointed in the Bankruptcy Case).  For the avoidance of doubt, the DIP Loan Proceeds shall not be used in a manner inconsistent with the Investment Agreement or the DIP Budget. |
| <u>Maturity</u>: | The DIP Loan shall mature (the "<u>Maturity Date</u>") upon the earliest to occur of: (i) December 31, 2022, (ii) the effective date of a confirmed chapter 11 plan for the Borrower implementing the terms of the Investment Agreement (as may be amended, modified, or supplemented in accordance with the terms of the Investment Agreement, an "<u>Approved Plan</u>"), (iii) 90 days following termination of the Investment Agreement, (iv) the closing of a sale of all or substantially all of the Borrower's assets to the Plan Investor other than pursuant to the Approved Plan, (v) a closing of sale of all or substantially all of Borrower's assets to a purchaser other than the Plan Investor, and (vi) the effective date of a confirmed chapter 11 plan of reorganization for the Borrower other than the Approved Plan (the aforementioned (v) and (vi), collectively, an "<u>Alternative Transaction</u>"). |
| <u>Availability</u>: | Upon the satisfaction or waiver of the Conditions Precedent (as defined below), and provided that at the time of each drawing, (i) the Borrower is in compliance with the terms of the DIP Budget and (ii) the Investment Agreement has not been terminated and is in full force and effect, up to $4,500,000.00 shall be made available to the Borrower. |
| <u>Funding</u>: | The DIP Loan shall be funded solely from the Escrowed Funds provided by Plan Investor in accordance with the Investment Agreement.  With respect to each drawing made by the Borrower from the Escrowed Funds, the Escrow Agent shall not provide funds to the Borrower unless (i) the Escrow Agent has received written certification from the Borrower that the Borrower provided no less than three (3) business days' prior written notice of the Borrower's draw request to the Plan Investor and (ii) the Escrow Agent has not received any objection to such draw request from the Plan Investor. For the avoidance of doubt, the only permitted objection to a draw request from the Plan Investor may be that a default exists and is continuing under the DIP Documents. |

Prior to the initial funding of the DIP Loan, the Investment Agreement shall be amended (the "Investment Agreement Amendment") and the Escrow Agreement shall be revised, prior to execution by the parties, to be consistent with this Term Sheet, to: (i) provide for or permit the distribution of Escrowed Funds to the Borrower for use as DIP Loan Proceeds in accordance with this Term Sheet and the DIP Order and (ii) provide that (A) if the Closing shall occur, any Escrowed Funds (together with all accrued investment income thereon, if any) used to fund the DIP Loan and any accrued and unpaid interest shall be applied as a credit at the Closing towards the Cash Payment portion of the Purchase Price payable to All Year by the Plan Investor and (B) if the Closing does not occur other than as the result of a termination of the Investment Agreement by the Borrower pursuant to Section 11.01(c) thereof, the DIP Loan (together with all accrued investment income thereon, if any), including all accrued interest, shall be repaid in full to the Plan Investor on the Maturity Date. Pursuant to Section 3.02(b) of the Investment Agreement, if the Investment Agreement is terminated by the Borrower pursuant to Section 11.01(c) thereof, the Borrower shall be entitled to retain the DIP Loan Proceeds and shall have no further obligations to the Plan Investor hereunder with respect to such proceeds.

| | |
|---|---|
| Pricing: | 5% per annum, accruing monthly and payable on the Maturity Date. |
| Default Interest: | 7% per annum, accruing monthly and payable on the Maturity Date. |
| Fees: | None. |
| Priority and Security: | The obligations of the Borrower with respect to the DIP Loan and the DIP Loan Proceeds shall at all times constitute a claim against the Borrower and its estate in the Bankruptcy Case, which is an administrative expense claim having priority, pursuant to section 364(c)(1) and 507(b) of the Bankruptcy Code, and seniority (in each case, subject to the Carve-Out (as defined below)), over any and all allowed administrative expenses and unsecured claims against the Borrower or its estate, now existing or hereafter arising, including, without limitation, administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(b) and (c), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (such claim, a "Superpriority Claim"). Subject to the Carve-Out, any such Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition property and assets of the Borrower and its estate, and all proceeds thereof, including for the avoidance of doubt, (i) any deposit in connection with any Alternative Transaction (whether terminated or |

3

otherwise) that becomes property of the Borrower's estate, (ii) claims against the Borrower's directors and officers (if any), and (iii) the proceeds of any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551, and 553(b) of the Bankruptcy Code.

**Carve-Out:** The "Carve-Out" shall be usual and customary for similar debtor-in-possession financings and shall be the sum of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee for Region 2 under 28 U.S.C. § 1930(a) plus interest at the statutory rate, (ii) all reasonable and documented fees and expenses, in an aggregate not to exceed $25,000, incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) to the extent allowed at any time, whether by interim or final compensation or other order, all accrued and unpaid claims for fees, costs and expenses incurred by persons or firms retained by the Borrower or any statutory committee appointed pursuant to sections 327, 328, or 1103 of the Bankruptcy Code.

