

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

Matthew P. Goren
+1 (212) 310-8440
matthew.goren@weil.com

May 20, 2022

**Via Email and ECF**

Honorable Martin Glenn
Chief United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Courtroom 523
New York, NY 10004-1408

*Re: In re All Year Holdings Limited, Chapter 11 Case No. 21-12051 (MG)*

Dear Chief Judge Glenn:

We represent All Year Holdings Limited, as debtor and debtor in possession (the "**Parent Debtor**") in the above-referenced chapter 11 case (the "**Chapter 11 Case**"). We submit this letter to update the Court and other parties in interest on several matters with respect to the Parent Debtor, including: (i) the status of the Parent Debtor's chapter 11 plan and related disclosure statement, (ii) a pending transaction with respect to the William Vale Hotel, (iii) the upcoming hearing on the Parent Debtor's proposed debtor-in-possession financing, and (iv) several other housekeeping matters.

### The Chapter 11 Plan and Disclosure Statement

We are pleased to inform the Court that the Parent Debtor has reached an agreement with Paragraph Partners LLC (the "**Plan Investor**") and Mishmeret Trust Company Ltd., in its capacity as trustee for the Parent Debtor's various series of notes (the "**Notes Trustee**"), on a mutually agreed form of chapter 11 plan (the "**Agreed Plan**") to implement the terms of the Investment Agreement.[1] The Agreed Plan was annexed to the Investment Agreement on May 10, 2022.

---

[1] The Investment Agreement, dated March 11, 2022 (as amended by Amendment No. 1 on April 21, 2022), among the Plan Investor, the Notes Trustee and Parent Debtor, is attached as <u>Exhibit A</u> to the *Notice of Hearing on Motion of Parent Debtor Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(b) and Fed. R. Bankr. P. 2002, 6004, and 9014 for Entry of Order (I) Approving Bid Protections and (II) Granting Related Relief* [ECF No. 66]. Capitalized terms used in this section but not defined herein have the definitions ascribed to them in the Investment Agreement or the Investment Agreement Amendment (as defined below), as applicable.

In accordance with the Investment Agreement, on May 17, 2022, the Plan Investor deposited with Madison Title Agency, as escrow agent, (i) the $4.5 million deposit (the "**Escrowed Funds**"), and (ii) a joinder to the Investment Agreement executed by Bent Philipson, to be held in escrow. The Parent Debtor is required under the Investment Agreement to file its disclosure statement and solicitation procedures motion for the Agreed Plan within fourteen (14) days following the receipt of the $4.5 million deposit.

The Parent Debtor will continue to apprise the Court of future progress, as well as any other updates with respect to the Agreed Plan and Disclosure Statement.

### The William Vale Hotel

As previously detailed to the Court, the Series C Notes Trustee has been considering two final offers to purchase the Series C Noteholders' rights, title, and interest in the William Vale mortgage and loan. The first offer was from Mr. Zelig Weiss, the 50% owner of the indirect parent of the entity which owns the William Vale Hotel, and the other offer was from the Plan Investor.

The Series C Noteholders' vote to consider the two final offers was originally scheduled to be held on April 26, 2022, but was delayed several times to allow the two final bidders an opportunity to increase and refine their final bids. Following further negotiations and discussions among the parties, a vote was held on May 8, 2022, at which time Series C Noteholders holding 93% of participating principal voted to approve the offer from the Plan Investor to purchase the Series C Noteholders' interest in the William Vale mortgage and note. Following the vote, Mr. Weiss submitted a further revised offer, which, we have been informed, the Series C Noteholders rejected and are proceeding with the Plan Investor's approved offer.

The offer from the Plan Investor provides that the Plan Investor will purchase the Series C Noteholders' rights, title, and interest in the William Vale mortgage and loan for $157,312,112. As previously detailed to the Court, in accordance with the Investment Agreement, the Plan Investor has agreed, upon consummation of a William Vale Purchase (as defined in the Investment Agreement) to increase the principal amount of the New Notes that will be issued by the Reorganized Debtor under the Agreed Plan for the benefit of impaired unsecured claimholders by an additional $2 million. As detailed below, the Plan Investor has also agreed to pay an additional $200,000 to the Parent Debtor as consideration for the Parent Debtor's direct equity interest in YG WV LLC, the non-debtor subsidiary of the Parent Debtor that owns the 50% interest in the entity that owns the William Vale Hotel, which shall be effectuated either (i) pursuant to the Agreed Plan, together with the other assets to be acquired by the Plan Investor, or (ii) in the case of a closing of the MLPSA (as defined below) following the effective date of the Agreed Plan, pursuant to a stand-alone sale transaction.

The terms of the agreement between the Series C Noteholders and the Plan Investor were memorialized in that certain Mortgage Loan Purchase and Sale Agreement between the Plan Investor and the Notes Trustee, on behalf of the Series C Noteholders, dated April 12, 2022 (the "**MLPSA**"). In accordance with the MLPSA, the Plan Investor has provided a $7.5 million

deposit.  The outside date for the closing of the William Vale Purchase under the MLPSA is July 24, 2022.  A copy of the MLPSA is attached hereto as **Exhibit A**.[2]

To implement the transfer of the Parent Debtor's direct interest in YG WV LLC, the Parent Debtor, the Notes Trustee, and the Plan Investor entered into an amendment to the Investment Agreement dated April 21, 2022 (the "**Investment Agreement Amendment**").  The amendment provides for the following:

First, the Investment Agreement Amendment revises the definition of "Excluded Assets" under the Investment Agreement to provide that if the Plan Investor consummates the William Vale Purchase (whether prior to, on, or after the Closing Date, but only until the expiration or termination by its terms of the MLPSA), the Parent Debtor's direct or indirect rights (including the right to receive any income or proceeds) in and to the Parent Debtor's membership interests in YG WV LLC would not be treated as Excluded Assets under the Investment Agreement or the Agreed Plan.

Second, the Investment Agreement Amendment revises the corresponding definition of "William Vale Purchase" under the Investment Agreement to provide for an additional $200,000 to be provided by the Plan Investor as consideration for the transfer of the Parent Debtor's indirect interest in the William Vale Hotel should the Plan Investor consummate the William Vale Purchase and provides a mechanism for the Parent Debtor to effectuate a separate stand-alone sale of its indirect interest in the William Vale Hotel if the Closing Date under the Investment Agreement does not occur on or prior to the Outside Date and the William Vale Purchase occurs thereafter.

