> ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X
                            :

In re                         :      Chapter 11
                            :

**ALL YEAR HOLDINGS LIMITED,**     :      Case No. 21-12051 (MG)
                            :

            Debtor.[1]          :
                            :

**Fed. Tax Id. No. 98-1220822**        :
------------------------------------------------------------ X

### <u>CHAPTER 11 PLAN OF REORGANIZATION OF ALL YEAR HOLDINGS LIMITED</u>

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtor*

Dated: May 31, 2022
       New York, New York

---

[1]     The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

**Table of Contents**

Page

ARTICLE I      DEFINITIONS AND INTERPRETATION. ................................................ 1
    A.      Definitions. ................................................................................................ 1
    B.      Interpretation; Application of Definitions and Rules of Construction........... 11
    C.      Reference to Monetary Figures. ................................................................. 12
    D.      Controlling Document. .............................................................................. 12
    E.      Certain Consent Rights............................................................................. 12
ARTICLE II      ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS ................. 12
    2.1.      Administrative Expense Claims. ............................................................... 12
    2.2.      Fee Claims. .............................................................................................. 13
    2.3.      Priority Tax Claims. ................................................................................. 13
ARTICLE III      CLASSIFICATION OF CLAIMS AND INTERESTS. ...................... 14
    3.1.      Classification in General. ......................................................................... 14
    3.2.      Summary of Classification. ...................................................................... 14
    3.3.      Special Provision Governing Unimpaired Claims....................................... 14
    3.4.      Elimination of Vacant Classes................................................................... 14
    3.5.      Voting Classes; Presumed Acceptance by Non-Voting Classes. ................. 14
    3.6.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code................................................................................................................ 15
ARTICLE IV      TREATMENT OF CLAIMS AND INTERESTS FOR THE DEBTOR. .......... 15
    4.1.      Priority Non-Tax Claims (Class 1). ........................................................... 15
    4.2.      Other Secured Claims (Class 2)................................................................. 15
    4.3.      General Unsecured Claims (Class 3).......................................................... 15
    4.4.      Remaining Unsecured Claims (Class 4). .................................................... 16
    4.5.      Subordinated Securities Claims (Class 5)................................................... 16
    4.6.      Equity Interests (Class 6).......................................................................... 16
ARTICLE V      MEANS FOR IMPLEMENTATION. .......................................................... 17
    5.1.      Sponsor Contribution and Distributions. .................................................... 17

5.2.    Authorization and Issuance of New Notes. ................................................................ 18

5.3.    Administration of Wind-Down Co. ........................................................................ 18

5.4.    Section 1145 Exemption .......................................................................................... 19

5.5.    Officers and New Board of Directors ..................................................................... 20

5.6.    Indemnification of Debtor's Directors and Officers ............................................... 20

5.7.    Effectuating Documents; Further Transactions. .................................................... 20

5.8.    Cancellation of Existing Securities and Agreements. ........................................... 22

5.9.    Cancellation of Liens. ............................................................................................ 22

5.10.    Subordination Agreements. ................................................................................... 22

5.11.    Closing of the Chapter 11 Case. ........................................................................... 22

5.12.    Notice of Effective Date. ....................................................................................... 22

ARTICLE VI    DISTRIBUTIONS. .................................................................................... 23

6.1.    Distributions Generally ........................................................................................... 23

6.2.    Distribution Record Date. ...................................................................................... 23

6.3.    Date of Distributions. ............................................................................................. 23

6.4.    Disbursing Agent. ................................................................................................... 23

6.5.    Rights and Powers of Disbursing Agent. ............................................................... 23

6.6.    Expenses of Disbursing Agent. .............................................................................. 24

6.7.    Postpetition Interest on Claims. ............................................................................. 24

6.8.    Delivery of Distributions. ....................................................................................... 24

6.9.    Distributions after Effective Date. ......................................................................... 24

6.10.    Unclaimed Property. .............................................................................................. 24

6.11.    Time Bar to Cash Payments. ................................................................................. 25

6.12.    Manner of Payment Under Plan. ........................................................................... 25

6.13.    Satisfaction of Claims. ........................................................................................... 25

6.14.    Minimum Cash Distributions. ............................................................................... 25

6.15.    Setoff and Recoupment. ......................................................................................... 25

WEIL:\98651725\3\12817.0007

6.16.    Allocation of Distributions between Principal and Interest............................................ 26

6.17.    No Distribution in Excess of Amount of Allowed Claim............................................. 26

6.18.    Distributions Free and Clear.......................................................................................... 26

6.19.    Withholding and Reporting Requirements. ................................................................... 26

ARTICLE VII   PROCEDURES FOR DISPUTED CLAIMS. ....................................................... 27

7.1.    Objections to Claims. ..................................................................................................... 27

7.2.    Resolution of Disputed Administrative Expenses and Disputed Claims....................... 27

7.3.    Payments and Distributions with Respect to Disputed Claims...................................... 27

7.4.    Distributions After Allowance........................................................................................ 27

7.5.    Estimation of Claims. ..................................................................................................... 27

7.6.    No Distributions Pending Allowance. ........................................................................... 28

7.7.    Claim Resolution Procedures Cumulative...................................................................... 28

7.8.    Insured Claims................................................................................................................ 28

7.9.    Tax Treatment of the Class 4 Disputed Claims Reserve. .............................................. 28

ARTICLE VIII EXECUTORY CONTRACTS AND UNEXPIRED LEASES....................................... 29

8.1.    General Treatment. ......................................................................................................... 29

8.2.    Determination of Assumption Disputes and Deemed Consent. ..................................... 29

8.3.    Rejection Damages Claims............................................................................................. 30

8.4.    Insurance Policies. ......................................................................................................... 31

8.5.    Assignment of Executory Contracts to Wind-Down Co. .............................................. 31

8.6.    Modifications, Amendments, Supplements, Restatements, or Other
         Agreements.................................................................................................................... 31

8.7.    Reservation of Rights. .................................................................................................... 32

ARTICLE IX   CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND
              EFFECTIVE DATE................................................................................................... 32

9.1.    Conditions Precedent to Confirmation of Plan.............................................................. 32

9.2.    Conditions Precedent to Effective Date......................................................................... 32

9.3.    Waiver of Conditions Precedent..................................................................................... 33

iii

| | | | |
|---|---|---|---|
| | 9.4. | Effect of Failure of a Condition. | 33 |
| ARTICLE X | | EFFECT OF CONFIRMATION OF PLAN. | 33 |
| | 10.1. | Vesting of Assets. | 33 |
| | 10.2. | Binding Effect. | 34 |
| | 10.3. | Discharge of Claims and Termination of Interests. | 34 |
| | 10.4. | Term of Injunctions or Stays. | 34 |
| | 10.5. | Injunction. | 34 |
| | 10.6. | Releases. | 35 |
| | 10.7. | Exculpation. | 37 |
| | 10.8. | Retention of Causes of Action/Reservation of Rights. | 37 |
| | 10.9. | Special Provisions Regarding Sole Shareholder | 37 |
| ARTICLE XI | | RETENTION OF JURISDICTION. | 38 |
| | 11.1. | Retention of Jurisdiction. | 38 |
| | 11.2. | Courts of Competent Jurisdiction. | 39 |
| ARTICLE XII | | MISCELLANEOUS PROVISIONS. | 39 |
| | 12.1. | Payment of Statutory Fees. | 39 |
| | 12.2. | Substantial Consummation of the Plan. | 40 |
| | 12.3. | Plan Supplement. | 40 |
| | 12.4. | Requests by the Reorganized Debtor and Wind-Down Co for Expedited Determination of Taxes. | 40 |
| | 12.5. | Exemption from Certain Transfer Taxes. | 40 |
| | 12.6. | Amendments. | 41 |
| | 12.7. | Effectuating Documents and Further Transactions. | 41 |
| | 12.8. | Revocation or Withdrawal of Plan. | 41 |
| | 12.9. | Severability of Plan Provisions. | 42 |
| | 12.10. | Governing Law. | 42 |
| | 12.11. | Time. | 42 |

12.12.    Dates of Actions to Implement the Plan. ........................................................................ 42

12.13.    Immediate Binding Effect. ............................................................................................... 42

12.14.    Deemed Acts. .................................................................................................................... 43

12.15.    Successor and Assigns. ..................................................................................................... 43

12.16.    Entire Agreement. ............................................................................................................. 43

12.17.    Exhibits to Plan. ............................................................................................................... 43

12.18.    Notices. ............................................................................................................................. 43

WEIL:\98651725\3\12817.0007

All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands, as debtor and debtor in possession (the "***Debtor***"), proposes the following chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Article I.A.

## ARTICLE I    DEFINITIONS AND INTERPRETATION.

A.    **Definitions.**  The following terms shall have the respective meanings specified below:

1.1    "***Administrative Expense Claim***" means any right to payment against the Debtor (and payable by the Reorganized Debtor or Wind-Down Co, as applicable) constituting a cost or expense of administration incurred during the Chapter 11 Case of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the businesses of the Debtor; (b) Fee Claims; and (c) any Claims arising under any debtor-in-possession financing provided to the Debtor.

1.2    "***Allowed***" means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtor or the Plan Administrator, as applicable; (c) as to which the liability of the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived in the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtor shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan.

1.3    "***Amended Organizational Documents***" means the forms of certificate of formation, certification of incorporation, limited liability company agreement, or other forms of organizational documents and bylaws for the Reorganized Debtor, as applicable, reasonably satisfactory to the Sponsor and consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable.

1.4    "***Asset***" means all of the right, title, and interest of the Debtor in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

1.5    "***Assumption Dispute***" means a pending objection relating to assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.6    "***Authorized Manager***" means any "Authorised Manager" appointed pursuant to the JPL Appointment Order.

1.7    "***Avoidance Actions***" means any and all actual or potential Causes of Action of the Debtor arising under chapter 5 of the Bankruptcy Code (other than section 542 or section 549 of the Bankruptcy Code) or under similar or related state or federal statutes and common law, including, without

limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance action claims, rights, and causes of action, and commercial tort law, to the extent not previously transferred, sold, assigned, or waived under any prior order of the Bankruptcy Court in the Chapter 11 Case.

1.8    "***Ballot***" means the form(s) distributed to holders of Impaired Claims entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

1.9    "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Case.

1.10    "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case or any other court having jurisdiction over the Chapter 11 Case, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

1.11    "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Case.

1.12    "***Business Day***" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.13    "***BVI Court***" means the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division, Virgin Islands or such other court having jurisdiction over the BVI Proceeding.

1.14    "***BVI Plan of Arrangement***" means the plan of arrangement to be consummated in the BVI Proceeding following entry of the Confirmation Order pursuant to which (x) the Equity Interests in the Debtor shall be cancelled and (y) NewCo shall merge with the Debtor and, following such merger, the Reorganized Debtor shall be the surviving entity, and on and after the Effective Date, 100% of the NewCo Shares in the Reorganized Debtor will be held by the Sponsor.

1.15    "***BVI Proceeding***" means Claim No. BVIHC (COM) 0220 of 2021, *In the Matter of All Year Holdings Limited and In the Matter of the BVI Insolvency Act, 2003 (as amended)* pending in the BVI Court.

1.16    "***Cash***" means legal tender of the United States of America.

1.17    "***Causes of Action***" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, belonging to the Debtor, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes:  (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense

including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.18    "*Chapter 11 Case*" means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date in the Bankruptcy Court.

1.19    "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code, as against the Debtor.

1.20    "*Class*" means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.21    "*Class 4 Disputed Claims Reserve*" means a reserve established and maintained by the Disbursing Agent to hold the Pro Rata Share of the Class 4 ED Distribution that would have been distributable on the Effective Date to holders of Disputed Remaining Unsecured Claims if such Claims were Allowed in the amount estimated by the Court or, in absence of such estimation, to the maximum extent, with any cash held in an interest-bearing account.

1.22    "*Class 4 ED Distribution*" means the Sponsor Contribution (including the New Notes) less the Wind Down Cash Funding.

1.23    "*Confirmation Date*" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.24    "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.25    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.26    "*Cure Amount*" means the Cash or other property to be paid or distributed by the Debtor or Wind-Down Co as applicable (as the parties may agree or the Bankruptcy Court may order), necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtor to assume or assume and assign any executory contract or unexpired lease.

1.27    "*Debtor*" has the meaning set forth in the introductory paragraph of the Plan.

1.28    "*Debtor in Possession*" means the Debtor in its capacity as debtor in possession in the Chapter 11 Case pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.29    "*Deeds of Trust*" means, collectively, the Series B Deed of Trust, the Series C Deed of Trust, the Series D Deed of Trust, and the Series E Deed of Trust.

1.30    "*Definitive Documents*" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to the Plan, including, but not limited to: (a) the Disclosure Statement; (b) any motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan, (c) the Disclosure Statement Order; (d) each of the documents comprising the Plan Supplement; (e) the Confirmation Order; and (f) the Plan Investment Agreement, each in form and substance reasonably acceptable to the Notes Trustee and the Sponsor.