**Conditions Precedent:** The funding of the initial draw, and each subsequent draw, under the DIP Loan shall be subject to the following conditions precedent:

- The Investment Agreement shall be in full force and effect, as amended by the Investment Agreement Amendment;

- The Escrow Agreement shall have been revised to be consistent with this Term Sheet and shall be in full force and effect;

- Entry of the DIP Order by the Bankruptcy Court in the Bankruptcy Case, which shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, or vacated;

- Delivery of the initial DIP Budget; and

- No trustee, examiner with expanded powers, or receiver shall have been appointed or designated with respect to the Borrower (other than the JPLs).

**Financial Covenants:** Compliance with a budget (the "DIP Budget"), in form and substance reasonably acceptable to the Plan Investor, with a permitted negative cash disbursements variance not greater than 15%, tested on a rolling four-week period basis beginning in the third week following entry of the DIP Order; provided, however, testing with respect to disbursements for professionals and advisors

4

of the Debtor shall be tested on a cumulative basis during the term of the DIP Loan). The form of the DIP Budget is attached hereto as <u>Schedule A</u>. The measure of cash disbursements shall include all cash disbursements of the Borrower.

| | |
|---|---|
| <u>Financial Reports</u>: | The Borrower shall provide a detailed, line by line, computation of actual to budget deviations on a bi-weekly basis beginning in the third week following entry of the DIP Order. For the foregoing analysis, the Borrower shall provide brief commentary for each material line item deviation (both favorable and unfavorable) when comparing actuals to DIP Budget for all variances greater than 10% and $25,000. |
| <u>Events of Default</u>: | The DIP Loan shall be subject to the following Events of Default (which can be waived by the Plan Investor): |

       i.   the Bankruptcy Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

      ii.   a default, subject to any applicable grace and/or cure periods, by the Borrower under the terms of the DIP Documents;

     iii.   termination of the Investment Agreement or the failure by the Borrower to meet or comply with any deadline or milestone set forth therein; and

     iv.   the use or application of proceeds in a manner not provided for in the DIP Budget.

| | |
|---|---|
| <u>Controlling Documents</u>: | In the event of any inconsistencies between this Term Sheet and the DIP Order, the terms of the DIP Order shall control. |
| <u>DIP Loan Costs</u>: | Plan Investor shall be entitled to reimbursement of its reasonable and documented, out-of-pocket fees and expenses for its legal counsel arising from or related to the negotiation of the DIP Loan to be paid by the Borrower out of the DIP Loan Proceeds within seven (7) business days following the entry of the DIP Order and funding of the DIP Loan in accordance with the terms hereof and in the DIP Order. |
| <u>Governing Law</u>: | New York. |
| <u>Counsel to Plan Investor</u>: | Locke Lord LLP. |

*[Signature Pages to Follow]*

5

This Term Sheet is entered into as of the date and year first above written.

**BORROWER:**

**ALL YEAR HOLDINGS LIMITED**

By: _____
Name:  Assaf Ravid
Title:   CRO

**PLAN INVESTOR:**

Paragraph Partners, LLC

By: _____
       Name:  Avi Philipson
       Title:   CEO

## Schedule A

**DIP Budget**

**All Year Holdings Limited**
**DIP Budget**
**Assumptions**

1. The Debtor is assumed to emerge from Chapter 11 bankruptcy protection on or before September 30, 2022. The DIP budget does not include post closing winddown costs. Such costs are assumed to be funded from the Debtor's cash on hand and closing proceeds.

2. <u>Personnel</u>- Personnel disbursements include payments to independent contractors and to the executive team. Contractors are paid on a biweekly basis, two weeks in arears. Executives' costs are funded in advance on the first of each month.

3. <u>Subsidiary Support</u>- Subsidiary support is comprised of payments to subsidiaries to fund operating shortfalls. Estimates are based on historical experience (since the petition date), and include provisions for real estate tax needs in June and September based on management's estimates.

4. <u>Rent and Office Expense</u>- The Debtor is required to vacate its corporate office by April 30, 2022. Rent and Office expense includes $5,000 per month for rent and other costs for new office space.

5. <u>Insurance</u>- Insurance relates to D&O premiums.

6. <u>Other</u>- Other disbursements of $75,000 per month is a provision for additional cash needs during the budget period.

7. <u>Professional Fees</u>- See Professional Fees Budget Detail. The budget assumes that retained professionals are paid pursuant to the interim compensation order, with holdbacks through April paid in July, and remaining holdbacks paid on the Effective Date. Ordinary course professionals are assumed to be paid in the month after services are rendered. The projections assume increases to the $150,000 OCP fee cap.

8. <u>US Trustee Fees</u>- Chapter 11 UST fees are calculated based upon the Bankruptcy Administration Improvement Act of 2020, Pub. L. No. 116-325, which provides for fees equal to 0.8% of quarterly disbursements for debtors with total quarterly disbursements between $1,000,000 and $31,249,937. Fees are assumed to be paid as they become due.

9. <u>DIP Loan Expenses</u>- Pursuant to the Term Sheet, interest accrues monthly at 5% per annum, and is payable on the maturity date.

10. <u>DIP Loan Draw</u>- The projections assume the Debtor draws prior to the beginning of the month for the following month's cash needs, in $100,000 increments. DIP loan draws are calculated to maintain at least $300,000 in liquidity to approximate one month's personnel and subsidiary support costs.