Third, the Investment Agreement Amendment extended the deadline for the Parties to agree on a form of Agreed Plan to be annexed to the Investment Agreement to May 10, 2022 (which deadline was met, as discussed above).  The Investment Agreement Amendment further provides that the Parent Debtor's membership interests in YG WV LLC will remain as "Excluded Assets" under the Investment Agreement and neither the Parent Debtor nor Wind Down Co will have any obligation to transfer the Parent Debtor's interest in the William Vale Hotel if either (i) the MLPSA expires or is terminated according to its terms or (ii) the Closing Date under the Investment Agreement has not occurred by December 31, 2022.

Accordingly, the parties anticipate that the transfer of the Parent Debtor's direct interest in YG WV LLC to the Plan Investor will be implemented pursuant to the Agreed Plan in the same manner as the Parent Debtor's other equity holdings in its subsidiaries.  Importantly, the consummation of the William Vale Purchase is not a condition precedent to confirmation of the Agreed Plan nor does the Plan Investor have the right to terminate the Investment Agreement if

---

[2]  The Plan Investor subsequently increased the offer for the Series C Noteholders' interest in the William Vale mortgage and loan to $158,612,112, subject to the Series C Noteholders' willingness to assign certain additional claims to the Plan Investor under the MLPSA.  The Plan Investor and the Trustee, on behalf of the Series C Noteholders, entered into a Statement of Obligation on May 12, 2022 which, if approved by a vote of the Series C Noteholders within 14 days of such date, will amend the MLPSA to reflect such increased consideration and such additional claim assignment.

the parties fail to close on the MLPSA. A copy of the Investment Agreement Amendment is attached hereto as **Exhibit B**.

We will continue to apprise the Court with any updates with respect to the William Vale transactions.

### The Parent Debtor's Debtor-in-Possession Financing Motion

On May 5, 2022, the Parent Debtor filed its *Motion of Parent Debtor for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 364, and 507 (I) Authorizing Parent Debtor to Use Escrowed Funds, (II) Providing Superpriority Administrative Expense Claim Status, and (III) Granting Related Relief* [ECF No. 92] (the "**DIP Motion**"), pursuant to which the Parent Debtor is seeking authority to utilize the $4.5 million Escrowed Funds (the "**DIP Loan**") provided by the Plan Investor under the Investment Agreement to fund its operations and to continue the administration of the Chapter 11 Case while it progresses towards implementation of the Investment Agreement and consummation of the Agreed Plan. The hearing before the Court on the DIP Motion is scheduled for May 26, 2022 at 2:00 p.m. (Eastern Time) (the "**May 26 Hearing**").

A limited objection to the DIP Motion was filed by Mr. Weiss [ECF No. 106] (the "**Limited Objection**") just prior to the filing of this status letter. The Limited Objection is the only response or objection received by the Parent Debtor with respect to the DIP Motion. Mr. Weiss has been participating as a bidder for a potential transaction involving the William Vale Hotel; however, as noted above, his offer to purchase the Series C Noteholders' right, title, and interest in the William Vale note and mortgage was rejected by the Series C Noteholders in favor of the Plan Investor's proposal. In addition, as previously set forth to the Court in the February 10, 2022 Status Letter [ECF No. 46], Mr. Weiss has been engaged in litigation for approximately a year with, among others, certain of the Parent Debtor's indirect subsidiaries before the New York State Supreme Court, Commercial Division in connection with certain defaults by the entity Mr. Weiss controls as lessee under the William Vale Hotel's ground lease, including, among other things, the failure to make required lease payments since February 1, 2021. Mr. Weiss is not, to the best of the Parent Debtor's knowledge and belief, a creditor of the Parent Debtor or party in interest in the Chapter 11 Case, nor does Mr. Weiss purport to be a creditor of the Parent Debtor or party in interest in his Limited Objection.

The Parent Debtor is continuing to review the Limited Objection and will file a reply in due course. To the extent necessary, the Parent Debtor will be prepared to address the Limited Objection at the May 26 Hearing and will otherwise be prepared to demonstrate that the proposed DIP Loan represents the best financing available and that its approval is in the best interests of the Parent Debtor and its estate.

### Other Administrative Matters

In addition to the foregoing, the Parent Debtor anticipates filing retention applications for several law firms that were previously retained by the Parent Debtor as "Ordinary Course Professionals" in accordance with the Court's order, dated February 1, 2022 [ECF No. 41] (the "**OCP Order**"). Specifically, the Parent Debtor anticipates filing formal retention applications for (a) Conyers, Dill & Pearman, (b) Bartov & Co., and (c) Koffsky Schwalb LLC, each of which is

4

likely to exceed the allowed case cap under the OCP Order, in part, due to the proceedings and approvals in Israel and the BVI that are now anticipated to be required in order to commence the solicitation of votes of the Noteholders and to implement the Agreed Plan for the Parent Debtor. The Parent Debtor will also be filing a retention application for Herrick Feinstein LLP, which has been assisting the Parent Debtor with certain state court litigation matters.  The Parent Debtor is working with these professionals to finalize and file their retention applications in short order.

We are available should the Court have any questions or wish to discuss any of the aforementioned matters prior to or at the next scheduled hearing.


Respectfully submitted,

/s/  *Matthew P. Goren*
     Matthew P. Goren

**EXHIBIT A**

Execution Version

MORTGAGE LOAN PURCHASE AND SALE AGREEMENT

Between

PARAGRAPH PARTNERS LLC

PURCHASER

and

MISHMERET TRUST COMPANY LTD., AN ISRAELI COMPANY,
AS TRUSTEE FOR THE HOLDERS OF THE DEBENTURES (SERIES C)
UNDER THAT CERTAIN DEED OF TRUST (AS DEFINED HEREIN)

SELLER

Dated April 12, 2022

This Mortgage Loan Purchase and Sale Agreement, dated April 12, 2022 (this "Agreement"), is between Paragraph Partners LLC, as purchaser (the "Purchaser"), and Mishmeret Trust Company Ltd., an Israeli company, solely, in its capacity as Trustee for the holders of the Debentures (Series C) of All Year Holdings Ltd. (the "Series C Bonds") under that certain deed of trust of the Debentures (Series C) (the "Deed of Trust"), as seller (together with its successors and assigns, the "Seller" or the "Trustee").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Amended and Restated Promissory Note, dated February 28, 2017 (the "Note"), between All Year Holdings Ltd. ("All Year Holdings") and Wythe Berry Fee Owner LLC (the "Borrower"), All Year Holdings made a loan (the "Mortgage Loan") to the Borrower in the original principal amount of $166,320,000.00;