3

1.31     "*Disallowed*" means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.32     "*Disbursing Agent*" means the Debtor or the Plan Administrator, as applicable, or any Entity designated by the Debtor or the Plan Administrator, as applicable (it being understood that, in the case of the Class 4 Disputed Claims Reserve, "Disbursing Agent" means the Plan Administrator or any Entity designated by the Plan Administrator).

1.33     "*Disclosure Statement*" means the disclosure statement filed by the Debtor in support of the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code (as may be amended, supplemented, or modified from time to time).

1.34     "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code.

1.35     "*Disputed*" means a Claim or Interest, including an Administrative Expense Claim, (a) that is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code or Bankruptcy Rule 3003(b)(1); or (b) as to which the Debtor, the Plan Administrator, or any parties in interest have interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.

1.36     "*Distribution Record Date*" means the Effective Date.

1.37     "*Effective Date*" means the date on which all conditions to the effectiveness of the Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms of the Plan.

1.38     "*Entity*" means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

1.39     "*Estate*" means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.40     "*Excluded Assets*" means (a) any and all of the Debtor's direct or indirect rights (including the right to receive any income or proceeds) in and to (i) any collateral securing the Series C Notes and Series E Notes, (ii) the Debtor's membership interests in YG WV LLC, and (iii) the assets described in the agreements among the Debtor, DCP All Year Pref Equity LLC and DCP Kings Point LLC, including, without limitation, any membership interests in All Year Holdings Common LLC, (b) any and all claims and Causes of Action, whether known or unknown, contingent, liquidated or disputed, that the Debtor, the Noteholders, or the Notes Trustee may have against any third-parties, including, but not limited to, any current or prior officer, director, advisor, representative, consultant, or shareholder of the Debtor (subject to the releases provided in Section 7.02 of the Plan Investment Agreement), other than any claims and Causes of Action that the Debtor may have with respect to whether or not Yoel Goldman or Tzipporah Goldman have any ownership interests in any of the Transferred Entities (as defined in the Plan Investment Agreement), which shall be retained by the Reorganized Debtor and the Reorganized Debtor shall be authorized to assert any and all claims arising under any applicable law to recover any properties or property interests listed on the Schedule of Transferred Entities, (c) those certain Series D debentures of the Debtor held by All Year Holdings Funding LLC, and (d) those assets vested in Wind-Down Co pursuant to the

WEIL:\98651725\3\12817.0007

Plan. Notwithstanding the foregoing, to the extent that the Sponsor effects the William Vale Purchase (whether prior to, on, or after the Effective Date, but only until the expiration or termination by its terms of the MPSA), the Debtor's direct or indirect rights (including the right to receive any income or proceeds) in and to the Debtor's membership interests in YG WV LLC shall not be Excluded Assets and (A) such rights shall vest in the Reorganized Debtor upon the Effective Date to the extent that the WV Sale Date is on or prior to the Effective Date and (B) such rights shall automatically transfer from Wind-Down Co to the Reorganized Debtor upon the payment of the WV Shares Consideration if the WV Sale Date is after the Effective Date. Notwithstanding the foregoing, the Debtor's membership interests in YG WV LLC shall remain Excluded Assets hereunder and neither the Debtor nor Wind-Down Co shall have any obligation with respect to a transfer of such interests if the MPSA expires or is terminated according to its terms. The rights and claims in (i) the settlement agreement with regard to MY 2011 Grand LLC et al as approved by the United States Bankruptcy Court for the Southern District of New York on October 25, 2021 (Case No. 19-23957 (RDD)), and (ii) the Lofts on Devoe LLC shall not be Excluded Assets.

1.41    "***Exculpated Parties***" means collectively, and in each case, solely in their capacities as such: (a) the Debtor and Reorganized Debtor; (b) the Plan Administrator; (c) Wind-Down Co; (d) the Notes Trustee and its representatives and advisors; (e) the Noteholders and their representatives and advisors; (f) the Sponsor and its representatives and advisors; (g) the JPLs; (h) the Authorized Managers; (i) any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (j) any independent directors appointed to the board of the Debtor on or after January 1, 2021; and (k) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC); provided, however, that Exculpated Parties shall not include Yoel Goldman or Tzipporah Goldman in any capacity.

1.42    "***Fee Claim***" means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by professional persons retained by the Debtor by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Case.

1.43    "***Final Order***" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.44    "***General Unsecured Claim***" means any Claim against the Debtor, that is not (a) an Administrative Expense Claim; (b) a Priority Tax Claim; (c) a Priority Non-Tax Claim; (d) a Remaining Unsecured Claim; or (e) a Subordinated Securities Claim. For the avoidance of doubt, General Unsecured Claims include all Intercompany Claims and the Taz Claim.

1.45    "***Impaired***" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

WEIL:\98651725\3\12817.0007

1.46    "**_Insured Claims_**" means any Claim or portion of a Claim that is, or may be, insured under the Debtor's insurance policies.

1.47    "**_Intercompany Claim_**" means any pre- or postpetition Claim against the Debtor held by a subsidiary or affiliate of the Debtor.

1.48    "**_Interest_**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) of the Debtor, including all ordinary shares, common stock, preferred stock, membership interest, partnership interest or other instrument evidencing any fixed or contingent ownership interest in the Debtor, whether or not transferable, and any share, option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtor, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtor, to acquire any such interests in the Debtor that existed immediately before the Effective Date.

1.49    "**_IRS_**" means the Internal Revenue Service of the United States.

1.50    "**_Israeli Proceeding_**" means the proceeding commenced by the Debtor on April 14, 2022 in the District Court of Tel Aviv Yafo for recognition of the chapter 11 as a foreign main proceeding under the applicable provisions of Chapter I, Part C of the Insolvency and Rehabilitation Law of Israel 5778-2018.

1.51    "**_Israeli Securities Actions_**" means, collectively, (i) CA (Financial) 15257-04-20 _Public Representatives (Registered NGO) v. All Year Holdings, et al._ (April 16, 2020) (Isr.); (ii) CA (Financial) 3325-12-20 _Shachar Group LTD v. All Year Holdings, et al._ (December 1, 2020) (Isr.); and (iii) CA (Financial) 37894-01-19 _Full Disclosure (Registered NGO) v. All Year Holdings, et al._ (filed on January 15, 2019).

1.52    "**_JPL Appointment Order_**" means the order of the BVI Court, dated December 20, 2021, appointing the JPLs.

1.53    "**_JPLs_**" means Charlotte Caulfield and Paul Pretlove of Kalo (BVI) Limited, each in their capacity as joint provisional liquidators appointed in the BVI Proceeding pursuant to the JPL Appointment Order.

1.54    "**_Lien_**" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien as defined in section 101(37) of the Bankruptcy Code.

1.55    "**_MPSA_**" means that certain Mortgage Purchase and Sale Agreement that may be entered into by and between the Notes Trustee and the Sponsor.

1.56    "**_NewCo_**" means a new BVI Entity, to be formed and 100% owned by the Sponsor, which shall merge with the Debtor as part of the BVI Plan of Arrangement.

1.57    "**_NewCo Shares_**" means the ordinary shares of NewCo.

1.58    "**_New Notes_**" means the new notes of the Reorganized Debtor in the principal aggregate amount of either (a) $20,000,000.00 or (b) if the Sponsor, or its affiliate, closes the William Vale Purchase (whether prior to, on, or after the Effective Date), $22,000,000.00, in each case to be issued on or about the Effective Date in accordance with Section 5.1 and subject to the value adjustment set forth in Section 2.02(b) of the Plan Investment Agreement, in the form attached hereto as **__Exhibit A__**.  The New Notes shall

be guaranteed by the New Notes Guarantor pursuant to the New Notes Guaranty, in the form attached hereto as **Exhibit B**.

1.59    "***New Notes Guarantor***" means Bent Philipson or such other individual or corporate entity affiliated with the Sponsor approved by the Notes Trustee.

1.60    "***New Notes Guaranty***" means the guaranty of the New Notes by the New Notes Guarantor, in the form attached hereto as **Exhibit B**.

1.61    "***Non-Securities Indemnity Claims***" means any Claims against the Debtor by any current or former officer or director of the Debtor for indemnification or contribution that are not Subordinated Securities Claims.

1.62    "***Noteholder Claims***" means, individually or collectively, the Series B Notes Claims, the Series C Notes Claims, the Series D Notes Claims, and the Series E Notes Claims.

1.63    "***Noteholders***" means, individually or collectively, the Series B Noteholders, Series C Noteholders, Series D Noteholders, and Series E Noteholders.

1.64    "***Notes***" means, collectively, the Series B Notes, the Series C Notes, the Series D Notes, and the Series E Notes.

1.65    "***Notes Trustee***" means Mishmeret Trust Company Ltd., as trustee under the respective Deeds of Trust.

1.66    "***Other Secured Claim***" means any Secured Claim other than a Priority Tax Claim.

1.67    "***Person***" means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Unit or any political subdivision thereof, or any other Entity.

1.68    "***Petition Date***" means December 14, 2021.

1.69    "***Plan***" means this chapter 11 plan of reorganization, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the terms hereof and the Bankruptcy Code.

1.70    "***Plan Administration Agreement***" means the agreement providing for the appointment of the Plan Administrator, which shall be in form and substance acceptable to the Notes Trustee in its sole and absolute discretion.

1.71    "***Plan Administrator***" means, together, those individuals selected by the Notes Trustee to serve as (a) "plan administrator" and (b) "claims administrator," who will administer and implement the Plan and the Assets of Wind-Down Co, in accordance with, and pursuant to the power and authority with respect to Wind-Down Co, as set forth in Section 5.3 of the Plan and with such rights, powers, and authorities as shall be delegated to and allocated between such individuals under the Plan Administration Agreement.  For the avoidance of doubt, each such "plan administrator" and "claims administrator" shall have only those rights and responsibilities as expressly set forth in the Plan Administration Agreement.

1.72    "*Plan Investment Agreement*" means that certain Investment Agreement dated March 11, 2022, by and among the Debtor, the Sponsor, and, solely with respect to certain specified sections therein, the Notes Trustee, including any and all amendments and all schedules and exhibits thereto.

1.73    "*Plan Supplement*" means a supplemental appendix to the Plan, which shall include (to the extent not previously filed with the Bankruptcy Court as stand-alone documents or as schedules or exhibits to the Disclosure Statement), among other things, forms or term sheets of applicable documents, schedules, and exhibits to the Plan to be filed with the Court, including, but not limited to, the Amended Organizational Documents, the Wind Down Budget, the Plan Administration Agreement, and the Schedule of Assumed Contracts; provided that, through the Effective Date, the Debtor shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan.  The Plan Supplement shall be filed with the Bankruptcy Court no later than seven (7) calendar days prior to the deadline to object to the Plan.  The Debtor shall have the right to amend the Plan Supplement documents through and including the Effective Date in accordance with Article IX of the Plan.

1.74    "*Priority Non-Tax Claim*" means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.75    "*Priority Tax Claim*" means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.76    "*Pro Rata Share*" and "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears relative to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.77    "*Professional Fees Escrow Account*" means the escrow account to be established and funded on or before the Effective Date pursuant to Section 2.2 of the Plan.

1.78    "*Released Parties*" means collectively, and in each case, solely in their capacities as such: (a) the Debtor and the Reorganized Debtor; (b) Wind-Down Co; (c) the Notes Trustee and its representatives and advisors; (d) the Noteholders and their representatives and advisors; (e) the Sponsor and its agents, officers, directors, principals, affiliates, representatives and advisors; (f) any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (g) any independent directors appointed to the board of the Debtor on or after January 1, 2021; (h) the JPLs; (i) the Authorized Managers; and (j) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC); provided, however, that Released Parties shall not include Yoel Goldman or Tzipporah Goldman in any capacity.

1.79    "*Remaining Unsecured Claims*" means the Noteholder Claims, the Subsidiary Plan Administrator Claims, and the Non-Securities Indemnity Claims.

1.80    "*Reorganized Debtor*" means the Debtor as reorganized on or after the Effective Date.

1.81    "*Schedule of Assumed Contracts*" means the schedule of contracts and leases (i) to be assumed by the Reorganized Debtor and (ii) assumed and assigned to Wind-Down Co, as applicable, to be filed with the Plan Supplement.

1.82 "***Schedules***" means the Debtor's schedules of assets and liabilities and statement of financial affairs [ECF Nos. 15, 16, 36, and 37].

1.83 "***Secured Claim***" means any Claim (a) secured by a Lien on collateral to the extent of the value of such collateral (after taking into account any senior Liens thereon) as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtor, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. For the avoidance of doubt the Noteholder Claims are not Secured Claims against the Debtor.

1.84 "***Series B Deed of Trust***" means that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of December 25, 2016, as supplemented or amended from time to time.

1.85 "***Series B Noteholders***" means holders of Series B Notes.

1.86 "***Series B Notes***" means notes issued under the Series B Deed of Trust.

1.87 "***Series B Notes Claims***" means the Claims against the Debtor arising from the Series B Notes issued under the Series B Deed of Trust which shall be allowed for all purposes pursuant to the Plan and the Confirmation Order in the amount of $141,434,950.21, on account of the total amount of principal, accrued and unpaid interest, and any other fees and expenses outstanding under the Series B Deed of Trust as of the Petition Date.

1.88 "***Series C Deed of Trust***" means that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of February 19, 2017, as supplemented or amended from time to time.