**All Year Holdings Limited**
DIP Budget

| Week Ending | 4/29/2022 | 5/6/2022 | 5/13/2022 | 5/20/2022 | 5/27/2022 | 6/3/2022 | 6/10/2022 | 6/17/2022 | 6/24/2022 | 7/1/2022 | 7/8/2022 | 7/15/2022 | 7/22/2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | |
| Operating Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Cash Receipts** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Personnel | (15,385) | (163,163) | - | (15,385) | - | (162,763) | - | (15,385) | - | (162,763) | - | (15,385) | - |
| Subsidiary Support | - | (13,200) | (96,800) | - | - | - | (110,000) | - | - | (360,000) | (110,000) | - | - |
| Rent and Office Expense | - | - | - | - | - | (5,000) | - | - | - | (5,000) | - | - | - |
| Insurance | - | - | - | - | - | (162,000) | - | - | - | - | - | - | - |
| Other | (220) | (1,050) | (73,730) | - | - | (75,000) | - | - | - | (75,000) | - | - | - |
| **Total Operating Disbursements** | (15,604) | (177,413) | (170,530) | (15,385) | - | (404,763) | (110,000) | (15,385) | - | (602,763) | (110,000) | (15,385) | - |
| | | | | | | | | | | | | | |
| **Bankruptcy Disbursements** | | | | | | | | | | | | | |
| Professional Fees | (390,503) | (132,019) | (56,930) | - | - | (714,008) | - | - | - | (873,606) | - | - | (494,729) |
| U.S. Trustee Fees | - | - | (12,974) | - | - | - | - | - | - | - | - | - | - |
| **Total Bankruptcy Disbursements** | (390,503) | (132,019) | (69,904) | - | - | (714,008) | - | - | - | (873,606) | - | - | (494,729) |
| | | | | | | | | | | | | | |
| **DIP Loan Expenses** | | | | | | | | | | | | | |
| DIP Lender Counsel Fees | - | - | - | - | - | (80,000) | - | - | - | - | - | - | - |
| Interest Expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total DIP Loan Expenses** | - | - | - | - | - | (80,000) | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| **Net Cash Flow Before DIP Loan Draw** | (406,107) | (309,432) | (240,434) | (15,385) | - | (1,198,771) | (110,000) | (15,385) | - | (1,476,368) | (110,000) | (15,385) | (494,729) |
| | | | | | | | | | | | | | |
| DIP Loan Draw | - | - | - | - | - | 400,000 | - | - | 2,500,000 | - | - | - | - |
| | | | | | | | | | | | | | |
| Cash, beginning | 2,278,003 | 1,871,896 | 1,562,465 | 1,322,031 | 1,306,646 | 1,306,646 | 507,875 | 397,875 | 382,490 | 2,882,490 | 1,406,122 | 1,296,122 | 1,280,738 |
| **Cash, ending** | $ 1,871,896 | $ 1,562,465 | $ 1,322,031 | $ 1,306,646 | $ 1,306,646 | $ 507,875 | $ 397,875 | $ 382,490 | $ 2,882,490 | $ 1,406,122 | $ 1,296,122 | $ 1,280,738 | $ 786,009 |
| | | | | | | | | | | | | | |
| DIP Loan, beginning | $ - | $ - | $ - | $ - | $ - | $ - | $ 400,000 | $ 400,000 | $ 400,000 | $ 2,900,000 | $ 2,903,932 | $ 2,903,932 | $ 2,903,932 |
| Accrued DIP Interest | | | | | | | | | | 3,932 | | | |
| DIP Loan Draw | - | - | - | - | - | 400,000 | - | - | 2,500,000 | - | - | - | - |
| **DIP Loan, ending** | $ - | $ - | $ - | $ - | $ - | $ 400,000 | $ 400,000 | $ 400,000 | $ 2,900,000 | $ 2,903,932 | $ 2,903,932 | $ 2,903,932 | $ 2,903,932 |