WHEREAS, the Mortgage Loan is secured by, among other things, a first lien mortgage (the "Mortgage") on the Borrower's fee simple interest in the real property and improvements having an address of 55 Wythe Avenue, Brooklyn, NY (the "Property");

WHEREAS, All Year Holdings assigned the Mortgage Loan, the Mortgage and those items detailed as items 1-9 of Schedule 1 of the Assignment of Loan Documents (as defined herein) (collectively, the "Assigned Loan Documents") and related loan documents to the Seller (the "2021 Assignment") pursuant to that certain Mortgage Loan Purchase and Sale Agreement, dated as of March 16, 2021 between the Seller and All Year Holdings (the "MPSA"), a true and correct copy of which is annexed hereto as **Exhibit A**;

WHEREAS, the 2021 Assignment caused Mishmeret to become owner of the Transferred Assets (as defined below) and the Lender (as such term is defined under the Assigned Loan Documents);

WHEREAS, in consideration for the Purchase Price (as defined below), the Seller has agreed to sell the Transferred Assets, and the Purchaser has agreed to purchase the Transferred Assets from the Seller, pursuant to the terms of this Agreement;

NOW, THEREFORE, in consideration of these premises and the mutual agreements hereinafter set forth, the parties hereto agree as follows:

1.    Consideration.  In consideration of the transfer of the Transferred Assets, the Purchaser shall pay to Seller $157,312,112 (the "Purchase Price").  The Purchase Price shall be paid on the Closing Date (as defined below), by a wire transfer of the following amounts to the Seller: (a) $149,812,112 (the "Cash Payment") payable by the Purchaser in immediately available funds, and (b) $7,500,000 (the "Deposit Amount") by way of release of such Deposit Amount in accordance with this Agreement.  The wire of the Purchase Price shall be made on the Closing Date (as defined below) to such bank account in accordance with the instructions to be provided by the Seller to the Purchaser, such instruction to be provided to the Purchaser not less than two (2) days in advance of the Closing Date.  The Cash Payment shall be reduced, dollar for dollar, by all

and any amounts received by Seller on account of the Assigned Loan Documents during the period commencing on the execution of this Agreement by the Purchaser through the date of Closing.

2.    <u>Closing</u>.

a.    <u>The Closing</u>.   The closing of the transactions contemplated under this Agreement (the "<u>Closing</u>") shall take place not later than 75 days from the date on which notice is provided to the Purchaser that Bondholders' Approval (as defined herein) has been received (the date on which the Closing occurs, the "<u>Closing Date</u>").   The parties hereto agree that time is of the essence with respect to this Agreement.

b.    <u>Transactions at the Closing</u>.   At the Closing, the following transactions shall occur simultaneously:

i.    The Seller shall sell, transfer, and assign, set over and otherwise convey to the Purchaser, without recourse, and the Purchaser shall purchase and acquire from the Seller, all of the Transferred Assets, as detailed in <u>Section 6</u> below, free and clear of any Encumbrances (as defined below).

ii.    The Seller shall deliver to the Purchaser all deliverables, as detailed in <u>Section 8</u> below.

iii.    The Purchaser shall pay, or cause to be paid, by wire transfer of immediately available funds, the Cash Payment.

iv.    The Escrow Agent (as defined below) shall transfer to the Seller the Deposit Amount and shall provide a confirmation to both parties of such transfer, and the Deposit Amount shall be credited against the Purchase Price.

3.    <u>Signing Procedure</u>.   The signing of this Agreement shall be as follows:

a.    This Agreement shall be signed first by the Purchaser, unilaterally, and shall be immediately binding upon the Purchaser (the date on which this Agreement is signed, the "<u>Effective Date</u>").

b.    No later than thirty-five (35) days following the Effective Date, a meeting of Series C Bondholders of All Year Holdings (the "<u>Bondholders</u>") shall be convened and the Bondholders shall vote on whether to enter into this Agreement (the "<u>Bondholders' Meeting</u>"). Nevertheless, the Purchaser shall not have any claim in the event the Bondholders' Meeting is not convened as set forth herein.  Within two (2) business days following Purchaser's receipt of written notice of the Bondholders' approval with the Required Majority (as defined below) in the Bondholders' Meeting to enter into this Agreement on a final basis (the "<u>Bondholders' Approval</u>"), Purchaser shall deposit the Deposit Amount with the Escrow Agent (as defined below) in accordance with <u>Section 5</u> hereof.  Within one business day following Seller's receipt of written

notice that the Deposit Amount was deposited with the Escrow Agent, Seller shall sign this Agreement, and shall provide the executed original to the Purchaser. Prior to signing this Agreement by the Trustee, this Agreement shall not be binding upon the Trustee or the Bondholders in any way. The term "Required Majority" means the required majority in accordance with the Deed of Trust and applicable law, as the Trustee shall determine.

        c.    Notwithstanding anything to the contrary contained herein, the Purchaser shall, *ipso facto*, no longer be bound by this Agreement upon the earliest to occur of any of the following events (each and all an "Event of Expiration"): (i) the Seller does not deliver to Purchaser a fully-executed original of this Agreement upon the date that is forty-five (45) days following the Effective Date; (ii) the results of the Bondholders' Meeting do not provide for the Bondholders' Approval; (iii) the Bondholders' Meeting is not convened upon the date that is thirty-five (35) days following the Effective Date; and/or (iv) within fourteen (14) days following the Effective Date, a notice to convene the Bondholders' Meeting in which the Bondholders shall vote on whether to enter into this Agreement is not published. For the avoidance of doubt, any of the above-mentioned events numbered (i) through (iv) shall not be considered as an "Event of Expiration" if such event was caused due to any written motion, submission, request, or joinder made by the Purchaser or an affiliate thereof which prevented the Seller or the Bondholders from taking any such actions or, with respect to (i) above, the failure to make the Deposit in accordance with Section 5 hereof (hereinafter, a "Purchaser Intervention").