1.89 "***Series C Noteholders***" means holders of Series C Notes.

1.90 "***Series C Notes***" means notes issued under the Series C Deed of Trust.

1.91 "***Series C Notes Claims***" means the Claims against the Debtor arising from the Series C Notes issued under the Series C Deed of Trust which shall be allowed for all purposes pursuant to the Plan and the Confirmation Order in the amount of $202,409,251.53, on account of the total amount of principal, accrued and unpaid interest, and any other fees and expenses outstanding under the Series C Deed of Trust as of the Petition Date.

1.92 "***Series D Deed of Trust***" means that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of June 29, 2017, as supplemented or amended from time to time.

1.93 "***Series D Noteholders***" means holders of Series D Notes.

1.94 "***Series D Notes***" means notes issued under the Series D Deed of Trust.

1.95 "***Series D Notes Claims***" means the Claims against the Debtor arising from the Series D Notes issued under the Series D Deed of Trust which shall be allowed for all purposes pursuant to the Plan and the Confirmation Order in the amount of $184,609,380.02, on account of the total amount of principal, accrued and unpaid interest, and any other fees and expenses outstanding under the Series D Deed of Trust as of the Petition Date.

1.96 "***Series E Deed of Trust***" means that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of February 4, 2018, as supplemented or amended from time to time.

WEIL:\98651725\3\12817.0007

1.97    "*Series E Noteholders*" means holders of Series E Notes.

1.98    "*Series E Notes*" means notes issued under the Series E Deed of Trust.

1.99    "*Series E Notes Claims*" means the Claims against the Debtor arising from the Series E Notes issued under the Series E Deed of Trust which shall be allowed for all purposes pursuant to the Plan and the Confirmation Order in the amount of $40,453,260.52, on account of the total amount of principal, accrued and unpaid interest, and any other fees and expenses outstanding under the Series E Deed of Trust as of the Petition Date.

1.100    "*Sponsor*" means Paragraph Partners LLC, or any affiliate designee permitted under the terms of the Plan Investment Agreement.

1.101    "*Sponsor Contribution*" means $40,000,000.00 in Cash provided by the Sponsor, the New Notes and the New Notes Guaranty, in each case in accordance with the Plan Investment Agreement.

1.102    "*Subordinated Securities Claim*" means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a security of the Debtor, or for damages arising from the purchase of sale of such a security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, including any Claim arising out of or related to the Israeli Securities Actions or other similar class action lawsuits brought in Israel before the Effective Date.

1.103    "*Subsidiary Plan Administrator Claim*" means any Claim brought by any plan administrator with respect to any of the debtors in the procedurally consolidated chapter 11 cases of *Evergreen Gardens Mezz, LLC, et.al.*, Case No. 21-10035 (MG) (Bankr. SD.N.Y.).

1.104    "*Tax Code*" means the Internal Revenue Code of 1986, as amended from time to time.

1.105    "*Taz Claim*" means any Claim of Taz Partners LLC arising under or relating to that certain confession of judgment entered against the Debtor by the Kings County Supreme Court on December 9, 2021 or the facts and circumstances alleged therein. For the avoidance of doubt, the Taz Claim shall be treated as a Class 3 General Unsecured Claim under the Plan.

1.106    "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

1.107    "*Unimpaired*" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.108    "*Voting Deadline*" means the date by which all persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan.

1.109    "*William Vale Promissory Note*" means all rights of the Notes Trustee for the Series C Notes in and to that certain Amended and Restated Promissory Note, dated February 28, 2017, originally between the Debtor and Wythe Berry Fee Owner LLC and that certain loan originally made by the Debtor to Wythe Berry Fee Owner LLC in the original principal amount of $166,320,000.00.

1.110    "*William Vale Property*" means that certain property located at 55 Wythe Avenue, Brooklyn, NY, 11222 and 100% owned by Wythe Berry Fee Owner LLC.

1.111   "**William Vale Purchase**" means, the assignment to and purchase by the Sponsor, or its affiliate, of all rights of the Notes Trustee for the Series C Notes in and to the William Vale Promissory Note, for a cash payment of $158,612,112.00.

1.112   "**Wind Down**" means the wind down, dissolution, and liquidation of Wind-Down Co and distribution of any remaining assets in accordance with the Plan.

1.113   "**Wind Down Budget**" means a budget for the Wind Down of Wind-Down Co, to be agreed between the Debtor and the Notes Trustee.

1.114   "**Wind Down Cash Funding**" means the amount necessary (a) to pay all Administrative Expense Claims in accordance with Section 2.1 below and (b) to fund the Wind Down Budget, as determined as of the Effective Date, and any subsequent earnings thereon.

1.115   "**Wind-Down Co**" means a new limited liability company that elects to be taxable as a corporation for U.S. federal income tax purposes to be formed on or prior to the Effective Date for the purpose of conducting the Wind Down in accordance with the Plan and the Plan Administration Agreement. The Excluded Assets and the Wind Down Cash Funding shall be transferred to, and vest in, Wind-Down Co on the Effective Date in accordance with the Plan.

1.116   "**WV Sale Date**" means the date of the consummation of the transactions contemplated under the MPSA.

1.117   "**WV Shares Consideration**" means an additional $200,000 as consideration for the Debtor's membership interests in YG WV LLC in the event of a William Vale Purchase, to be paid by the Sponsor to Wind-Down Co upon the later to occur of the Effective Date and the WV Sale Date.

1.118   "**Wythe Berry Fee Owner LLC**" means Wythe Berry Fee Owner LLC, entity organized in Delaware and 50% indirectly owned by the Debtor, which owns the William Vale Property.

B.      **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time as provided for in the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as otherwise required by the Plan; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.  Notwithstanding anything to the contrary herein, the power and authority of the Plan Administrator shall be defined by, and subject in all respects to, the terms and conditions of the Plan Administration Agreement.  Without derogating any rights of the parties under the

WEIL:\98651725\3\12817.0007

terms of the Plan Investment Agreement, any reference herein to "the property of the Debtor," or expressions of similar import, shall be understood to refer solely to property directly owned by the Debtor.

      C.      **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

      D.      **Controlling Document.**

In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement) and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), the Plan (without reference to the Plan Supplement) shall govern and control; provided, that in the event of a conflict between Confirmation Order, on the one hand, and any of the Plan, the Plan Supplement, or the Definitive Documents, the Confirmation Order shall govern and control in all respects.

      E.      **Certain Consent Rights.**

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the Sponsor and the Notes Trustee as set forth in the Plan Investment Agreement, respectively, with respect to the form and substance of the Plan, the Plan Supplement, and any Definitive Document, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the Plan Investment Agreement are terminated in accordance with their terms.

## ARTICLE II    ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

      2.1.    *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim), shall receive from the Plan Administrator, in full and final satisfaction, settlement, and release of such Claim against the Debtor, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. Amounts sufficient for the Plan Administrator to pay in full all Allowed Administrative Expense Claims that are the responsibility of Wind-Down Co in accordance with this Section 2.1, including all Fee Claims and any and all other amounts that may become due and payable in connection with the BVI Proceeding and the Israeli Proceeding, shall be funded on the Effective Date from, at the option of the Debtor, either: (i) the Debtor's cash on hand, or (ii) the Sponsor Contribution, provided that the Reorganized Debtor shall have a positive cash balance on the Effective Date. The Reorganized Debtor shall pay compensation for services rendered to it and reimbursement of expenses incurred on its behalf from and after the Effective Date in the ordinary course.

2.2.    *Fee Claims.*

(a)    All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, and counsel for the Plan Administrator on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date.  Objections to any Fee Claims must be filed and served on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, counsel for the Plan Administrator, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtor and the party requesting compensation of a Fee Claim, or as approved by the Court).

(b)    Allowed Fee Claims shall be paid in full, in Cash, by the Plan Administrator in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor, Reorganized Debtor or the Plan Administrator.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.

(c)    No later than 10 days prior to the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services prior to the Effective Date to the Debtor and the Notes Trustee and the Debtor (or Plan Administrator if applicable) shall, subject to the Plan, separately escrow from funds of the Debtor such estimated amounts in a Professional Fees Escrow Account for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtor or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim, and provide notice thereof to the Notes Trustee.  The Professional Fees Escrow Account shall be treated as a trust account for the benefit of holders of Fee Claims and otherwise subject to the terms of the Plan.  When all such Allowed Fee Claims have been paid in full, any remaining amount in a Professional Fees Escrow Account shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, Wind-Down Co for distribution in accordance with the terms hereof without any further action or order of the Bankruptcy Court.

(d)    The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date, including for services rendered or expenses incurred by the professionals of the Debtor or Wind-Down Co, as applicable, in the ordinary course and without the need for Bankruptcy Court approval.

2.3.    *Priority Tax Claims.*

Except to the extent that a holder of a Priority Tax Claim agrees to less favorable treatment, Priority Tax Claims shall be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course by the Reorganized Debtor.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Tax Claim available to the Debtor.

## ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1.    ***Classification in General.***

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.    ***Summary of Classification.***

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

**Claims Against and Interests in the Debtor**

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| 4 | Remaining Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |
| 6 | Equity Interests | Impaired | No (Deemed to reject) |

3.3.    ***Special Provision Governing Unimpaired Claims.***

Except as otherwise provided in the Plan, nothing in the Plan shall affect the rights of the Debtor or the Reorganized Debtor, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.4.    ***Elimination of Vacant Classes.***

Any Class of Claims against in the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.5.    ***Voting Classes; Presumed Acceptance by Non-Voting Classes.***

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

WEIL:\98651725\3\12817.0007

3.6. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

The Debtor shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that rejects or is deemed to reject the Plan. The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS FOR THE DEBTOR.

4.1. *Priority Non-Tax Claims (Class 1).*

(a) *Classification*: Class 1 consists of Priority Non-Tax Claims against the Debtor.

(b) *Treatment*: Except to the extent that a holder of a Priority Non-Tax Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan. On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Priority Non-Tax Claims in the ordinary course. The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Non-Tax Claim available to the Debtor.

(c) *Voting*: Class 1 is Unimpaired, and holders of Priority Non-Tax Claims against the Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of Priority Non-Tax Claims against the Debtor, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

4.2. *Other Secured Claims (Class 2).*

(a) *Classification*: Class 2 consists of the Other Secured Claims against the Debtor. To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b) *Treatment*: Except to the extent that a holder of an Other Secured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan. On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Other Secured Claims in the ordinary course. The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Other Secured Claim available to the Debtor.

(c) *Voting*: Class 2 is Unimpaired, and holders of Other Secured Claims against the Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of Other Secured Claims against the Debtor, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.3. *General Unsecured Claims (Class 3).*

(a) *Classification*: Class 3 consists of the General Unsecured Claims against the Debtor.

WEIL:\98651725\3\12817.0007

(b)     *Treatment*:  Except to the extent that a holder of a General Unsecured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of an Allowed General Unsecured Claim are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile each General Unsecured Claim in the ordinary course of business.

(c)     *Voting*: Class 3 is Unimpaired, and holders of General Unsecured Claims against the Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of General Unsecured Claims against the Debtor, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.4.     ***Remaining Unsecured Claims (Class 4).***

(a)     *Classification*:  Class 4 consists of Remaining Unsecured Claims against the Debtor.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Remaining Unsecured Claim against the Debtor agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Allowed Remaining Unsecured Claim, each such holder shall receive (i) on the Effective Date, from the Disbursing Agent (on behalf of the Debtor), its Pro Rata Share of the Class 4 ED Distribution, (ii) in the event the William Vale Purchase occurs subsequent to the Effective Date, from the Disbursing Agent (on behalf of the Debtor), its Pro Rata Share of any additional New Notes issued, and (iii) on such other date(s) as determined from time to time by the Plan Administrator, from Wind-Down Co, the amounts recovered, if any, from the Excluded Assets (including, but without limitation, from the prosecution of Avoidance Actions and other Causes of Action) and any remaining Wind Down Cash Funding.  Notwithstanding anything to the contrary herein, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan (including for purposes of distribution).  The right to the foregoing distributions shall be nontransferable except by will, intestate succession, or operation of law.

(c)     *Voting*:  Class 4 is Impaired, and the holders of Remaining Unsecured Claims against the Debtor are entitled to vote to accept or reject the Plan.

4.5.     ***Subordinated Securities Claims (Class 5).***

(a)     *Classification*:  Class 5 consists of the Subordinated Securities Claims against the Debtor.

(b)     *Treatment*: The holders of Subordinated Securities Claims against the Debtor shall not receive or retain any property under the Plan on account of such Claims.

(c)     *Voting*:  Class 5 is Impaired.  Under section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

4.6.     ***Equity Interests (Class 6).***

(a)     *Classification*:  Class 6 consists of Equity Interests in the Debtor.

(b)     *Treatment*: On or after the Effective Date, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all Equity Interests in the

16

Debtor shall be cancelled. The existing holders of the Equity Interests in the Debtor shall neither receive nor retain any property of the Debtor or interest in property of the Debtor on account of such Equity Interest.