**All Year Holdings Limited**
DIP Budget

| Week Ending | 7/29/2022 | 8/5/2022 | 8/12/2022 | 8/19/2022 | 8/26/2022 | 9/2/2022 | 9/9/2022 | 9/16/2022 | 9/23/2022 | 9/30/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | |
| Operating Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Cash Receipts** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | |
| Personnel | (15,385) | (147,378) | (15,385) | - | (15,385) | (147,378) | (15,385) | - | (15,385) | - | (921,905) |
| Subsidiary Support | - | - | (110,000) | - | - | - | (110,000) | - | - | (85,000) | (995,000) |
| Rent and Office Expense | - | (5,000) | - | - | - | (5,000) | - | - | - | - | (20,000) |
| Insurance | - | - | - | - | - | (54,000) | - | - | - | - | (216,000) |
| Other | - | (75,000) | - | - | - | (75,000) | - | - | - | - | (375,000) |
| **Total Operating Disbursements** | (15,385) | (227,378) | (125,385) | - | (15,385) | (281,378) | (125,385) | - | (15,385) | (85,000) | (2,527,905) |
| | | | | | | | | | | | |
| **Bankruptcy Disbursements** | | | | | | | | | | | |
| Professional Fees | (378,003) | - | - | - | - | (364,003) | - | - | - | (360,003) | (3,763,804) |
| U.S. Trustee Fees | (33,869) | - | - | - | - | - | - | - | - | - | (46,843) |
| **Total Bankruptcy Disbursements** | (411,873) | - | - | - | - | (364,003) | - | - | - | (360,003) | (3,810,647) |
| | | | | | | | | | | | |
| **DIP Loan Expenses** | | | | | | | | | | | |
| DIP Lender Counsel Fees | - | - | - | - | - | - | - | - | - | - | (80,000) |
| Interest Expense | - | - | - | - | - | - | - | - | - | - | - |
| **Total DIP Loan Expenses** | - | - | - | - | - | - | - | - | - | - | (80,000) |
| | | | | | | | | | | | |
| **Net Cash Flow Before DIP Loan Draw** | (427,257) | (227,378) | (125,385) | - | (15,385) | (645,381) | (125,385) | - | (15,385) | (445,003) | (6,418,553) |
| | | | | | | | | | | | |
| DIP Loan Draw | 400,000 | - | - | - | 1,150,737 | - | - | - | - | - | 4,450,737 |
| | | | | | | | | | | | |
| Cash, beginning | 786,009 | 758,752 | 531,374 | 405,989 | 405,989 | 1,541,341 | 895,960 | 770,575 | 770,575 | 755,191 | 2,278,003 |
| **Cash, ending** | $ 758,752 | $ 531,374 | $ 405,989 | $ 405,989 | $ 1,541,341 | $ 895,960 | $ 770,575 | $ 770,575 | $ 755,191 | $ 310,188 | $ 310,188 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| DIP Loan, beginning | $ 2,903,932 | $ 3,303,932 | $ 3,318,238 | $ 3,318,238 | $ 3,318,238 | $ 4,468,975 | $ 4,482,806 | $ 4,482,806 | $ 4,482,806 | $ 4,482,806 | $ - |
| Accrued DIP Interest | | 14,307 | | | | 13,831 | | | | 17,194 | 49,263 |
| DIP Loan Draw | 400,000 | - | - | - | 1,150,737 | - | - | - | - | - | 4,450,737 |
| **DIP Loan, ending** | $ 3,303,932 | $ 3,318,238 | $ 3,318,238 | $ 3,318,238 | $ 4,468,975 | $ 4,482,806 | $ 4,482,806 | $ 4,482,806 | $ 4,482,806 | $ 4,500,000 | $ 4,500,000 |

**All Year Holdings Limited**
**Professional Fees Budget**

|  |  | Fees Incurred | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Actual | Actual | Projected >>> | | | | | | | |
|  |  | December/ January | February | March | April | May | June | July | August | September | Total |
| **Retained Professionals** | **Role** | | | | | | | | | | |
| Weil Gotshal & Manges | Lead Counsel | $ 860,370 | $ 290,027 | $ 585,400 | $ 455,000 | $ 166,667 | $ 166,667 | $ 166,667 | $ 166,667 | $ 166,667 | $ 3,024,130 |
| Herrick Feinstein LLC | Litigation Counsel | 12,620 | 19,050 | 75,000 | 2,500 | 2,500 | 10,000 | 10,000 | 10,000 | 10,000 | 151,670 |
| Donlin Recano | Claims and Noticing Agent | - | - | - | - | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 100,000 |
| CFGI | Financial Advisors | - | - | 20,000 | 10,000 | 35,000 | 35,000 | 30,000 | 30,000 | 50,000 | 210,000 |
| Total Retained Professionals | | 872,990 | 309,077 | 680,400 | 467,500 | 224,167 | 231,667 | 226,667 | 226,667 | 246,667 | 3,485,800 |
| | | | | | | | | | | | |
| **JPL's and Ordinary Course Professionals** | | | | | | | | | | | |
| Archer and Greiner | Special Counsel | 9,315 | 8,603 | 21,471 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 84,389 |
| Koffsky Schwalb | Corporate Counsel | 56,720 | 53,045 | 44,069 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 363,835 |
| Kalo | BVI Provisional Liquidators | 93,492 | 77,003 | 100,457 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 570,951 |
| Amir Bartov Lawyers Co | Israeli Counsel | 30,734 | 29,830 | 46,206 | 40,000 | 40,000 | 40,000 | 20,000 | 20,000 | 20,000 | 286,771 |
| Conyers Dill and Pearman | BVI Insolvency Counsel | 14,047 | 111,412 | 18,816 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 444,275 |
| Israeli Company Representative | | - | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 | 9,360 |
| ISA | Israel Litigation Counsel | - | - | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 35,000 |
| BVI PR | Public Relations | - | - | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 35,000 |
| Total Ordinary Course Professionals | | 204,308 | 281,063 | 242,189 | 193,670 | 193,670 | 193,670 | 173,670 | 173,670 | 173,670 | 1,829,580 |
| | | | | | | | | | | | |
| **Grand Total** | | $1,077,298 | $ 590,140 | $ 922,589 | $ 661,170 | $ 417,837 | $ 425,337 | $ 400,337 | $400,337 | $ 420,337 | $ 5,315,380 |
| | | | | | | | | | | | |
| Accrued Professional Fees, beginning | | $ - | $1,077,298 | $ 1,545,180 | $ 1,786,954 | $ 1,868,673 | $ 1,572,501 | $ 1,124,232 | $ 651,837 | $ 688,170 | $ - |
| Fees Incurred | | 1,077,298 | 590,140 | 922,589 | 661,170 | 417,837 | 425,337 | 400,337 | 400,337 | 420,337 | 5,315,380 |
| Fees Paid | | - | (122,258) | (680,815) | (579,451) | (714,008) | (873,606) | (872,732) | (364,003) | (973,608) | (5,180,482) |
| Retainers Applied | | - | - | - | - | - | - | - | - | - | (134,898) |
| Accrued Professional Fees, ending | | $1,077,298 | $1,545,180 | $ 1,786,954 | $ 1,868,673 | $ 1,572,501 | $ 1,124,232 | $ 651,837 | $688,170 | $ 134,898 | $ 0 |