    4.    Covenants.

        a.    From and after the date both parties sign this Agreement and until the earlier of the Closing or the termination of this Agreement in accordance with Section 10, each of the parties shall act in a commercially reasonable manner in good faith in order to consummate the transaction contemplated herein.

        b.    Seller shall not, without the prior written approval of Purchaser, amend any of the Assigned Loan Documents or grant any waiver, forbearance, extension or other accommodation to Borrower. Seller shall promptly send to Purchaser copies of any notices received by Seller from Borrower or from any tenant, subtenant or manager of the Property. Seller shall promptly notify Purchaser of each payment received by Seller with respect to the Mortgage Loan after the date hereof.

        c.    From and after the date both parties sign this Agreement (including following the Closing) and as long as this Agreement has not been terminated in accordance with Section 10, Seller will not support any sale of the membership interests in YG WV LLC or any subsidiary thereof other than to the Buyer and shall take all commercially reasonable actions in support of such sale to the Buyer.

    5.    Deposit.

        a.    Upon Purchaser's receipt of written notice of the Bondholders' Approval, the Purchaser shall deposit the Deposit Amount in escrow with an Escrow Agent located in Israel

acceptable to Purchaser and Seller which shall serve as the escrow agent (the "Escrow Agent"). The date on which the Deposit is made is referred to as the "Deposit Date" herein.

b.     The escrow agreement attached hereto as **Exhibit B** (the "Escrow Agreement") shall provide that the Deposit Amount shall be held by the Escrow Agent in accordance with the terms thereof and shall provide, *inter alia*, for the delivery of written notice by Escrow Agent to Seller and Purchaser, via electronic mail, of confirmation of receipt of the Deposit Amount, and for the release or transfer of the Deposit Amount upon the earlier of:

i.      The earliest occurrence of any Event of Expiration following the Deposit Date – to the Purchaser.

ii.     Upon the Closing – to the Seller.

iii.    Upon termination of this Agreement in accordance with Section 10 hereof:

1.  to the extent such termination is pursuant to Section 10(a) – to the Purchaser, unless the parties agreed otherwise in the mutual written consent;

2.  to the extent such termination is pursuant to Section 10(b), 10(d) and/or 10(e) – to the Purchaser; *provided, however*, in the event such termination is pursuant to Section 10(d)(ii) and the circumstances described in Section 10(d)(ii) were caused solely by Purchaser objection to the grant of approval as set forth in Section 10(d)(ii), then to the Seller; and

3.  to the extent such termination is pursuant to Section 10(c) – to the Seller.

6.     Sale and Conveyance of the Transferred Assets.

a.     Seller does hereby agree that Seller shall, upon the Closing, sell, transfer, assign, set over and otherwise convey to the Purchaser, without recourse, and Purchaser does hereby agree that it shall purchase and acquire from the Seller free and clear of any Encumbrances the Note, the Mortgage and all Seller's right, title, and interest in and to the following (collectively, the "Transferred Assets"), in each case in accordance with the terms hereof:

i.      that certain Assignment of Loan Documents, dated as of March 16, 2021, between All Year Holdings and Seller, including all of Seller's right, title, and interest in and to the documents listed on Schedule 1 thereto and produced to the Purchaser, which include, but are not limited to, the Note and the Mortgage (the "Assignment of Loan Documents");

-4-

ii.       that certain Assignment of Consolidated Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of March 16, 2021, between All Year Holdings and Seller (the "<u>Assignment of Mortgage</u>");

iii.     that certain Allonge, dated as of March 16, 2021 to the Note, between All Year Holdings and Seller;

iv.     that certain Guaranty of Payment, dated as of February 28, 2017, made by the Borrower to Seller of the Series C Bonds;

v.      All and any claims and causes of action, guarantees or other rights related to the Transferred Assets and the Property, including without limitation any claims that Seller may have against the Borrower, or Wythe Berry LLC (the "<u>Lessee</u>") in connection with the Transferred Assets. The Purchaser is not acquiring, and the Transferred Assets shall not include: (i) any claims or causes of action of Seller and/or the Bondholders against any of the directors, officers or managers of the Borrower and (ii) any claims of Seller and/or the Bondholders under or in connection with the Deed of Trust against the Lessee, All Year Holdings, and their respective directors, officers, shareholders or managers including, but not limited to, the Bondholders' deficiency claims (each, an "<u>Excluded Claim</u>" and collectively, the "<u>Excluded Claims</u>"). The Seller, for itself and on behalf of its affiliates, the Bondholders and each of its and their respective successors, assigns, heirs and executors (the "<u>Noteholder Parties</u>"), hereby further agrees, from and after the Closing, to indemnify and hold harmless Purchaser and its affiliates, any current or former officer, director, manager, employee, attorney, agent or other representative of the Purchaser or its affiliates or the Reorganized Debtor (as defined in that certain Investment Agreement dated as of March 11, 2022 by and between, among others, the parties hereto (the "<u>Investment Agreement</u>")), or any of their respective successors, assigns, heirs and executors, in each case in their capacity as such (the "<u>Purchaser Releasees</u>") against any losses arising out of or in connection with any indemnification or contribution claim asserted by a third-party against any Purchaser Releasee resulting from a claim asserted by any Noteholder Party against such third-party. Furthermore, upon the confirmation and consummation of the Plan (as defined in the Investment Agreement), the Noteholder Parties shall not bring, and shall waive, any claim that any such Noteholder Party may have in existence as of the Closing against Wythe Berry Member LLC, the Reorganized Debtor (as defined in the Investment Agreement). For the avoidance of doubt, nothing in this <u>Section 6(a)(v)</u> shall, or shall be deemed to, (i) limit, reduce or otherwise impair any Noteholder Party's right to

file and prosecute claims in the All Year US Bankruptcy or in the All Year BVI Bankruptcy, (ii) release or waive any rights or remedies of any releasor under this Agreement or any agreement entered into in connection herewith or (iii) release or waive any rights or remedies of any releasor against, or provide any indemnification rights to, Yoel Goldman or Tzipporah Goldman, or any entity which is under the control or ownership of Yoel Goldman or Tzipporah Goldman other than, from and after the effective date of the Plan, the Transferred Assets (as defined in the Investment Agreement).

vi.    Any other asset, right or interest relating to the Property, the Note or the Mortgage that the Seller owns, including without limitation, all certificates, legal opinions or other documents related to, or evidencing, the Mortgage Loan, as obtained at the time of its origination and any subsequent modification or assignment; all of Seller's rights to principal, interest, fees, costs and expenses payable under the Mortgage after the Effective Date, all books and records related to the Mortgage, the Note, the Assignment of Mortgage and the Assignment of the Loan Documents, in each case to the extent they are in the possession of the Seller; *provided, however*, that failure of Seller to deliver any such assets, rights or interests to the Purchaser shall not constitute a default under this Agreement.

b.    Upon the sale of the Transferred Assets as of the Closing Date, the ownership of the Transferred Assets will be vested in the Purchaser.  As of the Closing Date, the Seller's records shall accurately reflect the sale of the Transferred Assets to the Purchaser.