(c)      *Voting*: Class 6 is Impaired. Under section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

## ARTICLE V    MEANS FOR IMPLEMENTATION.

5.1.    ***Sponsor Contribution and Distributions.***

(a)      On the Effective Date, in accordance with the Plan and the Plan Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, the Sponsor shall:

(i)      provide the Sponsor Contribution; and

(ii)      be the sole shareholder of the Reorganized Debtor, and on the Effective Date, shall hold 100% of the NewCo Shares free and clear of all Claims and Liens.

(b)      On the Effective Date, in accordance with the Plan and the Plan Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, the Disbursing Agent (on behalf of the Debtor) shall distribute Pro Rata the Class 4 ED Distribution to (i) the holders of Remaining Unsecured Claims that are Allowed as of the Effective Date, and (ii) the Disbursing Agent, to be held in the Class 4 Disputed Claims Reserve, on behalf of holders of Disputed Remaining Unsecured Claims.

(c)      On the Effective Date, in accordance with the Plan and the Plan Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, a single limited liability company unit representing a non-economic 100% ownership interest in Wind-Down Co shall be issued to the Plan Administrator. The Pro Rata Share of the Class 4 ED Distribution allocated to Disputed Remaining Unsecured Claims shall be held in one or more segregated accounts in the Class 4 Disputed Claims Reserve until such claims are Allowed or Disallowed, at which time the applicable portion of the Class 4 ED Distribution (including any earnings thereon, net of any allocable costs and expenses of the Class 4 Disputed Claims Reserve) shall be distributed to such holders of newly Allowed Remaining Unsecured Claims or to the holders of Remaining Unsecured Claims that were previously Allowed, as the case may be.

(d)      Following the distribution of all amounts from the Class 4 Disputed Claims Reserve, the liquidation of the Excluded Assets (including the completion of the prosecution of any Avoidance Actions and other Causes of Action held by Wind-Down Co), and the distribution of the proceeds therefrom and any remaining Wind Down Cash Funding in accordance with the Plan (including the payment of all costs and expenses and other liabilities of Wind-Down Co), Wind-Down Co shall be dissolved and the single unit shall be deemed cancelled and of no further force and effect. The Plan Administrator shall have no right to any distribution of property or value from Wind-Down Co by reason of its ownership of the single limited liability company unit.

(e)      In addition to the foregoing, in the event of a William Vale Purchase on or before December 31, 2022, the Sponsor shall pay to Wind-Down Co the WV Shares Consideration on the later date to occur of the Effective Date and the WV Sale Date.

WEIL:\98651725\3\12817.0007

(f)        The terms of the Plan Investment Agreement are fully incorporated herein and shall be binding and enforceable against the parties thereto, including, without limitation, the releases and indemnities set forth in Section 7.02(b) of the Plan Investment Agreement.

(g)        Neither the Reorganized Debtor nor the Sponsor shall have any liability for (i) Fee Claims, (ii) any amounts owed to any current officers or current directors of the Debtor or those serving in similar capacities for the period up to and including the Effective Date, or (iii) any payment to holders of Class 4 Remaining Unsecured Claims or any Subordinated Securities Claim.

5.2.    ***Authorization and Issuance of New Notes.***

Subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, the Debtor or Reorganized Debtor, as applicable, is authorized to issue all plan-related securities and documents, including, without limitation, the New Notes, and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership or limited liability company action.

5.3.    ***Administration of Wind-Down Co.***

(a)        On the Effective Date, the Excluded Assets and the Wind Down Cash Funding shall be transferred to Wind-Down Co.  The Sponsor and/or the Reorganized Debtor shall not bear any cost and expense and/or liability related to the administration of Wind-Down Co, including costs owed to the Plan Administrator and under Section 5.3(f) below.

(b)        On the Effective Date, the Notes Trustee shall appoint the Plan Administrator for the purpose of conducting the Wind Down of Wind-Down Co on terms and conditions set forth in the Plan Administration Agreement.  The retention of the Plan Administrator shall be pursuant to an agreement approved by the Notes Trustee and filed as part of the Plan Supplement.  Upon the conclusion of the Wind Down in accordance with Section 5.1(d) hereof, Wind-Down Co shall be dissolved by the Plan Administrator.  The Plan Administrator shall act for Wind-Down Co in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors or equivalent governing body, as applicable, and to officers, subject to the provisions hereof (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements, or similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same) and the Plan Administrator will be a representative of Wind-Down Co for purposes of section 1123(b)(3) of the Bankruptcy Code.  From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for Wind-Down Co with the authority set forth in this Section 5.3 and the Plan Administration Agreement.  The Plan Administrator shall be compensated and reimbursed for reasonable costs and expenses as set forth in the Plan Administration Agreement included in the Plan Supplement.

(c)        The Plan Administrator shall have the authority and right on behalf of Wind-Down Co, subject to the express terms of the Plan Administration Agreement but without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to: (i) implement the Wind Down as expeditiously as reasonably possible and administer the liquidation, dissolution, sale and/or abandonment or similar action of the Excluded Assets after the Effective Date in accordance with the Wind Down Budget; (ii) except to the extent Claims have been previously Allowed or are Unimpaired, control and effectuate the Claims reconciliation process; (iii) make distributions to holders of Allowed Claims in accordance with the Plan; (iv) retain and compensate professionals to assist in performing its duties under the Plan; (v)  complete and file, as

necessary, all final or otherwise required federal, state, and local tax returns and other tax reports for Wind-Down Co; (vi) represent the interests of Wind-Down Co before any taxing authority in all matters including, without limitations, any action, suit, proceeding, appeal or audit; and (vii) appoint and compensate an agent to effectuate distributions under the Plan with the consent of the Notes Trustee; and (viii) perform other duties and functions that are consistent with the implementation of the Plan or required by the Bankruptcy Code.

(d)     The Plan Supplement shall include the Wind Down Budget and, on the Effective Date, the Plan Administrator shall retain within Wind-Down Co funds sufficient to make the payments contemplated in the Wind Down Budget.

(e)     Wind-Down Co shall indemnify and hold harmless the Plan Administrator solely in its capacity as such and, where the Disbursing Agent is the Plan Administrator or an entity designated by the Plan Administrator, the Disbursing Agent solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's or Disbursing Agent's (as the case may be) gross negligence, willful misconduct, or criminal conduct.

(f)     The Plan Administrator shall effectuate the Wind Down in accordance with the Wind Down Budget.  The Plan Administrator shall pay any and all reasonable and documented costs and expenses incurred in connection with the Wind Down, including the reasonable fees and expenses of its professionals and the reasonable fees and expenses of the Debtor's professionals incurred for services rendered to the Debtor and the Estate following the Effective Date, without further order of the Bankruptcy Court, provided that such amounts are consistent with the Wind Down Budget.

(g)     Subject to any necessary approvals in the BVI Proceeding, all matters provided for herein involving the corporate structure of the Debtor, the Reorganized Debtor, or Wind-Down Co, to the extent applicable, or any corporate or related action required by the Debtor, the Reorganized Debtor, or Wind-Down Co, in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the JPLs, the Authorized Managers, or the stockholders, members, or directors or managers of the Debtor, the Reorganized Debtor, or Wind-Down Co, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtor, the Reorganized Debtor, or Wind-Down Co.  The Plan Administrator shall be authorized to file on behalf of Wind-Down Co, a certificate of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of Wind-Down Co.

5.4.    ***Section 1145 Exemption***

(a)     The offer, issuance, and distribution of the New Notes to holders of Allowed Remaining Unsecured Claims under Section 4.4 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

(b)     The New Notes shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933, as amended, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) the restrictions, if any, on the transferability of such securities and

instruments, including, without limitation, any restrictions on the transferability under the terms of the New Notes, and (iv) applicable regulatory approvals.

5.5. ***Officers and New Board of Directors***

(a)    On the Effective Date, the new board of directors of the Reorganized Debtor shall consist of at least three (3) directors.  Each such director shall serve from and after the Effective Date pursuant to the terms of the Amended Organizational Documents and the other constituent documents of the Reorganized Debtor.  After the Effective Date, the board of directors for the Reorganized Debtor will be elected by the Sponsor in accordance with the Amended Organizational Documents.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose in the Plan Supplement (or as a schedule or exhibit to the Disclosure Statement) the identity and affiliations of any person proposed to serve on the initial board of directors of the Reorganized Debtor.

(b)    After the Effective Date, officers of the Reorganized Debtor shall be appointed and serve in accordance with the Amended Organizational Documents.  The identity and affiliations of any person to serve as an officer of the Reorganized Debtor immediately following the Effective Date shall be disclosed in the Plan Supplement.

(c)    Subject to any necessary approvals in the BVI Proceeding, the JPLs, the Authorized Managers, and any officers of the Debtor, shall have no continuing rights or obligations to the Reorganized Debtor on or after the Effective Date in their capacities as such, and each such party shall resign (or shall be deemed to have resigned) and shall cease to act or serve as a director, officer, or any similar capacity on the Effective Date.

5.6. ***Indemnification of Debtor's Directors and Officers***

The Debtor and Wind-Down Co, as the case may be, shall purchase and maintain director and officer insurance coverage, in a coverage amount not to exceed the coverage amount in effect as of the Petition Date, for those Persons covered by any such policies in effect during the pendency of the Chapter 11 Case, continuing after the Effective Date, insuring such Persons in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtor prior to the Effective Date, the scope and amounts of which policies shall be disclosed in the Plan Supplement.

5.7. ***Effectuating Documents; Further Transactions.***

(a)    Upon the Effective Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms hereof, subject to any necessary approvals in the BVI Proceeding.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtor, the Reorganized Debtor, and Wind-Down Co, and any corporate or limited liability company action required by the Debtor, the Reorganized Debtor, or Wind-Down Co, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the JPLs, the Authorized Managers, or the directors, managers, or officers of the Debtor, the Reorganized Debtor, or Wind-Down Co, subject to any necessary approvals in the BVI Proceeding.  On or (as applicable) before the Effective Date, the Authorized Managers, and the authorized officers of the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor or Wind-Down Co, as applicable, including, but not limited to any and all other

agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Section 5.7 shall be effective notwithstanding any requirements under non-bankruptcy law.

(b)     On or as soon as practicable after the Effective Date, the Reorganized Debtor and Wind-Down Co may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, subject in all respects to the provisions of the Plan and the rights vested in the Notes Trustee, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction.

(c)     Prior to making any post-Effective Date distribution from Wind-Down Co to any holder of an Allowed Remaining Unsecured Claim pursuant to Section 4.4(b)(iii), Wind-Down Co shall adopt a "plan of liquidation" (as determined for U.S. federal income tax purposes) in furtherance of its duties and responsibilities under the Plan to monetize all of the remaining assets of Wind-Down Co (including any Avoidance Actions or other Causes of Action) and distribute the proceeds thereof in accordance with the Plan, and shall timely file IRS Form 966 in connection therewith.

(d)     <u>Certain Tax Matters</u>.  For U.S. federal income tax purposes, and comparable state and local tax purposes (as applicable):

(i)     The Debtor shall implement the Plan in a manner such that it shall continue to be treated as a disregarded entity through the implementation of the Plan on the Effective Date and shall not take any action that would cause the Debtor to be treated as an association taxable as a corporation at any time (prior to or on the Effective Date).

(ii)     the right of the holders of Allowed Remaining Unsecured Claims hereunder to any and all distributions from assets transferred to Wind-Down Co shall be treated as equity, and thus as stock, in Wind-Down Co.  Accordingly, each holder of an Allowed Remaining Unsecured Claim shall be treated for U.S. federal income tax purposes as receiving, and thereafter owning, stock in Wind-Down Co.

(iii)     The Reorganized Debtor and Wind-Down Co, and any officers thereof, and all holders of Claims shall report consistent with this Section 5.7(d) for all income tax purposes, and shall (X) use commercially reasonable efforts to cause consistent reporting therewith by others, or (Y) not join in, encourage, and/or support inconsistent reporting therewith by others.

(iv)     The Debtor shall be authorized to implement the Plan in the manner most tax efficient to Wind-Down Co and the holders of Remaining Unsecured Claims, as determined by the mutual agreement of the Debtor and the Notes Trustee, in their reasonable discretion given the totality of the circumstances.

21

5.8.    *Cancellation of Existing Securities and Agreements.*

(a)    On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtor or assumed and assigned to Wind-Down Co under the Plan, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all agreements, instruments, and other documents evidencing or issued pursuant to the Notes, or any indebtedness or other obligations thereunder, and any Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect against the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, and the obligations of the Debtor or Reorganized Debtor thereunder shall be deemed fully satisfied, released, and discharged.

(b)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Reorganized Debtor or assumed and assigned to Wind-Down Co pursuant to a Final Order of the Bankruptcy Court or hereunder.

5.9.    *Cancellation of Liens.*

Except as otherwise specifically provided herein, upon the payment in full in Cash of a Secured Claim, any Lien securing such Claim, shall be deemed released, and the holder of such Secured Claim shall be directed to release any collateral or other property of the Debtor or the Reorganized Debtor held by such holder and to take such actions as may be requested by the Debtor, the Reorganized Debtor or the Plan Administrator, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtor or the Reorganized Debtor.