**All Year Holdings Limited**
**Professional Fees Budget**

| | | | | | | Fees Paid | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual | Actual | Projected >>> | | | | | | | Effective Date | | |
| | February | March | April | May | June | Holdbacks Dec-Apr | July | August | September | Outstanding Fees, Including Holdbacks | Less: Retainers | Total, Net of Retainers |
| **Retained Professionals** | | | | | | | | | | | | |
| Weil Gotshal & Manges | $     - | $ (300,000) | $ (390,503) | $ (468,800) | $ (564,600) | $ (466,895) | $ (134,333) | $ (134,333) | $ (134,333) | $ (430,333) | $ 96,561 | $ (2,927,570) |
| Herrick Feinstein LLC | - | - | - | - | (87,336) | (21,834) | (2,000) | (8,000) | (8,000) | (24,500) | - | (151,670) |
| Donlin Recano | - | - | - | - | (20,000) | - | (20,000) | (20,000) | (20,000) | (20,000) | - | (100,000) |
| CFGI | - | - | - | (16,000) | (8,000) | (6,000) | (28,000) | (28,000) | (24,000) | (100,000) | - | (210,000) |
| Total Retained Professionals | - | (300,000) | (390,503) | (484,800) | (679,936) | (494,729) | (184,333) | (190,333) | (186,333) | (574,833) | 96,561 | (3,389,239) |
| | | | | | | | | | | | | |
| **JPL's and Ordinary Course Professionals** | | | | | | | | | | | | |
| Archer and Greiner | - | (17,918) | (21,471) | (7,500) | (7,500) | - | (7,500) | (7,500) | (7,500) | (7,500) | 25,000 | (59,389) |
| Koffsky Schwalb | (56,720) | (50,000) | (30,392) | (51,723) | (35,000) | - | (35,000) | (35,000) | (35,000) | (35,000) | 13,338 | (350,498) |
| Kalo | (34,804) | (135,691) | (100,457) | (50,000) | (50,000) | - | (50,000) | (50,000) | (50,000) | (50,000) | - | (570,951) |
| Amir Bartov Lawyers Co | (30,734) | (76,037) | - | (40,000) | (40,000) | - | (40,000) | (20,000) | (20,000) | (20,000) | - | (286,771) |
| Conyers Dill and Pearman | - | (100,000) | (25,459) | (68,816) | (50,000) | - | (50,000) | (50,000) | (50,000) | (50,000) | - | (444,275) |
| Israeli Company Representative | - | (1,170) | (1,170) | (1,170) | (1,170) | - | (1,170) | (1,170) | (1,170) | (1,170) | - | (9,360) |
| ISA | - | - | (5,000) | (5,000) | (5,000) | - | (5,000) | (5,000) | (5,000) | (5,000) | - | (35,000) |
| BVI PR | - | - | (5,000) | (5,000) | (5,000) | - | (5,000) | (5,000) | (5,000) | (5,000) | - | (35,000) |
| Total Ordinary Course Professionals | (122,258) | (380,815) | (188,949) | (229,208) | (193,670) | - | (193,670) | (173,670) | (173,670) | (173,670) | 38,338 | (1,791,243) |
| | | | | | | | | | | | | |
| **Grand Total** | $ (122,258) | $ (680,815) | $ (579,451) | $ (714,008) | $ (873,606) | $ (494,729) | $ (378,003) | $ (364,003) | $ (360,003) | $ (748,503) | $ 134,898 | $ (5,180,482) |

**Total Budget Period Payments (April through September):**  $ (3,763,804)    $ (4,377,409)

**<u>Exhibit B</u>**

**Baum Declaration**

WEIL:\98605972\12\12817.0007

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Parent Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
                                                          :
**In re**                                                 :    **Chapter 11**
                                                          :
**ALL YEAR HOLDINGS LIMITED,**                            :    **Case No. 21-12051 (MG)**
                                                          :
                    **Debtor.**[1]                         :
                                                          :
**Fed. Tax Id. No. 98-1220822**                           :
-----------------------------------------------------------X

**DECLARATION OF JOSEPH BAUM IN SUPPORT**
**OF MOTION OF PARENT DEBTOR FOR ENTRY OF AN**
**ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 364, AND 507**
**(I) AUTHORIZING PARENT DEBTOR TO USE ESCROWED**
**FUNDS, (II) PROVIDING SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE CLAIM STATUS, AND (III) GRANTING RELATED RELIEF**

  I, Joseph Baum, declare the following under penalty of perjury:

  1.  I am a partner of CFGI, LLC ("**CFGI**"), where I serve as the head of CFGI's

restructuring group. CFGI is headquartered at 340 Madison Avenue, 3rd Floor, New York, New

York 10173.