7.    <u>Books and Records; Certain Funds Received on or After the Closing Date</u>.

a.    Any funds received on or after the Closing Date by the Seller in connection with the Transferred Assets shall be held in trust for the benefit of the Purchaser as the owner of the Transferred Assets and shall be transferred promptly to the Purchaser.  All such payments received by the Seller in respect of the Mortgage Loan or any other Transferred Asset on or after the Closing Date shall belong to, and shall be promptly remitted to, the Purchaser.

b.    Seller intends to treat the transfer of the Transferred Assets to the Purchaser as a sale for tax purposes.

c.    The transfer of the Transferred Assets as of the Closing Date shall be reflected on the Purchaser's balance sheet and other financial statements as the purchase of the Transferred Assets by the Purchaser from the Seller.  The Purchaser intends to treat the transfer of the Transferred Assets from the Seller as a purchase for tax purposes.

8.     <u>Assignment and Assumption Documents; Originals of Certain Loan Documents; Estoppel.</u>

a.     In connection with the sale of the Transferred Assets, the Seller shall deliver or cause to be delivered to the Purchaser or its designee on the Closing Date (to the extent not previously delivered): the following documents or instruments with respect to the Mortgage Loan (collectively, the "<u>Mortgage File</u>"), in each case executed by the parties thereto:

i.   An original Assignment of Mortgage in favor of the Purchaser and in a form that is complete and suitable for recording in the jurisdiction in which the Property is located;

ii.  an original Assignment of Loan Documents in favor of the Purchaser in the form attached hereto as **Exhibit C**;

iii. the original Note issued by the Borrower with all applicable alonges;

iv.  the original or a certified copy of the recorded Mortgage;

v.   An assignment of each UCC-1 financing statement to Purchaser to be filed in the appropriate filing offices or record depositories shall be delivered by the Seller to the Purchaser or its designee for filing or recording, as applicable, by the Purchaser or its designee, on or promptly following the Closing Date;

vi.  A Termination of Assignment of Leases and Rents recorded 03/06/2017 in CRFN #2017000087419.

vii. A Termination of Collateral Assignment of Mortgage dated February 28, 2017, and recorded March 6, 2017 as CRFN 2017000087412.

viii. A Termination of Collateral Assignment of Assignment of Leases and Rents recorded 03/06/2017 in CRFN #2017000087420.

ix.  A UCC-3 Termination for that certain UCC-1 recorded in the county's clerk as 201700087421.

x.   A Correction Assignment of Mortgage for the following Assignment of Modification Agreement from ALL Year Holdings Limited to Mishmeret Trust Company LTD dated March 16, 2021 and recorded March 22, 2021 as CRFN 2021000104024, which will correct the following: Add reference to missing consolidation agreement recorded in CRFN 2017000087411. Correct CRFN for Modification Agreement recorded in CRFN 2017000121032.

    xi.    All other documents listed on <u>Schedule 1</u> hereto; and

    xii.    Notices to the Borrower in the forms to be reasonably agreed by the parties.

    b.    As a condition precedent to Buyer's obligation to close the sale of the Transferred Assets hereunder, the Seller shall also deliver or cause to be delivered to the Purchaser or its designee on or prior to the Closing Date a written estoppel certificate delivered to Seller and Purchaser executed by the Borrower in the form to be attached within 10 days of the Effective Date as **Exhibit D** hereto setting forth (i) the amount of the original principal amount of the Note and the unpaid principal amount of the Note, (ii) the current rate of interest of the Note, (iii) the date payments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment of the Debt (as defined in the Mortgage), and if any are alleged, the nature thereof and (v) that the Note, the Security Instrument and the other Loan Documents (each as defined in the Mortgage) have not been modified or if modified, giving particulars of such modification.

    9.    <u>Representations and Warranties</u>.

    a.    The Seller represents and warrants to the Purchaser as of the date of execution of this Agreement by the Seller and as of the Closing Date:

    i.    it is a company duly incorporated, validly existing and in good standing under the laws of Israel;

    ii.    it has the power and authority to own its property and to carry on its business as now conducted;

    iii.    it has the power to execute, deliver and perform this Agreement, and neither the execution and delivery by the Seller of this Agreement, nor the consummation by the Seller of the transactions herein contemplated, nor the compliance by the Seller with the provisions hereof, will (A) conflict with or result in a breach of, or constitute a default under, any of the provisions of the organizational documents of the Seller or any of the provisions of any US, Israel or foreign law, governmental rule, regulation, judgment, decree or order binding on the Seller or any of its properties, or any indenture, mortgage, contract or other instrument to which the Seller is a party or by which it is bound, except, in each of the foregoing cases, for conflicts, breaches or defaults that individually or in the aggregate would not reasonably be expected to have a material adverse effect on (1) the condition (financial or other) or operations of the Seller or its properties or (2) the consummation of the transactions contemplated in, or the enforceability against the Seller of, this Agreement, or (B) result in the creation or imposition of any lien, charge or encumbrance upon any of the Seller's property pursuant

to the terms of any such indenture, mortgage, contract or other instrument;

iv.    the execution, delivery and performance of this Agreement by the Seller have been duly authorized by all requisite action by the Seller and the Bondholders and will not violate or result in a material breach of any provision of its organizational documents;

v.    [intentionally omitted]

vi.    assuming the due authorization, execution and delivery of this Agreement by the Purchaser, this Agreement constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms subject to (A) applicable bankruptcy, insolvency, reorganization, receivership, conservatorship, liquidation, moratorium and other laws affecting the enforcement of creditors' rights generally, (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law, and (C) public policy considerations underlying the securities laws, to the extent that such public policy considerations limit the enforceability of the provisions of this Agreement that purport to provide indemnification or contribution for securities laws liabilities;

vii.    the Seller is the sole holder and sole record, legal and beneficial owner of the Transferred Assets and has good, valid and marketable title to the Transferred Assets and a first lien mortgage on the Borrower's fee simple interest in the Property and the Transferred Assets are, and upon Closing shall be transferred to the Purchaser, free and clear of all Encumbrances.  For purposes of this Agreement, the term "Encumbrance" means any encumbrance, lien, mortgage, charge, option, purchase right, pledge, hypothecation, preemption right, security interest, right of first refusal, transfer restriction, or other rights of third parties;