5.10.    *Subordination Agreements.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

5.11.    *Closing of the Chapter 11 Case.*

After the Estate has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

5.12.    *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Plan Administrator shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

WEIL:\98651725\3\12817.0007

# ARTICLE VI  DISTRIBUTIONS.

6.1.    ***Distributions Generally.***

The Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.  The Reorganized Debtor shall make all distributions with respect to all Unimpaired Claims in the ordinary course of business, which Unimpaired Claims shall not be subject to the claims reconciliation procedures set forth herein, and the Reorganized Debtor shall satisfy, dispute, pursue, or otherwise reconcile each Unimpaired Claim in the ordinary course of business.  The Plan Administrator shall be the Disbursing Agent with respect to all other Claims to be satisfied, disputed, pursued, or otherwise reconciled in accordance with the Plan.

6.2.    ***Distribution Record Date.***

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims maintained by the Debtor or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims.  Wind-Down Co shall have no obligation to recognize any transfer or designation of such Claims occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amount or Assumption Disputes, the Disbursing Agent shall not have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim or Cure Amount.

6.3.    ***Date of Distributions.***

Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan by the Plan Administrator shall be made on the Effective Date, as and when Claims are Allowed in the sole discretion of Wind-Down Co, or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; provided, that Wind-Down Co shall from time to time announce subsequent distribution dates to the extent they determine them to be appropriate

6.4.    ***Disbursing Agent.***

All distributions under the Plan shall be made by the Disbursing Agent and the Reorganized Debtor, as applicable, on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  Wind-Down Co shall use all commercially reasonable efforts to provide the Disbursing Agent and the Reorganized Debtor, as applicable, with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtor's books and records.

6.5.    ***Rights and Powers of Disbursing Agent.***

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or

WEIL:\98651725\3\12817.0007

willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)    The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.    ***Expenses of Disbursing Agent.***

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash, subject to the Plan Administration Agreements.

6.7.    ***Postpetition Interest on Claims.***

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims against the Debtor on or after the Petition Date.

6.8.    ***Delivery of Distributions.***

(a)    Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtor.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until the Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

6.9.    ***Distributions after Effective Date.***

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.10.    ***Unclaimed Property.***

Undeliverable distributions shall remain in the possession of Wind-Down Co until such time as a distribution becomes deliverable or a holder accepts distribution, or such distribution reverts back to Wind-Down Co and shall not be supplemented with any interest, dividends, or other accruals of

any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of one hundred and twenty (120) days from the applicable date of distribution and the holder of the Claim entitled to such distribution shall be discharged and forever barred.  After such date, all unclaimed property or interest in property of Wind-Down Co shall revert to and vest in Wind-Down Co and shall be thereafter disbursed to the holders of Remaining Unsecured Claims, and all unclaimed property or interest in property shall be discharged and forever barred.

6.11.    ***Time Bar to Cash Payments.***

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall immediately and irrevocably revert to Wind-Down Co and any Claim on account of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check prior to the expiration of the one hundred and twenty (120) day period from the date of issuance shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12.    ***Manner of Payment Under Plan.***

Except as otherwise specifically provided in the Plan, at the option of Wind-Down Co, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

6.13.    ***Satisfaction of Claims.***

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction and discharge of and exchange for the Debtor's and the Reorganized Debtor's, as the case may be, obligation on account of such Allowed Claims.

6.14.    ***Minimum Cash Distributions.***

Except with respect to any Claim that is Unimpaired under the Plan, the Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to this Section 6.14, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.15.    ***Setoff and Recoupment.***

The Reorganized Debtor, solely as to Unimpaired Claims, or Wind-Down Co, solely as to the Remaining Unsecured Claims, as applicable, or their designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Reorganized Debtor or Wind-Down Co may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law (other than the released Causes of Action); provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor or Wind-Down Co or its successor, of any claims, rights, or Causes of Action that the Reorganized Debtor or Wind-Down Co, or its successor or assign may possess against the holder of such Claim (other than the released Causes of Action).

WEIL:\98651725\3\12817.0007

6.16.    *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by Wind-Down Co), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the portion of such Allowed Claim (if any) that reflects reimbursable expenses, and then to the accrued and unpaid interest on such Allowed Claim.

6.17.    *No Distribution in Excess of Amount of Allowed Claim.*

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

6.18.    *Distributions Free and Clear.*

Except as provided herein, any distributions under the Plan shall be free and clear of and Liens, Claims, and encumbrances, and no other Entity, including the Debtor, the Reorganized Debtor, or Wind-Down Co, shall have any interest, legal, beneficial, or otherwise, in any amounts transferred pursuant to the Plan.

6.19.    *Withholding and Reporting Requirements.*

(a)    *Withholding Rights.*  In connection with the Plan, any Disbursing Agent and any other Person making distributions pursuant to the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Any Disbursing Agent and the Notes Trustee, or such other Entity designated thereby, as applicable, and any other Person making distributions pursuant to the Plan, shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate (including, in the event of a non-cash distribution, the claimant providing sufficient monies to satisfy the withholding).  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms.*  Any party entitled to receive any property as a distribution under the Plan shall, upon request of the Disbursing Agent or such other Entity designated by such Disbursing Agent (which Entity shall subsequently deliver to the Disbursing Agent any applicable Internal Revenue Service Form W-8 or Form W-9 or other tax information received) or such other Person making distributions pursuant to the Plan, deliver to such Person an appropriate Internal Revenue Service Form W-9 or (if the payee is a foreign Entity) Form W-8, and any other reasonably requested tax information.  If such request is made by the Plan Administrator or such other Entity designated by the Plan Administrator and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made, and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of any such distribution shall irrevocably revert to Wind-Down Co, and any Claim on account of such distribution shall be discharged and forever barred from assertion against Wind-Down Co, or its property.

## ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS.

7.1.    *Objections to Claims.*

As of the Effective Date, the Plan Administrator shall exclusively be entitled to object to Impaired Claims.  As of the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses that the Debtor had with regard to any Unimpaired Claim which they may object to or otherwise challenge in the ordinary course, except with respect to any Claim that is Allowed pursuant to the Plan.  Nothing under the Plan shall affect the Debtor's or the Reorganized Debtor's claims, causes of action, rights, or defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.  Any objections to Claims shall be served and filed by the Plan Administrator on or before the later of (a) one hundred and twenty (120) days after the Effective Date, and (b) on such other date as ordered by the Bankruptcy Court for cause.

7.2.    *Resolution of Disputed Administrative Expenses and Disputed Claims.*

On and after the Effective Date, except as otherwise provided herein, all Unimpaired Claims will be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course of business of the Reorganized Debtor.  If the Reorganized Debtor disputes any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Case had not been commenced and shall survive the Effective Date as if the Chapter 11 Case had not been commenced.  From and after the Effective Date, the Reorganized Debtor may satisfy, dispute, pursue, or otherwise resolve any Unimpaired Claim without approval of the Bankruptcy Court.  On or after the Effective Date, Wind-Down Co shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to Impaired Claims without further approval of the Bankruptcy Court.

7.3.    *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, the Debtor or Plan Administrator, as applicable, shall not be required to make any payment or distribution provided hereunder on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.4.    *Distributions After Allowance.*

After such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan (net of allocable costs and expenses of the Class 4 Disputed Claims Reserve, including taxes in accordance with Section 7.9), with or without interest as provided in the Plan.  Such distributions shall be made in accordance with Article VI of the Plan.

7.5.    *Estimation of Claims.*

The Plan Administrator may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Impaired Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Impaired Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Impaired Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Impaired Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In

WEIL:\98651725\3\12817.0007

the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Impaired Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Impaired Claim, the Debtor and the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtor to be estimated for voting purposes only.  Notwithstanding anything to the contrary herein, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan (including for purposes of distribution).

7.6.    ***No Distributions Pending Allowance.***

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.7.    ***Claim Resolution Procedures Cumulative.***

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.8.    ***Insured Claims.***

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtor's insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Court.

7.9.    ***Tax Treatment of the Class 4 Disputed Claims Reserve.***

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat the Class 4 Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Debtor, the Reorganized Debtor, the Plan Administrator, any Disbursing Agent, and the holders of Disputed Remaining Unsecured Claims) shall report for tax purposes consistently with the foregoing.  The Class 4 Disputed Claims Reserve shall be responsible for payment out of the available cash of such reserve allocable to the respective Disputed Remaining Unsecured Claims any allocable costs and expenses of the reserve, including any taxes imposed on the reserve or with respect to its assets.  Accordingly, subsequent distributions in respect of the allowance or disallowance of any Remaining Unsecured Claims shall be made net of any allocable costs and expenses of the reserve.  If the Class 4 Disputed Claims Reserve has insufficient cash to pay such costs and expenses, Wind-Down Co shall be responsible for the payment of such costs and expenses.  The Disbursing Agent or the Plan Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Class 4 Disputed Claims Reserve for all taxable periods through the termination of the Class 4 Disputed Claims Reserve.

WEIL:\98651725\3\12817.0007

**ARTICLE VIII          EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

8.1.    *General Treatment.*

(a)     As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected by the Debtor, unless such contract or unexpired lease (i) is specifically designated (x) by the Reorganized Debtors or (y) Wind-Down Co as a contract or unexpired lease to be assumed or assumed and assigned on the Schedule of Assumed Contracts to be filed with the Plan Supplement; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; (iv) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the Confirmation Date; or (v) is identified in Section 8.4 of the Plan.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumption, assumption and assignment, or rejection provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtor or Wind-Down Co, as applicable, has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtor or Wind-Down Co, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

8.2.    *Determination of Assumption Disputes and Deemed Consent.*

(a)     Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtor may otherwise agree. Cure Amounts for executory contracts or unexpired leases assumed by the Reorganized Debtor, if any, shall be the responsibility of, and paid by, the Reorganized Debtor and Cure Amounts for executory contracts or unexpired leases assumed and assigned to Wind-Down Co, if any, shall be the responsibility of Wind-Down Co and paid by the Plan Administrator.

(b)     The Debtor shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts. At least fourteen (14) days before the deadline to object to confirmation of the Plan, the Debtor shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned or rejected reflecting the Debtor's intention to potentially assume or assume and assign or reject the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed rejection, assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtor within fourteen (14) days of the service of such notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.** Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption or assumption and assignment or rejection of such executory contract or unexpired lease shall be deemed to have assented to such assumption or assumption and assignment or rejection, notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any subsidiary of the Debtor under such contract or lease or a change, if any, in the ownership or control to the extent

WEIL:\98651725\3\12817.0007

contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of the Reorganized Debtor or Wind-Down Co, as applicable, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of the Reorganized Debtor or Wind-Down Co, as applicable. Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption, assumption and assignment, or rejection or to the validity of such assumption, assumption and assignment, or rejection (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)      If there is an Assumption Dispute pertaining to assumption or assumption and assignment of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption or assumption and assignment being effective; provided, that the Debtor or the Plan Administrator, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)      To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtor or the Plan Administrator reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty to such executory contract or unexpired lease (or such lesser amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such counterparty and the Plan Administrator).

(e)      Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against the Debtor or defaults by the Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtor assumes, or assumes and assigns, such executory contract or unexpired lease. In accordance with section 365(k) of the Bankruptcy Code, assumption and assignment of any executory contract or unexpired lease, releases the Debtor and the Reorganized Debtor form any liability for breach of such contract of lease occurring after the Effective Date. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

8.3.      ***Rejection Damages Claims.***

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor and the Reorganized Debtor no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims.**

WEIL:\98651725\3\12817.0007

8.4.    *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtor shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety and assigned to Wind-Down Co, pursuant to sections 365 and 1123 of the Bankruptcy Code, and Wind-Down Co shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of the Debtor under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Expense Claim or objection to any Cure Amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

8.5.    *Assignment of Executory Contracts to Wind-Down Co.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease assumed and assigned to Wind-Down Co hereunder shall remain in full force and effect for the benefit of Wind-Down Co in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assumption and assignment effected pursuant to the Plan.

8.6.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

31

8.7.    *Reservation of Rights.*

(a)    The Schedule of Assumed Contracts, and any related cure notice, may be amended until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment or rejection and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtor's right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtor shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)    Neither the exclusion nor inclusion of any contract or lease by the Debtor on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor, or the Reorganized Debtor, or their respective affiliates have any liability thereunder.

(c)    Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtor and the Reorganized Debtor, under any executory or non-executory contract or any unexpired or expired lease.

(d)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

## ARTICLE IX  CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE.

9.1.    *Conditions Precedent to Confirmation of Plan.*

The following are conditions precedent to confirmation of the Plan:

(a)    the Disclosure Statement Order shall have been entered;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed and be in conformity with the Plan; and

(c)    the Plan Investment Agreement shall not have been terminated and shall be in full force and effect.

9.2.    *Conditions Precedent to Effective Date.*

The following are conditions precedent to the Effective Date of the Plan:

(a)    the Confirmation Order shall have been entered and have become a Final Order and shall be in full force and effect;

(b)    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(c)      all governmental approvals, orders and consents necessary in connection with the Plan Investment Agreement, including Bankruptcy Court approval, and any necessary approval from the BVI Court (including consummation of the BVI Plan of Arrangement) or any courts or regulatory authorities of Israel, including, but not limited to, recognition of the Confirmation Order in the Israeli Proceeding, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the consummation of the Plan Investment Agreement. For the avoidance of doubt, the approval or recognition of the treatment of Subordinated Securities Claims by the courts or regulatory authorities of Israel shall not be a condition precedent to the Effective Date;

(d)      the conditions to the obligations of the Debtor to consummate the Closing set forth in Sections 10.01 and 10.02 of the Plan Investment Agreement shall have been satisfied or waived in accordance with the terms thereof; and

(e)      the Professional Fees Escrow Account shall be established and fully funded.

Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, satisfaction of such conditions precedent shall be deemed to have occurred simultaneously on the Effective Date and no such action shall be deemed to have occurred prior to the taking of any other such action; provided that, to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

### 9.3.    *Waiver of Conditions Precedent.*

Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan, other than those set forth in Section 9.1(a) and Section 9.2(a), may be waived in writing with the consent of the Debtor, the Notes Trustee, and the Sponsor; *provided*, *however*, the requirement that the Confirmation Order become a Final Order set forth in Section 9.2(a) may be waived in writing by the Debtor with the consent of the Sponsor.

### 9.4.    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before December 31, 2022, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtor, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, the Notes Trustee, or any other Entity.

## ARTICLE X    EFFECT OF CONFIRMATION OF PLAN.

### 10.1.    *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all Excluded Assets and Wind Down Funding Cash shall be transferred to Wind-Down Co free and clear of all Claims, Liens, encumbrances, charges, and other interests except as provided pursuant to the Plan and the Confirmation Order, and (ii) all Transferred Entities (as defined in the Plan Investment Agreement) and any and all remaining property of the Debtor's Estate, except for the Excluded Assets, shall remain in, or

vest in, the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan and the Confirmation Order.  On and after the Effective Date, Wind-Down Co, with respect to clause (i) above, and the Reorganized Debtor, with respect to clause (ii) above, may take any action, including, without limitation, the operation of their businesses; the assertion of any Causes of Action; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether or not in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, each of the Reorganized Debtor and Wind-Down Co, as applicable, may pay the respective charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

10.2.    ***Binding Effect.***

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders are (a) Impaired or Unimpaired under the Plan; (b) presumed to accept or deemed to reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) will receive any distribution under the Plan.

10.3.    ***Discharge of Claims and Termination of Interests.***

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities of the Debtor that arose prior to the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against the Debtor, the Reorganized Debtor, or Wind-Down Co any such discharged Claim against or terminated Interest in the Debtor.

10.4.    ***Term of Injunctions or Stays.***

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all the Chapter 11 Case.

10.5.    ***Injunction.***

(a)     **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan, provided, however, the foregoing shall not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Plan.**

WEIL:\98651725\3\12817.0007

(b)      Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as expressly agreed to by (x) the Reorganized Debtor and a holder of any Unimpaired Claim or (y) Wind-Down Co and a holder of any Impaired Claim or Impaired Interest, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action against the Debtor that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Reorganized Debtor or Wind-Down Co, or against property or interests in property of any of the Debtor, the Reorganized Debtor or Wind-Down Co, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)      By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section 10.5.

(d)      The injunctions in this Section 10.5 shall extend to any successors of the Debtor (including the Reorganized Debtor and Wind-Down Co), and their respective property and interests in property.

10.6.    **_Releases._**

(a)      **_Estate Releases_**.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce (i) the Plan and (ii) the Definitive Documents (in each case, including, without limitation, any rights granted to the Plan Administrator under the Plan Administration Agreement), for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the services rendered by the Released Parties to facilitate the implementation of the Plan, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed released and discharged, to the maximum extent permitted by law, by the Debtor and its Estate, the Reorganized Debtor, and Wind-Down Co, in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons or Entities, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever,

WEIL:\98651725\3\12817.0007

including any derivative claims, asserted or assertable on behalf of the Debtor or its Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or its Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security or Asset of the Debtor, the Plan Investment Agreement, the business or contractual arrangements between any of the Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the Disclosure Statement, the Plan (including the Plan Supplement), the Deeds of Trust, the Notes, or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, provided, that nothing in this Section 10.6(a) shall be construed to release the Released Parties from gross negligence, willful misconduct, or fraud, in each case as determined by a Final Order.  The Debtor, its Estate, the Reorganized Debtor, and the Plan Administrator shall be permanently enjoined from prosecuting any of the foregoing claims or Causes of Action released under this Section 10.6(a) against each of the Released Parties.

(b)    **Mutual Releases**.

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date; (ii) for the right to defend against any objections to Claims that may be asserted under the Plan; or (iii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions made by the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed released and discharged by each of the other Released Parties, in each case, from any and all claims, Interests, or Causes of Action whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, the Debtor, the restructuring, the Chapter 11 Case, the pre- and postpetition marketing and sale process, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the Plan Investment Agreement, the Definitive Documents, the Deeds of Trust, the Notes, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; **provided**, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from any gross negligence, willful misconduct, or fraud, in each case as determined by a Final Order.  The Persons and Entities in (i) through (iii) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.

(c)    Notwithstanding anything to the contrary herein, nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

WEIL:\98651725\3\12817.0007

(d)       Notwithstanding the foregoing, nothing in the Plan shall, or shall be deemed to, release or waive any rights or remedies of any releasor against or provide any indemnification rights to Yoel Goldman or Tzipporah Goldman, or any entity which is under control or ownership of Yoel Goldman or Tzipporah Goldman other than the Transferred Entities.

(e)       The rights and obligations of the parties provided in connection with the releases set forth in Section 7.02 of the Plan Investment Agreement are in addition to the rights and obligations provided in this Section 10.6.

10.7.   *Exculpation.*

**To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any conduct occurring on or after the Petition Date in connection with or arising out of the filing and administration of the Chapter 11 Case, the marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or Asset of the Debtor; the Disclosure Statement, the Plan Investment Agreement, including the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, and consummation thereof, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for acts or omissions of an Exculpated Party that constitute gross negligence, fraud, or willful misconduct, in each case as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

10.8.   *Retention of Causes of Action/Reservation of Rights.*

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately prior to the Effective Date on behalf of its Estate in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtor. With respect to Unimpaired Claims, except as otherwise provided in the Plan, the Reorganized Debtor shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.  With respect to Impaired Claims, except as otherwise provided in the Plan, Wind-Down Co shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.

10.9.   *Special Provisions Regarding Sole Shareholder*

For the avoidance of doubt, nothing herein under the Plan, including under this Article X, or the Confirmation Order shall be deemed to discharge, waive, release, limit, or enjoin any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability of Yoel

WEIL:\98651725\3\12817.0007

Goldman or Tzipporah Goldman, or any entity which is under the control or ownership of Yoel Goldman or Tzipporah Goldman.

## ARTICLE XI  RETENTION OF JURISDICTION.

11.1.    *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter, and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Fee Claims;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Plan Investment Agreement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to hear and determine disputes arising in connection with the Plan Investment Agreement, or any agreement, instrument, or other document governing or relating to the Plan Investment Agreement;

(k)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(l)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any Disputed Claims for taxes and any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)     to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, exculpations, and injunctions issued thereunder;

(o)     to resolve disputes concerning Disputed Claims or the administration thereof;

(p)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)     to enter a final decree closing the Chapter 11 Case;

(r)     to recover all Assets of the Debtor and property of the Debtor's Estate, wherever located;

(s)     to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, or any deadline for responding or objection to a Cure Amount, in each case, for any purpose;

(t)     hear and determine matters or disputes arising from, or in connection with, the appointment of a successor Plan Administrator in the event of the Plan Administrator's death, disability, dissolution, or removal;

(u)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, including, without limitation, Avoidance Actions; and

(v)     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

11.2.   ***Courts of Competent Jurisdiction.***

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII MISCELLANEOUS PROVISIONS.

12.1.   ***Payment of Statutory Fees.***

On the Effective Date and thereafter as may be required, with respect to any Impaired Claims, Wind-Down Co shall make all required filings and pay all fees incurred pursuant to sections 1911

through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtor's case, until such time as a final decree is entered closing the Debtor's case, a Final Order converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtor's case is entered.  With respect to any Unimpaired Claims, the Reorganized Debtor shall make all aforementioned required filings and pay all such fees, if any.

12.2.   ***Substantial Consummation of the Plan.***

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.3.   ***Plan Supplement.***

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

12.4.   ***Requests by the Reorganized Debtor and Wind-Down Co for Expedited Determination of Taxes.***

The Reorganized Debtor shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date and through the Effective Date.  Wind-Down Co shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, through the date of its dissolution.

12.5.   ***Exemption from Certain Transfer Taxes.***

Pursuant to section 1146 of the Bankruptcy Code, (a) the making or delivery of any instrument of transfer in connection or furtherance of the Plan, and any financing by the Sponsor, (b) the issuance, transfer or exchange of any securities, instruments or documents pursuant to, in implementation of or as contemplated in the Plan and the Plan Investment Agreement, (c) the creation of any Lien, mortgage, deed of trust, or other security interest, (d) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with the Plan Investment Agreement, (e) all transfers and distributions by Wind-Down Co in furtherance of the Plan, and (f) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent provided by law, including, but not limited to: (i) mortgage recording taxes imposed under Article 11 of the tax law of the State of New York, (ii) the New York Real Estate transfer tax imposed under Article 31 of the Tax Law of the State of New York (including by reason of a change in the equity ownership of the Debtor), (iii) the New York City Real Property transfer tax imposed by title 11, chapter 21 of the New York City Administrative Code (including by reason of a change in the equity ownership of the Debtor) and, (iv) any similar tax on the recording of deeds, transfers or property or ownership interests in property, recording of mortgages or other security instruments imposed by the State of New York, or any political subdivision thereof.  Consistent with the foregoing, each recorder of deeds or similar official for

WEIL:\98651725\3\12817.0007

any county, city, or governmental unit in which any instrument hereunder is to be recorded (including, without limitation, the Register of the City of New York) shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.    All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Properties, any taxes from which the transactions effectuated pursuant to the Plan and Confirmation Order are exempt, pursuant to and in furtherance of section 1146(a) of the Bankruptcy Code and to the greatest extent provided by law, including but not limited to, New York State Real Estate Transfer Taxes, and any mortgage recording tax, and any penalties, interest, or additions to any tax related thereto.

12.6.    ***Amendments.***

(a)    *Plan Modifications*.    Subject to all consent rights of the Sponsor and the Notes Trustee, respectively, under the Plan Investment Agreement, the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan (i) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.    In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Notes Trustee and the Sponsor, the Debtor may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)    *Other Amendments*.    Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement, with the consent of the Notes Trustee and the Sponsor (such consent not to be unreasonably withheld), without further order or approval of the Bankruptcy Court.

12.7.    ***Effectuating Documents and Further Transactions.***

The Reorganized Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.8.    ***Revocation or Withdrawal of Plan.***

The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date in accordance with the Plan Investment Agreement.    If the Plan has been revoked or withdrawn prior to the Effective Date in accordance with the Plan Investment Agreement, or if confirmation or the occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor, the Notes Trustee, the Sponsor, or any

other Entity. This provision shall have no adverse impact on the rights of the Notes Trustee, the Sponsor, or the Debtor in respect of any such revocation or withdrawal.

12.9.    *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, with the reasonable consent of the Notes Trustee and the Sponsor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or further modified without the consent of (i) the Debtor or Wind-Down Co, as applicable, (ii) the Notes Trustee, and (iii) the Reorganized Debtor, but only to the extent such deletions or modifications negatively impact the Reorganized Debtor, and (c) nonseverable and mutually dependent.

12.10.    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to the Debtor or the Reorganized Debtor, shall be governed by the laws of the state of incorporation or organization of the Debtor or Reorganized Debtor.

12.11.    *Time.*

In computing any period of time prescribed or permitted by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.12.    *Dates of Actions to Implement the Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

12.13.    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtor.

12.14.  *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.15.  *Successor and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.16.  *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, the Plan Investment Agreement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which shall be deemed to become merged and integrated into the Plan.

12.17.  *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement documents) are incorporated into and are a part of the Plan as if set forth in full herein.

12.18.  *Notices.*

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, the Notes Trustee, the Sponsor, or Wind-Down Co, as applicable, to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    If to the Debtor:

c/o All Year Holdings Limited
199 Lee Avenue, #693,
Brooklyn, NY 11211
Attn: Mr. Asaf Ravid and Mr. Ephraim Diamond
Email: ravidasaf@gmail.com and ephraim@arbelcapital.com.

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:    Gary T. Holtzer, Esq.
         Matthew P. Goren, Esq.