---

[1] The Parent Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

2.    On April 7, 2022, the above-captioned debtor and debtor in possession (the "**Parent Debtor**") filed an application with this Court to retain and employ CFGI as its financial advisor in its chapter 11 case (the "**Chapter 11 Case**") [2]

3.    I am authorized to submit this declaration (this "**Declaration**") in support of the *Motion of Parent Debtor for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 364, and 507 (I) Authorizing the Parent Debtor to Use Escrowed Funds, (II) Providing Superpriority Administrative Expense Claim Status, and (III) Granting Related Relief* (the "**Motion**"),[3] filed contemporaneously herewith.  I am familiar with the Motion and the terms of the proposed debtor-in-possession term loan (the "**DIP Loan**") in the aggregate principal amount of up to $4,500,000.00 (the "**DIP Proceeds**") to be made available to the Parent Debtor and funded with the "Escrowed Funds," as defined in that certain Investment Agreement, dated March 11, 2022 (as amended on April 21, 2022, and as may be further amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Investment Agreement**"), by and among, *inter alia*, the Parent Debtor and Paragraph Partners, LLC (the "**Plan Investor**").

4.    Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Parent Debtor's operations and finances, my experience, my review of relevant documents, information provided to me by CFGI employees working under my supervision, or information provided to me by members of the Parent Debtor's management or its other professionals.  If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

---

[2]    *See Application Pursuant to 11 U.S.C. §§ 327(a) and 328, Fed. R. Bankr. P. 2014(a) and 2016, and L.B.R. 2014-1 for Authority to Retain and Employ CFGI as Financial Advisor for the Parent Debtor* Nunc Pro Tunc *to March 22, 2022* (ECF No. 71).

[3]    Capitalized terms used but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

WEIL:\98607337\9\12817.0007

**Qualifications**

5.      CFGI is a financial advisory firm with extensive experience in restructuring and providing financial and operational guidance to companies in distressed situations.   In particular, CFGI has experience in providing financial advisory services to troubled real estate companies.  CFGI's professionals have advised debtors, creditors, and equity holders in many chapter 11 and chapter 7 cases.  The current partners, managing directors, senior managers, and other professional staff of CFGI have extensive experience working with financially troubled companies in complex financial restructurings in and out-of-court.

6.      In addition to CFGI's experience in the reorganization, restructuring, and disposition of troubled companies, CFGI has developed an understanding of the Parent Debtor's financial history and business operations by working closely with the Parent Debtor's management and other professionals.

7.      I am a licensed Certified Public Account, Certified Insolvency and Restructuring Advisor, Certified Fraud Examiner, and Certified in Financial Forensics.  I lead a team of professionals at CFGI who specialize in restructuring.  I have over 20 years of experiencing leading the restructurings of distressed companies in the roles of Chief Restructuring Officer and financial advisor.  I have also represented secured and unsecured creditors, indenture trustees, receivers, examiners, and court-appointed trustees, and have served as a liquidating trustee.

8.      My professional affiliations include, but are not limited to, the American Institute of Certified Public Accountants, the American Bankruptcy Institute, the New Jersey Society of Certified Public Accountants, the Association of Insolvency and Restructuring Advisors, the Association of Certified Fraud Examiners and the Turnaround Management Association.  My representative chapter 11 engagements include, but are not limited to, the

following cases: *In re L&L Wings Inc.*, Case No. 21-10795 (SCC) (Bankr. S.D.N.Y. 2021)

(Financial Advisor to Debtor); *In re Dean & Deluca New York, Inc.*, Case No. 20-10916 (MEW)

(Bankr. S.D.N.Y. 2020) (Chief Restructuring Officer to Debtors); *In re Seasons Corporate, LLC*,

Case No. 18-45284 (NHL) (Bankr. E.D.N.Y. 2018) (Financial Advisor to Creditors' Committee);

*In re Tropicana Entertainment, LLC*, Case No. 08-10856 (KJC) (Bankr. D. Del. 2008) (Financial

Advisor to Debtor); *In re TOUSA, Inc.*, Case No. 08-10928 (JKO) (Bankr. S.D. Fla. 2008)

(Financial Advisor to Creditors' Committee); *In re Fleming Companies, Inc.*, Case No. 03-10945

(MFW) (Bankr. D. Del. 2003) (Financial Advisor to Creditors' Committee); *In re Worldcom, Inc.*,

Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. 2002) (Forensic Accountant to Examiner).

## The Parent Debtor's Immediate Need for the DIP Loan

9.     The Parent Debtor requires immediate access to postpetition financing so

that it has sufficient general corporate working capital to operate and administer this Chapter 11

Case while continuing on its path towards a successful reorganization.

10.    Prior to the date hereof, the CFGI team, working under my direction,

analyzed and reviewed the Parent Debtor's projected cash needs and prepared an initial DIP

Budget reflecting the Parent Debtor's ongoing cash needs through the anticipated effective date of

a chapter 11 plan implementing the terms of the Investment Agreement (the "**Plan**").  As a result

of this analysis and review, the CFGI team concluded that the Parent Debtor's non-debtor direct

and indirect subsidiaries do not generate sufficient cash flows to sustain the Parent Debtor's

ordinary course operations.  Specifically, the Parent Debtor projects that it will have nearly

exhausted its operating cash within the next 60 days and that it will be unable to sustain its

operations on a go forward basis.  Accordingly, without access to the DIP Loan and the DIP Loan

Proceeds made available in connection therewith, the Parent Debtor will be unable to consummate the transaction embodied in the Investment Agreement.