viii.    there are no legal or governmental proceedings pending to which the Seller is a party or of which any property of the Seller is the subject which, if determined adversely to the Seller, would interfere with or materially adversely affect the consummation of the transactions contemplated herein, and to the Seller's knowledge, no such proceedings are threatened by governmental authorities or by others;

ix.    no consent, approval, authorization (including by the Bondholders or third parties), order, license, registration or qualification of or with any such court or governmental agency or body is required for the consummation by the Seller of the transactions contemplated by

this Agreement, other than any consent, approval, authorization, order, license, registration or qualification that has been obtained;

x.    Seller provided good and valid consideration to acquire the Transferred Assets;

xi.    the sale of the Transferred Assets hereunder is undertaken by the Seller for good and valid consideration and is not undertaken with the intent to hinder, delay or defraud any of the Seller's creditors;

xii.    it has not dealt with any broker, investment banker, agent or other person, other than the Purchaser and its respective affiliates, that may be entitled to any commission or compensation in connection with the sale of the Transferred Assets or the consummation of any of the transactions contemplated hereby; and

xiii.    except as set forth in the Mortgage File, the Assigned Loan Documents have not been modified since the Seller became the lender under the Mortgage Loan, and since such time the Property has not been released from the lien of the Mortgage.

b.    The Purchaser represents and warrants to the Seller as of the Effective Date and as of the Closing Date:

i.    it is a company duly organized, validly existing, and in good standing under the place of its establishment;

ii.    it has the power and authority to own its property and to carry on its business as now conducted;

iii.    it has the power to execute, deliver and perform this Agreement, and neither the execution and delivery by the Purchaser of this Agreement, nor the consummation by the Purchaser of the transactions herein contemplated, nor the compliance by the Purchaser with the provisions hereof, will (A) conflict with or result in a breach of, or constitute a default under, any of the provisions of the organizational documents of the Purchaser or any of the provisions of any US or foreign law, governmental rule, regulation, judgment, decree or order binding on the Purchaser or any of its properties, or any indenture, mortgage, contract or other instrument to which the Purchaser is a party or by which it is bound, except, in each of the foregoing cases, for conflicts, breaches or defaults that individually or in the aggregate would not reasonably be expected to have a material adverse effect on (1) the condition (financial or other) or operations of the Purchaser or its properties or (2) the consummation of the transactions contemplated in, or the

-10-

enforceability against the Purchaser of, this Agreement, or (B) result in the creation or imposition of any lien, charge or encumbrance upon any of the Purchaser's property pursuant to the terms of any such indenture, mortgage, contract or other instrument;

iv. it has the financial capability to execute, deliver and perform this Agreement (including by way of external financing);

v. the execution, delivery and performance of this Agreement by Purchaser have been duly authorized by all requisite action by the Purchaser and will not violate or result in a material breach of any provision of its organizational documents;

vi. assuming the due authorization, execution and delivery of this Agreement by the Seller, this Agreement constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms subject to (A) applicable bankruptcy, insolvency, reorganization, receivership, conservatorship, liquidation, moratorium and other laws affecting the enforcement of creditors' rights generally, (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law, and (C) public policy considerations underlying the securities laws, to the extent that such public policy considerations limit the enforceability of the provisions of this Agreement that purport to provide indemnification or contribution for securities laws liabilities;

vii. there are no legal or governmental proceedings pending to which the Purchaser is a party or of which any property of the Purchaser is the subject, which, if determined adversely to the Purchaser, would interfere with or materially adversely affect the consummation of the transactions contemplated herein, and to the Purchaser's knowledge, no such proceedings are threatened by governmental authorities or by others;

viii. it is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default would have consequences that would materially adversely affect the condition (financial or other) or operations of the Purchaser or its properties or would have consequences that would materially adversely affect its performance hereunder;

ix. no consent, approval, authorization, order, license, registration or qualification of or with any such court or governmental agency or body is required for the consummation by the Purchaser of the

-11-

transactions contemplated by this Agreement, other than any consent, approval, authorization, order, license, registration or qualification that has been obtained or made or the lack of which would not individually or in the aggregate reasonably be expected to have a material adverse effect on the transactions contemplated herein;

x.      the purchase of the Transferred Assets hereunder is undertaken by the Purchaser for good and valid consideration and is not undertaken with the intent to hinder, delay or defraud any of the Purchaser's creditors; and

xi.      it has not dealt with any broker, investment banker, agent or other person, other than the Seller and its respective affiliates, that may be entitled to any commission or compensation in connection with the sale of the Transferred Assets or the consummation of any of the transactions contemplated hereby.

c.      Each party hereby agrees to promptly notify the other party of any breach of a representation or warranty contained in this Section 9 of which it has knowledge.

d.      It shall be a condition precedent to Purchaser's obligations to close the transaction contemplated herein that Seller's representations set forth herein remain true and correct in all material respects as of the Closing Date as if made on the Closing Date.

e.      The representations and warranties of the Seller as set forth in Section 9(a) and elsewhere in this Agreement shall not survive the Closing.

10.     Termination.  Without derogating from Section 3(c) above, this Agreement may be terminated at any time prior to the Closing:

a.      by the mutual written consent of Seller and Purchaser;

b.      by Purchaser by written notice to Seller if on the Closing Date the Purchaser is fully prepared and able to consummate the closing of the transaction contemplated herein but the Seller breaches its obligation to consummate the closing of the transaction contemplated herein;

c.      by Seller by written notice to Purchaser if on the Closing Date the Seller is fully prepared and able to consummate the closing of the transaction contemplated herein but the Purchaser breaches its specific obligation to consummate the closing of the transaction contemplated herein; and

d.      by Purchaser or Seller by written notice to the other party in the event that:

-12-

i.        there shall be any law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or

ii.      any governmental authority shall have issued an order restraining or enjoining the transactions contemplated by this Agreement, and such order shall have become final and non-appealable.