Telephone:  (212) 310-8000

43

Facsimile:  (212) 310-8007
Email:  Gary.Holtzer@weil.com
        Matthew.Goren@weil.com

(b)    If to the Notes Trustee:

Mishmeret Trust Company Ltd.
48 Menachem Begin Road
Tel Aviv 6618001, Israel

-and-

Chapman and Cutler LLP
1270 Avenue of the Americas
New York, NY 10020
Attn: Michael Friedman, Esq.
Email: friedman@chapman.com

-and-

Chapman and Cutler LLP
320 South Canal Street
Chicago, IL 60606
Attn: Stephen R. Tetro, III, Esq.
Email: stetro@chapman.com

(c) If to the Sponsor or on or after the Effective Date, the Reorganized Debtor:

Paragraph Partners LLC
270 Sylvan Avenue
Englewood Cliffs N.J. 07632
Suite 2260

-and-

Gissin & Co.
Habarzel 38B,
Tel Aviv 6971054, Israel
Attn: Yael Hershkovitz, Esq.
Email: Yael@gissinlaw.co.il

-and-

Locke Lord LLP
200 Vesey Street, 20th Floor
New York, NY 10281
Attn: Shalom Jacob, Esq.
Email: SJacob@lockelord.com

44

-and-

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attn: Avi D. Feinberg, Esq.
Email: Avi.Feinberg@friedfrank.com

(d) If to Wind-Down Co or the Plan Administrator after the Effective Date, to the notice
parties set forth in the Plan Administration Agreement.

[*Remainder of page intentionally left blank*]

WEIL:\98651725\3\12817.0007

After the Effective Date, Wind-Down Co shall have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, Wind-Down Co is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:   May 31, 2022

**ALL YEAR HOLDINGS LIMITED, as Debtor**

By: _/s/ Assaf Ravid_
Name: Assaf Ravid
Title: Authorized Manager

**EXHIBIT A**

**Form of New Notes**

*Final Form*

THE NOTE REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## PROMISSORY NOTE

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, All Year Holdings Limited, a company incorporated and existing under the laws of the British Virgin Islands (the "**Company**"), hereby unconditionally promises to pay to the order of [Holder][1] or its assigns (the "**Noteholder**," and together with the Company, the "**Parties**"), the principal amount of $20,000,000[2], as may be adjusted pursuant to <u>Section 2.3</u> of this Promissory Note (the "**Note**" and such principal amount, as may be adjusted, the "**Note Balance**").  Taz Partners LLC ("**Taz**") is executing this Note solely in respect of <u>Section 6.5</u> hereof.

1.    <u>Definitions; Interpretation</u>.

1.1    Capitalized terms used herein shall have the meanings set forth in this <u>Section 1.1</u>.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to the Company from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977.

"**Beneficial Ownership Regulation**" has the meaning set forth in <u>Section 9.10</u>.

"**Business Day**" means a day other than a Saturday, Sunday, any day on which commercial banks in Israel are authorized or required by law to close and the following Jewish holidays while occurring either in Israel or in New York: the two days of Rosh Hashanah,

---

[1] [TBD: Plan Administrator.]

[2] [NTD: Subject to increase to $22MM if Plan Investor consummates the William Vale Purchase prior to the Effective Date. If the William Vale Purchase is consummated by Plan Investor after the Effective Date, a new $2,000,000 note will be issued to Holder on substantially the same form with mechanics added to apply value reductions equally across the two notes.]

Yom Kippur, the first two days of Sukkot, Shemini Atzeret, Simchat Torah, the first two and last two days of Passover and the two days of Shavuot.

"**Company**" has the meaning set forth in the introductory paragraph.

"**Debt**" of the Company, means all (a) indebtedness for borrowed money; (b) obligations for the deferred purchase price of property or services, except trade payables arising in the ordinary course of business; (c) obligations evidenced by notes, bonds, debentures, or other similar instruments; (d) obligations as lessee under capital leases; (e) obligations in respect of any interest rate swaps, currency exchange agreements, commodity swaps, caps, collar agreements, or similar arrangements entered into by the Company providing for protection against fluctuations in interest rates, currency exchange rates, or commodity prices, or the exchange of nominal interest obligations, either generally or under specific contingencies; (f) obligations under acceptance facilities and letters of credit; (g) guaranties, endorsements (other than for collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person, or otherwise to assure a creditor against loss, in each case, in respect of indebtedness set out in clauses (a) through (f) of a Person other than the Company; (h) indebtedness set out in clauses (a) through (g) of any Person other than Company secured by any lien on any asset of the Company, whether or not such indebtedness has been assumed by the Company, and (i) indebtedness of any partnership, unlimited liability company, or unincorporated joint venture in which the Company is a general partner, member, or a joint venturer, respectively (unless such Debt is expressly made non-recourse to the Company).

"**Default**" means any of the events specified in Section 7, which constitute an Event of Default or which, upon the giving of notice, the lapse of time, or both, pursuant to Section 7, would, unless cured or waived, become an Event of Default.

"**Default Rate**" means 10%.

"**Event of Default**" has the meaning set forth in Section 7.

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

2

"**Guaranty Agreement**" means the Guaranty Agreement, dated as of the date hereof, by and between [Guarantor][3] and Noteholder.

"**Investment Agreement**" means that certain Investment Agreement, dated as of March 11, 2022 by and among the Company, Paragraph Partners LLC and Mishmeret Trust Company Ltd, as amended.

"**Law**" as to any Person, means any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Lien**" means any mortgage, pledge, hypothecation, encumbrance, lien (statutory or other), charge, or other security interest.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations or condition (financial or otherwise) of the Company; (b) the validity or enforceability of the Note or Guaranty Agreement; (c) the rights or remedies of the Noteholder hereunder or under the Guaranty Agreement; or (d) the Company's ability to perform any of its material obligations hereunder.

"**Maturity Date**" means the earlier of (a) the date that is 30 months from the date hereof and (b) the date on which all amounts under this Note shall become due and payable pursuant to Section 8.

"**Note**" has the meaning set forth in the introductory paragraph.

"**Note Balance**" has the meaning set forth in the introductory paragraph.

"**Noteholder**" has the meaning set forth in the introductory paragraph.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Parties**" has the meaning set forth in the introductory paragraph.

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56, signed into law October 26, 2001).

---

[3] [NTD: Identity of Guarantor / Guarantors to be discussed and approved by the Trustee]

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**Sanctioned Country**" means, at any time, a country or territory which is itself the subject or target of any comprehensive or country-wide Sanctions.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by a Sanctions Authority; (b) any Person operating, organized, or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person that is the subject or target of any Sanctions.

"**Sanctions**" mean all economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by a Sanctions Authority.

"**Sanctions Authority**" means OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, any EU member state, Her Majesty's Treasury of the United Kingdom, Israel, or other relevant sanctions authority.

1.2    Interpretation. For purposes of this Note (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Note as a whole. The definitions given for any defined terms in this Note shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein to: (x) Schedules, Exhibits, and Sections mean the Schedules, Exhibits, and Sections of this Note; (y) an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Note shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

2.    Payment Dates; Optional Prepayments.

2.1    Payment Dates. The Note Balance shall be due and payable according to the payment schedule attached hereto as Schedule A, with any amounts due hereunder and not already then paid to be paid, along with any Default Rate interest payable hereunder, on the Maturity Date.

2.2    Optional Prepayments. The Company may prepay the Note Balance in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with any accrued and unpaid Default Rate interest, if any. No prepaid amount may be reborrowed.

4

2.3    Value Adjustment. In the event that Subsidiary Value Reductions (according to the terms of, and as defined in, the Investment Agreement) exceed $4,250,000, the then-outstanding Note Balance shall be reduced by 50 cents for each dollar of Subsidiary Value Reduction between $4,250,000 and $7,250,000 and for any Subsidiary Value Reduction above $7,250,000, on a dollar-for-dollar basis, up to the total remaining Note Balance under the Notes (in each case, a "**Note Balance Reduction**"). Any such Note Balance Reduction shall reduce all remaining payments due under the Note according to Section 2.1 on a *pro-rata* basis (e.g., if there is a $6,000,000 Note Balance Reduction and three payments are remaining then $2,000,000 will be reduced from each such remaining payment). To the extent that Subsidiary Value Reductions are equal to or lesser than $4,250,000, no Note Balance Reduction will occur.

3.    Interest.

3.1    Interest Rate. Except as otherwise provided herein, the Note Balance shall not bear or accrue interest.

3.2    Default Interest. If any amount payable hereunder is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Default Rate from the date of such non-payment until such amount is paid in full.

3.3    Computation of Interest. If owing hereunder, all computations of interest shall be made on the basis of 365 or 366 days, as the case may be, and the actual number of days elapsed.

3.4    Interest Rate Limitation. If at any time and for any reason whatsoever, the interest rate payable on the Note Balance shall exceed the maximum rate of interest permitted to be charged by the Noteholder to the Company under applicable Law, such interest rate shall be reduced automatically to the maximum rate of interest permitted to be charged under applicable Law/that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest permitted by applicable Law shall be deemed a voluntary prepayment of principal.

4.    Payment Mechanics.

4.1    Manner of Payments. All payments hereunder shall be made in lawful money of the United States of America no later than 12:00 PM in New York, New York on the date on which such payment is due by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Company from time to time.

4.2    Application of Payments. All payments made under this Note shall be applied *first* to the payment of Expenses under and as defined in Section 9.2 below, *second* to accrued interest, if any, and *third* to the payment of the principal amount outstanding under the Note.

4.3     Business Day Convention. Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

4.4     Rescission of Payments. If at any time any payment made by the Company under this Note is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Company or otherwise, the Company's obligation to make such payment shall be reinstated as though such payment had not been made.

5.     Representations and Warranties. The Company hereby represents and warrants to the Noteholder on the date hereof as follows:

5.1     Existence; Power and Authority; Compliance with Laws. The Company (a) is a company incorporated and existing under the laws of the British Virgin Islands, validly existing, and in good standing under the laws of the state of its jurisdiction of organization, (b) has the requisite power and authority, and the legal right, to own, lease, and operate its properties and assets and to conduct its business as it is now being conducted, to execute and deliver this Note, and to perform its obligations hereunder, and (c) is in compliance with all Laws except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.2     Authorization; Execution and Delivery. The execution and delivery of this Note by the Company and the performance of its obligations hereunder have been duly authorized by all necessary company action in accordance with all applicable Laws. The Company has duly executed and delivered this Note.

5.3     No Approvals. All consents and authorizations of, filings with, notices to, or other acts by, or in respect of, any Governmental Authority or any other Person required in order for the Company to execute, deliver, and perform its obligations under this Note have been made or received, as applicable.

5.4     Enforceability. The Note is a valid, legal, and binding obligation of the Company, enforceable against the Company in accordance with its terms.

5.5     PATRIOT Act; Anti-Money Laundering. The Company is, and to the knowledge of the Company, its directors, officers, employees, and agents are, in compliance in all material respects with the PATRIOT Act, and any other applicable terrorism and money laundering laws, rules, regulations, and orders.

5.6     Anti-Corruption Laws and Sanctions.

(a)     The Company is, and to the knowledge of the Company, its directors, officers, employees, and agents are, in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.

6

(b)    The Company is not, and to the knowledge of the Company, no director, officer, employee of the Company, or any agent of the Company that will act in any capacity in connection with or benefit from the Note, is a Sanctioned Person.

6.    <u>Affirmative Covenants</u>. Until all amounts outstanding under this Note have been paid in full, the Company shall:

6.1    <u>Maintenance of Existence</u>. (a) Preserve, renew, and maintain in full force and effect its corporate or organizational existence and (b) take all reasonable action to maintain all rights, privileges, and franchises necessary or desirable in the normal conduct of its business, except, in each case, where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

6.2    <u>Compliance</u>. (a) Comply with all Laws applicable to it and its business and its obligations under its material contracts and agreements, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect and (b) maintain in effect and enforce policies and procedures reasonably designed to achieve compliance in all material respects by the Company and its directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

6.3    <u>Notice of Events of Default</u>. As soon as possible and in any event within three (3) Business Days after it becomes aware that an Event of Default has occurred, notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

6.4    <u>Further Assurances</u>. Upon the request of the Noteholder, promptly execute and deliver such further instruments and do or cause to be done such further acts as may be necessary or advisable to carry out the intent and purposes of this Note.

6.5    <u>Seniority of Note; Subordination of Taz Claim</u>. This Note shall rank senior to any claim of Taz against the Company arising under or relating to that certain confession of judgment entered against All Year Holdings Limited by the Kings County Supreme Court on December 9, 2021 (the "**Subordinated Claim**").  Taz agrees, by its execution hereof, that its right to collect any amounts in respect of the Subordinated Claim from the Company is and shall be subordinate to the prior payment in full in cash of all obligations arising hereunder, and that such subordination is for the benefit of and enforceable by the Noteholder hereof or in favor of any other Person entitled to enforce the Noteholder's rights hereunder.  If a payment or distribution is made to Taz by the Company in payment of the Subordinated Claim, Taz shall hold such payment or distribution up to the amount that is owed under this Note in trust for the Noteholder and shall pay it over to the Noteholder as a payment of this Note. No right of Noteholder to enforce the subordination of this Note shall be impaired by any act or failure to act by the Company or any other Person to comply with this <u>Section 6.5</u>.

7.    <u>Events of Default</u>. The occurrence and continuance of any of the following shall constitute an Event of Default hereunder:

7.1    <u>Failure to Pay</u>. The Company fails to pay any amount of the Loan when due.

7.2    <u>Breach of Representations and Warranties</u>. Any representation or warranty made by the Company to the Noteholder herein is incorrect in any material respect on the date as of which such representation or warranty was made.

7.3    <u>Breach of Covenants</u>. The Company fails to observe or perform any material covenant, obligation, condition, or agreement contained in this Note, and such failure continues for 14 days after written notice to the Company.