11.    Based on the DIP Budget and the CFGI team's analysis of the Parent Debtor's ongoing cash needs, I believe that the DIP Loan will provide the necessary liquidity to allow the Parent Debtor to continue on its path towards a comprehensive restructuring and ultimate successful emergence from chapter 11. The terms of the DIP Loan are governed by the DIP Documents and are summarized in the Motion.

12.    As set forth in the DIP Documents, the DIP Loan presented by the Plan Investor will allow the Parent Debtor to access the Escrowed Funds to be provided under the Investment Agreement. If the Plan is consummated, the DIP Loan will be repaid by application of a credit towards the Plan Consideration (as defined in the Investment Agreement) to be paid by the Plan Investor. To provide the Plan Investor with a source for repayment of the DIP Obligations if the transaction contemplated by the Investment Agreement is not consummated, the Parent Debtor has agreed to provide the Plan Investor with a superpriority administrative expense claim on account of any DIP Obligations, subject to the Carve-Out.

13.    The Plan Investor has agreed to provide the DIP Loan to the Parent Debtor on very favorable terms. Advances under the DIP Loan will bear interest at a below market rate of 5% per annum, accruing monthly and payable on the Maturity Date. The Plan Investor is not seeking payment of any commitment or closing fees or requiring the provision of any postpetition liens to secure the financing, terms that are customary in debtor-in-possession financing. In addition, the Plan Investor has agreed to forego the costly and lengthy process of negotiating a formal credit agreement and has agreed to permit the DIP Loan to be provided based upon the DIP

5

Term Sheet, a simple form of amendment to the Investment Agreement to permit the borrowing, and an agreed form of DIP Order.

14.     The DIP Loan to be provided by the Plan Investor will allow the Parent Debtor to access much needed liquidity without having to go through the process of seeking out additional third-party postpetition financing.  I do not believe that any third-party lender would be prepared to provide debtor-in-possession financing to the Parent Debtor, let alone on an unsecured basis.  I believe that, even if it were available, any third-party postpetition financing available to the Parent Debtor would be more costly and diminish recoveries for impaired creditors.  Even if the Parent Debtor was able to locate another potential lending source that was willing to provide financing to the Parent Debtor on an unsecured basis, I do not believe the terms provided by any such third-party source would be as favorable as the terms represented by the DIP Loan, which is being provided without any commitment or closing fees.  Further, it is my understanding that the Parent Debtor received a third-party offer for postpetition financing earlier in the Chapter 11 Case, but that the terms of such financing were significantly more costly than those proposed under the DIP Documents.

15.     Put simply, I believe that the DIP Loan represents the best financing available for the Parent Debtor.  For these reasons, and under the circumstances of this Chapter 11 Case, I believe that the DIP Loan provided in accordance with the DIP Documents, including the fees imposed thereunder, is reasonable, is in the best interests of the Parent Debtor and its estate, and represents the best financing available to the Parent Debtor.

### The DIP Loan was Negotiated in Good Faith and at Arm's Length

16.     The Parent Debtor, in consultation with CFGI and its other professional advisors, engaged in extensive negotiations with the Plan Investor.  Following such extensive

back-and-forth negotiations, the Parent Debtor was able to negotiate the terms of the DIP Loan set forth in the DIP Documents.  Ultimately, the DIP Loan reflects a compromise and is designed to permit the Parent Debtor to continue on its path towards a successful reorganization without having to incur unreasonable and unnecessary expenses.

17.     Accordingly, I believe that the DIP Loan and the DIP Documents were negotiated in good faith and at arm's length.  It represents the best postpetition financing available to the Parent Debtor under the circumstances and is supported by the Parent Debtor's key stakeholders.  As a result, I believe that the Court should approve and authorize the Parent Debtor's entry into the DIP Loan in accordance with the DIP Documents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  May 5, 2022
        New York, New York                    _/s/  Joseph Baum_____
                                              Joseph Baum
                                              Partner
                                              CFGI, LLC

WEIL:\98607337\9\12817.0007

## Exhibit C

**Form of Investment Agreement Amendment**

## Amendment No. 2 to Investment Agreement

This Amendment No. 2 to Investment Agreement (this "*Amendment*") is entered into as of the [___] day of May, 2022, by and among All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands (the "*Company*"), Paragraph Partners LLC, a US special purpose entity ("*Plan Investor*") and Mishmeret Trust Company Ltd. ("*Mishmeret*" or the "*Trustee*", and together with the Company and the Plan Investor, the "*Parties*"), solely in its capacity as Trustee for the Series B, C, D and E Notes issued by the Company pursuant those deeds of trust for each of the Notes by and between the Company and Mishmeret.

WHEREAS, the Company, the Plan Investor and Mishmeret (solely in its capacity as Trustee and in respect of Sections 7.02(b), 8.01(b), 8.01(c) and 8.02(c) thereof) have entered into that certain Investment Agreement, dated as of March 11, 2022 (the "*Agreement*"). Capitalized terms used herein without definition shall have the meanings assigned such terms in the Agreement.

WHEREAS, the Parties now desire to amend the Agreement as set forth herein; and

WHEREAS, pursuant to Section 12.11 of the Agreement, the Agreement may only be amended, restated, supplemented or otherwise modified by written agreement duly executed by each Party.

NOW, THEREFORE, the Parties, for good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties, do hereby agree as follows:

1. **Amendments**. The Agreement shall be amended as described in this Section 1.

   a. **Escrowed Funds**. Section 3.02 of the Agreement shall be amended and restated in its entirety as follows (newly added or changed text being identified in **bold** typeface):

   **Escrowed Funds**. Within five (5) business days of the later to occur of (i) the Court Break-Up Fee Approval Date and (ii) the date on which a Plan is annexed hereto as Exhibit A that is reasonably satisfactory to the Plan Investor and otherwise complies with the terms hereof, pursuant to the terms of the Escrow Agreement, Plan Investor shall (A) transfer the amount of $4,500,000 to **Madison Title Agency, LLC**, in its capacity as escrow agent (the "*Escrow Agent*"), by wire transfer of immediately available funds (the "*Escrowed Funds*"), and (B) deliver to the Escrow Agent a duly executed signature page to that certain **Joinder** annexed hereto as Exhibit D (the "*Guaranty*," and the date on which the Escrowed Funds are transferred and the Guaranty is delivered being referred to herein as the "*Escrow Date*"). Pursuant to the terms of the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

           (a)     if the Closing shall occur, the Escrowed Funds and all accrued investment income thereon shall be applied at the Closing towards the Cash

Payment portion of the Purchase Price payable to the Company by Plan Investor and the Guaranty shall, by its terms, cease to be effective;

(b)    if this Agreement is terminated by the Company pursuant to Section 11.01(c) (including due to the failure of the Plan Investor to close the Transaction), (1) the Escrowed Funds, together with all accrued investment income thereon (if any), shall be delivered to the Company and (2) the signature page to the Guaranty shall be delivered and released to the Company and the Guaranty shall then become immediately effective, in each case in accordance with and subject to the terms of Section 11.03(b); or

(c)    if this Agreement is terminated for any reason other than as set forth in Section 3.02(b) above, the Escrowed Funds, together with all accrued investment income thereon (if any), shall be promptly returned to Plan Investor, together with the Plan Investor's signature page to the Guaranty.

**Notwithstanding anything to the contrary contained herein, the Company shall be permitted, in accordance with the terms of (a) that certain DIP Term Sheet dated as of May [__], 2022 (the "*DIP Term Sheet*") by and between the Company and the Plan Investor and (b) the order of the Bankruptcy Court authorizing the Company to, among other things, borrow funds in accordance with the DIP Term Sheet (the "*DIP Order*"), make one or more requests to draw upon all or part of the Escrowed Funds by delivering a written certification to the Escrow Agent in accordance with the DIP Term Sheet, the provisions of the Escrow Agreement, and the DIP Order.  Any such drawn Escrowed Funds shall be utilized by the Company solely in accordance with the DIP Documents (as defined in the DIP Term Sheet), including without limitation, the DIP Budget (as defined in the DIP Term Sheet). Notwithstanding that the Company may draw upon and utilize the Escrowed Funds in accordance with the DIP Documents (including the DIP Budget), (i) such funds shall continue to be treated as Escrowed Funds for the purposes of this Agreement and (ii) the provisions of this Section 3.02, including the provisions governing the rights and obligations of the Parties with respect to the Escrowed Funds in the event (x) the Closing occurs or (y) the Closing does not occur and the Agreement is terminated, shall continue in full force and effect.  For the avoidance of doubt, if the Investment Agreement is terminated for any reason other than as set forth in Section 3.02(b) therein, the repayment to the Plan Investor of any amounts drawn by the Company under the DIP Loan in accordance with the DIP Documents shall be applied and treated as payment and delivery by the Company of Escrowed Funds in accordance with the Investment Agreement.  Pursuant to Section 3.02(b) of the Investment Agreement, if the Investment Agreement is terminated by the Borrower pursuant to Section 11.01(c) thereof, the Borrower shall be entitled to retain the DIP Loan Proceeds and shall have no further obligations to the Plan Investor hereunder with respect to such proceeds.**

2

2.     **Miscellaneous**.  As expressly amended hereby, the Agreement shall continue in full force and effect in accordance with the provisions thereof.  As used in the Agreement, "hereinafter," "hereto," "hereof," and words of similar import shall, unless the context otherwise requires, mean the Agreement after being amended by this Amendment. This Amendment shall become effective upon its execution by the parties hereto.  This Amendment may be executed in two or more counterparts (including counterparts transmitted in .pdf or similar format), each of which when so executed shall be deemed to be an original, and all such counterparts shall together constitute one and the same instrument.  This Amendment shall be construed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of laws thereof.

[Signature Page to Follow]

This Amendment No. 2 to Investment Agreement is entered into as of the date and year first above written.

**COMPANY:**

**ALL YEAR HOLDINGS LIMITED**

By: _____
      Name:  Assaf Ravid
      Title:   CRO

By: _____
      Name:  Ephraim Diamond
      Title:   ARO

**PLAN INVESTOR:**

Paragraph Partners LLC

By: _____
      Name:  Avi Philipson
      Title:   CEO

[SIGNATURE PAGE TO INVESTMENT AGREEMENT AMENDMENT NO. 2]

**Mishmeret:**

**Mishmeret Trust Company Ltd.**, as Trustee


By: _____

Name:
Title:

WEIL:\98609349\4\12817.0007