11.     <u>Notice of Termination; Effect of Termination</u>.

a.     A party desiring to terminate this Agreement pursuant to <u>Section 10</u> shall give written notice of such termination to the other party specifying the provision pursuant to which such termination is effective.

b.     Each party's right of termination under <u>Section 10</u> is in addition to the specific performance rights under applicable law.

c.     If this Agreement is validly terminated pursuant to <u>Section 10</u>, all further obligations of the parties under this Agreement will terminate and there shall be no liability on the part of any party other than as expressly set forth herein.

d.     In the event of the termination of this Agreement in accordance with <u>Section 10</u> hereof, the Escrow Agent shall release the Deposit Amount in accordance with <u>Section 5(b)</u> above.

12.     <u>Severability of Provisions</u>.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.  Furthermore, the parties shall in good faith endeavor to replace any provision held to be invalid or unenforceable with a valid and enforceable provision which most closely resembles, and which has the same economic effect as, the provision held to be invalid or unenforceable.

13.     <u>Governing Law</u>.  THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT, AND/OR THE INTERPRETATION AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS AND DECISIONS OF THE STATE OF ISRAEL, WITHOUT REGARD TO THE CHOICE OF LAW RULES THEREOF.

14.     <u>SUBMISSION TO JURISDICTION</u>.  EACH OF THE PARTIES HERETO IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DISTRICT COURT OF TEL AVIV – JAFFA FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION

-13-

OR PROCEEDING IN ANY SUCH COURT; (III) AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (IV) CONSENTS TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER.  THE ABOVE MENTIONED WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY ASSIGNMENT.

15.    Assignment.  No party may assign any of its rights under this Agreement without the prior consent of the other party, *provided, however*, that Purchaser may assign its rights and obligations hereunder (in whole or in part) effective no earlier than the Closing to (1) a special purpose vehicle (i.e., a bankruptcy remote entity without any prior assets, operations, obligations or debt) controlled by the controlling shareholders of the Purchaser; or (2) to any other entity with the consent of the Seller, which shall not be unreasonably withheld, delayed or conditioned, provided with respect of (1) and (2) that the Purchaser provides the Seller with the documents to effectuate any assignment, and any assignment of the Purchaser's rights hereunder occurs no less than five (5) business days prior to Closing.  Notwithstanding the foregoing, the Purchaser shall remain jointly liable under this Agreement with any assignee of the Purchaser's rights hereunder. Upon the reasonable request of Purchaser, Seller shall cooperate in a commercially reasonable manner, and at the sole cost and expense of Purchaser, to assign the Mortgage Loan and the Assigned Loan Documents directly to a third-party lender in connection with a refinance of the Property.

16.    No Third-Party Beneficiaries.  The parties do not intend the benefits of this Agreement to inure to any third party.

17.    Amendment.  This Agreement may be amended only by a written instrument that specifically refers to this Agreement and is executed by the Purchaser and the Seller.  This Agreement shall not be deemed to be amended orally or by virtue of any continuing custom or practices.

18.    Counterparts.  This Agreement may be executed in any number of counterparts, and by the parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement in Portable Document Format (PDF) or by facsimile transmission shall be as effective as delivery of a manually executed original counterpart of this Agreement.

19.    Exercise of Rights.  No failure or delay on the part of any party to exercise any right, power or privilege under this Agreement and no course of dealing between the Seller and the Purchaser shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein expressly provided

are cumulative and not exclusive of any rights or remedies which any party would otherwise have pursuant to law or equity. No notice to or demand on any party in any case shall entitle such party to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of other party to any other or further action in any circumstances without notice or demand.

20.    No Partnership.  Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto.  Nothing herein contained shall be deemed or construed as creating an agency relationship between the Purchaser and the Seller and neither party shall take any action which could reasonably lead a third party to assume that it has the authority to bind the other party or make commitments on such party's behalf.

21.    Integration.  This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof.

22.    Further Assurances.  From and after the Closing, the parties hereto shall execute such other and further documents, instruments and certificates and shall take or cause to be taken such further actions as may reasonably be necessary to carry out, evidence or effectuate the intent of this Agreement and the transactions contemplated hereby.  Each party hereto shall cooperate with the other parties, to the extent reasonably requested by such other parties, to enforce rights and obligations herein provided.

23.    Allocation of Fees and Expenses.  The fees and expenses of the Escrow Agent shall be borne equally by the Purchaser and the Seller.

24.    Notices.    All notices, demands, requests or other communications (collectively, "Notices") required to be given or which may be given hereunder shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, or (b) national overnight delivery service, or (c) personal delivery, addressed as follows:

If given to Seller:                          Mishmeret Trust Company, Ltd.
                                             Amot House Building B
                                             48 Menachem Begin Road
                                             Tel Aviv, Israel
                                             Attention: Mr. Rami Katzav

| | |
|---|---|
| With a copy being simultaneously delivered by the same method of delivery to: | Chapman and Cutler LLP<br>1270 Avenue of the Americas<br>New York, NY 10020<br>Attention: Michael Friedman, Esq.<br>Email: friedman@chapman.com |
| If given to Purchaser: | Paragraph Partners LLC Attention: Avi Philipson<br>E-mail:          aphilipson@graphgroup.com |
| With a copy being simultaneously delivered by the same method of delivery to: | Gissin & Co., Locke Lord LLP, Fried, Frank, Harris, Shriver & Jacobson LLP<br>Attention: Yael Hershkovitz, Shalom Jacob, Avi Feinberg<br><br>E-mail: yael@gissinlaw.co.il; SJacob@lockelord.com; Avi.Feinberg@friedfrank.com |

*     *     *     *     *     *

IN WITNESS WHEREOF, the Purchaser and the Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year detailed herein.

MISHMERET TRUST COMPANY LTD.,
AN ISRAELI COMPANY, AS TRUSTEE
(SERIES C)

By: _____

Name: Ram Sebty and Rami Katzav

Title: VP

Date: 5/12/2022

PARAGRAPH PARTNERS LLC

By: _____

Name: _____ Avi Philipson _____

Title: _____ CEO _____

Date: _____

**SCHEDULE 1**

[see executed pdf]

# EXHIBIT A

## True and Correct Copy of MPSA

**EXHIBIT B**

**Escrow Agreement**

**EXHIBIT C**

**Assignment of Loan Documents**

**EXHIBIT D**

**Estoppel Certificate**

**EXHIBIT B**

*Execution Version*

## Amendment No. 1 to Investment Agreement

This Amendment No. 1 to Investment Agreement (this "***Amendment***") is entered into as of the 21st day of April, 2022, by and among All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands (the "***Company***"), Paragraph Partners LLC, a US special purpose entity ("***Plan Investor***") and Mishmeret Trust Company Ltd. ("***Mishmeret***" or the "***Trustee***", and together with the Company and the Plan Investor, the "***Parties***"), solely in its capacity as Trustee for the Series B, C, D and E Notes issued by the Company pursuant those deeds of trust for each of the Notes by and between the Company and Mishmeret.

WHEREAS, the Company, the Plan Investor and Mishmeret (solely in its capacity as Trustee and in respect of Sections 7.02(b), 8.01(b), 8.01(c) and 8.02(c) thereof) have entered into that certain Investment Agreement, dated as of March 11, 2022 (the "***Agreement***").  Capitalized terms used herein without definition shall have the meanings assigned such terms in the Agreement.

WHEREAS, the Parties now desire to amend the Agreement as set forth herein; and

WHEREAS, pursuant to Section 12.11 of the Agreement, the Agreement may only be amended, restated, supplemented or otherwise modified by written agreement duly executed by each Party.

NOW, THEREFORE, the Parties, for good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties, do hereby agree as follows:

1.    **Amendments**.  The Agreement shall be amended as described in this Section 1.

    a.    **Excluded Assets**.  The definition of "Excluded Assets" shall be amended and restated in its entirety as follows (newly added text being identified in **bold** typeface):

"***Excluded Assets***" means (a) any and all of the Company's direct or indirect rights (including the right to receive any income or proceeds) in and to (i) any collateral securing the Secured Notes, (ii) the Company's membership interests in YG WV LLC **(subject to the last sentence hereof)**, and (iii) the assets described in the settlement agreements among the Company, DCP All Year Pref Equity LLC and DCP Kings Point LLC, (b) any and all claims, whether known or unknown, contingent, liquidated or disputed, that the Company or the Noteholders may have against any third-parties, including any current or prior officer, director or shareholder of the Company (subject to the releases provided in Section 7.02 above), (c) such other assets listed on Schedule B hereto and (d) those assets vested in Wind Down Co pursuant to the Plan.  It being clarified that the rights and claims in (i) the Settlement agreement with regard to MY 2011 Grand LLC et al as approved by US Bankruptcy court on October 25, 2021 (case No. 19-23957 (RDD)), and (ii) the Lofts on Devoe LLC shall not be Excluded Assets. **Notwithstanding the above, to the extent that the Plan Investor effects the William Vale Purchase (as defined herein) (whether prior to, on, or after the Closing Date, but only until the expiration or termination by its terms of that**

**certain Mortgage Purchase and Sale Agreement entered into by and between the Trustee and the Plan Investor (the "*MPSA*")), the Company's direct or indirect rights (including the right to receive any income or proceeds) in and to the Company's membership interests in YG WV LLC shall not be Excluded Assets hereunder or under the Plan, and the Plan shall provide for the automatic transfer of such interests to the Plan Investor upon the later of the MPSA closing date (the "*WV Sale Date*") and, to the extent that such WV Sale Date is after the Closing Date, the payment of the Shares Consideration (as defined below),** *provided that* **the Company's membership interests in YG WV LLC shall remain Excluded Assets hereunder and under the Plan and neither the Company nor Wind Down Co shall have any obligation hereunder with respect to a transfer of such interests if either (i) the MPSA expires or is terminated according to its terms or (ii) the Closing Date has not occurred by December 31, 2022.**

b.  <u>**Purchase Price Adjustments**</u>.  <u>Section 2.02(a)</u> of the Agreement shall be amended and restated in its entirety as follows (newly added text being identified in **bold** typeface):

<u>William Vale Purchase</u>.  In the event that the Plan Investor or an Affiliate thereof purchases substantially all of the rights of the Trustee for the Series C Notes in and to the William Vale Hotel (the "***William Vale Purchase***") **(whether prior to, on, or after the Closing Date)**, including, but not limited to, the Trustee's rights in and to that certain Amended and Restated Promissory Note, dated February 28, 2017, originally between the Company and Wythe Berry Fee Owner LLC (the "***Borrower***") and that certain loan originally made by the Company to the Borrower in the original principal amount of $166,320,000.00, **then (i)** the aggregate principal amount of the New Notes provided as part of the Purchase Price for these Transactions shall be increased from $20,000,000 to $22,000,000 **and (ii) the Plan shall require the Plan Investor to pay to Wind Down Co an additional $200,000 (the "*Shares Consideration*") on the later date to occur of the Closing Date and the WV Sale Date.  If the Closing Date does not occur on or prior to the Outside Date and the WV Sale Date occurs thereafter, the Company agrees to sell the Company's membership interests in YG WV LLC to the Plan Investor for $200,000 (in lieu of the adjustment to the Cash Payment set forth in subset (ii) in the immediately preceeding sentence) and to use commercially reasonable efforts to seek any necessary approvals to consummate such sale, including any approvals of the Bankruptcy Court and BVI Court, as necessary**.

c.  <u>**Plan Agreement Deadline Extension**</u>.  <u>Section 11.01(e)(iii)</u> of the Agreement shall be amended and restated in its entirety as follows (newly added text being identified in **bold** typeface):

a mutually acceptable Plan has not been annexed hereto as <u>Exhibit A</u> by **60** days from the Agreement Date.

2.      **<u>Miscellaneous</u>**.  As expressly amended hereby, the Agreement shall continue in full force and effect in accordance with the provisions thereof.  As used in the Agreement, "hereinafter," "hereto," "hereof," and words of similar import shall, unless the context otherwise requires, mean the Agreement after being amended by this Amendment.  This Amendment shall become effective upon its execution by the parties hereto.  This Amendment may be executed in two or more counterparts (including counterparts transmitted in .pdf or similar format), each of which when so executed shall be deemed to be an original, and all such counterparts shall together constitute one and the same instrument.  This Amendment shall be construed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of laws thereof.

[Signature Page to Follow]

This Amendment No. 1 to Investment Agreement is entered into as of the date and year first above written.

**COMPANY:**

**ALL YEAR HOLDINGS LIMITED**

By: _____
Name:  Assaf Ravid
Title:   CRO

By: _____
Name:  Ephraim Diamond
Title:   ARO

**PLAN INVESTOR:**

Paragraph Partners LLC

By: _____
Name:  Avi Philipson
Title:   CEO

**Mishmeret:**

**Mishmeret Trust Company Ltd.**, as Trustee

By: _____

Name:     Rami Sebty              Rami Katzav

Title:     סמנכ"ל                  סמנכל