7.4    <u>Cross-Defaults</u>. The Company fails to pay when due any amount of Debt greater than $10 million (other than Debt arising under this Note), or any interest or premium thereon, when due and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt, *provided that* no Event of Default shall be triggered by this <u>Section 7.4</u> as a result of the Company's failure to pay any Debt arising prior to the date hereof other than Debt documented by or arising under or in connection with any agreement identified as a Material Contract in the Investment Agreement.

7.5    <u>Bankruptcy</u>.

(a)    The Company commences any case, proceeding, or other action (i) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts or (ii) seeking appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or the Company makes a general assignment for the benefit of its creditors;

(b)    There is commenced against the Company any case, proceeding, or other action of a nature referred to in <u>Section 7.5(a)</u> which (i) results in the entry of an order for relief or any such adjudication or appointment or (ii) remains undismissed, undischarged, or unbonded for a period of 60 days;

(c)    There is commenced against the Company any case, proceeding, or other action seeking issuance of a warrant of attachment, execution, or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, or stayed or bonded pending appeal within 45 days from the entry thereof;

(d)    The Company takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in <u>Section 7.5(a)</u>, <u>Section 7.5(b)</u>, or <u>Section 7.5(c)</u> above; or

(e)    The Company is generally not, or shall be unable to, or admits in writing in a legal proceeding its inability to, pay its debts as they become due.

8.    <u>Remedies</u>. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Noteholder may, at its option, by written

8

notice to the Company (a) declare the entire principal amount of the Note Balance, together with any accrued interest thereon and any other amounts payable under this Note, immediately due and payable; and/or (b) exercise any or all of its rights, powers or remedies under applicable Law; *provided, however*, that if an Event of Default described in Section 7.5 shall occur, the principal of and accrued interest on the Loan, if any, shall become immediately due and payable without any notice, declaration, or other act on the part of the Noteholder.

9.    Miscellaneous.

9.1    Notices.

(a)    All notices, requests, or other communications required or permitted to be delivered hereunder shall be delivered in writing, in each case to the address specified below or to such other address as such Party may from time to time specify in writing in compliance with this provision:

(i)    If to the Company:

[ADDRESS]
Attn:
Telephone:
Email:

With a copy to (which shall not constitute notice):

[ADDRESS]
Attn:
Telephone:
Email:

(ii)    If to the Noteholder [Plan Administrator Information TBD]:

[ADDRESS]
Attn:
Telephone:
Email:

With a copy to (which shall not constitute notice):

[ADDRESS]
Attn:
Telephone:
Email:

(b)    Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received upon the sender's receipt of an

9

acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email, or other written acknowledgment).

9.2     <u>Expenses</u>. If an Event of Default shall occur and be continuing, the Company shall reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its external counsel) incurred by the Noteholder in connection with the enforcement of the Noteholder's rights hereunder and under the Guaranty Agreement (the foregoing, collectively, "**Expenses**").

9.3     <u>Governing Law</u>. This Note and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, and the transactions contemplated hereby shall be governed by the laws of the State of Israel.

9.4     <u>Submission to Jurisdiction</u>.

(a)     The Company hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note may be brought in the courts of the State of New York and (ii) submits to the jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against the Company in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

(b)     Nothing in this <u>Section 9.4</u> shall affect the right of the Noteholder to (i) commence legal proceedings or otherwise sue the Company in any other court having jurisdiction over the Company or (ii) serve process upon the Company in any manner authorized by the laws of any such jurisdiction.

9.5     <u>Venue</u>. The Company irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Note in any court referred to in <u>Section 9.4</u> and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

9.6     <u>Waiver of Jury Trial</u>. THE COMPANY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

9.7     <u>Integration.</u> This Note, the Investment Agreement and the Guaranty Agreement constitute the entire contract between the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

9.8     <u>Successors and Assigns</u>. This Note may be assigned or transferred by the Noteholder to any Person. The Company may not assign or transfer this Note or any of its

rights hereunder without the prior written consent of the Noteholder. This Note shall inure to the benefit of, and be binding upon, the Parties and their permitted assigns.

9.9     <u>Waiver of Notice</u>. The Company hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity, and diligence in taking any action to collect sums owing hereunder.

9.10    <u>PATRIOT Act</u>. The Noteholder hereby notifies the Company that pursuant to the requirements of the PATRIOT Act and 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**"), it may be required to obtain, verify, and record information that identifies the Company, which information may include the name and address of the Company and other information that will allow the Noteholder to identify the Company in accordance with the PATRIOT Act and the Beneficial Ownership Regulation, and the Company agrees to provide such information from time to time to the Noteholder.

9.11    <u>Amendments and Waivers</u>. No term of this Note may be waived, modified, or amended except by an instrument in writing signed by both of the Parties. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

9.12    <u>Headings</u>. The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand, or limit any of the terms or provisions hereof.

9.13    <u>No Waiver; Cumulative Remedies</u>. No failure to exercise, and no delay in exercising on the part of the Noteholder, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

9.14    <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of similar import in the Note shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based record-keeping system, as the case may be.

9.15    <u>Severability</u>. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

[SIGNATURE PAGE FOLLOWS]

*Final Form*

In witness whereof, the Company has executed this Note as of [date].

All Year Holdings Limited

By_____
Name:
Title:

[Signature Page to Promissory Note]

*Final Form*

Taz Partners LLC has executed this Note solely in respect of <u>Section 6.5</u> as of the date first written above.

Taz Partners LLC

By_____
Name:
Title:

[Signature Page to Promissory Note]

*Final Form*

<u>Schedule A</u>

| <u>Payment Date (on or before)</u> | <u>Payment Amount</u>[4] |
|---|---|
| [6 months from closing] | $3,000,000 |
| [12 months from closing] | $2,000,000 |
| [18 months from closing] | $5,000,000 |
| [24 months from closing] | $5,000,000 |
| [30 months from closing] | $5,000,000 |

---

[4] [NTD: Payment Amounts to be adjusted *pro rata* in case of increase described in footnote 2.]

[Schedule A to Promissory Note]

**EXHIBIT B**

**Form of New Notes Guaranty**

*Final Form*

# GUARANTY AGREEMENT

This GUARANTY AGREEMENT (this "**Guaranty**"), dated as of [DATE], is made by [Guarantor], a [_____] [_____] ("**Guarantor**"), in favor and for the benefit of [Holder], a [_____] [_____] ("**Beneficiary**").

Reference is made to that certain Promissory Note dated as of [DATE] (the "**Underlying Agreement**")[1], by and between All Year Holdings Limited, a company incorporated and existing under the laws of the British Virgin Islands ("**Obligor**"), and Beneficiary. In consideration of the substantial direct and indirect benefits derived by Guarantor from the transactions under the Underlying Agreement, Guarantor hereby agrees as follows:

1.    <u>Guaranty</u>. Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment of all amounts required to be paid by Obligor under the Underlying Agreement, plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder (collectively, the "**Obligations**").

2.    <u>Guaranty Absolute and Unconditional</u>. Guarantor agrees that its Obligations under this Guaranty are irrevocable, continuing, absolute and unconditional and shall not be discharged or impaired or otherwise affected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a)    Any illegality, invalidity or unenforceability of any Obligation or the Underlying Agreement.

(b)    Any change in the time, place or manner of payment or performance of, or in any other term of the Obligations, or any rescission, waiver, release, assignment, amendment or other modification of the Underlying Agreement.

(c)    Any taking, exchange, substitution, release, impairment, amendment, waiver, modification or non-perfection of any collateral or any other guaranty for the Obligations, or any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Obligations.

(d)    Any default, failure or delay, willful or otherwise, in the performance of the Obligations.

(e)    Any change, restructuring or termination of the corporate structure, ownership or existence of Guarantor or Obligor or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Obligor or its assets or any resulting restructuring, release or discharge of any Obligations.

---

[1] [If the William Vale Purchase is consummated by Plan Investor after the Effective Date, this definition will be amended to include the new note issued to Holder under the Underlying Agreement.]

(f)     Any failure of Beneficiary to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Obligor now or hereafter known to Beneficiary, Guarantor waiving any duty of Beneficiary to disclose such information.

(g)     The failure of any other guarantor or third party to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of Guarantor or any other guarantor or surety with respect to the Obligations.

(h)     The failure of Beneficiary to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Underlying Agreement.

(i)     The existence of any claim, set-off, counterclaim, recoupment or other rights that Guarantor or Obligor may have against Beneficiary (other than a defense of payment or performance) other than any Note Balance Reduction in accordance with the Underlying Agreement.

(j)     Any other circumstance (including, without limitation, any statute of limitations), act, omission or manner of administering the Underlying Agreement or any existence of or reliance on any representation by Beneficiary that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Guarantor.

3.     <u>Certain Waivers; Acknowledgments</u>. Guarantor further acknowledges and agrees as follows:

(a)     Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Obligations, until the complete irrevocable and indefeasible payment in full of the Obligations.

(b)     This Guaranty is a guaranty of payment and not of collection. Beneficiary shall not be obligated to enforce or exhaust its remedies against Obligor or under the Underlying Agreement before proceeding to enforce this Guaranty.

(c)     This Guaranty is a direct guaranty and independent of the obligations of Obligor under the Underlying Agreement. Beneficiary may resort to Guarantor for payment and performance of the Obligations whether or not Beneficiary shall have resorted to any collateral therefor or shall have proceeded against Obligor or any other guarantors with respect to the Obligations. Beneficiary may, at Beneficiary's option, proceed against Guarantor and Obligor, jointly and severally, or against Guarantor only without having obtained a judgment against Obligor.

(d)     Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to any of the Obligations and this Guaranty and any requirement that Beneficiary protect, secure, perfect or insure any lien or any property subject thereto.

(e)     Guarantor agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time all or part of any payment of any Obligation is voided, rescinded or recovered or must otherwise be returned by Beneficiary upon the insolvency, bankruptcy or reorganization of Obligor.

4.     <u>Subrogation</u>. Guarantor waives and shall not exercise any rights that it may acquire by way of subrogation, contribution, reimbursement or indemnification for payments made under this Guaranty until all Obligations shall have been indefeasibly paid and discharged in full.

5.     <u>Representations and Warranties</u>. To induce Beneficiary to enter into the Underlying Agreement, Guarantor represents and warrants that: (a) Guarantor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization; (b) this Guaranty constitutes Guarantor's valid and legally binding agreement in accordance with its terms; (c) the execution, delivery and performance of this Guaranty have been duly authorized by all necessary action and will not violate any order, judgment or decree to which Guarantor or any of its assets may be subject; and (d) Guarantor is currently solvent and will not be rendered insolvent by providing this Guaranty.

6.     <u>Notices</u>.

(a)     All notices, requests, or other communications required or permitted to be delivered hereunder shall be delivered in writing, in each case to the address specified below or to such other address as such Party may from time to time specify in writing in compliance with this provision:

If to the Guarantor:

[ADDRESS]

Attn: Avi Philipson
Telephone:
Email: aphilipson@graphgroup.com

With a copy to (which shall not constitute notice):

Gissin & Co., Locke Lord LLP, Fried, Frank, Harris, Shriver & Jacobson LLP
Attn: Adv. Yael Hershkovitz, Shalom Jacob, Avi Feinberg
Telephone:
Email: yael@gissinlaw.co.il; SJacob@lockelord.com;
Avi.Feinberg@friedfrank.com

If to the Beneficiary:

[ADDRESS]
Attn:
Telephone:
Email:

With a copy to (which shall not constitute notice):

[ADDRESS]
Attn:
Telephone:
Email:

(b)      Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email, or other written acknowledgment).

7.      <u>Assignment</u>. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided, however*, that Guarantor may not, without the prior written consent of Beneficiary, assign any of its rights, powers or obligations hereunder. Beneficiary may assign this Guaranty and its rights hereunder without the consent of Guarantor. Any attempted assignment in violation of this Section shall be null and void.

8.      <u>Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial</u>. <u>Sections 9.3</u> (Governing Law), <u>9.4</u> (Submission to Jurisdiction), <u>9.5</u> (Venue) and <u>9.6</u> (Waiver of Jury Trial) of the Underlying Agreement are hereby incorporated by reference *mutatis mutandis* as though fully set forth herein.

9.      <u>Cumulative Rights</u>. Each right, remedy and power hereby granted to Beneficiary or allowed it by applicable law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Beneficiary at any time or from time to time.

10.      <u>Severability</u>. If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty shall not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

11.      <u>Entire Agreement; Amendments; Headings; Effectiveness</u>. This Guaranty constitutes the sole and entire agreement of Guarantor and Beneficiary with respect to the subject matter hereof and supersedes all previous agreements or understandings, oral or written, with respect to such subject matter. No amendment or waiver of any provision of this Guaranty shall be valid and binding unless it is in writing and signed, in the case of an amendment, by both parties, or in the case of a waiver, by the party against which the waiver is to be effective. Section headings are for convenience of reference only and shall not define, modify, expand or limit any of the terms of this Guaranty. Delivery of this Guaranty by facsimile or in electronic (e.g., pdf) format shall be effective as delivery of a manually executed original of this Guaranty.

[SIGNATURE PAGE FOLLOWS]

*Final Form*

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

[_____]

By: _____

Name:

Title: