> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                          :
In re                                     :        Chapter 11
                                          :
ALL YEAR HOLDINGS LIMITED,                :        Case No. 21-12051 (MG)
                                          :
                Debtor.[1]                :
                                          :
Fed. Tax Id. No. 98-1220822               :
------------------------------------------------------------X

## AMENDED DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION OF ALL YEAR HOLDINGS LIMITED

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer
Matthew P. Goren

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtor*

Dated:  July 15, 2022
             New York, New York

---

[1]    The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

THE INFORMATION CONTAINED IN THIS AMENDED DISCLOSURE STATEMENT (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND TOGETHER WILL ALL SCHEDULES AND EXHIBITS HERETO, THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING VOTES ON THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

THE DEADLINE FOR CREDITORS IN THE VOTING CLASS (AS DEFINED BELOW) TO SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON SEPTEMBER 19, 2022 (THE "VOTING DEADLINE")[2], UNLESS EXTENDED BY THE DEBTOR.  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS SEPTEMBER 12, 2022 (THE "VOTING RECORD DATE").

RECOMMENDATION OF THE DEBTOR

THE DEBTOR SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.
THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN AND IMPLEMENTATION OF THE TRANSACTIONS CONTEMPLATED UNDER THE INVESTMENT AGREEMENT (AS DEFINED BELOW) PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS.  MISHMERET TRUST COMPANY LTD., AS TRUSTEE FOR THE DEBTOR'S VARIOUS SERIES OF NOTES (THE "NOTES TRUSTEE"), IS A PARTY TO CERTAIN PROVISIONS OF THE INVESTMENT AGREEMENT AND HAS PRELIMINARILY CONSENTED TO THE DEBTOR'S ENTRY INTO THE INVESTMENT AGREEMENT.  CLEARSTRUCTURE, SERVING AS ECONOMIC ADVISOR TO THE NOTES TRUSTEE, HAS ALSO RECOMMENDED THAT ALL HOLDERS OF SUCH SERIES OF NOTES VOTE TO ACCEPT THE PLAN.

PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY.  THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL PROVISIONS OF THE PLAN. ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND

---

[2] Certain dates and deadlines set forth herein relating to the Plan solicitation and confirmation process are subject to Bankruptcy Court approval and remain subject to change.

SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

ALL INFORMATION IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED OR COMPILED BY THE DEBTOR'S MANAGEMENT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AS OF THE DATE HEREOF (UNLESS OTHERWISE INDICATED HEREIN) BASED ON INFORMATION PROVIDED TO THE DEBTOR'S MANAGEMENT FROM THE DEBTOR'S EXISTING BOOKS AND RECORDS. THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS (E.G., STATEMENTS THAT PREDICT, PROJECT, OR USE FUTURE EVENTS AS EXPECTATIONS OR POSSIBILITIES) OR OTHER INFORMATION SET FORTH HEREIN WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING, BUT NOT LIMITED TO, THOSE IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.

THE DEBTOR BELIEVES THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW NOTES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE, AND EXPECTS THAT THE OFFER AND ISSUANCE OF THE NEW NOTES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS, THE FINANCIAL PROJECTIONS, OR ANY OTHER STATEMENTS OR ANALYSES CONTAINED HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

Table of Contents

Page

I.      EXECUTIVE SUMMARY ................................................................................1

II.     OVERVIEW OF THE DEBTOR'S BUSINESS ..........................................................7

        A.      The Debtor's Business, Management, and Employees...........................................7

        B.      The Debtor's Capital Structure and Prepetition Claims ........................................9

        C.      The Debtor's Professionals................................................................14

III.    KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11
        CASE ...............................................................................................15

        A.      Prepetition Re-Financing and De-Leveraging Efforts, the COVID-19
                Pandemic, and Other Operational Issues ......................................................15

        B.      Prepetition Creditor Negotiations, and the Taz Confession of Judgment..............17

        C.      The Evergreen Debtors' Chapter 11 Cases ..................................................18

IV.     OVERVIEW OF THE DEBTOR'S RESTRUCTURING...................................................18

        A.      Key Events During Chapter 11 Case ........................................................18

                1.      Appointment of the JPLs and the BVI Proceeding...................................18

                2.      Settlement Transaction and Agreement with Downtown Capital
                        Partners ........................................................................19

                3.      The Section 341 Meeting of Creditors.............................................20

                4.      The Debtor's Schedules and Statement of Financial Affairs and
                        Initial 2015.3 Report ...........................................................21

                5.      The Marketing Process and the Investment Agreement ............................21

                6.      Approval of the Bid Protections .................................................28

                7.      Retention of Professionals ......................................................29

                8.      Extension of the Debtor's Exclusive Time to File and Solicit a
                        Chapter 11 Plan.................................................................30

                9.      The William Vale Purchase ......................................................30

                10.     Debtor in Possession Financing.................................................31

                11.     Timetable for Debtor's Restructuring...........................................32

V.      PENDING LITIGATION ...............................................................................34

        A.      Summary of Pending Litigation...............................................................34

        B.      BVI Omnibus Settlement Authority Order .....................................................35

VI.     SUMMARY OF PLAN ................................................................................36

        A.      Administrative Expense and Priority Claims..................................................36

                1.      Administrative Expense Claims.................................................36

iii

2.      Fee Claims ..................................................................................37

3.      Priority Tax Claims.......................................................................37

B.    Classification of Claims and Interests....................................................38

1.      Classification in General ..............................................................38

2.      Summary of Classification............................................................38

3.      Special Provision Governing Unimpaired Claims .........................38

4.      Elimination of Vacant Classes .....................................................38

5.      Voting Classes; Presumed Acceptance by Non-Voting Classes...............39

6.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
        Bankruptcy Code ..........................................................................39

C.    Treatment of Claims and Interests .........................................................39

1.      Priority Non-Tax Claims (Class 1) ...............................................39

2.      Other Secured Claims (Class 2).....................................................39

3.      General Unsecured Claims (Class 3) .............................................39

4.      Remaining Unsecured Claims (Class 4) ........................................40

5.      Subordinated Securities Claims (Class 5).......................................40

6.      Equity Interests (Class 6) ..............................................................40

D.    Means for Implementation .....................................................................40

1.      Sponsor Contribution and Distributions .......................................40

2.      Authorization and Issuance of New Notes......................................41

3.      Administration of Wind-Down Co. ...............................................42

4.      Section 1145 Exemption ...............................................................43

5.      Officers and New Board of Directors ............................................44

6.      Indemnification of Debtor's Directors and Officers ......................44

7.      Effectuating Documents; Further Transactions. ............................44

8.      Cancellation of Existing Securities and Agreements......................46

9.      Cancellation of Liens. ...................................................................46

10.     Subordination Agreements............................................................46

11.     Closing of the Chapter 11 Case. ...................................................47

12.     Notice of Effective Date. ...............................................................47

E.    Distributions..........................................................................................47

1.      Distributions Generally.................................................................47

2.      Distribution Record Date. .............................................................47

iv

3.      Date of Distributions.................................................................47

4.      Disbursing Agent. ..................................................................48

5.      Rights and Powers of Disbursing Agent...................................48

6.      Expenses of Disbursing Agent...................................................48

7.      Postpetition Interest on Claims. ................................................48

8.      Delivery of Distributions. ........................................................48

9.      Distributions after Effective Date. ............................................49

10.     Unclaimed Property. ..............................................................49

11.     Time Bar to Cash Payments......................................................49

12.     Manner of Payment Under Plan.................................................49

13.     Satisfaction of Claims. .............................................................50

14.     Minimum Cash Distributions....................................................50

15.     Setoff and Recoupment. ...........................................................50

16.     Allocation of Distributions between Principal and Interest. .....................50

17.     No Distribution in Excess of Amount of Allowed Claim.........................50

18.     Distributions Free and Clear. ...................................................50

19.     Withholding and Reporting Requirements. ...............................51

F.      Procedures for Disputed Claims ...............................................51

1.      Objections to Claims ................................................................51

2.      Resolution of Disputed Administrative Expenses and Disputed
        Claims. ..................................................................................52

3.      Payments and Distributions with Respect to Disputed Claims.................52

4.      Distributions After Allowance. .................................................52

5.      Estimation of Claims................................................................52

6.      No Distributions Pending Allowance. .......................................53

7.      Claim Resolution Procedures Cumulative. ...............................53

8.      Insured Claims. ........................................................................53

9.      Tax Treatment of the Class 4 Disputed Claims Reserve ...........................53

G.      Executory Contracts and Unexpired Leases ............................54

1.      General Treatment ...................................................................54

2.      Determination of Assumption Disputes and Deemed Consent.................54

3.      Rejection Damages Claims. ......................................................56

4.      Insurance Policies. ...................................................................56

v

5.      Assignment of Executory Contracts to Wind-Down Co ............................ 56

6.      Modifications, Amendments, Supplements, Restatements, or Other
        Agreements. ....................................................................................... 57

7.      Reservation of Rights .......................................................................... 57

H.   Conditions Precedent to Confirmation of Plan and Effective Date ...................... 58

1.      Conditions Precedent to Confirmation of Plan ................................... 58

2.      Conditions Precedent to Effective Date. ............................................. 58

3.      Waiver of Conditions Precedent. ........................................................ 59

4.      Effect of Failure of a Condition. ......................................................... 59

I.   Effect of Confirmation of Plan ............................................................................ 59

1.      Vesting of Assets ................................................................................. 59

2.      Binding Effect. .................................................................................... 59

3.      Discharge of Claims and Termination of Interests. ............................ 60

4.      Term of Injunctions or Stays .............................................................. 60

5.      Injunction. ........................................................................................... 60

6.      Releases ............................................................................................... 61

7.      Exculpation. ........................................................................................ 63

8.      Retention of Causes of Action/Reservation of Rights. ...................... 63

9.      Special Provisions Regarding Sole Shareholder ................................ 64

J.   Retention of Jurisdiction ..................................................................................... 64

1.      Retention of Jurisdiction .................................................................... 64

2.      Courts of Competent Jurisdiction ....................................................... 66

K.   Miscellaneous Provisions .................................................................................... 66

1.      Payment of Statutory Fees ................................................................. 66

2.      Substantial Consummation of the Plan. ............................................. 66

3.      Plan Supplement. ................................................................................ 66

4.      Requests by the Reorganized Debtor and Wind-Down Co for
        Expedited Determination of Taxes. .................................................... 66

5.      Exemption from Certain Transfer Taxes. ........................................... 67

6.      Amendments. ...................................................................................... 67

7.      Effectuating Documents and Further Transactions ............................ 68

8.      Revocation or Withdrawal of Plan ...................................................... 68

9.      Severability of Plan Provisions. ......................................................... 68

WEIL:\98714375\5\12817.0007

|        | 10. | Governing Law. ...................................................................................69 |
|        | 11. | Time. ......................................................................................................69 |
|        | 12. | Dates of Actions to Implement the Plan. ....................................................69 |
|        | 13. | Immediate Binding Effect. ........................................................................69 |
|        | 14. | Deemed Acts. ...........................................................................................69 |
|        | 15. | Successor and Assigns. .............................................................................69 |
|        | 16. | Entire Agreement. ....................................................................................70 |
|        | 17. | Exhibits to Plan. ......................................................................................70 |

VII.    VALUATION OF THE DEBTOR .................................................................................70

VIII.   TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
        SECURITIES LAWS...................................................................................................71

IX.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN ..................73

|        | A. | Consequences to Debtor ...............................................................................74 |
|        | B. | Tax Treatment of Wind-Down Co and Wind Down Distributions........................75 |
|        | C. | Consequences to Holders of Remaining Unsecured Claims................................75 |
|        |    | 1. | Taxable Transaction................................................................76 |
|        |    | 2. | Character of Gain or Loss........................................................77 |
|        |    | 3. | Distributions in Respect of Accrued but Unpaid Interest or OID.............78 |
|        |    | 4. | Ownership and Disposition of the New Notes...........................................78 |
|        |    | 5. | Resolution of Disputed Remaining Unsecured Claims and Tax Treatment of the Class 4 Disputed Claims Reserve................................81 |
|        |    | 6. | Information Reporting and Backup Withholding .....................................82 |

X.      CERTAIN RISK FACTORS TO BE CONSIDERED .......................................83

|        | A. | Certain Bankruptcy Law and International Considerations................................83 |
|        |    | 1. | Risk of Non-Confirmation of Plan...........................................83 |
|        |    | 2. | Failure to Obtain Israeli and BVI Court Approvals...................................83 |
|        |    | 3. | Non-Consensual Confirmation ................................................83 |
|        |    | 4. | Risk Related to Parties in Interest Objecting to the Debtor's Classification of Claims and Interests........................................................84 |
|        |    | 5. | Risk of Non-Occurrence of Effective Date.................................84 |
|        |    | 6. | Risks Associated with the Investment Agreement.....................................84 |
|        |    | 7. | DIP Financing .......................................................................85 |
|        |    | 8. | Conversion into Chapter 7 Case .............................................85 |

WEIL:\98714375\5\12817.0007

|       | B. | Additional Factors Affecting the Value of the Debtor | 85 |
|       |    | 1. Claims Could Be More than Projected | 85 |
|       |    | 2. Valuation Regarding Avoidance Actions and Causes of Actions | 86 |
|       |    | 3. Inability to Meet Future Obligations | 86 |
|       | C. | Additional Factors | 86 |
|       |    | 1. Debtor Could Withdraw the Plan | 86 |
|       |    | 2. Debtor Has No Duty to Update | 86 |
|       |    | 3. No Representations Outside this Disclosure Statement Are Authorized | 86 |
|       |    | 4. No Legal or Tax Advice Is Provided by this Disclosure Statement | 86 |
|       |    | 5. No Admission Made | 87 |
|       |    | 6. Certain Tax Consequences | 87 |
| XI.   | VOTING PROCEDURES AND REQUIREMENTS | | 87 |
|       | A. | Voting Instructions and Voting Deadline | 87 |
|       | B. | Parties Entitled to Vote | 88 |
|       | C. | Change of Vote | 90 |
|       | D. | Waivers of Defects, Irregularities, etc. | 90 |
|       | E. | Miscellaneous | 91 |
| XII.  | CONFIRMATION OF PLAN | | 91 |
|       | A. | Confirmation Hearing | 91 |
|       | B. | Objections to Confirmation | 91 |
|       | C. | Requirements for Confirmation of Plan | 94 |
|       |    | 1. Requirements of Section 1129(a) of the Bankruptcy Code | 94 |
|       |    | 2. Additional Requirements for Non-Consensual Confirmation | 97 |
| XIII. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | 98 |
|       | A. | Alternative Plan of Reorganization | 98 |
|       | B. | Sale Under Section 363 of the Bankruptcy Code | 98 |
|       | C. | Continued Operation Outside of Bankruptcy | 99 |
|       | D. | Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law | 99 |
| XIV.  | CONCLUSION AND RECOMMENDATION | | 100 |

WEIL:\98714375\5\12817.0007

## **EXHIBITS**

i.    EXHIBIT A – Plan

ii.    EXHIBIT B – Investment Agreement

iii.    EXHIBIT C – Organizational Chart

iv.    EXHIBIT D – Israeli Disclosure Tables

    a.    EXHIBIT D-1 – Prior Year Income Report

    b.    EXHIBIT D-2 – Prior Year Property Report

    c.    EXHIBIT D-3 – Five Year Operating Plan

v.    EXHIBIT E – Appraisal Reports

    a.    EXHIBIT E-1 – LV Appraisal Report

    b.    EXHIBIT E-2 – Additional Appraisal Reports

vi.    EXHIBIT F – CVs for Directors of Reorganized Debtor

vii.    EXHIBIT G – Financial Projections

viii.    EXHIBIT H – Liquidation Analysis

WEIL:\98714375\5\12817.0007

## I.
## EXECUTIVE SUMMARY

All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands, as debtor and debtor in possession (the "**Debtor**" and, together with its direct and indirect non-debtor subsidiaries, the "**Company**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the *Chapter 11 Plan of Reorganization of All Year Holdings Limited,* dated May 31, 2022 (as may be amended, modified, or supplemented from time to time, and together with all schedules and exhibits thereto, the "**Plan**").[3]  A copy of the Plan is attached hereto as **Exhibit A**.

On December 14, 2021 (the "**Petition Date**"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  As described in further detail below, on December 16, 2021, the Debtor filed an application under the laws of the British Virgin Islands with the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division Virgin Islands (the "**BVI Court**") seeking the appointment of Paul Pretlove and Charlotte Caulfield of Kalo (BVI) Limited as joint provisional liquidators (the "**JPLs**" and, the appointment of the JPLs, the "**JPL Appointment**") under the applicable provisions of the BVI Insolvency Act 2003 (the "**BVI Proceeding**").  The BVI Court entered an order appointing the JPLs on December 20, 2021 (the "**JPL Order**").  In addition, on April 14, 2022, with the consent of the JPLs and the approval of the BVI Court, the Debtor commenced a proceeding in the District Court of Tel Aviv – Yafo (the "**Israeli Court**") for recognition of the Chapter 11 Case as a foreign main proceeding under the applicable provisions of Chapter I, Part C of the Insolvency and Rehabilitation Law 5778-2018 (the "**Israeli Recognition Proceeding**").  The Israeli Court entered an order recognizing the Chapter 11 Case on May 4, 2022.

Following a robust sales and marketing effort, the Debtor entered into an Investment Agreement, dated March 11, 2022 (as amended on April 21, 2022 and May 27, 2022, as may be further amended, modified, or supplemented from time to time, and together with all schedules and exhibits thereto, "**Investment Agreement**"), with Paragraph Partners LLC (the "**Sponsor**"), among others, to implement a comprehensive restructuring of the Debtor and present a path forward for the Debtor's successful emergence from chapter 11.  The Investment Agreement is the cornerstone of, and is to be implemented pursuant to, the Plan.  A copy of the Investment Agreement is annexed hereto as **Exhibit B**.

The Investment Agreement provides that, in exchange for one hundred percent of the equity of the reorganized Debtor (the "**Reorganized Debtor**"), the Sponsor will contribute $60,000,000 to the Debtor, which is comprised of (a) $40,000,000 in cash and (b) promissory notes in the aggregate amount of $20,000,000.  As set forth in further detail in Article IV below, the amount of (i) the promissory notes will increase to $22,000,000 and (ii) the cash contribution may increase by an

---

[3]     Unless otherwise indicated, capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to them in the Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

additional $200,000, if the Sponsor, or an affiliate of the Sponsor, consummates a transaction involving the William Vale hotel.[4]  Importantly, as part of the Investment Agreement, the Sponsor has agreed to assume all unsecured claims against the Debtor other than the Claims of holders of the Debtor's various series of notes (the "**Notes**" and the holders thereof, "**Noteholders**") and certain other discrete categories of Claims set forth therein and described below.  The Notes Trustee is a party to certain provisions of the Investment Agreement and has preliminarily consented to the Debtor's entry into the Investment Agreement.

As described in further detail below, the rights of holders of any Class 1 Priority Non-Tax Claims, Class 2 Other Secured Claims, and Class 3 General Unsecured Claims are Unimpaired under the Plan.  Except to the extent a holder of any Unimpaired Claims is a Releasing Party[5], the holders of Unimpaired Claims are not waiving or releasing any Claims against the Debtor or the other Released Parties, including, without limitation, the right (if any) to the payment of interest in accordance with, or as provided under, any documents relevant to such Unimpaired Claims or otherwise applicable law.  The holders of Class 5 Subordinated Securities Claims and Class 6 Equity Interests are not entitled to receive or retain any property under the Plan and are, therefore, deemed to reject and not entitled to vote on the Plan.

Accordingly, only holders of Class 4 Remaining Unsecured Claims are Impaired and entitled to vote on the Plan.  Class 4 is comprised of the holders of any Noteholder Claims, Subsidiary Plan Administrator Claims, and Non-Securities Indemnity Claims.  The Plan provides for material recoveries to the holders of Allowed Claims in Class 4 (Remaining Unsecured Claims) in the form of Cash, New Notes, and any potential recoveries on account of certain Causes of Action that have been preserved for the benefit of holders of Allowed Class 4 Claims.  The transactions contemplated under the Investment Agreement will maximize the value of the Debtor's estate and provide the basis for the expeditious conclusion of the Chapter 11 Case.

The Debtor commenced the Israeli Recognition Proceeding, with the consent of the JPLs and the approval of the BVI Court, in furtherance of its efforts to achieve a global resolution of Claims against, and Interests in, the Debtor, including with respect to the Debtor's various series of Israeli-issued Notes.  Because the Notes were issued by the Debtor on the Tel Aviv Stock Exchange ("**TASE**"), the Debtor is obligated to comply with certain reporting requirements under applicable Israeli law, including, without limitation, reporting obligations related to insolvency proceedings,

---

[4]    As explained in further detail in Article IV below, the Sponsor and the Notes Trustee, in its capacity as Notes Trustee for the Series C Notes, have entered into an agreement, dated March 24, 2022, pursuant to which the Sponsor has agreed to purchase the mortgage and note of the Series C Noteholders' for approximately $158,612,112.

[5]    Pursuant to Section 1.78 of the Plan, "***Released Parties***" means collectively, and in each case, solely in their capacities as such: (a) the Debtor and the Reorganized Debtor; (b) Wind-Down Co; (c) the Notes Trustee and its representatives and advisors; (d) the Noteholders and their representatives and advisors; (e) the Sponsor and its agents, officers, directors, principals, affiliates, representatives and advisors; (f) any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (g) any independent directors appointed to the board of the Debtor on or after January 1, 2021; (h) the JPLs; (i) the Authorized Managers; and (j) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC); provided, however, that Released Parties shall not include Yoel Goldman or Tzipporah Goldman in any capacity.

debt settlements, mergers or acquisitions, and company actions outside of the ordinary course of business, and is subject to the other Israeli laws applicable to reporting companies, including the Israeli Insolvency and Financial Rehabilitation Law 5778-2018.  The Debtor has been advised that, under the applicable provisions of the Insolvency and Financial Rehabilitation Law 5778-2018, a company must seek approval of the applicable Israeli court in order to present a debt settlement or plan of reorganization to its creditors for approval.  The Debtor further understands that the Insolvency and Financial Rehabilitation Law requires any debt settlement or plan of reorganization be approved by the company's creditors at a meeting(s) of such creditors convened in the manner approved by the Israeli court.  Accordingly, as the Debtor is a reporting company in Israel, the Debtor determined that it was necessary to commence the Israeli Recognition Proceeding to obtain court approval to convene a Noteholder meeting to vote on the Plan and the Investment Agreement (the "**Noteholder Meeting**") to comply with applicable Israeli securities laws.  Following confirmation of the Plan, the Debtor intends to also seek recognition of the Plan and the Confirmation Order in the Israeli Recognition Proceeding.

In addition, the Debtor is seeking authority from the BVI Court to implement a plan of arrangement (the "**BVI Plan of Arrangement**") following which, and subject to the occurrence of the Plan Effective Date, among other things, (i) the existing Equity Interests in the Debtor will be cancelled, and (ii) one hundred percent of the equity in the Reorganized Debtor will be held by the Sponsor. A hearing before the BVI Court on the Debtor's application to approve the BVI Plan of Arrangement is scheduled for July 21, 2022.  Approval of the terms of the Plan by each of the Israeli Court and the BVI Court are conditions to closing under the Investment Agreement.

In developing the Plan, the Debtor gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives of the Noteholders, the Notes Trustee, and other parties in interest.  The Debtor also conducted a careful review of the operations of its direct and indirect non-debtor subsidiaries, its prospects as an ongoing business, financial projections developed by management, and estimated recoveries in a liquidation scenario, and concluded that recoveries to the Debtor's creditors will be maximized under the Plan.  The Debtor believes that its business and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  Consistent with the liquidation analysis, appraisals, and other analyses prepared by the Debtor with the assistance of its advisors, the value of the Debtor is substantially greater as a going concern than in a liquidation.  The Debtor believes that any alternative to confirmation of the Plan would result in significant delays, litigation, and additional costs, which would ultimately lower the recoveries for all holders of Allowed Claims.

**Accordingly, the Debtor urges all holders of Claims entitled to vote to accept the Plan.**

**WHO IS ENTITLED TO VOTE**:  Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

WEIL:\98714375\5\12817.0007

**The Non-Voting Classes**. As the Plan provides for the payment in full of all Allowed Claims against the Debtor in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (General Unsecured Claims) (collectively, the "**Unimpaired Classes**"), no holders of Claims against the Debtor in the Unimpaired Classes are entitled to vote on the Plan. Except to the extent a holder of any Claims in an Unimpaired Class is a Releasing Party, the holders of Unimpaired Claims are not waiving or releasing any Claims against the Debtor or the other Released Parties, including, without limitation, the right (if any) to the payment of interest in accordance with, or as provided under, any documents relevant to such Unimpaired Claims or otherwise applicable law.

As described in further detail below, the holders of Claims against, and Interests in, the Debtor in Class 5 (Subordinated Securities Claims) and Class 6 (Equity Interests) (collectively, the "**Non-Voting Impaired Classes**" and, together with the Unimpaired Classes, the "**Non-Voting Classes**") shall not receive or retain any property under the Plan and, as a result, they are not entitled to vote on the Plan. On the Effective Date of the Plan, Claims and Interests in the Non-Voting Impaired Classes will be discharged to the fullest extent permitted by section 1141 of the Bankruptcy Code, and the holders of such Claims or Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against the Debtor, the Reorganized Debtor, or Wind-Down Co any such discharged Claims against or terminated Interests in the Debtor; provided that, except to the extent a holder of any such Claims or Interests is a Releasing Party, the holders of Claims or Interests in the Non-Voting Classes are not releasing any Claims against any Releasing Parties (other than the Debtor, the Reorganized Debtor, or Wind-Down Co.).

**The Voting Class**. The only class of Claims entitled to vote on the Plan and whose acceptances of the Plan will be solicited is Class 4 (Remaining Unsecured Claims). Creditors in the Voting Class may vote on the Plan unless:

(i) as of the Voting Record Date, the outstanding amount of such claimant's Claim is not greater than zero ($0.00);

(ii) as of the Voting Record Date, such claimant's Claim has been disallowed, expunged, disqualified, or suspended; or

(iii) as of the Voting Record Date, such claimant's Claim is subject to an objection or request for estimation, in accordance with the procedures set forth below.

Any creditor that is not scheduled in the Debtor's Schedules (as defined below) and that did not file a proof of claim prior to the Voting Record Date is not entitled to vote on the Plan.

<u>**Claims and Interests under the Plan**</u>

The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) the Classes that are impaired by the Plan, (iii) the Classes that are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Allowed Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, *see* Article VI — Summary of the Plan below.

| Class | Designation | Treatment and Approx. Percentage Recovery | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100%<br><br>Except to the extent that a holder of a Priority Non-Tax Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan. On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Priority Non-Tax Claims in the ordinary course. The Debtor does not believe there are any Priority Non-Tax Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan. To the extent any are asserted, the Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Non-Tax Claim available to the Debtor. | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | 100%<br><br>Except to the extent that a holder of an Other Secured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan. On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Other Secured Claims in the ordinary course. The Debtor does not believe there are any Other Secured Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan. To the extent any are asserted, the Reorganized Debtor shall retain the rights to any defenses and setoffs against any Other Secured Claim available to the Debtor. | Unimpaired | No (Presumed to accept) |
| 3 | General Unsecured Claims | 100%<br><br>Except to the extent that a holder of a General Unsecured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by the Plan. On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile General Unsecured Claims in the ordinary course of business. The Debtor is not aware of any General Unsecured Claims that may be asserted against it. However, the Sponsor's determination to assume any such Claims pursuant to the Investment Agreement will allow the Debtor to avoid the time and expense associated with fixing and prosecuting a bar date for filing proofs of Claim and undertaking a Claims reconciliation process. Given this, the Debtor has established a separate class for the General Unsecured Claims to the extent any such Claims are asserted against the Debtor. To the extent any General Unsecured Claims | Unimpaired | No (Presumed to accept) |

WEIL:\98714375\5\12817.0007

| Class | Designation | Treatment and Approx. Percentage Recovery | Impairment | Entitled to Vote |
|---|---|---|---|---|
| | | are asserted, the Reorganized Debtor shall retain the rights to any defenses and setoffs against any General Unsecured Claims available to the Debtor. | | |
| 4 | Remaining Unsecured Claims | Approx. 11-17%<br><br>Except to the extent that a holder of an Allowed Remaining Unsecured Claim against the Debtor agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Allowed Remaining Unsecured Claim, each such holder shall receive (i) on the Effective Date, from the Disbursing Agent (on behalf of the Debtor), its Pro Rata Share of the Class 4 ED Distribution, (ii) in the event the William Vale Purchase occurs subsequent to the Effective Date, from the Disbursing Agent (on behalf of the Debtor), its Pro Rata Share of any additional New Notes issued, and (iii) on such other date(s) as determined from time to time by the Plan Administrator, from Wind-Down Co, the amounts recovered, if any, from the Excluded Assets (including, but without limitation, from the prosecution of Avoidance Actions and other Causes of Action) and any remaining Wind Down Cash Funding. Notwithstanding anything to the contrary in the Plan, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan, including for purposes of distributions under the Plan. The Debtor will file a motion to estimate or objection to such Non-Securities Indemnity Claims on proper notice to applicable parties.  The right to the foregoing distributions shall be nontransferable except by will, intestate succession, or operation of law. | Impaired | Yes |
| 5 | Subordinated Securities Claims | 0%<br><br>The holders of Subordinated Securities Claims against the Debtor shall not receive or retain any property under the Plan on account of such Claims. | Impaired | No (Deemed to reject) |
| 6 | Equity Interests | 0%<br><br>On or after the Effective Date, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all Equity Interests in the Debtor shall be cancelled.  The existing holder of the Equity Interests in the Debtor shall neither receive nor retain any property of the Debtor or interest in property of the Debtor on account of such Equity Interest. | Impaired | No (Deemed to reject) |

THE PLAN PROVIDES THAT THE RELEASED PARTIES IDENTIFIED IN (A) – (I) IN THE IMMEDIATELY FOLLOWING SENTENCE SHALL BE DEEMED RELEASED AND

WEIL:\98714375\5\12817.0007

DISCHARGED TO THE MAXIMUM EXTENT PERMITTED BY LAW BY THE DEBTOR AND ITS ESTATE, THE REORGANIZED DEBTOR, AND WIND-DOWN CO.  FURTHER, THE PLAN PROVIDES FOR CERTAIN MUTUAL RELEASES BETWEEN AND AMONG (A) THE DEBTOR AND THE REORGANIZED DEBTOR; (B) WIND-DOWN CO; (C) THE NOTES TRUSTEE AND ITS REPRESENTATIVES AND ADVISORS; (D) THE NOTEHOLDERS AND THEIR REPRESENTATIVES AND ADVISORS; (E) THE SPONSOR AND ITS AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, REPRESENTATIVES AND ADVISORS; (F) ANY CURRENT OR FORMER CHIEF RESTRUCTURING OFFICER OR ASSOCIATE RESTRUCTURING OFFICER OF THE DEBTOR; (G) ANY INDEPENDENT DIRECTORS APPOINTED TO THE BOARD OF THE DEBTOR ON OR AFTER JANUARY 1, 2021; (H) THE JPLS; (I) THE AUTHORIZED MANAGERS; AND (J) ANY ADVISORS RETAINED BY THE DEBTOR IN CONNECTION WITH THE CHAPTER 11 CASE ON OR AFTER DECEMBER 29, 2020 (BUT NOT INCLUDING DOV TRATNER OR TRATNER AND ASSOCIATES PLLC); PROVIDED, HOWEVER, THAT RELEASED PARTIES SHALL NOT INCLUDE YOEL GOLDMAN OR TZIPPORAH GOLDMAN IN ANY CAPACITY.

**THE SOLICITATION PROCESS:**  As set forth above, the Debtor commenced the Israeli Recognition Proceeding on April 14, 2022.  The Debtor commenced the Israeli Recognition Proceeding in furtherance of its efforts to achieve a global resolution of Claims against, and Interests in, the Debtor, including with respect to the Debtor's various series of Notes.  In addition, as the Debtor is a reporting company in Israel, the Debtor determined that it was necessary to commence the Israeli Recognition Proceeding to obtain court approval to convene the Noteholder Meeting to vote on the Plan and the Investment Agreement.  As the Debtor is a reporting company in Israel and is, therefore, subject to certain reporting and other requirements under applicable Israeli law, the Debtor determined that it was necessary to commence the Israeli Recognition Proceeding to obtain court approval to convene the Noteholder Meeting to comply with applicable Israeli securities laws.

Following approval of the Disclosure Statement by the Bankruptcy Court, the Debtor intends to file a motion with the Israeli Court seeking authorization to convene the Noteholder Meeting to comply with applicable Israeli securities law and to allow the Debtor to commence solicitation of votes from the Noteholders on the Plan.  A Hebrew translation of this Disclosure Statement and other solicitation materials that are approved by the Bankruptcy Court will be attached to the summons of the Noteholder Meeting.  The Debtor will obtain approval from the Israeli Court to convene the Noteholder Meeting (the "**Israeli Court Approval Date**") prior to commencing its solicitation of votes to accept or reject the Plan.

## II.
## OVERVIEW OF THE DEBTOR'S BUSINESS

### A.    The Debtor's Business, Management, and Employees

The Debtor was established and incorporated on September 17, 2014, as a BVI business company under the laws of the BVI.  The Debtor operates as a holding company that, through its direct and indirect subsidiaries, focuses on the development, construction, acquisition, leasing and management of residential and commercial income producing properties in Brooklyn, New York.

Principally all of the Debtor's assets are located in the United States in New York. The Debtor was founded by Mr. Yoel Goldman, the Debtor's sole economic shareholder (the "**Sole Shareholder**").

The Debtor, through its subsidiaries, owns approximately 110 properties (including properties under development), consisting of over 1,000 residential and commercial units in Bushwick, Williamsburg, and Bedford-Stuyvesant. The Company's most valuable assets include, without limitation, the William Vale hotel, a luxury hotel in Williamsburg (the "**William Vale**"), and, until recently, the Denizen,[6] a luxury rental complex in Bushwick (the "**Denizen**"). An organizational chart of the Debtor and its direct and indirect subsidiaries, as of the date hereof, is annexed hereto as **Exhibit C**.[7]

Historically, the Debtor received funds through debt issuances, asset sales, and the operations of its direct and indirect, non-debtor property level subsidiaries (the "**PropCos**"). Currently, the Debtor is largely funding its operations from cash generated by asset sales and settlements with contract counterparties. The Debtor uses these funds to pay various operating expenses and advances funds in the amount of approximately $200,000 on a monthly basis to the PropCos to fund any operating shortfalls at the PropCos. A summary of the net income generated by the Debtor's non-debtor subsidiaries for the years ending 2019 through 2021 and a table reflecting the Debtor's equity interests in its non-debtor subsidiaries are annexed hereto as **Exhibit D-1** and **Exhibit D-2**, respectively.

Prior to the appointment of the JPLs, the Debtor's board of directors (the "**Board**") was comprised of the following five individuals: Mr. Shaul Schneider, Ms. Ayala Resnick-Dotan, Mr. Abe Wurzberger, Mr. Roni Kleinfeld, and the Sole Shareholder.

The Debtor does not currently have its own employees and has not employed any individuals within the one year period prior to the Petition Date. Prior to the appointment of the JPLs, the Debtor's business affairs and operations were managed by Mr. Assaf Ravid, the Chief Executive Officer and Chief Restructuring Officer (the "**CRO**"), and Mr. Ephraim Diamond, the Associate Restructuring Officer (the "**ARO**"), who are contract officers of the Debtor that are paid in advance on a monthly basis for their consulting services. The CRO and ARO were appointed prior to the Petition Date by the Debtor's Board on March 4, 2021 and December 30, 2020, respectively. As described in further detail below, following the appointment of the JPLs, Mr. Ravid and Mr. Diamond, along with certain other specific individuals, were designated as "Authorized Managers" as part of a protocol that was agreed to, and made part of the JPL Order, and the JPLs empowered

---

[6] As further described in Article IV, on February 22, 2021, Evergreen Gardens Mezz LLC ("**EGM**") commenced with the Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code. On September 14, 2021, Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I and EGM, the "**Evergreen Debtors**") commenced their own voluntary cases with the Bankruptcy Court under chapter 11 of the Bankruptcy Code. On November 5, 2021, the Court entered an order confirming the Evergreen Plan (as defined below), which chapter 11 plan became effective and was substantially consummated on December 2, 2021. A sale of the Denizen was consummated pursuant to the Evergreen Plan.

[7] The organizational chart of the Debtor attached hereto reflects certain updates to account for post-petition asset sales and other transactions involving subsidiaries of the Debtor and supersedes in all respects the organizational chart annexed to the Debtor's corporate ownership statement [ECF No. 2] filed on the Petition Date.

WEIL:\98714375\5\12817.0007

the Authorized Managers to maintain the Debtor's operations, pursue the restructuring, and to continue to pursue and oversee the Chapter 11 Case.

In addition to the Authorized Managers, four individuals, including two analysts and two administrative assistants, are paid as individual contractors through the Debtor's management company, Smart Management NY, Inc. ("**Smart Management**").

The day-to-day operations of certain of the PropCos were previously overseen by All Year Management, Inc., which was an affiliate of the Debtor and partially owned by the Sole Shareholder and a third party. However, on or about March 2021, the day-to-day operations of those PropCos, as well as certain payroll and other administrative services provided to the Debtor, were transitioned to Smart Management. To the best of the Debtor's knowledge and belief, Smart Management has no affiliation with the Sole Shareholder.

In addition to the Sole Shareholder's prior involvement with All Year Management, Inc., the Sole Shareholder previously served as a managing member or acted as authorized signatory for certain of the PropCos, including, among others, YG WV LLC ("**YG WV**"). The Debtor indirectly holds a 50% ownership interest in Wythe Berry Fee Owner LLC ("**Wythe Berry Fee Owner**"), the entity that owns the William Vale hotel, through YG WV. The remaining 50% interest is held by Mr. Zelig Weiss ("**Weiss**"). Wythe Berry LLC, an entity owned 50% by the Sole Shareholder and 50% by Weiss ("**Wythe Lessee**"), is the lessee of the William Vale property pursuant to a ground lease with the direct owner of the property (the "**Lease**"). The Sole Shareholder and Weiss are guarantors on the Lease. The Sole Shareholder is not currently involved with the management or operation of the William Vale, or the entities through which the property is held. To the best of the Debtor's knowledge and belief, except as set forth herein, the Sole Shareholder does not have any affiliation with any of the Debtor's creditors.

## B.     The Debtor's Capital Structure and Prepetition Claims

### 1.     *Prepetition Indebtedness*

As of the Petition Date, the Company had approximately $1.23 billion of outstanding funded debt obligations comprised of (i) approximately $565 million in borrowings on Series B, C, D, and E Notes issued by the Debtor, and (ii) approximately $760 million in property level mortgage debt secured by the Debtor's non-debtor subsidiaries which has been provided by various U.S. lenders.

The following is a summary of each of the categories of the Debtor's outstanding known liabilities as set forth in the Schedules.

### i.     The Noteholder Claims[8]

The Notes were issued by the Debtor on TASE in New Israeli Shekel and the deeds of trust and other documents governing the relationship between the Debtor and the Noteholders are governed

---

[8] The Notes were issued in New Israeli Shekel and, as a result, the principal amounts issued and related claim amounts for the various series of Notes set forth below have been converted to United States Dollars based on the currency exchange rate as of the Petition Date.

WEIL:\98714375\5\12817.0007

by Israeli law.  The Debtor suspended interest payments on its Series C and E Notes and its Series B and D Notes in November 2020 and January  2021, respectively.  On January 3, 2021, the four Series of Notes were de-listed and suspended from trading by TASE.

### a.    Series B Notes Claims

Pursuant to that certain Deed of Trust, dated as of December 25, 2016 (as amended, modified, renewed, or supplemented from time to time, the "**Series B Deed of Trust**"), by and between the Debtor, as issuer, and the Notes Trustee, the Debtor issued approximately $214 million in principal amount of unsecured notes (the "**Series B Notes**" and the holders thereof, the "**Series B Noteholders**").  As of the Petition Date, the Debtor owed approximately $141,434,950.21 in outstanding obligations under the Series B Notes, including principal, accrued and unpaid interest, fees, expenses, and other amounts outstanding under the Series B Deed of Trust.

### b.    Series C Notes Claims

Pursuant to that certain Deed of Trust, dated as of February 19, 2017 (as amended, modified, renewed, or supplemented from time to time, the "**Series C Deed of Trust**"), by and between the Debtor and the Notes Trustee, the Debtor issued approximately $198 million in principal amount of secured, first lien notes (the "**Series C Notes**" and the holders thereof, the "**Series C Noteholders**").  At issuance, the Series C Notes were secured by a collateral assignment of a loan and mortgage delivered by the Debtor (the "**Loan and Mortgage**"), which loan was secured by a mortgage delivered by Wythe Berry Fee Owner, an indirect non-debtor subsidiary of the Debtor that owns the William Vale hotel.  The Loan and Mortgage was subsequently assigned, on March 16, 2021, by the Debtor to the Notes Trustee, on behalf of the Series C Noteholders.  The Series C Notes are not secured by any assets of the Debtor.  As of the Petition Date, the Debtor owed approximately $202,409,251.53 in outstanding obligations under the Series C Notes, including principal, accrued and unpaid interest, fees, expenses, and other amounts outstanding under the Series C Deed of Trust.[9]  As described in further detail below, the closing of a transaction for the William Vale hotel will result in a reduction of the Allowed amount of the Series C Note Claims under the Plan.

### c.    Series D Notes Claims.

Pursuant to that certain Deed of Trust, dated as of June 29, 2017 (as amended, modified, renewed, or supplemented from time to time, the "**Series D Deed of Trust**"), by and between the Debtor and the Notes Trustee, the Debtor issued approximately $164 million in principal amount of

---

[9] Wythe Berry Fee Owner commenced an action against Wythe Lessee in the New York State Supreme Court, Commercial Division (the "**New York Court**") as a result of, among other things, Wythe Lessee's failure to make required lease payments under the Lease since February 1, 2021.  By order dated December 6, 2021, the New York Court ordered Wythe Lessee to make a payment of $7,500,000 on or before February 1, 2022 to Wythe Berry Fee Owner for "use and occupancy" of the Hotel during the pendency of the litigation.  On February 1, 2022, Wythe Berry Fee Owner and the Lessee entered into a stipulation, pursuant to which Wythe Lessee paid $7,500,000 to Wythe Berry Fee Owner in accordance with the order of the New York Court, which funds were paid to the Trustee, on behalf of the Series C bondholders.  The Allowed amount of the Series C Notes Claims under the Plan reflects the Trustee's receipt of such funds.

unsecured notes (the "**Series D Notes**" and the holders thereof, the "**Series D Noteholders**").  As of the Petition Date, the Debtor owed approximately $184,609,380.02 in outstanding obligations under the Series D Notes, including principal, accrued and unpaid interest, fees, expenses, and other amounts outstanding under the Series D Deed of Trust.

d.   <u>Series E Notes Claims</u>.

Pursuant to that certain Deed of Trust, dated as of February 4, 2018 (as amended, modified, renewed, or supplemented from time to time, the "**Series E Deed of Trust**"), by and between the Debtor, as issuer, EG II, as co-borrower, and the Notes Trustee, the Debtor and EG II issued approximately $263 million in principal amount of secured, first lien notes (the "**Series E Notes**" and the holders thereof, the "**Series E Noteholders**").  The Debtor's obligations on the Series E Notes under the Series E Deed of Trust were previously secured by a first priority lien and security interest on, among other things, the real property located at 54 Noll Street (Denizen Y) and all buildings, structures, fixtures and other improvements.  Pursuant to the Evergreen Plan, which became effective and was substantially consummated on December 2, 2021, the holders of the Series E Notes received a distribution from EG II in the amount of $244,965,080.37 on account of such allowed claims.  The Series E Notes are not secured by any assets of the Debtor.  As of the date hereof, the Debtor owes approximately $40,453,260.52 in outstanding obligations under the Series E Notes, including principal, accrued interest, fees, expenses, and other amounts, which amount represents the Series E Noteholders' deficiency claim against the Debtor, as a co-obligor under the Series E Notes.

In December 2021, among other things, the Noteholders voted in favor of a proposal providing that (i) in the event of a bankruptcy proceeding of the Parent Debtor initiated outside of Israel, the calculation of the deficiency claim, if any, for each series of Notes and any disbursement thereto (including without limitation the distribution on account of the claims of the Series C Notes whether or not the William Vale Purchase (as defined below) has been consummated) would be determined by the Notes Trustee pursuant to applicable Israeli law and (ii) in the event that a particular series of Notes were to receive a disbursement on its claim in excess of such series' determined share, such amount would be distributed among all Noteholders according to applicable Israeli law. Nothing contained in the proposal approved by the Noteholders was meant, or should be deemed, to derogate from any Noteholder claims against the Parent Debtor and is applicable only with respect to the allocation of distributions on account of the claims of the Noteholders as among themselves.

 The results of the Noteholders' votes are publicly available on the TASE website at the following links:

(i)    Series B Notes: https://maya.tase.co.il/reports/details/1418650/2/0);

(ii)   Series C Notes: (https://maya.tase.co.il/reports/details/1418307);

(iii)  Series D Notes: (https://maya.tase.co.il/reports/details/1418662/2/0); and

(iv)   Series E Notes: (https://maya.tase.co.il/reports/details/1418316/2/0).

ii.    Subordinated Securities Claims

As discussed in further detail in Article V below, the Debtor, along with certain of its former officers and directors, is a named defendant in two securities class action lawsuits pending in Israel.[10]  The Public Representatives Class Action and the Shachar Group Class Action (each as defined below) were commenced by lead plaintiffs representing parties who purchased any bonds issued by the Debtor between (i) June 1, 2018 and November 30, 2018 and (ii) July 1, 2020 and November 29, 2020, respectively.  Pursuant to the subordination requirements of section 510(b) of the Bankruptcy Code, any Claim arising out of or related to the Israeli Securities Actions, including, without limitation, any claim asserted against the Debtor by any former officer or director of the Debtor for indemnification or contribution arising out of or related to the Israeli Securities Actions, will be subordinated to all Claims or Interests that are senior to or equal in priority to such Claims.  Accordingly, in accordance with section 510(b) and the other provisions of the Bankruptcy Code, because the holders of Claims in Class 4 (Remaining Unsecured Claims) will not receive payment in full under the Plan, the Subordinated Securities Claims are not entitled to any recovery under the Plan.

       iii.     Non-Securities Indemnity Claims

The Debtor has listed certain contingent, unliquidated, and disputed claims for indemnification or contribution in its Schedules that may be asserted by its current or former directors and officers. These may include claims for indemnification or contribution arising out of or relating to potential actions that may be brought in the future against the Debtor's directors and officers, including, without limitation, claims or actions arising out of or relating to the Notes that may be brought by the Noteholders, the Notes Trustee, or the Plan Administrator, and for which such individuals may seek indemnification or contribution from the Debtor arising out of or relating to events that occurred prior to the Petition Date.

The Memorandum and Articles of Association of the Debtor (the "**M&As**"), originally filed in the BVI on September 17, 2014 and subsequently amended thereafter, provide that the Debtor shall indemnify its directors and officers against, among other things, all expenses, including legal fees, and judgments and other amounts paid in connection with legal proceedings commenced against such individuals as a result of their roles as directors or officers of the Debtor.  In addition, the Debtor previously entered into letter agreements with each of its directors and officers concerning their rights to indemnification and contribution from the Debtor (the "**Letters of Indemnity**"). The Letters of Indemnity, which are governed by Israeli law, each provide that the Debtor's total aggregate obligation to indemnify its directors and officers is capped at 25% of the existing equity value of the Debtor attributed to the Debtor's shareholders under the most recent consolidated financial statements, audited or reviewed, of the Debtor, as applicable, correct as of the date of the indemnification payment.  The Letters of Indemnity further provide that the Debtor's undertakings to indemnify its directors and officers under the Letters of Indemnity, including with respect to the aforementioned cap, apply with regard to any obligation or expense that may be indemnified under law or the M&As.

---

[10] The Israeli Class Actions are DC (TA) *Public Representatives (Registered NGO) v. All Year Holdings, et al.*, 15257-04-20 (January 15, 2019, updated April 16, 2020) (Isr.) and DC (TA) *Shachar Group LTD v. All Year Holdings, et al.*, 3325-12-20 (December 1, 2020) (Isr.).

WEIL:\98714375\5\12817.0007

The Debtor has been advised by its BVI counsel that parties are generally free to waive or contract around any indemnification requirements provided under the memorandum and articles of an entity incorporated in the BVI. Accordingly, as the Debtor is currently insolvent, in accordance with the Letters of Indemnity and based on the advice of its Israeli and BVI counsel, the Debtor believes that it has no obligation to indemnify its officers and directors under the M&As, the Letters of Indemnity, or otherwise. Therefore, any Non-Securities Indemnity Claims asserted by the Debtor's directors and officers have no value. The Debtor will be prepared to demonstrate in connection with confirmation of the Plan that the Non-Securities Indemnity Claims should be estimated at zero dollars ($0) for all purposes, including for purposes of distributions under the Plan.

       iv.    Subsidiary Plan Administrator Claim

The Debtor has listed in its Schedules a contingent, unliquidated, and disputed claim that may be asserted by the plan administrator appointed for EGM and EG I (the "**EGM Plan Administrator**") in the Evergreen Debtors' chapter 11 cases. In a letter to the Bankruptcy Court filed on April 19, 2022 [ECF No. 87], the EGM Plan Administrator indicated that it may hold Claims that relate to or arise as a result of that certain Contract of Sale, dated January 15, 2020, by and between Melrose Noll Brooklyn LLC (the "**2020 PSA Claimant**"), EG I, and EG II (as amended, the "**2020 PSA**") and the Debtor's alleged use or diversion of the deposit paid by the 2020 PSA Claimant in connection with the 2020 PSA. To date, the Debtor has not seen any documents and is not otherwise aware of any evidence to support any Subsidiary Plan Administrator Claims. To the extent any Claim is brought by a plan administrator with respect to any of the Evergreen Debtors, such Claims shall be classified in Class 4 (Remaining Unsecured Claims) under the Plan. Whether and to what extent such a claim will be an Allowed Claim is likely to be subject to further litigation before the Bankruptcy Court in connection with confirmation of the Plan.

       v.    Taz Claim

On December 13, 2021, the Debtor became aware of a $37 million judgment entered against it in Kings County Supreme Court on December 9, 2021 (the "**Taz Confession of Judgment**") resulting from outstanding confessions of judgement allegedly executed by the Sole Shareholder in favor of Taz Partners LLC ("**Taz Partners**"), an affiliate of the Sponsor.

The Debtor has requested and is reviewing documents in connection with the Taz Claim and is engaged in a continued dialogue regarding the claim with representatives of Taz Partners. Any Claim asserted against the Debtor arising out of or related to the Taz Confession of Judgment is classified as a Class 3 General Unsecured Claim and, pursuant to the terms of the Plan, will be assumed by the Sponsor on the Effective Date, subject to all available defenses.

The allowance or disallowance of the Taz Claim, however, will not impact recoveries to any other creditors under the Plan. Following the Effective Date, any repayment on account of the Taz Claim will be subordinated and will not be paid until the New Notes are repaid in full and the Sponsor's contribution under the Plan to the holders of Class 4 Remaining Unsecured Claims is satisfied in full.

WEIL:\98714375\5\12817.0007

The Sponsor has confirmed to the Debtor in writing that, other than the Taz Confession of Judgement between Taz Partners (an affiliate of the Sponsor) and the Sole Shareholder, there is no relationship between the Sole Shareholder and the Sponsor.

In addition, with the assistance of the Debtor, the Sponsor has engaged with certain of the Debtor's property-level lenders regarding, among other things, potential transactions to purchase or re-finance the outstanding property-level mortgage loans held by such lenders.

2. ***Equity Ownership***

The Sole Shareholder holds 100% of the common equity interests in the Debtor. To the best of the Debtor's knowledge and belief, the Sole Shareholder does not hold any financial interest in, or relationship with, any of the Debtor's various creditor constituencies.

**C.    The Debtor's Professionals**

To effectively and efficiently administer its restructuring, the Debtor has retained various professionals in the United States, Israel, and the BVI. Contact information for each of these professionals is set forth below.

| **U.S. Restructuring Professionals** | |
|---|---|
| Lead Counsel to the Debtor:<br><br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn:  Gary T. Holtzer, Esq.<br>          Matthew P. Goren, Esq.<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Email: Gary.Holtzer@weil.com<br>          Matthew.Goren@weil.com | Exclusive Real Estate Finance Broker to the Debtor:<br><br>Meridian Capital Group LLC<br>One Battery Park Plaza<br>New York, NY 10004<br>Attn:   Tamir Kazaz<br>           David Schechtman<br>Telephone: (212) 972-3600<br>Email: TKazaz@meridiancapital.com<br>          DSchechtman@meridiancapital.com |
| Financial Advisor to the Debtor:<br><br>CFGI, LLC<br>340 Madison Avenue<br>3rd Floor<br>New York, NY 10173<br>Attn:   Joseph Baum<br>Telephone: (646) 360-2850<br>Email: JBaum@cfgi.com | Solicitation and Voting Agent for the Debtor:<br><br>Donlin, Recano & Company, Inc.<br>6201 15th Avenue<br>Brooklyn, NY 11219<br>Attn:   Nellwyn Voorhies<br>           John Burlacu<br>Telephone:  (212) 481-1411<br>Email: NVoorhies@donlinrecano.com<br>          JBurlacu@donlinrecano.com |
| **Israel Restructuring Professionals:** | |

14

| | |
|---|---|
| <u>Israeli Restructuring Counsel to the Debtor</u>:<br><br>Bartov & Co.<br>The Museum Towers, 6th fl.,<br>4 Berkovich Street,<br>Tel Aviv 6423806<br>Attn:   Amir Bartov, Esq.<br>          Shirley Villensky, Esq.<br>Attn:   Amir@bartov-law.co.il<br>          Shirley@bartov-law.co.il | |
| **JPLs and BVI Restructuring Professionals:** | |
| <u>JPLs</u>:<br><br>Kalo Advisors<br>PO Box 4571, 4th Floor<br>LM Business Centre<br>Fish Lock Road<br>Road Town, Tortola<br>British Virgin Islands<br>Attn: Charlotte Caulfield<br>          Paul Pretlove<br>Telephone: +1 (284) 541 9600<br>Email: CCaulfield@kaloadvisors.com<br>          PPretlove@kaloadvisors.com | <u>BVI Restructuring Counsel to the Debtor</u>:<br><br>Conyers Dill & Pearman<br>P.O. Box 3140<br>Road Town<br>Tortola, VG 1110<br>British Virgin Islands<br>Attn:   Richard Evans<br>          Robert Briant<br>          Charles Goldblatt<br>Telephone: +1 (284) 852-1000<br>Fax: +1 (284) 852-1001<br>Email: Richard.Evans@conyers.com<br>          Robert.Briant@conyers.com<br>          Charles.Goldblatt@conyers.com |

## III.
## KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASE

**A.    <u>Prepetition Re-Financing and De-Leveraging Efforts, the COVID-19 Pandemic, and
Other Operational Issues</u>**

Like many real estate businesses, prior to the Petition Date, the Debtor was highly leveraged and eventually began to struggle to service its significant funded debt burden.  As described in further detail below, commencing in early 2020, the Debtor began taking steps to manage its debts. However, because the Debtor's revenues were derived primarily from residential and commercial rental income streams, they were adversely impacted by the COVID-19 pandemic, and the Debtor was ultimately unable to implement those de-leveraging transactions.  Further, as described below, a number of the Debtor's subsidiary holdings faced significant liquidity issues, placing further stress on those non-debtor subsidiaries and on the Debtor's entire enterprise.  Despite the recent modest uptick in the New York real estate market, the Debtor's current and projected revenues remained insufficient to service its debt.

WEIL:\98714375\5\12817.0007

More specifically, the Debtor was negotiating two material, liquidity enhancing, transactions that were delayed by the advent of the COVID-19 pandemic. First, following months of intense discussion, in February 2020, the Debtor received and executed a term sheet for a $675 million loan that would have both refinanced existing debts, including its Series E Notes, and provided the Debtor with excess liquidity. With the start of COVID-19 pandemic, the closing of this refinancing transaction was delayed multiple times and, in light of the significant strengthening of the Israeli Shekel against the dollar, the additional funds required to repay the Series E Notes would have left the Debtor with negative liquidity.

Second, in the first quarter of 2020, the Debtor entered into an agreement to sell 74 of its subsidiary properties, which at closing, would have provided the Debtor with excess liquidity to further reduce its leverage. At contract signing, the Debtor received a $15 million deposit with the closing expected to occur in the second quarter of 2020. However, following the start of the pandemic, the buyer, alleging seller misrepresentations, abruptly terminated the contract and currently is litigating with the Debtor over the return of its deposit.

The derailment of both of these de-leveraging transactions exacerbated the Debtor's already precarious cash flow position.

The Debtor also faced specific challenges at three of its material properties.

1.    The Denizen

As noted above, the anticipated $675 million financing would have refinanced the Series E Notes, which were collateralized by one of the two buildings (Denizen X) that together comprise the Denizen, which was one Debtor's flagship properties. The second building comprising the Denizen (Denizen Y), was financed separately with both a first lien mortgage and mezzanine debt. At the start of the pandemic, the Denizen Y was not fully occupied. The Debtor struggled to increase occupancy during the pandemic and was unable to generate sufficient cash to service the debts on this building. The mezzanine lender took steps to foreclose on its collateral, eventually forcing the Debtor to file its indirect subsidiary, EGM, for chapter 11 protection.

2.    The William Vale Hotel

As described in further detail above, the Debtor, through a series of direct and indirect non-debtor subsidiaries, owns a fifty percent share of the William Vale. The Series C Notes are not secured by any assets of the Debtor, but the Notes Trustee, on behalf of the Series C Noteholders, holds the Loan and Mortgage, which loan is secured by a mortgage on the William Vale. Utilizing a ground lease, the lessee's rent payments are used to pay the interest and principal on the Series C Notes. Starting in February 2021, the operating lessee, ostensibly due to the pandemic, ceased paying rent, causing the William Vale to stop paying the interest and principal due to the Series C Noteholders, who, in turn, placed the William Vale in default. The William Vale is currently in litigation with the lessee over termination of the lease and back payments.

3.    Smith Street

The Debtor, through a series of direct and indirect non-debtor subsidiaries is the owner of a development site in the Gowanus section of Brooklyn, which upon rezoning, was one of its most

WEIL:\98714375\5\12817.0007

valuable properties.  This site was leveraged with three loans: a first mortgage, a second mortgage, and a preferred equity investment.  Following significant delays in the rezoning process, the Debtor's plans to refinance and develop and/or sell the site at expected valuations were no longer achievable.  With no ability to generate cash, two of the lenders placed their loans in default, leading to a sale transaction of the site at current market value that remains pending.  The site is held by the Debtor's indirect subsidiary, All Year Equity Partners (as defined below), which entered into a settlement agreement with its Preferred Investor (as defined below), pursuant to which it was agreed upon that All Year Equity Partners would dispose of its holdings and distribute the proceeds in accordance with an agreed upon waterfall, as explained further in Article IV, Section A.2.

B.      **Prepetition Creditor Negotiations, and the Taz Confession of Judgment**

Faced with insolvency, the Debtor engaged with various stakeholders throughout the Company's capital structure to identify a path forward to maximize the value of its assets, including opportunistically disposing of a number of underperforming assets and settling certain outstanding claims.  In connection with these efforts, the Evergreen Debtors previously commenced voluntary chapter 11 cases with the Bankruptcy Court to consummate a value-maximizing sale of the Denizen for the benefit of their creditors.

During that process, the Debtor was engaged in extensive and ongoing discussions with its Noteholders and other constituents regarding potential transactions to restructure its other holdings.  As discussed in further detail below, since April 2021, the Debtor and representatives of the Noteholders have engaged in a robust and wide-ranging, public process to solicit interest and offers from potential third-party investors to either recapitalize the Debtor or undertake an outright purchase of the Debtor.  Through this process, the Debtor garnered strong interest and made substantial progress in selecting and finalizing an exit transaction.

Throughout that period, the Debtor's Board oversaw its restructuring with the protection of an agreement with the Sole Shareholder under which he could not change the Board or take actions that would adversely impact the process.  The agreement with the Sole Shareholder, which was set to expire at 11:59 pm (British Virgin Islands Time) on January 4, 2022, was reached after he previously took control of the Board and authorized payments satisfying obligations of the Debtor that he had also personally guaranteed.  Unable to extend the arrangement with the Sole Shareholder past January 4, 2022 on acceptable terms, and facing Noteholder threats to commence involuntary insolvency proceedings in Israel due to existing defaults, the Debtor's restructuring process became exposed to potential insolvency litigation across multiple jurisdictions.

Further, on December 13, 2021, the day before the Petition Date, the Debtor became aware that the Taz Confession of Judgment in the amount of $37 million was entered against it in Kings County Supreme Court.  The threat that the Taz Confession of Judgment could be levied against assets of the Debtor, including its cash, precluded the Debtor from continuing its restructuring process outside of the protections available under chapter 11 of the Bankruptcy Code.  Accordingly, the Debtor commenced the Chapter 11 Case with the consent and support of the Notes Trustee, on behalf of the Noteholders, to foster an orderly and value maximizing restructuring.

WEIL:\98714375\5\12817.0007

C.     **The Evergreen Debtors' Chapter 11 Cases**

On February 22, 2021, EGM commenced with the Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code.  On September 14, 2021, EG I and EG II commenced their own voluntary cases with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Evergreen Debtors were each wholly-owned, indirect subsidiaries of the Debtor.  The Evergreen Debtors' chapter 11 cases are being jointly administered for procedural purposes only under the lead case, *In re Evergreen Gardens Mezz LLC, et al.*, Case No., 21-10335 (MG).  The Debtor's Chapter 11 Case is being separately administered from the Evergreen Debtors' chapter 11 cases.

On November 5, 2021, the Court entered an order [ECF No. 222 on the EGM case docket] confirming the joint chapter 11 plan for the Evergreen Debtors [ECF No. 187 on the EGM case docket] (the "**Evergreen Plan**").  The Evergreen Plan, which implemented a sale of the Denizen, became effective and was substantially consummated on December 2, 2021.   Upon the consummation of the Evergreen Plan, all of the equity interests in the post-effective date Evergreen entities vested with the respective plan administrator for each of the Evergreen entities.  The Debtor no longer holds any equity interests in the Evergreen entities.

The Debtor has asserted a claim against EG I in EG I's chapter 11 case on account of certain intercompany loans provided by the Debtor to EG I prior to the commencement of EG I's chapter 11 case.  The loans total in excess of $2,100,000.  Separately, as described above, the EGM Plan Administrator has asserted claims against the Debtor in the Chapter 11 Case arising out of certain prepetition actions alleged to have been taken by the Sole Shareholder.

The EGM Plan Administrator must file an objection to the Debtor's claim against EG I by July 29, 2022.  The Debtor is currently engaged in preliminary settlement discussions with the EGM Plan Administrator.

IV.
**OVERVIEW OF THE DEBTOR'S RESTRUCTURING**

A.     **Key Events During Chapter 11 Case**

1.     **Appointment of the JPLs and the BVI Proceeding**

Prior to the commencement of the Chapter 11 Case, the Debtor issued a single Class A voting share (the "**Class A Share**") to the CRO and ARO on January 4, 2021, entitling them to vote on the appointment or removal of the directors of the Debtor but conferring no other voting rights. The Class A Share arrangement was put in place and agreed to because the Board and the Noteholders were concerned about the Sole Shareholder's decisions, actions, and priorities with respect to the Debtor's operations and restructuring efforts.  Following a number of agreed upon extensions with the Sole Shareholder, these voting rights were set to expire at 11:59 pm (British Virgin Islands Time) on January 4, 2022 unless the Sole Shareholder agreed to further amend the organizational documents of the Debtor to extend the voting rights associated with the Class A Share.  The expiration of these voting rights could have deprived the Debtor, the Noteholders, and other parties in interest of their ability to continue their discussions and finalize an exit transaction for the Debtor.

WEIL:\98714375\5\12817.0007

The Debtor made bona fide attempts to seek an extension of the January 4 deadline from the Sole Shareholder.  The Sole Shareholder, however, declined the Debtor's requests to further extend the Class A Share arrangement absent the Debtor agreeing in return to sell its interest in certain real estate holdings directly to the Sole Shareholder, which the Debtor believed would have made it more difficult to reach a restructuring agreement with all of its creditors and stakeholders.

Further, during the course of these discussions it became apparent that, absent a deal with the Sole Shareholder to extend the Class A Share, the Sole Shareholder intended to reassert control over the Debtor's restructuring process. Based on his statements and prior history, the Board had a real and well-founded concern about the Sole Shareholder's questionable decision making and that his priorities were not aligned with the best interests of the Debtor and its estate.  The Debtor also was mindful that the commencement of the Chapter 11 Case and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, might not preclude the Sole Shareholder from taking such actions to the detriment of the estate and its creditors.

In light of the impending expiration of the Class A Share and the Sole Shareholder's prior history, on December 16, 2021, the Debtor determined that the laws of the BVI, the governing law of the Debtor, required it to file an application with the BVI Court seeking the appointment of the JPLs over the Debtor under the applicable provisions of the BVI Insolvency Act, 2003.  The JPL Appointment was sought with the consent and support of the Notes Trustee, on behalf of the Noteholders.  The JPL Order approving the appointment of Ms. Charlotte Caulfield and Mr. Paul Pretlove of Kalo Advisors, a Caribbean-based independent advisory firm, as the JPLs, was made by Mr. Justice Jack on December 20, 2021.

The purpose of the JPL Appointment and the provisional liquidation was to assist the Debtor in its ongoing restructuring efforts and, in particular, to support the Chapter 11 Case.  Pursuant to the JPL Appointment, the Board was divested of all of its powers and decisional authority over the Debtor was transferred to the JPLs.  To assist with the provisional liquidation, a protocol was agreed to, and made part of the JPL Order, pursuant to which the JPLs delegated certain powers to specified individuals – namely, Mr. Shaul Schneider (an external director of the Debtor), Mr. Assaf Ravid (the Debtor's CRO), Mr. Ephraim Diamond (the Debtor's ARO), and Mr. Yizhar Shimoni (formerly, the Debtor's Chief Financial Officer)[11] – to empower them to maintain the Debtor's operations, pursue the restructuring, and continue to pursue and oversee the Chapter 11 Case. These individuals have continued to oversee the Debtor's day-to-day operations and lead its ongoing restructuring efforts for the benefit of the estate and its creditors.

### 2.    Settlement Transaction and Agreement with Downtown Capital Partners

Prior to the Petition Date, the Debtor was engaged in negotiations with its various stakeholders to identify a strategy for maximizing the value of its assets and reducing its liabilities as well as those of its various non-debtor affiliates.  Significant time was devoted to negotiations with (i) DCP All Year Pref Equity LLC (the "**Preferred Investor**") regarding a dispute relating to purported

---

[11] As of February 19, 2022, Mr. Shimoni resigned from his position as CFO.  Mr. Shimoni continues to be engaged by, and provide services to, the Debtor as a consultant.

defaults and breaches of investment documents governing the Preferred Investor's investment in All Year Equity Partners LLC ("**All Year Equity Partners**"), an indirect subsidiary of the Debtor, and (ii) DCP Kings Point LLC ("**DCP Kings**"), an affiliate of the Preferred Investor, in its capacity as a lender to Chester Holdings NY LLC ("**Chester**"), the majority of whose equity is directly owned by the Debtor.

These negotiations continued beyond the Petition Date and an agreement was reached to resolve these disputes whereby:

i.   All Year Equity Partners' manager, who was appointed by the Preferred Investor following purported defaults, would endeavor to dispose of the All Year Equity Partners' property holdings within a five-year period;

ii.  the Preferred Investor would receive priority to certain sale proceeds generated by the disposition of All Year Equity Partners' property holdings to resolve any of its claims under the relevant documents after which All Year Equity Partners, and ultimately the Debtor, would be entitled to share in such proceeds;

iii. All Year Equity Partners, the Preferred Investor, certain non-debtor affiliates, the Debtor, and the Noteholders would exchange mutual releases pursuant to which the Debtor was relieved of its obligations under applicable investment documents;

iv.  Chester would sell its equity interest in its subsidiary to DCP Kings in exchange for loan forgiveness from DCP Kings, a release of the Debtor's guarantee of such loan, a payment of $500,000, and a release of DCP Kings' security interest on All Year Equity Partners' membership in a non-debtor affiliate; and

v.   Each of the Debtor and Chester would indemnify and hold DCP Kings harmless from demands and liabilities stemming from certain breaches of representations and warranties set forth in the transaction documents and claims by certain creditors and parties in interest, not to exceed $500,000 in total.

Following entry into this agreement, on January 14, 2022, the Debtor filed the *Debtor's Motion Pursuant to Bankruptcy Code §§ 105(a) and 363 and Bankruptcy Rule 9019 for Approval of Settlement Providing for Recapitalization of Non-Debtor All Year Equity Partners LLC* [ECF No. 25].  No objections were filed, and a hearing was held before the Bankruptcy Court on January 25, 2022, after which an order was entered approving the terms of the settlement [ECF No. 34].

### 3.    The Section 341 Meeting of Creditors

On February 3, 2022, the Debtor's meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was conducted by counsel for the United States Trustee (the "**U.S. Trustee**"). The U.S. Trustee's counsel interviewed representatives of the Debtor and other parties in interest

were provided an opportunity to ask questions of the Debtor as well.  The Debtor and the U.S. Trustee's financial staff also participated in an initial debtor interview on January 18, 2022.

### 4.    The Debtor's Schedules and Statement of Financial Affairs and Initial 2015.3 Report

On December 28, 2021, the Debtor filed its schedules of assets and liabilities and statement of financial affairs [ECF Nos. 15 and 16] (the "**Original Schedules**").  On January 25, 2022, the Debtor filed amended and restated schedules of assets and liabilities and statements of financial affairs [ECF Nos. 36 and 37] (the "**Amended Schedules**" and, together with the Original Schedules, the "**Schedules**") to, among other things, (i) add certain former officers and directors to the list of creditors on Schedule E/F as having contingent, unliquidated, and disputed indemnity claims, (ii) revise the chart listing the approximate values of the Debtor's equity interests in its subsidiaries included in Schedule A/B, and (iii) make other minor and nonmaterial changes to correct certain typographical errors.

In addition, the Debtor filed its initial *Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest* on January 19, 2022 [ECF No. 30], which set forth the value, operations, and profitability of those entities in which the Debtor holds a substantial or controlling interest, as required by Bankruptcy Rule 2015.3.

### 5.    The Marketing Process and the Investment Agreement

Prior to the Petition Date, the Debtor engaged Meridian Investment Sales, a segment of Meridian Capital Group, LLC, and its broker-dealer affiliate, Tigerbridge Capital LLC d/b/a Meridian Securities (collectively, "**Meridian**"), to conduct a robust, wide-ranging public process to solicit interest and offers from potential third-party investors to either recapitalize the Debtor or undertake an outright purchase of the Debtor (the "**Marketing Process**").  Throughout the Marketing Process, the Debtor and Meridian diligently worked to ensure that the process was broad, transparent, inclusive, efficient, and value maximizing.

In March 2021, Meridian began working closely with the Debtor to compile various materials and proprietary information about the Debtor and its direct and indirect non-debtor subsidiaries for the purpose of establishing a virtual data room and due diligence library to enhance and facilitate the Marketing Process.  At the Debtor's direction, Meridian conducted site visits of all of the Company's properties and prepared a comprehensive offering memorandum.

On or around April 13, 2021, Meridian, in consultation with the Debtor, invited each of the potential third-party investors to participate in the Marketing Process.  Of the initial pool of potential investors, 37 executed confidentiality agreements to gain access to the data room, which contained, among other things, the offering memorandum, detailed financial information, and property-level information regarding real estate taxes, income, and expenses.  Thereafter, Meridian arranged more than 125 discussions with interested parties, many of which included the Debtor, to, among other things, answer diligence questions, discuss potential deal structures, and assist investors in formulating their bids.

WEIL:\98714375\5\12817.0007

Following an approximately two-month diligence period, the Debtor, in consultation with Meridian, requested that interested parties submit initial bids.  The Debtor received six written bids (the "**Initial Bids**").  The Debtor, in consultation with Meridian, evaluated the Initial Bids, focusing on several criteria, including, but not limited to: (a) the proposed purchase price and forms of consideration; (b) the proposed deal structure; (c) any proposed percentage ownership to be left with the Noteholders and other general unsecured creditors; (d) any diligence contingencies; and (e) the proposed amount of any deposit.

Negotiations regarding the Initial Bids occurred between May and June 2021.  Following extensive negotiations and the opportunity to conduct further diligence, the Debtor received six refined bids (the "**Refined Bids**").  The Debtor, in consultation with Meridian, evaluated the Refined Bids based on the criteria used to evaluate the Initial Bids and sought input from the Notes Trustee so as to better understand which proposed transactions were likely to be supported by the Noteholders.

After initially engaging on an exclusive basis with one potential investor which ultimately did not lead to a definitive agreement, the Debtor received three revised bids for potential transactions (the "**Revised Bids**").  After reviewing the Revised Bids based on the criteria used throughout the Marketing Process, the Debtor, in consultation with Meridian, determined that two of the bids, including the bid submitted by the Sponsor, contained materially better economic terms and thus were more likely to result in a value maximizing transaction.

Following the Petition Date, the Debtor continued engaging in discussions with the Notes Trustee and the bidders who had submitted the Revised Bids.  After extensive parallel track negotiations, the Debtor, in consultation with Meridian, thoroughly reviewed the near finalized investment agreements, focusing on, among other things, the following criteria: (a) the proposed purchase price, (b) the bidder's willingness to assume potential liabilities of the Debtor; (c) the bidder's willingness to submit a cash deposit; (d) any limitation on the Debtor's ability to pursue Alternative Transactions; and (e) any diligence exclusivity.  Based on this criteria and review, for several reasons, it was clear to the Debtor that the Sponsor's bid and related Investment Agreement provided the best actionable transaction to maximize value.

On or around March 6, 2022, the Debtor published the Investment Agreement on the TASE website.  On the same date, the Notes Trustee also published its intent to consent to the Debtor's entry into the Investment Agreement on the TASE website.  Accordingly, with the consent of the Notes Trustee and the approval of the JPLs, the Debtor entered into the Investment Agreement on March 11, 2022.

*The Investment Agreement*

The Investment Agreement represents a binding contract to acquire one hundred percent of the equity of the Reorganized Debtor, in exchange for the following consideration: (a) the Sponsor's contribution of $60,000,000 to the Debtor, which is comprised of (a) $40,000,000 in cash and (b)

promissory notes in the aggregate amount of $20,000,000;[12] and (b) the Sponsor's assumption of all unsecured claims against the Debtor, other than the Noteholders' Claims and certain other discrete categories of claims, all as more fully set forth in the Investment Agreement.

The Investment Agreement includes various customary representations, warranties, and covenants by and from the parties, as well as certain closing conditions and rights of termination related to the Chapter 11 Case. The transactions contemplated by the Investment Agreement are subject to Bankruptcy Court approval, entry of an order confirming a chapter 11 plan that effectuates the transaction, and, to the extent applicable, any necessary approvals in the BVI and Israel.

The Investment Agreement was subsequently amended on April 21, 2022 and May 27, 2022, respectively.

*Amendment No. 1 to Investment Agreement.*

On April 21, 2022, the Debtor, the Sponsor, and the Notes Trustee entered into that certain Amendment No. 1 to Investment Agreement (the "**First Investment Agreement Amendment**"), which provided for three notable changes, among others. First, the First Investment Agreement Amendment revised the definition of "Excluded Assets" under the Investment Agreement to provide that if the Sponsor consummates the William Vale Purchase (whether prior to, on, or after the Closing Date, but only until the expiration or termination by its terms of the MLPSA (as defined below)), the Debtor's direct or indirect rights (including the right to receive any income or proceeds) in and to the Debtor's membership interests in YG WV would not be treated as Excluded Assets under the Investment Agreement or the Plan.

Second, the First Investment Agreement Amendment revised the corresponding definition of "William Vale Purchase" under the Investment Agreement to provide for an additional $200,000 to be provided by the Sponsor as consideration for the Debtor's indirect interest in the William Vale hotel should the Sponsor consummate the William Vale Purchase and provided a mechanism for the Debtor to effectuate a separate stand-alone sale of its indirect interest in the William Vale hotel if the Closing Date under the Investment Agreement does not occur on or prior to the Outside Date and the William Vale Purchase occurs thereafter.

Third, the First Investment Agreement Amendment extended the deadline for the Parties to agree on a form of Plan to be annexed to the Investment Agreement to May 10, 2022. The First Investment Agreement Amendment further provided that the Debtor's membership interests in YG WV will remain as "Excluded Assets" under the Investment Agreement and neither the Debtor nor Wind-Down Co will have any obligation to transfer the Debtor's interest in the William Vale if either (i) the MLPSA expires or is terminated according to its terms or (ii) the Closing Date under the Investment Agreement has not occurred by December 31, 2022.

*Amendment No. 2 to Investment Agreement*

---

[12]   The amount of (a) the promissory notes will increase to $22,000,000 and (b) the cash contribution will increase by an additional $200,000, if the Sponsor or an affiliate purchases substantially all of the rights of the Notes Trustee for the Series C Notes in and to the Loan and Mortgage.

WEIL:\98714375\5\12817.0007

On May 27, 2022, the Debtor, the Sponsor, and the Notes Trustee entered into that certain Amendment No. 2 to the Investment Agreement (the "**Second Investment Agreement Amendment**" and, together with the First Investment Agreement Amendment, the "**Investment Agreement Amendments**"), which amended the Investment Agreement and the Escrow Agreement (as defined in the Investment Agreement) to permit the Debtor to draw upon and borrow the "Escrowed Funds" to continue to fund its operations and the costs of administering the Chapter 11 Case and to be used in accordance with the DIP Order, the DIP Term Sheet, and the DIP Budget (each as defined below).

The Escrowed Funds and the Guaranty (each as defined below) were delivered into escrow by the Sponsor on May 17, 2022 according to the terms of the Investment Agreement.

The following chart summarizes certain of the material terms of the Investment Agreement, as amended by the Investment Agreement Amendments:[13]

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| **Sponsor** | Paragraph Partners, LLC |
| **Equity Interests in the Reorganized Debtor and Purchase Price (Agreement §§ 2.01, 3.01)** | In exchange for 100% of the equity in the Reorganized Debtor, the Sponsor will contribute (collectively, the "**Plan Consideration**"): <br><br> (a) a cash payment in the amount of $40 million (the "**Cash Payment**"); <br><br> (b) promissory notes to be issued by the Reorganized Debtor (the "**New Notes**") in the aggregate principal amount of $20 million or, if the Sponsor or an affiliate thereof effects the William Vale Purchase, $22 million (subject to a Purchase Price Adjustment); and <br><br> (c) the Reorganized Debtor will assume all unsecured claims against the Debtor, other than: <br><br> (i) the claims of the Noteholders; <br><br> (ii) claims either subject to subordination pursuant to section 510(b) of the Bankruptcy Code or that arise out of a purchase, sale, or issuance or offer of a security of the Debtor, including any claims asserted in any class action lawsuits in Israel; <br><br> (iii) claims brought by any plan administrator in connection with prior chapter 11 cases of the Debtor's former direct or indirect subsidiaries; and <br><br> (iv) claims of the Debtor's current or former directors and officers for indemnification. |
| **Purchase Price Adjustments (Agreement § 2.02)** | In the event that the Sponsor or an Affiliate thereof purchases substantially all of the rights of the Notes Trustee for the Series C Notes in and to the William Vale Hotel (the "**William Vale Purchase**") (whether prior to, on, or after the Closing Date), including, but not limited to, the Notes Trustee's rights in and to that |

---

[13]    All capitalized terms set forth in this Section shall have the meanings ascribed to them in the Investment Agreement unless otherwise defined herein.  In the event of any inconsistencies between the provisions of the Investment Agreement and the general description of such agreement set forth herein, the Investment Agreement shall control.

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| | certain Amended and Restated Promissory Note, dated February 28, 2017, originally between the Debtor and Wythe Berry Fee Owner and that certain loan originally made by the Debtor to Wythe Berry Fee Owner in the original principal amount of $166,320,000.00, then (i) the aggregate principal amount of the New Notes provided as part of the Purchase Price for the Transactions shall be increased from $20,000,000 to $22,000,000 and (ii) the Plan shall require the Sponsor to pay to Wind Down Co an additional $200,000 (the "**Shares Consideration**") on the later date to occur of the Closing Date and the WV Sale Date (as defined below). If the Closing Date does not occur on or prior to the Outside Date and the WV Sale Date occurs thereafter, the Debtor agrees to sell the Debtor's membership interests in YG WV to the Sponsor for $200,000 (in lieu of the adjustment to the Cash Payment set forth in subset (ii) in the immediately preceding sentence) and to use commercially reasonable efforts to seek any necessary approvals to consummate such sale, including any approvals of the Bankruptcy Court and BVI Court, as necessary. <br><br> Between March 2, 2022 and nine months following the Closing, if the Sponsor discovers that the actual percentage of the Debtor's direct or indirect equity interest or ownership interest in a Subsidiary or any Owned Real Property, as applicable, is less than as stated in the Investment Agreement, the aggregate principal amount of the New Notes will be reduced in accordance with a specified formula. In the worst case, if the aggregate Subsidiary Value Reduction exceeds $7.25 million, the aggregate principal amount of the New Notes will be reduced on a dollar-for-dollar basis up to the total value of the New Notes. To the extent the Subsidiary Value Reductions are equal to or lesser than $4.25 million, no adjustment will be made to the aggregate principal amount of the New Notes. |
| **Excluded Assets (Agreement § 2.01, Annex A)** | Under the Investment Agreement, the Sponsor is not purchasing or receiving, directly or indirectly, any "Excluded Assets," which include, but are not limited to: <br><br> (a) the Debtor's right in and to: <br><br>     (i) collateral securing the Series C Notes and Series E Notes; <br><br>     (ii) the membership interests in YG WV (subject to the limitation set forth below); and <br><br>     (iii) the assets set forth in the DCP-All Year Recapitalization Agreement; <br><br> (b) any and all claims that the Debtor or the Noteholders may have against third-parties, including any current or former officer, director, or shareholder of the Debtor (subject to certain releases); and <br><br> (c) the assets vested in Wind Down Co pursuant to a chapter 11 plan. <br><br> Notwithstanding the above, to the extent that the Sponsor effects the William Vale Purchase (as defined herein) (whether prior to, on, or after the Closing Date, but only until the expiration or termination by its terms of that certain Mortgage Purchase and Sale Agreement entered into by and between the Notes Trustee and the Sponsor (as amended on May 24, 2022, and as may be further amended, modified, or supplemented from time to time the "**MLPSA**")), the Debtor's direct or indirect rights (including the right to receive any income or proceeds) in and to the Debtor's membership interests in YG WV shall not be Excluded Assets under the Investment Agreement or under a chapter 11 plan, and any chapter 11 plan shall provide for the automatic vesting of such assets in the Reorganized Debtor upon the later of the MLPSA closing date (the "**WV Sale Date**") and, to |

WEIL:\98714375\5\12817.0007

| MATERIAL TERMS OF INVESTMENT AGREEMENT |
|---|
| | the extent that such WV Sale Date is after the Closing Date, the payment of the Shares Consideration, provided that the Debtor's membership interests in YG WV shall remain Excluded Assets under the Investment Agreement and a chapter 11 plan and neither the Debtor nor Wind Down Co shall have any obligation under the Investment Agreement with respect to a transfer of such interests if either (i) the MLPSA expires or is terminated according to its terms or (ii) the Closing Date has not occurred by December 31, 2022. |
| **Escrowed Funds and Guaranty (Agreement § 3.02)** | Within five business days of the later of the date upon which (a) the Bankruptcy Court approves the Break-Up Fee and (b) a chapter 11 plan that is reasonably satisfactory to the Sponsor and otherwise complies with the terms of the Investment Agreement is annexed thereto, the Sponsor will (i) transfer $4.5 million to an Escrow Agent (the "**Escrowed Funds**") and (ii) deliver an executed joinder to the Investment Agreement (the "**Guaranty**"). <br><br> The Escrowed Funds will be either: <br><br> (a) applied at Closing towards the Cash Payment if the Closing occurs; <br><br> (b) delivered to the Debtor if the Investment Agreement is terminated by the Debtor due to the Sponsor's failure to close the transaction; or <br><br> (c) returned to the Sponsor if the Investment Agreement is terminated for any reason other than the Sponsor's failure to close the transaction. <br><br> Notwithstanding anything to the contrary contained in the Investment Agreement, the Debtor shall be permitted, in accordance with the terms of (a) that certain DIP Term Sheet dated as of May 5, 2022 (the "**DIP Term Sheet**") by and between the Debtor and the Sponsor and (b) the order of the Bankruptcy Court authorizing the Company to, among other things, borrow funds in accordance with the DIP Term Sheet (the "**DIP Order**"), make one or more requests to draw upon all or part of the Escrowed Funds by delivering a written certification to the Escrow Agent in accordance with the DIP Term Sheet, the provisions of the Escrow Agreement, and the DIP Order. Any such drawn Escrowed Funds shall be utilized by the Debtor solely in accordance with the DIP Documents (as defined in the DIP Term Sheet), including without limitation, the DIP Budget (as defined in the DIP Term Sheet). Notwithstanding that the Debtor may draw upon and utilize the Escrowed Funds in accordance with the DIP Documents (including the DIP Budget), (i) such funds shall continue to be treated as Escrowed Funds for the purposes of the Investment Agreement and (ii) the provisions of Section 3.02 of the Investment Agreement, including the provisions governing the rights and obligations of the Parties with respect to the Escrowed Funds in the event (x) the Closing occurs or (y) the Closing does not occur and the Investment Agreement is terminated, shall continue in full force and effect. For the avoidance of doubt, if the Investment Agreement is terminated for any reason other than as set forth in Section 3.02(b) of the Investment Agreement, the repayment to the Sponsor of any amounts drawn by the Debtor under the DIP Loan in accordance with the DIP Documents shall be applied and treated as payment and delivery by the Debtor of Escrowed Funds in accordance with the Investment Agreement. Pursuant to Section 3.02(b) of the Investment Agreement, if the Investment Agreement is terminated by the Company pursuant to Section 11.01(c) thereof, the Debtor shall be entitled to retain the DIP Loan Proceeds and shall have no further obligations to the Sponsor Investor hereunder with respect to such proceeds. |

WEIL:\98714375\5\12817.0007

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| **Indemnification, Exculpation and Release (Agreement § 7.02(b), (c))** | Effective as of the Closing and, with respect to the Notes Trustee and the Noteholders only if Noteholder Plan Approval (as defined below) is obtained:<br><br>(a) the Sponsor and its affiliates will grant customary releases to Wind Down Co, the Notes Trustee, the Noteholders, their affiliates, and any current or former officer, director, manager, employee, counsel, financial advisor, agent or representative of the Debtor, Wind Down Co, the Notes Trustee, the Noteholders, and their affiliates.<br><br>(b) Wind Down Co, the Notes Trustee, and the Noteholders and their affiliates will grant customary releases to the Sponsor, its affiliates, the Transferred Entities, and any current or former officer, director, manager, employee, counsel, financial advisor, agent or representative of the Sponsor or its affiliates.<br><br>(c) The parties have agreed to indemnify and hold harmless each other party against any losses arising out of or in connection with any third-party indemnification or contribution claims.<br><br>(d) For the avoidance of doubt, neither Yoel Goldman, Tzipporah Goldman, nor any entity under their control or ownership (other than the Transferred Entities) will be granted a release and all rights and remedies are preserved. |
| **Noteholder Plan Approval and Bankruptcy Milestones (Agreement §§ 8.01(c), 8.03)** | Within 60 days of the date upon which the Escrowed Funds and the Guaranty are delivered to the Escrow Agent (the "**Escrow Date**"), the Notes Trustee will convene a Noteholder Meeting to vote on the approval the transactions contemplated by the Investment Agreement (in the event that such vote is affirmative, the "**Noteholder Plan Approval**"); *provided that*, if (a) the Debtor has filed a motion to approve a disclosure statement pertaining to an agreed upon chapter 11 plan within 14 days of the Escrow Date and (b) the Debtor seeks approval of disclosure materials in an Israeli proceeding within 7 days following the entry of an order approving such disclosure statement, then such period will be automatically extended by up to 90 days.  If the Noteholder Plan Approval is not obtained on a final basis at such meeting, the Investment Agreement will automatically terminate and the Escrowed Funds shall be returned to the Sponsor.<br><br>The Debtor will use commercially reasonable efforts to comply with the following Bankruptcy Milestones:<br><br>(a) by August 8, 2022, have a hearing to consider confirmation of an agreed upon chapter 11 plan; and<br><br>(b) by August 23, 2022, obtain entry of an order confirming an agreed upon chapter 11 plan.<br><br>The Bankruptcy Milestones are subject to any extension of the time in which the Noteholder Meeting must be held, and may be extended:<br><br>(a) upon mutual agreement of the parties; or<br><br>(b) to accommodate the availability of the Bankruptcy Court. |
| **Conditions to Closing (Agreement § 10.01)** | The Closing is conditioned on, among other things:<br><br>(a) the Bankruptcy Court's entry of an order confirming an agreed upon chapter 11 plan and the absence of a stay of such order; |

27

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| | (b) Israeli Court approval of the Investment Agreement and the Plan under applicable provisions of the Israeli Insolvency Law 2018; |
| | (c) BVI Court approval of the Investment Agreement, as reflected in a confirmed chapter 11 plan and an order confirming same; and |
| | (d) the Sponsor's receipt of the release set forth in the Investment Agreement (as described above) from or on behalf of the Notes Trustee and the Noteholders. |
| **Termination and "Fiduciary Out" (Agreement § 11.01)** | The Investment Agreement may be terminated before the Closing: |
| | (a) by the mutual written consent of the Debtor and the Sponsor; |
| | (b) by the Debtor, if its fiduciaries determine in good faith that continued performance under the Investment Agreement would be inconsistent with the exercise of their fiduciary duties under applicable Law; |
| | (c) by either party, if the Closing shall not have occurred by September 23, 2022, *provided that*: |
| | (i) if Closing has not occurred due to unsatisfied Closing Conditions relating to obtaining government approvals, entry of an order confirming an agreed upon chapter 11 plan, Israeli Court approval, or BVI court approval, then no party may terminate the Investment Agreement prior to December 31, 2022; and |
| | (ii) if Closing has not occurred on or before September 23, 2022 or December 31, 2022, as applicable, due to a material breach of the Investment Agreement, then the breaching party may not terminate the Investment Agreement; |
| | (d) by either party, in the event that: |
| | (i) any governmental authority has issued a final, non-appealable order permanently enjoining the transaction; |
| | (ii) the Bankruptcy Court does not approve the Break-Up Fee by April 25, 2022; or |
| | (iii) a mutually acceptable chapter 11 plan is not annexed to the Investment Agreement by May 10, 2022. |

### 6.    Approval of the Bid Protections

The Investment Agreement provides the Sponsor with the following standard bid protections (collectively, the "**Bid Protections**"):

(a)    <u>Break-Up Fee</u>.    In the event that (A) the Investment Agreement is terminated (I) by the Debtor in exercising its "fiduciary out" under Section 11.01(b) or (II) by the Sponsor under Section 11.01(c) due to Debtor's breach of a representation or warranty or failure to comply with a covenant or agreement that would prevent the satisfaction of a closing condition, and (B) within six (6) months of such termination, the Debtor engages in an alternative transaction, through a chapter 11 plan or otherwise (an

WEIL:\98714375\5\12817.0007

"**Alternative Transaction**"), whereby a purchaser purchases substantially all of the Transferred Entities through one or a series of substantially contemporaneous transactions, then the Sponsor shall be entitled to a break-up fee in the amount of $1,800,000; *provided that*, if the Debtor does not engage in an Alternative Transaction during such 6-month period, but still confirms a chapter 11 plan that is expected to provide a recovery to the Noteholders in an amount equal to or greater than $30,000,000 within twelve (12) months of confirmation thereof, then the Sponsor shall instead be entitled to a Break-Up Fee in the amount of $900,000 (the "**Break-Up Fee**"); and

(b)    Expense Reimbursement.  In the event that the Investment Agreement is terminated (A) by the Debtor in exercising its "fiduciary out" under Section 11.01(b) or (B) by the Sponsor pursuant to Section 11.01(c) due to Debtor's breach of a representation or warranty or failure to comply with a covenant or agreement that would prevent the satisfaction of a closing condition, and no Break-Up Fee could be due and owing under the terms of Section 8.01(a) of the Investment Agreement, then the Sponsor shall be entitled to an expense reimbursement (the "**Expense Reimbursement**") in the amount of up to $300,000 for reasonable and documented fees and expenses incurred by the Sponsor in connection with the documentation and negotiation of the Investment Agreement and the transactions contemplated thereunder.

As set forth above, the Investment Agreement provides the Parent Debtor with a "fiduciary out" should the Parent Debtor determine, in the exercise of its fiduciary duties, to proceed with an alternative transaction.  The Parent Debtor is not subject to a "no shop" or any other provision restricting its ability to consider any alternative offers that may be presented during the Chapter 11 Case.  The Sponsor is not entitled to payment of a Break-Up Fee in the event the Debtor is unable to confirm a chapter 11 plan that vests the Debtor's interest in YG WV in the Reorganized Debtor.

The Investment Agreement required the Debtor to file a motion seeking approval of the Break-Up Fee and Expense Reimbursement protections within 14 days of execution.  Accordingly, following the Investment Agreement's execution on March 11, 2022, the Debtor filed the *Motion of Debtor Pursuant to 11 U.S.C. 105(a), 363, and 503(b) and Fed. R. Bankr. P. 2002, 6004, and 9014 for Entry of Order (I) Approving Bid Protections and (II) Granting Related Relief* [ECF No. 66] on March 25, 2022.  On April 19, 2022, the Bankruptcy Court entered an order approving the Bid Protections [ECF No. 85].

## 7.    Retention of Professionals

To effectively and efficiently administer the Chapter 11 Case, the Debtor has retained various professionals, including (i) Weil, Gotshal & Manges LLP, as lead counsel to the Debtor, (ii) Meridian, as exclusive real estate broker to the Debtor, (iii) CFGI, as financial advisor to the Debtor, (iv) Donlin, Recano & Company, Inc., as solicitation and voting agent for the Debtor, (v) Koffsky Schwalb LLC, as special counsel for the Debtor, (vi) Bartov & Co., as special Israeli

counsel for the Debtor, and (vii) certain other professionals that the Debtor engages in the ordinary course of its business, including (a) Archer & Greiner PC and (b) Conyers Dill & Pearman.

### 8.      Extension of the Debtor's Exclusive Time to File and Solicit a Chapter 11 Plan

On April 6, 2022, the Debtor filed the *Motion of Debtor Pursuant to 11 U.S.C. § 1121(d) to Extend Exclusive Periods* [ECF No. 70] (the "**Exclusivity Extension Motion**") seeking (i) an extension from April 13, 2022 to August 11, 2022 of the Bankruptcy Code's initial 120-day period during which time the Debtor has the exclusive right to file a chapter 11 plan, and (ii) an extension from June 13, 2022 to October 11, 2022 of the Bankruptcy Code's initial 180-day period during which time the Debtor has the exclusive right to solicit acceptance of a chapter 11 plan.  By order dated April 19, 2022 [ECF No. 86], the Bankruptcy Court approved the Exclusivity Extension Motion.

### 9.      The William Vale Purchase

The Debtor, the Notes Trustee, and the Sponsor have finalized the terms of a value-maximizing sale transaction concerning the William Vale hotel.  After engaging in discussions with various parties for approximately one year, the Notes Trustee, on behalf of the Series C Noteholders, considered two final offers to purchase the Series C Noteholders' rights, title, and interest in the Loan and Mortgage.  The first offer was from Weiss, the 50% owner of the indirect parent of the William Vale hotel, and the other offer was from the Sponsor.

The purchase price offered by Weiss was $2.2 million, and the Sponsor's offer was also $2.2 million, comprised of a $2,000,000 increase in the principal amount of the New Notes to be issued by the Reorganized Debtor under the Plan for the benefit of impaired unsecured claims and the payment of an additional $200,000 to the Debtor as consideration for its direct equity interest in YG WV.  Further, the Sponsor's offer to purchase the Loan and Mortgage will also result in a reduction of the Series C Notes Claims under the Plan.

The Series C Noteholders' vote to consider the two final offers was originally scheduled to be held on April 26, 2022, but was delayed several times to allow the two final bidders an opportunity to increase and refine their final bids.  Following further negotiations and discussions among the parties, a vote was held on May 8, 2022, at which time participating Series C Noteholders holding 93% of participating principal voted to approve the offer from the Sponsor to purchase the Series C Noteholders' interest in the Loan and Mortgage.  Following the vote, Weiss submitted a further revised offer, which the Series C Noteholders rejected and determined to proceed with the Sponsor's approved offer.  Weiss maintains that he continues to remain interested in potentially purchasing the Debtor's interest in YG WV.

The offer from the Sponsor provides that the Sponsor will purchase the Series C Noteholders' rights, title, and interest in the Loan and Mortgage for $158,612,112[14].  As set forth above, in

---

[14] The Sponsor subsequently increased the offer for the Series C Noteholders' interest in the William Vale mortgage and loan to $158,612,112, subject to the Series C Noteholders' willingness to assign certain additional claims to the Sponsor under the MLPSA.  The Sponsor and the Trustee, on behalf of the Series C Noteholders, entered into a Statement of Obligation on May 12, 2022 which set forth the amendments to the MLPSA to reflect such increased

accordance with the Investment Agreement, the Sponsor has agreed, upon consummation of the William Vale Purchase, to increase the principal amount of the New Notes that will be issued by the Reorganized Debtor under the Plan for the benefit of impaired unsecured claimholders by an additional $2,000,000.  The Sponsor has also agreed to pay an additional $200,000 to the Debtor as consideration for the Debtor's direct equity interest in YG WV, the non-debtor subsidiary of the Debtor that owns the 50% interest in the entity that owns the William Vale hotel, which shall be effectuated either (i) pursuant to the Plan, together with the other assets to be acquired by the Sponsor, or (ii) in the case of a closing of the MLPSA following the effective date of the Plan, pursuant to a stand-alone sale transaction.

The terms of the agreement between the Series C Noteholders and the Sponsor were memorialized in the MLPSA.  In accordance with the MLPSA, the Sponsor has provided a $7.5 million deposit.  The outside date for the closing of the William Vale Purchase under the MLPSA is July 24, 2022.

The Debtor, the Notes Trustee, and the Sponsor entered into the First Investment Agreement Amendment described in Subsection 5 above.  Accordingly, the parties anticipate that the Debtor's direct interest in YG WV will remain with, and vest in, the Reorganized Debtor pursuant to the Plan in the same manner as the Debtor's other equity holdings in its subsidiaries.

Weiss disputes the legality of the proposed William Vale Purchase and has commenced an adversary proceeding with the Bankruptcy Court by filing a complaint on July 5, 2022, seeking to enjoin the Debtor from consummating a transaction involving its interest in YG WV.  As part of his complaint, Weiss contends, among other things, that the vesting of the Debtor's interest in YG WV in the Reorganized Debtor under the Plan violates the restrictions set forth in the limited liability company operating agreement for Wythe Berry Member because YG WV has been dissolved as a matter of law, and, therefore is incapable of effectuating the proposed transaction.  The Debtor disputes the allegations in Weiss's complaint and, pursuant to the Court's docket entry, the Debtor's response is currently due August 15, 2022.  The adversary proceeding is titled *Zelig Weiss v. All Year Holdings Limited, Wythe Berry Member LLC, and YG WV LLC,* Adv. Pro. 22-01115 (Bankr. S.D.N.Y. July 5, 2022).  The Debtor believes that consummation of the William Vale Purchase and the sale of the Debtor's interest in YG WV are not conditions precedent to confirmation of the Plan or the occurrence of the Effective Date.  In addition, the Debtor believes that the Sponsor does not have the right to terminate the Investment Agreement if the relevant parties fail to close on the MLPSA or if the Debtor is unable to deliver its interest in YG WV until after the Effective Date or at all.  The Sponsor reserves all of its rights with respect to the foregoing.

### 10.    Debtor in Possession Financing

On May 5, 2022, the Debtor filed the *Motion of Parent Debtor for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 364, and 507 (I) Authorizing Parent Debtor to Use Escrowed Funds, (II) Providing Superpriority Administrative Expense Claim Status, and (III) Granting Related Relief* [ECF No. 92] (the "**DIP Motion**") seeking entry of an order (i) authorizing the Debtor to enter into a multiple draw debtor-in-possession term loan in an aggregate principal amount of up to

---

consideration and such additional claim assignment.  The Series C Noteholders subsequently voted to approve the Statement of Obligation, which amended the terms of the MLPSA without further action by any party thereto.

WEIL:\98714375\5\12817.0007

$4,500,000.00 (the "**DIP Loan**") made available to the Debtor and funded with "Escrowed Funds," as defined in that Investment Agreement, (ii) authorizing the Debtor to borrow under the DIP Loan and to incur all obligations owing thereunder and under the DIP Documents to the Sponsor (the "**DIP Obligations**"), (iii) authorizing the Debtor to, subject to the Carve-Out (as defined in the DIP Motion), grant a superpriority administrative expense claim to the Sponsor for all DIP Obligations, (iv) authorizing and directing the Debtor to pay the principal, interest, fees, and expenses payable under and in accordance with the DIP Documents, and (v) granting related relief.

As set forth above, any such drawn Escrowed Funds are required to be utilized by the Debtor solely in accordance with the DIP Documents (as defined in the DIP Term Sheet), including without limitation, the DIP Budget (as defined in the DIP Term Sheet).  Notwithstanding that the Debtor may draw upon and utilize the Escrowed Funds in accordance with the DIP Documents (including the DIP Budget), (i) such funds shall continue to be treated as Escrowed Funds for the purposes of the Investment Agreement and (ii) the provisions of Section 3.02 of the Investment Agreement, including the provisions governing the rights and obligations of the Parties with respect to the Escrowed Funds in the event (x) the Closing occurs or (y) the Closing does not occur and the Investment Agreement is terminated, shall continue in full force and effect. For the avoidance of doubt, if the Investment Agreement is terminated for any reason other than as set forth in Section 3.02(b) of the Investment Agreement, the repayment to the Sponsor of any amounts drawn by the Debtor under the DIP Loan in accordance with the DIP Documents shall be applied and treated as payment and delivery by the Debtor of Escrowed Funds in accordance with the Investment Agreement.  Pursuant to Section 3.02(b) of the Investment Agreement, if the Investment Agreement is terminated by the Company pursuant to Section 11.01(c) thereof, the Debtor shall be entitled to retain the DIP Loan Proceeds and shall have no further obligations to the Sponsor Investor hereunder with respect to such proceeds.

The BVI Court entered an order on May 24, 2022 authorizing the Debtor's entry into the DIP Loan, subject to the Bankruptcy Court's approval of the DIP Motion.  The Bankruptcy Court entered an order approving the DIP Motion on May 27, 2022 [ECF No. 120].

## 11.    Timetable for Debtor's Restructuring

### i.    Timetable for the U.S. Chapter 11 Case

In accordance with the Investment Agreement, the Debtor is obligated to proceed with the prompt implementation of the transactions contemplated thereunder through the Plan.  Among the milestones contained in the Investment Agreement is the requirement that a hearing on confirmation of a plan must be held by August 8, 2022 and that the Debtor must obtain entry of an order confirming the plan by August 23, 2022.  These deadlines, however, may also be extended in certain circumstances.  Upon obtaining approval of the Plan from the Bankruptcy Court, the parties anticipate that further approvals from the courts in the BVI and Israel will be necessary prior to closing under the Investment Agreement.  The anticipated timeline for obtaining the necessary approvals in the BVI and Israel is summarized below.

### ii.    Timetable for the Israeli Recognition Proceeding

On April 14, 2022, with the consent of the JPLs and approval of the BVI Court, the Debtor commenced the Israeli Recognition Proceeding with the Israeli Court. An order recognizing the Chapter 11 Case as the foreign main proceeding was entered by the Israeli Court on May 4, 2022.

The Debtor commenced the Israeli Recognition Proceeding in furtherance of its efforts to achieve a global resolution of Claims against, and Interests in, the Debtor, including with respect to the Debtor's various series of Notes. In addition, as the Debtor is a reporting company in Israel, the Debtor determined that it was necessary to commence the Israeli Recognition Proceeding to obtain court approval to convene the Noteholder Meeting to vote on the Plan and the Investment Agreement.

As further set forth in Article XI, following approval of this Disclosure Statement by the Bankruptcy Court, the Debtor intends to file a motion with the Israeli Court seeking authorization to convene the Noteholder Meeting. A Hebrew translation of this Disclosure Statement and other solicitation materials, as approved by the Bankruptcy Court, will be attached to the summons of the Noteholder Meeting. Following the Israeli Court Approval Date, the Debtor will commence its solicitation of votes on the Plan.

In addition, following entry of the Confirmation Order, the Debtor plans to file a motion with the Israeli Court seeking recognition of the Plan and the Confirmation Order.

iii.    Timetable for the BVI Plan of Arrangement and BVI Proceeding

The Debtor has filed a motion seeking authority from the BVI Court to implement the BVI Plan of Arrangement following which, and subject to the occurrence of the Plan Effective Date, among other things, (i) the existing equity interests in the Debtor will be cancelled, and (ii) one hundred percent of the equity in the Reorganized Debtor will be held by the Sponsor. A hearing before the BVI Court on the Debtor's application to approve the BVI Plan of Arrangement is scheduled for July 21, 2022. Subject to BVI Court approval, it is anticipated that the JPLs authority to act on behalf of or to bind the Reorganized Debtor will terminate on the Plan Effective Date. Following entry of the Confirmation Order by the Bankruptcy Court, the Debtor will file an application with the BVI Court seeking authorization to terminate the JPL Appointment.

A chart summarizing certain key dates and deadlines with respect to the Chapter 11 Case and the proceedings in Israel and the BVI is set forth below:

| Anticipated Timetable[15] | |
| --- | --- |
| Estimated Date for Obtaining BVI Court Approval of Plan of Arrangement | July 29, 2022 |
| Plan Supplement Filing Deadline | September 12, 2022 |

---

[15] The following dates and deadlines are subject to Bankruptcy Court approval and the Bankruptcy Court's availability and remain subject to change in accordance with the Investment Agreement and otherwise applicable law, including the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

| Anticipated Timetable[15] | |
|---|---|
| Plan Voting Deadline | September 19, 2022 at 5:00 p.m. (Eastern Time) |
| Plan Confirmation Objection Deadline | September 19, 2022 at 5:00 p.m. (Eastern Time) |
| Reply Deadline for Plan Objections | September 29, 2022 at 5:00 p.m. (Eastern Time) |
| Plan Confirmation Hearing | October 6, 2022 at 10 a.m. (Eastern Time) |
| Estimated Date for Obtaining Israeli Court Recognition of Plan and Confirmation Order | October 13, 2022 |
| BVI Hearing to Approve Termination of JPL Appointment | October 17, 2022 |
| Target Plan Effective Date / Closing Date | October 20, 2022 |

## V.
## PENDING LITIGATION

### A.    Summary of Pending Litigation

There is pending litigation in various civil actions involving the Debtor in Kings County Supreme Court of New York State (the "**Kings County Supreme Court**") and the Israeli Court.  To the extent that these asserted Claims (and any other contingent, unliquidated or disputed Claims) are not timely liquidated, the Debtor may seek to have them estimated for Plan confirmation purposes. The Debtor, however, cannot predict with certainty the outcome or effect of pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from the Debtor's current assessment.

The following is a summary of each of the prepetition litigations involving the Debtor and the classification of any claims related to such litigation under the Plan:

a. *All Year Holdings Limited individually and on behalf of Lofts on Devoe Residence LLC v. Abraham Greenhut, et al.* (Index No. 52871/2021): On November 9, 2021, the Debtor filed an action in Kings County Supreme Court against Abraham Greenhut ("**Greenhut**") and Devoe Residence LLC, an entity controlled by Greenhut ("**Devoe Residence**" and together with Greenhut, the "**Devoe Defendants**"), seeking to quiet title on a property located at 17 Devoe Street, Brooklyn, New York (the "**Devoe Property**" and the litigation proceeding, the "**Greenhut Action**").  The Devoe Property is owned by Lofts on Devoe LLC, a non-debtor entity whose membership interests are held 50% by the Debtor and 50% by Greenhut.  The complaint filed in the Greenhut Action alleges that Greenhut executed a deed unilaterally transferring the Devoe Property to Devoe Residence without authorization from the Debtor.

34

b.   *Taz Partners LLC v. Yoel Goldman and All Year Holdings Limited* (Index No. 564/2021): As set forth above, on December 13, 2021, the Debtor became aware of a $37 million judgment entered against it in Kings County Supreme Court on December 9, 2021, resulting from outstanding confessions of judgment allegedly executed by the Sole Shareholder.  This action has been stayed as to the Debtor.  Any claim arising out of or relating to the Taz Confession of Judgment will be treated as a Class 3 General Unsecured Claim under the Plan.

c.   DC (TA) *Public Representatives (Registered NGO) v. All Year Holdings, et al.*, 15257-04-20 (January 15, 2019, updated April 16, 2020) (Isr.) and DC (TA) *Shachar Group LTD v. All Year Holdings, et al.*, 3325-12-20 (December 1, 2020) (Isr.):  On January 15, 2019, Public Representatives (Registered NGO) filed a securities class action lawsuit against the Debtor and certain of its former officers and directors in the Economic Division of the District Court of Tel Aviv-Yafo in Israel (the class action lawsuit, the "**Public Representatives Class Action**").  In addition to the Public Representatives Class Action, the Debtor, along with certain of its former officers and directors, is a named defendant in a separate securities class action lawsuit filed by Shachar Group LTD in the Israeli Court on December 1, 2020 (the "**Shachar Group Class Action**" and, together with the Public Representatives Class Action, the "**Israeli Securities Actions**").  The Public Representatives Class Action and the Shachar Group Class Action were commenced by lead plaintiffs representing parties who purchased any series of bonds issued by the Debtor between (i) June 1, 2018 and November 30, 2018 and (ii) July 1, 2020 and November 29, 2020, respectively.  Each of the Israeli Class Actions is in its early stages and no class has been certified under applicable Israeli law in either case.  Further, both Israeli Class Actions are currently stayed.  Pursuant to the subordination provisions set forth in section 510(b) of the Bankruptcy Code, any Claims arising out of or related to the Israeli Securities Actions, including any claims for indemnification or contribution by any of the Debtor's current or former officer or director, will be treated as Class 5 Subordinated Securities Claims under the Plan.

d.   *Zelig Weiss v. All Year Holdings Limited, Wythe Berry Member LLC, and YG WV LLC,* Adv. Pro. 22-01115 (Bankr. S.D.N.Y. July 5, 2022):  On July 5, 2022, Weiss commenced an adversary proceeding with the Bankruptcy Court by filing a complaint seeking to enjoin the Debtor from consummating a transaction involving its interest in YG WV.  As part of his complaint, Weiss contends, among other things, that the vesting of the Debtor's interest in YG WV in the Reorganized Debtor under the Plan violates the restrictions set forth in the limited liability company operating agreement for Wythe Berry Member because YG WV has been dissolved as a matter of law, and, therefore is incapable of effectuating the proposed transaction.  The Debtor disputes the allegations in Weiss's complaint and, pursuant to the Court's docket entry, the Debtor's response is currently due August 5, 2022.

## B.    BVI Omnibus Settlement Authority Order

On April 29, 2022, the Debtor filed an application with the BVI Court seeking authority to take certain actions in connection with various negotiations and settlement discussions being conducted

WEIL:\98714375\5\12817.0007

by the Debtor without further sanction of the BVI Court (the "**BVI Omnibus Settlement Application**"). The Debtor is in the process of negotiating with various property-level partners regarding a potential sale of the Debtor's interests in certain PropCos. In addition, as set forth above, the Debtor and certain of its non-debtor subsidiaries are involved, either directly or indirectly, in various legal proceedings that the Debtor may seek to resolve in advance of confirmation of the Plan. Pursuant to the BVI Omnibus Settlement Application, the Debtor requested the sanction of the BVI Court to continue such discussions and finalize any necessary transaction or settlement agreements in connection therewith. The BVI Court entered an order approving the BVI Omnibus Settlement Application on June 13, 2022.

## VI.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the Plan, and contains other provisions necessary to implement the Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of claims and equity interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

### A.    Administrative Expense and Priority Claims

#### 1.    Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim), shall receive from the Plan Administrator, in full and final satisfaction, settlement, and release of such Claim against the Debtor, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. Amounts sufficient for the Plan Administrator to pay in full all Allowed Administrative Expense Claims that are the responsibility of Wind-Down Co in accordance with Section 2.1 of the Plan, including all Fee Claims and any and all other amounts that may become due and payable in connection with the BVI Proceeding and the Israeli Proceeding, shall be funded on the Effective Date from, at the option of the Debtor, either: (i) the Debtor's cash on hand, or (ii) the Sponsor Contribution, provided that the Reorganized Debtor shall have a positive cash balance on the Effective Date. The Reorganized Debtor shall pay compensation for services rendered to it and reimbursement of expenses incurred on its behalf from and after the Effective Date in the ordinary course.

WEIL:\98714375\5\12817.0007

### 2. Fee Claims

All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, and counsel for the Plan Administrator on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date. Objections to any Fee Claims must be filed and served on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, counsel for the Plan Administrator, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtor and the party requesting compensation of a Fee Claim, or as approved by the Court).

Allowed Fee Claims shall be paid in full, in Cash, by the Plan Administrator in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor, Reorganized Debtor or the Plan Administrator. Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders. The Reorganized Debtor shall have no liability for payment of any Fee Claims.

No later than 10 days prior to the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services prior to the Effective Date to the Debtor and the Notes Trustee and the Debtor (or Plan Administrator if applicable) shall, subject to the Plan, separately escrow from funds of the Debtor such estimated amounts in a Professional Fees Escrow Account for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties. If a holder of a Fee Claim does not provide an estimate, the Debtor or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim, and provide notice thereof to the Notes Trustee. The Professional Fees Escrow Account shall be treated as a trust account for the benefit of holders of Fee Claims and otherwise subject to the terms of the Plan. When all such Allowed Fee Claims have been paid in full, any remaining amount in a Professional Fees Escrow Account shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, Wind-Down Co for distribution in accordance with the terms of the Plan without any further action or order of the Bankruptcy Court.

The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date, including for services rendered or expenses incurred by the professionals of the Debtor or Wind-Down Co, as applicable, in the ordinary course and without the need for Bankruptcy Court approval.

### 3. Priority Tax Claims

Except to the extent that a holder of a Priority Tax Claim agrees to less favorable treatment, Priority Tax Claims shall be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course by

WEIL:\98714375\5\12817.0007

the Reorganized Debtor.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Tax Claim available to the Debtor.

### B.    Classification of Claims and Interests

#### 1.    Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

#### 2.    Summary of Classification

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

**Claims Against and Interests in the Debtor**

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| 4 | Remaining Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |
| 6 | Equity Interests | Impaired | No (Deemed to reject) |

#### 3.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing in the Plan shall affect the rights of the Debtor or the Reorganized Debtor, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

#### 4.    Elimination of Vacant Classes

Any Class of Claims against the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

WEIL:\98714375\5\12817.0007

### 5. Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

### 6. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

The Debtor shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that rejects or is deemed to reject the Plan.  The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### C. <u>Treatment of Claims and Interests</u>

### 1. Priority Non-Tax Claims (Class 1)

Except to the extent that a holder of a Priority Non-Tax Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Priority Non-Tax Claims in the ordinary course.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Non-Tax Claim available to the Debtor.  The Debtor does not believe there are any Priority Non-Tax Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan.

### 2. Other Secured Claims (Class 2)

Except to the extent that a holder of an Other Secured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Other Secured Claims in the ordinary course.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Other Secured Claim available to the Debtor. The Debtor does not believe there are any Other Secured Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan.

### 3. General Unsecured Claims (Class 3)

Except to the extent that a holder of a General Unsecured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of an Allowed General Unsecured Claim are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile each General Unsecured Claim in the ordinary course of business.  The Debtor is not aware of any Class 3 General Unsecured Claims that may be asserted against it.  However, the Sponsor's determination

WEIL:\98714375\5\12817.0007

to assume any such Claims pursuant to the Investment Agreement will allow the Debtor to avoid the time and expense associated with fixing and prosecuting a bar date for filing proofs of Claim and undertaking a Claims reconciliation process. Given this, the Debtor has established a separate class for the General Unsecured Claims to the extent any such Claims are asserted against the Debtor.

### 4.    Remaining Unsecured Claims (Class 4)

Except to the extent that a holder of an Allowed Remaining Unsecured Claim against the Debtor agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Allowed Remaining Unsecured Claim, each such holder shall receive (i) on the Effective Date, from the Disbursing Agent, its Pro Rata Share of the Class 4 ED Distribution and (ii) on such other date(s) as determined from time to time by the Plan Administrator, from Wind-Down Co, the amounts recovered, if any, from the Excluded Assets (including, but without limitation, from the prosecution of Avoidance Actions and other Causes of Action) and any remaining Wind Down Cash Funding. The right to the foregoing distributions shall be nontransferable except by will, intestate succession, or operation of law. Notwithstanding anything to the contrary in the Plan, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan, including for purposes of distributions under the Plan. The Debtor will file a motion to estimate or objection to such claims on proper notice to applicable parties.

### 5.    Subordinated Securities Claims (Class 5)

The holders of Subordinated Securities Claims against the Debtor shall not receive or retain any property under the Plan on account of such Claims.

### 6.    Equity Interests (Class 6)

On or after the Effective Date, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all Equity Interests in the Debtor shall be cancelled. The existing holders of the Equity Interests in the Debtor shall neither receive nor retain any property of the Debtor or interest in property of the Debtor on account of such Equity Interest.

### D.    **Means for Implementation**

### 1.    Sponsor Contribution and Distributions

On the Effective Date, in accordance with the Plan and the Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, the Sponsor shall: (i) provide the Sponsor Contribution; and (ii) be the sole shareholder of the Reorganized Debtor, and on the Effective Date, shall hold 100% of the NewCo Shares free and clear of all Claims and Liens.

On the Effective Date, in accordance with the Plan and the Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, the Disbursing Agent (on behalf of the Debtor) shall distribute Pro Rata the Class 4 ED Distribution to (i) the holders of Remaining Unsecured Claims that are Allowed as of the Effective Date, and (ii) the Disbursing

WEIL:\98714375\5\12817.0007

Agent, to be held in the Class 4 Disputed Claims Reserve, on behalf of holders of Disputed Remaining Unsecured Claims.

On the Effective Date, in accordance with the Plan and the Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, a single limited liability company unit representing a non-economic 100% ownership interest in Wind-Down Co shall be issued to the Plan Administrator. The Pro Rata Share of the Class 4 ED Distribution allocated to Disputed Remaining Unsecured Claims shall be held in one or more segregated accounts in the Class 4 Disputed Claims Reserve until such claims are Allowed or Disallowed, at which time the applicable portion of the Class 4 ED Distribution (including any earnings thereon, net of any allocable costs and expenses of the Class 4 Disputed Claims Reserve) shall be distributed to such holders of newly Allowed Remaining Unsecured Claims or to the holders of Remaining Unsecured Claims that were previously Allowed, as the case may be.

Following the distribution of all amounts from the Class 4 Disputed Claims Reserve, the liquidation of the Excluded Assets (including the completion of the prosecution of any Avoidance Actions and other Causes of Action held by Wind-Down Co), and the distribution of the proceeds therefrom and any remaining Wind Down Cash Funding in accordance with the Plan (including the payment of all costs and expenses and other liabilities of Wind-Down Co), Wind-Down Co shall be dissolved and the single unit shall be deemed cancelled and of no further force and effect. The Plan Administrator shall have no right to any distribution of property or value from Wind-Down Co by reason of its ownership of the single limited liability company unit.

In addition to the foregoing, in the event of a William Vale Purchase on or before December 31, 2022, the Sponsor shall pay to Wind-Down Co the WV Shares Consideration on the later date to occur of the Effective Date and the WV Sale Date.

The terms of the Investment Agreement are fully incorporated into the Plan and shall be binding and enforceable against the parties thereto, including, without limitation, the releases and indemnities set forth in Section 7.02(b) of the Investment Agreement.

Neither the Reorganized Debtor nor the Sponsor shall have any liability for (i) Fee Claims, (ii) any amounts owed to any current officers or current directors of the Debtor or those serving in similar capacities for the period up to and including the Effective Date, or (iii) any payment to holders of Class 4 Remaining Unsecured Claims or any Subordinated Securities Claim.

## 2. Authorization and Issuance of New Notes

Subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, the Debtor or Reorganized Debtor, as applicable, is authorized to issue all plan-related securities and documents, including, without limitation, the New Notes, and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership or limited liability company action. The Reorganized Debtor shall issue the New Notes, substantially in the form attached to the Plan as Exhibit A, in an aggregate principal amount of $20,000,000, subject to increase to $22,000,000 as described above. The New Notes will be unsecured obligations of the Reorganized Debtor and will contain customary covenants and events of default. The New Notes will not bear non-default interest. In connection with the

New Notes, Bent Philipson shall enter into a Guaranty Agreement, substantially in the form attached to the Plan as Exhibit B, on commercially customary terms to support the obligations of the Reorganized Debtor under the New Notes.

### 3.    Administration of Wind-Down Co.

On the Effective Date, the Excluded Assets and the Wind Down Cash Funding shall be transferred to Wind-Down Co.  The Sponsor and/or the Reorganized Debtor shall not bear any cost and expense and/or liability related to the administration of Wind-Down Co, including costs owed to the Plan Administrator and under Section 5.3(f) of the Plan.

On the Effective Date, the Notes Trustee shall appoint the Plan Administrator for the purpose of conducting the Wind Down of Wind-Down Co on terms and conditions set forth in the Plan Administration Agreement[16].  The retention of the Plan Administrator shall be pursuant to an agreement approved by the Notes Trustee and filed as part of the Plan Supplement.  Upon the conclusion of the Wind Down in accordance with Section 5.1(d) of the Plan, Wind-Down Co shall be dissolved by the Plan Administrator.  The Plan Administrator shall act for Wind-Down Co in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors or equivalent governing body, as applicable, and to officers, subject to the provisions in the Plan (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements, or similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same) and the Plan Administrator will be a representative of Wind-Down Co for purposes of section 1123(b)(3) of the Bankruptcy Code. From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for Wind-Down Co with the authority set forth in Section 5.3 of the Plan and the Plan Administration Agreement.  The Plan Administrator shall be compensated and reimbursed for reasonable costs and expenses as set forth in the Plan Administration Agreement included in the Plan Supplement.

The Plan Administrator shall have the authority and right on behalf of Wind-Down Co, subject to the express terms of the Plan Administration Agreement but without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to: (i) implement the Wind Down as expeditiously as reasonably possible and administer the liquidation, dissolution, sale and/or abandonment or similar action of the Excluded Assets after the Effective Date in accordance with the Wind Down Budget; (ii) except to the extent Claims have been previously Allowed or are Unimpaired, control and effectuate the Claims reconciliation process; (iii) make distributions to holders of Allowed Claims in accordance with the Plan; (iv) retain and compensate professionals to assist in performing its

---

[16] As defined in the Plan, "**Plan Administrator**" means, collectively, those individuals selected by the Notes Trustee to serve as(a) "plan administrator" and (b) "claims administrator," who, collectively, will administer and implement the Plan and the Assets of Wind-Down Co, in accordance with, and pursuant to the power and authority with respect to Wind-Down Co, as set forth in Section 5.3 of the Plan and with such rights, powers and authorities as shall be allocated among such individuals under the Plan Administration Agreement.

duties under the Plan; (v)  complete and file, as necessary, all final or otherwise required federal, state, and local tax returns and other tax reports for Wind-Down Co; (vi) represent the interests of Wind-Down Co before any taxing authority in all matters including, without limitations, any action, suit, proceeding, appeal or audit; and (vii) appoint and compensate an agent to effectuate distributions under the Plan with the consent of the Notes Trustee; and (viii) perform other duties and functions that are consistent with the implementation of the Plan or required by the Bankruptcy Code.

The Plan Supplement shall include the Wind Down Budget and, on the Effective Date, the Plan Administrator shall retain within Wind-Down Co funds sufficient to make the payments contemplated in the Wind Down Budget.

Wind-Down Co shall indemnify and hold harmless the Plan Administrator solely in its capacity as such and, where the Disbursing Agent is the Plan Administrator or an entity designated by the Plan Administrator, the Disbursing Agent solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's or Disbursing Agent's (as the case may be) gross negligence, willful misconduct, or criminal conduct.

The Plan Administrator shall effectuate the Wind Down in accordance with the Wind Down Budget.  The Plan Administrator shall pay any and all reasonable and documented costs and expenses incurred in connection with the Wind Down, including the reasonable fees and expenses of its professionals and the reasonable fees and expenses of the Debtor's professionals incurred for services rendered to the Debtor and the Estate following the Effective Date, without further order of the Bankruptcy Court, provided that such amounts are consistent with the Wind Down Budget.

Subject to any necessary approvals in the BVI Proceeding, all matters provided for in the Plan involving the corporate structure of the Debtor, the Reorganized Debtor, or Wind-Down Co, to the extent applicable, or any corporate or related action required by the Debtor, the Reorganized Debtor, or Wind-Down Co, in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the JPLs, the Authorized Managers, or the stockholders, members, or directors or managers of the Debtor, the Reorganized Debtor, or Wind-Down Co, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtor, the Reorganized Debtor, or Wind-Down Co. The Plan Administrator shall be authorized to file on behalf of Wind-Down Co, a certificate of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of Wind-Down Co.

### 4.    Section 1145 Exemption

The offer, issuance, and distribution of the New Notes to holders of Allowed Remaining Unsecured Claims under Section 4.4 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

WEIL:\98714375\5\12817.0007

The New Notes shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, as amended, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) the restrictions, if any, on the transferability of such securities and instruments, including, without limitation, any restrictions on the transferability under the terms of the New Notes, and (iv) applicable regulatory approvals.

## 5.    Officers and New Board of Directors

On the Effective Date, the new board of directors of the Reorganized Debtor shall consist of the following three (3) directors: Avi Philipson, Abraham Grunhut, and Andrew Chaimowitz. Curriculum vitae (CVs) for the new directors of the Reorganized Debtor are annexed hereto as **Exhibit F**.  Each such director shall serve from and after the Effective Date pursuant to the terms of the Amended Organizational Documents and the other constituent documents of the Reorganized Debtor.  After the Effective Date, the board of directors for the Reorganized Debtor will be elected by the Sponsor in accordance with the Amended Organizational Documents.

After the Effective Date, officers of the Reorganized Debtor shall be appointed and serve in accordance with the Amended Organizational Documents.  The identity and affiliations of any person to serve as an officer of the Reorganized Debtor immediately following the Effective Date shall be disclosed in the Plan Supplement.

Subject to any necessary approvals in the BVI Proceeding, the JPLs, the Authorized Managers, and any officers of the Debtor, shall have no continuing rights or obligations to the Reorganized Debtor on or after the Effective Date in their capacities as such, and each such party shall resign (or shall be deemed to have resigned) and shall cease to act or serve as a director, officer, or any similar capacity on the Effective Date.

## 6.    Indemnification of Debtor's Directors and Officers

The Debtor and Wind-Down Co, as the case may be, shall purchase and maintain director and officer insurance coverage, in a coverage amount not to exceed the coverage amount in effect as of the Petition Date, for those Persons covered by any such policies in effect during the pendency of the Chapter 11 Case, continuing after the Effective Date, insuring such Persons in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtor prior to the Effective Date, the scope and amounts of which policies shall be disclosed in the Plan Supplement.

## 7.    Effectuating Documents; Further Transactions.

Upon the Effective Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms of the Plan, subject to any necessary approvals in the BVI Proceeding.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtor, the Reorganized Debtor, and Wind-Down Co, and any corporate or limited liability company action required by the Debtor, the Reorganized Debtor, or Wind-Down Co, in connection with the Plan shall be deemed to have occurred and shall be in effect,

WEIL:\98714375\5\12817.0007

without any requirement of further action by the JPLs, the Authorized Managers, or the directors, managers, or officers of the Debtor, the Reorganized Debtor, or Wind-Down Co, subject to any necessary approvals in the BVI Proceeding.  On or (as applicable) before the Effective Date, the Authorized Managers, and the authorized officers of the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor or Wind-Down Co, as applicable, including, but not limited to any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Section 5.7 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

On or as soon as practicable after the Effective Date, the Reorganized Debtor and Wind-Down Co may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, subject in all respects to the provisions of the Plan and the rights vested in the Notes Trustee, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction.

Prior to making any post-Effective Date distribution from Wind-Down Co to any holder of an Allowed Remaining Unsecured Claim pursuant to Section 4.4(b)(iii) of the Plan, Wind-Down Co shall adopt a "plan of liquidation" (as determined for U.S. federal income tax purposes) in furtherance of its duties and responsibilities under the Plan to monetize all of the remaining assets of Wind-Down Co (including any Avoidance Actions or other Causes of Action) and distribute the proceeds thereof in accordance with the Plan, and shall timely file IRS Form 966 in connection therewith.

<u>Certain Tax Matters</u>.  For U.S. federal income tax purposes, and comparable state and local tax purposes (as applicable): (i) The Debtor shall implement the Plan in a manner such that it shall continue to be treated as a disregarded entity through the implementation of the Plan on the Effective Date and shall not take any action that would cause the Debtor to be treated as an association taxable as a corporation at any time (prior to or on the Effective Date); (ii) the right of the holders of Allowed Remaining Unsecured Claims hereunder to any and all distributions from assets transferred to Wind-Down Co shall be treated as equity, and thus as stock, in Wind-Down Co. Accordingly, each holder of an Allowed Remaining Unsecured Claim shall be treated for U.S. federal income tax purposes as receiving, and thereafter owning, stock in Wind-Down Co; (iii) the Reorganized Debtor and Wind-Down Co, and any officers thereof, and all holders of Claims shall report consistent with Section 5.7(d) of the Plan for all income tax purposes, and shall (X) use

WEIL:\98714375\5\12817.0007

commercially reasonable efforts to cause consistent reporting therewith by others, or (Y) not join in, encourage, and/or support inconsistent reporting therewith by others; (iv) the Debtor shall be authorized to implement the Plan in the manner most tax efficient to the Sponsor, Wind-Down Co and the holders of Remaining Unsecured Claims, as determined by the mutual agreement of the Debtor and the Notes Trustee, in their reasonable discretion given the totality of the circumstances.

### 8.    Cancellation of Existing Securities and Agreements.

On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtor or assumed and assigned to Wind-Down Co under the Plan, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all agreements, instruments, and other documents evidencing or issued pursuant to the Notes, or any indebtedness or other obligations thereunder, and any Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect against the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, and the obligations of the Debtor or Reorganized Debtor thereunder shall be deemed fully satisfied, released, and discharged.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Reorganized Debtor or assumed and assigned to Wind-Down Co pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 9.    Cancellation of Liens.

Except as otherwise specifically provided in the Plan, upon the payment in full in Cash of a Secured Claim, any Lien securing such Claim, shall be deemed released, and the holder of such Secured Claim shall be directed to release any collateral or other property of the Debtor or the Reorganized Debtor held by such holder and to take such actions as may be requested by the Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtor or the Reorganized Debtor.

### 10.    Subordination Agreements.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

WEIL:\98714375\5\12817.0007

### 11.    Closing of the Chapter 11 Case.

After the Estate has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 12.    Notice of Effective Date.

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Plan Administrator shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### E.    <u>Distributions</u>

### 1.    Distributions Generally

The Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.  The Reorganized Debtor shall make all distributions with respect to all Unimpaired Claims in the ordinary course of business, which Unimpaired Claims shall not be subject to the claims reconciliation procedures set forth in the Plan, and the Reorganized Debtor shall satisfy, dispute, pursue, or otherwise reconcile each Unimpaired Claim in the ordinary course of business.  The Plan Administrator shall be the Disbursing Agent with respect to all other Claims to be satisfied, disputed, pursued, or otherwise reconciled in accordance with the Plan.

### 2.    Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims maintained by the Debtor or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims.  Wind-Down Co shall have no obligation to recognize any transfer or designation of such Claims occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amount or Assumption Disputes, the Disbursing Agent shall not have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim or Cure Amount.

### 3.    Date of Distributions.

Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan by the Plan Administrator shall be made on the Effective Date, as and when Claims are Allowed in the sole discretion of Wind-Down Co, or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; provided, that Wind-Down Co shall from time to time announce subsequent distribution dates to the extent they determine them to be appropriate.

WEIL:\98714375\5\12817.0007

4.      **Disbursing Agent.**

All distributions under the Plan shall be made by the Disbursing Agent and the Reorganized Debtor, as applicable, on and after the Effective Date as provided in the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. Wind-Down Co shall use all commercially reasonable efforts to provide the Disbursing Agent and the Reorganized Debtor, as applicable, with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtor's books and records.

5.      **Rights and Powers of Disbursing Agent.**

From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

6.      **Expenses of Disbursing Agent.**

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash, subject to the Plan Administration Agreements.

7.      **Postpetition Interest on Claims.**

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims against the Debtor on or after the Petition Date.

8.      **Delivery of Distributions.**

Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall

WEIL:\98714375\5\12817.0007

transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtor.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until the Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing in the Plan shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

### 9. Distributions after Effective Date.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 10. Unclaimed Property.

Undeliverable distributions shall remain in the possession of Wind-Down Co until such time as a distribution becomes deliverable or a holder accepts distribution, or such distribution reverts back to Wind-Down Co and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of one hundred and twenty (120) days from the applicable date of distribution and the holder of the Claim entitled to such distribution shall be discharged and forever barred.  After such date, all unclaimed property or interest in property of Wind-Down Co shall revert to and vest in Wind-Down Co and shall be thereafter disbursed to the holders of Remaining Unsecured Claims, and all unclaimed property or interest in property shall be discharged and forever barred.

### 11. Time Bar to Cash Payments.

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall immediately and irrevocably revert to Wind-Down Co and any Claim on account of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check prior to the expiration of the one hundred and twenty (120) day period from the date of issuance shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 12. Manner of Payment Under Plan.

Except as otherwise specifically provided in the Plan, at the option of Wind-Down Co, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

WEIL:\98714375\5\12817.0007

13.     **Satisfaction of Claims.**

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction and discharge of and exchange for the Debtor's and the Reorganized Debtor's, as the case may be, obligation on account of such Allowed Claims.

14.     **Minimum Cash Distributions.**

Except with respect to any Claim that is Unimpaired under the Plan, the Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to Section 6.14 of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

15.     **Setoff and Recoupment.**

The Reorganized Debtor, solely as to Unimpaired Claims, or Wind-Down Co, solely as to the Remaining Unsecured Claims, as applicable, or their designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Reorganized Debtor or Wind-Down Co may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law (other than the released Causes of Action); provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor or Wind-Down Co or its successor, of any claims, rights, or Causes of Action that the Reorganized Debtor or Wind-Down Co, or its successor or assign may possess against the holder of such Claim (other than the released Causes of Action).

16.     **Allocation of Distributions between Principal and Interest.**

Except as otherwise required by law (as reasonably determined by Wind-Down Co), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the portion of such Allowed Claim (if any) that reflects reimbursable expenses, and then to the accrued and unpaid interest on such Allowed Claim.

17.     **No Distribution in Excess of Amount of Allowed Claim.**

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

18.     **Distributions Free and Clear.**

Except as provided in the Plan, any distributions under the Plan shall be free and clear of and Liens, Claims, and encumbrances, and no other Entity, including the Debtor, the Reorganized Debtor, or Wind-Down Co, shall have any interest, legal, beneficial, or otherwise, in any amounts transferred pursuant to the Plan.

WEIL:\98714375\5\12817.0007

19.    **Withholding and Reporting Requirements.**

*Withholding Rights*.  In connection with the Plan, any Disbursing Agent and any other Person making distributions pursuant to the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any Disbursing Agent and the Notes Trustee, or such other Entity designated thereby, as applicable, and any other Person making distributions pursuant to the Plan, shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate (including, in the event of a non-cash distribution, the claimant providing sufficient monies to satisfy the withholding).  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any such issuing or disbursing party for payment of any such tax obligations.

*Forms*.  Any party entitled to receive any property as a distribution under the Plan shall, upon request of the Disbursing Agent or such other Entity designated by such Disbursing Agent (which Entity shall subsequently deliver to the Disbursing Agent any applicable Internal Revenue Service Form W-8 or Form W-9 or other tax information received) or such other Person making distributions pursuant to the Plan, deliver to such Person an appropriate Internal Revenue Service Form W-9 or (if the payee is a foreign Entity) Form W-8, and any other reasonably requested tax information.  If such request is made by the Plan Administrator or such other Entity designated by the Plan Administrator and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made, and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of any such distribution shall irrevocably revert to Wind-Down Co, and any Claim on account of such distribution shall be discharged and forever barred from assertion against Wind-Down Co, or its property.

F.    **Procedures for Disputed Claims**

1.    **Objections to Claims**

As of the Effective Date, the Plan Administrator shall exclusively be entitled to object to Impaired Claims.  As of the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses that the Debtor had with regard to any Unimpaired Claim which they may object to or otherwise challenge in the ordinary course, except with respect to any Claim that is Allowed pursuant to the Plan.  Nothing under the Plan shall affect the Debtor's or the Reorganized Debtor's claims, causes of action, rights, or defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.  Any objections to Claims shall be served and filed by the Plan Administrator

WEIL:\98714375\5\12817.0007

on or before the later of (a) one hundred and twenty (120) days after the Effective Date, and (b) on such other date as ordered by the Bankruptcy Court for cause.

### 2.    Resolution of Disputed Administrative Expenses and Disputed Claims.

On and after the Effective Date, except as otherwise provided in the Plan, all Unimpaired Claims will be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course of business of the Reorganized Debtor.  If the Reorganized Debtor disputes any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Case had not been commenced and shall survive the Effective Date as if the Chapter 11 Case had not been commenced.  From and after the Effective Date, the Reorganized Debtor may satisfy, dispute, pursue, or otherwise resolve any Unimpaired Claim without approval of the Bankruptcy Court. On or after the Effective Date, Wind-Down Co shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to Impaired Claims without further approval of the Bankruptcy Court.

### 3.    Payments and Distributions with Respect to Disputed Claims.

Notwithstanding anything in the Plan to the contrary, if any portion of a Claim is a Disputed Claim, the Debtor or Plan Administrator, as applicable, shall not be required to make any payment or distribution provided hereunder on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 4.    Distributions After Allowance.

After such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan (net of allocable costs and expenses of the Class 4 Disputed Claims Reserve, including taxes in accordance with Section 7.9 of the Plan), with or without interest as provided in the Plan. Such distributions shall be made in accordance with Article VI of the Plan.

### 5.    Estimation of Claims.

The Plan Administrator may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Impaired Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Impaired Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Impaired Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Impaired Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Impaired Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Impaired Claim, the Debtor and the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtor to be estimated for voting purposes only.

WEIL:\98714375\5\12817.0007

Notwithstanding anything to the contrary in the Plan, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan, including for purposes of distributions under the Plan.

### 6.    No Distributions Pending Allowance.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.    Claim Resolution Procedures Cumulative.

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.    Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 8.    Insured Claims.

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtor's insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Court.

### 9.    Tax Treatment of the Class 4 Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat the Class 4 Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Debtor, the Reorganized Debtor, the Plan Administrator, any Disbursing Agent, and the holders of Disputed Remaining Unsecured Claims) shall report for tax purposes consistently with the foregoing.  The Class 4 Disputed Claims Reserve shall be responsible for payment out of the available cash of such reserve allocable to the respective Disputed Remaining Unsecured Claims any allocable costs and expenses of the reserve, including any taxes imposed on the reserve or with respect to its assets.  Accordingly, subsequent distributions in respect of the allowance or disallowance of any Remaining Unsecured Claims shall be made net of any allocable costs and expenses of the reserve.  If the Class 4 Disputed Claims Reserve has insufficient cash to pay such costs and expenses, Wind-Down Co shall be responsible for the payment of such costs and expenses.  The Disbursing Agent or the Plan Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Class 4 Disputed Claims Reserve for all taxable periods through the termination of the Class 4 Disputed Claims Reserve.

WEIL:\98714375\5\12817.0007

### G.    Executory Contracts and Unexpired Leases

#### 1.    General Treatment

As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected by the Debtor, unless such contract or unexpired lease (i) is specifically designated (x) by the Reorganized Debtors or (y) Wind-Down Co as a contract or unexpired lease to be assumed or assumed and assigned on the Schedule of Assumed Contracts to be filed with the Plan Supplement; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; (iv) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the Confirmation Date; or (v) is identified in Section 8.4 of the Plan.

(a)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumption, assumption and assignment, or rejection provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtor or Wind-Down Co, as applicable, has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtor or Wind-Down Co, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

#### 2.    Determination of Assumption Disputes and Deemed Consent.

Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtor may otherwise agree.  Cure Amounts for executory contracts or unexpired leases assumed by the Reorganized Debtor, if any, shall be the responsibility of, and paid by, the Reorganized Debtor and Cure Amounts for executory contracts or unexpired leases assumed and assigned to Wind-Down Co, if any, shall be the responsibility of Wind-Down Co and paid by the Plan Administrator.

The Debtor shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts.  At least fourteen (14) days before the deadline to object to confirmation of the Plan, the Debtor shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned or rejected reflecting the Debtor's intention to potentially assume or assume and assign or reject the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed rejection, assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtor within fourteen (14) days of the service of such notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption or assumption

and assignment or rejection of such executory contract or unexpired lease shall be deemed to have assented to such assumption or assumption and assignment or rejection, notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any subsidiary of the Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of the Reorganized Debtor or Wind-Down Co, as applicable, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of the Reorganized Debtor or Wind-Down Co, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in Section 8.2(b) of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption, assumption and assignment, or rejection or to the validity of such assumption, assumption and assignment, or rejection (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

If there is an Assumption Dispute pertaining to assumption or assumption and assignment of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption or assumption and assignment being effective; provided, that the Debtor or the Plan Administrator, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtor or the Plan Administrator reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty to such executory contract or unexpired lease (or such lesser amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such counterparty and the Plan Administrator).

Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against the Debtor or defaults by the Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtor assumes, or assumes and assigns, such executory contract or unexpired lease. In accordance with section 365(k) of the Bankruptcy Code, assumption and assignment of any executory contract or unexpired lease, releases the Debtor and the Reorganized Debtor form any liability for breach of such contract of lease occurring after the Effective Date.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

WEIL:\98714375\5\12817.0007

### 3.    Rejection Damages Claims.

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor and the Reorganized Debtor no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.  Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims.**

### 4.    Insurance Policies.

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtor shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety and assigned to Wind-Down Co, pursuant to sections 365 and 1123 of the Bankruptcy Code, and Wind-Down Co shall remain liable in full for any and all now existing or in the Plan after arising obligations, liabilities, terms, provisions and covenants of the Debtor under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Expense Claim or objection to any Cure Amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

### 5.    Assignment of Executory Contracts to Wind-Down Co.

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease assumed and assigned to Wind-Down Co hereunder shall remain in full force and effect for the benefit of Wind-Down Co in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory

56

contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assumption and assignment effected pursuant to the Plan.

### 6.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### 7.    Reservation of Rights.

The Schedule of Assumed Contracts, and any related cure notice, may be amended until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment or rejection and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtor's right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.   The Debtor shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

Neither the exclusion nor inclusion of any contract or lease by the Debtor on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor, or the Reorganized Debtor, or their respective affiliates have any liability thereunder.

Except as otherwise provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtor and the Reorganized Debtor, under any executory or non-executory contract or any unexpired or expired lease.

Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

WEIL:\98714375\5\12817.0007

### H.    Conditions Precedent to Confirmation of Plan and Effective Date

#### 1.    Conditions Precedent to Confirmation of Plan

The following are conditions precedent to confirmation of the Plan: (a) the Disclosure Statement Order shall have been entered; (b) the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed and be in conformity with the Plan; and (c) the Investment Agreement shall not have been terminated and shall be in full force and effect.

#### 2.    Conditions Precedent to Effective Date.

The following are conditions precedent to the Effective Date of the Plan: (a) the Confirmation Order shall have been entered and have become a Final Order and shall be in full force and effect; (b) all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; (c) all governmental approvals, orders and consents necessary in connection with the Investment Agreement, including Bankruptcy Court approval, and any necessary approval from the BVI Court (including consummation of the BVI Plan of Arrangement) or any courts or regulatory authorities of Israel, including, but not limited to, recognition of the Confirmation Order in the Israeli Proceeding, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the consummation of the Investment Agreement. For the avoidance of doubt, the approval or recognition of the treatment of Subordinated Securities Claims by the courts or regulatory authorities of Israel shall not be a condition precedent to the Effective Date; (d) the conditions to the obligations of the Debtor to consummate the Closing set forth in Sections 10.01 and 10.02 of the Investment Agreement shall have been satisfied or waived in accordance with the terms thereof; and (e) the Professional Fees Escrow Account shall be established and fully funded.

Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, satisfaction of such conditions precedent shall be deemed to have occurred simultaneously on the Effective Date and no such action shall be deemed to have occurred prior to the taking of any other such action; <u>provided that</u>, to the extent a condition precedent (a "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

The Debtor believes that consummation of the William Vale Purchase and the sale of the Debtor's interest in YG WV are not conditions precedent to confirmation of the Plan or the occurrence of the Effective Date.  In addition, the Debtor believes that the Sponsor does not have the right to terminate the Investment Agreement if the relevant parties fail to close on the MLPSA or if the Debtor is unable to deliver its interest in YG WV until after the Effective Date or at all.  The Sponsor reserves all of its rights with respect to the foregoing.

WEIL:\98714375\5\12817.0007

3.        **Waiver of Conditions Precedent.**

Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan, other than those set forth in Section 9.1(a) and Section 9.2(a) of the Plan, may be waived in writing with the consent of the Debtor, the Notes Trustee, and the Sponsor; *provided*, *however*, the requirement that the Confirmation Order become a Final Order set forth in Section 9.2(a of the Plan may be waived in writing by the Debtor with the consent of the Sponsor.

4.        **Effect of Failure of a Condition.**

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before December 31, 2022, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtor, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, the Notes Trustee, or any other Entity.

I.        <u>**Effect of Confirmation of Plan**</u>

1.        **Vesting of Assets**

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all Excluded Assets and Wind Down Funding Cash shall be transferred to Wind-Down Co free and clear of all Claims, Liens, encumbrances, charges, and other interests except as provided pursuant to the Plan and the Confirmation Order, and (ii) all Transferred Entities (as defined in the Investment Agreement) and any and all remaining property of the Debtor's Estate, except for the Excluded Assets, shall remain in, or vest in, the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan and the Confirmation Order. On and after the Effective Date, Wind-Down Co, with respect to clause (i) above, and the Reorganized Debtor, with respect to clause (ii) above, may take any action, including, without limitation, the operation of their businesses; the assertion of any Causes of Action; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether or not in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided in the Plan. Without limiting the foregoing, each of the Reorganized Debtor and Wind-Down Co, as applicable, may pay the respective charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

2.        **Binding Effect.**

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders are (a) Impaired or Unimpaired under the Plan; (b) presumed to accept or deemed to reject the Plan;

WEIL:\98714375\5\12817.0007

(c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) will receive any distribution under the Plan.

### 3.    Discharge of Claims and Termination of Interests.

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided in the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities of the Debtor that arose prior to the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against the Debtor, the Reorganized Debtor, or Wind-Down Co any such discharged Claim against or terminated Interest in the Debtor.

### 4.    Term of Injunctions or Stays.

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all the Chapter 11 Case.

### 5.    Injunction.

**Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan, provided, however, the foregoing shall not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as expressly agreed to by (x) the Reorganized Debtor and a holder of any Unimpaired Claim or (y) Wind-Down Co and a holder of any Impaired Claim or Impaired Interest, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action against the Debtor that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-**

WEIL:\98714375\5\12817.0007

Down Co; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Reorganized Debtor or Wind-Down Co, or against property or interests in property of any of the Debtor, the Reorganized Debtor or Wind-Down Co, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.5 of the Plan.

The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtor (including the Reorganized Debtor and Wind-Down Co), and their respective property and interests in property.

6.    Releases.

**Estate Releases**.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce (i) the Plan and (ii) the Definitive Documents (in each case, including, without limitation, any rights granted to the Plan Administrator under the Plan Administration Agreement), for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the services rendered by the Released Parties to facilitate the implementation of the Plan, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed released and discharged, to the maximum extent permitted by law, by the Debtor and its Estate, the Reorganized Debtor, and Wind-Down Co, in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons or Entities, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor or its Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or its Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security or Asset of the Debtor, the Investment Agreement, the business or contractual arrangements between any of the Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the Disclosure Statement, the Plan

WEIL:\98714375\5\12817.0007

(including the Plan Supplement), the Deeds of Trust, the Notes, or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, provided, that nothing in Section 10.6(a) of the Plan shall be construed to release the Released Parties from gross negligence, willful misconduct, or fraud, in each case as determined by a Final Order.  The Debtor, its Estate, the Reorganized Debtor, and the Plan Administrator shall be permanently enjoined from prosecuting any of the foregoing claims or Causes of Action released under Section 10.6(a) of the Plan against each of the Released Parties.

**Mutual Releases**.  As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date; (ii) for the right to defend against any objections to Claims that may be asserted under the Plan; or (iii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions made by the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed released and discharged by each of the other Released Parties, in each case, from any and all claims, Interests, or Causes of Action whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, the Debtor, the restructuring, the Chapter 11 Case, the pre- and postpetition marketing and sale process, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the Investment Agreement, the Definitive Documents, the Deeds of Trust, the Notes, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; **provided**, that nothing in Section 10.6(b) of the Plan shall be construed to release the Released Parties from any gross negligence, willful misconduct, or fraud, in each case as determined by a Final Order.  The Persons and Entities in (i) through (iii) of Section 10.6(b) of the Plan shall be permanently enjoined from prosecuting any of the foregoing claims or Causes of Action released under Section 10.6(b) of the Plan against each of the Released Parties.

Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

Notwithstanding the foregoing, nothing in the Plan shall, or shall be deemed to, release or waive any rights or remedies of any releasor against or provide any indemnification rights to Yoel Goldman or Tzipporah Goldman, or any entity which is under control or ownership of Yoel Goldman or Tzipporah Goldman other than the Transferred Entities.

Section 7.02 of the Investment Agreement contains mutual releases of various parties and their representatives, including the parties to that agreement. The rights and obligations of the parties provided in connection with such releases are in addition to the rights and obligations provided in Section 10.6 of the Plan.

### 7.    Exculpation.

**To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any conduct occurring on or after the Petition Date and up to and including the Effective Date in connection with or arising out of the filing and administration of the Chapter 11 Case, the marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or Asset of the Debtor; the Disclosure Statement, the Investment Agreement, including the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, and consummation thereof, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for acts or omissions of an Exculpated Party that constitute gross negligence, fraud, or willful misconduct, in each case as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

### 8.    Retention of Causes of Action/Reservation of Rights.

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately prior to the Effective Date on behalf of its Estate in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtor. With respect to Unimpaired Claims, except as otherwise provided in the Plan, the Reorganized Debtor shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced. With respect to Impaired Claims, except as otherwise provided in the Plan, Wind-Down Co shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.

WEIL:\98714375\5\12817.0007

### 9. Special Provisions Regarding Sole Shareholder

For the avoidance of doubt, nothing under the Plan, including under Article X, or the Confirmation Order shall be deemed to discharge, waive, release, limit, or enjoin any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability of Yoel Goldman or Tzipporah Goldman, or any entity which is under the control or ownership of Yoel Goldman or Tzipporah Goldman.

### J. Retention of Jurisdiction

### 1. Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(b)  to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(c)  to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(d)  to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(e)  to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)  to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)  to issue injunctions, enter, and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)  to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)  to hear and determine all Fee Claims;

WEIL:\98714375\5\12817.0007

(j)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Investment Agreement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)    to hear and determine disputes arising in connection with the Investment Agreement, or any agreement, instrument, or other document governing or relating to the Investment Agreement;

(l)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(m)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any Disputed Claims for taxes and any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)    to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, exculpations, and injunctions issued thereunder;

(p)    to resolve disputes concerning Disputed Claims or the administration thereof;

(q)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(r)    to enter a final decree closing the Chapter 11 Case;

(s)    to recover all Assets of the Debtor and property of the Debtor's Estate, wherever located;

(t)    to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, or any deadline for responding or objection to a Cure Amount, in each case, for any purpose;

(u)    hear and determine matters or disputes arising from, or in connection with, the appointment of a successor Plan Administrator in the event of the Plan Administrator's death, disability, dissolution, or removal;

(v)    to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtor, the Plan Administrator, or Wind-Down Co. pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, including, without limitation, Avoidance Actions; and

WEIL:\98714375\5\12817.0007

(w)     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 2.      Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### K.     <u>Miscellaneous Provisions</u>

### 1.      Payment of Statutory Fees

On the Effective Date and thereafter as may be required, with respect to any Impaired Claims, Wind-Down Co shall make all required filings and pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtor's case, until such time as a final decree is entered closing the Debtor's case, a Final Order converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtor's case is entered.  With respect to any Unimpaired Claims, the Reorganized Debtor shall make all aforementioned required filings and pay all such fees, if any.

### 2.      Substantial Consummation of the Plan.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 3.      Plan Supplement.

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

### 4.      Requests by the Reorganized Debtor and Wind-Down Co for Expedited Determination of Taxes.

The Reorganized Debtor shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date and through the Effective Date.  Wind-Down Co shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, through the date of its dissolution.

### 5.    Exemption from Certain Transfer Taxes.

Pursuant to section 1146 of the Bankruptcy Code, (a) the making or delivery of any instrument of transfer in connection or furtherance of the Plan, and any financing by the Sponsor, (b) the issuance, transfer or exchange of any securities, instruments or documents pursuant to, in implementation of or as contemplated in the Plan and the Investment Agreement, (c) the creation of any Lien, mortgage, deed of trust, or other security interest, (d) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with the Investment Agreement, (e) all transfers and distributions by Wind-Down Co in furtherance of the Plan, and (f) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent provided by law, including, but not limited to: (i) mortgage recording taxes imposed under Article 11 of the tax law of the State of New York, (ii) the New York Real Estate transfer tax imposed under Article 31 of the Tax Law of the State of New York (including by reason of a change in the equity ownership of the Debtor), (iii) the New York City Real Property transfer tax imposed by title 11, chapter 21 of the New York City Administrative Code (including by reason of a change in the equity ownership of the Debtor) and, (iv) any similar tax on the recording of deeds, transfers or property or ownership interests in property, recording of mortgages or other security instruments imposed by the State of New York, or any political subdivision thereof. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded (including, without limitation, the Register of the City of New York) shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.  All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Properties, any taxes from which the transactions effectuated pursuant to the Plan and Confirmation Order are exempt, pursuant to and in furtherance of section 1146(a) of the Bankruptcy Code and to the greatest extent provided by law, including but not limited to, New York State Real Estate Transfer Taxes, and any mortgage recording tax, and any penalties, interest, or additions to any tax related thereto.

### 6.    Amendments.

_Plan Modifications_.    Subject to all consent rights of the Sponsor and the Notes Trustee, respectively, under the Investment Agreement, the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan (i) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the

treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Notes Trustee and the Sponsor, the Debtor may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

*Other Amendments*.  Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement, with the consent of the Notes Trustee and the Sponsor (such consent not to be unreasonably withheld) without further order or approval of the Bankruptcy Court.

## 7.    Effectuating Documents and Further Transactions.

The Reorganized Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## 8.    Revocation or Withdrawal of Plan.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date in accordance with the Investment Agreement.  If the Plan has been revoked or withdrawn prior to the Effective Date in accordance with the Investment Agreement, or if confirmation or the occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor, the Notes Trustee, the Sponsor, or any other Entity.  This provision of the Plan shall have no adverse impact on the rights of the Notes Trustee, the Sponsor, or the Debtor in respect of any such revocation or withdrawal.

## 9.    Severability of Plan Provisions.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor with the reasonable consent of the Notes Trustee and the Sponsor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or further modified without the consent of (i) the Debtor or Wind-Down Co, as applicable, (ii) the Notes Trustee, and (iii) the Reorganized Debtor, but only to the extent such deletions or

WEIL:\98714375\5\12817.0007

modifications negatively impact the Reorganized Debtor, and (c) nonseverable and mutually dependent.

### 10. Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to the Debtor or the Reorganized Debtor, shall be governed by the laws of the state of incorporation or organization of the Debtor or Reorganized Debtor.

### 11. Time.

In computing any period of time prescribed or permitted by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12. Dates of Actions to Implement the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 13. Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtor.

### 14. Deemed Acts.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 15. Successor and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

WEIL:\98714375\5\12817.0007

### 16.    Entire Agreement.

On the Effective Date, the Plan, the Plan Supplement, the Investment Agreement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which shall be deemed to become merged and integrated into the Plan.

### 17.    Exhibits to Plan.

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement documents) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

## VII.
## VALUATION OF THE DEBTOR

***The Marketing Process Establishes the Debtor's Fair Market Value.***  As set forth above, the Debtor, in consultation with Meridian, conducted the extensive Marketing Process over a period of eleven (11) months to solicit interest and offers from potential third-party investors regarding a value-maximizing exit transaction.  In connection with the Marketing Process, interested parties were provided with the time, information and materials necessary to conduct extensive diligence regarding the Debtor's business.  As a result, the Marketing Process generated several bids and indications of interest for a transaction involving the Debtor.

The Debtor, in consultation with Meridian, focused on several criteria when evaluating the bids received, including, but not limited to: (a) the proposed purchase price and forms of consideration; (b) the proposed deal structure; (c) any proposed percentage ownership to be left with the Bondholders and other general unsecured creditors; (d) any diligence contingencies; and (e) the proposed amount of any deposit.  After receiving and evaluating the two Revised Bids submitted, the Debtor determined, in consultation with Meridian, that the offer received from the Sponsor and the related Investment Agreement contained, among other benefits, materially better economic terms than the any other bid received and presented the best actionable transaction to maximize value.  In addition, the Notes Trustee, on behalf of the Noteholders, the Debtor's largest creditor constituency, preliminarily consented to the Debtor's entry into the Investment Agreement.

Accordingly, the Debtor believes that the bid represented by the Investment Agreement establishes the fair market value of the Debtor's business because it represents a market-tested price and the greatest value achievable for the Debtor in the current market.

***The Debtor's December 2021 Appraisals.***  Attached hereto as **Exhibit E-1**, is an appraisal report, dated April 25, 2022, prepared by Level Valuation LLC, at the request of the Debtor (the "**LV Appraisal Report**").  The LV Appraisal Report estimates that, as of December 31, 2021, the appraisal value of 106 of the properties indirectly owned by the Debtor through the PropCos to be approximately $517,710,000.  As further described in the LV Appraisal Report, Level Valuation considered and evaluated three traditional valuation methodologies in preparing the appraisals: (i) income capitalization, (ii) sales comparison, and (iii) cost.  In addition to the LV Appraisal Report, separate appraisals were prepared for the Albee Square and North Flats properties, which are attached hereto as **Exhibit E-2** (the "**Additional Appraisal Reports**" and, together with the Level Appraisal Report, the "**Appraisal Reports**").  As set forth in the Additional Appraisal Reports,

the value of the Albee Square property, as of September 30, 2021, is estimated to be $161,500,000 and the value of the North Flats property, as of December 31, 2021, is estimated to be $83,500,000. The appraisal report prepared for the William Vale, based on the limited information available to the Debtor and the qualifications set forth therein, estimates the market value of the property to be $158,300,000 and $174,300,000 as of December 31, 2021 and December 31, 2023, respectively.

The value estimates set forth in the Appraisal Reports do not account for several factors that have a material negative impact on any residual value attributable to the Debtor, as the ultimate parent of the PropCos, including, without limitation, (i) the approximately $760 million in outstanding property-level mortgage debt, (ii) the interests and claims of the co-owners and partners in many of the PropCos and properties, (iii) any other claims or preferred interests that may be asserted against or in the PropCos or the properties that would be senior in priority to the claims of creditors of the Debtor, (iv) any claims relating to any debtor-in-possession financing, (v) any administrative expense claims arising out of or relating to the administration of the Chapter 11 Case, including the fees, costs, and expenses of any retained professionals in the Chapter 11 Case, and (vi) the approximately $565 million in funded debt and other claims against the Debtor.

***Financial Projections.*** Solely for purposes of the Plan, and solely based on information provided by the Debtor and without any independent verification, the Sponsor has prepared financial projections for the Reorganized Debtor following the Effective Date, which are attached to this Disclosure Statement as **Exhibit G** (the "**Financial Projections**"). In addition, the Sponsor anticipates that the equity interests in the Reorganized Debtor will be held through the following entities: Greenrock Realty Services LLC, Vickory Partners LLC, BVT Holdings LLC, and Cam Elm Company LLC. The principals who control these entities have more than seventy (70) years of combined experience in the real estate business. Currently, these individuals, through numerous entities, own and control over 40,000 residential apartments in the New York and New Jersey area and also own tens of millions of square feet of commercial and industrial space in and out of New York City. These principals also have several years of experience working with major financial and healthcare businesses. The Financial Projections and the experience and capabilities of these principals, among other things, demonstrate that the Reorganized Debtor has sufficient capital and means to consummate the Plan and meet its obligations on a go-forward basis, including with respect to the payments on the New Notes and all Unimpaired Claims under the Plan.

The Debtor and its professionals have not independently verified the Financial Projections prepared by the Sponsor. Such forecasts were developed solely for purposes of the formulation and negotiation of the Plan. Neither the Debtor, the Reorganized Debtor, the Sponsor, the Plan Administrator, nor any other person assumes responsibility for any differences between the estimated recoveries and actual outcomes.

## VIII.
## TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The offer, issuance, and distribution of the New Notes to holders of Allowed Remaining Unsecured Claims pursuant to the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act,

WEIL:\98714375\5\12817.0007

and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

The New Notes shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) the restrictions, if any, on the transferability of such securities and instruments, including, without limitation, any restrictions on the transferability under the terms of the New Notes, and (iv) applicable regulatory approvals.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a Claim against, or an Interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  In reliance upon this exemption, the New Notes issued to holders of Allowed Remaining Unsecured Claims generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a Claim with a view to distribution of any security to be received in exchange for the Claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

*Listing*.  Upon the Effective Date of the Plan, the New Notes will not be publicly traded or listed on any national securities exchange.  Accordingly, no assurance can be given that a holder of such

WEIL:\98714375\5\12817.0007

securities will be able to sell such securities in the future or as to the price at which any sale may occur.

*Legends.*

To the extent certificated, certificates evidencing the New Notes held by holders of 10% or more of the outstanding equity of the Reorganized Debtor, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE NOTES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS NEWCO RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## IX.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to holders of certain Claims entitled to vote on the Plan.  This summary does not address the U.S. federal income tax consequences to holders of Claims whose Claims are entitled to payment in full in Cash, holders of Claims who are deemed to have rejected the Plan, or holders of Interests.  Moreover, the following summary does not discuss the U.S. federal income tax consequences of the Plan if the Debtors elect prior to the Effective Date to pursue an Alternative Transaction.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), existing and proposed Treasury regulations thereunder, judicial authorities, published administrative rules and pronouncements of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties.  The Debtor has not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (such as non-U.S. persons, broker-dealers, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax deferred accounts, holders that are, or hold Claims through, S

WEIL:\98714375\5\12817.0007

corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction or other integrated investment, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The discussion assumes, except where otherwise indicated, that (i) the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. Each holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.*

## A.    Consequences to Debtor

The Debtor is a British Virgin Islands private company that has been treated as a disregarded entity for U.S. federal income tax purposes. As a disregarded entity, the Debtor is not subject to U.S. federal income tax. In addition, the Plan provides that the Debtor shall implement the Plan in a manner such that the Debtor should continue to be treated as a disregarded entity through the implementation of the Plan on the Effective Date.

Pursuant to the Plan, the Sponsor will acquire all of the Reorganized Debtor and, thus, all of the assets of the Debtor other than the Excluded Assets, in exchange for (i) at least $40,000,000 in Cash and (ii) New Notes in the aggregate principal amount of $20,000,000 (plus additional New Notes in the aggregate principal amount of $2,000,000 if the Sponsor, or its affiliate, closes the William Vale Purchase by year end), to be distributed pursuant to the Plan. The Excluded Assets and a portion of the Cash consideration will be transferred to Wind-Down Co. As discussed below, Wind-Down Co will be treated as a corporation for U.S. federal income tax purposes. *See* "Tax Treatment of Wind-Down Co and Wind Down Distributions," below.

For U.S. federal income tax purposes, the Debtor should be treated as selling (i) all of its assets (other than the Excluded Assets) to the Sponsor and (ii) all of its Excluded Assets to Wind-Down Co. It is also possible that the implementation of the Plan may result in the recognition of income from the cancellation of debt. However, as indicated, because the Debtor is a disregarded entity for U.S. federal income tax purposes, the Debtor does not expect to incur any U.S. federal income tax liability as a result of any income or gain that may be recognized as a result of the implementation of the Plan.

B.    **Tax Treatment of Wind-Down Co and Wind Down Distributions**

Pursuant to the Plan, Wind-Down Co will be a limited liability company that elects to be taxable as a corporation for U.S. federal income tax purposes, and the holders of Allowed Remaining Unsecured Claims (in respect of their right to any and all distributions from assets transferred to Wind-Down Co) will be regarded as the stockholders of Wind-Down Co for U.S. federal income tax purposes.

Accordingly, Wind-Down Co will be a separate taxable entity for U.S. federal, and applicable state and local, income tax purposes.  In general, Wind-Down Co's tax basis in the Excluded Assets will be the fair market value of the Excluded Assets at the time of transfer.  As a result, upon a disposition of the Excluded Assets, Wind-Down Co should generally only be taxable for U.S. federal income tax purposes on any appreciation in value after the Effective Date.

As a corporation for U.S. federal income tax purposes, the tax treatment of subsequent distributions by Wind-Down Co to the holders of Allowed Remaining Unsecured Claims as the regarded stockholders generally will depend on whether such distributions are made pursuant to a plan of liquidation adopted by the board.  Pursuant to the Plan, prior to making any such distributions, Wind-Down Co will adopt a "plan of liquidation" (as determined for U.S. federal income tax purposes) in furtherance of its duties and responsibilities under the Plan to monetize and distribute its assets.

Generally, if a subsequent distribution is made pursuant to a plan of liquidation, such distribution will be treated as a return of capital to the extent of a holder's tax basis in the stock (*i.e.,* the fair market value of the stock when received), and thereafter as gain in respect of the sale or exchange of the stock.  Otherwise, any distributions with respect to stock of Wind-Down Co will be treated as a taxable dividend to the extent paid out of Wind-Down Co's current or accumulated earnings and profits as determined under U.S. federal income tax principles, and will be taxable to the holder as ordinary income when received.  To the extent the amount of any distribution exceeds available earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the stock as to which the distribution was made, but not below zero.  Any remaining excess will be treated as gain from the sale or exchange of Wind-Down Co stock.  Depending on the type of holder and the holder's particular circumstances, a taxable dividend may be a qualified dividend entitled to a lower tax rate or may be eligible for a dividends received deduction (the benefits of which may be mitigated by the extraordinary dividend rules).

C.    **Consequences to Holders of Remaining Unsecured Claims**

Pursuant to the Plan, each holder of an Allowed Remaining Unsecured Claim will receive (i) on the Effective Date, its Pro Rata Share of the Class 4 ED Distribution (comprising both Cash and New Notes), with the exception that a portion of the New Notes potentially may be distributed after the Effective Date by year end (if the William Vale Purchase closes after the Effective Date), and (ii) thereafter, from Wind-Down Co as and when determined by the Plan Administrator, any available proceeds from the liquidation of the Excluded Assets and any remaining Wind Down Cash Funding (after satisfying all other obligations and expenses of Wind-Down Co).

75

The Debtor expects, and as indicated above the Plan provides, that the right of the holders of Allowed Remaining Unsecured Claims to any remaining amounts recoverable by Wind-Down Co will be treated as equity, and thus as stock, in Wind-Down Co for U.S. federal income tax purposes. Further thereto, the Plan requires that all holders of Claims report consistent therewith for all income tax purposes, use commercially reasonable efforts to cause consistent reporting by others, and not join in, encourage, and/or support inconsistent reporting by others. Accordingly, the following discussion assumes that each holder of an Allowed Remaining Unsecured Claim will be treated for U.S. federal income tax purposes (as regards to their right to any and all distributions from assets transferred to Wind-Down Co) as receiving stock in Wind-Down Co, and that any subsequent distributions from Wind-Down Co to holders of an Allowed Remaining Unsecured Claim will be treated as distributions to them as stockholders. For a discussion of the U.S. federal income tax treatment of such distributions to U.S. holders, *see* "Tax Treatment of Wind-Down Co and Wind Down Distributions," above.

As used herein, the term "U.S. holder" means a beneficial owner of a Remaining Unsecured Claim that is for U.S. federal income tax purposes:

1.   an individual who is a citizen or resident of the United States;

2.   a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

3.   an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

4.   a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Remaining Unsecured Claims, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.

1.      **Taxable Transaction**

In general, each U.S. holder of an Allowed Remaining Unsecured Claim will have a taxable exchange on the Effective Date. Accordingly, each U.S. holder of an Allowed Remaining Unsecured Claim generally should recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference, if any, between (i) the sum of the amount of any Cash, the "issue price" of the respective New Notes (as discussed below, see subsection 4 "Ownership and Disposition of the New Notes – Determination of OID and Issue Price") and the fair market value of Wind-Down Co stock received or treated as received by the holder (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued original issue discount ("**OID**")) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See*

"Character of Gain or Loss" below. In addition, a U.S. holder will have interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* "Distributions in Respect of Accrued But Unpaid Interest or OID" below. A U.S. holder that has an underlying Claim in multiple classes or receives consideration from multiple source generally will be taxed based on the aggregate consideration received in respect of such Claim.

In the event a portion of the New Notes is separately distributed after the Effective Date or any Disputed Remaining Unsecured Claims as of the Effective Date are subsequently disallowed, a holder of a previously Allowed Remaining Unsecured Claim may have additional gain (if any) and/or imputed interest income in respect of the additional distribution of New Notes or subsequent distributions from the Class 4 Disputed Claims Reserve or the deemed receipt of additional Wind-Down Co stock. *See* "Resolution of Disputed Remaining Unsecured Claims and Tax Treatment of the Class 4 Disputed Claims Reserve," below. In addition, it is possible that the recognition of any loss realized by a holder with respect to an Allowed Remaining Unsecured Claim as to which additional distributions could be received on account of the subsequent disallowance of Disputed Remaining Unsecured Claims may be deferred until all such Claims are Allowed or Disallowed. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such holders in respect of their Claims due to the receipt of cash in a taxable year subsequent to the taxable year in which the Effective Date occurs. This discussion assumes that the installment method does not apply, either because the exchange is not eligible or because the holder elects out of such treatment.

A U.S. holder's tax basis in the respective New Notes received and in the Wind-Down Co stock treated as received should equal the amount taken into account in determining the holder's gain or loss, and the U.S. holder's holding period in such New Notes and stock generally should begin on the day following the Effective Date.

## 2. Character of Gain or Loss

Where gain or loss is recognized by a U.S. holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. holder, whether the Claim constitutes a capital asset in the hands of the U.S. holder and how long the Claim has been held, whether the Claim was acquired at a market discount, and whether and to what extent the U.S. holder previously claimed a bad debt deduction.

A U.S. holder that purchased any debt underlying its Claim from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.

Under these rules, any gain recognized on the exchange of such Claim (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. holder, on a

77

constant yield basis) during the U.S. holder's period of ownership, unless the U.S. holder elected to include the market discount in income as it accrued.  If a U.S. holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

### 3.      Distributions in Respect of Accrued but Unpaid Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. holder of an Allowed Remaining Unsecured Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. holder as interest income (if not previously included in the U.S. holder's gross income).  Conversely, a U.S. holder generally recognizes a deductible loss to the extent any accrued interest claimed or accrued OID was previously included in the U.S. holder's gross income and is not paid in full.

The Plan provides that consideration received in respect of an Allowed Claim is allocable first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the portion of such Allowed Claim (if any) that reflects reimbursable expenses, and then to the accrued and unpaid interest on such Allowed Claim, if any.  *See* Section 6.16 of the Plan.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  You are urged to consult your own tax advisor regarding the allocation of consideration and the inclusion and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 4.      Ownership and Disposition of the New Notes

The following discussion is based on the principal terms of the New Notes set forth in the form of New Note included as an exhibit to the Plan.  To the extent the terms vary, and depending on any additional terms, as well as the applicable facts and circumstances as the issue date of the New Notes, the federal income tax treatment may differ from that described below.  *All holders are urged to consult their tax advisors regarding the tax treatment of the New Notes.*

Of particular note regarding present terms of the New Notes is that the principal amount of the New Notes is subject to reduction in the event of any Subsidiary Value Reductions (as defined in the Investment Agreement) during the nine-month period after the Closing Date.  Accordingly, it is possible that the New Notes may be regarded as a "contingent payment debt instrument" for U.S. federal income tax purposes unless, based on all the facts and circumstances as of the issue date, it is "significantly more likely than not" that the scheduled payment of the full stated principal amount will occur.  The Debtor currently believes, and the tax discussion herein assumes, that it *is* significantly more likely than not that the full stated principal amount will be paid, and that the New Notes are therefore not contingent payment debt instruments.  However, such determination ultimately will be made by the Reorganized Debtor, based on the facts and circumstances at the time of the issuance of the New Notes.

### a.      Determination of OID and Issue Price

The New Notes will be considered issued with OID in an amount equal to the excess of the "stated redemption price at maturity" of the New Notes over the "issue price" of the New Notes (as

discussed below) by an amount equal to or greater than a statutorily defined *de minimis* amount. The *de minimis* amount is equal to 0.25% of the stated redemption price at maturity multiplied by the number of remaining whole years to maturity. The stated redemption price at maturity of the New Notes is the total of all payments due on the New Notes other than payments of "qualified stated interest" (of which there are none under the present terms). In general, qualified stated interest means stated interest that is unconditionally payable in Cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or a single qualified floating rate.

For U.S. federal income tax purposes, the "issue price" of the New Notes depends, in part, on whether (i) any Allowed Remaining Unsecured Claims (in particular, any of the Noteholder Claims) are considered traded on an "established market" for U.S. federal income tax purposes and (ii) whether a portion of the New Notes are separately issued after the Effective Date (due to a post-Effective Date closing of the William Vale Purchase). The issue price of a debt issuance that is traded on an established market or that is issued, in whole or in part, for existing debt so traded would be the fair market value of such debt issuance (or such exchanged debt) on the issue date as determined by such trading. Subject to certain exceptions, the issue price of a debt that is neither so traded, nor issued for existing debt so traded, would be the lower of its imputed principal amount (*i.e.,* all payments on the note discounted back based on the applicable federal rate published by the IRS) or its stated principal amount. Thus, in this latter instance, since the New Notes do not bear any stated interest, the issue price would be its imputed principal amount.

Pursuant to applicable Treasury regulations, a debt instrument will not be treated as traded on an established market if the outstanding stated principal amount of such debt instrument does not exceed $100 million. Accordingly, since the stated principal amount of the New Notes will in no event exceed $22 million, whether the New Notes are considered traded on an established market depends on whether any series of Noteholder Claims that have an outstanding principal amount in excess of $100 million is traded on an established market. Any such series of Noteholder Claims will be treated as traded on an established market for U.S. federal income tax purposes only if it is traded on an established market during the 31-day period beginning 15 days before the Effective Date. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale of the Noteholder Claims, or if there is one or more "firm quotes" or "indicative quotes" for such debt, in each case as such terms are defined in applicable Treasury regulations. If the Reorganized Debtor determines that an applicable trading market exists, such that the issue price of the New Notes is its fair market value (based on the trading in the Noteholder Claims), such determination as to the existence of an applicable trading market and the resulting issue price of the New Notes will be binding on all holders of Allowed Remaining Unsecured Claims unless such holder discloses, on a timely filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from the Reorganized Debtor's determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

In the event the William Vale Purchase occurs after the Effective Date, additional New Notes will be issued and distributed after the Effective Date (in the aggregate stated principal amount of $2 million) and might have a different "issue price" than the New Notes issued on the

WEIL:\98714375\5\12817.0007

Effective Date and, thus, might not be fungible for U.S. federal income tax purposes or from a sale perspective.  In general, whether the additional New Notes would have the same issue price with the previously issued New Notes will depend on whether the issuance of such additional New Notes is part of the same "issue" as the previously issued New Notes (meaning that they are issued within 13 days after the Effective Date) or is treated as a "qualified reopening" within the meaning of the Treasury regulations governing subsequent issuances (which depends, in part, on whether the effective yield of the additional notes is within 10% of the original notes).

As previously discussed, the principal amount of the New Notes may be reduced under certain circumstances.  Were such circumstances to occur, a U.S. holder may be required to redetermine the issue price of the New Notes at such time, as discussed in the next section.

### b.    Treatment as Reissuance Upon Actual Occurrence of Contingency

As discussed above, the discussion herein assumes that, as of the issue date of the New Notes, it is "significantly more likely than not" that the scheduled payment of the full stated principal amount will occur.  Nevertheless, there exists the possibility that the principal amount may be subsequently reduced under certain circumstances.  If such circumstances actually occur, the New Notes will be treated as reissued at such time solely for purposes of the OID rules, for an amount equal to the adjusted issue price of the New Notes and a stated redemption price at maturity equal to the reduced principal amount.  *All holders are urged to consult their tax advisors regarding the tax treatment of the New Notes in the event of a deemed reissuance.*

### c.    Accrual and Amortization of OID

A U.S. holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a "constant yield" to maturity basis over the term of the New Notes, in advance of the receipt of the cash attributable to such OID and regardless of the U.S. holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the New Notes that is attributable to previously accrued OID that has been included in the U.S. holder's income.

The amount of OID includible in income for a taxable year by a U.S. holder generally will equal the sum of the "daily portions" of the total OID on the New Notes for each day during the taxable year (or portion thereof) on which such U.S. holder held the New Notes.  Generally, the daily portion of the OID is determined by allocating to each day during an accrual period a ratable portion of the OID on such New Notes that is allocable to the accrual period in which such day is included.  The amount of OID allocable to each accrual period generally will be an amount equal to the excess of (i) product of (x) "adjusted issue price" of such New Notes at the beginning of such accrual period and (y) its "yield to maturity" over (ii) the aggregate amount of any qualified stated interest payments allocable to the accrual period.  The "adjusted issue price" of such New Notes at the beginning of any accrual period will equal the issue price, increased by the total OID accrued for each prior accrual period, less any cash payments made on such New Notes on or before the first day of the accrual period (other than qualified stated interest).

The "yield to maturity" of the New Notes will be computed on the basis of a constant annual interest rate and compounded at the end of each accrual period.  If the amount of OID on the New

WEIL:\98714375\5\12817.0007

Notes is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID generally will be treated as gain from the sale of the New Notes, and a Pro Rata amount of such *de minimis* OID must be included in income as principal payments are received on the New Notes.

### d. Sale or other Disposition of New Notes

Subject to the discussion above with respect to the potential carryover of accrued market discount to the New Notes, upon the sale, exchange or other taxable disposition of a New Note, a U.S. holder generally will recognize taxable gain or loss equal to the difference, if any, between (i) the sum of cash plus the fair market value of any property received from such sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and (ii) the U.S. holder's adjusted tax basis in their interest in the New Note. A U.S. holder's initial tax basis in a New Note will be increased by any OID previously included in income and decreased by any payments received on the New Notes other than qualified stated interest. Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the New Note has been held for more than one year at the time of its sale, exchange or other taxable disposition. Certain non-corporate U.S. holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains. The deductibility of capital losses is subject to significant limitations.

### 5. Resolution of Disputed Remaining Unsecured Claims and Tax Treatment of the Class 4 Disputed Claims Reserve

Any cash and New Notes that would be distributable in respect of any Disputed Remaining Unsecured Claim on the Effective Date had such Disputed Claim been Allowed will be deposited into the Class 4 Disputed Claims Reserve as determined pursuant to the Plan or an estimation proceeding. As discussed below, the Class 4 Disputed Claims reserve is intended to be treated as a "disputed ownership fund" for U.S. federal income tax purposes. In contrast, any amounts that would subsequently be distributable by Wind-Down Co in respect of a Disputed Remaining Unsecured Claim if such Claim were to be ultimately Allowed shall be retained as an asset of Wind-Down Co and not distributed until such Claim is resolved. Consistent with the treatment of the right of holders of Allowed Remaining Unsecured Claims to any remaining amounts recoverable by Wind-Down Co as stock in Wind-Down Co for U.S. federal income tax purposes, the resolution of a Disputed Remaining Unsecured Claim likely will result in a deemed distribution of stock in Wind-Down Co to the holder of the Disputed Remaining Unsecured Claim to the extent Allowed and otherwise to holders of previously Allowed Remaining Unsecured Claims.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will treat the Class 4 Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury regulations section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtor, the Reorganized Debtor, the Plan Administrator, any Disbursing Agent, and the holders of Remaining Unsecured Claims) shall be required to report for tax purposes consistently with the foregoing.

A disputed ownership fund is a separate taxable entity for U.S. federal income tax purposes. Accordingly, the Class 4 Disputed Claims Reserve will be subject to tax annually on any net income earned with respect to its assets (including any gain recognized by it upon its distribution of the New Notes, due to the treatment of such distribution as a sale at fair market value).  A disputed ownership fund that holds only passive assets is taxed at the maximum rate applicable to trusts and estates.  The Class 4 Disputed Claims Reserve will be responsible for payment, out of available Cash of such reserve allocable to the respective Disputed Remaining Unsecured Claims, of any taxes imposed on the Class 4 Disputed Claims Reserve or with respect to its assets.  If the Class 4 Disputed Claims Reserve has insufficient Cash to pay such taxes, Wind-Down Co will be responsible for the payment of such taxes.

To the extent that a Disputed Remaining Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent will distribute to the holder thereof out of the Class 4 Disputed Claims Reserve any amount to which such holder is entitled pursuant to the Plan with respect to the amount of any cash and New Notes distributable on the Effective Date (which distribution will be net of allocable expenses of the reserve, including taxes, relating to the retention or disposition of such assets).  Alternatively, the Disbursing Agent will distribute such amount to holders of previously Allowed Remaining Unsecured Claims in accordance with the Plan.  All distributions from the Class 4 Disputed Claims Reserve will be treated as received by holders in respect of their Claims as if distributed by the Debtors.

## 6.    Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

*The foregoing summary has been provided for informational purposes only.  All holders of Claims and Interests are urged to consult their tax advisors concerning the U.S. federal, state, local, and other tax consequences applicable under the Plan.*

# X.
# CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference herein. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

## A.      Certain Bankruptcy Law and International Considerations

### 1.      Risk of Non-Confirmation of Plan

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, even though the Notes Trustee, on behalf of the Noteholders, has preliminarily consented to the Debtor's entry into the Investment Agreement, the Debtor can make no assurances that it will receive the requisite acceptances to confirm the Plan through this solicitation process.  Even if the Voting Class votes in favor of the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

In the event that the Debtor is unable to obtain sufficient votes from the Voting Class, the Debtor may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims as those proposed in the Plan.

### 2.      Failure to Obtain Israeli and BVI Court Approvals

The Investment Agreement and the Plan require the Debtor to seek certain approvals from the BVI and Israeli Courts in order to consummate the transactions contemplated thereunder, including, without limitation, approval of the BVI Plan of Arrangement by the BVI Court and recognition of the Plan and the Confirmation Order by the Israeli Court.  The Debtor anticipates obtaining the necessary approvals from the BVI and Israeli Courts by October 2022; however, there can be no assurance that the necessary approvals from these courts will not take longer than anticipated. Further, although the Debtor believes that the Plan and the transactions contemplated thereunder will satisfy all of the applicable requirements under BVI and Israeli law, there can be no assurance that the BVI and Israeli Courts will reach the same conclusion or that modifications to the Plan will not be required or that such modifications would not necessitate re-solicitation of votes.

### 3.      Non-Consensual Confirmation

In the event that any impaired class of claims or equity interests does not accept or is deemed not to accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being

determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to, or be deemed to, reject the Plan, these requirements must be satisfied with respect to such rejecting Classes. Pursuant to the Plan, the Non-Voting Impaired Classes – Class 5 (Subordinated Securities Claims) and Class 6 (Equity Interests) – are deemed to reject the Plan and, accordingly, are not entitled to vote. The Debtor believes that the Plan satisfies these requirements with respect to such Classes.

### 4.    Risk Related to Parties in Interest Objecting to the Debtor's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 5.    Risk of Non-Occurrence of Effective Date

The consummation of the Investment Agreement is a condition precedent to the Effective Date of the Plan. The Investment Agreement provides that the agreement may be terminated by either the Debtor or the Sponsor before the closing if, among other things, the closing does not occur by September 23, 2022 (the "**Outside Date**").[17] Although the Debtor believes that the closing will occur in advance of the Outside Date, there can be no assurance as to the timing of the closing. Further, if the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtor and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to Claims and Interests would remain unchanged.

### 6.    Risks Associated with the Investment Agreement

As set forth above, the Plan is premised on the Investment Agreement which provides for the closing of the transactions contemplated thereunder and the distribution of the proceeds from such closing in accordance with the Plan. There are various closing conditions under the Investment Agreement, which the Debtor believes it can satisfy. However, in the event the Debtor fails to satisfy any of the closing conditions or the Investment Agreement is terminated in accordance with its terms for any reason as permitted therein or otherwise, including as a result of breach by the

---

[17] This deadline may be extended in certain circumstances to December 31, 2022, as set forth in Section 11.01(d) of the Investment Agreement.

WEIL:\98714375\5\12817.0007

Sponsor, the Chapter 11 Case and distributions to holders of Claims and Interests could be significantly impacted.

In addition, the Investment Agreement provides that the Plan Consideration may be subject to downward adjustment if the Sponsor, between March 2, 2022 and nine months following the closing, discovers that the actual percentage of the Debtor's direct or indirect equity interest or ownership interest in a Subsidiary or any Owned Real Property (each as defined in the Investment Agreement), is less than as stated in the Investment Agreement. Any adjustments to the purchase price would reduce the amount of funds available for distribution to holders of Claims and Interests.

### 7.      DIP Financing

As set forth above, to continue its business operations and fund the Chapter 11 Case, the Debtor has negotiated and secured a commitment for a multiple draw debtor-in-possession term loan from the Sponsor and filed the DIP Motion to seek approval of the proposed DIP Loan. If the Chapter 11 Case takes longer than expected to conclude or the Debtor defaults under its obligations under the DIP Loan, the Debtor may exhaust or lose access to its financing before the transactions contemplated under the Investment Agreement can be effectuated. There is no assurance that the Debtor will be able to obtain additional financing from other third-party lenders. In either such case, the liquidity necessary to bridge to the closing under the Investment Agreement may be materially impaired.

### 8.      Conversion into Chapter 7 Case

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* Article XI hereof, as well as the Liquidation Analysis attached hereto as **Exhibit H**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### B.      Additional Factors Affecting the Value of the Debtor

### 1.      Claims Could Be More than Projected

There can be no assurance that the Allowed amount of Claims in Class 4 (Remaining Unsecured Claims) will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, unanticipated events and circumstances may affect the ultimate results. With respect to the Non-Securities Indemnity Claims, there is a risk that the Bankruptcy Court determines that such Claims should not be estimated at zero dollars ($0) for all purposes under the Plan. Therefore, the actual amount of Allowed Claims may vary from the Debtor's feasibility analysis, and the variation may be material.

WEIL:\98714375\5\12817.0007

### 2.    Valuation Regarding Avoidance Actions and Causes of Actions

Under the Plan, the Plan Administrator has the right to pursue and prosecute Avoidance Actions and other Causes of Action. The Debtor has not performed an analysis of the potential value, if any, of the Avoidance Actions or other Causes of Action. The amount and timing of recovery thereof are unknown. Any proceeds of the Avoidance Actions and other Causes of Action would benefit the holders of Remaining Unsecured Claims.

### 3.    Inability to Meet Future Obligations

As set forth in Article VII above, the Financial Projections attached hereto as **Exhibit G** demonstrate that the Reorganized Debtor has sufficient capital and means to consummate the Plan and meet its obligations on a go-forward basis. However, due to various unforeseen market factors and causes, there is a risk that the Reorganized Debtor will not generate sufficient cash to meet its future obligations, including with respect to the payments on the New Notes and satisfaction of any Unimpaired Claims under the Plan.

### C.    Additional Factors

### 1.    Debtor Could Withdraw the Plan

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor.

### 2.    Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.    No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or whether to object to confirmation of the Plan.

5.        **No Admission Made**

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or holders of Claims or Interests.

6.        **Certain Tax Consequences**

For a discussion of certain tax considerations to the Debtor and certain holders of Claims in connection with the implementation of the Plan, *see* Article IX hereof.

## XI.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, all creditors entitled to vote in the Voting Class should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

A.        **Voting Instructions and Voting Deadline**

The Debtor is providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (the "**Solicitation Package**") to all record holders of Claims in Class 4 (Remaining Unsecured Claims).

With respect to the Claims in the Voting Class held by the Noteholders, the Debtor will transmit one Solicitation Package to the Notes Trustee on account of the Noteholders' Claims in Class 4 (Remaining Unsecured Claims), which shall include a master Ballot to aggregate the votes for all such claims.  The master Ballot to be transmitted to the Notes Trustee will specify that the Notes Trustee is to submit the completed and executed Ballot to the Debtor by electronic mail.  Further, in connection with voting on the Plan, each Noteholder will be provided with the opportunity to elect to assign any and all claims and causes of action that such Noteholder may hold in its capacity as a Noteholder to the Plan Administrator to pursue for the benefit of such Noteholders.  The master Ballot will provide a space for the Notes Trustee to record whether a Noteholder has affirmatively elected to assign such claims and causes of action to the Plan Administrator.

With respect to any other holders of Claims in Class 4 (Remaining Unsecured Claims), the Debtor will transmit a general Ballot to such holders that can be used to vote on the Plan.

**Each Ballot contains detailed voting instructions.  Each Ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date, and the applicable standards for tabulating Ballots.  The Voting Record Date for determining which holders are entitled to vote on the Plan is September 12, 2022.  Please complete the information requested on the Ballot, sign, date and indicate your vote on the Ballot, and return the completed Ballot in the manner specified on the Ballot you received.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE**

**OF SEPTEMBER 19, 2022 AT 5:00 P.M. (EASTERN TIME). HOWEVER, THE VOTING DEADLINE MAY BE EXTENDED IN THE SOLE DISCRETION OF THE DEBTOR.**

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED IN DETERMINING ACCEPTANCE OF THE PLAN.

If you hold a Claim in the Voting Class and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact any of the representatives at the Voting Agent at (212) 771-1128 or (ii) by emailing DRCVote@DonlinRecano.com.

### B.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan. Pursuant to section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not actually vote on the Plan and will not receive a Ballot. If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan.

The Voting Class. The only Voting Class that is Impaired and entitled to receive distributions under the Plan and, therefore, the only class that is entitled to vote to accept or reject the Plan, is Class 4 (Remaining Unsecured Claims). Accordingly, the votes of the holders of Claims in Class 4 will be solicited in connection with the Plan.

Based upon the Debtor's Schedules and the provisions of the Plan, creditors in Class 4 (Remaining Unsecured Claims) may vote on the Plan unless:

WEIL:\98714375\5\12817.0007

     (i)       as of the Voting Record Date, the outstanding amount of such claimant's Claim is not greater than zero ($0.00);

     (ii)     as of the Voting Record Date, such claimant's Claim has been disallowed, expunged, disqualified, or suspended; or

     (iii)    as of the Voting Record Date, such claimant's Claim is subject to an objection or request for estimation, in accordance with the procedures set forth below.

Any creditor that is not scheduled in the Debtor's Schedules and that did not file a proof of Claim prior to the Voting Record Date shall not be entitled to vote on the Plan.

The Non-Voting Classes.  The Plan does not impair Claims in the Unimpaired Classes – Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (General Unsecured Claims).  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in the Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote.  Further, the holders of Claims or Interests in the Non-Voting Impaired Classes – Class 5 (Subordinated Securities Claims) and Class 6 (Equity Interests) – are not entitled to receive or retain any property under the Plan.  Therefore, pursuant to section 1126(g) of the Bankruptcy Code, the Non-Voting Impaired Classes are deemed to reject the Plan and, accordingly, are not entitled to vote.  Accordingly, no holders of Claims against, and Interests in, the Debtor in the Non-Voting Classes will be solicited in connection with the Plan.  The holders of Claims against and Interests in the Debtor in the Non-Voting Classes will, however, receive notice of the hearing to consider approval of this Disclosure Statement and confirmation of the Plan and related dates and deadlines.

Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a Claim, and without prejudice to the rights of the Debtor to dispute the allowance of any Claim, each Claim within the Voting Class will be temporarily Allowed in an amount equal to the amount of such Claim set forth in the Debtor's Schedules; *provided*, *however*, that:

     (i)     if a Claim is allowed pursuant to the Plan or by order of the Bankruptcy Court (entered prior to the Voting Deadline), such Claim shall be allowed for voting purposes in the Allowed amount set forth in the Plan or such order;

     (ii)    if a Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, such Claim is temporarily allowed for voting purposes in the amount so estimated or Allowed in such order;

     (iii)   if a Claim is listed in the Schedules as partially unliquidated such claim shall be allowed in the partially liquidated amount for voting purposes only;

     (iv)   if a Claim is listed in the Schedules as wholly contingent, unliquidated, or disputed, such Claim is accorded one vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution; and

WEIL:\98714375\5\12817.0007

(v)      if a creditor holds or has purchased, based on the Schedules, duplicate Claims within the same class, such creditor shall be provided with only one Solicitation Package and one Ballot for voting a single aggregated Claim in such class.

If a creditor seeks to challenge the allowance or amount of its Claim for voting purposes, the creditor is required to file with the Bankruptcy Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes in a different amount.  Upon the filing of any such motion, the creditor's Ballot shall not be counted unless temporarily allowed by an order of the Bankruptcy Court entered prior to or concurrently with entry of an order confirming the Plan.  All motions pursuant to Bankruptcy Rule 3018(a) must be filed on or before the date which is seven (7) days prior to the Voting Deadline.

The Plan provides for the allowed amount of the Claims against the Debtor arising from the various series of Notes issued by the Debtor.

For a detailed description of the treatment of Claims and Interests under the Plan, *see* Article VI of this Disclosure Statement.

### C.      **Change of Vote**

Any party who has submitted a properly completed Ballot to the Voting Agent prior to the Voting Deadline may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

### D.      **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtor, as applicable, in its sole discretion, which determination will be final and binding.  The Debtor reserves the right to reject any and all Ballots submitted by any of its creditors not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, as applicable, be unlawful.  The Debtor further reserves its rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of its creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines.  Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

WEIL:\98714375\5\12817.0007

### E.    Miscellaneous

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted in determining acceptance or rejection of the Plan.  The Debtor, in its sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.  If you return more than one Ballot voting different Claims with the Ballots reflecting different votes, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  The holders of claims in the Voting Class are required to vote all of their Claims either to accept or reject the Plan.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will not be counted.

The Ballots provided to the holders of Claims in the Voting Class will reflect the principal amount of such claimant's Claim.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of Claims in Class 4 who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtor may, in its sole discretion, reject such Ballot as invalid and, therefore, decline to utilize it in connection with seeking confirmation of the Plan.

### XII.
### CONFIRMATION OF PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  On, or shortly following, the date hereof, the Debtor will request that the Bankruptcy Court schedule a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), which hearing may be adjourned at the request of the Debtor, including in the event that approval from the Israeli Court to convene the Noteholder Meeting prior to commencing solicitation takes longer than anticipated.    Notice of the Confirmation Hearing will be provided to all known holders of Claims and Interests or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Case.

### B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector,

WEIL:\98714375\5\12817.0007

the nature and amount of Claims or Interests held or asserted by the objector against the Debtor's estate, the basis for the objection and the specific grounds thereof, and must be filed with the Bankruptcy Court, with a copy to the chambers of Chief United States Bankruptcy Judge Martin Glenn, the United States Bankruptcy Judge appointed to the Chapter 11 Case, together with proof of service thereof, and served **no later than September 19, 2022, at 5:00 p.m. (Eastern Time) (the "Confirmation Objection Deadline")**, upon the following parties in accordance with the Local Bankruptcy Rules and via email, including such other parties as the Bankruptcy Court may order:

    (a)    The Debtor:

        All Year Holdings Limited
        12 Spencer Street, 3rd Floor
        Brooklyn, NY 11205
        Attn: Mr. Assaf Ravid and Mr. Ephraim Diamond
        Email: ravidasaf@gmail.com and ephraim@arbelcapital.com

        -and-

        Weil, Gotshal & Manges LLP
        767 Fifth Avenue
        New York, NY 10153
        Attn:   Gary T. Holtzer, Esq.
               Matthew Goren, Esq.
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007
        Email: Gary.Holtzer@weil.com
               Matthew.Goren@weil.com

    (b)    The Notes Trustee:

        Mishmeret Trust Company Ltd.
        48 Menachem Begin Road
        Tel Aviv 6618001
        Israel

        -and-

        Chapman and Cutler LLP
        1270 Avenue of the Americas
        New York, NY 10020
        Attention: Michael Friedman, Esq.
        Email: friedman@chapman.com

        -and-

        Chapman and Cutler LLP

111 West Monroe Street
Chicago, IL 60603
Attention: Stephen Tetro, Esq.
Email: stetro@chapman.com

(c)        The Sponsor

Gissin & Co.
Habarzel 38B
Tel Aviv 6971054, Israel
Attention: Yael Hershkovitz, Esq.
Email: Yael@gissinlaw.co.il

-and-

Locke Lord LLP
200 Vesey Street, 20th Floor
New York, NY 10281
Attention: Shalom Jacob, Esq.
Email: SJacob@lockelord.com

-and-

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attention: Avi D. Feinberg, Esq.
Email: Avi.Feinberg@friedfrank.com

(d)        The United States Trustee

The United States Trustee Office Region 2
Attn: Andrea B. Schwartz and Shara Cornell, Esq.
U.S. Federal Building
201 Varick Street, Room 1006
New York, NY 10014-7016
Email: andrea.b.schwartz@usdoj.gov
          shara.cornell@usdoj.gov

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

WEIL:\98714375\5\12817.0007

C.      **Requirements for Confirmation of Plan**

1.      **Requirements of Section 1129(a) of the Bankruptcy Code**

(a)      General Requirements.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)     the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    the Debtor has complied with the applicable provisions of the Bankruptcy Code;

(iii)   the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)    any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)     the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan;

(vi)    with respect to each Class of Claims or Interests, each holder of an impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)   except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either has accepted the Plan or is not impaired under the Plan;

WEIL:\98714375\5\12817.0007

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full the allowed amount of such Claims on the Effective Date, and that priority tax Claims will receive either payment in full of the allowed amount of such Claims on the Effective Date or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan; and

(xi)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)    Acceptance of the Plan

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (1) holders of at least two-thirds (2/3) in amount and (2) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan.

Holders of Claims that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTOR WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

(c)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the Plan or (ii) receive or retain under the plan property of a value, as of the Effective Date of the Plan, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

95

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive upon a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtor believes that under the Plan all holders of impaired Allowed Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtor's belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Allowed Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit H**.

The Debtor believes that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor. The Liquidation Analysis provided in **Exhibit H** is solely for the purpose of disclosing to holders of Claims the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(d)     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan satisfies this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan and the Sponsor's financial wherewithal to consummate the transactions contemplated under the Investment Agreement. Based upon this analysis, the Debtor believes that it will have sufficient resources to make all payments required pursuant to the Plan.

The Sponsor has prepared the Financial Projections annexed hereto as **Exhibit G** based on the information provided by the Debtor. Based upon the Financial Projections and the other information provided by the Sponsor to demonstrate its financial wherewithal, the Debtor believes that the Reorganized Debtor to comply with its obligations under the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Reorganized Debtor. Accordingly, the Debtor believes the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code. Article XI hereof sets forth certain risk factors that could impact the feasibility of the Plan.

### 2.    Additional Requirements for Non-Consensual Confirmation

With respect to the Non-Voting Impaired Classes – Class 5 (Subordinated Securities Claims) and Class 6 (Equity Interests) – which are Impaired and deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each such Class of Claims, the Plan "does not discriminate unfairly" and is "fair and equitable", pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

The Debtor submits that the "unfair discrimination" and "fair and equitable" tests are satisfied.

(a)    Unfair Discrimination Test

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtor believes the Plan satisfies the "unfair discrimination" test.  The Bankruptcy Code provides that the Subordinated Securities Claims in Class 5 are to be subordinated to claims held by general unsecured creditors, such as holders of Remaining Unsecured Claims (Class 4) and General Unsecured Claims (Class 3).  Consequently, the disparate treatment of the Subordinated Securities Claims is consistent with the Bankruptcy Code.  Further, the holders of Equity Interests (Class 6) are not entitled to any recovery under the Plan and, accordingly, the disparate treatment of the Equity Interests is consistent with the Bankruptcy Code.

Moreover, based on the estimated recoveries, as further set forth in Article VI, no class of Claims is receiving more than 100% of its Claims.

(b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied for the plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the plan.

The Debtor believes that the Plan satisfies the "fair and equitable" test.

- **Unsecured Creditors**.  Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.  Except to the

WEIL:\98714375\5\12817.0007

extent that a holder of a General Unsecured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of a Class 3 General Unsecured Claim are unaltered by the Plan.  Although holders of Allowed Class 4 Remaining Unsecured Claims are not likely to receive payment in full of their claims, the Plan provides that junior classes, i.e., the holders of the Class 5 Subordinated Securities Claims and Class 6 Equity Interests will not receive or retain any property under the Plan.  Accordingly, the Plan meets the "fair and equitable" test with respect to Class 3 General Unsecured Claims and Class 4 Remaining Unsecured Claims against the Debtor.  Further, since the holders of Class 6 Equity Interests will not receive or retain any property under the Plan, the Plan meets the "fair and equitable" test with respect to Class 5 Subordinated Securities Claims against the Debtor.

- **Interests**.  Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.  There are no holders of equity interests in the Debtor that are junior to the Class 6 Equity Interests.   Accordingly, the Plan meets the "fair and equitable" test with respect to Class 6 Equity Interests.

## XIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has evaluated several alternatives to the Plan.  After studying these alternatives, the Debtor has concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.  In addition, as set forth below, the Debtor evaluated whether it could continue to operate its business outside of bankruptcy if the Chapter 11 Case was closed without confirmation and implementation of the Plan.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtor (or if the Debtor's exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve the sale of the Debtor's assets to a party other than the Sponsor through a newly negotiated investment agreement.  Based upon the extensive marketing efforts conducted both prior to and during the Chapter 11 Case, the Debtor believes that the Plan premised on the Investment Agreement, as described herein, enables its key creditor constituencies to realize the most value under the circumstances and is in the best interests of all stakeholders.

### B.    Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtor could seek authorization from the Bankruptcy Court, after notice and a hearing, to sell its assets under section 363 of the Bankruptcy Code.  However, upon

WEIL:\98714375\5\12817.0007

analysis and consideration of this alternative, the Debtor does not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Plan as a result of, among other things, (i) the incurrence of potentially significant transfer taxes that would be incurred in connection with multiple transactions that would otherwise be avoided under a chapter 11 plan, (ii) the time and expense of negotiating with PropCo-level partners and mortgage lenders on each one-off sale, and (iii) the additional time and expense required to maintain and administer the Chapter 11 Case to pursue the section 363 transactions, including any additional brokerage fees or other professional fees.

## C.      Continued Operation Outside of Bankruptcy

In connection with certain disclosure requirements under applicable Israeli law, the Debtor has evaluated the alternative scenario in which the holders of Class 3 General Unsecured Claims and Class 4 Remaining Unsecured Claims convert their claims into equity of the Debtor and continue to operate the Debtor in the ordinary course for a period of five years, after which time the Debtor consummates a sale of the existing properties in its portfolio (such analysis, the "**Five Year Operating Plan**"). The Five Year Operating Plan attached hereto as **Exhibit D-3** reflects, to the best of the Debtor's knowledge, information, and belief, and subject to the disclaimers set forth in **Exhibit D-3** and in this Disclosure Statement, the expected result of continued operation of the Debtor during the applicable period.  As set forth in **Exhibit D-3**, the alternative scenario contemplated under the Five Year Operating Plan does not result in materially higher recoveries to the holders of Class 3 General Unsecured Claims and Class 4 Remaining Unsecured Claims and presents substantial risks.  In addition to delaying the distribution of proceeds to such holders for a period of five years, the Debtor estimates that financing of approximately $24.1 million will be necessary to continue to fund the operations of the Debtor and its non-debtor subsidiaries, and there is no guarantee the Debtor would be able to secure such financing.  Further, if the Debtor continued the operation of its business outside of bankruptcy, the Debtor would continue to be exposed to the industry risks and unknowns that currently face real estate businesses operating in the New York residential real estate market.  Accordingly, the Debtor believes that consummation of the Plan and the Investment Agreement is in the best interests of the Debtor and its various stakeholders and is superior to the continued operation of the Debtor's business outside of bankruptcy as contemplated under the Five Year Operating Plan.

## D.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit H**.

The Debtor believes that liquidation under chapter 7 would result in lower distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the case and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtor's Chapter 11 Case.  In the event that the Debtor's assets are

WEIL:\98714375\5\12817.0007

liquidated under chapter 7, the Debtor's estate would also likely incur several additional fees and expenses as a result of conducting the liquidation, which may include, without limitation, additional brokerage fees, certain transfer taxes, and, if applicable, prepayment penalties related to satisfying any outstanding property-level mortgage debt. These are in addition to the additional layer of fees that may be incurred by a chapter 7 trustee and its professionals. The payment of all of these fees and expenses would reduce the amount of funds available for distribution to the Debtor's creditors. In addition, the consent of the Debtor's co-owners and partners at the property level may be required to liquidate certain of the Debtor's holdings, which presents the risk that such consents may be withheld and those assets could not be liquidated for the benefit of creditors.

## XIV.
## CONCLUSION AND RECOMMENDATION

The Debtor believes the Plan is in the best interests of all stakeholders and urges the holders of Claims in Class 4 to vote in favor thereof.


Dated: July 15, 2022

Respectfully submitted,


**ALL YEAR HOLDINGS LIMITED**


By: _/s/ Assaf Ravid_
Name:  Assaf Ravid
Title:   Authorized Manager

100

**<u>Exhibit A</u>**

**Plan**

ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X
                                    :

In re                                :      **Chapter 11**
                                      :

**ALL YEAR HOLDINGS LIMITED,**      :      **Case No. 21-12051 (MG)**
                                      :

              **Debtor.**[1]         :
                                      :

**Fed. Tax Id. No. 98-1220822**       :
------------------------------------------------------------ X

## CHAPTER 11 PLAN OF REORGANIZATION OF ALL YEAR HOLDINGS LIMITED

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtor*

Dated:  May 31, 2022
          New York, New York

---

[1]    The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

## Table of Contents

Page

ARTICLE I      DEFINITIONS AND INTERPRETATION. ........................................................ 1

    A.      Definitions. ............................................................................................................ 1

    B.      Interpretation; Application of Definitions and Rules of Construction......................... 11

    C.      Reference to Monetary Figures. ............................................................................ 12

    D.      Controlling Document. ........................................................................................ 12

    E.      Certain Consent Rights........................................................................................ 12

ARTICLE II      ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS ....................... 12

    2.1.      Administrative Expense Claims. ........................................................................ 12

    2.2.      Fee Claims. .................................................................................................... 13

    2.3.      Priority Tax Claims. ........................................................................................ 13

ARTICLE III      CLASSIFICATION OF CLAIMS AND INTERESTS. ...................................... 14

    3.1.      Classification in General. ................................................................................ 14

    3.2.      Summary of Classification. .............................................................................. 14

    3.3.      Special Provision Governing Unimpaired Claims........................................................ 14

    3.4.      Elimination of Vacant Classes. .......................................................................... 14

    3.5.      Voting Classes; Presumed Acceptance by Non-Voting Classes. ................................. 14

    3.6.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
       Code................................................................................................................. 15

ARTICLE IV      TREATMENT OF CLAIMS AND INTERESTS FOR THE DEBTOR. ................ 15

    4.1.      Priority Non-Tax Claims (Class 1). .................................................................. 15

    4.2.      Other Secured Claims (Class 2)........................................................................ 15

    4.3.      General Unsecured Claims (Class 3)................................................................... 15

    4.4.      Remaining Unsecured Claims (Class 4). ........................................................... 16

    4.5.      Subordinated Securities Claims (Class 5)............................................................ 16

    4.6.      Equity Interests (Class 6)................................................................................. 16

ARTICLE V      MEANS FOR IMPLEMENTATION. ..................................................................... 17

    5.1.      Sponsor Contribution and Distributions. ............................................................ 17

i

| | | | |
|---|---|---|---|
| 5.2. | Authorization and Issuance of New Notes. | | 18 |
| 5.3. | Administration of Wind-Down Co. | | 18 |
| 5.4. | Section 1145 Exemption | | 19 |
| 5.5. | Officers and New Board of Directors | | 20 |
| 5.6. | Indemnification of Debtor's Directors and Officers | | 20 |
| 5.7. | Effectuating Documents; Further Transactions. | | 20 |
| 5.8. | Cancellation of Existing Securities and Agreements. | | 22 |
| 5.9. | Cancellation of Liens. | | 22 |
| 5.10. | Subordination Agreements. | | 22 |
| 5.11. | Closing of the Chapter 11 Case. | | 22 |
| 5.12. | Notice of Effective Date. | | 22 |
| ARTICLE VI | DISTRIBUTIONS. | | 23 |
| 6.1. | Distributions Generally | | 23 |
| 6.2. | Distribution Record Date. | | 23 |
| 6.3. | Date of Distributions. | | 23 |
| 6.4. | Disbursing Agent. | | 23 |
| 6.5. | Rights and Powers of Disbursing Agent. | | 23 |
| 6.6. | Expenses of Disbursing Agent. | | 24 |
| 6.7. | Postpetition Interest on Claims. | | 24 |
| 6.8. | Delivery of Distributions. | | 24 |
| 6.9. | Distributions after Effective Date. | | 24 |
| 6.10. | Unclaimed Property. | | 24 |
| 6.11. | Time Bar to Cash Payments. | | 25 |
| 6.12. | Manner of Payment Under Plan. | | 25 |
| 6.13. | Satisfaction of Claims. | | 25 |
| 6.14. | Minimum Cash Distributions. | | 25 |
| 6.15. | Setoff and Recoupment. | | 25 |

6.16.    Allocation of Distributions between Principal and Interest.........................................26

6.17.    No Distribution in Excess of Amount of Allowed Claim...........................................26

6.18.    Distributions Free and Clear..............................................................................26

6.19.    Withholding and Reporting Requirements. ..................................................................26

ARTICLE VII    PROCEDURES FOR DISPUTED CLAIMS. ....................................................27

7.1.    Objections to Claims. ............................................................................................27

7.2.    Resolution of Disputed Administrative Expenses and Disputed Claims.......................27

7.3.    Payments and Distributions with Respect to Disputed Claims....................................27

7.4.    Distributions After Allowance. ...............................................................................27

7.5.    Estimation of Claims. ............................................................................................27

7.6.    No Distributions Pending Allowance. ......................................................................28

7.7.    Claim Resolution Procedures Cumulative..................................................................28

7.8.    Insured Claims.......................................................................................................28

7.9.    Tax Treatment of the Class 4 Disputed Claims Reserve. .............................................28

ARTICLE VIII EXECUTORY CONTRACTS AND UNEXPIRED LEASES.........................................29

8.1.    General Treatment. ...............................................................................................29

8.2.    Determination of Assumption Disputes and Deemed Consent. ..................................29

8.3.    Rejection Damages Claims......................................................................................30

8.4.    Insurance Policies. ................................................................................................31

8.5.    Assignment of Executory Contracts to Wind-Down Co. ............................................31

8.6.    Modifications, Amendments, Supplements, Restatements, or Other
Agreements.............................................................................................................31

8.7.    Reservation of Rights.............................................................................................32

ARTICLE IX    CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND
EFFECTIVE DATE...................................................................................................32

9.1.    Conditions Precedent to Confirmation of Plan.............................................................32

9.2.    Conditions Precedent to Effective Date........................................................................32

9.3.    Waiver of Conditions Precedent..................................................................................33

WEIL:\98651725\3\12817.0007

9.4.    Effect of Failure of a Condition. ................................................................... 33

ARTICLE X    EFFECT OF CONFIRMATION OF PLAN. ................................................... 33

10.1.    Vesting of Assets. ......................................................................................... 33

10.2.    Binding Effect. .............................................................................................. 34

10.3.    Discharge of Claims and Termination of Interests. ...................................... 34

10.4.    Term of Injunctions or Stays. ....................................................................... 34

10.5.    Injunction. ..................................................................................................... 34

10.6.    Releases. ........................................................................................................ 35

10.7.    Exculpation. .................................................................................................. 37

10.8.    Retention of Causes of Action/Reservation of Rights. ................................. 37

10.9.    Special Provisions Regarding Sole Shareholder ........................................... 37

ARTICLE XI    RETENTION OF JURISDICTION. ............................................................... 38

11.1.    Retention of Jurisdiction. .............................................................................. 38

11.2.    Courts of Competent Jurisdiction. ................................................................ 39

ARTICLE XII    MISCELLANEOUS PROVISIONS. ............................................................. 39

12.1.    Payment of Statutory Fees. ........................................................................... 39

12.2.    Substantial Consummation of the Plan. ........................................................ 40

12.3.    Plan Supplement. ........................................................................................... 40

12.4.    Requests by the Reorganized Debtor and Wind-Down Co for Expedited
Determination of Taxes. ................................................................................ 40

12.5.    Exemption from Certain Transfer Taxes. ...................................................... 40

12.6.    Amendments. ................................................................................................. 41

12.7.    Effectuating Documents and Further Transactions. ...................................... 41

12.8.    Revocation or Withdrawal of Plan. ............................................................... 41

12.9.    Severability of Plan Provisions. .................................................................... 42

12.10.    Governing Law. ............................................................................................. 42

12.11.    Time. .............................................................................................................. 42

WEIL:\98651725\3\12817.0007

12.12.    Dates of Actions to Implement the Plan. ............................................................ 42

12.13.    Immediate Binding Effect. ................................................................................. 42

12.14.    Deemed Acts. ...................................................................................................... 43

12.15.    Successor and Assigns. ....................................................................................... 43

12.16.    Entire Agreement. ............................................................................................... 43

12.17.    Exhibits to Plan. ................................................................................................. 43

12.18.    Notices. ............................................................................................................... 43

WEIL:\98651725\3\12817.0007

All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands, as debtor and debtor in possession (the "***Debtor***"), proposes the following chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Article I.A.

## ARTICLE I    DEFINITIONS AND INTERPRETATION.

A.    **Definitions.**  The following terms shall have the respective meanings specified below:

1.1    "***Administrative Expense Claim***" means any right to payment against the Debtor (and payable by the Reorganized Debtor or Wind-Down Co, as applicable) constituting a cost or expense of administration incurred during the Chapter 11 Case of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the businesses of the Debtor; (b) Fee Claims; and (c) any Claims arising under any debtor-in-possession financing provided to the Debtor.

1.2    "***Allowed***" means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtor or the Plan Administrator, as applicable; (c) as to which the liability of the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived in the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtor shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan.

1.3    "***Amended Organizational Documents***" means the forms of certificate of formation, certification of incorporation, limited liability company agreement, or other forms of organizational documents and bylaws for the Reorganized Debtor, as applicable, reasonably satisfactory to the Sponsor and consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable.

1.4    "***Asset***" means all of the right, title, and interest of the Debtor in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

1.5    "*Assumption Dispute*" means a pending objection relating to assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.6    "***Authorized Manager***" means any "Authorised Manager" appointed pursuant to the JPL Appointment Order.

1.7    "***Avoidance Actions***" means any and all actual or potential Causes of Action of the Debtor arising under chapter 5 of the Bankruptcy Code (other than section 542 or section 549 of the Bankruptcy Code) or under similar or related state or federal statutes and common law, including, without

limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance action claims, rights, and causes of action, and commercial tort law, to the extent not previously transferred, sold, assigned, or waived under any prior order of the Bankruptcy Court in the Chapter 11 Case.

1.8      "***Ballot***" means the form(s) distributed to holders of Impaired Claims entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

1.9      "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Case.

1.10      "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case or any other court having jurisdiction over the Chapter 11 Case, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

1.11      "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Case.

1.12      "***Business Day***" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.13      "***BVI Court***" means the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division, Virgin Islands or such other court having jurisdiction over the BVI Proceeding.

1.14      "***BVI Plan of Arrangement***" means the plan of arrangement to be consummated in the BVI Proceeding following entry of the Confirmation Order pursuant to which (x) the Equity Interests in the Debtor shall be cancelled and (y) NewCo shall merge with the Debtor and, following such merger, the Reorganized Debtor shall be the surviving entity, and on and after the Effective Date, 100% of the NewCo Shares in the Reorganized Debtor will be held by the Sponsor.

1.15      "***BVI Proceeding***" means Claim No. BVIHC (COM) 0220 of 2021, *In the Matter of All Year Holdings Limited and In the Matter of the BVI Insolvency Act, 2003 (as amended)* pending in the BVI Court.

1.16      "***Cash***" means legal tender of the United States of America.

1.17      "***Causes of Action***" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, belonging to the Debtor, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes:  (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense

including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.18    "*Chapter 11 Case*" means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date in the Bankruptcy Court.

1.19    "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code, as against the Debtor.

1.20    "*Class*" means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.21    "*Class 4 Disputed Claims Reserve*" means a reserve established and maintained by the Disbursing Agent to hold the Pro Rata Share of the Class 4 ED Distribution that would have been distributable on the Effective Date to holders of Disputed Remaining Unsecured Claims if such Claims were Allowed in the amount estimated by the Court or, in absence of such estimation, to the maximum extent, with any cash held in an interest-bearing account.

1.22    "*Class 4 ED Distribution*" means the Sponsor Contribution (including the New Notes) less the Wind Down Cash Funding.

1.23    "*Confirmation Date*" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.24    "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.25    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.26    "*Cure Amount*" means the Cash or other property to be paid or distributed by the Debtor or Wind-Down Co as applicable (as the parties may agree or the Bankruptcy Court may order), necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtor to assume or assume and assign any executory contract or unexpired lease.

1.27    "*Debtor*" has the meaning set forth in the introductory paragraph of the Plan.

1.28    "*Debtor in Possession*" means the Debtor in its capacity as debtor in possession in the Chapter 11 Case pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.29    "*Deeds of Trust*" means, collectively, the Series B Deed of Trust, the Series C Deed of Trust, the Series D Deed of Trust, and the Series E Deed of Trust.

1.30    "*Definitive Documents*" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to the Plan, including, but not limited to: (a) the Disclosure Statement; (b) any motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan, (c) the Disclosure Statement Order; (d) each of the documents comprising the Plan Supplement; (e) the Confirmation Order; and (f) the Plan Investment Agreement, each in form and substance reasonably acceptable to the Notes Trustee and the Sponsor.

WEIL:\98651725\3\12817.0007

1.31 "***Disallowed***" means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.32 "***Disbursing Agent***" means the Debtor or the Plan Administrator, as applicable, or any Entity designated by the Debtor or the Plan Administrator, as applicable (it being understood that, in the case of the Class 4 Disputed Claims Reserve, "Disbursing Agent" means the Plan Administrator or any Entity designated by the Plan Administrator).

1.33 "***Disclosure Statement***" means the disclosure statement filed by the Debtor in support of the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code (as may be amended, supplemented, or modified from time to time).

1.34 "***Disclosure Statement Order***" means the order entered by the Bankruptcy Court finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code.

1.35 "***Disputed***" means a Claim or Interest, including an Administrative Expense Claim, (a) that is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code or Bankruptcy Rule 3003(b)(1); or (b) as to which the Debtor, the Plan Administrator, or any parties in interest have interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.

1.36 "***Distribution Record Date***" means the Effective Date.

1.37 "***Effective Date***" means the date on which all conditions to the effectiveness of the Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms of the Plan.

1.38 "***Entity***" means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

1.39 "***Estate***" means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.40 "***Excluded Assets***" means (a) any and all of the Debtor's direct or indirect rights (including the right to receive any income or proceeds) in and to (i) any collateral securing the Series C Notes and Series E Notes, (ii) the Debtor's membership interests in YG WV LLC, and (iii) the assets described in the agreements among the Debtor, DCP All Year Pref Equity LLC and DCP Kings Point LLC, including, without limitation, any membership interests in All Year Holdings Common LLC, (b) any and all claims and Causes of Action, whether known or unknown, contingent, liquidated or disputed, that the Debtor, the Noteholders, or the Notes Trustee may have against any third-parties, including, but not limited to, any current or prior officer, director, advisor, representative, consultant, or shareholder of the Debtor (subject to the releases provided in Section 7.02 of the Plan Investment Agreement), other than any claims and Causes of Action that the Debtor may have with respect to whether or not Yoel Goldman or Tzipporah Goldman have any ownership interests in any of the Transferred Entities (as defined in the Plan Investment Agreement), which shall be retained by the Reorganized Debtor and the Reorganized Debtor shall be authorized to assert any and all claims arising under any applicable law to recover any properties or property interests listed on the Schedule of Transferred Entities, (c) those certain Series D debentures of the Debtor held by All Year Holdings Funding LLC, and (d) those assets vested in Wind-Down Co pursuant to the

WEIL:\98651725\3\12817.0007

Plan. Notwithstanding the foregoing, to the extent that the Sponsor effects the William Vale Purchase (whether prior to, on, or after the Effective Date, but only until the expiration or termination by its terms of the MPSA), the Debtor's direct or indirect rights (including the right to receive any income or proceeds) in and to the Debtor's membership interests in YG WV LLC shall not be Excluded Assets and (A) such rights shall vest in the Reorganized Debtor upon the Effective Date to the extent that the WV Sale Date is on or prior to the Effective Date and (B) such rights shall automatically transfer from Wind-Down Co to the Reorganized Debtor upon the payment of the WV Shares Consideration if the WV Sale Date is after the Effective Date. Notwithstanding the foregoing, the Debtor's membership interests in YG WV LLC shall remain Excluded Assets hereunder and neither the Debtor nor Wind-Down Co shall have any obligation with respect to a transfer of such interests if the MPSA expires or is terminated according to its terms. The rights and claims in (i) the settlement agreement with regard to MY 2011 Grand LLC et al as approved by the United States Bankruptcy Court for the Southern District of New York on October 25, 2021 (Case No. 19-23957 (RDD)), and (ii) the Lofts on Devoe LLC shall not be Excluded Assets.

1.41    "*Exculpated Parties*" means collectively, and in each case, solely in their capacities as such: (a) the Debtor and Reorganized Debtor; (b) the Plan Administrator; (c) Wind-Down Co; (d) the Notes Trustee and its representatives and advisors; (e) the Noteholders and their representatives and advisors; (f) the Sponsor and its representatives and advisors; (g) the JPLs; (h) the Authorized Managers; (i) any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (j) any independent directors appointed to the board of the Debtor on or after January 1, 2021; and (k) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC); provided, however, that Exculpated Parties shall not include Yoel Goldman or Tzipporah Goldman in any capacity.

1.42    "*Fee Claim*" means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by professional persons retained by the Debtor by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Case.

1.43    "*Final Order*" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.44    "*General Unsecured Claim*" means any Claim against the Debtor, that is not (a) an Administrative Expense Claim; (b) a Priority Tax Claim; (c) a Priority Non-Tax Claim; (d) a Remaining Unsecured Claim; or (e) a Subordinated Securities Claim. For the avoidance of doubt, General Unsecured Claims include all Intercompany Claims and the Taz Claim.

1.45    "*Impaired*" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.46     "**_Insured Claims_**" means any Claim or portion of a Claim that is, or may be, insured under the Debtor's insurance policies.

1.47     "**_Intercompany Claim_**" means any pre- or postpetition Claim against the Debtor held by a subsidiary or affiliate of the Debtor.

1.48     "**_Interest_**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) of the Debtor, including all ordinary shares, common stock, preferred stock, membership interest, partnership interest or other instrument evidencing any fixed or contingent ownership interest in the Debtor, whether or not transferable, and any share, option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtor, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtor, to acquire any such interests in the Debtor that existed immediately before the Effective Date.

1.49     "**_IRS_**" means the Internal Revenue Service of the United States.

1.50     "**_Israeli Proceeding_**" means the proceeding commenced by the Debtor on April 14, 2022 in the District Court of Tel Aviv Yafo for recognition of the chapter 11 as a foreign main proceeding under the applicable provisions of Chapter I, Part C of the Insolvency and Rehabilitation Law of Israel 5778-2018.

1.51     "**_Israeli Securities Actions_**" means, collectively, (i) CA (Financial) 15257-04-20 _Public Representatives (Registered NGO) v. All Year Holdings, et al._ (April 16, 2020) (Isr.); (ii) CA (Financial) 3325-12-20 _Shachar Group LTD v. All Year Holdings, et al._ (December 1, 2020) (Isr.); and (iii) CA (Financial) 37894-01-19 _Full Disclosure (Registered NGO) v. All Year Holdings, et al._ (filed on January 15, 2019).

1.52     "**_JPL Appointment Order_**" means the order of the BVI Court, dated December 20, 2021, appointing the JPLs.

1.53     "**_JPLs_**" means Charlotte Caulfield and Paul Pretlove of Kalo (BVI) Limited, each in their capacity as joint provisional liquidators appointed in the BVI Proceeding pursuant to the JPL Appointment Order.

1.54     "**_Lien_**" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien as defined in section 101(37) of the Bankruptcy Code.

1.55     "**_MPSA_**" means that certain Mortgage Purchase and Sale Agreement that may be entered into by and between the Notes Trustee and the Sponsor.

1.56     "**_NewCo_**" means a new BVI Entity, to be formed and 100% owned by the Sponsor, which shall merge with the Debtor as part of the BVI Plan of Arrangement.

1.57     "**_NewCo Shares_**" means the ordinary shares of NewCo.

1.58     "**_New Notes_**" means the new notes of the Reorganized Debtor in the principal aggregate amount of either (a) $20,000,000.00 or (b) if the Sponsor, or its affiliate, closes the William Vale Purchase (whether prior to, on, or after the Effective Date), $22,000,000.00, in each case to be issued on or about the Effective Date in accordance with Section 5.1 and subject to the value adjustment set forth in Section 2.02(b) of the Plan Investment Agreement, in the form attached hereto as **__Exhibit A__**.  The New Notes shall

WEIL:\98651725\3\12817.0007

be guaranteed by the New Notes Guarantor pursuant to the New Notes Guaranty, in the form attached hereto as **Exhibit B**.

1.59    "*New Notes Guarantor*" means Bent Philipson or such other individual or corporate entity affiliated with the Sponsor approved by the Notes Trustee.

1.60    "*New Notes Guaranty*" means the guaranty of the New Notes by the New Notes Guarantor, in the form attached hereto as **Exhibit B**.

1.61    "*Non-Securities Indemnity Claims*" means any Claims against the Debtor by any current or former officer or director of the Debtor for indemnification or contribution that are not Subordinated Securities Claims.

1.62    "*Noteholder Claims*" means, individually or collectively, the Series B Notes Claims, the Series C Notes Claims, the Series D Notes Claims, and the Series E Notes Claims.

1.63    "*Noteholders*" means, individually or collectively, the Series B Noteholders, Series C Noteholders, Series D Noteholders, and Series E Noteholders.

1.64    "*Notes*" means, collectively, the Series B Notes, the Series C Notes, the Series D Notes, and the Series E Notes.

1.65    "*Notes Trustee*" means Mishmeret Trust Company Ltd., as trustee under the respective Deeds of Trust.

1.66    "*Other Secured Claim*" means any Secured Claim other than a Priority Tax Claim.

1.67    "*Person*" means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Unit or any political subdivision thereof, or any other Entity.

1.68    "*Petition Date*" means December 14, 2021.

1.69    "*Plan*" means this chapter 11 plan of reorganization, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the terms hereof and the Bankruptcy Code.

1.70    "*Plan Administration Agreement*" means the agreement providing for the appointment of the Plan Administrator, which shall be in form and substance acceptable to the Notes Trustee in its sole and absolute discretion.

1.71    "*Plan Administrator*" means, together, those individuals selected by the Notes Trustee to serve as (a) "plan administrator" and (b) "claims administrator," who will administer and implement the Plan and the Assets of Wind-Down Co, in accordance with, and pursuant to the power and authority with respect to Wind-Down Co, as set forth in Section 5.3 of the Plan and with such rights, powers, and authorities as shall be delegated to and allocated between such individuals under the Plan Administration Agreement.  For the avoidance of doubt, each such "plan administrator" and "claims administrator" shall have only those rights and responsibilities as expressly set forth in the Plan Administration Agreement.

WEIL:\98651725\3\12817.0007

1.72    "**Plan Investment Agreement**" means that certain Investment Agreement dated March 11, 2022, by and among the Debtor, the Sponsor, and, solely with respect to certain specified sections therein, the Notes Trustee, including any and all amendments and all schedules and exhibits thereto.

1.73    "**Plan Supplement**" means a supplemental appendix to the Plan, which shall include (to the extent not previously filed with the Bankruptcy Court as stand-alone documents or as schedules or exhibits to the Disclosure Statement), among other things, forms or term sheets of applicable documents, schedules, and exhibits to the Plan to be filed with the Court, including, but not limited to, the Amended Organizational Documents, the Wind Down Budget, the Plan Administration Agreement, and the Schedule of Assumed Contracts; provided that, through the Effective Date, the Debtor shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan.  The Plan Supplement shall be filed with the Bankruptcy Court no later than seven (7) calendar days prior to the deadline to object to the Plan.  The Debtor shall have the right to amend the Plan Supplement documents through and including the Effective Date in accordance with Article IX of the Plan.

1.74    "**Priority Non-Tax Claim**" means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.75    "**Priority Tax Claim**" means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.76    "**Pro Rata Share**" and "**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears relative to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.77    "**Professional Fees Escrow Account**" means the escrow account to be established and funded on or before the Effective Date pursuant to Section 2.2 of the Plan.

1.78    "**Released Parties**" means collectively, and in each case, solely in their capacities as such: (a) the Debtor and the Reorganized Debtor; (b) Wind-Down Co; (c) the Notes Trustee and its representatives and advisors; (d) the Noteholders and their representatives and advisors; (e) the Sponsor and its agents, officers, directors, principals, affiliates, representatives and advisors; (f) any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (g) any independent directors appointed to the board of the Debtor on or after January 1, 2021; (h) the JPLs; (i) the Authorized Managers; and (j) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC); provided, however, that Released Parties shall not include Yoel Goldman or Tzipporah Goldman in any capacity.

1.79    "**Remaining Unsecured Claims**" means the Noteholder Claims, the Subsidiary Plan Administrator Claims, and the Non-Securities Indemnity Claims.

1.80    "**Reorganized Debtor**" means the Debtor as reorganized on or after the Effective Date.

1.81    "**Schedule of Assumed Contracts**" means the schedule of contracts and leases (i) to be assumed by the Reorganized Debtor and (ii) assumed and assigned to Wind-Down Co, as applicable, to be filed with the Plan Supplement.

8

1.82    "**Schedules**" means the Debtor's schedules of assets and liabilities and statement of financial affairs [ECF Nos. 15, 16, 36, and 37].

1.83    "**Secured Claim**" means any Claim (a) secured by a Lien on collateral to the extent of the value of such collateral (after taking into account any senior Liens thereon) as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtor, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. For the avoidance of doubt the Noteholder Claims are not Secured Claims against the Debtor.

1.84    "**Series B Deed of Trust**" means that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of December 25, 2016, as supplemented or amended from time to time.

1.85    "**Series B Noteholders**" means holders of Series B Notes.

1.86    "**Series B Notes**" means notes issued under the Series B Deed of Trust.

1.87    "**Series B Notes Claims**" means the Claims against the Debtor arising from the Series B Notes issued under the Series B Deed of Trust which shall be allowed for all purposes pursuant to the Plan and the Confirmation Order in the amount of $141,434,950.21, on account of the total amount of principal, accrued and unpaid interest, and any other fees and expenses outstanding under the Series B Deed of Trust as of the Petition Date.

1.88    "**Series C Deed of Trust**" means that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of February 19, 2017, as supplemented or amended from time to time.

1.89    "**Series C Noteholders**" means holders of Series C Notes.

1.90    "**Series C Notes**" means notes issued under the Series C Deed of Trust.

1.91    "**Series C Notes Claims**" means the Claims against the Debtor arising from the Series C Notes issued under the Series C Deed of Trust which shall be allowed for all purposes pursuant to the Plan and the Confirmation Order in the amount of $202,409,251.53, on account of the total amount of principal, accrued and unpaid interest, and any other fees and expenses outstanding under the Series C Deed of Trust as of the Petition Date.

1.92    "**Series D Deed of Trust**" means that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of June 29, 2017, as supplemented or amended from time to time.

1.93    "**Series D Noteholders**" means holders of Series D Notes.

1.94    "**Series D Notes**" means notes issued under the Series D Deed of Trust.

1.95    "**Series D Notes Claims**" means the Claims against the Debtor arising from the Series D Notes issued under the Series D Deed of Trust which shall be allowed for all purposes pursuant to the Plan and the Confirmation Order in the amount of $184,609,380.02, on account of the total amount of principal, accrued and unpaid interest, and any other fees and expenses outstanding under the Series D Deed of Trust as of the Petition Date.

1.96    "**Series E Deed of Trust**" means that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of February 4, 2018, as supplemented or amended from time to time.

1.97    "**Series E Noteholders**" means holders of Series E Notes.

1.98    "**Series E Notes**" means notes issued under the Series E Deed of Trust.

1.99    "**Series E Notes Claims**" means the Claims against the Debtor arising from the Series E Notes issued under the Series E Deed of Trust which shall be allowed for all purposes pursuant to the Plan and the Confirmation Order in the amount of $40,453,260.52, on account of the total amount of principal, accrued and unpaid interest, and any other fees and expenses outstanding under the Series E Deed of Trust as of the Petition Date.

1.100    "**Sponsor**" means Paragraph Partners LLC, or any affiliate designee permitted under the terms of the Plan Investment Agreement.

1.101    "**Sponsor Contribution**" means $40,000,000.00 in Cash provided by the Sponsor, the New Notes and the New Notes Guaranty, in each case in accordance with the Plan Investment Agreement.

1.102    "**Subordinated Securities Claim**" means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a security of the Debtor, or for damages arising from the purchase of sale of such a security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, including any Claim arising out of or related to the Israeli Securities Actions or other similar class action lawsuits brought in Israel before the Effective Date.

1.103    "**Subsidiary Plan Administrator Claim**" means any Claim brought by any plan administrator with respect to any of the debtors in the procedurally consolidated chapter 11 cases of *Evergreen Gardens Mezz, LLC, et.al.*, Case No. 21-10035 (MG) (Bankr. SD.N.Y.).

1.104    "**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time.

1.105    "**Taz Claim**" means any Claim of Taz Partners LLC arising under or relating to that certain confession of judgment entered against the Debtor by the Kings County Supreme Court on December 9, 2021 or the facts and circumstances alleged therein. For the avoidance of doubt, the Taz Claim shall be treated as a Class 3 General Unsecured Claim under the Plan.

1.106    "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

1.107    "**Unimpaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.108    "**Voting Deadline**" means the date by which all persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan.

1.109    "**William Vale Promissory Note**" means all rights of the Notes Trustee for the Series C Notes in and to that certain Amended and Restated Promissory Note, dated February 28, 2017, originally between the Debtor and Wythe Berry Fee Owner LLC and that certain loan originally made by the Debtor to Wythe Berry Fee Owner LLC in the original principal amount of $166,320,000.00.

1.110    "**William Vale Property**" means that certain property located at 55 Wythe Avenue, Brooklyn, NY, 11222 and 100% owned by Wythe Berry Fee Owner LLC.

WEIL:\98651725\3\12817.0007

1.111    "*William Vale Purchase*" means, the assignment to and purchase by the Sponsor, or its affiliate, of all rights of the Notes Trustee for the Series C Notes in and to the William Vale Promissory Note, for a cash payment of $158,612,112.00.

1.112    "*Wind Down*" means the wind down, dissolution, and liquidation of Wind-Down Co and distribution of any remaining assets in accordance with the Plan.

1.113    "*Wind Down Budget*" means a budget for the Wind Down of Wind-Down Co, to be agreed between the Debtor and the Notes Trustee.

1.114    "*Wind Down Cash Funding*" means the amount necessary (a) to pay all Administrative Expense Claims in accordance with Section 2.1 below and (b) to fund the Wind Down Budget, as determined as of the Effective Date, and any subsequent earnings thereon.

1.115    "*Wind-Down Co*" means a new limited liability company that elects to be taxable as a corporation for U.S. federal income tax purposes to be formed on or prior to the Effective Date for the purpose of conducting the Wind Down in accordance with the Plan and the Plan Administration Agreement. The Excluded Assets and the Wind Down Cash Funding shall be transferred to, and vest in, Wind-Down Co on the Effective Date in accordance with the Plan.

1.116    "*WV Sale Date*" means the date of the consummation of the transactions contemplated under the MPSA.

1.117    "*WV Shares Consideration*" means an additional $200,000 as consideration for the Debtor's membership interests in YG WV LLC in the event of a William Vale Purchase, to be paid by the Sponsor to Wind-Down Co upon the later to occur of the Effective Date and the WV Sale Date.

1.118    "*Wythe Berry Fee Owner LLC*" means Wythe Berry Fee Owner LLC, entity organized in Delaware and 50% indirectly owned by the Debtor, which owns the William Vale Property.

B.    **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time as provided for in the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as otherwise required by the Plan; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.  Notwithstanding anything to the contrary herein, the power and authority of the Plan Administrator shall be defined by, and subject in all respects to, the terms and conditions of the Plan Administration Agreement.  Without derogating any rights of the parties under the

WEIL:\98651725\3\12817.0007

terms of the Plan Investment Agreement, any reference herein to "the property of the Debtor," or expressions of similar import, shall be understood to refer solely to property directly owned by the Debtor.

C.      **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

D.      **Controlling Document.**

In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement) and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), the Plan (without reference to the Plan Supplement) shall govern and control; provided, that in the event of a conflict between Confirmation Order, on the one hand, and any of the Plan, the Plan Supplement, or the Definitive Documents, the Confirmation Order shall govern and control in all respects.

E.      **Certain Consent Rights.**

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the Sponsor and the Notes Trustee as set forth in the Plan Investment Agreement, respectively, with respect to the form and substance of the Plan, the Plan Supplement, and any Definitive Document, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the Plan Investment Agreement are terminated in accordance with their terms.

## ARTICLE II    ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

2.1.    *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim), shall receive from the Plan Administrator, in full and final satisfaction, settlement, and release of such Claim against the Debtor, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. Amounts sufficient for the Plan Administrator to pay in full all Allowed Administrative Expense Claims that are the responsibility of Wind-Down Co in accordance with this Section 2.1, including all Fee Claims and any and all other amounts that may become due and payable in connection with the BVI Proceeding and the Israeli Proceeding, shall be funded on the Effective Date from, at the option of the Debtor, either: (i) the Debtor's cash on hand, or (ii) the Sponsor Contribution, provided that the Reorganized Debtor shall have a positive cash balance on the Effective Date. The Reorganized Debtor shall pay compensation for services rendered to it and reimbursement of expenses incurred on its behalf from and after the Effective Date in the ordinary course.

2.2.    *Fee Claims.*

(a)     All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, and counsel for the Plan Administrator on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date.  Objections to any Fee Claims must be filed and served on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, counsel for the Plan Administrator, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtor and the party requesting compensation of a Fee Claim, or as approved by the Court).

(b)     Allowed Fee Claims shall be paid in full, in Cash, by the Plan Administrator in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor, Reorganized Debtor or the Plan Administrator.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.

(c)     No later than 10 days prior to the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services prior to the Effective Date to the Debtor and the Notes Trustee and the Debtor (or Plan Administrator if applicable) shall, subject to the Plan, separately escrow from funds of the Debtor such estimated amounts in a Professional Fees Escrow Account for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtor or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim, and provide notice thereof to the Notes Trustee.  The Professional Fees Escrow Account shall be treated as a trust account for the benefit of holders of Fee Claims and otherwise subject to the terms of the Plan.  When all such Allowed Fee Claims have been paid in full, any remaining amount in a Professional Fees Escrow Account shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, Wind-Down Co for distribution in accordance with the terms hereof without any further action or order of the Bankruptcy Court.

(d)     The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date, including for services rendered or expenses incurred by the professionals of the Debtor or Wind-Down Co, as applicable, in the ordinary course and without the need for Bankruptcy Court approval.

2.3.    *Priority Tax Claims.*

Except to the extent that a holder of a Priority Tax Claim agrees to less favorable treatment, Priority Tax Claims shall be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course by the Reorganized Debtor.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Tax Claim available to the Debtor.

WEIL:\98651725\3\12817.0007

## ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1.    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.    *Summary of Classification.*

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

**Claims Against and Interests in the Debtor**

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| 4 | Remaining Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |
| 6 | Equity Interests | Impaired | No (Deemed to reject) |

3.3.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing in the Plan shall affect the rights of the Debtor or the Reorganized Debtor, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.4.    *Elimination of Vacant Classes.*

Any Class of Claims against in the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.5.    *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

WEIL:\98651725\3\12817.0007

3.6.    ***Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.***

The Debtor shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that rejects or is deemed to reject the Plan. The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS FOR THE DEBTOR.

4.1.    ***Priority Non-Tax Claims (Class 1).***

(a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims against the Debtor.

(b)    *Treatment*:  Except to the extent that a holder of a Priority Non-Tax Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan. On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Priority Non-Tax Claims in the ordinary course. The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Non-Tax Claim available to the Debtor.

(c)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims against the Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of Priority Non-Tax Claims against the Debtor, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

4.2.    ***Other Secured Claims (Class 2).***

(a)    *Classification*:  Class 2 consists of the Other Secured Claims against the Debtor. To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)    *Treatment*:  Except to the extent that a holder of an Other Secured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan. On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Other Secured Claims in the ordinary course. The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Other Secured Claim available to the Debtor.

(c)    *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims against the Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of Other Secured Claims against the Debtor, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.3.    ***General Unsecured Claims (Class 3).***

(a)    *Classification*:  Class 3 consists of the General Unsecured Claims against the Debtor.

WEIL:\98651725\3\12817.0007

(b)     *Treatment*:  Except to the extent that a holder of a General Unsecured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of an Allowed General Unsecured Claim are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile each General Unsecured Claim in the ordinary course of business.

(c)     *Voting*: Class 3 is Unimpaired, and holders of General Unsecured Claims against the Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of General Unsecured Claims against the Debtor, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.4.    ***Remaining Unsecured Claims (Class 4).***

(a)     *Classification*:  Class 4 consists of Remaining Unsecured Claims against the Debtor.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Remaining Unsecured Claim against the Debtor agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Allowed Remaining Unsecured Claim, each such holder shall receive (i) on the Effective Date, from the Disbursing Agent (on behalf of the Debtor), its Pro Rata Share of the Class 4 ED Distribution, (ii) in the event the William Vale Purchase occurs subsequent to the Effective Date, from the Disbursing Agent (on behalf of the Debtor), its Pro Rata Share of any additional New Notes issued, and (iii) on such other date(s) as determined from time to time by the Plan Administrator, from Wind-Down Co, the amounts recovered, if any, from the Excluded Assets (including, but without limitation, from the prosecution of Avoidance Actions and other Causes of Action) and any remaining Wind Down Cash Funding.  Notwithstanding anything to the contrary herein, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan (including for purposes of distribution).  The right to the foregoing distributions shall be nontransferable except by will, intestate succession, or operation of law.

(c)     *Voting*:  Class 4 is Impaired, and the holders of Remaining Unsecured Claims against the Debtor are entitled to vote to accept or reject the Plan.

4.5.    ***Subordinated Securities Claims (Class 5).***

(a)     *Classification*:  Class 5 consists of the Subordinated Securities Claims against the Debtor.

(b)     *Treatment*: The holders of Subordinated Securities Claims against the Debtor shall not receive or retain any property under the Plan on account of such Claims.

(c)     *Voting*:  Class 5 is Impaired.  Under section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

4.6.    ***Equity Interests (Class 6).***

(a)     *Classification*:  Class 6 consists of Equity Interests in the Debtor.

(b)     *Treatment*: On or after the Effective Date, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all Equity Interests in the

WEIL:\98651725\3\12817.0007

Debtor shall be cancelled.  The existing holders of the Equity Interests in the Debtor shall neither receive nor retain any property of the Debtor or interest in property of the Debtor on account of such Equity Interest.

(c)    *Voting*:  Class 6 is Impaired.  Under section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

## ARTICLE V    MEANS FOR IMPLEMENTATION.

5.1.    ***Sponsor Contribution and Distributions.***

(a)    On the Effective Date, in accordance with the Plan and the Plan Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, the Sponsor shall:

(i)    provide the Sponsor Contribution; and

(ii)    be the sole shareholder of the Reorganized Debtor, and on the Effective Date, shall hold 100% of the NewCo Shares free and clear of all Claims and Liens.

(b)    On the Effective Date, in accordance with the Plan and the Plan Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, the Disbursing Agent (on behalf of the Debtor) shall distribute Pro Rata the Class 4 ED Distribution to (i) the holders of Remaining Unsecured Claims that are Allowed as of the Effective Date, and (ii) the Disbursing Agent, to be held in the Class 4 Disputed Claims Reserve, on behalf of holders of Disputed Remaining Unsecured Claims.

(c)    On the Effective Date, in accordance with the Plan and the Plan Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, a single limited liability company unit representing a non-economic 100% ownership interest in Wind-Down Co shall be issued to the Plan Administrator.  The Pro Rata Share of the Class 4 ED Distribution allocated to Disputed Remaining Unsecured Claims shall be held in one or more segregated accounts in the Class 4 Disputed Claims Reserve until such claims are Allowed or Disallowed, at which time the applicable portion of the Class 4 ED Distribution (including any earnings thereon, net of any allocable costs and expenses of the Class 4 Disputed Claims Reserve) shall be distributed to such holders of newly Allowed Remaining Unsecured Claims or to the holders of Remaining Unsecured Claims that were previously Allowed, as the case may be.

(d)    Following the distribution of all amounts from the Class 4 Disputed Claims Reserve, the liquidation of the Excluded Assets (including the completion of the prosecution of any Avoidance Actions and other Causes of Action held by Wind-Down Co), and the distribution of the proceeds therefrom and any remaining Wind Down Cash Funding in accordance with the Plan (including the payment of all costs and expenses and other liabilities of Wind-Down Co), Wind-Down Co shall be dissolved and the single unit shall be deemed cancelled and of no further force and effect.  The Plan Administrator shall have no right to any distribution of property or value from Wind-Down Co by reason of its ownership of the single limited liability company unit.

(e)    In addition to the foregoing, in the event of a William Vale Purchase on or before December 31, 2022, the Sponsor shall pay to Wind-Down Co the WV Shares Consideration on the later date to occur of the Effective Date and the WV Sale Date.

17

(f)    The terms of the Plan Investment Agreement are fully incorporated herein and shall be binding and enforceable against the parties thereto, including, without limitation, the releases and indemnities set forth in Section 7.02(b) of the Plan Investment Agreement.

(g)    Neither the Reorganized Debtor nor the Sponsor shall have any liability for (i) Fee Claims, (ii) any amounts owed to any current officers or current directors of the Debtor or those serving in similar capacities for the period up to and including the Effective Date, or (iii) any payment to holders of Class 4 Remaining Unsecured Claims or any Subordinated Securities Claim.

5.2.    *Authorization and Issuance of New Notes.*

Subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, the Debtor or Reorganized Debtor, as applicable, is authorized to issue all plan-related securities and documents, including, without limitation, the New Notes, and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership or limited liability company action.

5.3.    *Administration of Wind-Down Co.*

(a)    On the Effective Date, the Excluded Assets and the Wind Down Cash Funding shall be transferred to Wind-Down Co. The Sponsor and/or the Reorganized Debtor shall not bear any cost and expense and/or liability related to the administration of Wind-Down Co, including costs owed to the Plan Administrator and under Section 5.3(f) below.

(b)    On the Effective Date, the Notes Trustee shall appoint the Plan Administrator for the purpose of conducting the Wind Down of Wind-Down Co on terms and conditions set forth in the Plan Administration Agreement. The retention of the Plan Administrator shall be pursuant to an agreement approved by the Notes Trustee and filed as part of the Plan Supplement. Upon the conclusion of the Wind Down in accordance with Section 5.1(d) hereof, Wind-Down Co shall be dissolved by the Plan Administrator. The Plan Administrator shall act for Wind-Down Co in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors or equivalent governing body, as applicable, and to officers, subject to the provisions hereof (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements, or similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same) and the Plan Administrator will be a representative of Wind-Down Co for purposes of section 1123(b)(3) of the Bankruptcy Code. From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for Wind-Down Co with the authority set forth in this Section 5.3 and the Plan Administration Agreement. The Plan Administrator shall be compensated and reimbursed for reasonable costs and expenses as set forth in the Plan Administration Agreement included in the Plan Supplement.

(c)    The Plan Administrator shall have the authority and right on behalf of Wind-Down Co, subject to the express terms of the Plan Administration Agreement but without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to: (i) implement the Wind Down as expeditiously as reasonably possible and administer the liquidation, dissolution, sale and/or abandonment or similar action of the Excluded Assets after the Effective Date in accordance with the Wind Down Budget; (ii) except to the extent Claims have been previously Allowed or are Unimpaired, control and effectuate the Claims reconciliation process; (iii) make distributions to holders of Allowed Claims in accordance with the Plan; (iv) retain and compensate professionals to assist in performing its duties under the Plan; (v) complete and file, as

necessary, all final or otherwise required federal, state, and local tax returns and other tax reports for Wind-Down Co; (vi) represent the interests of Wind-Down Co before any taxing authority in all matters including, without limitations, any action, suit, proceeding, appeal or audit; and (vii) appoint and compensate an agent to effectuate distributions under the Plan with the consent of the Notes Trustee; and (viii) perform other duties and functions that are consistent with the implementation of the Plan or required by the Bankruptcy Code.

(d)    The Plan Supplement shall include the Wind Down Budget and, on the Effective Date, the Plan Administrator shall retain within Wind-Down Co funds sufficient to make the payments contemplated in the Wind Down Budget.

(e)    Wind-Down Co shall indemnify and hold harmless the Plan Administrator solely in its capacity as such and, where the Disbursing Agent is the Plan Administrator or an entity designated by the Plan Administrator, the Disbursing Agent solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's or Disbursing Agent's (as the case may be) gross negligence, willful misconduct, or criminal conduct.

(f)    The Plan Administrator shall effectuate the Wind Down in accordance with the Wind Down Budget.  The Plan Administrator shall pay any and all reasonable and documented costs and expenses incurred in connection with the Wind Down, including the reasonable fees and expenses of its professionals and the reasonable fees and expenses of the Debtor's professionals incurred for services rendered to the Debtor and the Estate following the Effective Date, without further order of the Bankruptcy Court, provided that such amounts are consistent with the Wind Down Budget.

(g)    Subject to any necessary approvals in the BVI Proceeding, all matters provided for herein involving the corporate structure of the Debtor, the Reorganized Debtor, or Wind-Down Co, to the extent applicable, or any corporate or related action required by the Debtor, the Reorganized Debtor, or Wind-Down Co, in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the JPLs, the Authorized Managers, or the stockholders, members, or directors or managers of the Debtor, the Reorganized Debtor, or Wind-Down Co, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtor, the Reorganized Debtor, or Wind-Down Co.  The Plan Administrator shall be authorized to file on behalf of Wind-Down Co, a certificate of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of Wind-Down Co.

5.4.    ***Section 1145 Exemption***

(a)    The offer, issuance, and distribution of the New Notes to holders of Allowed Remaining Unsecured Claims under Section 4.4 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

(b)    The New Notes shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933, as amended, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) the restrictions, if any, on the transferability of such securities and

instruments, including, without limitation, any restrictions on the transferability under the terms of the New Notes, and (iv) applicable regulatory approvals.

5.5.    *Officers and New Board of Directors*

(a)    On the Effective Date, the new board of directors of the Reorganized Debtor shall consist of at least three (3) directors. Each such director shall serve from and after the Effective Date pursuant to the terms of the Amended Organizational Documents and the other constituent documents of the Reorganized Debtor. After the Effective Date, the board of directors for the Reorganized Debtor will be elected by the Sponsor in accordance with the Amended Organizational Documents. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose in the Plan Supplement (or as a schedule or exhibit to the Disclosure Statement) the identity and affiliations of any person proposed to serve on the initial board of directors of the Reorganized Debtor.

(b)    After the Effective Date, officers of the Reorganized Debtor shall be appointed and serve in accordance with the Amended Organizational Documents. The identity and affiliations of any person to serve as an officer of the Reorganized Debtor immediately following the Effective Date shall be disclosed in the Plan Supplement.

(c)    Subject to any necessary approvals in the BVI Proceeding, the JPLs, the Authorized Managers, and any officers of the Debtor, shall have no continuing rights or obligations to the Reorganized Debtor on or after the Effective Date in their capacities as such, and each such party shall resign (or shall be deemed to have resigned) and shall cease to act or serve as a director, officer, or any similar capacity on the Effective Date.

5.6.    *Indemnification of Debtor's Directors and Officers*

The Debtor and Wind-Down Co, as the case may be, shall purchase and maintain director and officer insurance coverage, in a coverage amount not to exceed the coverage amount in effect as of the Petition Date, for those Persons covered by any such policies in effect during the pendency of the Chapter 11 Case, continuing after the Effective Date, insuring such Persons in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtor prior to the Effective Date, the scope and amounts of which policies shall be disclosed in the Plan Supplement.

5.7.    *Effectuating Documents; Further Transactions.*

(a)    Upon the Effective Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms hereof, subject to any necessary approvals in the BVI Proceeding. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtor, the Reorganized Debtor, and Wind-Down Co, and any corporate or limited liability company action required by the Debtor, the Reorganized Debtor, or Wind-Down Co, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the JPLs, the Authorized Managers, or the directors, managers, or officers of the Debtor, the Reorganized Debtor, or Wind-Down Co, subject to any necessary approvals in the BVI Proceeding. On or (as applicable) before the Effective Date, the Authorized Managers, and the authorized officers of the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor or Wind-Down Co, as applicable, including, but not limited to any and all other

WEIL:\98651725\3\12817.0007

agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Section 5.7 shall be effective notwithstanding any requirements under non-bankruptcy law.

(b)     On or as soon as practicable after the Effective Date, the Reorganized Debtor and Wind-Down Co may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, subject in all respects to the provisions of the Plan and the rights vested in the Notes Trustee, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction.

(c)     Prior to making any post-Effective Date distribution from Wind-Down Co to any holder of an Allowed Remaining Unsecured Claim pursuant to Section 4.4(b)(iii), Wind-Down Co shall adopt a "plan of liquidation" (as determined for U.S. federal income tax purposes) in furtherance of its duties and responsibilities under the Plan to monetize all of the remaining assets of Wind-Down Co (including any Avoidance Actions or other Causes of Action) and distribute the proceeds thereof in accordance with the Plan, and shall timely file IRS Form 966 in connection therewith.

(d)     <u>Certain Tax Matters</u>.  For U.S. federal income tax purposes, and comparable state and local tax purposes (as applicable):

(i)     The Debtor shall implement the Plan in a manner such that it shall continue to be treated as a disregarded entity through the implementation of the Plan on the Effective Date and shall not take any action that would cause the Debtor to be treated as an association taxable as a corporation at any time (prior to or on the Effective Date).

(ii)     the right of the holders of Allowed Remaining Unsecured Claims hereunder to any and all distributions from assets transferred to Wind-Down Co shall be treated as equity, and thus as stock, in Wind-Down Co.  Accordingly, each holder of an Allowed Remaining Unsecured Claim shall be treated for U.S. federal income tax purposes as receiving, and thereafter owning, stock in Wind-Down Co.

(iii)     The Reorganized Debtor and Wind-Down Co, and any officers thereof, and all holders of Claims shall report consistent with this Section 5.7(d) for all income tax purposes, and shall (X) use commercially reasonable efforts to cause consistent reporting therewith by others, or (Y) not join in, encourage, and/or support inconsistent reporting therewith by others.

(iv)     The Debtor shall be authorized to implement the Plan in the manner most tax efficient to Wind-Down Co and the holders of Remaining Unsecured Claims, as determined by the mutual agreement of the Debtor and the Notes Trustee, in their reasonable discretion given the totality of the circumstances.

WEIL:\98651725\3\12817.0007

5.8.    *Cancellation of Existing Securities and Agreements.*

(a)    On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtor or assumed and assigned to Wind-Down Co under the Plan, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all agreements, instruments, and other documents evidencing or issued pursuant to the Notes, or any indebtedness or other obligations thereunder, and any Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect against the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, and the obligations of the Debtor or Reorganized Debtor thereunder shall be deemed fully satisfied, released, and discharged.

(b)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Reorganized Debtor or assumed and assigned to Wind-Down Co pursuant to a Final Order of the Bankruptcy Court or hereunder.

5.9.    *Cancellation of Liens.*

Except as otherwise specifically provided herein, upon the payment in full in Cash of a Secured Claim, any Lien securing such Claim, shall be deemed released, and the holder of such Secured Claim shall be directed to release any collateral or other property of the Debtor or the Reorganized Debtor held by such holder and to take such actions as may be requested by the Debtor, the Reorganized Debtor or the Plan Administrator, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtor or the Reorganized Debtor.

5.10.    *Subordination Agreements.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

5.11.    *Closing of the Chapter 11 Case.*

After the Estate has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

5.12.    *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Plan Administrator shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## ARTICLE VI  DISTRIBUTIONS.

6.1.    *Distributions Generally.*

The Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.  The Reorganized Debtor shall make all distributions with respect to all Unimpaired Claims in the ordinary course of business, which Unimpaired Claims shall not be subject to the claims reconciliation procedures set forth herein, and the Reorganized Debtor shall satisfy, dispute, pursue, or otherwise reconcile each Unimpaired Claim in the ordinary course of business.  The Plan Administrator shall be the Disbursing Agent with respect to all other Claims to be satisfied, disputed, pursued, or otherwise reconciled in accordance with the Plan.

6.2.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims maintained by the Debtor or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims.  Wind-Down Co shall have no obligation to recognize any transfer or designation of such Claims occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amount or Assumption Disputes, the Disbursing Agent shall not have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim or Cure Amount.

6.3.    *Date of Distributions.*

Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan by the Plan Administrator shall be made on the Effective Date, as and when Claims are Allowed in the sole discretion of Wind-Down Co, or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; provided, that Wind-Down Co shall from time to time announce subsequent distribution dates to the extent they determine them to be appropriate

6.4.    *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent and the Reorganized Debtor, as applicable, on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  Wind-Down Co shall use all commercially reasonable efforts to provide the Disbursing Agent and the Reorganized Debtor, as applicable, with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtor's books and records.

6.5.    *Rights and Powers of Disbursing Agent.*

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or

willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)    The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.6.    *Expenses of Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash, subject to the Plan Administration Agreements.

### 6.7.    *Postpetition Interest on Claims.*

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims against the Debtor on or after the Petition Date.

### 6.8.    *Delivery of Distributions.*

(a)    Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtor. In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until the Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

### 6.9.    *Distributions after Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.10.    *Unclaimed Property.*

Undeliverable distributions shall remain in the possession of Wind-Down Co until such time as a distribution becomes deliverable or a holder accepts distribution, or such distribution reverts back to Wind-Down Co and shall not be supplemented with any interest, dividends, or other accruals of

any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of one hundred and twenty (120) days from the applicable date of distribution and the holder of the Claim entitled to such distribution shall be discharged and forever barred.  After such date, all unclaimed property or interest in property of Wind-Down Co shall revert to and vest in Wind-Down Co and shall be thereafter disbursed to the holders of Remaining Unsecured Claims, and all unclaimed property or interest in property shall be discharged and forever barred.

6.11.    ***Time Bar to Cash Payments.***

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall immediately and irrevocably revert to Wind-Down Co and any Claim on account of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check prior to the expiration of the one hundred and twenty (120) day period from the date of issuance shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12.    ***Manner of Payment Under Plan.***

Except as otherwise specifically provided in the Plan, at the option of Wind-Down Co, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

6.13.    ***Satisfaction of Claims.***

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction and discharge of and exchange for the Debtor's and the Reorganized Debtor's, as the case may be, obligation on account of such Allowed Claims.

6.14.    ***Minimum Cash Distributions.***

Except with respect to any Claim that is Unimpaired under the Plan, the Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to this Section 6.14, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.15.    ***Setoff and Recoupment.***

The Reorganized Debtor, solely as to Unimpaired Claims, or Wind-Down Co, solely as to the Remaining Unsecured Claims, as applicable, or their designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Reorganized Debtor or Wind-Down Co may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law (other than the released Causes of Action); provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor or Wind-Down Co or its successor, of any claims, rights, or Causes of Action that the Reorganized Debtor or Wind-Down Co, or its successor or assign may possess against the holder of such Claim (other than the released Causes of Action).

WEIL:\98651725\3\12817.0007

6.16.  ***Allocation of Distributions between Principal and Interest.***

Except as otherwise required by law (as reasonably determined by Wind-Down Co), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the portion of such Allowed Claim (if any) that reflects reimbursable expenses, and then to the accrued and unpaid interest on such Allowed Claim.

6.17.  ***No Distribution in Excess of Amount of Allowed Claim.***

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

6.18.  ***Distributions Free and Clear.***

Except as provided herein, any distributions under the Plan shall be free and clear of and Liens, Claims, and encumbrances, and no other Entity, including the Debtor, the Reorganized Debtor, or Wind-Down Co, shall have any interest, legal, beneficial, or otherwise, in any amounts transferred pursuant to the Plan.

6.19.  ***Withholding and Reporting Requirements.***

(a)  *Withholding Rights.*  In connection with the Plan, any Disbursing Agent and any other Person making distributions pursuant to the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Any Disbursing Agent and the Notes Trustee, or such other Entity designated thereby, as applicable, and any other Person making distributions pursuant to the Plan, shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate (including, in the event of a non-cash distribution, the claimant providing sufficient monies to satisfy the withholding).  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)  *Forms.*  Any party entitled to receive any property as a distribution under the Plan shall, upon request of the Disbursing Agent or such other Entity designated by such Disbursing Agent (which Entity shall subsequently deliver to the Disbursing Agent any applicable Internal Revenue Service Form W-8 or Form W-9 or other tax information received) or such other Person making distributions pursuant to the Plan, deliver to such Person an appropriate Internal Revenue Service Form W-9 or (if the payee is a foreign Entity) Form W-8, and any other reasonably requested tax information.  If such request is made by the Plan Administrator or such other Entity designated by the Plan Administrator and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made, and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of any such distribution shall irrevocably revert to Wind-Down Co, and any Claim on account of such distribution shall be discharged and forever barred from assertion against Wind-Down Co, or its property.

26

## ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS.

7.1.    *Objections to Claims.*

As of the Effective Date, the Plan Administrator shall exclusively be entitled to object to Impaired Claims.  As of the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses that the Debtor had with regard to any Unimpaired Claim which they may object to or otherwise challenge in the ordinary course, except with respect to any Claim that is Allowed pursuant to the Plan.  Nothing under the Plan shall affect the Debtor's or the Reorganized Debtor's claims, causes of action, rights, or defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.  Any objections to Claims shall be served and filed by the Plan Administrator on or before the later of (a) one hundred and twenty (120) days after the Effective Date, and (b) on such other date as ordered by the Bankruptcy Court for cause.

7.2.    *Resolution of Disputed Administrative Expenses and Disputed Claims.*

On and after the Effective Date, except as otherwise provided herein, all Unimpaired Claims will be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course of business of the Reorganized Debtor.  If the Reorganized Debtor disputes any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Case had not been commenced and shall survive the Effective Date as if the Chapter 11 Case had not been commenced.  From and after the Effective Date, the Reorganized Debtor may satisfy, dispute, pursue, or otherwise resolve any Unimpaired Claim without approval of the Bankruptcy Court.  On or after the Effective Date, Wind-Down Co shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to Impaired Claims without further approval of the Bankruptcy Court.

7.3.    *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, the Debtor or Plan Administrator, as applicable, shall not be required to make any payment or distribution provided hereunder on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.4.    *Distributions After Allowance.*

After such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan (net of allocable costs and expenses of the Class 4 Disputed Claims Reserve, including taxes in accordance with Section 7.9), with or without interest as provided in the Plan.  Such distributions shall be made in accordance with Article VI of the Plan.

7.5.    *Estimation of Claims.*

The Plan Administrator may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Impaired Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Impaired Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Impaired Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Impaired Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In

the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Impaired Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Impaired Claim, the Debtor and the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtor to be estimated for voting purposes only. Notwithstanding anything to the contrary herein, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan (including for purposes of distribution).

7.6.    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.7.    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.8.    *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtor's insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Court.

7.9.    *Tax Treatment of the Class 4 Disputed Claims Reserve.*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat the Class 4 Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtor, the Reorganized Debtor, the Plan Administrator, any Disbursing Agent, and the holders of Disputed Remaining Unsecured Claims) shall report for tax purposes consistently with the foregoing. The Class 4 Disputed Claims Reserve shall be responsible for payment out of the available cash of such reserve allocable to the respective Disputed Remaining Unsecured Claims any allocable costs and expenses of the reserve, including any taxes imposed on the reserve or with respect to its assets. Accordingly, subsequent distributions in respect of the allowance or disallowance of any Remaining Unsecured Claims shall be made net of any allocable costs and expenses of the reserve. If the Class 4 Disputed Claims Reserve has insufficient cash to pay such costs and expenses, Wind-Down Co shall be responsible for the payment of such costs and expenses. The Disbursing Agent or the Plan Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Class 4 Disputed Claims Reserve for all taxable periods through the termination of the Class 4 Disputed Claims Reserve.

WEIL:\98651725\3\12817.0007

**ARTICLE VIII          EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

8.1.    *General Treatment.*

(a)      As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected by the Debtor, unless such contract or unexpired lease (i) is specifically designated (x) by the Reorganized Debtors or (y) Wind-Down Co as a contract or unexpired lease to be assumed or assumed and assigned on the Schedule of Assumed Contracts to be filed with the Plan Supplement; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; (iv) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the Confirmation Date; or (v) is identified in Section 8.4 of the Plan.

(b)      Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumption, assumption and assignment, or rejection provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtor or Wind-Down Co, as applicable, has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtor or Wind-Down Co, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

8.2.    *Determination of Assumption Disputes and Deemed Consent.*

(a)      Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtor may otherwise agree.  Cure Amounts for executory contracts or unexpired leases assumed by the Reorganized Debtor, if any, shall be the responsibility of, and paid by, the Reorganized Debtor and Cure Amounts for executory contracts or unexpired leases assumed and assigned to Wind-Down Co, if any, shall be the responsibility of Wind-Down Co and paid by the Plan Administrator.

(b)      The Debtor shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts.  At least fourteen (14) days before the deadline to object to confirmation of the Plan, the Debtor shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned or rejected reflecting the Debtor's intention to potentially assume or assume and assign or reject the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed rejection, assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtor within fourteen (14) days of the service of such notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption or assumption and assignment or rejection of such executory contract or unexpired lease shall be deemed to have assented to such assumption or assumption and assignment or rejection, notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any subsidiary of the Debtor under such contract or lease or a change, if any, in the ownership or control to the extent

29

contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of the Reorganized Debtor or Wind-Down Co, as applicable, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of the Reorganized Debtor or Wind-Down Co, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption, assumption and assignment, or rejection or to the validity of such assumption, assumption and assignment, or rejection (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)        If there is an Assumption Dispute pertaining to assumption or assumption and assignment of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption or assumption and assignment being effective; provided, that the Debtor or the Plan Administrator, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)        To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtor or the Plan Administrator reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty to such executory contract or unexpired lease (or such lesser amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such counterparty and the Plan Administrator).

(e)        Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against the Debtor or defaults by the Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtor assumes, or assumes and assigns, such executory contract or unexpired lease.  In accordance with section 365(k) of the Bankruptcy Code, assumption and assignment of any executory contract or unexpired lease, releases the Debtor and the Reorganized Debtor form any liability for breach of such contract of lease occurring after the Effective Date.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

8.3.    ***Rejection Damages Claims.***

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor and the Reorganized Debtor no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.  Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims.**

8.4.    *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtor shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety and assigned to Wind-Down Co, pursuant to sections 365 and 1123 of the Bankruptcy Code, and Wind-Down Co shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of the Debtor under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Expense Claim or objection to any Cure Amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

8.5.    *Assignment of Executory Contracts to Wind-Down Co.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease assumed and assigned to Wind-Down Co hereunder shall remain in full force and effect for the benefit of Wind-Down Co in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assumption and assignment effected pursuant to the Plan.

8.6.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

WEIL:\98651725\3\12817.0007

8.7.    *Reservation of Rights.*

(a)    The Schedule of Assumed Contracts, and any related cure notice, may be amended until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment or rejection and/or (ii) amend the proposed Cure Amount; <u>provided</u>, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtor's right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtor shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)    Neither the exclusion nor inclusion of any contract or lease by the Debtor on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor, or the Reorganized Debtor, or their respective affiliates have any liability thereunder.

(c)    Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtor and the Reorganized Debtor, under any executory or non-executory contract or any unexpired or expired lease.

(d)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

## ARTICLE IX  CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE.

9.1.    *Conditions Precedent to Confirmation of Plan.*

The following are conditions precedent to confirmation of the Plan:

(a)    the Disclosure Statement Order shall have been entered;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed and be in conformity with the Plan; and

(c)    the Plan Investment Agreement shall not have been terminated and shall be in full force and effect.

9.2.    *Conditions Precedent to Effective Date.*

The following are conditions precedent to the Effective Date of the Plan:

(a)    the Confirmation Order shall have been entered and have become a Final Order and shall be in full force and effect;

(b)    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(c)      all governmental approvals, orders and consents necessary in connection with the Plan Investment Agreement, including Bankruptcy Court approval, and any necessary approval from the BVI Court (including consummation of the BVI Plan of Arrangement) or any courts or regulatory authorities of Israel, including, but not limited to, recognition of the Confirmation Order in the Israeli Proceeding, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the consummation of the Plan Investment Agreement. For the avoidance of doubt, the approval or recognition of the treatment of Subordinated Securities Claims by the courts or regulatory authorities of Israel shall not be a condition precedent to the Effective Date;

(d)      the conditions to the obligations of the Debtor to consummate the Closing set forth in Sections 10.01 and 10.02 of the Plan Investment Agreement shall have been satisfied or waived in accordance with the terms thereof; and

(e)      the Professional Fees Escrow Account shall be established and fully funded.

Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, satisfaction of such conditions precedent shall be deemed to have occurred simultaneously on the Effective Date and no such action shall be deemed to have occurred prior to the taking of any other such action; provided that, to the extent a condition precedent (a "*Prerequisite Condition*") may be required to occur prior to another condition precedent (a "*Subsequent Condition*") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.3.      *Waiver of Conditions Precedent.*

Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan, other than those set forth in Section 9.1(a) and Section 9.2(a), may be waived in writing with the consent of the Debtor, the Notes Trustee, and the Sponsor; *provided*, *however*, the requirement that the Confirmation Order become a Final Order set forth in Section 9.2(a) may be waived in writing by the Debtor with the consent of the Sponsor.

9.4.      *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before December 31, 2022, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtor, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, the Notes Trustee, or any other Entity.

## ARTICLE X    EFFECT OF CONFIRMATION OF PLAN.

10.1.      *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all Excluded Assets and Wind Down Funding Cash shall be transferred to Wind-Down Co free and clear of all Claims, Liens, encumbrances, charges, and other interests except as provided pursuant to the Plan and the Confirmation Order, and (ii) all Transferred Entities (as defined in the Plan Investment Agreement) and any and all remaining property of the Debtor's Estate, except for the Excluded Assets, shall remain in, or

WEIL:\98651725\3\12817.0007

vest in, the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan and the Confirmation Order.  On and after the Effective Date, Wind-Down Co, with respect to clause (i) above, and the Reorganized Debtor, with respect to clause (ii) above, may take any action, including, without limitation, the operation of their businesses; the assertion of any Causes of Action; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether or not in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, each of the Reorganized Debtor and Wind-Down Co, as applicable, may pay the respective charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

10.2.    ***Binding Effect.***

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders are (a) Impaired or Unimpaired under the Plan; (b) presumed to accept or deemed to reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) will receive any distribution under the Plan.

10.3.    ***Discharge of Claims and Termination of Interests.***

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities of the Debtor that arose prior to the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against the Debtor, the Reorganized Debtor, or Wind-Down Co any such discharged Claim against or terminated Interest in the Debtor.

10.4.    ***Term of Injunctions or Stays.***

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all the Chapter 11 Case.

10.5.    ***Injunction.***

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan, provided, however, the foregoing shall not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Plan.**

(b)     Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as expressly agreed to by (x) the Reorganized Debtor and a holder of any Unimpaired Claim or (y) Wind-Down Co and a holder of any Impaired Claim or Impaired Interest, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action against the Debtor that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Reorganized Debtor or Wind-Down Co, or against property or interests in property of any of the Debtor, the Reorganized Debtor or Wind-Down Co, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section 10.5.

(d)     The injunctions in this Section 10.5 shall extend to any successors of the Debtor (including the Reorganized Debtor and Wind-Down Co), and their respective property and interests in property.

10.6.   *Releases.*

(a)     <u>Estate Releases</u>.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce (i) the Plan and (ii) the Definitive Documents (in each case, including, without limitation, any rights granted to the Plan Administrator under the Plan Administration Agreement), for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the services rendered by the Released Parties to facilitate the implementation of the Plan, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed released and discharged, to the maximum extent permitted by law, by the Debtor and its Estate, the Reorganized Debtor, and Wind-Down Co, in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons or Entities, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever,

WEIL:\98651725\3\12817.0007

including any derivative claims, asserted or assertable on behalf of the Debtor or its Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or its Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security or Asset of the Debtor, the Plan Investment Agreement, the business or contractual arrangements between any of the Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the Disclosure Statement, the Plan (including the Plan Supplement), the Deeds of Trust, the Notes, or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, provided, that nothing in this Section 10.6(a) shall be construed to release the Released Parties from gross negligence, willful misconduct, or fraud, in each case as determined by a Final Order.  The Debtor, its Estate, the Reorganized Debtor, and the Plan Administrator shall be permanently enjoined from prosecuting any of the foregoing claims or Causes of Action released under this Section 10.6(a) against each of the Released Parties.

(b)    **Mutual Releases**.

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date; (ii) for the right to defend against any objections to Claims that may be asserted under the Plan; or (iii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions made by the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed released and discharged by each of the other Released Parties, in each case, from any and all claims, Interests, or Causes of Action whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, the Debtor, the restructuring, the Chapter 11 Case, the pre- and postpetition marketing and sale process, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the Plan Investment Agreement, the Definitive Documents, the Deeds of Trust, the Notes, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; **provided**, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from any gross negligence, willful misconduct, or fraud, in each case as determined by a Final Order.  The Persons and Entities in (i) through (iii) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.

(c)    Notwithstanding anything to the contrary herein, nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

(d)        Notwithstanding the foregoing, nothing in the Plan shall, or shall be deemed to, release or waive any rights or remedies of any releasor against or provide any indemnification rights to Yoel Goldman or Tzipporah Goldman, or any entity which is under control or ownership of Yoel Goldman or Tzipporah Goldman other than the Transferred Entities.

(e)        The rights and obligations of the parties provided in connection with the releases set forth in Section 7.02 of the Plan Investment Agreement are in addition to the rights and obligations provided in this Section 10.6.

10.7.    *Exculpation.*

**To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any conduct occurring on or after the Petition Date in connection with or arising out of the filing and administration of the Chapter 11 Case, the marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or Asset of the Debtor; the Disclosure Statement, the Plan Investment Agreement, including the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, and consummation thereof, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for acts or omissions of an Exculpated Party that constitute gross negligence, fraud, or willful misconduct, in each case as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

10.8.    *Retention of Causes of Action/Reservation of Rights.*

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately prior to the Effective Date on behalf of its Estate in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtor. With respect to Unimpaired Claims, except as otherwise provided in the Plan, the Reorganized Debtor shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.  With respect to Impaired Claims, except as otherwise provided in the Plan, Wind-Down Co shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.

10.9.    *Special Provisions Regarding Sole Shareholder*

For the avoidance of doubt, nothing herein under the Plan, including under this Article X, or the Confirmation Order shall be deemed to discharge, waive, release, limit, or enjoin any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability of Yoel

Goldman or Tzipporah Goldman, or any entity which is under the control or ownership of Yoel Goldman or Tzipporah Goldman.

## ARTICLE XI  RETENTION OF JURISDICTION.

11.1.    *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter, and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Fee Claims;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Plan Investment Agreement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to hear and determine disputes arising in connection with the Plan Investment Agreement, or any agreement, instrument, or other document governing or relating to the Plan Investment Agreement;

WEIL:\98651725\3\12817.0007

(k)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(l)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any Disputed Claims for taxes and any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)     to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, exculpations, and injunctions issued thereunder;

(o)     to resolve disputes concerning Disputed Claims or the administration thereof;

(p)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)     to enter a final decree closing the Chapter 11 Case;

(r)     to recover all Assets of the Debtor and property of the Debtor's Estate, wherever located;

(s)     to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, or any deadline for responding or objection to a Cure Amount, in each case, for any purpose;

(t)     hear and determine matters or disputes arising from, or in connection with, the appointment of a successor Plan Administrator in the event of the Plan Administrator's death, disability, dissolution, or removal;

(u)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, including, without limitation, Avoidance Actions; and

(v)     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

11.2.   *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII MISCELLANEOUS PROVISIONS.

12.1.   *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, with respect to any Impaired Claims, Wind-Down Co shall make all required filings and pay all fees incurred pursuant to sections 1911

through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtor's case, until such time as a final decree is entered closing the Debtor's case, a Final Order converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtor's case is entered. With respect to any Unimpaired Claims, the Reorganized Debtor shall make all aforementioned required filings and pay all such fees, if any.

### 12.2. *Substantial Consummation of the Plan.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3. *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

### 12.4. *Requests by the Reorganized Debtor and Wind-Down Co for Expedited Determination of Taxes.*

The Reorganized Debtor shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date and through the Effective Date. Wind-Down Co shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, through the date of its dissolution.

### 12.5. *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the making or delivery of any instrument of transfer in connection or furtherance of the Plan, and any financing by the Sponsor, (b) the issuance, transfer or exchange of any securities, instruments or documents pursuant to, in implementation of or as contemplated in the Plan and the Plan Investment Agreement, (c) the creation of any Lien, mortgage, deed of trust, or other security interest, (d) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with the Plan Investment Agreement, (e) all transfers and distributions by Wind-Down Co in furtherance of the Plan, and (f) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent provided by law, including, but not limited to: (i) mortgage recording taxes imposed under Article 11 of the tax law of the State of New York, (ii) the New York Real Estate transfer tax imposed under Article 31 of the Tax Law of the State of New York (including by reason of a change in the equity ownership of the Debtor), (iii) the New York City Real Property transfer tax imposed by title 11, chapter 21 of the New York City Administrative Code (including by reason of a change in the equity ownership of the Debtor) and, (iv) any similar tax on the recording of deeds, transfers or property or ownership interests in property, recording of mortgages or other security instruments imposed by the State of New York, or any political subdivision thereof. Consistent with the foregoing, each recorder of deeds or similar official for

40

any county, city, or governmental unit in which any instrument hereunder is to be recorded (including, without limitation, the Register of the City of New York) shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.   All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Properties, any taxes from which the transactions effectuated pursuant to the Plan and Confirmation Order are exempt, pursuant to and in furtherance of section 1146(a) of the Bankruptcy Code and to the greatest extent provided by law, including but not limited to, New York State Real Estate Transfer Taxes, and any mortgage recording tax, and any penalties, interest, or additions to any tax related thereto.

12.6.   ***Amendments.***

(a)      *Plan Modifications*.   Subject to all consent rights of the Sponsor and the Notes Trustee, respectively, under the Plan Investment Agreement, the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan (i) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.   In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Notes Trustee and the Sponsor, the Debtor may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)      *Other Amendments*.   Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement, with the consent of the Notes Trustee and the Sponsor (such consent not to be unreasonably withheld), without further order or approval of the Bankruptcy Court.

12.7.   ***Effectuating Documents and Further Transactions.***

The Reorganized Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.8.   ***Revocation or Withdrawal of Plan.***

The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date in accordance with the Plan Investment Agreement.   If the Plan has been revoked or withdrawn prior to the Effective Date in accordance with the Plan Investment Agreement, or if confirmation or the occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor, the Notes Trustee, the Sponsor, or any

WEIL:\98651725\3\12817.0007

other Entity.  This provision shall have no adverse impact on the rights of the Notes Trustee, the Sponsor, or the Debtor in respect of any such revocation or withdrawal.

### 12.9. *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, with the reasonable consent of the Notes Trustee and the Sponsor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or further modified without the consent of (i) the Debtor or Wind-Down Co, as applicable, (ii) the Notes Trustee, and (iii) the Reorganized Debtor, but only to the extent such deletions or modifications negatively impact the Reorganized Debtor, and (c) nonseverable and mutually dependent.

### 12.10. *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to the Debtor or the Reorganized Debtor, shall be governed by the laws of the state of incorporation or organization of the Debtor or Reorganized Debtor.

### 12.11. *Time.*

In computing any period of time prescribed or permitted by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12. *Dates of Actions to Implement the Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 12.13. *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtor.

WEIL:\98651725\3\12817.0007

12.14. *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.15. *Successor and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.16. *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, the Plan Investment Agreement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which shall be deemed to become merged and integrated into the Plan.

12.17. *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement documents) are incorporated into and are a part of the Plan as if set forth in full herein.

12.18. *Notices.*

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, the Notes Trustee, the Sponsor, or Wind-Down Co, as applicable, to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)      If to the Debtor:

c/o All Year Holdings Limited
199 Lee Avenue, #693,
Brooklyn, NY 11211
Attn: Mr. Asaf Ravid and Mr. Ephraim Diamond
Email: ravidasaf@gmail.com and ephraim@arbelcapital.com.

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:    Gary T. Holtzer, Esq.
         Matthew P. Goren, Esq.

Telephone:  (212) 310-8000

WEIL:\98651725\3\12817.0007

Facsimile:  (212) 310-8007
Email:  Gary.Holtzer@weil.com
        Matthew.Goren@weil.com

(b)      If to the Notes Trustee:

Mishmeret Trust Company Ltd.
48 Menachem Begin Road
Tel Aviv 6618001, Israel

-and-

Chapman and Cutler LLP
1270 Avenue of the Americas
New York, NY 10020
Attn: Michael Friedman, Esq.
Email: friedman@chapman.com

-and-

Chapman and Cutler LLP
320 South Canal Street
Chicago, IL 60606
Attn: Stephen R. Tetro, III, Esq.
Email: stetro@chapman.com

(c) If to the Sponsor or on or after the Effective Date, the Reorganized Debtor:

Paragraph Partners LLC
270 Sylvan Avenue
Englewood Cliffs N.J. 07632
Suite 2260

-and-

Gissin & Co.
Habarzel 38B,
Tel Aviv 6971054, Israel
Attn: Yael Hershkovitz, Esq.
Email: Yael@gissinlaw.co.il

-and-

Locke Lord LLP
200 Vesey Street, 20th Floor
New York, NY 10281
Attn: Shalom Jacob, Esq.
Email: SJacob@lockelord.com

44

-and-

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attn: Avi D. Feinberg, Esq.
Email: Avi.Feinberg@friedfrank.com

(d) If to Wind-Down Co or the Plan Administrator after the Effective Date, to the notice
parties set forth in the Plan Administration Agreement.

[*Remainder of page intentionally left blank*]

45

After the Effective Date, Wind-Down Co shall have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, Wind-Down Co is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:   May 31, 2022

**ALL YEAR HOLDINGS LIMITED, as Debtor**

By: _/s/ Assaf Ravid_____
Name: Assaf Ravid
Title: Authorized Manager

**EXHIBIT A**

**Form of New Notes**

*Final Form*

THE NOTE REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## PROMISSORY NOTE

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, All Year Holdings Limited, a company incorporated and existing under the laws of the British Virgin Islands (the "**Company**"), hereby unconditionally promises to pay to the order of [Holder][1] or its assigns (the "**Noteholder**," and together with the Company, the "**Parties**"), the principal amount of $20,000,000[2], as may be adjusted pursuant to Section 2.3 of this Promissory Note (the "**Note**" and such principal amount, as may be adjusted, the "**Note Balance**").  Taz Partners LLC ("**Taz**") is executing this Note solely in respect of Section 6.5 hereof.

1.    Definitions; Interpretation.

1.1    Capitalized terms used herein shall have the meanings set forth in this Section 1.1.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to the Company from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977.

"**Beneficial Ownership Regulation**" has the meaning set forth in Section 9.10.

"**Business Day**" means a day other than a Saturday, Sunday, any day on which commercial banks in Israel are authorized or required by law to close and the following Jewish holidays while occurring either in Israel or in New York: the two days of Rosh Hashanah,

---

[1] [TBD: Plan Administrator.]

[2] [NTD: Subject to increase to $22MM if Plan Investor consummates the William Vale Purchase prior to the Effective Date. If the William Vale Purchase is consummated by Plan Investor after the Effective Date, a new $2,000,000 note will be issued to Holder on substantially the same form with mechanics added to apply value reductions equally across the two notes.]

Yom Kippur, the first two days of Sukkot, Shemini Atzeret, Simchat Torah, the first two and last two days of Passover and the two days of Shavuot.

"**Company**" has the meaning set forth in the introductory paragraph.

"**Debt**" of the Company, means all (a) indebtedness for borrowed money; (b) obligations for the deferred purchase price of property or services, except trade payables arising in the ordinary course of business; (c) obligations evidenced by notes, bonds, debentures, or other similar instruments; (d) obligations as lessee under capital leases; (e) obligations in respect of any interest rate swaps, currency exchange agreements, commodity swaps, caps, collar agreements, or similar arrangements entered into by the Company providing for protection against fluctuations in interest rates, currency exchange rates, or commodity prices, or the exchange of nominal interest obligations, either generally or under specific contingencies; (f) obligations under acceptance facilities and letters of credit; (g) guaranties, endorsements (other than for collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person, or otherwise to assure a creditor against loss, in each case, in respect of indebtedness set out in clauses (a) through (f) of a Person other than the Company; (h) indebtedness set out in clauses (a) through (g) of any Person other than Company secured by any lien on any asset of the Company, whether or not such indebtedness has been assumed by the Company, and (i) indebtedness of any partnership, unlimited liability company, or unincorporated joint venture in which the Company is a general partner, member, or a joint venturer, respectively (unless such Debt is expressly made non-recourse to the Company).

"**Default**" means any of the events specified in <u>Section 7,</u> which constitute an Event of Default or which, upon the giving of notice, the lapse of time, or both, pursuant to <u>Section 7</u>, would, unless cured or waived, become an Event of Default.

"**Default Rate**" means 10%.

"**Event of Default**" has the meaning set forth in <u>Section 7</u>.

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

2

"**Guaranty Agreement**" means the Guaranty Agreement, dated as of the date hereof, by and between [Guarantor][3] and Noteholder.

"**Investment Agreement**" means that certain Investment Agreement, dated as of March 11, 2022 by and among the Company, Paragraph Partners LLC and Mishmeret Trust Company Ltd, as amended.

"**Law**" as to any Person, means  any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Lien**" means any mortgage, pledge, hypothecation, encumbrance, lien (statutory or other), charge, or other security interest.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations or condition (financial or otherwise) of the Company; (b) the validity or enforceability of the Note or Guaranty Agreement; (c) the rights or remedies of the Noteholder hereunder or under the Guaranty Agreement; or (d) the Company's ability to perform any of its material obligations hereunder.

"**Maturity Date**" means the earlier of (a) the date that is 30 months from the date hereof and (b) the date on which all amounts under this Note shall become due and payable pursuant to Section 8.

"**Note**" has the meaning set forth in the introductory paragraph.

"**Note Balance**" has the meaning set forth in the introductory paragraph.

"**Noteholder**" has the meaning set forth in the introductory paragraph.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Parties**" has the meaning set forth in the introductory paragraph.

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56, signed into law October 26, 2001).

---

[3] [NTD: Identity of Guarantor / Guarantors to be discussed and approved by the Trustee]

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**Sanctioned Country**" means, at any time, a country or territory which is itself the subject or target of any comprehensive or country-wide Sanctions.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by a Sanctions Authority; (b) any Person operating, organized, or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person that is the subject or target of any Sanctions.

"**Sanctions**" mean all economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by a Sanctions Authority.

"**Sanctions Authority**" means OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, any EU member state, Her Majesty's Treasury of the United Kingdom, Israel, or other relevant sanctions authority.

1.2    <u>Interpretation</u>. For purposes of this Note (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Note as a whole. The definitions given for any defined terms in this Note shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein to: (x) Schedules, Exhibits, and Sections mean the Schedules, Exhibits, and Sections of this Note; (y) an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Note shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

2.    <u>Payment Dates; Optional Prepayments</u>.

2.1    <u>Payment Dates</u>. The Note Balance shall be due and payable according to the payment schedule attached hereto as <u>Schedule A</u>, with any amounts due hereunder and not already then paid to be paid, along with any Default Rate interest payable hereunder, on the Maturity Date.

2.2    <u>Optional Prepayments</u>. The Company may prepay the Note Balance in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with any accrued and unpaid Default Rate interest, if any. No prepaid amount may be reborrowed.

4

2.3     Value Adjustment. In the event that Subsidiary Value Reductions (according to the terms of, and as defined in, the Investment Agreement) exceed $4,250,000, the then-outstanding Note Balance shall be reduced by 50 cents for each dollar of Subsidiary Value Reduction between $4,250,000 and $7,250,000 and for any Subsidiary Value Reduction above $7,250,000, on a dollar-for-dollar basis, up to the total remaining Note Balance under the Notes (in each case, a "**Note Balance Reduction**"). Any such Note Balance Reduction shall reduce all remaining payments due under the Note according to Section 2.1 on a *pro-rata* basis (e.g., if there is a $6,000,000 Note Balance Reduction and three payments are remaining then $2,000,000 will be reduced from each such remaining payment). To the extent that Subsidiary Value Reductions are equal to or lesser than $4,250,000, no Note Balance Reduction will occur.

3.     Interest.

3.1     Interest Rate. Except as otherwise provided herein, the Note Balance shall not bear or accrue interest.

3.2     Default Interest. If any amount payable hereunder is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Default Rate from the date of such non-payment until such amount is paid in full.

3.3     Computation of Interest. If owing hereunder, all computations of interest shall be made on the basis of 365 or 366 days, as the case may be, and the actual number of days elapsed.

3.4     Interest Rate Limitation. If at any time and for any reason whatsoever, the interest rate payable on the Note Balance shall exceed the maximum rate of interest permitted to be charged by the Noteholder to the Company under applicable Law, such interest rate shall be reduced automatically to the maximum rate of interest permitted to be charged under applicable Law/that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest permitted by applicable Law shall be deemed a voluntary prepayment of principal.

4.     Payment Mechanics.

4.1     Manner of Payments. All payments hereunder shall be made in lawful money of the United States of America no later than 12:00 PM in New York, New York on the date on which such payment is due by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Company from time to time.

4.2     Application of Payments. All payments made under this Note shall be applied *first* to the payment of Expenses under and as defined in Section 9.2 below, *second* to accrued interest, if any, and *third* to the payment of the principal amount outstanding under the Note.

5

4.3     <u>Business Day Convention</u>. Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

4.4     <u>Rescission of Payments</u>. If at any time any payment made by the Company under this Note is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Company or otherwise, the Company's obligation to make such payment shall be reinstated as though such payment had not been made.

5.     <u>Representations and Warranties</u>. The Company hereby represents and warrants to the Noteholder on the date hereof as follows:

5.1     <u>Existence; Power and Authority; Compliance with Laws</u>. The Company (a) is a company incorporated and existing under the laws of the British Virgin Islands, validly existing, and in good standing under the laws of the state of its jurisdiction of organization, (b) has the requisite power and authority, and the legal right, to own, lease, and operate its properties and assets and to conduct its business as it is now being conducted, to execute and deliver this Note, and to perform its obligations hereunder, and (c) is in compliance with all Laws except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.2     <u>Authorization; Execution and Delivery</u>. The execution and delivery of this Note by the Company and the performance of its obligations hereunder have been duly authorized by all necessary company action in accordance with all applicable Laws. The Company has duly executed and delivered this Note.

5.3     <u>No Approvals</u>. All consents and authorizations of, filings with, notices to, or other acts by, or in respect of, any Governmental Authority or any other Person required in order for the Company to execute, deliver, and perform its obligations under this Note have been made or received, as applicable.

5.4     <u>Enforceability</u>. The Note is a valid, legal, and binding obligation of the Company, enforceable against the Company in accordance with its terms.

5.5     <u>PATRIOT Act; Anti-Money Laundering</u>. The Company is, and to the knowledge of the Company, its directors, officers, employees, and agents are, in compliance in all material respects with the PATRIOT Act, and any other applicable terrorism and money laundering laws, rules, regulations, and orders.

5.6     <u>Anti-Corruption Laws and Sanctions</u>.

(a)     The Company is, and to the knowledge of the Company, its directors, officers, employees, and agents are, in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.

6

(b)    The Company is not, and to the knowledge of the Company, no director, officer, employee of the Company, or any agent of the Company that will act in any capacity in connection with or benefit from the Note, is a Sanctioned Person.

6.    <u>Affirmative Covenants</u>. Until all amounts outstanding under this Note have been paid in full, the Company shall:

6.1    <u>Maintenance of Existence</u>. (a) Preserve, renew, and maintain in full force and effect its corporate or organizational existence and (b) take all reasonable action to maintain all rights, privileges, and franchises necessary or desirable in the normal conduct of its business, except, in each case, where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

6.2    <u>Compliance</u>. (a) Comply with all Laws applicable to it and its business and its obligations under its material contracts and agreements, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect and (b) maintain in effect and enforce policies and procedures reasonably designed to achieve compliance in all material respects by the Company and its directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

6.3    <u>Notice of Events of Default</u>. As soon as possible and in any event within three (3) Business Days after it becomes aware that an Event of Default has occurred, notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

6.4    <u>Further Assurances</u>. Upon the request of the Noteholder, promptly execute and deliver such further instruments and do or cause to be done such further acts as may be necessary or advisable to carry out the intent and purposes of this Note.

6.5    <u>Seniority of Note; Subordination of Taz Claim</u>. This Note shall rank senior to any claim of Taz against the Company arising under or relating to that certain confession of judgment entered against All Year Holdings Limited by the Kings County Supreme Court on December 9, 2021 (the "**Subordinated Claim**"). Taz agrees, by its execution hereof, that its right to collect any amounts in respect of the Subordinated Claim from the Company is and shall be subordinate to the prior payment in full in cash of all obligations arising hereunder, and that such subordination is for the benefit of and enforceable by the Noteholder hereof or in favor of any other Person entitled to enforce the Noteholder's rights hereunder.  If a payment or distribution is made to Taz by the Company in payment of the Subordinated Claim, Taz shall hold such payment or distribution up to the amount that is owed under this Note in trust for the Noteholder and shall pay it over to the Noteholder as a payment of this Note. No right of Noteholder to enforce the subordination of this Note shall be impaired by any act or failure to act by the Company or any other Person to comply with this <u>Section 6.5</u>.

7.    <u>Events of Default</u>. The occurrence and continuance of any of the following shall constitute an Event of Default hereunder:

7.1    <u>Failure to Pay</u>. The Company fails to pay any amount of the Loan when due.

7

7.2    <u>Breach of Representations and Warranties</u>. Any representation or warranty made by the Company to the Noteholder herein is incorrect in any material respect on the date as of which such representation or warranty was made.

7.3    <u>Breach of Covenants</u>. The Company fails to observe or perform any material covenant, obligation, condition, or agreement contained in this Note, and such failure continues for 14 days after written notice to the Company.

7.4    <u>Cross-Defaults</u>. The Company fails to pay when due any amount of Debt greater than $10 million (other than Debt arising under this Note), or any interest or premium thereon, when due and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt, *provided that* no Event of Default shall be triggered by this <u>Section 7.4</u> as a result of the Company's failure to pay any Debt arising prior to the date hereof other than Debt documented by or arising under or in connection with any agreement identified as a Material Contract in the Investment Agreement.

7.5    <u>Bankruptcy</u>.

(a)    The Company commences any case, proceeding, or other action (i) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts or (ii) seeking appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or the Company makes a general assignment for the benefit of its creditors;

(b)    There is commenced against the Company any case, proceeding, or other action of a nature referred to in <u>Section 7.5(a)</u> which (i) results in the entry of an order for relief or any such adjudication or appointment or (ii) remains undismissed, undischarged, or unbonded for a period of 60 days;

(c)    There is commenced against the Company any case, proceeding, or other action seeking issuance of a warrant of attachment, execution, or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, or stayed or bonded pending appeal within 45 days from the entry thereof;

(d)    The Company takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in <u>Section 7.5(a)</u>, <u>Section 7.5(b)</u>, or <u>Section 7.5(c)</u> above; or

(e)    The Company is generally not, or shall be unable to, or admits in writing in a legal proceeding its inability to, pay its debts as they become due.

8.    <u>Remedies</u>. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Noteholder may, at its option, by written

notice to the Company (a) declare the entire principal amount of the Note Balance, together with any accrued interest thereon and any other amounts payable under this Note, immediately due and payable; and/or (b) exercise any or all of its rights, powers or remedies under applicable Law; *provided, however*, that if an Event of Default described in <u>Section 7.5</u> shall occur, the principal of and accrued interest on the Loan, if any, shall become immediately due and payable without any notice, declaration, or other act on the part of the Noteholder.

9. <u>Miscellaneous</u>.

9.1 <u>Notices</u>.

(a) All notices, requests, or other communications required or permitted to be delivered hereunder shall be delivered in writing, in each case to the address specified below or to such other address as such Party may from time to time specify in writing in compliance with this provision:

(i) If to the Company:

[ADDRESS]
Attn:
Telephone:
Email:

With a copy to (which shall not constitute notice):

[ADDRESS]
Attn:
Telephone:
Email:

(ii) If to the Noteholder [Plan Administrator Information TBD]:

[ADDRESS]
Attn:
Telephone:
Email:

With a copy to (which shall not constitute notice):

[ADDRESS]
Attn:
Telephone:
Email:

(b) Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received upon the sender's receipt of an

9

acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email, or other written acknowledgment).

9.2    Expenses. If an Event of Default shall occur and be continuing, the Company shall reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its external counsel) incurred by the Noteholder in connection with the enforcement of the Noteholder's rights hereunder and under the Guaranty Agreement (the foregoing, collectively, "**Expenses**").

9.3    Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, and the transactions contemplated hereby shall be governed by the laws of the State of Israel.

9.4    Submission to Jurisdiction.

(a)    The Company hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note may be brought in the courts of the State of New York and (ii) submits to the jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against the Company in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

(b)    Nothing in this Section 9.4 shall affect the right of the Noteholder to (i) commence legal proceedings or otherwise sue the Company in any other court having jurisdiction over the Company or (ii) serve process upon the Company in any manner authorized by the laws of any such jurisdiction.

9.5    Venue. The Company irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Note in any court referred to in Section 9.4 and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

9.6    Waiver of Jury Trial. THE COMPANY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

9.7    Integration. This Note, the Investment Agreement and the Guaranty Agreement constitute the entire contract between the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

9.8    Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any Person. The Company may not assign or transfer this Note or any of its

rights hereunder without the prior written consent of the Noteholder. This Note shall inure to the benefit of, and be binding upon, the Parties and their permitted assigns.

9.9 <u>Waiver of Notice</u>. The Company hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity, and diligence in taking any action to collect sums owing hereunder.

9.10 <u>PATRIOT Act</u>. The Noteholder hereby notifies the Company that pursuant to the requirements of the PATRIOT Act and 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**"), it may be required to obtain, verify, and record information that identifies the Company, which information may include the name and address of the Company and other information that will allow the Noteholder to identify the Company in accordance with the PATRIOT Act and the Beneficial Ownership Regulation, and the Company agrees to provide such information from time to time to the Noteholder.

9.11 <u>Amendments and Waivers</u>. No term of this Note may be waived, modified, or amended except by an instrument in writing signed by both of the Parties. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

9.12 <u>Headings</u>. The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand, or limit any of the terms or provisions hereof.

9.13 <u>No Waiver; Cumulative Remedies</u>. No failure to exercise, and no delay in exercising on the part of the Noteholder, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

9.14 <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of similar import in the Note shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based record-keeping system, as the case may be.

9.15 <u>Severability</u>. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

[SIGNATURE PAGE FOLLOWS]

*Final Form*

In witness whereof, the Company has executed this Note as of [date].

All Year Holdings Limited

By_____
Name:
Title:

*Final Form*

Taz Partners LLC has executed this Note solely in respect of <u>Section 6.5</u> as of the date first written above.

Taz Partners LLC

By_____
Name:
Title:

*Final Form*

<u>Schedule A</u>

| <u>Payment Date (on or before)</u> | <u>Payment Amount</u>[4] |
|---|---|
| [6 months from closing] | $3,000,000 |
| [12 months from closing] | $2,000,000 |
| [18 months from closing] | $5,000,000 |
| [24 months from closing] | $5,000,000 |
| [30 months from closing] | $5,000,000 |

---

[4] [NTD: Payment Amounts to be adjusted *pro rata* in case of increase described in footnote 2.]

**EXHIBIT B**

**Form of New Notes Guaranty**

# GUARANTY AGREEMENT

This GUARANTY AGREEMENT (this "**Guaranty**"), dated as of [DATE], is made by [Guarantor], a [_____] [_____] ("**Guarantor**"), in favor and for the benefit of [Holder], a [_____] [_____] ("**Beneficiary**").

Reference is made to that certain Promissory Note dated as of [DATE] (the "**Underlying Agreement**")[1], by and between All Year Holdings Limited, a company incorporated and existing under the laws of the British Virgin Islands ("**Obligor**"), and Beneficiary. In consideration of the substantial direct and indirect benefits derived by Guarantor from the transactions under the Underlying Agreement, Guarantor hereby agrees as follows:

1.    <u>Guaranty</u>. Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment of all amounts required to be paid by Obligor under the Underlying Agreement, plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder (collectively, the "**Obligations**").

2.    <u>Guaranty Absolute and Unconditional</u>. Guarantor agrees that its Obligations under this Guaranty are irrevocable, continuing, absolute and unconditional and shall not be discharged or impaired or otherwise affected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a)    Any illegality, invalidity or unenforceability of any Obligation or the Underlying Agreement.

(b)    Any change in the time, place or manner of payment or performance of, or in any other term of the Obligations, or any rescission, waiver, release, assignment, amendment or other modification of the Underlying Agreement.

(c)    Any taking, exchange, substitution, release, impairment, amendment, waiver, modification or non-perfection of any collateral or any other guaranty for the Obligations, or any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Obligations.

(d)    Any default, failure or delay, willful or otherwise, in the performance of the Obligations.

(e)    Any change, restructuring or termination of the corporate structure, ownership or existence of Guarantor or Obligor or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Obligor or its assets or any resulting restructuring, release or discharge of any Obligations.

---

[1] [If the William Vale Purchase is consummated by Plan Investor after the Effective Date, this definition will be amended to include the new note issued to Holder under the Underlying Agreement.]

(f)     Any failure of Beneficiary to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Obligor now or hereafter known to Beneficiary, Guarantor waiving any duty of Beneficiary to disclose such information.

(g)     The failure of any other guarantor or third party to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of Guarantor or any other guarantor or surety with respect to the Obligations.

(h)     The failure of Beneficiary to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Underlying Agreement.

(i)     The existence of any claim, set-off, counterclaim, recoupment or other rights that Guarantor or Obligor may have against Beneficiary (other than a defense of payment or performance) other than any Note Balance Reduction in accordance with the Underlying Agreement.

(j)     Any other circumstance (including, without limitation, any statute of limitations), act, omission or manner of administering the Underlying Agreement or any existence of or reliance on any representation by Beneficiary that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Guarantor.

3.     <u>Certain Waivers; Acknowledgments</u>. Guarantor further acknowledges and agrees as follows:

(a)     Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Obligations, until the complete irrevocable and indefeasible payment in full of the Obligations.

(b)     This Guaranty is a guaranty of payment and not of collection. Beneficiary shall not be obligated to enforce or exhaust its remedies against Obligor or under the Underlying Agreement before proceeding to enforce this Guaranty.

(c)     This Guaranty is a direct guaranty and independent of the obligations of Obligor under the Underlying Agreement. Beneficiary may resort to Guarantor for payment and performance of the Obligations whether or not Beneficiary shall have resorted to any collateral therefor or shall have proceeded against Obligor or any other guarantors with respect to the Obligations. Beneficiary may, at Beneficiary's option, proceed against Guarantor and Obligor, jointly and severally, or against Guarantor only without having obtained a judgment against Obligor.

(d)     Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to any of the Obligations and this Guaranty and any requirement that Beneficiary protect, secure, perfect or insure any lien or any property subject thereto.

(e)    Guarantor agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time all or part of any payment of any Obligation is voided, rescinded or recovered or must otherwise be returned by Beneficiary upon the insolvency, bankruptcy or reorganization of Obligor.

4.    <u>Subrogation</u>. Guarantor waives and shall not exercise any rights that it may acquire by way of subrogation, contribution, reimbursement or indemnification for payments made under this Guaranty until all Obligations shall have been indefeasibly paid and discharged in full.

5.    <u>Representations and Warranties</u>. To induce Beneficiary to enter into the Underlying Agreement, Guarantor represents and warrants that: (a) Guarantor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization; (b) this Guaranty constitutes Guarantor's valid and legally binding agreement in accordance with its terms; (c) the execution, delivery and performance of this Guaranty have been duly authorized by all necessary action and will not violate any order, judgment or decree to which Guarantor or any of its assets may be subject; and (d) Guarantor is currently solvent and will not be rendered insolvent by providing this Guaranty.

6.    <u>Notices</u>.

(a)    All notices, requests, or other communications required or permitted to be delivered hereunder shall be delivered in writing, in each case to the address specified below or to such other address as such Party may from time to time specify in writing in compliance with this provision:

If to the Guarantor:

[ADDRESS]

Attn: Avi Philipson
Telephone:
Email: aphilipson@graphgroup.com

With a copy to (which shall not constitute notice):

Gissin & Co., Locke Lord LLP, Fried, Frank, Harris, Shriver & Jacobson LLP
Attn: Adv. Yael Hershkovitz, Shalom Jacob, Avi Feinberg
Telephone:
Email: yael@gissinlaw.co.il; SJacob@lockelord.com;
Avi.Feinberg@friedfrank.com

If to the Beneficiary:

[ADDRESS]
Attn:
Telephone:
Email:

With a copy to (which shall not constitute notice):

[ADDRESS]
Attn:
Telephone:
Email:

(b)    Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email, or other written acknowledgment).

7.    <u>Assignment</u>. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided, however*, that Guarantor may not, without the prior written consent of Beneficiary, assign any of its rights, powers or obligations hereunder. Beneficiary may assign this Guaranty and its rights hereunder without the consent of Guarantor. Any attempted assignment in violation of this Section shall be null and void.

8.    <u>Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial</u>. Sections <u>9.3</u> (Governing Law), <u>9.4</u> (Submission to Jurisdiction), <u>9.5</u> (Venue) and <u>9.6</u> (Waiver of Jury Trial) of the Underlying Agreement are hereby incorporated by reference *mutatis mutandis* as though fully set forth herein.

9.    <u>Cumulative Rights</u>. Each right, remedy and power hereby granted to Beneficiary or allowed it by applicable law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Beneficiary at any time or from time to time.

10.    <u>Severability</u>. If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty shall not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

11.    <u>Entire Agreement; Amendments; Headings; Effectiveness</u>. This Guaranty constitutes the sole and entire agreement of Guarantor and Beneficiary with respect to the subject matter hereof and supersedes all previous agreements or understandings, oral or written, with respect to such subject matter. No amendment or waiver of any provision of this Guaranty shall be valid and binding unless it is in writing and signed, in the case of an amendment, by both parties, or in the case of a waiver, by the party against which the waiver is to be effective. Section headings are for convenience of reference only and shall not define, modify, expand or limit any of the terms of this Guaranty. Delivery of this Guaranty by facsimile or in electronic (e.g., pdf) format shall be effective as delivery of a manually executed original of this Guaranty.

[SIGNATURE PAGE FOLLOWS]

*Final Form*

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

[_____]

By: _____

Name:

Title:

## **Exhibit B**

**Investment Agreement**

**INVESTMENT AGREEMENT**

dated as of March, 11, 2022

by and among

**All Year Holdings Limited, as the Company**

and

**Paragraph Partners LLC, as Plan Investor**

and

**Mishmeret Trust Company Ltd.**, solely in its capacity as Trustee
and in respect of Sections 7.02(b), 8.01(b), 8.01(c) and 8.02(c)

This INVESTMENT AGREEMENT, dated as of March 11, 2022 (the "***Agreement Date***"), is made by and between All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands (the "***Company***") and Paragraph Partners LLC, a US a special purpose entity ("***Plan Investor***").  Mishmeret Trust Company Ltd. ("***Mishmeret***"), solely in its capacity as Trustee for the Series B Notes and Series D Notes issued by the Company (the "***Unsecured Notes***") and the Series C Notes and Series E Notes issued by the Company (the "***Secured Notes***" and, together with the Unsecured Notes, the "***Notes***" and the holders of such Notes, the "***Noteholders***") pursuant those deeds of trust for each of the Notes (the "***Deeds of Trust***") by and between the Company and Mishmeret, is executing this agreement solely in respect of <u>Sections 7.02(b)</u>, <u>8.01(b)</u>, <u>8.01(c)</u> and <u>8.02(c)</u> hereof.

## PRELIMINARY STATEMENTS

A.     WHEREAS, on December 14, 2021 (the "***Petition Date***"), the Company (in such capacity, the "***Debtor***") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") (the case filed with the Bankruptcy Court, the "***Bankruptcy Case***").

B.     WHEREAS, on December 16, 2021, the Company voluntarily sought the appointment of joint provisional liquidators (the "***JPLs***") from the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division, Virgin Islands (the "***BVI Court***").  An order appointing the JPLs was entered by the BVI Court on December 20, 2021 (the voluntary liquidation proceeding filed with the BVI Court, the "***BVI Proceedings***").

C.     WHEREAS, the Debtor and Plan Investor wish to execute this agreement to set forth certain terms and conditions related to a proposed transaction that would be effected in the Bankruptcy Case pursuant to a Plan (as defined in <u>Annex A</u>), and a disclosure statement prepared by the Debtor in form and substance reasonably acceptable to the Plan Investor.

D.     WHEREAS, following the execution of this Agreement, the Debtor shall commence Israeli proceedings (the "***Israeli Proceedings***").

E.     WHEREAS, to the Knowledge of the Company, the Company owns, directly or indirectly, Equity Interests in the entities in the percentages set forth on <u>Schedule A-1</u> (each such entity, a "***Transferred Entity***" and collectively with the Company, the "***Transferred Entities")*** and, to the Knowledge of the Company, the Transferred Entities directly or indirectly own certain real properties as depicted on the chart attached hereto as <u>Schedule A-2</u>.

F.     WHEREAS, to implement the Transactions and the reorganization of the Debtor, Plan Investor desires to provide funding for the Plan in exchange for acquiring, as provided in the Plan, upon the terms and subject to the conditions set forth herein and therein, newly issued shares or Equity Interests in the Reorganized Debtor (as defined below) ("***New Shares***"), which will represent one hundred percent (100%) of the aggregate number of New Shares issued and outstanding as of the Effective Time (as defined below) (such shares or Equity Interests to be acquired by Plan Investor hereunder, the "***Reorganized Equity Interests***").

G.       WHEREAS, in exchange for receipt of the Reorganized Equity Interests, (a) the Plan Investor will pay to the Debtor's estate, for distribution in accordance with the Plan, a cash payment in the amount of $40,000,000 (the "***Cash Payment***"), (b) the Reorganized Debtor will deliver promissory notes, in the form attached hereto as <u>Exhibit B</u> in the aggregate amount of $20,000,000, or, in the event that the Plan Investor effects the William Vale Purchase (as defined below), $22,000,000, and subject to the adjustment provisions set forth in <u>Section 2.02</u> (the "***Purchase Price Adjustment***") hereof, to the Recovering Creditors (as defined below) or their nominees (the "***New Notes***") in accordance with the Plan, with such New Notes to be subject to personal or corporate guarantees acceptable in form and substance to the Debtor and the Noteholders (the "***New Guarantees***") and (c) the Reorganized Debtor will assume the Assumed Claims (as defined below) in accordance with the Plan (the Cash Payment, the New Notes, the New Guarantees, the assumption of the Assumed Claims, collectively, the "***Plan Consideration***").

H.       WHEREAS, immediately prior to the Closing, Wind Down Co (as defined below) will execute and deliver to the Company and Plan Investor a Joinder Agreement in substantially the form attached as <u>Exhibit C</u> to join as a Party to this Agreement and a Joinder Agreement in the form attached to the Escrow Agreement to join as a Party to the Escrow Agreement.

I.       NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement and in the Confirmation Order, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I

### DEFINITIONS

Section 1.01.  <u>Certain Defined Terms</u>.  Capitalized terms used in this Agreement have the meanings specified in <u>Annex A</u>.

## ARTICLE II

### PURCHASE AND SALE; CLOSING

Section 2.01.  <u>Issuance and Sale of the Reorganized Equity Interests</u>.  On the terms and subject to the conditions set forth in this Agreement, the Plan, and the Confirmation Order, at the Closing, the Company shall issue, sell, convey, assign, transfer and deliver to Plan Investor, and Plan Investor shall purchase, acquire and accept from the Company, the Reorganized Equity Interests, free and clear of all Liens (other than any Assumed Claims, restrictions under the Securities Act or any other applicable securities Laws or the Company's governing documents).  Notwithstanding the foregoing, the Plan Investor shall not, as part of the Transactions, purchase or receive, directly or indirectly, any Excluded Assets.

Section 2.02.  <u>Purchase Price Adjustments</u>

(a)      <u>William Vale Purchase</u>.  In the event that the Plan Investor or an Affiliate thereof purchases substantially all of the rights of the Trustee for the Series C Notes in and to the William Vale Hotel (the "***William Vale Purchase***"), including, but not limited to, the Trustee's rights in and to that certain Amended and Restated Promissory Note, dated February 28,

2

2017, originally between the Company and Wythe Berry Fee Owner LLC (the "Borrower") and that certain loan originally made by the Company to the Borrower in the original principal amount of $166,320,000.00, the aggregate principal amount of the New Notes provided as part of the Purchase Price for these Transactions shall be increased from $20,000,000 to $22,000,000.

(b)    Value Adjustment.

(i)    From the Investor Signing Date until the date that is nine (9) months following the Closing (the "***Adjustment Period***"), to the extent that the Plan Investor discovers by Reasonable Evidence that the actual percentage of the Company's direct or indirect Equity Interest in a Subsidiary is less than the Stated Percentage or that the actual percentage of the Company's direct or indirect ownership interest in any Owned Real Property is less than as set forth under "***Stated Percentage***" on Schedule A-1, then the Subsidiary Value of each applicable Subsidiary shall be deemed to be reduced by a proportionate amount (a "***Subsidiary Value Reduction***"). For purposes of this Agreement, "***Reasonable Evidence***" shall be any evidence presented by the Plan Investor to the appointed administrator of the assets of Wind Down Co (the "***Wind Down Administrator***") or, prior to the Effective Time, to the Company, in each case that a court of competent jurisdiction would reasonably be expected to consider sufficient to rule in favor of the claimant, *provided that* if the Plan Investor and the Wind Down Administrator or the Company, as applicable, are not able to agree on whether or not any presented evidence constitutes Reasonable Evidence hereunder, then such matter shall be submitted for binding resolution by arbitration in New York, New York, upon the appointment of a retired judge to serve as arbitrator, and in accordance with the Comprehensive Arbitration Rules & Procedures of JAMS.

(ii)    To the extent that the aggregate Subsidiary Value Reductions exceed $4,250,000, the aggregate principal amount of the New Notes provided as part of the Purchase Price for these Transactions shall be reduced by 50 cents for each dollar of Subsidiary Value Reduction between $4,250,000 and $7,250,000 and for any Subsidiary Value Reduction above $7,250,000, on a dollar-for-dollar basis, up to the total value of the New Notes. For the avoidance of doubt, to the extent the Subsidiary Value Reductions are equal to or lesser than $4,250,000, no adjustment will be made to the aggregate principal amount of the New Notes.

Section 2.03.    Closing.    The closing of the Transactions (the "***Closing***") shall take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical Closing, at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153), at 9:00 a.m. (New York City time) on the second (2nd) Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with ARTICLE X (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing. The date on which the Closing occurs is referred to in this Agreement as the "***Closing Date***." For all purposes under this Agreement and each other

3

Transaction Agreement, (a) except as otherwise provided in this Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.

## ARTICLE III

## PURCHASE PRICE AND CERTAIN CLOSING MATTERS

Section 3.01.   Purchase Price.  The aggregate consideration to be paid by Plan Investor to the Company for the issuance and sale of the Reorganized Equity Interests set forth in this Agreement (the "***Purchase Price***") shall be the Plan Consideration, which shall be distributable by the Debtor or its disbursing agent in accordance with the Plan.

Section 3.02.   Escrowed Funds.  Within five (5) business days of the later to occur of (i) the Court Break-Up Fee Approval Date and (ii) the date on which a Plan is annexed hereto as Exhibit A  that is reasonably satisfactory to the Plan Investor and otherwise complies with the terms hereof, pursuant to the terms of the Escrow Agreement, Plan Investor shall (A) transfer the amount of $4,500,000 to [●], in its capacity as escrow agent (the "***Escrow Agent***"), by wire transfer of immediately available funds (the "***Escrowed Funds***"), and (B) deliver to the Escrow Agent a duly executed signature page to that certain limited corporate guaranty annexed hereto as Exhibit D (the "***Guaranty,***" and the date on which the Escrowed Funds are transferred and the Guaranty is delivered being referred to herein as the "***Escrow Date***").  Pursuant to the terms of the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

      (a)     if the Closing shall occur, the Escrowed Funds and all accrued investment income thereon shall be applied at the Closing towards the Cash Payment portion of the Purchase Price payable to the Company by Plan Investor and the Guaranty shall, by its terms, cease to be effective;

      (b)     if this Agreement is terminated by the Company pursuant to Section 11.01(c) (including due to the failure of the Plan Investor to close the Transaction), (1) the Escrowed Funds, together with all accrued investment income thereon (if any), shall be delivered to the Company and (2) the signature page to the Guaranty shall be delivered and released to the Company and the Guaranty shall then become immediately effective, in each case in accordance with and subject to the terms of Section 11.03(b); or

      (c)     if this Agreement is terminated for any reason other than as set forth in Section 3.02(b) above, the Escrowed Funds, together with all accrued investment income thereon (if any), shall be promptly returned to Plan Investor, together with the Plan Investor's signature page to the Guaranty.

Section 3.03.   Certain Closing Deliverables.  At the Closing:

(a)     The Company shall deliver or cause to be delivered to Plan Investor (or with respect to clause (iii), to the Escrow Agent) the following:

      (i)      the Reorganized Equity Interests and to the extent the Reorganized Equity

4

Interests are certificated, certificates evidencing the Reorganized Equity Interests;

(ii)      the officer's certificate required to be delivered to Plan Investor pursuant to Section 10.02(a)(iii);

(iii)     a counterpart of the Joint Written Instructions, duly executed by the Company, directing the Escrow Agent to deliver to Wind Down Co the Escrowed Funds in accordance with Section 3.02(a);

(iv)     all other documents, instruments of conveyance and transfer, in form and substance reasonably acceptable to Plan Investor and the other parties thereto, as may be necessary to convey the Reorganized Equity Interests to Plan Investor;

(v)      the positive cash balance of the Company, it being clarified that the Investor shall not be obligated to close if the Company will not have a positive cash balance upon consummation of the Closing;

(vi)     resignation letters of all officers of the Company and confirmation that all payments to such officers were made on or prior to the Closing in accordance with the Plan and no court appointed liquidators or similar representatives (including, but not limited to, the JPLs) will, from and after the Closing, exercise any authority or control over the Company; and

(vii)    all books and records of the Company and each Subsidiary (including, without limitation, all outstanding contracts and agreements); *provided, however,* that failure of the Company to deliver or cause to be delivered such books and records to the Plan Investor shall not constitute a default under this Agreement and shall not constitute a basis for the Plan Investor to terminate this Agreement or to delay or avoid Closing hereunder.

(b)      Plan Investor shall deliver or cause to be delivered the following:

(i)      to the Debtor, the Cash Payment, (*less* the Escrowed Funds) by wire transfer of immediately available funds to an account or accounts as directed by the Company at least two (2) Business Days prior to the Closing Date;

(ii)     to the Recovering Creditors or their nominees, the New Notes and New Guarantees;

(iii)    to Wind Down Co, a receipt for the Reorganized Equity Interests, duly executed by Plan Investor;

(iv)     the officer's certificate required to be delivered to the Company pursuant to Section 10.01(a)(iii);

(v)      a counterpart of the Joint Written Instructions, duly executed by Plan Investor, directing the Escrow Agent to deliver to Wind Down Co the Escrowed Funds in accordance with Section 3.02(a); and

5

(vi)    all other documents, instruments of conveyance and transfer, in form and substance reasonably acceptable to the Company and the other parties thereto, as may be necessary to convey the Reorganized Equity Interests to Plan Investor.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to Plan Investor that, to the Knowledge of the Company, except as set forth in the Disclosure Schedules and subject to the Company's right to update such representations and warranties set forth in <u>Section 6.07</u>:

Section 4.01.   <u>Formation and Qualification of the Transferred Entities</u>.  Each Transferred Entity is a corporation or other organization duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization, as set forth on <u>Schedule A-1</u>, and has the requisite corporate or other appropriate power and authority to operate its business as now conducted, all except as would not reasonably be expected to have a Material Adverse Effect.

Section 4.02.   <u>Capital Structure of the Transferred Entities</u>.  The percentage ownership of the Equity Interests of each Transferred Entity, and (except in the case of the Company) each registered and direct owner thereof, is set forth on <u>Schedule A-1</u>.  Except for such authorization required by the Bankruptcy Court and, to the extent applicable, in connection with the Ancillary Proceedings, at the Closing, the Reorganized Debtor will issue to Plan Investor the Reorganized Equity Interests (which shall represent one hundred percent (100%) of the aggregate number of issued and outstanding New Shares as of the Effective Time), free and clear of all Liens, except (i) any Assumed Claim, (ii) any Lien under the Securities Act or any other applicable securities Laws or (iii) any Lien arising out of, under or in connection with this Agreement, the Company's governing documents, or any other Transaction Agreement, (iv) any Lien created by or through, or resulting from any facts or circumstances relating to, Plan Investor or its Affiliates or (v) any other Permitted Lien.  All such Reorganized Equity Interests will be, as of the Effective Time, duly authorized and validly issued, and if applicable, fully paid and nonassessable.

Section 4.03.   <u>Authority of the Company; Enforceability</u>.  Except for such authorizations required by the Bankruptcy Court and, to the extent applicable, in connection with the Ancillary Proceedings, the Company has the requisite corporate or other appropriate power to execute, deliver and perform its obligations under the Company Transaction Agreements (including the consummation of the Company Transactions) to which it is a party.  The execution, delivery and performance by the Company of the Company Transaction Agreements (including the consummation of the Company Transactions) to which it is a party have been (or will be prior to the Closing) duly authorized by all requisite corporate or similar action on the part of the Company. This Agreement has been duly executed and delivered by the Company, and upon execution and delivery thereof, the other Company Transaction Agreements will be duly executed and delivered by the Company, and (assuming due authorization, execution and delivery thereof by the other parties hereto and thereto (other than the Company)) this Agreement constitutes, and upon execution and delivery thereof, the other Company Transaction Agreements will constitute, legal, valid and binding obligations of the Company, enforceable against the Company in accordance

with their respective terms, subject to entry by the Bankruptcy Court of the Confirmation Order and the Bankruptcy and Equity Exception, and, to the extent applicable, any necessary approvals in connection with the Ancillary Proceedings.

Section 4.04.   No Conflict.   Provided that all Consents listed on Schedules 4.04 and 4.05 have been obtained, except as may result from any facts or circumstances relating directly to Plan Investor or its Affiliates (as opposed to any other third-party or its Affiliates), the execution, delivery and performance by the Company of the Company Transaction Agreements do not and will not:

(a)      violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of the Company;

(b)      violate, conflict with, result in a breach of or constitute a violation or default (or any event that, with notice or lapse of time or both would constitute a default) under or give rise to any right of termination, cancellation, modification or acceleration of, or loss of a benefit under, any Material Contract, except, in each case, that would not reasonably be expected to have a Material Adverse Effect; or

(c)      violate any Law or Order applicable to the Company, except as would not reasonably be expected to have a Material Adverse Effect.

Section 4.05.   Consents and Approvals.   Except (a) for such authorizations required by the Bankruptcy Court and, to the extent applicable, any necessary approvals in connection with the Ancillary Proceedings and any required Noteholder approvals, (b) where the failure to obtain such Consent, or take such action or make such filing or notification, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, (c) as may be necessary as a result of any facts or circumstances relating to Plan Investor or Plan Investor's Affiliates (as opposed to any other third-party or its Affiliates), and (d) for the filing, or receipt of, any Consents or notices listed on Schedule 4.05, no Consents by or actions of, or filings with or notifications to any Government Authority are necessary in connection with (i) the execution, delivery and performance by the Company of the Company Transaction Agreements or (ii) the consummation by the Company of the Company Transactions.

Section 4.06.   Financial Information.   Schedule 4.06 sets forth the unaudited balance sheet and income statement for each of the property-owning entities for the fiscal year ended December 31, 2021, (the "*Financial Statements*").

Section 4.07.   Absence of Litigation.   Other than as set forth on Schedule 4.07, no Actions are pending or, to the Knowledge of the Company, are threatened against the Company or the other Transferred Entities, in each case except as would not reasonably be expected to be material to the Company and the Transferred Entities taken as a whole.

Section 4.08.   Brokers.   Without derogating from 3.03(a)(v) above, except for fees and expenses of Meridian Capital Group, LLC (the "*Company's Financial Advisor*"), no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Company or the other Transferred Entities, or, following the Closing Date, Wind Down Co, in connection with the Transactions.

Section 4.09.   <u>Material Contracts</u>.

(a)   <u>Schedule 4.09(a)</u> lists the following Contracts to which, to the Knowledge of the Company, the Company is a party, in each case that is in effect on the Investor Signing Date (collectively, the "***Material Contracts***") (other than any purchase orders issued under any such Contracts):

> (i)   a joint-venture, partnership or limited liability company agreement or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any joint venture, partnership or limited liability company, other than any such agreement or arrangement solely between or among any of the Transferred Entities;

> (ii)   an acquisition agreement that contains "earn-out" or other contingent payment obligations that would reasonably be expected to result in future payments by the Company in excess of $250,000.00;

> (iii)   an agreement relating to indebtedness for borrowed money or any financial guaranty including any pledge or charge involving an amount in excess of $1,000,000.00 or any settlement with respect thereof;

> (iv)   Contracts with any Affiliate or current officer or director of either the Company or any of the other Transferred Entities (other than Contracts made in the ordinary course of business on terms generally available to similarly situated non-affiliated parties); or

> (v)   Contracts to acquire, receive or dispose of any operating business or the capital stock of any other Person, in each case for consideration in excess of $250,000.000.

(b)   The Company has made available to Plan Investor in a data room administered by the Company true and complete copies of each Material Contract, or, to the extent such Material Contracts could not be disclosed in whole or part as a result of any confidentiality or other legal restriction, the Company has made available to Plan Investor such portions of those Material Contracts as it could lawfully disclose and has informed Plan Investor of any materials withheld on the basis of any confidentiality or other legal restriction.  Each Material Contract is a legal, valid and binding obligation of the Company and, to the Knowledge of the Company, each other party to such Material Contract, and is enforceable against the Company and, to the Knowledge of the Company, each other party to such Material Contract, in accordance with its terms, subject, in each case, to the Bankruptcy and Equity Exception.

Section 4.10.   <u>Insurance</u>.   The Transferred Entities maintain insurance in such amounts and against such risks as the Company believes to be customary for the Business in which it and the Transferred Entities operate.  To the Knowledge of the Company, neither the Company nor any of the other Transferred Entities have received notice of any pending or threatened cancellation with respect to any material insurance policy, and each of the Transferred Entities is in compliance in all material respects with all conditions contained in its material insurance policies.

8

Section 4.11.   <u>Real Property</u>.

(a)    <u>Schedule 4.11(a)</u> sets forth the rent roll of the leases or subleases of real property, in effect as of the date set forth in such schedule, with respect to which any Transferred Entity is the lessor, tenant or lessee (each individually, a "***Real Property Lease***" and, collectively, the "***Real Property Leases***").   Subject to the Bankruptcy and Equity Exception, the applicable Transferred Entity has a valid, binding and enforceable leasehold interest under each of the Real Property Leases under which it is tenant or lessee.  To the Knowledge of the Company, no event has occurred in the last twelve (12) months or condition exists that with notice or lapse of time, or both, would constitute a material default by a Transferred Entity under any of the Real Property Leases, other than defaults that have been cured or waived in writing.

(b)    To the Knowledge of the Company, <u>Schedule A-2</u> sets forth all real property directly or indirectly owned in whole or in part by the Transferred Entities ("***Owned Real Property***"). Each Transferred Entity owns good and valid title in fee simple to the Owned Real Property.  The ownership of each parcel of Owned Real Property is listed on <u>Schedule A-2</u>.

Section 4.12.   <u>Tax Matters</u>.

(a)    The Company is classified as a disregarded entity for U.S. federal income tax purposes and has had such classification at all times since its formation.

(b)    Except as set forth on <u>Schedule 4.12(b)</u>, each Transferred Entity is classified as either a partnership or a disregarded entity for U.S. federal income tax purposes and has been so classified at all times since its formation.

(c)    All income and other material Tax Returns required to be filed by the Company or the Transferred Entities have been timely filed, and all material Taxes due (whether or not shown on any Tax Returns) by the Company or the Transferred Entities have been paid, unless payment was precluded by reason of the Bankruptcy Case.

(d)    All Tax Returns described in <u>Section 4.12(c)</u> are true, correct, and complete in all material respects.

(e)    There are no Tax audits or other Tax examinations that are pending or have been threatened in writing, nor any Tax deficiencies that have been assessed or proposed, with respect to the Company or the Transferred Entities (other than to the extent disclosed in any proof of Claim for Taxes filed in the Bankruptcy Case).

(f)    Other than customary provisions in commercial agreements the principal purposes of which do not relate to Taxes, neither the Company nor any Transferred Entity is a party or has liability under any Tax sharing agreement, Tax indemnity agreement or similar agreement, understanding or arrangement, nor any liability for the Taxes of any other person under Treasury Regulations § 1.1502-6 (or similar provision under state, local, or non-U.S. Tax law), as a transferee or successor, by contract or otherwise.

9

(g) There are no material Tax Liens on any assets of the Company or of any Transferred Entity other than for Taxes not yet due.

(h) None of the Company or the Transferred Entities has been granted any extension of a period for the filing of any Tax Returns outside the ordinary course of business, and neither the Company nor any Transferred Entity has granted any waiver of any statute of limitations for the assessment of any Tax.

(i) All material withholding Taxes with respect to the Company or any Transferred Entity have been properly withheld and remitted.

Section 4.13.    No Other Representations or Warranties.

(a) Except for the representations and warranties expressly set forth in this ARTICLE IV (as modified by the Disclosure Schedules, as may be updated according to the terms hereof), the certificate to be delivered pursuant to Section 10.02(a)(iii) and the information provided under Section 4.09(b), neither the Company nor any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at Law or in equity, on behalf of the Company, the other Transferred Entities or any of their respective Affiliates, including any representation or warranty regarding the Company, any other Transferred Entity or any other Person, the Reorganized Equity Interests, the Business (including any assets of the business), the Transactions, any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements or any other matter, and the Company hereby disclaims all other representations and warranties of any kind whatsoever, express or implied, written or oral, at Law or in equity, whether made by or on behalf of the Company, any other Transferred Entity or any other Person, including any of their respective Representatives.  Except for the representations and warranties expressly set forth in this ARTICLE IV, the Company hereby (i) disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Assets or the Business, and (ii) disclaims all Liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) to Plan Investor or any of Plan Investor's Affiliates or any Representatives of Plan Investor or any of Plan Investor's Affiliates (including any opinion, information, projection, or advice that may have been or may be provided to Plan Investor by the Company's Financial Advisor or other Representative of the Company or the other Transferred Entities, respectively), including omissions therefrom.    Without limiting the foregoing, the Company makes no representation or warranty of any kind whatsoever, express or implied, written or oral, at Law or in equity, to Plan Investor or any of its Affiliates or any Representatives of Plan Investor of any of its Affiliates regarding the probable success, profitability or value of the Transferred Entities or the Business.

(b) EXCEPT AS EXPRESSLY STATED HEREIN, THE COMPANY SPECIFICALLY DISCLAIMS, AND EXCLUDES HEREFROM, WITH RESPECT TO THE BUSINESS AND THE TRANSFERRED ENTITIES: (I) ANY WARRANTY AS TO THE VALUE,

10

DESIGN, QUALITY, OR CONDITION OF ANY PROPERTIES OWNED OR OPERATED BY THE TRANSFERRED ENTITIES, (II) ANY IMPLIED REPRESENTATION OR WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE OR FOR A PARTICULAR PURPOSE, (III) ANY IMPLIED REPRESENTATION OR WARRANTY OF FREEDOM FROM ANY RIGHTFUL CLAIM BY WAY OF INFRINGEMENT OF ANY PATENT, TRADEMARK, COPYRIGHT, OR PROPRIETARY RIGHTS OR THE LIKE, (IV) ANY IMPLIED REPRESENTATION OR WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, (V) ANY EXPRESS OR IMPLIED WARRANTY REGARDING THE CONDITION OF THE BUSINESS AND (VI) ANY OBLIGATION OR LIABILITY ON ITS PART ARISING IN CONTRACT OR IN TORT, ACTUAL OR IMPUTED, OR IN STRICT LIABILITY, INCLUDING ANY OBLIGATION OR LIABILITY FOR LOSS OF USE, REVENUE OR PROFIT WITH RESPECT TO THE BUSINESS OR FOR ANY LIABILITY OF THE TRANSFERRED ENTITIES OR THE TRANSFERRED ENTITIES TO ANY THIRD-PARTY OR ANY OTHER DIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGE WHATSOEVER.

(c)     NOTWITHSTANDING THE FOREGOING, NOTHING IN THIS <u>SECTION 4.13</u> SHALL LIMIT PLAN INVESTOR'S ABILITY TO RELY ON THE EXPRESS REPRESENTATIONS AND WARRANTIES IN ARTICLE IV (AS MODIFIED BY THE DISCLOSURE SCHEDULES).

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF PLAN INVESTOR**

Plan Investor hereby represents and warrants to the Company that upon the signing of this Agreement and on the Closing Date, except as set forth in the Disclosure Schedules:

Section 5.01.    <u>Formation and Authority of Plan Investor; Enforceability</u>.    Plan Investor is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Plan Investor Transaction Agreements (including the consummation of the Plan Investor Transactions).    The execution, delivery and performance of the Plan Investor Transaction Agreements by Plan Investor (including the consummation of the Plan Investor Transactions) have been duly authorized by all requisite corporate or organizational action on the part of Plan Investor, and no shareholder or other similar approval is required in connection with Plan Investor's execution, delivery and performance of the Plan Investor Transaction Agreements.    This Agreement has been, and upon execution and delivery thereof, the other Plan Investor Transaction Agreements will be, duly executed and delivered by Plan Investor, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Plan Investor Transaction Agreements will constitute, legal, valid and binding obligations of Plan Investor enforceable against Plan Investor in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

11

Section 5.02.   No Conflict.  Provided that all Consents and other actions described in Section 5.03 have been obtained, except as may result from any facts or circumstances relating to the Company, the Transferred Entities or their respective Affiliates (as opposed to any other third-party or its Affiliates), the execution, delivery and performance by Plan Investor of the Plan Investor Transaction Agreements do not and will not:

(a)    violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of Plan Investor;

(b)    violate or conflict with in any material respect any Law or Order applicable to Plan Investor; or

(c)    result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to any Person any right to terminate, amend, accelerate or cancel, or result in the creation of any Lien (other than a Permitted Lien) on any assets or properties of Plan Investor pursuant to, any Contract to which Plan Investor or any of its Subsidiaries or Affiliates is a party or by which any of such assets or properties is bound, except for any such conflicts, violations, terminations, cancellations, breaches, defaults, rights or Liens as would not materially impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements.

Section 5.03.   Consents and Approvals.   Except (a) for such authorizations required by the Bankruptcy Court and, to the extent applicable, any necessary approvals in connection with the Ancillary Proceedings and any required Noteholder approvals, (b) where the failure to obtain such Consent, or take such action or make such filing or notification, would not materially impair or delay the ability of Plan Investor to consummate the Transaction or otherwise perform its obligations under the Agreement, (c) as may be necessary as a result of any facts or circumstances relating to the Company, the Transferred Entities or their respective Affiliates (as opposed to any other third-party or its Affiliates), and (d) for the filing, or receipt of, any Consents or notices listed on Schedule 5.03, no material Consents by or actions of, or filings with or notifications to any Government Authority are necessary in connection with (i) the execution, delivery and performance by Plan Investor of the Transaction Agreements or (ii) the consummation by Plan Investor of the Transactions.

Section 5.04.   Absence of Restraints; Compliance with Laws.

(a)    To the knowledge of Plan Investor, no facts or circumstances exist that would reasonably be expected to impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements.

(b)    Plan Investor is not in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to materially impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements.

(c)      As of the Investor Signing Date, there are no Actions pending or, to the knowledge of Plan Investor, threatened, that would affect in any material respect Plan Investor's ability to perform its obligations under the Plan Investor Transaction Agreements or to consummate the Transactions contemplated by the Plan Investor Transaction Agreements.

Section 5.05.   <u>Securities Matters</u>.  Plan Investor is an "institutional accredited investor" (as such term is defined in Rule 501 of Regulation D under the Securities Act).  The Reorganized Equity Interests are being acquired by Plan Investor for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Reorganized Equity Interests or any interest in them.  Plan Investor has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its investment in the Reorganized Equity Interests, and Plan Investor is capable of bearing the economic risks of such investment.  Plan Investor acknowledges that the Reorganized Equity Interests have not been registered under the Securities Act, or any securities Laws or any state or other jurisdiction (U.S. or non-U.S.), and understands and agrees that it may not sell or dispose of any Reorganized Equity Interests except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable securities Laws of any state or other jurisdiction (U.S. or non-U.S.).

Section 5.06.   <u>Financial Ability</u>.  Plan Investor has, and will have at the Closing, (a) sufficient immediately available funds and the financial ability to pay the Purchase Price and any other amounts required to be paid by Plan Investor hereunder and (b) the resources and capabilities (financial and otherwise) to perform its obligations under the Plan Investor Transaction Agreements and the Plan, including all financial obligations thereunder.  Plan Investor has not incurred, and is not contemplating or aware of, any obligation, commitment, restriction or other Liability of any kind, in each case that would impair or adversely affect such resources, funds or capabilities.

Section 5.07.   <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Plan Investor or any of Plan Investor's Affiliates in connection with any Transaction.

Section 5.08.   <u>Absence of Litigation</u>.  No Actions are pending or, to the knowledge of Plan Investor, threatened against Plan Investor that would reasonably be expected to materially and adversely affect Plan Investor's ability to perform its obligations under the Plan Investor Transaction Agreements or to consummate the Transactions contemplated by the Plan Investor Transaction Agreements.

Section 5.09.   <u>Solvency</u>.  Immediately after giving effect to the consummation of the Transactions (including any financings being entered into in connection therewith) and taking into account all obligations of Plan Investor pursuant to the Transaction Agreements:

(a)      the fair saleable value (determined on a going concern basis) of the assets of Plan Investor will be greater than the total amount of its Liabilities;

(b)      Plan Investor will be solvent and able to pay its debts and obligations in the ordinary course of business as they become due; and

13

(c)    Plan Investor will have adequate capital to carry on its business and all businesses in which they are about to engage.

Section 5.10.    <u>Investigation</u>.  Without limiting, reducing or otherwise modifying the effectiveness of the representations and warranties provided by the Company hereunder, Plan Investor acknowledges and agrees that it:

(a)    has completed such inquiries and investigations as it has deemed appropriate into, and, based thereon, has formed an independent judgment concerning, the Transferred Entities, the Reorganized Equity Interests, the Assets and the Liabilities of the Transferred Entities, the Business and the Transactions, and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements; and

(b)    has been granted access to a data room administered by the Company that has been populated with projections, forecasts, estimates, appraisals, statements, promises, advice, data or information about the Company, the other Transferred Entities, the Reorganized Equity Interests, the Assets and the Liabilities of the Transferred Entities, the Business and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements responsive to its requests.  Plan Investor further acknowledges and agrees that (x) the only representations and warranties made by the Company are the representations and warranties expressly set forth in <u>ARTICLE IV</u> (as modified by the Disclosure Schedules, as may be updated according to the terms hereof), the certificate delivered pursuant to <u>Section 10.02(a)(iii)</u> and the information provided under <u>Section 4.09(b)</u>, and Plan Investor has not relied upon any other representations or warranties of any kind whatsoever, express or implied, written or oral, at Law or in equity, including any representation or warranty regarding the Company, any other Transferred Entity or any other Person, the Reorganized Equity Interests, any Assets or Liabilities of the Transferred Entities, the Business, the Transactions, any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements or any other matter, or other projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) by or on behalf of the Company or any of its Affiliates, any Representatives of the Company or any of its Affiliates, or any other Person, including any projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through the Company's Financial Advisor, or management presentations, data rooms (electronic or otherwise) or other due diligence information (including any opinion, information, projection, or advance that may have been or may be provided to Plan Investor by any of the Company's Financial Advisor or other Representative of the Company or the other Transferred Entities, respectively), other than as expressly set forth herein, and that Plan Investor will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information and (y) any claims Plan Investor may have for breach of any representation or warranty shall be based solely on the representations and warranties of the Company expressly set forth in <u>ARTICLE IV</u> (as modified by the Disclosure Schedules, as may be updated according to the terms hereof) and the certificate delivered

14

pursuant to Section 10.02(a)(iii).    Except as otherwise expressly set forth in this Agreement, Plan Investor understands and agrees that the Transferred Entities, the Reorganized Equity Interests, the Assets and Liabilities of the Transferred Entities, and the Business, are being transferred, directly or indirectly, on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in ARTICLE IV (as modified by the Disclosure Schedules, as may be updated according to the terms hereof) without any other representations or warranties of any nature whatsoever.  Without limiting the foregoing, Plan Investor further acknowledges and agrees that Plan Investor has relied on its own inspection and knowledge of the Business in determining if the Business is acceptable and satisfactory to Plan Investor and acknowledges that in no event shall the Company have any liability to the Plan Investor, and the Plan Investor shall have no termination rights, with respect to a breach of representation, warranty or covenant under this Agreement to the extent that the Plan Investor knew of such breach as of the Investor Signing Date or as of the Closing, *provided that* nothing in this Section 5.10(b) shall limit the effectiveness of the adjustment set forth in Section 2.02(b).  Furthermore, Plan Investor hereby acknowledges the disclaimer set forth in Section 4.13.

Section 5.11.  The Plan Investor is not aware of any information that constitutes Reasonable Evidence for purposes of Section 2.02(b) hereof.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

Section 6.01.  Conduct of Business Before the Closing.  Plan Investor acknowledges that the Debtor will operate its Business in the context of the Bankruptcy Case and the Ancillary Proceedings.  Subject to the foregoing, the Company shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause (solely to the extent under its control, including in light of not being the manager of certain Transferred Entities), the other Transferred Entities to, maintain the Assets in their current condition (in all material respects) and, preserve in all material respects the present business operations, organization and goodwill of the Business, and the present relationships with Persons having significant business relationships with the Business, and the parties to this Agreement shall cooperate with one another and shall take commercially reasonable steps to stabilize the Company's assets, work with mortgage lenders to lower debt service payments, resolve all open litigation, and pay all outstanding debts to facilitate securing a more stable cash flow, all consistent with recent past practice.  Except (i) as required by applicable Law or by Order of the Bankruptcy Court or the courts in the Ancillary Proceedings, or as otherwise expressly contemplated by the Transaction Agreements or (ii) for matters identified on Schedule 6.01, during the Pre-Closing Period, unless Plan Investor otherwise consents in writing (which consent shall not be unreasonably withheld, conditioned or delayed), the Company will, and will use commercially reasonable efforts to cause (solely to the extent under its control, including in light of not being the manager of certain Transferred Entities), the other Transferred Entities to, conduct the Business in the ordinary course of business and shall not do any of the following, all without derogating from the Investor's right to receive the Company with a positive cash balance:

15

(a)     Grant any Lien on the Reorganized Equity Interests or any material Assets (in each case, whether tangible or intangible), in each case, other than a Permitted Lien or in connection with any DIP Loan Agreement (*provided*, that any Lien granted in connection with a DIP Loan Agreement shall be released at or prior to the Closing and shall be repaid at or prior to the Closing from the Cash Payment);

(b)     acquire (by merger, consolidation, acquisition of stock or assets or otherwise) any corporation, partnership or other business organization, business or division;

(c)     transfer or provide any Person with the right to acquire any Transferred Entity having a net equity value to the Company in excess of $250,000.00 or any direct or indirect ownership interest therein;

(d)     incur or issue any Debt or assume, grant, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any Person, or make any loans or advances, in each case, other than (x) in connection with a DIP Loan Agreement (*provided*, that any Lien granted in connection with a DIP Loan Agreement shall be released at or prior to the Closing and shall be repaid at or prior to the Closing from the Cash Payment) or (y) Debt incurred in the ordinary course of business consistent with past practice in an aggregate amount less than $250,000.00;

(e)     redeem, repurchase, issue or sell any Transferred Equity Interests, or securities convertible into or exchangeable for such Transferred Equity Interests, or issue or grant any options, warrants, calls, subscription rights or other rights of any kind to acquire such Transferred Equity Interests or securities;

(f)     (i) declare or set aside any dividends or distributions on any capital stock of or other Equity Interest in any Transferred Entity (in cash or in kind),other than dividends or distributions payable by one wholly-owned Transferred Entity to another wholly-owned Transferred Entity or payable to any holders of Equity Interests of a Transferred Entity on a pari passu basis (including the Company, which, for the avoidance of doubt, shall not include Yoel Goldman or Tzipporah Goldman), (ii) amend any organizational documents or (iii) commence any additional bankruptcy or insolvency proceeding with respect to any Transferred Entity;

(g)     (i) settle any claim with respect to a material Tax Liability, (ii) surrender any right to claim a refund of a material amount of Taxes, (iii) file any amended Tax Return making a material change, or (iv) enter into any closing agreement in respect of a material amount of Taxes;

(h)     make any material change in its accounting practices unless required by GAAP or applicable Law;

(i)     enter into any settlement or release with respect to any Action relating to the Business, other than any settlement or release that (i) contemplates only the payment of money without ongoing limits on the conduct or operation of the Business and which payment is not, individually or in the aggregate, in excess of $250,000.00, or (ii) involves a settlement

16

of any claim(s) listed on Schedule 6.01 hereto or having a value below $250,000.00 individually and $1,000,000.00 in the aggregate;

(j)    enter into any legally binding commitment with respect to any of the foregoing;

(k)    share any confidential or proprietary information with any outside parties, unless required by law, court order or applicable regulation.

Notwithstanding anything to the contrary contained herein, nothing herein shall prevent any Transferred Entity from taking or failing to take any action for the establishment of any policy, procedure or protocol required to be taken under law or instruction of Government Authorities in response to COVID-19 or any other reasonably required COVID-19 Measures and (x) no actions taken or any failure to take such actions shall be deemed to violate or breach this Agreement in any way, (y) all such actions or failure to take such actions shall be deemed to constitute an action taken in the ordinary course of business and (z) no such actions taken to satisfy legal or regulatory requirements shall serve as a basis for the Plan Investor to terminate this Agreement or assert that any of the conditions to the Closing contained herein have not been satisfied.

For the avoidance of doubt, the Company makes no representations, warranties, or covenants in connection with any action that may or may not be taken by third-party holders of Equity Interests in, or third-party managers or managing members of, any Transferred Entity and any action taken or not taken by such Person that would otherwise result in a violation of any prohibition of this Section 6.01 shall not be deemed a breach of this Section 6.01 by the Company or the Transferred Entities.

Section 6.02.    Access to Information.

(a)    During the Pre-Closing Period, to the extent in the control of the Company, upon reasonable prior notice, the Company shall, and shall cause each of the other Transferred Entities to, afford the Representatives of Plan Investor reasonable access, during normal business hours, to the properties, books and records of the Business and Transferred Entities, for purposes of consummating the Transactions, in each case, at the sole cost and expense of Plan Investor.

(b)    Notwithstanding anything in this Agreement to the contrary, during the Pre-Closing Period:

(i)    (A) in no event shall the Company, the other Transferred Entities or their respective Affiliates be obligated to provide any (1) access or information in violation of any applicable Law, (2) information the disclosure of which could reasonably be expected to jeopardize any applicable privilege (including the attorney-client privilege) available to the Company, the other Transferred Entities or any of their respective Affiliates relating to such information, or (3) information the disclosure of which would cause the Company, any other Transferred Entity or any of their respective Affiliates to breach a confidentiality obligation to which it is bound; provided, that, in the event that the Company withholds access or information in reliance on the foregoing clause (A), the Company shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Plan Investor that such access or information is being so withheld

17

and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law, and (B) any access or investigation contemplated by Section 6.02(a) shall not unreasonably interfere with any of the businesses, personnel or operations of the Company, the other Transferred Entities or any of their respective Affiliates or the Business; and

(ii)      the auditors and accountants of the Company, the other Transferred Entities or any of their respective Affiliates or the Business shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants.

Section 6.03.    Confidentiality.  Plan Investor acknowledges that the Confidential Information and Transaction Information (as defined in the Confidentiality Agreement) provided to it in connection with this Agreement, including information provided under Section 6.02, is subject to the Confidentiality Agreement and the terms of the Confidentiality Agreement are incorporated into this Agreement by reference and shall continue in full force and effect (and all obligations thereunder shall be binding upon Plan Investor and its Representatives (as defined in the Confidentiality Agreement) until the Closing).

Section 6.04.    Regulatory Approvals.

(a)      Each of Plan Investor and the Company shall take any and all steps to make all required filings and shall act in a reasonably commercial manner to promptly obtain all Consents, Permits and Orders of all Government Authorities (other than any required approvals or actions of the Bankruptcy Court or the courts in the Ancillary Proceedings, which are governed exclusively by ARTICLE VIII) that may be, or become, necessary for the execution and delivery of and performance of its obligations pursuant to, the Transaction Agreements (including the consummation of the Transactions) (collectively, the "**Government Approvals**").

(b)      Each Party shall promptly notify the other Party of any material oral or written communication it or any of its Representatives receives from any Government Authority relating to the matters that are the subject of this Section 6.04, permit the other Party and its respective Representatives to review in advance any communication relating to the matters that are the subject of this Section 6.04 proposed to be made by such Party to any Government Authority and provide the other Parties with copies of all substantive correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Government Authority or members of its staff, on the other hand, relating to the matters that are the subject of this Section 6.04, provided, however, that materials proposed to be submitted in response to any such Government Authority communication may be redacted: (i) as necessary to comply with Contractual arrangements, applicable Law or by Order of the Bankruptcy Court or the Courts in the Ancillary Proceedings; and (ii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns to the extent not governed by a common interest

18

privilege or doctrine. No Party shall agree to participate in any meeting or substantive discussion with any Government Authority in respect of any such filings, investigation or other inquiry unless it consults with the other Party in advance and, to the extent permitted by such Government Authority, gives the other Party the opportunity to attend and participate at such meeting. Subject to the Confidentiality Agreement, the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods. The Parties shall share the right to control and direct the process by which the Parties seek to avoid or eliminate impediments under any antitrust, competition, trade regulation or foreign investment regulation Law, including by directing the strategy and making final determinations related to the review or investigation of the Transactions by any Government Authority and attending all meetings, substantive discussions, and communications with any Government Authority related to the review or investigation of the Transactions except to the extent that such Government Authority may request to communicate exclusively with one Party. Nothing in this Section 6.04(b) shall be applicable to Tax matters.

(c)    Actions or agreements required of Plan Investor pursuant to this Section 6.04 shall under no circumstances be considered a Material Adverse Effect.

Section 6.05.    Third-Party Consents. Each Party agrees to reasonably cooperate to obtain any other Consents from any third person other than a Government Authority that may be required in connection with the Transactions (the "***Third-Party Consents***"). Notwithstanding anything in this Agreement to the contrary, the Company and its Affiliates shall not be required to compensate any third-party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to remain primarily, secondarily or contingently liable for any Liability) to any third-party to obtain any such Third-Party Consent. For the avoidance of doubt, no representation, warranty or covenant of the Company contained in the Transaction Agreements shall be breached or deemed breached, and no condition shall be deemed not satisfied, based on (a) the failure to obtain any Third-Party Consents or (b) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Third-Party Consents.

Section 6.06.    Cooperation. During the Pre-Closing Period, (a) the Company and Plan Investor shall, and shall cause their respective controlled Affiliates to, (i) refrain from taking any actions that would reasonably be expected to impair, delay or impede the Closing and (ii) without limiting the foregoing, use reasonable best efforts to cause all Closing Conditions and covenants of the other Party to be met as promptly as practicable and in any event on or before the Outside Date and (b) each Party shall keep the other Party reasonably apprised of the status of the matters relating to the completion of the Transactions, including with respect to the negotiations relating to the satisfaction of the Closing Conditions and covenants of the other Party.

Section 6.07.    Schedule Updates. During the Pre-Closing Period, the Company shall advise Plan Investor in writing if, in the Company's Knowledge, any of the representations or warranties contained in ARTICLE IV hereof become incorrect in any manner that could reasonably be expected to cause any closing condition not to be satisfied. If any such matter requires any change

19

to the Disclosure Schedules, the Company may promptly deliver to Plan Investor a supplement to such Disclosure Schedules specifying such change (each a "***Schedule Update***"). Upon the delivery of a Schedule Update, (i) the specified representations and warranties made by the Company will be modified as described in the Schedule Update and (ii) Plan Investor will not have the right to terminate this Agreement or prevent the consummation of the transactions contemplated by this Agreement on account of any modification contained in a Schedule Update *provided* that if any Schedule Update shows a Subsidiary Value Reduction then the adjustment mechanism set forth in <u>Section 2.02(b)</u> shall apply.

## ARTICLE VII

## POST-CLOSING COVENANTS

Section 7.01.    <u>Access</u>.

(a)    From and after the Closing Date for a period of three (3) years, in connection with any reasonable business purpose, including the preparation or amendment of Tax Returns, financial statements, or the determination of any matter relating to the rights or obligations of Wind Down Co or any of its Affiliates under any Transaction Agreement, or as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Case or the Ancillary Proceedings, upon reasonable prior notice, and except to the extent necessary to (i) ensure compliance with any applicable Law or an order of the Bankruptcy Court or the courts in the Ancillary Proceedings, (ii) preserve any applicable privilege (including the attorney-client privilege) or (iii) comply with any Contractual confidentiality obligations, Plan Investor shall, and shall cause each of the Transferred Entities, their respective Affiliates and their respective Representatives to (A) afford Wind Down Co and its Representatives and their respective Affiliates reasonable access, during normal business hours, to the properties, books and records of Plan Investor and its Affiliates in respect of any of the Transferred Entities and the Business, (B) furnish to Wind Down Co and its Representatives or their respective Affiliates such additional financial and other information regarding the Transferred Entities and the Business as Wind Down Co or its Representatives may from time to time reasonably request and (C) make available to Wind Down Co and its Representatives and their respective Affiliates those employees of Plan Investor or its Affiliates whose assistance, expertise, testimony, notes or recollections or presence may be necessary to assist Wind Down Co or its Representatives or their respective Affiliates in connection with its inquiries for any purpose referred to above, including the presence of such Persons for interviews and depositions and as witnesses in hearings or trials for such purposes; <u>provided</u>, <u>however</u>, that, unless the Plan Investor agrees otherwise in writing, such information (including information described in testimony) shall, unless reasonably necessary, be limited solely to information pertaining to the Pre-Closing Period, and such investigation shall not unreasonably interfere with the business or operations of Plan Investor or any of its Affiliates; and <u>provided</u> <u>further</u>, that the auditors and accountants of Plan Investor or its Affiliates shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants. Notwithstanding anything to the

20

contrary herein, Wind Down Co shall have continued access to all books and records of the Transferred Entities as is necessary to administer the Bankruptcy Case and the Ancillary Proceedings and Wind Down Co and its Representatives may retain copies of such books and records, as necessary or appropriate in connection with such purpose.

(b)     If so requested by Plan Investor, on the one hand, or Wind Down Co or any of its Affiliates, on the other hand, Wind Down Co or one of its Affiliates, or Plan Investor and Wind Down Co shall, and shall cause its applicable Affiliates to enter, into a customary joint defense agreement or common interest agreement with Plan Investor and its Affiliates, or Wind Down Co and its Affiliates, as applicable, with respect to any information to be provided to Wind Down Co or its Affiliates pursuant to Section 7.01(a).

Section 7.02.    Directors' and Officers' Indemnification and Exculpation; Release.

(a)     [Reserved]

(b)     Effective as of the Closing and, with respect to Mishmeret and the Noteholders (in each case for itself and on behalf of its Affiliates and each of its and their respective successors, assigns, heirs and executors) solely provided that Noteholder Plan Approval has been received:

(i)      Plan Investor, for itself and on behalf of its Affiliates and each of its and their respective successors, assigns, heirs and executors (the "*Plan Investor Releasors*"), hereby irrevocably, knowingly and voluntarily releases, covenants not to sue, discharges and forever waives and relinquishes all claims, demands, liabilities, defenses, affirmative defenses, setoffs, counterclaims, actions and causes of action of whatever kind or nature, whether known or unknown (each a "*Claim*"), which any such releasing Plan Investor Releasor has, may have or may assert now or in the future, in his, her or its capacity as a purchaser, creditor or equityholder, of the Company against Wind Down Co, Mishmeret, the Noteholders, their Affiliates, any current or former officer, director, manager, employee, counsel, financial advisor, agent or other Representative of the Company Wind Down Co, Mishmeret, the Noteholders, or their Affiliates, or any of their respective successors, assigns, heirs and executors (the "*Company and Noteholder Releasees*"), arising out of, based upon or resulting from any contract, transaction, event, circumstance, action, failure to act, occurrence or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken or permitted prior to the Closing (each a "*First-Party Plan Investor Claim*");

(ii)     each of the Plan Investor Releasors hereby further agrees to indemnify and hold harmless each of the Company and Noteholder Releasee against any losses arising out of or in connection with any indemnification or contribution Claim asserted by a third-party against any Company and Noteholder Releasee resulting from a Claim asserted by any such Plan Investor Releasor against such third-party in his, her or its capacity as a purchaser, creditor or equityholder, of the Company;

(iii)    Wind Down Co, Mishmeret and the Noteholders, in each case for itself and on behalf of its Affiliates and each of its and their respective successors, assigns, heirs and

21

executors (the "***Company and Noteholder Releasors***") hereby irrevocably, knowingly and voluntarily releases, covenants not to sue, discharges and forever waives and relinquishes all Claims, which any such releasing Company and Noteholder Releasor has, may have or may assert now or in the future against Plan Investor, its Affiliates, the Transferred Entities, any current or former officer, director, manager, employee, attorney, agent or other Representative of the Plan Investor or its Affiliates, or any of their respective successors, assigns, heirs and executors, in each case in their capacity as such (the "***Plan Investor Releasees***"), arising out of, based upon or resulting from any contract, transaction, event, circumstance, action, failure to act, occurrence or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken or permitted prior to the Closing (each a "***First-Party Company and Noteholder Claim***"); and

(iv)     each of the Company and Noteholder Releasors hereby further agrees to indemnify and hold harmless each Plan Investor Releasee against any losses arising out of or in connection with any indemnification or contribution Claim asserted by a third-party including any current or prior officer, director or shareholder of the Company against any Plan Investor Releasee resulting from a Claim asserted by any Company and Noteholder Releasor against such third-party.

(c)     Notwithstanding the foregoing, nothing in this <u>Section 7.02</u> shall be deemed to release or waive any rights or remedies of any releasor (i) under this Agreement or any other Transaction Agreement or (ii) against Yoel Goldman or Tzipporah Goldman, or any entity which is under control or ownership of Yoel Goldman or Tzipporah Goldman other than the Transferred Entities.

Section 7.03.   <u>Preservation of Books and Records</u>.  The Company and its Affiliates shall have the right to transfer to Wind Down Co at Closing copies of all books and records of the Business relating to periods ending on or before the Closing Date.  Plan Investor agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Plan Investor or its Affiliates for a period of three (3) years from the Closing Date.  After such three (3) year period before Plan Investor or any Affiliate shall dispose of any of such books and records, Plan Investor shall give at least thirty (30) days' prior written notice to Wind Down Co of its such intention to dispose such books and records, and Wind Down Co, and/or any of its Affiliates shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect.

Section 7.04.   <u>Further Assurances; Cooperation</u>.

(a)     From time to time following the Closing, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and such instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the Transactions as may be reasonably requested by the other Party.

(b)     Effective as of the Closing Date, Plan Investor hereby grants to Wind Down Co and its Affiliates a royalty-free, fully paid-up, irrevocable, worldwide, non-exclusive license to use the Business Names and Business Marks, solely (a) in accordance with substantially

22

the same, but in no event less than, the standards observed by Wind Down Co and its Affiliates, and (b) in connection with the winding down and cessation of Wind Down Co and its Affiliates.  The foregoing license will expire twelve (12) months from the Closing Date.

## ARTICLE VIII

## BANKRUPTCY PROVISIONS

Section 8.01.   Break-Up Fee; Noteholder Approval.

(a)    Subject to Noteholder and Bankruptcy Court approval, in the event that (i) this Agreement is terminated by the Company pursuant to Section 11.01(b) or by the Plan Investor pursuant to  Section 11.01(c)  and  (ii) within six (6) months of such termination, the Company engages in an alternative transaction (an "***Alternative Transaction***") (through a chapter 11 plan of reorganization or otherwise) whereby a purchaser purchases all or substantially all of the Transferred Entities through one or a series of substantially contemporaneous transactions, then the Plan Investor shall be entitled to a break-up fee (the "***Break-Up Fee***") in the amount of $1,800,000 *provided that* if the Company does not engage in an Alternative Transaction during such 6-month period, but still confirms a chapter 11 plan of reorganization that is expected to provide a recovery to the Noteholders in an amount equal to or greater than $30,000,000 within twelve (12) months of confirmation thereof, then the Plan Investor shall instead be entitled to a Break-Up Fee in the amount of $900,000.  In the event that this Agreement is terminated pursuant to Section 11.01(b) or by the Plan Investor pursuant to Section 11.01(c) and no Break-Up Fee could be due and owing under the terms of this Section 8.01(a), then the Plan Investor shall be entitled to an expense reimbursement (the "***Expense Reimbursement***") in an amount of up to $300,000 for reasonable and documented fees and expenses of the Plan Investor incurred in connection with the documentation and negotiation of this Agreement and the Transactions contemplated hereby.  If due under the terms hereof, the Plan Investor shall be granted an allowed administrative claim against the Company in the amount of the Break-Up Fee or the Expense Reimbursement, as applicable, in accordance with Section 503(b)(l) of the Bankruptcy Code without further act, notice, deed or court order and shall not be subject to any challenge, objection, setoff or counterclaim.  If owing hereunder in connection with an Alternative Transaction, the Break-Up Fee shall be payable in full upon the consummation of such Alternative Transaction.  The Plan Investor acknowledges and agrees that the amounts payable under this Section 8.01(a) (x) shall constitute liquidated damages and not penalties and (y) shall, together with the right to seek the payment of such amounts (if and when due in accordance with the terms of this Section 8.01(a)), constitute the Plan Investor's sole recourse and sole remedy for any reason under this Agreement.

(b)    Within 14 days following the Agreement Date, the Company shall file a motion with the Bankruptcy Court reasonably satisfactory to the Plan Investor seeking approval by the Bankruptcy Court of the Company's entry into this Agreement and its undertakings hereunder, including the Break-Up Fee (the date on which such approval is received by the Bankruptcy Court being referred to herein as the "***Court Break-Up Fee Approval Date***").  Mishmeret shall support such motion and shall take all actions reasonably necessary to

23

support, and shall not oppose in any way, the approval of such motion, the Break-Up Fee and the Expense Reimbursement, and shall not oppose the payment thereof, unless Mishmeret shall have reasonable grounds to assert that the Break-Up Fee or the Expense Reimbursement is not payable hereunder.

(c)    Within 60 days of the Escrow Date, Mishmeret shall convene a meeting of the Noteholders to vote whether to approve or not approve the Transactions contemplated hereby (an affirmative vote to approve such Transactions, including directing the Trustee to act pursuant to Sections 7.02(b), Section 8.01(b), this Section 8.01(c) and Section 8.02(c), by the applicable requisite majority of Noteholders under the Deeds of Trust being referred to herein as the "***Noteholder Plan Approval***"), *provided that* if (i) the Company has filed a motion with the Bankruptcy Court seeking approval of a disclosure statement in respect of the Plan within 14 days of the Escrow Date and (ii) the Company seeks approval of disclosure materials in respect of the Plan in the Israeli Proceedings within 7 days of the entry of an order by the Bankruptcy Court approving a disclosure statement in support of the plan, then such period shall be extended automatically, as needed, to a maximum of up to an additional 90 days.  If at such meeting, Noteholder Plan Approval is not obtained on a final basis, then this Agreement shall automatically terminate and be of no continuing force and effect and the Plan Investor and the Company shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver to the Plan Investor the Escrowed Funds plus any accrued investment income or interest thereon.

(d)    Notwithstanding anything to the contrary contained in this Section 8.01, no Break-Up Fee or Expense Reimbursement will be due and owing to the Plan Investor if this Agreement is terminated as a result of a breach by the Plan Investor of its obligation to consummate the Closing when required pursuant to the terms of this Agreement or as a result of a material breach of any other of its covenants or agreements herein.

Section 8.02.    Confirmation Order.

(a)    The Company and Plan Investor acknowledge and agree that this Agreement and the Transactions are subject to entry of the Confirmation Order and the Ancillary Approval Orders that embodies the terms of this Agreement.  Notwithstanding the aforesaid, in the event of any discrepancy between this Agreement and the Confirmation Order, the Confirmation Order shall govern.

(b)    The Company shall use commercially reasonable efforts to give notice under the Bankruptcy Code and Israeli Insolvency Law and BVI laws of the request for a hearing with respect to the approval of the Transactions to all Persons entitled to such notice and other appropriate notice as required by the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court and corresponding rules in the Ancillary Proceedings, including such additional notice as the Bankruptcy Court or the Courts in the Ancillary Proceedings shall direct or as Plan Investor may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court or the Courts in the Ancillary Proceedings relating to this Agreement or the Transactions.

24

(c)     The Plan Investor and, subject in all respects to the receipt of Noteholder Plan Approval, Mishmeret on behalf of itself and the Noteholders, agrees that it shall support and take all actions necessary or reasonably requested by the Company to support, and shall not oppose in any way, the Plan and the Ancillary Approval Orders, the solicitation of votes with respect thereto, approval of a disclosure statement in support of the Plan, and, subject to Bankruptcy Court approval of such disclosure statement, confirmation and consummation of the Plan (and, for the avoidance of doubt, to not take any actions inconsistent with such obligations), including to promptly take such actions as are reasonably requested by the Company to assist in obtaining entry of the Confirmation Order and the Ancillary Approval Orders and a finding of adequate assurance of future performance, to the extent applicable, including furnishing witnesses, affidavits or other documents or information for filing with the Bankruptcy Court, and the courts in the Ancillary Proceedings, for the purposes, among others, of providing necessary assurances of performance by Plan Investor under this Agreement.

(d)     Without derogating from Section 8.02(a) above, the Company shall be responsible for making all necessary filings with the Bankruptcy Court and the courts in the Ancillary Proceedings, shall provide all necessary notices in connection therewith and shall bear any and all of its own expenses with respect thereof. The Company and Plan Investor shall consult with one another regarding substantive pleadings that any of them intends to file with the Bankruptcy Court or the courts in the Ancillary Proceedings in connection with, or which might reasonably affect the Bankruptcy Court's (or the courts' in the Ancillary Proceedings) approval or modification of, as applicable, the Plan and the Confirmation Order. The Company shall provide (or shall cause their Representatives to provide) Plan Investor with an advance draft of, and a reasonable opportunity to review and comment upon, the Confirmation Order (and the motion seeking approval of same) as soon as reasonably practicable prior to the date the Company intends to file such motion or proposed order and the Company shall consider any reasonable modifications of such documents requested by Plan Investor. Unless (i) this Agreement has been terminated in accordance with Article XI or (ii) the Company has breached any representation or warranty or failed to comply with any covenant or agreement applicable to the Company that would cause any Closing Condition not to be satisfied (provided such breach or failure has not been waived or cured) and Plan Investor is seeking to enforce its rights under this Agreement with respect to such breach or failure, Plan Investor shall not, without the prior written consent of the Company (which consent may not be unreasonably withheld or delayed), file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Reorganized Equity Interests or any other assets of the Company or any of its Affiliates. Plan Investor shall provide (or shall cause its Representatives to provide) the Company with advance drafts of, and a reasonable opportunity to review and comment upon substantive pleadings, motions, and supporting papers prepared by Plan Investor to be filed with the Bankruptcy Court or the courts in the Ancillary Proceedings in connection with the Transaction as soon as reasonably practicable prior to the date Plan Investor intends to file such motion, pleading or court filing, and Plan Investor shall make any reasonable modifications of such documents requested by the Company. In the event the entry of the Confirmation Order or any other Order of the Bankruptcy Court or the courts in the Ancillary Proceedings relating to this Agreement or the Transactions shall be appealed (or if any petition for certiorari or motion for

25

reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Confirmation Order or other such Order), the Company and Plan Investor shall use their respective commercially reasonable efforts to defend such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(e)     For the avoidance of doubt, the Plan Investor shall not be liable for administrative fees and expenses of the Company.

(f)     The Company shall request that the Confirmation Order entered by the Bankruptcy Court exempt the sale of the Reorganized Equity Interests to Plan Investor from any Transfer Taxes.

(g)     The Debtor shall propose and pursue confirmation of a Plan that embodies the terms of this Agreement and the Plan Investor shall support such Plan subject to receipt of a court-approved Disclosure Schedule.

Section 8.03.   Bankruptcy Milestones.   The Company shall use commercially reasonable efforts to:

(a)     have a hearing scheduled to consider confirmation of the Plan and the approval of the Confirmation Order for no later than 150 days from the Agreement Date; and

(b)     obtain entry of the Confirmation Order by no later than 165 days from the Agreement Date (collectively, the "***Bankruptcy Milestones***").

The Bankruptcy Milestones may be extended upon mutual agreement between the Company and Plan Investor or as necessary to accommodate the availability of the Bankruptcy Court and shall be subject to any extension provided for in Section 8.01(c).

# ARTICLE IX

# TAX MATTERS

Section 9.01.   Transfer Taxes.   The Parties acknowledge and agree that all Transactions shall occur pursuant to the Plan and accordingly, the Plan shall seek approval from Bankruptcy Court to consummate the Transactions with an exemption from Transfer Taxes pursuant to Section 1146(a) of the Bankruptcy Code to the maximum extent permitted thereby.

Section 9.02.   Income Tax Treatment.   The Parties agree that for all U.S. federal, state, and local income tax purposes, the Transactions shall be treated as a purchase by the Plan Investor of all of the assets of the Company for an amount equal to the Purchase Price, plus all liabilities to which the assets are subject (as determined for applicable Tax purposes) immediately following consummation of the Plan, and the Parties shall report consistently with such treatment for all U.S. federal, state, and local income tax reporting purposes.

# ARTICLE X

## CONDITIONS TO CLOSING

Section 10.01. <u>Conditions to Obligations of the Company</u>.  The obligation of the Company to consummate the Closing shall be subject to the satisfaction or waiver by the Company in its sole discretion, at or before the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties; Covenants</u>.

(i)    all representations and warranties of Plan Investor contained in this Agreement shall be true and correct as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, that, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Plan Investor's ability to perform its obligations under this Agreement and consummate the Transactions; <u>provided</u>, however, that for purposes of determining the satisfaction of the condition in this clause (i), no effect shall be given to the exceptions of "material" in such representations and warranties;

(ii)    the covenants contained in this Agreement required to be complied with by Plan Investor on or before the Closing shall have been complied with in all material respects, and

(iii)    the Company shall have received a certificate signed by an authorized officer of Plan Investor, dated as of the Closing Date, certifying as to the matters set forth in the foregoing clauses (i) and (ii).

(b)    <u>Governmental Approvals</u>.  All Required Approvals shall have been obtained or, if applicable, shall have expired, shall have been waived by the applicable Government Authority or shall have been terminated.

(c)    <u>No Order</u>.  There shall be no Order in existence that enjoins or otherwise prohibits the sale of the Reorganized Equity Interests pursuant to this Agreement or the other Transactions.

(d)    <u>Transaction Agreements</u>.  Plan Investor shall have executed and delivered to the Company all Plan Investor Transaction Agreements and the other deliverables contemplated by <u>Section 3.03(b)</u>.

(e)    <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order shall not be subject to any stay.

(f)    <u>Israeli Proceedings</u>.  Approval by the Israeli Court of the terms of this Agreement and all annexes thereto under Section 320 or Chapter C to the Israeli Insolvency law 2018 including without limitation the Plan, on terms reasonably acceptable to the Company.

(g)    <u>BVI Proceedings.</u>  Approval by the BVI Court of the terms of this Agreement, as approved pursuant to the Plan and Confirmation Order, and all annexes thereto, on terms reasonably acceptable to the Company.

Section 10.02. <u>Conditions to Obligations of Plan Investor</u>.  The obligations of Plan Investor to consummate the Closing shall be subject to the satisfaction or waiver by Plan Investor in its sole discretion, at or before the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties; Covenants</u>.

(i)    all representations and warranties of the Company contained in this Agreement shall be true and correct as of the Closing as if made on the Closing Date, except as would not reasonably be expected to have a Material Adverse Effect;

(ii)    the covenants contained in this Agreement required to be complied with by the Company on or before the Closing shall have been complied with in all material respects; and

(iii)    Plan Investor shall have received a certificate signed by an authorized officer of the Company, dated as of the Closing Date, with respect to the matters set forth in the foregoing clause (i).

(b)    <u>Governmental Approvals</u>.  All Required Approvals shall have been obtained or, if applicable, shall have expired or been waived by the applicable Government Authority, have been terminated.

(c)    <u>No Order</u>.  There shall be no Order in existence that enjoins or otherwise prohibits the sale of the Reorganized Equity Interests pursuant to this Agreement or the other Transactions.

(d)    <u>The Company Transaction Agreements</u>.  The Company shall have executed and delivered, or caused to be executed and delivered, to Plan Investor all of the Company Transaction Agreements and the other deliverables contemplated by <u>Section 3.03(a)</u>; *provided that* failure of the Company to deliver any books or records of the Company or any Subsidiary shall not be a condition to closing hereunder.

(e)    <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order shall not be subject to any stay.

(f)    <u>Israeli Proceedings</u>.  Approval by the Israeli Court of the terms of this Agreement and all annexes thereto under Section 320 or Chapter C to the Israeli Insolvency law 2018 including without limitation the Plan, on terms reasonably acceptable to Plan Investor.

(g)    <u>BVI Proceedings.</u>  Approval by the BVI Court of the terms of this Agreement, as approved pursuant to the Plan and Confirmation Order, and all annexes thereto, in accordance with the terms of this Agreement.

28

(h)    <u>Noteholder Release</u>.  The Plan Investor shall have received a release from or on behalf of Mishmeret and the Noteholders as set forth in <u>Section 7.02(b)</u> hereof.

Section 10.03. <u>Frustration of Closing Conditions</u>.  Neither the Company nor Plan Investor may rely on the failure of any condition set forth in this <u>ARTICLE X</u> to be satisfied if such failure was caused by such Party's failure to act in good faith or to use reasonable best efforts to cause the Closing Conditions of each such other Party to be satisfied, including as required by <u>Section 6.04</u>.

Section 10.04. <u>Waiver of Closing Conditions</u>.  Upon the occurrence of the Closing, any condition set forth in this <u>ARTICLE X</u> that was not satisfied as of the Closing shall be deemed to have been waived as of and from the Closing.

## ARTICLE XI

## TERMINATION

Section 11.01. <u>Termination</u>.  Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing:

(a)    by the mutual written consent of the Company and Plan Investor;

(b)    by the Company, if the fiduciaries of the Company determine in good faith (after consultation with legal counsel) that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable Law (and, for the avoidance of doubt, a termination resulting from the Company's exercise of its fiduciary duty hereunder may give rise to payment of a Break-Up Fee in accordance with <u>Section 8.01(a)</u> hereof);

(c)    by either party, if the other party shall have breached any representation or warranty or failed to comply with any covenant or agreement that would cause any Closing Condition set forth in <u>Section 10.01(a)</u> or <u>Section 10.02(a)</u> not to be satisfied, and (i) such breach is not waived or (ii) if such breach is curable and is not cured by the breaching party prior to the earlier of (A) ten (10) Business Days after receipt of notice of the other party's intent to terminate and (B) the Outside Date; <u>provided</u>, <u>however</u>, that the terminating party is not then in material breach of this Agreement;

(d)    by either the Company or Plan Investor, if the Closing shall not have occurred by September 23, 2022 (the "***Outside Date***"); <u>provided</u>, <u>however</u>, that (i) if the Closing shall not have occurred due to the Closing Conditions set forth in <u>Section 10.01(b), (e), (f) or (g)</u> and <u>Section 10.02(b), (e), (f) or (g)</u> remaining unsatisfied or not waived and (ii) if all other Closing Conditions of the respective Parties shall have been fulfilled or waived (other than such Closing Conditions as are to be satisfied only at the Closing but subject to such conditions being capable of being satisfied as of the Outside Date), then no Party may terminate this Agreement pursuant to this <u>Section 11.01(d)</u> prior to December 31, 2022; <u>provided further</u>, that if the Closing shall not have occurred on or before the Outside Date or December 31, 2022, as applicable, due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Plan Investor or the

Company, then the breaching Party may not terminate this Agreement pursuant to this Section 11.01(d); or

(e)      by either the Company or Plan Investor, in the event that (i) any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the Transactions and such Order shall have become final and non-appealable (*provided*, *however*, that the right to terminate this Agreement under this Section 11.01(e)(i) shall not be available to the Company or Plan Investor whose action or failure to fulfill any obligation under this Agreement has been the cause of the issuance of such Order or other action), (ii) the Break-Up Fee is not approved by the Bankruptcy Court by 45 days from the Agreement Date, or (iii) a mutually acceptable Plan has not been annexed hereto as Exhibit A by 45 days from the Agreement Date.

Section 11.02. Notice of Termination. If either the Company or Plan Investor desires to terminate this Agreement pursuant to Section 11.01, such Party shall give written notice of such termination to the other Party.

Section 11.03. Effect of Termination.

(a)      If this Agreement is terminated pursuant to Section 11.01, this Agreement shall thereupon become null and void and of no further force and effect, except for the provisions of (i) Section 3.02,   (ii) Section 6.03,   (iii) Section 8.01,   (iv) this   Section 11.03   and (v) Article XII.  Nothing in this Section 11.03 shall be deemed to release any Party from any Liability for any breach by such Party of any term of this Agreement or impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement; provided, however, that, if this Agreement is validly terminated pursuant to this Article XI, no Party shall have any remedy or right to recover for any Liabilities resulting from any breach of this Agreement unless the breaching Party willfully and knowingly committed fraud against the non-breaching Party with the specific intent to deceive and mislead the non-breaching Party regarding the representations and warranties made in this Agreement or if the Plan Investor failed to consummate the Closing when required pursuant to the terms of this Agreement, provided notwithstanding anything to the contrary contained in this Agreement, in no event shall the Plan Investor's liability hereunder exceed the aggregate amount of the Escrowed Funds and the Guaranty.

(b)      Notwithstanding Section 11.03(a), in the event of a termination of this Agreement after Plan Investor's deposit of Escrowed Funds only pursuant to Section 3.02(b) above, then Plan Investor and the Company shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver to the Company the Escrowed Funds plus any accrued investment income or interest thereon.  In any other event of Termination after Plan Investor's deposit of Escrowed Funds the Plan Investor and the Company shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver to the Plan Investor the Escrowed Funds plus any accrued investment income or interest thereon.

30

(c)     the parties acknowledge that the agreements contained in <u>Section 11.03(b)</u> are an integral part of the Transaction, and that without these agreements, the parties would not have entered into this Agreement; accordingly, if any party fails to deliver such Joint Written Instructions or timely pay any amount due pursuant to <u>Section 11.03(b)</u> and, in order to obtain the payment, the other party commences an Action which results in a judgement against such breaching party for any payment set forth in <u>Section 11.03(b)</u>, and such breaching party shall pay the other party its costs and expenses (including attorney's fees and disbursements) in connection with such Action, together with interest on such payment at the Interest Rate through the date such payment was actually received.  Further, each party agrees that the other party may seek any other remedies at law or equity arising from such breach of this Agreement, pursuant to <u>Section 12.17</u>.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01. <u>Rules of Construction</u>.    The following rules of construction shall govern the interpretation of this Agreement:

(a)     references to "applicable" Law or Laws with respect to a particular Person, thing or matter means only such Law or Laws as to which the Government Authority that enacted or promulgated such Law or Laws has jurisdiction over such Person, thing or matter as determined under the Laws of the State of New York as required to be applied thereunder by the Bankruptcy Court; references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(b)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two (2) days after a triggering event and such event occurs on a Tuesday, then the action must be taken by Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(c)     whenever the context requires, words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender;

(d)     (i) the provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement and (ii) references to the terms "Article," "Section," "subsection," "subclause," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, subsections, subclauses, clauses, Schedules and Exhibits to this Agreement unless otherwise specified;

31

(e)     (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits thereto, (ii) the terms "thereof," "therein," "thereby," "thereto" and derivative or similar words refer to this Agreement to which the context refers, including the Schedules and Exhibits thereto, (iii) the terms "include," "includes," "including" and words of similar import when used in this Agreement mean "including, without limitation" unless otherwise specified, (iv) the term "any" means "any and all" and (v) where the context permits, the term "or" shall not be exclusive and shall mean "and/or";

(f)     (i) references to "days" means calendar days unless Business Days are expressly specified, (ii) references to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)) and (iii) references to "$" mean U.S. dollars;

(g)     accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control;

(h)     references to any Person includes such Person's successors and permitted assigns;

(i)     whenever this Agreement requires the Company or Plan Investor, as applicable, to take any action, such requirement shall be deemed to involve an undertaking to take such action or, to the extent possible, to cause any Transferred Entity to take such action on the part of (x) prior to Closing, the Company or (y) following Closing, Plan Investor, as applicable;

(j)     unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if";

(k)     references to "ordinary course of business" shall be deemed to refer to an action taken, or omitted to be taken, in the ordinary and usual course of the Company's and its Subsidiaries' business, consistent with past practice (including, for the avoidance of doubt, recent past practice in light of COVID-19); and

(l)     each Party has participated in the negotiation and drafting of this Agreement, and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision in this Agreement; the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.  Further, prior drafts of this Agreement or any ancillary agreements, schedules or exhibits thereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements, schedules or exhibits hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the Parties; and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of such prior drafts.

32

Section 12.02. <u>Expenses</u>.   Except as otherwise specified in the Transaction Agreements with respect to legal or other administrative fees or expenses payable by the Company in connection with any Plan, each Party will pay its own costs and expenses, including legal, consulting, financial advisor and accounting fees and expenses, incurred in connection with the Transaction Agreements and the Transactions, irrespective of when incurred or whether or not the Closing occurs.

Section 12.03. <u>Notices</u>.   All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed, or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this <u>Section 12.03</u>):

| | |
|---|---|
| If to the Company, to: | All Year Holdings Limited<br>12 Spencer Street, 3rd Floor<br>Brooklyn, NY 11211<br>Attn: Mr. Asaf Ravid and Mr. Ephraim Diamond<br>Email: ravidasaf@gmail.com<br>          ephraim@arbelcapital.com |
| with a copy (which will not constitute notice) to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention:  Gary Holtzer<br>                  Gavin Westerman<br>E-mails:    gary.holtzer@weil.com<br>                  gavin.westerman@weil.com |
| If to Plan Investor, to: | Paragraph Partners LLC Attention: Avi Philipson<br>E-mail: aphilipson@graphgroup.com |
| with a copy (which will not constitute notice) to: | Gissin & Co., Locke Lord LLP, Fried, Frank, Harris, Shriver & Jacobson LLP<br>Attention: Yael Hershkovitz, Shalom Jacob, Avi Feinberg<br>E-mail: yael@gissinlaw.co.il; SJacob@lockelord.com; Avi.Feinberg@friedfrank.com |

Section 12.04. <u>Survival</u>.  Except to the extent that any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Effective Time.

Section 12.05. <u>Limitation on Liability</u>.  Notwithstanding anything in this Agreement or in any

33

other Transaction Agreement to the contrary, the sole recourse and sole remedy of the Plan Sponsor for any breach or other claim under this Agreement (whether against the Company or Wind Down Co.) shall be the right to seek the amounts payable under <u>Section 8.01(a)</u>, in accordance with, and subject to the terms thereof.  For the avoidance of doubt, the foregoing sentence shall not impact the application of (i) <u>Section 2.02(b)</u> or (ii) the Conditions to Closing provisions of <u>Article X</u>, in each case in accordance with its terms.

Section 12.06.  <u>Public Announcements</u>.  The initial press release with respect to the execution of this Agreement shall be a joint press release to be reasonably agreed upon by the Parties.  Neither Party nor any Affiliate or Representative of such Party shall issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of the Transaction Agreements or the Transactions without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), except as a Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by order of the Bankruptcy Court or the courts in the Ancillary Proceedings, in which case Plan Investor and the Company, as applicable, will have the right to review and comment on such press release or announcement prior to publication.

Section 12.07.  <u>Severability</u>.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 12.08.  <u>Assignment</u>.  This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  Neither Party may assign (whether by operation of Law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that any Party may assign this Agreement and any or all rights and obligations under this Agreement to any of its controlled Affiliates;  <u>provided</u> <u>further</u>, that, no such assignment shall release the assigning Party from any Liability under this Agreement.  Any attempted assignment in violation of this <u>Section 12.08</u> shall be void *ab initio*.

Section 12.09.  <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and, except with respect to the non-Contracting Parties pursuant to <u>Section 12.18</u>, or as expressly set forth in this Agreement, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party.  Notwithstanding anything to the contrary in this Agreement, all rights and obligations of the Company or Wind Down Co, as applicable, shall vest in Wind Down Co, effective as of the Closing, upon the execution by Wind Down Co of a joinder to this Agreement.

34

Section 12.10. <u>Entire Agreement</u>.  This Agreement (including the Disclosure Schedules) and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.  To the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other Transaction Agreement (which, for the avoidance of doubt, excludes the Confirmation Order and any other Order of the Bankruptcy Court), this Agreement will govern and control.

Section 12.11. <u>Amendments</u>.  This Agreement (including all Exhibits and Schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

Section 12.12. <u>Waiver</u>.  At any time before the Closing, either the Company or Plan Investor may (a) extend the time for the performance of any obligation or other acts of the other Party, (b) waive any breaches or inaccuracies in the representations and warranties of the other Party contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance with any covenant, agreement or condition contained in this Agreement but such waiver of compliance with any such covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Any such waiver shall be in a written instrument duly executed by the waiving Party.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.13. <u>Governing Law</u>.  This Agreement, and any Action that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "***Transaction Dispute***"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York to be applied.

Section 12.14. <u>Dispute Resolution; Consent to Jurisdiction</u>.

(a)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12.03</u>; <u>provided</u>, <u>however</u>, upon the closing of the Bankruptcy Case, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S.

35

District Court for the Southern District of New York sitting in New York County or the Commercial Division of the Courts of the State of New York sitting in the County of New York and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

    (i)    submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

    (ii)    agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

    (iii)    agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in <u>Section 12.03</u> of any process required by any such court, will be effective service of process; <u>provided</u>, <u>however</u>, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of New York.

(b)    The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of New York for any purpose except with respect to any Transaction Dispute.

Section 12.15. <u>Waiver of Jury Trial</u>.  To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.  Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement upon which such Party is relying and will rely in entering into this Agreement.  Each Party may file an original counterpart or a copy of this <u>Section 12.15</u> with any court as written evidence of the consent of each Party to the waiver of its right to trial by jury.

Section 12.16. <u>Admissibility into Evidence</u>.  All offers of compromise or settlement among the Parties or their Representatives in connection with the attempted resolution of any Transaction Dispute (a) shall be deemed to have been delivered in furtherance of a Transaction Dispute settlement, (b) shall be exempt from discovery and production and (c) shall not be admissible into evidence (whether as an admission or otherwise) in any proceeding for the resolution of the Transaction Dispute.

Section 12.17. <u>Remedies; Specific Performance</u>.

(a)    Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and

36

the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)     Each Party agrees that irreparable damage would occur, and the Parties would not have an adequate remedy at law, if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the other Party will be entitled to injunctive relief from time to time to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at Law or in equity.  Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement.  Each Party expressly disclaims that it is owed any duty not expressly set forth in this Agreement, and waives and releases all tort claims and tort causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

Section 12.18. <u>Non-Recourse</u>.  All claims, obligations, Liabilities, or causes of action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their permitted assignees ("***Contracting Parties***").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or Representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or Representative of, and any financial advisor or lender to any of the foregoing ("***Nonparty Affiliates***"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach thereof; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates.  Except as set forth in <u>Section 7.02</u>, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person or entity not a party to this Agreement (it being expressly agreed that the Nonparty Affiliates to whom this <u>Section 12.18</u> applies shall be third-party beneficiaries of this <u>Section 12.18</u>).

Section 12.19. <u>Interest</u>.  If any payment required to be made to a Party under this Agreement is made after the date on which such payment is due, interest shall accrue at the Interest Rate on such amount from (but not including) the due date of the payment to (and including) the date such payment is actually made.  All computations of interest pursuant to this Agreement shall be made on the basis of a year of three hundred sixty-five (365) days, in each case for the actual number of

37

days from (but not including) the first day to (and including) the last day occurring in the period for which such interest is payable.

Section 12.20. <u>Disclosure Schedules and Exhibits</u>.  The Disclosure Schedules, Schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.  Any capitalized terms used in any Exhibit or Schedule or in the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement.  The representations and warranties of the Company set forth in this Agreement are made and given subject to the disclosures contained in the Disclosure Schedules.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item.  Any matter, information or item disclosed in the Disclosure Schedules, under any specific representation or warranty or Schedule or section thereof shall be deemed to be disclosed and incorporated by reference in any other Schedule or section of the Disclosure Schedules to the extent it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other Schedule(s) or section(s).  The inclusion of any matter, information or item in the Disclosure Schedules as an exception to a representation or warranty shall not be deemed to constitute (a) an admission of any Liability by the Company to any third-party, (b) an admission that any breach or violation of applicable Laws or any contract or agreement to which the Company is a party exists or has actually occurred, (c) an admission that such item is outside the ordinary course of business or not consistent with past practice, or (d) otherwise imply an admission that such item represents a material exception or material fact, event, circumstance or that such item has had, or would reasonably be expected to have a Material Adverse Effect.  The Disclosure Schedules have been arranged for purposes of convenience in separately titled Schedules corresponding to the Sections of this Agreement.

Section 12.21. <u>Provision Respecting Legal Representation</u>.  Each Party to this Agreement agrees, on its own behalf and on behalf of its Affiliates and Representatives, that Weil, Gotshal & Manges LLP may serve as counsel to Transferred Entities, on the one hand, and Wind Down Co, on the other hand, in connection with the negotiation, preparation, execution and delivery of the Transaction Agreements and the consummation of the Transactions, and that, following consummation of the Transactions, Weil, Gotshal & Manges LLP may serve as counsel to Wind Down Co or any Affiliate or Representative of Wind Down Co, in connection with any litigation, claim or obligation arising out of or relating to the Transactions and the Transaction Agreements notwithstanding such prior representation of any Transferred Entity and each Party consents thereto and waives any conflict of interest arising therefrom, and each Party shall cause its Affiliates to consent to waive any conflict of interest arising from such representation.

Section 12.22. <u>Privilege</u>.  Plan Investor, for itself and its Affiliates, and its and its Affiliates' respective successors and assigns, hereby irrevocably and unconditionally acknowledges and agrees that, other than in the case of potential willfully and knowingly committed fraud with the specific intent to deceive and mislead (such potential claims to be reasonably determined upon the advice of counsel), all attorney-client privileged communications between or among the Company, any other Transferred Entity and their respective current or former Affiliates or Representatives and their counsel, including Weil, Gotshal & Manges LLP and such other counsel provided on <u>Schedule 12.22</u>, made before the consummation of the Closing in connection with the negotiation,

38

preparation, execution, delivery and Closing under any Transaction Agreement, any Transaction Dispute or, before the Closing, any other matter, shall continue after the Closing to be privileged communications with such counsel and neither Plan Investor nor any of its former or current Affiliates nor any Person purporting to act on behalf of or through Plan Investor or any of its current of former Affiliates, shall seek to obtain the same by any process on the grounds that the privilege attaching to such communications belongs to Plan Investor, any of its Subsidiaries (including the Transferred Entities) or the Business.  Notwithstanding the foregoing, in the event that a dispute arises after the Closing between Plan Investor or any of its Subsidiaries (including the Transferred Entities), on the one hand, and a third-party other than Wind Down Co and its Affiliates, on the other hand, the Transferred Entities may assert the attorney-client privilege with respect to such communications to prevent disclosure of confidential communications to such third-party; provided, however, that the Transferred Entities may not waive such privilege without the prior written consent of, prior to the Closing, the Company or, following the Closing, Wind Down Co.  Furthermore, notwithstanding the foregoing, the Company shall provide such privileged communications to the Plan Investor to the extent such communications relate to both (i) the Transferred Entities or their Owned Real Property *and* (ii) matters which occurred prior to December 31, 2020.

Section 12.23. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Company and Plan Investor have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**COMPANY:**

**ALL YEAR HOLDINGS LIMITED**

By: _____
Name:  Assaf Ravid
Title:  CRO

By: _____
Name: Ephraim Diamond
Title:  ARO

**PLAN INVESTOR:**

Paragraph Partners LLC

By: _____
Name:  Avi Philipson
Title: CEO

[SIGNATURE PAGE TO INVESTMENT AGREEMENT]

**Mishmeret:**

**Mishmeret Trust Company Ltd.,** as Trustee
solely in respect of Sections 7.02(b), 8.01(b), 8.01(c) and
8.02(c)

By: _____
    Name:
    Title:

## ANNEX A

## DEFINITIONS

"*Action*" means any action, suit, arbitration, audit, investigation or proceeding by or before any Government Authority.

"*Affiliate*" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; provided, however, that for the purposes of this Agreement (a) prior to the Closing, the Company and the other Transferred Entities shall not be deemed an Affiliate of Plan Investor and (b) after the Closing, Plan Investor shall be deemed an Affiliate of each of the Transferred Entities.

"*Agreement*" means this Investment Agreement, dated as of the Agreement Date, by and between the Company and Plan Investor, including the Disclosure Schedules and the Schedules, Exhibits, and all amendments to such agreement made in accordance with Section 12.11.

"*Agreement Date*" shall have the meaning as set forth in the Preamble.

"*Ancillary Proceedings*" means, as applicable, the BVI Proceedings and the Israeli Proceedings.

"*Assets*" means the assets, properties and rights (including tangible and intangible) that are owned, leased or licensed by any Transferred Entity.

"*Assumed Claims*" means all unsecured claims, whether liquidated or unliquidated, contingent or noncontingent, disputed or undisputed, and regardless of when arising, against the Company other than (a) the claims of the Noteholders, (b) Subordinated Claims, (c) claims brought by any plan administrator in connection with prior chapter 11 cases of former direct or indirect subsidiaries of the Company, and (d) contingent unliquidated damages in connection with potential indemnification claims from current or former directors or officers of the Company.

"*Bankruptcy and Equity Exception*" means the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Law relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"*Bankruptcy Case*" shall have the meaning as set forth in the Recitals.

"*Bankruptcy Code*" shall have the meaning as set forth in the Recitals.

"*Bankruptcy Court*" shall have the meaning as set forth in the Recitals.

"*Bankruptcy Milestones*" shall have the meaning as set forth in Section 8.02(b).

"***Business***" means the ordinary course business of the Company purchasing, owning, managing, maintaining, renting, and selling real property.

"***Business Day***" means any day that is not a Saturday, a Sunday or other day on which commercial banks in Israel or in the City of New York, New York are required or authorized by Law to be closed.

"***Business Names and Business Marks***" means the Trademarks of the Transferred Entities and Internet domain names embodying any of the foregoing.

"***BVI Proceedings***" shall have the meaning as set forth in the Recitals.

"***Closing***" shall have the meaning as set forth in Section 2.03.

"***Closing Conditions***" means conditions to the respective obligations of the Parties to consummate the Transactions, as set forth in ARTICLE X.

"***Closing Date***" shall have the meaning as set forth in Section 2.03.

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended.

"***Company***" shall have the meaning as set forth in the Preamble.

"***Company Knowledge Parties***" means Asaf Ravid and Ephraim Diamond.

"***Company Transaction Agreements***" means this Agreement and each other Transaction Agreement to which the Company is named as a party on the signature pages thereto.

"***Company Transactions***" means the transactions contemplated by the Company Transaction Agreements.

"***Confidentiality Agreement***" means the Confidentiality Agreement dated as of February 4, 2022, by and between Paragraph Partners LLC and the Company, as the same may be amended from time to time in accordance with its terms.

"***Confirmation Order***" shall be an order or orders of the Bankruptcy Court approving this Agreement and the terms and conditions hereof, and approving and authorizing the Company to consummate the Transactions, including to provide for the issuance of the Reorganized Equity Interests to the Plan Investor free and clear of all Liens (other than any restrictions under the Securities Act or any other applicable securities Laws or the Company's governing documents) and claims (other than the Assumed Claims), and any terms of such order or orders implicating these approvals or authorizations shall be in form and substance reasonably acceptable to the Plan Investor.

"***Consent***" means any consent, approval, signature, novation, waiver of rights or authorization.

"***Contract***" or "***Contractual***" means any written contract, agreement, undertaking,

indenture, note, bond, mortgage, lease, sublease, license, sublicense, sales order, purchase order or other instrument or commitment that purports to be binding on any Person or any part of its property (or subjects any such assets or property to a Lien).

"*Contracting Parties*" shall have the meaning as set forth in <u>Section 12.18</u>.

"*Control*" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.  The terms "Controlled by," "Controlled," "under common Control with" and "Controlling" shall have correlative meanings.

"*COVID-19*" means SARS-CoV-2 or COVID-19, and any evolutions or variants thereof or related or associated epidemics, pandemic or disease outbreaks.

"*COVID-19 Measures*" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester or any other Law, Order, Legal Action, directive, guideline or recommendation by any Governmental Body in connection with or in response to COVID-19, including the Coronavirus Aid, relief, and Economic Security Act (CARES).

"*Debt*" means, without duplication, (i) indebtedness or other obligations for borrowed money or in respect of loans or advances or issued in substitution for or exchange of indebtedness for borrowed money or loans or advances, whether short-term or long-term, secured or unsecured, (ii) any indebtedness or other obligations evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness or other obligations guaranteed, including guarantees in the form of an agreement to repurchase or reimburse or that assures a creditor against loss, (iv) any indebtedness or other obligations secured by a Lien on the Company's interest in any assets, and (v) all accrued interest, premiums, penalties (including any prepayment penalties or premiums) and other obligations related to any of the foregoing.

"*Debtor*" means the Company as debtor and debtor-in-possession under the Bankruptcy Code in the Bankruptcy Case.

"*DIP Loan Agreement*" means an agreement providing for debtor-in-possession financing to the Debtor, which financing will be paid in full at or prior to Closing pursuant to the Plan from the Cash Payment.

"*Disclosure Schedules*" means the disclosure schedules dated as of the Investor Signing Date delivered by the Company to Plan Investor, which form a part of this Agreement.

"*Effective Time*" means 11:59 p.m. (local time) on the last calendar day immediately preceding the Closing Date.

"*Equity Interest*" means any share, capital stock, partnership, limited liability company, membership or similar interest in any Person.

"*Escrow Agent*" shall have the meaning as set forth in <u>Section 3.02</u>.

"*Escrow Agreement*" means that certain Escrow Agreement to be entered into by and among the Escrow Agent, the Company and Plan Investor.

"*Escrowed Funds*" shall have the meaning as set forth in Section 3.02.

"*Excluded Assets*" means (a) any and all of the Company's direct or indirect rights (including the right to receive any income or proceeds) in and to (i) any collateral securing the Secured Notes, (ii) the Company's membership interests in YG WV LLC, and (iii) the assets described in the settlement agreements among the Company, DCP All Year Pref Equity LLC and DCP Kings Point LLC, (b) any and all claims, whether known or unknown, contingent, liquidated or disputed, that the Company or the Noteholders may have against any third-parties, including any current or prior officer, director or shareholder of the Company (subject to the releases provided in Section 7.02 above), (c) such other assets listed on Schedule B hereto and (d) those assets vested in Wind Down Co pursuant to the Plan.  It being clarified that the rights and claims in (i) the Settlement agreement with regard to MY 2011 Grand LLC et al as approved by US Bankruptcy court on October 25, 2021 (case No. 19-23957 (RDD)), and (ii) the Lofts on Devoe LLC shall not be Excluded Assets.

"*Exhibits*" means the exhibits dated as of the Agreement Date (and as may be amended from time to time) which form a part of this Agreement.

"*Financial Statements*" shall have the meaning as set forth in Section 4.06.

"*GAAP*" means U.S. generally accepted accounting principles.

"*Government Approvals*" shall have the meaning as set forth in Section 6.04(a).

"*Government Authority*" means any U.S. federal, state or local or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, ministry, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body.

"*Interest Rate*" means the rate designated from time to time in Section 6621(a)(2) of the Code, compounded on a daily basis.

"*Investor Signing Date*" means March 2, 2022.

"*Israeli Proceedings*" shall have the meaning as set forth in the Recitals.

"*IRS*" means the U.S. Internal Revenue Service.

"*Joint Written Instructions*" means written instructions executed by each of Plan Investor and prior to the Closing, the Company, or following the Closing, Wind Down Co, a form of which is attached to the Escrow Agreement as an exhibit thereto.

"*Knowledge of the Company*" or "*Company Knowledge*" means the actual knowledge, as of the Investor Signing Date of the Company Knowledge Parties.

"*Law*" means any U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, Order or other requirement or rule of law (including common law) promulgated by a Government Authority.

"*Liabilities*" means any liability, Debt, guarantee, claim, demand, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or known or unknown, due or to become due) of any kind, nature or and description, including all costs and expenses related thereto, regardless of whether or not required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether or not immediately due and payable.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien (as defined in Section 101(37) of the Bankruptcy Code) or charge of any kind.

"*Material Adverse Effect*" means any fact, event, change, effect, development, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (A) the ability of the Company to perform its obligations hereunder and consummate the Transactions or (B) the business, operations, properties, Assets, Liabilities or financial condition of the Business; provided, that none of the following, either alone or in combination, will constitute a Material Adverse Effect: (i) any change in the United States or foreign economies or securities or financial markets in general (including any decline in the price of securities generally or any market or index); (ii) any change that generally affects any industry in which the Business operates; (iii) general business or economic conditions in any of the geographical areas in which the Business operates; (iv) national or international political or social conditions, including any change arising in connection with, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions, whether commenced before or after the Investor Signing Date and whether or not pursuant to the declaration of a national emergency or war; (v) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any pandemic, epidemic, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (vi) any actions specifically required to be taken or omitted pursuant to this Agreement or any other Transaction Agreement or actions taken or omitted to be taken at the express written request, or with the expressly written consent, of Plan Investor; (vii) any changes in applicable Laws or GAAP; (viii) the pendency of the Bankruptcy Case or the Ancillary Proceedings, any Order of the Bankruptcy Court and any actions or omissions of the Company or any other Transferred Entity in compliance with such Orders; (ix) any change resulting from (A) the public announcement of the entry into this Agreement or (B) the consummation of the Transactions; (x) any internet or "cyber" attack or hacking; (xi) any effects or changes arising from or related to the breach of this Agreement by Plan Investor; or (xii) any effects or changes arising from or related to COVID-19 or any COVID-19 Measure that relates to, or arises out of, an epidemic, pandemic or disease outbreak (including the COVID-19 pandemic) or any change in such COVID-19 Measure following the Investor Signing Date or any Transferred Entity's compliance therewith; provided, that that the exceptions set forth in clauses (i) through (v) of this definition shall not be regarded as exceptions solely to the extent that any such described event has a disproportionately adverse impact on the Business, as compared to other companies in the industries in which the Business

operates.

"*Material Contracts*" shall have the meaning set forth in Section 4.10(a).

"*New Shares*" shall have the meaning as set forth in the Recitals.

"*Nonparty Affiliates*" shall have the meaning as set forth in Section 12.18.

"*Order*" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Government Authority.

"*Outside Date*" shall have the meaning as set forth in Section 11.01(e).

"*Party*" or "*Parties*" means, individually or collectively, Plan Investor and the Company.

"*Permits*" means all permits, licenses, approvals, authorizations, registrations, concessions, grants, franchises, certificates (other than aviation-related certificates) and waivers issued or required by any Government Authority under applicable Law.

"*Permitted Liens*" means (a) Liens in respect of any liabilities and obligations reflected in the Company Financial Statements, (b) with respect to the Owned Real Property and leased real property of the Company and the Company Subsidiaries, (i) defects, exceptions, restrictions, rights of way, easements, covenants, encroachments and other imperfections of title, none of which materially impair or interfere with the present users of such property, and (ii) zoning, entitlement, land use, environmental regulations, and building restrictions, none of which materially impair or interfere with the present uses of such property, (c) Liens for current Taxes not yet delinquent or being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP on the Company Financial Statements, (d) mechanics', carriers', workmen's, repairmen's or other like Liens that arise or are incurred in the ordinary course of business for amounts not yet due and payable; (e) Liens to be released on or prior to the Closing Date, solely to the extent actually so released, and (f) any other Liens that, individually or in the aggregate, do not materially impair the continued use and operation, or materially detract from the value, of the assets or properties to which they relate.

"*Person*" means any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association or organization or other legal entity.

"*Plan*" means the chapter 11 plan of reorganization to be filed in the Bankruptcy Case with respect to the Debtor (including all exhibits, supplements, appendices and schedules thereto), in substantially the form to be attached hereto as Exhibit A or, in connection with material terms in the Plan related to this Agreement or the consummation of Plan Investor Transactions, reasonably acceptable to Plan Investor and Mishmeret, as such may be amended, supplemented or modified from time to time in accordance with the terms and conditions herein.

"*Plan Investor*" shall have the meaning as set forth in the Preamble.

"*Plan Investor Transaction Agreements*" means this Agreement and each other Transaction Agreement to which Plan Investor is named as a party on the signature pages thereto.

"*Plan Investor Transactions*" means the transactions contemplated by the Plan Investor Transaction Agreements.

"*Pre-Closing Period*" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is terminated in accordance with its terms.

"*Purchase Price*" shall have the meaning as set forth in Section 3.01.

"*Recovering Creditors*" means the holders of unsecured claims against the Debtor, allowed by the Bankruptcy Court as required pursuant to the Plan, other than the holders of Assumed Claims and the holders of Subordinated Claims.

"*Reorganized Debtor*" means the Debtor as reorganized pursuant to the Plan and Confirmation Order upon the Effective Date.

"*Reorganized Equity Interests*" shall have the meaning as set forth in the Recitals.

"*Representative*" of a Person means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, investment bankers or other representatives of such Person.

"*Required Approvals*" means the approvals of the Government Authorities set forth on Schedules 10.01(b) and 10.02(b).

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Subordinated Claims*" means any claims against the Debtor subject to subordination pursuant to Section 510(b) of the Bankruptcy Code, and any claim for or that arises from the rescission of a purchase, sale, issuance or offer of a security of the Debtor, or for damages arising from the purchase of sale of such a security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such claim and including class action (CA 20-04-15257) or other similar class action lawsuits brought in Israel

"*Subsidiary*" of any specified Person means any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding equity securities or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such Person.

"*Subsidiary Value*" means the allocation of the Purchase Price for a Subsidiary as set forth on Schedule 4.02.

"*Tax*" or "*Taxes*" means all U.S. federal, state, local, foreign and other income, excise, gross receipts, ad valorem, value-added, sales, use, production, employment, unemployment, severance, franchise, profits, registration, license, lease, service, service use,

environmental, recording, documentary, filing, permit or authorization, stamp, business and occupation, gains, property, leasing, transfer, payroll, intangibles or other taxes, duties, levies or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"*Tax Returns*" means all returns, reports and other filings (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates, claims (including claims for refunds) and information returns) supplied or required to be supplied to a Taxing Authority relating to Taxes or otherwise appropriate, including any amendments thereof.

"*Taxing Authority*" means any U.S. federal, state, local or non-U.S. jurisdiction (including any subdivision and any revenue agency of a jurisdiction) imposing Taxes and the agencies, if any, charged with the collection, administration or enforcement of such Taxes for such jurisdiction.

"*Third-Party Consents*" shall have the meaning as set forth in Section 6.05.

"*Transaction Agreements*" means this Agreement, the Escrow Agreement and any other agreements, instruments or documents required to be delivered at the Closing, in each case including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"*Transaction Dispute*" shall have the meaning as set forth in Section 12.13.

"*Transactions*" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"*Transfer Taxes*" means all sales, harmonized use, excise, ad valorem, direct or indirect real property, transfer, intangible, stamp, business and occupation, value added, recording, documentary, filing, permit or authorization, leasing, license, lease, service, service use, severance Taxes together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"*Transferred Entities*" shall have the meaning as set forth in the Recitals.

"*Transferred Equity Interests*" shall mean the Equity Interests in the Transferred Entities (other than the Company).

"*Tenant*" means any Person who holds or possesses any property (or portion of any property) that is directly or indirectly owned by any of the Transferred Entities.

"*U.S.*" means the United States of America.

"*William Vale Hotel*" means that certain real property located in Brooklyn, New York having an address of 55 Wythe Avenue, Brooklyn, NY and all rights related thereto.

"*Wind Down Co*" means a liquidating trust or other entity formed for the primary

purpose of liquidating the estate of the Debtor and distributing the proceeds thereof and the proceeds from the sale of the Reorganized Equity Interests in accordance with the Plan.

*Execution Version*

## Amendment No. 1 to Investment Agreement

This Amendment No. 1 to Investment Agreement (this "***Amendment***") is entered into as of the 21st day of April, 2022, by and among All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands (the "***Company***"), Paragraph Partners LLC, a US special purpose entity ("***Plan Investor***") and Mishmeret Trust Company Ltd. ("***Mishmeret***" or the "***Trustee***", and together with the Company and the Plan Investor, the "***Parties***"), solely in its capacity as Trustee for the Series B, C, D and E Notes issued by the Company pursuant those deeds of trust for each of the Notes by and between the Company and Mishmeret.

Whereas, the Company, the Plan Investor and Mishmeret (solely in its capacity as Trustee and in respect of <u>Sections 7.02(b)</u>, <u>8.01(b)</u>, <u>8.01(c)</u> and <u>8.02(c)</u> thereof) have entered into that certain Investment Agreement, dated as of March 11, 2022 (the "***Agreement***"). Capitalized terms used herein without definition shall have the meanings assigned such terms in the Agreement.

Whereas, the Parties now desire to amend the Agreement as set forth herein; and

Whereas, pursuant to <u>Section 12.11</u> of the Agreement, the Agreement may only be amended, restated, supplemented or otherwise modified by written agreement duly executed by each Party.

Now, Therefore, the Parties, for good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties, do hereby agree as follows:

1. **Amendments**. The Agreement shall be amended as described in this Section 1.

    a. **Excluded Assets**. The definition of "Excluded Assets" shall be amended and restated in its entirety as follows (newly added text being identified in **bold** typeface):

    "***Excluded Assets***" means (a) any and all of the Company's direct or indirect rights (including the right to receive any income or proceeds) in and to (i) any collateral securing the Secured Notes, (ii) the Company's membership interests in YG WV LLC **(subject to the last sentence hereof)**, and (iii) the assets described in the settlement agreements among the Company, DCP All Year Pref Equity LLC and DCP Kings Point LLC, (b) any and all claims, whether known or unknown, contingent, liquidated or disputed, that the Company or the Noteholders may have against any third-parties, including any current or prior officer, director or shareholder of the Company (subject to the releases provided in <u>Section 7.02</u> above), (c) such other assets listed on <u>Schedule B</u> hereto and (d) those assets vested in Wind Down Co pursuant to the Plan. It being clarified that the rights and claims in (i) the Settlement agreement with regard to MY 2011 Grand LLC et al as approved by US Bankruptcy court on October 25, 2021 (case No. 19-23957 (RDD)), and (ii) the Lofts on Devoe LLC shall not be Excluded Assets. **Notwithstanding the above, to the extent that the Plan Investor effects the William Vale Purchase (as defined herein) (whether prior to, on, or after the Closing Date, but only until the expiration or termination by its terms of that**

**certain Mortgage Purchase and Sale Agreement entered into by and between the Trustee and the Plan Investor (the "*MPSA*")), the Company's direct or indirect rights (including the right to receive any income or proceeds) in and to the Company's membership interests in YG WV LLC shall not be Excluded Assets hereunder or under the Plan, and the Plan shall provide for the automatic transfer of such interests to the Plan Investor upon the later of the MPSA closing date (the "*WV Sale Date*") and, to the extent that such WV Sale Date is after the Closing Date, the payment of the Shares Consideration (as defined below), *provided that* the Company's membership interests in YG WV LLC shall remain Excluded Assets hereunder and under the Plan and neither the Company nor Wind Down Co shall have any obligation hereunder with respect to a transfer of such interests if either (i) the MPSA expires or is terminated according to its terms or (ii) the Closing Date has not occurred by December 31, 2022.**

b. <u>**Purchase Price Adjustments**</u>. Section 2.02(a) of the Agreement shall be amended and restated in its entirety as follows (newly added text being identified in **bold** typeface):

<u>William Vale Purchase</u>. In the event that the Plan Investor or an Affiliate thereof purchases substantially all of the rights of the Trustee for the Series C Notes in and to the William Vale Hotel (the "***William Vale Purchase***") **(whether prior to, on, or after the Closing Date)**, including, but not limited to, the Trustee's rights in and to that certain Amended and Restated Promissory Note, dated February 28, 2017, originally between the Company and Wythe Berry Fee Owner LLC (the "***Borrower***") and that certain loan originally made by the Company to the Borrower in the original principal amount of $166,320,000.00, **then (i)** the aggregate principal amount of the New Notes provided as part of the Purchase Price for these Transactions shall be increased from $20,000,000 to $22,000,000 **and (ii) the Plan shall require the Plan Investor to pay to Wind Down Co an additional $200,000 (the "*Shares Consideration*") on the later date to occur of the Closing Date and the WV Sale Date. If the Closing Date does not occur on or prior to the Outside Date and the WV Sale Date occurs thereafter, the Company agrees to sell the Company's membership interests in YG WV LLC to the Plan Investor for $200,000 (in lieu of the adjustment to the Cash Payment set forth in subset (ii) in the immediately preceeding sentence) and to use commercially reasonable efforts to seek any necessary approvals to consummate such sale, including any approvals of the Bankruptcy Court and BVI Court, as necessary**.

c. <u>**Plan Agreement Deadline Extension**</u>. Section 11.01(e)(iii) of the Agreement shall be amended and restated in its entirety as follows (newly added text being identified in **bold** typeface):

a mutually acceptable Plan has not been annexed hereto as <u>Exhibit A</u> by **60** days from the Agreement Date.

2.       **<u>Miscellaneous</u>**.  As expressly amended hereby, the Agreement shall continue in full force and effect in accordance with the provisions thereof.  As used in the Agreement, "hereinafter," "hereto," "hereof," and words of similar import shall, unless the context otherwise requires, mean the Agreement after being amended by this Amendment. This Amendment shall become effective upon its execution by the parties hereto.  This Amendment may be executed in two or more counterparts (including counterparts transmitted in .pdf or similar format), each of which when so executed shall be deemed to be an original, and all such counterparts shall together constitute one and the same instrument.  This Amendment shall be construed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of laws thereof.

[Signature Page to Follow]

This Amendment No. 1 to Investment Agreement is entered into as of the date and year first above written.

**COMPANY:**

**ALL YEAR HOLDINGS LIMITED**

By: _____
    Name:  Assaf Ravid
    Title:   CRO

By: _____
    Name:  Ephraim Diamond
    Title:   ARO

**PLAN INVESTOR:**

Paragraph Partners LLC

By: _____
    Name:  Avi Philipson
    Title:   CEO

**Mishmeret:**

**Mishmeret Trust Company Ltd.**, as Trustee

By: _____

Name:    Rami Sebty              Rami Katzav

Title:    סמנכ"ל                    סמנכל

## Amendment No. 2 to Investment Agreement

This Amendment No. 2 to Investment Agreement (this "*Amendment*") is entered into as of the 27th day of May, 2022, by and among All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands (the "*Company*"), Paragraph Partners LLC, a US special purpose entity ("*Plan Investor*") and Mishmeret Trust Company Ltd. ("*Mishmeret*" or the "*Trustee*", and together with the Company and the Plan Investor, the "*Parties*"), solely in its capacity as Trustee for the Series B, C, D and E Notes issued by the Company pursuant those deeds of trust for each of the Notes by and between the Company and Mishmeret.

WHEREAS, the Company, the Plan Investor and Mishmeret (solely in its capacity as Trustee and in respect of Sections 7.02(b), 8.01(b), 8.01(c) and 8.02(c) thereof) have entered into that certain Investment Agreement, dated as of March 11, 2022 (the "*Agreement*").  Capitalized terms used herein without definition shall have the meanings assigned such terms in the Agreement.

WHEREAS, the Parties now desire to amend the Agreement as set forth herein; and

WHEREAS, pursuant to Section 12.11 of the Agreement, the Agreement may only be amended, restated, supplemented or otherwise modified by written agreement duly executed by each Party.

NOW, THEREFORE, the Parties, for good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties, do hereby agree as follows:

1. **Amendments**.  The Agreement shall be amended as described in this Section 1.

    a. **Escrowed Funds**.  Section 3.02 of the Agreement shall be amended and restated in its entirety as follows (newly added or changed text being identified in **bold** typeface):

    **Escrowed Funds**. Within five (5) business days of the later to occur of (i) the Court Break-Up Fee Approval Date and (ii) the date on which a Plan is annexed hereto as Exhibit A that is reasonably satisfactory to the Plan Investor and otherwise complies with the terms hereof, pursuant to the terms of the Escrow Agreement, Plan Investor shall (A) transfer the amount of $4,500,000 to **Madison Title Agency, LLC**, in its capacity as escrow agent (the "*Escrow Agent*"), by wire transfer of immediately available funds (the "*Escrowed Funds*"), and (B) deliver to the Escrow Agent a duly executed signature page to that certain **Joinder** annexed hereto as Exhibit D (the "*Guaranty*," and the date on which the Escrowed Funds are transferred and the Guaranty is delivered being referred to herein as the "*Escrow Date*"). Pursuant to the terms of the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

    (a)    if the Closing shall occur, the Escrowed Funds and all accrued investment income thereon shall be applied at the Closing towards the Cash

Payment portion of the Purchase Price payable to the Company by Plan Investor and the Guaranty shall, by its terms, cease to be effective;

(b)    if this Agreement is terminated by the Company pursuant to Section 11.01(c) (including due to the failure of the Plan Investor to close the Transaction), (1) the Escrowed Funds, together with all accrued investment income thereon (if any), shall be delivered to the Company and (2) the signature page to the Guaranty shall be delivered and released to the Company and the Guaranty shall then become immediately effective, in each case in accordance with and subject to the terms of Section 11.03(b); or

(c)    if this Agreement is terminated for any reason other than as set forth in Section 3.02(b) above, the Escrowed Funds, together with all accrued investment income thereon (if any), shall be promptly returned to Plan Investor, together with the Plan Investor's signature page to the Guaranty.

**Notwithstanding anything to the contrary contained herein, the Company shall be permitted, in accordance with the terms of (a) that certain DIP Term Sheet dated as of May 5, 2022 (the "*DIP Term Sheet*") by and between the Company and the Plan Investor and (b) the order of the Bankruptcy Court authorizing the Company to, among other things, borrow funds in accordance with the DIP Term Sheet (the "*DIP Order*"), make one or more requests to draw upon all or part of the Escrowed Funds by delivering a written certification to the Escrow Agent in accordance with the DIP Term Sheet, the provisions of the Escrow Agreement, and the DIP Order.  Any such drawn Escrowed Funds shall be utilized by the Company solely in accordance with the DIP Documents (as defined in the DIP Term Sheet), including without limitation, the DIP Budget (as defined in the DIP Term Sheet). Notwithstanding that the Company may draw upon and utilize the Escrowed Funds in accordance with the DIP Documents (including the DIP Budget), (i) such funds shall continue to be treated as Escrowed Funds for the purposes of this Agreement and (ii) the provisions of this Section 3.02, including the provisions governing the rights and obligations of the Parties with respect to the Escrowed Funds in the event (x) the Closing occurs or (y) the Closing does not occur and the Agreement is terminated, shall continue in full force and effect.  For the avoidance of doubt, if the Investment Agreement is terminated for any reason other than as set forth in Section 3.02(b) therein, the repayment to the Plan Investor of any amounts drawn by the Company under the DIP Loan in accordance with the DIP Documents shall be applied and treated as payment and delivery by the Company of Escrowed Funds in accordance with the Investment Agreement.  Pursuant to Section 3.02(b) of the Investment Agreement, if the Investment Agreement is terminated by the Borrower pursuant to Section 11.01(c) thereof, the Borrower shall be entitled to retain the DIP Loan Proceeds and shall have no further obligations to the Plan Investor hereunder with respect to such proceeds.**

2

2.    **<u>Miscellaneous</u>**.  As expressly amended hereby, the Agreement shall continue in full force and effect in accordance with the provisions thereof.  As used in the Agreement, "hereinafter," "hereto," "hereof," and words of similar import shall, unless the context otherwise requires, mean the Agreement after being amended by this Amendment. This Amendment shall become effective upon its execution by the parties hereto.  This Amendment may be executed in two or more counterparts (including counterparts transmitted in .pdf or similar format), each of which when so executed shall be deemed to be an original, and all such counterparts shall together constitute one and the same instrument.  This Amendment shall be construed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of laws thereof.

[Signature Page to Follow]

WEIL:\98609349\4\12817.0007

This Amendment No. 2 to Investment Agreement is entered into as of the date and year first above written.

**COMPANY:**

**ALL YEAR HOLDINGS LIMITED**

By: _____
Name:  Assaf Ravid
Title:   CRO

By: _____
Name:  Ephraim Diamond
Title:   ARO

**PLAN INVESTOR:**

Paragraph Partners LLC

By: _____
Name:  Avi Philipson
Title:   CEO

This Amendment No. 2 to Investment Agreement is entered into as of the date and year first above written.

**COMPANY:**

**ALL YEAR HOLDINGS LIMITED**

By: _____
    Name:  Assaf Ravid
    Title:   CRO

By: _____
    Name:  Ephraim Diamond
    Title:   ARO

**PLAN INVESTOR:**

Paragraph Partners LLC

By: _____
    Name:  Avi Philipson
    Title:   CEO

This Amendment No. 2 to Investment Agreement is entered into as of the date and year first above written.

**COMPANY:**

**ALL YEAR HOLDINGS LIMITED**

By: _____

Name:  Assaf Ravid

Title:    CRO

By: _____

Name:  Ephraim Diamond

Title:    ARO

**PLAN INVESTOR:**

Paragraph Partners LLC

By: _____

Name:  Avi Philipson

Title:    CEO

WEIL:\98609349\4\12817.0007

**Mishmeret:**

**Mishmeret Trust Company Ltd.,** as Trustee

By: _____

Name:   Rami Sebty          Rami Katzav

Title:   סמנכ"ל          סמנכל

WEIL:\98609349\4\12817.0007

**<u>Exhibit C</u>**

**Organizational Chart**

## All Year Holdings Limited (BVI) Organizational Chart of the Corporate Group:



## All Year Holdings Limited (BVI) Organizational Chart of the Corporate Group:



2

## All Year Holdings Limited (BVI) Organizational Chart of the Corporate Group:



## All Year Holdings Limited (BVI) Organizational Chart of the Corporate Group:





Key:

The BVI is currently involved in litigation concerning these entities

4

## Exhibit D

**Israeli Disclosure Tables**

WEIL:\98714375\5\12817.0007

The following exhibits (the "**Israeli Disclosure Exhibits**") are intended to satisfy certain disclosure requirements under applicable Israeli law. Pursuant to sections 37T(a)(2)(c) and 37T(a)(2)(d) of the Securities Regulations (Periodic and Immediate Reports), 1970 and sections 38(3) and 38(4) of the Companies Regulations (Application for Compromise or Settlement), 2002, an application to approve a compromise or settlement plan for the purpose of reorganization of a company must specify, inter alia, the estimates and data which support a conclusion that the proposed plan is in the best interests of creditors and parties in interest and the estimated recoveries that creditors might receive if the proposed plan was not consummated and the debtor instead continued to operate its business in the ordinary course for a specified period of time.

Furthermore, pursuant to sections 37T(a)(1) of the Securities Regulations (Periodic and Immediate Reports), 1970, a company must include a company's most recent periodic and quarterly reports, including any material change or discovery that has occurred in any matter described in the periodic report, in the disclosure statement for a debt settlement proposal to address a company's financial difficulties. The information included in the Israeli Disclosure Exhibits is being provided in satisfaction of these requirements.

THE DEBTOR PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF ITS ADVISERS. THE DEBTOR DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRS) AND ISRAELI SECURITIES REGULATIONS (ANNUAL FINANCIAL STATMENTS), 2010, AND THE RULES AND REGULATIONS OF THE ISRAELI SECURITIES AUTHORITY OR THE U.S. SECURITIES AND EXCHANGE COMMISSION. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTOR DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND ISRAELI SECURITIES LAW, 1968. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. IN ADDITION, CERTAIN OF THE PROJECTIONS MAY BE BASED ON DATA AND INFORMATION PROVIDED BY EXTERNAL SOURCES THAT HAS NOT BEEN INDEPENDENTLY VERIFIED BY THE DEBTOR OR ITS ADVISORS AND, THEREFORE, THE DEBTOR MAKES NO REPRESENTATIONS REGARDING THE ACCURACY OF SUCH INFORMATION OR THE PROJECTED RESULTS DERIVED THEREFROM. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN

THE FORWARD-LOOKING STATEMENTS, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTOR PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTOR AND REORGANIZED DEBTOR, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

WEIL:\98644645\4\12817.0007

**<u>Exhibit D-1</u>**

**Prior Year Income Report**

**All Year Holdings**

**Statements of Income and Other Comprehensive Income**

**USD thousands**

| | | For the year ended 31 December | | |
|---|---|---|---|---|
| | | **2019** | **2020** | **2021** |
| Rental income and associated revenues | $ | 59,572 $ | 55,232 $ | 41,285 (1) |
| Property operating expenses | | (12,003) | (11,452) | (10,406) (2) |
| **Rent and associated revenues, net** | | 47,569 | 43,780 | 30,878 |
| Financing expenses | | (26,361) | (26,323) | (33,643) (3) |
| **Net income (loss) for the period** | $ | 21,208 $ | 17,457 $ | (2,764) (4) |
| | | | | |
| **Net income (loss) Allocation** | | | | |
| All Year Holdings | $ | 12,077 $ | 4,989 $ | (546) |
| Partners interests | | 9,131 | 12,468 | (2,219) |
| | $ | 21,208 $ | 17,457 $ | (2,764) |
| | | | | |
| **Net Income (Loss) Allocation--Excluding The William Vale** | | | | |
| All Year Holdings without The W Vale Hotel | $ | 7,862 $ | 4,989 $ | 4,426 |
| Partners interests without the W Vale Hotel | | 4,916 | 2,953 | 2,753 |
| | $ | 12,778 $ | 7,942 $ | 7,180 (5) |

<u>**Assumptions**</u>

- This report presents the historical net income for the Transferred Entities during the periods noted, based solely on operating income and expenses (but including interest expense). The report does not include income from financing or investing activities. Income and expenses directly attributable to the Debtor, including obligations relating to the Notes and General & Administrative expenses are not presented.

- The financial results herein (other than as provided for in the footnotes) are presented on an accrual basis based on the Debtor's unaudited internal books and records.

<u>**Footnotes**</u>

(1) The material decrease in 2021 revenues is attributable to the lessee of The William Vale defaulting on its obligations under the lease.

(2) Property Operating Expense figures include only direct expenses attributable to the Transferred Entities and does not account for the Debtor's General & Administrative and other expenses attributable to the Debtor.

(3) The material increase in 2021 financing expenses is attributable to the accrual of default interest on The William Vale mortgage due to a payment default.

(4) Net Income figures do not include amortization payments in the sum of $11.3MM for 2019, $11.5MM for 2020 and $14.7MM for 2021.

(5) Net Income figures do not include amortization payments in the sum of $7.2MM for 2019, $7.4MM for 2020 and $10.6MM for 2021.

## Exhibit D-2

**Prior Year Property Report**

All Year Holdings
(in '000's)

| | Name | All Year Holdings % | Property Type | Value as of December 31, 2018 (100%) [1] | Value as of December 31, 2019 (100%) [1] | Value as of December 31, 2021 (100%) [2] | Total First Mortgage (100%) as of December 31, 2021 | Mortgages Interest % | Income 100% (Annually) [3] | Loan To Value (LTV) | Net Operating Income [3] | Total Yearly Mortgage (Principal & Interest) Payments [3] | Occupancy [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Spencer Albee Equities LLC | 50% | Residential | $ 169,900 | $ 155,200 | $ 162,100 | $ 132,628 | 3.90% | $ 7,177.673 | 82% | $ 4,881,000 | $ 5,130 | 98% |
| 2 | The North Flats LLC | 33.3% | Residential | $ 86,900 | $ 80,300 | $ 83,500 | $ 48,927 | 3.25% | $ 273.535 | 59% | $ 219,000 | $ 289 | 50% |
| 3 | 271 Metropolitan LLC | 57.50% | Residential | $ 36,000 | $ 36,000 | $ 36,200 | $ 22,647 | 3.53% | $ 2,044.818 | 63% | $ 1,729,862 | $ 1,360 | 100% |
| 4 | 268 Metropolitan Ave LLC | 50% | Residential | $ - | $ 23,500 | $ 24,200 | $ 13,755 | 4.38% | $ 1,328.329 | 57% | $ 1,173,535 | $ 839 | 96% |
| 5 | Hudson View Realty LLC | 50% | Residential | $ 20,000 | $ 19,600 | $ 15,600 | $ 11,292 | 3.25% | $ 1,148.906 | 72% | $ 843,109 | $ 659 | 100% |
| 6 | 392 St Marks LLC | 50% | Residential | $ 15,100 | $ 15,100 | $ 14,700 | $ 10,043 | 3.65% | $ 895.780 | 68% | $ 761,591 | $ 604 | 100% |
| 7 | 132 Havemeyer St LLC | 50% | Residential | $ 14,800 | $ 14,800 | $ 14,300 | $ 10,099 | 3.38% | $ 896.188 | 71% | $ 760,846 | $ 564 | 95% |
| 8 | 82 Jefferson LLC | 50% | Residential | $ 12,800 | $ 12,800 | $ 12,400 | $ 8,957 | 3.38% | $ 822.381 | 72% | $ 659,798 | $ 560 | 87% |
| 9 | 533 Knickerbocker LLC & Knickerbocker St Holdings LLC | 75% | Residential | $ 12,700 | $ 12,000 | $ 11,370 | $ 7,852 | 3.75% | $ 638.839 | 69% | $ 394,724 | $ 468 | 94% |
| 10 | 57-59 Grand St LLC | 50% | Residential | $ 16,100 | $ 15,600 | $ 10,900 | $ 8,308 | 3.55% | $ 719.110 | 76% | $ 467,271 | $ 506 | 100% |
| 11 | 125 Leonard LLC & 133-135 Leonard LLC | 50% | Residential | $ 10,400 | $ 10,400 | $ 10,000 | $ 6,355 | 3.38% | $ 625.372 | 64% | $ 535,292 | $ 382 | 100% |
| 12 | 78 Havemeyer LLC | 50% | Residential | $ 8,600 | $ 8,600 | $ 8,010 | $ 4,669 | 3.50% | $ 357.713 | 58% | $ 258,350 | $ 311 | 100% |
| 13 | 1159 Dean LLC | 50% | Residential | $ 8,500 | $ 8,500 | $ 7,890 | $ 5,920 | 3.63% | $ 461.809 | 75% | $ 329,257 | $ 358 | 100% |
| 14 | 212-214 Grand LLC | 50% | Residential | $ 8,500 | $ 7,900 | $ 7,560 | $ 5,009 | 3.60% | $ 391.504 | 66% | $ 183,093 | $ 296 | 88% |
| 15 | A&M Park Enterprises LLC | 50% | Residential | $ 9,000 | $ 8,200 | $ 7,490 | $ 5,033 | 3.25% | $ 430.427 | 67% | $ 273,768 | $ 308 | 100% |
| 16 | 252 Grand LLC | 50% | Residential | $ 8,000 | $ 7,300 | $ 6,680 | $ 4,571 | 3.50% | $ 379.086 | 68% | $ 334,782 | $ 281 | 100% |
| 17 | 1058 Bergen Street LLC | 50% | Residential | $ 7,200 | $ 7,200 | $ 6,620 | $ 5,313 | 3.60% | $ 372.378 | 80% | $ 279,793 | $ 314 | 100% |
| 18 | 89 North LLC | 100% | Residential | $ 6,199 | $ 7,300 | $ 6,600 | $ 5,780 | 3.19% | $ 246.803 | 88% | $ 58,065 | $ 289 | 75% |
| 19 | 101 Quincy LLC | 50% | Residential | $ 7,100 | $ 7,100 | $ 6,570 | $ 3,917 | 3.75% | $ 418.757 | 60% | $ 344,250 | $ 249 | 100% |
| 20 | 473 Park Pl LLC | 50% | Residential | $ 7,200 | $ 7,100 | $ 6,480 | $ 4,876 | 3.25% | $ 480.590 | 75% | $ 382,562 | $ 283 | 100% |
| 21 | 335 St. Nicholas LLC | 100% | Residential | $ 6,900 | $ 6,900 | $ 6,390 | $ 5,198 | 3.55% | $ 385.335 | 81% | $ 296,271 | $ 306 | 100% |
| 22 | 690 Prospect Pl LLC | 50% | Residential | $ 6,500 | $ 6,500 | $ 6,370 | $ 3,745 | 3.75% | $ 273.886 | 59% | $ 219,919 | $ 240 | 100% |
| 23 | 461 Park Place LLC | 75% | Residential | $ 6,800 | $ 6,600 | $ 6,260 | $ 4,629 | 3.56% | $ 334.105 | 74% | $ 244,242 | $ 274 | 100% |
| 24 | 469 Park LLC | 75% | Residential | $ 6,900 | $ 6,600 | $ 6,170 | $ 4,555 | 3.56% | $ 360.874 | 74% | $ 274,979 | $ 269 | 100% |
| 25 | 591 Franklin LLC | 100% | Residential | $ 6,700 | $ 6,700 | $ 5,920 | $ 4,647 | 3.55% | $ 276.956 | 78% | $ 178,586 | $ 275 | 100% |
| 26 | 654 Park Place LLC | 50% | Residential | $ 6,300 | $ 6,300 | $ 5,870 | $ 4,262 | 3.38% | $ 417.393 | 73% | $ 322,168 | $ 238 | 100% |
| 27 | 143 N8 C3 Realty Investors LLC | 100% | Residential | $ 6,800 | $ 6,500 | $ 5,820 | $ 4,197 | 3.60% | $ 410.332 | 72% | $ 286,366 | $ 249 | 90% |
| 28 | 778 Lincoln Place LLC | 50% | Residential | $ 6,300 | $ 6,100 | $ 5,710 | $ 4,336 | 3.60% | $ 148.807 | 76% | $ 78,307 | $ 256 | 100% |
| 29 | 648 Myrtle Ave LLC | 100% | Residential | $ 5,900 | $ 5,900 | $ 4,900 | $ 3,383 | 3.38% | $ 374.400 | 69% | $ 307,542 | $ 214 | 100% |
| 30 | 871 Grand LLC | 50% | Residential | $ 5,700 | $ 5,700 | $ 5,490 | $ 4,031 | 3.82% | $ 397.868 | 73% | $ 274,546 | $ 240 | 100% |
| 31 | 65 Kent Avenue LLC | 100% | Residential | $ 5,400 | $ 5,500 | $ 5,200 | $ 2,270 | 24.00% | $ 344.156 | 44% | $ 328,630 | $ 427 | 100% |
| 32 | 916 Madison St LLC | 50% | Residential | $ 5,600 | $ 5,600 | $ 5,200 | $ 4,328 | 3.25% | $ 373.822 | 83% | $ 308,055 | $ 252 | 100% |
| 33 | 1055 Dean LLC | 100% | Residential | $ 5,400 | $ 5,600 | $ 5,120 | $ 3,344 | 3.60% | $ 338.086 | 65% | $ 220,011 | $ 198 | 100% |
| 34 | 378 Lewis LLC | 100% | Residential | $ 4,900 | $ 4,900 | $ 5,010 | $ 2,734 | 3.50% | $ 256.976 | 55% | $ 204,499 | $ 168 | 100% |
| 35 | 236 Meserole LLC | 50% | Residential | $ 4,800 | $ 4,800 | $ 4,980 | $ 3,142 | 3.82% | $ 276.537 | 63% | $ 204,678 | $ 189 | 100% |
| 36 | 277 Classon LLC | 100% | Residential | $ 5,000 | $ 5,100 | $ 4,930 | $ 3,241 | 3.60% | $ 298.119 | 66% | $ 248,383 | $ 191 | 78% |
| 37 | 574 Broadway LLC | 50% | Residential | $ 5,300 | $ 5,300 | $ 4,770 | $ 3,214 | 3.55% | $ 365.565 | 67% | $ 276,879 | $ 190 | 100% |
| 38 | 259 Evergreen Realty LLC | 100% | Residential | $ 4,700 | $ 4,700 | $ 4,690 | $ 2,822 | 3.82% | $ 270.167 | 60% | $ 202,585 | $ 168 | 100% |
| 39 | 716 Jefferson Ave LLC | 50% | Residential | $ 4,700 | $ 4,700 | $ 4,550 | $ 2,775 | 3.42% | $ 375.453 | 61% | $ 231,792 | $ 161 | 100% |
| 40 | 161 Meserole LLC | 50% | Residential | $ 4,700 | $ 4,700 | $ 4,420 | $ 3,305 | 3.38% | $ 289.549 | 75% | $ 233,566 | $ 185 | 89% |
| 41 | 79 South 6th Street LLC | 50% | Residential | $ 4,400 | $ 4,400 | $ 4,370 | $ 2,456 | 4.13% | $ 221.493 | 56% | $ 183,180 | $ 153 | 100% |
| 42 | 28 Wilson LLC | 50% | Residential | $ 4,300 | $ 4,300 | $ 4,240 | $ 3,227 | 3.60% | $ 265.836 | 76% | $ 168,696 | $ 191 | 89% |
| 43 | 506 Dekalb LLC | 100% | Residential | $ 4,200 | $ 4,200 | $ 4,180 | $ 2,295 | 3.55% | $ 192.270 | 55% | $ 139,751 | $ 135 | 100% |
| 44 | 132A Stanhope LLC | 17% | Residential | $ 4,200 | $ 4,200 | $ 4,110 | $ 3,010 | 3.60% | $ 269.960 | 73% | $ 214,861 | $ 180 | 100% |
| 45 | Bedford Living, LLC | 50% | Residential | $ 4,200 | $ 4,200 | $ 4,080 | $ 2,713 | 3.56% | $ 217.139 | 66% | $ 159,741 | $ 161 | 100% |
| 46 | 273 Driggs LLC | 50% | Residential | $ 4,500 | $ 4,500 | $ 4,070 | $ 2,478 | 3.62% | $ 216.910 | 61% | $ 152,081 | $ 151 | 100% |
| 47 | 679 - 681 Classon Avenue LLC | 50% | Residential | $ 4,900 | $ 4,400 | $ 3,940 | $ 2,895 | 3.58% | $ 294.760 | 73% | $ 165,878 | $ 173 | 100% |
| 48 | 274 Jefferson LLC | 50% | Residential | $ 4,000 | $ 4,000 | $ 3,880 | $ 2,090 | 3.88% | $ 236.242 | 54% | $ 170,477 | $ 142 | 100% |

**All Year Holdings**
(in '000's)

| | Name | All Year Holdings % | Property Type | Value as of December 31, 2018 (100%) [1] | Value as of December 31, 2019 (100%) [1] | Value as of December 31, 2021 (100%) [2] | Total First Mortgage (100%) as of December 31, 2021 | Mortgages Interest % | Income 100% (Annually) [3] | Loan To Value (LTV) | Net Operating Income [3] | Total Yearly Mortgage (Principal & Interest) Payments | Occupancy [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 49 | 1088 Bedford Ave LLC | 50% | Residential | $ 4,000 | $ 4,000 | $ 3,870 | $ 2,595 | 3.63% | $ 128.138 | 67% | $ 89,157 | $ 154 | 100% |
| 50 | 311 Melrose LLC | 100% | Residential | $ 4,200 | $ 4,200 | $ 3,770 | $ 2,791 | 3.55% | $ 266.035 | 74% | $ 196,029 | $ 165 | 100% |
| 51 | 69 Stockholm Street LLC | 50% | Residential | $ 3,800 | $ 3,800 | $ 3,710 | $ 2,613 | 3.61% | $ 249.751 | 70% | $ 184,129 | $ 157 | 100% |
| 52 | 307 Devoe LLC | 100% | Residential | $ 4,100 | $ 4,000 | $ 3,680 | $ 2,213 | 3.54% | $ 240.187 | 60% | $ 187,816 | $ 134 | 100% |
| 53 | 198 Scholes LLC | 65% | Residential | $ 4,200 | $ 4,200 | $ 3,570 | $ 2,760 | 3.55% | $ 180.573 | 77% | $ 135,592 | $ 163 | 100% |
| 54 | West Tremont Housing LLC | 100% | Residential | $ 4,400 | $ 3,800 | $ 3,540 | $ 2,815 | 3.64% | $ 170.056 | 80% | $ 91,437 | $ 167 | 100% |
| 55 | 305 Grand LLC | 50% | Residential | $ 4,900 | $ 4,100 | $ 3,400 | $ 2,583 | 3.55% | $ 278.445 | 76% | $ 191,221 | $ 157 | 100% |
| 56 | 254 Palmetto Street LLC | 100% | Residential | $ 3,700 | $ 3,700 | $ 3,330 | $ 2,855 | 3.55% | $ 246.828 | 86% | $ 157,022 | $ 169 | 100% |
| 57 | Y & M Management LLC | 75% | Residential | $ 3,700 | $ 3,700 | $ 3,310 | $ 2,064 | 3.63% | $ 225.311 | 62% | $ 179,975 | $ 123 | 100% |
| 58 | 694 Franklin Avenue LLC | 50% | Residential | $ 2,800 | $ 3,200 | $ 3,310 | $ 1,593 | 4.25% | $ 190.717 | 48% | $ 165,027 | $ 100 | 100% |
| 59 | Ralph & Ralph Properties LLC | 50% | Residential | $ 3,400 | $ 3,500 | $ 3,290 | $ 1,240 | 5.09% | $ 317.142 | 38% | $ 208,438 | $ 98 | 100% |
| 60 | 54 Lewis LLC | 100% | Residential | $ 3,400 | $ 3,400 | $ 3,260 | $ 2,471 | 3.45% | $ 192.774 | 76% | $ 135,877 | $ 142 | 100% |
| 61 | 71 Wilson LLC | 50% | Residential | $ 3,200 | $ 3,200 | $ 3,180 | $ 2,140 | 3.60% | $ 204.567 | 67% | $ 160,433 | $ 127 | 100% |
| 62 | 1012 Willoughby Avenue LLC | 50% | Residential | $ 3,200 | $ 3,200 | $ 3,140 | $ 2,023 | 3.25% | $ 169.039 | 64% | $ 121,664 | $ 124 | 100% |
| 63 | 1361 Greene LLC | 50% | Residential | $ 3,200 | $ 3,200 | $ 3,140 | $ 1,952 | 3.38% | $ 135.255 | 62% | $ 95,876 | $ 124 | 100% |
| 64 | 145 Driggs LLC | 50% | Residential | $ 4,500 | $ 4,500 | $ 3,130 | $ 3,082 | 3.45% | $ 264.809 | 98% | $ 180,276 | $ 177 | 100% |
| 65 | The Henrica Group LLC | 100% | Residential | $ 3,200 | $ 3,200 | $ 3,090 | $ 2,185 | 3.55% | $ 136.623 | 71% | $ 92,136 | $ 129 | 100% |
| 66 | 163 Troutman Realty LLC | 100% | Residential | $ 3,100 | $ 3,100 | $ 3,040 | $ 2,383 | 3.45% | $ 205.650 | 78% | $ 169,418 | $ 137 | 100% |
| 67 | 360 Decatur LLC | 66.67% | Residential | $ 3,000 | $ 3,200 | $ 3,020 | $ 1,755 | 3.50% | $ 198.040 | 58% | $ 133,214 | $ 108 | 100% |
| 68 | 222 Stanhope II LLC | 50% | Residential | $ 3,100 | $ 3,100 | $ 3,020 | $ 1,463 | 3.38% | $ 183.635 | 48% | $ 85,216 | $ 84 | 100% |
| 69 | 1221 Atlantic Avenue LLC | 100% | Residential | $ 3,200 | $ 3,200 | $ 3,010 | $ 1,845 | 3.60% | $ 260.210 | 61% | $ 120,222 | $ 109 | 100% |
| 70 | 48 Wilson LLC | 50% | Residential | $ 3,100 | $ 3,100 | $ 2,980 | $ 2,057 | 3.55% | $ 141.775 | 69% | $ 102,233 | $ 121 | 100% |
| 71 | 238 Troutman LLC | 75% | Residential | $ 3,000 | $ 3,000 | $ 2,970 | $ 1,963 | 3.25% | $ 187.875 | 66% | $ 146,750 | $ 120 | 100% |
| 72 | 226 Troutman LLC | 50% | Residential | $ 3,000 | $ 3,000 | $ 2,960 | $ 2,023 | 3.25% | $ 172.592 | 68% | $ 126,906 | $ 124 | 100% |
| 73 | 233 Jefferson LLC | 100% | Residential | $ 3,000 | $ 3,000 | $ 2,940 | $ 2,023 | 3.25% | $ 161.568 | 69% | $ 118,804 | $ 124 | 100% |
| 74 | 283 Nostrand Ave Realty LLC | 50% | Residential | $ 3,100 | $ 3,100 | $ 2,940 | $ 1,982 | 4.25% | $ 143.056 | 67% | $ 107,198 | $ 126 | 100% |
| 75 | WWW 888 Realty Inc. | 100% | Residential | $ 3,000 | $ 3,000 | $ 2,930 | $ 1,984 | 3.55% | $ 181.581 | 68% | $ 145,390 | $ 117 | 100% |
| 76 | 247 Troutman LLC | 50% | Residential | $ 3,000 | $ 3,000 | $ 2,930 | $ 2,066 | 3.60% | $ 180.631 | 71% | $ 140,744 | $ 122 | 100% |
| 77 | 165 Central Avenue Realty LLC | 50% | Residential | $ 3,000 | $ 3,000 | $ 2,920 | $ 2,313 | 3.45% | $ 180.990 | 79% | $ 135,197 | $ 133 | 100% |
| 78 | 242 Troutman LLC | 75% | Residential | $ 2,900 | $ 2,900 | $ 2,920 | $ 2,023 | 3.25% | $ 184.689 | 69% | $ 143,501 | $ 124 | 100% |
| 79 | 30 Driggs LLC | 50% | Residential | $ 3,000 | $ 3,000 | $ 2,890 | $ 2,020 | 3.55% | $ 147.584 | 70% | $ 100,271 | $ 119 | 100% |
| 80 | 231 Jefferson LLC | 100% | Residential | $ 3,000 | $ 3,000 | $ 2,890 | $ 2,023 | 3.25% | $ 181.503 | 70% | $ 136,426 | $ 124 | 100% |
| 81 | 1358 Dekalb LLC | 50% | Residential | $ 2,900 | $ 2,900 | $ 2,890 | $ 1,997 | 3.45% | $ 174.861 | 69% | $ 135,802 | $ 115 | 100% |
| 82 | Lavan Equities LLC | 50% | Residential | $ 2,900 | $ 2,900 | $ 2,890 | $ 1,849 | 3.63% | $ 179.977 | 64% | $ 139,848 | $ 109 | 100% |
| 83 | 239 Troutman LLC | 50% | Residential | $ 3,000 | $ 3,000 | $ 2,870 | $ 1,963 | 3.25% | $ 171.251 | 68% | $ 134,206 | $ 120 | 100% |
| 84 | 1420 Putnam Avenue LLC | 100% | Residential | $ 2,900 | $ 2,900 | $ 2,870 | $ 2,134 | 3.55% | $ 181.399 | 74% | $ 137,414 | $ 126 | 100% |
| 85 | 1418 Putnam Avenue LLC | 100% | Residential | $ 2,800 | $ 2,800 | $ 2,790 | $ 2,043 | 3.55% | $ 161.575 | 73% | $ 120,544 | $ 121 | 100% |
| 86 | Harman Towers LLC | 50% | Residential | $ 2,800 | $ 2,800 | $ 2,730 | $ 1,208 | 3.38% | $ 149.015 | 44% | $ 113,584 | $ 69 | 100% |
| 87 | Dodworth Enterprise LLC | 60% | Residential | $ 2,700 | $ 2,700 | $ 2,660 | $ 1,500 | 4.25% | $ 183.396 | 56% | $ 150,247 | $ 65 | 100% |
| 88 | 170 Knickerbocker LLC | 50% | Residential | $ 3,000 | $ 3,000 | $ 2,640 | $ 1,848 | 3.75% | $ 194.989 | 70% | $ 160,149 | $ 111 | 100% |
| 89 | Grove Palace LLC | 100% | Residential | $ 2,600 | $ 2,600 | $ 2,640 | $ 1,910 | 3.55% | $ 169.615 | 72% | $ 131,519 | $ 113 | 100% |
| 90 | 192 BSD Realty LLC | 50% | Residential | $ 2,700 | $ 2,700 | $ 2,600 | $ 1,792 | 3.60% | $ 175.921 | 69% | $ 128,920 | $ 106 | 100% |
| 91 | 697 Prospect Pl LLC | 100% | Residential | $ 2,600 | $ 2,600 | $ 2,580 | $ 1,593 | 4.25% | $ 160.863 | 62% | $ 120,375 | $ 101 | 100% |
| 92 | 401 Suydam St LLC | 50% | Residential | $ 2,600 | $ 2,600 | $ 2,520 | $ 1,883 | 3.55% | $ 158.927 | 75% | $ 115,712 | $ 111 | 100% |
| 93 | 166 Harman Realty LLC | 100% | Residential | $ 2,400 | $ 2,400 | $ 2,470 | $ 1,726 | 3.25% | $ 192.413 | 70% | $ 154,542 | $ 106 | 100% |
| 94 | 1044 Flushing Avenue LLC | 100% | Residential | $ 2,300 | $ 2,300 | $ 2,420 | $ 1,589 | 3.55% | $ 154.211 | 66% | $ 103,490 | $ 94 | 100% |
| 95 | 215 Himrod LLC | 50% | Residential | $ 2,500 | $ 2,500 | $ 2,410 | $ 1,728 | 3.55% | $ 114.019 | 72% | $ 66,731 | $ 102 | 100% |
| 96 | The Troutman Residence LLC | 100% | Residential | $ 3,200 | $ 2,500 | $ 2,330 | $ 1,774 | 3.16% | $ 122.798 | 76% | $ 69,627 | $ 99 | 100% |
| 97 | 273 Skillman St LLC | 100% | Residential | $ 2,000 | $ 2,000 | $ 2,090 | $ 1,064 | 4.13% | $ 109.677 | 51% | $ 83,956 | $ 66 | 100% |
| 98 | 136 Kingsland LLC | 50% | Residential | $ 2,500 | $ 2,500 | $ 2,020 | $ 1,352 | 3.12% | $ 105.166 | 67% | $ 42,811 | $ 75 | 83% |

**All Year Holdings**
(in '000's)

| | Name | All Year Holdings % | Property Type | Value as of December 31, 2018 (100%) [1] | Value as of December 31, 2019 (100%) [1] | Value as of December 31, 2021 (100%) [2] | Total First Mortgage (100%) as of December 31, 2021 | Mortgages Interest % | Income 100% (Annually) [3] | Loan To Value (LTV) | Net Operating Income [3] | Total Yearly Mortgage (Principal & Interest) Payments | Occupancy [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 99 | 3609 15th Avenue LLC | 100% | Residential | $ 2,100 | $ 2,100 | $ 1,990 | $ 1,302 | 3.63% | $ 147.130 | 65% | $ 95,044 | $ 77 | 100% |
| 100 | 90 Wilson LLC | 100% | Residential | $ 2,000 | $ 2,000 | $ 1,970 | $ 1,319 | 4.25% | $ 75.329 | 67% | $ 49,849 | $ 84 | 100% |
| 101 | 1136 Willoughby LLC | 100% | Residential | $ 2,400 | $ 2,200 | $ 1,970 | $ 1,406 | 3.20% | $ 86.812 | 71% | $ 55,129 | $ 79 | 100% |
| 102 | 199 Weirfield LLC | 50% | Residential | $ 2,200 | $ 1,900 | $ 1,860 | $ 1,171 | 3.38% | $ 100.482 | 63% | $ 81,643 | $ 74 | 100% |
| 103 | 3611 15th Avenue LLC | 50% | Residential | $ 2,100 | $ 2,100 | $ 1,840 | $ 1,208 | 3.59% | $ 137.737 | 66% | $ 93,889 | $ 71 | 100% |
| 104 | Gunther Apartment Corp | 100% | Residential | $ 1,400 | $ 1,400 | $ 1,560 | $ 1,021 | 3.20% | $ 115.350 | 65% | $ 79,135 | $ 57 | 100% |
| 105 | 300 Troutman LLC | 90% | Residential | $ 2,100 | $ 1,600 | $ 1,390 | $ 1,011 | 3.25% | $ 116.523 | 73% | $ 72,774 | $ 62 | 100% |
| 106 | 161 Troutman LLC | 50% | Residential | $ 1,700 | $ 1,400 | $ 1,220 | $ 753 | 3.12% | $ 87.090 | 62% | $ 45,954 | $ 42 | 100% |
| 107 | 189 Menahan LLC | 66.6% | Residential | $ 1,600 | $ 1,300 | $ 1,200 | $ 911 | 3.35% | $ 100.890 | 76% | $ 45,345 | $ 52 | 100% |
| 108 | The William Vale [4] | 50.0% | Hotel | $ 250,000 | $ 245,000 | $ 158,300 | $ 155,925 | 3.95% | $ 15,000.000 | 98% | $ 2,500,000 | $ 14,284 | 100% |
| | **Total** | | | $ 1,040,399 | $ 1,030,700 | $ 921,610 | $ 688,151 | | $ 53,728.039 | | $ 30,878,451 | $ 40,918 | |

**Notes**

[1] Values as of December 31, 2018 and December 31, 2019 are based on the Debtor's internal valuations as of the dates noted.

[2] Values as of December 31, 2021 are based on independent appraisals prepared by Level Valuation in a report dated April 25, 2022, and Bowery Valuation in a report dated March 9, 2022.

[3] The noted columns are based on the Debtor's December 31, 2021 unaudited internal financials.

[4] Total First Mortgage as of December 31, 2021 listed for The William Vale property excludes $12,628,000 in accrued interest and default fees. The difference between Income and Net Operating Income is attributable to the lessee of The William Vale defaulting on its obligations under the lease.

| | Name | All Year Holdings % | Total Assets | Total Liabilities | Total Equity | UNADJUSTED AYH Equity (See Note [B]) | Adjustments and Provisions | Notes | ADJUSTED AYH Equity |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Spencer Albee Equities LLC | 50% | $ 163,120 | $ 136,250 | $ 26,870 | $ (4,843) | $ 4,843 | [B] | $ - |
| 2 | The North Flats LLC | 33.3% | $ 83,726 | $ 51,128 | $ 32,598 | $ 208 | $ 7,879 | [B][C] | $ 8,087 |
| 3 | 271 Metropolitan LLC | 57.5% | $ 36,788 | $ 23,333 | $ 13,456 | $ 7,737 | $ - | | $ 7,737 |
| 4 | 268 Metropolitan Ave LLC | 50% | $ 24,539 | $ 14,163 | $ 10,376 | $ 3,404 | $ 715 | [B] | $ 4,118 |
| 5 | Hudson View Realty LLC | 50% | $ 15,855 | $ 11,979 | $ 3,876 | $ 1,938 | $ - | | $ 1,938 |
| 6 | 392 St Marks LLC | 50% | $ 14,853 | $ 10,135 | $ 4,718 | $ 2,359 | $ (1) | | $ 2,358 |
| 7 | 132 Havemeyer St LLC | 50% | $ 14,580 | $ 10,189 | $ 4,391 | $ 2,196 | $ (13) | | $ 2,183 |
| 8 | 82 Jefferson LLC | 50% | $ 12,481 | $ 9,402 | $ 3,079 | $ 1,540 | $ - | | $ 1,540 |
| 9 | 533 Knickerbocker LLC & Knickerbocker St Holdings LLC | 75% | $ 11,660 | $ 7,871 | $ 3,789 | $ 2,842 | $ (76) | [D] | $ 2,765 |
| 10 | 57-59 Grand St LLC | 50% | $ 11,193 | $ 8,569 | $ 2,624 | $ 1,312 | $ (59) | | $ 1,253 |
| 11 | 125 Leonard LLC & 133-135 Leonard LLC | 50% | $ 10,280 | $ 6,426 | $ 3,854 | $ 1,927 | $ (17) | | $ 1,910 |
| 12 | 78 Havemeyer LLC | 50% | $ 8,273 | $ 4,713 | $ 3,560 | $ 1,780 | $ (30) | | $ 1,750 |
| 13 | 1159 Dean LLC | 50% | $ 8,037 | $ 6,125 | $ 1,912 | $ 956 | $ (20) | | $ 935 |
| 14 | 212-214 Grand LLC | 50% | $ 7,650 | $ 5,149 | $ 2,501 | $ 1,250 | $ (54) | | $ 1,196 |
| 15 | A&M Park Enterprises LLC | 50% | $ 7,645 | $ 5,090 | $ 2,555 | $ 1,278 | $ (65) | | $ 1,212 |
| 16 | 252 Grand LLC | 50% | $ 6,999 | $ 4,663 | $ 2,337 | $ 1,168 | $ (24) | | $ 1,144 |
| 17 | 1058 Bergen Street LLC | 50% | $ 6,667 | $ 5,370 | $ 1,298 | $ 649 | $ (7) | | $ 642 |
| 18 | 89 North LLC | 100% | $ 7,346 | $ 6,591 | $ 755 | $ 755 | $ - | | $ 755 |
| 19 | 101 Quincy LLC | 50% | $ 6,797 | $ 3,989 | $ 2,808 | $ 1,404 | $ (24) | | $ 1,380 |
| 20 | 473 Park Pl LLC | 50% | $ 6,522 | $ 5,081 | $ 1,441 | $ 721 | $ - | | $ 721 |
| 21 | 335 St. Nicholas LLC | 100% | $ 6,428 | $ 5,241 | $ 1,187 | $ 1,187 | $ - | | $ 1,187 |
| 22 | 690 Prospect Pl LLC | 50% | $ 6,469 | $ 3,782 | $ 2,687 | $ 1,343 | $ (39) | | $ 1,305 |
| 23 | 461 Park Place LLC | 75% | $ 6,300 | $ 4,682 | $ 1,618 | $ 1,213 | $ (10) | | $ 1,203 |
| 24 | 469 Park LLC | 75% | $ 6,228 | $ 4,630 | $ 1,599 | $ 1,199 | $ - | | $ 1,199 |
| 25 | 591 Franklin LLC | 100% | $ 5,983 | $ 4,740 | $ 1,243 | $ 1,243 | $ - | | $ 1,243 |
| 26 | 654 Park Place LLC | 50% | $ 5,998 | $ 4,318 | $ 1,680 | $ 840 | $ - | | $ 840 |
| 27 | 143 N8 C3 Realty Investors LLC | 100% | $ 5,916 | $ 4,281 | $ 1,635 | $ 1,635 | $ - | | $ 1,635 |
| 28 | 778 Lincoln Place LLC | 50% | $ 5,919 | $ 4,386 | $ 1,533 | $ 767 | $ (137) | | $ 630 |
| 29 | 648 Myrtle Ave LLC | 100% | $ 4,985 | $ 3,434 | $ 1,551 | $ 1,551 | $ (1,000) | [E] | $ 551 |
| 30 | 871 Grand LLC | 50% | $ 5,585 | $ 4,080 | $ 1,505 | $ 752 | $ (15) | | $ 737 |
| 31 | 65 Kent Avenue LLC | 100% | $ 5,410 | $ 2,981 | $ 2,428 | $ 2,428 | $ (500) | [F] | $ 1,928 |
| 32 | 916 Madison St LLC | 50% | $ 5,264 | $ 4,376 | $ 888 | $ 444 | $ (16) | | $ 428 |
| 33 | 1055 Dean LLC | 100% | $ 5,193 | $ 3,385 | $ 1,808 | $ 1,808 | $ - | | $ 1,808 |
| 34 | 378 Lewis LLC | 100% | $ 5,094 | $ 2,921 | $ 2,173 | $ 2,173 | $ - | | $ 2,173 |
| 35 | 236 Meserole LLC | 50% | $ 5,049 | $ 3,174 | $ 1,875 | $ 938 | $ (10) | | $ 928 |
| 36 | 277 Classon LLC | 100% | $ 4,949 | $ 3,288 | $ 1,661 | $ 1,661 | $ (7) | | $ 1,661 |
| 37 | 574 Broadway LLC | 50% | $ 4,871 | $ 3,268 | $ 1,603 | $ 801 | $ (7) | | $ 794 |
| 38 | 259 Evergreen Realty LLC | 100% | $ 4,776 | $ 2,834 | $ 1,941 | $ 1,941 | $ (971) | [G] | $ 971 |
| 39 | 716 Jefferson Ave LLC | 50% | $ 4,642 | $ 2,871 | $ 1,771 | $ 886 | $ (27) | | $ 859 |
| 40 | 161 Meserole LLC | 50% | $ 4,485 | $ 3,342 | $ 1,143 | $ 571 | $ (5) | | $ 567 |
| 41 | 79 South 6th Street LLC | 50% | $ 4,509 | $ 2,482 | $ 2,027 | $ 1,014 | $ (4) | | $ 1,010 |
| 42 | 28 Wilson LLC | 50% | $ 4,271 | $ 3,272 | $ 998 | $ 499 | $ (16) | | $ 483 |
| 43 | 506 Dekalb LLC | 100% | $ 4,210 | $ 2,324 | $ 1,886 | $ 1,886 | $ - | | $ 1,886 |
| 44 | 132A Stanhope LLC | 17% | $ 4,156 | $ 3,073 | $ 1,084 | $ 184 | $ - | | $ 184 |
| 45 | Bedford Living, LLC | 50% | $ 4,126 | $ 2,737 | $ 1,389 | $ 695 | $ (9) | | $ 685 |
| 46 | 273 Driggs LLC | 50% | $ 4,102 | $ 2,497 | $ 1,605 | $ 802 | $ (9) | | $ 794 |
| 47 | 679 - 681 Classon Avenue LLC | 50% | $ 4,079 | $ 2,969 | $ 1,110 | $ 555 | $ (24) | | $ 531 |
| 48 | 274 Jefferson LLC | 50% | $ 3,998 | $ 2,120 | $ 1,879 | $ 939 | $ (19) | | $ 920 |

| | Name | All Year Holdings % | Total Assets | Total Liabilities | Total Equity | UNADJUSTED AYH Equity (See Note [B]) | Adjustments and Provisions | Notes | ADJUSTED AYH Equity |
|---|---|---|---|---|---|---|---|---|---|
| 49 | 1088 Bedford Ave LLC | 50% | $ 3,896 | $ 2,621 | $ 1,275 | $ 638 | $ (38) | | $ 599 |
| 50 | 311 Melrose LLC | 100% | $ 3,805 | $ 2,977 | $ 828 | $ 828 | $ - | | $ 828 |
| 51 | 69 Stockholm Street LLC | 50% | $ 3,778 | $ 2,651 | $ 1,126 | $ 563 | $ (35) | | $ 528 |
| 52 | 307 Devoe LLC | 100% | $ 3,714 | $ 2,233 | $ 1,481 | $ 1,481 | $ (741) | [G] | $ 741 |
| 53 | 198 Scholes LLC | 65% | $ 3,614 | $ 2,793 | $ 821 | $ 534 | $ (15) | | $ 519 |
| 54 | West Tremont Housing LLC | 100% | $ 3,640 | $ 2,901 | $ 740 | $ 740 | $ - | | $ 740 |
| 55 | 305 Grand LLC | 50% | $ 3,542 | $ 2,636 | $ 907 | $ 453 | $ (22) | | $ 431 |
| 56 | 254 Palmetto Street LLC | 100% | $ 3,349 | $ 3,024 | $ 324 | $ 324 | $ - | | $ 324 |
| 57 | Y & M Management LLC | 75% | $ 3,374 | $ 2,110 | $ 1,264 | $ 948 | $ (114) | [G] | $ 834 |
| 58 | 694 Franklin Avenue LLC | 50% | $ 3,475 | $ 1,627 | $ 1,847 | $ 924 | $ (5) | | $ 919 |
| 59 | Ralph & Ralph Properties LLC | 50% | $ 3,435 | $ 1,256 | $ 2,178 | $ 1,089 | $ - | | $ 1,089 |
| 60 | 54 Lewis LLC | 100% | $ 3,283 | $ 2,504 | $ 779 | $ 779 | $ - | | $ 779 |
| 61 | 71 Wilson LLC | 50% | $ 3,210 | $ 2,171 | $ 1,038 | $ 519 | $ - | | $ 519 |
| 62 | 1012 Willoughby Avenue LLC | 50% | $ 3,176 | $ 2,078 | $ 1,098 | $ 549 | $ - | | $ 549 |
| 63 | 1361 Greene LLC | 50% | $ 3,218 | $ 1,976 | $ 1,243 | $ 621 | $ (24) | | $ 597 |
| 64 | 145 Driggs LLC | 50% | $ 3,244 | $ 3,121 | $ 123 | $ 61 | $ (22) | | $ 39 |
| 65 | The Henrica Group LLC | 100% | $ 3,133 | $ 2,311 | $ 822 | $ 822 | $ - | | $ 822 |
| 66 | 163 Troutman Realty LLC | 100% | $ 3,067 | $ 2,406 | $ 660 | $ 660 | $ - | | $ 660 |
| 67 | 360 Decatur LLC | 66.7% | $ 3,160 | $ 1,828 | $ 1,332 | $ 888 | $ (49) | | $ 839 |
| 68 | 222 Stanhope II LLC | 50% | $ 3,103 | $ 1,525 | $ 1,578 | $ 789 | $ (19) | | $ 770 |
| 69 | 1221 Atlantic Avenue LLC | 100% | $ 3,077 | $ 1,881 | $ 1,195 | $ 1,195 | $ - | | $ 1,195 |
| 70 | 48 Wilson LLC | 50% | $ 3,023 | $ 2,099 | $ 924 | $ 462 | $ (15) | | $ 447 |
| 71 | 238 Troutman LLC | 75% | $ 3,016 | $ 1,976 | $ 1,041 | $ 780 | $ - | | $ 780 |
| 72 | 226 Troutman LLC | 50% | $ 3,052 | $ 2,039 | $ 1,013 | $ 506 | $ (22) | | $ 484 |
| 73 | 233 Jefferson LLC | 100% | $ 2,983 | $ 2,029 | $ 954 | $ 954 | $ - | | $ 954 |
| 74 | 283 Nostrand Ave Realty LLC | 50% | $ 2,966 | $ 2,000 | $ 966 | $ 483 | $ (19) | | $ 464 |
| 75 | WWW 888 Realty Inc. | 100% | $ 2,957 | $ 2,000 | $ 957 | $ 957 | $ - | | $ 957 |
| 76 | 247 Troutman LLC | 50% | $ 2,957 | $ 2,085 | $ 871 | $ 436 | $ - | | $ 436 |
| 77 | 165 Central Avenue Realty LLC | 50% | $ 2,943 | $ 2,354 | $ 590 | $ 295 | $ (12) | | $ 283 |
| 78 | 242 Troutman LLC | 75% | $ 2,958 | $ 2,058 | $ 900 | $ 675 | $ - | | $ 675 |
| 79 | 30 Driggs LLC | 50% | $ 2,936 | $ 2,038 | $ 898 | $ 449 | $ (21) | | $ 428 |
| 80 | 231 Jefferson LLC | 100% | $ 2,918 | $ 2,038 | $ 880 | $ 880 | $ - | | $ 880 |
| 81 | 1358 Dekalb LLC | 50% | $ 2,903 | $ 2,020 | $ 883 | $ 441 | $ - | | $ 441 |
| 82 | Lavan Equities LLC | 50% | $ 2,941 | $ 1,866 | $ 1,075 | $ 538 | $ (12) | | $ 526 |
| 83 | 239 Troutman LLC | 50% | $ 2,963 | $ 2,063 | $ 899 | $ 450 | $ (15) | | $ 435 |
| 84 | 1420 Putnam Avenue LLC | 100% | $ 2,904 | $ 2,260 | $ 644 | $ 644 | $ - | | $ 644 |
| 85 | 1418 Putnam Avenue LLC | 100% | $ 2,800 | $ 2,058 | $ 742 | $ 742 | $ - | | $ 742 |
| 86 | Harman Towers LLC | 50% | $ 2,810 | $ 1,247 | $ 1,563 | $ 782 | $ - | | $ 782 |
| 87 | Dodworth Enterprise LLC | 60% | $ 2,729 | $ 1,528 | $ 1,201 | $ 721 | $ - | | $ 721 |
| 88 | 170 Knickerbocker LLC | 50% | $ 2,681 | $ 27 | $ 2,653 | $ 1,327 | $ (1) | | $ 1,326 |
| 89 | Grove Palace LLC | 100% | $ 2,690 | $ 2,026 | $ 664 | $ 664 | $ - | | $ 664 |
| 90 | 192 BSD Realty LLC | 50% | $ 2,673 | $ 1,813 | $ 860 | $ 430 | $ (8) | | $ 422 |
| 91 | 697 Prospect Pl LLC | 100% | $ 2,592 | $ 1,702 | $ 890 | $ 890 | $ - | | $ 890 |
| 92 | 401 Suydam St LLC | 50% | $ 2,550 | $ 1,920 | $ 629 | $ 315 | $ (10) | | $ 305 |
| 93 | 166 Harman Realty LLC | 100% | $ 2,558 | $ 1,818 | $ 740 | $ 740 | $ - | | $ 740 |
| 94 | 1044 Flushing Avenue LLC | 100% | $ 2,450 | $ 1,599 | $ 852 | $ 852 | $ - | | $ 852 |
| 95 | 215 Himrod LLC | 50% | $ 2,463 | $ 1,748 | $ 715 | $ 357 | $ (25) | | $ 332 |
| 96 | The Troutman Residence LLC | 100% | $ 2,372 | $ 1,790 | $ 583 | $ 583 | $ - | | $ 583 |
| 97 | 273 Skillman St LLC | 100% | $ 2,132 | $ 1,123 | $ 1,010 | $ 1,010 | $ - | | $ 1,010 |
| 98 | 136 Kingsland LLC | 50% | $ 2,093 | $ 1,371 | $ 722 | $ 361 | $ (30) | | $ 331 |

| | Name | All Year Holdings % | Total Assets | Total Liabilities | Total Equity | UNADJUSTED AYH Equity (See Note [B]) | Adjustments and Provisions | Notes | ADJUSTED AYH Equity |
|---|---|---|---|---|---|---|---|---|---|
| 99 | 3609 15th Avenue LLC | 100% | $ 2,069 | $ 1,316 | $ 753 | $ 753 | $ - | | $ 753 |
| 100 | 90 Wilson LLC | 100% | $ 1,985 | $ 1,330 | $ 655 | $ 655 | $ - | | $ 655 |
| 101 | 1136 Willoughby LLC | 100% | $ 1,992 | $ 1,458 | $ 535 | $ 535 | $ - | | $ 535 |
| 102 | 199 Weirfield LLC | 50% | $ 1,897 | $ 1,185 | $ 712 | $ 356 | $ - | | $ 356 |
| 103 | 3611 15th Avenue LLC | 50% | $ 1,887 | $ 1,238 | $ 649 | $ 324 | $ - | | $ 324 |
| 104 | Gunther Apartment Corp | 100% | $ 1,617 | $ 1,036 | $ 581 | $ 581 | $ - | | $ 581 |
| 105 | 300 Troutman LLC | 90% | $ 1,462 | $ 1,041 | $ 421 | $ 379 | $ (3) | | $ 376 |
| 106 | 161 Troutman LLC | 50% | $ 1,306 | $ 770 | $ 536 | $ 268 | $ (5) | | $ 263 |
| 107 | 189 Menahan LLC | 66.6% | $ 1,232 | $ 931 | $ 301 | $ 200 | $ (6) | | $ 194 |
| 108 | The William Vale | 50.0% | $ 158,300 | $ 168,553 | $ (10,253) | $ (5,127) | $ 5,127 | | $ - |
| | Property Encumbrances | | | $ 20,086 | $ (20,086) | $ (20,086) | $ - | [A] | $ (20,086) |
| | **Total** | | $ 933,057 | $ 733,969 | $ 199,087 | $ 75,503 | $ 14,067 | | $ 89,570 |

**Notes**

[A] Various non-debtor subsidiaries of the Debtor are defendants in two lawsuits in which the respective plaintiffs, Good Light Funding LLC and DW Brooklyn 75 LLC, have asserted monetary claims totaling $20,085,567 against the subsidiaries (such obligations, the "Good Light Funding Obligation" and the Werner Deposit Obligation"). In addition, both plaintiffs have filed lis pendens' against 74 of the properties indirectly owned by the Debtor.

[B] The equity balances of the noted properties include preferred equity amounts as listed below. Preferred equity is held by third parties, and represents a reduction in equity allocable to the Debtor.

Spencer Albee Equities LLC - $36,556,000

The North Flats LLC - $31,974,000

268 Metropolitan LLC - $3,569,000 (This amount is alleged by a partner and is disputed by the Debtor. Litigation regarding this matter is ongoing.)

[C] Adjustment of $7,879,000 to AYH Equity in The North Flats LLC relates to a liability on the North Flats LLC's books for amounts loaned to the entity by the Debtor.

[D] The Debtor is currently in litigation with a third party over the ownership of 533 Knickerbocker LLC & Knickerbocker St Holdings LLC. The third party contends that it is a 25% shareholder in the property. Depending on the outcome of litigation, AYH equity in the property may be reduced.

[E] The equity value of 648 Myrtle has been discounted to account for a tenancy dispute affecting the ongoing profitability of two of the units.

[F] Due to ongoing litigation with its lender regarding default interest, the equity in 65 Kent was discounted by $500,000.

[G] At management's discretion, the equity value of these properties have been reduced to reflect potential reduction in ownership percentage as a result of information obtained by the Debtor.

**Exhibit D-3**

**Five Year Operating Plan**

**All Year Holdings**
**Five Year Operating Plan**

**Report Date: May 26, 2022**

The Five Year Operating Plan (the "Operating Plan") was prepared by the Debtor's management with the assistance of the Debtor's retained Financial Advisors, and is based on the material assumptions set forth below. The Operating Plan reflects, to the best of the Debtor's knowledge, information and belief, the expected results of operations and cash flows of the Debtor for the applicable periods. Accordingly, this Operating Plan reflects the Debtor's reasonable judgment and estimation as of the date hereof of expected future operating conditions and future business decisions, which are subject to change.

The Debtor has no obligation to revise the Operating Plan to reflect circumstances existing after the date of this report or to reflect the occurrence of unanticipated events. The Debtor assumes no responsibility to advise any parties who rely on the projections included in  the Operating Plan regarding any subsequent changes or otherwise.

The Five Year Operating Analysis is intended to satisfy certain disclosure requirements under applicable Israeli law.

Disclaimer

**All Year Holdings**
**Assumptions**

**General Assumptions:**

1. The Operating Plan assumes that instead of pursuing the transactions contemplated under the Investment Agreement, the Noteholders and other unsecured creditors convert their debt into equity and continue to operate the Debtor under its current management over the five years ending September 30, 2027 (the "Operating Period").

2. At the conclusion of the Operating Period, the Operating Plan assumes that the Debtor effectuates a sale of the existing real estate properties held by its non-debtor subsidiaries (the "Asset Sale"). All proceeds net of outstanding debt obligations would be distributed to creditors.

3. The Operating Plan assumes that the property level mortgage loans remain outstanding under their terms and are in good standing. Obligations are based on management's estimate.

**Operating Assumptions:**

4. <u>Property Profile</u>- The Operating Plan assumes that with the exception of the immediate disposition of Albee Square, property count remains constant, with no acquisitions or dispositions occurring until the conclusion of the Operating Period.

5. <u>Portfolio Management</u>- The Operating Plan assumes that the Debtor receives pro rata annual distributions of positive net cash flow and provides pro rata funding to support cash flow deficits based on its share of ownership. With the exception of 892 Myrtle Avenue, 259 Evergreen Avenue, and 307 Devoe Street, ownership percentages are based on the Debtor's last reported  financial statements.  An asset management fee equal to 2% of effective gross income of the entire portfolio is included in the Debtor's corporate operating expenses. Portfolio performance is based on current operating results, including a 5% vacancy factor and 100% collections, with operating income and expense escalations each year. The Operating Plan does not take into account the effects of amortization, rate resetting, or refinancing of  underlying mortgage loans. All figures are presented on an accrual basis.

6. <u>Corporate Expenses</u>- The Operating Plan assumes that the Debtor will incur ongoing corporate operating expenses as part of the management of the portfolio. These include personnel costs at 50% of the current run rate, rent expense, as well as various insurance and other expenses.

7. <u>Line of Credit</u>- In order to fund operating shortfalls and various administrative claims outstanding at September 30, 2022, the Operating Plan assumes that the Debtor obtains an unsecured revolving line of credit at an annual interest rate of 15%. Interest on this loan is assumed to accumulate throughout the Operating Period. Any available net cash flow from operations is assumed to be applied to the outstanding loan balance, with the remaining balance at September 30, 2027 to be paid off from the proceeds of the Asset Sale.

8. <u>Grand Living II LLC Settlement Receivable</u> – Anticipated proceeds resulting from the consensual multiparty agreement dated August 30, 2021 in connection with the MY 2011 Grand LLC, et al. Chapter 11 case (No. 19-23957 (RDD)). The Operating Plan assumes that proceeds are collected in the year ending September 30, 2023.

Assumptions

**All Year Holdings**
**Assumptions**

9. <u>Werner/Good Light Funding Settlement</u>- Various non-debtor subsidiaries of the Debtor are defendants in two lawsuits in which the respective plaintiffs, Good Light Funding LLC and DW Brooklyn 75 LLC, have asserted monetary claims against the subsidiaries (such obligations, the "Good Light Funding Obligation" and the Werner Deposit Obligation").  In addition, both plaintiffs have filed lis pendens' against 74 of the properties indirectly owned by the Debtor. The Operating Plan assumes that these obligations are satisfied in the year ending September 30, 2023.

10. <u>DIP Loan</u>- The balance of the DIP Loan on September 30, 2022 is anticipated to be $4,500,000, as set forth in the DIP budget filed with the Court  on May 5, 2022. The Operating Plan assumes that the balance of the DIP Loan is paid off at the onset of the Operating Period.

**Asset Sale Assumptions:**

11. <u>Valuation</u>- The sale prices of the Debtor's properties have been estimated based on capitalization rates unique to each property. These rates were based on the 'Estimated OAR' rates as of December 31, 2021 as provided by Level Valuation in their appraisal report dated April 25, 2022. In aggregate, the portfolio is valued at a 5.25% capitalization rate.

12. <u>Net Proceeds</u>- Net proceeds from the Asset Sale has been presented net of underlying debt and preferred equity obligations and sale related expenses, including broker fees ($12.1M-$13.13M), transfer taxes ($19.8M-$21.6M), and other selling expenses ($6.1M-$6.6M).

13. <u>Other Considerations</u>-  For purposes of the Operating Plan, the Debtor did not apply any additional discounts to account for lack of control and/or minority ownership interests, which, if applied, would further reduce recoveries. In addition, future cash flows are shown in actual dollars and have not been discounted to present values.

**All Year Holdings**
**Projected Operating Statements**

| | | | 12 Months Ended | | | |
|---|---|---|---|---|---|---|
| | Year 1 9/30/2023 | Year 2 9/30/2024 | Year 3 9/30/2025 | Year 4 9/30/2026 | Year 5 9/30/2027 | Total |
| NET SUBSIDIARY DISTRIBUTIONS | $ (1,238,538) | $ 2,650,712 | $ 3,147,345 | $ 3,658,214 | $ 4,183,739 | $ 12,401,471 |
| | | | | | | |
| CORPORATE EXPENSES: | | | | | | |
| PERSONNEL | 1,084,268 | 1,105,953 | 1,128,072 | 1,150,634 | 1,173,646 | 5,642,574 |
| ASSET MANAGEMENT FEE | 839,984 | 851,558 | 871,866 | 892,715 | 914,123 | 4,370,246 |
| RENT AND OFFICE | 60,000 | 61,200 | 62,424 | 63,672 | 64,946 | 312,242 |
| INSURANCE | 324,000 | 330,480 | 337,090 | 343,831 | 350,708 | 1,686,109 |
| OTHER | 600,000 | 612,000 | 624,240 | 636,725 | 649,459 | 3,122,424 |
| TOTAL CORPORATE/WAREHOUSE EXPENSES | 2,908,252 | 2,961,192 | 3,023,691 | 3,087,578 | 3,152,883 | 15,133,596 |
| | | | | | | |
| INCOME/(LOSS) FROM OPERATIONS | (4,146,790) | (310,480) | 123,653 | 570,636 | 1,030,856 | (2,732,125) |
| INTEREST EXPENSE (CREDIT LINE) | 4,245,000 | 4,612,500 | 5,370,000 | 6,187,500 | 7,065,000 | 27,480,000 |
| | | | | | | |
| NET LOSS | $ (8,391,790) | $ (4,922,980) | $ (5,246,347) | $ (5,616,864) | $ (6,034,144) | $ (30,212,125) |

**All Year Holdings**
**Net Equity Value**

| | Year 1 9/30/2023 | Year 2 9/30/2024 | Year 3 9/30/2025 | Year 4 9/30/2026 | Year 5 9/30/2027 |
|---|---|---|---|---|---|
| Portfolio Valuation | $ 609,918,739 | $ 617,277,754 | $ 632,537,446 | $ 648,225,623 | $ 664,354,881 |
| Less: | | | | | |
| Outstanding Mortgage/Preferred Equity | (405,885,021) | (405,885,021) | (405,885,021) | (405,885,021) | (405,885,021) |
| Selling Costs | (38,119,921) | (38,579,860) | (39,533,590) | (40,514,101) | (41,522,180) |
| Net Proceeds | 165,913,797 | 172,812,874 | 187,118,835 | 201,826,501 | 216,947,680 |
| Capital Account Adjustments | (11,126,623) | (11,126,623) | (11,126,623) | (11,126,623) | (11,126,623) |
| Proceeds Available for Distribution | $ 154,787,174 | $ 161,686,251 | $ 175,992,212 | $ 190,699,878 | $ 205,821,057 |
| Net AYH Share of Proceeds | $ 88,010,128 | $ 92,402,886 | $ 101,183,215 | $ 110,214,954 | $ 119,505,536 |
| Available Cash Balance | 331,760 | 308,780 | 262,434 | 345,570 | 311,425 |
| Beginning Loan Balance | - | 28,300,000 | 33,200,000 | 38,400,000 | 44,100,000 |
| Line of Credit Draw | 24,055,000 | 287,500 | - | - | - |
| Interest Accrual | 4,245,000 | 4,612,500 | 5,370,000 | 6,187,500 | 7,065,000 |
| Line of Credit Payoff | - | - | (170,000) | (487,500) | (1,065,000) |
| Outstanding Line of Credit Balance | 28,300,000 | 33,200,000 | 38,400,000 | 44,100,000 | 50,100,000 |
| Net Equity Available for Distribution | $ 60,041,888 | $ 59,511,667 | $ 63,045,649 | $ 66,460,524 | $ 69,716,961 |

**All Year Holdings**
**Sources and Uses**

| | Year 1 9/30/2023 | Year 2 9/30/2024 | Year 3 9/30/2025 | Year 4 9/30/2026 | Year 5 9/30/2027 | Total | Asset Sale 9/30/2027 |
|---|---|---|---|---|---|---|---|
| | | | 12 Months Ended | | | | |
| **Cash Sources:** | | | | | | | |
| Income From Operations | $ - | $ - | $ 123,653 | $ 570,636 | $ 1,030,856 | $ 1,725,145 | $ - |
| Line of Credit Draw | 24,055,000 | 287,500 | - | - | - | 24,342,500 | - |
| Grand Living II LLC Settlement | 5,227,000 | - | - | - | - | 5,227,000 | - |
| Net Working Capital Provided | - | 22,980 | 46,347 | - | 34,144 | 103,471 | 311,425 |
| Asset Sale Proceeds | - | - | - | - | - | - | 119,505,536 |
| **Total Cash Sources** | $ 29,282,000 | $ 310,480 | $ 170,000 | $ 570,636 | $ 1,065,000 | $ 31,398,116 | $ 119,816,961 |
| | | | | | | | |
| **Cash Uses:** | | | | | | | |
| Loss From Operations | $ (4,146,790) | $ (310,480) | $ - | $ - | $ - | $ (4,457,270) | $ - |
| Werner/Good Light Funding Settlement | (20,000,000) | - | - | - | - | (20,000,000) | - |
| DIP Loan Payoff | (4,500,000) | - | - | - | - | (4,500,000) | - |
| Line of Credit Payoff | - | - | (170,000) | (487,500) | (1,065,000) | (1,722,500) | (50,100,000) |
| Net Working Capital Used | (635,210) | - | - | (83,136) | - | (718,346) | - |
| Net Equity Available for Distribution | - | - | - | - | - | - | (69,716,961) |
| **Total Cash Uses** | $ (29,282,000) | $ (310,480) | $ (170,000) | $ (570,636) | $ (1,065,000) | $ (31,398,116) | $ (119,816,961) |

| | |
|---|---|
| **Net Equity Available for Distribution** | $ 69,716,961 |

## **Exhibit E**

**Appraisal Reports**

**<u>Exhibit E-1</u>**

**LV Appraisal Report**

# LEVELVALUATION

244 5th Avenue, Suite E82, New York, NY 10001   |   www.levelvaluation.com

**Appraisal Report**

## 106 Properties Owned by All Year Holdings Limited

As of December 31, 2021

**PREPARED FOR:**

Assaf Ravid
All Year Holdings Limited
199 Lee Avenue
Brooklyn, NY 11211

**PORTFOLIO LOCATION MAP**



**REPRESENTATIVE PHOTOS - CERTAIN SUBJECT PROPERTIES IN THE PORTFOLIO**



132 Havemeyer Street



160 Havemeyer Street



271 Metropolitan Avenue



381 Metropolitan Avenue



65 Kent Avenue



574 Broadway

# LEVELVALUATION

Level Valuation LLC
244 5th Avenue, Suite E82
New York, NY 10001
C 917-885-4419
O 646-929-3893
lev@levelvaluation.com

April 25, 2022

Assaf Ravid
All Year Holdings Limited
199 Lee Avenue
Brooklyn, NY 11211

Dear Mr. Ravid,

Level Valuation provided valuation services (the "Services") to All Year Holdings Limited ("Client"). Pursuant to our engagement agreement dated February 17, 2022, Level Valuation estimated fair values for the (106) properties (collectively, the "Portfolio") owned by All Year Holdings Limited as of December 31, 2021 (the "Effective Date") strictly for financial reporting purposes in accordance with the International Financial Reporting Standards (IFRS). The individual property listing is provided in the data-tape provided by Level Valuation to the Client (please refer to Addendum B) and together with the supporting analyses (please refer to Addendum C) for each property are saved in an agreed upon Dropbox folder – both, the data-tape and the supporting analyses for each property, are an integral part of this appraisal report.

This appraisal report documents the results of our analyses. The date as of which our analyses shall apply is December 31, 2021, with the date of report being April 25, 2022. **It should be noted that to fully understand our estimates herein, one needs to review the supporting documentation for each property within the Portfolio which was saved in an agreed upon Dropbox folder (as an Addendum C) and is an integral part of this appraisal report.**

This is an appraisal report prepared according to reporting guidelines as contained in the Uniform Standards of Professional Appraisal Practice (USPAP), Standard Rule 2-2(a). This appraisal has been conducted to conform to USPAP as promulgated by the Appraisal Foundation and the Code of Professional Ethics of the Appraisal Institute. The report lists our assumptions and describes the limiting conditions under which our analysis has been made.

This appraisal is performed **strictly** for financial reporting purposes in accordance with IFRS 13, *Fair Value Measurement* and IAS 40, *Investment Property*. This appraisal has been conducted to conform to USPAP as promulgated by the Appraisal Foundation and the Code of Professional Ethics of the Appraisal Institute.

Level Valuation understands that its fair value estimates for the properties within the Portfolio are to be used to aid All Year Holdings Limited to provide a basis for the Client's reporting / disclosure obligations regarding the fair value estimates for the properties including as regarding the Courts (defined later within this report) and the Tel Aviv Stock exchange. Level Valuation gives full consent to the inclusion of the appraisal report in its **entirety** (with all of the supporting schedules) within the Court filings.

April 25, 2022
Mr. Ravid
Page 2

Based upon our analyses, and subject to the assumptions and limiting conditions described in the accompanying report, it is our opinion that the fair value of the Portfolio, as of the Effective Date was:

| All Year Holdings Limited - Fair Value Summary | | | |
|---|---|---|---|
| Neighborhood | Number of Properties | Fair Value as of 4Q 2021 | % Composition by Neighborhood |
| Bedford Stuyvesant | 17 | $64,580,000 | 12% |
| Borough Park | 2 | $3,830,000 | 1% |
| Bushwick | 43 | $137,490,000 | 27% |
| Crown Heights | 18 | $105,140,000 | 20% |
| East Williamsburg | 5 | $18,590,000 | 4% |
| Greenpoint | 3 | $10,090,000 | 2% |
| Ridgewood | 1 | $6,390,000 | 1% |
| Williamsburg | 17 | $171,600,000 | 33% |
| **TOTAL** | **106** | **$517,710,000** | **100%** |

Please refer to the data-tape and the supporting schedules provided by Level Valuation to the Client and saved in an agreed upon Dropbox folder as supporting documentation prepared by Level Valuation which led to the individual fair value estimates for the subject properties which totaled to the Portfolio figure listed above.

The above estimates are subject to the Certification, and Assumptions and Limiting Conditions presented later in this report.

April 25, 2022
Mr. Ravid
Page 3

**In addition, we made the following specific assumptions as part of this appraisal assignment:**

- We were provided with rent rolls for the properties within the Portfolio in excel. We assumed that information in the rent rolls can be tied to signed leases (apartment and commercial units). We also assumed that the unit count and bedroom count information listed in the rent rolls or provided separately by the Client are complete and accurate. We also relied on the occupancy and payment status information provided by the Client for both apartment and commercial units.

- We were provided with historical operating statements for the properties within the Portfolio in excel. We assumed that historical operating information is complete and accurate.

- Certain properties within the Portfolio have units which are rent regulated. We assumed that those units comply with all Division of Housing & Community Renewal (DHCR) requirements or whatever the applicable regulatory program they are subject to.

- Certain properties within the Portfolio have violations from the NYC Building Department. While this is typical for buildings in New York City, we assumed that all violations from the Building Department will be cleared and will not impact the operations of the subject properties within the Portfolio.

- Reportedly, there is litigation with tenants on certain units within the Portfolio. We assumed that the cost to resolve the litigation is not material and is part of normal business practice for such a portfolio.

- We performed a site visit to all the properties within the Portfolio (either as part of the current appraisal assignment or prior appraisal assignments involving the properties within the Portfolio). During our visit we visited certain units (residential and commercial, if applicable) and certain common areas. We assumed that all of the other areas which we did not visit are in similar condition to the areas which we did visit.

- There are duplex units at some properties within the Portfolio which include finished basement. We understand that finished basement space is not legally livable space; however, this space does generate income and our research shows that market participants would give credit to the income generated from this space.

- There are mezzanine units at some properties within the Portfolio. We understand that mezzanine space might not be legally livable space; however, this space does generate income and our research shows that market participants would give credit to the income generated from this space.

- We have made a best effort to identify and list herein all of the information provided by the Client which was relied upon by Level Valuation. There might have been information provided by the Client which was relied upon by Level Valuation which is not listed herein. In general, we relied on all information provided by the Client and did not in any way independently verify that information.

**If any of the specific assumptions listed above prove false, our fair value estimates will likely change.**

April 25, 2022
Mr. Ravid
Page 4

The accompanying prospective financial analyses are based on estimates and assumptions developed in connection with the appraisal. However, some assumptions inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our prospective financial analyses will vary from our estimates and the variations may be material.

This report, the final estimates of value and the prospective financial analyses are intended solely for your information and assistance for the function stated above, and should not be relied upon for any other purpose.  Neither our report nor any of its contents nor any reference to the appraisers or our firm, may be included or quoted in any document, offering circular or registration statement, prospectus, sales brochure, other appraisal, loan or other agreement without Level Valuation's prior written approval of the form and context in which it will appear. Level Valuation appreciates this opportunity to be of service to you. If you have any questions or comments about this report, please do not hesitate to call us.

Respectfully submitted,

**LEVEL VALUATION LLC**

Lev Yagudayev, MAI
244 5th Avenue, Suite E82
New York, NY 10001
646.929.3893
lev@levelvaluation.com

NY General Real Estate Appraiser
License Number: 46000044217
Expiration: March 6, 2023

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ .9

AREA ANALYSIS ..................................................................................................................... 12

MARKET ANALYSIS .............................................................................................................. 35

RENT-REGULATED PROPERTIES ....................................................................................... 55

HIGHEST AND BEST USE ...................................................................................................... 65

VALUATION METHODOLOGY ............................................................................................. 66

CONCLUSION ........................................................................................................................ ..74

CERTIFICATION ..................................................................................................................... 75

Addendum A – Assumptions and Limiting Conditions
Addendum B – Data-tape (in excel format saved in Dropbox)
Addendum C – Supporting analyses for each subject property (in PDF format saved in Dropbox)
Addendum D – Comparable sale write-ups for each category (in PDF format saved in Dropbox)
Addendum E – Liquidation Analysis
Addendum F – Qualifications / License

# INTRODUCTION

## PROPERTY IDENTIFICATION

The properties within the Portfolio are located in Brooklyn (with the exception of 335-337 St. Nicholas Avenue), one of the Boroughs within New York City. Most of the properties are located in Bushwick, Williamsburg/East Williamsburg, Crown Heights and Bedford Stuyvesant, as can be seen in the following table.

| All Year Holdings Limited - Neighborhood Concentration ||
|---|---|
| Neighborhood | Number of Properties |
| Bushwick | 43 |
| Crown Heights | 18 |
| Williamsburg | 17 |
| Bedford Stuyvesant | 17 |
| East Williamsburg | 5 |
| Greenpoint | 3 |
| Borough Park | 2 |
| Ridgewood, Queens | 1 |
| **TOTAL** | **106** |

The properties within the Portfolio include multi-family and mixed-use (multi-family and commercial) buildings. Most of the apartment units are at market; however, a portion of the Portfolio is subject to some sort of rent regulation, as summarized in the table below.

| All Year Holdings Limited - Categories ||
|---|---|
| Property Type | Number of Properties |
| Multi-family, Market Units, Renovated and Recent Construction | 62 |
| Multi-family, Mostly Market Units, Renovated | 14 |
| Multi-family, Regulated Units, Renovated | 7 |
| Mixed-Use, Market Units, Renovated | 13 |
| Mixed-Use, Regulated Units, Renovated | 10 |
| **TOTAL** | **106** |

More than half of the Portfolio consists of multi-family buildings with market rate units. These range from small, 3 to 4 unit buildings to 23-25-unit buildings, with a large concentration of renovated and recently built 6 to 8-unit walk up buildings. Mixed-use building include storefronts on the ground floor.

As will be described later in this report, as part of our analysis we classified the properties within the Portfolio into ten categories, with each category having its own set of comparable transactions (the comparable transactions are presented in Addendum D).

The properties within the Portfolio are considered to be of average condition.

Specific information about the properties within the Portfolio is presented in the supporting schedules which were provided by Level Valuation to the Client and saved in an agreed upon Dropbox folder.

### PROPERTY OWNERSHIP

Certain information relating to the ownership history of the properties within the Portfolio is presented in the supporting schedules which were provided by Level Valuation to the Client and saved in an agreed upon Dropbox folder.

To the best of our knowledge, none of the properties are currently being marketed for sale (directly / on an individual basis).

### SCOPE OF WORK

The objective of this appraisal is to estimate the fair value of the properties within the Portfolio as of the Effective Date. In preparing this appraisal, we performed the following:

- Visited and toured the properties within the Portfolio (either as part of the current appraisal assignment or prior appraisal assignments involving the properties within the Portfolio) and the comparable properties (when applicable);
- Reviewed documentation provided by the Client, including rent rolls, operating statements, leases (both commercial and residential), etc.;
- Researched regional and local social and economic data;
- Researched regional and local real estate market data;
- Reviewed subject property related data, including site dimensions and size, zoning, real estate taxes, easements, city utilities, etc.;
- Performed a highest and best use analysis for each property within the Portfolio;
- Determined the applicable approaches to estimate the fair value of each property within the Portfolio, and performed associated analyses;
- Determined reasonable exposure time associated with the concluded fair values for each property within the Portfolio.

### DEFINITION OF VALUE

For financial reporting purposes, the type of value is fair value. Fair value is defined by IFRS 13, *Fair Value Measurement*, as the "price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date".

**INTEREST APPRAISED**

Interests appraised for the properties within the Portfolio are presented in the supporting schedules which were provided by Level Valuation to the Client and saved in an agreed upon Dropbox folder.

According to the Sixth Edition of the *Dictionary of Real Estate Appraisal*, fee simple interest is defined as the "absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."

According to the Sixth Edition of the *Dictionary of Real Estate Appraisal*, leased fee interest is defined as the "ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires".

**PURPOSE AND INTENDED USE OF THE REPORT**

As stated in the engagement agreement dated February 17, 2022, between Level Valuation LLC and All Year Holdings Limited (the "Client"), Services and Level Valuation's work product is to provide a basis for the Client's reporting / disclosure obligations regarding the fair value estimates for the properties within the Portfolio including as regarding the Courts (defined below) and the Tel Aviv Stock exchange.

Level Valuation gives full consent to the inclusion of the appraisal report in its **entirety** (with all of the supporting schedules) within the Court filings

No other use is intended or should be inferred.

**INTENDED USER**

The Client is the sole intended user of Level Valuation's work product. This appraisal report and its underlying data may be filed fully into various pleadings and disclosures made to the bankruptcy court in New York, the BVI Court and/or the Israeli court (collectively, the "Courts") or the Tel Aviv Stock Exchange as part of a proceeding to which the Client is subject or a party. Such pleadings and disclosures will be distributed or made available to various interested parties.

Level Valuation's work product may not be made available to any other third party.

**EXTRAORDINARY ASSUMPTIONS AND HYPOTHETICAL CONDITIONS**

We did not make any extraordinary assumptions or assumed any hypothetical conditions as part of this appraisal assignment. Please refer to the list of specific assumptions made as part of this appraisal assignment, as listed earlier in this report.



# AREA ANALYSIS

## NEW YORK CITY

New York City (the "City" or "NYC"), the most populous city in the US, is located at the southern tip of the State of New York. The City is the center of the New York metropolitan area, which is one of the most populous urban clusters in the world. Being a global center of commerce, finance, media, art, fashion, research, technology, education, and entertainment, the City is considered as one of the world's most powerful metropolitans.

Dutch settlers first came to the City in 1624 and founded New Amsterdam in Lower Manhattan. The British seized the City in 1664 and renamed it New York. Over the next century, diverse immigration from Europe and Africa grew the City's population. The City served as capital of the United States between 1785 and 1790, and remained the largest city in the country ever since.

NYC consists of five boroughs, each of which is a separate county of New York State. The five boroughs – Brooklyn, Queens, Manhattan, Bronx, and Staten Island – all previously independent cities that were consolidated into a single city in 1898 increasing its population from 2 million to almost 3.5 million people overnight. The opening of the subway in 1904 helped bind the new city together. Throughout the first half of the 20th century, the City became a world center for industry, commerce, and communication. Returning World War II veterans created a post-war economic boom and New York emerged from the war as the leading city of the world, with Wall Street leading America's place as the world's dominant economic power. The United Nations Headquarters was completed in 1952, solidifying New York's global geopolitical influence.

In the 1970s, job losses due to industrial restructuring caused NYC to suffer from economic problems and rising crime rates. While a resurgence in the financial industry greatly improved the City's economic health in the 1980s, the City's crime rate continued to increase through that decade and into the beginning of the 1990s. By the mid-1990s, crime rates started to drop dramatically due to revised police strategies, improving economic opportunities, gentrification, and the influx of new residents, both Americans and new immigrants from Asia and Latin America. Important new sectors, such as the City's high tech industry (referred to as "Silicon Alley"), emerged in the City's economy.

New York City suffered the bulk of the economic damage and largest loss of human life in the aftermath of the September 11, 2001 attacks; the twin towers of the World Trade Center were destroyed, killing 2,192 civilians, 343 firefighters, and 71 law enforcement officers. The area was rebuilt with a new One World Trade Center (the tallest skyscraper in the Western Hemisphere), a 9/11 memorial and museum, and other new buildings and infrastructure. Hurricane Sandy was a destructive storm in New York in October 2012, flooding numerous streets, tunnels, and subway lines in Lower Manhattan, as well as low-lying areas of Brooklyn, Queens, and Staten Island. Electrical power was lost in many parts of the City and its suburbs.

In March 2020, the first case of COVID-19 was confirmed in the City, leading to its lockdown. The City rapidly became the global epicenter of the pandemic during the early phase, before the infection became widespread across the world and the rest of the nation. The effect on the City's economy, which heavily relies on tourism, entertainment and trade was substantial; according to information by the New York State Department of Labor Statistics, private sector jobs in New York City fell by 560,100 over-the-year through December 2020. Losses were widespread and occurred

in leisure and hospitality (223,200), professional and business services (88,000), trade, transportation, and utilities (84,800), educational and health services (72,700), other services (31,700), financial activities (27,100), natural resources, mining, and construction (19,100), manufacturing (11,800), and information (1,700).

According to a February 2021 report published by The Center for New York City Affairs, "New York City lost 750,000 payroll and self-employed/independent contractor jobs on average between the months of February and December in 2020. The loss for the entire year was the worst single-year city job decline since the 1930s." According to 1 January 2022 report published by The Center for New York City Affairs, "as of December 2021, New York City had regained only 55 percent of the jobs lost during the first two months of the pandemic (March and April of 2020), and the total payroll employment level was still 421,000 below the February 2020 level. Nearly 82 percent of the missing jobs in the city fall in the face-to-face category of industries that have been hardest hit during the pandemic, led by accommodation and food services (still down by nearly one-third) and arts, entertainment, and recreation (19 percent jobs deficit). With deficits of 17-19 percent, construction, manufacturing, and other services are close behind."

## Population

New York's population reached 8 million people in 2000 and was reported at approximately 8.4 million people in 2020. The table below presents historical population statistics for NYC.

| Population Statistics | | | | |
|---|---|---|---|---|
| Geographic Area | 2010 Census | Current Statistics | Change (#) | Change (%) |
| Bronx | 1,384,603 | 1,418,207 | 33,604 | 2.4% |
| Brooklyn | 2,504,717 | 2,559,903 | 55,186 | 2.2% |
| Manhattan | 1,586,360 | 1,628,706 | 42,346 | 2.7% |
| Queens | 2,230,578 | 2,253,858 | 23,280 | 1.0% |
| Staten Island | 468,730 | 476,143 | 7,413 | 1.6% |
| New York City | 8,174,988 | 8,398,748 | 223,760 | 2.7% |
| New York State | 19,378,124 | 19,453,561 | 75,437 | 0.4% |
| United States | 308,758,105 | 328,239,523 | 19,481,418 | 6.3% |
| Source: U.S. Census Bureau | | | | |

Manhattan had the highest growth in population with a total increase of 2.7% over the 2010 Census. The NYC boroughs are all projected to experience moderate growth, ranging between 1.0% and 2.7% over the 2010 Census.

**Number of Households**

Number of households statistics based on census data are summarized as follows:

| Households Statistics | | |
|---|---|---|
| Geographic Area | Current Households | Current Persons per Household |
| Bronx | 499,728 | 2.79 |
| Brooklyn | 950,856 | 2.69 |
| Manhattan | 758,133 | 2.07 |
| Queens | 779,234 | 2.91 |
| Staten Island | 166,152 | 2.81 |
| New York City | 3,154,103 | 2.62 |
| New York State | 7,316,537 | 2.60 |
| United States | 119,730,128 | 2.63 |
| Source: U.S. Census Bureau | | |

As illustrated in the table above, NYC has a total of 3.1 million households with Brooklyn having the highest number households and Staten Island the lowest.

**Household Median Income**

Household median income statistics based on census data are summarized as follows:

| Household Median Income Statistics | |
| --- | --- |
| **Geographic Area** | **Current Statistics** |
| Bronx | $38,085 |
| Brooklyn | $56,015 |
| Manhattan | $82,459 |
| Queens | $64,987 |
| Staten Island | $79,267 |
| New York City | $60,762 |
| New York State | $65,323 |
| United States | $60,293 |
| Source: U.S. Census Bureau | |

As illustrated in the table above, Manhattan has the highest household income of the NYC boroughs and Bronx has the lowest.

**Housing Units**

Housing units statistics based on census data are summarized as follows:

| Housing Units Statistics | | |
|---|---|---|
| **Geographic Area** | **Current Housing Units** | **Current Owner-Occupied Housing Unit Rate** |
| Bronx | 532,487 | 19.60% |
| Brooklyn | 1,053,767 | 30.00% |
| Manhattan | 886,249 | 24.10% |
| Queens | 865,878 | 44.60% |
| Staten Island | 181,199 | 69.70% |
| New York City | 3,519,580 | 32.70% |
| New York State | 8,363,934 | 53.90% |
| United States | 138,537,078 | 63.80% |
| Source: U.S. Census Bureau | | |

As illustrated in the table above, NYC has a total of 3.5 million housing units with Brooklyn having the highest number units and Staten Island the lowest.

**Employment**

An overview of the total civilian labor force in the New York-Jersey City-White Plains, NY-NJ Metropolitan Statistical Area from 2011 through December 2021 is included in the following chart supplied by the Bureau of Labor Statistics. From December 2020 to December 2021.

When looking at the industries separately, over the past ten years Education and Health Services sector exhibited the most significant positive growth. On the other hand, the Manufacturing sector had a significant decline.

The following table presents a more detailed picture of the non-agricultural industry trends from 2011 to December 2021.

| Non-Agricultural Industry Trends: New York-Jersey City-White Plains, NY-NJ MSA | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Dec. 2020 | Dec. 2021 | Avg An. Growth: 2011 to 2021 | Avg Annual Growth: Dec-2020 to Dec-2021 |
| **NON-FARM EMPLOYMENT** | | | | | | | | | | | | | | | |
| Goods Producing | 412.9 | 416.0 | 427.2 | 439.5 | 457.5 | 468.1 | 473.3 | 480.8 | 483.7 | 428.5 | 436.8 | 437.6 | 439.7 | 0.5% | 0.5% |
| Service-Providing | 5,774.8 | 5,878.4 | 5,989.0 | 6,144.7 | 6,293.4 | 6,416.3 | 6,536.5 | 6,644.6 | 6,759.5 | 6,085.6 | 6,257.6 | 6,170.3 | 6,538.1 | 0.9% | 6.0% |
| Total Non-Farm Employment | 6,187.7 | 6,294.4 | 6,416.2 | 6,584.2 | 6,750.9 | 6,884.4 | 7,009.8 | 7,125.4 | 7,243.2 | 6,514.1 | 6,694.4 | 6,607.9 | 6,977.8 | 0.9% | 5.6% |
| Employment Growth | 1.6% | 1.7% | 1.9% | 2.6% | 2.5% | 2.0% | 1.8% | 1.6% | 1.7% | -10.1% | 2.8% | -7.9% | 5.6% | --- | --- |
| **SELECT NON-AGRICULTURAL INDUSTRIES** | | | | | | | | | | | | | | | |
| Mining, Logging, and Construction | 201.1 | 205.5 | 217.6 | 230.2 | 246.4 | 256.9 | 264.4 | 273.6 | 279.8 | 248.7 | 253.9 | 257.0 | 253.3 | 2.2% | -1.4% |
| Manufacturing | 211.8 | 210.5 | 209.6 | 209.3 | 211.1 | 211.3 | 208.9 | 207.2 | 203.9 | 179.8 | 183.0 | 180.6 | 186.4 | -1.4% | 3.2% |
| Trade, Transportation, and Utilities | 1,097.9 | 1,118.9 | 1,136.7 | 1,160.2 | 1,175.3 | 1,179.3 | 1,192.8 | 1,197.9 | 1,196.6 | 1,054.7 | 1,090.6 | 1,115.6 | 1,164.1 | 0.1% | 4.3% |
| Information | 223.2 | 228.8 | 232.7 | 240.3 | 245.5 | 249.8 | 256.9 | 261.3 | 268.3 | 253.3 | 268.5 | 256.2 | 281.0 | 1.9% | 9.7% |
| Financial Activities | 588.7 | 586.3 | 586.6 | 595.3 | 606.3 | 616.4 | 623.2 | 632.4 | 640.9 | 620.1 | 617.9 | 617.3 | 623.4 | 0.6% | 1.0% |
| Professional and Business Services | 947.6 | 977.4 | 1,004.3 | 1,032.6 | 1,069.8 | 1,097.5 | 1,115.8 | 1,138.5 | 1,166.5 | 1,076.6 | 1,110.0 | 1,082.9 | 1,167.9 | 1.8% | 7.8% |
| Education and Health Services | 1,191.9 | 1,216.7 | 1,248.5 | 1,294.0 | 1,337.1 | 1,383.8 | 1,432.3 | 1,486.3 | 1,545.3 | 1,466.2 | 1,508.8 | 1,509.0 | 1,551.1 | 2.3% | 2.8% |
| Leisure and Hospitality | 538.2 | 564.4 | 590.4 | 619.6 | 643.3 | 661.1 | 683.8 | 694.7 | 701.7 | 445.4 | 498.2 | 422.1 | 566.1 | -0.3% | 34.1% |
| Other Services | 263.8 | 271.7 | 276.5 | 284.3 | 291.8 | 298.6 | 299.7 | 302.5 | 306.6 | 253.8 | 264.1 | 256.5 | 272.6 | 0.2% | 6.3% |
| Government | 923.5 | 914.2 | 913.3 | 918.5 | 924.2 | 929.9 | 932.1 | 931.1 | 933.6 | 915.5 | 899.5 | 910.7 | 911.9 | -0.4% | 0.1% |
| Total Select Non-Agricultural Empl. | 6,187.7 | 6,294.4 | 6,416.2 | 6,584.3 | 6,750.8 | 6,884.6 | 7,009.9 | 7,125.5 | 7,243.2 | 6,514.1 | 6,694.5 | 6,607.9 | 6,977.8 | 0.9% | 5.6% |

Source: U.S. Department of Labor. Figures are in thousands of employees.

*AREA ANALYSIS*

**Employment Statistics**

The following tables present the unemployment data from the U.S. Bureau of Labor Statistics for the New York City and Kings County from 2011 through December 2021.

| New York City, NY - Employment Statistics | | | | | |
|---|---|---|---|---|---|
| Year | Labor Force | Employment | Change in Employment | Unemployment | Unemployment Rate |
| 2011 | 3,975,190 | 3,612,336 | 0.37% | 362,854 | 9.1% |
| 2012 | 4,021,038 | 3,642,138 | 0.83% | 378,900 | 9.4% |
| 2013 | 4,065,235 | 3,707,286 | 1.79% | 357,949 | 8.8% |
| 2014 | 4,091,078 | 3,801,857 | 2.55% | 289,221 | 7.1% |
| 2015 | 4,089,053 | 3,860,683 | 1.55% | 228,370 | 5.6% |
| 2016 | 4,087,556 | 3,877,385 | 0.43% | 210,171 | 5.1% |
| 2017 | 4,298,924 | 4,105,067 | 5.87% | 193,857 | 4.5% |
| 2018 | 4,283,779 | 4,108,083 | 0.07% | 175,696 | 4.1% |
| 2019 | 4,298,866 | 4,133,704 | 0.62% | 165,162 | 3.8% |
| 2020 | 4,104,665 | 3,595,769 | -13.01% | 508,896 | 12.4% |
| 2021 | 4,043,671 | 3,645,307 | 1.38% | 398,364 | 9.9% |
| Dec-20 | 3,964,116 | 3,471,464 | -16.52% | 492,652 | 12.4% |
| Dec-21 | 3,971,798 | 3,707,265 | 6.79% | 264,533 | 6.7% |

Source: U.S. Bureau of Labor Statistics

Note:

[1] Annual numbers represent average over the year.

| Kings County, NY - Employment Statistics | | | | | |
|---|---|---|---|---|---|
| Year | Labor Force | Employment | Change in Employment | Unemployment | Unemployment Rate |
| 2011 | 1,174,299 | 1,061,492 | 0.58% | 112,807 | 9.6% |
| 2012 | 1,189,756 | 1,072,483 | 1.04% | 117,273 | 9.9% |
| 2013 | 1,206,307 | 1,093,739 | 1.98% | 112,568 | 9.3% |
| 2014 | 1,213,696 | 1,123,287 | 2.70% | 90,409 | 7.4% |
| 2015 | 1,209,375 | 1,139,369 | 1.43% | 70,006 | 5.8% |
| 2016 | 1,206,229 | 1,142,605 | 0.28% | 63,624 | 5.3% |
| 2017 | 1,210,854 | 1,154,942 | 1.08% | 55,912 | 4.6% |
| 2018 | 1,200,369 | 1,149,788 | -0.45% | 50,581 | 4.2% |
| 2019 | 1,196,433 | 1,148,750 | -0.09% | 47,683 | 4.0% |
| 2020 | 1,151,130 | 1,006,852 | -12.35% | 144,278 | 12.5% |
| 2021 | 1,171,215 | 1,049,454 | 4.23% | 121,761 | 10.4% |
| Dec-20 | 1,135,929 | 1,000,555 | -13.33% | 135,374 | 11.9% |
| Dec-21 | 1,153,636 | 1,060,021 | 5.94% | 93,615 | 8.1% |

Source: U.S. Bureau of Labor Statistics

Note:

[1] Annual numbers represent average over the year.

**Transportation**

New York's network of expressways includes four major interstates. North/South highways spanning the City include I-87 and I-95, each of these interstates enter and stop within the City limits. East/West highways include I-78 and I-80. I-80's eastern terminus is in Teaneck, New Jersey and connects I-287, which is a beltway around the City.

The John F. Kennedy ("JFK") Airport is located in the borough of Queens, and is the United States' 5th busiest airport in terms of total passenger traffic and the busiest airport in terms of international passenger traffic. It is situated on 4,930 acres and contains more than 131 gates within six terminals. 2019 statistics show there were approximately 456,000 plane movements serving approximately 62.5 million passengers, and over 1.34 million tons of Air Cargo were moved through the JFK Airport. 2020 statistics show there were approximately 200,000 plane movements (-56%) serving approximately 16.6 million passengers (-73%), and 1.15 million tons of Air Cargo were moved through the JFK Airport. 2021 statistics show there were approximately 288,000 plane movements (44% more than 2020 but 37% below 2019) serving approximately 31 million passengers (86% more than 2020 but 50% below 2019), and 1.43 million tons of Air Cargo were moved through the JFK Airport.

The LaGuardia Airport is also located in the borough of Queens, and is the United States' 20th busiest airport. It is situated on 680 acres and can accommodate up to 79 aircraft gates at a time. 2019 statistics show there were over 370,000 plane movements serving approximately 31.1 million passengers passing through LaGuardia Airport. 2020 statistics show there were approximately 139,000 plane movements (-63%) serving approximately 8.2 million passengers (-73%) passing through LaGuardia Airport. 2021 statistics show there were approximately 177,000 plane movements (28% more than 2020 but 52% below 2019) serving approximately 15.7 million passengers (90% more than 2020 but 50% below 2019).

The Newark Liberty International Airport is located in Newark, New Jersey and is the United States' 15th busiest airport in terms of total passenger traffic and the 6th busiest airport in terms of international passenger traffic.  It is situated on 425 acres and contains 122 gates within three terminals. 2019 statistics show there were almost 446,000 plane movements serving approximately 46.3 million passengers, and almost 825,000 tons of Air Cargo were moved through Newark Liberty International Airport. 2020 statistics show there were approximately 211,000 plane movements (-36%) serving approximately 15.9 million passengers (-66%), and 695,000 tons (-16%) of Air Cargo were moved through the Newark Liberty International Airport. 2021 statistics show there were approximately 285,000 plane movements (35% more than 2020 but 36% below 2019) serving approximately 29 million passengers (84% more than 2020 but 37% below 2019), and approximately 780,000 tons of Air Cargo were moved through the JFK Airport.

The New York City area is served by the MTA subway and bus system, which provides a fixed-fare subway and bus service throughout the New York City metropolitan area. New York is cited as having the most extensive public transportation system in the nation, with an annual typically estimated of 2.5 billion passengers using the system. However, as a result of COVID-19, daily ridership plummeted since March 2020; subway ridership fell by over 90% in April 2020, over 85% in May 2020, approximately 75% below prior year ridership in July and August, and approximately 70% below prior year ridership in September through December 2020. Similar ridership was recorded early in 2021, however subway ridership during the last quarter of 2021 has recovered to approximately 60% of the pre-pandemic levels. Bus ridership initially dropped by 70% to 80%;

however, improved in 64% of pre-pandemic level during the 4th quarter of 2021. LIRR ridership dropped by 95% in April and May of 2020, however improved to 60% of the pre-pandemic ridership in recent months.

Amtrak provides the long distance ground travel for New York with rails connecting New York to several large cities along the east coast from Canada to Florida.

**Tourism**

According to NYC & Company, the City's official marketing, tourism and partnership organization, a record 66.6 million visitors arrived in New York City in 2019, surpassing the previous record of 65.1 million visitors set in 2018. New York City's number of visitors increased from 36.2 million visitors in 2000 to 47.1 million visitors in 2008 (a 30% increase), and after an approximately 3% decline to 45.6 million visitors in 2009 rebounded and consistently grown by a total of 46% through 2019 (or over 2 million per year, 66.6 million visitors). According to NYC & Company, approximately 53.1 million of the 2019 visitations were domestic travelers and the remaining 13.5 million were international. However, after a good start in 2020, the numbers of visitors have fallen as a result of the COVID-19 pandemic, with 22.3 million visitors during 2020, reflecting a 67% decline in comparison to 2019. The number of visitors increased to 32.9 million in 2021, still well below pre-pandemic levels. As of March 2022, NYC & Company projects a return to pre-pandemic levels by 2023, as can be seen in the following chart.



*AREA ANALYSIS*

### Economy

#### Introduction

The commentary which follows was prepared by CoStar as of 4Q 2021 relating to the New York metro economy.

At the start of 2020, New York City's economy was on solid footing. Tech, media, and finance firms were continuing to expand their presence, leading to near record levels of employment and participation. As hiring increased, so has the population, with New York City growing by 7.7% since 2010. Tourism was at an all-time high, contributing to an economic impact of $70 billion in 2019 which helped fuel the growth of both the retail and hospitality sectors.

Today, however, the pandemic continues to negatively impact the local economy. The local unemployment rate initially increased from 3.8% to 20% due to a mixture of residents fleeing and non-essential businesses having to close their doors. While many jobs have been regained since, the seasonally adjusted unemployment rate of New York City, at 6.7%, is still elevated compared to the national average of 3.8%.

The tourism industry has been one of the key casualties of the pandemic. The number of jobs in New York in the food and beverage, hospitality, and entertainment sectors that are supported by tourism spending surpassed 450,000 pre-pandemic. But the City has since witnessed retail shops, restaurants, and even major hotels close their doors permanently as international visitors and business travelers largely stayed away. To reach pre-pandemic hiring levels, the leisure and hospitality sector in New York City still needs to regain more than 100,000 jobs.

But New York's recovery still moves onward as above average vaccination rates have led to the majority of business restrictions being eased. The hotel industry has witnessed occupancy levels rise since the return of Broadway along with the arrival of international travelers. Additionally, the restaurant industry is witnessing better days as the number of diners making reservations continues to rise. With New Yorkers growing increasingly mobile, subway ridership has notably increased.

And although more New Yorkers continue to travel and enjoy leisure activities, most are still not utilizing the office. With many companies continuing to operate remotely, office usage in New York remains far below pre-pandemic levels and this has negatively affected the many small businesses that catered to this group. Despite offices being largely empty, the office-using employment sectors of tech and finance have regained 97% of all jobs lost.

#### Summary of Economic Activity

The following information was published by the Federal Reserve Board in the Beige Book publication dated December 1, 2021. The information pertains to the Second District, which covers all of New York State, Northern New Jersey, and Southwestern Connecticut.

The Second District economy continued to expand at a modest pace, with contacts in most sectors continuing to express optimism about the near-term outlook. Both wages and prices have continued to accelerate, as supply disruptions and labor shortages have intensified. The job market has remained exceptionally tight, with businesses continuing to add staff and many looking to hire more workers. Consumer spending was steady, with sales of durable goods



continuing to be restrained by severe supply shortages. The home sales market strengthened further, while apartment rental markets have continued to rebound; office markets have been stable. Both residential and commercial construction activity increased modestly, despite shortages of materials. Finally, contacts in the broad finance sector noted some pickup in activity, while regional banks reported some improvement in delinquency rates and higher loan demand from commercial customers.

Employment and Wages: Employment has continued to increase modestly, restrained by ongoing labor shortages. Businesses reported widespread ongoing difficulty in both hiring new workers and retaining existing staff, as many employees are quitting to work for a different company or look for a new job. A New York City employment agency reported a marked pickup in job openings, particularly at small to medium sized firms, but a severe shortage of candidates. Labor shortages persist across a wide range of occupations but particularly in technology, sales, and human resources. Among the reasons cited for this shortage are ongoing COVID concerns, child care, and a reduced urgency to work due to fiscal support and accumulated savings.

Of note, leisure & hospitality businesses reported widespread increases in staffing levels, and firms in the manufacturing and distribution sectors also report fairly strong hiring. Businesses in most sectors also expect to ramp up staffing levels in the months ahead.

Wage escalation has been prevalent across all major industry sectors but particularly widespread among leisure & hospitality firms. An employment agency in upstate New York reported rapid escalation in wages and benefits, as well as increasing use of perks to attract workers. Looking ahead, businesses across all major sectors foresee continued widespread wage hikes.

Prices: A large and growing proportion of firms reported escalation in input prices—particularly in the manufacturing, distribution, and construction sectors. A large majority of contacts in all sectors continue to anticipate rising input prices in the months ahead.

Hikes in businesses' selling prices have also grown increasingly widespread—most notably among manufacturers, wholesalers, retailers, and construction firms. Retailers reported more widespread price hikes than at any time in almost a decade. A majority of businesses in most sectors plan to raise their selling prices in the months ahead.

Consumer Spending: Consumer spending has been mixed but fairly steady overall in the latest reporting period. Non-auto retailers reported steady to modestly higher sales in October and early November, and they were cautiously optimistic about the upcoming holiday season. Supply disruptions have caused scattered stockouts, particularly for furniture. One retail chain noted that New York City stores have seen some improvement due to the gradual return of office workers and tourists. While in-store business has remained well below normal levels, strong on-line sales in the metro area have boosted total business above pre-pandemic levels. Consumer confidence among New York State residents rebounded strongly in October, after dropping in September.

New vehicle sales continued to weaken, mostly due to a lack of supply but also some drop off in buyer traffic. Many dealers have little or no inventory and expect this to continue through at least mid-2022 due to the microchip shortage, as well as general supply chain disruptions. Dealers noted that almost all cars coming off the production line have already

been sold. Sales of used vehicles have picked up a bit due to a modest increase in inventory and continued robust demand.

Manufacturing and Distribution: Manufacturing and transportation & warehousing firms saw continued solid growth in recent weeks, while wholesalers noted a pickup in growth to a brisk pace. However, many businesses in these sectors complained that ongoing labor shortages and supply disruptions are increasingly impeding business. Still, manufacturers and wholesalers continued to express fairly widespread optimism about the near-term outlook, while those in transportation & warehousing were moderately optimistic.

Services: Service industry activity continued to expand at a modest pace in recent weeks. New York City subway ridership has increased steadily, though it is still about 40 percent below comparable 2019 levels. Leisure & hospitality businesses noted a pickup in growth. Contacts in the professional & business services and information industries reported more modest growth, while education & health businesses indicated little change in business. Service firms generally remained optimistic.

Tourism has continued to increase, helped by a series of events, most notably the New York City marathon. Weekend hotel occupancy rates have climbed above 80 percent, even as more hotels have re-opened, approaching pre-pandemic levels; mid-week rates have risen but remain well below normal at 50-60 percent. Increased occupancy, along with a gradual rebound in room rates, have boosted revenue. The re-opening of borders is expected to further buoy New York City's hospitality and related sectors, as well as bring some influx of Canadian visitors, which would benefit parts of upstate New York.

Real Estate and Construction: Housing markets have continued to strengthen across most of the District since the last report. Home sales activity picked up noticeably across New York City, reaching its highest level in decades, while the inventory of unsold homes receded further. Inventory levels remain somewhat above normal in Manhattan but are at exceptionally low levels across the rest of the District, where they have continued to restrain sales activity and push up prices. In Manhattan, home prices continued to climb, particularly at the high end of the market, where they now exceed pre-pandemic levels.

New York City's residential rental market has strengthened considerably in recent weeks, particularly in Manhattan where rents and occupancy rates have rebounded to around pre-pandemic levels—exceeding them at the higher end of the market but still lagging at the lower end.

Commercial real estate markets have been steady, on balance, across the District. In New York City, office rents and availability rates were little changed in recent weeks, and leasing activity has picked up. Across the rest of the District, office vacancy rates edged up in most areas, while rents were generally steady. The industrial market continued to strengthen, with vacancy rates steady to down slightly near record lows and rents continuing to escalate. The retail leasing market has shown scattered signs of a pickup.

Both multi-family residential and non-residential construction starts were steady, though there continues to be a good deal of ongoing construction. However, some industry contacts reported that activity slowed further in October, partly due to normal seasonal effects but also reflecting worker shortages and problems acquiring construction materials. Moreover, construction sector contacts have  grown more pessimistic about

prospects for the months ahead. A good deal of new apartment development (rentals and condos) is currently in the pipeline.

<u>Banking and Finance</u>: Businesses in the broad finance sector indicated that activity has picked up modestly and were generally optimistic about the near-term outlook. Small to medium-sized banks across the District reported stronger demand for commercial mortgages and commercial & industrial loans but steady demand from households. Refinancing activity remained unchanged, on net. Credit standards were reported as unchanged across all categories. Loan spreads narrowed for consumer and commercial loans, but they widened for residential mortgages. Delinquency rates improved across all categories. Finally, bankers reported some reduction in leniency for consumer and commercial loan borrowers.

**BROOKLYN**

Brooklyn is the most populous of NYC's five boroughs, with an estimated 2.58 million residents in 2018. Since 1896, Brooklyn has had the same boundaries as Kings County, the most populous county in the State of New York, and the second-most densely populated county in the United States, after the County of New York (Manhattan). In fact, if each of the five boroughs was a separate city today, Brooklyn would rank as the third most populous city in the US, behind Los Angeles and Chicago.

The Dutch colonized Brooklyn in 1646, establishing six different towns with defined borders, which eventually became English settlements, and later consolidated to create the City of Brooklyn. The original six Brooklyn towns settled by the Dutch were Bushwick, Brooklyn, Flatlands, Gravesend, New Utrecht and Flatbush. Present-day Brooklyn neighborhoods bearing these names are located roughly in the center of each of these original towns. Brooklyn experienced multiple economic cycles during its history. Supported by waves of immigrations in the 19th and 20th centuries, Brooklyn's economy experienced several expansion periods, and the rise and fall of industries over the years. The New York Bridge Company was founded in 1865 and constructed the Brooklyn Bridge, which opened in 1883 and brought a new wave of people into Brooklyn who were seeking relief from the high rents and small apartments of New York City (much like the current days).

By the 1950s, Brooklyn's industrial energies began to wane. Heavy manufacturers began to move to cheaper locations in other cities, and the ports became less active as large container ships, requiring deep harbors, began to dominate the shipping trade. Economic dislocation and the easy availability of government-sponsored housing loans spurred the middle classes to leave their old neighborhoods for the suburbs. Hundreds of thousands of middle class residents abandoned Brooklyn for Queens, Long Island's Nassau County, Staten Island, and New Jersey. Once-vibrant neighborhoods fell into disrepair, decay, and poverty. Manufacturing fell by one half between 1954 and 1990, and the Brooklyn dockyards were largely abandoned. Even the Brooklyn Navy Yard, which was built in 1801, closed in 1966. The blackout of 1977 became one of Brooklyn's worst moments. The power failure led to widespread rioting, looting, and arson; entire sections of various neighborhoods went up in flames. Several blocks of the main Broadway shopping district in Bushwick were torched, with devastating effects. One-third of the remaining stores closed immediately, and more than 40% of Bushwick's commercial and retail operations went out of business within a year.

Despite the turmoil of the 1970s and early 1980s, the final decade of the 20th century witnessed a revival in Brooklyn's fortunes. Crime rates decreased during the 1990s, and neighborhoods like Brooklyn Heights, Fort Greene, and Clinton Hill began to spring back to life. The Brooklyn Academy of Music began to draw avant-garde crowds from Manhattan, the Navy Yard began redevelopment into a booming industrial park, and a new generation of artists, fleeing from the high rents in Manhattan, created vibrant new communities in DUMBO (Down Under the Manhattan Bridge Overpass), Williamsburg, and Greenpoint. Additional new waves of immigrants

continued to make the borough their home, lending new accents, flavors, and textures to old Brooklyn neighborhoods.

In the first decades of the 21st century, Brooklyn has experienced a renaissance as an avant garde destination for hipsters, with associated gentrification, dramatic house price increases, and a decrease in housing affordability. Since 2010, Brooklyn has evolved into a thriving hub of entrepreneurship and high technology startup firms, and of postmodern art and design.

**POPULATION, BUSINESS AND JOBS**

Demographic changes in Brooklyn over the past few years have been fairly dramatic. Data by the U.S. Census Bureau indicates that Brooklyn's population grew from roughly 2.5 million in 2010 to approximately 2.6 million in 2020. The population increase has largely been driven by the influx of Millennials (those born between 1981 and 1997). Since 2000, Brooklyn's population between the ages of 25 and 34 has exploded by more than 19.5% while that age group has increased by only 8.4% across the US as a whole.

According to a June 2019 report by the Center for an Urban Future ("CUF"), like many other urban centers over the past decade, Brooklyn has seen strong job growth in healthcare, retail, restaurants, and education. But Brooklyn's economy has kicked into higher gear than most other places thanks to the borough's runaway success in the innovation economy.

As this report details, Brooklyn is one of just a handful of regions across the country to capture a significant share of the growth occurring in the innovation economy—a set of industries fueled by technology, creativity, and invention that is driving much of the nation's high-wage job gains. Over the past decade, Brooklyn has outperformed the rest of New York City in these innovation industries, which have added thousands of well-paying jobs for New Yorkers, helped diversify the borough's economy, and given Brooklyn an important competitive advantage in a part of the economy that is expected to grow significantly in the years ahead.

Tech Start-Us - As seen in the following chart, of all major tech hubs in the nation, Brooklyn's start-up growth rate since 2008 was second only to San Francisco. Brooklyn's 356 percent growth rate topped New York City (308 percent), Philadelphia (290 percent), Los Angeles (279 percent), and Chicago (270 percent).



A detailed analysis of data from Crunchbase—a leading global database that tracks tech-enabled start-ups using a mix of public, private, and self-reported sources—reveals that Brooklyn was home to 1,205 tech-enabled start-ups in 2018, up from 264 start-ups in 2008. Brooklyn has

approximately 9% of New York City's tech start-ups, up from approximately 6% in 2000 and a higher share than ever before. Employment in Brooklyn's tech sector increased by 175% from 2007 to 2017, more than double the 86% increase in Manhattan over the same period. The borough has a particularly high concentration of start-ups in media entertainment (~250 start-ups), commerce and shopping (~175), financial services (~100), and data and analytics (~80). But in the past three years, Brooklyn has also seen significant growth in a number of emerging fields, including artificial intelligence (more than 20 start-ups), blockchain, and virtual reality.

Creative Companies - The number of jobs in Brooklyn's creative industries increased by 155% over the past decade, significantly outpacing the 16% growth in Manhattan's creative economy. In eight different creative industries, employment in Brooklyn has increased by at least 200% over the past decade: industrial design, motion picture and video industries, sound recording industries, advertising, commercial photography, graphic design, landscape design, and marketing. In many creative industries, Brooklyn is home to a significant share of all new jobs created nationally in recent years. Brooklyn accounted for 5% of all fashion and jewelry design jobs created in the United States between 2007 and 2017. The borough is home to a significant share of all new jobs created nationally in several other creative industries, including film and television (4% of all new U.S. jobs), advertising (3%), and industrial design (2%). And while graphic design jobs declined by 14% nationally during the past decade, employment increased by 262% in Brooklyn.

Innovative Manufacturers - Driven by a new generation of companies at the intersection of manufacturing, technology, and design, Brooklyn's manufacturing sector has significantly outperformed the City as a whole in rebounding from the Great Recession. Whereas manufacturing employment citywide is down 7.2% since 2011 (a net loss of 5,398 jobs), Brooklyn posted a net gain of 1% (or 198 jobs).

Like the rest of the City, Brooklyn has suffered job losses in many traditional manufacturing subsectors. But the borough has experienced net job gains in several manufacturing subsectors connected to tech or design, including electrical equipment and appliances manufacturing, jewelry and silverware manufacturing, ornamental and architectural metal products manufacturing, furniture and related products manufacturing, medical equipment and supplies manufacturing, and machinery manufacturing.

There are other clear signs that Brooklyn is seeing growth among makers that fuse traditional manufacturing processes with tech and design. For instance, of the 1,205 tech-enabled start-ups in Brooklyn, ~40 were in manufacturing (up from 23 in 2013). Other tech-enabled start-ups in Brooklyn are sprouting in fields with strong connections to manufacturing, including hardware (Brooklyn has ~100 hardware start-ups), food and beverage (more than 50 start-ups), consumer electronics, consumer goods, clothing and apparel, and government and military.

Overall, the CUF report's analysis of Brooklyn's tech sector finds a growing advantage over Manhattan in several fields with a connection to manufacturing and the creative industries, including computer hardware, consumer electronics, music and audio, and gaming.

**LINKAGE**

The NYC subway system is the primary means of transportation, connecting between the boroughs, with an average weekday ridership of approximately 760,000 passengers in 2021 (which is significantly lower than the 5.5 million passengers in 2019). The following photo is a portion of the NYC subway map.



As can be seen in the subway map, Northern Brooklyn is very accessible via the subway system, with the famous L-train running along Manhattan's 14th Street through Williamsburg and the Northern part of Bushwick before turning south towards East New York. The J, Z and M trains serve the southern part of Bushwick and Williamsburg, as well as Bedford Stuyvesant, which is also well served by the A and C trains. Crown Heights is connected through the red, green and blue lines which are running through Downtown Brooklyn, east and west of Manhattan and all the way to the Bronx.

**RESIDENTIAL MULTIFAMILY REAL ESTATE**

The evolution of Northern Brooklyn's residential market development over recent years should be viewed in conjunction with the major growth in a specific population age group – the Millennials. According to a June 2016 article published by The Real Deal, the impact of Millennials on real estate has to be viewed through the lens of the broader sharing economy that Millennials have embraced, as well as their demand for experiences over things, social engagement and — above all else — flexibility. The article notes that research on Millennials indicates that they are not making decisions about where they are going to live beyond the next 12 months.

With the barrier of entry to buying residential real estate much higher now than it was before the financial crisis in 2008, many New Yorkers (particularly younger ones) have been forced to rent. This fact has not been lost on developers who have geared much of their NYC rental product to

Millennials — whether it's extra bike storage (one in five Millennials bikes at least once a week, according to the Urban Land Institute), USB charging ports in apartments (two-thirds of Millennials don't have landlines, according to the Centers for Disease Control) or co-working space (nearly one-third of Millennials are self-employed, according to a 2015 survey by online stock brokerage TD Ameritrade).

Millennials are more used to a college sort of mentality of living with neighbors in close proximity, and they like saving $500 to $1,000 a month on rent which they can spend on entertainment. While data on co-living spaces and shared living is still hard to come by, landlords can achieve a higher price per foot since bedrooms are smaller than they are in average apartments — even as tenants pay at- or below-market rates for apartments.

It is noted however, that starting 2018, and more so in the end of 2019, demographic reports indicated that millennials are actually leaving New York City, and Brooklyn in particular, stating the high cost of living and elevated state and local income taxes as the main reasons. Further, recent reports indicate that a side effect of the COVID-19 pandemic has been the move of a large number of young families and single young professionals to the suburbs back to their parents' homes. As many companies are quickly building the infrastructure for efficient work-from-home practice, there is an uncertainty regarding the long-term effect of this phenomenon on Urban living in general, and particularly in New York City and Brooklyn.

According to Ariel Property Advisors' mid-year 2020 report, the first half of 2020 will forever be remembered for the global outbreak of the COVID-19 pandemic. The virus spread quickly in New York City mainly because of the high population density and crowded public transportation systems. On March 20th, Governor Cuomo issued a citywide executive order closing down all "non-essential" commercial businesses. The economic impact has been devastating, and the commercial real estate market has suffered because of it. Hundreds of thousands of New Yorkers were unemployed, and many residential tenants were struggling to pay their rent.

Most retail businesses have had to weather the storm without being allowed to operate and all development projects were forced to stop.

According to Ariel Property Advisors' year end 2021 report, "after a difficult 2020 that saw Brooklyn's investment sales market have its worst year in over a decade, Brooklyn bounced back in a big way in 2021, finishing the year with metrics that were virtually identical to 2019's pre-COVID numbers. Increasing rents coupled with decreasing vacancy and an overall supply shortage helped spur activity down the stretch of 2021. Of the 881 total transactions, 53% took place during the 2nd half of the year, yet they represented 73% of the total dollar volume. The late surge was due to the return of institutional money into the marketplace, as the 8 largest transactions in the borough all closed during the back half of the year. There is optimism that this momentum will continue into 2022 as we push into the post-pandemic era."

The 2021 Ariel Property Advisors' report noted that "the multifamily market in Brooklyn saw steep year over year increases across all metrics in 2021, surpassing even 2019 pre-COVID levels by a wide margin. The increase of transactions is likely due to both the inactivity in 2020 as well as the market comprehension of the Housing Stability and Tenant Protection Act of 2019 ("HSTPA") which has resulted in a decrease in all multifamily pricing indicators; Large funds are purchasing free market properties and buildings with 421A tax abatements under the assumption that the borough will continue to grow, and demand will increase. But there was also an increase of

transaction volume in the medium and smaller properties in 2021 compared to 2020 as more and more investors who were sitting on the side-lines re-enter the market."

The change of direction is evident in the following chart.



The report also noted that "steep increase in dollar volume can be attributed to the Starett City Portfolio partial interest sale which contributed over $1 billion." The sale of 123 Melrose Street, which closed in December for over $500 million, also contributed to the large dollar volume in 2021. Williamsburg, Bedford Stuyvesant and Bushwick were the top three neighborhoods in terms of number of sold properties sold, with almost 300 properties trading hands in 2021 (combined).

CONCLUSION

The properties within the Portfolio are concentrated in Northern Brooklyn neighborhoods which went through (and are going through) a process of gentrification, drawing in young population which has been changing the makeup of neighborhoods demographics and the job market in Brooklyn. Over the past few years, Brooklyn has evolved into a thriving hub of entrepreneurship and high technology startup firms, and of postmodern art and design. All indication are showing that this trend can continue in coming years, strengthening demand for rental properties.

The properties within the Portfolio are well maintained, are located in close proximity to transportation, and are designed for room sharing, all of which are aspects which will benefit the Portfolio in the long-term, especially with regards to the millennial population.

## MARKET ANALYSIS

Overview of local market conditions is a necessary aspect of the appraisal process. The market analysis forms a basis for assessing market area boundaries, supply and demand factors, and indications of financial feasibility. The following discussion illustrates some general observations about the Property's surrounding apartment market. The information which follows was compiled by CoStar as of around the Effective Date.

MACRO MARKET

The Property's macro market consists of the Long Island Market as defined by CoStar (the "Market"). The map of the macro market as well as the location of Kings County within the macro market is as follows:



The Market experienced a steep drop in renter demand in 2020 as the pandemic caused residents to exit New York City and contributed to the unemployment rate surging to 20% as many businesses were forced to shutter. Annual absorption totals were in negative territory for the first time in recorded history, concessions became more common as vacancies soared throughout the Market, and widespread uncertainty resulted in investors largely staying on the sidelines last year.

But the sector appears to have recovered at the start of 2022. Renter demand has rebounded impressively due to a mixture of enticing concessions, the return of in-person learning, and the lifting of all business restrictions. Helping matters is the fact that New Yorkers who left the area, did not stray far, often going to more suburban parts of the metro in New Jersey and Westchester County.

Despite the completion of more than 20,000 new units since the start of 2020, the influx of demand helped vacancies reach their pre-pandemic average. Jersey City, Long Island City, and Brooklyn continue to contain the metro's most active supply pipelines. Though developers remain busy, the base case forecast projects that vacancies will remain tight as demand is expected to keep pace with supply

With renter demand blunted in 2020, asking rents were lowered throughout much of the Market, while the number of properties offering concessions had risen sharply as owners aimed to entice

tenants. But with demand rebounding in recent quarters, year-over-year rental growth has been witnessed across most submarkets in 4Q21, with popular neighborhoods in Brooklyn and Manhattan accounting for the largest annual gains. Concessions remain part of the equation but are now less common as building occupancies have notably improved.

**Inventory**

According to CoStar, the Market had 28,693 apartment buildings containing 725,485 apartment units. The inventory has been generally stable.

Please refer to the table below for a presentation of historical supply in the Market.

| Long Island Market - Apartment Inventory | | | | |
|---|---|---|---|---|
| Period | Inventory (Buildings) | Inventory (Units) | Change (No. of Units) | Change (%) |
| 4Q 2021 | 28,693 | 725,485 | 12,793 | 1.8% |
| 4Q 2020 | 28,465 | 712,692 | 8,148 | 1.2% |
| 2021 | 28,693 | 725,485 | 12,793 | 1.8% |
| 2020 | 28,465 | 712,692 | 8,148 | 1.2% |
| 2019 | 28,329 | 704,544 | 11,226 | 1.6% |
| 2018 | 28,124 | 693,318 | 12,799 | 1.9% |
| 2017 | 27,934 | 680,519 | 14,930 | 2.2% |
| 2016 | 27,727 | 665,589 | 7,541 | 1.1% |
| 2015 | 27,536 | 658,048 | 6,794 | 1.0% |
| 2014 | 27,398 | 651,254 | 4,812 | 0.7% |
| 2013 | 27,314 | 646,442 | 4,967 | 0.8% |
| 2012 | 27,226 | 641,475 | 4,420 | 0.7% |
| 2011 | 27,112 | 637,055 | 2,778 | 0.4% |
| 2010 | 27,038 | 634,277 | 4,610 | 0.7% |
| 2009 | 26,960 | 629,667 | 4,321 | 0.7% |
| 2008 | 26,797 | 625,346 | 3,411 | 0.5% |
| 2007 | 26,601 | 621,935 | 4,562 | 0.7% |
| 2006 | 26,374 | 617,373 | 4,195 | 0.7% |
| 2005 | 26,155 | 613,178 | 3,721 | 0.6% |
| 2004 | 25,899 | 609,457 | 4,330 | 0.7% |
| 2003 | 25,706 | 605,127 | 1,755 | 0.3% |
| 2002 | 25,613 | 603,372 | 3,151 | 0.5% |
| 2001 | 25,524 | 600,221 | 2,641 | 0.4% |
| 2000 | 25,414 | 597,580 | - | - |
| Source: CoStar, 4Q 2021 | | | | |

**Vacancy Rates**

According to CoStar, vacancy in the Market was 2.00% as of 4Q 2021 (a decrease of 80 basis points from 4Q 2020).

Robust renter demand typically defined the Market as vacancies have historically remained low despite the notable number of new units coming to market over the past decade.

But the pandemic initially caused New York's apartment market to swiftly reverse course in 2020 as high unemployment, an urban exodus, and the continued completion of thousands of units resulted in the metro recording negative annual absorption for the first time in history

But the metro appears to have recovered at the start of 2022 as widespread concessions, continued hiring, and the reopening of New York City have fueled renter demand over the past year. Vacancies are now at their pre-pandemic rate, even in expensive submarkets located near office nodes in Manhattan and Brooklyn despite most companies continuing to operate remotely. This is important to note as the omicron variant has already delayed return to office plans for many firms.

The more suburban parts of the metro have fared better as these areas do not face the same issues that are initially weakened their urban counterparts, with submarkets in Westchester County and suburban New Jersey witnessing declines in vacancy since the end of 2020.

Looking ahead, vacancies are projected to remain stable throughout the forecast as demand is expected to keep pace with supply despite many units currently under construction.

Please refer to the table on the following page for a presentation of historical vacancy rates in the Market.

*MARKET ANALYSIS*

| Long Island Market - Apartment Vacancy | | | | | | | |
|---|---|---|---|---|---|---|---|
| Period | Inventory (Buildings) | Inventory (Units) | Vacant Units | Vacancy | Change (bpts) | Occupancy | Change (bpts) |
| 4Q 2021 | 28,693 | 725,485 | 14,014 | 2.00% | -80 | 98.00% | 80 |
| 4Q 2020 | 28,465 | 712,692 | 19,296 | 2.80% | 50 | 97.20% | -50 |
| 2021 | 28,693 | 725,485 | 14,014 | 2.00% | -80 | 98.00% | 80 |
| 2020 | 28,465 | 712,692 | 19,296 | 2.80% | 50 | 97.20% | -50 |
| 2019 | 28,329 | 704,544 | 15,377 | 2.30% | 0 | 97.70% | 0 |
| 2018 | 28,124 | 693,318 | 14,790 | 2.30% | -30 | 97.70% | 30 |
| 2017 | 27,934 | 680,519 | 16,505 | 2.60% | 20 | 97.40% | -20 |
| 2016 | 27,727 | 665,589 | 15,305 | 2.40% | -20 | 97.60% | 20 |
| 2015 | 27,536 | 658,048 | 16,614 | 2.60% | 0 | 97.40% | 0 |
| 2014 | 27,398 | 651,254 | 16,532 | 2.60% | -20 | 97.40% | 20 |
| 2013 | 27,314 | 646,442 | 17,593 | 2.80% | -20 | 97.20% | 20 |
| 2012 | 27,226 | 641,475 | 18,886 | 3.00% | -10 | 97.00% | 10 |
| 2011 | 27,112 | 637,055 | 19,759 | 3.10% | -10 | 96.90% | 10 |
| 2010 | 27,038 | 634,277 | 20,082 | 3.20% | 0 | 96.80% | 0 |
| 2009 | 26,960 | 629,667 | 20,207 | 3.20% | 0 | 96.80% | 0 |
| 2008 | 26,797 | 625,346 | 20,162 | 3.20% | 20 | 96.80% | -20 |
| 2007 | 26,601 | 621,935 | 18,650 | 3.00% | 10 | 97.00% | -10 |
| 2006 | 26,374 | 617,373 | 17,783 | 2.90% | -10 | 97.10% | 10 |
| 2005 | 26,155 | 613,178 | 18,255 | 3.00% | 0 | 97.00% | 0 |
| 2004 | 25,899 | 609,457 | 18,290 | 3.00% | 40 | 97.00% | -40 |
| 2003 | 25,706 | 605,127 | 15,407 | 2.60% | 40 | 97.40% | -40 |
| 2002 | 25,613 | 603,372 | 12,967 | 2.20% | 30 | 97.80% | -30 |
| 2001 | 25,524 | 600,221 | 10,939 | 1.90% | 10 | 98.10% | -10 |
| 2000 | 25,414 | 597,580 | 9,836 | 1.80% | - | 98.20% | - |

Source: CoStar, 4Q 2021

LEVELVALUATION

**Rental Rates**

Heading into 2020, rent growth continued to remain positive as robust renter demand kept vacancies low. But the pandemic resulted in rents quickly moving in the opposite direction as renter demand was negatively impacted in 2020. With vacancies rising sharply last year, annual rental growth remained in negative territory from 2Q 20 to 1Q 21. The submarkets witnessing the steepest declines were primarily located in Manhattan and Brooklyn; expensive areas that attract renters due to their proximity to office nodes.

But with absorption levels rebounding in 2021, year-over-year rental growth now stands at 4.8% as asking rents have slightly surpassed their pre-pandemic totals. While locales in Westchester County and suburban New Jersey continue to witness annual rent growth at an average of about 3%, more popular neighborhoods in Manhattan and Brooklyn have experienced the largest recent rent gains.

And while the number of buildings offering concessions, such as multiple months of free rent, increased dramatically in 2020, the practice has grown less common as building occupancies have notably improved metro-wide. Recently delivered buildings should continue to advertise concessions in an attempt to quickly stabilize occupancies, though they will likely be far less enticing compared to last year.

Please refer to the table below for information on historical rental rates in the Market.

| Long Island Market - Apartment Rents | | | | |
|---|---|---|---|---|
| Period | Asking Rent Per Unit | Change (%) | Asking Rent Per SF | Change (%) |
| 4Q 2021 | $2,368 | 4.3% | $3.05 | 4.8% |
| 4Q 2020 | $2,270 | 0.3% | $2.91 | 0.0% |
| 2021 | $2,368 | 4.3% | $3.05 | 4.8% |
| 2020 | $2,270 | 0.3% | $2.91 | 0.0% |
| 2019 | $2,263 | 1.9% | $2.91 | 2.1% |
| 2018 | $2,221 | 2.4% | $2.85 | 2.5% |
| 2017 | $2,169 | 1.4% | $2.78 | 1.5% |
| 2016 | $2,138 | 2.1% | $2.74 | 2.2% |
| 2015 | $2,094 | 3.4% | $2.68 | 3.5% |
| 2014 | $2,025 | 2.7% | $2.59 | 2.4% |
| 2013 | $1,972 | 2.3% | $2.53 | 2.4% |
| 2012 | $1,928 | 1.4% | $2.47 | 1.6% |
| 2011 | $1,902 | 1.1% | $2.43 | 0.8% |
| 2010 | $1,881 | 2.1% | $2.41 | 2.1% |
| 2009 | $1,843 | -8.7% | $2.36 | -8.5% |
| 2008 | $2,019 | -1.2% | $2.58 | -1.1% |
| 2007 | $2,043 | 5.4% | $2.61 | 5.2% |
| 2006 | $1,938 | 4.9% | $2.48 | 4.6% |
| 2005 | $1,847 | 1.4% | $2.37 | 1.7% |
| 2004 | $1,821 | 1.7% | $2.33 | 1.7% |
| 2003 | $1,791 | -0.1% | $2.29 | 0.0% |
| 2002 | $1,792 | 0.2% | $2.29 | 0.0% |
| 2001 | $1,789 | 2.9% | $2.29 | 2.7% |
| 2000 | $1,739 | - | $2.23 | - |

Source: CoStar, 4Q 2021

**New Construction**

Throughout the past cycle, developers have remained active in the Market; attracted by the Market's healthy fundamentals and robust renter demand. More than 20,000 units were under construction at the start of 2020 in what was projected to be a year where the multifamily market maintained its momentum.

Development is widespread but a significant number of units are located in Brooklyn, Long Island City, and Jersey City; areas where a supply wave has been ongoing for more than five years.

And as demand has started to trickle out to the more suburban nodes of the metro, development activity has followed. At the start of 2022, more than 3,000 units are under construction in Greater Hudson County, where development has been clustered around the PATH station in Harrison and more than 3,400 units are underway in the Yonkers/New Rochelle area in Westchester County.

With renter demand negatively impacted last year, owners of newer properties have adjusted their leasing timelines and many have offered generous concession packages to spur demand as the supply pipeline in New York City remains bloated. Recently delivered buildings have been quite aggressive in their offering in order to quickly fill occupancies.

Please refer to the table on the following page for historical information on new construction in the Market.

| Long Island Market - Apartment Under Construction | | | | |
|---|---|---|---|---|
| Period | Inventory (Units) | Under Construction Bldgs | Under Construction Units | Under Construction Percent |
| 4Q 2021 | 725,485 | 24 | 3,967 | 0.5% |
| 4Q 2020 | 712,692 | 251 | 16,728 | 2.3% |
| 2021 | 725,485 | 24 | 3,967 | 0.5% |
| 2020 | 712,692 | 251 | 16,728 | 2.3% |
| 2019 | 704,544 | 340 | 22,235 | 3.2% |
| 2018 | 693,318 | 378 | 23,491 | 3.4% |
| 2017 | 680,519 | 398 | 27,600 | 4.1% |
| 2016 | 665,589 | 408 | 30,789 | 4.6% |
| 2015 | 658,048 | 402 | 30,870 | 4.7% |
| 2014 | 651,254 | 216 | 19,094 | 2.9% |
| 2013 | 646,442 | 132 | 11,096 | 1.7% |
| 2012 | 641,475 | 114 | 8,626 | 1.3% |
| 2011 | 637,055 | 137 | 7,046 | 1.1% |
| 2010 | 634,277 | 92 | 3,874 | 0.6% |
| 2009 | 629,667 | 94 | 5,725 | 0.9% |
| 2008 | 625,346 | 182 | 5,952 | 1.0% |
| 2007 | 621,935 | 220 | 4,604 | 0.7% |
| 2006 | 617,373 | 254 | 5,325 | 0.9% |
| 2005 | 613,178 | 242 | 5,247 | 0.9% |
| 2004 | 609,457 | 274 | 4,623 | 0.8% |
| 2003 | 605,127 | 206 | 4,956 | 0.8% |
| 2002 | 603,372 | 115 | 3,700 | 0.6% |
| 2001 | 600,221 | 94 | 3,314 | 0.6% |
| 2000 | 597,580 | 126 | 3,310 | 0.6% |

Source: CoStar, 4Q 2021

**Absorption**

According to CoStar, net absorption has been positive in the Market (even during the pandemic), which is indicative of a strong market in which market demand meets the supply.

Please refer to the table below for information on historical absorption rates in the Market.

| Long Island Market - Apartment Absorption | | |
|---|---|---|
| Period | Net Absorption Units | Net Absorption % |
| 4Q 2021 | 4,293 | 0.60% |
| 4Q 2020 | 1,979 | 0.30% |
| 2021 | 18,290 | 2.50% |
| 2020 | 4,085 | 0.60% |
| 2019 | 10,682 | 1.50% |
| 2018 | 14,617 | 2.10% |
| 2017 | 13,773 | 2.00% |
| 2016 | 8,883 | 1.30% |
| 2015 | 6,766 | 1.00% |
| 2014 | 5,893 | 0.90% |
| 2013 | 6,292 | 1.00% |
| 2012 | 5,297 | 0.80% |
| 2011 | 3,103 | 0.50% |
| 2010 | 4,737 | 0.70% |
| 2009 | 4,279 | 0.70% |
| 2008 | 1,905 | 0.30% |
| 2007 | 3,696 | 0.60% |
| 2006 | 4,370 | 0.70% |
| 2005 | 3,761 | 0.60% |
| 2004 | 1,444 | 0.20% |
| 2003 | -738 | -0.10% |
| 2002 | 1,000 | 0.20% |
| 2001 | 1,472 | 0.20% |
| 2000 | 2,286 | 0.40% |
| Source: CoStar, 4Q 2021 | | |

**MICRO MARKET**

The Property's micro market consists of Kings County as defined by CoStar (the "Submarket"). The map of the micro market is as follows.



**Inventory**

According to CoStar, the Submarket had 19,624 apartment buildings containing 409,131 apartment units. The inventory has been stable.

Please refer to the table below for a presentation of historical supply in the Submarket.

| Period | Inventory (Buildings) | Inventory (Units) | Change (No. of Units) | Change (%) |
|--------|----------------------|-------------------|----------------------|-----------|
| 4Q 2021 | 19,624 | 409,131 | 6,518 | 1.6% |
| 4Q 2020 | 19,465 | 402,613 | 5,089 | 1.3% |
| 2021 | 19,624 | 409,131 | 6,518 | 1.6% |
| 2020 | 19,465 | 402,613 | 5,089 | 1.3% |
| 2019 | 19,384 | 397,524 | 7,257 | 1.9% |
| 2018 | 19,244 | 390,267 | 6,943 | 1.8% |
| 2017 | 19,122 | 383,324 | 9,410 | 2.5% |
| 2016 | 18,982 | 373,914 | 4,177 | 1.1% |
| 2015 | 18,852 | 369,737 | 3,699 | 1.0% |
| 2014 | 18,759 | 366,038 | 2,994 | 0.8% |
| 2013 | 18,694 | 363,044 | 2,819 | 0.8% |
| 2012 | 18,621 | 360,225 | 2,663 | 0.7% |
| 2011 | 18,537 | 357,562 | 1,532 | 0.4% |
| 2010 | 18,489 | 356,030 | 3,360 | 1.0% |
| 2009 | 18,442 | 352,670 | 3,201 | 0.9% |
| 2008 | 18,335 | 349,469 | 1,677 | 0.5% |
| 2007 | 18,215 | 347,792 | 2,086 | 0.6% |
| 2006 | 18,082 | 345,706 | 1,897 | 0.6% |
| 2005 | 17,959 | 343,809 | 2,615 | 0.8% |
| 2004 | 17,782 | 341,194 | 1,528 | 0.4% |
| 2003 | 17,666 | 339,666 | 556 | 0.2% |
| 2002 | 17,620 | 339,110 | 888 | 0.3% |
| 2001 | 17,578 | 338,222 | 787 | 0.2% |
| 2000 | 17,532 | 337,435 | - | - |

Source: CoStar, 4Q 2021

**Vacancy Rates**

According to CoStar, vacancy in the Submarket was 1.90% at the end of 4Q 2021. Vacancy has historically been between 2% and 3%.

Please refer to the table below for a presentation of historical vacancy rates in the Submarket.

| Kings County - Apartment Vacancy | | | | | | | |
|---|---|---|---|---|---|---|---|
| Period | Inventory (Buildings) | Inventory (Units) | Vacant Units | Vacancy | Change (bpts) | Occupancy | Change (bpts) |
| 4Q 2021 | 19,624 | 409,131 | 7,551 | 1.90% | -100 | 98.10% | 100 |
| 4Q 2020 | 19,465 | 402,613 | 10,809 | 2.90% | 70 | 97.10% | -70 |
| 2021 | 19,624 | 409,131 | 7,551 | 1.90% | -100 | 98.10% | 100 |
| 2020 | 19,465 | 402,613 | 10,809 | 2.90% | 70 | 97.10% | -70 |
| 2019 | 19,384 | 397,524 | 7,836 | 2.20% | -20 | 97.80% | 20 |
| 2018 | 19,244 | 390,267 | 8,765 | 2.40% | -30 | 97.60% | 30 |
| 2017 | 19,122 | 383,324 | 9,523 | 2.70% | 20 | 97.30% | -20 |
| 2016 | 18,982 | 373,914 | 8,895 | 2.50% | -20 | 97.50% | 20 |
| 2015 | 18,852 | 369,737 | 9,391 | 2.70% | 0 | 97.30% | 0 |
| 2014 | 18,759 | 366,038 | 9,333 | 2.70% | -20 | 97.30% | 20 |
| 2013 | 18,694 | 363,044 | 10,137 | 2.90% | -20 | 97.10% | 20 |
| 2012 | 18,621 | 360,225 | 10,963 | 3.10% | -10 | 96.90% | 10 |
| 2011 | 18,537 | 357,562 | 11,321 | 3.20% | 0 | 96.80% | 0 |
| 2010 | 18,489 | 356,030 | 11,482 | 3.20% | 10 | 96.80% | -10 |
| 2009 | 18,442 | 352,670 | 10,935 | 3.10% | 0 | 96.90% | 0 |
| 2008 | 18,335 | 349,469 | 10,624 | 3.10% | 40 | 96.90% | -40 |
| 2007 | 18,215 | 347,792 | 9,440 | 2.70% | 0 | 97.30% | 0 |
| 2006 | 18,082 | 345,706 | 9,212 | 2.70% | -10 | 97.30% | 10 |
| 2005 | 17,959 | 343,809 | 9,510 | 2.80% | 0 | 97.20% | 0 |
| 2004 | 17,782 | 341,194 | 9,415 | 2.80% | 40 | 97.20% | -40 |
| 2003 | 17,666 | 339,666 | 8,058 | 2.40% | 30 | 97.60% | -30 |
| 2002 | 17,620 | 339,110 | 6,860 | 2.10% | 30 | 97.90% | -30 |
| 2001 | 17,578 | 338,222 | 5,476 | 1.80% | 20 | 98.20% | -20 |
| 2000 | 17,532 | 337,435 | 4,963 | 1.60% | - | 98.40% | - |
| Source: CoStar, 4Q 2021 | | | | | | | |

<u>Bushwick</u>: The coronavirus pandemic reversed Bushwick's rapid growth, and in 2020, Bushwick saw the first quarterly negative net absorption reading since 2004. As of 4Q 2021, demand has returned to positive levels and vacancy has decreased from the peak, which is indicative of the level of demand units in Brooklyn generate. Vacancies will be tested in the coming years, however, with 2,500 units currently under construction.

Bushwick should be able to count on the same demand drivers that have allowed it to thrive over the past decade. The neighborhood offers excellent transit options and relative affordability. Three subway lines connect the neighborhood to Manhattan, and although rents have risen in recent years, especially in the Class A segment, apartments here are still less expensive than other Brooklyn locations with similar connectivity. At 33, the median age of the neighborhood is one of the lowest in the metro. The lower median age can be attributed to the influx of residents in their 20s to Bushwick and parts of Bed-Stuy. With the migration of young, creative types farther east comes gentrification, and this influx of higher earners has allowed median income growth to rise quickly in recent years.

Different parts of Bushwick have their own drivers. In the past, Fort Greene, Clinton Hill, and the western end of Bed-Stuy saw the most development earlier in the past decade, particularly of high-end properties, given their proximity to Downtown Brooklyn. But as increasing rents across western Brooklyn displace residents, more are migrating eastward. Bushwick is attracting young creative types priced out of areas farther west, as Williamsburg once did.

<u>Williamsburg</u>: The pandemic negatively affected Williamsburg's fundamentals. New properties struggled to fill units for the first time in years as demand was easily outpaced by new supply which caused vacancies to rise.

But the situation has quickly reversed in 2021 as robust demand has helped lower vacancies as Williamsburg remains a top destination for young renters. Williamsburg's excellent demand drivers, including abundant retail amenities, manageable rents compared with Manhattan, and proximity to nearby job centers, should continue to support demand from young professionals.

The supply pipeline will bring further tests to occupancies, with under-construction units totaling 14.9% of existing inventory. Even with the resurgence of the dynamic neighborhood life that made Williamsburg so attractive, a full recovery to the pre-pandemic vacancy rate is likely to take a number of years.

**Rental Rates**

Please refer to the table below for information on historical rental rates in the Submarket.

| Kings County - Apartment Rents | | | | |
|---|---|---|---|---|
| Period | Asking Rent Per Unit | Change (%) | Asking Rent Per SF | Change (%) |
| 4Q 2021 | $2,483 | 3.8% | $3.36 | 4.0% |
| 4Q 2020 | $2,393 | -1.2% | $3.23 | -1.5% |
| 2021 | $2,483 | 3.8% | $3.36 | 4.0% |
| 2020 | $2,393 | -1.2% | $3.23 | -1.5% |
| 2019 | $2,421 | 1.7% | $3.28 | 1.9% |
| 2018 | $2,381 | 1.9% | $3.22 | 2.2% |
| 2017 | $2,336 | 1.0% | $3.15 | 1.0% |
| 2016 | $2,313 | 1.6% | $3.12 | 1.6% |
| 2015 | $2,277 | 2.3% | $3.07 | 2.0% |
| 2014 | $2,225 | 2.3% | $3.01 | 2.4% |
| 2013 | $2,174 | 2.1% | $2.94 | 2.1% |
| 2012 | $2,129 | 1.2% | $2.88 | 1.4% |
| 2011 | $2,104 | 1.3% | $2.84 | 1.4% |
| 2010 | $2,078 | 2.9% | $2.80 | 2.9% |
| 2009 | $2,020 | -10.3% | $2.72 | -10.5% |
| 2008 | $2,252 | -1.2% | $3.04 | -1.3% |
| 2007 | $2,279 | 6.0% | $3.08 | 5.8% |
| 2006 | $2,151 | 5.6% | $2.91 | 5.8% |
| 2005 | $2,036 | 1.5% | $2.75 | 1.5% |
| 2004 | $2,006 | 1.9% | $2.71 | 1.9% |
| 2003 | $1,969 | -0.6% | $2.66 | -0.4% |
| 2002 | $1,980 | -0.1% | $2.67 | 0.0% |
| 2001 | $1,981 | 2.8% | $2.67 | 2.7% |
| 2000 | $1,927 | - | $2.60 | - |
| Source: CoStar, 4Q 2021 | | | | |

<u>Bushwick</u>: Though demand was consistently positive over the past decade, new supply across the metro subdued had caused rent growth to moderate in Bushwick prior to 2020. The coronavirus pandemic put further pressure on rent growth as renter demand was disrupted and

unemployment soared. But the situation has reversed course as occupancies improved and annual rent growth currently stands at 1.1%.

Bushwick may benefit from offering greater value than nearby submarkets, Williamsburg and Downtown Brooklyn, and may see demand from renters looking for larger apartments or a cheaper option with strong transport options. And while concessions have grown more common in 2020, they have declined in recent quarters as occupancies improved.

<u>Williamsburg</u>: Rent growth in Williamsburg slowed in 2020 as the pandemic dampened the dynamic neighborhood life of Williamsburg. But now that the City has lifted social distancing restrictions, rent growth is back in positive territory, registering at 6.8% in the past 12 months. This is a more rapid pace than was measured pre-pandemic.

A large supply pipeline may put pressure on rent for existing properties, and landlords are offering months of free rent and other concessions in order to attract tenants. Recently delivered buildings faced the greatest difficulties during the pandemic. Landlords of these buildings offered significant concessions to attract tenants.

Rents in Williamsburg are the most expensive outside of Manhattan, though they still offer a substantial discount to some of the priciest neighborhoods in New York. However, rents for new buildings in Williamsburg easily rival comparable submarkets in Manhattan, with the average rent for Class A units over $4,000. This is a substantial premium from the rest of Brooklyn and other locations in the outer boroughs.

New Construction

Please refer to the table below for historical information on new construction in the Submarket.

| | | | | |
|---|---|---|---|---|
| **Kings County - Apartment Under Construction** | | | | |
| Period | Inventory (Units) | Under Construction Bldgs | Under Construction Units | Under Construction Percent |
| 4Q 2021 | 409,131 | 13 | 691 | 0.2% |
| 4Q 2020 | 402,613 | 171 | 7,177 | 1.8% |
| 2021 | 409,131 | 13 | 691 | 0.2% |
| 2020 | 402,613 | 171 | 7,177 | 1.8% |
| 2019 | 397,524 | 221 | 11,244 | 2.8% |
| 2018 | 390,267 | 256 | 14,513 | 3.7% |
| 2017 | 383,324 | 262 | 16,107 | 4.2% |
| 2016 | 373,914 | 275 | 18,744 | 5.0% |
| 2015 | 369,737 | 267 | 18,183 | 4.9% |
| 2014 | 366,038 | 143 | 10,594 | 2.9% |
| 2013 | 363,044 | 98 | 6,640 | 1.8% |
| 2012 | 360,225 | 90 | 4,791 | 1.3% |
| 2011 | 357,562 | 101 | 3,518 | 1.0% |
| 2010 | 356,030 | 62 | 2,026 | 0.6% |
| 2009 | 352,670 | 56 | 3,764 | 1.1% |
| 2008 | 349,469 | 121 | 4,368 | 1.2% |
| 2007 | 347,792 | 134 | 2,311 | 0.7% |
| 2006 | 345,706 | 148 | 2,449 | 0.7% |
| 2005 | 343,809 | 138 | 2,407 | 0.7% |
| 2004 | 341,194 | 186 | 2,757 | 0.8% |
| 2003 | 339,666 | 127 | 2,076 | 0.6% |
| 2002 | 339,110 | 58 | 838 | 0.2% |
| 2001 | 338,222 | 44 | 915 | 0.3% |
| 2000 | 337,435 | 55 | 1,041 | 0.3% |
| Source: CoStar, 4Q 2021 | | | | |

Bushwick: Bushwick is amid a large supply wave, adding more than 6,000 units in the past five years. In addition, 2,500 units are under construction, representing 5.8% of existing inventory. Construction starts have slowed since the onset of the pandemic, with 2021 marking the least starts since 2013.

The Bushwick is dominated by Class B & C units housed in low- and mid-rise buildings. The zoning restrictions in the area often limit building height and floor-area ratio to prevent new buildings from changing the character of these neighborhoods. This fact, coupled with demand spilling over from Williamsburg, has emboldened developers to build high-quality buildings here with more than 100 units.

<u>Williamsburg</u>: Williamsburg has been targeted by developers in recent years, due to increased demand from young affluent renters. Much of the neighborhood was once an industrial zone, and many older industrial properties have been converted or demolished into new apartment buildings.

More than 7,000 units have delivered in the past five years, and the current construction pipeline represents 14.9% of existing inventory. Recent construction activity has been concentrated along the waterfront with many projects offering views of the East River.

One of the most notable waterfront projects is Spitzer Enterprise's 420 Kent, where more than 850 units have delivered since the start of 2019 across multiple properties. The first building, consisting of 252 units, delivered in early 2019 and quickly reached a stabilized occupancy level. The second phase of 605 units delivered in 1Q20.

Development on the waterfront is also concentrated in the Greenpoint neighborhood. Several buildings have delivered and are in the works at Greenpoint Landing. The 10-building complex should eventually create 5,500 units. This includes 1,400 affordable units for residents making 30%-120% of the AMI.

One of the largest projects under construction is also located in Greenpoint. Halycon Management's 33-story building, which is expected to deliver in 2022, will add 700 units to the submarket. The waterfront site is a former industrial park that was destroyed by fire in 2006.

*MARKET ANALYSIS*

**Absorption**

According to CoStar, net absorption has been positive in the Submarket, which is indicative of a strong market in which market demand meets the supply.

Please refer to the table below for information on historical absorption rates in the Submarket.

| Kings County - Apartment Absorption | | |
|---|---|---|
| Period | Net Absorption Units | Net Absorption % |
| 4Q 2021 | 2,231 | 0.50% |
| 4Q 2020 | 768 | 0.20% |
| 2021 | 9,906 | 2.40% |
| 2020 | 1,980 | 0.50% |
| 2019 | 8,208 | 2.10% |
| 2018 | 7,744 | 2.00% |
| 2017 | 8,798 | 2.30% |
| 2016 | 4,633 | 1.20% |
| 2015 | 3,692 | 1.00% |
| 2014 | 3,819 | 1.00% |
| 2013 | 3,673 | 1.00% |
| 2012 | 3,022 | 0.80% |
| 2011 | 1,694 | 0.50% |
| 2010 | 2,813 | 0.80% |
| 2009 | 2,893 | 0.80% |
| 2008 | 497 | 0.10% |
| 2007 | 1,859 | 0.50% |
| 2006 | 1,967 | 0.60% |
| 2005 | 2,520 | 0.70% |
| 2004 | 164 | 0.00% |
| 2003 | -665 | -0.20% |
| 2002 | -593 | -0.20% |
| 2001 | 229 | 0.10% |
| 2000 | 882 | 0.30% |
| Source: CoStar, 4Q 2021 | | |

**MARKET ANALYSIS CONCLUSION**

As of the Effective Date, the fundamentals in the Market and the Submarket have been improving following the impacts of COVID-19 and are expected to continue to remain stable in the long term, with near-term uncertainty.

# RENT-REGULATED PROPERTIES

A subset of the multi-family property type in New York City are the rent-regulated properties. Following the November 2018 election, New York's State Senate, which had a Republican majority for over a decade, became under Democratic control. New York's rent stabilization laws were up for renewal in June 2019, and many landlords believed that upcoming change in stabilization law would favor tenants and make it more difficult to realize upside potential associated with converting regulated units to market. Sale brokers corroborate this perception, and noted that sales activity of rent-regulated buildings had come to a pause which was expected to continue until clear indication of the new laws would be available. During the first half of 2019, prior to the passing of the new laws, some brokers opined that rent-regulated building will not trade solely on the basis on their upside potential, but closer to "fully market" buildings in terms of return requirement (slightly below given secure income stream and some future upside potential).

### Historic Background

Various forms of rent regulations have been around in New York State, and especially in the City of New York, for almost two centuries. The City's population experienced dramatic growth over various periods in its history, however the supply of rental housing has been limited by a variety of public actions, such as zoning laws which limit the size, use and location of residential housing, building codes which restrict materials used in construction and design, historic preservation laws which limit demolition or alteration of certain structures; wage and labor policies raise the expense of construction and maintenance, public ownership of parks, roads and other spaces which limit the availability of building sites. These public actions, which benefited the general public, also indirectly raise the cost of new construction and site acquisition and thereby contribute to the housing shortage. While this is true in every city, in a highly congested area such as New York City, the costs and benefits of public intervention are more pronounced.

The continuation of these regulations has been dictated by the inability of public housing programs or of the private housing market to produce an adequate supply of affordable housing in various municipalities in the State. In these municipalities, government regulations minimize market distortions created by a housing shortage (the net rental vacancy rate being less than 5%). As a result, a temporary emergency measure has been transformed into a stable fixture of New York's housing market.

### *Post-World War I Controls*

The first emergency rent laws were introduced in 1919 and adopted in 1920. Emergency Rent Laws of 1920 were adopted in the wake of dramatic increases in eviction proceedings and a collapse in new construction caused by a diversion of resources to the World War I effort. Under these laws the courts of New York State were effectively charged with the administration of rents. When challenged by tenants, rent increases were reviewed according to a standard of "reasonableness". Effectively, any increase over that of a prior year was presumed "unjust, unreasonable and oppressive" unless an owner could demonstrate otherwise. Landlords seeking to justify rent increases were generally required to submit a Bill of Particulars setting forth gross income and expense figures.

The housing shortage of the early 1920's was severe. Vacancy rates fell below 1% from 1920 through 1924. To induce new construction, the City exempted all properties built between 1920

and 1926 from property taxation until 1932. In addition, all units constructed after September 27, 1920 were exempt from the rent laws. Notwithstanding the presence of relatively strict rent protections for existing units, new construction proceeded at a record pace, with hundreds of thousands of new apartments being added to the stock before the decade ended. By 1928 the City's vacancy rate was approaching 8% and rent regulations were no longer needed. A phase out began in 1926 in the form of luxury decontrol – exempting units renting for more than $20 per room per month. After 1928, apartments renting for $10 or more, per room, per month were excluded. The Rent Laws of 1920 expired completely in June 1929, although limited protections against unjust evictions were continued.

### Federal Rent Controls 1943-1950

The next phase of rent regulations, which started in 1943 following the Emergency Price Control Act of 1942 (a federal act), has been in continuous existence in New York State through the present. The laws have been substantially changed and modified, the location and type of housing subject to regulation periodically altered, and the responsibility for administering the rent regulatory system has also shifted between various governmental jurisdictions: federal, state and city.

In 1942, President Franklin D. Roosevelt signed into law the Emergency Price Control Act ("EPCA") which provided for a universal, nationwide price regulatory system. Price controls were the government's response to inflationary pressures resulting from a fully employed wartime economy that channeled resources exclusively to the war effort. Price controls for rental apartments in residential areas were included in the EPCA. Rents in most counties in the State were placed under Federal regulation. In November 1943 the Federal Office of Price Administration issued regulations freezing New York City rents at the March 1943 levels.

With the end of the war and the normalization of the national economy, the EPCA was allowed to expire in June 1947. In its place Congress enacted the Federal Housing and Rent Act of 1947 which became effective in July 1947. Under this Law, new construction after February 1, 1947 was totally exempted from controls while pre-1947 buildings remained subject to continuing regulation (even today, the February 1, 1947 initial occupancy date remains a key determinant in establishing the control status of housing accommodations in New York State and New York City).

### State Rent Controls 1950-1962

In anticipation of the withdrawal of Federal controls and because of the continuing housing shortage, the State adopted its own set of regulations. Subsequent Federal legislation, the 1949 Federal Housing and Rent Act, gave the States authority to assume administrative control of rent regulation and the power to continue, eliminate or modify the Federal system.

In 1950, the Temporary State Housing Rent Commission was designated as the agency responsible for administering the regulation of rental housing by Chapter 250 of the Laws of 1950. This Act also froze rents at the level in effect on March 1, 1950, in order to give the Commission time to develop a rent control plan for New York. To ease the transition from Federal controls, the plan that was adopted by the Legislature in 1951 closely paralleled the Federal regulatory system that was in effect.

At the time of the initiation of State rent control, approximately 2,500,000 rental units were under control statewide. About 85% of these units were in New York City. The State system regulated

all relationships between owners and tenants pertaining to rents, services and evictions. To administer the system local rent offices were established throughout the State.

As the severe housing shortage created by World War II and the inflationary pressure caused by the Korean War (1950-1953) gradually abated, the State enacted a series of limited decontrol measures. Apartments in one or two-family houses which became vacant on or after April 1953 were exempted from controls; counties, cities and towns outside of New York City were given decontrol power; and in 1958, the first luxury decontrol order was issued which deregulated approximately 600 units in New York City then renting for more than $417.66 per month unfurnished and $500 per month if the apartment was furnished.

By 1961, there were approximately 1,800,000 units subject to rent control throughout the State. Only in New York City and 18 counties outside of the City contained rent controlled units.

*Rent Control and Rent Stabilization 1962-1984*

While the gradual decontrol trend continued throughout much of the 1960's, a significant administrative change occurred at the beginning of the decade. In 1962, the responsibility for administering rent control within New York City was transferred to the City under the Local Emergency Rent Control Act. This Law enabled the City to shape its own rent control program, since the overwhelming majority of controlled units were located in the City. The administration of State rent control was transferred from the Temporary State Housing Commission to the State Division of Housing and Community Renewal ("DHCR") in 1964.

In 1964, approximately 5,000 "high" rent apartments in New York City were decontrolled (unfurnished units renting for $250 per month or more and furnished units renting for $300 or more as of April 1960). Decontrol was staggered. Units were decontrolled immediately upon vacancy, while occupied units were subject to a test based on family size and characteristics (such as families with school age children) and apartment size.

A 1965 housing survey revealed a vacancy rate of 8.8% in unfurnished and furnished apartments with rents in excess of $250 and $300 respectively. A 1968 order decontrolled units with such rents as of April 1, 1965. This decontrol measure was also staggered. Approximately 7,000 units were decontrolled under the 1968 Administrator's order.

By 1969, economic conditions changed as a result of national as well as local economic factors. Nationally, the Vietnam War caused a steep rise in the rate of inflation and locally, housing production dropped. The overall vacancy rate which stood at 3.2% in 1965 fell drastically to 1.2% in 1968. Rents escalated rapidly in the non-regulated sector. The tightening of the rental housing market led the City to enact the Rent Stabilization Law of 1969. Approximately 400,000 New York City apartments, in buildings containing 6 or more units, which were exempt from rent control became covered by rent stabilization. Of the 400,000 apartments, 325,000 were in buildings constructed after February 1, 1947. Approximately 75,000 of the 400,000 apartments were former rent controlled apartments which had been decontrolled.

Rent Stabilization is substantially different from rent control applicable to pre-1947 buildings. The Rent Stabilization Law, which contains a built-in rent adjustment mechanism and a simplified procedural structure, was designed to more readily adapt to changes in the housing market place. This "second generation rent regulation law" featuring industry self-regulation, was conceived as a flexible response to the housing shortage. The Rent Stabilization Law provided for the

establishment of a Rent Guidelines Board with the power to establish levels of rent increases for renewal leases and new tenancies. The Law authorized the creation of the Conciliation and Appeals Board ("CAB") to receive and act on complaints from tenants and applications from owners. The Law also provided for the Rent Stabilization Association ("RSA") to develop a code of regulations. Owners were required to join RSA and comply with the provisions of the code in order to prevent their apartments from being placed under rent control.

The newly established, less stringent, rent stabilization system incorporated an automatic mechanism for periodic rent adjustments. An adjustment feature was soon added to the rent control system in order to preserve, maintain and improve this older housing stock. This adjustment feature, enacted by Local Law 30 of 1970, is the Maximum Base Rent ("MBR") program, which was the most significant revision of the City's rent control system. In the MBR program, a mathematical formula is used to compute the maximum rent levels for each controlled apartment in the City. This theoretical maximum base rent represents an approximation of the actual income required to operate the housing unit under current costs, including provisions for an 8.5% return on equalized assessed value. The MBR is adjusted every two years to reflect changes in economic conditions. Rent increases under the MBR program were capped at 7.5% a year and were applied until the MBR is reached. To qualify for a rent increase under the program, the owner must provide essential services, keep the building free of major code violations and invest an appropriate amount of rental income for operation and maintenance.

In 1971, soon after New York City extended rent stabilization to post-1947 buildings, the State passed several laws designed to deregulate, over time, the controlled and stabilized housing stock. Chapter 371 of the Laws of 1971 provided for decontrol of rent controlled and rent stabilized units which were voluntarily vacated on or after July 1971. Thus, owners could set market rents upon vacancy. In addition, the "Urstadt" Law, named after the then State Housing Commissioner Charles Urstadt, prohibited any municipality in the State from adopting new regulations that were more stringent than those that were presently in effect.

From July 1971 through December 1973 approximately 300,000 rent controlled units were decontrolled and approximately 88,000 rent stabilized apartments were destabilized. Rapid inflation caused by the continuing Vietnam War was the economic hallmark of this period. In response, the Federal government imposed a 90-day wage and price freeze in late 1971. The Federal program was completely discontinued in January, 1973. However, the general price inflation during the period, combined with vacancy decontrol, resulted in very large rent increases for apartments located in New York City and its surrounding suburbs.

In response to these spiraling rent levels, Governor Nelson Rockefeller directed the Temporary State Commission on Living Costs and the Economy of the State of New York to conduct hearings and make recommendations on vacancy decontrol. The Commission, under then Chairman Andrew Stein, recommended the repeal of vacancy decontrol. Its findings indicated that vacancy decontrol resulted in average rent increases of 52% in decontrolled apartments and 19% in previously stabilized units in New York City, while operating costs increased by 7.9%. Vacancy decontrol resulted in average rent increases of 47% in Nassau County and 45% in Westchester County. According to the Commission, in New York City, the excess rent was not reinvested in capital improvements, but in fact resulted in an actual decrease of 30% in renovations.

The State Legislature's response to rising public apprehensions caused by rapid rent increases and an inadequate supply of affordable housing was the enactment of the Emergency Tenant

Protection Act of 1974 ("ETPA"). ETPA provided for a stabilization system in Nassau, Rockland and Westchester counties in municipalities which chose to adopt such regulations based on a housing emergency, meaning the vacancy rate was less than 5%. The Act also substantially amended the New York City Rent Stabilization Law, and ended the vacancy decontrol provisions of the 1971 legislation as they applied to rent stabilization.

In New York City, the ETPA placed buildings with six or more units that were completed between March 1969 and December 1973 under rent stabilization for the first time. In addition, rent controlled units and rent stabilized units, in buildings with six or more units and deregulated by vacancy decontrol, were re-regulated and placed under stabilization (the vacancy decontrol provisions for rent controlled apartments remained in effect and these units either become stabilized or decontrolled upon vacancy).

In Nassau, Rockland and Westchester counties, the ETPA allowed for local determination of its applicability. Buildings with six or more housing units completed prior to January 1974 could be placed under regulation. The Act also directed the creation of county rent guidelines boards ("RGB") to determine annual rent adjustments for classes of housing within the respective counties. The New York State Division of Housing and Community Renewal (DHCR) was directed to implement the ETPA outside of New York City.

### State Regulation 1984 to 2015

After this flurry of activity in the early 1970's which reshaped rent regulation downstate, the next major change in the rent regulation laws did not occur for almost a decade. On June 30, 1983, the Omnibus Housing Act, Chapter 403 of the Laws of 1983, was enacted. The Act transferred the administration of the rent control and rent stabilization programs in back to the State. Commencing April 1984, the New York State DHCR administered all four rent regulatory laws, statewide:

- The Emergency Housing Rent Control Law of 1950.
- The Local Emergency Rent Control Act of 1962.
- The Rent Stabilization Law of 1969.
- The Emergency Tenant Protection Act of 1974.

The 1983 Omnibus Housing Act abolished the CAB and the New York City Division of Rent Control. The Act required owners to register by July 1, 1984 the rents and services in effect on April 1, 1984 for all stabilized apartments and to update that registration each year. In addition, the Act eliminated the availability of three year leases as a lease renewal option for tenants. The 1983 Act also limited the rent guidelines boards' power to adopt several adjustments or special guidelines at different times during a guidelines year. The boards could now adopt only one guidelines "package" during the guidelines year. The Act instituted a treble damage penalty for owners who collected willful overcharges and also placed a four year statute of limitations on the establishment of overcharges. Finally, the Act provided for an alternative hardship application procedure for stabilized units.

The next major revision of the rent laws occurred with the passage of the Rent Regulation Reform Act of 1993. The Act deregulated vacant apartments and occupied regulated apartments, which became vacant, that rented for $2,000 or more per month between July 7 and October 1, 1993. In addition, rent regulated apartments renting for $2,000 or more per month as of October 1,

1993, which are occupied by tenants with combined household incomes in excess of $250,000 in each of two immediately preceding years are deregulated upon application by the owner, at the expiration of the stabilized lease. For rent controlled tenants in this category, decontrol will occur on March 1st or June 1st of the year following the year in which the owner filed a petition for decontrol depending on the nature of the proceeding. This income based decontrol process, administered by DHCR, relied upon data furnished to it by the New York State Department of Taxation and Finance as part of the income verification process.

While the luxury decontrol provisions of the 1993 Act affected only 1% of the more than 1 million units under regulation in New York, they represent a significant departure from previous legislation because eligibility criteria were applied to the economic characteristics of the household. This was the first time in New York's history of rent regulation that a "means test" has been employed to determine the regulatory status of the housing unit.

The 1993 law also established one-fortieth the cost of individual apartment improvements as the allowable monthly rent increase when such improvements are made. It extended ETPA until June 1997, and was followed by the Rent Regulation Reform Act of 1997, under which the laws were renewed for six more years, with some major changes, including allowable vacancy increases, modification to succession rights, reduction of combined household incomes in excess of $250,000 to $175,000 as threshold for high-income decontrol, removing "hold-out" rent controlled tenants from buildings where the owner seeks to demolish and construct new units (if such tenants occupy less than 10% of the units in a building the owner may remove such tenants, but must provide relocation benefits established by the DHCR), as well as a few other changes.

The Rent Law of 2003 extended the regulation until 2011; it allowed for the deregulation of an apartment upon vacancy if the legal regulated rent may be raised above $2,000, even if the new tenant is not actually charged an amount above $2,000, and permitted an owner, upon renewal, to increase a rent stabilized tenant's rent to the maximum legal regulated rent, regardless of whether a tenant has been paying a preferential rent (but did not prohibit contractual agreements between owners and tenants to maintain the preferential rent after renewal).

The Rent Act of 2011 extended the regulation until 2015; it limited the vacancy increases to once every calendar year, amended the increase in rent due to individual apartment improvements (1/40 of costs for building larger than 35 units and 1/60 of the costs for buildings 35 units or fewer), and adjusted high-rent/vacancy deregulation to $2,500 and high-rent/high-income deregulation to $200,000.

The Rent Act of 2015 extended the regulation until June 2019; it adjusted high-rent/vacancy deregulation to $2,700, extended amortization of major capital improvement ("MCI") from 7 years to 8-9 years, depending on building size, and limited vacancy lease increases based on historical vacancy frequency for each unit.

The history of rent regulation as described above provides some insight into the complexity and difficulty of achieving the goal of establishing fair rents in a market where there is a housing shortage. The goal is simply to introduce fairness into a market. However, complexities arise from the necessity of balancing the interest of owners seeking a fair return on investment and the interest of tenants seeking protection from excessive rent increases. This balancing of interests necessitates that rent regulation be more than a mechanism to restrain rent increases but also be a system to maintain an adequate supply of affordable housing.

**The Housing Stability and Tenant Protection Act of 2019**

On June 14, 2019, the State legislator passed "The Housing Stability and Tenant Protection Act of 2019". The 74-page legislation, which Governor Andrew Cuomo signed into law right after it passed, strengthened tenant protections for residents of the nearly one million rent-stabilized apartments in New York City, and  made the rent regulation laws permanent, after 40 years of State rent laws expiring every four to eight years and then being temporarily extended. The new rent regulations dramatically limited landlords' ability to raise rents on the basis of building and apartment renovations.

A June 2019 research report published by The Greysteel Company LLC provided a summary of the changes resulted from The Housing Stability and Tenant Protection Act of 2019, as follows:

*RENT-REGULATED PROPERTIES*

| The Housing Stability and Tenant Protection Act of 2019 - Regulation Changes | | |
|---|---|---|
| **Regulation** | **Prior to June 2019** | **Revision in the June 2019 Rent Act** |
| **Rent Regulation Laws Expiration** | Rent regulation laws required renewal every four to eight years | Rent regulation laws are permanent, only an act of the legislature can repeal or terminate them |
| **High-Income Deregulation** | Landlord allowed to charge market-rate rent for a unit if the tenant's income exceeded $200,000 for two years in a row | Elimination of High-Income Deregulation |
| **High-Rent Deregulation** | Landlord allowed to deregulate a unit if it became vacant and the rent surpassed a certain threshold ($2,774.76/ month) | Elimination of High-Rent Deregulation |
| **Vacancy Bonus** | Landlord allowed to raise rents as much as 20% each time a unit becomes vacant | Elimination of Vacancy Bonus |
| **Longevity Bonus** | Landlord allowed to raise rents by additional amounts based on the duration of the previous tenancy | Elimination of Longevity Bonus |
| **Preferential Rents** | Landlord, who has offered a tenant below legal regulated rent, is allowed to raise "preferential rent" to the full legal rent upon renewal | Landlord prohibited from raising rent to the full legal rent upon renewal, but allowed to charge full legal regulated rent once vacant and rent-setting regulatory agreements with federal or state agencies will still be permitted |
| **Major Capital Improvements (MCI)** | Rent increases capped at 6.0% on units with MCIs and rent increases don't expire | Rent increases capped at 2.0% (also attributable to MCIs completed within the past seven years) and expires after 30 years, with a requirement that 25% of MCIs be inspected and audited by a city agency |
| **Individual Apartment Improvements (IAI)** | No cap on IAI spending limit and rent increases don't expire. Rent increase calculated based on 1/40 of the costs for building with 35 units or fewer, or 1/60 of the costs for building with more than 35 units. | Caps the amount of IAI spending at $15,000 over a 15-year period (limited to three IAIs during that time period with a maximum of one every 10 years) and expires after 30 years, with a requirement to clear any hazardous violations prior to an IAI rent increase violations in the apartment before collecting an increase. Rent increase calculated based on 1/168 of the costs for building with 35 units or fewer, or 1/180 of the costs for building with more than 35 units. |
| **Condo/ Co-Op Conversions** | Required 15% of apartments to be sold and the purchasers may be outside investors; an option of "eviction plans" allowed | Requires 51% of tenants agree to purchase apartments before the conversion can be effective, eliminates the option of "eviction plans" and institutes reforms for non- eviction plans. |
| **Owner Use Exception to Rent Regulation** | Landlord allowed to refuse renewal of a rent stabilized lease in order to take possession of one or more dwelling units for personal or immediate family use; eviction process may begin once the current lease expires with notice | Limits the use of the "owner use" provision to a single unit and requires that the owner (or immediate family) use the unit as their primary residence; long-term tenants protected from eviction under this exception by reducing the current length of tenancy required to be protected from eviction to 15 years. |
| **Rent Overcharge Look-Back** | Landlord can be found liable for rent overcharge claims using a four-year look-back period to determine a reliable base rent and can avoid treble damages if the amount of the rent overcharge is voluntarily returned prior to a court or HCR decision | Look-back period extended to six years (or more if necessary) to determine a reliable base rent and treble damages no longer avoidable; tenants are allowed to assert their overcharge claims in court or at HCR. |
| **Stabilized Apartments Rented by Nonprofits** | Rent-stabilized units provided by nonprofits to individuals who are homeless or are at risk of homelessness will remain rent-stabilized | No change |
| **Class-Specific Renewal Increases** | No precedent | Prohibits RGB from setting additional increases based on the current rental cost of a unit or the amount of time since the owner was authorized to take additional rent increases, such as a vacancy bonus. |
| **Large Rent Increases for Rent-Controlled Tenants** | No precedent | Maximum Collectible Rent increases calculated using the average of the five most recent RGB annual rent increases for one-year renewals; fuel pass-along charges prohibited |
| **Annual Report from HCR** | No precedent | Requires HCR to submit an annual report on the programs and activities undertaken by the Office of Rent Administration (ORA) and the Tenant Protection Unit (TPU) regarding implementation, administration, and enforcement of the rent regulation system. |
| **Housing Security and Tenant Protections** | No precedent | Creates transformational protections for all residential tenants, bans the use of tenant blacklists, limits security deposits to one month's rent, includes protections for tenants during the eviction process, and creates the crime of unlawful eviction |



**The Effects on Rent-Regulated Properties' Business Strategy, Operation, and Valuation**

The Housing Stability and Tenant Protection Act of 2019 (the "Act") resulted in a 30% to 50% decline in values for properties with rent-regulated units. Some of the reasons for the decline in values are outlined below:

- Since the new law eliminated the ability of owners to realize the upside potential associated with the difference between legal rent and market rent (and in many cases even between preferential rent and legal rent), buyers will now require a "satisfactory return", or a cap rate, which is based on <u>in-place</u> income in pricing a property. The cap rate is affect by multiple considerations, including:

  - Uncertainty related to the future actions of the legislature with respect to the new law – i.e. the question-mark related to future amendments to the law in the coming months or years, and if those will improve or worsen the position of the owners has an effect on the cap rates.

  - Some participants are of the opinion that some of the changes with the laws will be revised in a few years from now once unintended consequences of the law become apparent (loss of jobs in industries related to renovation of and services provided to rent-regulated properties, deterioration of assets and potentially abandonment of assets). These participants expects cap rates for regulated properties to remain below market properties.

  - Others believe that with the current political environment the worse has yet to come, and expect a further pro-tenant shift in the law in the coming months. These participants estimated current cap rates for regulated properties well above market properties.

  - Another group of participants view the political map as constantly changing and believe that it may take a cycle of 7-10 years before some of changes in the law will be reversed. These participants expect cap rates to be in-line with market properties.
  - Additional uncertainty associated with real estate tax hikes was also mentioned as a key consideration which is expected to impact future cash flows.

  - Some participants indicated the preference of operating a market property over a regulated property due to the reduced effort associated in operating such properties (from the perspective of dealing with tenancy and bureaucracy). These participants assert that cap rates of regulated properties should be higher than market properties at this point of time.

  - Some participants indicated that while the law eliminate traditional ways to increase cash flow over the holding period, they expect to find alternative ways to do so over time. These participants assert that cap

rates should still stay below market properties.

- The low interest rate environment has a positive effect on cap rates, including for regulated properties.

## HIGHEST AND BEST USE

Highest and best use is defined by *The Dictionary of Real Estate Appraisal*, Sixth Edition published by the Appraisal Institute as:

> *The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.*

> Legally Permissible: What uses are permitted by zoning and other legal restrictions?

> Physically Possible: To what use is the site physically adaptable?

> Financially Feasible: Which possible and permissible use will produce any net return to the owner of the site?

> Maximally Productive: Among the feasible uses which use will produce the highest net return, (i.e., the highest present worth)?

The highest and best use conclusions for the properties within the Portfolio are presented in the supporting schedules which were provided by Level Valuation to the Client and saved in an agreed upon Dropbox folder.

# VALUATION METHODOLOGY

### OVERVIEW

As part of our analysis, we considered and evaluated each of the three traditional approaches to value: income capitalization, sales comparison, and cost. The three approaches are defined briefly as follows:

### Cost Approach

The cost approach involves an analysis of the physical value of the property. That is, the current market value of the land, assumed to be vacant, plus the depreciated cost of the improvements present on the site. Depreciated cost is based on the estimated cost of replacing the structural and site improvements, less any accrued depreciation from physical deterioration, functional obsolescence, and or external obsolescence.

### Sales Comparison Approach

This approach is based on the principle of substitution. That is, when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming no costly delay occurs in making the substitution. Since no two properties are ever truly identical, the necessary adjustments for differences in quality, location, size, services, and market appeal between the appraised property and comparable (substitute) properties are a function of the appraiser's experience and judgment.

### Income Approach

This approach entails an analysis of the property in terms of its ability to provide a sufficient net annual return on investment capital. There are two techniques used to assess the economic potential of the appraised property; direct capitalization and discounted cash flow analysis. The discounted cash flow analysis technique discounts a property's forecasted future income flows over a stipulated holding period to arrive at an indication of present value. Direct capitalization employs an overall capitalization rate to a stabilized income stream to arrive at an indication of value.

The cost approach was not deemed required by the scope of work and therefore not developed. The sales comparison and income approaches provide reliable indications of market value, independent of the cost approach. The sales comparison approach was developed (in most cases) as a corroborating approach.

The methodologies used for properties within the Portfolio are presented in the supporting schedules which were provided by Level Valuation to the Client and saved in an agreed upon Dropbox folder.

**VALUATION METHODOLOGY**

ADDITIONAL DETAILS

**Cost Approach.** The cost approach to value was not developed as part of the analyses since investors do not consider this approach when making investment decisions for such properties.

**Sales Comparison Approach.**   As noted earlier, this approach is based on the principle of substitution - when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming no costly delay occurs in making the substitution. Market participants indicate that, considering the large volume of transactions, buyers and sellers in the Portfolio's market monitor comparable transactions' metrics and pricing, which they consider in the investment decision-making process. Accordingly, with exception of a handful of properties for which truly comparable sales (or sales with some reasonable level of comparability) were not found, a value estimate was developed for all of the Portfolio's properties using the sales comparison approach.

**Selection of Comparable Sales**

In selecting comparable sales for each property, we attempted to include information regarding the sale of properties with similar attributes, with emphasis on the following:

- Property type – multi-family with market units, multi-family with regulated units, mixed-use properties which include a retail component, etc.;
- Location – to the extent possible, within the same neighborhood;
- Property size – each property size category attracts different types of buyers, with different investment perspective; and
- Property age – new construction vs. older buildings;

For all but a few of the comparable sales, we obtained and analyzed historical financial information and projections associated with the transaction, in comparison to the subject properties, under the understanding that differences in net operating income ("NOI") per unit of comparison, in many cases, will reflect less observable differences between buildings, such as building quality/conditions, units sizes, interior amenities and proximity to trains.

**Units of Comparison**

Traditionally, buyers and sellers in the market considered price per unit and even more so price per square foot as the main units of comparison by which a potential investment is measured against alternative investments. However, given the apparent demographic changes over the past few years, and the current prevalence of shared occupancies of units, rental income is fundamentally generated by an individual bedroom within the unit. Changes in space requirements by occupants lead to reconfiguration of older buildings through renovation to increase bedroom count to maximize rent (of course, along-side of improving the condition and appearance of a building). We observed similar trends in new construction of rental buildings, in which bedroom count is maximized through creation of smaller bedrooms and in some cases mezzanine level bedrooms (which may skew other metrics of pricing measurements). Accordingly, investors are shifting more and more attention to price per bedroom as a unit of comparison. Still, market participants indicate that investors, while understanding how buildings generate income, are looking for a deal to "make sense" on a price per square foot and a price per unit.

In our analyses, we considered all three units of comparison, and based on feedback from market

participants, placed more weight on price per square foot than other metrics. We also note that in cases where a property includes a significant retail component, price per unit and price per bedroom measures can sometimes be misleading, and there were instances in which we decided to focus solely on price per square foot as a unit of comparison.

**Income Approach.** All of the properties within the Portfolio are income-producing, and are generally purchased on the basis of their income generation capacity. Accordingly, a value estimate using the income approach was developed for all properties.

Estimating a value based on the income approach involves two steps: the first is projecting future cash flows which can be generated from a property, and second is pricing this cash flow through the use of capitalization rates or income multiples. The following sections describe the framework of our income approach analyses of the properties within the Portfolio.

**Cash Flows**

Most of the income associated with the properties is generated from renting the residential units and any available commercial spaces. Other sources of income can include parking, laundry and in some case use of amenities. The main expense items include real estate taxes, property insurance, utilities, repairs and maintenance, and management fees.

**Market Rent**

Since residential leases are typically signed on an annual basis, the best comparable rentals are usually derived from leases at the subject property. Accordingly, when rental information was available at the subject property (which was the case for the majority of the properties), review of the rent roll was the first step in our residential rental analysis, and was given most weight in our market rent selection.

In addition, we interviewed residential rental brokers focusing on Northern Brooklyn neighborhoods. The following table summarizes rental rates indicated by brokers for the neighborhoods in which the Portfolio has a large presence.

*VALUATION METHODOLOGY*

| Residential Rental Brokers' Market Rent Survey | | | |
|---|---|---|---|
| Neighborhood | Unit Type [1] | Market Rent Per Bedroom | |
| | | Min | Max |
| Bedford Stuyvesant | Small | $1,200 | $1,300 |
| | Large | $900 | $1,000 |
| Bushwick | Small | $1,200 | $1,400 |
| | Large | $900 | $1,100 |
| Crown Heights | Small | $1,300 | $1,500 |
| | Large | $1,200 | $1,300 |
| Williamsburg | Small | $2,000 | $2,500 |
| | Large | $1,400 | $2,000 |

Notes:

[1] Small units refer to 2BR units, large units are 3BR or more.

Additional comments by brokers:

- Bedroom sizes do not effect pricing

- Finished basement, although not legally considered bedrooms, generate rent which is similar to a bedroom.

- Backyard access adds $200-$300 per month for the unit's rent.

- Mezzanine bedrooms are considered full bedrooms.

- Older, unrenovated building - rental rates will be $100 lower per bedroom.

During 2020 and early in 2021, vacancy across the market and the Portfolio increased as part of the effects of COVID-19. While some reduction in market rent was observed, most landlords offered heavy concessions – as high as 5 month free on a 12-month lease - in order to attract tenants to their buildings. Similar concessions were offered by the Client for many of the properties within the Portfolio. However, by the end of 2021, occupancy has increased back to pre-COVID levels; the residential units within 98 of the 106 Portfolio properties were fully leased, with an average occupancy of 99.2% across the entire Portfolio. As a result, rental rates have rebounded to their pre-COVID levels.

Retail leases are typically longer term, 5-10 years. In estimating market rent for retail spaces, we looked at each subject property's rent roll to identify recently signed leases, obtained information regarding recently signed leases at comparable properties and interviewed retail brokers (when possible).

**Operating Expenses**

The Client provided us with multiple years of operating statements for each operating property within the Portfolio. In estimating the subject properties' operating expenses, we primarily relied on historical operations performance, which we benchmarked against operating results for

comparable properties.

Real estate taxes – for existing properties, we assumed real estate taxes in-line with historical figures. For newly built properties, an adjustment was assumed based on taxes per square foot estimated using comparable newly constructed properties.

**Income Capitalization**

For each of the properties within the Portfolio, we considered two methods to convert projected cash flows into value indication: (1) capitalization of a single year of net operating income using a market-based capitalization rate, and (2) applied a market-based multiplier to the estimated effective gross income. In all cases, the direct capitalization method was applied, with the effective gross income multiplier method only applicable in certain cases.

### Capitalization Rates

A capitalization rate, or cap rate, which is expressed in percentages, is used to convert a single year of net operating income into a value indication. It represents a required return on an investment which considers risk-free rate of return, the risk associated with owning and operating a property, and the expected future cash flow and value appreciation.

There are various methods to estimate an appropriate cap rate, including analyzing comparable sales, interviewing buyers and sellers, reviewing published surveys and a buildup based on quantifying the cap rate's components (mentioned in the previous paragraph). It should be noted however, that no matter how a cap rate is estimated, it should be associated with a consistent methodology to estimate NOI (for both the subject property and the comparable sales from which the cap rate is being extracted), in terms of NOI timing (in-place, trailing twelve months or future year) and how expense line items are considered.

For the properties within the Portfolio, there are several main factors which affected the cap rate selection, as follows:

- Property size – expressed in transaction dollar volume and helps identify the profile of a potential buyer, and in turn, their required return;
- Property type – multi-family vs. mixed-use residential with retail space;
- Upside potential – value-add vs. stabilized "maxed-out" property;
- Location – established neighborhoods vs. neighborhoods in transition; and
- Property condition.

### Property Size

As noted above, property size, expressed in dollar amount of a transaction, helps identify profiles of potential buyers of a property, and in turn the sources of money and return requirements.

A large portion of the Portfolio is comprised of 6-8 unit walk up buildings, primarily with market rate units. Buyers of these properties, which are trading at a range of $1 million and up to approximately $10 million, are typically local investors using private resources. Based on our analyses of transactions of such properties in recent months, combined with interviews of market participants, cap rates for these properties range from 5% to 6% (typically around the middle of the range).



Larger renovated properties, trading from $10 million and up to $20-$30 million are typically acquired by local families that own other properties in the area and are looking to add to their holdings, as well as small funds, syndicators, and owners of several smaller buildings which are looking to consolidate into one larger building and typically will to take slightly lower returns using 1031 exchange money.

Properties priced between $20-$30 million and $50-$60 million are typically acquired by high net worth buyers, often coming from outside of the NYC area and looking for yield alternatives, or real estate private equity allocating funds for these types of properties.

Above this range, properties are targeted by institutional investors, such as large real estate managers, REITs and pension funds. Cap rates of mid- to high- 4% are observed in such transactions.

### Location

Based on our research, all of the properties within the Portfolio are located within neighborhoods which at the current time, are considered to be desirable from an investment standpipe (some more desirable than others). Feedback from market participants indicates that Williamsburg, Greenpoint and Crown Heights are considered by investors to be more established than Bushwick and Bedford Stuyvesant; however, differences in cap rates between these neighborhoods, if any, are very subtle, and typically result from attracting certain profile of buyers – for example, buyers using 1031 exchange money willing to pay higher prices for "parking" their money in a location which is perceived as more established. According to market participants, differences between neighborhoods, as well as location within a neighborhood, are reflected in achieved rents and net operating income.

### Property Condition

All other things being equal, a property in better condition would trade for a lower cap rate.

**Capitalization Rates Summary**

In light of the above factors, we classified the properties within the Portfolio into ten portfolio categories. For each category, a different set of comparable transactions was considered in order to determine appropriate capitalization rate assumptions to be used in the analysis of the properties classified within the category (the comparable transactions are presented in Addendum D). The following table summarizes cap rates from comparables by Category compared to the implied cap rates from our final fair value estimates.

| All Year Holdings Limited - Capitalization Rate Assumptions | | | | | | |
|---|---|---|---|---|---|---|
| Portfolio Category | Number of Properties | Cap Rates From Comparables | | | Implied Cap Rates From Final Value Estimate | | |
| | | Min | Max | Average | Min | Max | Average |
| MF - Market, Renovated | 40 | 5.00% | 5.76% | 5.29% | 5.24% | 5.76% | 5.49% |
| MF - Recent Construction | 13 | 4.73% | 5.27% | 5.07% | 5.12% | 5.37% | 5.24% |
| Recent Construction Institution | 5 | 4.51% | 5.10% | 4.75% | 4.68% | 5.27% | 4.94% |
| MF - 3 to 4 Family | 3 | 5.18% | 5.66% | 5.38% | 5.29% | 5.43% | 5.34% |
| MF - Williamsburg, 4 Family | 1 | 4.93% | 5.75% | 5.27% | - | - | 5.03% |
| MF - Mostly Market | 14 | 4.68% | 5.88% | 5.38% | 5.00% | 5.50% | 5.29% |
| MF - Small Rent Regulated | 6 | 5.05% | 6.64% | 5.66% | 5.49% | 5.51% | 5.50% |
| MF - Large Rent Regulated | 1 | 4.68% | 5.77% | 5.30% | - | - | 5.26% |
| MU-Market | 13 | 5.22% | 5.98% | 5.51% | 5.41% | 5.66% | 5.51% |
| MU-Rent Regulated | 10 | 5.00% | 5.62% | 5.37% | 5.39% | 5.70% | 5.54% |

**EGI Multipliers**

The use of income multipliers as a measure of pricing is based on a buyer's belief that the property can operate at efficiency and margins commensurate with the buyer's experience in operating similar properties, rather than a seller's historical performance. Income multipliers were always used by buyers in Brooklyn, however our research indicates that for larger properties, buyers are ascribing less weight to multipliers, primarily due large variation in real estate taxes.

Theoretically, Income multipliers follow similar patterns as cap rates. As already indicated, the effective gross income multiplier method was only applicable in certain cases.

**Income Approach Reconciliation**

When developing a value estimate using both the direct capitalization of net operating income and applying EGI multipliers, we reconciled to a single-value estimate and weighted each approach depending on the individual subject property circumstances.

**Overall Reconciliation Process**

Market participants indicate that properties such as those within the Portfolio are being analyzed in this market based on price per square foot, price per unit, and price per bedroom, as well as overall capitalization rate and effective gross income multiplier. Mimicking market participants' activities, most weight was given to the income capitalization approach via the direct capitalization analysis, with the sales comparison approach used to corroborate the income-based value estimates.

## CONCLUSION

Based upon our analyses, and subject to the assumptions and limiting conditions described in the accompanying report, it is our opinion that the fair value of the Portfolio, as of the Effective Date was:

| All Year Holdings Limited - Fair Value Summary | | | |
|---|---|---|---|
| Neighborhood | Number of Properties | Fair Value as of 4Q 2021 | % Composition by Neighborhood |
| Bedford Stuyvesant | 17 | $64,580,000 | 12% |
| Borough Park | 2 | $3,830,000 | 1% |
| Bushwick | 43 | $137,490,000 | 27% |
| Crown Heights | 18 | $105,140,000 | 20% |
| East Williamsburg | 5 | $18,590,000 | 4% |
| Greenpoint | 3 | $10,090,000 | 2% |
| Ridgewood | 1 | $6,390,000 | 1% |
| Williamsburg | 17 | $171,600,000 | 33% |
| **TOTAL** | **106** | **$517,710,000** | **100%** |

Please refer to the data-tape and the supporting schedules provided by Level Valuation to the Client and saved in an agreed upon Dropbox folder as supporting documentation prepared by Level Valuation which led to the individual fair value estimates for the subject properties which totaled to the Portfolio figure listed above.

The above estimates are subject to the Certification, and Assumptions and Limiting Conditions presented later in this report.

## CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the properties that are the subject of this report and no personal interest with respect to the parties involved.
- I have performed services, as an appraiser, regarding the properties that are the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- I have no bias with respect to the properties that are the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.
- I have made a personal inspection of the properties that are the subject of this report (either as part of the current appraisal assignment or prior appraisal assignments involving the properties within the Portfolio).
- Roiy Guy provided me with significant real property appraisal assistance. Mr. Guy assisted in the development of the report and assignment results.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, which includes the Uniform Standards of Professional Appraisal Practice.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- As of the date of this report, Lev Yagudayev, MAI has completed the requirements of the continuing education program of the Appraisal Institute for Designated Members.

**LEVEL VALUATION LLC**

Lev Yagudayev, MAI

NY General Real Estate Appraiser
License Number: 46000044217
Expiration: March 6, 2023

**Addenda**

Addendum A – Assumptions and Limiting Conditions

Addendum B – Data-tape (in excel format saved in Dropbox)

Addendum C – Supporting analyses for each subject property (in PDF format saved in Dropbox)

Addendum D – Comparable sale write-ups for each category (in PDF format saved in Dropbox)

Addendum E – Liquidation Analysis

Addendum F – Qualifications / License

**Addendum A**

## Assumptions and Limiting Conditions

This appraisal report has been based on, and is subject to, the following general assumptions and limiting conditions:

- The value reported is only applicable to the purpose, function, and terms stated in this report and shall not be used for any other purpose.

- The appraisers have assumed that the reader(s) of this report is well versed in real estate and is a sophisticated and knowledgeable business person(s).

- No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated. The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated. It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

- Responsible ownership and competent property management are assumed.

- The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

- All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.

- It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.

- It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described and considered in the appraisal report. It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

- It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless nonconformity has been identified, described and considered in the appraisal report.

- The appraisers shall not be required to give testimony as a witness or to appear in any capacity in any legal or administrative hearing or procedure, or to have any continued service responsibility unless compensated, by the engager of this report, in advance, according to their fee schedule then in effect.

- Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such material on or in the property. The appraiser, however is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there are no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or

engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

- The Appraisers are not engineers, no warranties are made by references to physical property characteristics in terms of quality, condition, cost, suitability, soil conditions, flood risk, obsolescence, etc., and no liability is assumed for any engineering-related issues.

- Possession of this report or a copy thereof does not imply right of publication, nor use for any purpose by any other than the person to whom it is addressed, without the written consent of Level Valuation.

- The liability of Level Valuation, and its employees is limited to the client. This appraisal was prepared specifically for our client, to whom this appraisal was addressed.

- The Client acknowledges that Level Valuation is a corporation and agrees that any claim made by the Client arising out of any act or omission of any director, officer, agent, or employee of Level Valuation, in the execution or performance of its contractual or professional responsibilities shall be made solely against Level Valuation in its corporate capacity and not against any such director, officer, agent or employee.

- Cash flow projections are forecasts of estimated future operating characteristics and are predicated on the information and assumptions contained within the appraisal report. The achievement of the financial projections will be affected by fluctuating economic conditions and is dependent upon other future occurrences that cannot be assured. Actual results may well vary from the projections contained herein. The appraisers do not warrant that these forecasts will occur. Projections may be affected by circumstances beyond the current realm of knowledge or control of the appraisers. The appraisers are not trying to forecast the future but rather are attempting to replicate techniques utilized by market participants for properties similar to the subject.

- The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements for the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible non-compliance with the requirements of the ADA in estimating the value of the property.

**Addendum B**

**Data-tape (in excel format saved in Dropbox)**

**Addendum C**

**Supporting analyses for each subject property (in PDF format saved in Dropbox)**



**Addendum D**

**Comparable sale write-ups for each category (in PDF format saved in Dropbox)**

**Addendum E**

## Liquidation Analysis

**Liquidation Value**

Liquidation value is defined in *The Appraisal of Real Estate*, Fifteenth Edition published by the Appraisal Institute as "The most probable price that a specified interest in property should bring under the following conditions: (1) Consummation of a sale within a short time period. (2) The property is subjected to market conditions prevailing as of the date of valuation. (3) Both the buyer and seller are acting prudently and knowledgeably. (4) The seller is under extreme compulsion to sell. (5) The buyer is typically motivated. (6) Both parties are acting in what they consider to be their best interests. (7) A normal marketing effort is not possible due to the brief exposure time. (8) Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto. (9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**Liquidation Value Exposure Period**

Based on our agreement with the Client, the exposure period of the liquidation value is assumed to be approximately 3 months.

At the Client's request, we presented a range of liquidation values for each property within the data-tape. The range is based on a discount of 10% to 20% applied to the fair value for each property, which is based on our experience and research.

**Addendum F**

## Qualifications / License

# LEVELVALUATION



**Lev Yagudayev, MAI**
Office:   646-929-3893
Cell:       917-885-4419
lev@levelvaluation.com

## Experience

Lev Yagudayev has over 20 years of experience in different facets of commercial real estate and is a specialist in the area of valuation for financial reporting purposes. He has valued real estate and instruments secured by real estate in nearly every major market in the U.S. and comprising most property types.

Prior to joining Level Valuation, Mr. Yagudayev worked for approximately two years in the appraisal practice at Situs RERC, where he served as a director and Northeast practice leader. While at Situs RERC, Mr. Yagudayev was responsible for managing Situs RERC's Northeast practice and delivering the following services: portfolio valuation services, purchase price allocation studies, International Financial Reporting Standards (IFRS) valuation services, investor reporting, and due diligence services.

Prior to Situs RERC, Mr. Yagudayev worked for nine years in the real estate consulting practice at Deloitte. In his latest role, he served as senior manager and portfolio valuation services leader for the East region. While at Deloitte, Mr. Yagudayev provided valuation and due diligence services to alternative investment managers; advised and consulted clients on a variety of issues relating to commercial real estate and real estate instruments; worked with clients to improve their processes relating to valuation, financial reporting, and investor reporting; and interacted daily with senior executives and decision makers at many real estate firms.

Prior to Deloitte, Mr. Yagudayev worked at Emigrant Bank, where he focused on commercial real estate valuation, REO management/disposition, mortgage underwriting, loan origination, and foreclosures.

Mr. Yagudayev is also an adjunct professor at the Fordham Graduate School of Business where he teaches real estate finance and is a faculty advisor to the real estate club.

## Education

- ➢ Fordham University
    - o M.B.A., finance and professional accounting
- ➢ Hofstra University
    - o B.S., biochemistry



**Exhibit E-2**

**Additional Appraisal Reports**



APPRAISAL REPORT

# 430-438 Albee Square

# Brooklyn, New York 11201

Mixed-Use Building
Bowery Report No. JOB-2100013663

REQUESTED BY

# Joel Gluck

Spencer Equity Group Limited
522 Lefferts Avenue
Brooklyn, NY 11225

DATE OF VALUE

September 30, 2021

PREPARED BY



Kevin
Walsh, MAI



Hannah
Karpin



Michelle
Zell, MAI



61-63 Crosby Street, 3rd Floor
New York, NY 10012

November 8, 2021

Mr. Joel Gluck
Spencer Equity Group Limited
522 Lefferts Avenue
Brooklyn, NY 11225

Re:    Appraisal File No. JOB-2100013663
       Mixed-Use Building
       430-438 Albee Square
       Brooklyn, New York 11201

Dear Mr. Gluck,

In accordance with your request, we have completed an appraisal of 430-438 Albee Square in Brooklyn, New York 11201. The purpose of this appraisal is to advance an opinion of the As Is Fair Value of the Leased Fee Interest in the subject.

We have appraised the above referenced property, the conclusions of which are set forth in the attached appraisal report. This is an Appraisal Report that is intended to comply with the reporting requirements set forth under Standards Rule 2-2 of USPAP and the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute. In addition, this appraisal has been prepared in compliance with IFRS 13 (International Financial Reporting Standards 13-fair value measurement). The depth of analysis discussed in this report is specific to the needs of the client and for the intended use stated in the report.

The report is intended for use only by Park Management, its successors, assigns, and affiliates. The report is intended only for use in Park Management's financial statements. The use by others is not intended by Bowery Valuation.

We consent to the inclusion of the valuation in its entirety within Spencer Equity Group Limited's financial reporting

The subject, 430-438 Albee Square, consists of a 28-story elevatored mixed-use retail and residential building containing 150 residential units. The subject's residential portion is currently 100% occupied with no vacant units. We note all of the subject's residential units are rent stabilized due to the subject's 15-year 421(A) tax benefit, which is currently in the third year. We note the subject is subdivided into a residential condominium and a commercial condominium in order to secure related tax benefits. The residential portion is in the third year of a 15-year 421(A) tax exemption. The retail condominium is in the first year of an ICAP tax exemption as new commercial construction.

There is a total of 31,167 square feet of retail space situated on the ground floor, second, third, and cellar levels (according to the condominium declaration). The third floor is currently being used as amenity space (playroom, gym, and lounge) for the residential tenants. There is 10,258 square feet on the ground floor, 9,061 square feet on the second floor, 3,786 square feet on the third floor, and 8,062 below grade square feet in the cellar. The leasable area is calculated to be 30,109 square feet across all levels. The commercial space is currently 53% occupied based off of leasable square footage, with a restaurant tenant occupying a portion of the ground floor and a medical office tenant occupying the entire second floor. A breakdown of the retail space is provided below.



61-63 Crosby Street, 3rd Floor
New York, NY 10012

Mr. Gluck
Page 3
November 8, 2021

| Unit | Status | Floor | Leasable SF |
|------|--------|-------|-------------|
| LL | Vacant | Basement | 8,062 |
| 1 | Vacant | Ground | 2,200 |
| 2 | Cajun Restaurant Albee LLC | Ground | 7,000 |
| 3 | Reproductive Medicine Associates of New York LLP | 2 | 9,061 |
| 4 | Vacant | 3 | 3,786 |
| | | | 30,109 |

430-438 Albee Square contains 160,577± gross square feet above grade (according to the public record). 430-438 Albee Square is situated on the west side of Albee Square, between Fulton Street and Willoughby Street, in the Downtown Brooklyn neighborhood (Kings County) in the State of New York. The site contains a total land area of 0.3± acres / 11,943± square feet and is located in an C6-2.5 (Special Downtown Brooklyn Zoning District) zone. It is identified on Kings County Tax Maps as Block 146, Lots 1001 & 1002.

The highest and best use of 430-438 Albee Square is as a mixed-use building. This conclusion is based on its zoning, physical characteristics, location, and forecasted economic conditions.

The global outbreak of the "novel coronavirus," which has resulted in the COVID-19 pandemic, is presently affecting the US population and economy. The extent and magnitude of the direct or indirect effects of this event on the national and local economy or real estate markets, varies depending upon the geographic location and property type. As the pandemic has progressed, there has been increased clarity regarding the effects through more recent analytical and transactional data, as well as via market participant information and expectations. Our analysis of these and related issues is presented in the attached report. The reader is cautioned and reminded that the conclusions presented in this appraisal report are based on information available as of the effective date(s) of valuation indicated. Although we have made reasonable efforts to estimate the impact, the uncertainty in the real estate and financial markets creates the potential for a more significant change in income and value over a relatively short period of time.

After carefully considering all available information and factors affecting value, our opinion is as follows:

### Fair Value Opinion

| Value | Date of Value | Interest Appraised | Conclusion |
|-------|---------------|--------------------|-----------| 
| Fair Value As Is | September 30, 2021 | Leased Fee Interest | $161,500,000 |

The value conclusions are subject to the following **Extraordinary Assumptions**[1] that may affect the assignment results. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

• None.

The value conclusions are based on the following Hypothetical Conditions[2] that may affect the assignment results.

• None.

---

[1] The definition of Extraordinary Assumptions can be found in the Glossary of Terms, which is located in the Addenda.

[2] The definition of Hypothetical Conditions can be found in the Glossary of Terms, which is located in the Addenda.



61-63 Crosby Street, 3rd Floor
New York, NY 10012

Mr. Gluck
Page 3
November 8, 2021

The opinion of value expressed herein is subject to the certification, assumptions and limiting conditions, and all other information contained in the following written appraisal report.

Sincerely,

Kevin Walsh, MAI
Vice President
Certified General Real Estate Appraiser
NY License No. 46-52078
kevin.walsh@boweryvaluation.com
(917) 304-4889

Hannah Karpin
Valuation Associate
hannah.karpin@boweryvaluation.com
(310) 720-2073

Michelle Zell, MAI
Senior Vice President
Certified General Real Estate Appraiser
NY License No. 46-49921
michelle.zell@boweryvaluation.com
(917) 533-3141

# Summary of Salient Facts & Conclusions

## Property Identification



The subject, 430-438 Albee Square, consists of a 28-story elevatored mixed-use retail and residential building containing 150 residential units. The subject's residential portion is currently 100% occupied with no vacant units. We note all of the subject's residential units are rent stabilized due to the subject's 15-year 421(A) tax benefit, which is currently in the third year. The commercial space is currently 53% occupied based off of leasable square footage, with a restaurant tenant occupying a portion of the ground floor and a medical office tenant occupying the entire second floor. Property amenities include a full-time doorman, community outdoor space, tenant lounge, fitness center, and bicycle storage. Unit amenities include private outdoor space and in-unit laundry. The property is in excellent condition.

### Salient Facts

| | | | |
|---|---|---|---|
| **Residential Units:** | 150 | **Zoning** | C6-4.5 (Special Downtown Brooklyn Zoning District) zone |
| **Commercial Square Feet** | 31,167 sq. ft. gross / 30,109 sq ft leasable | **Flood Hazard Zone** | Zone X |
| **Year Built** | 2018 | **Exposure Time** | 9-12 Months |
| **Block/Lot** | 146 / 1001 & 1002 | **Property Rights Appraised** | Leased Fee Interest |
| **Site Area (sq. ft./ acres)** | 11,943± SF/ 0.3± acres | **Date of Inspection** | October 25, 2021 |
| **GBA (sq. ft.)** | 160,577 (public record) | **Date of Report** | September 30, 2021 |

### Financial Indicators

| Financial Indicators | Total | Per SF-GBA |
|---|---|---|
| Effective Gross Income | $9,310,852 | $57.98 |
| Stabilized Residential Occupancy | 97% | |
| Expense Ratio | 34% | |
| Net Operating Income | $6,159,581 | $38.36 |
| Capitalization Rate | 4.25% | |
| Income Capitalization Approach- Fair Value As Is | $161,500,000 | $1,006 |
| Sales Comparison Approach - Fair Value As Is | $161,100,000 | $1,003 |

Fair Value Opinion

| Value | Date of Value | Interest Appraised | Conclusion |
|---|---|---|---|
| Fair Value As Is | September 30, 2021 | Leased Fee Interest | $161,500,000 |

The value conclusions are subject to the following **Extraordinary Assumptions**[3] that may affect the assignment results. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

•None.

The value conclusions are based on the following **Hypothetical Conditions**[4] that may affect the assignment results.

•None.

The opinion of value expressed herein is subject to the certification, assumptions and limiting conditions, and all other information contained in the following written appraisal report.

---

[3] *The definition of Extraordinary Assumptions can be found in the Glossary of Terms, which is located in the Addenda.*

[4] *The definition of Hypothetical Conditions can be found in the Glossary of Terms, which is located in the Addenda.*

# Table of Contents

Introduction ................................................................................................................................9

  Purpose & Date of Value Opinion.............................................................................................9

  Identification of the Client........................................................................................................9

  Intended Use and User..............................................................................................................9

  Property Rights Appraised........................................................................................................9

  Property History.........................................................................................................................9

  Exposure Time............................................................................................................................9

  Definition of Fair Value ...........................................................................................................10

  General Assumptions ...............................................................................................................10

  Scope of the Appraisal ............................................................................................................10

  Data Sources.............................................................................................................................11

  Neighborhood & Demographic Overview .............................................................................12

  Downtown Brooklyn at a Glance..........................................................................................z12

  Neighborhood...........................................................................................................................13

  Demographics...........................................................................................................................15

Zoning Summary .........................................................................................................................17

  C6-4.5 Zoning ...........................................................................................................................17

  Special Downtown Brooklyn District .....................................................................................18

  Appraiser's Conclusion on Conformity .................................................................................19

Assessed Values & Real Estate Taxes .......................................................................................20

  Tax Rates ..................................................................................................................................21

  Present Value of 421-a Benefits .............................................................................................23

Site Description ...........................................................................................................................31

Description of Improvements.....................................................................................................33

  Structural & Mechanical.........................................................................................................34

  Layout & Finishes ....................................................................................................................34

  Building Condition....................................................................................................................35

  Summary ...................................................................................................................................36

Highest & Best Use .....................................................................................................................37

  As Vacant...................................................................................................................................37

  As Improved ..............................................................................................................................37

Appraisal Valuation Process ......................................................................................................39

Income Approach ........................................................................................................................40

  Base Rental Income .................................................................................................................40

  Commercial Income .................................................................................................................52

Commercial Reimbursements ....................................................................................................60

Vacancy and Collection Loss .................................................................................................60

Effective Gross Income Summary .........................................................................................60

Operating Expense Analysis...................................................................................................61

Stabilized Income and Expenses ...........................................................................................66

Income Capitalization ............................................................................................................67

Sales Comparison Approach.......................................................................................................72

Comparable Sales Outlines ...................................................................................................73

Reconciliation & Final Value Opinion ........................................................................................79

Certification ................................................................................................................................80

Addenda ......................................................................................................................................82

Glossary of Terms ..................................................................................................................82

Contingent & Limiting Conditions ........................................................................................85

Subject Property Photos ........................................................................................................88

Zoning Map.............................................................................................................................95

Flood Map ..............................................................................................................................95

New York County Area Analysis ............................................................................................96

Downtown Brooklyn: Multifamily Submarket Analysis…………………………………………104

Downtown Brooklyn: Retail Submarket Analysis………………………………………………110

# Introduction

## Purpose & Date of Value Opinion

The purpose of this appraisal is to advance an opinion of the As Is Fair Value of the Leased Fee Interest in the subject as of September 30, 2021.

## Identification of the Client

Spencer Equity Group Limited has engaged us and is our client for this assignment.

## Intended Use and User

The Intended Use is for Spencer Equity Group Limited's preparation of financial statements. We consent to the inclusion of the valuation in its entirety within Spencer Equity Group Limited's financial reporting. The Intended User of the report is Spencer Equity Group Limited with is successors, assigns and affiliates. This appraisal is not intended for any other use or user. No party or parties other than the intended user may use or rely on the information, opinions and conclusions contained in this report.

## Property Rights Appraised

The subject is appraised on the basis of Leased Fee Interest.[5]

## Property History

The current owner of record is Spencer Albee Equities LLC per Kings County records. There have been no transfers of the subject within the last 3 years.  We are not aware of any additional bids, transactions, offers or options to purchase for this asset.

We previously appraised the subject in December 2020 for $159.2M, with an NOI of $6,040,445. The subject was also appraised in August 2020, with a value of $159.7M. The difference in value between August and December of 2020 was primarily based on the burn off of free rent concessions. The current NOI is $6,159,581 and the value is 161.5M. The difference stems from decreased taxes, the fully occupied residential units, and an additional residential tenant amenities fee. In addition, the NPV of the tax benefit decreased from $19.1m to $17.9M.

## Exposure Time[6]

It is our opinion that a normal exposure time for the subject property is between nine and twelve months. This conclusion is predicated on interviews with brokers and other real estate industry sources and on information obtained in the verification process. The value reported herein presumes such an exposure time.

---

[5] The definitions of property rights can be found in the Glossary of Terms, which is located in the Addenda.

[6] The definition of Exposure Time can be found in the Glossary of Terms, which is located in the Addenda.

## Definition of Fair Value

IFRS 13 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date (ie an exit price). That definition of fair value emphasis that fair value is a market-based measurement, not an entity-specific measurement.   When measuring fair value, an entity uses the assumptions that market participants would use when pricing the asset or liability under current market conditions, including assumptions about risk. As a result, an entity's intention to hold an asset or to settle or otherwise fulfil a liability is not relevant when measuring fair value. The IFRS explains that a fair value measurement requires an entity to determine the following:

(a) the particular asset or liability being measured;

(b) for a non-financial asset, the highest and best use of the asset and whether the asset is used in combination with other assets or on a stand-alone basis;

(c) the market in which an orderly transaction would take place for the asset or liability; and

(d) the appropriate valuation technique(s) to use when measuring fair value. The valuation technique(s) used should maximize the use of relevant observable inputs and minimize unobservable inputs. Those inputs should be consistent with the inputs a market participant would use when pricing the asset or liability.

## General Assumptions

Various estimates of gross building area, number of apartments, and total livable area were furnished by the owner, client, and/or their agents. This opinion of value reported herein assumes that the data provided are the most recent and accurate.

 We note that our appraisers are not experts in the following domains:

- Technical Environmental Inspections: No Environmental Site Assessment report was provided in conjunction with this appraisal. If a report is commissioned and there are any environmental issues uncovered, they could affect our opinion of value reported. We recommend the services of a professional engineer for this purpose.

- Zoning Ordinances: We recommend an appropriately qualified land use attorney if a definitive determination of compliance is required.

- Building Inspections: We recommend a building engineer or professional property inspector for the inspection. Any immediate expenditures that a trained professional may determine are needed, could affect our opinion of value reported.

- Easements, Encroachments, and Restrictions: We know of no deed restrictions, private or public, that further limit the subject property's use. The research required to determine whether or not such restrictions exist, however, is beyond the scope of this appraisal assignment. Deed restrictions are a legal matter and only a title examination by an attorney or Title Company can usually uncover such restrictive covenants. Thus, we recommend a title search to determine if any such restrictions do exist.

- Building Health and Fire Codes: Our valuation assumes there are no known code violations.

## Scope of the Appraisal

Within the course of this assignment, we have:

- Inspected the interior and exterior of the subject property.

- Researched and investigated the location in terms of its economic activity, development patterns, and future trends and related their impact in the market.

- Determined the Highest and Best Use of the subject property based on an analysis of all relevant factors.

- Conducted a market survey of rent and vacancy levels of similar buildings.

- Analyzed the subject's operating expense history and projections, as well as expense reports of comparable properties, in order to accurately project the stabilized cash flow.

- Projected the net operating income under stabilized operation and applied a market-derived capitalization rate to develop an opinion of value by the income approach.

- Researched and analyzed sales of competitive assets and applied the techniques of the sales comparison approach in providing an opinion of value.

- Advanced an opinion of the As Is fair value of the identified interest.

## Data Sources

The data contained within this appraisal was compiled from market analysis utilizing the following sources (unless otherwise noted): NYC Department of Finance, NYC Department of Buildings, NYC Department of Planning Zoning & Land Use, Claritas, CoStar, Federal Reserve, and FEMA. The subject photos were taken by Kevin Walsh on October 25, 2021, while those used for the comparable rentals and sales were sourced from the public domain. When possible, we have confirmed the reported data with parties to the transactions or those who are intimately familiar with their critical details.

Sources of Data

| Data | Source/Verification: |
|---|---|
| Site Size | Public Record |
| Excess/Surplus Land | Tax Map |
| Gross Size/Units | Public Record |
| Commercial SF | Owner |
| Residential SF | Appraiser's Estimate; Owner |
| Number of Buildings | Inspection; Owner |
| Amenities | Inspection; Streeteasy.com |
| Deferred Maintenance | Inspection |
| Income Data | Owner; Market Forecast |
| Expense Data | Owner; Expense Comparables |

## Neighborhood & Demographic Overview

## Downtown Brooklyn at a Glance



*Source: Google Maps*

### Summary

Downtown Brooklyn is truly the center of it all. Bordered by Brooklyn Heights, Fort Greene, and Boerum Hill, the area is a major hub for businesses, retail as well as a spectacular art and culture scene. Today, the neighborhood is a scurry of urban bustle and activity, full of entertainment, good eats, a growing skyline, and luxury housing and hotels. The last decade has seen a major boom in construction, particularly in the retail and luxury housing sector.

The following demographic profile, assembled by Environics Analytics, a nationally recognized compiler of demographic data, reflects the subject's municipality (Downtown Brooklyn) and market (Brooklyn). All values presented herein are estimates for 2021 and all figures presented are for the subject neighborhood unless stated otherwise.

Area Analysis

### Key Neighborhood and Demographic Trends

| | Area | 2000 Census | 2010 Census | Change | 2021 Est. | Change | 2026 Projected | Change |
|---|---|---|---|---|---|---|---|---|
| Population | Downtown Brooklyn | 32,076 | 37,080 | 15.60% | 47,810 | 28.94% | 50,234 | 5.07% |
| | Brooklyn | 2,465,323 | 2,504,700 | 1.60% | ,663,688 | 6.35% | 2,729,851 | 2.48% |
| Households | Downtown Brooklyn | 13,975 | 16,709 | 19.56% | 22,074 | 32.11% | 23,262 | 5.38% |
| | Brooklyn | 880,721 | 916,856 | 4.10% | 989,055 | 7.88% | 1,018,358 | 2.96% |
| Family Households | Downtown Brooklyn | 5,878 | 7,175 | 22.07% | 9,297 | 29.57% | 9,786 | 5.26% |
| | Brooklyn | 584,121 | 573,363 | -1.84% | 614,593 | 7.19% | 631,736 | 2.79% |

## Neighborhood

### Housing



Households by Household Size

**HOUSEHOLDS**

**22,074**

**AVERAGE HOUSEHOLD SIZE**

**2.01**



Occupied Housing Units by Tenure

**MAJORITY OCCUPIED HOUSING UNITS**

**66% Renter**

Area Analysis



**MEDIAN OWNER-OCCUPIED HOUSING VALUE**

$1,059,354



**NEIGHBORHOOD HOUSING UNITS**

24,655

**COUNTY/CITY HOUSING UNITS**

1,074,602



**NEIGHBORHOOD MEDIAN YEAR STRUCTURE BUILT**

1961

**COUNTY/CITY MEDIAN YEAR STRUCTURE BUILT**

1941

# Demographics

## Population





POPULATION

47,810

MEDIAN AGE

37

AVERAGE AGE

38



MEDIAN HOUSEHOLD INCOME

$135,165

AVERAGE HOUSEHOLD INCOME

$190,888

## Employment & Transportation



Area Analysis



Travel Time to Work

AVERAGE TRAVEL TIME TO WORK

**35 minutes**



Transport Mode to Work in Neighborhood

## Transport Modes and Access

 Major roads include Interstate 278, which runs east and west through the northern part of the neighborhood. In addition, Brooklyn Bridge, and the entrance to are located within the neighborhood.

 Downtown Brooklyn has some of the best public transportation options within New York City. Nearly every subway line, with the exception of the J, Z, M, and 7, have stops within the neighborhood. There is a total of  ten subway stations in the area. In addition, near the southwest corner of Downtown Brooklyn is the Barclays Center, which provides access to more than six LIRR routes.

 The MTA provides bus routes that connect the downtown to other areas. The bus system within the area is extensive.

 The New York City area has access to three major airports; Newark in New Jersey (13 mi.), LaGuardia in Queens (10 mi.), and JFK in Queens (11 mi.)

## Conclusion

Downtown Brooklyn has changed dramatically since the area was rezoned in 2004, which allowed for residential growth. Beautiful and luxurious new condos have reshaped the skyline, bringing a fresh mix of people and businesses to an area once known for courthouses, colleges, and office buildings. Amenities are within reach and include great restaurants, grocery stores, movie theaters, gyms, multiple subway stops and an LIRR station. With all its convenience, amenities, and range of housing that keeps growing, Downtown Brooklyn will continue to attract demand.

# Zoning Summary

Zoning Map



430-438 Albee Square is in a C6-4.5 (Special Downtown Brooklyn Zoning District) zone. Below is a summary of the subject property's zoning requirements and compliance with regard to use and bulk regulations.

## C6-4.5 Zoning

C6 districts permit a wide range of high-bulk commercial uses requiring a central -location. Most C6 districts are in Manhattan, Downtown Brooklyn, and Downtown Jamaica; a C6-3D district is mapped in the Civic Center area of the Bronx. Corporate headquarters, large hotels, department stores and entertainment facilities in high-rise mixed buildings are permitted in C6 districts.

C6-1, C6-2 and most C6-3 districts, typically mapped in areas outside central business cores, such as the Lower East Side and Chelsea, have a commercial floor area ratio (FAR) of 6.0; the C6-3D district has a FAR of 9.0. C6-4 through C6-9 districts, typically mapped within the city's major business districts, have a maximum FAR of 10.0 or 15.0, exclusive of any applicable bonus. Floor area may be increased by a bonus for a public plaza or Inclusionary Housing.

C6-2A, C6-3A, C6-3X and C6-4A are contextual districts with maximum building heights. C6-3D and C6-4X districts allow towers above a building base; special rules determine the tower's height and articulation. All other C6 districts allow towers to penetrate a sky exposure plane and do not require a contextual base.

C6 districts are widely mapped within special districts. C6-4.5, C6-5.5, C6-6.5 and C6-7T districts are mapped only within the Special Midtown District and have unique floor area ratios and bonus rules. C6-1G, C6-2G, C6-2M and C6-4M districts are mapped in Chinatown and Chelsea and in the Special Garment Center District and have rules for the conversion of non-residential space to residential use.

C6 districts are well served by mass transit, and off-street parking is generally not required, except within the C6-3D district.

### C6 Commercial Districts

| District | Residential District Equivalent | Commercial FAR | Residential FAR |
|---|---|---|---|
| C6-1 | R7 | 6.0[4] | 0.87-3.44[3] |
| C6-1A | R6 | 6.0[4] | 0.78-2.43[2,5] |
| C6-2 | R8 | 6.0[4] | 0.94-6.02[3,5] |
| C6-2A | R8A | 6.0 | 6.02[5] |
| C6-3 | R9 | 6.0[4] | 0.99-7.52[5] |
| C6-3A | R9A | 6.0 | 7.52[5] |
| C6-3D | R9D | 9.0 | 9.0[5] |
| C6-3X | R9X | 6.0 | 9.0 |
| C6-4 | R10 | 10.0[4] | 10.0[4,5] |
| C6-4A | R10A | 10.0 | 10.0[5] |
| C6-4X | R10X | 10.0[4] | 10.0[5] |
| C6-5 | R10 | 10.0[4] | 10.0[4,5] |
| C6-6 | R10 | 15.0[4] | 10.0[5] |
| C6-7 | R10 | 15.0[4] | 10.0[5] |
| C6-8 | R10 | 10.0[4] | 10.0[4,5] |
| C6-9 | R10 | 15.0[4] | 10.0[5] |

[1] 4.0 FAR on wide streets outside the Manhattan Core under the Quality Housing Project
[2] 3.0 FAR on wide streets outside the Manhattan Core under the Quality Housing Project
[3] 7.2 FAR on wide streets outside the Manhattan Core under the Quality Housing Project
[4] FAR bonus of up to 20% for a public plaza
[5] Increase in FAR with Inclusionary Housing Program

For the C6-4.5 Commercial zoning in the Special Downtown Brooklyn District in particular, the zoning text states the maximum permitted Floor Area Ratio for Commercial or Community Facility uses is 12.0.

## Special Downtown Brooklyn District

The Special Downtown Brooklyn District (DB) establishes special height and setback regulations and urban design guidelines to promote and support the continued growth of Downtown Brooklyn as a unique mixed use area. The economic, civic and retail center of the borough, Downtown Brooklyn is the city's third largest central business district – a hub of office buildings, courthouses and government buildings, major academic and cultural institutions, and active retail corridors. It is surrounded by historic residential neighborhoods.

Flexible height and setback regulations for a range of moderate- to high-density residential and commercial zoning districts facilitate development on the small, irregularly-shaped lots typical of Downtown Brooklyn. The higher density zoning districts allow either Quality Housing buildings with height limits or towers-on-a-base without height limits. The Inclusionary Housing R10 Program, which offers incentives for the provision of affordable housing, is applicable in the highest-density zoning districts. The moderate-density zoning districts allow for flexible building envelopes with height limits. A height limitation area is designated on Schermerhorn Street and Flatbush Avenue Extension as a transition between the high-rise core of the central business district and adjacent residential neighborhoods. Urban design guidelines promote ground floor retail and street wall continuity, storefront glazing, sidewalk widening, curb cut restrictions and off-street relocation of subway stairs.

There are two subdistricts - Atlantic Avenue and Fulton Mall - each with its own bulk and use regulations intended to preserve the scale and character of Atlantic Avenue, including certain architectural features, and to create an attractive shopping environment within the Fulton Mall, respectively.

## Appraiser's Conclusion on Conformity

The subject is in an C6-4.5 (Special Downtown Brooklyn Zoning District) zone, which permits residential and commercial uses as of right. The subject is conforming with regards to the allowable uses.

|  |  | Residential | Commercial |
|---|---|---|---|
| Site Area (SF) |  | 11,943 | 11,943 |
| Zoning FAR | x | 10.00 | 12.00 |
| Maximum Buildable Area As of Right: |  | 119,430 | 143,316 |

The subject's C6-4.5 Commercial zoning district allows for a residential FAR of 10.00 and a commercial FAR of 12.00. Therefore, the subject site allows for a residential project with a zoning floor area of 119,430 square feet as of right. A commercial property allows for an FAR of 12.00 and 143,316 square feet as of right. As the developer built a primarily residential building with retail use on Floors 1, 2, and 3, they developed a project to the maximum residential bulk of 10.00. Therefore, the allowable commercial bulk remaining is equal to an FAR of 2.00. The allowable bulk and planned zoning floor area is reported as follows:

|  | Residential | Commercial |
|---|---|---|
|  | 11,943 | 11,943 |
| x | 10.00 | 2.00 |
|  | 119,430 | 23,886 |

The subject contains 160,577 square feet of gross building area above grade. After deductions for certain mechanical, below grade, and common areas The subject contains 119,299 square feet of residential zoning floor area and 23,549 square feet of commercial zoning floor area. Thus, the subject is complying with regards to bulk regulations.

Per zoning, the subject is required to have available parking. Based on the zoning code, parking is required for 20% of all residential units. Therefore, 30 parking spaces are required at the subject. Parking is not required for the commercial space. In order to conform to the municipal zoning code for parking, the owner acquired the right to occupy 30 spaces in a nearby garage in the local market area. Therefore, the subject is complying with parking requirements.

# Assessed Values & Real Estate Taxes



430-438 Albee Square is designated on Kings County Tax Maps as block/lot 146 / 1001 & 1002. Lot 1001 is the commercial condominium and is a tax class 4 property and Lot 1002 is the residential condominium and is a tax class 2 property. Lot 1001 was recently approved for ICAP tax benefits while Lot 1002 is in the third year of a 15-year 421A, with the analysis of each benefit provided below. The current assessed values are shown below:

### 2021/2022 Tentative Assessed Value

Current Assessment:    **146 / 1001**

|  |  | Actual |  | Transitional |
|---|---|---|---|---|
| Land |  | $215,010 |  | $165,600 |
| Building | + | $3,227,490 | + | $4,510,350 |
| **Total** |  | $3,442,500 | ` | $4,675,950 |

Current Assessment:    **146 / 1002**

|  |  | Actual |  | Transitional |
|---|---|---|---|---|
| Land |  | $860,040 |  | $662,400 |
| Building | + | $11,795,760 | + | $11,844,990 |
| **Total** |  | $12,655,800 |  | $12,507,390 |

## Tax Rates

The City of New York has four tax categories for real property. Lot 1001 is the commercial condominium and is a tax class 4 property and Lot 1002 is the residential condominium and is a tax class 2 property. The following is a historical analysis of tax rates:

### Real Estate Tax Rates

| Year | Class 1 | Class 2 | Class 3 | Class 4 |
|------|---------|---------|---------|---------|
| 2010/2011 | 17.364 | 13.353 | 12,631 | 10.312 |
| 2011 /2012 | 18.205 | 13.433 | 12.473 | 10.152 |
| 2012/2013 | 18.569 | 13.181 | 12.477 | 10.288 |
| 2013/2014 | 19.191 | 13.145 | 11.902 | 10.323 |
| 2014/2015 | 19.157 | 12.855 | 11.125 | 10.684 |
| 2015/2016 | 19.554 | 12.883 | 10.813 | 10.656 |
| 2016/2017 | 19.991 | 12.892 | 10.934 | 10.574 |
| 2017/2018 | 20.385 | 12.719 | 11.891 | 10.514 |
| 2018/2019 | 20.919 | 12.612 | 12.093 | 10.514 |
| 2019/2020 | 21.167 | 12.473 | 12.536 | 10.537 |
| 2020/2021 | 21.045 | 12.267 | 12.826 | 10.694 |
| 2021/2022 | 19.963 | 12.235 | 12.289 | 10.755 |

### 2021-2022 Real Estate Tax Rate Calculation

| Year | Class 1 | Class 2 | Class 3 | Class 4 |
|------|---------|---------|---------|---------|
| 2H FY- 2021/2022 | 18.881% | 12.203% | 11.752% | 10.816% |
| 1H FY- 2021/2022 | 21.045% | 12.267% | 12.826% | 10.694% |
| **Blended Tax Rate** | **19.963%** | **12.235%** | **12.289%** | **10.755%** |

In July 2021, the City Council set the fiscal year 2022 (7/1/2021 – 6/30/2022) property tax rates. The new tax rates were not in place for the July 1, 2021, tax bill. As such, the previous tax rate was applied to the tax bill and adjustments will be made to subsequent tax bills to reflect the changes. The new tax rates will be applied for the second half of tax year 2021/2022. As such we apply the blended rate of the 2020/2021 and 2022 tax rate. For the subject, we have applied the 2021/2022 class 2 tax rate which is 12.235%, and the tax class 4 rate is 10.755%. The 2021/2022 rates were established in the second quarter of 2020.

### 2021/2022 Final Tax Liability Forecast

**146 / 1001**

| | | Total |
|------|------|-------|
| Taxable Assessed Value | | $3,442,500 |
| Tax Rate | x | 10.755% |
| **Tax Liability** | | **$370,241** |
| **Tax Liability Per SF** | | **$11.88** |

**146 / 1002**

| | | Total |
|------|------|-------|
| Taxable Assessed Value | | $12,507,390 |
| Tax Rate | x | 12.235% |
| **Tax Liability** | | **$1,530,279** |
| **Tax Liability Per SF** | | **$11.83** |

Additionally, the subject is located within the Metrotech Business Improvement District. The current BID tax liability for both lots and the total tax liability is provided below.

| | |
|---|---|
| RE Tax Liability | $1,900,520 |
| Metrotech BID - Lot 1001 | $12,109 |
| Metrotech BID - Lot 1002 | $43,995 |
| | $1,956,624 |

In order to support the real estate tax liability, we surveyed those of comparable residential buildings and retail condominiums in the area:

### Competitive RE Tax Assessment Retail Condominiums

| Comparable | | Year Built | Area (SF) | Tax Liability PSF |
|---|---|---|---|---|
| 60 | Water Street | 2013 | 15,410 | $12.07 |
| 384 | Bridge Street | 2012 | 25,284 | $15.26 |
| 180 | Myrtle Avenue | 2014 | 10,998 | $11.19 |
| 236 | Livingston Street | 2009 | 27,866 | $14.50 |
| 1 | Dekalb Avenue | 2011 | 19,967 | $12.80 |
| | Comp Min. | | 10,998 | **$11.19** |
| | Comp Avg. | | 19,905 | **$13.16** |
| | Comp Max. | | 27,866 | **$15.26** |

The comparable retail condominiums range from $11.19 to $15.26 per square foot and average $13.16 per square foot. All of the tax comparables are similar, newly built, retail condominiums, ranging in size from 10,998 to 27,866 square feet. Prior to the anticipated ICAP tax benefit, the subject's tax liability of $11.88 per square foot is reasonably within the comparable range and applied in our analysis.

### Competitive RE Tax Assessment Residential Buildings

| Comparable | | Year Built | Area (SF) | Tax Liability PSF |
|---|---|---|---|---|
| 237 | Duffield Stret | 2015 | 91,981 | $11.62 |
| 180 | Nassau Street | 2013 | 108,501 | $12.87 |
| 177 | Front Street | 2015 | 136,730 | $9.80 |
| 309 | Gold Street | 2013 | 235,382 | $13.95 |
| 1134 | Fulton Street | 2017 | 164,163 | $9.65 |
| | Comp Min. | | 91,981 | **$9.65** |
| | Comp Avg. | | 147,351 | **$11.58** |
| | Comp Max. | | 235,382 | **$13.95** |

The comparable retail condominiums range from $9.65 to $13.95 per square foot and average $11.58 per square foot. All of the tax comparables are similar, newly built, elevatored residential buildings, ranging in size from 91,981 to 235,382 square feet. Prior to the 421a tax benefit, the subject's tax liability of $11.83 per square foot is at the average of the comparable range and applied in our analysis.

As stated above, Lot 1001 is anticipated to receive an ICAP tax abatement while Lot 1002 benefits from a 15-year 421A tax exemption and is currently in the second year of the benefit. A summary and analysis of these tax benefits is shown below.

## 421-A Tax Benefit Analysis

The subject benefits from a 15-year 421A tax exemption which began in the 2020/2021 tax year. The subject is currently in the 3 year of the benefit. We have reported pertinent details about the program below.

The 421(a) real estate tax exemption program was created in 1971 to spur residential development which was uncommon at the time. As of December 31, 2015, the previous program has expired and is no longer applicable to new construction in New York City, although properties which broke ground prior to December 31, 2015 may qualify according to the former program rules. The program partially exempts real-estate taxes for newly constructed properties located outside of an "exclusion zone," typically for a period of 15 years but for a 10-year period within Manhattan. The subject benefit was granted under a previous version of the 421a program.

The base assessed value is $362,065 . We note the department of finance reports the exemption using the Actual Assessed Values but according to the most recent tax bill, Q3 2021,  the current exemption is $12,145,325 , which utilizes the Transitional Assessed Values.

### Assessment Information

| Description | Land | Total |
|---|---|---|
| ESTIMATED MARKET VALUE | 1,911,200 | 28,124,000 |
| MARKET AV | 860,040 | 12,655,800 |
| MARKET EX | | 12,293,735 |
| TRANS AV | 662,400 | 12,507,390 |
| TRANS EX | | 12,145,325 |

### Taxable/Billable Assessed Value

| | Assessed Value |
|---|---|
| Subject To Adjustments, Your 2021/22 Taxes Will Be Based On | 362,065 |

### Exemption Information

| Code | Description | Exempt Value |
|---|---|---|
| 48806 | 421A | 12,293,735 |

## Present Value of 421-a Benefits

The following chart shows the projection of the tax savings accrued over the benefit period. These are calculated simply as full taxes less taxes due.   We note:

- We have grown the assessed value by 3% each year and have kept the tax rate stable.

- We have applied a 5.00% discount rate to our analysis.

Since the tax benefits do not run in perpetuity, we have processed the full stabilized tax liability in our analysis and applied the present value of the tax benefits as an adjustment to value.

The calculation of the present value of the remining tax benefits is presented on the following page.

Assessed Value and Real Estate Taxes

| Year | Projected AV | Base AV | Maximum Exemption | % of Exemption Allowed (Phase Out) | Allowable Exemption | Taxable AV | Tax Rate | Full Taxes | Net Taxes | Tax Savings |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | $12,507,390 | $362,065 | $12,145,325 | 100% | $12,145,325 | $362,065 | 12.235% | $1,530,279 | $44,299 | $1,485,981 |
| 4 | $12,882,612 | $362,065 | $12,520,547 | 100% | $12,520,547 | $362,065 | 12.235% | $1,576,188 | $44,299 | $1,531,889 |
| 5 | $13,269,090 | $362,065 | $12,907,025 | 100% | $12,907,025 | $362,065 | 12.235% | $1,623,473 | $44,299 | $1,579,175 |
| 6 | $13,667,163 | $362,065 | $13,305,098 | 100% | $13,305,098 | $362,065 | 12.235% | $1,672,177 | $44,299 | $1,627,879 |
| 7 | $14,077,178 | $362,065 | $13,715,113 | 100% | $13,715,113 | $362,065 | 12.235% | $1,722,343 | $44,299 | $1,678,044 |
| 8 | $14,499,493 | $362,065 | $14,137,428 | 100% | $14,137,428 | $362,065 | 12.235% | $1,774,013 | $44,299 | $1,729,714 |
| 9 | $14,934,478 | $362,065 | $14,572,413 | 100% | $14,572,413 | $362,065 | 12.235% | $1,827,233 | $44,299 | $1,782,935 |
| 10 | $15,382,512 | $362,065 | $15,020,447 | 100% | $15,020,447 | $362,065 | 12.235% | $1,882,050 | $44,299 | $1,837,752 |
| 11 | $15,843,987 | $362,065 | $15,481,922 | 100% | $15,481,922 | $362,065 | 12.235% | $1,938,512 | $44,299 | $1,894,213 |
| 12 | $16,319,307 | $362,065 | $15,957,242 | 80% | $12,765,794 | $3,553,513 | 12.235% | $1,996,667 | $434,772 | $1,561,895 |
| 13 | $16,808,886 | $362,065 | $16,446,821 | 60% | $9,868,093 | $6,940,794 | 12.235% | $2,056,567 | $849,206 | $1,207,361 |
| 14 | $17,313,153 | $362,065 | $16,951,088 | 40% | $6,780,435 | $10,532,718 | 12.235% | $2,118,264 | $1,288,678 | $829,586 |
| 15 | $17,832,547 | $362,065 | $17,470,482 | 20% | $3,494,096 | $14,338,451 | 12.235% | $2,181,812 | $1,754,309 | $427,503 |

|  |  |  |  |  |  |  |  |  | NPV | $14,199,062 |
|  |  |  |  |  |  |  |  |  | NPV (RD) | $14,200,000 |

## Industrial and Commercial Incentive Program (ICIP)/ Industrial and Commercial Abatement (ICAP) Tax Benefit

ICIP and ICAPs are commercial tax benefit programs for significant renovations done to commercial properties or units. The ICIP program was created in 1984 and the ICAP (Industrial & Commercial Abatement Program) replaced the Industrial Commercial Exemption Program (ICIP) which ended in 2008. Previously approved ICIP benefits were not affected. An important difference between an exemption and an abatement is in the accounting within the broader property tax system – an exemption is a reduction of taxable assessed value applied before a tax liability is calculated, while an abatement is an offset against a property tax bill.

The City of New York grants tax exemptions and abatements under the Industrial and Commercial Incentive Plan (ICIP). Partial exemptions from or abatement of Real Estate Taxes for varying periods of up to 25 years are provided for eligible industrial or commercial buildings which are constructed, modernized, rehabilitated, expanded, or otherwise physically improved. A Certificate of Eligibility is issued for projects which meet the program requirements.

The program grants long-term real estate tax exemptions for the construction or alteration of eligible industrial or commercial buildings. Qualifying industrial projects may also receive partial tax abatement for any existing real estate tax liability. For commercial projects, the program provides a full exemption on the increase in assessed value attributable to the improvements for 25 years, followed by five years of exemption declining at 20% per year. Commercial projects may also be eligible for a partial tax abatement based on the real estate taxes levied in the year prior to commencement of construction.

To be eligible for the ICAP, industrial and commercial buildings must be built, modernized, expanded or otherwise physically improved. There are locational limitations and spend minimums. There are two main effects from moving from an exemption to an abatement. First, under ICAP, the value of the abatement is determined by the initial tax rate (set in the year prior to the issuance of the first building permit) and does not get adjusted in future years to reflect changes in the tax rate (minimizing some of the fluctuation in tax expenditure we saw with ICIP). Therefore, the value of the abatement is more fixed under ICAP than ICIP. The "Abatement Base" is equal to the "Post-completion Tax" minus 115% of the "Initial Tax." The "Post-completion Tax" is the taxable assessed value (the lower of the actual or transitional assessed values) shown on the assessment roll with a taxable status date immediately following the earlier of (1) completion of construction (issuance of a Final Certificate of Occupancy) or (2) four years from the date of issuance of the project's first building permit multiplied by the "Initial Tax Rate." The "Initial Tax Rate" is the tax rate applicable to the assessment roll with a taxable status date immediately preceding the issuance of the first building permit. The "Initial Tax" is the taxable assessed value indicated on the assessment roll with a taxable status date immediately preceding issuance of the first building permit multiplied by "Initial Tax Rate."

Limitations on Eligibility For Certain Types Of Property

Utilities: No benefits are permitted for utility property, which includes all property used by a utility in the ordinary course of business, as well as land and buildings owned by a utility.

Retail: A property may be subject to varying abatement schedules, depending on the percentage of the property that is dedicated to retail purposes.

The amount of the abatement base is generally the difference in tax liability imposed on the building or structure between two points in time, if the second tax liability exceeds the first tax liability by more than 15 percent.

The initial tax liability (point 1) is the liability for the building or structure on the tax roll with a taxable status date preceding the first building permit or commencement of construction if no permit is required (vacant land in this instance).  The post-completion tax (point 2) is the tax liability for the building or structure on the tax roll with a taxable status date immediately following the earlier of completion of construction; or four years from the date of issuance of the first building permit or commencement of construction, if no building permit was required.

The abatement is equal to the amount by which the post completion tax exceeds 115 percent of the initial tax. At no time during the benefit period may the abatement reduce the initial tax liability imposed on the building or structure nor may it reduce the amount of taxes imposed on the land portion of the assessment.

Projects that consist of industrial construction work or commercial construction work in areas designated as special commercial abatement areas may also be entitled to additional benefits during years two through thirteen of the benefit period (so called inflation protection). Unlike the previous ICIP, the inflation protection is more generous for industrial construction work than otherwise qualifying commercial construction work. For work other than the industrial work, inflation protection is limited to increases that are above 5%. However, in both cases, the abatement base will not be increased by inflation protection if the taxable assessed value in any year increases by more than five percent as a result of a physical change (construction or alterations).

### Additional Industrial Abatement

Notwithstanding the statutory provision that the abatement may not reduce the amount of the initial tax, industrial projects that meet a higher minimum required expenditure (40 percent rather than 30 percent) are also eligible for an additional abatement based on the initial tax. There is an abatement schedule of 12 years that coincides with the schedule for the abatement base described above that provides a maximum abatement of 50 percent of the initial tax in the first four years, declining every two years by 10 percentage points. These amounts are not subject to inflation protection.

### Abatement Schedules

Industrial: As noted immediately above, the additional industrial abatement based on the initial tax is granted for a 12-year period. There is a 25-year abatement schedule for industrial construction work and commercial construction work in special commercial construction areas, provided no more than 10 percent of the building or structure is used for retail purposes. In those cases where retail use exceeds ten percent, the excess retail space is subject to a 15-year benefit schedule.

There is no retail restriction in the Regular construction area.

### Other Schedules

For commercial construction outside a special commercial construction area, there is a 15-year abatement schedule.

Renovation: There are two schedules for renovation work in Renovation areas of Manhattan: (a) in Lower Manhattan and the Garment District, there is a 12 year schedule; (b) for the Renovation area south of 59th Street, excluding the Lower Manhattan and Garment District areas, the schedule is ten years. The final schedule is an eight year benefit period for commercial construction work on new buildings or structures that meet certain statutory requirements in Lower Manhattan.

### Deadlines

The Preliminary Application must be filed before obtaining a building permit, or, if no permit is required, before starting construction. Under the law, ICAP applications filed after construction commencement or building permit issuance must automatically be denied. Preliminary ICAP applications will be accepted until March 1, 2017. The Final Application is filed within one year after the building permit is received.

### Timing

The owner informed that they are applying for a 15-year ICAP abatement will consist of a benefit period of 15 years for commercial construction. The tax abatement under the ICAP program is not available until the earlier of (a) January 5, of a tax year following completion of construction or (b) four years from the date of issuance of the first building permit. The first taxable year post completion is the 2021/2022 tax year.

## Location

- New Commercial Construction can be anywhere in the City except in some parts of Manhattan. The areas south of 96th Street (including the south side 96th Street) and north of Murray, Frankfort, and Dover Streets do not qualify.

- Commercial Renovations can be anywhere in the City except in some parts of Manhattan. The areas between 59th Street and 96th Street (including north side of 59th street and south side of 96th street) do not qualify. Additional commercial renovation benefits are available below 59th Street and these areas:

- Garment Center District.

- Lower Manhattan in the area between Murray Street, Battery Place, South Street and West Street.

## Improvements

- You must spend at least 30% of the property's Taxable Assessed Value no later than four years from the date the building permit was first issued or from the start of construction if no permit is required.

- There are additional benefits for construction projects that spend 40% of the Taxable Assessed Value.

- Construction must be completed no later than five years from the date of issuance of the first building permit, or if no permit is required, from the start of

- There can be multiple schedules:

  - Where more than 10% of the building is used for retail purposes, only the non-retail portions of the building are eligible for the 15-year benefit and up to 10% of the retail portion are eligible for the 25-year benefit. The remaining retail portion shall be eligible for benefits in accordance with the 15-year schedule.

- Special Area & Regular Area

## Details

The base assessment prior to redevelopment was $484,049 based on our review of public record before allocating this figure to the residential and commercial components. The residential base taxes are known as the 421a is in place and equal $362,065. The remainder dedicated to the commercial component is $121,984. Therefore, the commercial base taxes would reflect 25% of the total base taxes ($121,984 divided by $484,049). This amount is reasonable based on the commercial size at the subject and we will consider $121,984 to be the base tax amount for the expected commercial tax benefits (ICAP). The base tax rate when development began in the 2015/2016 tax year was 12.883% suggesting a base tax liability of $15,715. Therefore, 115% of the base tax liability equals $18,072 , as calculated below.

| | |
|---|---|
| Base Tax Liability | $15,715 |
| Base Factor | 115% |
| Base Liability for ICAP Calculation | $18,072 |

The stabilized tax assessment is $2,097,432 , indicating a stabilized tax liability of $368,141 as calculated above. Therefore, the Year 1 tax abatement is $350,068  ($368,141 - $18,072).

The subject property is anticipated to benefit from both a 25-year ICAP abatement and a 15-year ICAP abatement as the subject is in a designated 'Special Area – High Needs Neighborhood' per New York City. In this location, the 25-year benefit is granted for both 10% of the unit area overall as well as the proportion of the retail condominium that will be commercial (medical office) use. For the subject, the medical office space accounts for 29% of the unit area. Therefore, 39% of the unit area is eligible for the extended 25-year benefit (10% of the overall unit area + medical office space). The remainder (61%) will receive a 15-year ICAP benefit. The proportion of retail to commercial area is further summarized as follows:

| Space | # of Years of ICAP Benefit | Floor | SF | SF % of Total | Adjusted ICAP % |
|---|---|---|---|---|---|
| Retail | 15 | Cellar, 1st, 3rd | 22,106 | 71% | 61% |
| Medical Office | 25 | 2nd | 9,061 | 29% | 39% |
| | | | 31,167 | | 100% |

Therefore, we have presented two ICAP cash flow models, one for each expected benefit term (i.e. a "Retail" model for 15 years and a "Commercial" model for 25 years). Based on the foregoing, we will allocate the taxable assessed value, base year taxes, and abatement base amounts, as follows:

| Space | ICAP Split for Tax Benefit Term | Taxable AV | 115% of Base Year | Abatement Base Amount |
|---|---|---|---|---|
| Retail | 61% | $2,097,432 | $11,011 | $213,288 |
| Medical Office | 39% | $1,345,068 | $7,061 | $136,780 |
| | 100% | $3,442,500 | $18,072 | $350,068 |

The calculation of value for the "Retail" ICAP abatement is based on the following assumptions:

| ASSUMPTIONS | | | FUTURE TAXES | |
|---|---|---|---|---|
| 2020/2021 Tax Rate: | 10.755% | | Stabilized Tax Liability | $225,579 |
| Annual Rate of Growth (Tax Rate): | 0% | | Stabilized Assessment | $2,097,432 |
| Discount Rate: | 5.00% | | ICAP Abatement | $213,288 |
| | | | Annual Rate of Growth (Assessment): | 3% |

| Year | Projected AV | Tax Rate | Full Taxes | Benefit Amount | % of Allowed (Phaseout) | Net Benefit Amount | Net Taxes | Tax Savings |
|---|---|---|---|---|---|---|---|---|
| 1 | $2,097,432 | 0.10755 | $225,579 | $213,288 | 100% | $213,288 | $12,291 | $213,288 |
| 2 | $2,160,355 | 0.10755 | $232,346 | $213,288 | 100% | $213,288 | $19,058 | $213,288 |
| 3 | $2,225,166 | 0.10755 | $239,317 | $213,288 | 100% | $213,288 | $26,028 | $213,288 |
| 4 | $2,291,921 | 0.10755 | $246,496 | $213,288 | 100% | $213,288 | $33,208 | $213,288 |
| 5 | $2,360,678 | 0.10755 | $253,891 | $213,288 | 100% | $213,288 | $40,603 | $213,288 |
| 6 | $2,431,499 | 0.10755 | $261,508 | $213,288 | 100% | $213,288 | $48,219 | $213,288 |
| 7 | $2,504,444 | 0.10755 | $269,353 | $213,288 | 100% | $213,288 | $56,065 | $213,288 |
| 8 | $2,579,577 | 0.10755 | $277,433 | $213,288 | 100% | $213,288 | $64,145 | $213,288 |
| 9 | $2,656,964 | 0.10755 | $285,756 | $213,288 | 100% | $213,288 | $72,468 | $213,288 |
| 10 | $2,736,673 | 0.10755 | $294,329 | $213,288 | 100% | $213,288 | $81,041 | $213,288 |
| 11 | $2,818,773 | 0.10755 | $303,159 | $213,288 | 100% | $213,288 | $89,871 | $213,288 |
| 12 | $2,903,337 | 0.10755 | $312,254 | $213,288 | 80% | $170,631 | $141,623 | $170,631 |
| 13 | $2,990,437 | 0.10755 | $321,621 | $213,288 | 60% | $127,973 | $193,649 | $127,973 |
| 14 | $3,080,150 | 0.10755 | $331,270 | $213,288 | 40% | $85,315 | $245,955 | $85,315 |
| 15 | $3,172,554 | 0.10755 | $341,208 | $213,288 | 20% | $42,658 | $298,551 | $42,658 |
| | | | | | | **NPV:** | | **$1,998,150** |
| | | | | | | **ROUNDED:** | | **$2,000,000** |

The calculation of value for the "Commercial" ICAP abatement is based on the following assumptions:

| ASSUMPTIONS | | FUTURE TAXES | |
|---|---|---|---|
| 2020/2021 Tax Rate: | 10.755% | Stabilized Tax Liability | $144,662 |
| Annual Rate of Growth (Tax Rate): | 0% | Stabilized Assessment | $1,345,068 |
| Discount Rate: | 5.00% | ICAP Abatement | $136,780 |
| | | Annual Rate of Growth (Assessment): | 3% |

| Year | Projected AV | Tax Rate | Full Taxes | Benefit Amount | % of Allowed (Phaseout) | Net Benefit Amount | Net Taxes | Tax Savings |
|---|---|---|---|---|---|---|---|---|
| 1 | $1,345,068 | 0.10755 | $144,662 | $136,780 | 100% | $136,780 | $7,882 | $136,780 |
| 2 | $1,385,420 | 0.10755 | $149,002 | $136,780 | 100% | $136,780 | $12,222 | $136,780 |
| 3 | $1,426,983 | 0.10755 | $153,472 | $136,780 | 100% | $136,780 | $16,692 | $136,780 |
| 4 | $1,469,792 | 0.10755 | $158,076 | $136,780 | 100% | $136,780 | $21,296 | $136,780 |
| 5 | $1,513,886 | 0.10755 | $162,818 | $136,780 | 100% | $136,780 | $26,038 | $136,780 |
| 6 | $1,559,302 | 0.10755 | $167,703 | $136,780 | 100% | $136,780 | $30,923 | $136,780 |
| 7 | $1,606,081 | 0.10755 | $172,734 | $136,780 | 100% | $136,780 | $35,954 | $136,780 |
| 8 | $1,654,264 | 0.10755 | $177,916 | $136,780 | 100% | $136,780 | $41,136 | $136,780 |
| 9 | $1,703,892 | 0.10755 | $183,254 | $136,780 | 100% | $136,780 | $46,473 | $136,780 |
| 10 | $1,755,009 | 0.10755 | $188,751 | $136,780 | 100% | $136,780 | $51,971 | $136,780 |
| 11 | $1,807,659 | 0.10755 | $194,414 | $136,780 | 100% | $136,780 | $57,633 | $136,780 |
| 12 | $1,861,889 | 0.10755 | $200,246 | $136,780 | 100% | $136,780 | $63,466 | $136,780 |
| 13 | $1,917,745 | 0.10755 | $206,254 | $136,780 | 100% | $136,780 | $69,473 | $136,780 |
| 14 | $1,975,278 | 0.10755 | $212,441 | $136,780 | 100% | $136,780 | $75,661 | $136,780 |
| 15 | $2,034,536 | 0.10755 | $218,814 | $136,780 | 100% | $136,780 | $82,034 | $136,780 |
| 16 | $2,095,572 | 0.10755 | $225,379 | $136,780 | 100% | $136,780 | $88,599 | $136,780 |
| 17 | $2,158,439 | 0.10755 | $232,140 | $136,780 | 90% | $123,102 | $109,038 | $123,102 |
| 18 | $2,223,192 | 0.10755 | $239,104 | $136,780 | 80% | $109,424 | $129,680 | $109,424 |
| 19 | $2,289,888 | 0.10755 | $246,277 | $136,780 | 70% | $95,746 | $150,531 | $95,746 |
| 20 | $2,358,585 | 0.10755 | $253,666 | $136,780 | 60% | $82,068 | $171,598 | $82,068 |
| 21 | $2,429,342 | 0.10755 | $261,276 | $136,780 | 50% | $68,390 | $192,886 | $68,390 |
| 22 | $2,502,223 | 0.10755 | $269,114 | $136,780 | 40% | $54,712 | $214,402 | $54,712 |
| 23 | $2,577,289 | 0.10755 | $277,187 | $136,780 | 30% | $41,034 | $236,153 | $41,034 |
| 24 | $2,654,608 | 0.10755 | $285,503 | $136,780 | 20% | $27,356 | $258,147 | $27,356 |
| 25 | $2,734,246 | 0.10755 | $294,068 | $136,780 | 10% | $13,678 | $280,390 | $13,678 |
| | | | | | | **NPV:** | | **$1,719,522** |
| | | | | | | **ROUNDED:** | | **$1,700,000** |

Finally, we present the present value of the 421A and separate ICAP benefits which we add to our final value indication.

| | |
|---|---|
| NPV of 421A Benefits - Residential | $14,200,000 |
| NPV of ICAP Benefits - Retail | $2,000,000 |
| NPV of ICAP Benefits - Medical Office | $1,700,000 |
| **Total** | **$17,900,000** |

# Site Description



| | |
|---|---|
| **Location** | 430-438 Albee Square is situated on the west side of Albee Square, between Fulton Street and Willoughby Street, in the Downtown Brooklyn neighborhood (Kings County) in the State of New York. |
| **Surrounding Land Uses** | Surrounding land uses include multi-family and mixed-use high-rise buildings with ground floor retail space. The DeKalb Av subway station is a 4-minute walk away. The Hoyt St subway station is a 3-minute walk away. The Jay St - MetroTech subway station is a 5-minute walk away. A transportation summary is provided below: |



TRANSPORTATION

| | | |
|---|---|---|
| 2 3 | at Hoyt St | under 500 feet |
| B Q R | at DeKalb Av | under 500 feet |
| A C F R | at Jay St - MetroTech | 0.11 miles |
| A C G | at Hoyt & Schermerhorn | 0.16 miles |
| 2 3 4 5 | at Nevins St | 0.24 miles |

| | |
|---|---|
| **Easements, Encroachments, and Restrictions** | Based upon a review of the deed, there do not appear to be any easements, encroachments, or restrictions that would adversely affect value. |
| **Site Area** | 0.3± acres./ 11,943± square feet |
| **Shape** | Regular |

| | |
|---|---|
| **Frontage** | Albee Square: 103.760 feet |
| **Topography** | Generally level |
| **Drainage** | Assumed adequate |
| **Access** | Residential entrance on Albee Square. Retail is accessed from the same street. The upper floor retail spaces, as well as the cellar level, are accessed from a dedicated elevator within the retail unit. The retail cellar space is also accessed from a dedicated door from the street leading to a stairwell. |
| **Paving** | All roads are paved with asphalt and are in satisfactory condition. |
| **Street Drainage** | Street drainage is collected by gravity into the local sewer storm system mains. |
| **Street Lighting** | Adequate |
| **Utilities & Services** | Water/Sewer and Refuse – Municipal<br>Police & Fire Protection – Municipal<br>Gas & Electric – |
| **Hazardous Substances** | We observed no evidence of toxic or hazardous substances that require remediation during our inspection of the site. |
| **Flood Hazard Status[7]** | Located in "Zone X" on the National Flood Insurance Program Rate Map dated September 5, 2007 Community Panel #3604970203F. Flood zone X is a low- to moderate-risk area. |
| **Conclusion** | The site is like others in the vicinity, and there are no negative external factors.  Site is adequate for its current use. |

---

[7] *The flood map can be found in the Map Gallery, which is located in the Addenda.*

# Description of Improvements[8]

The subject, 430-438 Albee Square, consists of a 28-story elevatored mixed-use retail and residential building containing 150 residential units. 430-438 Albee Square contains 160,577± gross square feet above grade (according to the public record). The residential portion contains a leasable area of 117,141 square feet. The residential units are broken down as follows.

| Unit Type | No. of Units | Rooms / Unit | Total Rooms | Avg SF / Unit | Total Leasable SF |
|---|---|---|---|---|---|
| Studio | 8 | 2 | 16 | 481 | 3,844 |
| One-Bedroom | 4 | 3 | 12 | 580 | 2,318 |
| Two-Bedroom | 137 | 4 | 548 | 800 | 109,613 |
| Three-Bedroom | 1 | 5 | 5 | 1,366 | 1,366 |
| Totals/Average | 150 | | 581 | 781 | 117,141 |

There is a total of 31,167 square feet of retail space situated on the ground floor, second, third, and cellar levels (according to the condominium declaration). The third floor is currently being used as amenity space (playroom, gym, and lounge) for the residential tenants. There is 10,258 square feet on the ground floor, 9,061 square feet on the second floor, 3,786 square feet on the third floor, and 8,062 below grade square feet in the cellar. The leasable area is calculated to be 30,109 square feet across all levels. The commercial space is currently 53% occupied based off of leasable square footage, with a restaurant tenant occupying a portion of the ground floor and a medical office tenant occupying the entire second floor. A breakdown of the retail space is provided below.

| Unit | Status | Floor | Leasable SF |
|---|---|---|---|
| LL | Vacant | Basement | 8,062 |
| 1 | Vacant | Ground | 2,200 |
| 2 | Cajun Restaurant Albee LLC | Ground | 7,000 |
| 3 | Reproductive Medicine Associates of New York LLP | 2 | 9,061 |
| 4 | Vacant | 3 | 3,786 |
| | | | 30,109 |

Property amenities include a full-time doorman, community outdoor space, tenant lounge, fitness center, and bicycle storage. Unit amenities include private outdoor space and in-unit laundry. The property is in excellent condition.

## Building Inspection

On October 25, 2021, Kevin Walsh of Bowery Valuation conducted an interior and exterior inspection of the subject property. The inspection included a tour of the building facade, exterior entrance, interior hallways, common areas, unit interiors, mechanical/electrical systems, stairs, and roof. We were able to inspect the stairs and they are in excellent condition. We were able to inspect the roof and it is in excellent condition. Nevertheless, we recommend a roof inspection by a qualified professional. Moreover, we did not observe any hazardous substances on the improvements or adverse environmental or physical conditions.

We inspected residential units 14F, 11E, and 4G which are in excellent condition. We also inspected the common areas, amenity spaces, utilities, roof, and each commercial space.

The improvements are outlined below.

---

[8] The subject property photos can be found in the Addenda.

# Structural & Mechanical

## Structural

| | |
|---|---|
| Foundation | Poured concrete |
| Structural System: | Reinforced concrete and Structural Steel |
| Exterior Walls | Steel and Glass |
| Roof | Flat built-up roof. The roof is utilized as communal roof deck and is landscaped. |
| Windows | Casement Glass Windows. Commercial Space has plate glass windows. |

## Mechanicals

| | |
|---|---|
| Heating/ Cooling Systems/ Hot water | Individual HVAC units per apartment providing heat and air conditioning. HVAC for commercial units are on a portion of the roof. Tenants are directly metered for interior unit electric and heat usage. |
| Electric/Gas/Water | Cooking gas and gas-fired hot water are master metered. Tenants are directly metered for electricity usage. The meters are located in the basement. |
| Plumbing | PVC, copper, and iron |
| Fire Safety | Fully sprinklered |

# Layout & Finishes

## Interior Layout and Finish

| | |
|---|---|
| Basement | The basement contains amenity areas, retail rentable area, as well as the electric meters, hot water heaters, and additional mechanicals. |
| Lobby/Common Areas | Carpeted floors, sheetrock walls/ceilings, recessed lighting on upper floors. Lobby level has ceramic tiled floors, wallpapered or painted sheetrock, and recessed lighting. Amenity spaces have ceramic tiled flooring, recessed lighting, and sheetrock walls and ceilings |
| Laundry | There are in-unit washers and dryers as well as shared laundry room in the basement. |
| Stairwells | There are two interior staircases that run from the basement floor to the roof. |
| Elevators | Two elevators, one servicing the residential portion and one servicing the commercial portion. |
| Security | Security cameras throughout, door locks and full-time doormen. |
| Amenities | The subject property features a full-time doorman, community outdoor space, tenant lounge, fitness center, and bicycle storage. Unit amenities include private outdoor space and in-unit laundry.. |
| Parking | Per zoning, the subject is required to have available parking. No parking is provided on site. In order to conform to the municipal zoning code for parking, the owner acquired nearby parking spaces in the local market area (see 'Zoning' section). |
| Commercial Space | A portion of the ground floor has been leased out to a restaurant tenant which is in |

the final stages of building out the space. The remaining vacant ground floor area is in shell form, concrete floors and exposed ceilings. The entire second floor has been leased to a medical office tenant which is also in the final stages of being built out. The below grade area and the leasable area on the third floor is in shell form.

## Unit Finishes

**Baths**

The subject's units generally feature excellent quality bathroom finishes relative to typical units in similar elevator apartment buildings in the subject's area. The subject units typically feature: good ceramic tiled flooring, porcelain stand-alone sinks, and porcelain tubs/ fiber glass showers.

**Kitchens**

The subject's units generally feature excellent quality kitchen finishes relative to typical units in similar elevator apartment buildings in the subject's area. The subject units typically feature excellent quality wood cabinets with granite/stone countertops, ceramic tiled flooring and stainless-steel appliances. Units include dishwashers and washer/dryers.

**Living area/Bedrooms**

The subject's units generally feature excellent quality living area finishes relative to typical units in similar elevator apartment buildings in the subject's area. The subject units typically feature hardwood floors and painted drywall walls.

**Furniture, Fixtures, and Intangibles:**

In the local market, unit fixtures, such as appliances, typically trade with the property and are considered part of the real estate. Further, there are no other personal property, trade fixture, or intangible items that influence value. As such, we do not report a separate FF&E value.

### Residential Unit Distribution Summary

| Unit Type | No. of Units | Rooms / Unit | Total Rooms | Avg SF / Unit | Total Leasable SF |
|---|---|---|---|---|---|
| Studio | 8 | 2 | 16 | 481 | 3,844 |
| One-Bedroom | 4 | 3 | 12 | 580 | 2,318 |
| Two-Bedroom | 137 | 4 | 548 | 800 | 109,613 |
| Three-Bedroom | 1 | 5 | 5 | 1,366 | 1,366 |
| **Totals/Average** | **150** | | **581** | **781** | **117,141** |

# Building Condition

## Condition

As new construction, the subject is in excellent condition as observed on our site inspection. The final CO was issued in January of 2019.

## Deferred Maintenance

We did not receive a Physical Risk Report. No deferred maintenance was observed during out inspection.

## Remaining Economic Life

430-438 Albee Square was constructed in 2018. Similar buildings have a typical economic life of 60 years and we forecast and effective age of 3 years with a remaining economic life of 58 years.

## Summary

The subject, 430-438 Albee Square, consists of a 28-story elevatored mixed-use retail and residential building containing 150 residential units. 430-438 Albee Square contains 160,577± gross square feet above grade (according to the public record). Based on our inspection, the subject is in excellent condition.

# Highest & Best Use

In determining highest and best use, we have considered the current trends of supply and demand on the market, current zoning regulations and other possible restrictions, and Neighboring land uses.

It is to be recognized that in cases where a site has existing improvements on it, the highest and best use may be determined to be different from the existing use. The existing use will continue, however, unless and until land value in its highest and best use exceeds the total value of the property in its existing use.

In estimating highest and best use, alternative uses[9], such as the legally permissible use, the physically possible use, the financially feasibility, and the highest and best use, are considered and tested for the subject site.

## As Vacant

**Legally Permissible**

The subject is in zone C6-4.5 (Special Downtown Brooklyn Zoning District), which permits residential and commercial uses as of right.

**Physically Possible**

The site is of good size and has good street access. The lot has 11,943 of total square feet with good frontage on Albee Square: 103.760 feet. Based on a 10.00 FAR for residential and a 2.00 FAR for commercial, 143,316 square feet of development is allowed on the site. The physical characteristics of the site do not appear to impose any unusual restrictions on development, and we are not aware of any easement or encroachments that would impact development. All necessary utilities are available, and the site appears functional for a variety of permitted uses.

**Financially Feasible**

The subject is located within a predominantly mixed-use district with a variety of new construction mixed-use residential properties as well as buildings that have been converted from industrial or commercial use to residential in the neighborhood. Based on our analysis of the market, there is sufficient demand for mixed-use residential and commercial properties. Market conditions are such that mixed-use residential and commercial development is feasible, as the value would sufficiently exceed the cost plus developer's profit. New construction in the neighborhood is currently underway and new developed multifamily apartments in the subject's submarket are selling, an indication of feasibility.

**Maximally Productive/ Highest and Best Use**

All legally permissible, physically possible, and financially feasible uses of the site, as vacant, have been presented and examined.

In conclusion, it is our opinion that the highest and best use of the subject, as vacant, is to develop a mixed-use residential and commercial property.

## As Improved

**Legally Permissible**

The subject is in zone C6-4.5 (Special Downtown Brooklyn Zoning District), which permits residential and commercial uses as of right.

As a newly constructed building, the subject is comprised of residential and commercial uses that conform to current use and comply with bulk requirements.

**Physically Possible**

The subject is was built in 2018 and contains 160,577 square feet. As previously indicated within the zoning section, the subject appears to comply with current zoning.  the subject improvements are in excellent condition overall and relatively

---

[9] The definitions of these alternative uses can be found in the Glossary of Terms, which is located in the Addenda.

well maintained and functional for its use.

**Financially Feasible**

Our analysis in the Income Approach shows that the currently existing building has an 'as is' value of $161,500,000. This amount is well above prevailing land values. Considering the current improvements contribute value to the land, the current use represents the most financially feasible use as improved. We also note that all apartment units are subject to rent regulation based on a requirement that all apartments subject to 421(a) benefits must be rent stabilized during the duration of the benefit term. The presence of rent-regulated tenants makes demolition illegal.

**Maximally Productive/ Highest and Best Use**

All legally permissible, physically possible, and financially feasible uses of the site, as improved, have been presented and examined.

It is our opinion that the highest and best use of the subject, as improved as proposed, given the current improvements is its current use as a mixed-use building.

**Conclusion**

Based on the above analysis, continued residential and commercial use is concluded to be the highest and best use as improved.

**Most Probable Buyer**

The most likely buyer is a regional or institutional owner of similar mixed-use buildings.

# Appraisal Valuation Process

The estimated values arrived at by the approaches to value used in this report are as follows:

The Cost Approach is based on the understanding that market participants relate value to cost. In the Cost Approach a property is valued based on a comparison with the cost to build a new or substitute property. The cost estimate is adjusted for all depreciation affecting the existing property. This approach traditionally reflects a good indicator of value when the improvements being appraised are new or close to new or when the property has unique or specialized improvements.

The Income Capitalization Approach reflects an analysis of a property's capacity to generate future income and capitalizes the income into an indication of present value. This approach reflects the market's perception of a relationship between a property's potential income and its market value. It is a strong indicator of value when market rents, vacancy rates, stabilized expenses, capitalization/discount rates are based on reliable market data. The two common valuation techniques associated with the Income Capitalization Approach are direct capitalization and the discounted cash flow (DCF) analysis, with one or both methods applied as appropriate. This approach is widely used in appraising income producing properties.

The Sales Comparison Approach assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with similar utility. This approach is reliable in an active market with sufficient sales data where few differences exist between the comparable sales and the subject, and the sales data collected is credible and accurate. Similar property types in competitive locations tend to sell within a consistent range, and this factor makes valuation on a per square foot and per unit basis a strong predictor of value. The Sales Comparison Approach is often relied upon for owner-user properties. For leased properties, this approach is more often considered as secondary support for the Income Approach.

Each approach applied is then reconciled to a final value conclusion after weighing the quantity and quality of data analyzed and the applicability of each approach to the subject property type.

Approaches to Value Applied

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | No |
| Income Approach | Applicable | Yes |
| Sales Approach | Applicable | Yes |

The Cost Approach is traditionally a good indicator of value when properties being appraised are new or close to new. However, a major consideration is that investors in this asset class would not likely consider building a substitute as a methodology for valuing this one as the typical buyer is not generally a real estate developer, but rather a property manager. Further, construction was completed in 2018 and is currently 100% occupied. Additionally, investors typically give nominal weight to this analysis since the asset is operating on a stabilized basis. Therefore, as a result of the limited use of this approach, it has not been applied. The exclusion of this approach is not considered to impact the reliability of the appraisal.

# Income Approach

In the Income Capitalization Approach, a property's capacity to generate future benefits is analyzed; the forecasted income is capitalized into an indication of present value. Definitions of commonly used measures of anticipated benefits are defined in the Glossary of Terms within the Addenda.

The income capitalization approach supports two methodologies: direct and yield capitalization. Investors in the local market typically utilize a direct capitalization when making investment decisions for this asset class, therefore we conclude that the direct capitalization method is appropriate to apply to the subject.

## Base Rental Income

430-438 Albee Square contains a total of 150 units including a mix of studios as well as one- to three-bedroom units. The subject's residential portion is currently 100% occupied with 0 vacant units. We note all of the subject's residential units are rent stabilized due to the subject's 15-year 421(A) tax benefit, which is currently in the third year.  Although requested, we were not provided with the registered rents for the subject's stabilized units.

A current rent roll summary is shown below:

Unit Breakdown - Range Per Month

| Unit | No. of Units | Rental Range Per Month | | | Total Annual Rent | Avg. Rent Per Month |
|------|------|------|------|------|------|------|
| Studio | 8 | $2,690 | - | $2,750 | $261,726 | $2,726 |
| One-Bedroom | 4 | $3,197 | - | $3,390 | $157,047 | $3,272 |
| Two-Bedroom | 137 | $3,250 | - | $7,000 | $7,063,827 | $4,297 |
| Three-Bedroom | 1 | $8,000 | - | $8,000 | $96,000 | $8,000 |
| **Totals/Average** | **150** | | | | **$7,578,600** | **$4,210** |

Unit Breakdown - Range Per Square Foot

| Unit | No. of Units | Rental PSF Range | | | Avg. Rent Per Square Foot |
|------|------|------|------|------|------|
| Studio | 8 | $60 | - | $71 | $68 |
| One-Bedroom | 4 | $67 | - | $69 | $68 |
| Two-Bedroom | 137 | $51 | - | $76 | $65 |
| Three-Bedroom | 1 | $70 | - | $70 | $70 |
| **Totals/Average** | **150** | | | | **$66** |

## Comparable Rentals

In order to gauge the reasonableness of the subject's occupied units and forecast market rent for the vacant units, we have examined the following rental activity in the submarket and note that the rents listed below indicate the effective rent, net of concessions.



| # | Property/Address | Year Built | Total Units | Distance to Subject | Unit Mix | Avg. Rent | Unit Sq. Ft. | Rent PSF |
|---|---|---|---|---|---|---|---|---|
| 1 | 80 DeKalb Avenue Brooklyn | 2011 | 365 | 0.20 | Studio | $2,640 | 559 | $57 |
|   |   |   |   |   | 1BD | $3,365 | 650 | $62 |
|   |   |   |   |   | 2BD | $5,285 | 885 | $72 |
|   |   |   |   |   | 3BD | $5,915 | 975 | $73 |
| 2 | 66 Rockwell Place Brooklyn | 2012 | 326 | 0.20 | Studio | $2,890 | 536 | $65 |
|   |   |   |   |   | 1BD | $3,773 | 696 | $65 |
|   |   |   |   |   | 2BD | $5,800 | 986 | $71 |
|   |   |   |   |   | 3BD | - | - | - |
| 3 | 1 Flatbush Avenue Brooklyn | 2018 | 183 | 0.20 | Studio | $3,095 | 561 | $66 |
|   |   |   |   |   | 1BD | $3,595 | 633 | $68 |
|   |   |   |   |   | 2BD | $5,445 | 1,168 | $56 |
|   |   |   |   |   | 3BD | - | - | - |
| 4 | 250 Ashland Place Brooklyn | 2015 | 586 | 0.20 | Studio | $2,857 | 500 | $69 |
|   |   |   |   |   | 1BD | $3,824 | 660 | $70 |
|   |   |   |   |   | 2BD | $6,095 | 930 | $79 |
|   |   |   |   |   | 3BD | $7,628 | 1,200 | $76 |
| 5 | 300 Ashland Place Brooklyn | 2016 | 379 | 0.20 | Studio | $3,063 | 460 | $80 |
|   |   |   |   |   | 1BD | $3,693 | 650 | $68 |
|   |   |   |   |   | 2BD | $4,941 | 945 | $63 |
|   |   |   |   |   | 3BD | - | - | - |
| 6 | 33 Bond Street Brooklyn | 2015 | 714 | 0.20 | Studio | $2,421 | 450 | $65 |
|   |   |   |   |   | 1BD | $3,430 | 650 | $63 |
|   |   |   |   |   | 2BD | $4,910 | 975 | $60 |
|   |   |   |   |   | 3BD | - | - | - |

Comparable Apartment Buildings Photos

80 DeKalb Avenue



66 Rockwell Place



1 Flatbush Avenue



250 Ashland Place



300 Ashland Place



33 Bond Street



## Comparable Apartment Summaries

**80 Dekalb Avenue** - DKLB BKLN was built in 2011 and has 365 residential units. It contains studios, one-bedrooms, and two-bedrooms. Each residential unit features 9- to 11-foot-high ceilings, designer kitchens, oversized closets, luxurious baths, and washers and dryers. Amenities include 24-hour doorman, on-site parking, oversized sundeck, bike room, valet service, and 5,000 square feet of amenity space. We note that the finishes and amenities are somewhat similar to the subject property. However, given that it is slightly older, we expect the subject's rent to outperform this comparable.

**66 Rockwell Place** - 66 Rockwell Place was built in 2012 and has 326 residential units. It contains studios, one-bedrooms, and two-bedrooms. Residential units feature bamboo wood floors, black granite counter tops, Whirlpool appliances, and washers & dryers. Amenities include 24-hour concierge, valet service, recreational lounge, a Zen garden, rooftop sun deck, and a health club. We note that the finishes and amenities are somewhat similar to the subject property. However, given that the comparable is slightly older and has larger sized units, we expect the subject's rent to, on average, outperform this comparable on a per square foot basis.

**1 Flatbush Avenue** - 1 Flatbush Avenue is a recently constructed, 19-story elevatored luxury residential building containing 183 residential units. Property amenities include a 24-hour concierge, fitness studio, yoga studio, gaming lounge, resident's lounge/co-working space, and landscaped roof deck with outdoor grills. We note that the finishes and amenities are similar to the subject property and we expect the subject's rent to perform similarly to this comparable.

**250 Ashland Place** - The Ashland was built in 2015 and features 586 residential units. It contains studios, one-bedrooms, two-bedrooms, and three-bedrooms. Units feature floor to ceiling glass windows, open closets, black countertops, and stainless-steel appliances. Amenities include fitness center, outdoor terraces, screening room, billiard room, BBQ area, and an outdoor movie screening area. We note that the finishes and amenities are somewhat similar to the subject property, and we expect the subject's rent to perform similarly to this comparable on a nominal basis.

**300 Ashland Place** - 300 Ashland Place was built in 2016 and features 379 residential units. It contains studios, one-bedrooms, and two-bedrooms. Units feature expansive windows, solar shades, Corian windowsills, Caesarstone and stainless-steel countertops, Bosch kitchen appliances, and Grohe bathroom fixtures. Amenities include bike room, concierge, media room, fitness center, and community recreation facilities. We note that the finishes and amenities are somewhat similar to the subject property, and we expect the subject's rent to perform similarly to this comparable on a nominal basis.

**33 Bond Street** - 33 Bond Street was built in 2015 and features 714 residential units. It contains studios, one-bedrooms, and two-bedrooms. Units feature white oak strip floors, spacious living room, in-unit washer and dryer, floor-to-ceiling windows, and chefs' kitchens. Amenities include 18,500 square feet of landscaped roof deck, featuring a golf putting green, BBQ grills, cabanas, sundeck, and outdoor shower. There are also conference rooms, individual workstations, and concierge service. We note that the finishes and amenities are somewhat similar to the subject property. However, we expect the subject to outperform this comparable on a per square foot basis.

*Income Approach*

## Comparable #1: 80 DeKalb Avenue



1

| Building Name: | DKLB BKLN |
|---|---|
| Address: | 80 DeKalb Avenue |
| Location: | Brooklyn |
| Building Type: | High Rise |
| Total Number of Units: | 365 |
| Date Constructed/ Renovated: | 2011 |

| Unit Type | Avg Rent | Avg SF | Avg Rent PSF |
|---|---|---|---|
| Studio | $2,640 | 559 | $56.67 |
| One BD | $3,365 | 650 | $62.12 |
| Two BD | $5,285 | 885 | $71.66 |
| Three BD | $5,915 | 975 | $72.80 |

**Unit Features** — **Property Features**

| *Unit Amenities* | | *Kitchen* | | *Convenience* | | *Leisure* | |
|---|---|---|---|---|---|---|---|
| x | AC | x | Range/Stove | x | On-Site Maintenance | x | Fitness Center |
| | Carpeting | x | Refrigerator | x | On-Site Management | | Pool |
| x | Wood Floors | x | Microwave | x | Doorman | x | Media Room |
| | Tile Flooring | x | DW | x | Parking | | Playground |
| | Walk-in Closets | | Disposal | x | Laundry Room | x | Roof Deck |
| x | Washer / Dryer | | | x | Elevator | | |

| *Bathrooms* | | *Utilities Included* | |
|---|---|---|---|
| x | One per unit | x | Heat |
| | | x | Hot Water / Gas |
| | | | Electric / Cooking Gas |
| *Outdoor* | | x | Water / Sewer |
| x | Balcony / Patio | x | Trash |

*Source: StreetEasy*

*Income Approach*

## Comparable #2: 66 Rockwell Place



2

| | |
|---|---|
| Building Name: | 66 Rockwell |
| Address: | 66 Rockwell Place |
| Location: | Brooklyn |
| Building Type: | High Rise |
| Total Number of Units: | 326 |
| Date Constructed/ Renovated: | 2012 |

| Unit Type | Avg Rent | Avg SF | Avg Rent PSF |
|---|---|---|---|
| Studio | $2,890 | 536 | $64.70 |
| One BD | $3,773 | 696 | $65.05 |
| Two BD | $5,800 | 986 | $70.59 |
| Three BD | | | |

| Unit Features | | Property Features | |
|---|---|---|---|

**Unit Amenities**
- x AC
- Carpeting
- x Wood Floors
- Tile Flooring
- Walk-in Closets
- x Washer / Dryer

**Kitchen**
- x Range/Stove
- x Refrigerator
- x Microwave
- x DW
- Disposal

**Bathrooms**
- x One per unit

**Outdoor**
- x Balcony / Patio

**Convenience**
- x On-Site Maintenance
- x On-Site Management
- x Doorman
- x Parking
- x Laundry Room
- x Elevator

**Leisure**
- x Fitness Center
- Pool
- Tennis Court
- Playground
- x Roof Deck

**Utilities Included**
- x Heat
- x Hot Water / Gas
- Electric / Cooking Gas
- x Water / Sewer
- x Trash

*Source: StreetEasy*

*Income Approach*

**Comparable #3:** 1 Flatbush Avenue



3

| | |
|---|---|
| Building Name: | 1 Flatbush |
| Address: | 1 Flatbush Avenue |
| Location: | Brooklyn |
| Building Type: | High Rise |
| Total Number of Units: | 183 |
| Date Constructed/ Renovated: | 2018 |

| Unit Type | Avg Rent | Avg SF | Avg Rent PSF |
|---|---|---|---|
| Studio | $3,095 | 561 | $66.20 |
| One BD | $3,595 | 633 | $68.15 |
| Two BD | $5,445 | 1,168 | $55.94 |
| Three BD | | | |

| Unit Features | | Property Features | |
|---|---|---|---|
| *Unit Amenities* | *Kitchen* | *Convenience* | *Leisure* |
| x   AC | x   Range/Stove | x   On-Site Maintenance | x   Fitness Center |
|     Carpeting | x   Refrigerator | x   On-Site Management |     Pool |
| x   Wood Floors | x   Microwave |     Doorman |     Tennis Court |
|     Tile Flooring | x   DW |     Parking |     Playground |
|     Walk-in Closets |     Disposal | x   Laundry Room | x   Roof Deck |
|     Washer / Dryer | | x   Elevator | |
| | *Bathrooms* | | *Utilities Included* |
| | x   One per unit | |     Heat |
| | | |     Hot Water / Gas |
| | | |     Electric / Cooking Gas |
| | *Outdoor* | | x   Water / Sewer |
| | x   Balcony / Patio | | x   Trash |

*Source: Internal*

*Income Approach*

## Comparable #4: 250 Ashland Place



4

| | |
|---|---|
| Building Name: | The Ashland |
| Address: | 250 Ashland Place |
| Location: | Brooklyn |
| Building Type: | High Rise |
| Total Number of Units: | 586 |
| Date Constructed/ Renovated: | 2015 |

| Unit Type | Avg Rent | Avg SF | Avg Rent PSF |
|---|---|---|---|
| Studio | $2,857 | 500 | $68.57 |
| One BD | $3,824 | 660 | $69.53 |
| Two BD | $6,095 | 930 | $78.65 |
| Three BD | $7,628 | 1,200 | $76.28 |

### Unit Features / Property Features

**Unit Amenities**
- x AC
- Carpeting
- x Wood Floors
- Tile Flooring
- Walk-in Closets
- x Washer / Dryer

**Kitchen**
- x Range/Stove
- x Refrigerator
- x Microwave
- x DW
- Disposal

**Bathrooms**
- x One per unit

**Outdoor**
- x Balcony / Patio

**Convenience**
- x On-Site Maintenance
- x On-Site Management
- Doorman
- Parking
- x Laundry Room
- x Elevator

**Leisure**
- x Fitness Center
- Pool
- Tennis Court
- Playground
- x Roof Deck

**Utilities Included**
- x Heat
- x Hot Water / Gas
- Electric / Cooking Gas
- x Water / Sewer
- x Trash

*Source: StreetEasy*

*Income Approach*

### Comparable #5: 300 Ashland Place



5

| Building Name: | 300 Ashland Place |
| Address: | 300 Ashland Place |
| Location: | Brooklyn |
| Building Type: | High Rise |
| Total Number of Units: | 379 |
| Date Constructed/ Renovated: | 2016 |

| Unit Type | Avg Rent | Avg SF | Avg Rent PSF |
|---|---|---|---|
| Studio | $3,063 | 460 | $79.90 |
| One BD | $3,693 | 650 | $68.18 |
| Two BD | $4,941 | 945 | $62.74 |
| Three BD | | | |

| Unit Features | | | Property Features | | |
|---|---|---|---|---|---|

**Unit Amenities**

| | | | | Kitchen | | | | | Convenience | | | | | Leisure | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | AC | | | x | Range/Stove | | | x | On-Site Maintenance | | | x | Fitness Center | |
| | Carpeting | | | x | Refrigerator | | | x | On-Site Management | | | | Pool | |
| x | Wood Floors | | | x | Microwave | | | | Doorman | | | | Tennis Court | |
| | Tile Flooring | | | x | DW | | | | Parking | | | | Playground | |
| | Walk-in Closets | | | | Disposal | | | x | Laundry Room | | | x | Roof Deck | |
| x | Washer / Dryer | | | | | | | x | Elevator | | | | | |

**Bathrooms**

| x | One per unit |
|---|---|

**Utilities Included**

| x | Heat |
|---|---|
| x | Hot Water / Gas |
| | Electric / Cooking Gas |
| x | Water / Sewer |
| x | Trash |

**Outdoor**

| | Balcony / Patio |
|---|---|

*Source: StreetEasy*

*Income Approach*

### Comparable #6: 33 Bond Street



6

| Building Name: | 33 Bond Street |
| Address: | 33 Bond Street |
| Location: | Brooklyn |
| Building Type: | High Rise |
| Total Number of Units: | 714 |
| Date Constructed/ Renovated: | 2015 |

| Unit Type | Avg Rent | Avg SF | Avg Rent PSF |
|---|---|---|---|
| Studio | $2,421 | 450 | $64.56 |
| One BD | $3,430 | 650 | $63.32 |
| Two BD | $4,910 | 975 | $60.43 |
| Three BD | | | |

| Unit Features | | | | Property Features | | | |
|---|---|---|---|---|---|---|---|
| **Unit Amenities** | | **Kitchen** | | **Convenience** | | **Leisure** | |
| | AC | X | Range/Stove | X | On-Site Maintenance | X | Fitness Center |
| X | Carpeting | X | Refrigerator | x | On-Site Management | X | Pool |
| X | Wood Floors | | Microwave | | Business Center | | Tennis Court |
| | Tile Flooring | X | DW | X | Parking | | Playground |
| X | Walk-in Closets | | Disposal | | Laundry Room | | Baseketball Court |
| | Washer / Dryer | | | | Elevator | | |
| | | **Bathrooms** | | | | **Utilities Included** | |
| | | x | One per unit | | | | Heat |
| | | | | | | | Hot Water / Gas |
| | | **Outdoor** | | | | | Electric / Cooking Gas |
| | | X | Balcony / Patio | | | x | Water / Sewer |
| | | | | | | x | Trash |

*Source: StreetEasy*

### Rent Reconciliation

Important considerations in determining potential rental value include location, access to transportation and neighborhood amenities, and building design and condition. The subject is in a desirable section of Downtown Brooklyn, a neighborhood that has seen significant investment in the past 5 to 10 years. The site has good access to mass transportation, and the block is appealing. The comparables are similar in their physical and locational appeal and are good indicators of value. We note that all of the comparables are either new construction or recently renovated or converted buildings with comparable amenity packages and intra-unit amenities and finishes.

## Studio Units

Due to the 421-A tax benefit all of the subject units are subject to Rent Stabilization Guidelines. The initial rents are set at market rate and rent increases are limited to those set by the Rent Stabilization Guidelines. The subject's occupied studio units range from $2,690 to $2,750 per month with an average of $2,726 per month or $60 to $71 per square foot with an average of $68 per square foot. The comparable studio units range from $2,421 to $3,095 per month with an average of $2,828 per month or $57 to $80 per square foot with an average of $67 per square foot. Based on the range of the comparables and the subjects occupied units, we forecast a market rent of $2,700 or $67 per square foot which is toward the average of the range on a both a nominal basis and on a per square foot basis.

## One-Bedroom Units

Due to the 421-A tax benefit all of the subject units are subject to Rent Stabilization Guidelines. The initial rents are set at market rate and rent increases are limited to those set by the Rent Stabilization Guidelines. The subject's occupied one-bedroom units range from $3,197 to $3,390 per month with an average of $3,272 per month or $67 to $69 per square foot with an average of $66 per square foot. The comparable one-bedroom units range from $3,365 to $3,824 per month with an average of $3,613 per month or $62 to $70 per square foot with an average of $66 per square foot. Based on the range of the comparables and the subjects occupied units, we forecast a market rent of $68 per square foot indicating an average monthly rate of $3,284 which is at the high end of the range on a per square foot basis but toward the average on a nominal basis.

## Two-Bedroom Units

Due to the 421-A tax benefit all of the subject units are subject to Rent Stabilization Guidelines. The initial rents are set at market rate and rent increases are limited to those set by the Rent Stabilization Guidelines. The subject's 137 occupied free market two-bedroom units range from $3,250 to $7,000 per month with an average of $4,297 per month or $51 to $76 per square foot and average $65 per square foot. The two-bedroom units have a wide range of rents due to units on higher floors with views commanding higher rents, as well as variations in unit sizes. Further, the units are rent stabilized and therefore can have varied legal rents depending upon unit turnover and regulation status. The comparable two-bedroom units range from $4,910 to $6,095 per month with an average of $5,413 per month or $56 to $79 per square foot and average $67 per square foot. We note the subject's nominal range is wider than the comparable range, but most of the subject's two-bedroom unit rents are supported by the comparables. The subject's average rent per square foot is supported by the comparable range. The  in place average rent is below the comparable range on a nominal basis, but is near the average of the comparable range on a per square foot basis. Unit 28A has the highest rent of $7,000 due to the fact that it is a penthouse unit, and nearly twice as large as the other two-bedroom units in the subject. Excluding Unit 28A from the calculations, since it is an outlier, the subject's two-bedroom units range from $3,250 per month to $5,155 per month, with an average of $4,277 per month. Based on the subject's free market rents and the range of the comparables, we forecast a market rent for the subject's two-bedroom unit at $65 per month which is in line with the historical performance of the subject. Our market rent projection indicates and average monthly rent of $4,334  which is below the comparable range on a nominal basis but at the comparable average on a per square foot basis.

## Three-Bedroom Units

Due to the 421-A tax benefit all of the subject units are subject to Rent Stabilization Guidelines. The initial rents are set at market rate and rent increases are limited to those set by the Rent Stabilization Guidelines. The subject's 1 free market three-bedroom unit is leased at $8,000 per month or $70 per square foot. The comparable three-bedroom units range from $5,915 to $7,628 per month with an average of $6,772 per month or $73 to $76 per square foot and average $75. Based on the subject's current in place rent, we forecast a market rent of $70 per square foot and $8,000  per month which is below the average on a per square foot basis but above on a nominal basis.

A summary of the comparables and our market rent survey is shown below.

### Market Rent Forecast

| | Studio | Studio PSF | 1-bedroom | 1-bedroom PSF | 2-bedroom | 2-bedroom PSF | 3-bedroom | 3-bedroom PSF |
|---|---|---|---|---|---|---|---|---|
| Min | $2,421 | $57 | $3,365 | $62 | $4,910 | $56 | $5,915 | $73 |
| Max | $3,095 | $80 | $3,824 | $70 | $6,095 | $79 | $7,628 | $76 |
| Average | $2,828 | $67 | $3,613 | $66 | $5,413 | $67 | $6,772 | $75 |
| Subject Avg. | $2,726 | $68 | $3,272 | $68 | $4,297 | $65 | $8,000 | $70 |
| **Market Rent Conlusion:** | **$2,700** | **$67** | **$3,284** | **$68** | **$4,334** | **$65** | **$8,000** | **$70** |

## Rent Adjustments

### Stabilized Increases

The Housing Stability & Tenant Protection Act of 2019 was signed into Law in New York on June 14, 2019, severely limiting the future potential increases in rent for vacant rent stabilized units. Individual Apartment Increases (IAI) limits have been greatly reduced as are the allowable annual increases due to Major Capital Improvements (MCI). Also, landlords are now unable to take a vacancy allowance bonus on any vacated rent stabilized unit and must maintain the last legal rent as recorded on the DHCR rent roll, and are thus limited to the one-year or two-year allowed annual increase per the Rent Stabilization Guidelines Board. The allowable increases for units subject to rent stabilization for 2020-2022 have been frozen for a one-year lease at 0% and 1.0% for the second year on a two-year contract. Given that most rent stabilized units will turnover during our forecast period, it is necessary to reflect this in our pro forma. However, given that the one-year increase approved by the Rent Stabilization Guidelines Board is 0%, we do not apply any growth factor to the stabilized income during our pro forma period.

### Vacant Unit Forecast

Although requested, we were not provided with the registered rents for the subject's stabilized units. We were provided with the September Rent Roll for the subject, and we note the subject's units are now fully leased. The subject is 100% occupied, therefore we have not projected market rent for any vacant units. According to ownership, new leases are not receiving concessions, therefore we have not projected concessions in our analysis. Further, we do not deduct any lease-up costs due to the subject's full occupancy of its residential units.

### Rent Roll Summary by Rent Regulation Status

| Income Type | No. of Units | Rental Range Per Month | | | Total Annual Rent | Avg. Rent Per Month |
|---|---|---|---|---|---|---|
| Rent Stabilized | 150 | $2,690 | - | $7,000 | $7,578,600 | $4,210 |
| Vacant | 0 | $0 | - | $0 | $0 | $3,950 |
| Concession In place leases | 0 | $0 | - | $0 | $0 | $0 |
| **Totals/Average** | **150** | | | | **$7,578,600** | **$4,210** |

The average in place monthly rent is $4,210 per month. Based on our market rent forecast, the subject rent roll is leased at 99% of market rents. We note that several units leased during the pandemic and contained rent concessions. We apply the net rent (after concessions) in our analysis and note that there is upside potential as the leases expire, and the units can be leased at the full rent.

The contract rents are based on the following expense structure:

| | |
|---|---|
| **Landlord's Obligations** | Hot water, cooking gas, common area electricity, refuse removal, water/sewer and common area maintenance. |
| **Tenant Obligations** | In-unit electricity (heating and cooling). |

## Potential Gross Residential Income

Potential gross residential income is summarized by income type:

| Income Type | Annual Rent | | Increase | | PGI |
|---|---|---|---|---|---|
| Rent Stabilized | $7,578,600 | x | 1.00000 | = | $7,578,600 |
| Vacant | $0 | x | 1.00000 | = | $0 |
| **Total** | **$7,578,600** | | | | **$7,578,600** |

## Other Income

### Amenity Income

According to ownership, the subject receives $50 per month per residential unit for the use of common area spaces and amenities such as the fitness center, playroom, and common lounge. The total is $90,000 of amenities income per year.

## Commercial Income

There is a total of 31,167 square feet of retail space situated on the ground floor, second, third, and cellar levels (according to the condominium declaration). The third floor is currently being used as amenity space (playroom, gym, and lounge) for the residential tenants. There is 10,258 square feet on the ground floor, 9,061 square feet on the second floor, 3,786 square feet on the third floor, and 8,062 below grade square feet in the cellar. The leasable area is calculated to be 30,109 square feet across all levels. The commercial space is currently 53% occupied based off of leasable square footage, with a restaurant tenant occupying a portion of the ground floor and a medical office tenant occupying the entire second floor. A breakdown of the retail space is provided below.

| Unit | Status | Floor | Leasable SF |
|---|---|---|---|
| LL | Vacant | Basement | 8,062 |
| 1 | Vacant | Ground | 2,200 |
| 2 | Cajun Restaurant Albee LLC | Ground | 7,000 |
| 3 | Reproductive Medicine Associates of New York LLP | 2 | 9,061 |
| 4 | Vacant | 3 | 3,786 |
| | | | 30,109 |

A summary of the current commercial rent roll is provided below:

| Tenant | Floor | SF | Lease Start Date | Monthly Rent | Annual Rent | Rent PSF | Details | |
|--------|-------|----|------------------|--------------|-------------|----------|---------|--|
| Cajun Restaurant Albee LLC | Partial Ground Floor | 7,000 | 12/29/2019 | $49,583 | $595,000 | $85 | Lease Expiration: | 15-year term with a 5-year renewal option at a fixed rent. |
| | | | | | | | Taxes: | Tenant's proportional share (Calculated to be 22%) of all inreases in the RE tax assessment over the 2019/2020 base year. |
| | | | | | | | Electric: | Tenant |
| | | | | | | | Insurance: | Tenant |
| | | | | | | | Maint: | Tenant |
| | | | | | | | Other: | 9-month free rent period beginning after the execution of the lease- dated 12/29/2019. Tenant Improvement allowance of $350,000. Commenced on |
| Reproductive Medicine Associates of New York LLP | 2nd Floor, Lobby Area (Excluded from Leasable Area) | 9,061 | 2/27/2020 | $51,660 | $619,916 | $68 | Lease Expiration: | 15-year termwith a 5-year renewal option at Fair Market Rent. |
| | | | | | | | Taxes: | Tenant's proportional share (Calculated to be 34%) of all inreases in the RE tax assessment over the 2019/2020 base year. |
| | | | | | | | Electric: | Tenant |
| | | | | | | | Insurance: | Tenant |
| | | | | | | | Maint: | All Operating expense increases over the 2020 Calendar year |
| | | | | | | | Other: | 11-month free rent period beginning after the commencement of the lease - dated 03/27/2020. One-time $60,000 fee payable to the Landlord. Tenant Improvement allowance of |
| **Totals** | | **16,061** | | **$101,243** | **$1,214,916** | **$76** | | |

## Comparable Rentals – Grade Level

We have examined the following rental activity in the submarket to determine market rent and gauge the reasonableness of the in-place rent. We are going to present three sets of commercial comparable leases for the grade level, below grade level, and upper floor spaces.

*Income Approach*

## Grade Level Comparable Lease Map



## Comparable Lease Summary -Grade Level

| # | Address | Tenant | Start Date | Sq. Ft. | Base Rent | Lease Terms |
|---|---------|--------|-----------|---------|-----------|-------------|
| 1 | 131 5th Avenue | Jersey Mike's Subs | Sep-21 | 1,200 | $99 | Gross |
| 2 | 252-260 Court Street | Spear Physical Therapy | Jun-21 | 4,661 | $110 | Modified gross |
| 3 | 673 Atlantic Avenue | The Simpson | Nov-20 | 6,700 | $77 | Modified gross |
| 4 | 80-84 Livingston Street | Crab Dynasty | Aug-20 | 1,400 | $77 | Modified gross |
| 5 | 475 Clermont Avenue | Fitness Factory Health Club | Jan-20 | 18,000 | $80 | Modified gross |
| 6 | 49 Willoughby Street | Retail | Sep-19 | 1,200 | $100 | Modified gross |
| 7 | 33 Bond Street | Taste Korea | Jun-19 | 1,712 | $70 | Modified gross |
| | | | Min: | 1,200 | $70 | |
| | | | Avg: | 4,982 | $88 | |
| | | | Max: | 18,000 | $110 | |

Income Approach

| Details | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Comp 6 | Comp 7 |
|---|---|---|---|---|---|---|---|
| Tenant Name | Jersey Mike's Subs | Spear Physical Therapy | The Simpson | Crab Dynasty | Fitness Factory Health Club | Retail | Taste Korea |
| Address | 131 5th Avenue | 252-260 Court Street | 673 Atlantic Avenue | 80-84 Livingston Street | 475 Clermont Avenue | 49 Willoughby Street | 33 Bond Street |
| Date Signed | Sep-21 | Jun-21 | Nov-20 | Aug-20 | Jan-20 | Sep-19 | Jun-19 |
| Square Feet | 1,200 | 4,661 | 6,700 | 1,400 | 18,000 | 1,200 | 1,712 |
| Corner | Mid-block | Corner | Corner | Mid-block | Corner | Mid-block | Mid-block |
| Lease Terms | Gross | Modified gross | Modified gross | Modified gross | Modified gross | Modified gross | Modified gross |
| **Rent/SF** | **$99.00** | **$110** | **$77.00** | **$76.79** | **$80.00** | $100.00 | $70.09 |
| Market Conditions (Time) | 0.00% | 0.00% | 0.00% | 0.00% | -5.00% | -5.00% | -5.00% |
| **Trended Price/SF** | **$99.00** | **$110.00** | **$77.00** | **$76.79** | **$76.00** | **$95.00** | **$66.59** |
| Square feet | 0.00% | 0.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% |
| Location | 0.00% | -5.00% | 5.00% | 5.00% | 10.00% | 0.00% | 10.00% |
| Utility | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Corner | 0.00% | 0.00% | 0.00% | 5.00% | 0.00% | 0.00% | 0.00% |
| Condition | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 5.00% | 0.00% |
| Lease Terms | -5.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Total** | **-5.00%** | **-5.00%** | **5.00%** | **10.00%** | **20.00%** | **5.00%** | **0.00%** |
| **Adjusted Rent/SF** | **$94.05** | **$104.50** | **$80.85** | **$84.47** | **$91.20** | **$99.75** | **$66.59** |
| **Market Rent Conclusion** | **100** | | | | | | |

| Comps: | Unadjusted | Adjusted |
|---|---|---|
| Min | $70 | $67 |
| Avg | $88 | $88 |
| Max | $110 | $105 |
| Median | $80 | $88 |

## Rent Conclusion

The comparables range from $70 per square foot to $110 per square foot, with an average of $88 per square foot. After adjustments, the comparables range from $74 per square foot to $105 per square foot, with an average rent of $89 per square foot. They range in size from 1,200 to 18,000 square feet and average of 4,982 square feet. All of the comparable leases have been signed since June 2019. Comparables 5, 6, and 7 were signed before the start of the pandemic, and warranted downwards adjustments due to the superiority of the market conditions for commercial spaces at that time. We note the subject is located directly across the street from City Point, a mixed-use development containing approximately 700,000 square feet of retail space with Joybird, Casper, Target, Trader Joe's, and Alamo Drafthouse having locations in the development.

The lease for the subject's occupied retail space, 7,000 square feet at grade, began in December 2019 with a base rent of $85 per square foot. The tenant is responsible for reimbursing its proportion taxes over a base year. The rent for this unit falls toward the mid-point of the comparable range and is considered market oriented.

There is currently 2,200 square feet of ground floor retail space available for lease, according to marketing materials the subject. The space is advertised at a rent of $100 per square foot. Since the two most recent lease comps support this rental rate, we project a market rent of $100 per square foot for this space. This rent is above the average for the comparable range, however we emphasize the recently leased ground floor space at the subject and note the vacant space is smaller which attracts a larger potential tenant pool. We project lease terms to be for 10 years, modified gross whereby tenants reimburse taxes over a base year.

## Comparable Rentals – Upper Level

We have examined the following rental activity in the submarket to determine market rent and gauge the reasonableness of the projected rent.

Upper Level Comparable Lease Map



Comparable Lease Summary - Upper Level

| # | Address | Tenant | Start Date | Sq. Ft. | Base Rent | Lease Terms |
|---|---------|--------|-----------|---------|-----------|-------------|
| 1 | 1190 Fulton Street | Eprine Community Services | Mar-21 | 6,000 | $49 | Modified Gross, 2nd Floor |
| 2 | 10 Grand Street | Social Chain | Mar-21 | 6,000 | $61 | Triple Net, 11nd Floor |
| 3 | 388 Bridge Street | Datacubed | Apr-20 | 11,366 | $43 | Modified Gross, 4th Floor |
| 4 | 82-84 Montague Street | Higher Grounds | Jul-20 | 5,000 | $80 | Modified Gross, 2nd Floor |
| 5 | 83-85 3rd Avenue | LifeStance Health, Inc. | Dec-20 | 5,500 | $50 | Moditied Gross, 3rd Floor |
| | | | **Min:** | **5,000** | **$43** | |
| | | | **Avg:** | **6,773** | **$56** | |
| | | | **Max:** | **11,366** | **$80** | |

Income Approach

| Details | Subject Base Unit | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 |
|---|---|---|---|---|---|---|
| Tenant Name | Reproductive Medicine Associates of New York LLP | Eprine Community Services | Social Chain | Datacubed | Higher Grounds | LifeStance Health, Inc. |
| Address | I30-438 Albee Square | 1190 Fulton Street | 10 Grand Street | 388 Bridge Street | 82-84 Montague Street | 83-85 3rd Avenue |
| Date Signed | Feb-20 | Mar-21 | Mar-21 | Apr-20 | Jul-20 | Dec-20 |
| Square Feet | 9,061 | 6,000 | 6,000 | 11,366 | 5,000 | 5,500 |
| Corner | Corner | Corner | Corner | Mid-block | Corner | Mid-block |
| Lease Terms | Modified gross | Modified Gross, 2nd Floor | Triple Net, 11nd Floor | Modified Gross, 4th Floor | Modified Gross, 2nd Floor | Modified Gross, 3rd Floor |
| Rent/SF | $68.42 | $48.92 | $61.00 | $42.50 | $80.00 | $50.00 |
| Market Conditions (Time) | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| | $68.42 | $48.92 | $61.00 | $42.50 | $80.00 | $50.00 |
| Trended Price/SF | | | | | | |
| Square feet | | -5.00% | -5.00% | 5.00% | -10.00% | -5.00% |
| Location | | 10.00% | 0.00% | 10.00% | 0.00% | 10.00% |
| Utility | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Corner | | 0.00% | 0.00% | 0.00% | 0.00% | 5.00% |
| Condition | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Lease Terms | | 0.00% | 10.00% | 0.00% | 0.00% | 0.00% |
| Total | | 5.00% | 5.00% | 15.00% | -10.00% | 10.00% |
| | $68.42 | $51.37 | $64.05 | $48.88 | $72.00 | $55.00 |
| Adjusted Rent/SF | | | | | | |
| Market Rent | | | | | | |
| Conclusion | | $68.00 | | | | |

| Comps: | Unadjusted | adjusted |
|---|---|---|
| Min | $43 | $49 |
| Avg | $56 | $58 |
| Max | $80 | $72 |
| Median | $50 | $55 |

## Rent Conclusion

The comparables range from $43 per square foot to $80 per square foot, with an average of $56 per square foot. They range in size from 5,000 to 11,366 square feet and averaged 6,773 square feet. All of the comparable leases have been signed since December 2020, a period of stable market conditions for upper-level space. After adjustments, the comparable leases range from $49 per square foot to $72 per square foot with an average of $58 per square foot. The subject's entire second floor space, 9,061 square feet, was leased by a medical office tenant with the lease commencing on February 27, 2020 and a base rent of $68 per square foot. The tenant is responsible for its proportional share of tax increases over the 19/20 base year. As well as all operating increases over the 2020 calendar year. The base rent falls toward the mid-point of the comparable range, is well supported by the comparables and is market oriented.

We spoke to the broker who is marketing the third floor commercial space, and he notes that the asking rent is $60 per square foot. This space is atypical in that it is accessed through the residential tenant amenities space, therefore we weighed the lower end of our comparable leases in our analysis. We project a rental rate of $35 per square foot.

## Comparable Rentals – Below Grade

We have examined the following rental activity in the submarket to determine market rent and project rent for the subject's vacant space.

Below Grade Comparable Lease Map



Comparable Lease Summary – Below Grade

| # | Address | Tenant | Start Date | Sq. Ft. | Base Rent | Lease Terms |
|---|---------|--------|-----------|---------|-----------|-------------|
| 1 | 1111 Bedford Ave | Retail | Oct-21 | 4,000 | $28 | NN |
| 2 | 60 Broadway | JOKR US Corp | May-21 | 3,000 | $50 | Modified Gross |
| 3 | 888 Lorimer St | Soft Service | Apr-21 | 2,855 | $59 | Modified Gross |
| 4 | 137 Atlantic Ave | Make A Frame - Atlantic | Nov-20 | 3,600 | $53 | Modified Gross |
| 5 | 1104 Fulton Street | Olgam 1104 Fulton Tenant | Jul-20 | 8,700 | $50 | Modified Gross |
| | | | **Min:** | **2,855** | **$28** | |
| | | | **Avg:** | **4,431** | **$48** | |
| | | | **Max:** | **8,700** | **$59** | |

*Income Approach*

| Details | Subject Base Unit | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 |
|---|---|---|---|---|---|---|
| Tenant Name | Vacant | Retail | JOKR US Corp | Soft Service | Make A Frame - Atlantic | Olgam 1104 Fulton Tenant |
| Address | 430-438 Albee Square | 1111 Bedford Ave | 60 Broadway | 888 Lorimer St | 137 Atlantic Ave | 1104 Fulton Street |
| Date Signed | N/a | Oct-21 | May-21 | Apr-21 | Nov-20 | Jul-20 |
| Square Feet | 8,062 | 4,000 | 3,000 | 2,855 | 3,600 | 8,700 |
| Corner | Corner | Corner | Corner | Mid-block | Mid-block | Mid-block |
| Lease Terms | | NN | Modified Gross | Modified Gross | Modified Gross | Modified Gross |
| **Rent/SF** | **$0.00** | **$28.00** | **$50.00** | **$58.84** | **$53.00** | **$50.00** |
| Market Conditions (Time) | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| | **$0.00** | **$28.00** | **$50.00** | **$58.84** | **$53.00** | **$50.00** |
| **Trended Price/SF** | | | | | | |
| Square feet | | -5.00% | -5.00% | -5.00% | -5.00% | 0.00% |
| Location | | 10.00% | 10.00% | 0.00% | 0.00% | -5.00% |
| Utility | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Corner | | 0.00% | 0.00% | 5.00% | 0.00% | 5.00% |
| Condition | | 5.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Lease Terms | | 10.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Total** | | **20.00%** | **5.00%** | **0.00%** | **-5.00%** | **0.00%** |
| | **$0.00** | **$33.60** | **$52.50** | **$58.84** | **$50.35** | **$50.00** |
| **Adjusted Rent/SF** | | | | | | |
| **Market Rent** | | | | | | |
| **Conclusion** | | **$45.00** | | | | |

| Comps: | Unadjusted | Adjusted |
|---|---|---|
| Min | $28 | $34 |
| Avg | $48 | $49 |
| Max | $59 | $59 |
| Median | $50 | $50 |

## Rent Conclusion

The comparables range from $28 per square foot to $59 per square foot, with an average of $48 per square foot. They range in size from 2,855 to 8,700 square feet and average 4,431 square feet. After adjustments, the comparable range extends from $31 per square foot to $56 per square foot, with an average of $46 per square foot. All of the comparable leases have been signed since July 2020, a period of stable market conditions for basement-level space. The subject's basement contains 8,062 square feet and is currently vacant. According to ownership, the asking rate is $45 per square foot, which is supported by the comparable range and is market oriented. Therefore, we project a rent for the basement space of $45.00 per square foot.

We note that below grade area typically rents for a percentage of the ground floor rent, between 40%-50%. The projection of $45 per square foot equates to 45% of the projected $100 per square foot for ground floor space, which is in-line with market trends.

Based on our market rent projections and in-place leases, the potential gross income of the retail space is calculated below:

| Tenant | Floor | SF | Price PSF | Annual Rent |
|---|---|---|---|---|
| Lower Level Vacant Space | LL | 8,062 | $45 | $362,790 |
| Ground Floor Vacant Space | Ground | 2,200 | $100 | $220,000 |
| Ground Floor Occupied Space | Ground | 7,000 | $85 | $595,000 |
| Second Floor Occupied Space | 2 | 9,061 | $68 | $619,916 |
| Third Floor Vacant Space | 3 | 3,786 | $35 | $132,510 |
| Total | | 30,109 | | $1,930,216 |

We deduct $50 TI for the ground floor space and $20 TI for the basement and third floor space. The total TI is $346,960.

| | SF | Total TI | TI PSF |
|---|---|---|---|
| Ground Floor Vacant Space | 2,200 | $110,000 | $50 |
| Third Floor Vacant Space | 3,786 | $75,720 | $20 |
| Lower Level Vacant Space | 8,062 | $161,240 | $20 |
| | | $346,960 | |

## Commercial Reimbursements

Cajun Restaurant Albee LLC, the ground floor tenant, is responsible for its proportional share (22%) of all tax increases over the 2019/2020 base year. Reproductive Medicine Associates of New York LLP, the second-floor tenant, is responsible for its proportional share (34%) of all tax increases over the 2019/2020 base year. The subject tax liability has decreased since the 2019/2020 tax year, we do not apply any tax reimbursements for these leases.

We note that we do not apply any reimbursement for operating expense for Reproductive Medicine Associates of New York LLP as 2020 is the base year for this calculation.

## Vacancy and Collection Loss

The subject is in the Downtown Brooklyn submarket (as per Costar), which has experienced a current vacancy rate of 3.1%. The current vacancy rate in the New York metro area is 2.4%. The subject is fully occupied and we emphasize the current high occupancy as an indication of the subject's performance. Based on the general vacancy rate reported by CoStar as well as typical investor expectations, a 3.0% vacancy and collection will be applied to the residential income.

In terms of commercial vacancy and collection loss, CoStar reports retail vacancy in the submarket at 5.5%. Due to the subject's prime location near a commercial corridor, and high-end finishes we forecast a stabilized 3.0% vacancy rate for the commercial income. This accounts for any potential turnover during the holding period.

## Effective Gross Income Summary

### Effective Gross Income

| | |
|---|---|
| Potential Residential Income | $7,578,600 |
| Potential Commercial Income | $1,930,216 |
| Amenities Income | $90,000 |
| **Potential Gross Income** | **$9,598,816** |
| Less Residential V/C Loss @ 3% | -$230,058 |
| Less Commercial V/C Loss @ 3% | -$57,906 |
| **Effective Gross Income** | **$9,310,852** |

# Operating Expense Analysis

We were provided with the September 2021 and 2020 T-12 historical income and expenses statement for the subject property. Therefore, we analyzed the subject's historical operating expenses as well as expense reports of comparable properties, in developing our forecast of operating expenses. The data, analyzed in terms of residential units and gross square footage, is presented below.

### September '21 T-12 Historical Expenses

|  | Sept T12 '20 | Sept T12 '21 |
|---|---|---|
| Potential Gross Income | $7,333,766 | $8,242,760 |
| Other Income |  | $20,863 |

| Operating Expenses | Sept T12 '20 | Sept T12 '21 |
|---|---|---|
| Real Estate Taxes | $661,668 | $59,655 |
| Insurance | $107,798 | $91,913 |
| Utilities | $110,949 | $164,617 |
| Fuel | $23,804 | $25,243 |
| Water and Sewer | $73,124 | $129,106 |
| Repairs and Maintenance | $507,681 | $183,148 |
| Payroll | $356,410 | $329,031 |
| General, Admin & Misc | $860,400 | $102,254 |
| Management | $198,000 | $201,960 |
| **Total Operating Expenses (Excl. Taxes)** | **$2,238,166** | **$1,227,272** |

| Operating Expenses PSF | Sept T12 '20 | Sept T12 '21 |
|---|---|---|
| Real Estate Taxes | $4.12 | $0.37 |
| Insurance | $0.67 | $0.57 |
| Utilities | $0.69 | $1.03 |
| Fuel | $0.15 | $0.16 |
| Water and Sewer | $0.46 | $0.80 |
| Repairs and Maintenance | $3.16 | $1.14 |
| Payroll | $2.22 | $2.05 |
| General, Admin & Misc | $5.36 | $0.64 |
| Management | $1.23 | $1.26 |
| **Total Operating Expenses PSF (Excl. Taxes)** | **$13.94** | **$7.64** |

| Operating Expenses Per Unit | Sept T12 '20 | Sept T12 '21 |
|---|---|---|
| Real Estate Taxes | $4,411 | $398 |
| Insurance | $719 | $613 |
| Utilities | $740 | $1,097 |
| Fuel | $159 | $168 |
| Water and Sewer | $487 | $861 |
| Repairs and Maintenance | $3,385 | $1,221 |
| Payroll | $2,376 | $2,194 |
| General, Admin & Misc | $5,736 | $682 |
| Management | $1,320 | $1,346 |
| **Total Operating Expenses Per Unit (Excl. Taxes)** | **$14,921** | **$8,182** |

## Comparable Expenses

| Comparable: | 1 | 2 | 3 | 4 | Average |
|---|---|---|---|---|---|
| GBA: | 141,019 | 123,741 | 99,821 | 869,066 | 308,412 |
| Units: | 120 | 144 | 147 | 500 | 228 |
| | | | | | |
| **Operating Expenses** | | | | | |
| Insurance | $56,805 | $82,055 | $63,329 | $106,896 | $77,271 |
| Utilities | $84,150 | $52,022 | $44,064 | $541,591 | $180,457 |
| Fuel | $50,871 | $46,978 | $27,122 | $254,765 | $94,934 |
| Water & Sewer | $106,450 | $93,614 | $64,907 | $296,599 | $140,393 |
| Repairs & Maintenance | $126,352 | $130,144 | $26,998 | $2,246,169 | $632,416 |
| Payroll & Benefits | $66,033 | $203,207 | $120,156 | $2,533,953 | $730,837 |
| General & Administrative | $131,293 | $5,117 | $243,249 | $736,828 | $279,122 |
| Management Fees | $251,458 | $148,562 | $270,992 | $547,609 | $304,655 |
| **Total Operating Expenses** | **$873,412** | **$761,699** | **$860,817** | **$7,264,410** | **$2,440,085** |
| | | | | | |
| **Operating Expenses PSF** | | | | | |
| Insurance | $0.40 | $0.66 | $0.63 | $0.12 | $0.46 |
| Utilities | $0.60 | $0.42 | $0.44 | $0.62 | $0.52 |
| Fuel | $0.36 | $0.38 | $0.27 | $0.29 | $0.33 |
| Water & Sewer | $0.75 | $0.76 | $0.65 | $0.34 | $0.63 |
| Repairs & Maintenance | $0.90 | $1.05 | $0.27 | $2.58 | $1.20 |
| Payroll & Benefits | $0.47 | $1.64 | $1.20 | $2.92 | $1.56 |
| General & Administrative | $0.93 | $0.04 | $2.44 | $0.85 | $1.06 |
| Management Fees | $1.78 | $1.20 | $2.71 | $0.63 | $1.58 |
| **Total Operating Expenses** | **$6.19** | **$6.16** | **$8.62** | **$8.36** | **$7.33** |
| | | | | | |
| **Operating Expenses Per Unit** | | | | | |
| Insurance | $473 | $570 | $431 | $214 | $422 |
| Utilities | $701 | $361 | $300 | $1,083 | $611 |
| Fuel | $424 | $326 | $185 | $510 | $361 |
| Water & Sewer | $887 | $650 | $442 | $593 | $643 |
| Repairs & Maintenance | $1,053 | $904 | $184 | $4,492 | $1,658 |
| Payroll & Benefits | $550 | $1,411 | $817 | $5,068 | $1,962 |
| General & Administrative | $1,094 | $36 | $1,655 | $1,474 | $1,065 |
| Management Fees | $2,095 | $1,032 | $1,843 | $1,095 | $1,516 |
| **Total Operating Expenses** | **$7,278** | **$5,290** | **$5,856** | **$14,529** | **$8,238** |

## Estimated Operating Expenses

Our analysis is presented:

### Real Estate Taxes

As discussed, we utilize the forecasted real estate taxes of $1,956,624 or $12.18 per square foot.

### Insurance

| Per SF Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $0.67 | $0.62 | | | |
| Comparables | | | $0.12 | $0.46 | $0.66 |
| **Appraiser** | | | | | **$0.60** |

Insurance costs vary by the type of coverage. Costs are generally lower (on a per square foot basis) for larger buildings and for multi-building policies. The comparables range from $0.12 to $0.66 per square foot and average $0.46 per square foot. The 2020 T-12 expense was $0.67 per square foot, and the 2021 T-12 expense was $0.57. We project this expense at $0.60 per square foot, or $96,346 annually. We emphasize the most recent historical expense in our projection.

### Electricity

| Per SF Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $0.69 | $1.03 | | | |
| Comparables | | | $0.42 | $0.52 | $0.62 |
| **Appraiser** | | | | | **$0.90** |

The T-12 expense was $1.03 per square foot which is above the comparable range. We assume the stabilized expense is lower as the commercial tenants will pay utilities directly once in occupancy. We project this expense at $0.90 per square foot, or $144,519 annually. We have concluded to an expense projection between the two most recent historical expenses for the subject.

### Fuel

| Per SF Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $0.15 | $0.16 | | | |
| Comparables | | | $0.27 | $0.33 | $0.38 |
| **Appraiser** | | | | | **$0.15** |

The T-12 expense was $0.16 per square foot. Based on the information above, we project this expense at $0.15 per square foot, or $24,087 annually which is beneath the range but as the newly constructed units will have individual HVAC systems that tenants are responsible for.

### Water and Sewer

| Per SF Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $0.46 | $0.80 | | | |
| Comparables | | | $0.34 | $0.63 | $0.76 |
| **Appraiser** | | | | | **$0.75** |

The T-12 expense was $803 per unit. We project this expense at $0.75 per square foot or $120,433 annually. We emphasize the most subject's most recent annual expense in our projection.

## Repairs & Maintenance

| Per SF Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $3.16 | $1.14 | | | |
| Comparables | | | $0.27 | $1.20 | $2.58 |
| **Appraiser** | | | | | **$1.15** |

This expense varies depending on building age, management philosophy, services provided, and accounting methodology. Some management companies expense items that are normally included as capital costs. In addition, repair and maintenance costs may change from year to year; in some cases, repairs that require attention may be postponed due to cash flow considerations. The comparables range from $0.27 to $2.58 per square foot and average $1.20 per square foot. We project a market oriented expense at $1.15 per square foot, or $184,664 annually based on the fact the subject is newly built and in excellent condition.

## Payroll

| Per Unit Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $2,376 | $2,194 | | | |
| Comparables | | | $550 | $1,962 | $5,068 |
| **Appraiser** | | | | | **$2,195** |

Payroll costs will cover a full-time doorman and a few part-time porters whose duties will include front desk security, trash removal, common area cleaning and general maintenance. Payroll taxes and fringes cover state and federal taxes as well as benefits that building employees receive. The T-12 expense was $2,194 per unit. We apply the payroll expense at $2,195 per unit, or $329,183 annually. We emphasize the most recent historical expense in our projection.

## General, Administrative & Miscellaneous

| Per SF Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $5.36 | $0.64 | | | |
| Comparables | | | $0.04 | $1.06 | $2.44 |
| **Appraiser** | | | | | **$0.25** |

This expense allows for any expenditure not included in the above categories including general administrative costs, accounting/legal, permits and dues, miscellaneous charges, office expense, etc. We note the owner's historical expense is above the comparable range. Therefore, we apply a market-oriented expense for this category. We forecast this expense at $0.25 per square foot, or $40,144 annually. Additionally, we account for broker's commission separately.

## Replacement Reserves

This expense provides for the periodic replacement of building components that wear out more rapidly than the building itself and that must be replaced periodically during the building's economic life. The comparables did not report any reserve amounts as typically any reserves costs would be captured in annual repairs and maintenance costs. We have projected this expense at $150 per unit or $22,500 annually.

## Management Fee

| Per SF Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $1.23 | $1.26 | | | |
| Comparables | | | $0.63 | $1.58 | $2.71 |
| **Appraiser** | | | | | **$1.45** |

*Income Approach*

Management fees for commercial properties typically range from 2% to 6% of effective gross income in the local market. The comparables range from $0.63 to $2.71 per square foot and average $1.58 per square foot. Therefore, we apply a 2.50% management fee, which equates to $232,771 annually.

## Total Operating Expenses Current Date – Net of Taxes

| Per Unit Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $14,921 | $8,182 | | | |
| Comparables | | | $5,290 | $8,238 | $14,529 |
| **Appraiser** | | | | | **$7,964** |

| Per SF Summary | 2020 T12 | 2021 T12 | Low | Average | High |
|---|---|---|---|---|---|
| Subject | $13.94 | $7.64 | | | |
| Comparables | | | $6.16 | $7.33 | $8.62 |
| **Appraiser** | | | | | **$7.44** |

Operating expenses, exclusive of real estate taxes, were forecasted at $7.44 per square foot and $7,964 per unit. Excluding real estate taxes, the comparables ranged from $6.16 to $8.62 per square foot and $5,290 to $14,529 per unit. Our forecasted expenses is within the range on a per square foot basis and on a per unit basis. Further, our forecast is logically placed in relation to both the historical and projected performance of the asset. We note that the subject's historicals include expenses that are not considered to recurring and we have projected market-oriented expense for these categories. We also note that we account for broker's fee and commission separately in the income capitalization section. Thus, this forecast is reasonable and will be applied in our valuation analysis.

Next, we present and compare the Sept '21 T-12 income and expenses with our forecasted income and expenses.

| | Sept T12 '20 | Sept T12 '21 | Bowery Pro Forma |
|---|---|---|---|
| **Effective Gross Income** | **$7,333,766** | **$8,263,623** | **$9,310,852** |
| | | | |
| **Operating Expenses** | | | |
| Real Estate Taxes | $661,668 | $59,655 | $1,956,624 |
| Insurance | $107,798 | $91,913 | $96,346 |
| Electricity | $110,949 | $164,617 | $144,519 |
| Fuel | $23,804 | $25,243 | $24,087 |
| Water & Sewer | $73,124 | $129,106 | $120,433 |
| Repairs & Maintenance | $507,681 | $183,148 | $184,664 |
| Payroll & Benefits | $356,410 | $329,031 | $329,183 |
| General, Admin & Misc | $860,400 | $102,254 | $40,144 |
| Replacement Reserves | | | $22,500 |
| Management Fees | $198,000 | $201,960 | $232,771 |
| **Total Operating Expenses** | **$2,899,835** | **$1,286,927** | **$3,151,271** |
| Total Operating Expenses (Excl. Taxes) | $2,238,166 | $1,227,272 | $1,194,647 |
| **Net Operating Income** | **$4,433,932** | **$6,976,696** | **$6,159,581** |
| Operating Expense Ratio (excl. Taxes) | 31% | 15% | 13% |

## Stabilized Income and Expenses

Pro Forma

| Pro Forma | $ | PSF | Per Unit |
|---|---|---|---|
| **Income** | | | |
| Potential Residential Income | $7,578,600 | $47.20 | $50,524 |
| Potential Commercial Income | $1,930,216 | $12.02 | $12,868 |
| Amenities Income | $90,000 | $0.56 | $600 |
| **Potential Gross Income** | **$9,598,816** | **$59.78** | **$63,992** |
| Less Residential V/C Loss @ 3% | -$230,058 | -$1.43 | -$1,534 |
| Less Commercial V/C Loss @ 3% | -$57,906 | -$0.36 | -$386 |
| **Effective Gross Income** | **$9,310,852** | **$57.98** | **$62,072** |
| | | | |
| **Operating Expenses** | | | |
| Real Estate Taxes | $1,956,624 | $12.18 | $13,044 |
| Insurance | $96,346 | $0.60 | $642 |
| Electricity | $144,519 | $0.90 | $963 |
| Fuel | $24,087 | $0.15 | $161 |
| Water & Sewer | $120,433 | $0.75 | $803 |
| Repairs & Maintenance | $184,664 | $1.15 | $1,231 |
| Payroll & Benefits | $329,183 | $2.05 | $2,195 |
| General, Admin & Misc | $40,144 | $0.25 | $268 |
| Replacement Reserves | $22,500 | $0.14 | $150 |
| Management Fees | $232,771 | $1.45 | $1,552 |
| **Total Operating Expenses** | **$3,151,271** | **$19.62** | **$21,008** |
| | | | |
| Total Expenses Excluding RE Taxes | $1,194,647 | $7.44 | $7,964 |
| | | | |
| **Net Operating Income** | **$6,159,581** | **$38.36** | **$41,064** |
| Operating Expense Ratio | 34% | | |

# Income Capitalization

In developing an opinion of the overall capitalization rate required by an investor, we will apply several methods of analyses: (1) Band of Investment; (2) Debt Coverage Ratio; (3) Direct Comparable Sales; and (4) Investor Surveys.

## Band of Investment Technique

We use the Band of Investment technique to estimate a capitalization rate that accounts for the combination of equity and prevailing financing. The rate developed is a weighted average, the weights being percentages of the total value, which are occupied by the mortgage and equity positions.

### Mortgage Component

A survey of active lenders in the subject property's influencing market indicates that 25-year and 30-year mortgage commitments are typically 100 to 300 basis points above 10-year treasuries.

Survey of Competitive Rates

| Survey of Competitive Rates | Rate |
|---|---|
| Federal Funds Rate | 0.00%-0.25% |
| 5-year CD | 1.10%-1.60% |
| 10-year Treasury Bond | 1.07% |
| 30-year Treasury Bond | 1.81% |
| Corporate Bonds (Moody's Seasoned AAA) | 2.26% |
| Municipal Bonds (AAA, 10-year) | 1.45% |

*Source: Federal Reserve Statistical Release, FRED, bankrate.com, fmsbonds.com*

Currently, 10-year treasuries are trading at 1.07% suggesting mortgage rates of roughly 3.00% to 4.00%. The current mortgage market indicates a competitive interest rate, as there is strong demand from mortgage lenders seeking stable deals.

After surveying several commercial mortgage lenders, it is our opinion that a typical creditworthy purchaser could obtain financing from a lending source in an amount equal to 75% percent of value at an annual interest rate of 4.00% and a 30-year payout. Therefore, the mortgage constant is 0.05730.

### Equity Component

As a stabilized income pro forma is expressed in constant dollars, an equity divided rate will be applied. The consensus of those actively engaged in the marketplace for apartment buildings is that Year 1 equity rates of return (based upon forecasting techniques and assumptions like those utilized herein) fall within a broad range, depending on numerous risk factors, including among others:

**Location –** the better the location, the lower the rate of return;

**Physical Characteristics–** the newer the property, the higher the quality of construction and finishes, and the better the design and layout of the physical structure, the lower the rate of return;

**Degree of Growth Forecasted for Income and Expenses –** the more aggressive and value enhancing the valuation assumptions, the higher the rate of return;

**Amount of Equity Investment Required –** the greater the required equity investment (that portion of the total acquisition cost not typically funded by conventional financing), the higher the rate of return;

**Type of Investment –** the riskier the perceived return on investment for a particular type of real estate, the higher the rate of return.

Applying an appropriate equity dividend rate to the mortgage equity technique is an integral part of the valuation process. As previously stated, the equity rate of return is sensitive to the risk associated with the property, whether it be location, income flows, functional or physical obsolescence, and most important of all, the economic climate. First, we look at national surveys to understand appropriate yield rates. The latest Realty Rates survey indicates an average equity dividend rate of 11.03% and ranges from 6.20% to 14.99%.

### Equity Dividend Rate Survey

| Survey | Type of Product | Equity Dividend Rates | | |
|--------|-----------------|-----------|-----|-------|
| Realty Rates | Apartments - All Types | 6.20% | to | 14.99% |
| Q2 2021 | Market | 11.03% | avg | |

Next, we consider the subject property place in the marketplace. 430-438 Albee Square is a stable product within a good location in Downtown Brooklyn. The asset is nearby to public transportation options and proximate to highways. Based on our discussions with market participants, equity dividend rates for residential real estate investments typically range from 2.00% to 10.00%, depending on the above noted factors.

We believe an investor in the subject property would accept an initial annual return of 3.50% in anticipation of a stable income flow and property appreciation over time. It should be emphasized that the equity dividend rate is not necessarily the same as an equity yield rate or true rate of return on equity capital. The equity dividend rate is an equity capitalization that reflects all benefits that can be recognized by the equity investor as of the date of purchase. We selected this rate based on the subject's location in a good residential area, and its good access and visibility. We summarize the mortgage and equity parameters utilized in our derivation of an overall capitalization rate below:

### Selected Loan Terms

| Typical Loan Terms | Value |
|--------------------|-------|
| Mortgage Rate | 4.00% |
| Amortization Term (Years) | 30 |
| Number of Payments | 360 |
| Loan-to-Value Ratio (M) | 75% |
| Equity Ratio | 25% |
| Mortgage Constant | 0.05730 |

### Band of Investment

| Band of Investment | | Value |
|--------------------|---|-------|
| Loan-to-Value Ratio (M) | | 75% |
| Mortgage Constant | x | 0.05730 |
| **Mortgage Component** | | **4.2975%** |
| | | |
| Equity Ratio | | 25% |
| Equity Dividend Rate | x | 3.50% |
| **Equity Component** | | **0.8750%** |
| | | |
| **Indicated Overall Rate** | | **5.1725%** |

## Direct Comparable Sales

Below we present a summary of capitalization rate comparables:

### Comparable Cap Rates Table

| # | Address | Year Built | Type | Sale Date | Cap Rate |
|---|---------|-----------|------|-----------|----------|
| 1 | 117 Kent Avenue, Brooklyn, NY | 2008 | Multi-Family | Aug-20 | 4.03% |
| 2 | 1 Flatbush Avenue, Brooklyn NY | 2018 | Mixed-Use | Jun-20 | 4.18% |
| 3 | 564 Saint Johns Place, Brooklyn, NY | 2015 | Multi-Family | Jun-19 | 5.44% |
| 4 | 395 Leonard Street, Brooklyn NY | 2013 | Multi-Family | Feb-19 | 3.93% |
| 5 | 42-20 24th Street, Queens, NY | 2017 | Multi-Family | Nov-18 | 3.24% |
| 6 | 237 11th Street, Brooklyn NY | 2015 | Mixed-Use | May-18 | 4.25% |
| | | | | Average | 4.18% |

Not all of our comparables from the Sales Approach offer capitalization rates, thus we provide additional capitalization rates of buildings that have sold. The additional rates are good indicators of capitalization rates for the subject and are recent; however, there are differences regarding the comps, which do not justify utilizing the comps in the Sales Comparison approach such as location and/or size. We note that the subject and comparables 1, 2, 4, 5, and 6 benefit from a 421A tax exemption. All of the comparables have been adjusted so that the sales are analyzed similarly to the subject. We highlight the sale of 1 Flatbush Avenue, which is a newly constructed mixed-use building. The residential portion of the building traded at a 4.18% cap rate in June of 2020. Additionally, 117 Kent Avenue, located in Williamsburg recently sold at a 4.03% cap rate. Nonetheless, the above-mentioned comps are good indicators of cap rates for a property similar to the subject.

## Investor Surveys

The PwC Real Estate and Situs – RERC Investor surveys summarize the expectations of institutional investors. As indicated, the going-in capitalization rates range from 3.50% to 8.00% with an average between 5.00% and 5.22%.

### Investment Survey Yield Trends

| Survey | Type of Product | Overall Cap Rate | | |
|--------|-----------------|------------------|---|---|
| PwC | National Apartment Market | 3.50% | - | 8.00% |
| Q2 2021 | | 5.22% | avg | |
| Situs - R.E.R.C. | National Apartment Market | 4.30% | - | 6.50% |
| Q2 2021 | | 5.00% | avg | |

## Capitalization Rate Conclusion

### Capitalization Rate Summary

| Survey | Overall Cap Rate | | |
|--------|------------------|---|---|
| Band of Investment | | | 5.17% |
| PwC | 3.50% | - | 8.00% |
| Q2 2021 | 5.19% | avg | |
| Situs - RERC | 4.30% | - | 6.50% |
| Q2 2021 | 5.00% | avg | |
| Comparable Sales | 3.24% | - | 5.44% |
| | 4.18% | avg | |

Overall capitalization rates are influenced by numerous factors, of which the most influential are: investors' perception of risk, the potential for net income growth, and the market for competitive assets. As indicated by the local comparable sales, assets in the submarket tend to trade for going-in returns toward the middle of the national range.

In terms of its position within the market range, it is our view that an investor would accept a return near the middle of the comparable range for the subject property. Our opinion is based on the following factors:

- With respect to income, the subject's residential units are 100% occupied and currently leased at slightly below market rates, suggesting moderate but typical risk to the cash flow, but limited potential for future income spikes  given the 421a tax benefit. Allowable rent increases are set by the rent stabilization board for the duration of the tax benefit, restricting any outsized rent growth. However, the subject's income levels have not been impacted by the new rent stabilization laws that were passed in June 2019, as the initial leases were set at market levels.

- Many of the subject's leases were signed during COVID and include concessions. As we are underwriting the net rents, there is upside potential as the in place leases expire and ownership can lease the units at the full rent stabilized rent.

- The subject's retail portion is 61% occupied, based on leasable square feet, with a portion of the ground floor leased to a restaurant tenant for a 15-year term and the entire second floor leased to a medical office tenant for a15-year term.

It is in a market where there has been historically strong demand for investment and capitalization rates have been historically strong. We emphasize the number on new developments in the pipeline within the Downtown Brooklyn submarket which highlights investor demand.

Balancing these factors, it is our view that a 4.25% overall rate would be required by an investor. We note that we emphasize cap rate comparables 1 and 2, which are recent transaction that have occurred in the current market environment, since the onset of the Covid-19 Pandemic, and conclude above these comparables.

## Adjustments to Value

To our capitalized value we add the net present value of the 421a and ICAP tax benefits. We deduct retail lease-up costs and anticipated Tis for the vacant retail spaces. An explanation of these deductions is provided on the following page.

## Commercial Rent Loss/Lease Up Deduction

Given that the commercial spaces are in good condition and ready to be leased, we project a lease up period equal to 9 months as well as 6 months of free rent on a new lease. Our total rent loss and lease up deduction is equal to 12 months. We also project a brokerage commission equal to 35% of the annual rent.

| Tenant | Monthly Rent | Months Rent Loss | Rent Loss Deduction |
|---|---|---|---|
| Lower Level Vacant Space | $30,233 | 12 | $362,790 |
| Ground Floor Vacant Space | $18,333 | 12 | $220,000 |
| Third Floor Vacant Space | $11,043 | 12 | $132,510 |
| **Total** | | | **$715,300** |

| Tenant | Annual Rent | Leasing Commission | LC Deduction |
|---|---|---|---|
| Lower Level Vacant Space | $362,790 | 35% | $126,977 |
| Ground Floor Vacant Space | $220,000 | 35% | $77,000 |
| Third Floor Vacant Space | $132,510 | 35% | $46,379 |
| **Total** | | | **$250,355** |

The total rent loss and lease up deduction (residential and commercial) is calculated to be $965,655. Additionally, we deduct $50 TI for the ground floor space and $20 TI for the basement space. The total TI is $346,960.

### As Is Fair Value

| | Date of Value | Value | Final Value (Rd) |
|---|---|---|---|
| NOI | | $6,159,581 | |
| Cap Rate | | 4.25% | |
| Indicated Value | | $144,931,317 | |
| More NPV of Tax Benefits | | $17,900,000 | |
| Less Retail Rent Loss/Brokerage Commission | | ($965,655) | |
| Less TIs vacant retail space | | ($346,960) | |
| **As Is Fair Value Via the Income Capitalization Approach** | **September 30, 2021** | **$161,518,702** | **$161,500,000** |
| **Indicated Value  RD** | | **$161,500,000** | |

# Sales Comparison Approach

In the Sales Comparison Approach, an opinion of market value is provided by comparing the subject property to transactions of competitive assets. A major premise is the principle of substitution which holds market value is directly related to the prices of comparable properties as a knowledgeable investor will pay no more for a substitute. The procedure involved in this Approach is to research the market for sales of improved properties which are comparable, select appropriate units of comparison, adjust the sale prices to the subject, and then reconcile the range of adjusted sale prices into an opinion of value. In order to analyze comparable sales, it is necessary to convert the sale prices to an appropriate unit of comparison, a process which facilitates price comparisons between properties of different sizes, and it also enables adjustment for qualitative differences. Since investors typically purchase mixed-use buildings in the subject's area in terms of value per square foot, we have applied this unit of comparison.  We note that there is a dearth of recently traded properties similar to the subject that are similar in construction, condition, and location within the immediate area over the last year. We therefore expanded our search radius both in terms distance and sale date. All sales have been adjusted for the 421a tax abatement.

Comparable Sales Summary



| # | Address | Sale Date | SF / Units | Sale Price | Price Per SF | Cap Rate |
|---|---------|-----------|------------|------------|--------------|----------|
| 1 | 555 4th Avenue, Brooklyn, NY 11215 | Jul-21 | 103,430 / 134 | $75,752,386 | $732 | Not Reported |
| 2 | 117 Kent Avenue, Brooklyn, NY 11249 | Aug-20 | 82,081 / 62 | $39,840,000 | $485 | 4.03% |
| 3 | 123 Hope Street, Brooklyn, NY 11211 | Mar-20 | 101,716 / 136 | $64,354,000 | $633 | N/a |
| 4 | 1 Flatbush Avenue, Brooklyn, NY 11217 | Jun-20 | 109,350 / 183 | $101,350,000 | $927 | 4.18% |

## Comparable Sales Outlines

### Comparable Sale 1



**555 4th Avenue, Brooklyn, NY 11215**

| | |
|---|---|
| Grantee | 555 Fourth Avenue Owner LLC |
| Grantor | Vii/541-555 Fourth Owner LLC |
| Sale No. | 0.00 |
| GBA (SF) | 103,430 |

| | | | |
|---|---|---|---|
| Block/ Lot | 1047/3 | NOI | N/a |
| Building to Land Ratio | 7.18 | Cap Rate | N/a |
| | | Sale Date | 7/28/2021 |
| Site Area (SF) | 14,400 | Sale Price | $75,752,386 |
| Year Built | 2018 | Price Per SF | $732 |

This is the sale of an 11-story, elevatored, mixed-use apartment building. It features 134 residential units,  and has 103,392 square feet of gross building area on 14,400 square feet of land. The property was constructed in 2018. It sold on July 28, 2021 for $86,000,000. The property has a 35 year 421a tax benefit estimated to be worth $10,247,614. We have deducted this from the sale price, resulting in $75,752,386 which equates to $732.40 per square foot. After multiple attempts, parties to the transaction could not be reached. All data is reported by CoStar and Public Record.

## Comparable Sale 2

### 117 Kent Avenue, Brooklyn, NY 11249



| Grantee | | 111 Kent LLC |
| --- | --- | --- |
| Grantor | | Svf Kent Brooklyn Corporation |
| Sale No. | | 2020000239895 |
| GBA (SF) | | 82,081 |
| Block/ Lot | 2317 / 5 | **NOI** $1,605,552 |
| Building to Land Ratio | 3.96 | **Cap Rate** 4.03% |
| | | **Sale Date** 8/14/2020 |
| Site Area (SF) | 20,726 | **Sale Price** $39,840,000 |
| Year Built | 2008 | **Price Per SF** $485 |

This is the sale of a 7 story, walk-up, mixed-use apartment building. It features 62 residential units, and has 82,081 square feet of gross building area on 20,726 square feet of land. The property was constructed in 2008. It sold on August 14, 2020 for $45,340,000. The property has a 421a tax benefit estimated to be worth $5.5M. We have deducted this from the sale price, resulting in $39,840,000 which equates to $485.37 per square foot. We have been advised that although the seller sold the property below their original purchase price ($56M in 2012), it was a market transaction. No special conditions affected the sale price. The NOI based on full taxes results in a cap rate of 4.03%. Details of the sale were confirmed with a party to the transaction, CoStar, and Public Record.

## Comparable Sale 3

### 123 Hope Street, Brooklyn, NY 11211



| Grantee | | 123 Hope Street LLC |
| --- | --- | --- |
| Grantor | | Shuster Hope LLC |
| Sale No. | | 2020000110674 |
| GBA (SF) | | 101,716 |
| Block/ Lot | 2347/1 | **NOI** N\a |
| Building to Land Ratio | 6.48 | **Cap Rate** N/a |
| | | **Sale Date** 3/26/2020 |
| Site Area (SF) | 15,698 | **Sale Price** $64,354,000 |
| Year Built | 2019 | **Price Per SF** $633 |

This is the sale of a 5 story, elevatored, mixed-use apartment building. It features 136 residential units, 11,146 square feet of ground floor commercial space, and has 101,716 square feet of gross building area on 15,698 square feet of land. The building includes such amenities as elevator. The property was constructed in 2017. It sold on March 26, 2020 for $83,764,000 which equates to $823.51 per square foot. We note that the property currently benefits from a 421a tax exemption which is in year 2 of 35, and the net present value of the tax savings is $19,410,000, when discounted at 5.50%. We have subtracted this tax benefit from the actual sale price to analyze the sale price independent of this tax benefit. This equates to an adjusted price of $64,354,000 which equates to $632.68 per square foot. We attempted to reach the parties involved in the sale, but after multiple attempts we were unsuccessful. We note that 98 of the 136 residential units are rent stabilized. All data is reported by CoStar and Public Record.

Comparable Sale 4



**1 Flatbush Avenue, Brooklyn, NY 11217**

| | | | |
|---|---|---|---|
| Grantee | | | 1FBBK Owner LLC |
| Grantor | | | One Flatbush Avenue Property LLC |
| Sale No. | | | 2020000178555 |
| GBA (SF) | | | 109,350 |
| Block/ Lot | 2106 / 1202 | NOI | $4,236,430 |
| Building to Land Ratio | 8.76 | Cap Rate | 4.18% |
| | | Sale Date | 6/10/2020 |
| Site Area (SF) | 12,482 | Sale Price | $101,350,000 |
| Year Built | 2018 | Price Per SF | $927 |

This is the sale of a 183-unit high rise apartment building, known as 1 Flatbush, located in Brooklyn, NY 11217. The property, built in 2018, contains 109,350 square feet of GBA on 12,482 square feet of land. The building most recently sold for $101,350,000. The property is a newly constructed 19-story elevatored luxury mixed-use retail and residential building in Downtown Brooklyn. The residential and retail portions are divided into two separate condominiums and this is the sale of the residential portion only. Of the 183 residential units, 134 are market rate and 48 (or 26%) are affordable units. There is also one super's unit. The property's gross square footage if 160,372, with 109,350 square feet of residential space. The property is part of the Affordable New York program, which is a 35-year tax benefit and requires 26% of the units be affordable. Property amenities include a 24-hour concierge, fitness studio, yoga studio, gaming lounge, resident's lounge/co-working space, and landscaped roof deck with outdoor grills.

Sales Comparison Approach

## Comparable Sales Adjustment Grid

| Sale No. | Subject | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Address: | 430-438 Albee Square, Brooklyn, New York 11201 | 555 4th Avenue, Brooklyn, NY 11215 | 117 Kent Avenue, Brooklyn, NY 11249 | 123 Hope Street, Brooklyn, NY 11211 | 1 Flatbush Avenue, Brooklyn, NY 11217 |
| Sale Date: | | 7/28/2021 | 8/14/2020 | 3/26/2020 | 6/10/2020 |
| No. SF | 160,577 | 103,430 | 82,081 | 101,716 | 109,350 |
| Sale Price | | $75,752,386 | $39,840,000 | $64,354,000 | $101,350,000 |
| **Price Per SF** | | **$732** | **$485** | **$633** | **$927** |
| Property Rights: | Leased Fee Interest | 0% | 0% | 0% | 0% |
| Financing Terms: | None | 0% | 0% | 0% | 0% |
| Conditions of Sale: | None | 0% | 0% | 0% | 0% |
| Market Conditions (Time): | September 30, 2021 | 0% | 0% | 0% | 0% |
| **Trended Price Per SF** | | **$732** | **$485** | **$633** | **$927** |
| Location: | Downtown Brooklyn | 5% | 0% | 0% | 0% |
| Size: | 160,577 | -5% | -5% | -5% | -5% |
| Utility: | Full Service/Elevator | 5% | 10% | 10% | 5% |
| Condition: | Excellent | 0% | 5% | 0% | 0% |
| **Total Adjustments** | | **5%** | **10%** | **5%** | **0%** |
| **Adjusted Price Per SF** | | **$769** | **$534** | **$664** | **$927** |

| | Unadjusted | | Adjusted |
|---|---|---|---|
| **Low** | **$485** | **Low** | **$534** |
| **High** | **$927** | **High** | **$927** |
| **Average** | **$694** | **Average** | **$724** |
| **Median** | **$683** | **Median** | **$717** |

Adjustments for the comparable sales have been considered based on comparison to the subject for financing terms, conditions of sale, market conditions (time), location, size, utility, and age/condition.

**Property Rights Appraised**    The purpose of this adjustment is to account for differences in the property rights transferred with the sale. We are valuing the leased fee interest in the subject property, as reflected by all of the comparables. Thus, no property rights adjustments are required.

**Financing**    The purpose of adjusting for financing terms is to determine cash equivalent sale prices for the comparable sales in accordance with the definition of market value for this report. No financing terms adjustments are required.

**Conditions of Sale**    Condition of sale refers to the motivations of the buyer and seller involved in a particular transaction. All sales are arm's length, and no adjustments are required.

**Market Conditions (Time)**    The purpose of this adjustment is to account for changes in market conditions. All comparables used in this analysis sold at a similar time; therefore, no adjustments were required. All sales took place since March 2020. We have not made any adjustments for market conditions since all of the sales have taken place since the onset of the pandemic.

**Location**    The subject property is located in Downtown Brooklyn.  We considered the following adjustments:

- Comparable 1 is located in Park Slope, which is an inferior location.

- Comparables 2, 3, and 4are located in Downtown Brooklyn or Williamsburg and have similarly desirable location to the subject; no adjustments were required for these sales.

Overall, Comparables 1 received a positive adjustment for location.

**Size**    This adjustment accounts for the difference in size between each of the comparables and the subject property. The sales range in size from 82,081 to 109,350 square feet, while the subject property is 160,577  square feet. We note that there is an inverse relationship between size and price.

- Comparables 1, 2, 3, and 4 are significantly smaller than the subject and received negative adjustments.

**Utility**    This adjustment reflects building height or number of stories, retail space, views, exterior appeal, and the interior finishes, design and layout of each comparable as compared to the subject property. The subject is a newly constructed 28-story, full-service elevator building with retail space located within a highly trafficked corridor of Downtown Brooklyn.

- Sales 1, 2, 3, and 4 received a 5% upward adjustment due to the lack of, or inferior retail space compared to the subject.

- Sales 2 and 3 are mid-rise buildings with inferior views. These sales received a positive 5% adjustment.

- All sales are highly amenitized, similar to the subject, thus no adjustment is made for amenities.

A chart outlining the net utility adjustments is provided below:

| # | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **Retail Space** | 5% | 5% | 5% | 5% |
| **Height / Views** | 0% | 5% | 5% | 0% |
| **Amenities** | 0% | 0% | 0% | 0% |
| **Net Adjustment** | 5% | 10% | 10% | 5% |

**Condition**   The subject property was constructed in 2019 and all sales are newly constructed and have relatively similar appeal. Sale 2 was constructed in 2008, thus it required an upward adjustment. Sale 5 was constructed in 2013 and warranted an upward adjustment. The other comparables were constructed within three years of the subject, therefore no additional condition adjustments were necessary.

All adjustments are percentages. A positive adjustment to a sale indicates an inferior characteristic relative to the subject. A negative adjustment indicates a superior characteristic relative to the subject. After adjustments, the comparable sales exhibited a range between $534 and $927 per square foot with an average of $724 per square foot and a median of $717 per square foot. We emphasize Sales 1 and 4 in our analysis, and conclude slightly above the central tendencies for the comparable range. Thus, considering the elements of comparison noted above, our opinion of market value is $900 per square foot, which is calculated as follows.

We have made the same deductions as in the Income Approach, all the deductions are summarized below:

Fair Value As Is

| | Date of Value | Value | Final Value (RD) |
|---|---|---|---|
| Concluded Value Per Square Foot | | $900 | |
| Square Footage | | 160,577 | |
| Indicated Value | | $144,519,300 | |
| Add NPV of Tax Benefits | | $17,900,000 | |
| Less Retail Rent Loss/Brokerage Commission | | ($965,655) | |
| Less TIs vacant retail space | | ($346,960) | |
| **Current As Is Fair Value via the Sales Comparison Approach** | **September 30, 2021** | **$161,106,685** | **$161,100,000** |

# Reconciliation & Final Value Opinion

The estimated values arrived at by the approaches to value used in this report are as follows:

Fair Value Opinion

| Approach | Value | Interest Appraised | Date of Value | Conclusion |
|---|---|---|---|---|
| Cost Approach | N/A | N/A | N/A | Not Applied |
| Income Approach | Fair Value "As Is" | Leased Fee Interest | September 30, 2021 | $161,500,000 |
| Sales Approach | Fair Value "As Is" | Leased Fee Interest | September 30, 2021 | $161,100,000 |

The Cost Approach is traditionally a good indicator of value when properties being appraised are new or close to new. The difficulty in credibly isolating the influence of physical and economic depreciation on value affects the reliability of this approach. Investors typically give nominal weight to this analysis if the asset is operating on a stabilized basis and its cost bears little relationship to the value. 430-438 Albee Square was constructed in 2018 but is operating on a stabilized basis, therefore we chose not to use this approach.

The Income Approach is a strong indicator of value when market rents, vacancy rates, stabilized expenses, capitalization/discount rates are based on reliable market data. In this case, given the depth of the market, there are numerous transactions from which to glean points of analysis, lending credibility to the results of the approach. Multifamily and mixed-use assets are generally acquired for their capacity to generate a return on and of capital, which is why this is the methodology primarily applied by investors. Balancing these two factors, most weight is placed on the opinion developed by the Income Approach.

The Sales Comparison Approach is reliable when few differences exist between the comparable sales and the subject, and the sales data collected is credible and accurate. Similar property types in competitive locations tend to sell within a consistent range, and this factor makes valuation on a per square foot and per unit basis a strong predictor of value. The Sales Comparison Approach is largely used as a secondary support for our opinion developed in the application of the Income Approach.

Final Value Opinion

| Value | Date of Value | Interest Appraised | Conclusion |
|---|---|---|---|
| Fair Value As Is | September 30, 2021 | Leased Fee Interest | $161,500,000 |

The value conclusions are subject to the following **Extraordinary Assumptions**[10] that may affect the assignment results. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

- None.

The value conclusions are based on the following **Hypothetical Conditions**[11] that may affect the assignment results.

- None.

The opinion of value expressed herein is subject to the certification, assumptions and limiting conditions, and all other information contained in the following written appraisal report.

---

[10] *The definition of Extraordinary Assumptions can be found in the Glossary of Terms, which is located in the Addenda.*

[11] *The definition of Hypothetical Conditions can be found in the Glossary of Terms, which is located in the Addenda.*

# Certification

We certify to the best of our knowledge:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice and the current version of the FIRREA of 1989, including its Title XI regulations.

- Kevin Walsh has made a personal inspection of the property that is the subject of this report on October 25, 2021. Michelle Zell, MAI, and Hannah Karpin have not made a personal inspection of the property that is the subject of this report.

- No one provided significant real property appraisal assistance to the person signing this certification.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.

- As of the date of this report, Michelle Zell, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

- We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

Kevin Walsh, MAI
Vice President
Certified General Real Estate Appraiser
NY License No. 46-52078
kevin.walsh@boweryvaluation.com
(917) 304-4889

Hannah Karpin
Valuation Associate
hannah.karpin@boweryvaluation.com
(310) 720-2073

Michelle Zell, MAI
Senior Vice President
Certified General Real Estate Appraiser
NY License No. 46-49921
michelle.zell@boweryvaluation.com
(917) 533-3181

# Addenda

## Glossary of Terms

Unless otherwise noted, *The Dictionary of Real Estate Appraisal*, 6th edition (Chicago: Appraisal Institute, 2015) is the source of the following definitions.

**Condominium**: A multiunit structure, or a unit within such a structure, with a condominium form of ownership.

**Deferred Maintenance:** Items of wear and tear on a property that should be fixed now to protect the value or income-producing ability of the property, such as a broken window, a dead tree, a leak in the roof, or a faulty roof that must be completely replaced. These items are almost always curable.

**Depreciation:** A loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvements on the same date.

**Direct Capitalization:** A method used to convert an estimate of a single year's net operating income expectancy into an indication of value in one direct step, either by dividing the income estimate by an appropriate rate or by multiplying the income estimate by an appropriate factor. This technique employs capitalization rates and multipliers extracted from sales. Only the first year's income is considered. Yield and value change are implied, but not identified overall. This method is most useful when the property is already operating on a stabilized basis.[12]

**Discounted Cash Flow:** The procedure in which a discount rate is applied to a set of projected income streams and a reversion. The analysis specifics the quantity and timing of the reversion, and discounts each to its present value at a specified yield rate.

**Effective Date: (1)** The date on which the appraisal or review applies. **(2)** In a lease document, the date upon which the lease goes into effect.

**Effective Gross Income:** The anticipated income from all operations of real property adjusted for vacancy and collection losses.

**Entrepreneurial Profit: (1)** A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovative change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses. **(2)** In economics, the actual return on successful management practices, often identified with coordination, the fourth factor of production following land, labor, and capital; also called entrepreneurial return or entrepreneurial reward.

**Equity Dividend:** The portion of net income that remains after debt service is paid; this is returned to the equity position.

**Exposure Time: (1)** The time a property remains on the market. **(2)** The estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. **Note:** Exposure time is a retrospective.

**Extraordinary Assumption:** An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions.

**Fee Simple Interest:** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

---

[12] *The Appraisal of Real Estate, 14th Edition (Appraisal Institute: 2013)*

**Financial Feasibility:** An analysis to determine which of those uses deemed possible and legal can provide a net return to the owner of the site.

**Gross Building Area:** Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved.

**Highest and Best Use: (1)** The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. **(2)** The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid.[13] **(3)** [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.[14]

**Hypothetical Condition:** A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis.

**Leased Fee Interest:** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

**Leasehold Interest:** The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease.

**Legally Permissible Use:** An investigation into existing zoning regulations, lease terms, and deed restrictions on the site to determine which uses are legally permitted.

**Marketing Time:** An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal.

**Market Rent:** The most probable rent that property should bring in a competitive and open market reflecting the conditions and restrictions of a specified lease agreement, including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

**Net Operating Income:** The anticipated net income remaining after all operating expenses are deducted from effective gross income.

**Net Rentable Area:** For office or retail buildings, the tenant's pro rata portion of the entire office floor, excluding elements of the building that penetrate through the floor to the areas below. The rentable area of a floor is computed by measuring to the inside finished surface of the dominant portion of the permanent building walls, excluding any major vertical penetrations of the floor. Alternatively, the amount of space on which the rent is based; calculated according to local practice.

**Physically Possible Use:** An analysis to determine those uses of the subject which can be deemed physically possible.

**Potential Gross Income:** The total potential income attributable to the real property at full occupancy before operating expenses are deducted. It may refer to the level of rental income prevailing in the market or that contractually determine by existing leases.

**Property Rights Appraised:** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

---

[13] *Parker, David. International Valuation Standards (John Wiley & Sons, Ltd: 2016)*

[14] Uniform Appraisal Standards for Federal Land Acquisitions *(The Appraisal Foundation: 2016)*

**Prospective Opinion of Value:** A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

**Replacement Costs:** The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout.

**Reproduction Costs:** The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, super-adequacies, and obsolescence of the subject building.

**Reversion:** A lump-sum benefit an investor expects to receive upon the termination of the investment.

**Stabilized Income: (1)** An estimate of income, either current or forecasted, that presumes the property is at stabilized occupancy. **(2)** The forecast of the subject property's yearly average income (or average- equivalent income) expected for the economic life of the subject property. **(3)** Projected income that is subject to change but has been adjusted to reflect an equivalent, stable annual income.

**Stabilized Occupancy: (1)** The occupancy of a property that would be expected at a particular point in time, considering its relative competitive strength and supply and demand conditions at the time, and presuming it is priced at market rent and has had reasonable market exposure. A property is at stabilized occupancy when it is capturing its appropriate share of market demand. **(2)** An expression of the average or typical occupancy that would be expected for a property over a specified projection period or over its economic life.

**Yield Capitalization:** The capitalization method used to convert future benefits into present value by discounting each future benefit at an appropriate yield rate. This method explicitly considers a series of cash flows (net income over a holding period) over time together with any reversion value or resale proceeds. Since this technique explicitly reflects the investment's income pattern, it is especially suited to multi-tenant properties with varying leasing schedules as well as properties that are not operating at stabilized occupancy.[15]

---

[15] *The Appraisal of Real Estate, 14th Edition (Appraisal Institute: 2013)*

# Contingent & Limiting Conditions

1. Any legal description or plats reported herein are assumed to be accurate. Any sketches, surveys, plats, photographs, drawings or other exhibits are included only to assist the intended user to better understand and visualize the subject property, the environs, and the competitive data. We have made no survey of the property and assume no responsibility in connection with such matters.

2. The appraiser has not conducted any engineering or architectural surveys in connection with this appraisal assignment. Information reported pertaining to dimensions, sizes, and areas is either based on measurements taken by the appraiser or the appraiser's staff or was obtained or taken from referenced sources and is considered reliable. No responsibility is assumed for the costs of preparation or for arranging geotechnical engineering, architectural, or other types of studies, surveys, or inspections that require the expertise of a qualified professional.

3. No responsibility is assumed for matters legal in nature. Title is assumed to be good and marketable and in fee simple unless otherwise stated in the report. The property is considered to be free and clear of existing liens, easements, restrictions, and encumbrances, except as stated.

4. Unless otherwise stated herein, it is assumed there are no encroachments or violations of any zoning or other regulations affecting the subject property and the utilization of the land and improvements is within the boundaries or property lines of the property described and that there are no trespasses or encroachments.

5. Bowery Real Estate Systems, Inc. assumes there are no private deed restrictions affecting the property which would limit the use of the subject property in any way.

6. It is assumed the subject property is not adversely affected by the potential of floods; unless otherwise stated herein.

7. It is assumed all water and sewer facilities (existing and proposed) are or will be in good working order and are or will be of sufficient size to adequately serve any proposed buildings.

8. Unless otherwise stated within the report, the depiction of the physical condition of the improvements described herein is based on visual inspection. No liability is assumed for the soundness of structural members since no engineering tests were conducted. No liability is assumed for the condition of mechanical equipment, plumbing, or electrical components, as complete tests were not made. No responsibility is assumed for hidden, unapparent or masked property conditions or characteristics that were not clearly apparent during our inspection.

9. If building improvements are present on the site, no significant evidence of termite damage or infestation was observed during our physical inspection, unless so stated in the report. No termite inspection report was available, unless so stated in the report. No responsibility is assumed for hidden damages or infestation.

10. Any proposed or incomplete improvements included in this report are assumed to be satisfactorily completed in a workmanlike manner or will be thus completed within a reasonable length of time according to plans and specifications submitted.

11. No responsibility is assumed for hidden defects or for conformity to specific governmental requirements, such as fire, building, safety, earthquake, or occupancy codes, except where specific professional or governmental inspections have been completed and reported in the appraisal report.

12. Responsible ownership and competent property management are assumed.

13. The appraisers assume no responsibility for any changes in economic or physical conditions which occur following the effective date of value within this report that would influence or potentially affect the analyses, opinions, or conclusions in the report. Any subsequent changes are beyond the scope of the report.

14. The value estimates reported herein apply to the entire property. Any proration or division of the total into fractional interests will invalidate the value estimates, unless such proration or division of interests is set forth in the report.

15. Any division of the land and improvement values estimated herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application.

16. Unless otherwise stated in the report, only the real property is considered, so no consideration is given to the value of personal property or equipment located on the premises or the costs of moving or relocating such personal property or equipment.

17. Unless otherwise stated, it is assumed that there are no subsurface oil, gas or other mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Nor are the rights associated with extraction or exploration of such elements considered; unless otherwise stated. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

18. Any projections of income and expenses, including the reversion at time of resale, are not predictions of the future. Rather, they are our best estimate of current market thinking of what future trends will be. No warranty or representation is made that these projections will materialize. The real estate market is constantly fluctuating and changing. It is not the task of an appraiser to estimate the conditions of a future real estate market, but rather to reflect what the investment community envisions for the future in terms of expectations of growth in rental rates, expenses, and supply and demand. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

19. Unless subsoil opinions based upon engineering core borings were furnished, it is assumed there are no subsoil defects present, which would impair development of the land to its maximum permitted use or would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

20. Bowery Real Estate Systems, Inc. representatives are not experts in determining the presence or absence of hazardous substances, defined as all hazardous or toxic materials, wastes, pollutants or contaminants (including, but not limited to, asbestos, PCB, UFFI, or other raw materials or chemicals) used in construction or otherwise present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such substances or for loss as a result of the presence of such substances. Appraisers are not qualified to detect such substances. The client is urged to retain an expert in this field.

21. We are not experts in determining the habitat for protected or endangered species, including, but not limited to, animal or plant life (such as bald eagles, gophers, tortoises, etc.) that may be present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such species or for loss as a result of the presence of such species. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent endangered species impact studies, research, and investigation that may be provided.

22. No environmental impact studies were either requested or made in conjunction with this analysis. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental impact studies, research, and investigation that may be provided.

23. The appraisal is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the report; further, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

24. Neither all nor any part of the contents of this report or copy thereof, shall be conveyed to the public through advertising, public relations, news, sales, or any other media, without the prior written consent and approval of the appraisers. This limitation pertains to any valuation conclusions, the identity of the analyst or the firm and any reference to the professional organization of which the appraiser is affiliated or to the designations thereof.

25. Although the appraiser has made, insofar as is practical, every effort to verify as factual and true all information and data set forth in this report, no responsibility is assumed for the accuracy of any information furnished the appraiser either by the client or others. If for any reason, future investigations should prove any data to be in substantial variance with that presented in this report, the appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or estimates of value.

26. If this report has been prepared in a so-called "public non-disclosure" state, real estate sales prices and other data, such as rents, prices, and financing, are not a matter of public record. If this is such a "non-disclosure" state, although extensive effort has been expended to verify pertinent data with buyers, sellers, brokers, lenders, lessors, lessees, and other sources considered reliable, it has not always been possible to independently verify all significant facts. In these instances, the appraiser may have relied on verification obtained and reported by appraisers outside of our office. Also, as necessary, assumptions and adjustments have been made based on comparisons and analyses using data in the report and on interviews with market participants. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

## Subject Property Photos

All subject photos were taken on the date of value of this appraisal.

Building Facade

Building Facade





Building Facade

Subject Street





Subject Street

Exterior Entrance





Addenda

Typical Stairway



Typical Hallway



Typical Hallway



Typical Hallway



Typical Kitchen



Typical Kitchen



Addenda

Typical Kitchen

Typical Bathroom





Typical Bathroom

Typical Bedroom





Typical Bedroom

Typical Bedroom







Typical Living Room

Typical Living Room





Cooling System

Roof





Basement

Basement





Entry Hall



Entry Hall




Outdoor Space



Outdoor Space



Outdoor Space



Laundry In Unit



Addenda

Common Lounge

Common Lounge





Common Lounge

Fitness Center





Upper Level Commercial

Upper Level Commercial





Addenda

Upper Level Commercial



Upper Level Commercial



Ground Floor Commercial



Ground Floor Commercial



Ground Floor Commercial



Ground Floor Commercial



## Zoning Map



## Flood Map



## New York County Area Analysis



This report was compiled using data as of 2021 Q3 unless otherwise noted. Data is from a number of sources including the U.S. Bureau of Labor Statistics, the U.S. Bureau of Economic Analysis, and the U.S. Census Bureau.

### Overview

New York County (Manhattan) is the most densely populated and geographically smallest of the five boroughs of New York City. It is the urban core of the New York metropolitan area and serves as the city's economic and administrative center. The borough consists mostly of Manhattan Island, bounded by the Hudson, East, and Harlem rivers, as well as several small adjacent islands. Anchored by Wall Street in the Financial District of Lower Manhattan, New York City has been called both the most economically powerful city and the leading financial center of the world. Despite being the second-smallest American county overall, it is the most populated and most densely populated U.S. county. Manhattan has the third-largest population of New York City's five boroughs, after Brooklyn and Queens. Numerous colleges and universities are located in Manhattan, including Columbia University, New York University, Cornell Tech, Weill Cornell Medical College, and Rockefeller University, which have been ranked among the top 40 in the world.

At the start of 2020, New York City's economy was on solid footing. Tech, media, and finance firms were continuing to expand their presence, leading to near-record levels of employment and participation. Tourism was at an all-time high, contributing to an economic impact of $70 billion in 2019 which helped fuel the growth of both the retail and hospitality sectors.

Today, however, the pandemic has significantly weakened the economy. Many residents relocated out of New York City in droves as the area became the initial epicenter of the outbreak. The economy suffered further when businesses were forced to cut staff or close altogether. This sudden and extreme reaction resulted in New York County area employers shedding over 193,267 jobs (21.5% of the labor market). New York City was the hotspot for the virus and policymakers imposed a strict lockdown to slow the spread, negatively impacting the economy and labor market. With vaccinations ramping up over the spring, restrictions have eased. Hiring has picked up over the past few months, as of 09/21, New York County's economic output is growing at 1.9% per year. The unemployment rate currently sits at 6.9%, above its five-year average of 5.5% but below the state level of 7.1%. The largest industry in terms of employment in New York County is Professional & Business Services, which employs 25.6% of all workers in the County.

### Area Fundamentals

| Attribute | County Level Value | 5 Year Growth Rate | Relative to Baseline (MSA) |
|---|---|---|---|
| Employment | 816,200 | -5.8% | Slower than MSA |
| GDP | $635.3 billion | 12.6% | Faster than MSA |
| Population | 1,611,989 | -1.5% | Slower than MSA |
| Per Capita Personal Income | $197,847 | 30.9% | Faster than MSA |

## Labor Market Conditions

According to the Q1 2021 Quarterly Census of Employment and Wages, New York County employed 2,066,618 employees, with establishments in the Professional & Business Services, Education & Health Services, and Financial Activities industries accounting for the top three employers. These industries employ 530,440 (25.6%), 415,529 (20.1%), and 377,078 (18.2%) workers in the County, respectively. New York County has an especially large share of workers in the Information industry. In fact, its 8.8% fraction of workers is 4.4 times higher than the National average.

### New York County Employment Composition & Wages by Industry (2021 Q1)



*Source: U.S. Bureau of Labor Statistics*

The unemployment rate in New York County has compressed over the past year to the current rate of 6.9%, just slightly above the New York-Newark-Jersey City, NY-NJ-PA rate of 6.8%. As of 09/21, total employment is up 6% on a year-over-year basis. The unemployment rate remains above its pre-pandemic level (Feb 2020) of 3.3%.



Source: U.S. Bureau of Labor Statistics

According to the Q1 2021 Quarterly Census of Employment and Wages, New York County has seen private employment compress 10.7% (-228,587) in total over the last five years. During that time, the Natural Resources & Mining, Information, and Financial Activities industries saw the strongest growth, expanding 61.5%, 20.6%, and 0.8%, respectively. Meanwhile, the Leisure & Hospitality Industry has seen employment collapse 53.1% over the previous five years. Over the past year, most industries have lost employees. The Leisure & Hospitality sector saw the largest decline in employees and remains 53.1% below Q1 2020 levels.



Source: U.S. Bureau of Labor Statistics

*Note: Employment growth rates are not displayed for industries where the BLS has suppressed employment data for quality or privacy concerns.*

## Economic Production

GDP by county is a measure of the market value of final goods and services produced within a county area in a particular period. While GDP data at the county level is not yet available, 2019 data from the U.S. Bureau of Economic Analysis points to steady growth for New York County, which produced ~$635.3 billion of output that year, representing an annual change of 1.9% compared to 1.2% for the Metro.



*Source: U.S. Bureau of Economic Analysis*

## Demographics

Going back ten years, New York County has seen its population expand 0.1% per annum to the 2020 count of 1,611,989. Over the past five years, growth has declined, contracting 0.3% per annum since 2015. This growth rate falls short of the Nation, which has expanded 0.6% per year over the last five years.

Addenda



*Source: U.S. Census Bureau*

Going back five years, New York County residents have seen its per capita personal income expand 6.2% per annum to the 2019 level of $197,847. Over the past three years, growth has expanded, growing 6.4% per annum since 2016. This growth rate exceeds the Nation, which has expanded 4.2% per year over the last three years.



*Source: U.S. Census Bureau*

In New York County, 87.3% have a high school diploma or higher, with 65.1% having an Associates degree or higher and 61.3% having a bachelor's degree or higher.



Source: U.S. Census Bureau

## Infrastructure

The transportation system of New York City is a network of complex infrastructural systems. New York City, being the most populous city in the United States, has a transportation system which includes one of the largest subway systems in the world, regional commuter trains, an extensive bus system in each of the five boroughs, citywide and Staten Island ferry systems, yellow taxis and ride-sharing apps throughout the city, and multiple international airports.

 The New York region's expressway network is extensive and includes four primary Interstate Highways: Interstate 78, Interstate 80, Interstate 87, and Interstate 95. Interstate 78 and Interstate 87, which have, respectively, their eastern and southern termini in the city, as well as Interstate 95 enter the city limits, while Interstate 80's eastern terminus is in Teaneck, New Jersey.

 The dominant mode of transportation in New York City is rail. The New York City Subway is the largest subway system in the world when measured by number of stations (472) and provides more than 100 stations in New York County along more than a dozen routes.

New York City's commuter rail system is the most extensive in the United States, with about 250 stations and 20 rail lines serving more than 150 million commuters annually in the tri-state region. Commuter rail service from the suburbs is operated by two agencies. The MTA operates the Long Island Railroad on Long Island and the Metro-North Railroad in the Hudson Valley and Connecticut. New Jersey Transit operates the rail network west of the Hudson River. These rail systems converge at the two busiest train stations in the United States, Penn Station and Grand Central Terminal, both in Manhattan. Intercity service is provided by Amtrak, connecting to many cities in the Northeast Corridor, stretching from Washington, DC north through Baltimore, Philadelphia, Trenton, NYC, Stamford, New Haven, and Boston.

The Port Authority Trans-Hudson (PATH) is a rapid transit system that links New York County to Jersey City, Hoboken, Harrison, and Newark, in New Jersey.

 Operated by the MTA, New York City and New York County have the largest bus system in the U.S. running 24/7 across the five boroughs encompassing 238 routes. There are several private bus companies providing transit within New York City and throughout the region.

 Within the New York City metropolitan area, the airport system—which includes John F. Kennedy International Airport, LaGuardia Airport, Newark Liberty International Airport

## Housing

Not only did the pandemic shock the economy, but it has had different economic effects on sectors and regions. For example, the residential housing market in the United States has been robust since the initial shutdown in Q1 and Q2 2020. Historically low mortgage rates, the desire for more space, and the ability to work from home have led to the highest number of home sales while historically low inventory levels have pushed values to record highs in most counties and metros across the Nation.

In New York County, Realtor.com data points to continued growth in values. In fact, as of 09/2021, the median home list price sits at $1,500,000, an increase of 8% compared to a decrease of 3% for the New York-Newark-Jersey City, NY-NJ-PA Metro, and an increase of 9% across the Nation over the past year.



*Source: Realtor.com*

## Outlook

The United States economy continues to recover from the aftermath of the Covid-19 pandemic. The labor market has restored almost 17 million of the 21 million jobs lost at the beginning of the pandemic, as measured by non-farm employment, bringing the unemployment rate to 4.8% as of September 2021. GDP increased at a historically fast annual rate of 6.7% in Q2 2021, according to data released by the Bureau of Economic Analysis. Growth of 6.7% in Q2 was up from the first quarter, when real GDP increased 6.3%. The increase in second quarter GDP reflected the continued economic recovery, reopening of establishments, and continued government response related to the COVID-19 pandemic. Supply chain issues as well as a slowdown in consumer spending growth slowed GDP growth down to 2% in the third quarter. Supply-chain disruptions such as delays at U.S. ports and international manufacturing issues contributed to a sharp increase in inflation and pose a risk to the economic outlook. Despite supply-side challenges, many economic observers expect the economy to regain momentum in the final months of the year conditional on Covid-19 cases continuing to fall.

At the start of 2020, New York City's economy was on solid footing. Tech, media, and finance firms were continuing to expand their presence, leading to near-record levels of employment and participation. Tourism was at an all-time high. That all reversed course in 2020 but has rebounded relatively fast in 2021. Growth has been slow, but the gradual reopening of businesses has led to a resurgence of activity. New York City remains resilient and many new growth opportunities have emerged.

## Downtown Brooklyn: Multifamily Submarket Analysis

The information contained in this report was provided using 2021 Q3 CoStar data for the Downtown Brooklyn Multifamily Submarket ("Submarket") located in the New York - NY Market ("Market").



## Overview

Prior to the pandemic, Downtown Brooklyn was one of the fastest-growing areas in the New York metro. An increasingly affluent demographic drove demand for the luxury units being constructed in the submarket. Total inventory has increased by nearly 70% in the past decade. Demand well outpaced new supply prior to the pandemic, and vacancy reached a record low in 2019. The landscape of Downtown Brooklyn's multifamily market rapidly shifted during the pandemic. Out-migration from New York is slowed demand and put pressure on occupancies and vacancy increased. Midway through 2021 demand has returned to positive levels. However, the submarket will face pressure from the supply pipeline, with 4,200 units under construction, and new units are likely to see slower lease-up. Rent growth turned negative in 2020, and investment volume also decreased. Rents in Downtown Brooklyn were the most expensive outside of Manhattan until 2020 Q4, and saw a near 8% annual decline in 2020. Rent growth is back on the upswing as of 2021 Q3. Despite demand and rental growth trending positively, investment activity remains below pre-pandemic levels.

### Sector Fundamentals

| | Downtown Brooklyn | YoY | QoQ | New York | YoY | QoQ |
|---|---|---|---|---|---|---|
| Market Rent/Unit | $3,812 | 9.0% | 2.5% | $2,813 | 5.2% | 1.7% |
| Vacancy Rate | 2.69% | -221 bps | -66 bps | 2.52% | -126 bps | -45 bps |
| Net Absorption Units | 167 | 216.8% | -16.9% | 9,776 | 1467.3% | -11.9% |
| Asset Value/Unit | $626,206 | 2.5% | 1.1% | $416,369 | 3.6% | 1.0% |
| Market Cap Rate | 3.89% | 8 bps | 2 bps | 4.4% | 7 bps | 2 bps |

Addenda

| | | | | | | |
|---|---|---|---|---|---|---|
| Transaction Count | 4 | 33% | -56% | 243 | 9% | -33% |
| Sales Volume | $23,300,000 | 56% | -33% | $1,569,945,088 | 58% | -13% |

Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for multifamily space in the Submarket are presented in the ensuing table.

### Historical Multifamily Performance: Downtown Brooklyn Submarket

| Period | Inventory Units | Under Construction Units | Net Delivered Units 12 Mo | Absorption Units 12 Mo | Vacancy Rate | Market Effective Rent/Unit |
|---|---|---|---|---|---|---|
| 2021 Q3 | 21,528 | 4,192 | 71 | 546 | 2.7% | $3,812 |
| 2021 Q2 | 21,503 | 4,192 | 46 | 236 | 3.4% | $3,718 |
| 2020 | 21,457 | 4,238 | 0 | -456 | 5.0% | $3,426 |
| 2019 | 21,457 | 2,719 | 226 | 622 | 2.8% | $3,673 |
| 2018 | 21,231 | 881 | 1,757 | 1,888 | 4.7% | $3,582 |
| 2017 | 19,474 | 2,439 | 3,047 | 2,871 | 5.8% | $3,456 |
| 2016 | 16,427 | 4,823 | 689 | 965 | 5.7% | $3,450 |
| 2015 | 15,738 | 5,481 | 1,083 | 691 | 7.6% | $3,414 |
| 2014 | 14,655 | 4,515 | 1,050 | 1,003 | 5.5% | $3,275 |
| 2013 | 13,605 | 2,628 | 359 | 331 | 5.5% | $3,210 |
| 2012 | 13,246 | 931 | 186 | 295 | 5.4% | $3,128 |
| 2011 | 13,060 | 205 | 115 | 570 | 6.3% | $3,077 |

## Supply & Demand

Downtown Brooklyn's apartment market is recovering from the negative effects of the pandemic. Despite limited deliveries in 2020 compared to recent years, vacancy is elevated due to negative net absorption during the pandemic. As of 2021 Q3 approximately 4,200 units are under construction, totalling a substantial 20% of existing inventory. More than 7,000 units delivered in the five years between 2015 and 2019. Despite the influx of new units, vacancy was at a historic low at the end of 2019. It's unclear if units delivering over the next two years will see pre-pandemic levels of demand. High-income renters boosted demand for the luxury product flooding Downtown Brooklyn over the past decade. The population here has grown significantly as a surplus of retail, office, and multifamily development have helped transform the submarket into a desirable live/work/play destination. Office projects like DUMBO Heights and Empire Stores have attracted tech and creative companies, increasing employment opportunities in the submarket. Luxury apartments here, while not cheap, still rent at a notable discount compared to most of Manhattan.

According to NYU's Furman Center, the submarket's median household income ranks near the top of New York City, as it has grown by 33% since 2010. Government agencies and financial companies have historically been the largest employers, but the tech, advertising, media, and information (TAMI) sector has fueled job creation and income growth here. Companies like Etsy, Vice Media, and HUGE all call Downtown Brooklyn home. Student demand also bears monitoring: Pratt, NYU Polytechnic, and Long Island University combine to create a student population of more than 20,000, all near Downtown. And with on-campus accommodations available for only about 3,300 students, a majority will be looking for off-campus housing. A survey from a Class A property here said students comprise 30%–40% of its renters

### Vacancy Rates

| 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Q2 | Q3 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| National | 6.7% | 6.2% | 6.1% | 6.2% | 6.1% | 6.5% | 6.7% | 6.4% | 6.5% | 6.7% | 5.1% | 4.5% |
| Market | 3.5% | 3.3% | 3.2% | 3.1% | 3.2% | 2.9% | 3.1% | 2.7% | 2.8% | 3.7% | 3.0% | 2.5% |
| Submarket | 6.3% | 5.4% | 5.5% | 5.5% | 7.6% | 5.7% | 5.8% | 4.7% | 2.8% | 5.0% | 3.4% | 2.7% |



## Rents

Rent growth in Downtown Brooklyn recently returned to positive levels, after four consecutive quarters of declining growth. Rental decreases in Downtown Brooklyn were concentrated in luxury properties. Buildings rated Class A and B recorded a 9% drop in 2020, compared to 3% decrease in Class C properties and flat rents in Class C properties. Across the metro, expensive neighborhoods and expensive buildings saw the largest declines. However, these neighborhoods are seeing an influx of demand with people returning to offices and the start of the school year. Though concessions are present in many properties, rents are back on the upswing. At the start of 2020, rents in Downtown Brooklyn were the most expensive outside of Manhattan, with a premium of about 10% over Williamburg and Hoboken. Sharp rental declines have seen Williamsburg overtake Downtown Brooklyn in rent prices, and the submarket is now just slightly more expensive than Hoboken.

### Market Rents

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Q2 | Q3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| National | $1,091 | $1,114 | $1,142 | $1,172 | $1,223 | $1,251 | $1,280 | $1,321 | $1,365 | $1,363 | $1,469 | $1,517 |
| Market | $2,363 | $2,399 | $2,442 | $2,507 | $2,585 | $2,622 | $2,646 | $2,702 | $2,747 | $2,666 | $2,766 | $2,813 |
| Submarket | $3,077 | $3,128 | $3,210 | $3,275 | $3,414 | $3,450 | $3,456 | $3,582 | $3,673 | $3,426 | $3,718 | $3,812 |



## Construction & Future Supply

The inventory in Downtown Brooklyn has rapidly expanded, with an influx of new units opening over the past decade. Developers have sought to build more luxury housing as the submarket has witnessed an influx of wealthy renters over the past decade. Total inventory has increased by close to 70% since 2010, with the vast majority of new units in the Class A and B segment. Some have voiced concerns of oversupply, but strong absorption gains seen in Downtown Brooklyn pre-pandemic have kept developers optimistic. However, 4,200 units are under construction, totalling 20% of existing inventory. This is one of the highest under construction ratios across the metro, and this could hamstring occupancies over the next few years.

One notable project underway is 9 DeKalb Avenue, the supertall skyscraper that will become the tallest New York City building outside of Manhattan when it is completed. JDS Development Group broke ground earlier this year and estimates a late 2022 completion date. The 425-unit project will consist of a mix of condos and rental units. The largest project under construction is located on Dekalb Avenue and Whilloughby St. The Willoughby will comprise of 476 units across 34 stories, and is being developed by RXR Realty and Long Island University. The project is scheduled to complete in October 2021. High-end amenities are supporting demand among the affluent demographic that has been in-migrating of late. Many well-occupied properties go beyond the typical fitness centers and concierges, and it is now common to see buildings with movie theaters, pet play/wash areas, pools, and rooftop lounges.



## Capital Markets

Downtown Brooklyn has attracted significant investment in recent years as buyers chase opportunities in this rapidly growing multifamily submarket. Sales volume topped $100 million in each year between 2012 and 2019, peaking in 2017 at close to $350 million of deals closed. Deal flowed slowed in 2020 with the pandemic negatively affected apartment fundamentals and investor's balance sheets. Activity in the first half of 2021 has also been lackluster, with just over $30 million trading in the year so far.



Sales in the past 12 months have been limited to deals below $10 million. The largest trade in 2020 was the acquisition of 34-36 Remsen St. in Brooklyn Heights for $9.9 million by a private investor. The seller of the 20-unit building individual was also a private individual. Most sales volume in 2019 was attributable to Class C deals. One of the most notable transactions was Anpora Real Estate's April acquisition of the 11-unit property at 35 Pineapple St. in Brooklyn Heights for $14.9 million. The asset, which includes ground-floor retail, previously traded in December 2016 for $10.3 million. Benchmark Real Estate Group was the seller on last year's transaction and flipped the property at a reported 3.74% cap rate.



## Outlook

Strong economic growth and a drastically improving public health situation helped boost multifamily fundamentals over the first three quarters of 2021. With demand and rent growth indicators surging, investors have regained confidence in the sector, and sales volume has returned to more normal levels over the past few quarters. Still, with nearly 20% of current inventory under construction, a few headwinds exist that could put upward pressure on vacancies over the next few quarters. Some of these units will deliver amid a potential slowdown in demand due to seasonality and the fading effects of fiscal stimulus that has helped thousands of people pay rent. Looking ahead to the near-term, it is likely that demand will remain strong, but supply will likely put upward pressure on vacancy rates.

# Downtown Brooklyn: Retail Submarket Analysis

The information contained in this report was provided using 2021 Q3 CoStar data for the Downtown Brooklyn Retail Submarket ("Submarket") located in the New York - NY Market ("Market").



## Overview

The subject property is located in the Downtown Brooklyn Submarket of the New York - NY Market, defined in the map above. This Submarket is home to 6.4 million square feet of retail space, accounting for 1.0% of the Market's total inventory. Downtown Brooklyn has transformed from a sleepy office district to an area characterized by brand-new luxury high-rises and high-earning millennial residents. Though the submarket has seen an influx of new development, retail activity hasn't followed at the same pace. Prior to 2020 consumer demand was shifting from brick-and-mortar stores towards online channels, putting pressure on vacancy rates and rent growth across most submarkets. The Downtown Brooklyn retail sector, which was already lagging the residential and office landscape in recent years, slowed further during the coronavirus pandemic.

### Sector Fundamentals

|  | Downtown BK | YoY | QoQ | New York | YoY | QoQ |
|---|---|---|---|---|---|---|
| Market Rent/SF | $90.66 | -0.3% | -0.1% | $44.53 | 0.2% | 0.0% |
| Vacancy Rate | 5.74% | 225 bps | 19 bps | 4.21% | 8 bps | -14 bps |
| Availability Rate | 7.8% | 222 bps | -11 bps | 6.0% | -2 bps | -16 bps |
| Net Absorption SF | -11,855 | -123.3% | -367.2% | 888,176 | 159.7% | 145.5% |
| Asset Value/SF | $573 | 1.7% | 1.5% | $412 | 0.3% | 0.6% |
| Market Cap Rate | 5.11% | 0 bps | -2 bps | 6.1% | 5 bps | 1 bps |
| Transaction Count | 4 | 100% | -20% | 458 | -17% | -34% |
| Sales Volume | $19,710,000 | 195% | -44% | $914,153,344 | 16% | -38% |

Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for retail space in the Submarket are presented in the ensuing table.

### Historical Retail Performance: Downtown Brooklyn Submarket

| Period | Inventory SF | Under Construction SF | Net Delivered SF 12 Mo | Net Absorption SF 12 Mo | Vacancy Rate | Availability Rate | Market Rent/SF |
|---|---|---|---|---|---|---|---|
| 2021 Q3 | 6,369,513 | 13,600 | 0 | -143,267 | 5.7% | 7.8% | $90.66 |
| 2021 Q2 | 6,369,513 | 13,600 | 2,328 | -80,606 | 5.5% | 7.9% | $90.79 |
| 2020 | 6,369,513 | 13,600 | -33,490 | 6,685 | 4.0% | 6.1% | $89.10 |
| 2019 | 6,403,003 | 0 | -44,228 | -67,277 | 4.6% | 7.1% | $91.63 |
| 2018 | 6,447,231 | 5,850 | -19,775 | -58,760 | 4.3% | 6.8% | $88.90 |
| 2017 | 6,455,216 | 5,850 | 0 | 83,236 | 3.5% | 5.0% | $87.39 |
| 2016 | 6,455,216 | 0 | 650,000 | 478,861 | 4.8% | 5.9% | $85.27 |
| 2015 | 5,805,216 | 650,000 | -41,607 | 64,788 | 2.4% | 4.7% | $83.22 |
| 2014 | 5,846,823 | 650,000 | -9,523 | 98,527 | 4.2% | 6.2% | $79.82 |
| 2013 | 5,856,346 | 650,000 | -23,915 | -68,257 | 6.0% | 7.4% | $76.29 |
| 2012 | 5,880,261 | 650,000 | 149,820 | 83,384 | 5.2% | 6.9% | $71.93 |
| 2011 | 5,730,441 | 150,000 | 0 | -10,820 | 4.2% | 7.2% | $69.89 |

## Supply & Demand

The Submarket is home to 6.4 million square feet of retail space, and developers have added, net of demolitions, 639.1k square feet over the past ten years. These developments have expanded inventory by 11.2%. Downtown Brooklyn has seen an influx of residential development over the past decade, and a number of large retailers have followed. Target, Trader Joe's, Chelsea Piers Fitness, and Lululemon are among retailers that have opened stores in the submarket in the past five years.

The coronavirus pandemic has caused a slowdown in demand and an increase in vacancy in Downtown Brooklyn. By far the largest store closure in the submarket since the outbreak of the pandemic was Century21, which filed for bankruptcy in September and has shuttered all stores nationwide, including the 115,000-SF store at City Point BKYLN. With demand falling, vacancy rates have expanded to 5.7%, moving above the 10-year average of 4.3% and above the Market average by 153 bps. In the third quarter, the Submarket vacated 11.9k square feet, a decrease from the 4.4k square feet of net absorption in 2021 Q2. With 11.9k square feet vacated in the third quarter, vacancy rates have expanded 19 bps since Q2. Combined, net absorption through the first three quarters of 2021 totaled -108,564 square feet.

### Vacancy Rates

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Q2 | Q3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| National | 6.9% | 6.7% | 6.3% | 5.7% | 5.3% | 4.7% | 4.5% | 4.4% | 4.5% | 5.0% | 5.0% | 4.8% |
| Market | 5.1% | 5.4% | 4.9% | 4.4% | 4.1% | 3.7% | 3.7% | 3.5% | 3.7% | 4.2% | 4.3% | 4.2% |
| Submarket | 4.2% | 5.2% | 6.0% | 4.2% | 2.4% | 4.8% | 3.5% | 4.3% | 4.6% | 4.0% | 5.5% | 5.7% |



## Rents

At $90.66/SF, rents in Downtown Brooklyn are among the highest in the metro. Retailers have been attracted to the influx of high-earning residents moving into the submarket, as well as the proximity to Manhattan and a myriad of office tenants. Rents in the Submarket have grown 3.0% per annum over the past decade, exceeding the Market, where rents expanded 2.2% per annum during that time. However, the coronavirus pandemic negatively affected the Downtown Brooklyn retail submarket, and rents fell for the first time in a decade. In 2019 Q4, annual rent growth in the Submarket accelerated above the previous quarter, but remained below the historical average, with annual growth of 3.1%. In 2020 Q2, quarterly rent growth fell to -0.1%. By the end of 2020, rents had fallen 2.8% from the 2019 Q4 rent level of $91.63/SF. Quarterly growth in 2021 remains in negative territory.

Many storefronts have gone dark, due to the inability to recover from the period of lost revenue during the shutdown, as well as over softening of retail demand drivers from the economic shock caused by the pandemic. As retailers vacate their storefronts, landlords were forced to lower rents and offer competitive concession packages and tenant incentive allowances.

### Market Rents

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Q2 | Q3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| National | $18.1 | $18.2 | $18.6 | $19.1 | $19.7 | $20.1 | $20.7 | $21.2 | $21.7 | $21.9 | $22.1 | $22.3 |
| Market | $36.5 | $37.3 | $39.0 | $40.5 | $41.9 | $42.6 | $43.6 | $44.2 | $44.9 | $43.8 | $44.5 | $44.5 |
| Submarket | $69.9 | $71.9 | $76.3 | $79.8 | $83.2 | $85.3 | $87.4 | $88.9 | $91.6 | $89.1 | $90.8 | $90.7 |



Market Rent/SF - Annual & Quarterly Growth

## Construction & Future Supply

Developers have been active for much of the past ten years. In fact, they have added 810.3k square feet to the Submarket over that time, expanding inventory by 11.2%. Construction has been muted in Downtown Brooklyn since 2016, when the 650,000-SF retail portion of CityPoint at 445 Albee Square W delivered. The project is anchored by a 115,420-SF Century 21 and a 63,130-SF Target. Other retailers in the development, which is part of a 1.8 million-SF mixed-use development, include Trader Joe's, Alamo Drafthouse Cinema, CVS Pharmacy, and smaller retailers and restaurants.

Downtown Brooklyn is a dense, mature submarket with limited land available for development. Most retail development takes place within office or residential mixed-use properties. There is currently one retail space under construction, a 13,600-SF space at 514 Atlantic Ave. The pandemic has accelerated many trends that were shaping the retail landscape, namely transitioning from traditional brick-and-mortar retail to e-commerce and omnichannel retail models. Developers have less incentive to build new retail space with the demand for physical retail stores decreasing.

## Under Construction SF - Share of Inventory



## Capital Markets

Buyers have shown steady interest and have been busily acquiring assets over the years. Going back three years, investors have closed, on average, 15 transactions per year with an annual average sales volume of $45.8 million. Over the past year, there were 19 closed transactions across 103.9k square feet, representing $81.9 million in dollar volume. In 2021 Q3, there were 4 sales for a total sales volume of $19.7 million. The largest retail property transaction in the past 12 months was a 12,000-SF three-story building at 275 Livingston St., which closed in July 2021 for $12.75 million. The purchaser Lonicera Partners intends to develop a 29-story residential building at the site. The seller was Aview Equities.

## Sales Volume & Transaction Count



Market pricing, based on the estimated price movement of all properties in the Submarket, sat at $573/SF and has expanded 2% over the past year, while the market cap rate has remained stable  over the past year at 5.1%. Although capital markets have held up relatively well, uncertainty still remains.  Some investors may need to see signs of sustained economic growth before engaging.



## Outlook

The new year has delivered encouraging news for the retail sector: Retail sales activity surged as the year commenced, vaccine rollouts are supporting strong consumer confidence metrics, and leasing activity among many tenant segments remains strong.  Such positive news does not, however, overshadow the complexity and nuance that the sector possesses. Indeed, a tale of two recoveries continues to unfold, and property performance continues to vary significantly by subtype, location, class, and tenant composition.

For retail properties in Downtown Brooklyn, current fundamentals point to weak demand, hampering any improvement in rents, which remain in negative territory. Even with the vaccines, it is probable retailers will continue to face turbulence in the coming quarters. Those effects will likely linger for the foreseeable future, impacting demand, rent growth, and the capital markets in the process.

# Qualifications

## Kevin Walsh, MAI

Vice President

### Experience

Kevin Walsh is a Vice President at Bowery Valuation who joined the firm in Jan 2020. He has worked in the real estate industry for 17 years and in the appraisal industry for 7 years. Before joining Bowery, Mr. Walsh served as a Senior Appraiser at Aaron Valuation based in New York City.

Kevin's commercial appraisal experience includes valuation of apartment buildings, condominium and cooperative buildings, industrial buildings, schools, office buildings, mixed-use properties, affordable housing, schools, and leasehold interests.  He has extensive experience valuing land and prospective developments in New York City.

Kevin graduated from Washington University in St. Louis with a degree in Business Administration and from New York University with a Masters in Social Work. He is a student in the New York University Schack Institute Real Estate Finance Masters program.

### Education

| New York University | Masters in Real Estate Finance (expected 2023) |
| | Masters in Social Work |
| Washington University | Bachelors of Science in Business Administration and Bachelor of Arts in Japanese Studies |
| Appraisal Institute | Completed required coursework for MAI designation |

### Certifications & Professional Designations

| Appraisal Institute | MAI, Designated Member |
| | Currently certified by the Appraisal Institute's voluntary program of continuing education for its designated members. |
| Certified General Real Estate Appraiser | New York (#46-52078) |
| | |

## Hannah Karpin

Valuation Associate

### Experience

Hannah Karpin is a Valuation Associate at Bowery Valuation who joined the firm in July 2021. Hannah is actively engaged in appraising mixed-use and multifamily properties in New York and New Jersey.

Hannah graduated from the University of Chicago in June 2021 with a Bachelor of Arts degree in Economics and Art History with a specialization in Architecture. During her time there, she was involved with various business and consulting clubs, and held internship positions at the Israel Museum in Jerusalem and the Hyde Park Art Center in Chicago.

### Education

| | |
|---|---|
| University of Chicago | Bachelor of Arts with a concentration in Economics, secondary field in Art History |
| Appraisal Institute | Basic Appraisal Procedures<br>Basic Appraisal Principles |

## Michelle Zell, MAI

Senior Vice President

### Experience

Michelle Zell is a Senior Vice President at Bowery Valuation, who joined the firm in October 2019. She has worked in the real estate appraisal industry for 16 years.

Ms. Zell has appraised multi-family, condominium and cooperative apartment buildings, retail properties, office buildings, restaurants, industrial properties, hotels, and vacant land properties in New York, New Jersey, Connecticut, Pennsylvania, Texas, and Florida.  Ms. Zell specializes in managing large portfolios, appraising large scale existing and proposed developments, appraisals for EB-5 financing, market studies, and appraisals for litigation and condemnation proceedings.

Ms. Zell performs and manages appraisals for Israeli bond issuances in excess of $1B, and has extensive experience with the Israeli bond market since 2012.  She specializes in serving a liaison between the appraisers, the audit firms and the Israeli Security Authority.

Significant appraisal assignments include Peter Cooper Village/Stuyvesant Town, a rental apartment complex in New York City with 12,000 units, the condominium conversion of The Apthorp and the Belnord, two large scale prewar landmarked developments in Manhattan,  70 Pine Street, the 1M square foot former AIG headquarters converted to rental apartments, hotel, private club, restaurant and retail space, 701 7th Avenue, a proposed hotel and retail development located in Times Square and valued at $2B, market rent determination for Bell Works- the former Ball Labs in Holmdel, NJ, and multiple large developments for EB-5 financing including The Armature Works in Washington DC (a proposed mixed use retail, apartment and hotel development), 1 Journal Square (a proposed mixed use development in Jersey City),  The  Retail at Nassau Coliseum (proposed retail and entertainment complex adjacent to Nassau Coliseum), and Pacific Park (a proposed development of 15 land parcels to be developed with high rise residential, condominium, office and school buildings).

Before joining Bowery, Ms. Zell served as a Senior Appraiser at BBG (formerly Leitner Group) in New York City from 2003 through October 2019.

### Education

| | |
|---|---|
| Cornell University | Bachelor of Science |
| Emory University | Master of Public Health |

### Certifications & Professional Designations

| | |
|---|---|
| Appraisal Institute | MAI, Designated Member |
| | Currently certified by the Appraisal Institute's voluntary program of continuing education for its designated members. |
| Certified  General  Real  Estate Appraiser | New York (#46-49921) Florida (#RZ4135) Texas (#TX 1380938G) |

### Publications

Ms. Zell published an article about the mainstreaming of alternative lending in GlobeSt.com, dated August 5, 2019. https://www.globest.com/2019/08/05/the-mainstreaming-of-alternative-lending/

## Licenses

Kevin Walsh, State Certified General Appraiser– New York



Michelle Zell, State Certified General Appraiser– New York



 bowery

APPRAISAL REPORT

# 163 North 6th Street & 180-198 North 7th Street Brooklyn, NY 11211

Elevatored Multifamily Property (Converted Religious Facility)
Bowery Report No. JOB-2100013679

REQUESTED BY

## Joe Gluck

Spencer Equity Group Limited
522 Lefferts Avenue
Brooklyn, NY 11225

DATE OF VALUE

As Is: December 31, 2021

As Stabilized: June 30, 2022

PREPARED BY

        

Michelle Zell, MAI    Kevin Walsh, MAI    Steven Wang



61-63 Crosby Street, Floor 3
New York, NY 10012

March 9, 2022

Mr. Joe Gluck
Spencer Equity Group Limited
522 Lefferts Avenue
Brooklyn, NY 11225

Re:     Appraisal File No. JOB-2100013679
        Multifamily Property
        163 North 6th Street & 180-198 North 7th Street
        Brooklyn, NY 11211

Dear Mr. Gluck,

In accordance with your request, we have completed an appraisal of 163 North 6th Street & 180-198 North 7th Street in the Williamsburg neighborhood of Brooklyn, New York 11211. The purpose of this appraisal is to advance an opinion of the Prospective Fair Value As Stabilized and As Is Fair Value of the Leased Fee Interest in the subject.

We have appraised the above referenced property, the conclusions of which are set forth in the attached appraisal report. This is an Appraisal Report that is intended to comply with the reporting requirements set forth under Standards Rule 2-2 of USPAP and the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute. In addition, this appraisal has been prepared in compliance with IFRS 13 (International Financial Reporting Standards 13-fair value measurement).  The depth of analysis discussed in this report is specific to the needs of the client and for the intended use stated in the report.

The report is intended for use only by Spencer Equity Group Limited, its successors, assigns, and affiliates. The report is intended only for use in Spencer Equity Group Limited's financial statements.  The use by others is not intended by Bowery Valuation.

The subject, 163 North 6th Street & 180-198 North 7th Street, consists of a five-story elevatored multi-family building containing 92 residential units. The property is a luxury conversion and expansion of a religious facility comprised of two wings, an east and west wing. The east wing of the property contains 40 units, was completed in 2014, and is partially leased. The west wing of the property, which contains 52 units, was completed in 2016, recently brought into legal compliance, and is now fully leased. The work required for the west wing included purchasing additional air rights and converting the below-grade area from residential area to storage.  The subject is 72.83% occupied with 25 vacant residential units, all in the east wing.

The subject property was overbuilt by about 7,588 square feet according to documentation provided by ownership and the necessary air rights were acquired in December 2017. Additionally, 14,079 square feet of the basement area was not legally compliant as it was livable area and required reconfiguring to rentable storage area. We have been informed that ownership has completed the work necessary and has received a Certificate of Occupancy from the Department of Buildings. 163 North 6th Street & 180-198 North 7th Street contains 92,025± gross square feet (according to the owner). A breakdown of the space is provided below.

| Floor | Area |
| --- | --- |
| Below Grade Area | 14,079 |
| Above Grade Area | 66,531 |
| Mezzanine Area | 11,415 |
|  | 92,025 |

Property amenities include a recreational/yoga room, common roof deck, parking, and storage area. Unit amenities include private outdoor space and in-unit laundry. The property is in excellent condition.

It is an assumption of this report that developer will lease the remaining 25 vacant units within a 6-month period from the effective date of value. The anticipated date of stabilization is June 30, 2022.



61-63 Crosby Street, Floor 3
New York, NY 10012

Mr. Gluck
Page 2
March 9, 2022

163 North 6th Street & 180-198 North 7th Street is situated on a block-through site with frontage on both North 6th Street and North 7th Street, in the Williamsburg neighborhood (Kings County) in the State of New York. It was originally built in 1900 and renovated/expanded in 2014 and 2016. The site contains a total land area of 0.8± acres / 33,763± square feet and is located in an R6B zone. It is identified on Kings County Tax Maps as Block 2328, Lot 15.

The highest and best use of 163 North 6th Street & 180-198 North 7th Street is as a multi-family building. This conclusion is based on its zoning, physical characteristics, location, and forecasted economic conditions.

Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformance with the Standards of Professional Practice and Code of Professional Ethics of the Appraisal Institute, the Uniform Standard of Professional Appraisal Practice (USPAP), and applicable state appraisal regulations.

The global outbreak of a novel coronavirus which causes the disease known as COVID-19 was officially declared a pandemic by the World Health Organization (WHO). It is currently unknown what long-term effect this event may have on the national economy, the local economy, or the market in which the subject property is located. The reader is cautioned, and reminded that the conclusions presented in this appraisal report apply only as of the effective date(s) indicated. The appraiser makes no representation as to the effect on the subject property of this event, or any event, subsequent to the effective date of the appraisal.

After carefully considering all available information and factors affecting value, our opinion is:

### Final Value Conclusion

| Value | Date | Interest Appraised | Conclusion |
|---|---|---|---|
| Prospective Fair Value As Stabilized | June30, 2022 | Leased Fee Interest | $84,400,000 |
| As Is Fair Value | December 31, 2021 | Leased Fee Interest | $83,500,000 |

The global outbreak of the "novel coronavirus," which has resulted in the COVID-19 pandemic, is presently affecting the US population and economy. The extent and magnitude of the direct or indirect effects of this event on the national and local economy or real estate markets, varies depending upon the geographic location and property type. As the pandemic has progressed, there has been increased clarity regarding the effects through more recent analytical and transactional data, as well as via market participant information and expectations. Our analysis of these and related issues is presented in the attached report. The reader is cautioned and reminded that the conclusions presented in this appraisal report are based on information available as of the effective date(s) of valuation indicated. Although we have made reasonable efforts to estimate the impact, the uncertainty in the real estate and financial markets creates the potential for a more significant change in income and value over a relatively short period of time.



61-63 Crosby Street, Floor 3
New York, NY 10012

Mr. Gluck
Page 3
March 9, 2022

The value conclusions are subject to the following **Extraordinary Assumptions**[1] that may affect the assignment results. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions:

- None.

The value conclusions are based on the following **Hypothetical Conditions**[2] that may affect the assignment results:

- None.

The opinion of value expressed herein is subject to the certification, assumptions and limiting conditions, and all other information contained in the following written appraisal report.

Thank you for the opportunity to serve you.

Sincerely,

Michelle Zell, MAI
Senior Vice President
Certified General Real Estate Appraiser
NY License No. 46-49921
michelle.zell@boweryvaluation.com
(917) 533-3141

Kevin Walsh, MAI
Vice President
Certified General Real Estate Appraiser
NY License No. 46-52078
kevin.walsh@boweryvaluation.com
(917) 304-4889

Steven Wang
Valuation Associate
steven.wang@boweryvaluation.com
(857) 332-1336

---

[1] The definition of Extraordinary Assumptions can be found in the Glossary of Terms, which is located in the Addenda.

[2] The definition of Hypothetical Conditions can be found in the Glossary of Terms, which is located in the Addenda.

# Summary of Salient Facts & Conclusions

## 163 North 6th Street & 180-198 North 7th Street



The subject, 163 North 6th Street & 180-198 North 7th Street, consists of a five-story elevatored multi-family building containing 92 residential units. The property is a luxury conversion and expansion of a religious facility comprised of two wings, an east and west wing. The east wing of the property contains 40 units, was completed in 2014, and is partially leased. The west wing of the property, which contains 52 units, was completed in 2016, recently brought into legal compliance, and is now fully leased. The work required for the west wing included purchasing additional air rights and converting the below-grade area from residential area to storage. The subject is 72.83% occupied with 25 vacant residential units, all in the east wing.

163 North 6th Street & 180-198 North 7th Street contains 92,025± gross square feet (according to the owner). Property amenities include a recreational/yoga room, common roof deck, parking, and storage area. Unit amenities include private outdoor space and in-unit laundry. The property is in excellent condition.

## Salient Facts

| | | | |
|---|---|---|---|
| **Residential Units:** | 92 | **Zoning** | R6B zone |
| **Commercial Units:** | None | **Flood Hazard Zone** | Zone X |
| **Year Built** | 1900<br>East Wing: 2014<br>West Wing: 2016 | **Exposure Time** | 9-12 Months |
| **Block/Lot** | 2328 / 15 | **Property Rights Appraised** | Leased Fee Interest |
| **Site Area (sq. ft./ acres)** | 33,763± SF/ 0.8± acres | **Date of Inspection** | December 8, 2021 |
| **GBA (sq. ft.)** | 92,025 (Ownership) | **Date of Report** | December 31, 2021 |

Financial Indicators

| Financial Indicators | Total | Per SF-GBA | Per Unit |
|---|---|---|---|
| Effective Gross Income | $5,352,987 | $58.17 | $58,185 |
| Stabilized Residential Occupancy | 95.50% | - | - |
| Expense Ratio | 29% | - | - |
| Net Operating Income | $3,795,779 | $41.25 | $41,258 |
| Capitalization Rate | 4.50% | - | - |
| Income Capitalization Approach - Fair Value As Stabilized | $84,400,000 | $917.14 | $917,391 |
| Income Capitalization Approach – Fair Value As Is | $83,500,000 | $907.36 | $907,609 |
| Sales Comparison Approach – Fair Value As Stabilized | $79,600,000 | $864.98 | $865,217 |
| Sales Comparison Approach – Fair Value As Is | $78,800,000 | $856.29 | $856,522 |

Final Value Conclusion

| Value | Date | Interest Appraised | Conclusion |
|---|---|---|---|
| Prospective Fair Value As Stabilized | June 30, 2022 | Leased Fee Interest | $84,400,000 |
| Fair Value As Is | December 31, 2021 | Leased Fee Interest | $83,500,000 |

The value conclusions are subject to the following **Extraordinary Assumptions**[3] that may affect the assignment results. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions:

- None.

The value conclusions are based on the following **Hypothetical Conditions**[4] that may affect the assignment results:

- None.

---

[3] The definition of Extraordinary Assumptions can be found in the Glossary of Terms, which is located in the Addenda.

[4] The definition of Hypothetical Conditions can be found in the Glossary of Terms, which is located in the Addenda.

# Table of Contents

Introduction ........................................................................................................................................................1

    Purpose & Date of Value ...............................................................................................................................1

    Identification of the Client............................................................................................................................1

    Intended Use and User..................................................................................................................................1

    Property Rights Appraised............................................................................................................................1

    Property History.............................................................................................................................................1

    Exposure Time ...............................................................................................................................................1

    Definition of Fair Value .................................................................................................................................1

    General Assumptions ....................................................................................................................................2

    Scope of the Appraisal ..................................................................................................................................2

    Data Sources...................................................................................................................................................3

    New York County Area Analysis ...................................................................................................................4

Neighborhood & Demographic Overview......................................................................................................11

    Williamsburg at a Glance ............................................................................................................................11

    Neighborhood...............................................................................................................................................12

    Demographics...............................................................................................................................................14

    Conclusion ....................................................................................................................................................15

Zoning Summary ..............................................................................................................................................16

    R6B Zoning....................................................................................................................................................16

    Appraiser's Conclusion on Conformity ....................................................................................................17

Assessed Value & Real Estate Taxes.............................................................................................................18

    Current Tax Liability .....................................................................................................................................18

    Comparable Tax Liabilities .........................................................................................................................20

    Conclusion ....................................................................................................................................................20

Site Description ................................................................................................................................................21

Description of Improvements..........................................................................................................................23

    Building Description .....................................................................................................................................23

    Structural & Mechanical..............................................................................................................................24

    Layout & Finishes .........................................................................................................................................24

    Building Condition........................................................................................................................................25

    Summary ........................................................................................................................................................25

Submarket Analyses ........................................................................................................................................27

    Williamsburg: Multifamily Submarket Analysis ......................................................................................27

Highest & Best Use ..........................................................................................................................................33

    As Vacant.......................................................................................................................................................33

As Improved ........................................................................................................33

Appraisal Valuation Process ...............................................................................35

Income Capitalization Approach .........................................................................36

   Income Analysis.............................................................................................36

   Operating Expense Analysis ..........................................................................45

   Stabilized Income & Expenses ......................................................................50

   Net Operating Income Comparison................................................................50

   Income Capitalization ...................................................................................51

   Capitalization Rate Conclusion .....................................................................53

Sales Comparison Approach................................................................................55

   Comparable Sales Outline .............................................................................56

Reconciliation & Final Value ...............................................................................64

Certification .......................................................................................................65

Addenda ............................................................................................................67

   Contingent & Limiting Conditions .................................................................67

   Subject Property Photos.................................................................................70

   Map Gallery...................................................................................................76

   Rent Roll & Financial Statements ...................................................................78

   New York: Multifamily Market Analysis ..........................................................81

   Qualifications ................................................................................................89

   Licenses ........................................................................................................93

# Introduction

## Purpose & Date of Value

The purpose of the appraisal is to provide an opinion of As Is Fair Value of the leased fee interest as of December 31, 2021, and the Prospective Fair Value As Stabilized of the leased fee interest as of June 30, 2022.

## Identification of the Client

Spencer Equity Group Limited has engaged us and is our client for this assignment.

## Intended Use and User

The Intended Use is for Spencer Equity Group Limited's preparation of financial statements. We consent to the inclusion of the valuation in its entirety within Spencer Equity Group Limited's financial reporting. The Intended User of the report is Spencer Equity Group Limited with is successors, assigns and affiliates. This appraisal is not intended for any other use or user. No party or parties other than the intended user may use or rely on the information, opinions and conclusions contained in this report.

## Property Rights Appraised

The subject is appraised on the basis of Leased Fee Interest.[5]

## Property History

The current owner of record is The North Flats LLC per Kings County records.  The property was not purchased in the last 3 years.

Our appraised value of $84,400,000 for the subject represents a $7,400,000, or an 8.77% increase over our valuation as of December 2020 of $77,000,000. The increase in value is due to an increase in residential unit income as a result of improving market conditions, and considering the building is at 72.83% occupancy as opposed to primarily vacant last year.

We are not aware of any additional bids, transactions, offers or options to purchase for this asset.

## Exposure Time[6]

It is our opinion that a normal exposure time for the subject property is between nine and twelve months. This conclusion is predicated on interviews with brokers and other real estate industry sources and on information obtained in the verification process. The value reported herein presumes such an exposure time.

## Definition of Fair Value

IFRS 13 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date (ie an exit price). That definition of fair value emphasis that fair value is a market-based measurement, not an entity-specific measurement.  When measuring fair value, an entity uses the assumptions that market participants would use when pricing the asset or liability under current market conditions, including assumptions about risk. As a result, an entity's intention to hold an asset or to

---

[5] The definitions of property rights can be found in the Glossary of Terms, which is located in the Addenda.

[6] The definition of Exposure Time can be found in the Glossary of Terms, which is located in the Addenda.

settle or otherwise fulfil a liability is not relevant when measuring fair value. The IFRS explains that a fair value measurement requires an entity to determine the following:

(a)  the particular asset or liability being measured;

(b)  for a non-financial asset, the highest and best use of the asset and whether the asset is used in combination with other assets or on a stand-alone basis;

(c)  the market in which an orderly transaction would take place for the asset or liability; and

(d)  the appropriate valuation technique(s) to use when measuring fair value. The valuation technique(s) used should maximise the use of relevant observable inputs and minimize unobservable inputs. Those inputs should be consistent with the inputs a market participant would use when pricing the asset or liability.

## General Assumptions

Various estimates of gross building area, number of apartments, and total livable area were furnished by the owner, client, and/or their agents. This opinion of value reported herein assumes that the data provided are the most recent and accurate.

 We note that our appraisers are not experts in the following domains:

•  Technical Environmental Inspections: No Environmental Site Assessment report was provided in conjunction with this appraisal. If a report is commissioned and there are any environmental issues uncovered, they could affect our opinion of value reported. We recommend the services of a professional engineer for this purpose.

•  Zoning Ordinances: We recommend an appropriately qualified land use attorney if a definitive determination of compliance is required.

•  Building Inspections: We recommend a building engineer or professional property inspector for the inspection. Any immediate expenditures that a trained professional may determine are needed, could affect our opinion of value reported.

•  Easements, Encroachments, and Restrictions: We know of no deed restrictions, private or public, that further limit the subject property's use. The research required to determine whether or not such restrictions exist, however, is beyond the scope of this appraisal assignment. Deed restrictions are a legal matter and only a title examination by an attorney or Title Company can usually uncover such restrictive covenants. Thus, we recommend a title search to determine if any such restrictions do exist.

•  Building Health and Fire Codes: Our valuation assumes there are no known code violations.

## Scope of the Appraisal

Within the course of this assignment, we have:

•  Inspected the interior and exterior of the subject property.

•  Researched and investigated the location in terms of its economic activity, development patterns, and future trends and related their impact in the market.

•  Determined the Highest and Best Use of the subject property based on an analysis of all relevant factors.

•  Conducted a market survey of rent and vacancy levels of similar buildings.

•  Analyzed the subject's operating expense projections, as well as expense reports of comparable properties, in order to accurately project the stabilized cash flow.

•  Projected the net operating income under stabilized operation and applied a market-derived capitalization rate to develop an opinion of value by the income approach.

- Researched and analyzed sales of competitive assets and applied the techniques of the sales comparison approach in providing an opinion of value.

- Advanced an opinion of the As Stabilized and As Is fair value of the identified interest.

## Data Sources

The data contained within this appraisal was compiled from market analysis utilizing the following sources (unless otherwise noted): NYC Department of Finance, NYC Department of Buildings, NYC Department of Planning Zoning & Land Use, Claritas, CoStar, Federal Reserve, and FEMA. The subject photos were taken by Pat Ippolito on December 8, 2021, while those used for the comparable rentals and sales were sourced from the public domain. When possible, we have confirmed the reported data with parties to the transactions or those who are intimately familiar with their critical details.

Sources of Data

| Data | Source/Verification: |
|---|---|
| Site Size | Public Record |
| Excess/Surplus Land | Tax Map |
| Gross Size/Units | Public Record |
| Residential SF | Appraiser's Estimate; Owner |
| Number of Buildings | Inspection; Owner |
| Amenities | Inspection |
| Deferred Maintenance | Inspection |
| Income Data | Market Forecast |
| Expense Data | Expense Comparables |

# New York County Area Analysis

This report was compiled using data as of 2021 Q3 unless otherwise noted. Data is from a number of sources including the U.S. Bureau of Labor Statistics, the U.S. Bureau of Economic Analysis, and the U.S. Census Bureau.



## Overview

New York County (Manhattan) is the most densely populated and geographically smallest of the five boroughs of New York City. It is the urban core of the New York metropolitan area and serves as the city's economic and administrative center. The borough consists mostly of Manhattan Island, bounded by the Hudson, East, and Harlem rivers, as well as several small adjacent islands. Anchored by Wall Street in the Financial District of Lower Manhattan, New York City has been called both the most economically powerful city and the leading financial center of the world. Despite being the second-smallest American county overall, it is the most populated and most densely populated U.S. county. Manhattan has the third-largest population of New York City's five boroughs, after Brooklyn and Queens. Numerous colleges and universities are located in Manhattan, including Columbia University, New York University, Cornell Tech, Weill Cornell Medical College, and Rockefeller University, which have been ranked among the top 40 in the world.

At the start of 2020, New York City's economy was on solid footing. Tech, media, and finance firms were continuing to expand their presence, leading to near-record levels of employment and participation. Tourism was at an all-time high, contributing to an economic impact of $70 billion in 2019 which helped fuel the growth of both the retail and hospitality sectors. Today, however, the pandemic has significantly weakened the economy. Many residents relocated out of New York City in droves as the area became the initial epicenter of the outbreak. The economy suffered further when businesses were forced to cut staff or close altogether. This sudden and extreme reaction resulted in New York County area employers shedding over 193,267 jobs (21.5% of the labor market). New York City was the hotspot for the virus and policymakers imposed a strict lockdown to slow the spread, negatively impacting the economy and labor market. With vaccinations ramping up over the spring, restrictions have eased. Hiring has picked up over the past few months, as of 09/21, New York County's economic output is growing at 1.9% per year. The unemployment rate currently sits at 6.9%, above its five-year average of 5.5% but below the state level of 7.1%. The largest industry in terms of employment in New York County is Professional & Business Services, which employs 25.6% of all workers in the County.

Area Fundamentals

| Attribute | County Level Value | 5 Year Growth Rate | Relative to Baseline (MSA) |
|---|---|---|---|
| Employment | 816,200 | -5.8% | Slower than MSA |
| GDP | $635.3 billion | 12.6% | Faster than MSA |
| Population | 1,611,989 | -1.5% | Slower than MSA |
| Per Capita Personal Income | $197,847 | 30.9% | Faster than MSA |

## Labor Market Conditions

According to the Q1 2021 Quarterly Census of Employment and Wages, New York County employed 2,066,618 employees, with establishments in the Professional & Business Services, Education & Health Services, and Financial Activities industries accounting for the top three employers. These industries employ 530,440 (25.6%), 415,529 (20.1%), and 377,078 (18.2%) workers in the County, respectively. New York County has an especially large share of workers in the Information industry. In fact, its 8.8% fraction of workers is 4.4 times higher than the National average.

### New York County Employment Composition & Wages by Industry (2021 Q1)



*Source: U.S. Bureau of Labor Statistics*

The unemployment rate in New York County has compressed over the past year to the current rate of 6.9%, just slightly above the New York-Newark-Jersey City, NY-NJ-PA rate of 6.8%. As of 09/21, total employment is up 6% on a year-over-year basis. The unemployment rate remains above its pre-pandemic level (Feb 2020) of 3.3%.



*Source: U.S. Bureau of Labor Statistics*

According to the Q1 2021 Quarterly Census of Employment and Wages, New York County has seen private employment compress 10.7% (-228,587) in total over the last five years. During that time, the Natural Resources & Mining, Information, and Financial Activities industries saw the strongest growth, expanding 61.5%, 20.6%, and 0.8%, respectively. Meanwhile, the Leisure & Hospitality Industry has seen employment collapse 53.1% over the previous five years. Over the past year, most industries have lost employees. The Leisure & Hospitality sector saw the largest decline in employees and remains 53.1% below Q1 2020 levels.



*Source: U.S. Bureau of Labor Statistics*

*Note: Employment growth rates are not displayed for industries where the BLS has suppressed employment data for quality or privacy concerns.*

*Neighborhood & Demographic Overview*

## Economic Production

GDP by county is a measure of the market value of final goods and services produced within a county area in a particular period. While GDP data at the county level is not yet available, 2019 data from the U.S. Bureau of Economic Analysis points to steady growth for New York County, which produced ~$635.3 billion of output that year, representing an annual change of 1.9% compared to 1.2% for the Metro.



*Source: U.S. Bureau of Economic Analysis*

## Demographics

Going back ten years, New York County has seen its population expand 0.1% per annum to the 2020 count of 1,611,989. Over the past five years, growth has declined, contracting 0.3% per annum since 2015. This growth rate falls short of the Nation, which has expanded 0.6% per year over the last five years.



*Source: U.S. Census Bureau*

Going back five years, New York County residents have seen its per capita personal income expand 6.2% per annum to the 2019 level of $197,847. Over the past three years, growth has expanded, growing 6.4% per annum since 2016. This growth rate exceeds the Nation, which has expanded 4.2% per year over the last three years.



Source: U.S. Census Bureau

## Infrastructure

The transportation system of New York City is a network of complex infrastructural systems. New York City, being the most populous city in the United States, has a transportation system which includes one of the largest subway systems in the world, regional commuter trains, an extensive bus system in each of the five boroughs, citywide and Staten Island ferry systems, yellow taxis and ride-sharing apps throughout the city, and multiple international airports.

 The New York region's expressway network is extensive and includes four primary Interstate Highways: Interstate 78, Interstate 80, Interstate 87, and Interstate 95. Interstate 78 and Interstate 87, which have, respectively, their eastern and southern termini in the city, as well as Interstate 95 enter the city limits, while Interstate 80's eastern terminus is in Teaneck, New Jersey.

 The dominant mode of transportation in New York City is rail. The New York City Subway is the largest subway system in the world when measured by number of stations (472) and provides more than 100 stations in New York County along more than a dozen routes.

New York City's commuter rail system is the most extensive in the United States, with about 250 stations and 20 rail lines serving more than 150 million commuters annually in the tri-state region. Commuter rail service from the suburbs is operated by two agencies. The MTA operates the Long Island Railroad on Long Island and the Metro-North Railroad in the Hudson Valley and Connecticut. New Jersey Transit operates the rail network west of the Hudson River. These rail systems converge at the two busiest train stations in the United States, Penn Station and Grand Central Terminal, both in Manhattan. Intercity service is provided by Amtrak, connecting to many cities in the Northeast Corridor, stretching from Washington, DC north through Baltimore, Philadelphia, Trenton, NYC, Stamford, New Haven, and Boston.

The Port Authority Trans-Hudson (PATH) is a rapid transit system that links New York County to Jersey City, Hoboken, Harrison, and Newark, in New Jersey.

 Operated by the MTA, New York City and New York County have the largest bus system in the U.S. running 24/7 across the five boroughs encompassing 238 routes. There are several private bus companies providing transit within New York City and throughout the region.

 **Within the New York City metropolitan area, the airport system–which includes** John F. Kennedy International Airport, LaGuardia Airport, Newark Liberty International Airport

## Housing

Not only did the pandemic shock the economy, but it has had different economic effects on sectors and regions. For example, the residential housing market in the United States has been robust since the initial shutdown in Q1 and Q2 2020. Historically low mortgage rates, the desire for more space, and the ability to work from home have led to the highest number of home sales while historically low inventory levels have pushed values to record highs in most counties and metros across the Nation. In New York County, Realtor.com data points to continued growth in values. In fact, as of 09/2021, the median home list price sits at $1,500,000, an increase of 8% compared to a decrease of 3% for the New York-Newark-Jersey City, NY-NJ-PA Metro, and an increase of 9% across the Nation over the past year.



*Source: Realtor.com*

## Outlook

The United States economy continues to recover from the aftermath of the Covid-19 pandemic. The labor market has restored almost 17 million of the 21 million jobs lost at the beginning of the pandemic, as measured by non-farm employment, bringing the unemployment rate to 4.8% as of September 2021. GDP increased at a historically fast annual rate of 6.7% in Q2 2021, according to data released by the Bureau of Economic Analysis. Growth of 6.7% in Q2 was up from the first quarter, when real GDP increased 6.3%. The increase in second quarter GDP reflected the continued economic recovery, reopening of establishments, and continued government response related to the COVID-19 pandemic. Supply chain issues as well as a slowdown in consumer spending growth slowed GDP growth down to 2% in the third quarter. Supply-chain disruptions such as delays at U.S. ports and international manufacturing issues contributed to a sharp increase in inflation and pose a risk to the economic outlook. Despite

supply-side challenges, many economic observers expect the economy to regain momentum in the final months of the year conditional on Covid-19 cases continuing to fall. At the start of 2020, New York City's economy was on solid footing. Tech, media, and finance firms were continuing to expand their presence, leading to near-record levels of employment and participation. Tourism was at an all-time high. That all reversed course in 2020 but has rebounded relatively fast in 2021. Growth has been slow, but the gradual reopening of businesses has led to a resurgence of activity. New York City remains resilient and many new growth opportunities have emerged.

# Neighborhood & Demographic Overview

## Williamsburg at a Glance



Williamsburg is a neighborhood in the borough of Brooklyn, in New York City and nearby East Williamsburg, Greenpoint, and Bedford Stuyvesant.

## Overview

Located across East River from the East Village and Lower Manhattan, Williamsburg was initially a large manufacturing neighborhood with industrial properties. As a manufacturing neighborhood, the area attracted hard-working New Yorkers. In the early 1980's, many went to Williamsburg to escape rising rents in the East Village and Lower East Side and took advantage of the inexpensive vacant loft spaces left vacant by former factories and warehouses. Eventually, with reduced crime and escalating housing costs throughout the city, the area became more inviting to other New Yorkers with moderate incomes who sought cheap rents in an increasingly desirable area.  Decades later, Williamsburg began to attract an overflow of artists from downtown Manhattan, and since then it has become a beacon of Brooklyn creativity.  These days you will find luxury developments, Whole Foods, Starbucks, highly-rated restaurants, major music/concert venues, the most popular brunch spots, and a slew of beautiful high-end hotels throughout. More recently, office developments have become the norm, especially along the River.

The following demographic profile, assembled by Environics Analytics, a nationally recognized compiler of demographic data, reflects the subject's municipality and market. All values presented herein are estimates for 2021 and all figures presented are for the subject neighborhood unless stated otherwise.

| | Area | 2000 Census | 2010 Census | Change | 2021 Est. | Change | 2026 Projected | Change |
|---|---|---|---|---|---|---|---|---|
| Population | Williamsburg | 110,960 | 124,554 | 1.16% | 142,743 | 1.37% | 147,218 | 0.62% |
| | Brooklyn | 2,465,323 | 2,504,700 | 0.16% | | 0.30% | 2,599,104 | 0.13% |
| | | | | | 2,581,803 | | | |
| Households | Williamsburg | 36,940 | 45,274 | 2.06% | 53,297 | 1.64% | 55,350 | 0.76% |
| | Brooklyn | 880,721 | 916,856 | 0.40% | 959,831 | 0.46% | 970,708 | 0.23% |
| Family Households | Williamsburg | 23,612 | 24,418 | 0.34% | 28,003 | 1.38% | 28,934 | 0.66% |
| | Brooklyn | 584,121 | 573,363 | -0.19% | 595,447 | 0.38% | 601,035 | 0.19% |

## Neighborhood

### Housing



Households by Household Size

HOUSEHOLDS

53,297

AVERAGE HOUSEHOLD SIZE

2.67



Occupied Housing Units by Tenure

MAJORITY OCCUPIED HOUSING UNITS

86% Renter Occupied



**MEDIAN OWNER-OCCUPIED HOUSING VALUE**

**$1,067,993**



**NEIGHBORHOOD HOUSING UNITS**

**57,909**

**COUNTY/CITY HOUSING UNITS**

**1,050,421**



**NEIGHBORHOOD MEDIAN YEAR STRUCTURE BUILT**

**1965**

**COUNTY/CITY MEDIAN YEAR STRUCTURE BUILT**

**1941**

## Local Commerce & Recent Development

Historically, Williamsburg has had many smaller locally owned stores, restaurants and coffee shops, however, given the large demographic shift numerous national brand and luxury retailers have opened up. This trend has caused Bedford Avenue around North 7th to become one of the most desirable retail strips in New York City.

Permits have been filed for two mixed-use towers along the waterfront at 484 Kent Avenue located between South 10th Street and Division Street. The lot is steps from the South Williamsburg stop on the East River Ferry. Naftali

Group is listed as the owner and will develop 21 stories including 380k square feet, with ground floor retail, 182 residences, and 178 enclosed parking spaces.

## Demographics

### Population





POPULATION

**142,743**

MEDIAN AGE

**45**

AVERAGE AGE

**33**





MEDIAN HOUSEHOLD INCOME

**$67,837**

AVERAGE HOUSEHOLD INCOME

**$114,108**

### Employment & Transportation



Top 5 Employment Occupations in Neighborhood



## Travel Time to Work

AVERAGE TRAVEL TIME TO WORK

**37 minutes**



## Transport Mode to Work in Neighborhood

| Mode | Percentage |
|------|-----------|
| Public Transport | 62.9% |
| Walked | 14.7% |
| Drove Alone | 8.9% |
| Worked at Home | 6.9% |
| Bicycle | 3.1% |
| Carpooled | 2.5% |
| Other Means | 1.0% |



### Transport Modes and Access

There are several options for transportation by car from Brooklyn to Manhattan. The quickest routes include those via either the Queens Midtown Tunnel in Long Island City to the north, or the Williamsburg Bridge. The Brooklyn Queens Expressway (BQE / I-278) provides Highway access through Brooklyn and Queens and continues to the Bronx, and it also connects to the Long Island Expressway (LIE / I-495) to Long Island.

Williamsburg is served by the L, J, M, Z and G train lines. All lines, but the G train, provide access into Manhattan.

Numerous MTA bus routes serve the neighborhood. Williamsburg is served by the B32, B62, B39, B60, B54, B46, B48, B43, and B48.

The nearest major airports are LaGuardia Airport (7.2 mi.) and John F. Kennedy International Airport (13.9 mi.) followed by Newark Liberty International Airport (25.4).

## Conclusion

Williamsburg is a highly desirable neighborhood in Brooklyn given its proximity to Lower Manhattan. The new development continues to add to the growth of the neighborhood, and it is expected to remain a desirable area for years to come.

# Zoning Summary

Zoning Map



163 North 6th Street & 180-198 North 7th Street is located in a R6B zone. Below is a summary of the subject property's zoning requirements and compliance with regard to use and bulk regulations.

## R6B Zoning

R6B districts are often traditional row house districts, which preserve the scale and harmonious streetscape of neighborhoods of four-story attached buildings developed during the 19th century. Many of these houses are set back from the street with stoops and small front yards that are typical of Brooklyn's "brownstone" neighborhoods, such as Park Slope, Boerum Hill and Bedford Stuyvesant.

The Floor Area Ratio (FAR) of 2.0 and the mandatory Quality Housing regulations also accommodate apartment buildings at a similar four- to five-story scale. The base height of a new building before setback must be between 30 and 40 feet; the maximum height is 50 feet. For buildings providing a qualifying ground floor, the maximum base height and overall height increase by five feet. Curb cuts are prohibited on zoning lot frontages less than 40 feet. The street wall of a new building, on any lot up to 50 feet wide, must be as deep as one adjacent street wall but no deeper than the other. Buildings must have interior amenities for the residents pursuant to the Quality Housing Program. Off-street parking is required for 50% of dwelling units. It is not allowed in front of a building.

### R6B General Residence District

| District | Max FAR | Max Corner Lot Coverage | Max Lot Coverage | Interior | Base Height | Max Building Height | Min. Required Parking[2] |
|----------|---------|-------------------------|------------------|----------|-------------|---------------------|--------------------------|
| R6B | 2.0[1] | 100% | 60% | | 30-40 ft | 50 ft | 50% of dwelling units |

*[1] 2.2 FAR with Inclusionary Housing designated area bonus*
*[2] Waived if 5 or fewer spaces required.*

## Appraiser's Conclusion on Conformity

The residential and commercial property is in an R6B zone, which permits residential and community uses as of right. The subject is conforming with regards to the allowable uses.

Based on the maximum effective residential FAR of 2.00 and a lot area of 33,763 square feet, 67,526 square feet of buildable area is permitted on site.

The subject was overbuilt by approximately 6,652 square feet and this caused a delay in obtaining a Certificate of Occupancy. Ownership acquired an additional 7,883 square feet of building rights in December 2017 and thus the subject's current bulk is legal and is complying with regards to bulk regulations.

With 46 parking spaces, the subject is in compliance with parking requirements. In terms of age, size, condition, and construction, the subject building conforms to surrounding structures in its immediate neighborhood.

# Assessed Value & Real Estate Taxes



## Current Tax Liability

163 North 6th Street & 180-198 North 7th Street is located in Kings county (borough of Brooklyn), Brooklyn, NY. It is designated on the tax maps as Block 2328, Lot 15. We note that the 2021-2022 final tax assessments do not reflect the assessment upon stabilization. Further, we have presented the 2022-2023 tentative tax assessments. We note that our date of value is December 31, 2021, which is prior to the new assessment. Thus, we have projected the subject's stabilized tax liability to follow.

### 2021-2022 Final Tax Assessment

|  |  | Actual | Transitional |
|---|---|---|---|
| Land |  | $759,600 | $732,750 |
| Improvements | + | $4,756,050 | $5,352,750 |
| **Total** |  | **$5,515,650** | **$6,085,500** |

### 2022-2023 Tentative Tax Assessment

|  |  | Actual | Transitional |
|---|---|---|---|
| Land |  | $759,600 | $761,910 |
| Improvements | + | $5,839,650 | $5,455,180 |
| **Total** |  | **$6,599,250** | **$6,217,080** |

In July 2021, the City Council set the fiscal year 2021/22 (7/1/2021 – 6/30/2022) property tax rates. The new tax rates were not in place for the July 1, 2021 tax bills; as such, the previous year tax rate was initially applied to the July 2021 tax bills and adjustments were then made to subsequent tax bills to reflect the change in rate for any overpayment or underpayment. The new tax rates are reflected in the second half of tax year bills, which represent a blend of the initial tax rate in place in July of 2021 and second half of the fiscal year to achieve the actual 2021/22 tax rate. For the

subject, we have applied the appropriate 2021/22 fiscal year tax rate to the most recent assessed value of the property to determine its current tax liability.

### Current and Historic Real Estate Tax Rates

| Year | Class 2 |
|------|---------|
| 2021/2022 | 12.235% |
| 2020/2021 | 12.267% |
| 2019/2020 | 12.473% |
| 2018/2019 | 12.612% |
| 2017/2018 | 12.719% |
| 2016/2017 | 12.892% |
| 2015/2016 | 12.883% |
| 2014/2015 | 12.855% |
| 2013/2014 | 13.145% |
| 2012/2013 | 13.181% |
| 2011/2012 | 13.433% |
| 2010/2011 | 13.353% |
| 2009/2010 | 13.241% |
| 2008/2009 | 12.596% |
| 2007/2008 | 11.928% |
| 2006/2007 | 12.737% |

### 2021-2022 Real Estate Tax Rate Calculation

| Year | Class 1 | Class 2 | Class 3 | Class 4 |
|------|---------|---------|---------|---------|
| 2H FY- 2021/2022 | 18.881% | 12.203% | 11.752% | 10.816% |
| 1H FY- 2021/2022 | 21.045% | 12.267% | 12.826% | 10.694% |
| **Blended Tax Rate** | **19.963%** | **12.235%** | **12.289%** | **10.755%** |

## Tax Re-Assessment

In order to determine the subject property's tax burden and full assessment upon completion, the New York City Assessment Roll Guidelines have been examined, as well as tax burdens of comparable, recently constructed market-rate apartment buildings in the surrounding area. According to the Assessors Guidelines for the 2020/2021 tax year, unregulated elevator apartment buildings in the Outer Boroughs such as the subject have an effective tax burden ranging from 19% to 23% of their effective gross income. We have forecast taxes in the unrestricted market-rent scenario assuming an effective burden of 19% of gross income.

| | | |
|------|---|---------|
| **EGI** | | $5,365,020 |
| **Tax Liability Ratio** | × | 19% |
| **Projected Tax Liability** | | $1,019,354 |
| **Tax Liability PSF** | | $11.08 |
| **Tax Rate** | | 12.235% |
| **Impied Assessed Value** | | $8,331,457 |

The tax burden forecast of $1,019,354 amounts to $11.08 per square foot of GBA with an implied assessment of $8,331,457 upon stabilization. As support for this forecast, we have also examined tax burdens of comparable recently constructed buildings in the area.

## Comparable Tax Liabilities

In order to support the current real estate tax liability, we surveyed those of comparable buildings in the area.

|  | Year Built | GBA | Taxes/SF |
|---|---|---|---|
| 205 North 9th Street | 2011 | 106,678 | $11.79 |
| 230 North 9th Street | 2014 | 86,700 | $10.94 |
| 55 Roebling Street | 2007 | 60,755 | $10.46 |
| 255 North 7th Street | 2014 | 62,969 | $11.50 |
| 208 North 10th Street | 2011 | 73,850 | $11.18 |
|  | **Min** | | **$10.46** |
|  | **Average** | | **$11.17** |
|  | **Max** | | **$11.79** |

## Conclusion

### Tax Liability Summary

|  | PSF |
|---|---|
| Comp Min. | $10.46 |
| Comp Avg. | $11.17 |
| Comp Max. | $11.79 |
| **Current Subject Tax Liability** | **$11.08** |

The subject property's taxes per square foot fall within the market range and are considered reasonable. Thus, we apply our estimated stabilized tax liability of $1,019,354.80 in our analysis.

# Site Description



| | |
|---|---|
| **Location** | 163 North 6th Street & 180-198 North 7th Street is situated on a block-through site with frontage on both North 6th Street and North 7th Street, in the Williamsburg neighborhood (Kings County) in the State of New York. |
| **Surrounding Land Uses/ Transportation Summary** | Surrounding land uses include multi-family and mixed-use mid-rise buildings. The Bedford Av subway station is a 2 minute walk away. The Metropolitan Av subway station is a 9 minute walk away. The Lorimer Street subway station is an 11 minute walk away. A transportation summary is provided below: |



| | |
|---|---|
| **Easements, Encroachments, and Restrictions** | Based upon a review of the deed, there do not appear to be any easements, encroachments, or restrictions that would adversely affect value. |
| **Site Area** | 0.8± acres./ 33,763± square feet |

| | | |
|---|---|---|
| **Shape** | Irregular | |

**Frontage**

| Street | Frontage (ft) |
|---|---|
| North 6th Street | 135 |
| North 7th Street | 200 |

**Topography**  Generally level

**Drainage**  Assumed adequate

**Access**  There is a main entrance to the east Wing on North 7th Street. Two of the units in the east Wing have private entrances from North 7th Street. Two entrances to the west wing from North 6th Street and one from the parking lot.

**Paving**  All roads are paved with asphalt and are in satisfactory condition.

**Street Drainage**  Street drainage is collected by gravity into the local sewer storm system mains.

**Street Lighting**  Adequate

**Utilities & Services**  Water/Sewer and Refuse – Municipal
Police & Fire Protection – Municipal
Gas & Electric – Con Ed and/or National Grid

**Hazardous Substances**  We observed no evidence of toxic or hazardous substances that require remediation during our inspection of the site.

**Flood Hazard Status[7]**  Located in "Zone X" on the National Flood Insurance Program Rate Map dated September 5, 2007 Community Panel #3604970204F. Flood zone X is a low- to moderate-risk area.

**Conclusion**  The site is like others in the vicinity, and there are no negative external factors.  Site is adequate for its current use.

---

[7] The flood map can be found in the Map Gallery, which is located in the Addenda.

# Description of Improvements

## Building Description

The subject, 163 North 6th Street & 180-198 North 7th Street, consists of a five-story elevatored multi-family building containing 92 residential units. The property is a luxury conversion and expansion of a religious facility comprised of two wings, an east and west wing. The east wing of the property contains 40 units, was completed in 2014, and is partially leased. The west wing of the property, which contains 52 units, was completed in 2016, recently brought into legal compliance, and is now fully leased. The work required for the west wing included purchasing additional air rights and converting the below-grade area from residential area to storage.  The subject is 72.83% occupied with 25 vacant residential units, all in the east wing.

163 North 6th Street & 180-198 North 7th Street contains 92,025± gross square feet (according to the owner). The gross building area is broken down as follows.

| Floor | Area |
|---|---|
| Below Grade Area | 14,079 |
| Above Grade Area | 66,531 |
| Mezzanine Area | 11,415 |
| | 92,025 |

The subject's units have high-end finishes and contain washers/dryers. Many of the units have private outdoor spaces. Many of the units in the east wing (the former church building) incorporate the former structure's large stained-glass windows and other architectural features. Property amenities include a recreational/yoga room, common roof deck, parking, and storage area. Unit amenities include private outdoor space and in-unit laundry. The property is in excellent condition.

## Building Inspection

On December 8, 2021, Pat Ippolito of Bowery Valuation conducted an interior and exterior inspection of the subject property. The inspection included a tour of the building facade, exterior entrance, interior hallways, common areas, mechanical/electrical systems, stairs, and roof. We were able to inspect the stairs and they are in excellent condition. We were able to inspect the roof and it is in good condition. Nevertheless, we recommend a roof inspection by a qualified professional. Moreover, we did not observe any hazardous substances on the improvements or adverse environmental or physical conditions.

## Unit Inspection

### Inspected Units Summary

| # | Unit # | Unit Type | Lease Status | Condition | Status for Occupancy |
|---|---|---|---|---|---|
| 1 | A1 | Three Bedroom - Triplex | Vacant | Average | Ready for occupancy |
| 2 | B16 | Two Bedroom - Duplex | Vacant | Average | Ready for occupancy |
| 3 | 105 | One Bedroom | Occupied | Average | N/A |
| 4 | 108 | Two Bedroom | Occupied | Average | N/A |

The improvements are outlined below.

## Structural & Mechanical

### Structural

| | |
|---|---|
| **Foundation** | Poured concrete |
| **Exterior Walls** | Masonry |
| **Roof** | The west wing roof is flat and covered with roof decking material. The east wing (former church building) has a pitched roof with asphalt shingles. |
| **Windows** | Fixed pane, sliding, and casement windows in steel frames. There are some stained-glass windows retained from the original structure. |

### Mechanicals

| | |
|---|---|
| **Heating/ Cooling Systems/ Hot water** | Individual HVAC units per apartment providing heat and air conditioning. Individual hot water tanks located in unit. Tenants are direct metered for interior unit electric and heat usage. |
| **Electric/Gas/Water** | Tenants are directly metered for electricity usage. The meters are located in the basement. |
| **Plumbing** | PVC, copper, and iron |
| **Fire Safety** | Fully sprinklered |

## Layout & Finishes

### Interior Layout and Finish

| | |
|---|---|
| **Basement** | Most of the basement level includes rentable area that was formerly the lower level of ground floor duplex units. However, as part of the required work to obtain a certificate of occupancy, this area has been converted into rentable storage areas separated from the livable area above by a door. This area can be leased together with the upper area or separately. The basement also contains the meters. |
| **Lobby/Common Areas** | Common area finishes are new and of high grade. Floors are a combination of stone and hardwood. Walls are painted sheetrock. There are ornamental hanging, ceiling attached and wall attached light fixtures. |
| **Laundry** | There are in-unit washers and dryers. |
| **Stairwells** | There are two interior staircases that runs from the basement floor to the roof in each building. |
| **Elevators** | One elevator |
| **Security** | Security cameras throughout, door locks and full-time doormen. |
| **Amenities** | Property amenities include a recreational/yoga room, common roof deck, parking, and storage area. Unit amenities include private outdoor space and in-unit laundry. The property is in excellent condition. |
| **Parking** | Parking Lot with capacity for 46 parking spaces. |

## Unit Finishes

| | |
|---|---|
| **Baths** | The subject's units generally feature excellent quality bathroom finishes relative to typical units in similar elevator apartment buildings in the subject's area. The subject units typically feature: good ceramic tiled flooring, porcelain stand-alone sinks, and porcelain tubs/ fiber glass showers. |
| **Kitchens** | The subject's units generally feature excellent quality kitchen finishes relative to typical units in similar elevator apartment buildings in the subject's area. The subject units typically feature excellent quality wood cabinets with granite/stone countertops, ceramic tiled flooring and stainless-steel appliances. Units include dishwashers and washer/dryers. |
| **Living area/Bedrooms** | The subject's units generally feature excellent quality living area finishes relative to typical units in similar elevator apartment buildings in the subject's area. The subject units typically feature hardwood floors and painted drywall walls and incorporate the original structure given each unit a unique design. |

## Distribution and Unit Type

The east wing of the subject contains 40 units, and the west wing contains 52 units. Many of the units are duplex or triplex units with mezzanine or basement levels and each unit has a unique layout. The mezzanine levels are flexibly used as bedrooms and for other purposes, and as previously noted, as part of the legalization process the finished basement area was converted from livable area connected to above-grade units into rentable storage area separated from the units. We have relied upon the square footages provided by the owner in our analysis.

# Building Condition

## Condition

As recently renovated, the subject is in excellent condition as observed on our site inspection.

## Deferred Maintenance

We did not receive a Physical Risk Report and as this building is newly constructed there is no expected deferred maintenance.

## Remaining Economic Life

163 North 6th Street & 180-198 North 7th Street was originally constructed in 1900 and the east wing was completed in 2014 and the west wing was completed in 2016. Similar buildings have a typical economic life of 60 years and we forecast and effective age of 5 years with a remaining economic life of 55 years.

# Summary

The subject, 163 North 6th Street & 180-198 North 7th Street, consists of a five-story elevatored multi-family building containing 92 residential units. The property is a luxury conversion and expansion of a religious facility comprised of two wings, an east and west wing.

The subject, 163 North 6th Street & 180-198 North 7th Street, consists of a five-story elevatored multi-family building containing 92 residential units. The property is a luxury conversion and expansion of a religious facility comprised of two wings, an east and west wing. The east wing of the property contains 40 units, was completed in 2014, and is partially leased. The west wing of the property, which contains 52 units, was completed in 2016, recently brought into legal compliance, and is now fully leased. The work required for the west wing included purchasing additional

air rights and converting the below-grade area from residential area to storage.  The subject is 72.83% occupied with 25 vacant residential units, all in the east wing.

163 North 6th Street & 180-198 North 7th Street contains 92,025± gross square feet (according to the owner). We have relied upon the square footages provided by the owner in our analysis.

# Submarket Analyses

## Williamsburg: Multifamily Submarket Analysis

The information contained in this report was provided using 2021 Q3 CoStar data for the Williamsburg Multifamily Submarket ("Submarket") located in the New York - NY Market ("Market").



## Overview

Following a rapid transformation from an industrial zone and working-class neighborhood, the Williamsburg multifamily submarket has become one of New York's most prominent. Williamsburg has one of the highest percentages of renters in the New York market. Long a hotspot for younger residents, the submarket has a lower median age and lower median incomes compared with most of the metro. But median age is on the rise and new residents are coming in with higher salaries and looking for high-end buildings with amenities. High prices have limited condo demand and driven most of this new population into rentals.   On the other hand, transit options from Williamsburg to Manhattan are limited compared with adjacent submarkets. Commute times to either Downtown or Midtown Manhattan are generally about 25-35 minutes. Long Island City offers quicker commutes to Midtown Manhattan and a direct connection to Hudson Yards through the 7 train. Meanwhile, Downtown Brooklyn has seven subway lines that run directly to Manhattan.

Despite a record year for new units opening in 2019, vacancy was close to the historic low prior to the pandemic. However, the area's rapid growth has slowed, and fundamentals have softened in the past 12 months. Demand slowed as many renters vacated the submarket for areas with less expensive rents and more space for social distancing, while new units continued to increase inventory. Supply-side pressure continues to hamstring occupancy, with underway units representing 9.8% of existing inventory. Rent growth and investment were booming prior to the pandemic. Williamsburg is now the most expensive submarket outside of Manhattan across the metro, overtaking Downtown Brooklyn. However, rent growth reversed in 2020, though is well into recovery. Investment activity remains slow, with buyers taking a cautious approach in the uncertain economic landscape.

## Sector Fundamentals

| | Williamsburg | YoY | QoQ | New York | YoY | QoQ |
|---|---|---|---|---|---|---|
| Market Rent/Unit | $3,736 | 5.7% | 1.9% | $2,813 | 5.2% | 1.7% |
| Vacancy Rate | 4.73% | -186 bps | -59 bps | 2.52% | -126 bps | -45 bps |
| Net Absorption Units | 320 | 48.1% | 2.6% | 9,776 | 1467.3% | -11.9% |
| Asset Value/Unit | $506,184 | 2.1% | 0.8% | $416,369 | 3.6% | 1.0% |
| Market Cap Rate | 4.21% | 9 bps | 3 bps | 4.4% | 7 bps | 2 bps |
| Transaction Count | 11 | -15% | -45% | 243 | 9% | -33% |
| Sales Volume | $25,296,480 | -65% | -9% | $1,569,945,088 | 58% | -13% |

Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for multifamily space in the Submarket are presented in the ensuing table.

## Historical Multifamily Performance: Williamsburg Submarket

| Period | Inventory Units | Under Construction Units | Net Delivered Units 12 Mo | Absorption Units 12 Mo | Vacancy Rate | Market Effective Rent/Unit |
|---|---|---|---|---|---|---|
| 2021 Q3 | 33,379 | 3,290 | 478 | 1,071 | 4.7% | $3,736 |
| 2021 Q2 | 33,249 | 3,340 | 649 | 967 | 5.3% | $3,666 |
| 2020 | 33,091 | 3,423 | 1,626 | 642 | 6.5% | $3,551 |
| 2019 | 31,465 | 3,731 | 1,709 | 1,951 | 3.6% | $3,573 |
| 2018 | 29,756 | 4,363 | 1,507 | 1,649 | 4.5% | $3,433 |
| 2017 | 28,249 | 4,405 | 1,892 | 1,599 | 5.3% | $3,375 |
| 2016 | 26,354 | 4,829 | 478 | 601 | 4.5% | $3,388 |
| 2015 | 25,876 | 3,292 | 1,250 | 1,202 | 5.0% | $3,317 |
| 2014 | 24,626 | 1,475 | 874 | 1,239 | 5.0% | $3,245 |
| 2013 | 23,752 | 1,674 | 1,057 | 1,095 | 6.8% | $3,187 |
| 2012 | 22,695 | 1,755 | 791 | 854 | 7.2% | $3,139 |
| 2011 | 21,904 | 1,179 | 549 | 445 | 7.8% | $3,092 |

## Supply & Demand

The coronavirus pandemic negatively affected Williamsburg's fundamentals. New properties struggled to fill units for the first time in years. After reaching a record low in 2019, vacancies increased and out-migration from New York put pressure on occupancy. However, heading into fall of 2021 the recovery is well underway and vacancy has decreased from peak levels. The pipeline will bring further tests to occupancies, with under-construction units totaling 9.8% of existing inventory. Even with the resurgence of the dynamic neighborhood life that made Williamsburg such an attractive submarket, a full recovery in the vacancy rate is likely to take a number of years. The submarket's excellent demand drivers, including abundant retail amenities, manageable rents compared with Manhattan, and proximity to nearby job centers, have supported demand from young professionals.

### Vacancy Rates

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Q2 | Q3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| National | 6.7% | 6.2% | 6.1% | 6.2% | 6.1% | 6.5% | 6.7% | 6.4% | 6.5% | 6.7% | 5.1% | 4.5% |
| Market | 3.5% | 3.3% | 3.2% | 3.1% | 3.2% | 2.9% | 3.1% | 2.7% | 2.8% | 3.7% | 3.0% | 2.5% |
| Submarket | 7.8% | 7.2% | 6.8% | 5.0% | 5.0% | 4.5% | 5.3% | 4.5% | 3.6% | 6.5% | 5.3% | 4.7% |

### Absorption & Vacancy Rates



### Rents

Rent growth in Williamsburg slowed in 2020. The pandemic dampened the dynamic neighborhood life of Williamsburg, though now the city has lifted social distancing restrictions, rent growth is back in positive territory, clocking in at 5.7% in the past 12 months, more rapid growth than pre-pandemic. A large supply pipeline may put pressure on rent for existing properties, and landlords are offering months of free rent and other concessions in order to attract tenants. Recently delivered buildings faced the greatest difficulties during the pandemic. Landlords of these buildings offered significant concessions to attract tenants. Rents in the submarket are the most expensive outside of Manhattan, though they still offer a substantial discount to some of the priciest neighborhoods in New York. However, rents for new buildings in Williamsburg easily rival comparable submarkets in Manhattan, with the average rent for class A and B units over $4,000. This is a substantial premium from the rest of Brooklyn and other locations in the outer boroughs.

### Market Rents

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Q2 | Q3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| National | $1,091 | $1,114 | $1,142 | $1,172 | $1,223 | $1,251 | $1,280 | $1,321 | $1,365 | $1,363 | $1,469 | $1,517 |
| Market | $2,363 | $2,399 | $2,442 | $2,507 | $2,585 | $2,622 | $2,646 | $2,702 | $2,747 | $2,666 | $2,766 | $2,813 |
| Submarket | $3,092 | $3,139 | $3,187 | $3,245 | $3,317 | $3,388 | $3,375 | $3,433 | $3,573 | $3,551 | $3,666 | $3,736 |

Submarket Analyses



Market Effective Rent/Unit - Annual & Quarterly Growth

## Construction & Future Supply

Williamsburg has been targeted by developers in recent years, due to demand from young affluent renters. Much of the neighborhood was once an industrial zone, and many older industrial properties have been converted or demolished into new apartment buildings. Nearly 7,500 units have delivered in the past five years, and the current construction pipeline represents 9.8% of existing inventory. Recent construction activity has been concentrated along the waterfront. Out of the 15 projects larger than 100 units that have delivered since 2017 or are currently under construction, 10 are located along the East River. Development on the submarket's waterfront is also concentrated in the Greenpoint neighborhood. Several buildings have delivered and are in the works at Greenpoint Landing. The 10-building complex should eventually create 5,500 units " nearly one-third of the submarket's inventory. This includes 1,400 affordable units for residents making 30%-120% of the AMI.



Under Construction Units - Share of Inventory

Submarket Analyses

## Capital Markets

After a strong start in 2020 Q1 the pandemic resulted in slowing deal flow over the remainder of the year and has continued on a sluggish pace into 2021. Total transaction volume in 2020 decreased by just over 25% year over year. Total volume in the first half of 2021 reached just $43 million, well below pre-pandemic levels. With the investment landscape disrupted, valuations have fallen. American Realty Advisors sold its 62-unit property at 111 Kent St. for $45 million in August 2020. The luxury rental building is located in Williamsburg, and the sale price reflects an $11 million loss for ARA, which purchased the property in 2012. The buyer, China-based Yihai Group North America, was able to take advantage of unfavorable market conditions in 2020.



This sale, which closed in October 2020, points to the post-pandemic long-term confidence international investors have in Williamsburg. Another notable deal last year was JZ Capital Partners' sale of a waterfront development site at 18 India St. in Greenpoint to a joint venture between the Australia-based companies Lendlease and Aware Super. The new owners purchased the lot for $111 million and plan to build a mixed-use tower with 800 rental units, 30% of which will be affordable housing. Other deals in the past 12 months have closed at $7.5 million or below. The outlook for investment sales in Williamsburg is unclear. Interest remains, but pricing is a question for many buyers.



## Outlook

Strong economic growth and a drastically improving public health situation helped boost multifamily fundamentals over the first three quarters of 2021. With demand and rent growth indicators surging, investors have regained confidence in the sector, and sales volume has returned to more normal levels over the past few quarters. In the Submarket, current fundamentals indicate growing demand despite an increase in inventory. With demand outpacing new inventory, vacancy rates have compressed over the past year. With vacancy rates compressing, quarterly growth in 2021 Q3 reached 1.9%, pushing annual growth to 5.7%. Looking ahead to the final quarter of 2021, it is likely that demand will remain strong, but the pipeline will bring further tests to occupancies, with under-construction units totaling 9.8% of existing inventory.

# Highest & Best Use

In determining highest and best use, we have considered the current trends of supply and demand on the market, current zoning regulations and other possible restrictions, and Neighboring land uses.

It is to be recognized that in cases where a site has existing improvements on it, the highest and best use may be determined to be different from the existing use. The existing use will continue, however, unless and until land value in its highest and best use exceeds the total value of the property in its existing use.

In estimating highest and best use, alternative uses[8], such as the legally permissible use, the physically possible use, the financially feasibility, and the highest and best use, are considered and tested for the subject site.

## As Vacant

**Legally Permissible**

The subject is in zone R6B, which permits residential and community facility use as of right. Based on the maximum effective FAR of 2.00 and a lot area of 33,763 square feet, 67,526 square feet of max buildable area is permitted on site. There are no zoning changes anticipated and no easements or encroachments that preclude development.

**Physically Possible**

The site is of good size and has good street access. The lot has 33,763 of total square feet.  The physical characteristics of the site do not appear to impose any unusual restrictions on development, and we are not aware of any easement or encroachments that would impact development. All necessary utilities are available, and the site appears functional for a variety of permitted uses.

**Financially Feasible**

The subject is located within a predominantly mixed-use and multi-family district with a variety of new construction mixed-use and residential properties as well as buildings that have been converted from industrial or commercial use to residential in the neighborhood. Based on our analysis of the market, there is sufficient demand for mixed-use residential and commercial properties. Market conditions are such that mixed-use residential and commercial development is feasible, as the value would sufficiently exceed the cost plus developer's profit. Although rents for commercial and community use are below that of residential rents. New construction in the neighborhood is currently underway and new developed multifamily apartments in the subject's submarket are selling, an indication of feasibility.

**Maximally Productive/ Highest and Best Use**

All legally permissible, physically possible, and financially feasible uses of the site, as vacant, have been presented and examined.

In conclusion, it is our opinion that the highest and best use of the subject, as vacant, is to develop a multi-family property.

## As Improved

**Legally Permissible**

The subject is in zone R6B, which permits residential and community uses as of right.

With the owner's acquisition of development rights in December 2017, it is assumed that the subject is be a legal bulk. The subject is complying with parking requirements and its residential use is legal. In terms of age, size, condition and construction characteristics, the subject building conforms to surrounding improvements in its immediate neighborhood

---

[8] *The definitions of these alternative uses can be found in the Glossary of Terms, which is located in the Addenda.*

| | |
|---|---|
| **Physically Possible** | The subject is was originally built in 1900 and renovated/expanded in 2014 and 2016 and contains 92,025 gross square feet. As previously indicated within the zoning section, the subject appears to comply with current zoning.  The subject improvements are in excellent condition overall and relatively well maintained and functional for its use. |
| **Financially Feasible** | The subject property is located within a desirable residential neighborhood exhibiting low vacancy rates and increasing rental rates. As improved, the subject has excellent appeal, and will generate a positive net cash flow, and an adequate return to the owners. Therefore, the continued use as a multifamily apartment is financially feasible as the improvements contribute to the value of the land. |
| **Maximally Productive/ Highest and Best Use** | All legally permissible, physically possible, and financially feasible uses of the site, as improved, have been presented and examined. |
| | It is our opinion that the highest and best use of the subject, as improved as proposed, given the current improvements is its current use as a elevatored multi-family building (converted religious facility). |
| **Conclusion** | Based on the above analysis, continued residential use is concluded to be the highest and best use as improved. |
| **Most Probable Buyer** | The most likely buyer is a regional or institutional owner of similar elevatored multi-family buildings. |

# Appraisal Valuation Process

The estimated values arrived at by the approaches to value used in this report are as follows:

The Cost Approach is based on the understanding that market participants relate value to cost. In the Cost Approach a property is valued based on a comparison with the cost to build a new or substitute property. The cost estimate is adjusted for all depreciation affecting the existing property. This approach traditionally reflects a good indicator of value when the improvements being appraised are new or close to new or when the property has unique or specialized improvements.

The Income Capitalization Approach reflects an analysis of a property's capacity to generate future income and capitalizes the income into an indication of present value. This approach reflects the market's perception of a relationship between a property's potential income and its market value. It is a strong indicator of value when market rents, vacancy rates, stabilized expenses, capitalization/discount rates are based on reliable market data. The two common valuation techniques associated with the Income Capitalization Approach are direct capitalization and the discounted cash flow (DCF) analysis, with one or both methods applied as appropriate. This approach is widely used in appraising income producing properties.

The Sales Comparison Approach assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with similar utility. This approach is reliable in an active market with sufficient sales data where few differences exist between the comparable sales and the subject, and the sales data collected is credible and accurate. Similar property types in competitive locations tend to sell within a consistent range, and this factor makes valuation on a per square foot and per unit basis a strong predictor of value. The Sales Comparison Approach is often relied upon for owner-user properties. For leased properties, this approach is more often considered as secondary support for the Income Approach.

Each approach applied is then reconciled to a final value conclusion after weighing the quantity and quality of data analyzed and the applicability of each approach to the subject property type.

### Approaches to Value Applied

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | No |
| Income Approach | Applicable | Yes |
| Sales Approach | Applicable | Yes |

The Cost Approach is traditionally a good indicator of value when properties being appraised are new or close to new. However, a major consideration is that investors in this asset class would not likely consider building a substitute as a methodology for valuing this one as the typical buyer is not generally a real estate developer, but rather a property manager. Therefore, as a result of the limited use of this approach, it has not been applied. The exclusion of this approach is not considered to impact the reliability of the appraisal.

# Income Capitalization Approach

In the Income Capitalization Approach, a property's capacity to generate future benefits is analyzed; the forecasted income is capitalized into an indication of present value. Definitions of commonly used measures of anticipated benefits are defined in the Glossary of Terms within the Addenda.

The income capitalization approach supports two methodologies: direct and yield capitalization. Investors in the local market typically utilize a direct capitalization when making investment decisions for this asset class, therefore we conclude that the direct capitalization method is appropriate to apply to the subject.

## Income Analysis

### Current Residential Rent Roll

We received the rent rolls for both the east and west wings of the building. However, we did not receive bedroom counts for the units in the east wing as ownership does not have that information. The units in the east wing have unusual layouts. Many units are duplexes or triplexes and include mezzanine levels which are flexibly used as bedrooms or for other uses. Also, as previously noted, as part of the legalization process the finished basement area was converted from livable area connected to above-grade units into rentable storage area separated from the units.

Because all 25 of the vacant units are in the east wing and we received square footage information for each unit, we have analyzed the subject's rents on a per square foot basis. The rent rolls provided by ownership showed that the building contains 67 occupied units and 25 vacant units, generating $3,950,752 of total annual residential income.

The total net rentable area at the subject is 68,854 square feet of above grade area including mezzanine space, and an additional 14,079 square feet of finished below grade rentable storage area. This equates to a total rentable area of 82,933 square feet. Compared to the gross building area of 92,025 this equates to a loss factor of 10%.

The subject's current rent roll is presented on the following pages:

Income Approach

| # | Unit # | Rooms | Bedrooms | Rent Status | Lease Status | Monthly Rent |
|---|--------|-------|----------|-------------|--------------|--------------|
| 1 | A1 | - | - | Market Rate | Vacant | - |
| 2 | A2 | - | - | Market Rate | Vacant | - |
| 3 | A3 | - | - | Market Rate | Vacant | - |
| 4 | A4 | - | - | Market Rate | Vacant | - |
| 5 | A5 | - | - | Market Rate | Vacant | - |
| 6 | A6 | - | - | Market Rate | Vacant | - |
| 7 | A7 | - | - | Market Rate | Occupied | $7,557.85 |
| 8 | A8 | - | - | Market Rate | Occupied | $10,000.00 |
| 9 | A9 | - | - | Market Rate | Occupied | $13,240.03 |
| 10 | A10 | - | - | Market Rate | Vacant | - |
| 11 | A11 | - | - | Market Rate | Occupied | $6,620.02 |
| 12 | A12 | - | - | Market Rate | Vacant | - |
| 13 | A13 | - | - | Market Rate | Vacant | - |
| 14 | A14 | - | - | Market Rate | Occupied | $5,516.68 |
| 15 | A15 | - | - | Market Rate | Vacant | - |
| 16 | A16 | - | - | Market Rate | Occupied | $5,296.01 |
| 17 | A17 | - | - | Market Rate | Occupied | $6,700.00 |
| 18 | B1 | - | - | Market Rate | Vacant | - |
| 19 | B2 | - | - | Market Rate | Vacant | - |
| 20 | B3 | - | - | Market Rate | Occupied | $4,689.18 |
| 21 | B4 | - | - | Market Rate | Occupied | $4,854.68 |
| 22 | B5 | - | - | Market Rate | Vacant | - |
| 23 | B6 | - | - | Market Rate | Occupied | $4,523.68 |
| 24 | B7 | - | - | Market Rate | Vacant | - |
| 25 | B8 | - | - | Market Rate | Occupied | $6,068.35 |
| 26 | B9 | - | - | Market Rate | Vacant | - |
| 27 | B10 | - | - | Market Rate | Vacant | - |
| 28 | B11 | - | - | Market Rate | Vacant | - |
| 29 | B12 | - | - | Market Rate | Occupied | $4,799.51 |
| 30 | B13 | - | - | Market Rate | Vacant | - |
| 31 | B14 | - | - | Market Rate | Vacant | - |
| 32 | B15 | - | - | Market Rate | Vacant | - |
| 33 | B16 | - | - | Market Rate | Vacant | - |
| 34 | C1 | - | - | Market Rate | Vacant | - |
| 35 | C2 | - | - | Market Rate | Vacant | - |
| 36 | C3 | - | - | Market Rate | Occupied | $4,000.00 |
| 37 | C5 | - | - | Market Rate | Occupied | $4,413.34 |
| 38 | C6 | - | - | Market Rate | Vacant | - |
| 39 | C7 | - | - | Market Rate | Vacant | - |
| 40 | 101 | 4 | 2 | Market Rate | Occupied | $5,100.00 |
| 41 | 102 | 4 | 2 | Market Rate | Occupied | $5,100.00 |
| 42 | 103 | 4 | 2 | Market Rate | Occupied | $5,150.00 |
| 43 | 104 | 3 | 1 | Market Rate | Occupied | $4,500.00 |
| 44 | 105 | 3 | 1 | Market Rate | Occupied | $4,600.00 |
| 45 | 107 | 4 | 2 | Market Rate | Occupied | $5,000.00 |
| 46 | 108 | 4 | 2 | Market Rate | Occupied | $4,500.00 |
| 47 | 109 | 4 | 2 | Market Rate | Occupied | $4,750.00 |
| 48 | 110 | 4 | 2 | Market Rate | Occupied | $4,650.00 |
| 49 | 111 | 4 | 2 | Market Rate | Occupied | $4,600.00 |
| 50 | 201 | 3 | 1 | Market Rate | Occupied | $4,200.00 |
| 51 | 202 | 3 | 1 | Market Rate | Occupied | $4,000.00 |
| 52 | 203 | 3 | 1 | Market Rate | Occupied | $4,350.00 |
| 53 | 204 | 3 | 1 | Market Rate | Occupied | $4,700.00 |
| 54 | 205 | 4 | 2 | Market Rate | Occupied | $5,700.00 |
| 55 | 206 | 2 | 0 | Market Rate | Occupied | $4,600.00 |
| 56 | 207 | 4 | 2 | Market Rate | Occupied | $4,850.00 |
| 57 | 208 | 3 | 1 | Market Rate | Occupied | $4,350.00 |
| 58 | 209 | 3 | 1 | Market Rate | Occupied | $4,350.00 |

| 59 | 210 | 3 | 1 | Market Rate | Occupied | $4,225.00 |
| 60 | 211 | 4 | 2 | Market Rate | Occupied | $4,800.00 |
| 61 | 301 | 4 | 2 | Market Rate | Occupied | $4,850.00 |
| 62 | 302 | 3 | 1 | Market Rate | Occupied | $4,025.00 |
| 63 | 303 | 3 | 1 | Market Rate | Occupied | $4,300.00 |
| 64 | 304 | 3 | 1 | Market Rate | Occupied | $4,500.00 |
| 65 | 305 | 3 | 1 | Market Rate | Occupied | $4,600.00 |
| 66 | 306 | 2 | 0 | Market Rate | Occupied | $4,000.00 |
| 67 | 307 | 4 | 2 | Market Rate | Occupied | $4,850.00 |
| 68 | 308 | 3 | 1 | Market Rate | Occupied | $4,250.00 |
| 69 | 309 | 3 | 1 | Market Rate | Occupied | $4,300.00 |
| 70 | 310 | 3 | 1 | Market Rate | Occupied | $4,250.00 |
| 71 | 311 | 4 | 2 | Market Rate | Occupied | $4,800.00 |
| 72 | 401 | 4 | 2 | Market Rate | Occupied | $4,900.00 |
| 73 | 402 | 3 | 1 | Market Rate | Occupied | $4,050.00 |
| 74 | 403 | 3 | 1 | Market Rate | Occupied | $4,175.00 |
| 75 | 404 | 3 | 1 | Market Rate | Occupied | $4,200.00 |
| 76 | 405 | 3 | 1 | Market Rate | Occupied | $4,350.00 |
| 77 | 406 | 2 | 0 | Market Rate | Occupied | $4,000.00 |
| 78 | 407 | 4 | 2 | Market Rate | Occupied | $4,900.00 |
| 79 | 408 | 3 | 1 | Market Rate | Occupied | $4,300.00 |
| 80 | 409 | 3 | 1 | Market Rate | Occupied | $4,300.00 |
| 81 | 410 | 3 | 1 | Market Rate | Occupied | $4,300.00 |
| 82 | 411 | 4 | 2 | Market Rate | Occupied | $4,850.00 |
| 83 | 501 | 4 | 2 | Market Rate | Occupied | $4,950.00 |
| 84 | 502 | 3 | 1 | Market Rate | Occupied | $4,075.00 |
| 85 | 503 | 3 | 1 | Market Rate | Occupied | $4,200.00 |
| 86 | 504 | 3 | 1 | Market Rate | Occupied | $4,300.00 |
| 87 | 505 | 3 | 1 | Market Rate | Occupied | $4,350.00 |
| 88 | 506 | 2 | 0 | Market Rate | Occupied | $4,000.00 |
| 89 | 507 | 4 | 2 | Market Rate | Occupied | $6,000.00 |
| 90 | 508 | 3 | 1 | Market Rate | Occupied | $4,750.00 |
| 91 | 509 | 3 | 1 | Market Rate | Occupied | $4,300.00 |
| 92 | 510 | 4 | 2 | Market Rate | Occupied | $4,900.00 |
| **Totals/Avgs** | | **448** | **264** | | | **$329,229.33** |
| **Annual** | | | | | | **$3,950,751.96** |

*Income Approach*

## Comparable Rentals

In order to forecast market rent for the subject units, we have examined the following rental activity in the submarket and note that the rents listed below indicate the effective rent, net of concessions:

### Studio Rentals



Studio Rentals Summary

| Comp | Address | Rooms | Bedrooms | Monthly Rent | Sq. Ft. | Rent/SF |
|------|---------|-------|----------|--------------|---------|---------|
| 1 | 390 Wythe Avenue, Brooklyn, NY | 2 | 0 | $4,200 | 1,000 | $50.40 |
| 2 | 99 Gold Street, Brooklyn, NY | 2 | 0 | $4,495 | 1,072 | $50.32 |
| 3 | 365 Bridge Street, Brooklyn, NY | 2 | 0 | $4,500 | 1,175 | $45.96 |
| 4 | 275 Park Avenue, Brooklyn, NY | 2 | 0 | $4,000 | 950 | $50.53 |
| 5 | 72 Berry Street, Brooklyn, NY | 2 | 0 | $4,300 | 925 | $55.78 |
| | | | | Min $4,000 | | $45.96 |
| | | | | Average $4,299 | | $50.60 |
| | | | | Max $4,500 | | $55.78 |

1 BR Rentals



1 BR Rentals Summary

| Comp | Address | Rooms | Bedrooms | Monthly Rent | Sq. Ft. | Rent/SF |
|------|---------|-------|----------|--------------|---------|---------|
| 1 | 461 Dean Street, Brooklyn, NY | 3 | 1 | $4,170 | 729 | $68.64 |
| 2 | 170 North 5th Street, Brooklyn, NY | 3 | 1 | $4,975 | 1,109 | $53.83 |
| 3 | 60 South 8th Street, Brooklyn, NY | 3 | 1 | $4,300 | 844 | $61.14 |
| 4 | 45 Hoyt Street, Brooklyn, NY | 3 | 1 | $4,060 | 702 | $69.40 |
| 5 | 21 India Street, Brooklyn, NY | 3 | 1 | $4,560 | 695 | $78.73 |
| | | | | Min $4,060 | | $53.83 |
| | | | | Average $4,413 | | $66.35 |
| | | | | Max $4,975 | | $78.73 |

**2 BR Rentals**



2 BR Rentals Summary

| Comp | Address | Rooms | Bedrooms | Monthly Rent | Sq. Ft. | Rent/SF |
|---|---|---|---|---|---|---|
| 1 | 491 Keap Street, Brooklyn, NY | 4 | 2 | $5,145 | 925 | $66.75 |
| 2 | 65 Lafayette Avenue, Brooklyn, NY | 4 | 2 | $5,300 | 800 | $79.50 |
| 3 | 92 Clay Street, Brooklyn, NY | 4 | 2 | $4,650 | 1,200 | $46.50 |
| 4 | 76 Engert Avenue, Brooklyn, NY | 4 | 2 | $5,600 | 947 | $70.96 |
| 5 | 140 Hope Street, Brooklyn, NY | 4 | 2 | $6,200 | 1,000 | $74.40 |
| | | | | **Min $4,650** | | **$46.50** |
| | | | | **Average $5,379** | | **$67.62** |
| | | | | **Max $6,200** | | **$79.50** |

### 3 BR Rentals Summary

| Comp | Address | Rooms | Bedrooms | Monthly Rent | Sq. Ft. | Rent/SF |
|------|---------|-------|----------|--------------|---------|---------|
| 1 | 12 Stagg Street, Brooklyn, NY | 5 | 3 | $3,750 | 1,200 | $37.50 |
| 2 | 365 South 5th Street, Brooklyn, NY | 5 | 3 | $4,499 | 1,600 | $33.74 |
| 3 | 11 Jackson Street, Brooklyn, NY | 5 | 3 | $5,500 | 1,100 | $60.00 |
| 4 | 162 Bedford Avenue, Brooklyn, NY | 5 | 3 | $4,799 | 1,200 | $47.99 |
| 5 | 111 North 3rd Street, Brooklyn, NY | 5 | 3 | $5,975 | 1,200 | $59.75 |
| | | | | Min $3,750 | | $33.74 |
| | | | | Average $4,905 | | $47.80 |
| | | | | Max $5,975 | | $60.00 |

### 4 BR Rentals Summary

| Comp | Address | Rooms | Bedrooms | Monthly Rent | Sq. Ft. | Rent/SF |
|------|---------|-------|----------|--------------|---------|---------|
| 1 | 43 Bushwick Avenue, Brooklyn, NY | 6 | 4 | $5,000 | 1,000 | $60.00 |
| 2 | 140 Hope Street, Brooklyn, NY | 6 | 4 | $6,300 | 1,200 | $63.00 |
| 3 | 173 North 8th Street, Brooklyn, NY | 6 | 4 | $5,999 | 1,000 | $71.99 |
| 4 | 462 Keap Street, Brooklyn, NY | 6 | 4 | $5,959 | 1,850 | $38.65 |
| 5 | North 4th Street, Brooklyn, NY | 6 | 4 | $7,404 | 2,056 | $43.21 |
| | | | | Min $5,000 | | $38.65 |
| | | | | Average $6,132 | | $55.37 |
| | | | | Max $7,404 | | $71.99 |

## Rent Reconciliation

Important considerations in determining potential rental value include location, access to transportation and neighborhood amenities, and building design and condition. The subject is in a desirable section of Williamsburg, a neighborhood that has seen significant investment in the past 5 to 10 years. The site has good access to mass transportation, and the block is appealing. The comparables are similar in their physical and locational appeal and are good indicators of value. We note that all of the comparables are either new construction or recently renovated or converted buildings with comparable amenity packages and intra-unit amenities and finishes.

### West Wing Market Rent Conclusion

### Studio Units

The subject's studio units range from $4,000 to $4,600 per month with an average of $4,150 per month. The subject's rents vary slightly due to minor differences in terms of finishes, layout, and size, as well as when the units were leased. The comparable studio units range from $4,000 to $4,500 per month with an average of $4,299 per month. Based on the subject's market rate rents and the range of the comparables, we forecast a market rent for the subject's studio units of $4,200 per month. We note that this is an average market rent projection and that we expect individual unit rents to vary based on unit amenities, location in the building, and timing.  Considering the range of the comparables and our market rent forecasts for the subject units, the subject's market rate units are all currently market oriented.

### 1 BR Units

The subject's market rate one-bedroom units range from $4,000 to $4,750 per month with an average of $4,316 per month. The subject's rents vary slightly due to minor differences in terms of finishes, layout, and size, as well as how long each tenant has been in place. The comparable one-bedroom units range from $4,060 to $4,975 per month with an average of $4,413 per month. Based on the subject's market rate rents and the range of the comparables, we forecast a market rent for the subject's one-bedroom units of $4,350 per month. We note that this

is an average market rent projection and that we expect individual unit rents to vary based on unit amenities, location in the building, and timing.  Considering the range of the comparables and our market rent forecasts for the subject units, the subject's market rate units are all currently market oriented.

## 2 BR Units

The subject's market rate two-bedroom units range from $4,500 to $6,000 per month with an average of $4,960 per month. The subject's rents vary slightly due to minor differences in terms of finishes, layout, and size, as well as how long each tenant has been in place. The comparable two-bedroom units range from $4,650 to $6,200 per month with an average of $5,379 per month. Based on the subject's market rate rents and the range of the comparables, we forecast a market rent for the subject's two-bedroom units of $5,000 per month. Considering the range of the comparables and our market rent forecasts for the subject units, the subject's market rate units are all currently market oriented.

Overall, the west wing's 53 units are fully occupied. The rent roll provided by ownership for the west wing showed rents ranging from $4,000 to $6,000 with an average of $4,546 on a monthly basis which is supported by the comparable rents.The west wing's rent roll is overall market oriented and thus we apply the contract rents in our analysis.

## East Wing Market Rent Conclusion

As there is no bedroom count information for the 39 east wing units, we reconcile and project a market rent on a per square foot basis.

The comparable rentals described above exhibit a range of $34 to $80 with an average of $58 on a per square foot basis. As all of the comparables are in newly constructed or newly renovated buildings, they are an excellent indicator of acheivable market rent for the subject. We generally consider the unique appeal of the subejct as a converted religious facility to have a positive effect on the acheivable rent.

Of the east wing's 39 units, 14 are occupied and 25 are vacant. The 14 occupied units have rents ranging from $4,000 to $13,240 with an average of $6,305 on a monthly basis and $43 to $101 with an average of $64 on a per square foot basis. The subject's units with very high rents are ideally situated within its former church structure which incorporates stained-glass windows, interior archways, and other unique features and layouts.

Given the subject's unique layouts and appeal as a converted religious facility, we forecast an average market rent slightly above that of the comaprable range. We conclude to an average market rent of $60 per square foot. The subject's vacant residential space totals 25,255 square feet.  Our rent projection for the regulated space is calculated below.

| | | |
|---|---|---|
| Vacant Unit Area | | 25,255 |
| Market Rent PSF | x | $60 |
| | | **$1,515,270** |

Our market rent forecast equates to a gross potential income of $1,515,270 for the 25,255 square feet of vacant net rentable area at the subject. Our market rent projection equates to an average monthly rent of $5,051 per month for the 25 vacant units. As noted above, this is below the average contract rent for the east wing of $6,305 per month.  The owner informed us that there are no concessions related to the current tenants. We have applied the net rents provided by the owner in our analysis.

### Vacant Unit Forecast

| Vacant Units | Market Rent PSF | Market Rent | Annual Total |
|---|---|---|---|
| 25 | $60 | $5,051 | $1,515,270 |
| **25** | **$60** | **$5,051** | **$1,515,270** |

We apply the in-place rents for all 67 occupied units in our analysis and our market rent projection for the 25 vacant units. The contract rents are based on the following expense structure:

| | |
|---|---|
| **Landlord's Obligations** | Heat, common area electricity, refuse removal, water/sewer and common area maintenance. |
| **Tenant Obligations** | In-unit electricity and cooking gas. |

## Potential Gross Residential Income

Potential gross residential income is summarized by income type:

### Potential Gross Residential Income

| Income Type | Annual Rent | | Increase | | PGI |
|---|---|---|---|---|---|
| Market Rate | $5,466,022 | x | 1.00000 | = | $5,466,022 |
| **Total** | **$5,466,022** | | | | **$5,466,022** |

## Miscellaneous Income

### Parking Income

The subject contains an on-site parking component with capacity for 46 spaces available for lease. The owner informed us that there are 29 spaces leased at a rate of $400 per space per month. As parking is a function of occupancy, we deduct the residential vacancy and collection loss equal to 4.5% from this income. As the subject's parking is only 63% occupied, the current parking rent roll is not considered stabilized. We have applied parking income based on a rate of $400 per month applied to the 29 leased spaces. We apply a typical vacancy and collection loss to this income.

| **Parking Income** | |
|---|---|
| Monthly Income Per Space | $400 |
| Spaces | 29 |
| Monthly Parking Income | $11,600 |
| **Annual** | **$139,200** |

We present comparable parking spaces in the subject's area in order to determine the reasonableness of the subject's rents. Based on the parking comparables below, we consider the subject's parking income to be market oriented and will be applied in the stabilized pro forma.

### Parking Income

| Address | Monthly Rate | Annual Rate |
|---|---|---|
| 46 Roebling Street | $400 | $4,800 |
| 101 Bedford Avenue | $350 | $4,200 |
| 1 North 4th Place | $375 | $4,500 |
| 150 Union Avenue | $400 | $4,800 |
| 63 Northside Piers | $350 | $4,200 |
| **Min** | **$350** | **$4,200** |
| **Average** | **$375** | **$4,500** |
| **Max** | **$400** | **$4,800** |

Parking is providing $139,200 of additional annual income for the subject. This forecast has been applied to our analysis.

Income Approach

## Residential Vacancy and Collection Loss

CoStar reports the submarket rate near 95.27% and metro area rate near 97.48%. Based on 163 North 6th Street & 180-198 North 7th Street's current and historical operating results, macro market conditions, and investor expectations, a 4.50% residential vacancy and collection loss has been applied. We note that the subject is 72.83% occupied and contains 92 market rate residential units. We have not been advised of any concessions or collection loss related to the current tenants. Therefore, we apply a market-oriented vacancy and collection loss.

## Effective Gross Income Summary

### Effective Gross Income

| | |
|---|---|
| Potential Residential Income | $5,466,022 |
| Parking Income | $139,200 |
| **Potential Gross Income** | **$5,605,222** |
| Less Residential V/C Loss @ 4.50% | -$245,971 |
| Less Parking V/C Loss @ 4.50% | -$6,264 |
| **Effective Gross Income** | **$5,352,987** |

## Operating Expense Analysis

We were provided with the owner's 2021 annualized historical expenses for the subject property. Therefore, we analyzed the subject's operating expense projections, as well as expense reports of comparable properties, in developing our forecast of operating expenses. The data, analyzed in terms of residential units and gross square footage, is presented below.

## Owner's Operating Expense History

### *Historical Expenses

| | 2021 Annualized Historical | | |
|---|---|---|---|
| | Gross | Per SF | Per Unit |
| Effective Gross Revenue | $1,914,114 | $20.80 | $20,806 |
| **Operating Expenses** | | | |
| Real Estate Taxes | $790,155 | $8.59 | $8,589 |
| Insurance | $129,923 | $1.41 | $1,412 |
| Electricity | $10,260 | $0.11 | $112 |
| Repairs & Maintenance | $38,530 | $0.42 | $419 |
| General & Administrative | $5,566 | $0.06 | $61 |
| Management Fees | $158,078 | $1.72 | $1,718 |
| **Total Operating Expenses** | **$1,132,512** | **$12.31** | **$12,310** |
| **Total Operating Expenses (Excl. RE Taxes)** | **$342,357** | **$3.72** | **$3,721** |

*We note that in 2021 the occupancy rate was less than 50%

## Comparable Operating Expenses

### Basis & Totals

|  | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Average |
|---|---|---|---|---|---|---|
| SF | 141,019 | 123,741 | 66,780 | 119,185 | 54,775 | 101,100 |
| Units | 120 | 144 | 67 | 120 | 64 | 103 |
| Insurance | $56,805 | $82,055 | $22,500 | $65,000 | $28,750 | $51,022 |
| Electricity | $84,150 | $52,022 | $12,000 | $27,750 | - | $43,981 |
| Fuel | $50,871 | $46,978 | $49,000 | $100,350 | $30,500 | $55,540 |
| Water & Sewer | $106,450 | $93,614 | $70,426 | $151,600 | $51,570 | $94,732 |
| Repairs & Maintenance | $126,352 | $130,144 | $33,500 | $73,200 | $54,200 | $83,479 |
| Payroll & Benefits | $66,033 | $203,207 | $20,000 | $100,000 | $45,900 | $87,028 |
| General & Administrative | $131,293 | $5,117 | - | $7,500 | $12,500 | $39,103 |
| Management Fees | $251,458 | $148,562 | $32,605 | $65,000 | $34,500 | $106,425 |
| **Total Operating Expenses** | **$873,412** | **$761,699** | **$240,031** | **$590,400** | **$257,920** | **$544,692** |

### Per Square Foot

|  | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Average |
|---|---|---|---|---|---|---|
| Insurance | $0.40 | $0.66 | $0.34 | $0.55 | $0.52 | $0.49 |
| Electricity | $0.60 | $0.42 | $0.18 | $0.23 | - | $0.36 |
| Fuel | $0.36 | $0.38 | $0.73 | $0.84 | $0.56 | $0.57 |
| Water & Sewer | $0.75 | $0.76 | $1.05 | $1.27 | $0.94 | $0.96 |
| Repairs & Maintenance | $0.90 | $1.05 | $0.50 | $0.61 | $0.99 | $0.81 |
| Payroll & Benefits | $0.47 | $1.64 | $0.30 | $0.84 | $0.84 | $0.82 |
| General & Administrative | $0.93 | $0.04 | - | $0.06 | $0.23 | $0.32 |
| Management Fees | $1.78 | $1.20 | $0.49 | $0.55 | $0.63 | $0.93 |
| **Total Operating Expenses** | **$6.19** | **$6.16** | **$3.59** | **$4.95** | **$4.71** | **$5.12** |

### Per Unit

|  | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Average |
|---|---|---|---|---|---|---|
| Insurance | $473 | $570 | $336 | $542 | $449 | $474 |
| Electricity | $701 | $361 | $179 | $231 | - | $368 |
| Fuel | $424 | $326 | $731 | $836 | $477 | $559 |
| Water & Sewer | $887 | $650 | $1,051 | $1,263 | $806 | $931 |
| Repairs & Maintenance | $1,053 | $904 | $500 | $610 | $847 | $783 |
| Payroll & Benefits | $550 | $1,411 | $299 | $833 | $717 | $762 |
| General & Administrative | $1,094 | $36 | - | $63 | $195 | $347 |
| Management Fees | $2,095 | $1,032 | $487 | $542 | $539 | $939 |
| **Total Operating Expenses** | **$7,278** | **$5,290** | **$3,583** | **$4,920** | **$4,030** | **$5,020** |

*Income Approach*

## Estimated Operating Expenses

Our stabilized annual expense forecast is presented:

### Real Estate Taxes

As presented earlier, we forecasted the tax payment at $1,014,017 annually or $11.02 per square foot.

### Insurance

| PSF Summary | Value | Low | Average | High |
|---|---|---|---|---|
| 2021 Annualized Historical | $1.41 | | | |
| Comparable | | $0.34 | $0.49 | $0.66 |
| **Appraiser's Forecast** | **$1.40** | | | |

Insurance costs vary by the type of coverage. Costs are generally lower (on a per square foot basis) for larger buildings and for multi-building policies. Based on the information above, we have projected this expense at $1.40 per square foot, or $128,835 annually. Our forecast emphasizes the historical expense.

### Electricity

### Utilities

| PSF Summary | Value | Low | Average | High |
|---|---|---|---|---|
| 2021 Annualized Historical | $0.11 | | | |
| Comparable | | $0.18 | $0.36 | $0.60 |
| **Appraiser's Forecast** | **$0.25** | | | |

Based on the information above, we have projected this expense at $0.25 per square foot, or $23,006 annually.

### Water & Sewer

| Per Unit Summary | Value | Low | Average | High |
|---|---|---|---|---|
| Comparable | | $650 | $931 | $1,263 |
| **Appraiser's Forecast** | **$800** | | | |

Based on the information above, we have projected this expense at $800 per unit, or $73,600 annually. Our forecast is toward the average of the comparable range.

### Repairs & Maintenance

| PSF Summary | Value | Low | Average | High |
|---|---|---|---|---|
| 2021 Annualized Historical | $0.42 | | | |
| Comparable | | $0.50 | $0.81 | $1.05 |
| **Appraiser's Forecast** | **$0.70** | | | |

This expense varies depending on building age, management philosophy, services provided, and accounting methodology. Some management companies expense items that are normally included as capital costs. In addition, repair and maintenance costs may change from year to year; in some cases, repairs that require attention may be postponed due to cash flow considerations. B Based on the information above, we have projected this expense at $0.70 per square foot, or $64,417 annually. Our forecast is within the comparable range and is appropriate considering the subject's relatively large unit sizes.

## Payroll & Benefits

| Per Unit Summary | Value | Low | Average | High |
|---|---|---|---|---|
| Comparable | | $299 | $762 | $1,411 |
| **Appraiser's Forecast** | **$550** | | | |

Payroll costs will cover building staff whose duties will include trash removal, common area cleaning and general maintenance. Payroll taxes and fringes cover state and federal taxes as well as benefits that building employees receive. Based on the information above, we have projected this expense at $550 per unit, or $50,600 annually.

## General & Administrative

| PSF Summary | Value | Low | Average | High |
|---|---|---|---|---|
| 2021 Annualized Historical | $0.06 | | | |
| Comparable | | $0.04 | $0.32 | $0.93 |
| **Appraiser's Forecast** | **$0.25** | | | |

This expense allows for any expenditure not included in the above categories including general administrative costs, accounting/legal, permits and dues, miscellaneous charges, office expense, etc. Based on the information above, we have projected this expense at $0.25 per square foot, or $23,006 annually.

## Management Fees

| PSF Summary | Value | Low | Average | High |
|---|---|---|---|---|
| 2021 Annualized Historical | $1.72 | | | |
| Comparable | | $0.49 | $0.93 | $1.78 |
| **Appraiser's Forecast** | **$1.74** | | | |

Typically, management fees for residential properties range from 2% to 6% of effective gross income. We have projected this expense at 3.00% of effective gross income, which equates to $1.74 per square foot or $160,108 annually.

## Replacement Reserves

This expense provides for the periodic replacement of building components that wear out more rapidly than the building itself and that must be replaced periodically during the building's economic life. We note the owner did not indicate this expense. We have projected this expense at $150 per unit, or $13,800 annually.

## otal Operating Expenses

### Per Square Foot

| PSF Summary | Value | Low | Average | High |
|---|---|---|---|---|
| 2021 Annualized Historical | $3.72 | | | |
| Comparable | | $3.59 | $5.12 | $6.19 |
| **Appraiser's Forecast** | **$5.84** | | | |

Per Unit

| Per Unit Summary | Value | Low | Average | High |
|---|---|---|---|---|
| 2021 Annualized Historical | $3,721 | | | |
| Comparable | | $3,583 | $5,020 | $7,278 |
| **Appraiser's Forecast** | **$5,846** | | | |

Operating expenses, exclusive of real estate taxes, were forecasted at $5.84 per square foot and $5,846 per unit. Excluding real estate taxes, the comparables ranged from $3.59 to $6.19 per square foot and $3,583 to $7,278 per unit. Our forecast is within the comparable range on both a per square foot and per unit basis, as well as logically placed in relation to the historical performance of the asset. Thus, this forecast is reasonable and will be applied in our valuation analysis.

## Stabilized Income & Expenses

Pro Forma

| Pro Forma | $ | PSF | Per Unit | % of PGI |
|---|---|---|---|---|
| **Income** | | | | |
| Potential Residential Income | $5,466,022 | $59.40 | $59,413 | 97.52% |
| Other Income | $139,200 | $1.51 | $1,513 | 2.48% |
| **Potential Gross Income** | **$5,605,222** | **$60.91** | **$60,926** | |
| Less Residential V/C Loss @ 4.50% | -$245,971 | -$2.67 | -$2,674 | -4.4% |
| Less Parking V/C Loss @ 4.50% | -$6,264 | -$0.07 | -$68 | 0.1% |
| **Effective Gross Income** | **$5,352,987** | **$58.17** | **$58,185** | **95.50%** |
| | | | | |
| **Operating Expenses** | | | | **% of EGI** |
| Real Estate Taxes | $1,019,354 | $11.08 | $11,080 | 19.04% |
| Insurance | $128,835 | $1.40 | $1,400 | 2.41% |
| Electricity | $23,006 | $0.25 | $250 | 0.43% |
| Water & Sewer | $73,600 | $0.80 | $800 | 1.37% |
| Repairs & Maintenance | $64,418 | $0.70 | $700 | 1.20% |
| Payroll & Benefits | $50,600 | $0.55 | $550 | 0.95% |
| General & Administrative | $23,006 | $0.25 | $250 | 0.43% |
| Management Fees | $160,590 | $1.75 | $1,746 | 3.00% |
| Replacement Reserves | $13,800 | $0.15 | $150 | 0.26% |
| **Total Operating Expenses** | **$1,557,208** | **$16.92** | **$16,926** | **29.09%** |
| | | | | |
| Total Expenses Excluding RE Taxes | $537,854 | $5.84 | $5,846 | 10.05% |
| | | | | |
| **Net Operating Income** | **$3,795,779** | **$41.25** | **$41,258** | **70.91%** |
| Operating Expense Ratio | 29% | | | |

## Net Operating Income Comparison

| | 2021 Annualized Historical | Bowery Pro Forma |
|---|---|---|
| **Effective Gross Income** | $1,914,114 | $5,352,987 |
| **Operating Expense** | | |
| Real Estate Taxes | $790,155 | $1,019,354 |
| Insurance | $129,923 | $128,835 |
| Electricity | $10,260 | $23,006 |
| Water & Sewer | - | $73,600 |
| Repairs & Maintenance | $38,530 | $64,418 |
| Payroll & Benefits | - | $50,600 |
| General & Administrative | $5,566 | $23,006 |
| Management Fees | $158,078 | $160,590 |
| Replacement Reserves | - | $13,800 |
| **Total Operating Expenses** | **$1,132,512** | **$1,557,208** |
| Total Expenses Excluding RE Taxes | $342,357 | $537,854 |
| | | |
| **Net Operating Income** | **$781,602** | **$3,795,779** |
| Operating Expense Ratio | 59% | 29% |

# Income Capitalization

In developing an opinion of the overall capitalization rate required by an investor, we will apply several methods of analyses: (1) Band of Investment; (2) Comparable Capitalization Rates; and (3) National Survey Responses.

## Band of Investment Technique

We use the Band of Investment technique to estimate a capitalization rate that accounts for the combination of equity and prevailing financing. The rate developed is a weighted average, the weights being percentages of the total value, which are occupied by the mortgage and equity positions.

### Mortgage Component

A survey of active lenders in the subject property's influencing market indicates that 25-year and 30-year mortgage commitments are typically 175 to 450 basis points above 10-year treasuries.

### Survey of Competitive Rates

| | |
|---|---|
| Federal Funds Rate | 0.00%-0.25% |
| 5-year CD | 0.98%-1.30% |
| 10-year Treasury Bond | 1.74% |
| 30-year Treasury Bond | 2.08% |
| Corporate Bonds (AAA) | 2.83% |

*Source: Federal Reserve Statistical Release*

Currently, 10-year treasuries are trading at 1.74% suggesting mortgage rates of roughly 3.5% to 6.25%. The current mortgage market indicates a competitive interest rate, as there is strong demand from mortgage lenders seeking stable multi-unit residential deals.

After surveying several commercial mortgage lenders, it is our opinion that a typical creditworthy purchaser could obtain financing from a lending source in an amount equal to 75% of value at an annual interest rate of 3.5% and a 30-year payout. Therefore, the mortgage constant is 0.0539.

### Equity Component

As a stabilized income pro forma is expressed in constant dollars, an equity divided rate will be applied. The consensus of those actively engaged in the marketplace for apartment buildings is that Year 1 equity rates of return (based upon forecasting techniques and assumptions like those utilized herein) fall within a broad range, depending on numerous risk factors, including among others:

**Location**- the better the location, the lower the rate of return;

**Physical Characteristics**- the newer the property, the higher the quality of construction and finishes, and the better the design and layout of the physical structure, the lower the rate of return;

**Degree of Growth Forecasted for Income and Expenses**- the more aggressive and value enhancing the valuation assumptions, the higher the rate of return;

**Amount of Equity Investment Required**- the greater the required equity investment (that portion of the total acquisition cost not typically funded by conventional financing), the higher the rate of return;

**Type of Investment**- the riskier the perceived return on investment for a particular type of real estate, the higher the rate of return.

Applying an appropriate equity dividend rate to the mortgage equity technique is an integral part of the valuation process. As previously stated, the equity rate of return is sensitive to the risk associated with the property, whether it be location, income flows, functional or physical obsolescence, and most important of all, the economic climate.

First, we look at national surveys to understand appropriate equity dividend rates. The latest Realty Rates survey indicates an average equity dividend rate of 10.69% and ranges from 6.10% to 14.45%.

### Investor Surveys

| Survey | Type of Product | Equity Dividend Rates |
|---|---|---|
| Realty Rates | National Apartment | 6.10% to 14.45% |
| 4Q 2021 | Market | 10.69% Average |

Based on our discussions with market participants, equity dividend rates for multi-unit residential real estate investments typically range from 2.00% to 10.00%, depending on the above noted factors.

We believe an investor in the subject property would accept an initial annual return of 6% in anticipation of a stable income flow and property appreciation over time. It should be emphasized that the equity dividend rate is not necessarily the same as an equity yield rate or true rate of return on equity capital. The equity dividend rate is an equity capitalization that reflects all benefits that can be recognized by the equity investor as of the date of purchase. We selected this rate based on the subject's location in a good residential area, and its good access and visibility. We summarize the mortgage and equity parameters utilized in our derivation of an overall capitalization rate.

### Selected Loan Terms

| Typical Loan Terms | Value |
|---|---|
| Mortgage Rate | 3.50% |
| Amortization Term (Years) | 30 |
| Number of Payments | 360 |
| Loan-to-Value Ratio (M) | 75% |
| Equity Ratio | 25% |
| Mortgage Constant | 5.39% |

### Band of Investment

| Band of Investment | | Value |
|---|---|---|
| Mortgage Ratio | | 75% |
| Annual Mortgage Constant | x | 5.39% |
| **Mortgage Component** | | **4.04%** |
| | | |
| Equity Ratio | | 25% |
| Equity Dividend Rate | x | 6.00% |
| **Equity Component** | | **1.50%** |
| | | |
| **Indicated Overall Rate** | | **5.54%** |

## Comparable Capitalization Rates

Comparable Cap Rates Table

| # | Address | Property Type | Number of Units | Year Built | Sale Date | Capitalization Rate |
|---|---------|---------------|-----------------|------------|-----------|---------------------|
| 1 | 255 North 7th Street, Brooklyn, New York 11211 | Multifamily | 169 | 2015 | 12/21/21 | 4.67% |
| 2 | 137 Bayard Street, Brooklyn, New York 11222 | Multifamily | 27 | 2015 | 12/15/21 | 4.50% |
| 3 | 117 Kent Avenue, Brooklyn, New York 11249 | Mixed-Use | 62 | 2008 | 8/14/20 | 4.03% |
| 4 | 1 Flatbush Ave., Brooklyn, New York 11217 | Multifamily | 183 | 2018 | 6/20/20 | 4.18% |
| 5 | 564 St Johns Place, Brooklyn, New York 11238 | Multifamily | 193 | 2015 | 6/28/19 | 5.44% |
| 6 | 88 Richardson Street, Brooklyn, New York 11211 | Multifamily | 188 | 2013 | 2/14/19 | 4.74% |
| | | | | | Avg | **4.60%** |

We analyzed sales of comparable multifamily assets within the subject's periphery and they exhibit overall capitalization rates from 4.03% to 5.54% with an average of 4.62%. We have supplemented our capitalization rate comparables with additional comparables not used in our sales comparison approach. The additional rates are good indicators for capitalization rates for the subject and are recent, however, there are differences regarding the comparables which do not justify utilizing the comparable in the sales comparison approach (i.e. location, size, etc.).

## National Survey Responses

The PwC Real Estate and Real Estate Research Corporation's investment surveys summarize the expectations of institutional investors. As indicated, the going-in capitalization rates range from 3.00% to 7.00%, with an average between 4.30% and 4.42%.

## Capitalization Rate Conclusion

It is our view that a 4.50% overall rate would be required by an investor. The value is calculated below:

### Summary

| Survey | Low | Avg | High |
|--------|-----|-----|------|
| Band of Investment | - | 5.54% | - |
| PwC 4Q 2021 | 3.00% | 4.42% | 7.00% |
| Situs-RERC 4Q 2021 | 3.60% | 4.30% | 6.00% |
| Comparable Cap Rates | 4.03% | 4.62% | 5.54% |

Overall capitalization rates are influenced by numerous factors, of which the most influential are: investors' perception of risk, the potential for net income growth, and the market for competitive assets. As indicated by the local comparable sales, assets in the submarket tend to trade for going-in returns toward the middle of the national range.

In terms of its position within the market range, it is our view that an investor would accept a return near the middle of the comparable range for the subject property but above the average. Our opinion is based on the following factors:

- With respect to income, the subject's residential units are 72.83% occupied and at market level. We note the subject benefits from its status as a market rate building since the passing of the TPA act in 2019 which restricts rent increases on stabilized units and keeps units in rent stabilization in perpetuity. Therefore, the subject is in excellent position to benefit from increases in market rents in the near term as rents and occupancy levels stabilize as the impact of Covi-19 subside.

- It is in a market where there has been historically strong demand for investment and capitalization rates have been historically strong. We emphasize the number on new developments and re-developments in the Williamsburg submarket which highlights investor demand.

- Finally, as a newly renovated property, the subject is in excellent condition and has limited risk of unscheduled capital repairs and exhibits similar risk to the comparables as they are new construction or renovated properties as well. We also note the subject's unique status as a converted religious facility whereby the unit layouts are unique and differentiate it from the marketplace.

Balancing these factors, it is our view that a 4.50% overall rate would be required by an investor. We deduct residential unit lease up costs.

## Adjustments to Value

To get from the Prospective Fair Value As Stabilized to the As Is Fair Value, we apply 6 months of rent loss to the residential units and 1 additional month for broker fees. This deduction factors in the residential vacancy & collection loss of 4.5%. The total deduction is $844,132.

These adjustments are shown below:

### Fair Value Conclusion via the Income Capitalization Approach

|  | Date of Value | Value | Final Value (RD) |
|---|---|---|---|
| NOI |  | $3,795,779 | - |
| Cap Rate |  | 4.50% | - |
| Indicated Value As Stabilized |  | $84,350,636 | - |
| **Prospective Fair Value As Stabilized** | **June 30, 2022** | **$84,350,636** | **$84,400,000** |
| Residential Rent Loss (6 months leasing, 1 month commission) |  | ($844,132) | - |
| **As Is Fair Value Via the Income Capitalization Approach** | **December 31, 2021** | **$83,506,504** | **$83,500,000** |

In consideration of the above analysis, the Prospective Fair Value As Stabilized of $84,400,000 reflects a unit value of $917 per square foot. The final values are rounded to the nearest $100,000.

# Sales Comparison Approach

In the Sales Comparison Approach, an opinion of market value is provided by comparing the subject property to transactions of competitive assets. A major premise is the principle of substitution which holds market value is directly related to the prices of comparable properties as a knowledgeable investor will pay no more for a substitute property.

The steps taken to apply this approach include the following: (a) research, confirm and verify all pertinent data for the most relevant sales within the defined market area; (b) analyze the sales considering appropriate adjustments for material difference in comparison to the subject property; and (c) reconcile the range of adjusted sale data into an opinion of value.

In order to analyze comparable sales, it is necessary to convert the sale prices to an appropriate unit of comparison, a process which facilitates price comparisons between properties of different sizes, and it also enables adjustment for qualitative differences. Since investors typically purchase multi-unit residential buildings in the subject's area in terms of value per square foot, we have applied this unit of comparison.



Comparable Sales Summary[9]

|  | Address | Sale Date | Square Feet | Sale Price | Sale Price Per SF | NOI Per SF | Cap Rate |
|---|---|---|---|---|---|---|---|
| 1 | 255 North 7th Street, Brooklyn, NY | 12/21/2021 | 151,766 | $113,080,000 | $745 | N/A | N/A |
| 2 | 555 4th Avenue, Brooklyn, NY | 7/22/2021 | 103,430 | $78,300,000 | $757 | N/A | N/A |
| 3 | 1 Flatbush Ave., Brooklyn, NY | 6/20/2020 | 109,350 | $101,350,000 | $927 | $39 | 4.18% |
| 4 | 564 St Johns Place, Brooklyn, NY | 6/28/2019 | 136,864 | $97,350,000 | $711 | $39 | 5.54% |
| 5 | 88 Richardson Street, Brooklyn, NY | 2/14/2019 | 186,779 | $130,442,500 | $698 | $33 | 4.74% |

---

[9] The outlines of each of the comparable sales can be found in the Addenda.

*Sales Comparison Approach*

# Comparable Sales Outline

## Comparable Sale 1



### Location Overview

| | |
|---|---|
| Street Address | 255 North 7 Street |
| City | Brooklyn |
| State | NY |
| Zip | 11211 |
| Property ID | 2322/28 |
| Neighborhood/District | Williamsburg |

### Property Information

| | | | |
|---|---|---|---|
| Property Name | 247N7 | Building Amenities | Fitness Center, Doorman/Concierge, Shared Roof Deck, Shared Common Outdoor Space |
| Condition | Excellent | | |
| Year Built | 2014 | | |
| # Floors | 6 | GBA | 151,766 SF |
| Building Type | Elevator | Site Area | 32,567 SF |
| | | Residential Units | 169 |
| | | Comparable Type | Multifamily |

### Sale Information

| | | | |
|---|---|---|---|
| Sale Status | Transaction | Price Adjustment | $3,320,000 |
| Sale Date | 12/21/2021 | Adjusted Sale Price | $113,080,000 |
| Grantee | HUBB NYC | Per Unit | $669,112 |
| Grantor | Greystar Real Estate Partners | Per SF | $745 |
| Unique Sale ID | 2021000513423 | Cap Rate | 4.67% |
| Deed Sale Price | $116,200,000 | | |

### Appraiser Comments

This is the sale of a 6-story residential building constructed in 2014 and containing 169 residential units. We spoke with Robert Hinckley, a Senior Managing Director from JLL, who confirmed the details of the sale. Amenities include a fitness center, doorman, shared roof deck, and outdoor space. The building is in excellent condition. We have subtracted the NPV of the remaining 421a benefit from the deed price, which equates to $3,320,000. Additionally, we were provided with the marketing brochure prepared by JLL, which noted a cap rate of 4.67%. The data is also confirmed with CoStar and Public Record.

## Comparable Sale 2



### Location Overview

| | |
|---|---|
| Street Address | 555 4 Avenue |
| City | Brooklyn |
| State | NY |
| Zip | 11215 |
| Property ID | 1047/3 |
| Neighborhood/District | Park Slope |

### Property Information

| | | | |
|---|---|---|---|
| Condition | Excellent | Site Area | 14,400 SF |
| Year Built | 2018 | Residential Units | 134 |
| # Floors | 11 | Comparable Type | Mixed-Use |
| Building Type | Elevator | Commercial Units | 1 |
| Building Amenities | Elevator, Laundry Room, Bike Room, Doorman/Concierge, Shared Roof Deck, Shared Common Outdoor Space, Common Lounge Space | Commercial Area | 11,155 SF |
| | | Unit Types | Studio, 1 BR, 2 BR |
| GBA | 103,430 SF | | |

### Sale Information

| | | | |
|---|---|---|---|
| Sale Status | Transaction | Price Adjustment | $7,700,000 |
| Sale Date | 7/22/2021 | Adjusted Sale Price | $78,300,000 |
| Grantee | 555 Fourth Avenue Owner LLC | Per Unit | $580,000 |
| Grantor | Partners VII/541-555 Fourth Owner LLC | Per SF | $757 |
| | | Cap Rate | N/A |
| Deed Sale Price | $86,000,000 | | |

## Appraiser Comments

This is the sale of an 11-story luxury residential building constructed in 2018 and containing 134 residential units. We estimate the NPV of the 421a tax savings at $7,700,000. The building amenities and include outdoor space, a roof deck, full-time doorman and concierge, bike room, and laundry room. We have subtracted this NPV from the deeded price to value the property independent of the tax benefit. We attempted to reach the parties involved in the sale, but after multiple attempts we were unsuccessful. All data is reported by CoStar and Public Record.

*Sales Comparison Approach*

## Comparable Sale 3



### Location Overview

| | |
|---|---|
| **Street Address** | 1 Flatbush Ave. |
| **City** | Brooklyn |
| **State** | NY |
| **Zip** | 11217 |
| **Property ID** | 2160/1202 |
| **Neighborhood/District** | Downtown Brooklyn |

### Property Information

| | | | |
|---|---|---|---|
| **Condition** | Excellent | **GBA** | 109,350 SF |
| **Year Built** | 2018 | **Site Area** | 12,482 SF |
| **# Floors** | 19 | **Residential Units** | 183 |
| **Building Type** | Elevator | **Comparable Type** | Multifamily |
| **Building Amenities** | Fitness Center, Elevator, Laundry Room, Bike Room, Doorman/Concierge, Shared Recreation Room, Shared Roof Deck | | |

### Sale Information

| | | | |
|---|---|---|---|
| **Sale Status** | Transaction | **Deed Sale Price** | $101,350,000 |
| **Sale Date** | 6/20/2020 | **Per Unit** | $553,825 |
| **Grantee** | 1FBBK Owner LLC | **Per SF** | $927 |
| **Grantor** | One Flatbush Avenue Property LLC | **Cap Rate** | 4.18% |

### Appraiser Comments

This is the sale of the residential component of 1 Flatbush Avenue, a 19-story luxury residential building constructed in 2018 and containing 183 residential units and base retail. 1 Flatbush is located at the corner of Flatbush Avenue and Fulton Street in the Downtown Brooklyn neighborhood of Brooklyn. Property amenities include a 24-hour concierge, fitness studio, yoga studio, gaming lounge, resident's lounge/co-working space, and landscaped roof deck with outdoor grills. The property is in excellent condition, having been constructed in 2018. The residential and retail portion were divided into two separate condominium units for tax benefit purposes. The residential portion is identified as Lot 1202 of Block 2106. As noted, the sale pertains solely to the residential portion of the building, and the retail condominium was not included. Of the 183 residential units, 134 units are market rate units, 48 units are affordable units, and one unit is a super's unit. The entire building contains approximately 160,372± gross square feet above grade. The residential portion consists of 109,350 square feet. The property benefits from a 35-year 421a tax benefit. The owner acquired title to the property on June 10, 2020 (contract signed March 12, 2020) for a purchase price of $101,350,000. This was an arm's length transaction, and the property was openly marketed by Cushman and Wakefield for an undisclosed asking price. It is noted that we have deducted the NPV of the 421a tax benefits from the purchase price, which was calculated at approximately $46 million when discounted at 5.50%. Thus, the adjusted price equates to $55.35 million.

*Sales Comparison Approach*

## Comparable Sale 4



### Location Overview

| | |
|---|---|
| Street Address | 564 St Johns Place |
| City | Brooklyn |
| State | NY |
| Zip | 11238 |
| Property ID | 1178/26 |
| Neighborhood/District | Crown Heights |

### Property Information

| | | | |
|---|---|---|---|
| Year Built | 2015 | Site Area | 33,900 SF |
| # Floors | 8 | Residential Units | 193 |
| Building Type | Elevator | Comparable Type | Multifamily |
| Building Amenities | Elevator, Fitness Center, Bike Room, Covered Parking | Commercial Units | N/A |
| | | Commercial Area | N/A |
| GBA | 136,864 SF | | |

### Sale Information

| | | | |
|---|---|---|---|
| Sale Status | Transaction | Deed Sale Price | $97,350,000 |
| Sale Date | 6/28/2019 | Per Unit | $504,404 |
| Grantee | 564 St. Johns Gardens, Lp | Per SF | $711 |
| Grantor | 564 St. Johns Acquisition Llc | Cap Rate | 5.44% |
| Unique Sale ID | 2019000214154 | | |

### Appraiser Comments

This is the sale of an 8 story, elevatored, multifamily apartment building known as the Frederick. It features 193 rent stabilized residential units, and has 136,864 square feet of gross building area on 33,900 square feet of land. The building includes such amenities as fitness center, bike room, and covered parking. The property was constructed in 2015. It sold on June 28, 2019, for $117,000,000 which equates to $854.86 per square foot. It reportedly traded at a 5.75% cap rate with a net operating income of $6,727,500. However, the property is receiving a 421a tax abatement. We deduct the net present value of the remaining tax benefit from the sale price to get an adjusted sale price of $97,350,000. The adjusted NOI is then $5,391,789 and the adjusted cap rate is 5.54%. All data is reported by CoStar and Public Record.

## Comparable Sale 5



### Location Overview

| | |
|---|---|
| **Street Address** | 88 Richardson Street |
| **City** | Brooklyn |
| **State** | NY |
| **Zip** | 11211 |
| **Property ID** | 2732/12 |
| **Neighborhood/District** | Williamsburg |

### Property Information

| | | | |
|---|---|---|---|
| **Condition** | Excellent | **GBA** | 186,779 SF |
| **Year Built** | 2013 | **Site Area** | 38,983 SF |
| **# Floors** | 7 | **Residential Units** | 188 |
| **Building Type** | Elevator | **Comparable Type** | Multifamily |

### Sale Information

| | | | |
|---|---|---|---|
| **Sale Status** | Transaction | **Deed Sale Price** | $130,442,500 |
| **Sale Date** | 2/14/2019 | **Per Unit** | $693,843 |
| **Grantee** | Udr Leonard Pointe LLC | **Per SF** | $698 |
| **Grantor** | 88 Richardson Owner LLC | **Cap Rate** | 4.74% |
| **Unique Sale ID** | 2019000066248 | | |

### Appraiser Comments

This is the sale of a 188-unit apartment building located in Brooklyn, NY. The property, built in 2015, contains 186,779 square feet of GBA on 40,136. acres of land. The building most recently sold for $130,442,500. This is a 7-story building known as Leonard Pointe. The property features 24-hr concierge service, an exterior waterfall and indoor fireplace in the lobby, a landscaped courtyard, elevator-accessible rooftop space, community room with pool table and air hockey, screening room, car and bike parking and pet grooming space. This property is close to public transportation. The property has a 25-year 421a tax exemption. The sale represents the building that is 100% market rate. All of the affordable units are in a separate building on an adjacent lot and not part of the sale. Reportedly, once L train was no longer shutting down, ownership has been able to increase rents by approximately 5%.

## Comparable Sales Adjustment Grid

| Comparable # | Subject | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Address | 163 North 6th Street & 180-198 North 7th Street, Brooklyn, NY | 255 North 7th Street, Brooklyn, NY | 555 4th Avenue, Brooklyn, NY | 1 Flatbush Ave., Brooklyn, NY | 564 St Johns Place, Brooklyn, NY | 88 Richardson Street, Brooklyn, NY |
| Sale Date | | 12/21/2021 | 07/22/2021 | 06/20/2020 | 06/28/2019 | 02/14/2019 |
| No. Units | 92 | 169 | 135 | 183 | 193 | 188 |
| GBA | 92,025 | 151,766 | 103,430 | 109,350 | 136,864 | 186,779 |
| Year Built | 1900 | 2014 | 2018 | 2018 | 2015 | 2013 |
| Condition | Excellent | Excellent | Excellent | Excellent | Excellent | Excellent |
| Sale Price | | $113,080,000 | $78,300,000 | $101,350,000 | $97,350,000 | $130,442,500 |
| **Price Per SF:** | | **$745** | **$757** | **$927** | **$711** | **$698** |
| Property Rights | Leased Fee Interest | 0% | 0% | 0% | 0% | 0% |
| Financing Terms | None | 0% | 0% | 0% | 0% | 0% |
| Conditions of Sale | None | 0% | 0% | 0% | 0% | 0% |
| Market Conditions (Time): | June 30, 2022 | 0% | 0% | 0% | -5% | -5% |
| **Trended Price Per SF:** | | **$745** | **$757** | **$927** | **$676** | **$663** |
| Location | Williamsburg | 0% | 10% | -5% | 5% | 0% |
| Utility | N/A | 0% | 0% | -5% | 0% | 0% |
| Size | 92,025 | 10% | 0% | 0% | 5% | 10% |
| Rent Stabilization Level | 0% | 5% | 5% | 5% | 5% | 5% |
| Condition | Excellent | 0% | 0% | 0% | 0% | 0% |
| **Net Adjustments** | | **15%** | **15%** | **-5%** | **15%** | **15%** |
| **Adjusted Price Per SF** | | **$857** | **$871** | **$881** | **$777** | **$763** |

| Unadjusted | | | Adjusted | |
|---|---|---|---|---|
| Low | $698 | | Low | $763 |
| High | $927 | | High | $881 |
| Average | $768 | | Average | $830 |
| Median | $745 | | Median | $857 |

| | |
|---|---|
| **Property Rights Appraised** | The purpose of this adjustment is to account for differences in the property rights transferred with the sale. We are valuing the leased fee interest in the subject property, as reflected by all of the comparables. Thus, no adjustments were required. |
| **Financing Terms** | The purpose of adjusting for financing terms is to determine cash equivalent sale prices for the comparables in accordance with the definition of market value for this report. To the best of our knowledge, all of the comparables used in this analysis were accomplished with cash or market-oriented financing. Therefore, no adjustments were required. |
| **Conditions of Sale** | Condition of sale refers to the motivations of the buyer and seller involved in a particular transaction. However, all comparables used in this analysis are considered to be "arm's-length" market transactions between both knowledgeable buyers and sellers on the open market. Therefore, no adjustments were required. |
| **Market Conditions (Time)** | The purpose of this adjustment is to account for changes in market conditions. Comparables 4 and 5 received minor adjustments to account for moderate market depreciation as they transacted prior to the pandemic. |
| **Location** | The subject property is located in the Williamsburg neighborhood of Brooklyn, New York.<br><br>Comparables 2 and 4 are located in Park Slope and Crown Heights, which are inferior neighborhoods by median property value and distance to Manhattan. Thus, they required upward adjustments of 10% and 5%, respectively. Comparable 3 is located in Downtown Brooklyn, which is a superior neighborhood, and thus required a 5% downward adjustment. |
| **Utility** | The subject is a multifamily, through lot, elevatored building. It features excellent quality apartment finishes. The subject property features the following amenities: parking.<br><br>We have considered corner vs. mid-block location, unit and property finishes, walk-up vs. elevator, unit and building amenities, and commercial space within the scope of the utility adjustment. Comparable 2 is a taller building with superior height and views, and amenities. Thus, it required a -5% adjustment. |
| **Size** | This adjustment accounts for the difference in size between each of the comparables and the subject property. We note that there is an inverse relationship between size and per square foot such that smaller buildings will sell for a higher price per square foot and vice versa. Comparables 1, 4 and 5 warranted upward adjustments as they are significantly larger than the subject. |
| **Rent Stabilization Level** | The subject is not rent stabilized. All of the comparable sales are rent stabilized under their 421a tax benefits. However, given that they are new construction their rents are typically near market levels. Nonetheless we apply a 5% upward adjustment to each of the comparables to account for their higher rent stabilization levels. |
| **Condition** | The subject property was constructed in 1900 and is in excellent condition. The comparables sold in similar condition to the subject, and no adjustment was warranted. |

After adjustments, the comparable sales exhibited a range between $762.98 per square foot and $880.50 per square foot with an average of $829.60 per square foot and a median of $856.86 per square foot. We emphasize comparables 1 and 2, which are the two most recent sales, in making our value conclusion. Additionally, comparable 1 has a highly similar location to the subject. Its adjusted sale price per square foot is $857. Comparable 2 is very similar in size and has an adjusted sale price per square foot of $871. Thus, considering the elements of comparison

noted above and the measures of central tendency, we conclude towards the average adjusted price of comparables 1 and 2. Our opinion of market value is $865.00 per square foot. We make the same deductions as in the Income Approach. The adjustments are shown on the following page.

### Fair Value Conclusion via the Sales Comparison Approach

| | Date of Value | Value | Final Value (RD) |
|---|---|---|---|
| Concluded Value Per Square Foot | | $865.00 | - |
| Square Footage | | 92,025 | - |
| Indicated Value As Stabilized | | $79,601,625 | - |
| **Prospective Fair Value As Stabilized** | **June 30, 2022** | **$79,601,625** | **$79,600,000** |
| Residential Rent Loss (6 months leasing, 1 month commission) | | ($844,132) | - |
| **As Is Fair Value Via the Sales Comparison Approach** | **December 31, 2021** | **$78,757,493** | **$78,800,000** |

The final values are rounded to the nearest $100,000.

# Reconciliation & Final Value

The estimated values arrived at by the approaches to value used in this report are as follows:

### Estimated Values

| Approach | Value | Date | Conclusion |
|---|---|---|---|
| Cost Approach | N/A | N/A | Not Applied |
| Income Approach | Prospective Fair Value As Stabilized | June 30, 2022 | $84,400,000 |
| Income Approach | Fair Value As Is | December 31, 2021 | $83,500,000 |
| Sales Approach | Prospective Fair Value As Stabilized | June 30, 2022 | $79,600,000 |
| Sales Approach | Fair Value As Is | December 31, 2021 | $78,800,000 |

The Cost Approach is traditionally a good indicator of value when properties being appraised are new or close to new. The difficulty in credibly isolating the influence of physical and economic depreciation on value affects the reliability of this approach. Investors typically give nominal weight to this analysis if the asset is operating on a stabilized basis and its cost bears little relationship to the value. 163 North 6th Street & 180-198 North 7th Street was constructed in 1900 and has notable physical and economic depreciation, therefore we chose not to use this approach.

The Income Approach is a strong indicator of value when market rents, vacancy rates, stabilized expenses, capitalization/discount rates are based on reliable market data. In this case, given the depth of the market, there are numerous transactions from which to glean points of analysis, lending credibility to the results of the approach. Multifamily and mixed-use assets are generally acquired for their capacity to generate a return on and of capital, which is why this is the methodology primarily applied by investors. Balancing these two factors, most weight is placed on the opinion developed by the Income Approach.

The Sales Comparison Approach is reliable when few differences exist between the comparable sales and the subject, and the sales data collected is credible and accurate. Similar property types in competitive locations tend to sell within a consistent range, and this factor makes valuation on a per square foot and per unit basis a strong predictor of value. The Sales Comparison Approach is largely used as a secondary support for our opinion developed in the application of the Income Approach.

### Final Value Conclusion

| Value | Date | Interest Appraised | Conclusion |
|---|---|---|---|
| Prospective Fair Value As Stabilized | June 30, 2022 | Leased Fee Interest | $84,400,000 |
| Fair Value As Is | December 31, 2021 | Leased Fee Interest | $83,500,000 |

The value conclusions are subject to the following **Extraordinary Assumptions**[10] that may affect the assignment results. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions:

- None.

The value conclusions are based on the following **Hypothetical Conditions**[11] that may affect the assignment results:

- None.

---

[10] The definition of Extraordinary Assumptions can be found in the Glossary of Terms, which is located in the Addenda.

[11] The definition of Hypothetical Conditions can be found in the Glossary of Terms, which is located in the Addenda.

# Certification

We certify to the best of our knowledge:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- We previously appraised this property in December 2020.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standard of Professional Practice of the Appraisal Institute, the Uniform Standards of Professional Appraisal Practice, and applicable state appraisal regulations.

- Pat Ippolito has made a personal inspection of the property that is the subject of this report on 12/08/21. Michelle Zell and Kevin Walsh have made personal inspections of the property for prior reports. Steven Wang has not made a personal inspection of the property that is the subject of this report.

- Pat Ippolito provided significant real property appraisal assistance to the person signing this certification by performing the property inspection.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.

- As of the date of this report, Michelle Zell, MAI and Kevin Walsh, MAI have completed the continuing education program for Designated Members of the Appraisal Institute.

- We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

Michelle Zell, MAI
Senior Vice President
Certified General Real Estate Appraiser
NY License No. 46-49921
michelle.zell@boweryvaluation.com
(917) 533-3141

Kevin Walsh, MAI
Vice President
Certified General Real Estate Appraiser
NY License No. 46-52078
kevin.walsh@boweryvaluation.com
(917) 304-4889

Steven Wang
Valuation Associate
steven.wang@boweryvaluation.com
(857) 332-1336

# Addenda

## Contingent & Limiting Conditions

1.  Any legal description or plats reported herein are assumed to be accurate. Any sketches, surveys, plats, photographs, drawings, or other exhibits are included only to assist the intended user to better understand and visualize the subject property, the environs, and the competitive data. We have made no survey of the property and assume no responsibility in connection with such matters.

2.  The appraiser has not conducted any engineering or architectural surveys in connection with this appraisal assignment. Information reported pertaining to dimensions, sizes, and areas is either based on measurements taken by the appraiser or the appraiser's staff or was obtained or taken from referenced sources and is considered reliable. No responsibility is assumed for the costs of preparation or for arranging geotechnical engineering, architectural, or other types of studies, surveys, or inspections that require the expertise of a qualified professional.

3.  No responsibility is assumed for matters legal in nature. Title is assumed to be good and marketable and in fee simple unless otherwise stated in the report. The property is considered to be free and clear of existing liens, easements, restrictions, and encumbrances, except as stated.

4.  Unless otherwise stated herein, it is assumed there are no encroachments or violations of any zoning or other regulations affecting the subject property and the utilization of the land and improvements is within the boundaries or property lines of the property described and that there are no trespasses or encroachments.

5.  Bowery Real Estate Systems, Inc. assumes there are no private deed restrictions affecting the property which would limit the use of the subject property in any way.

6.  It is assumed the subject property is not adversely affected by the potential of floods; unless otherwise stated herein.

7.  It is assumed all water and sewer facilities (existing and proposed) are or will be in good working order and are or will be of sufficient size to adequately serve any proposed buildings.

8.  Unless otherwise stated within the report, the depiction of the physical condition of the improvements described herein is based on visual inspection. No liability is assumed for the soundness of structural members since no engineering tests were conducted. No liability is assumed for the condition of mechanical equipment, plumbing, or electrical components, as complete tests were not made. No responsibility is assumed for hidden, unapparent, or masked property conditions or characteristics that were not clearly apparent during our inspection.

9.  If building improvements are present on the site, no significant evidence of termite damage or infestation was observed during our physical inspection, unless so stated in the report. No termite inspection report was available, unless so stated in the report. No responsibility is assumed for hidden damages or infestation.

10. Any proposed or incomplete improvements included in this report are assumed to be satisfactorily completed in a workmanlike manner or will be thus completed within a reasonable length of time according to plans and specifications submitted.

11. No responsibility is assumed for hidden defects or for conformity to specific governmental requirements, such as fire, building, safety, earthquake, or occupancy codes, except where specific professional or governmental inspections have been completed and reported in the appraisal report.

12. Responsible ownership and competent property management are assumed.

13. The appraisers assume no responsibility for any changes in economic or physical conditions which occur following the effective date of value within this report that would influence or potentially affect the analyses, opinions, or conclusions in the report. Any subsequent changes are beyond the scope of the report.

14. The value estimates reported herein apply to the entire property. Any proration or division of the total into fractional interests will invalidate the value estimates, unless such proration or division of interests is set forth in the report.

15. Any division of the land and improvement values estimated herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application.

16. Unless otherwise stated in the report, only the real property is considered, so no consideration is given to the value of personal property or equipment located on the premises or the costs of moving or relocating such personal property or equipment.

17. Unless otherwise stated, it is assumed that there are no subsurface oil, gas or other mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Nor are the rights associated with extraction or exploration of such elements considered; unless otherwise stated. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

18. Any projections of income and expenses, including the reversion at time of resale, are not predictions of the future. Rather, they are our best estimate of current market thinking of what future trends will be. No warranty or representation is made that these projections will materialize. The real estate market is constantly fluctuating and changing. It is not the task of an appraiser to estimate the conditions of a future real estate market, but rather to reflect what the investment community envisions for the future in terms of expectations of growth in rental rates, expenses, and supply and demand. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

19. Unless subsoil opinions based upon engineering core borings were furnished, it is assumed there are no subsoil defects present, which would impair development of the land to its maximum permitted use or would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

20. Bowery Real Estate Systems, Inc. representatives are not experts in determining the presence or absence of hazardous substances, defined as all hazardous or toxic materials, wastes, pollutants or contaminants (including, but not limited to, asbestos, PCB, UFFI, or other raw materials or chemicals) used in construction or otherwise present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such substances or for loss as a result of the presence of such substances. Appraisers are not qualified to detect such substances. The client is urged to retain an expert in this field.

21. We are not experts in determining the habitat for protected or endangered species, including, but not limited to, animal or plant life (such as bald eagles, gophers, tortoises, etc.) that may be present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such species or for loss as a result of the presence of such species. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent endangered species impact studies, research, and investigation that may be provided.

22. No environmental impact studies were either requested or made in conjunction with this analysis. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental impact studies, research, and investigation that may be provided.

23. The appraisal is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the report; further, that all applicable

zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

24.  Neither all nor any part of the contents of this report or copy thereof, shall be conveyed to the public through advertising, public relations, news, sales, or any other media, without the prior written consent and approval of the appraisers. This limitation pertains to any valuation conclusions, the identity of the analyst or the firm and any reference to the professional organization of which the appraiser is affiliated or to the designations thereof.

25.  Although the appraiser has made, insofar as is practical, every effort to verify as factual and true all information and data set forth in this report, no responsibility is assumed for the accuracy of any information furnished the appraiser either by the client or others. If for any reason, future investigations should prove any data to be in substantial variance with that presented in this report, the appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or estimates of value.

26.  If this report has been prepared in a so-called "public non-disclosure" state, real estate sales prices and other data, such as rents, prices, and financing, are not a matter of public record. If this is such a "non-disclosure" state, although extensive effort has been expended to verify pertinent data with buyers, sellers, brokers, lenders, lessors, lessees, and other sources considered reliable, it has not always been possible to independently verify all significant facts. In these instances, the appraiser may have relied on verification obtained and reported by appraisers outside of our office. Also, as necessary, assumptions and adjustments have been made based on comparisons and analyses using data in the report and on interviews with market participants. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

# Subject Property Photos

All subject photos were taken on the date of value of this appraisal.

Building Facade

Building Facade





Subject Street

Subject Street





Exterior Entrance

Exterior Entrance





Addenda

Typical Stairway



Typical Hallway



Typical Hallway



Typical Kitchen



Typical Kitchen



Typical Kitchen



Addenda

Typical Bathroom

Typical Bathroom





Typical Bathroom

Typical Bedroom





Typical Bedroom

Typical Living Room





Typical Living Room



Electric Meters



Gas Meters



Cooling System



Cooling System



Cooling System



Addenda

Hot Water System

Hot Water System




Roof

Roof




Basement

Basement




Addenda

Outdoor Space



Outdoor Space



Parking



Parking



## Map Gallery

### Zoning Map



Addenda

## Flood Map



# Rent Roll & Financial Statements

**North Flats**

**Profit & Loss**

**January through September 2021**

1:50 PM

10/07/2021

Accrual Basis

| | Jan - Sep 21 |
|---|---|
| Ordinary Income/Expense | |
| Income | |
| Rental Income | 1,914,113.97 |
| Total Income | 1,914,113.97 |
| Gross Profit | 1,914,113.97 |
| Expense | |
| Operating Expenses | |
| Utilities | 10,260.33 |
| Misc | 3,791.30 |
| Maintenance | 38,529.96 |
| Telephone | 1,737.34 |
| Total Operating Expenses | 54,318.93 |
| Insurance | 129,922.88 |
| Interest Expense | 1,759,563.89 |
| Postage and Delivery | 37.75 |
| 66700 · Professional Fees | 158,077.54 |
| Real Estate Taxes | 790,154.71 |
| Total Expenses | 2,837,756.77 |
| Total Expense | 2,892,075.70 |
| Net Ordinary Income | -977,961.73 |
| Net Income | -977,961.73 |

**Page 1 of 1**

# Rent Roll Analysis

### Property: North Flats LLC
*As of 01/15/22*

| Tenant Name | Unit | Unit Type | Lease Start | Lease End | # Bed | Rent | Preferential | Security Deposit |
|---|---|---|---|---|---|---|---|---|
| **North Flats LLC** | | | | | | | | |
| Panico, Lauren | 101 | DS | 1/1/22 | 2/28/23 | 0 | 5,100.00 | 5,100.00 | 5,100.00 |
| Demarais, Michael | 102 | DS | 1/1/22 | 2/28/23 | 0 | 5,100.00 | 5,100.00 | 3,825.00 |
| Abrams, Timothy | 103 | DS | 1/1/22 | 3/31/23 | 0 | 5,150.00 | 5,150.00 | 5,150.00 |
| Rodriguez, Yannell | 104 | DS | 1/1/22 | 2/28/23 | 0 | 4,500.00 | 4,500.00 | 4,500.00 |
| Davis, Ryan | 105 | DS | 12/15/21 | 6/30/23 | 0 | 4,600.00 | 4,600.00 | 4,600.00 |
| Kent, Lisa | 107 | DS | 12/1/21 | 5/31/23 | 0 | 5,000.00 | 5,000.00 | 5,000.00 |
| Shobande, Oluwaseun | 108 | DS | 1/15/22 | 3/31/23 | 0 | 4,500.00 | 4,500.00 | 0.00 |
| Gorog, Henry | 109 | DS | 12/1/21 | 1/31/23 | 0 | 4,750.00 | 4,750.00 | 4,750.00 |
| Shuster, Jacob | 110 | DS | 1/1/22 | 2/28/23 | 0 | 4,650.00 | 4,650.00 | 4,650.00 |
| <VACANT> | 111 | DS | | | 0 | 0.00 | 0.00 | 0.00 |
| Lenihan, Patrick | 201 | DS | 11/5/21 | 4/30/23 | 0 | 4,200.00 | 4,200.00 | 4,200.00 |
| O'Brien, Cathal | 202 | DS | 12/1/21 | 1/31/23 | 0 | 4,000.00 | 4,000.00 | 4,000.00 |
| Bajj, Daniel | 203 | DS | 1/1/22 | 6/30/23 | 0 | 4,350.00 | 4,350.00 | 4,350.00 |
| Tarnas, Casey | 204 | DS | 10/20/21 | 4/30/23 | 0 | 4,700.00 | 4,700.00 | 4,700.00 |
| Pinedo Basanez, Pablo | 205 | DS | 10/29/21 | 4/30/23 | 0 | 5,700.00 | 5,700.00 | 5,700.00 |
| PATEL, APURVA | 206 | DS | 11/1/21 | 4/30/23 | 0 | 4,600.00 | 4,600.00 | 4,600.00 |
| Lynch, Krista | 207 | DS | 10/20/21 | 4/30/23 | 0 | 4,850.00 | 4,850.00 | 4,850.00 |
| Mcgrew, Isabelle | 208 | DS | 11/1/21 | 4/30/23 | 0 | 4,350.00 | 4,350.00 | 0.00 |
| Baldwin, Thomas | 208 | DS | 12/18/21 | 2/28/23 | 0 | 4,350.00 | 4,350.00 | 4,350.00 |
| Torres Llorca, Dimas | 209 | DS | 11/15/21 | 5/31/23 | 0 | 4,350.00 | 4,350.00 | 4,350.00 |
| Barrera, Jesus | 210 | DS | 12/15/21 | 6/30/23 | 0 | 4,225.00 | 4,225.00 | 4,225.00 |
| Cullina, Joseph | 211 | DS | 11/15/21 | 5/31/23 | 0 | 4,800.00 | 4,800.00 | 4,800.00 |
| Renard, Max | 301 | DS | 11/1/21 | 4/30/23 | 0 | 4,850.00 | 4,850.00 | 4,850.00 |
| Liss, Daniel | 302 | DS | 1/1/22 | 2/28/23 | 0 | 4,025.00 | 4,025.00 | 4,025.00 |
| Theodoredis, Amalia | 303 | DS | 12/15/21 | 2/28/23 | 0 | 4,300.00 | 4,300.00 | 4,300.00 |
| Weiss, Veronica | 304 | DS | 10/15/21 | 4/30/23 | 0 | 4,500.00 | 4,500.00 | 4,500.00 |
| Richter, Samuel | 305 | DS | 10/15/21 | 6/30/23 | 0 | 4,600.00 | 4,600.00 | 4,600.00 |
| Guleria, Navneet | 306 | DS | 10/20/21 | 4/30/23 | 0 | 4,000.00 | 4,000.00 | 4,000.00 |
| Firestone, Lacey | 307 | DS | 11/1/21 | 4/30/23 | 0 | 4,850.00 | 4,850.00 | 4,850.00 |
| Cowley, Olivia | 308 | DS | 11/7/21 | 5/31/23 | 0 | 4,250.00 | 4,250.00 | 4,250.00 |
| Nieto, Thomas | 309 | DS | 10/15/21 | 4/30/23 | 0 | 4,300.00 | 4,300.00 | 4,300.00 |
| Plancon, Carole | 310 | DS | 11/15/21 | 5/31/23 | 0 | 4,250.00 | 4,250.00 | 4,250.00 |
| Goldman, Matthew | 311 | DS | 10/15/21 | 4/30/23 | 0 | 4,800.00 | 4,800.00 | 4,800.00 |
| Aidaoui, Jessica | 401 | DS | 11/1/21 | 4/30/23 | 0 | 4,900.00 | 4,900.00 | 4,900.00 |
| Cohen, Jeffrey | 402 | DS | 12/15/21 | 6/30/23 | 0 | 4,050.00 | 4,050.00 | 4,050.00 |
| Andrew, Luke | 403 | DS | 11/15/21 | 5/31/23 | 0 | 4,175.00 | 4,175.00 | 4,175.00 |
| Evnin, Alexandra | 404 | DS | 10/15/21 | 4/30/23 | 0 | 4,200.00 | 4,200.00 | 4,200.00 |
| Banchetti, Alberto | 405 | DS | 11/1/21 | 4/30/23 | 0 | 4,350.00 | 4,350.00 | 4,350.00 |
| Lichtenstein, Ryan | 406 | DS | 10/20/21 | 4/30/23 | 0 | 4,000.00 | 4,000.00 | 4,000.00 |
| Morales  guar, Luis | 407 | DS | 10/29/21 | 4/30/23 | 0 | 4,900.00 | 4,900.00 | 4,900.00 |
| Meadow, Alex | 408 | DS | 11/1/21 | 4/30/23 | 0 | 4,300.00 | 4,300.00 | 4,300.00 |
| Redford, Bianca | 409 | DS | 10/15/21 | 4/30/23 | 0 | 4,300.00 | 4,300.00 | 4,300.00 |
| Chan, Jonathan | 410 | DS | 10/23/21 | 4/30/23 | 0 | 4,300.00 | 4,300.00 | 4,300.00 |
| Sirqueira Silva, Karina | 411 | DS | 10/28/21 | 4/30/23 | 0 | 4,850.00 | 4,850.00 | 4,850.00 |
| McMillen, Thomas | 501 | DS | 10/15/21 | 4/30/23 | 0 | 4,950.00 | 4,950.00 | 4,950.00 |
| Rothe, Ingrid | 502 | DS | 1/1/22 | 2/28/23 | 0 | 4,075.00 | 4,075.00 | 4,075.00 |
| Portokalidis, Georgios | 503 | DS | 10/23/21 | 4/30/23 | 0 | 4,200.00 | 4,200.00 | 4,200.00 |
| Himmelstrup, Kasper | 504 | DS | 10/15/21 | 4/30/23 | 1 | 4,300.00 | 4,300.00 | 4,300.00 |
| Suarez, Thomas | 505 | DS | 10/20/21 | 4/30/23 | 0 | 4,350.00 | 4,350.00 | 4,350.00 |
| Swartz, Charles | 506 | DS | 10/1/21 | 3/31/23 | 0 | 4,000.00 | 4,000.00 | 4,000.00 |
| Richless, Andrew | 507 | DS | 10/1/21 | 5/31/23 | 0 | 6,000.00 | 6,000.00 | 6,000.00 |
| Masiello, Robert | 508 | DS | 11/10/21 | 5/31/23 | 0 | 4,750.00 | 4,750.00 | 4,750.00 |
| O'Hare, Shannon | 509 | DS | 11/13/21 | 5/31/23 | 1 | 4,300.00 | 4,300.00 | 4,300.00 |
| Bratches, Jack | 510 | DS | 10/1/21 | 9/30/22 | 0 | 4,900.00 | 4,900.00 | 4,900.00 |

Rent Roll Analysis    12/29/21 2:09 PM                    Page 1 of 2              rentmanager.com - property management systems  rev.12.760

| Tenant Name | Unit | Unit Type | Lease Start | Lease End | # Bed | Rent | Preferential | Security Deposit |
|---|---|---|---|---|---|---|---|---|
| **Totals for North Flats LLC** | | | | | | 240,700.00 | 240,700.00 | 230,575.00 |

| | | | Rent | Preferential | Security Deposit |
|---|---|---|---|---|---|
| | | | 240,700.00 | 240,700.00 | 230,575.00 |

## Report Summary

| Detail | Value |
|---|---|
| Total Possible Rent | 240,700.00 |
| Vacancy Rent | 0.00 |
| Occupied Unit Rent | 240,700.00 |
| # of Units | 53 |
| Vacant Units | 1 |
| Occupancy | 98.11% |

## New York: Multifamily Market Analysis

The information contained in this report was provided using 2021 Q3 CoStar data for the New York - NY Multifamily Market ("Market").



### Overview

The New York apartment market experienced a steep drop in renter demand last year as the pandemic caused residents to exit New York City. Absorption totals in 2020 were in negative territory for the first time in recorded history, concessions became widespread as vacancies soared throughout the metro, and widespread uncertainty resulted in investors largely staying on the sidelines last year.

But the recovery is now well underway at the end of 2021 Q3. Renter demand has rebounded impressively due to a mixture of enticing concessions, the return of in-person learning, and the lifting of all business restrictions. Helping matters is the fact that New Yorkers who left the area, did not stray far, often going to more suburban parts of the metro in New Jersey and Westchester County.

Despite the completion of more than 25,000 new units since the start of 2020, the influx of demand helped vacancies reach its prepandemic average. More than 58,000 units are under construction at the start of 2021 Q4 as projects continue to break ground quarter-over-quarter.

With renter demand blunted in 2020, asking rents were lowered throughout much of the metro, while the number of properties offering concessions had risen sharply as owners aimed to entice tenants. But with demand rebounding in recent quarters, year-over-year rental growth has been witnessed across most submarkets in 2021 Q3, with popular neighborhoods in Brooklyn and Manhattan accounting for the largest annual gains. Concessions remain part of the equation but have grown less common as building occupancies have notably improved.

A much weakened, but still expensive market is not exactly one that lends itself to a lot of deal flow and the delta between buyers and sellers in New York remains wide as a result. Only $5 billion has traded hands in 2020,

representing the lowest total since the tail-end of the Great Recession in 2010. This decline in deal-flow has continued thus far in 2021, but perhaps New York's swift recovery will lure investors off the sidelines.

### Sector Fundamentals

| | New York | YoY | QoQ | National | YoY | QoQ |
|---|---|---|---|---|---|---|
| Market Rent/Unit | $2,813 | 5.2% | 1.7% | $1,517 | 11.6% | 3.3% |
| Vacancy Rate | 2.52% | -126 bps | -45 bps | 4.54% | -212 bps | -58 bps |
| Net Absorption Units | 9,776 | 1467.3% | -11.9% | 187,579 | 48.4% | -27.9% |
| Asset Value/Unit | $416,369 | 3.6% | 1.0% | $228,510 | 9.7% | 2.8% |
| Market Cap Rate | 4.4% | 7 bps | 2 bps | 5.3% | -8 bps | -2 bps |
| Transaction Count | 243 | 9% | -33% | 5,074 | 27% | -11% |
| Sales Volume | $1,569,945,088 | 58% | -13% | $48,626,847,744 | 116% | 5% |

Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for multifamily space in the Market are presented in the ensuing table.

### Historical Multifamily Performance: New York Market

| Period | Inventory Units | Under Construction Units | Net Delivered Units 12 Mo | Absorption Units 12 Mo | Vacancy Rate | Market Effective Rent/Unit |
|---|---|---|---|---|---|---|
| 2021 Q3 | 1,433,792 | 59,013 | 16,126 | 33,879 | 2.5% | $2,813 |
| 2021 Q2 | 1,430,467 | 58,267 | 16,766 | 23,388 | 3.0% | $2,766 |
| 2020 | 1,420,767 | 61,064 | 15,199 | 1,650 | 3.7% | $2,666 |
| 2019 | 1,405,568 | 54,815 | 19,489 | 18,132 | 2.8% | $2,747 |
| 2018 | 1,386,079 | 47,190 | 22,533 | 26,972 | 2.7% | $2,702 |
| 2017 | 1,363,546 | 48,229 | 27,627 | 24,188 | 3.1% | $2,646 |
| 2016 | 1,335,916 | 55,740 | 15,601 | 20,249 | 2.9% | $2,622 |
| 2015 | 1,320,312 | 53,210 | 14,573 | 12,205 | 3.2% | $2,585 |
| 2014 | 1,305,739 | 39,990 | 11,435 | 11,862 | 3.1% | $2,507 |
| 2013 | 1,294,304 | 25,741 | 9,504 | 11,333 | 3.2% | $2,442 |
| 2012 | 1,284,800 | 19,335 | 6,666 | 9,245 | 3.3% | $2,399 |
| 2011 | 1,278,134 | 14,272 | 7,015 | 7,212 | 3.5% | $2,363 |

## Supply & Demand

Robust renter demand typically defined the New York metro as vacancies have historically remained low despite the notable number of new units coming to market over the past decade. But the pandemic caused New York's apartment market to swiftly reverse course last year as high unemployment, an urban exodus, and the continued completion of thousands of units resulted in the metro recording negative annual absorption for the first time in history. But the metro has swiftly recovered at the end of 2021 Q3 as widespread concessions, continued hiring, and the reopening of New York City have fueled renter demand in the new year. Vacancies are now at their prepandemic rate, even in expensive submarkets located near office nodes in Manhattan and Brooklyn even though companies continue to operate remotely.

### Vacancy Rates

|          | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Q2   | Q3   |
|----------|------|------|------|------|------|------|------|------|------|------|------|------|
| National | 6.7% | 6.2% | 6.1% | 6.2% | 6.1% | 6.5% | 6.7% | 6.4% | 6.5% | 6.7% | 5.1% | 4.5% |
| Market   | 3.5% | 3.3% | 3.2% | 3.1% | 3.2% | 2.9% | 3.1% | 2.7% | 2.8% | 3.7% | 3.0% | 2.5% |
| Class A  | 6.0% | 5.0% | 6.1% | 6.8% | 9.2% | 6.5% | 8.0% | 5.9% | 5.8% | 8.4% | 7.1% | 7.1% |
| Class B  | 3.6% | 3.5% | 3.2% | 3.2% | 3.2% | 3.0% | 3.1% | 2.8% | 3.1% | 3.9% | 3.6% | 3.0% |
| Class C  | 3.2% | 3.0% | 2.8% | 2.6% | 2.5% | 2.3% | 2.2% | 2.1% | 2.0% | 2.6% | 2.3% | 2.0% |

The more suburban parts of the metro have fared better as these areas do not face the same issues that are initially weakened their urban counterparts, with submarkets in Westchester County and suburban New Jersey witnessing declines in vacancy since last year. Looking ahead, vacancies are projected to remain stable as more than 55,000 units remain under construction. And while demand levels have impressed in recent quarters, the base case forecast projects that demand will keep pace with supply.



### Rents

Rent growth continued to remain positive heading into 2020 as robust renter demand fueled positive absorption totals. But the pandemic resulted in rents quickly moving in the opposite direction as renter demand was negatively impacted. With vacancies rising sharply year, annual rental growth remained in negative territory from 2020 Q2 to 2021 Q1. The submarkets witnessing the steepest declines were primarily located in Manhattan and Brooklyn; expensive areas that attract renters due to their proximity to office nodes. But with absorption levels rebounding in 2021, year-over-year rental growth has risen sharply in 2021 Q4. While locales in Westchester County and suburban New Jersey continue to witness annual rent growth at an average of about 3%, more popular neighborhoods in Manhattan and Brooklyn have experienced the largest rent gains. And while the number of buildings offering concessions, such as multiple months of free rent, increased dramatically last year, the practice has grown less common as building occupancies have notably improved metrowide. Recently delivered buildings should continue to advertise concessions in an attempt to quickly stabilize occupancies, though they will likely be far less enticing compared to last year.

### Market Rents

|         | 2011   | 2012   | 2013   | 2014   | 2015   | 2016   | 2017   | 2018   | 2019   | 2020   | Q2     | Q3     |
|---------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| National | $1,091 | $1,114 | $1,142 | $1,172 | $1,223 | $1,251 | $1,280 | $1,321 | $1,365 | $1,363 | $1,469 | $1,517 |
| Market   | $2,363 | $2,399 | $2,442 | $2,507 | $2,585 | $2,622 | $2,646 | $2,702 | $2,747 | $2,666 | $2,766 | $2,813 |
| Class A  | $3,161 | $3,220 | $3,286 | $3,392 | $3,480 | $3,505 | $3,521 | $3,608 | $3,680 | $3,458 | $3,518 | $3,676 |
| Class B  | $2,528 | $2,568 | $2,615 | $2,685 | $2,779 | $2,821 | $2,848 | $2,907 | $2,953 | $2,882 | $2,928 | $2,982 |
| Class C  | $1,695 | $1,711 | $1,738 | $1,771 | $1,826 | $1,869 | $1,895 | $1,928 | $1,956 | $1,956 | $1,965 | $1,980 |



Market Effective Rent/Unit - Annual & Quarterly Growth

## Construction & Future Supply

Throughout the past cycle, developers have remained active in the New York metro; attracted by the market's healthy fundamentals and robust renter demand. More than 57,000 units were under construction at the start of 2020 in what was projected to be a year where the multifamily market maintained its momentum. Despite the issues brought on by the pandemic, developers have remained busy as more than 21,000 new units broke ground in 2020. But it should be noted that only 11,000 units have entered the pipeline at the start of 21Q4, putting the metro on track for the lowest number of annual construction starts since 2013.

At the end of 2021 Q3, more than 55,000 units were under construction. Development is widespread but a significant number of units are located in Brooklyn, Long Island City, and Jersey City; areas where a supply wave has been ongoing for more than five years. And as demand has started to trickle out to the more suburban nodes of the metro, development activity has followed. More than 3,000 units are under construction in Greater Hudson County, where development has been clustered around the PATH station in Harrison and more than 3,400 units are underway in the Yonkers/New Rochelle area in Westchester County.  With renter demand negatively impacted last year, owners of newer properties have adjusted their leasing timelines, and many have offered generous concession packages to spur demand as the supply pipeline in New York City remains bloated. Recently delivered Class A & B buildings have been quite aggressive in their offering in order to quickly fill occupancies.

## Under Construction Units - Share of Inventory



## Capital Markets

Entering 2020, sales volume had topped $9 billion annually for seven consecutive years as investors remained attracted to the robust renter demand, low vacancy rates, and continued rental growth that has defined the New York multifamily market. During this span, pricing has continued to trend upward while cap rates remained low. But with renter demand blunted since 20Q1, investment volume sharply declined in 2020 with only $5 billion trading hands, the lowest total since 2010. Limited investment activity has continued into 2021, although perhaps New York's swift recovery will lure investors back in the near future. Some of the more notable deals took place outside of New York City in suburban communities. In 20Q2, Ginsburg Development Companies acquired the 74-unit Stratus on the Hudson in Yonkers from RMS Companies for $39.5 million. Again in 20Q2, Autumn Drive LLC acquired the 216-unit Cascades at Tinton Falls from AvalonBay Communities for $64.9 million. AvalonBay was active again in 2021 Q3, selling the 110-unit Village at Bronxville to Goldman Sachs for $89 million. Considering all the difficulties facing dense neighborhoods in New York City, suburban submarkets have served as a haven for investment capital.



Weakness in the market was apparent in sales that occurred later in 2020. In Brooklyn, American Realty Advisors sold its 62-unit property at 111 Kent Street for $45 million. The luxury rental building is located in Williamsburg, and the sale price reflects an $11 million loss for ARA who purchased the property in 2012. But not all recent trades are being discounted. An example of this was the 2021 Q1 purchase of the Brownstones at Englewood by Rockwood Capital for $140 million. The reported cap rate of 4% is likely due to the New Jersey building's relatively high occupancy of 94% during this time. Additionally, the pricing per unit was high compared to buildings within the submarket that have traded hands over the past two years.



## Outlook

Strong economic growth and a drastically improving public health situation helped boost multifamily fundamentals over the first three quarters of 2021. With demand and rent growth indicators surging, investors have regained

confidence in the sector, and sales volume has returned to more normal levels over the past few quarters. Still, a few headwinds exist that could put upward pressure on vacancies over the next few quarters. The Market still faces a robust near-term supply pipeline, and those units will deliver amid a potential slowdown in demand due to seasonality, but it is likely that absorption rates will remain above the historical average and new deliveries, lending to continued growth in rents and values.

## Appendix

### New York Multifamily Market Overview

| Submarket | Inventory Units | Vacancy Rate | Under Construction Units | Market Effective Rent/Unit |
|---|---|---|---|---|
| West Bronx | 89,276 | 0.5% | 1,445 | $1,449 |
| Flatbush | 58,474 | 2.0% | 1,197 | $1,936 |
| Upper East Side | 58,184 | 3.1% | 34 | $4,076 |
| South Bronx | 58,088 | 0.8% | 2,373 | $1,509 |
| Upper West Side | 57,314 | 2.4% | 180 | $4,707 |
| Prospect Park | 54,164 | 1.8% | 3,463 | $2,484 |
| Upper Manhattan | 54,129 | 1.2% | 214 | $2,068 |
| Central Queens | 45,192 | 1.0% | 1,594 | $2,010 |
| Harlem | 43,009 | 3.0% | 327 | $2,277 |
| Bushwick | 42,887 | 3.3% | 2,373 | $2,507 |
| Northwestern Queens | 38,328 | 1.3% | 1,710 | $2,080 |
| Southwest Brooklyn | 36,629 | 1.6% | 597 | $1,688 |
| East Village | 33,637 | 1.4% | 44 | $4,105 |
| Williamsburg | 33,379 | 4.7% | 3,290 | $3,736 |
| Midtown West | 32,486 | 2.7% | 40 | $3,945 |
| North Middlesex County | 32,484 | 2.9% | 1,314 | $1,814 |
| Lower West Side | 30,130 | 2.2% | 146 | $4,523 |
| South Shore Brooklyn | 29,537 | 0.8% | 654 | $1,844 |
| Greater Hudson County | 28,117 | 7.1% | 3,371 | $2,095 |
| Yonkers/Mt Vernon/New Rochelle | 27,936 | 2.6% | 3,544 | $2,047 |
| Northeast Queens | 25,700 | 1.2% | 1,126 | $1,894 |
| Southeast Bronx | 25,667 | 0.6% | 147 | $1,532 |
| Southeast Queens | 25,267 | 2.8% | 2,035 | $1,834 |
| Chelsea | 24,272 | 2.6% | 2,348 | $4,518 |
| East Monmouth County | 23,173 | 1.3% | 164 | $1,728 |
| Greater Bergen County | 22,216 | 2.4% | 515 | $1,881 |
| Jersey City Waterfront | 22,041 | 5.1% | 1,855 | $3,257 |
| Downtown Brooklyn | 21,528 | 2.7% | 4,192 | $3,812 |
| Murray Hill/Kips Bay | 19,756 | 3.0% | 125 | $4,194 |
| North Hudson County | 19,652 | 6.1% | 612 | $2,579 |
| Long Island City | 19,419 | 6.8% | 5,420 | $3,089 |

| | | | | |
|---|---|---|---|---|
| East Harlem | 19,165 | 4.9% | 776 | $2,896 |
| Passaic County | 18,454 | 1.5% | 683 | $1,659 |
| Jersey City/Journal Square | 17,802 | 8.3% | 2,839 | $2,285 |
| Midtown South | 17,507 | 5.2% | 364 | $4,462 |
| East Bronx | 17,200 | 0.5% | 287 | $1,497 |
| Turnpike West | 16,301 | 2.5% | 0 | $1,834 |
| Financial District | 15,855 | 4.1% | 595 | $4,476 |
| Lower East Side | 14,747 | 3.8% | 486 | $3,792 |
| Midtown East | 14,093 | 2.5% | 257 | $4,140 |
| Hackensack/Teaneck | 13,061 | 3.4% | 1,715 | $1,838 |
| Bergen County Waterfront | 12,996 | 2.9% | 190 | $2,615 |
| Turnpike East | 12,614 | 2.8% | 754 | $1,657 |
| North Ocean County | 10,558 | 1.5% | 472 | $1,536 |
| Hoboken | 9,761 | 3.8% | 43 | $3,664 |
| Northwest Bronx | 9,481 | 0.5% | 224 | $2,380 |
| Staten Island | 8,799 | 1.9% | 155 | $1,719 |
| East New York | 8,741 | 0.6% | 212 | $1,383 |
| Westchester County South | 8,402 | 4.8% | 108 | $2,682 |
| Rockland County | 8,205 | 3.2% | 44 | $2,105 |
| South Shore Queens | 8,105 | 0.7% | 166 | $1,577 |
| Westchester County North | 7,911 | 6.8% | 852 | $2,271 |
| Little Italy/Chinatown | 7,787 | 2.1% | 12 | $3,233 |
| White Plains | 4,981 | 8.0% | 992 | $2,656 |
| Middletown/Goshen | 4,087 | 1.0% | 158 | $1,647 |
| Outlying Orange County | 3,716 | 1.5% | 0 | $1,488 |
| Morningside Heights | 3,684 | 5.1% | 0 | $3,756 |
| Roosevelt Island | 3,115 | 2.1% | 0 | $3,771 |
| West Monmouth County | 2,131 | 0.7% | 0 | $2,063 |
| Newburgh | 1,495 | 1.1% | 0 | $1,726 |
| South Ocean County | 967 | 3.9% | 180 | $1,661 |

# Qualifications

## Michelle Zell, MAI

Senior Vice President

### Experience

Michelle Zell is a Senior Vice President at Bowery Valuation, who joined the firm in October 2019. She has worked in the real estate appraisal industry for 16 years.

Ms. Zell has appraised multi-family, condominium and cooperative apartment buildings, retail properties, office buildings, restaurants, industrial properties, hotels, and vacant land properties in New York, New Jersey, Connecticut, Pennsylvania, Texas, and Florida.  Ms. Zell specializes in managing large portfolios, appraising large scale existing and proposed developments, appraisals for EB-5 financing, market studies, and appraisals for litigation and condemnation proceedings.

Ms. Zell performs and manages appraisals for Israeli bond issuances in excess of $1B, and has extensive experience with the Israeli bond market since 2012.  She specializes in serving a liaison between the appraisers, the audit firms and the Israeli Security Authority.

Significant appraisal assignments include Peter Cooper Village/Stuyvesant Town, a rental apartment complex in New York City with 12,000 units, the condominium conversion of The Apthorp and the Belnord, two large scale prewar landmarked developments in Manhattan,  70 Pine Street, the 1M square foot former AIG headquarters converted to rental apartments, hotel, private club, restaurant and retail space, 701 7th Avenue, a proposed hotel and retail development located in Times Square and valued at $2B, market rent determination for Bell Works- the former Ball Labs in Holmdel, NJ, and multiple large developments for EB-5 financing including The Armature Works in Washington DC (a proposed mixed use retail, apartment and hotel development), 1 Journal Square (a proposed mixed use development in Jersey City),  The Retail at Nassau Coliseum (proposed retail and entertainment complex adjacent to Nassau Coliseum), and Pacific Park (a proposed development of 15 land parcels to be developed with high rise residential, condominium, office and school buildings).

Before joining Bowery, Ms. Zell served as a Senior Appraiser at BBG (formerly Leitner Group) in New York City from 2003 through October 2019.

### Education

| | |
|---|---|
| **Cornell University** | Bachelor of Science |
| **Emory University** | Master of Public Health |

### Certifications & Professional Designations

| | |
|---|---|
| **Appraisal Institute** | MAI, Designated Member |
| | Currently certified by the Appraisal Institute's voluntary program of continuing education for its designated members. |
| **Certified General Real Estate Appraiser** | New York (#46-49921) Florida (#RZ4135) Texas (#TX 1380938G) |

### Publications

Ms. Zell published an article about the mainstreaming of alternative lending in GlobeSt.com, dated August 5, 2019. https://www.globest.com/2019/08/05/the-mainstreaming-of-alternative-lending/

## Kevin Walsh, MAI

Vice President

### Experience

Kevin Walsh is a Vice President at Bowery Valuation who joined the firm in Jan 2020. He has worked in the real estate industry for 17 years and in the appraisal industry for 7 years. Before joining Bowery, Mr. Walsh served as a Senior Appraiser at Aaron Valuation based in New York City.

Kevin's commercial appraisal experience includes valuation of apartment buildings, condominium and cooperative buildings, industrial buildings, schools, office buildings, mixed-use properties, affordable housing, schools, and leasehold interests.  He has extensive experience valuing land and prospective developments in New York City.

Kevin graduated from Washington University in St. Louis with a degree in Business Administration and from New York University with a Masters in Social Work. He is a student in the New York University Schack Institute Real Estate Finance Masters program.

### Education

| New York University | Masters in Real Estate Finance (expected 2023) |
|---|---|
| | Masters in Social Work |
| Washington University | Bachelors of Science in Business Administration and Bachelor of Arts in Japanese Studies |
| Appraisal Institute | Completed required coursework for MAI designation |

### Certifications & Professional Designations

| Appraisal Institute | MAI, Designated Member |
|---|---|
| | Currently certified by the Appraisal Institute's voluntary program of continuing education for its designated members. |
| Certified General Real Estate Appraiser | New York (#46000052078) |

## Steven Wang

Valuation Associate

## Experience

Steven Wang is a Valuation Associate at Bowery Valuation who joined the firm in April 2021. At Bowery Mr. Wang is actively engaged in appraising multifamily and mixed-use properties in New York and New Jersey.

Prior to joining Bowery, Mr. Wang worked as a real estate private equity research intern at Astor Realty Capital, and as a summer associate consultant at Weitzman Associates, a boutique real estate valuation and appraisal firm.

Mr. Wang graduated from Cornell University with a Bachelor of Science degree in Hotel Administration and a minor in Real Estate.

## Education

| | |
|---|---|
| **Cornell University, SC Johnson College of Business** | Dean's List<br>Bachelor of Science with a concentration in Finance and a minor in Real Estate |
| **Appraisal Institute** | Basic Appraisal Principles<br>Basic Appraisal Procedures |

## Certifications & Professional Designations

| | |
|---|---|
| **U.S. Green Building Council** | LEED Green Associate |
| **Smith Travel Research (STR)** | Certification in Hotel Industry Analytics |

## Pat Ippolito

Valuation Specialist

### Experience

Pat Ippolito is a Valuation Specialist at Bowery Valuation who joined the firm in August 2019. He has worked in the real estate appraisal industry for a total of 2 years and has appraised 1-4 family residential properties as well as performing commercial and residential inspections with detailed photos and notes in the Greater New York area Before joining Bowery, Mr. Ippolito was previously employed in business development in the residential and commercial financing sector.

### Education

| | |
|---|---|
| **State University of NY at Buffalo** | Economics Major |
| **Appraisal Institute** | Basic Appraisal Principles |
| | Basic Appraisal Procedures |
| | 2020-2021 National USPAP |
| | Supervisor-Trainee Course for NY |
| | Residential Market Analysis and Highest & Best |
| **Appraisal Trainee** | Pending Trainee Application |

## Licenses

Michelle Zell, State Certified General Appraiser– New York



Kevin Walsh, State Certified General Appraiser– New York



Pat Ippolito



# Glossary of Terms

Unless otherwise noted, The Dictionary of Real Estate Appraisal, 6th edition (Chicago: Appraisal Institute, 2015) is the source of the following definitions.

| | |
|---|---|
| **As Is Market Value** | The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date, according to the Interagency Appraisal and Evaluation Guidelines (Federal Deposit Insurance Corporation: 2010). Note: The use of the "as is" phrase is specific to appraisal regulations pursuant to FIRREA applying to appraisals prepared for regulated lenders in the United States. |
| **Condominium** | A multiunit structure, or a unit within such a structure, with a condominium form of ownership. |
| **Deferred Maintenance** | Items of wear and tear on a property that should be fixed now to protect the value or income-producing ability of the property, such as a broken window, a dead tree, a leak in the roof, or a faulty roof that must be completely replaced. These items are almost always curable. |
| **Depreciation** | A loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvements on the same date. |
| **Direct Capitalization** | A method used to convert an estimate of a single year's net operating income expectancy into an indication of value in one direct step, either by dividing the income estimate by an appropriate rate or by multiplying the income estimate by an appropriate factor. This technique employs capitalization rates and multipliers extracted from sales. Only the first year's income is considered. Yield and value change are implied, but not identified overall. This method is most useful when the property is already operating on a stabilized basis, according to The Appraisal of Real Estate, 14th Edition (Appraisal Institute: 2013). |
| **Discounted Cash Flow** | The procedure in which a discount rate is applied to a set of projected income streams and a reversion. The analysis specifics the quantity and timing of the reversion, and discounts each to its present value at a specified yield rate. |
| **Effective Date** | (1) The date on which the appraisal or review applies. (2) In a lease document, the date upon which the lease goes into effect. |
| **Effective Gross Income** | The anticipated income from all operations of real property adjusted for vacancy and collection losses. |
| **Entrepreneurial Profit** | (1) A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovative change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses. (2) In economics, the actual return on successful management practices, often identified with coordination, the fourth factor of production following land, labor, and capital; also called entrepreneurial return or entrepreneurial reward. |
| **Equity Dividend** | The portion of net income that remains after debt service is paid; this is returned to the equity position. |

| Excess Land | Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. Dictionary of RE Appraisal, pp. 80-81. |
| --- | --- |
| Exposure Time | (1) The time a property remains on the market. (2) The estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. Note: Exposure time is a retrospective. |
| Extraordinary Assumption | An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. |
| Fee Simple Interest | Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. |
| Financial Feasibility | An analysis to determine which of those uses deemed possible and legal can provide a net return to the owner of the site. |
| Gross Building Area | Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved. |
| Highest and Best Use | (1) The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. (2) The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid, according to David Parker's International Valuation Standards (John Wiley & Sons, Ltd: 2016). (3) The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future, according to the Uniform Appraisal Standards for Federal Land Acquisitions (The Appraisal Foundation: 2016). |
| Hypothetical Condition | A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. |
| Insurable Value | A type of value for insurance purposes. |
| Leased Fee Interest | The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. |
| Leasehold Interest | The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. |
| Legally Permissible Use | An investigation into existing zoning regulations, lease terms, and deed restrictions on the site to determine which uses are legally permitted. |
| Liquidation Value (also known as Disposition Value) | The most probable price that a specified interest in real property should bring under the following conditions: • Consummation of a sale within a short time period. • The property is subjected to market conditions prevailing as of the date of valuation. • Both the buyer and seller are acting prudently and knowledgeably. • The seller is under extreme compulsion to sell. • The buyer is typically motivated. • Both parties are acting in what they consider to be their best interests. • A normal marketing effort is not |

possible due to the brief exposure time. • Payment will be made in cash in US dollars or in terms of financial arrangements comparable thereto. • The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**Marketing Time**

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal.

**Market Rent**

The most probable rent that property should bring in a competitive and open market reflecting the conditions and restrictions of a specified lease agreement, including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

**Net Operating Income**

The anticipated net income remaining after all operating expenses are deducted from effective gross income.

**Net Rentable Area**

For office or retail buildings, the tenant's pro rata portion of the entire office floor, excluding elements of the building that penetrate through the floor to the areas below. The rentable area of a floor is computed by measuring to the inside finished surface of the dominant portion of the permanent building walls, excluding any major vertical penetrations of the floor. Alternatively, the amount of space on which the rent is based; calculated according to local practice.

**Physically Possible Use**

An analysis to determine those uses of the subject which can be deemed physically possible.

**Potential Gross Income**

The total potential income attributable to the real property at full occupancy before operating expenses are deducted. It may refer to the level of rental income prevailing in the market or that contractually determine by existing leases.

**Property Rights Appraised**

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

**Prospective Opinion of Value**

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

**Replacement Cost for Insurance Purposes**

The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design, and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted).

**Replacement Costs**

The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout.

**Reproduction Costs**

The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, super-adequacies, and obsolescence of the subject building.

| | |
|---|---|
| **Retrospective Value Opinion** | A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion". |
| **Reversion** | A lump-sum benefit an investor expects to receive upon the termination of the investment. |
| **Stabilized Income** | (1) An estimate of income, either current or forecasted, that presumes the property is at stabilized occupancy. (2) The forecast of the subject property's yearly average income (or average- equivalent income) expected for the economic life of the subject property. (3) Projected income that is subject to change but has been adjusted to reflect an equivalent, stable annual income. |
| **Stabilized Occupancy** | (1) The occupancy of a property that would be expected at a particular point in time, considering its relative competitive strength and supply and demand conditions at the time, and presuming it is priced at market rent and has had reasonable market exposure. A property is at stabilized occupancy when it is capturing its appropriate share of market demand. (2) An expression of the average or typical occupancy that would be expected for a property over a specified projection period or over its economic life. |
| **Surplus Land** | Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. Dictionary of RE Appraisal, pp. 227-228. |
| **Yield Capitalization** | The capitalization method used to convert future benefits into present value by discounting each future benefit at an appropriate yield rate. This method explicitly considers a series of cash flows (net income over a holding period) over time together with any reversion value or resale proceeds. Since this technique explicitly reflects the investment's income pattern, it is especially suited to multi-tenant properties with varying leasing schedules as well as properties that are not operating at stabilized occupancy, according to The Appraisal of Real Estate, 14th Edition (Appraisal Institute: 2013). |



CBRE HOTELS
The World's Leading Hotel Experts.

# APPRAISAL REPORT

The William Vale
111 North 12th Street
Brooklyn,  County, New York   11222
CBRE, Inc. File No. 22-414NH-0102

*Efrem Schwalb*
*Partner*
*KOFFSKY SCHWALB, LLC*
*500 Seventh Avenue, 8th Floor*
*New York, New York  10018*

www.cbre.com/valuation
www.cbrehotels.com

**CBRE**

# CBRE HOTELS

The World's Leading Hotel Experts



200 Park Avenue, 20th Floor
New York, NY 10166

T  (212) 207-6092

www.cbrehotels.com

VALUATION & ADVISORY SERVICES

February 23, 2022

Efrem Schwalb
Partner
KOFFSKY SCHWALB, LLC
500 Seventh Avenue, 8th Floor
New York, New York  10018

RE:    Appraisal of The William Vale
       111 North 12th Street
       Brooklyn,  County, New York  11222
       CBRE, Inc. File No. 22-414NH-0102-1

Dear Mr. Schwalb:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property.  Our analysis is presented in the following appraisal report.

The subject is a mixed-use development comprising of a 183-key hotel, 37,422 square feet of leasable retail space, 42,734 square feet of leasable community service office space, and a 228-stall parking garage.

The hotel, known as the William Vale, contains amenities such as a 60-foot pool, fitness center, a rooftop ice rink, Spa, 2 year-round restaurants and 2 seasonal restaurants. The subject also has a ballroom, meeting space, 50-foot public plaza, and public park located on top of the retail space.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

| MARKET VALUE CONCLUSION | | | | |
|---|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion | Per Room |
| As Is - Hotel | Leased Fee Interest | December 31, 2021 | $100,500,000 | $549,180 |
| As Is - Commercial | Leased Fee Interest | December 31, 2021 | $57,800,000 | |
| **Total Value** | | | **$158,300,000** | |
| As Stabilized - Hotel | Leased Fee Interest | December 31, 2023 | $107,000,000 | $584,699 |
| As Stabilized - Commercial | Leased Fee Interest | December 31, 2023 | $67,300,000 | |
| **Total Value** | | | **$174,300,000** | |
| Compiled by CBRE | | | | |

Efrem Schwalb
February 23, 2022
Page 2

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

*As of the date of value and the date of this report, the nation, region, and market area remain impacted by the COVID-19 pandemic. This could have a continued prolonged effect on macroeconomic conditions, though at this time the length of duration is unknown. The perceived impact on real estate varies on several factors including asset class, use, tenancy, and location. Our analysis considers available information as of the effective date. We recommend evaluating positions in all real estate asset classes regularly during the time of uncertainty.*

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute. It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).

The report is intended for use by Koffsky Schwalb, LLC on behalf of All Year Holdings. We confirm that we have given consent for financial reporting of said report for publishing on the Tel Aviv Stock Exchange for 2021.

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

Edward Eschmann, MAI
Director
Phone: (212) 207-6092
Fax: (212) 207-6169

Benjamin J. Holliday
Senior Valuation Associate
Phone: (212) 715-5711



Efrem Schwalb
February 23, 2022
Page 3

Email:    Edward.Eschmann@cbre.com          Email:    Benjamin.Holliday@cbre.com
NY State Certification #46-02842            NY State Appraiser Assistant: #48-53650



# Certification

We certify to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.

4.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

5.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

6.  This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

7.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of New York.

8.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

9.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

10. As of the date of this report, Edward Eschmann, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

11. Benjamin Holliday has made a personal inspection of the property that is the subject of this report.

12. No one provided significant real property appraisal assistance to the persons signing this report.

13. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc.  Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.

14. Edward Eschmann, MAI and Benjamin Holliday have not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

Edward Eschmann
NY State Certification #46-02842

Benjamin J. Holliday
NY State Appraiser Assistant: #48-53650

i



# Subject Photographs



Aerial View



**Subject Photographs**



Exterior View of Subject



Exterior view of Subject from N 12th Street



View of Plaza/Hotel Entrance



View of Plaza/Leuca Entrance



View of Plaza/Interior Retail



View of Plaza/Office building



**Subject Photographs**



View of Plaza Entrance from South



Entrance to community space



Hotel Front Desk



Hotel Lobby



Below Hotel Lobby Mezzanine



Interior of Leuca



**Subject Photographs**



Entrance to Parking Garage



View of Subject from Berry Street



Residential SE of property



Industrial/Brewery SW of property

v



# Executive Summary

| | |
|---|---|
| **Property Name** | The William Vale |
| **Location** | 111 North 12th Street, Brooklyn,  County, New York 11249 |
| | |
| **Highest and Best Use** | |
| As If Vacant | Mixed - Use |
| As Improved | Mixed - Use |
| **Property Rights Appraised** | Leased Fee Interest |
| **Date of Report** | February 11, 2022 |
| **Date of Inspection** | February 2, 2022 |
| **Estimated Exposure Time** | 12 Months |
| **Estimated Marketing Time** | 12 Months |
| **Land Area** | 1.15 AC                     50,000 SF |
| **Improvements** | |
| Property Type | Full Service Hotel, w mixed use Office and Retail |
| Number of Buildings | 1 |
| Number of Stories | 23 |
| Gross Building Area | 275,238 SF |
| *Office* | *194,762 SF* |
| *Retail* | *32,742 SF* |
| *Hotel* | *47,734 SF* |
| Number of Units | 183 |
| Number of Rooms | 183 |
| Restaurant/Lounge | Year-Round: Westlight, Leuca; Seasonal: Mister Dips, Vale Pool Area |
| Meeting Space | Ballroom, Westlight, Conference Rooms, Terrace, 23rd Floor, Leuca Private Dining Room |
| Property Amenities | Pool, Spa, Fitness Center, Public Park, Parking |
| Year Built | 2017 |
| Condition | Average |
| **Buyer Profile** | Investor-Local |



## HOTEL COMPONENT

**Financial Indicators**

| | |
|---|---|
| 2019 Historical Occupancy | 77.9% |
| Projected Year 1 Occupancy | 62.0% |
| Projected Year 2 Occupancy | 70.0% |
| Stabilized Occupancy | 77.0% |
| Estimated Stabilization | December-2023 |
| 2019 Historical Average Daily Rate | $363.18 |
| Projected Year 1 Average Daily Rate | $357.50 |
| Projected Year 2 Average Daily Rate | $384.31 |
| Stabilized Average Daily Rate | $403.53 |

| Projected Inflation Rates | *ADR* | *Expenses* |
|---|---|---|
| Year 1 | 10.0% | 3.0% |
| Year 2 | 7.5% | 3.0% |
| Year 3 | 5.0% | 3.0% |
| Year 4 | 3.0% | 3.0% |
| Year 5 | 3.0% | 3.0% |
| Stabilized | 3.0% | 3.0% |

| | As Is | As Stabilized |
|---|---|---|
| Going-In Capitalization Rate | 5.00% | |
| Discount Rate | 8.00% | 7.75% |
| Terminal Capitalization Rate | 5.50% | 5.50% |

| **Year 1 Operating Data** | *Total* | *Per Room* |
|---|---|---|
| Total Revenue | $28,863,197 | $157,722.39 |
| Operating Expenses | $25,638,644 | $140,101.88 |
| Expense Ratio | 88.83% | |
| Net Operating Income (EBITDA) | $3,224,552 | $17,620.50 |

| **Stabilized Operating Data - Year 3** | *Total* | *Per Room* |
|---|---|---|
| Total Revenue | $40,414,160 | $220,842.40 |
| Operating Expenses | $35,352,985 | $193,185.71 |
| Expense Ratio | 87.48% | |
| Net Operating Income (EBITDA) | $5,061,174 | $27,656.69 |



*Executive Summary*

| Market Value As Is On | December 31, 2021 | | |
|---|---|---|---|
| Sales Comparison Approach | | $93,100,000 | $508,743 |
| Income Capitalization Approach | | $100,500,000 | $549,180 |
| **Market Value As Stabilized On** | **December 31, 2023** | | |
| Income Capitalization Approach | | $107,000,000 | $584,699 |

### CONCLUDED MARKET VALUE

| Appraisal Premise | Interest Appraised | Date of Value | Value |
|---|---|---|---|
| Hotel - As Is | Leased Fee Interest | December 31, 2021 | $100,500,000 |
| Hotel - As Stabilized | Leased Fee Interest | December 31, 2023 | $107,000,000 |

Compiled by CBRE

## RETAIL - OFFICE COMPONENT

**Financial Indicators**

| | | |
|---|---|---|
| Current Occupancy | 45.8% | |
| Stabilized Occupancy | 90.0% | |
| Stabilized Credit Loss | 1.0% | |
| Overall Capitalization Rate | 5.25% | |
| | As Is | As Stabilized |
| Discount Rate | 6.75% | 6.25% |
| Terminal Capitalization Rate | 5.50% | 5.50% |

| Pro Forma | Total | Per SF |
|---|---|---|
| Effective Gross Income | $4,746,881 | $59.22 |
| Operating Expenses | $1,026,566 | $12.81 |
| Expense Ratio | 21.63% | |
| Net Operating Income | $3,720,315 | $46.41 |
| Income Capitalization Approach | | |
| Direct Capitalization | $70,000,000 | $873.30 |
| Discounted Cash Flow | $57,800,000 | $721.09 |
| **Market Value As Stabilized On**  **December 31, 2023** | | |
| Income Capitalization Approach | | |
| Direct Capitalization | $77,600,000 | $968.11 |
| Discounted Cash Flow | $67,300,000 | $839.61 |

### CONCLUDED MARKET VALUE

| Appraisal Premise | Interest Appraised | Date of Value | Value |
|---|---|---|---|
| As Is | Leased Fee Interest | December 31, 2021 | $57,800,000 |
| Prospective As Stabilized | Leased Fee Interest | December 31, 2023 | $67,300,000 |

Compiled by CBRE



| MARKET VALUE CONCLUSION | | | | |
|---|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion | Per Room |
| As Is - Hotel | Leased Fee Interest | December 31, 2021 | $100,500,000 | $549,180 |
| As Is - Commercial | Leased Fee Interest | December 31, 2021 | $57,800,000 | |
| **Total Value** | | | **$158,300,000** | |
| As Stabilized - Hotel | Leased Fee Interest | December 31, 2023 | $107,000,000 | $584,699 |
| As Stabilized - Commercial | Leased Fee Interest | December 31, 2023 | $67,300,000 | |
| **Total Value** | | | **$174,300,000** | |
| Compiled by CBRE | | | | |

## STRENGTHS/OPPORTUNITIES

- Subject is located in Williamsburg, which is one of the trendiest neighborhoods in New York City;

- Subject rooms , rooftop bar, and meeting space offers some of the best panoramic views of Manhattan;

- Subject has a parking garage, a unique characteristic when compared to nearby competitive properties.

- According to market participants, the Williamsburg neighborhood is quite popular for events, especially weddings. Subject is well positioned to capitalize on that market.

- Subject is one of the top luxury products within the Brooklyn/Coney Island Submarket.

## WEAKNESSES/THREATS

- Subject has many competitive properties nearby;

- The subject is especially vulnerable to the impacts of COVID-19 being composed of hotel, office, and retail.

## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- We have been provided with financial statements, rent rolls and prior appraisal for this appraisal analysis.  We have no reason to believe that the information is inaccurate.  We have relied upon this information in the preparation of this report.  If there are substantial inaccuracies or differences than that which has been provided, it may have impact on the analysis and value reported herein and we reserve the right to modify this report accordingly.



[1] The Appraisal Foundation, *USPAP, 2020-2021*



## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purposes of analysis." [2]

- None noted

---

[2] The Appraisal Foundation, *USPAP, 2020-2021*



# Table of Contents

Certification ........................................................................................................................ i

Subject Photographs ......................................................................................................... ii

Executive Summary ........................................................................................................... vi

Table of Contents .............................................................................................................. xi

Introduction ...................................................................................................................... 1

Site Analysis ..................................................................................................................... 23

Improvements Analysis ..................................................................................................... 27

Zoning ............................................................................................................................... 31

Tax and Assessment Data ................................................................................................ 33

Market Analysis ................................................................................................................. 38

Highest and Best Use ....................................................................................................... 74

Appraisal Methodology ..................................................................................................... 76

Income Capitalization Approach ....................................................................................... 77

Sales Comparison Approach ............................................................................................ 128

Reconciliation of Value ...................................................................................................... 133

Real Property Value Allocation ......................................................................................... 135

Assumptions and Limiting Conditions ............................................................................... 138

ADDENDA
A   Operating Data
B   Smith Travel Research Report
C   Client Contract Information
D   Qualifications



# Introduction

## OWNERSHIP AND PROPERTY HISTORY

Title to the property is currently vested in the name of Wythe Berry Fee Owner LLC, who acquired title to lot 1 in May 4th, 2014 for $10,000,000 and lot 10 on April 29th, 2014 for $16,500,000. The lots were merged making the total acquisition price $26,500,000.

## LEASE AGREEMENT

The subject is encumbered by a net lease operating agreement for 15-years with a 5-year option. The rent is flat at $15,000,000 for the duration of the lease and option period, plus 1.5% of the gross revenue for any years where the total revenue is $50,000,000 or more. The lease began on February 1, 2017 and ends on January 31, 2032 and is triple net. The lease is at the end of year 3 (year 4 begins February 1, 2020).

## INTENDED USE OF REPORT

This appraisal is to be used for internal decision making purposes related to partner negotiation with potential litigation and no other use is permitted.

## INTENDED USER OF REPORT

This appraisal is to be used by KOFFSKY SCHWALB, LLC and no other user may rely on our report unless as specifically indicated in the report.

> Intended Users - the intended user is the person (or entity) who the appraiser intends will use the results of the appraisal. The client may provide the appraiser with information about other potential users of the appraisal, but the appraiser ultimately determines who the appropriate users are given the appraisal problem to be solved. Identifying the intended users is necessary so that the appraiser can report the opinions and conclusions developed in the appraisal in a manner that is clear and understandable to the intended users. Parties who receive or might receive a copy of the appraisal are not necessarily intended users. The appraiser's responsibility is to the intended users identified in the report, not to all readers of the appraisal report. [3]

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to estimate the market value of the subject property.

## DEFINITION OF VALUE

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

---

[3] Appraisal Institute, The Appraisal of Real Estate, 14th ed. (Chicago: Appraisal Institute, 2013), 50.



The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

## EXPOSURE/MARKETING TIME

The exposure/marketing time is a function of price, time, and use.  It is not an isolated estimate of time alone.  In consideration of these factors, we have analyzed the following:

| EXPOSURE/MARKETING TIME DATA | | |
|---|---|---|
| Investment Type | Exposure/Mktg. (Months) Range | Average |
| Comparable Sales Data | 2.0 - 12.0 | 6.6 |
| *PwC Full Service Hotels 3rd Qtr. 2021* National Data | 1.0 - 12.0 | 6.8 |
| Local Market Professionals | 6.0 - 12.0 | 9.0 |
| **CBRE Exposure Time Estimate** | **6 - 12 Months** | |
| **CBRE Marketing Period Estimate** | **6 - 12 Months** | |
| PwC Real Estate Investor Survey | | |

---

[4] Interagency Appraisal and Evaluation Guidelines; December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472.



## INTEREST APPRAISED

The value estimated represents the Leased Fee Interest and is defined as follows:

*Fee Simple Estate* - Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat. [5]

*Leased Fee Interest* - A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease). [6]

*Leasehold Interest* - The tenant's possessory interest created by a lease. [7]

## SCOPE OF WORK

This Appraisal Report is intended to comply with the reporting requirements set forth under Standards Rule 2 of USPAP.  The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered and analysis is applied.  CBRE, Inc. completed the following steps for this assignment:

### Extent to Which the Property is Identified

The property is identified through the following sources:

- postal address
- assessor's records
- legal description

### Extent to Which the Property is Inspected

CBRE, Inc. inspected the subject site and its surrounding environs on the effective date of appraisal.  Our inspection included viewing the site from public roads.  We did not walk the entire site or drive the interior of the site and have assumed that the portions of the site not actually observed are in similar condition to the areas observed.

Therefore, all physical information regarding the subject was obtained from the following sources:

- county assessor's records
- a previous appraisal dated December 31, 2019 and prepared by Michelle Zell, MAI

---

[5] *Dictionary of Real Estate Appraisal*, 78.

[6] *Dictionary of Real Estate Appraisal*, 113.

[7] *Dictionary of Real Estate Appraisal*, 113.



## TYPE AND EXTENT OF THE DATA RESEARCHED

CBRE reviewed the following:

- applicable tax data
- zoning requirements
- flood zone status
- demographics
- income and expense data (through a previous appraisal)
- comparable data

### Type and Extent of Analysis Applied

CBRE, Inc. analyzed the data gathered through the use of appropriate and accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value.  The steps required to complete each approach are discussed in the methodology section.

### Data Resources Utilized in the Analysis

| DATA SOURCES | |
|---|---|
| *Item:* | *Source(s):* |
| **Site Data** | |
| Size | CoStar, Landvision, NYC Public Records, Prior Appraisal |
| **Improved Data** | |
| Building Area | CoStar, Landvision, NYC Public Records, Prior Appraisal |
| Area Breakdown/Use | CoStar, Landvision, NYC Public Records, Prior Appraisal |
| No. Bldgs. | CoStar, Landvision, NYC Public Records, Prior Appraisal |
| Parking Spaces | CoStar, Landvision, NYC Public Records, Prior Appraisal |
| Year Built/Developed | CoStar, Landvision, NYC Public Records, Prior Appraisal |
| **Economic Data** | |
| Deferred Maintenance: | None Noted |
| Building Costs: | No building costs were provided by owner. |
| Income Data: | Prior Appriasal |
| Expense Data: | Prior Appriasal |
| **Other** | |
| Market Statistics | Custom Trends Report provided by STR |
| Compiled by CBRE | |



# Area Analysis

The dynamic nature of economic relationships within a market area has a direct bearing on real estate values and the long-term quality of a real estate investment. In the market, the value of a property is not based on the price paid for it in the past or the cost of its creation, but on what buyers and sellers perceive it will provide in the future. Consequently, the attitude of the market towards a property within a specific neighborhood or market area reflects the probable future trend of that area.

Since real estate is an immobile asset, economic trends affecting its locational quality in relation to other competing properties within its market area will also have a direct effect on its value as an investment. To accurately reflect such influences, it is necessary to examine the past and probable future trends, which may affect the economic structure of the market and evaluate their impact on the market potential of the subject. This section of the report is designed to isolate and examine the discernible economic trends in the region and neighborhood, which influence and create value for the subject property.

## Regional Area

The subject property is located in New York City, which is comprised of the five boroughs of Brooklyn, Bronx, Queens, Manhattan, and Staten Island.





The examination of social forces is primarily based upon demographic characteristics of an area including, but not limited to, population trends, age of population and household formation. A review of these demographic trends is imperative in order to determine the basic demand for real property in the area.

## Population

The population in New York City has increased approximately 4.0% from 2010 to 2021, as estimated by CBRE (LAM). Changes among the different boroughs varied considerably, with Staten Island reflecting the lowest population increase of 1.8%, while Brooklyn's population had the largest increase of 2.5%. The 2021 estimates and the 2026 projections are based on the following census data.

| NEW YORK CITY POPULATION DATA | | | | | |
|---|---|---|---|---|---|
| | 2010 Census | 2021 Estimate | 2010-2021 % Change | 2026 Projection | 2021-2026 % Change |
| Bronx | 1,385,108 | 1,415,469 | 2.2% | 1,438,765 | 1.6% |
| Brooklyn | 2,504,700 | 2,567,163 | 2.5% | 2,612,421 | 1.8% |
| Manhattan | 1,585,873 | 1,633,977 | 3.0% | 1,654,548 | 1.3% |
| Queens | 2,230,722 | 2,283,222 | 2.4% | 2,304,964 | 1.0% |
| Staten Island | 468,730 | 477,344 | 1.8% | 481,819 | 0.9% |
| **New York City** | **8,175,133** | **8,502,614** | **4.0%** | **8,627,187** | **1.5%** |
| Source: CBRE Location Analytics & Mapping (LAM) | | | | | |

The population within the city is expected to increase through 2026. Over the next five years Brooklyn is anticipated to have the highest increase in population with an increase of 1.8%. The New York City Boroughs are all projected to experience moderate growth, ranging from 0.9% to 1.8% over the next 5 years. Overall, the population in New York City is projected to increase by 1.5% into 2026. Compared to the 2010-2021 period, growth is expected to decline for the years between 2021-2026.



## Households

Household statistics based on census data are summarized as follows.

| NEW YORK CITY HOUSEHOLD DATA | | | | | |
|---|---|---|---|---|---|
| | 2010 Census | 2021 Estimate | 2010-2021 % Change | 2026 Projection | 2021-2026 % Change |
| Bronx | 483,449 | 499,225 | 3.3% | 508,665 | 1.9% |
| Brooklyn | 916,856 | 948,409 | 3.4% | 967,701 | 2.0% |
| Manhattan | 763,846 | 794,969 | 4.1% | 807,556 | 1.6% |
| Queens | 780,117 | 796,959 | 2.2% | 804,103 | 0.9% |
| Staten Island | 165,516 | 169,096 | 2.2% | 170,757 | 1.0% |
| **New York City** | **3,109,784** | **3,240,290** | **4.2%** | **3,289,804** | **1.5%** |
| Source: CBRE Location Analytics & Mapping (LAM) | | | | | |

As illustrated in the previous table, the number of households in New York City has increased by 4.2% since 2010 and is expected to increase by 1.5% from 2021-2026. The number of households are expected to grow at the greatest rate in the Brooklyn borough over the next 5 years at 2.0%. According to CBRE (LAM) estimates, the slowest growth is expected to occur in Queens (0.9%).

## Income

The following chart below describes the income trends across the five boroughs of New York City.

| NEW YORK CITY MEDIAN HOUSEHOLD INCOME DATA | | | | | |
|---|---|---|---|---|---|
| | 2010 Census | 2021 Estimate | 2010-2021 % Change | 2026 Projection | 2021-2026 % Change |
| Bronx | $32,568 | $41,506 | 27.4% | $46,360 | 11.7% |
| Brooklyn | $49,522 | $65,282 | 31.8% | $75,784 | 16.1% |
| Manhattan | $75,009 | $93,975 | 25.3% | $108,295 | 15.2% |
| Queens | $62,344 | $74,759 | 19.9% | $82,756 | 10.7% |
| Staten Island | $82,915 | $88,633 | 6.9% | $101,337 | 14.3% |
| **New York City** | **$50,711** | **$65,069** | **28.3%** | **$71,551** | **10.0%** |
| Source: CBRE Location Analytics & Mapping (LAM) | | | | | |

Over the last two decades, median household income across the five boroughs have increased dramatically. Of the five boroughs of New York City, Manhattan carries the highest median household income, followed by Staten Island and Queens. Over the next five-year period, the median household income within the boroughs is projected to grow within a range of 10.7% to 16.1%. Across the five boroughs, Brooklyn is expected to see the highest income appreciation at 16.1%.

## Transportation

Transportation has been a major factor in the development of New York City. The city has a well-integrated network of highways with a well-developed mass transportation system which



facilitates access for commuters as well as the distribution of goods and services through the region. Vehicular transportation in the region and the borough is facilitated through a network of highways while the Metropolitan Transit Authority operates a rail and bus network.

Two of the area airports, LaGuardia and JFK International Airports are both located within Queens. Within Manhattan, of the two major business areas, Midtown is more convenient in terms of commuting than Downtown due to its proximity to the commuter train system. While the automobile is the primary mode of transportation surrounding New York City, primary access in Manhattan is provided by mass transportation, specifically the subway system.

The Long Island Expressway, the Grand Central Parkway, and Belt Parkway facilitate vehicular access to the area. The Tri-borough Bridge, Queensboro, Brooklyn Bridge, Williamsburg Bridge, Manhattan Bridge, Midtown Tunnel and Brooklyn-Battery Tunnel provide access to Manhattan.

## Governmental Forces

### Overview

The Mayor and the City Council govern the City of New York. In addition, there is a Borough President in each borough and Councilpersons, which govern individual districts within each borough. Local city officials implement land use regulations through the auspices of the Bureau of Economic Development, Zoning Department and Department of City Planning. The local planning board with neighborhood representation must also review any proposed project. Support services, such as transportation, schools, health care, police, and fire protection are provided by the City of New York.

### Taxes

Residents of New York City are taxed on three levels, the first is the Federal Government, second is the State of New York, and the last is the City of New York, which imposes a resident income tax and property taxes for those persons who reside within the five boroughs. The combined income tax rate for persons in New York City is one of the highest in the nation and imposes a hindrance towards relocating to the city. Residential property taxes, however, are comparably low to surrounding Nassau, Suffolk and Westchester Counties. The City of New York has recently sought to re-impose the so called "commuter tax" on suburban residents who work in the City. Such a measure would require State approval and as of the date of this analysis these approvals have not been granted.

### Land Use Regulations

The City Planning Department, Zoning Department and the Economic Development Authority govern land use regulations. These agencies as well as other city departments govern land use controls that include zoning, growth management systems, subdivision regulations, development fees and environmental restrictions. The net effect of these land use policies is to raise the cost of land development, especially in Manhattan.



## Zoning

Zoning regulations and planning have the greatest impact on property values and development in the city. The zoning regulations within the city are the most complex in the country, increasing the cost of all residential and commercial development in the city.

## Municipal Services

The City of New York provides public services such as police and fire protection, schools and other basic services.

## Economic Forces

With 223,860 full-time employees in 2020, the City Of New York serves as the area's largest employer. NYC Department of Education is the second largest employer in the area with 114,999 active employees and following third is the Metropolitan Transit Authority. The chart below shows the New York City's 15 largest employers.

| NEW YORK CITY LARGEST EMPLOYERS | | |
|---|---|---|
| **Ranking** | **Company Name** | **Number of Employees in New York City** |
| 1 | City Of New York* | 223,860 |
| 2 | NYC Department Of Education | 114,999 |
| 3 | Metropolitan Transit Authority | 74,087 |
| 4 | Northwell Health | 68,000 |
| 5 | NYC Health and Hospitals | 42,000 |
| 6 | Mount Sinai Health Systems | 38,000 |
| 7 | JP Morgan Chase | 37,000 |
| 8 | NYU Langone Health | 28,000 |
| 9 | Verizon | 26,800 |
| 10 | Montefiore Health System | 23,374 |
| 11 | New York Presbyterian Hospital | 20,000 |
| 12 | Citigroup Inc. | 15,000 |
| 13 | Memorial Sloan Kettering | 14,230 |
| 14 | Columbia University | 13,080 |
| 15 | Bank Of America | 13,000 |

*All New York City agencies, excluding Department Of Education
Data as of January 2020. Source(s): NYCOpenData, Bloomberg.com, Zippia.com



## Employment

The following chart outlines total employment and the composition of the different employment industries in New York City between 2010 and 2020.

| | | | | | ANNUAL EMPLOYMENT BY INDUSTRY | | | | | | | | |
| | | | | | NEW YORK CITY 2010-2020 (000's) | | | | | | | | |
| Industry | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Avg. Ann. Growth | Total % Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Goods Producing** | **188.8** | **188.1** | **192.5** | **199.0** | **205.3** | **213.6** | **223.3** | **225.6** | **229.4** | **228.5** | **190.6** | **0.1%** | **1.0%** |
| Construction | 112.5 | 112.4 | 116.2 | 122.6 | 129.3 | 139.4 | 147.2 | 152.5 | 158.8 | 159.9 | 134.2 | 1.8% | 19.3% |
| Manufacturing | 76.3 | 75.7 | 76.3 | 76.4 | 76.0 | 74.2 | 76.1 | 73.1 | 70.6 | 68.6 | 56.5 | -2.4% | -26.0% |
| | | | | | | | | | | | | | |
| **Service Producing** | **3,522.7** | **3,610.6** | **3,693.0** | **3,782.8** | **3,898.5** | **3,997.1** | **4,122.5** | **4,202.6** | **4,323.0** | **4,425.5** | **3,953.7** | **1.1%** | **12.2%** |
| Trade, Transportation & Utilities | 559.1 | 574.7 | 589.3 | 603.8 | 618.4 | 629.1 | 630.4 | 634.3 | 631.2 | 639.4 | 548.0 | -0.2% | -2.0% |
| Information | 166.0 | 170.9 | 175.8 | 179.6 | 184.5 | 186.2 | 192.6 | 197.1 | 204.4 | 208.9 | 204.4 | 2.1% | 23.1% |
| Financial Activities | 428.6 | 439.5 | 439.1 | 437.9 | 448.8 | 458.1 | 465.9 | 469.8 | 474.7 | 471.9 | 459.7 | 0.7% | 7.3% |
| Prof. & Business Services | 575.8 | 598.3 | 620.4 | 643.6 | 668.9 | 690.2 | 722.3 | 742.3 | 762.1 | 794.0 | 723.8 | 2.3% | 25.7% |
| Educational & Health Services | 752.4 | 769.2 | 786.2 | 813.2 | 846.6 | 877.3 | 928.7 | 963.4 | 1,006.2 | 1,052.9 | 1,002.8 | 3.0% | 33.3% |
| Leisure & Hospitality | 322.2 | 342.2 | 365.7 | 385.4 | 406.8 | 421.3 | 440.2 | 452.1 | 463.0 | 466.3 | 274.8 | -1.3% | -14.7% |
| Other Services | 160.6 | 165.2 | 170.4 | 174.9 | 179.5 | 187.1 | 190.1 | 191.5 | 193.1 | 196.6 | 165.3 | 0.3% | 2.9% |
| Government | 558.0 | 550.6 | 546.1 | 544.4 | 545.0 | 547.8 | 552.3 | 552.1 | 588.3 | 595.5 | 574.9 | 0.3% | 3.0% |
| | | | | | | | | | | | | | |
| **Total Employment** | **3,711.5** | **3,798.7** | **3,885.5** | **3,981.8** | **4,103.8** | **4,210.7** | **4,345.8** | **4,428.2** | **4,552.4** | **4,654.0** | **4,144.3** | **1.1%** | **11.7%** |
| | | | | | | | | | | | | | |
| **Employment Change** | | | | | | | | | | | | | |
| Goods Producing | -6.7% | -0.4% | 2.3% | 3.4% | 3.1% | 4.1% | 4.5% | 1.0% | 1.7% | -0.4% | -16.6% | | |
| Service Producing | 0.9% | 2.5% | 2.3% | 2.4% | 3.1% | 2.5% | 3.1% | 1.9% | 2.9% | 2.4% | -10.7% | | |
| Total Employment | 0.5% | 2.3% | 2.3% | 2.5% | 3.1% | 2.6% | 3.2% | 1.9% | 2.8% | 2.2% | -11.0% | | |

Source: US Bureau of Labor Statistics

While the table presented above indicates that annual total employment in the City of New York has varied notably since 2010, the total increase over the last decade holds at 11.7%. Over the last ten years, New York City has seen consistent employment growth; at almost 1.1% on an annual basis.

New York City is predominantly a service-oriented economy, with approximately 95% of the current employment within the services producing sector. In the period between 2010 and 2020, the services producing sector experienced average annual growth of 1.1%. The Goods Producing sector has experienced mixed performance, as the construction sector has grown while the manufacturing sector has slowed.

The following table and chart below illustrate the change in employment from the most recently reported month, over the same month of the previous year in NYC.

| | NON-AGRICULTURAL INSURED EMPLOYMENT BY MAJOR INDUSTRY DIVISION | | | | |
| | December 2020 to 2021 Comparison - Not Seasonally Adjusted | | | | |
| | NEW YORK CITY, NY | | | | |
| INDUSTRY | Average Employment December 2020 (000's) | 2020 SHARE % | Average Employment December 2021 (000's)(P) | 2021 Share % | CHANGE |
|---|---|---|---|---|---|
| Construction and Mining | 139.8 | 3.4% | 135.6 | 3.1% | -3.0% |
| Manufacturing | 53.4 | 1.3% | 53.9 | 1.2% | 0.9% |
| T.T.C.P.U.* | 545.0 | 13.3% | 580.8 | 13.4% | 6.6% |
| Information | 204.5 | 5.0% | 222.3 | 5.1% | 8.7% |
| F.I.R.E.** | 465.7 | 11.4% | 458.4 | 10.5% | -1.6% |
| Professional & Business Services | 701.1 | 17.1% | 751.7 | 17.3% | 7.2% |
| Educational & Health Services | 1,023.0 | 25.0% | 1,060.3 | 24.4% | 3.6% |
| Leisure & Hospitality | 224.8 | 5.5% | 329.0 | 7.6% | 46.4% |
| Other Services | 154.3 | 3.8% | 161.7 | 3.7% | 4.8% |
| Government | 588.6 | 14.4% | 591.7 | 13.6% | 0.5% |
| **TOTALS** | **4,100.2** | **100.0%** | **4,345.4** | **100.0%** | **6.0%** |

\* Trade, Transportation, & Public Utilities        \*\* Finance/Insurance/Real Estate        (P) Preliminary data

Source: U.S. Bureau of Labor Statistics: Compiled by CBRE, Inc.



**Site Analysis**



As of December 2021, total employment in New York City experienced a 6.0% increase from the prior year's figures. Eight of the ten sectors above posted annual increases in employment; this is a direct result of the resurgence in economic activity due to the improving conditions from the pandemic. As indicated above, Leisure & Hospitality experienced the largest gain in employment at 46.4% YoY. Leisure & Hospitality was the hardest hit sector during the initial stages of the pandemic, as such, this dramatic uptick in employment can be correlated to its resounding recovery. Other large improvements in employment were noted in the Information (+8.7%) and Professional & Business Services (+7.2%). Educational & Health Services continues to hold the largest share of employment in the area at 24.4%, this sector experienced a gain of 3.6% in employment.

## Unemployment Rate

The following table and chart detail the historical and current unemployment rate in New York City, New York State, and the country.

| UNEMPLOYMENT | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 | Dec-21 |
| New York City | 8.6% | 7.9% | 8.1% | 7.5% | 6.0% | 4.8% | 4.5% | 4.0% | 3.7% | 3.4% | 9.5% | 9.1% | 6.0% |
| New York | 8.7% | 8.3% | 8.6% | 7.8% | 6.3% | 5.2% | 4.9% | 4.6% | 4.1% | 3.8% | 10.0% | 8.5% | 5.0% |
| US | 9.6% | 8.9% | 8.1% | 7.4% | 6.2% | 5.3% | 4.9% | 4.4% | 3.9% | 3.7% | 8.1% | 6.5% | 3.7% |
| (*) Percentages are preliminary. All figures were revised by BLS on February 7, 2022 | | | | | | | | | | | | | |
| Source: Bureau of Labor Statistics; Compiled by CBRE | | | | | | | | | | | | | |



Site Analysis



Unemployment Insurance (UI) claims show millions of American workers, including hundreds of thousands of New York residents, struggling with COVID-19 in relation to economic hardship. Since March 2020, the U.S. economy has been grappling with the fallout of the COVID-19 pandemic. Amidst the worst of the pandemic, a total of over nearly 62 million Americans filed for unemployment insurance. This unemployment figure mirrors a level that is only comparable with the Great Depression. The downturn in the labor market was unique in that steep job losses were precipitated by a forced shutdown of the economy.

Several fiscal policies were implemented by the government to help counteract the economic pressures of the shutdown. The federal CARES Act stimulus package (expired on July 31st, 2020) helped enable a more sustainable recovery by providing liquidity support to businesses, including forgivable loans for small businesses, and capital to back new credit facilities for larger businesses. On December 21st, 2020, Congress passed a long-anticipated additional round of COVID relief legislation as part of the Bipartisan-Bicameral Omnibus COVID Relief Deal. This relief bill provides additional stimulus to individuals, businesses, and hospitals in response to the economic distress caused by the coronavirus (COVID-19) pandemic. On March 11th, 2021, a $1.9 trillion coronavirus relief packaged was signed into law. This mammoth of a package entails another stimulus payment, continued unemployment benefits, tax breaks, expanded child work credits, funding for vaccine delivers, extended eviction ban, and additional money for state, local, and tribal governments.

According to the Bureau of Labor Statistics, for the month ending December 2021, the national unemployment rate held 280-basis points lower compared to the year prior to 3.7%. This improved unemployment figure is correlated with the ongoing recovery of business activity across the nation. The data also indicates a growing improvement as the vaccine rollout continues to progress in the nation. The beginning of a vaccination campaign in the US and worldwide represents hope that such efforts will deliver concrete results in the near future. Furthermore, as the recent data shows, the unemployment rate within New York also improved in December 2021, falling 350 basis points from the previous year, to 5.0%. Lastly, the unemployment rate in NYC continues to hold at an elevated level compared to the state and nation, at 6.0%. This unemployment rate largely reflects the jobs held by New York City residents, while the job data portrayed in the previous section reflects jobs located within the city itself; many of which, are



held by non-New York City residents. Recent UI claims continue to reflect the widespread economic hardship for the city's workforce as hospitality, retail/food, entertainment, health care, construction, manufacturing, and other predominately non-office-using industries have made up the majority of the cumulative claims. Many employers, primarily in the aforementioned sectors, were forced to cut most of their payroll as job losses mounted in relation to loan payments, fixed costs, and loss in revenue. As the data shows, the unemployment rate in New York City has increased to a level that is significantly higher than the jobless trend of the state and nation. Overall, we expect unemployment to remain high within NYC, NYS, and the nation for the near term and through 2021.

## Conclusion

In mid-March 2020, NYS emerged as the U.S. epicenter of the public health crisis that has impacted the globe, with which service-oriented industries have taken the brunt of the COVID-19 outbreak. New York City began a phased reopening in summer 2020 and as of May 19th, 2021, New York State has lifted the statewide mask mandate for fully vaccinated persons in regard to most business and public settings, as well as the removal of most capacity restrictions. Although the vaccination campaign has encouraged optimism, businesses and workplaces will still take time to return to normal, and we expect a negative growth outlook through 2021 as New York City, the state, and the nation continues to regain footing that was lost to the pandemic.



# Neighborhood Analysis



## Location

The subject property is located in the Williamsburg neighborhood of Brooklyn, New York. Brooklyn, also known as Kings County, is an urban location and one of the five boroughs that comprise New York City. Williamsburg is broken into three segments; South Williamsburg, East Williamsburg, and North Williamsburg. The subject falls just north of the North and South Williamsburg border, which is tentatively drawn at Grand Street.

## Boundaries

The Williamsburg neighborhood boundaries are detailed as follows:

*North:*     Newtown Creek
*South:*     Flushing Avenue
*East:*      Bushwick Avenue
*West:*      East River

## Land Use

An overview of the Land Use within the District is included in the following map and chart:

14



## Land Use, 2014

| | Lots | Lot Area Sq. Ft.(000) | % |
|---|---|---|---|
| 1- 2 Family Residential | 2,615 | 5,083.4 | 5.3 |
| Multi-Family Residential | 6,183 | 22,846.6 | 23.9 |
| Mixed Resid. / Commercial | 2,557 | 9,067.4 | 9.5 |
| Commercial / Office | 512 | 3,432.5 | 3.6 |
| Industrial | 1,436 | 26,201.8 | 27.4 |
| Transportation / Utility | 194 | 9,235.6 | 9.7 |
| Institutions | 351 | 4,990.5 | 5.2 |
| Open Space / Recreation | 79 | 4,833.1 | 5.1 |
| Parking Facilities | 523 | 3,358.3 | 3.5 |
| Vacant Land | 400 | 2,710.4 | 2.8 |
| Miscellaneous | 321 | 3,853.4 | 4.0 |
| **Total** | **15,171** | **95,612.9** | **100.0** |

Historically, the Greenpoint-Williamsburg neighborhoods were middle income neighborhoods made up of warehouse and manufacturing facilities with residential housing for workers in the area. There remains a large amount of older (pre-1950s) industrial buildings in the area. However, in recent years many of these industrial properties have been torn down or converted to commercial and or residential uses. Most retail properties are small, multi-story buildings, with ground floor retail and upper floor residential or office space. The land use consists mainly of industrial and multi-family units, which make up 27.4% and 23.9% of the neighborhood respectively. Mixed residential units make up 9.5%, while 1-2 family residential units make up 5.3% of land use in the neighborhood.  The following map describes how the land use is dispersed throughout the community district.

15





It can be noted that the industrial land use in the community district is concentrated in areas that have waterway access.



In addition to industrial properties, retail properties are located along North 6th Street and Bedford Avenue, two main commercial corridors in the neighborhood. Most retail properties are small, multi-story buildings, with ground floor retail and upper floor residential or office space. The majority of the residential development is located along the secondary roadways in the center portion of the neighborhood.

North Williamsburg is bounded by the East River on the west, Union Avenue on the east, from North 15th Street and McCarren Park on the north, and Grand Street to the south. Also known as the Northside, this area is considered the most desirable section of Williamsburg and has seen the most new development and gentrification in recent years. Often seen as an extension of the Lower East Side/East Village art scene, the Northside is a mix of long-time residents, young artists and professionals attracted to the area because of its atmosphere and convenience to Manhattan. However, more recently, the extent of and type of development in the area has attracted not only the 20's and 30's age group, but also the upper aged that look to remain proximate and living among the vibrancy of youth historically attracted to the area. Bedford Avenue is the main retail strip in the area filled with shopping, design and art galleries, and a wide variety of trendy bars and restaurants. This location is a thriving retail area by day offering variety of retail and personal service shops providing for the needs of local residents, however is vibrant and robustly lively at night given the wide variety retailers catering to the trendy food, restaurant and bar scene.

### Growth Patterns

On May 11, 2005, the City Council approved the rezoning of nearly 200 blocks in the Greenpoint and Williamsburg neighborhoods. The rezoning change reflects two trends in the area: 1) The decline of the once-dominant heavy manufacturing presence in the neighborhood and 2) The conversion of vacant industrial spaces to residential loft areas in recent years. 3) The making of a greater skyline. The majority of new development in the Williamsburg neighborhood represents the conversion of former industrial buildings and sites into residential condominium units.

Since the rezoning of the area, Williamsburg has become a hot bed of luxury condominium construction. Thousands of condo and rental units were, and continue to be constructed in the neighborhood. Upward pressure on rents throughout Williamsburg has contributed to displacement of the less affluent residents already living there.

### Northside Williamsburg Development Projects

**The Edge:** The Edge waterfront development is a luxury condominium development built along the Williamsburg waterfront to the north of Northside piers, adjacent residential development. The recently completed "Edge" consists of two buildings: The Edge-North, a 15 story structure with 282 condominium units and The Edge South built 30-stories high and boasting 283 condominium units. In addition, there are two separate low-rise buildings along Kent Avenue that



house 347 affordable units.  This project also includes 63,717 SF of retail space, which is sorely needed for the new development in the area.  Further this project includes the parking garage space, licensed for 442 spaces that is the subject of this report.

Douglas Development has broken ground on a third building. The building is designed by architects the Stephen B Jacobs group. It will rise 40 stories — 398 feet — and contain 554 units. In addition, there will be 678 square feet of commercial space, 160 "dry floodproofed" parking spaces, bike storage, regular storage, a business center, a playroom, an outdoor, a gym, and, most notably, a rooftop terrace with a barbecue, pool and hot tub.

**Northside Piers:** The Northside Piers Development is a luxury condominium development built along the Williamsburg waterfront adjacent to the Edge. The development currently consists of two high-rise towers, One Northside Piers- built 30 stories high, includes 183 condominium units and Two Northside Piers –also 30 Stories, includes 283 condominium units.

A third tower, a 41 story building with 510 rental apartments at North Fourth Street, was completed as of December 2014, and joined pioneer towers like Schaefer Landing, completed in 2003, the Northside Piers development (2007) and the Edge (2008). The land for 1N4th was originally to be the site of a third condominium tower in the Northside Piers development. Due to sluggish sales however, Douglaston took over the property in 2011 and decided to approach the rental market. 184 Kent Avenue was one of Williamsburg's first warehouse to luxury rental conversions in 2010. The building contains 338 rentals, and had studios starting at $2,800 a month, one-bedrooms at $3,300 and two-bedrooms at $4,350 as of December 2014. (As of May 2015, the Williamsburg warehouse, newly dubbed Austin Nichols House after the original name of the 1915 manufacturing facility, is to be converted to one-to-three bedroom condos which will start at $800,000). According to a New York Times article from December 2014, "Rents at 1N4th will be comparable to 184 Kent. Apartments will range from studios of about 466 square feet to three-bedrooms of at least 1,249 square feet, according to Katie Ackel of MNS Real Impact Real Estate, who is marketing the building. Rents range from $2,200 to $3,250 a month for studios, $2,800 to $3,700 for one-bedrooms, and $4,200 to $5,800 for two-bedrooms, she said. Three-bedroom apartments start in the high $5,000s a month and go up to $8,500 a month." Furthermore, "as many as 10 more waterfront high-rises may eventually join 1N4th, including three towers at the Domino Sugar site and several more on sites south of the Williamsburg Bridge." These residential towers could add as many as 4,300 additional apartments to the neighborhood.

**Domino Sugar Factory Site:** South of 1N4th, but north of the Williamsburg Bridge, is the 11-acre site of an old Domino Sugar factory, where three waterfront towers, one of them 55 stories, will eventually flank the waterside refinery building, a designated landmark that will be converted to office space.  "The entire project will have more than 2,200 rental apartments, about 700 of which will be affordable; two office buildings (one tower will be half residential and half office); a school; and a six-acre park," said David Lombino, the director of special projects for Two Trees,



as reported by the New York Times. The first rental apartments will probably be available in spring or summer 2017, and the project is estimated to be completed in six to eight years

**South of Williamsburg Bridge:** Towers may eventually continue south of the Williamsburg Bridge, where there are now only a couple of residential high-rises. According to the New York Times, "470-490 Kent Avenue, now occupied by Boro Park Certified Lumber & Home Center, is to become a development called Rose Plaza on the River. Five buildings, three of which are towers, with a total of 754 apartments, are envisioned, of which 226 would be affordable, according to Howard S. Weiss, a lawyer who consulted with the owners in obtaining the permit." Another potential development spot is on 420-430 Kent Avenue, the former Kedem Winery. Zoning allows for more than 800 rental apartments with 20% of them affordable.

**McCarren Park:** Along the border of Williamsburg and Greenpoint is 35-acre McCarren Park.  The parks highlight is the McCarren Pool which was one of 11 public pools opened in the summer of 1936 by Mayor Fiorello LaGuardia and Parks Commissioner Robert Moses. It closed in 1984 due to deterioration of its infrastructure and public opposition to its renovation. The site was abandoned for more than 20 years and was an example of urban decline. In 2009, Mayor Michael R. Bloomberg and Parks Commissioner Adrian Benepe broke ground on the restoration of McCarren Pool. $50 million dollars was allocated to fund the renovation of the historic McCarren pool and to develop a year-round recreation center. As of July 2012, the New McCarren Park pool opened to the public. The redesign included a conversion of the pool to ice skating rink during winter months; a year-round recreation center, weight and cardio rooms, multipurpose community rooms, office space; and preservation and restoration of the historic bathhouse building and entry arch.

**Access**

The area has relatively good access via public transportation.  The J, M, and Z trains can be accessed from Broadway and Marcy Avenue, just under the Williamsburg Bridge just west of the subject site. This train crosses the East River to lower Manhattan. The first Manhattan stop is at Delancey Street where commuters can access the B-D-F and M trains which traverse though lower and midtown Manhattan, thus offering proximity to the core workplaces and office markets. The L-train has a stop at the corner of Graham Avenue and Metropolitan Ave, which is less than a block from the subject property.  This train navigates under the East River and its third stop in Manhattan is at Union Square, whereby it connects with the N-R-Q-W and 4-5-6 trains. These subway lines provide access to upper and lower Manhattan. The L-train is a cross town shuttle which heads west to 8th Avenue and also grants access to the F-M, A-C-E, and 1-2 and 3 trains as well. Thus, the L-train crosses paths with every major subway, and not only provides transfer for transportation to upper and lower Manhattan, but also affords access to Brooklyn, Queens and the Bronx. The G train also runs north and south through the neighborhood, providing



access to north to queens as well as south and east to other parts of Brooklyn. Below is a map of the neighborhoods subway access. The subject is in good position for subway access, and is closest to the L train stops at Bedford Avenue and Lorimer Street.



A Water taxi service is offered at the waterfront esplanade by NY Waterway at the waterfront piers located at North 6th Street and the East River. This service offers travel to and from 33rd and 34th Streets in Midtown Manhattan as well as Pier 11 at Wall Street in lower Manhattan, amongst other locations. The taxi provides a commuting service from Williamsburg to Lower Manhattan daily on an hourly basis, with more frequent service (every 20 minutes) at high use (rush hour) times. Single ride, weekly and monthly tickets are available.

The area is accessible by automobile via nearby expressways and parkways including the Brooklyn Queens Expressway and the Long Island Expressway. In addition main roadways in the area include Grand Street, Metropolitan Avenue, and Flushing Avenue, which provide east-west access. Manhattan Avenue and Bushwick Avenue provide north-south access. Entrance to Manhattan is provided via the Williamsburg Bridge and the Midtown Tunnel. These routes are accessible via Grand Street and the Long Island Expressway respectively.

Finally, the area is serviced by two major airports. John F. Kennedy (JFK) International airport is located just east of Brooklyn off the Belt Parkway in Queens, and LaGuardia Airport is located north of Brooklyn in northern Queens just off the Grand Central Parkway. Both airports are easily accessed by both vehicle and public transportation from Brooklyn.



## Demographics

Selected neighborhood demographics for the immediate subject neighborhood, and the county are shown in the following table:

| SELECTED DEMOGRAPHICS | | |
|---|---|---|
| 55 Wythe Ave<br>Brooklyn, NY 11249 | Kings County | 11249 - Brooklyn |
| Population | | |
| 2026 Total Population | 2,612,421 | 47,324 |
| 2021 Total Population | 2,567,163 | 43,493 |
| 2010 Total Population | 2,504,700 | 30,208 |
| 2000 Total Population | 2,465,326 | 30,982 |
| *Annual Growth 2021 - 2026* | *0.35%* | *1.70%* |
| *Annual Growth 2010 - 2021* | *0.22%* | *3.37%* |
| *Annual Growth 2000 - 2010* | *0.16%* | *-0.25%* |
| Households | | |
| 2026 Total Households | 967,701 | 18,264 |
| 2021 Total Households | 948,409 | 16,561 |
| 2010 Total Households | 916,856 | 10,526 |
| 2000 Total Households | 880,727 | 7,639 |
| *Annual Growth 2021 - 2026* | *0.40%* | *1.98%* |
| *Annual Growth 2010 - 2021* | *0.31%* | *4.21%* |
| *Annual Growth 2000 - 2010* | *0.40%* | *3.26%* |
| Income | | |
| 2021 Median Household Income | $65,282 | $99,319 |
| 2021 Average Household Income | $99,082 | $138,642 |
| 2021 Per Capita Income | $36,671 | $52,801 |
| 2021 Pop 25+ College Graduates | 698,287 | 15,783 |
| Age 25+ Percent College Graduates - 2021 | 39.7% | 56.0% |
| Source:  ESRI | | |

As shown above, the population within the Williamsburg neighborhood(s) has grown considerably in the last five years and has increased at a greater rate than the rest of Brooklyn (Kings County) since 2010. This trend is expected to continue through 2026. The subject waterfront zip code is experiencing high growth rate due to the larger scale developments that have occurred on the available land in this location. The number of households in the subject's zip code has increased by nearly 2% annually in the last five years.

Although the Claritas data indicates an average household income of a middle income demographic, there is an abundance of luxury rental and condominium product that has been developed and absorbed over the last 10 years. This is attracting a more affluent character, and consequently, the demographics should shift toward higher per capita and household income levels into the foreseeable future. The current pricing reflects the upper end of the Brooklyn



housing market for both condominiums and rental properties. As a result, although it's not indicated in the Claritas report, the current housing prices in the area make a good argument that the household income in the area is most likely above average for Brooklyn.

## Williamsburg Residential Outlook

| WILLIAMSBURG MARKET SNAPSHOT | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Condo | | Co-ops | | New Devs | | Rental | |
| | Listings | Median Price | Listings | Median Price | Listings | Median Price | Listings | Median Price |
| Studio | 8 | $699,000 | - | - | - | - | 75 | $2,750 |
| 1 BR | 52 | $906,690 | - | - | - | - | 252 | $3,250 |
| 2 BR | 56 | $1,399,500 | - | - | - | - | 282 | $3,500 |
| 3 BR | 16 | $2,467,500 | - | - | - | - | 101 | $3,999 |
| 3 + BR | 4 | $4,775,000 | - | - | - | - | 25 | $4,800 |
| Source: Streeteasy.com | | | | | | | | |

## Neighborhood Conclusion

Williamsburg as a whole is a middle income community that is moving toward higher income demographics, that borders lower income neighborhoods. The Northside section of Williamsburg has witnessed significant gentrification within the last 10 years and represents a higher income demographic than the other sections of the neighborhood. The population has been growing substantially in the past five years and is expected to continue to do so in the near future.

Development has been prolific and will provide an increasing demand for housing in the area. However, the main demand driver for the neighborhood is its proximity to Manhattan. The Bedford and Marcy Ave Stations on the L and J-Z subway lines respectively, are located just one stop from Manhattan. As a result, the neighborhood has been competing and attracting Manhattan residents because of its lower price points for modern housing, neighborhood vibrancy, and quick commute to Manhattan employment. The neighborhood has developed into a destination neighborhood with an eclectic mix of restaurants and night life and has become an extension of the Lower East Side. The long-term outlook for the neighborhood is quite favorable.



# Site Analysis

The following chart summarizes the salient characteristics of the subject site.

| SITE SUMMARY AND ANALYSIS | | |
|---|---|---|
| **Physical Description** | | |
| Gross Site Area | 1.15 Acres | 50,000 Sq. Ft. |
| Net Site Area | 1.15 Acres | 50,000 Sq. Ft. |
| Primary Road Frontage | N 12th St. | 250 Feet |
| Secondary Road Frontage | Wythe Ave. | 200 Feet |
| Additional Road Frontage | N 13th St. | 250 Feet |
| Shape | Rectangular | |
| Topography | Level | |
| Zoning District | M1-2 | |
| Flood Map Panel No. & Date | 3604970202F | 5-Sep-07 |
| Flood Zone | Zone X | |
| Adjacent Land Uses | Commercial, Industrial, and Residential uses | |
| **Comparative Analysis** | **Rating** | |
| Visibility | Average | |
| Functional Utility | Assumed adequate | |
| Traffic Volume | Average | |
| Adequacy of Utilities | Assumed adequate | |
| Landscaping | Average | |
| Drainage | Assumed adequate | |
| **Utilities** | **Provider** | **Adequacy** |
| Water | City of New York | Yes |
| Sewer | City of New York | Yes |
| Natural Gas | ConEd / National Grid | Yes |
| Electricity | ConEd | Yes |
| Telephone | Various | Yes |
| Mass Transit | Metropolitan Transit Authority | Yes |
| **Other** | **Yes** | **No** | **Unknown** |
| Detrimental Easements | | x | |
| Encroachments | | x | |
| Deed Restrictions | | x | |
| Reciprocal Parking Rights | | x | |
| Source:  Various sources compiled by CBRE | | | |

## INGRESS/EGRESS

Ingress and egress is available to the site via a North 12th Street, Wythe Avenue, and North 13th Street.

## ENVIRONMENTAL ISSUES

The appraiser is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site.   The existence of



hazardous materials or underground storage tanks may affect the value of the property. For this appraisal, CBRE, Inc. has specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

## ADJACENT PROPERTIES

The adjacent land uses are summarized as follows:

| | |
|---|---|
| North: | Industrial, Office |
| South: | Industrial |
| East: | Industrial |
| West: | Hotel, Industrial |

## CONCLUSION

The site is rectangular shaped, is well located and afforded good access and good visibility from roadway frontage. The size of the site is typical for the area and use. There are no known detrimental uses in the immediate vicinity. Overall, there are no known factors which are considered to prevent the site from development to its highest and best use.



Site Analysis

## FLOOD PLAIN MAP





## IMPROVEMENTS LAYOUT





# Improvements Analysis

The following chart shows a summary of the improvements.

| IMPROVEMENTS SUMMARY AND ANALYSIS | |
|---|---|
| Property Type | Hotel        (Resort) |
| Number of Buildings | 1 |
| Number of Stories | 23 |
| Year Built | 2017 |
| Gross Building Area | 275,238 SF |
| Number of Guest Rooms | 183 |
| Restaurant/Lounge | Year-Round: Westlight, Leuca; Seasonal: Mister Dips, Vale Pool Area |
| Meeting/Banquet Rooms | Ballroom, Westlight, Conference Rooms, Terrace, 23rd Floor, Leuca Private Dining Room |
| Property Amenities | Pool, Spa, Fitness Center, Public Park, Parking |
| Parking Type: | Parking Garage |
| Parking Spaces: | 228 |
| Source:  Various sources compiled by CBRE | |

Building plans and specifications were not provided for the preparation of this appraisal. A site visit was also conducted without management. CBRE was not able to visit the rooms and other portions of the property. Our improvement analysis relies on a prior appraisal written by Michelle Zell, MAI in December 2019.



Stacking Plan

Cellar - Retail space, ballroom, conference and board rooms, employee areas, commercial kitchen, mechanicals

Cellar Mezzanine - F&B accessory spaces

Ground - Retail, hotel and office lobbies, restaurant, pedestrian plaza, loading dock

FLOOR 2 - The Vale Park, parking

FLOOR 3 - Parking

FLOOR 4 - Outdoor event space, hotel fitness center, pool deck with kitchen and bar, bridge to The Vale Park

FLOOR 5-9 - Office Space (includes both commercial office space and community facility i.e. Doctor's offices

FLOOR 10 - Mechanicals, IT room

FLOORS 11-12, 14-19 - 20 hotel rooms per floor including two junior suites

FLOOR 20 - 12 rooms including The Vale Garden Residence (a "presidential suite" with 2 bedrooms and living areas spread over 3000 SF of indoor and outdoor space), 2 one-bedroom suites and 2 junior suites

FLOOR 21 - 11 rooms including 2 one-bedroom suites and 2 junior suites

FLOOR 22 - Westlight, a rooftop restaurant/bar/cocktail lounge

FLOOR 23 - Westlight Roof Deck; an outdoor event space with unparalleled city views



## YEAR BUILT

The property was built in 2017.

## PROPERTY LAYOUT

| Floor | Gross SF | Deductions | ZFA | Use |
|---|---|---|---|---|
| Cellar | 50,000 | 50,000 | 0 | Retail, ballroom, meeting space, kitchen |
| Cellar Mezz | 1,899 | 1,899 | 0 | Hotel |
| 1 | 30,752 | 9,886 | 20,866 | Retail, Hotel Lobby, restaurant |
| 2 | 20,078 | 19,594 | 484 | Parking, park |
| 3 | 31,966 | 18,912 | 13,054 | Parking |
| 4 | 3,397 | 172 | 3,225 | Hotel Amenity space (pool, gym) |
| 5 | 8,649 | 608 | 8,041 | Office |
| 6 | 8,669 | 953 | 7,717 | Office |
| 7 | 8,669 | 953 | 7,717 | Office |
| 8 | 8,669 | 953 | 7,717 | Office |
| 9 | 8,669 | 953 | 7,717 | Office |
| 10 | 8,878 | 8,878 | 0 | Mechanical |
| 11 | 7,964 | 676 | 7,288 | Hotel |
| 12 | 7,964 | 644 | 7,320 | Hotel |
| 14 | 7,964 | 644 | 7,320 | Hotel |
| 15 | 7,964 | 644 | 7,320 | Hotel |
| 16 | 7,964 | 644 | 7,320 | Hotel |
| 17 | 7,964 | 644 | 7,320 | Hotel |
| 18 | 7,964 | 644 | 7,320 | Hotel |
| 19 | 7,964 | 644 | 7,320 | Hotel |
| 20 | 6,963 | 673 | 6,290 | Hotel |
| 21 | 6,967 | 696 | 6,271 | Hotel |
| 22 | 5,631 | 386 | 5,245 | Restaurant |
| 23 | 834 | 834 | 0 | Roof top lawn/event space |
| Bulkhead | 834 | 834 | 0 | Hotel |
| Total | 275,238 | 122,371 | 152,867 | |
| Total Above Grade | 223,339 | 70,472 | 152,867 | |



## HOTEL ROOM MIX

### Hotel Room Type Summary

| Room Type | # Rooms | % of Total |
|---|---|---|
| Standard King | 120 | 66 |
| Corner Suite | 20 | 11 |
| Gotham Queen (Manhattan view) | 10 | 5.5 |
| Gotham King (Manhattan view) | 20 | 11 |
| 2 Double Beds | 8 | 4 |
| Bedroom Suites | 4 | 2 |
| Vale Garden Residence | 1 | 0.5 |
| **Total** | **183** | **100** |

## PROPERTY AMENITIES & FEATURES

Subject has a 24-hour fitness center, a bar/lounge and a rooftop terrace. WiFi in public areas is free. Additionally, a 24-hour business center, a 24-hour front desk, a conference center, and a coffee shop/café are onsite. The subject has a seasonal outdoor pool that is used during spring/summer. The subject offers dry cleaning/laundry services.

Room features include a soundproofed rooms, free WiFi and MP3 docks. Flat-screen TVs come with cable channels, and guests can also appreciate conveniences like refrigerators and coffee makers.

## LIFE SAFETY AND FIRE PROTECTION

CBRE, Inc. is not qualified to determine adequate levels of safety & fire protection, whereby it is recommended that the client/reader review available permits, etc. prior to making a business decision.

## FUNCTIONAL UTILITY

The current design characteristics of the subject appear to meet modern standards. All of the floor plans are considered to feature functional layouts and the overall layout of the property is considered functional in utility. The unit mix appears functional and no conversion is warranted.

## ADA COMPLIANCE

All common areas of the property appear to have handicap accessibility. The client/reader's attention is directed to the specific limiting conditions regarding ADA compliance.

## ENVIRONMENTAL ISSUES

The appraiser is not qualified to detect the existence of any potentially hazardous materials such as lead paint, asbestos, urea formaldehyde foam insulation, or other potentially hazardous



construction materials on or in the improvements.  The existence of such substances may affect the value of the property.  For the purpose of this assignment, we have specifically assumed there are no hazardous materials that would cause a loss in value to the subject.

## ECONOMIC AGE AND LIFE

CBRE, Inc.'s estimate of the subject improvements effective age and remaining economic life is depicted in the following chart:

| ECONOMIC AGE AND LIFE | |
|---|---|
| Actual Age | 5 Years |
| Effective Age | 5 Years |
| MVS Expected Life | 60 Years |
| Remaining Economic Life | 55 Years |
| Accrued Physical Incurable Depreciation | 8.3% |
| Compiled by CBRE | |

The remaining economic life is based upon our on-site observations and a comparative analysis of typical life expectancies as published by Marshall and Swift, LLC, in the Marshall Valuation Service cost guide.  While CBRE, Inc. did not observe anything to suggest a different economic life, a capital improvement program could extend the life expectancy.

## CONCLUSION

The improvements are in excellent condition. Despite our limited site inspections, the property is brand new and appears to be well maintained.



# Zoning

The following chart summarizes the subject's zoning requirements.

## NYC ZONING SUMMARY

| | |
|---|---|
| **Zoning District** | M1-2 |
| **Legal Use** | Yes |
| **Legally Complying Density** | Yes |
| **Type** | Light Manufacturing District (High Performance) |
| **Permitted Uses** | M1 districts range from the Garment District in Manhattan and Port Morris in the Bronx with multistory lofts, to parts of Red Hook or College Point with one- or two-story warehouses characterized by loading bays. M1 districts are often buffers between M2 or M3 districts and adjacent residential or commercial districts. M1 districts typically include light industrial uses, such as woodworking shops, repair shops, and wholesale service and storage facilities. Nearly all industrial uses are allowed in M1 districts if they meet the stringent M1 performance standards. Offices, hotels and most retail uses are also permitted. Certain community facilities, such as hospitals, are allowed in M1 districts only by special permit, but houses of worship are allowed as-of-right.<br><br>In M1-5A and M1-5B districts mapped in SoHo/NoHo, artists may occupy joint living-work quarters as an industrial use. Other than M1 districts paired with residence districts in Special Mixed Use Districts, M1-5M and M1-6M districts (by special permit) and M1-D districts (by authorization or certification) are the only manufacturing districts in which residences are permitted. However, in M1-6D districts, residential use may be allowed as-of-right on zoning lots under certain conditions.<br><br>In M1-5M and M1-6M districts, mapped in parts of Chelsea, space in an industrial building may be converted to residential use, provided a specified amount of floor area is preserved for particular industrial and commercial uses.<br><br>Floor area ratios in M1 districts range from 1.0 to 10.0, depending on location; building height and setbacks are controlled by a sky exposure plane which may be penetrated by a tower in certain districts. Although new industrial buildings are -usually low-rise structures that fit within sky exposure plane, commercial and community facility buildings can be constructed as towers in M1-3 through M1-6 districts. In the highest density manufacturing district, M1-6, mapped only in Manhattan, an FAR of 12 can be achieved with a bonus for a public plaza. Except along district boundaries, no side yards are required. Rear yards at least 20 feet deep are usually required, except within 100 feet of a corner.<br><br>Parking and loading requirements vary with district and use. M1-1, M1-2 and M1-3 districts are subject to parking requirements based on the type of use and size of an establishment. For example, a warehouse in an M1-1 district requires one off-street parking space per 2,000 square feet of floor area or per every three employees, whichever would be less. Parking is not required in Long Island City or M1-4, M1-5 and M1-6 districts, mapped mainly in Manhattan. Requirements for loading berths of specified dimensions differ according to district, size and type of use. |
| **Maximum FAR** | Commercial: 2, Allowable Facility: 4.8 |
| **Additional FAR Information** | In Community District 1, in the Borough of Queens, in the M1-2 District bounded by a line 100 feet southwesterly of 37th Avenue, a line 100 feet southeasterly of 24th Street, a line 100 feet southwesterly of 39th Avenue, 24th Street, and a line 100 feet northeasterly of 40th Avenue, 23rd Street, 39th Avenue and 24th Street, the maximum floor area ratio shall be increased to 4.0 provided that such additional floor area is limited to the following uses: photographic or motion picture production studios and radio or television studios listed in Use Group 10A; and uses listed in Use Groups 16A, 16D, 17A and 17B as set forth in Section 123-22 (Modification of Use Groups 16, 17 and 18), except for automobile, motorcycle, trailer or boat sales, motorcycle or motor scooter rental establishments, poultry or rabbit killing establishments, riding academies, stables for horses and trade schools for adults.  For buildings used for a conforming manufacturing use which were in existence prior to December 15, 1961, such buildings or structures may be expanded for a manufacturing use.  Such expansion may consist of an enlargement, or additional development, on the same zoning lot, provided that:<br>(a) the resulting total floor area shall not be greater than:<br>(1) 150 percent of the floor area existing on December 15, 1961; or<br>(2) 110 percent of the maximum floor area otherwise permitted under the provisions of Section 43-12 (Maximum Floor Area Ratio).<br>(b) the resulting floor area ratio shall not exceed the highest of:<br>(1) 150 percent of the maximum floor area ratio otherwise permitted under the provisions of Section 43-12;<br>(2) 110 percent of the floor area ratio existing on December 15, 1961; or<br>(3) a floor area ratio of 2.4, provided that in the event this paragraph, (b)(3), is utilized, the City Planning Commission shall administratively certify and the City Council approve, that such expansion will not adversely affect the surrounding area. |
| **Special Resolution:** | On December 20, 2018, the City Council adopted the M1 Hotel Text amendment 42-111 with modifications that regulated M1 Districts to allow hotel development in the district.  The amendment calls for special City Council review of new hotel development in M district. |
| **Source:** | Zoning Text by NYC Department of City Planning |

31



## ANALYSIS AND CONCLUSION

The improvements represent a legally-conforming use and, if damaged, may be restored without special permit application. Additional information may be obtained from the appropriate governmental authority. For purposes of this appraisal, CBRE has assumed the information obtained is correct.

## ZONING MAP





# Tax and Assessment Data

The subject property is assessed and taxed by the City of New York on an ad valorem basis. Real property in New York State is not required to be assessed at 100% of market value, but all the ratables within a taxing jurisdiction must be assessed at a consistent percentage of market value. The state legislature exempted the City of New York from this requirement. As such, NYC is permitted to classify real property by type and to assess classifications at different fractions of their market values thus the legislature permitted the taxation burden to be shared inequitably among categories of properties in this area.

In New York City, reassessments occur annually, and local authorities' phase in changes over a five-year period. During the phase-in, the annual assessed values are "transitional values". The full reassessed value is the "actual" or "target" value. The first transitional value is the original assessed value plus 20% of the difference between the original and target values. The 20% increments are added to each prior year's transitional value. The overall building is identified as Block 2283, Lot 1 and is currently assessed as a Class IV property. Its current and historical transitional and actual assessments are as follows.

| AD VALOREM TAX INFORMATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Block 2283, Lot 1 | 2015/2016 | 2016/2017 | 2017/2018 | 2018/2019 | 2019/2020 | 2020/2021 | 2021/2022 | 2022/2023T |
| Market Value | $2,000,000 | $9,933,276 | $39,070,000 | $46,912,000 | $42,513,000 | $44,671,000 | $37,742,000 | $39,910,000 |
| Actual Assessment | | | | | | | | |
|   Land | $900,000 | $900,000 | $900,000 | $900,000 | $900,000 | $900,000 | $900,000 | $900,000 |
|   Building | $0 | $3,569,974 | $16,681,500 | $20,210,400 | $18,230,850 | $19,201,950 | $16,083,900 | $17,059,500 |
|   Total | $900,000 | $4,469,974 | $17,581,500 | $21,110,400 | $19,130,850 | $20,101,950 | $16,983,900 | $17,959,500 |
| Transitional Assessment | | | | | | | | |
|   Land | $556,200 | $900,000 | $900,000 | $900,000 | $900,000 | $900,000 | $900,000 | $900,000 |
|   Building | $0 | $3,307,174 | $16,499,700 | $20,119,500 | $19,814,490 | $19,612,800 | $18,787,500 | $18,157,320 |
|   Total | $556,200 | $4,207,174 | $17,399,700 | $21,019,500 | $20,714,490 | $20,512,800 | $19,687,500 | $19,057,320 |
|   Taxable Assessment | $556,200 | $4,207,174 | $17,399,700 | $21,019,500 | $20,714,490 | $20,512,800 | $16,983,900 | $17,959,500 |
| General Tax Rate   (per $100 A.V.) | 10.656 | 10.656 | 10.514 | 10.514 | 10.537 | 10.694 | 10.755 | 10.863 |
| **Total Taxes after exemption** | **$59,269** | **$476,320** | **$1,829,404** | **$2,209,990** | **$2,015,818** | **$2,149,703** | **$1,826,618** | **$1,950,860** |
| Exemption | $0 | $0 | $1,702,009 | $1,702,009 | $1,702,009 | $1,702,009 | $1,702,009 | $1,702,009 |
| **Total Real Estate Tax Liability** | **$59,269** | **$476,320** | **$127,395** | **$507,981** | **$313,809** | **$447,694** | **$124,609** | **$248,851** |
| (1) The 2015/2016 tax rate is projected at 1.0% increase over prior year rate. | | | | | | | | |
| Source:  Assessor's Office | | | | | | | | |

## DELINQUENCY

Tax payments are reportedly current

## TAX COMPARABLES

As a crosscheck to the subject's applicable real estate taxes, CBRE, Inc. has reviewed the real estate tax information according to  County for comparable properties in the market area. The following table summarizes the comparables employed for this analysis:



| AD VALOREM TAX COMPARABLES | | | | | |
|---|---|---|---|---|---|
| Comparable Hotel | The Hoxton Williamsburg | The Williamsburg Hotel | Wythe Hotel | McCarren Hotel | **The William Vale** |
| Year Built | 2018 | 2016 | 2012 | 2011 | 2017 |
| No. Rooms | 175 | 147 | 69 | 64 | 183 |
| Tax Year | 2021/22 | 2021/22 | 2021/22 | 2021/22 | 2021/22 |
| **Assessor's Actual Value** | $10,723,050 | $11,216,700 | $16,785,450 | $5,780,700 | $16,983,900 |
| **Transitional Value** | $13,789,710 | $15,634,410 | $20,572,380 | $9,503,910 | $19,687,500 |
| **AV Per Room** | $61,275 | $76,304 | $243,267 | $90,323 | $92,808 |
| **TAV per Room** | $78,798 | $106,357 | $298,150 | $148,499 | $107,582 |
| Source: Assessor's Office | | | | | |

Assessments for comparable properties have a target "actual" assessed value ranging from $61,275 to $243,267 per room, with an average of $117,792. The "transitional" assessed value ranges from $78,798 to $298,150 per room, with an average of $157,951. The subject's "actual" assessment is noted at $92,808 per room for the actual assessed value and $107,582 per room for the transitional assessed value., which is in the middle of the range and thus considered reasonable. Assessments have been reduced in 2021 given lower revenues due to Covid, but as revenues increase going forward, we have forecast assessment growth greater than inflationary expectation. We have increased the assessment by 10% per year to 2024/2025 which brings assessment levels back toward pre-covid levels. We have increased assessment by 2.0% per year thereafter.

## FUTURE TAX INCREASES

The New York City Council sets the annual tax rate for each property class based on the total amount of ratables and budget needs. The rate is typically established in June and takes effect on July 1st; however at times the rate is established or changed in the middle of the tax year, resulting 1st half and 2nd half rates.

Below is a history summary of tax rates for the City of New York:



Tax and Assessment Data

## NYC TAX RATES

| YEAR | Tax Class I | | Tax Class II | | Tax Class III | | Tax Class IV | |
|---|---|---|---|---|---|---|---|---|
| | Rate | % Change | Rate | % Change | Rate | % Change | Rate | % Change |
| CBRE Projection 22/23 | 21.507% | 1.00% | 12.357% | 1.00% | 12.412% | 1.00% | 10.863% | 1.00% |
| 21/22 | 21.294% | 1.19% | 12.235% | -0.26% | 12.289% | -4.19% | 10.755% | 0.57% |
| 20/21 | 21.045% | -0.58% | 12.267% | -1.65% | 12.826% | 2.31% | 10.694% | 1.49% |
| 19/20 | 21.167% | 1.19% | 12.473% | -1.10% | 12.536% | 3.66% | 10.537% | 0.22% |
| 18/19 | 20.919% | 2.62% | 12.612% | -0.84% | 12.093% | 1.70% | 10.514% | 0.00% |
| 17/18 | 20.385% | 1.97% | 12.719% | -1.34% | 11.891% | 8.75% | 10.514% | -0.57% |
| 16/17 | 19.991% | 2.23% | 12.892% | 0.07% | 10.934% | 1.12% | 10.574% | -0.77% |
| 15/16 | 19.554% | 2.07% | 12.883% | 0.22% | 10.813% | -2.80% | 10.656% | -0.26% |
| 14/15 | 19.157% | -0.18% | 12.855% | -2.21% | 11.125% | -6.53% | 10.684% | 3.50% |
| 13/14 | 19.191% | 3.35% | 13.145% | -0.27% | 11.902% | -4.61% | 10.323% | 0.34% |
| 12/13 | 18.569% | 2.00% | 13.181% | -1.88% | 12.477% | 0.03% | 10.288% | 1.34% |
| 11/12 | 18.205% | 4.84% | 13.433% | 0.60% | 12.473% | -1.25% | 10.152% | -1.55% |
| 10/11 | 17.364% | 1.62% | 13.353% | 0.85% | 12.631% | -0.88% | 10.312% | -1.09% |
| 09/10 | 17.088% | 1.79% | 13.241% | 1.44% | 12.743% | 1.32% | 10.426% | -1.75% |
| 08/09 3rd/4th Qtr. | 16.787% | 7.57% | 13.053% | 7.53% | 12.577% | 7.51% | 10.612% | 7.52% |
| 08/09 1st/2nd Qtr. | 15.605% | 1.11% | 12.139% | 1.77% | 11.698% | 1.05% | 9.870% | -1.88% |
| 07/08 | 15.434% | -4.24% | 11.928% | -6.35% | 11.577% | -3.58% | 10.059% | -8.53% |
| 06/07 | 16.118% | 2.36% | 12.737% | 2.75% | 12.007% | -2.45% | 10.997% | -2.73% |

Source: New York City Department of Finance

## INDUSTRIAL AND COMMERCIAL ABATEMENT PROGRAM

The Industrial and Commercial Abatement Program provides abatements for real property taxes for varying periods up to 25 years. Eligible industrial and commercial buildings must be built, modernized, expanded, or otherwise physically improved. To be eligible for commercial New Construction benefits, an applicant may build anywhere in New York City except in Manhattan, south of the centerline of 96th Street and north of Murray, Frankfort, and Dover Streets. The subject had qualified for this program from original construction in 2009 and is currently in the mid-years of the program.

The taxable assessment for the improvements is reduced by 100% of the exemption for the first 16 years of the exemption period, then by a sliding scale of 10% per year for the remaining nine years of the exemption period. The following chart illustrates the taxes and tax savings for the subject property. The "As If No ICAP" taxable assessment represents current assessment of the subject property and its current exemption and our forecasts of future year assessments and exemptions. We have further estimated the value of the exemption utilizing a safer discount rate of 5.50% for the tax savings when converting to value.



**William Vail ICAP**                **Projected Assessment**

**Brooklyn, NY**                **& ICAP-25 yr. Tax Exemption Benefits**

| Year | Year of Programs | Taxable Assessment If No ICAP-25 y | Projected Tax Rate | Real Estate Taxes (As If No ICAP-25 yr.) | Real Estate Taxes (Incl. ICAP-25 yr.) | Real Estate Tax Savings |
|------|------------------|-----------------------------------|--------------------|------------------------------------------|---------------------------------------|-------------------------|
| 2017/18 | 1 | $17,399,700 | 10.514 | $1,829,404 | $127,395 | $1,702,009 |
| 2018/19 | 2 | $21,019,500 | 10.514 | $2,209,990 | $507,981 | $1,702,009 |
| 2019/20 | 3 | $19,130,850 | 10.537 | $2,015,818 | $313,809 | $1,702,009 |
| 2020/21 | 4 | $20,101,950 | 10.694 | $2,149,703 | $447,694 | $1,702,009 |
| 2021/22 | 5 | $16,983,900 | 10.755 | $1,826,618 | $124,609 | $1,702,009 |
| 2022/23 | 6 | $17,959,500 | 10.863 | $1,950,860 | $248,851 | $1,702,009 |
| 2023/24 | 7 | $18,318,690 | 10.971 | $2,009,776 | $307,767 | $1,702,009 |
| 2024/25 | 8 | $18,409,821 | 11.081 | $2,039,971 | $337,962 | $1,702,009 |
| 2025/26 | 9 | $18,201,184 | 11.192 | $2,037,021 | $335,012 | $1,702,009 |
| 2026/27 | 10 | $18,692,392 | 11.304 | $2,112,916 | $410,907 | $1,702,009 |
| 2027/28 | 11 | $19,066,240 | 11.417 | $2,176,726 | $474,717 | $1,702,009 |
| 2028/29 | 12 | $19,447,564 | 11.531 | $2,242,463 | $540,454 | $1,702,009 |
| 2029/30 | 13 | $19,836,516 | 11.646 | $2,310,185 | $608,176 | $1,702,009 |
| 2030/31 | 14 | $20,233,246 | 11.763 | $2,379,953 | $677,944 | $1,702,009 |
| 2031/32 | 15 | $20,637,911 | 11.880 | $2,451,827 | $749,818 | $1,702,009 |
| 2032/33 | 16 | $21,050,669 | 11.999 | $2,525,873 | $823,864 | $1,702,009 |
| 2033/34 | 17 | $21,471,683 | 12.119 | $2,602,154 | $1,070,346 | $1,531,808 |
| 2034/35 | 18 | $21,901,116 | 12.2402 | $2,680,739 | $1,455,292 | $1,225,446 |
| 2035/36 | 19 | $22,339,139 | 12.3626 | $2,761,697 | $1,903,885 | $857,813 |
| 2036/37 | 20 | $22,785,921 | 12.4862 | $2,845,101 | $2,330,413 | $514,688 |
| 2037/38 | 21 | $23,241,640 | 12.6111 | $2,931,023 | $2,673,679 | $257,344 |
| 2038/39 | 22 | $23,706,473 | 12.7372 | $3,019,539 | $2,916,602 | $102,938 |
| 2039/40 | 23 | $24,180,602 | 12.8646 | $3,110,730 | $3,079,848 | $30,881 |
| 2040/41 | 24 | $24,664,214 | 12.9932 | $3,204,674 | $3,198,497 | $6,176 |
| 2041/42 | 25 | $25,157,498 | 13.1231 | $3,301,455 | $3,300,837 | $618 |

|  |  |  |  | AS IS NPV | 8.50% | $13,390,293 |
|  |  |  |  |  |  | **$13,400,000** |
|  |  |  |  | AS STAB NPV | 8.50% | $12,214,699 |
|  |  |  |  |  |  | **$12,200,000** |

Compiled by CBRE

## TAX AND ASSESSMENT CONCLUSIONS

Based on the foregoing information, the subject's current assessment is well supported by the comparable properties shown. We utilized an 8.5% discount rate to the real estate tax savings for the balance of the tax exemption. For the purposes of this analysis, we have used the projected abated tax amounts in our projection of cash flows, yet for the direct capitalization, utilize the actual tax and add in the value of the abatement to the value conclusion.



**Tax and Assessment Data**

### R.E. TAXES - TRANSITIONAL ASSESSMENT PHASE-IN  -  LOT 11

| Tax | Yr. | Act. Assmt. | Trans. Assmt. | 2019/ 2020 | 2020/ 2021 | 2021/ 2022 | 2022/ 2023 | 2023/ 2024 | 2024/ 2025 | 2025/ 2026 | 2026/ 2027 | 2027/ 2028 | 2028/ 2029 | 2029/ 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | / 20 | $19,130,850 | $20,714,490 | -$395,910 | -$395,910 | -$395,910 | -$395,910 | -$395,910 | | | | | | |
| 2020 | / 21 | $20,101,950 | $20,512,800 | | $194,220 | $194,220 | $194,220 | $194,220 | $194,220 | | | | | |
| 2021 | / 22 | $16,983,900 | $19,687,500 | | | -$623,610 | -$623,610 | -$623,610 | -$623,610 | -$623,610 | | | | |
| 2022 | / 23 | $17,959,500 | $19,057,320 | | | | $195,120 | 195,120 | 195,120 | $195,120 | $195,120 | | | |
| 2023 | / 24 | $18,318,690 | $18,498,978 | | | | | $71,838 | $71,838 | $71,838 | $71,838 | $71,838 | | |
| 2024 | / 25 | $18,685,064 | $18,409,821 | | | | | | $73,275 | $73,275 | $73,275 | $73,275 | $73,275 | |
| 2025 | / 26 | $19,058,765 | $18,201,184 | | | | | | | $74,740 | $74,740 | $74,740 | $74,740 | 74,740 |
| 2026 | / 27 | $19,439,940 | $18,692,392 | | | | | | | | $76,235 | $76,235 | $76,235 | 76,235 |
| 2027 | / 28 | $19,828,739 | $19,066,240 | | | | | | | | | $77,760 | $77,760 | 77,760 |
| 2028 | / 29 | $20,225,314 | $19,447,564 | | | | | | | | | | $79,315 | $79,315 |
| 2029 | / 30 | $20,629,820 | $19,836,516 | | | | | | | | | | | $80,901 |
| | | | **Previous Transitional** | $21,110,400 | $20,714,490 | $20,512,800 | $19,687,500 | $19,057,320 | $18,498,978 | $18,409,821 | $18,201,184 | $18,692,392 | $19,066,240 | $19,447,564 |
| | | | **Phase In** | ($395,910) | ($201,690) | ($825,300) | ($630,180) | ($558,342) | (89,157) | (208,637) | 491,208 | 373,848 | 381,325 | 388,951 |
| | | | **Current Trans. Assessment** | $20,714,490 | $20,512,800 | $19,687,500 | $19,057,320 | $18,498,978 | $18,409,821 | $18,201,184 | $18,692,392 | $19,066,240 | $19,447,564 | $19,836,516 |
| | | | **Current Actual Assessment** | $19,130,850 | $20,101,950 | $16,983,900 | $17,959,500 | $18,318,690 | $18,685,064 | $19,058,765 | $19,439,940 | $19,828,739 | $20,225,314 | $20,629,820 |
| | | | **Taxable (min of Actual & Trans.)** | $19,130,850 | $20,101,950 | $16,983,900 | $17,959,500 | $18,318,690 | $18,409,821 | $18,201,184 | $18,692,392 | $19,066,240 | $19,447,564 | $19,836,516 |
| | | | **Taxable amount** | $19,130,850 | $20,101,950 | $16,983,900 | $17,959,500 | $18,318,690 | $18,409,821 | $18,201,184 | $18,692,392 | $19,066,240 | $19,447,564 | $19,836,516 |
| | | | **Tax Rate** | 10.537 | 10.694 | 10.755 | 10.863 | 10.971 | 11.081 | 11.192 | 11.304 | 11.417 | 11.531 | 11.646 |
| | | | **Subject Taxes** | $2,015,818 | $2,149,703 | $1,826,410 | $1,950,860 | $2,009,776 | $2,039,971 | $2,037,021 | $2,112,916 | $2,176,726 | $2,242,463 | $2,310,185 |
| | | | **Annual % Increase** | --- | 6.6% | -15.0% | 6.8% | 3.0% | 1.5% | -0.1% | 3.7% | 3.0% | 3.0% | 3.0% |
| | | | **Fiscal taxes** | | | | | | | | | | | |

CBRE/NYC Department of Finance



*Highest and Best Use*

# Market Analysis

## HOTEL MARKET NATIONAL OVERVIEW

The following overview was derived primarily from CBRE Hotels Research (CBRE Hotels) 3rd Qtr. 2021 Hotel Horizons© report for the United States, as well as CBRE Econometric Advisors (CBRE-EA), and Kalibri Labs.   Please note the following overview was published while the Omicron Variant was just emerging (Omicron as announced on November 24, 2021). The full effects of the Omicron Variant is unknown at this time (though the rate of infection appears to be much faster than the Delta Variant) and this overview could change as new information and developments are announced.

## National Economic Summary

According to the Bureau of Economic Analysis (BEA), GDP growth moderated to +2.1% in Q3, down from 6.7% in Q2, owing to more difficult prior year comparisons as the economy progressed to a more mature phase of the recovery. Q3 2021 and Q2 2021 GDP were 1.8% and 2.0% ahead of 2019's levels, underscoring the fact that the U.S. has now made a full economic recovery. The two categories of GDP that most closely relate to the hotel industry are consumption of goods and services (+1.7% annualized in Q3), and investment spending (+11.6% annualized in Q3). Food services and accommodations posted a comparatively modest Q3 annualized growth figure, +12.3% quarter-over-quarter, down from +68.0% in Q2, and the category is just 0.5% below its pre-pandemic levels. Total nonfarm payroll employment grew 629,000 jobs/month on average in Q3, according to the Bureau of Labor Statistics (BLS). At the end of Q3, employment remained 2.4% below September of 2019's levels, a shortfall of roughly 3.6 million jobs. Leisure and hospitality employment increased by an average of 189,000 jobs per month in Q3, narrowing the shortfall vs. 2019 levels from 1,700,000 (10.4%) in Q2 to 1,300,000 jobs (7.7%) in Q3. Inflation, as measured by the Consumer Price Index (CPI), increased to 5.3% in Q3 2021, up from 4.8% in Q2. This was the fastest growth rate since 2008. CBRE expects disruptions to the global supply chain to continue to put pressure on CPI growth until Q2 2022, when forecasts call for it to moderate to under 3%. At its peak in July of 2021, RevPAR reached 97% of 2019's levels according to Kalibri Labs. In late summer, early fall, delays in return to office created by the Delta variant led to a modest fall-off in demand, with Q3 RevPAR coming in at 91% relative to 2019. Moving forward, we expect trends in the northern U.S. to continue to moderate with the onset of winter, partially offset in key markets by the resumption of international travel from some countries. Although we have seen some pick-up in corporate and group travel, we expect momentum to build in late spring or early summer 2022. We now forecast a full recovery in RevPAR to 2019's levels in 2023 on a national basis

## Baseline Forecast

Despite an increase in Covid infections and the emergence of the Delta variant, RevPAR continued to improve in Q3, reaching 97% of 2019's levels in July. Full quarter RevPAR came in



at $84.68, 91% of Q3 2019 RevPAR, beating our outlook largely on rate. We are raising our 2022 RevPAR forecasts and beyond, as the resumption of inbound international travel and delayed or furloughed supply growth will result in increased demand and stronger pricing power. Barring the emergence of a 'game changing' variant (potentially Omicron), we now forecast demand, ADR and RevPAR will return to 2019's levels in early 2023, early 2022, and middle 2023, respectively. With rate gains leading the recovery, it is possible that several markets and asset types could see a recovery in profits before a full recovery in demand. We still expect drive-to and resort locations to be the strongest, followed by smaller group and corporate markets. Those markets most dependent on city wide conventions and a full return in international travel will recover last, with some not seeing a recovery until 2026 and potentially beyond.

**Annual Performance - Five Year History and Forecast - All US Hotels**

| Year | Occ | Δ Occ | ADR | Δ ADR | RevPAR | Δ RevPAR |
|------|------|--------|----------|--------|--------|----------|
| 2016 | 66.3% | 0.1% | $124.15 | 2.5% | $82.34 | 2.6% |
| 2017 | 66.8% | 0.7% | $126.28 | 1.7% | $84.33 | 2.4% |
| 2018 | 66.5% | -0.4% | $128.68 | 1.9% | $85.59 | 1.5% |
| 2019 | 66.7% | 0.3% | $129.62 | 0.7% | $86.45 | 1.0% |
| 2020 | 42.7% | -35.9% | $100.76 | -22.3% | $43.07 | -50.2% |
| 2021F | 55.7% | 30.4% | $120.98 | 20.1% | $67.40 | 56.5% |
| 2022F | 61.2% | 9.9% | $130.78 | 8.1% | $80.04 | 18.8% |
| 2023F | 63.9% | 4.4% | $135.98 | 4.0% | $86.88 | 8.5% |
| 2024F | 64.8% | 1.4% | $140.11 | 3.0% | $90.73 | 4.4% |
| 2025F | 65.4% | 1.0% | $143.67 | 2.5% | $93.97 | 3.6% |

Source: CBRE Hotels Research, Kalibri Labs, Q3 2021

The following chart provides a snapshot of national trends forecast over the next four quarters. The arrows show the forecasted direction of change over the next four quarters vs. the previous four quarters. Green indicates the change will be above the long-run average, and orange indicates it will be below.

39





Source: CBRE Hotels Research, Q3 2021

## The Demand for Travel

Stays in hotels, short-term rentals, and on cruise ships are driven by leisure and the need for face-to-face business meetings. People avoid travel when they feel unsure about their future financial state (constraint #1) and when they feel afraid to make trips (constraint #2). In the wake of the 2008 financial crisis, for example, future cash flow and wealth uncertainties severely impacted travel. Fear of travel is a broader and more complicated phenomena than financial insecurity. Following the tragic 9/11 events, for example, potential travelers avoided boarding airplanes for fear of being entangled in terrorist acts.

The most complex constraint impairing travel comes from the fear of contracting communicable diseases or infections. The world has recently experienced outbreaks of several forms of transmissible viruses such as SARS, Ebola, and H1N1 (Swine Flu). These illnesses took a large human toll, but while the effects on the paid accommodation industry were measurable, they were not devastating. COVID-19 virus is far more dangerous, and the prospects in the travel industry could experience a reduction in business and leisure trips if another variant emerges (like Omicron).

## Impact on Profits

As a result of the low occupancy levels achieved during 2020, hotel owners and operators responded by reducing their fixed costs as much as possible and spending just a minimal amount



on the variable costs. As expected, there is a correlation between the occupancy level and the achieved profit margins. The lower the occupancy level, the lower the GOP and EBITDA margins.

While 2020 was grim, we did observe strong efforts of U.S. hotel operators to minimize losses. Operational decisions that led to enhanced revenue yield and efficient cost controls contributed to muting declines in profits. As shown below, the flow-through from revenue decline to GOP decline has narrowed during each of the past three downturns, while the flow-through from revenue growth to GOP growth during recovery has amplified over the past two expansion cycles.



Source: CBRE Hotels Research, Trends, Same-Store Sample.

As the industry starts to recover from the pandemic, there have been other unexpected challenges. Worker shortages in the lodging industry present a challenging labor environment as many former employees have moved on to other industries or are staying home and still collecting unemployment. Others are worried about wider inflationary pressures and the rising costs of goods. As costs rise, hoteliers will continue will be forced to find and implement new and effective cost saving measures.

### Investment Rates

Investment rate data for hotel properties from the latest Real Estate Investor Surveys published by PWC is illustrated in the following table:

| HOTEL INVESTOR SURVEY DATA | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Discount Rate | | Overall Cap Rate | | Terminal Cap Rate | | |
| Source/Type | Range | Average | Range | Average | Range | Average | |
| PwC Survey: (3rd Qtr. 2021) | | | | | | | |
| Luxury | 6.50% - 11.00% | 9.27% | 4.00% - 9.50% | 6.91% | 5.00% - 9.50% | 7.41% | |
| Full Service | 8.75% - 11.00% | 10.23% | 6.00% - 9.50% | 7.80% | 6.50% - 10.00% | 8.50% | |
| Limited Service | 8.00% - 11.50% | 9.60% | 7.00% - 11.00% | 9.03% | 8.00% - 11.00% | 9.15% | |
| Select Service | 8.00% - 12.00% | 10.15% | 6.00% - 10.00% | 7.90% | 7.00% - 9.00% | 8.00% | |
| Compiled by: CBRE | | | | | | | |



According to PwC, as of 3rd Qtr. 2021, discount rates in luxury/upper-upscale segment experienced a decrease (-26 basis points) compared to the 1st Qtr. 2021 survey.  Overall rates of return decreased by -59 basis points.  For the full-service segment, discount rates increased by 17 basis points while overall capitalization rates were down by -25 basis points. The select-service segment experienced decreases in discount rates by -8 basis points while overall capitalization rates decreased by -61 basis points. Limited-service hotels experienced a decline in discount rates (-10 basis points), while overall capitalization rates also decreased (-15 basis points).

### Investment Activity

According to Real Capital Analytics (RCA) Q3 2021 US Capital Trends – Hotel report, "Deal volume for hotels bounced back more sharply than any other sector in Q3'21, with the highest triple-digit growth rates relative to a year ago. The high growth rate is more of a story of the rebound to normality rather than a shift to new patterns of investor demand as seen with the industrial sector. Nonetheless, some of the worst parts of the pandemic seem to be behind the hotel market."  Real Capital Analytics also noted the following:

- 'Anytime there is a double-digit growth rate in deal volume — let alone the quadruple-digit rate posted by the hotel sector for the quarter — it is a sign that one big deal may have driven the activity. For the hotel sector, the Blackstone JV with Starwood Capital that purchased Extended Stay America was behind 42% of all the deal volume for the quarter.'
- 'Deal activity averaged $9.4b for every third quarter period between 2015 and 2019, with some quarters as high as $13.6b and others as low as $7.3b. This puts the $9.0b for Q3'21 within the range of normality. Deal structure is an important part of this return to normal levels of activity.'
- 'The deal activity involving individual assets for Q3'21 totaled $6.6b, a figure up 207% from the lows of Q3'20. Looking past the lows of 2020 to the change from 2019 shows that these individual asset deals are where the return to normality is concentrated. Such sales totaled $6.2b in Q3'19, placing the activity this year 6% ahead of that pre-pandemic mark.'
- 'Portfolio and entity-level sales were up 1,296% from a year earlier in Q3'21, and while the levels are still low relative to 2019, a one-time event masks the true health of the market. The Chesapeake Lodging Trust sale for $2.5b in Q3'19 sets too high of a hurdle to make comparisons, as these megadeals do not happen every quarter. Comparing portfolio sales alone, deal activity did come in at a stronger pace in Q3'21 with sales of $2.4b, up 23% from the level set in Q3'19.'
- 'Over the last year, cap rates for the total hotel market fell 30 bps. This drop was seen even as the risk-free rate of the 10yr UST rose. During the most uncertain parts of the pandemic from Q2'20 to Q4'20, the 10yr UST averaged 0.7% versus the 1.3% average for Q3'21. The spread to the risk-free rate has narrowed as investors become less fearful.'
- 'Cap rates for full-service hotels compressed more than those for limited-service assets over the last year, with the RCA HS cap rate for full-service segments down 30 bps to the 7.2% level. By contrast, limited-service hotels only saw a 10 bps decline in cap rates to reach 8.8%. The declines in cap rates for full-service hotels have really been a 2021 phenomenon as the promise of vaccines suggested that some sort of return to normality was possible. Deal volume has followed.'



- 'Relative to Q3'19, before Covid-19 hit the U.S., individual asset sales involving full-service hotels have climbed more than those for limited-service. Again, looking at individual asset sales removes the one-time jump from the Chesapeake Realty Trust deal in Q3'19, a deal with a number of full-service assets. Such deals for full-service hotels were up 7% from the pace set in Q3'19 and 4% for limited-service hotels.'

### What's Next

While the lodging industry is recovering from the worst downturn in history, there are still many challenges. The full effects of Omicron remain unclear at this time. If cases start to surge and hospitalizations increase, more travel restrictions could be mandated. While RevPAR for year-end 2021 is expected to finish significantly above 2020, full recovery is not expected until 2023. Business travel remains muted while meeting and group demand and international travel will not start recovering until 2022. While the recovery is generally expected to be long and protracted, there are still some bright spots. Drive-to resort markets are performing very well, with some markets experiencing record operating levels. Moreover, household savings is at a record high, and consumer spending is projected to remain aggressive and continue shifting from goods to services. This will benefit the drive-to leisure markets as pent-up demand remains and people are still seeking vacations and extended getaways closer to home. While the Omicron Variant could drastically change things temporarily, as could potential future variants, most observers are cautiously optimistic regarding the prospects over the next 12 to 24 months.

## NEW YORK AREA HOTEL MARKET ANALYSIS

New York City boasts a wealth of hostelry demand generators across all demand segments. As the financial and cultural capital of the world as well as a premier tourism destination, the Manhattan (and the outer boroughs of New York City) hotel market is and has been one of the strongest hotel markets in the world.

## DEMAND DRIVERS

The success of the New York City hotel market is a function of its vast supply of robust, high-end corporate, leisure, and meeting and group demand generators. New York City benefits from both domestic and international leisure and business travel from all around the world; it maintains arguably the strongest corporate demand base of any hotel market; and is also home to some of the largest, most storied event venues.

### Air Traffic

The chart below illustrates passenger traffic trends over the last 14 years for the three major airports servicing the Tristate area; the LaGuardia, John F. Kennedy and Newark International Airports.



OVERALL NEW YORK CITY MAJOR AIRPORT TRAVEL STATISTICS

| AREA AIRPORT PASSENGER TRAFFIC | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | JFK Dom | JFK Intl | LGA Dom | LGA Intl | EWR Dom | EWR Intl | TOTAL | YOY Change |
| 2003 | 16,400,000 | 15,300,000 | 21,400,000 | 1,000,000 | 21,800,000 | 7,700,000 | 83,600,000 | --- |
| 2004 | 20,100,000 | 17,500,000 | 23,200,000 | 1,300,000 | 23,000,000 | 8,900,000 | 94,000,000 | 12.4% |
| 2005 | 22,100,000 | 18,800,000 | 24,400,000 | 1,500,000 | 23,700,000 | 9,400,000 | 99,900,000 | 6.3% |
| 2006 | 23,000,000 | 19,600,000 | 24,500,000 | 1,300,000 | 25,600,000 | 10,000,000 | 104,000,000 | 4.1% |
| 2007 | 26,200,000 | 21,500,000 | 23,800,000 | 1,200,000 | 25,600,000 | 10,800,000 | 109,100,000 | 4.9% |
| 2008 | 25,200,000 | 22,600,000 | 21,900,000 | 1,100,000 | 24,200,000 | 11,100,000 | 106,100,000 | -2.7% |
| 2009 | 24,000,000 | 21,900,000 | 21,100,000 | 1,000,000 | 22,800,000 | 10,600,000 | 101,400,000 | -4.4% |
| 2010 | 23,400,000 | 23,100,000 | 23,000,000 | 1,000,000 | 21,700,000 | 11,500,000 | 103,700,000 | 2.3% |
| 2011 | 23,800,000 | 23,900,000 | 23,100,000 | 1,000,000 | 22,200,000 | 11,500,000 | 105,500,000 | 1.7% |
| 2012 | 24,200,000 | 25,100,000 | 24,300,000 | 1,400,000 | 22,800,000 | 11,200,000 | 109,000,000 | 3.3% |
| 2013 | 23,900,000 | 26,500,000 | 25,000,000 | 1,700,000 | 23,700,000 | 11,300,000 | 112,100,000 | 2.8% |
| 2014 | 25,000,000 | 28,200,000 | 25,100,000 | 1,800,000 | 23,800,000 | 11,800,000 | 115,700,000 | 3.2% |
| 2015 | 26,800,000 | 30,000,000 | 26,700,000 | 1,800,000 | 25,700,000 | 11,800,000 | 122,800,000 | 6.1% |
| 2016 | 27,200,000 | 31,700,000 | 28,000,000 | 1,800,000 | 28,000,000 | 12,300,000 | 129,000,000 | 5.0% |
| 2017 | 26,900,000 | 32,500,000 | 27,500,000 | 2,100,000 | 30,300,000 | 12,900,000 | 132,200,000 | 2.5% |
| 2018 | 28,100,000 | 33,500,000 | 27,900,000 | 2,200,000 | 31,900,000 | 14,100,000 | 137,700,000 | 4.2% |
| 2019 | 28,200,000 | 34,300,000 | 28,900,000 | 2,200,000 | 32,000,000 | 14,300,000 | 139,900,000 | 1.6% |
| 2020 | 8,300,000 | 8,400,000 | 7,900,000 | 400,000 | 12,100,000 | 3,800,000 | 40,900,000 | -70.8% |
| Source: Port Authority of New York/New Jersey | | | | | | | |

As per the most recent information compiled by the Port Authority, the John F. Kennedy airport facilitated the greatest volume of travelers in 2019 with approximately 62,5 million passengers, both domestic and international.   It can be noticed that the John F. Kennedy and Newark International airport handle the majority of international flights but all three airports handle a fairly equal balance of domestic flights.   Passenger traffic has consistently increased since slumping in 2009 until 2020 at which time the Covid pandemic put a significant challenge to the entire travel industry.   The following graphs illustrate passenger and freight statistics at all three major airports.







Source: Port Authority of New York & New Jersey

The charts illustrate how each of the New York/New Jersey airports have had increased passenger air traffic through to 2019 and up to the Covid pandemic in 2020. New York airports illustrate a greater increase which is due primarily to the capacity issues at Newark. Both JFK and LaGuardia have seen more substantive increases in the last five years compared to its New Jersey counterpart. In terms of freight, Newark and La Guardia airports are showing a decline in cargo shipments which is due to the high expense of air cargo and increased port, rail and trucking cargo into and supporting the tri-state area.

## Tourism

Further adding to New York City's tourism bottom line has been the continued influx of visitors, both foreign and domestic to the city. As depicted below, New York saw record numbers in 2016 and marks the eighth year in a row of constant increases in the number of visitors; a trend



forecast to continue through 2019. The graph below serves to underscore the vitality and growth that New York City tourism has experienced since 2003.



Source: NYC & Co.

As can be seen from the chart above, New York City welcomed a record 66.3 million visitors in 2019, setting another record ten years in the running for travel and tourism in New York City. As seen, New York City Company forecasts a return to pre-pandemic visitation in 2023 forecasting 69.9 visitors. Both domestic and international travel are expected to rebound by that time.

According to NYC and Co., New York City remained the most popular destination for international visitors in the United States. New York City has maintained its rank as the number one U.S. destination for overseas travelers, as well as its status as the number one destination in tourism spending in the U.S. throughout 2019 and several years prior.

New York City has numerous other demand generators in addition to those mentioned above. Other major attractions include Central Park, Times Square, the Statue of Liberty, luxury shopping on 5th and Madison Avenues, Ellis Island, the New York Botanical Garden and the Empire State Building among many others. The World Trade Center Memorial, and the adjacent Calatrava retail pavilion are some of the city's newest and largest tourist attractions, attracting millions to the site annually. The City's wealth of demand generators is what has established it as the number one tourist destination and will support a robust hotel market in the near and long term.

Capital spending on infrastructure has also allowed New York City to remain as the top visited destination in the United States. New York has the largest subway system allowing for ease of access throughout the five boroughs. The MTA subway systems is constantly undergoing upgrades, but in the last decade, significant capital projects have come to fruition enhancing



tourist and commuters alike.  The projects include the Q-train (Second Avenue) extension to the Upper East Side, the No. 7 train extension into Hudson Yards, the redevelopment of the Fulton Street station, the Moynihan and Penn Station upgrades.  In addition, the addition of new subway cars and individual station upgrades has significantly improved the flow of system users throughout the city. Other capital projects include the ongoing $4.0 Billion upgrade to the LaGuardia International Airport.  Each of these infrastructure projects will allow for New York City to remain as the US top travel destination location.

## Office Market

Given business travel accounts for a substantial portion of the overall demand base for New York City hotels, the health of the New York City hotel market is directly tied to the success of the New York City office market. In order to illustrate this relationship, we have compared the historical city-wide occupancy percentages for the Manhattan office and hotel markets dating back to 1992.



The chart above illustrates the close correlation between hotel occupancy and office occupancy. As the office markets flourish, same is said for the hospitality market and vice versa as the strong corporate markets reflect demand.  Noted peaks are seen during strong economic periods including the late 1990's when the economy recovered from the deep recession at the beginning of that decade triggered by the Savings & Loan financial crisis.  Both office and hotel occupancy retracted in early 2000's coinciding with the dot.com bubble that put economic stress on markets. The office market rose to peak levels and the hospitality market performance followed until the financial crisis and the Great Financial Recession (GFR) that occurred in 2008/2009.  Since 2010, the economy has gained momentum, the office markets showed stability and then strength, and hospitality has followed suit, until the Covid pandemic hit in 2020. Given the office markets are far more stable in terms of leased property for long terms and the hotel market is effectively priced day to day with no guarantees of occupancy, there was a divergence post Covid whereby the hospitality market was impacted immediately yet the office markets, although



corporate users were not using their offices, and they too largely closed up, the occupancy was stable due to those long term lease contracts that allowed office markets to whether a storm of such far better than the hotel industry. As seen the office market did dip, but hotel market significantly dropped. So too will a rebound in the hotel markets and it is being seen as of the 1Q2021 and 2Q2021 as occupancies at New York City hotels begin the V shape recovery.

As a barometer of hospitality performance, we have looked at the overall office market performance as it relates to future hospitality performance given corporate demand is largely gained from the office sector.

### Manhattan Office Market

A fourth quarter of 2021 summary of the Manhattan office market is presented in the following table.

| Submarket | # of Bldgs | Inventory (SF) | Avg Asking Rent/SF | Vacancy Rate | Availability Rate | YTD Net Absorption | YTD Leasing Activity |
|---|---|---|---|---|---|---|---|
| **NEW YORK CITY OFFICE MARKET OVERVIEW - 4th QUARTER 2021** | | | | | | | |
| **MIDTOWN** | | | | | | | |
| Park Avenue | 37 | 28,721,008 | $99.13 | 9.60% | 14.60% | (74,138) | 1,972,618 |
| 5th/Madison Ave | 28 | 12,143,337 | $102.28 | 14.00% | 17.90% | 123,876 | 729,490 |
| East Side | 46 | 21,473,030 | $72.96 | 19.50% | 23.40% | (711,524) | 774,164 |
| 6th/Rock Cntr. | 45 | 45,718,227 | $78.05 | 10.40% | 12.60% | (138,541) | 1,703,856 |
| TimesSquare/West Side | 43 | 32,170,132 | $76.37 | 13.20% | 21.50% | (1,375,098) | 2,002,829 |
| Times Square South | 48 | 19,258,387 | $56.53 | 13.70% | 18.00% | 143,857 | 1,275,467 |
| Grand Central | 85 | 46,546,525 | $71.55 | 13.40% | 16.80% | (837,909) | 2,330,601 |
| Plaza District | 23 | 11,315,065 | $95.67 | 16.30% | 19.70% | 281,945 | 606,182 |
| Penn Station | 37 | 35,672,963 | $110.00 | 16.60% | 19.50% | (4,130,244) | 1,458,135 |
| **Total Midtown Market** | **392** | **253,018,674** | **$83.45** | **13.60%** | **17.60%** | **(6,717,776)** | **12,853,342** |
| **MIDTOWN-SOUTH** | | | | | | | |
| Chelsea | 70 | 18,710,832 | $81.88 | 15.20% | 17.00% | (818,283) | 913,234 |
| Flatiron | 71 | 12,317,061 | $74.23 | 13.40% | 19.30% | 30,288 | 1,269,453 |
| Park South/Madison Sq. | 59 | 19,933,608 | $76.34 | 13.00% | 23.80% | (1,660,959) | 958,426 |
| Union Square | 34 | 5,350,842 | $88.90 | 20.10% | 22.00% | (73,675) | 291,374 |
| Noho/Soho | 61 | 8,491,797 | $78.03 | 10.80% | 12.50% | 271,350 | 737,248 |
| Hudson Square/TriBeCa | 36 | 16,619,724 | $77.64 | 10.00% | 13.10% | (57,065) | 615,310 |
| **Total Midtown South** | **331** | **81,423,864** | **$78.56** | **13.20%** | **18.10%** | **(2,308,344)** | **4,785,045** |
| **DOWNTOWN** | | | | | | | |
| Financial | 80 | 56,367,510 | $57.83 | 19.20% | 27.70% | (6,355,061) | 1,565,992 |
| City Hall | 31 | 13,875,310 | $56.70 | 11.30% | 12.90% | (235,441) | 468,110 |
| Downtown West | 10 | 20,043,863 | $71.16 | 10.40% | 14.60% | (118,697) | 749,700 |
| **Total Downtown** | **121** | **90,286,683** | **$59.62** | **16.00%** | **22.50%** | **(6,709,199)** | **2,783,802** |
| **Overall Manhattan** | **844** | **424,729,221** | **$76.45** | **14.00%** | **18.70%** | **(15,735,319)** | **20,422,189** |

**CBRE**

The NYC office market as tracked by CBRE contains approximately 424.8 million square feet of rentable area across 844 buildings. The current overall average asking rent in Manhattan is $76.45/SF, $0.57 greater than the prior quarter, and with an availability rate of 18.70%, 0.10% higher than in 3Q21, and a vacancy rate of 14.00, 0.9% greater than in 3Q2021. The office markets are generally considered to be very soft currently and there remains question as to the impact of Covid and work from home remote work experience and how it will impact office



performance going into the future. Needless to say, the jury remains out as this is a complex and changing environment and there are many mixed signals currently.

## BROOKLYN OFFICE MARKET

The subject property falls within the Brooklyn office market as defined by CoStar. A table summarizing the total office statistics within the market is presented below:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **BROOKLYN OFFICE MARKET HISTORIC OVERVIEW** | | | | | | | | | |
| Quarter | Inventory Bldgs | Inventory SF | Vacant SF Total | Vacant Percent % Total | Total Available SF Total | Availability Rate | Net Absorption SF Total | Leasing Activity SF Total | Average Rent |
| 2022 Q1 | 2,262 | 62,359,486 | 9,419,765 | 15.1% | 10,106,813 | 15.8% | 205,894 | 104,149 | $40.07 |
| 2021 Q4 | 2,262 | 62,359,486 | 9,625,659 | 15.4% | 10,477,905 | 16.4% | 190,875 | 379,241 | $39.95 |
| 2021 Q3 | 2,260 | 62,255,722 | 9,712,770 | 15.6% | 10,464,040 | 16.3% | 407,724 | 327,414 | $39.95 |
| 2021 Q2 | 2,259 | 61,564,835 | 9,429,607 | 15.3% | 10,205,397 | 16.1% | (309,024) | 742,953 | $39.42 |
| 2021 Q1 | 2,259 | 61,594,316 | 9,150,064 | 14.9% | 10,893,862 | 17.1% | (308,782) | 292,675 | $39.91 |
| 2020 Q4 | 2,245 | 60,728,488 | 7,975,454 | 13.1% | 10,341,346 | 16.4% | (911,776) | 259,199 | $37.19 |
| 2020 Q3 | 2,246 | 60,778,588 | 7,113,778 | 11.7% | 9,982,283 | 15.8% | (569,816) | 786,184 | $37.15 |
| 2020 Q2 | 2,243 | 60,458,688 | 6,224,062 | 10.3% | 8,800,893 | 13.9% | (64,744) | 512,967 | $38.14 |
| 2020 Q1 | 2,239 | 60,185,930 | 5,886,560 | 9.8% | 8,530,174 | 13.5% | (469,444) | 1,088,528 | $36.99 |
| 2019 Q4 | 2,236 | 60,167,037 | 5,398,223 | 9.0% | 8,703,720 | 13.8% | 461,567 | 414,772 | $36.97 |
| 2019 Q3 | 2,230 | 59,344,453 | 5,037,206 | 8.5% | 8,520,152 | 13.5% | 640,574 | 503,586 | $38.09 |
| 2019 Q2 | 2,226 | 58,651,522 | 4,984,849 | 8.5% | 8,669,624 | 13.8% | (37,483) | 1,039,285 | $38.44 |
| 2019 Q1 | 2,228 | 58,753,513 | 5,049,357 | 8.6% | 7,947,819 | 12.7% | (106,874) | 464,633 | $38.43 |
| 2018 Q4 | 2,224 | 58,576,259 | 4,764,229 | 8.1% | 7,118,756 | 11.4% | (20,713) | 1,056,162 | $38.24 |
| 2018 Q3 | 2,221 | 58,446,550 | 4,613,807 | 7.9% | 6,924,686 | 11.1% | (55,869) | 445,073 | $38.37 |
| 2018 Q2 | 2,219 | 58,941,030 | 5,052,418 | 8.6% | 6,366,570 | 10.2% | (621,853) | 385,753 | $38.26 |
| 2018 Q1 | 2,217 | 58,916,672 | 4,406,158 | 7.5% | 6,180,610 | 9.9% | 310,000 | 414,757 | $37.32 |
| 2017 Q4 | 2,208 | 58,520,555 | 4,319,420 | 7.4% | 6,328,529 | 10.2% | (575,338) | 792,482 | $37.18 |
| 2017 Q3 | 2,205 | 58,457,470 | 3,681,046 | 6.3% | 5,788,108 | 9.4% | 677,834 | 492,708 | $36.43 |
| 2017 Q2 | 2,200 | 57,906,858 | 4,079,178 | 7.0% | 6,219,632 | 10.1% | (47,943) | 714,485 | $35.62 |
| Source: Costar; Compiled by CBRE | | | | | | | | | |

Within the Brooklyn office market, CoStar tracks nearly 62.35 million square feet of office space across 2,262 inventory buildings. The vacancy rate in Q1 2022 decreased to 15.1%, indicating a 30-basis point decrease from the previous quarter. Net absorption for Q1 recorded weaker than the prior quarter, but still positive at 205,894 square feet. The availability rate in the Brooklyn office market held at 15.8%; this figure represents a quarterly decrease of 60 basis points. Furthermore, the market exhibited another solid leasing quarter, with which 104,149 square feet of office space was leased. Over the last year, the average asking rent in the market has remained steady with rates between the $39.91-$40.07 threshold. This trend continues to remain true as the average asking rent in Brooklyn held at $40.07 per square foot.

## Hotel Horizons and New York City

Hotel Horizons® is a series of econometrically derived reports prepared on a quarterly basis that analyzes the historical and expected performance of 65 major U.S. lodging markets, as well as our national summary report of the entire U.S. lodging industry. Hotel Horizons® reports contain



five years of forecast data and five years of historical market performance information. A variety of economic, demographic, and other benchmarking statistics appear in the reports to provide the reader with a deeper understanding of local market conditions.

CBRE Company through its Economic Advisors and the purchase of PKF Hospitality Research, continued with the hospitality economic research preparing hotel market forecasts based on accepted econometric procedures and judgment. The product name for the research reports and forecasts is known as Hotel Horizons®. The two-stage process for producing the forecasts firstly involves econometric estimation of future hotel market activity and financial performance based on historical relationships between economic and hotel market variables, and secondly, a judgmental review of modeled outputs by experienced hotel market analysts. The hotel industry expertise dates back to the 1930s.  CBRE-EA and others believe that errors in forecasting are minimized by relying on both data analytics and judgment.

Econometric forecasting represents one of the most sophisticated approaches to gaining insight into future economic activity. Unlike some forecasting methods used in business practice, the models that underlie econometric forecasts contain variables based in economic theory. The forecasts come from historical relationships, similar to statistical correlations, among hotel market measures and economic variables. The measures for the variables come from actual market transactions involving individuals and firms interacting in the economy.

Gaining insight into the futures of complicated economic environments requires the introduction of multi-level forecasting models. Several equations often need to be identified and estimated to model complex economic conditions such as the national economy. Multi-equation models have considerable appeal for economic forecasting because they explicitly recognize the interdependence of relationships commonly encountered in markets. Perhaps the best example of this type of model is one that involves both the demand side and the supply side of markets, in which prices of goods are set by the interaction of buyers and sellers. Thus, price appears as a variable in both the demand and supply equations.

A committee of hotel experts from CBRE Hotels performs a thorough review of each model prediction. These assessments are made by locally-based hotel experts working in the various offices around the U.S. The quarterly forecasts for the current and forecast period years are subject to review. The committee modifies the model's market prediction when there is compelling evidence that factors have come into play that the model could not possibly foresee. A Super Bowl-type event, as an extreme example, would cause the committee's forecast to differ noticeably from the model's prediction—not only in the city in which the event will occur, but also competing cities within the region. In most instances, however, the committee either defers to the model prediction or makes modest adjustments.

According to Hotel Horizons®, the hotel outlook for all chain-affiliated properties in the New York lodging market is shown below, and includes both the full- and limited-service segments. As indicated below, the local market trends were in modest decline in the past five years,



declining in terms of RevPAR in the last 4 of 5 years through 2019. This decline is mostly considered due to the new supply coming into the market early on from 2015-2018, with international trade concerns in 2019 (disputes between the US Trump administration and China), then the significant decline from the impact of the Covid pandemic in 2020.

In making projections for the Subject property, it is important to note the highly dynamic features of the hotel market in New York City and around the country. Hotel Horizons provides annual forecasts, but also provides quarterly forecasts. Given the changing market conditions and Covid impact, the CBRE market research has carefully analyzed the hotel performance statistics and economics of this as well as comparing this event verses past market disruptions, such as the great recession, 9-11, dot.com bubble, stock market decline of 1987 and subsequent Savings and Loan debacle and ensuing recessions, etc. The CBRE Hotel Horizon Research offers baseline, upside, downside and severe downside forecasting modeling using proprietary algorithms of economics in these forecasting models.   The Hotel Horizon, is known and accepted as industrywide benchmarking tool for its forecast modeling.  We have relied on the annualized projections from CBRE Hotels Research and the Hotel Horizon reports to forecast growth rates in ADR for the Subject. Forecasts for New York City total market performance, Upper-Priced, Mid-Priced and Low-Priced Hotels baseline forecasts is shown in the tables that follow:

Forecasts for New York City total market performance, Upper-Priced, Mid-Priced and Low-Priced Hotels baseline forecasts is shown in the tables that follow:

| Hotel Horizons History and Forecast 3Q2021 | | | | | | | | | | | | | |
| New York — All Hotels — Baseline Forecast Scenario | | | | | | | | | | | | | |
| Year | Occ | ΔOcc | ADR | ΔADR | RevPAR | ΔRevPAR | Supply | ΔSupply | Demand | ΔDemand | Revenue | ΔRevenue |
|------|------|------|------|------|--------|---------|--------|---------|--------|---------|---------|----------|
| 2016 | 87.0% |      | $251.17 |      | $218.58 |        | 115,750 |        | 100,729 |        | 25,301,020 |        |
| 2017 | 85.2% | -2.1% | $248.25 | -1.2% | $211.57 | -3.2% | 119,345 | 3.1% | 101,711 | 1.0% | 25,250,408 | -0.2% |
| 2018 | 85.9% | 0.8% | $251.75 | 1.4% | $216.28 | 2.2% | 122,989 | 3.1% | 105,662 | 3.9% | 26,601,026 | 5.3% |
| 2019 | 85.8% | -0.2% | $243.07 | -3.4% | $208.50 | -3.6% | 125,912 | 2.4% | 108,006 | 2.2% | 26,253,581 | -1.3% |
| 2020 | 39.4% | -54.1% | $138.16 | -43.2% | $54.37 | -73.9% | 127,331 | 1.1% | 50,114 | -53.6% | 6,924,254 | -73.6% |
| 2021 | 47.6% | 20.9% | $175.72 | 27.2% | $83.62 | 53.8% | 128,754 | 1.1% | 61,276 | 22.3% | 10,767,700 | 55.5% |
| 2022 | 64.8% | 36.1% | $208.86 | 18.9% | $135.28 | 61.8% | 138,499 | 7.6% | 89,708 | 46.4% | 18,737,282 | 74.0% |
| 2023 | 72.4% | 11.8% | $225.59 | 8.0% | $163.38 | 20.8% | 140,795 | 1.7% | 101,967 | 13.7% | 23,003,257 | 22.8% |
| 2024 | 76.6% | 5.7% | $241.43 | 7.0% | $184.88 | 13.2% | 141,709 | 0.6% | 108,515 | 6.4% | 26,199,241 | 13.9% |
| 2025 | 79.2% | 3.5% | $252.61 | 4.6% | $200.13 | 8.3% | 142,599 | 0.6% | 112,978 | 4.1% | 28,539,508 | 8.9% |
| 2026 | 81.3% | 2.6% | $262.51 | 3.9% | $213.38 | 6.6% | 143,413 | 0.6% | 116,575 | 3.2% | 30,602,418 | 7.2% |
| 2027 | 82.4% | 1.4% | $271.24 | 3.3% | $223.62 | 4.8% | 144,211 | 0.6% | 118,893 | 2.0% | 32,249,269 | 5.4% |
| 2028 | 83.6% | 1.4% | $278.42 | 2.6% | $232.79 | 4.1% | 144,919 | 0.5% | 121,166 | 1.9% | 33,735,682 | 4.6% |
| 2029 | 84.5% | 1.1% | $284.77 | 2.3% | $240.74 | 3.4% | 145,509 | 0.4% | 123,011 | 1.5% | 35,030,554 | 3.8% |
| 2030 | 85.3% | 0.9% | $290.71 | 2.1% | $247.91 | 3.0% | 146,089 | 0.4% | 124,586 | 1.3% | 36,218,406 | 3.4% |
| 2031 | 85.9% | 0.7% | $296.23 | 1.9% | $254.39 | 2.6% | 146,549 | 0.3% | 125,850 | 1.0% | 37,280,812 | 2.9% |
| Source: Forecast Hotel Data - CBRE Hotels Research, Historical Hotel Data - Kalibri Labs, Q3 2021. | | | | | | | | | | | | | |

Hotel Horizons 3Q2021 reported pre-Covid Occupancy at 85.8% and ADR for the entire New York market at $243.07 down -3.4% from $251.75 in 2018.  RevPar was $208.50 in 2019 falling 3.6% from the prior year.  RevPar fell 73.9% during 2020 to $54.37.  The market recovery post-Covid is forecast to return to pre-Covid levels by 2024/25 when ADR and RevPAR tops 2019 results.



The Upper priced results are as follows:

| Hotel Horizons History and Forecast 3Q2021 | | | | | | | | | | | |
| New York — Upper-Priced Hotels — Baseline Forecast Scenario | | | | | | | | | | | |
| Year | Occ | ΔOcc | ADR | ΔADR | RevPAR | ΔRevPAR | Supply | ΔSupply | Demand | ΔDemand | Revenue | ΔRevenue |
|------|------|-------|---------|-------|---------|---------|--------|---------|--------|---------|------------|----------|
| 2016 | 86.1% | | $320.19 | | $275.58 | | 47,609 | | 41,045 | | 13,142,546 | |
| 2017 | 86.4% | 0.4% | $321.72 | 0.5% | $278.01 | 0.9% | 46,851 | -1.8% | 40,486 | -1.4% | 13,025,282 | -0.9% |
| 2018 | 84.9% | -1.7% | $333.08 | 3.5% | $282.92 | 1.8% | 46,503 | -0.7% | 39,500 | -2.4% | 13,156,880 | 1.0% |
| 2019 | 85.2% | 0.3% | $320.86 | -3.7% | $273.30 | -3.4% | 46,278 | -0.5% | 39,419 | -0.2% | 12,648,222 | -3.9% |
| 2020 | 27.2% | -68.1% | $189.01 | -41.1% | $51.39 | -81.2% | 46,779 | 1.1% | 12,720 | -67.7% | 2,404,219 | -81.0% |
| 2021 | 38.8% | 42.6% | $239.09 | 26.5% | $92.72 | 80.4% | 47,116 | 0.7% | 18,271 | 43.6% | 4,368,602 | 81.7% |
| 2022 | 60.6% | 56.4% | $280.29 | 17.2% | $169.95 | 83.3% | 51,758 | 9.9% | 31,383 | 71.8% | 8,796,426 | 101.4% |
| 2023 | 70.2% | 15.8% | $298.91 | 6.6% | $209.90 | 23.5% | 52,917 | 2.2% | 37,159 | 18.4% | 11,107,430 | 26.3% |
| 2024 | 75.7% | 7.8% | $318.53 | 6.6% | $241.02 | 14.8% | 53,260 | 0.6% | 40,300 | 8.5% | 12,836,960 | 15.6% |
| 2025 | 78.6% | 3.9% | $334.57 | 5.0% | $262.95 | 9.1% | 53,599 | 0.6% | 42,126 | 4.5% | 14,094,196 | 9.8% |
| 2026 | 81.5% | 3.7% | $347.48 | 3.9% | $283.09 | 7.7% | 53,904 | 0.6% | 43,916 | 4.2% | 15,259,970 | 8.3% |
| 2027 | 82.9% | 1.7% | $359.01 | 3.3% | $297.56 | 5.1% | 54,201 | 0.5% | 44,924 | 2.3% | 16,128,330 | 5.7% |
| 2028 | 84.2% | 1.6% | $369.79 | 3.0% | $311.50 | 4.7% | 54,475 | 0.5% | 45,889 | 2.1% | 16,969,330 | 5.2% |
| 2029 | 85.4% | 1.4% | $378.58 | 2.4% | $323.42 | 3.8% | 54,722 | 0.5% | 46,750 | 1.9% | 17,698,614 | 4.3% |
| 2030 | 86.4% | 1.1% | $388.06 | 2.5% | $335.16 | 3.6% | 54,939 | 0.4% | 47,449 | 1.5% | 18,413,278 | 4.0% |
| 2031 | 86.8% | 0.6% | $397.00 | 2.3% | $344.77 | 2.9% | 55,085 | 0.3% | 47,839 | 0.8% | 18,992,128 | 3.1% |
| Source: Forecast Hotel Data - CBRE Hotels Research, Historical Hotel Data - Kalibri Labs, Q3 2021. | | | | | | | | | | | |

Hotel Horizons 3Q2021 reported pre-Covid Occ at 85.2% and ADR at $320.86, and RevPAR for the Upper priced segment in New York market in 2019 was $273.30, down -3.4% from $282.92 in 2018. In 2020, RevPAR came in at $51.39 in this segment off 81.2%. The upper priced segment recovery is forecast to return to pre-Covid levels by 2025/26 when ADR and RevPAR tops 2019 results.

The mid-priced segment is illustrated as follows:

| Hotel Horizons History and Forecast 3Q2021 | | | | | | | | | | | |
| New York — Mid-Priced Hotels — Baseline Forecast Scenario | | | | | | | | | | | |
| Year | Occ | ΔOcc | ADR | ΔADR | RevPAR | ΔRevPAR | Supply | ΔSupply | Demand | ΔDemand | Revenue | ΔRevenue |
|------|------|-------|---------|-------|---------|---------|--------|---------|--------|---------|------------|----------|
| 2016 | 88.7% | | $212.80 | | $188.84 | | 53,651 | | 47,610 | | 10,131,616 | |
| 2017 | 86.0% | -3.0% | $209.96 | -1.3% | $180.64 | -4.3% | 57,284 | 6.8% | 49,285 | 3.5% | 10,347,927 | 2.1% |
| 2018 | 87.9% | 2.1% | $214.46 | 2.1% | $188.46 | 4.3% | 58,708 | 2.5% | 51,591 | 4.7% | 11,064,507 | 6.9% |
| 2019 | 87.8% | -0.1% | $209.27 | -2.4% | $183.79 | -2.5% | 61,064 | 4.0% | 53,628 | 3.9% | 11,223,065 | 1.4% |
| 2020 | 43.9% | -50.0% | $121.83 | -41.8% | $53.52 | -70.9% | 60,098 | -1.6% | 26,401 | -50.8% | 3,216,696 | -71.3% |
| 2021 | 50.4% | 14.8% | $154.98 | 27.2% | $78.16 | 46.0% | 63,502 | 5.7% | 32,026 | 21.3% | 4,963,653 | 54.3% |
| 2022 | 68.0% | 34.9% | $176.78 | 14.1% | $120.25 | 53.8% | 67,414 | 6.2% | 45,856 | 43.2% | 8,106,584 | 63.3% |
| 2023 | 75.0% | 10.3% | $191.65 | 8.4% | $143.76 | 19.6% | 68,178 | 1.1% | 51,141 | 11.5% | 9,801,547 | 20.9% |
| 2024 | 78.4% | 4.5% | $205.68 | 7.3% | $161.26 | 12.2% | 68,625 | 0.7% | 53,805 | 5.2% | 11,066,986 | 12.9% |
| 2025 | 80.6% | 2.9% | $215.08 | 4.6% | $173.44 | 7.5% | 69,047 | 0.6% | 55,680 | 3.5% | 11,975,717 | 8.2% |
| 2026 | 81.9% | 1.5% | $223.78 | 4.0% | $183.18 | 5.6% | 69,437 | 0.6% | 56,837 | 2.1% | 12,719,566 | 6.2% |
| 2027 | 82.5% | 0.8% | $231.82 | 3.6% | $191.29 | 4.4% | 69,824 | 0.6% | 57,615 | 1.4% | 13,356,678 | 5.0% |
| 2028 | 83.5% | 1.2% | $237.18 | 2.3% | $197.99 | 3.5% | 70,162 | 0.5% | 58,570 | 1.7% | 13,891,748 | 4.0% |
| 2029 | 84.2% | 0.9% | $242.20 | 2.1% | $204.04 | 3.1% | 70,419 | 0.4% | 59,322 | 1.3% | 14,368,222 | 3.4% |
| 2030 | 84.8% | 0.7% | $246.27 | 1.7% | $208.89 | 2.4% | 70,711 | 0.4% | 59,976 | 1.1% | 14,770,885 | 2.8% |
| 2031 | 85.4% | 0.7% | $250.49 | 1.7% | $213.95 | 2.4% | 70,960 | 0.4% | 60,607 | 1.1% | 15,181,946 | 2.8% |
| Source: Forecast Hotel Data - CBRE Hotels Research, Historical Hotel Data - Kalibri Labs, Q3 2021. | | | | | | | | | | | |

Hotel Horizons 3Q2021 reported pre-Covid Occ was 87.8%, ADR at $209.27 and RevPAR at $183.79 for the Mid-priced segment in New York, which was down -2.4% and -2.5%, respectively from 2018. The Mid-priced segment recovery is forecast to return to pre-Covid levels by 2025/26 when ADR and RevPAR tops 2019 results.



Highest and Best Use

The lower priced segment results are illustrated below.

| Hotel Horizons History and Forecast 3Q2021 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New York — Lower-Priced Hotels — Baseline Forecast Scenario | | | | | | | | | | | | |
| Year | Occ | ΔOcc | ADR | ΔADR | RevPAR | ΔRevPAR | Supply | ΔSupply | Demand | ΔDemand | Revenue | ΔRevenue |
| 2016 | 83.8% | | $167.85 | | $140.66 | | 14,409 | | 12,075 | | 2,026,858 | |
| 2017 | 78.5% | -6.3% | $157.22 | -6.3% | $123.41 | -12.3% | 15,211 | 5.6% | 11,940 | -1.1% | 1,877,198 | -7.4% |
| 2018 | 82.0% | 4.4% | $163.30 | 3.9% | $133.84 | 8.5% | 17,778 | 16.9% | 14,571 | 22.0% | 2,379,639 | 26.8% |
| 2019 | 80.6% | -1.7% | $159.25 | -2.5% | $128.29 | -4.2% | 18,569 | 4.4% | 14,959 | 2.7% | 2,382,294 | 0.1% |
| 2020 | 53.7% | -33.3% | $118.55 | -25.6% | $63.71 | -50.3% | 20,455 | 10.2% | 10,993 | -26.5% | 1,303,339 | -45.3% |
| 2021 | 60.5% | 12.6% | $130.73 | 10.3% | $79.14 | 24.2% | 18,137 | -11.3% | 10,979 | -0.1% | 1,435,445 | 10.1% |
| 2022 | 64.5% | 6.6% | $147.09 | 12.5% | $94.90 | 19.9% | 19,327 | 6.6% | 12,470 | 13.6% | 1,834,272 | 27.8% |
| 2023 | 69.4% | 7.5% | $153.24 | 4.2% | $106.31 | 12.0% | 19,700 | 1.9% | 13,667 | 9.6% | 2,094,280 | 14.2% |
| 2024 | 72.7% | 4.8% | $159.28 | 3.9% | $115.78 | 8.9% | 19,824 | 0.6% | 14,410 | 5.4% | 2,295,294 | 9.6% |
| 2025 | 76.0% | 4.6% | $162.77 | 2.2% | $123.77 | 6.9% | 19,953 | 0.7% | 15,172 | 5.3% | 2,469,594 | 7.6% |
| 2026 | 78.8% | 3.7% | $165.77 | 1.8% | $130.67 | 5.6% | 20,071 | 0.6% | 15,822 | 4.3% | 2,622,883 | 6.2% |
| 2027 | 81.0% | 2.8% | $169.02 | 2.0% | $136.94 | 4.8% | 20,186 | 0.6% | 16,354 | 3.4% | 2,764,262 | 5.4% |
| 2028 | 82.4% | 1.7% | $172.04 | 1.8% | $141.73 | 3.5% | 20,281 | 0.5% | 16,708 | 2.2% | 2,874,604 | 4.0% |
| 2029 | 83.2% | 1.0% | $174.95 | 1.7% | $145.50 | 2.7% | 20,368 | 0.4% | 16,940 | 1.4% | 2,963,717 | 3.1% |
| 2030 | 84.0% | 0.9% | $176.81 | 1.1% | $148.44 | 2.0% | 20,440 | 0.3% | 17,161 | 1.3% | 3,034,244 | 2.4% |
| 2031 | 84.9% | 1.1% | $178.51 | 1.0% | $151.52 | 2.1% | 20,504 | 0.3% | 17,404 | 1.4% | 3,106,738 | 2.4% |
| Source: Forecast Hotel Data - CBRE Hotels Research, Historical Hotel Data - Kalibri Labs, Q3 2021. | | | | | | | | | | | | |

Hotel Horizons 2Q2021 reported pre-Covid Occ at 80.6%, ADR at $159.25 and RevPAR for the at $128.29, down -2.5% and 4.2% respectively from 2018. In 2020, RevPAR was down -50.3% in the Lower-priced segment. The segment recovery post-Covid is forecast to return to pre-Covid levels by 2025 when ADR and RevPAR tops 2019 results.

Occupancy has begun to build in the first quarter 2021 after mass vaccinations began in same quarter. More hotels began reopening and occupancies continued to increase albeit far from stabilized levels seen in 2019. The following chart illustrates the historical statistics for the overall New York Market on a quarterly basis.

| Hotel Horizon History and Forecast 3Q 2021 (QUARTERLY HISTORY) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New York — All Hotels — Baseline Forecast Scenario | | | | | | | | | | | | |
| Year | QTR | Occ | ΔOcc | ADR | ΔADR | RevPAR | ΔRevPAR | Supply | ΔSupply | Demand | ΔDemand | Revenue | ΔRevenue |
| 2016 | 1 | 80.2% | | $198.92 | | $159.63 | | 113,383 | | 90,986 | | 18,099,597 | |
| 2016 | 2 | 88.5% | | $259.17 | | $229.44 | | 115,362 | | 102,129 | | 26,468,701 | |
| 2016 | 3 | 90.3% | | $257.72 | | $232.80 | | 116,371 | | 105,118 | | 27,091,315 | |
| 2016 | 4 | 88.7% | | $281.83 | | $250.12 | | 104,595 | | 92,800 | | 29,478,882 | |
| 2017 | 1 | 78.6% | -2.1% | $193.13 | -2.9% | $151.71 | -5.0% | 118,993 | 4.9% | 93,475 | 2.7% | 18,053,525 | -0.3% |
| 2017 | 2 | 88.6% | 0.0% | $255.86 | -1.3% | $226.58 | -1.2% | 118,475 | 2.7% | 104,917 | 2.7% | 26,844,655 | 1.4% |
| 2017 | 3 | 88.0% | -2.5% | $253.04 | -1.8% | $222.79 | -4.3% | 119,133 | 2.4% | 104,891 | -0.2% | 26,542,301 | -2.0% |
| 2017 | 4 | 85.6% | -3.5% | $284.50 | 0.9% | $243.63 | -2.6% | 120,764 | 2.5% | 103,416 | -1.1% | 29,422,023 | -0.2% |
| 2018 | 1 | 79.7% | 1.5% | $199.80 | 3.5% | $159.23 | 5.0% | 122,628 | 3.1% | 97,729 | 4.6% | 19,526,436 | 8.2% |
| 2018 | 2 | 89.0% | 0.5% | $263.04 | 2.8% | $234.05 | 3.3% | 122,499 | 3.4% | 108,999 | 3.9% | 28,671,780 | 6.8% |
| 2018 | 3 | 88.2% | 0.2% | $254.31 | 0.5% | $224.29 | 0.7% | 122,920 | 3.2% | 108,409 | 3.4% | 27,569,666 | 3.9% |
| 2018 | 4 | 86.7% | 1.2% | $284.09 | -0.1% | $246.21 | 1.1% | 123,897 | 2.6% | 107,376 | 3.8% | 30,504,934 | 3.7% |
| 2019 | 1 | 76.8% | -3.6% | $189.94 | -4.9% | $145.95 | -8.3% | 124,739 | 1.7% | 95,850 | -1.9% | 18,205,755 | -6.8% |
| 2019 | 2 | 88.5% | -0.6% | $255.66 | -2.8% | $226.18 | -3.4% | 124,824 | 1.9% | 110,431 | 1.3% | 28,233,493 | -1.5% |
| 2019 | 3 | 89.8% | 1.8% | $243.71 | -4.2% | $218.82 | -2.4% | 126,296 | 2.7% | 113,400 | 4.6% | 27,637,237 | 0.2% |
| 2019 | 4 | 87.8% | 1.3% | $274.60 | -3.3% | $240.97 | -2.1% | 127,750 | 3.1% | 112,104 | 4.4% | 30,784,408 | 0.9% |
| 2020 | 1 | 62.1% | -19.1% | $171.79 | -9.6% | $106.76 | -26.8% | 129,166 | 3.5% | 80,274 | -16.3% | 13,790,623 | -24.3% |
| 2020 | 2 | 32.4% | -63.3% | $118.60 | -53.6% | $38.45 | -83.0% | 127,294 | 2.0% | 41,275 | -62.6% | 4,895,551 | -82.7% |
| 2020 | 3 | 30.8% | -65.7% | $117.04 | -52.0% | $36.02 | -83.5% | 126,889 | 0.5% | 39,055 | -65.6% | 4,571,369 | -83.5% |
| 2020 | 4 | 31.8% | -63.7% | $112.06 | -59.2% | $35.65 | -85.2% | 125,996 | -1.4% | 40,085 | -64.2% | 4,492,056 | -85.4% |
| 2021 | 1 | 33.0% | -47.0% | $109.77 | -36.1% | $36.18 | -66.1% | 126,774 | -1.9% | 41,790 | -47.9% | 4,587,684 | -66.7% |
| 2021 | 2 | 46.2% | 42.4% | $146.51 | 23.5% | $67.63 | 75.9% | 127,426 | 0.1% | 58,826 | 42.5% | 8,619,097 | 76.1% |
| 2021 | 3 | 54.1% | 75.8% | $199.88 | 70.8% | $108.17 | 200.3% | 129,011 | 1.7% | 69,819 | 78.8% | 13,956,160 | 205.3% |
| 2021 | 4 | 56.3% | 77.1% | $212.20 | 89.4% | $119.54 | 235.3% | 131,748 | 4.6% | 74,220 | 85.2% | 15,750,155 | 250.6% |
| Source: Forecast Hotel Data - CBRE Hotels Research, Historical Hotel Data - Kalibri Labs, Q3 2021. | | | | | | | | | | | | | |

Market participants including investors, financiers, managers and operators alike have had a predisposition of a very cautious outlook currently. The overall viewpoint as we continue to move forward is a more positive, albeit given the Delta Variant, most are unknowing and just hopeful. Advance reservation books are filling at slow pace yet some managers have indicated cancellations do occur at greater propensity when Covid and Delta headlines are negative and



persists. The above chart however does illustrate the New York hospitality market is in the beginning stages of what appears a rebound. The interviews are relevant as they tend to be more current than the latest quarterly reports illustrate, which are typically a quarter behind. The interviews with operators are also looking at day to day bookings, current feet on the ground performance looking at their own future and industry reservations. It is noted the general overall operators opinions are becoming more positive as we move further away from the pandemic.

## SUBMARKET PERFROMANCE

The subject is located in the Brooklyn submarket area. This historical performance of this market area is illustrated below. Although the submarket performance forecast is yet published, utilizing the total market performance estimates we have forecasted the subject submarket in the chart below:

| Hotel Horizon History – Actual Performance Data, Updated Monthly (Quarterly) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New York — Brooklyn/Coney Island Submarket — All Hotels | | | | | | | | | | | | | |
| Year | QTR | Occ | ΔOcc | ADR | ΔADR | RevPAR | ΔRevPAR | Supply | ΔSupply | Demand | ΔDemand | Revenue | ΔRevenue |
| 2015 | 1 | 71.6% | | $132.03 | | $94.58 | | 3,058 | | 2,190 | | 289,224 | |
| 2015 | 2 | 87.1% | | $177.95 | | $155.01 | | 3,117 | | 2,715 | | 483,189 | |
| 2015 | 3 | 86.6% | | $182.40 | | $157.96 | | 3,344 | | 2,896 | | 528,228 | |
| 2015 | 4 | 81.2% | | $183.73 | | $149.20 | | 3,479 | | 2,825 | | 519,085 | |
| 2016 | 1 | 71.9% | 0.3% | $139.90 | 6.0% | $100.54 | 6.3% | 3,554 | 16.2% | 2,554 | 16.6% | 357,347 | 23.6% |
| 2016 | 2 | 82.0% | -5.9% | $182.22 | 2.4% | $149.35 | -3.7% | 3,773 | 21.0% | 3,092 | 13.9% | 563,477 | 16.6% |
| 2016 | 3 | 83.4% | -3.8% | $184.80 | 1.3% | $154.04 | -2.5% | 3,910 | 16.9% | 3,259 | 12.5% | 602,251 | 14.0% |
| 2016 | 4 | 81.6% | 0.5% | $189.14 | 2.9% | $154.43 | 3.5% | 3,984 | 14.5% | 3,253 | 15.1% | 615,298 | 18.5% |
| 2017 | 1 | 72.8% | 1.3% | $141.20 | 0.9% | $102.78 | 2.2% | 4,147 | 16.7% | 3,018 | 18.2% | 426,218 | 19.3% |
| 2017 | 2 | 88.3% | 7.7% | $180.13 | -1.1% | $158.98 | 6.4% | 4,169 | 10.5% | 3,679 | 19.0% | 662,742 | 17.6% |
| 2017 | 3 | 86.4% | 3.7% | $183.22 | -0.9% | $158.29 | 2.8% | 4,292 | 9.8% | 3,708 | 13.8% | 679,421 | 12.8% |
| 2017 | 4 | 81.0% | -0.8% | $184.02 | -2.7% | $149.07 | -3.5% | 4,659 | 16.9% | 3,774 | 16.0% | 694,537 | 12.9% |
| 2018 | 1 | 75.4% | 3.5% | $144.72 | 2.5% | $109.06 | 6.1% | 4,909 | 18.4% | 3,699 | 22.6% | 535,390 | 25.6% |
| 2018 | 2 | 88.7% | 0.5% | $187.41 | 4.0% | $166.25 | 4.6% | 4,781 | 14.7% | 4,241 | 15.3% | 794,794 | 19.9% |
| 2018 | 3 | 86.6% | 0.3% | $185.99 | 1.5% | $161.12 | 1.8% | 4,804 | 11.9% | 4,162 | 12.2% | 774,065 | 13.9% |
| 2018 | 4 | 84.2% | 4.0% | $193.19 | 5.0% | $162.70 | 9.1% | 4,804 | 3.1% | 4,046 | 7.2% | 781,617 | 12.5% |
| 2019 | 1 | 72.3% | -4.1% | $138.15 | -4.5% | $99.85 | -8.4% | 5,026 | 2.4% | 3,633 | -1.8% | 501,887 | -6.3% |
| 2019 | 2 | 88.1% | -0.7% | $182.85 | -2.4% | $161.11 | -3.1% | 4,897 | 2.4% | 4,315 | 1.7% | 789,006 | -0.7% |
| 2019 | 3 | 89.1% | 2.9% | $175.73 | -5.5% | $156.62 | -2.8% | 5,150 | 7.2% | 4,590 | 10.3% | 806,534 | 4.2% |
| 2019 | 4 | 85.7% | 1.7% | $182.34 | -5.6% | $156.20 | -4.0% | 5,176 | 7.7% | 4,434 | 9.6% | 808,534 | 3.4% |
| 2020 | 1 | 63.0% | -12.9% | $126.13 | -8.7% | $79.44 | -20.4% | 5,019 | -0.1% | 3,161 | -13.0% | 398,719 | -20.6% |
| 2020 | 2 | 51.2% | -41.9% | $122.12 | -33.2% | $62.54 | -61.2% | 5,027 | 2.7% | 2,575 | -40.3% | 314,408 | -60.2% |
| 2020 | 3 | 49.5% | -44.4% | $115.05 | -34.5% | $56.99 | -63.6% | 5,059 | -1.8% | 2,506 | -45.4% | 288,335 | -64.3% |
| 2020 | 4 | 46.9% | -45.2% | $106.82 | -41.4% | $50.12 | -67.9% | 5,093 | -1.6% | 2,390 | -46.1% | 255,286 | -68.4% |
| 2021 | 1 | 49.4% | -21.6% | $101.37 | -19.6% | $50.02 | -37.0% | 5,146 | 2.5% | 2,540 | -19.7% | 257,437 | -35.4% |
| 2021 | 2 | 56.7% | 10.7% | $130.68 | 7.0% | $74.08 | 18.5% | 5,159 | 2.6% | 2,925 | 13.6% | 382,216 | 21.6% |
| 2021 | 3 | 60.5% | 22.1% | $162.41 | 41.2% | $98.23 | 72.4% | 5,190 | 2.6% | 3,139 | 25.3% | 509,856 | 76.8% |

Source: CBRE Hotels Research, Historical Hotel Data - Kalibri Labs, Q3 2021, CBRE Estimates

Occupancy has begun to build in the first quarter 2021 after mass vaccinations were beginning and the country was reopening. 2Q showed marked improvement in pricing and Occupancy and 3Q, which includes the summer high season has been more positive than expectation. Rates are forecast to follow increases in Occupancy and RevPAR performance expected to be returning to normalized conditions by 2024/25.

We have also interviewed market participants including investors, financiers, managers and operators alike. The overall viewpoint as we continue to move forward is a more positive forecast, more so than shown by the above CBRE HH reports. Although this is anecdotal, we consider this relevant as the interviews are current, and based on current day to day performance, and not based on history. It is noted, in the general, overall operators opinions are becoming more positive as we move further away from the pandemic.



## OUTER BOROUGH HOTEL MARKET ANALYSIS

The historical performance for properties in the outer boroughs of Queens, Brooklyn, Bronx, and Staten Island is presented below, and includes both the upper-tier and lower-tier segments.  As indicated below, the local market trends are improving.  This is primarily due to increased development in these areas, including the opening of the Barclays Center in Downtown Brooklyn, as well as new residential buildings, office buildings and improvements to retail areas like Fulton Street in Brooklyn and Main Street in Flushing. In addition, these markets accommodate the business and leisure traveler who either cannot find a room in Manhattan or seek less expensive accommodations. In the current lending environment, construction financing is available which has driven land values up in Manhattan and made the outer boroughs more affordable and more attractive for hotel development.  However, the recent popularity of the outer boroughs has also driven up land prices in those neighborhoods. Hotel development continues to be strong, with Downtown Brooklyn, Williamsburg, Flushing and Brooklyn Queens leading the way.

The subject is located in Red Hook neighborhood of the borough of Brooklyn in Kings County, NY.  Hotel development in the area consists of a variety of branded and independent limited and full service hotels. A general overview of the lodging market for all four outer boroughs is presented below.

### Queens

Hotel development in Queens, New York's largest borough, is in a recent boom, with numerous additions to supply in the past few years and more in the pipeline. Brooklyn is one neighborhood seeing an uptick in development due to its: recent major zoning change allowing for up-zoned redevelopment, proximity to Manhattan, growing residential market, cultural and recreational institutions, and growing restaurant scene. Other major areas such as Flushing, Long Island City and Jamaica as well as the surrounding areas near John F. Kennedy International Airport and LaGuardia International Airport are also seeing a major renaissance in hotel development. Both airport areas have a need for quality supply as the inventory of hotels is dated and in need of upgrades. These airports are some of the busiest in the nation and quality accommodations are in demand and necessary.  Flushing is home to many parks, cultural and recreational attractions, including Citi Field, US Tennis Center and the Queens Botanical Gardens, and is one of New York City's major Chinatowns, having the largest Asian population outside of the city. Hotel developers are looking to capitalize off the Queen's growing tourism market and as such, the borough has experiencing a surge in hotel development.

### Brooklyn

Brooklyn in recent years has undergone a major transformation and is seeing growth in development of all asset classes, including office, residential, and hotel. Brooklyn's convenient access to Manhattan, coupled with the area's wide assortment of recreational and leisure attractions is able to draw demand from Manhattan.   The Millennial TAMI demographic (Technology, Advertising, Media and Information) is flocking to Brooklyn in droves increasing the



need for quality housing, retail and office properties, which in turn drives the need for increased hotel supply in the area.  Specifically, the locations most proximate to public transportation (train and subway) are seeing the highest degree of demand and subsequently the greatest increases in supply.  New attractions such as the Barclays Center in Downtown Brooklyn and the building of high-end retail and residential projects, as well as a creative culture created by artists and creative-types commonly referred to as "hipsters" is attracting visitors to the market so they can witness gentrification at its finest, with the result being a need for increased lodging assets of all types.  In recent years Brooklyn has transformed into a leisure destination unto itself that stands alone from Manhattan as much as it is a feeder to it.  Brooklyn has a significant pipeline of new supply expected to come to market in the near future with areas like Williamsburg and the tech-triangle of Downtown Brooklyn, DUMBO and Brooklyn Heights leading the way.

### Bronx

Hotels located in the Bronx are comprised of mainly economy class and limited-service hotels. However, like other boroughs, the Manhattan pricing of apartment units has pushed would-be-Manhattanites into the outer boroughs, and the South Bronx's attractiveness in rent and commute has attracted demand from residential, retail, and commercials users. Neighborhoods such as Mott Haven, Port Morris, and Hunts Point are especially popular, and an increasing number of residential developments are in the early stages of development.  As the other asset classes take off in the Bronx, the area is seeing more hotel development, especially in the South Bronx.

### Staten Island

Staten Island is becoming more accessible to Manhattan through various infrastructure projects, including the raising of the Bayonne Bridge, building of the new Goethals Bridge, and the widening of the Staten Island Expressway. In addition, projects along the North Shore such as the New York Wheel, Lighthouse Point and Empire Outlets will draw travelers to Staten Island once completed.

## HISTORICAL PERFORMANCE

### BROOKLYN/CONEY ISLAND SUBMARKET

The subject is located in the Brooklyn/Coney Island submarket.  The map illustrating the submarket is shown below.   CBRE notes 7,592 rooms in the supply of this submarket comprising approximately 5.9 percent of available rooms of the entire New York market.



**Highest and Best Use**



The following presents historical data for the submarket.



**Highest and Best Use**

### New York, NY Submarket Summary

| Submarket | Upper-Priced Properties | Rooms | % Mkt | Mid-Priced Properties | Rooms | % Mkt | Lower-Priced Properties | Rooms | % Mkt | Totals Properties | Rooms | % Mkt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Times Square Area | 29 | 9,868 | 7.6% | 68 | 16,791 | 12.9% | 16 | 2,731 | 2.1% | 113 | 29,390 | 22.7% |
| Midtown N/South Central Park | 27 | 9,690 | 7.5% | 33 | 10,080 | 7.8% | 6 | 826 | 0.6% | 66 | 20,596 | 15.9% |
| Chelsea/Flatiron District | 15 | 3,091 | 2.4% | 39 | 7,423 | 5.7% | 8 | 3,191 | 2.5% | 62 | 13,705 | 10.6% |
| SoHo | 13 | 2,565 | 2.0% | 14 | 1,434 | 1.1% | 8 | 1,229 | 0.9% | 35 | 5,228 | 4.0% |
| Downtown Manhattan | 16 | 3,901 | 3.0% | 21 | 4,576 | 3.5% | 1 | 89 | 0.1% | 38 | 8,566 | 6.6% |
| East Village | 9 | 1,860 | 1.4% | 24 | 2,095 | 1.6% | 9 | 1,069 | 0.8% | 42 | 5,024 | 3.9% |
| Midtown East | 21 | 6,218 | 4.8% | 34 | 5,013 | 3.9% | 5 | 1,110 | 0.9% | 60 | 12,341 | 9.5% |
| Upper East Side | 19 | 3,943 | 3.0% | 14 | 2,890 | 2.2% | 2 | 553 | 0.4% | 35 | 7,386 | 5.7% |
| Uptown/The Bronx | 4 | 566 | 0.4% | 26 | 2,343 | 1.8% | 16 | 1,371 | 1.1% | 46 | 4,280 | 3.3% |
| Long Island City/Astoria | 1 | 348 | 0.3% | 21 | 2,470 | 1.9% | 21 | 1,639 | 1.3% | 43 | 4,457 | 3.4% |
| East Queens | 3 | 664 | 0.5% | 15 | 2,105 | 1.6% | 16 | 1,213 | 0.9% | 34 | 3,982 | 3.1% |
| JFK Airport/Jamaica | 3 | 803 | 0.6% | 21 | 3,554 | 2.7% | 23 | 1,614 | 1.2% | 47 | 5,971 | 4.6% |
| Brooklyn/Coney Island | 10 | 2,356 | 1.8% | 44 | 3,935 | 3.0% | 19 | 1,301 | 1.0% | 73 | 7,592 | 5.9% |
| SW Brooklyn/Staten Island | 0 | 0 | 0.0% | 11 | 889 | 0.7% | 5 | 291 | 0.2% | 16 | 1,180 | 0.9% |
| **Total** | 170 | 45,873 | 35.4% | 385 | 65,598 | 50.6% | 155 | 18,227 | 14.1% | 710 | 129,698 | 100.0% |

Source: Kalibri Labs, Q3 2021

The submarket is represented an array of economy to upscale hotels with a predisposition of mid-scale properties. Between 2015 and 2019, occupancy for all hotels in the district was within a tight range between mid 80% level. Additionally, over the last five years, ADR largely also remained in a tight range from from $182.35 to $185.86 from 2016 to 2019. 2020, of course, is not included in that range of histrorical figures as it is a significant outlier due to the Covid pandemic.

According to CBRE Hotels America's Research, the historical performance for properties in the Brooklyn/Coney Island is shown below.

| Hotel Horizon History and Forecast 3Q 2021 (Annual) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| New York — Brooklyn/Coney Island Submarket — All Hotels | | | | | | | | | | |
| Year | Occ | ΔOcc | ADR | ΔADR | RevPAR | ΔRevPAR | Supply | ΔSupply | Demand | ΔDemand |
| 2015 | 81.8% |  | $171.39 |  | $140.19 |  | 3,251 |  | 2,659 |  |
| 2016 | 79.9% | -2.3% | $175.94 | 2.7% | $140.56 | 0.3% | 3,806 | 17.1% | 3,041 | 14.4% |
| 2017 | 82.2% | 2.8% | $173.82 | -1.2% | $142.80 | 1.6% | 4,318 | 13.5% | 3,548 | 16.7% |
| 2018 | 83.7% | 1.9% | $178.86 | 2.9% | $149.72 | 4.8% | 4,824 | 11.7% | 4,038 | 13.8% |
| 2019 | 83.9% | 0.2% | $171.34 | -4.2% | $143.70 | -4.0% | 5,063 | 4.9% | 4,246 | 5.1% |
| 2020 | 52.6% | -37.3% | $118.17 | -31.0% | $62.17 | -56.7% | 5,050 | -0.3% | 2,657 | -37.4% |
| Source: Forecast Hotel Data - CBRE Hotels Research, Historical Hotel Data - Kalibri Labs, Q3 2021, CBRE Estimates | | | | | | | | | | |

As seen above, in 2019 Occupancy was reported at 83.9%, with ADR in low $170 level while RevPAR was noted at $143.70. In 2020, Occupancy fell 37.3%, rate down -31.0% to -$118.17 and the RevPAR declined fell -56.7% to $62.70. The declines, inasmuch as significant, however are less than experienced in the New York City Market overall. Brooklyn held up better than New York City. In fact, Brooklyn submarket experienced near 10% less decline in occupancy, rate and RevPAR, on a percentage basis. Growth rates are expended to see double digit gains in the NY market. Given the local Brooklyn market experienced less decline, the growth in its rebound is likely to be somewhat muted compared to NY overall. The following chart illustrates CBRE forecast for the submarket.



**Highest and Best Use**

| Hotel Horizon History and Forecast 3Q 2021 (Annual) | | | | | | | | | |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| New York — Brooklyn/Coney Island Submarket — All Hotels | | | | | | | | | |
| Year | Occ | ΔOcc | ADR | ΔADR | RevPAR | ΔRevPAR | Supply | ΔSupply | Demand | ΔDemand |
| 2015 | 81.8% | | $171.39 | | $140.19 | | 3,251 | | 2,659 | |
| 2016 | 79.9% | -2.3% | $175.94 | 2.7% | $140.56 | 0.3% | 3,806 | 17.1% | 3,041 | 14.4% |
| 2017 | 82.2% | 2.8% | $173.82 | -1.2% | $142.80 | 1.6% | 4,318 | 13.5% | 3,548 | 16.7% |
| 2018 | 83.7% | 1.9% | $178.86 | 2.9% | $149.72 | 4.8% | 4,824 | 11.7% | 4,038 | 13.8% |
| 2019 | 83.9% | 0.2% | $171.34 | -4.2% | $143.70 | -4.0% | 5,063 | 4.9% | 4,246 | 5.1% |
| 2020 | 52.6% | -37.3% | $118.17 | -31.0% | $62.17 | -56.7% | 5,050 | -0.3% | 2,657 | -37.4% |
| 2021 | 61.9% | 17.6% | $131.71 | 11.5% | $81.51 | 31.1% | 6,621 | 31.1% | 3,125 | 17.6% |
| 2022 | 74.7% | 20.7% | $151.05 | 14.7% | $112.83 | 38.4% | 6,731 | 38.4% | 3,772 | 20.7% |
| 2023 | 77.5% | 3.7% | $154.26 | 2.1% | $119.53 | 5.9% | 7,130 | 5.9% | 3,913 | 3.7% |
| 2024 | 78.6% | 1.4% | $156.95 | 1.7% | $123.34 | 3.2% | 7,358 | 3.2% | 3,969 | 1.4% |
| 2025 | 78.7% | 0.2% | $159.98 | 1.9% | $125.98 | 2.1% | 7,515 | 2.1% | 3,976 | 0.2% |
| Source: Forecast Hotel Data - CBRE Hotels Research, Historical Hotel Data - Kalibri Labs, Q3 2021, CBRE Estimates | | | | | | | | | |

Although the 2020 was a very bleak year that has not ever been seen before, there is historical evidence that the hospitality industry has always rebounded following every downturn. The industry normally operates in parallel with economic robustness and the underlying economic picture is not as awful as it is in the hotel sector. Yes, these sectors have been hit particularly hard and the employment picture in hospitality sector is bleak currently, yet underlying employment of the overall economy has recovered to near pandemic levels. Where employment has declined in hospitality it has increased in other areas such as healthcare. Epic as it has been and certainly a black swan event to certain parts of the economy, fundamentally, the economic view is stable to good. Consumer spending represents about 70% of GDP and consumers have not cut back as spending patterns have remained strong. Personal savings rates have been very high while personal debt has declined. Of course, GDP experienced a decline in 2020, however market pandits and economists forecast GDP to experience rebounding growth to a level bringing the economy back to pre-pandemic levels in near term erasing covid decline for 2020. The political environment appears much more stable than it was pre-election. In 2020 and 2021, the financial equity markets continued to exceed record levels once again. As the economy continues to improve, time will tell how the hospitality industry rebounds coming out of the pandemic, yet knowingly, the nadir has passed and momentum has begun to build in the later months of 2021.

RevPAR faced steep declines as a result of the pandemic, and the deceleration presented significant headwind challenges for almost the entire industry, yet this followed several robust years of growth and hoteliers nimble enough to cut costs through the pandemic and push through to the flip side of the pandemic are going to be in a stronger position to take advantage of the rebound.

There are national and international investors who still desire to place capital into well-established markets such as New York City. Given the disruption, many have placed capital aside ready to take advantage. As we and investment community all have muddled through the pandemic, the future gets less foggy every passing day. As opportunities present themselves, investors appear to be ready to take advantage.



Much uncertainty and fear was in the market through 2020 as the world took pause. There is much less uncertainty as of year-end 2021, than a year or even a quarter ago. The uncertainty present in the market appears abated, while three (needle shot) vaccinations and boosters are being widely distributed and there is one additional vaccine, in pill form, which is currently being pushed through the FDA and being heralded as a game changer. The challenges of the pandemic have been met with great strides and significant accomplishment by both the medical community and world at large. Economic fundamentals are currently supportive of a rebound. There is resiliency of world-wide financial markets, and there is an economic strength supporting a continued economic resilience coming out of the pandemic. There is support from monetary policy with the Feds mandated to support low unemployment. Interest rates are at historical low levels and the Treasury is expecting keep interest low for the foreseeable future. The political environment appears to be proactive to provide further support if needed. Fundamentally, the American consumer remains in good standing. There has been a huge resiliency in our nation facing the pandemic and exceptional resiliency down to those people who have lost loved ones. As it relates to hospitality, although hotel demand will continue to face challenges, and depressed from pre-Covid levels in the near term, while the vaccination reach the millions, domestic travel has kick started and in November 2021, borders opened to vaccinated individuals with little restriction. It is hard to not follow the doom and gloom headlines, yet people have short memories, and in the fast pace of New York City, the pandemic is not likely to hold it down. With regained confidence as the US and the world reaches herd vaccination, the Leisure market has been the first to rebound. The American consumer has once again opened its pocketbook, supporting their local business and this is going to be followed by expansion to travel. There is a high degree of consumer savings and significant pent-up demand. Similarly, the international market travel will open up adding to the domestic travel and demand. Business spending will rebound and business travel, which will be slightly subdued initially will lag behind the consumer rebound given organization of schedules have to be put back in place which takes time. Large meetings and conventions will lag behind as well but continue to be promoted as venues look to regain traction and market share as we come out of the pandemic.

### Competitive Hotel Market Analysis

The subject is classified as an economy full-service hotel and is located in the western Brooklyn market of Brooklyn, New York. Hotel development in the area consists of a variety of independent, branded select- and full-service hotels and is generally located proximate to subway station stops or travel links.



## Summary of Competitive Properties

The following table provides a summary of the subject's competitive hotel set. These comparables were based on location and class of the property.

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PRIMARY COMPETITIVE HOTELS** | | | | | | | | | | | | | | | | |
| | | | | | | | 12 Months Ending December 31, 2019 | | | | | | | | | |
| Property | Number of Rooms | Percentage Competitive | Year Built | Affiliation Date | Competitive Rooms | Distance From Subj. | Occ. | Percent of Yr. Open | Total Room Nights | Occupied Room Nights | Occupancy Penetration | Occupancy Penetration | ADR | ADR Penetration | ADR Penetration | RevPAR | RevPAR Penetration |
| The William Vale | 183 | 100% | 2017 | Aug-16 | 183 | | 77.9% | 100% | 66,978 | 52,036 | 90% | 90% | $360 - $370 | 111% | 111% | $282.16 | 112% |
| The Tillary Hotel Brooklyn | 174 | 100% | 2015 | Sep-17 | 174 | | 75% - 80% | 100% | 63,510 | 48,903 | 99% | 90% - 100% | $175 - $185 | 55% | 50% - 60% | $135 - $140 | 50% - 60% |
| 1 Hotel Brooklyn Bridge | 195 | 100% | 2017 | Jul-20 | 195 | | 75% - 80% | 100% | 71,175 | 54,805 | 99% | 90% - 100% | $420 - $430 | 130% | 125% - 135% | $320 - $330 | 125% - 135% |
| McCarren Hotel | 64 | 100% | 2011 | May-20 | 64 | | 75% - 80% | 100% | 23,360 | 17,987 | 99% | 90% - 100% | $310 - $320 | 97% | 90% - 100% | $240 - $250 | 90% - 100% |
| The Box House Hotel | 128 | 100% | 2011 | May-11 | 128 | | 75% - 80% | 100% | 46,720 | 35,974 | 99% | 90% - 100% | $260 - $270 | 81% | 75% - 85% | $200 - $210 | 75% - 85% |
| Wythe Hotel | 69 | 100% | 2012 | Jul-20 | 69 | | 75% - 80% | 100% | 25,185 | 19,392 | 99% | 90% - 100% | $250 - $260 | 78% | 75% - 85% | $190 - $200 | 75% - 85% |
| The Williamsburg Hotel | 147 | 100% | 2016 | Dec-16 | 147 | | 75% - 80% | 100% | 53,655 | 41,314 | 99% | 90% - 100% | $270 - $280 | 84% | 80% - 90% | $205 - $215 | 80% - 90% |
| The Hoxton Williamsburg | 175 | 100% | 2018 | Jul-20 | 175 | | 70% - 75% | 100% | 63,875 | 47,197 | 95% | 90% - 100% | $225 - $235 | 71% | 65% - 75% | $165 - $175 | 60% - 70% |
| W New York Union Square | 270 | 100% | 1911/2000 | Nov-00 | 270 | | 75% - 80% | 100% | 98,550 | 77,608 | 102% | 95% - 105% | $375 - $385 | 117% | 110% - 120% | $295 - $305 | 115% - 125% |
| Hotel Indigo Lower East Side | 294 | 100% | 2015 | Nov-15 | 294 | | 80% - 85% | 100% | 107,310 | 86,728 | 104% | 100% - 110% | $240 - $250 | 75% | 70% - 80% | $195 - $205 | 75% - 85% |
| The New York Edition | 273 | 100% | 1909/2015 | May-15 | 273 | | 75% - 80% | 100% | 99,645 | 75,870 | 98% | 90% - 100% | $490 - $500 | 152% | 145% - 155% | $370 - $380 | 145% - 155% |
| Primary Totals/Averages | 1,972 | | | | 1,972 | | 75% - 80% | 100% | 719,963 | 557,814 | | | $320 - $330 | | | $235 - $245 | |
| Compiled by CBRE | | | | | | | | | | | | | | | | |

The primary competitive set has a total of 1,972 rooms and 1,789 without the subject. The 2019, the last stabilized year per-Covid pandemic occupancy and ADR achieved by these properties was roughly 75-80% and $320-$330, respectively. The subject performed in line with the comparable set in terms of Occupancy but ADR penetration index was 111% and RevPAR index was 112%.

Market performance has fallen due to Covid impact, yet statistical evidence was unreliable given reporting was intermittent with many closures and the markets experiencing significant disruption.

We have relied on historical data in our analysis as market participants and economics alike are all forecasting based on past historical performance and how long it will take for full rebound to pre-covid levels.



## STR Custom Trend Report

In order to more precisely identify hotel market trends, as they relate to the subject, CBRE has relied on a customized report prepared by STR, Inc., a national firm specializing in tracking hotel data.  STR is generally considered the standard source of reliable data for most markets.  While it is widely utilized, it is important to note some of its limitations.   Specifically, hotels are occasionally dropped in and out of the sample, and not all hotels report data in a consistent and timely matter.  As a result, the data set is sometimes skewed upwards or downwards depending on the particular market and the overall quality of the data is negatively impacted.  For most markets, however, it is considered to provide an accurate overall picture of market performance, and therefore, has been used in this analysis.  The hotels included in the STR report are based on interviews with representatives of the subject and subsequent field research.

The trends in room supply, occupancy, average daily rate, and room-night demand (defined as the number of occupied rooms) for the subject's competitive set are illustrated as follows:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **HISTORICAL MARKET PERFORMANCE** | | | | | | | | | |
| **STR TREND COMPETITIVE PROPERTIES** | | | | | | | | | |
| Year | Room Night Supply | Percent Change | Market Occupancy | Room Night Demand | Percent Change | Average Daily Rate | Percent Change | RevPAR | Percent Change |
| 2017 | 338,413 | --- | 70.4% | 238,123 | --- | $261.61 | --- | $184.08 | --- |
| 2018 | 372,084 | 9.9% | 76.6% | 284,879 | 19.6% | $306.80 | 17.3% | $234.89 | 27.6% |
| 2019 | 414,640 | 11.4% | 76.4% | 316,980 | 11.3% | $312.09 | 1.7% | $238.58 | 1.6% |
| 2021 | 413,021 | -0.4% | 67.1% | 277,043 | -12.6% | $317.92 | 1.9% | $213.25 | --- |
| CAG * | | -0.4% | | | -12.6% | | 1.9% | | -10.6% |
| Dec YTD 2019 | 414,640 | --- | 76.4% | 316,980 | --- | $312.09 | --- | $238.58 | --- |
| Dec YTD 2021 | 413,021 | --- | 67.1% | 277,043 | --- | $317.92 | --- | $213.25 | --- |
| CAG * | | -0.4% | | | -12.6% | | 1.9% | | -10.6% |

\* Compound Annual Growth
Source:  STR Trend Report

As seen in the statistical trend exhibited by the competitive set, this set also experienced declines through Covid Pandemic, but it is noted it performed much better relative to both occupancy and rate through the pandemic.  Current or 2021 demand levels are only off 12.6% from 2019 pre-pandemic levels, yet rate is indicated to be slightly up since 2019.  Overall RevPAR is down 10.6% to year end 2021 from 2019 pre-pandemic levels.

## Proposed Hotels/Additions to Supply

CBRE did not include any new Proposed Hotels/Additions to Supply due to no new competitive hotels being built within the Williamsburg Market Area that would compete with the subject property. There is also uncertainty over whether some proposed projects will come to fruition as the impact of COVID has created uncertainty over the feasibility of new hotel development.

While CBRE has made several attempts to determine the level of new hotel supply entering the marketplace, it is impossible to determine every hotel that will be developed in the future, when they will be completed, or their potential impact to the subject.  In conducting our investigations regarding the potential for additions to supply in the competitive market, we interviewed various



developers and planning officials. We have identified additional projects in the local area but have not specifically included these properties in our analysis due to the stage of development, financing issues, market positioning, location, and/or rate structure. The inherent risk of any future new hotel supply has been implicitly considered in the selection of a stabilized occupancy level for the subject property.

## HOTEL DEMAND GENERATORS

Demand for hotel rooms is categorized in three ways:

- Demonstrated Demand: the demand already captured at competitive hotels;
- Induced Demand: the demand that does not presently seek accommodations in the competitive market, but could be persuaded to do so through marketing efforts, room rates, facilities, services and amenities.
- Unsatisfied Demand: the demand that seeks accommodations in the market but is not satisfied due to one of a number of factors: sell-outs during peak season; lack of a particular type of accommodation; lack of meeting space; or high room rates.

Hotel demand for the neighborhood is primarily generated by the Brooklyn proximity to its neighboring New York City, the most sought out city in the nation in terms of business travel and tourists alike. It is the financial capital of the nation (and world), is home to numerous fortune 500 companies, is home to three international airports in the metropolitan area, has numerous museums, renowned professional sports teams and huge tourist attractions including Times Square, Fifth Avenue shopping, Empire State Building, Central Park, etc. Demand, although not assured has been growing significantly over the last half dozen years and has historically been positive over the last three decades. The market has been considered underserved by the hotel industry for many years.

### Demand Segmentation

In most markets, overall demand varies based on the nature of travel. In most markets, the lodging demand is generated from three different segments: Corporate, Group/Meeting and Leisure travelers. In some markets, a fourth classification may be present, such as airline contract or government. A breakdown of the overall market segments is illustrated in the following table.

| DEMAND SEGMENTATION – COMPETITIVE MARKET AND SUBJECT | | | | | |
|---|---|---|---|---|---|
| | Competitive Set | | Subject Property | | |
| Segment | 2019 Demand | % | 2019 Demand | % | Penetration |
| Corp. Individual | 197,891 | 35% | 13,009 | 25% | 71% |
| Group | 187,536 | 34% | 18,213 | 35% | 104% |
| Leisure | 172,386 | 31% | 20,814 | 40% | 130% |
| Total | 557,814 | 100% | 52,036 | 100% | 100% |
| Compiled by CBRE | | | | | |

The following analysis schedule illustrates our projections of future demand growth for the local market by demand segment.



COMMERCIAL DEMAND SEGMENT

Commercial travelers are defined as business people attracted by businesses in the area. Most demand from the corporate segment is generated between Sunday and Thursday nights, declines Friday and Saturday nights, and increases somewhat on Sundays. The typical duration of occupancy is one to three days and is characterized by single occupancy. Historically, this demand segment has been somewhat less price sensitive than other segments. The commercial segment includes smaller sub-segments, including corporate transient demand and corporate volume discount. Commercial transient demand includes individuals visiting the companies in the immediate area or passing through town. Often, these types of travelers are influenced by quality of the hotel, brand loyalty, and location. Corporate volume demand is generated by local firms and includes employees of the company or others doing business with the firm. Rates are often pre-negotiated with the hotel and are sometimes discounted in return for a high number of occupied rooms. However the subject property doesn't have a high percentage of corporate guest and this segment is limited given the limited scale, nominal amenities and scope of the facility.

MEETING AND GROUP DEMAND SEGMENT

Meeting and Group travelers are defined as any group occupying five or more rooms on a given night. This segment includes corporate groups, associations, SMERF (social, military, educational, religious, and fraternal) groups. This segment is typically attracted by a hotel's meeting facilities and recreational amenities in the area. Demand from corporate groups is typically generated between Sunday and Thursday nights, and can include corporate functions, holiday parties, incentive groups, etc. Often, corporate groups pay high rates, especially incentive groups, where companies "wine and dine" their top salesman and upscale/luxury hotels. Corporate groups tend to have a high level of single occupancy, while other groups tend to have more double occupancy. Associations and SMERF groups have a more varied occupancy pattern and often hold weekend meetings. This demand segment tends to be somewhat price sensitive. The typical stay for group demand is between three and five days. There is a perception (often true) that by occupying a block of rooms, a volume discount should be given. Group/meeting travelers have a tendency to stay at full-service hotels and utilize a hotel's food and beverage facilities. This segment is also seasonal, and repeat business on an annual basis is not guaranteed. Overall, the group/meeting segment is desirable as it provides for a full utilization of hotel facilities, albeit it is not considered a significant demand segment for the subject property.

Few facilities accommodate group demand in south Brooklyn as few facilities offer significant amounts of meeting space and dining options. Hotels with larger amenities are located closer to downtown Brooklyn and most are larger full service properties. Other larger meeting spaces are found near the JFK and LGA Airports and in New York City markets where other larger hotels are found and can accommodate the groups and also offer dining facilities. Social events such as



weddings and other social events will also provide for group demand albeit not hosting the actual events given lack of meeting space.

LEISURE DEMAND SEGMENT

Leisure travelers generally include vacationers or travelers passing through the area. This category effectively includes all non-commercial related travelers too small to be defined as a group. This segment is typically attracted by a hotel's location relative to area attractions (including friends/relatives). Demand from leisure/transient travelers is typically generated throughout the week during peak periods, with more weekend demand in shoulder seasons. Leisure travelers tend to have a high level of double occupancy. Both components of this demand segment tend to be price sensitive. The typical stay for leisure travelers is between two and five days. Transient travelers typically occupy a room for one night only.

Future leisure demand is related to the overall health of the local and national economy. As discussed in the Regional analysis of this report, the local and regional economy has been devastated by Covid pandemic, yet it is expected to rebound in a V shape recovery over the next two to three years.

Based upon our research with some reliance placed on the CBRE Horizon Hotel forecasts, the following illustrates our forecast segment demand growth:

| ANNUAL DEMAND GROWTH RATES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Segment | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 and beyond |
| Corp. Individual | 15.0% | 12.5% | 10.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Group | 15.0% | 12.5% | 10.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Leisure | 15.0% | 12.5% | 10.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Compiled by CBRE | | | | | | | | |

As seen, we forecast an increase in demand in 2022 as the area continues to recover post pandemic. We have estimated a strong recovery which is supported by our internal Hotel Horizons forecasts over the next several years as the market returns to normal conditions post Covid.

## Latent Demand

Latent demand represents potential room nights in the marketplace that could not be accommodated by the existing hotels, and comes in two forms: Induced demand and displaced demand. Induced demand represents additional accommodated room nights by the introduction of a new demand generator, such as the construction of a conference center, a major company moving into the area, or the introduction of a new hotel that has distinct advantages over the existing competitors. For this analysis, we have included induced demand in our analysis, as the new supply we have identified as competitive to the subject will induce demand to their own properties and to the Brooklyn market.



## Displaced Demand

CBRE has also considered displaced demand for this analysis. Displaced demand occurs when individuals are unable to rent a room because all of the hotels in the marketplace are filled to capacity. As a result, individuals must defer their trips or make accommodations in other markets. Because this demand was not accommodated historically, it is not illustrated in the estimate of the historic accommodated room night demand. Displaced demand is illustrated further in markets where there are distinct high and low seasons, or several periods of high and low occupancy throughout the year. We have not included displaced demand for the subject set given near term conditions and long term recovery.

Based on market factors presented throughout this section, the forecast of overall demand growth for the subject's market is illustrated as follows:

| PROJECTED BASE DEMAND, ANNUAL GROWTH, AND MARKET-WIDE OCCUPANCY | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Competitive Set Year Ending 12/31/ | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
| **Corp. Individual** | | | | | | | | | | | |
| Annual Growth | | 15.0% | 12.5% | 10.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Base Nightly Demand | 439 | 504 | 567 | 624 | 630 | 637 | 643 | 649 | 656 | 663 | 669 |
| Annual Room Nights | 160,082 | 184,094 | 207,106 | 228,441 | 230,095 | 232,395 | 234,719 | 237,716 | 239,437 | 241,832 | 244,250 |
| Total Segment Demand | 160,082 | 184,094 | 207,106 | 228,441 | 230,095 | 232,395 | 234,719 | 237,716 | 239,437 | 241,832 | 244,250 |
| **Group** | | | | | | | | | | | |
| Annual Growth | | 15.0% | 12.5% | 10.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Base Nightly Demand | 416 | 478 | 538 | 591 | 597 | 603 | 609 | 616 | 622 | 628 | 634 |
| Annual Room Nights | 151,705 | 174,461 | 196,269 | 216,487 | 218,055 | 220,235 | 222,438 | 225,277 | 226,909 | 229,178 | 231,469 |
| Total Segment Demand | 151,705 | 174,461 | 196,269 | 216,487 | 218,055 | 220,235 | 222,438 | 225,277 | 226,909 | 229,178 | 231,469 |
| **Leisure** | | | | | | | | | | | |
| Annual Growth | | 15.0% | 12.5% | 10.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Base Nightly Demand | 382 | 439 | 494 | 544 | 549 | 555 | 560 | 566 | 571 | 577 | 583 |
| Annual Room Nights | 139,450 | 160,367 | 180,413 | 198,998 | 200,439 | 202,444 | 204,468 | 207,079 | 208,578 | 210,664 | 212,770 |
| Total Segment Demand | 139,450 | 160,367 | 180,413 | 198,998 | 200,439 | 202,444 | 204,468 | 207,079 | 208,578 | 210,664 | 212,770 |
| **Totals** | | | | | | | | | | | |
| Corp. Individual | 160,082 | 184,094 | 207,106 | 228,441 | 230,095 | 232,395 | 234,719 | 237,716 | 239,437 | 241,832 | 244,250 |
| Group | 151,705 | 174,461 | 196,269 | 216,487 | 218,055 | 220,235 | 222,438 | 225,277 | 226,909 | 229,178 | 231,469 |
| Leisure | 139,450 | 160,367 | 180,413 | 198,998 | 200,439 | 202,444 | 204,468 | 207,079 | 208,578 | 210,664 | 212,770 |
| **Total Market Demand** | 451,237 | 518,922 | 583,788 | 643,926 | 648,589 | 655,074 | 661,625 | 670,072 | 674,924 | 681,674 | 688,489 |
| Growth over Prior Year | | 15.0% | 12.5% | 10.3% | 0.7% | 1.0% | 1.0% | 1.3% | 0.7% | 1.0% | 1.0% |
| **Market Statistics** | | | | | | | | | | | |
| Existing Rooms Supply | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 |
| Total Available Room Nights | 842,420 | 842,420 | 842,420 | 844,728 | 842,420 | 842,420 | 842,420 | 844,728 | 842,420 | 842,420 | 842,420 |
| Growth over Prior Year | | 0.0% | 0.0% | 0.3% | -0.3% | 0.0% | 0.0% | 0.3% | -0.3% | 0.0% | 0.0% |
| Potential Market-wide Occupancy | 53.6% | 61.6% | 69.3% | 76.2% | 77.0% | 77.8% | 78.5% | 79.3% | 80.1% | 80.9% | 81.7% |
| Accommodated Market Occupancy | 53.6% | 61.6% | 69.3% | 76.2% | 77.0% | 77.8% | 78.5% | 79.3% | 80.1% | 80.9% | 81.7% |

Source: CBRE

Overall occupancy in the market is illustrated to increase in near term (year 1) and ramps to mid to high 80s level back to pre-Covid levels down the road several years for the competitive properties.

## HISTORICAL OPERATING PERFORMANCE

The subject occupancy, ADR, and RevPAR budget is illustrated as follows:



Highest and Best Use

| SUBJECT'S HISTORIC OPERATING PERFORMANCE | | | | | |
|---|---|---|---|---|---|
| Period | Occupancy | % Change | ADR | % Change | RevPAR | % Change |
| Year Ended: 12/31/2017 | 74.4% | -- | $334.70 | -- | $249.02 | -- |
| Year Ended: 12/31/2018 | 77.0% | 3.5% | $371.26 | 10.9% | $285.87 | 14.8% |
| Year Ended: 12/31/2019 | 77.9% | -1.2% | $363.18 | 2.2% | $282.93 | 2.2% |
| Source:  CBRE/Property Management | | | | | |

The client did not provide any income/expense data for years prior to 2019.

## FORECAST OF OCCUPANCY AND AVERAGE DAILY RATE

The average daily rate and the overall occupancy of a lodging facility are the foundation for the property's financial performance.  While a property's other revenue components (food and beverage, telephone, spa, other income, etc.) are crucial to the operation of the hotel, they are dependent on the overall number of occupied rooms.  Furthermore, the occupancy and average daily rate of a hotel are highly correlated.  In reality, one cannot make a projection of one without a projection of the other.  Therefore, while we have made specific projections of occupancy, but have considered the subject's positioned rate in our forecast.

In order to project the future occupancy levels of the subject, we have estimated the level of patronage by market segment that can be reasonably captured (penetration).  The extent to which the subject can capture demand from each market segment was estimated by performing a fair share penetration analysis.

A hotel's fair share is defined as the number of available rooms divided by the total supply of available rooms in the competitive market, including the subject.  Factors indicating the subject would possess competitive advantages suggest a market penetration in excess of 100 percent of fair share, while competitive weaknesses are reflected in penetration less than 100 percent.

### Penetration

Penetration is the relationship between a market's fair share and its actual share of the overall demand.  For example, a 100-room hotel would equate to 10% of a 1,000 room competitive set.  If this hotel were to capture 10% of the overall lodging demand, it would penetrate the market by 100 percent.

Market penetration, or penetration rate, is the ratio of captured demand to fair share of demand.  Factors indicating competitive advantages are typically reflected in penetration rates above 100 percent, while, conversely, competitive disadvantages are reflected in penetration rates below 100 percent. Actual penetration of each market segment by the Subject may deviate from fair market share for the reasons such as the following:



*Highest and Best Use*

### PROJECTED SUBJECT PENETRATION SCHEDULE

| Year Ending 12/31/ | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|
| **SUBJECT PROPERTY FAIR SHARE** | | | | | | | | | |
| Market Room Supply | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 |
| Subject Avg. Room Count | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 |
| Fair Share | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% |
| **ROOM NIGHTS CAPTURED BY SUBJECT** | | | | | | | | | |
| **Corp. Individual** | | | | | | | | | |
| Fair Share | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% |
| Penetration Factor | 70.9% | 70.9% | 70.9% | 70.9% | 70.9% | 70.9% | 70.9% | 70.9% | 70.9% |
| Market Share | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% |
| Demand | 160,082 | 184,094 | 207,106 | 228,441 | 230,095 | 232,395 | 234,719 | 237,716 | 239,437 |
| Market Share | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% | 5.6% |
| Capture | 8,994 | 10,343 | 11,636 | 12,834 | 12,927 | 13,056 | 13,187 | 13,355 | 13,452 |
| **Group** | | | | | | | | | |
| Fair Share | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% |
| Penetration Factor | 104.7% | 104.7% | 104.7% | 104.7% | 104.7% | 104.7% | 104.7% | 104.7% | 104.7% |
| Market Share | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% |
| Demand | 151,705 | 174,461 | 196,269 | 216,487 | 218,055 | 220,235 | 222,438 | 225,277 | 226,909 |
| Market Share | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% | 8.3% |
| Capture | 12,591 | 14,480 | 16,290 | 17,968 | 18,098 | 18,279 | 18,462 | 18,698 | 18,833 |
| **Leisure** | | | | | | | | | |
| Fair Share | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% |
| Penetration Factor | 130.1% | 130.1% | 130.1% | 130.1% | 130.1% | 130.1% | 130.1% | 130.1% | 130.1% |
| Market Share | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% |
| Demand | 139,450 | 160,367 | 180,413 | 198,998 | 200,439 | 202,444 | 204,468 | 207,079 | 208,578 |
| Market Share | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% | 10.3% |
| Capture | 14,390 | 16,548 | 18,617 | 20,535 | 20,684 | 20,890 | 21,099 | 21,369 | 21,523 |
| **Total Capture** | 35,975 | 41,371 | 46,543 | 51,337 | 51,709 | 52,226 | 52,748 | 53,422 | 53,809 |
| **Potential Subject Occupancy** | 53.9% | 61.9% | 69.7% | 76.6% | 77.4% | 78.2% | 79.0% | 79.8% | 80.6% |
| **Overall Potential Subject Penetration** | 100.5% | 100.5% | 100.5% | 100.5% | 100.5% | 100.5% | 100.5% | 100.5% | 100.5% |

Compiled by CBRE

- The competitive advantages or disadvantages of the hotel versus the competition taking into consideration such factors as age, location, room rate structure, chain affiliation, quality of management, marketing efforts, and image;
- The characteristics, needs, and composition of each market segment;
- The restrain on demand captured due to capacity constraints during certain periods of the week or times of the year; and
- Management decisions concerning target markets.

The current market penetration rates of the competitive hotels and the subject, broken down by demand segment, are illustrated as follows:



Highest and Best Use

| | 2021 Average Room Count | Estimated 2021 Occupancy | 2021 Fair Share | Segmented Penetration | | | |
|---|---|---|---|---|---|---|---|
| **SEGMENTED PENETRATION** | | | | | | | |
| Property | | | | Corp. Individual | Group | Leisure | Total |
| The William Vale | 183 | 77.9% | 9.3% | 71% | 105% | 130% | 90% |
| The Tillary Hotel Brooklyn | 174 | 75% - 80% | 8.8% | 90% - 100% | 100% - 110% | 90% - 100% | 90% - 100% |
| 1 Hotel Brooklyn Bridge | 195 | 75% - 80% | 9.9% | 80% - 90% | 115% - 125% | 90% - 100% | 90% - 100% |
| McCarren Hotel | 64 | 75% - 80% | 3.2% | 80% - 90% | 55% - 65% | 155% - 165% | 90% - 100% |
| The Box House Hotel | 128 | 75% - 80% | 6.5% | 105% - 115% | 100% - 110% | 75% - 85% | 90% - 100% |
| Wythe Hotel | 69 | 75% - 80% | 3.5% | 90% - 100% | 100% - 110% | 90% - 100% | 90% - 100% |
| The Williamsburg Hotel | 147 | 75% - 80% | 7.5% | 135% - 145% | 85% - 95% | 60% - 70% | 90% - 100% |
| The Hoxton Williamsburg | 175 | 70% - 75% | 8.9% | 105% - 115% | 80% - 90% | 85% - 95% | 90% - 100% |
| Total/Avg | 1,973 | 77.5% | 100.0% | 100% | 100% | 100% | 100% |

Compiled by CBRE

The subject has shown to overpreform against the set most recently which is due in large part to the its' independent status and it being a unique property in the overall market. We are of the opinion the property will remain to penetrate better as the market distances itself form Covid, yet believe the property will continue to underperform with a penetration index of below 100 yet at a lesser degree than illustrated by recent statistics. We forecast improvement toward the 100 level, yet it is appreciated that the property, is forecast to continue to penetrate at fair share given its independent status relative to the set.

Overall, the subject improvements represent a viable hotel. The projections of captured penetration rates for the subject by demand segment along with the resulting projections of occupied room-nights are illustrated as follows:

Given the property has largely fully open and available the entire property with 183 rooms, all future calculations are based on this total room count of 183 rooms in available in service inventory. The overall accommodated room night demand is multiplied by the subject's fair share and by the projected penetration ratio to derive the subject's accommodated room night demand. Although the subject's illustrated occupancy rates increase after the stabilized year, we have selected  as the stabilized occupancy figure.

The stabilized occupancy figure is intended to be an average figure over the projected holding period. The following depicts the derivation of the occupancy projections for the subject.



| SUBJECT PROPERTY ESTIMATED OCCUPANCY ADJUSTED TO PROJECTION DATES | | | | | |
|---|---|---|---|---|---|
| **Competitive Set Year Ending 12/31/** | **2021** | **2022** | **2023** | **2024** | **2025** |
| Room Nights Captured | 35,975 | 41,371 | 46,543 | 51,337 | 51,709 |
| Available Room Nights | 66,795 | 66,795 | 66,795 | 66,978 | 66,795 |
| Potential Subject Occupancy | 53.9% | 61.9% | 69.7% | 76.6% | 77.4% |
| Overall Potential Subject Market Share | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% |
| Overall Potential Subject Penetration | 100.5% | 100.5% | 100.5% | 100.5% | 100.5% |
| **Adjustment to Projection Year Ending 12/30/** | **2022** | **2023** | **2024** | **2025** | **2026** |
| First Year % | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Second Year % | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Adjusted Room Nights Accommodated | 41,371 | 46,543 | 51,337 | 51,709 | 52,226 |
| Projection Period Fiscal Year Occupancy | 61.9% | 69.7% | 76.6% | 77.4% | 78.2% |
| **Rounded Occupancy** | **62%** | **70%** | **77%** | **77%** | **78%** |
| Overall Market Share | 8.0% | 8.0% | 8.0% | 7.9% | 8.0% |
| Overall Penetration | 100.7% | 101.3% | 100.7% | 100.0% | 100.3% |
| Captured Room Nights (Based on Rounded Occ.) | 41,413 | 46,757 | 51,573 | 51,432 | 52,100 |
| **Adjustment to Projection Year Ending 12/30/** | **2022** | **2023** | **2024** | **2025** | **2026** |
| First Year % | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Second Year % | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Adjusted Room Nights Accommodated | 41,371 | 46,543 | 51,337 | 51,709 | 52,226 |
| Projection Period Fiscal Year Occupancy | 61.9% | 69.7% | 76.6% | 77.4% | 78.2% |
| **Rounded Occupancy** | **62%** | **70%** | **77%** | **77%** | **78%** |
| Overall Market Share | 8.0% | 8.0% | 8.0% | 7.9% | 8.0% |
| Overall Penetration | 100.7% | 101.0% | 101.0% | 100.0% | 100.3% |
| Captured Room Nights (Based on Rounded Occ.) | **41,413** | **46,757** | **51,573** | **51,432** | **52,100** |
| Compiled by CBRE | | | | | |

Our concluded stabilized occupancy figure is estimated at 77% for the forecasts with which we note will be reached by the fourth year of our projection given the rate structure we have considered.

### Average Daily Rate

As noted previously, one of the most important considerations in deriving an opinion of value of a hotel is its forecast of a supportable average daily rate (ADR). The ADR of a hotel can be calculated by dividing the total rooms revenue by the total number of occupied rooms achieved during a specified period of time.

#### SUBJECT'S COMPETITIVE POSITIONING

Although the forecast of average daily rate follows the discussion of future occupancy, these two figures are highly correlated, and one cannot make projections of occupancy without specific assumptions of ADR. This relationship is defined by RevPAR, or Revenue Per Available Room. RevPAR is the measure of a property's ability to maximize rooms revenue. Theoretically, for example, if a lodging property's ADR increases substantially (with no market influencing factors), its occupancy would decrease. Conversely, if a property's ADR decreases, an increase in



occupancy would be anticipated. In each instance, RevPAR would remain unchanged. The historic ADR and RevPAR for the subject and the competitive set is illustrated as follows:

| SUBJECT AND COMPETITIVE ADR AND REVPAR | | |
|---|---|---|
| | 2019 | 2019 |
| Property | ADR | RevPAR |
| Subject (The William Vale ) | $363.18 | $282.16 |
| The Tillary Hotel Brooklyn | $175 - $185 | $135 - $140 |
| 1 Hotel Brooklyn Bridge | $495 - $505 | $380 - $390 |
| McCarren Hotel | $220 - $230 | $170 - $180 |
| The Box House Hotel | $270 - $280 | $205 - $215 |
| Wythe Hotel | $260 - $270 | $200 - $210 |
| The Williamsburg Hotel | $245 - $255 | $190 - $200 |
| The Hoxton Williamsburg | $225 - $235 | $165 - $175 |
| Market Weighted Average | $329.39 | $255.21 |
| Subject's Positioned ADR as of 12/31/2019: | $363.18 | |
| Subject's Positioned ADR as of 12/31/2021: | $325.00 | |
| Source: CBRE | | |

As illustrated in the preceding chart, the competitive set properties suggest an ADR range of approximately $175 to $505 for 2021. The weighted average for the competitive set was roundly $329.39 in 2021.

The projections for ADR growth and the resulting rates used in the analysis are based on forecasts and the dynamics that impact the immediate area competitive set and market. We have considered forecasts with some reliance on CBRE Hotel Horizon market reports, status of the property relative to the comp set and Covid related conditions that have impacted the market. The following chart illustrates our forecasts for the subject property ADR pricing performance.

| SUBJECT'S ESTIMATED ADR | | |
|---|---|---|
| 12 Months Ending | ADR Growth | Estimated ADR |
| 12/30/2021 | 0.0% | $325.00 |
| 12/30/2022 | 10.0% | $357.50 |
| 12/30/2023 | 7.5% | $384.31 |
| 12/30/2024 | 5.0% | $403.53 |
| 12/30/2025 | 3.0% | $415.63 |
| 12/30/2026 | 3.0% | $428.10 |
| 12/30/2027 | 3.0% | $440.95 |
| 12/30/2028 | 3.0% | $454.17 |
| Source: CBRE | | |

We forecast growth over the positioned ADR as the New York market comes out of the Covid pandemic. We also conclude that there will be a strong growth period in 2022 as pent-up tourism demand returns to the city.



Overall, we conclude the subject improvements represent a viable ADR and growth for the hotel..

## Best Internet Rate

The following table displays the current best internet rates found on the selected properties nearby the subject. The rates were extracted from the hotel's website and does not include rates listed by online travel agencies. The rates displayed were the "standard rate" listed for the lowest priced room without including any discounts or special deals. The selected months were April, June, August, and October, and the length of stay was 3 nights for 1 guest.

The purpose of this table is to show what ADR would be reasonable in this market going forward. Some of the selected properties were inferior and/or superior to the subject property.

| Current Best Internet Rates | | | | | | |
|---|---|---|---|---|---|---|
| For Standard Rooms at Selected Comparable Lodging Operations as of 1/22/2022 | | | | | | |
| | | | Selected Dates for 3 Nights, 1 Guest | | | |
| Property # | Name | STR Chain Scales | April 8-11 | June 10-13 | August 12-15 | October 7-10 |
| **1** | **The William Vale** | | **$488** | **$592** | **$793** | **$808** |
| 2 | Wythe Hotel | | N/A | $492 | $393 | $452 |
| 3 | The Williamsburg Hotel | | $362 | $386 | $419 | $486 |
| 4 | The Hoxton Williamsburg | | $386 | $369 | $346 | $446 |
| 5 | McCarren Hotel | | $229 | $315 | $315 | $400 |
| 6 | Hotel Indigo Williamsburg | | $304 | $424 | $429 | $507 |
| 7 | The Box House Hotel | | $499 | $499 | $499 | $499 |
| 8 | Hotel Brooklyn Bridge | | $765 | $750 | $821 | $892 |
| | | Minimum Rate | $229 | $315 | $315 | $400 |
| | | Maximum Rate | $765 | $750 | $821 | $892 |
| | | Average | $433 | $478 | $502 | $561 |
| | | Median | $374 | $424 | $419 | $486 |
| Compiled by CBRE | | | | | | |

## CONCLUSION

The subject's occupancy, ADR, RevPAR, and corresponding room revenue for the first several years of our projection analysis are illustrated as follows:

| OCCUPANCY, ADR, & ROOMS REVENUE CONCLUSIONS | | | | | |
|---|---|---|---|---|---|
| Fiscal Year Ending 12/30/ | 2022 | 2023 | 2024 | 2025 | 2026 |
| Avg. Available Rooms | 183 | 183 | 183 | 183 | 183 |
| Annual Room Nights | 66,795 | 66,795 | 66,978 | 66,795 | 66,795 |
| Occupancy | 62% | 70% | 77% | 77% | 77% |
| Occupied Rooms | 41,413 | 46,757 | 51,573 | 51,432 | 51,432 |
| ADR | $357.50 | $384.31 | $403.53 | $415.63 | $428.10 |
| RevPAR | $221.65 | $269.02 | $310.72 | $320.04 | $329.64 |
| Total Rooms Revenue | $14,805,112 | $17,969,107 | $20,811,180 | $21,376,949 | $22,018,257 |
| Source: CBRE | | | | | |

Based on the foregoing analysis, the indicated occupancy and ADR figures are achievable. Although it is possible that the subject will experience growth in occupancy and ADR above those estimated in this report, it is also possible that sudden economic downturns, unexpected additions to rooms supply, the start or end of an oil boom, or other external factors will force the property



below the selected point of stability.  Consequently, the estimated occupancy and ADR levels are representative of the most likely potential operations of the subject over the projected holding period based on our analysis of the market as of the date of this appraisal.

Our projections include a sustainable occupancy and market supported ADR. The subject's projection of rooms revenue is illustrated again in the Income Capitalization Section of this report.



# Highest and Best Use

In appraisal practice, the concept of highest and best use represents the premise upon which value is based. The four criteria the highest and best use must meet are:

- legally permissible;
- physically possible;
- financially feasible; and
- maximally productive.

The highest and best use analysis of the subject is discussed below.

## AS VACANT

### Legally Permissible

The legally permissible uses were discussed in the Site Analysis and Zoning Sections.

### Physically Possible

The subject is adequately served by utilities, and has an adequate shape and size, sufficient access, etc., to be a separately developable site. There are no known physical reasons why the subject site would not support any legally probable development (i.e. it appears adequate for development).

Existing structures on similar sites provides additional evidence for the physical possibility of development.

### Financially Feasible

The determination of financial feasibility is dependent primarily on the relationship of supply and demand for the legally probable land uses versus the cost to create the uses. As discussed in the market analysis, the subject hotel market is generally stabilized. Much hotel development has occurred in Brooklyn in the past several years, including nearby Sunset Park and downtown Brooklyn with those hotels experiencing good demand and occupancy levels. These other newly built hotels performance illustrate profitability and support financial feasibility.

### Maximally Productive – Conclusion

The final test of highest and best use of the site as if vacant is that the use be maximally productive, yielding the highest return to the land.

Based on the information presented above and upon information contained in the market and neighborhood analysis, we conclude that the highest and best use of the subject as if vacant would be the development of a hotel property. More specifically, the subject would be developed at a density of maximum allowable FAR, which is typical of similar projects in this market. Our analysis of the subject and its respective market characteristics indicate the most likely buyer, as if vacant, would be an investor (land speculation) or a hotel developer.



## AS IMPROVED

Currently, the subject site is currently developed with a upper-upscale/luxury hotel with full-services. Its highest and best use is considered to be as is developed and in use as a hotel. No other use is considered reasonable of financially feasible given the existing improvements developed on the site. Therefore, the highest and best use analysis, as improved, is for a hotel.



# Appraisal Methodology

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

## SALES COMPARISON APPROACH

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier. Adjustments are applied to the physical units of comparison derived from the comparable sale. The unit of comparison chosen for the subject is then used to yield a total value. Economic units of comparison are not adjusted, but rather analyzed as to relevant differences, with the final estimate derived based on the general comparisons.

## COST APPROACH

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

## METHODOLOGY APPLICABLE TO THE SUBJECT

In valuing the subject, the sales and income approaches are applicable and have been utilized. The cost approach was not considered applicable given the age of the property and subjectivity in determining depreciation. The cost analysis is utilized to estimate replacement cost value for an estimate of insurable value.



# Income Capitalization Approach

The Income Capitalization Approach to value is based upon the premise that an investor would not pay more for a property than for another investment with similar risk and return characteristics. This approach analyzes a property's ability to generate financial returns as an investment, and converts the anticipated future benefits of property ownership into an estimate of present value. For income producing properties like hotels, future benefits include net income before debt service and depreciation and any reversionary proceeds from a sale. The income capitalization approach is the preferred value method for existing hotels and most closely reflects the underwriting practices of informed buyers. It is also particularly relevant for hotels, which are typically purchased for investment purposes and involve relatively high risks.

The Income Capitalization includes two approaches to forming an opinion of market value: the Direct Capitalization Approach and the Discounted Cash Flow Analysis. The Direct Capitalization Approach involves capitalizing a single, stabilized estimate of net income at a market derived capitalization rate – a rate that reflects an appropriate risk adjusted return to an investor. The net income that is capitalized relates to a representative year, or more technically, the discounted average net income over the property's economic life. The Discounted Cash Flow Analysis involves deriving an indicated present value by discounting estimating net operating income streams for each year of the projection period (10 years in this analysis) and proceeds from a hypothetical sale of the property at reversion at a chosen yield rate chosen yield rate (internal rate of return or discount rate). For this analysis, we have utilized the discounted cash flow method to value the subject property and tested the reasonableness of the implied historical, first year, stabilized year and deflated stabilized direct capitalization rates.

## OCCUPANCY, ADR, AND REVPAR CONCLUSIONS

The subject's occupancy, ADR, RevPAR, and corresponding room revenue for the first several years of our projection analysis are illustrated as follows and were discussed and analyzed in the hotel market analysis:

| OCCUPANCY, ADR, & ROOMS REVENUE CONCLUSIONS | | | | | |
|---|---|---|---|---|---|
| Fiscal Year Ending 12/30/ | 2022 | 2023 | 2024 | 2025 | 2026 |
| Avg. Available Rooms | 183 | 183 | 183 | 183 | 183 |
| Annual Room Nights | 66,795 | 66,795 | 66,978 | 66,795 | 66,795 |
| Occupancy | 61% | 70% | 77% | 77% | 77% |
| Occupied Rooms | 40,745 | 46,757 | 51,573 | 51,432 | 51,432 |
| ADR | $381.34 | $392.78 | $404.56 | $416.70 | $429.20 |
| RevPAR | $232.62 | $274.95 | $311.51 | $320.86 | $330.48 |
| Total Rooms Revenue | $15,537,638 | $18,364,979 | $20,864,528 | $21,431,747 | $22,074,700 |
| Source: CBRE | | | | | |



*Income Capitalization Approach*

## INCOME AND EXPENSE HISTORY

Historical income and expense data was made available and is summarized in the table that follows.  For purposes of our analysis, we assume the information provided is accurate.  Where applicable, we have reclassified the available information to conform to the *Uniform System of Accounts for the Lodging Industry*, an industry-standard accounting format.  The *Uniform System of Accounts for the Lodging Industry* was developed by the American Hotel & Motel Association and is in general use throughout the hospitality industry. In conformance with this system of account classifications, only direct operating expenses are charged to operating departments of the hotel. The general overhead items which are applicable to operations as a whole are classified as undistributed operating expenses and include administration and general expenses, marketing expenses, property operations and maintenance expenses, energy and utility costs, management fees, property taxes, insurance, and a reserve for replacement.  The subject operating statements have been reconstructed to conform to the *Uniform System of Accounts for the Lodging Industry*.



*Income Capitalization Approach*

| | | Complete Calendar Year Ended: | | | Complete Calendar Year Ended: | | | | Trailing 12 Months Ending: | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SUBJECT OPERATING HISTORY** | | | | | | | | | | | | |
| Period Reported: | | 12/31/2017 | | | 12/31/2018 | | | | 1/31/2019 | | | |
| Days Open | | 365 | | | 365 | | | | 365 | | | |
| No. of Rooms | | 183 | | | 183 | | | | 183 | | | |
| Occupied Room Nights | | 49,695 | | | 51,432 | | | | 52,036 | | | |
| Occupancy | | 74.4% | | | 77.0% | | | | 77.9% | | | |
| Average Daily Rate | | $334.70 | | | $371.26 | | | | $363.18 | | | |
| RevPAR | | $249.02 | | | $285.87 | | | | $282.93 | | | |
| | Total | Ratio to Sales | PAR | POR | Total | Ratio to Sales | PAR | POR | Total | Ratio to Sales | PAR | POR |
| **REVENUE** | | | | | | | | | | | | |
| Rooms | $16,633,129 | 46.4% | $90,891 | $334.70 | $19,094,787 | 49.6% | $104,343 | $371.26 | $18,898,622 | 48.9% | $103,271 | $363.18 |
| Food & Beverage | 18,956,901 | 52.9% | $103,590 | $381.46 | 18,924,890 | 49.2% | $103,415 | $367.96 | 18,960,997 | 49.1% | $103,612 | $364.38 |
| Other Operated Departments | 256,247 | 0.7% | $1,400 | $5.16 | 476,910 | 1.2% | $2,606 | $9.27 | 764,890 | 2.0% | $4,180 | $14.70 |
| Miscellaneous Income | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 |
| Total Operating Revenue | $35,846,277 | 100.0% | $195,881 | $721.33 | $38,496,587 | 100.0% | $210,364 | $748.49 | $38,624,509 | 100.0% | $211,063 | $742.27 |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | | | | |
| Rooms Expense | $5,404,338 | 32.5% | $29,532 | $108.75 | $5,582,925 | 29.2% | $30,508 | $108.55 | $5,471,736 | 29.0% | $29,900 | $105.15 |
| Food & Beverage Expense | 20,699,643 | 109.2% | $113,113 | $416.53 | 17,622,733 | 93.1% | $96,299 | $342.64 | 17,548,677 | 92.6% | $95,894 | $337.24 |
| Food & Beverage Expense - Other | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 |
| Other Operated Departments Expense | 15,731 | 6.1% | $86 | $0.32 | 309,763 | 65.0% | $1,693 | $6.02 | 258,485 | 33.8% | $1,412 | $4.97 |
| Total Departmental Expenses | $26,119,712 | 72.9% | $142,731 | $525.60 | $23,515,421 | 61.1% | $128,500 | $457.21 | $23,278,898 | 60.3% | $127,207 | $447.36 |
| DEPARTMENTAL PROFIT | $9,726,565 | 27.1% | $53,151 | $195.73 | $14,981,166 | 38.9% | $81,864 | $291.28 | $15,345,611 | 39.7% | $83,856 | $294.90 |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | | | | |
| Administrative and General | $2,938,391 | 8.2% | $16,057 | $59.13 | $2,873,939 | 7.5% | $15,705 | $55.88 | $2,995,971 | 7.8% | $16,371 | $57.57 |
| Information and Telecommunications Systems | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 |
| Marketing | 1,266,120 | 3.5% | $6,919 | $25.48 | 1,471,562 | 3.8% | $8,041 | $28.61 | 1,733,473 | 4.5% | $9,473 | $33.31 |
| Franchise Fees | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 |
| Property Operations and Maintenance | 870,058 | 2.4% | $4,754 | $17.51 | 841,385 | 2.2% | $4,598 | $16.36 | 925,310 | 2.4% | $5,056 | $17.78 |
| Utilities | 534,526 | 1.5% | $2,921 | $10.76 | 534,810 | 1.4% | $2,922 | $10.40 | 506,965 | 1.3% | $2,770 | $9.74 |
| Total Undistributed Expenses | $5,609,095 | 15.6% | $30,651 | $112.87 | $5,721,696 | 14.9% | $31,266 | $111.25 | $6,161,719 | 16.0% | $33,671 | $118.41 |
| GROSS OPERATING PROFIT | $4,117,470 | 11.5% | $22,500 | $82.85 | $9,259,470 | 24.1% | $50,598 | $180.03 | $9,183,892 | 23.8% | $50,185 | $176.49 |
| Management Fee | $2,220,486 | 6.2% | $12,134 | $44.68 | $1,084,332 | 2.8% | $5,925 | $21.08 | $3,020,502 | 7.8% | $16,505 | $58.05 |
| INCOME BEFORE NON-OPERATING INCOME AND EXPENSES | $1,896,984 | 5.3% | $10,366 | $38.17 | $8,175,138 | 21.2% | $44,673 | $158.95 | $6,163,390 | 16.0% | $33,680 | $118.44 |
| **NON-OPERATING INCOME AND EXPENSES** | | | | | | | | | | | | |
| Property Taxes | $56,980 | 0.2% | $311 | $1.15 | $65,810 | 0.2% | $360 | $1.28 | $230,436 | 0.6% | $1,259 | $4.43 |
| Insurance | 141,012 | 0.4% | $771 | $2.84 | 162,272 | 0.4% | $887 | $3.16 | 150,622 | 0.4% | $823 | $2.89 |
| Reserve for Replacement | 300,000 | 0.8% | $1,639 | $6.04 | 300,000 | 0.8% | $1,639 | $5.83 | - | 0.0% | $0 | $0.00 |
| Total Non-Operating Income and Expenses | $497,992 | 1.4% | $2,721 | $10.02 | $528,082 | 1.4% | $2,886 | $10.27 | $381,058 | 1.0% | $2,082 | $7.32 |
| NET INCOME (EBITDA) | $1,398,992 | 3.9% | $7,645 | $28.15 | $7,647,056 | 19.9% | $41,787 | $148.68 | $5,782,332 | 15.0% | $31,597 | $111.12 |

\* Departmental expense ratios are based on departmental revenues; Franchise/Royalty ratio is based on room revenues; all others are based on total revenues.

Source:  Hotel Operating Statements



*Income Capitalization Approach*

## INCOME AND EXPENSE COMPARABLES

This analysis incorporates revenue estimates based on our survey of comparable and competitive properties, and general market trend information.   The revenue and expense comparisons include full service hotels all located in the region.   The comparable hotels' financial information is obtained in part from confidential information submitted for the 2019 edition (2019 year-end data) of the CBRE Hotels' Americas Research publication *Trends® in the Hotel Industry* (U.S. edition). For reasons of confidentiality, we have not disclosed the identity of the comparable hotels.



**Income Capitalization Approach**

## COMPARABLE INCOME AND EXPENSE DATA - SELECTED HOTELS

| | Comparable 1 | | | Comparable 2 | | | Comparable 3 | | | Comparable 4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Property | | | | | | | | | | | | |
| Location | Manhattan | | | Brooklyn | | | Manhattan | | | Manhattan | | |
| Hotel Description / Name | Luxury | | | Upper Upscale | | | Upper Upscale | | | Luxury | | |
| Year | 2019 | | | 2019 | | | 2019 | | | 2019 | | |
| Days Open | 365 | | | 365 | | | 365 | | | 365 | | |
| Avg. No. of Rooms | 270 | | | 175 | | | 294 | | | 273 | | |
| Occupancy | 87.5% | | | 82.1% | | | 89.8% | | | 84.6% | | |
| Average Daily Rate | $380.64 | | | $230.57 | | | $245.53 | | | $494.42 | | |
| | Ratio to Sales | PAR | POR | Ratio to Sales | PAR | POR | Ratio to Sales | PAR | POR | Ratio to Sales | PAR | POR |
| **REVENUE** | | | | | | | | | | | | |
| Rooms | 85.1% | $121,496 | $380.64 | 57.5% | $69,093 | $230.57 | 76.7% | $80,490 | $245.54 | 82.5% | $152,709 | $494.42 |
| Food & Beverage | 9.7% | $13,921 | $43.61 | 41.0% | $49,310 | $164.55 | 4.3% | $4,495 | $13.71 | 11.4% | $21,051 | $68.16 |
| Other Operated Departments | 5.2% | $7,385 | $23.14 | 1.5% | $1,858 | $6.20 | 0.0% | $0 | $0.00 | 6.1% | $11,307 | $36.61 |
| Miscellaneous Income | 0.0% | $37 | $0.12 | 0.0% | $0 | $0.00 | 19.0% | $19,893 | $60.68 | 0.0% | $1 | $0.00 |
| Total Operating Revenue | 100.0% | $142,839 | $447.50 | 100.0% | $120,260 | $401.32 | 100.0% | $104,878 | $319.94 | 100.0% | $185,069 | $599.20 |
| **DEPARTMENTAL EXPENSES*** | | | | | | | | | | | | |
| Rooms Expense | 33.2% | $40,335 | $126.37 | 30.6% | $21,130 | $70.51 | 36.4% | $29,274 | $89.30 | 35.0% | $53,399 | $172.89 |
| Food & Beverage Expense | 182.2% | $25,370 | $79.48 | 93.6% | $46,131 | $153.94 | 100.5% | $4,515 | $13.77 | 122.6% | $25,811 | $83.57 |
| Other Operated Departments Expense | 1.4% | $103 | $0.32 | 16.2% | $300 | $1.00 | 0.0% | $0 | $0.00 | 12.9% | $1,454 | $4.71 |
| Miscellaneous Income Expense | 0.0% | $0 | $0.00 | | $0 | $0.00 | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 |
| Total Departmental Expenses | 46.1% | $65,807 | $206.17 | 56.2% | $67,561 | $225.45 | 32.2% | $33,790 | $103.08 | 43.6% | $80,664 | $261.16 |
| **DEPARTMENTAL PROFIT** | 53.9% | $77,032 | $241.33 | 43.8% | $52,699 | $175.86 | 67.8% | $71,088 | $216.86 | 56.4% | $104,406 | $338.03 |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | | | | |
| Administrative and General | 10.4% | $14,844 | $46.50 | 14.7% | $17,653 | $58.91 | 5.8% | $6,114 | $18.65 | 10.2% | $18,795 | $60.85 |
| Information and Telecommunications Systems | 2.5% | $3,514 | $11.01 | 2.5% | $3,057 | $10.20 | 0.6% | $599 | $1.83 | 2.6% | $4,768 | $15.44 |
| Marketing | 8.1% | $11,604 | $36.36 | 8.0% | $9,681 | $32.31 | 6.7% | $7,031 | $21.45 | 9.5% | $17,518 | $56.72 |
| Property Operations and Maintenance | 4.6% | $6,604 | $20.69 | 4.7% | $5,595 | $18.67 | 4.6% | $4,805 | $14.66 | 4.5% | $8,407 | $27.22 |
| Utilities | 2.6% | $3,720 | $11.66 | 3.0% | $3,645 | $12.16 | 2.5% | $2,594 | $7.91 | 1.8% | $3,264 | $10.57 |
| Total Undistributed Expenses | 28.2% | $40,286 | $126.21 | 33.0% | $39,630 | $132.25 | 20.2% | $21,144 | $64.50 | 28.5% | $52,752 | $170.79 |
| **GROSS OPERATING PROFIT** | 25.7% | $36,746 | $115.12 | 10.9% | $13,069 | $43.61 | 47.6% | $49,944 | $152.36 | 27.9% | $51,654 | $167.24 |
| Management Fee | 2.0% | $2,846 | $8.92 | 4.5% | $5,424 | $18.10 | 4.6% | $4,801 | $14.65 | 3.7% | $6,833 | $22.12 |
| **INCOME BEFORE NON-OPERATING INCOME AND EXPENSES** | 23.7% | $33,899 | $106.20 | 6.4% | $7,646 | $25.51 | 43.0% | $45,143 | $137.71 | 24.2% | $44,821 | $145.12 |
| **NON-OPERATING INCOME AND EXPENSES** | | | | | | | | | | | | |
| Property Taxes | 11.7% | $16,739 | $52.44 | 5.5% | $6,639 | $22.15 | 9.6% | $10,113 | $30.85 | 3.9% | $7,195 | $23.29 |
| Insurance | 0.3% | $390 | $1.22 | 0.7% | $794 | $2.65 | 0.5% | $573 | $1.75 | 0.4% | $831 | $2.69 |
| Reserve for Replacement | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 |
| Capital Expenditures | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 |
| Total Non-Operating Income and Expenses | 12.0% | $17,129 | $53.66 | 6.2% | $7,433 | $24.80 | 10.2% | $10,686 | $32.60 | 4.3% | $8,025 | $25.98 |
| | | $0 | $0.00 | | $0 | $0.00 | | $0 | $0.00 | | $0 | $0.00 |
| **NET INCOME (EBITDA)** | 11.7% | $16,770 | $52.54 | 0.2% | $213 | $0.71 | 32.9% | $34,457 | $105.11 | 19.9% | $36,795 | $119.13 |

\* Departmental expense ratios are based on departmental revenues; Franchise/Royalty ratio is based on room revenues; all others are based on total revenues.

Source: Hotel Operating Statements



*Income Capitalization Approach*

## FIXED AND VARIABLE REVENUE AND EXPENSE ANALYSIS

Operating revenues and expenses for hotels have a component that is fixed and a component that is variable with respect to increases or decreases in occupancy. The fixed component increases at an inflationary level, while the variable component is adjusted in proportion to the use of the hotel facility.

The applicable fixed and variable ratios were derived through discussions with hotel experts and are consistent with industry norms. These ratios and the associated revenue component drivers are illustrated as follows:

| FIXED AND VARIABLE AMOUNTS | | | |
|---|---|---|---|
| COMPONENT | FIXED % | VARIABLE % | VAR. DRIVER |
| REVENUE | | | |
| Rooms | N/A | N/A | N/A |
| Food & Beverage | 20.0% | 80.0% | Occ Rooms |
| Other Operated Departments | 30.0% | 70.0% | Occ Rooms |
| Miscellaneous Income | 20.0% | 80.0% | Occ Rooms |
| | | | |
| DEPARTMENTAL EXPENSES | | | |
| Rooms Expense | 60.0% | 40.0% | Occ Rooms |
| Food & Beverage Expense | 40.0% | 60.0% | Food Rev |
| Food & Beverage Expense - Other | 50.0% | 50.0% | Food Rev |
| Other Operated Departments Expense | 50.0% | 50.0% | MOR Rev |
| | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | |
| Administrative and General | 90.0% | 10.0% | Total Rev |
| Information and Telecommunications Systems | 85.0% | 15.0% | Total Rev |
| Marketing | 70.0% | 30.0% | Total Rev |
| Franchise Fees | N/A | N/A | See Detail |
| % or Room Revenue | | | |
| % of F&B Revenue | | | |
| % of Other Revenue | | | |
| % of Total Revenue | | | |
| Property Operations and Maintenance | 70.0% | 30.0% | Total Rev |
| Utilities | 90.0% | 10.0% | Total Rev |
| Management Fee | 0.0% | 100.0% | Total Rev |
| | | | |
| FIXED CHARGES | | | |
| Property Taxes | 100.0% | 0.0% | N/A |
| Insurance | 100.0% | 0.0% | N/A |
| Reserve for Replacement | 0.0% | 100.0% | N/A |

Source: CBRE

82



*Income Capitalization Approach*

## DEPARTMENTAL PROJECTIONS

### Rooms Department

ROOMS REVENUES

The subject's and the comparable data revenues for this department as a percentage of total revenues, as a percentage of Rooms department revenues, and on a per occupied room basis are summarized as follows:

| ROOMS REVENUE | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $16,633 | 46.4% | $90,891 | $334.70 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $19,095 | 49.6% | $104,343 | $371.26 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $18,899 | 48.9% | $103,271 | $363.18 |
| | | | | |
| Comparable 1 | $32,804 | 85.1% | $121,496 | $380.64 |
| Comparable 2 | $12,091 | 57.5% | $69,093 | $230.57 |
| Comparable 3 | $23,664 | 76.7% | $80,490 | $245.54 |
| Comparable 4 | $41,690 | 82.5% | $152,709 | $494.42 |
| | | | | |
| **DCF Estimate - YR 1** | **$15,538** | **51.3%** | **$84,905** | **$381.34** |
| **DCF Stabilized Estimate - YR 3** | **$20,865** | **51.5%** | **$114,014** | **$404.56** |
| **Hypothetical Stabilized Estimate** | **$19,667** | **51.5%** | **$107,469** | **$381.34** |
| Compiled by CBRE | | | | |

Analysis of Rooms Department Revenues were previously provided.

ROOMS EXPENSES

Rooms expenses include labor costs such as salaries and wages for front desk, housekeeping, reservations, bell staff and laundry, plus employee benefits. Also included herein are linens, cleaning supplies, guest supplies, uniforms, central or franchise reservation fees, equipment leases and travel agent commissions. In this case, travel agent commissions and other related costs are being included in franchise fees below because this is how the subject operating statements are constructed. Payroll costs are typically the largest component. A hotel is labor-intensive, although relatively low-paying. Overall, wages typically account for 50% to 60% of the total departmental expense. The comparable data and projections for the subject are summarized as follows:



**Income Capitalization Approach**

| ROOMS EXPENSE | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Dept. Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $5,404 | 32.5% | $29,532 | $108.75 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $5,583 | 29.2% | $30,508 | $108.55 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $5,472 | 29.0% | $29,900 | $105.15 |
| | | | | |
| Comparable 1 | $10,890 | 33.2% | $40,335 | $126.37 |
| Comparable 2 | $3,698 | 30.6% | $21,130 | $70.51 |
| Comparable 3 | $8,607 | 36.4% | $29,274 | $89.30 |
| Comparable 4 | $14,578 | 35.0% | $53,399 | $172.89 |
| | | | | |
| **DCF Estimate - YR 1** | **$4,121** | **26.5%** | **$22,519** | **$101.14** |
| **DCF Stabilized Estimate - YR 3** | **$6,013** | **28.8%** | **$32,859** | **$116.60** |
| **Hypothetical Stabilized Estimate** | **$5,668** | **28.8%** | **$30,973** | **$109.90** |
| Compiled by CBRE | | | | |

## Food & Beverage Department

### FOOD & BEVERAGE REVENUE

Food & Beverage revenue is generated by a hotel's restaurants, lounges, coffee shops, snack bars, banquet rooms, and room service.  The subject's and the comparable data revenues for this department as a percentage of total revenues, on a per available room basis, and on a per occupied room basis are summarized as follows:

| FOOD & BEVERAGE REVENUE | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $18,957 | 52.9% | $103,590 | $381.46 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $18,925 | 49.2% | $103,415 | $367.96 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $18,961 | 49.1% | $103,612 | $364.38 |
| | | | | |
| Comparable 1 | $3,759 | 9.7% | $13,921 | $43.61 |
| Comparable 2 | $8,629 | 41.0% | $49,310 | $164.55 |
| Comparable 3 | $1,321 | 4.3% | $4,495 | $13.71 |
| Comparable 4 | $5,747 | 11.4% | $21,051 | $68.16 |
| | | | | |
| **DCF Estimate - YR 1** | **$13,572** | **47.0%** | **$74,163** | **$327.72** |
| **DCF Stabilized Estimate - YR 3** | **$18,875** | **46.7%** | **$103,142** | **$365.99** |
| **Hypothetical Stabilized Estimate** | **$17,791** | **46.7%** | **$97,221** | **$344.98** |
| Compiled by CBRE | | | | |

### FOOD & BEVERAGE EXPENSES

Food & Beverage expenses include the costs of goods sold (Food & Beverage), labor and related benefits, and other operating expenses.  Labor costs include departmental management, cooks and kitchen personnel, service staff, banquet staff and bartenders.  Other operating expenses include china, silverware, linens, restaurant and kitchen supplies, menus and printing, and special promotions.  As with the rooms department, payroll costs are typically the largest component.  The comparable data and projections for the subject are summarized as follows:



*Income Capitalization Approach*

| FOOD & BEVERAGE EXPENSE | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Dept. Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $20,700 | 109.2% | $113,113 | $416.53 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $17,623 | 93.1% | $96,299 | $342.64 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $17,549 | 92.6% | $95,894 | $337.24 |
| | | | | |
| Comparable 1 | $6,850 | 182.2% | $25,370 | $79.48 |
| Comparable 2 | $8,073 | 93.6% | $46,131 | $153.94 |
| Comparable 3 | $1,328 | 100.5% | $4,515 | $13.77 |
| Comparable 4 | $7,046 | 122.6% | $25,811 | $83.57 |
| | | | | |
| **DCF Estimate - YR 1** | **$12,893** | **95.0%** | **$70,455** | **$311.33** |
| **DCF Stabilized Estimate - YR 3** | **$17,931** | **95.0%** | **$97,985** | **$347.69** |
| **Hypothetical Stabilized Estimate** | **$16,902** | **95.0%** | **$92,360** | **$327.73** |

Compiled by CBRE

## Other Operated Departments

### OTHER OPERATED DEPARTMENTS REVENUES

Other Operated Departments revenues are those derived from garage and parking, guest laundry, gift shop, retail, newsstand, spa et cetera, when operated by the hotel. Also included are revenues generated from sources not included elsewhere, such as on-demand movie rentals, vending machines, fax and business services. The subject's and the comparable data revenues for this department as a percentage of total revenues, on a per available room basis, and on a per occupied room basis are summarized as follows:

| OTHER OPERATED DEPARTMENTS REVENUE | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $256 | 0.7% | $1,400 | $5.16 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $477 | 1.2% | $2,606 | $9.27 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $765 | 2.0% | $4,180 | $14.70 |
| | | | | |
| Comparable 1 | $1,994 | 5.2% | $7,385 | $23.14 |
| Comparable 2 | $325 | 1.5% | $1,858 | $6.20 |
| Comparable 3 | $0 | 0.0% | $0 | $0.00 |
| Comparable 4 | $3,087 | 6.1% | $11,307 | $36.61 |
| | | | | |
| **DCF Estimate - YR 1** | **$486** | **1.7%** | **$2,657** | **$11.74** |
| **DCF Stabilized Estimate - YR 3** | **$728** | **1.8%** | **$3,978** | **$14.12** |
| **Hypothetical Stabilized Estimate** | **$686** | **1.8%** | **$3,750** | **$13.31** |

Compiled by CBRE

### OTHER OPERATED DEPARTMENTAL EXPENSES

Other Operated Departmental expenses are those expenses (labor and other) which offset the revenue generated by other operated departments, such as garage, guest laundry, athletic facilities and gift shop, as well as rental activity. The comparable data and projections for the subject are summarized as follows:



| OTHER OPERATED DEPARTMENTS EXPENSE | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Dept. Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $16 | 6.1% | $86 | $0.32 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $310 | 65.0% | $1,693 | $6.02 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $258 | 33.8% | $1,412 | $4.97 |
| | | | | |
| Comparable 1 | $28 | 1.4% | $103 | $0.32 |
| Comparable 2 | $53 | 16.2% | $300 | $1.00 |
| Comparable 3 | $0 | 0.0% | $0 | $0.00 |
| Comparable 4 | $397 | 12.9% | $1,454 | $4.71 |
| | | | | |
| **DCF Estimate - YR 1** | **$170** | **35.0%** | **$930** | **$4.11** |
| **DCF Stabilized Estimate - YR 3** | **$255** | **35.0%** | **$1,392** | **$4.94** |
| **Hypothetical Stabilized Estimate** | **$240** | **35.0%** | **$1,312** | **$4.66** |
| Compiled by CBRE | | | | |

## TOTAL OPERATING REVENUE

The subject's total operating revenue estimates are detailed as follows:

| TOTAL OPERATING REVENUE | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $35,846 | 100.0% | $195,881 | $721.33 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $38,497 | 100.0% | $210,364 | $748.49 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $38,625 | 100.0% | $211,063 | $742.27 |
| | | | | |
| Comparable 1 | $38,567 | 100.0% | $142,839 | $447.50 |
| Comparable 2 | $21,046 | 100.0% | $120,260 | $401.32 |
| Comparable 3 | $30,834 | 100.0% | $104,878 | $319.94 |
| Comparable 4 | $50,524 | 100.0% | $185,069 | $599.20 |
| | | | | |
| **DCF Estimate - YR 1** | **$28,863** | **100.0%** | **$157,722** | **$696.96** |
| **DCF Stabilized Estimate - YR 3** | **$40,414** | **100.0%** | **$220,842** | **$783.63** |
| **Hypothetical Stabilized Estimate** | **$38,094** | **100.0%** | **$208,165** | **$738.65** |
| Compiled by CBRE | | | | |

## TOTAL DEPARTMENTAL EXPENSES

The subject's total departmental expense estimates are detailed as follows:

| TOTAL DEPARTMENTAL EXPENSES | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Total Dept. Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $26,120 | 72.9% | $142,731 | $525.60 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $23,515 | 61.1% | $128,500 | $457.21 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $23,279 | 60.3% | $127,207 | $447.36 |
| | | | | |
| Comparable 1 | $17,768 | 46.1% | $65,807 | $206.17 |
| Comparable 2 | $11,823 | 56.2% | $67,561 | $225.45 |
| Comparable 3 | $9,934 | 32.2% | $33,790 | $103.08 |
| Comparable 4 | $22,021 | 43.6% | $80,664 | $261.16 |
| | | | | |
| **DCF Estimate - YR 1** | **$16,921** | **58.6%** | **$92,463** | **$408.59** |
| **DCF Stabilized Estimate - YR 3** | **$23,953** | **59.3%** | **$130,891** | **$464.45** |
| **Hypothetical Stabilized Estimate** | **$22,578** | **59.3%** | **$123,377** | **$437.79** |
| Compiled by CBRE | | | | |



## Departmental Profit

Total departmental profit is as follows.

| | | | | |
|---|---|---|---|---|
| **DEPARTMENTAL PROFIT** | | | | |
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $9,727 | 27.1% | $53,151 | $195.73 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $14,981 | 38.9% | $81,864 | $291.28 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $15,346 | 39.7% | $83,856 | $294.90 |
| | | | | |
| Comparable 1 | $20,799 | 53.9% | $77,032 | $241.33 |
| Comparable 2 | $9,222 | 43.8% | $52,699 | $175.86 |
| Comparable 3 | $20,900 | 67.8% | $71,088 | $216.86 |
| Comparable 4 | $28,503 | 56.4% | $104,406 | $338.03 |
| | | | | |
| **DCF Estimate - YR 1** | **$11,942** | **41.4%** | **$65,259** | **$288.37** |
| **DCF Stabilized Estimate - YR 3** | **$16,461** | **40.7%** | **$89,952** | **$319.18** |
| **Hypothetical Stabilized Estimate** | **$15,516** | **40.7%** | **$84,788** | **$300.86** |

Compiled by CBRE

## EXPENSE PROJECTIONS

In order to estimate expenses for the subject, the following data has been reviewed and analyzed:

- available historical data for the subject;
- published industry averages for similar hotel segments and geographic regions; and
- actual operating expense data for similar properties.

The individual expense categories applicable to the subject are discussed in the following sections.

### Undistributed Operating Expenses

Undistributed operating expenses are typically not directly related to an associated revenue source, but can be compared on the basis of total revenues for similar types of hotels. These expenses are therefore compared and estimated as a percentage of total revenues.

#### ADMINISTRATIVE AND GENERAL EXPENSES

Administrative and general expenses include payroll and related expenses for the general manager, human resources and training, security, clerical staff, controller and accounting staff. Other expenses include office supplies, computer services, accounting and legal fees, cash overages and shortages, bad debt expenses, travel insurance, credit card commissions, transportation (non-guest) and travel and entertainment. These payroll costs are significant. The comparable data and projections for the subject are summarized as follows:



*Income Capitalization Approach*

| ADMINISTRATIVE AND GENERAL EXPENSES | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $2,938 | 8.2% | $16,057 | $59.13 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $2,874 | 7.5% | $15,705 | $55.88 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $2,996 | 7.8% | $16,371 | $57.57 |
| | | | | |
| Comparable 1 | $4,008 | 10.4% | $14,844 | $46.50 |
| Comparable 2 | $3,089 | 14.7% | $17,653 | $58.91 |
| Comparable 3 | $1,798 | 5.8% | $6,114 | $18.65 |
| Comparable 4 | $5,131 | 10.2% | $18,795 | $60.85 |
| | | | | |
| **DCF Estimate - YR 1** | **$2,479** | **8.6%** | **$13,548** | **$59.87** |
| **DCF Stabilized Estimate - YR 3** | **$3,352** | **8.3%** | **$18,318** | **$65.00** |
| **Hypothetical Stabilized Estimate** | **$3,160** | **8.3%** | **$17,266** | **$61.27** |
| Compiled by CBRE | | | | |

## INFORMATION AND TELECOMMUNICATIONS SYSTEMS

Telecommunications expense was not included due to management combining it into the Administrative and General Expense line item.

## MARKETING EXPENSES

Marketing expenses include payroll and related expenses for the sales and marketing staff, direct sales expenses, advertising and promotion, travel expenses for the sales staff and civic and community projects. This category may also include a national advertising fee or assessment paid to the franchise company, plus the cost of frequent guest stay programs. Note that the Trends data includes all franchise fees in marketing. The HOST data is inconsistent – franchise fees appear in both. The comparable data and projections for the subject are summarized as follows:

| MARKETING EXPENSES | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $1,266 | 3.5% | $6,919 | $25.48 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $1,472 | 3.8% | $8,041 | $28.61 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $1,733 | 4.5% | $9,473 | $33.31 |
| | | | | |
| Comparable 1 | $3,133 | 8.1% | $11,604 | $36.36 |
| Comparable 2 | $1,694 | 8.0% | $9,681 | $32.31 |
| Comparable 3 | $2,067 | 6.7% | $7,031 | $21.45 |
| Comparable 4 | $4,782 | 9.5% | $17,518 | $56.72 |
| | | | | |
| **DCF Estimate - YR 1** | **$1,300** | **4.5%** | **$7,104** | **$31.39** |
| **DCF Stabilized Estimate - YR 3** | **$1,641** | **4.1%** | **$8,965** | **$31.81** |
| **Hypothetical Stabilized Estimate** | **$1,546** | **4.1%** | **$8,451** | **$29.99** |
| Compiled by CBRE | | | | |

## PROPERTY OPERATIONS & MAINTENANCE

Property operations & maintenance expenses includes all payroll and related expenses for maintenance personnel, cost of maintenance supplies, cost of repairs and maintenance of the building, furniture and equipment, the grounds and the removal of waste matter. The comparable data and projections for the subject are summarized as follows:



| PROPERTY OPERATIONS AND MAINTENANCE EXPENSES | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $870 | 2.4% | $4,754 | $17.51 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $841 | 2.2% | $4,598 | $16.36 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $925 | 2.4% | $5,056 | $17.78 |
| | | | | |
| Comparable 1 | $1,783 | 4.6% | $6,604 | $20.69 |
| Comparable 2 | $979 | 4.7% | $5,595 | $18.67 |
| Comparable 3 | $1,413 | 4.6% | $4,805 | $14.66 |
| Comparable 4 | $2,295 | 4.5% | $8,407 | $27.22 |
| | | | | |
| **DCF Estimate - YR 1** | **$722** | **2.5%** | **$3,947** | **$17.44** |
| **DCF Stabilized Estimate - YR 3** | **$1,025** | **2.5%** | **$5,603** | **$19.88** |
| **Hypothetical Stabilized Estimate** | **$967** | **2.5%** | **$5,282** | **$18.74** |
| Compiled by CBRE | | | | |

## UTILITY COSTS

Utility expenses typically include electricity, fuel (oil, gas and coal), purchased steam and water. This category also includes any central plant and energy management systems. The comparable data and projections for the subject are summarized as follows:

| UTILITIES EXPENSES | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $535 | 1.5% | $2,921 | $10.76 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $535 | 1.4% | $2,922 | $10.40 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $507 | 1.3% | $2,770 | $9.74 |
| | | | | |
| Comparable 1 | $1,004 | 2.6% | $3,720 | $11.66 |
| Comparable 2 | $638 | 3.0% | $3,645 | $12.16 |
| Comparable 3 | $763 | 2.5% | $2,594 | $7.91 |
| Comparable 4 | $891 | 1.8% | $3,264 | $10.57 |
| | | | | |
| **DCF Estimate - YR 1** | **$365** | **1.3%** | **$1,992** | **$8.80** |
| **DCF Stabilized Estimate - YR 3** | **$524** | **1.3%** | **$2,862** | **$10.16** |
| **Hypothetical Stabilized Estimate** | **$494** | **1.3%** | **$2,698** | **$9.57** |
| Compiled by CBRE | | | | |

## TOTAL UNDISTRIBUTED OPERATING EXPENSES

The subject's total undistributed expense estimates are detailed as follows:



| TOTAL UNDISTRIBUTED EXPENSES | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $5,609 | 15.6% | $30,651 | $112.87 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $5,722 | 14.9% | $31,266 | $111.25 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $6,162 | 16.0% | $33,671 | $118.41 |
| | | | | |
| Comparable 1 | $10,877 | 28.2% | $40,286 | $126.21 |
| Comparable 2 | $6,935 | 33.0% | $39,630 | $132.25 |
| Comparable 3 | $6,216 | 20.2% | $21,144 | $64.50 |
| Comparable 4 | $14,401 | 28.5% | $52,752 | $170.79 |
| | | | | |
| **DCF Estimate - YR 1** | **$4,866** | **16.9%** | **$26,592** | **$117.51** |
| **DCF Stabilized Estimate - YR 3** | **$6,542** | **16.2%** | **$35,748** | **$126.85** |
| **Hypothetical Stabilized Estimate** | **$6,166** | **16.2%** | **$33,696** | **$119.57** |
| Compiled by CBRE | | | | |

## Management Fees

The projection of income and expense assumes competent management by a professional management company. We assume that upon a sale, if the subject could be obtained free and clear of any prior management encumbrance, a prudent investor would retain competent management with fees structured at current rates. Some companies provide management services alone, while others offer both management services and a brand name affiliation. When a management company has no brand identification, the property owner can often acquire a franchise that provides the necessary image and recognition. Management fees have typically equated to roughly 3 to 5 percent of total revenues. For our analysis we used a management fee of 3%. The comparable data and projections for the subject are summarized as follows:

| MANAGEMENT FEE | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $2,220 | 6.2% | $12,134 | $44.68 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $1,084 | 2.8% | $5,925 | $21.08 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $3,021 | 7.8% | $16,505 | $58.05 |
| | | | | |
| Comparable 1 | $768 | 2.0% | $2,846 | $8.92 |
| Comparable 2 | $949 | 4.5% | $5,424 | $18.10 |
| Comparable 3 | $1,412 | 4.6% | $4,801 | $14.65 |
| Comparable 4 | $1,865 | 3.7% | $6,833 | $22.12 |
| | | | | |
| **DCF Estimate - YR 1** | **$908** | **3.0%** | **$4,964** | **$22.29** |
| **DCF Stabilized Estimate - YR 3** | **$1,216** | **3.0%** | **$6,642** | **$23.57** |
| **Hypothetical Stabilized Estimate** | **$1,146** | **3.0%** | **$6,261** | **$22.22** |
| Compiled by CBRE | | | | |



## Income Before Non-Operating Income and Expenses

| INCOME BEFORE NON-OPERATING INCOME AND EXPENSES | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $1,897 | 5.3% | $10,366 | $38.17 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $8,175 | 21.2% | $44,673 | $158.95 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $6,163 | 16.0% | $33,680 | $118.44 |
| | | | | |
| Comparable 1 | $9,153 | 23.7% | $33,899 | $106.20 |
| Comparable 2 | $1,338 | 6.4% | $7,646 | $25.51 |
| Comparable 3 | $13,272 | 43.0% | $45,143 | $137.71 |
| Comparable 4 | $12,236 | 24.2% | $44,821 | $145.12 |
| | | | | |
| **DCF Estimate - YR 1** | **$6,210** | **21.5%** | **$33,935** | **$149.96** |
| **DCF Stabilized Estimate - YR 3** | **$8,707** | **21.5%** | **$47,578** | **$168.82** |
| **Hypothetical Stabilized Estimate** | **$8,207** | **21.5%** | **$44,847** | **$159.13** |

Compiled by CBRE

## Non-Operating Income and Expenses

These items are typically not directly related to an associated revenue source, and are typically not compared on the basis of total revenues for similar types of hotels. These expenses are therefore not typically compared and estimated as a percentage of total revenues. This general category also includes other income that is not directly related to operations (such as cell tower income and longer term rental of space).

### PROPERTY TAXES

Property taxes were discussed in greater detail previously in this report. Management includes the deducted property tax in their operating statements. CBRE included the total property tax amount in our analysis. The projections for the subject are summarized as follows:

| PROPERTY TAXES | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $57 | 0.2% | $311 | $1.15 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $66 | 0.2% | $360 | $1.28 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $230 | 0.6% | $1,259 | $4.43 |
| | | | | |
| Comparable 1 | $4,520 | 11.7% | $16,739 | $52.44 |
| Comparable 2 | $1,162 | 5.5% | $6,639 | $22.15 |
| Comparable 3 | $2,973 | 9.6% | $10,113 | $30.85 |
| Comparable 4 | $1,964 | 3.9% | $7,195 | $23.29 |
| | | | | |
| **DCF Estimate - YR 1** | **$1,827** | **6.3%** | **$9,982** | **$44.11** |
| **DCF Stabilized Estimate - YR 3** | **$2,010** | **5.0%** | **$10,982** | **$38.97** |
| **Hypothetical Stabilized Estimate** | **$1,894** | **5.0%** | **$10,352** | **$36.73** |

Compiled by CBRE

### INSURANCE

The insurance expense includes the cost of insuring the hotel building and contents against fire, weather, sprinkler leakage, boiler explosion, plate glass breakage, or other perils such as terrorism. This category includes all insurance costs except workers' compensation. The comparable data and projections for the subject are summarized as follows:



*Income Capitalization Approach*

| INSURANCE | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $141 | 0.4% | $771 | $2.84 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $162 | 0.4% | $887 | $3.16 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $151 | 0.4% | $823 | $2.89 |
| | | | | |
| Comparable 1 | $105 | 0.3% | $390 | $1.22 |
| Comparable 2 | $139 | 0.7% | $794 | $2.65 |
| Comparable 3 | $168 | 0.5% | $573 | $1.75 |
| Comparable 4 | $227 | 0.4% | $831 | $2.69 |
| | | | | |
| **DCF Estimate - YR 1** | **$293** | **1.0%** | **$1,601** | **$7.08** |
| **DCF Stabilized Estimate - YR 3** | **$423** | **1.0%** | **$2,314** | **$8.21** |
| **Hypothetical Stabilized Estimate** | **$399** | **1.0%** | **$2,181** | **$7.74** |
| Compiled by CBRE | | | | |

## RESERVES FOR REPLACEMENT

Structural reserves account for the replacement of short-lived items, including the roof, building systems, and parking lot.  FF&E reserves for replacement are typically included in hotel expense projections to account for the periodic replacement of the furniture, fixtures and equipment (FF&E).  It does not reflect the value of existing FF&E.  It is solely an expense to reflect future replacements of short-lived items.  This expense can be based on the actual replacement cost of the FF&E, its projected economic life and a reasonable reinvestment rate for the reserve funds (essentially a sinking fund account).  An alternative and more widely utilized method is to estimate FF&E reserves based on a percentage of total revenues.   Using this method, the typical ratio ranges from 2 to 5 percent of total revenues depending on the quality level of the property and the specific amenities and services present. The comparable data and projections for the subject are summarized as follows:

| RESERVE FOR REPLACEMENT | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $300 | 0.8% | $1,639 | $6.04 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $300 | 0.8% | $1,639 | $5.83 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $0 | 0.0% | $0 | $0.00 |
| | | | | |
| Comparable 1 | $0 | 0.0% | $0 | $0.00 |
| Comparable 2 | $0 | 0.0% | $0 | $0.00 |
| Comparable 3 | $0 | 0.0% | $0 | $0.00 |
| Comparable 4 | $0 | 0.0% | $0 | $0.00 |
| | | | | |
| **DCF Estimate - YR 1** | **$866** | **3.0%** | **$4,732** | **$20.91** |
| **DCF Stabilized Estimate - YR 3** | **$1,212** | **3.0%** | **$6,625** | **$23.51** |
| **Hypothetical Stabilized Estimate** | **$1,143** | **3.0%** | **$6,245** | **$22.16** |
| Compiled by CBRE | | | | |

For this analysis, we have estimated a reserves allowance at 3.0% of total revenue beginning in of our analysis.

## TOTAL NON-OPERATING INCOME AND EXPENSES

The subject's total non-operating income and expense estimates are detailed as follows:



| TOTAL NON-OPERATING INCOME AND EXPENSES | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $498 | 1.4% | $2,721 | $10.02 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $528 | 1.4% | $2,886 | $10.27 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $381 | 1.0% | $2,082 | $7.32 |
| | | | | |
| Comparable 1 | $4,625 | 12.0% | $17,129 | $53.66 |
| Comparable 2 | $1,301 | 6.2% | $7,433 | $24.80 |
| Comparable 3 | $3,142 | 10.2% | $10,686 | $32.60 |
| Comparable 4 | $2,191 | 4.3% | $8,025 | $25.98 |
| | | | | |
| **DCF Estimate - YR 1** | **$2,986** | **10.3%** | **$16,315** | **$72.09** |
| **DCF Stabilized Estimate - YR 3** | **$3,646** | **9.0%** | **$19,922** | **$70.69** |
| **Hypothetical Stabilized Estimate** | **$3,436** | **9.0%** | **$18,778** | **$66.63** |
| Compiled by CBRE | | | | |

## NET INCOME (EBITDA) CONCLUSION

The subject's net operating income is detailed as follows:

| NET INCOME (EBITDA) | | | | |
|---|---|---|---|---|
| Year | Total $ (000's) | As a % of Revenue | Per Available Room | Per Occupied Room |
| Subject Complete Calendar Year Ended: Dec 31, 2017 | $1,399 | 3.9% | $7,645 | $28.15 |
| Subject Complete Calendar Year Ended: Dec 31, 2018 | $7,647 | 19.9% | $41,787 | $148.68 |
| Subject Trailing 12 Months Ending: Jan 31, 2019 | $5,782 | 15.0% | $31,597 | $111.12 |
| | | | | |
| Comparable 1 | $4,528 | 11.7% | $16,770 | $52.54 |
| Comparable 2 | $37 | 0.2% | $213 | $0.71 |
| Comparable 3 | $10,130 | 32.9% | $34,457 | $105.11 |
| Comparable 4 | $10,045 | 19.9% | $36,795 | $119.13 |
| | | | | |
| **DCF Estimate - YR 1** | **$3,225** | **11.2%** | **$17,621** | **$77.86** |
| **DCF Stabilized Estimate - YR 3** | **$5,061** | **12.5%** | **$27,657** | **$98.14** |
| **Hypothetical Stabilized Estimate** | **$4,771** | **12.5%** | **$26,069** | **$92.50** |
| Compiled by CBRE | | | | |

## UNTRENDED NOI ANALYSIS

## DISCOUNTED CASH FLOW ANALYSIS

The discounted cash flow analysis relies on a projection of net operating income over a fixed holding period and a future sale of the property at the end of the holding period.  This is consistent with current investor trends for analyzing this property type.  The discounted cash flow analysis takes into consideration the timing and degree of the projected changes in average daily rate, occupancy, and expenses for the subject.



## Financial Assumptions

| SUMMARY OF DISCOUNTED CASH FLOW INPUT | |
|---|---|
| **General** | |
| Start Date | Dec-21 |
| Terms of Analysis | 10 Years |
| Software | Excel |
| **Growth Rates** | |
| Stabilized ADR Growth | 3.00% |
| ADR Growth (Yr. 2) | 7.50% |
| ADR Growth (Yr. 3) | 5.00% |
| ADR Growth (Stabilized) | 3.00% |
| Stabilized Expense Growth | 3.00% |
| **Revenue Assumptions** | |
| 2019 Average Daily Rate | $363.18 |
| Year 1 Projected ADR | $357.50 |
| Year 2 Projected ADR | $384.31 |
| Stabilized Average Daily Rate | $403.53 |
| **Occupancy Assumptions** | |
| 2019 Occupancy | 77.90% |
| Year 1 Projected Occupancy | 62.00% |
| Year 2 Projected Occupancy | 70.00% |
| Stabilized Occupancy | 77.00% |
| Estimated Stabilization | Dec-23 |
| **Financial** | |
| Discount Rate | 8.00% |
| Terminal Capitalization Rate | 5.50% |
| Discount Rate - As Stabilized | 7.75% |
| Terminal Capitalization Rate - As Stabilized | 5.50% |
| **Other** | |
| Cost of Sale | 4.00% |
| Capital Expenses (Capital Expenditures) | $0 |
| Compiled by CBRE | |

## CASH FLOW ASSUMPTIONS

The discounted cash flow analysis relies on the income and expense projections presented earlier in this section. Specific assumptions integral to the analysis are summarized as follows:

## GENERAL ASSUMPTIONS

The DCF analysis utilizes a 10-year projection period with fiscal year inflation and discounting. This is consistent with current investor assumptions. The analysis is done with Excel software.



GROWTH RATE ASSUMPTIONS

The inflation and growth rates for the DCF analysis have been estimated by analyzing the expectations typically used by buyers and sellers in the local marketplace. Published investor surveys, an analysis of the Consumer Price Index (CPI), as well as CBRE's survey of brokers and investors active in the local market form the foundation for the selection of the appropriate growth rates.

| SUMMARY OF GROWTH RATES | | | |
|---|---|---|---|
| Investment Type | Rent | Expenses | Inflation |
| U.S. Bureau of Labor Statistics  (CPI-U) | | | |
| 10-Year Snapshot Average as of  Dec-21 | | | 1.96% |
| *PwC Limited Service Hotels* | | | |
| National Data | 6.50% | 3.00% | n/a |
| *RERC Hotels* | | | |
| National Data | 1.50% | 3.30% | n/a |
| **CBRE Estimate** | **3.65%** | **3.00%** | **3.00%** |
| Compiled by: CBRE | | | |

OCCUPANCY ASSUMPTIONS

The occupancy rate over the holding period is based on the subject's estimated stabilized occupancy rate and estimated lease-up period to achieve a stabilized occupancy position. The complete discussion and analysis of occupancy is located in the Hotel Market Analysis.

## HOTEL INVESTOR RATES

Provided on the following pages is a discussion of the direct capitalization, discount, and terminal capitalization rates.

### Direct Capitalization

Direct capitalization is a method used to convert a single year's estimated stabilized net operating income into a value indication. The following subsections represent different techniques for deriving an overall capitalization rate for direct capitalization. This figure will be used in a direct capitalization table presented following the discounted cash flow analysis. It also impacts the terminal capitalization rate selection.

COMPARABLE SALES

The overall capitalization rates (OAR's) confirmed for the comparable sales analyzed in the sales comparison approach are as follows:



## COMPARABLE CAPITALIZATION RATES

| Sale | Name Location | Sale Date | Sale Price $/Unit | OAR Basis | OAR |
|---|---|---|---|---|---|
| 1 | Cambria Suites Times Square | Sep-21 | $451,531 | Fee Simple | 4.50% |
| 2 | The James Nomad | Mar-20 | $535,098 | Fee Simple | 4.41% |
| 2 | The Quin | Jun-18 | $819,076 | Fee Simple | 4.43% |
| 3 | W Union Square | Sep-18 | $622,222 | Fee Simple | 3.81% |
| 4 | Dumont | Jun-17 | $468,254 | Fee Simple | 3.30% |
| 5 | Hilton Fashion District | Dec-16 | $510,000 | Fee Simple | 4.89% |
| 6 | Hilton Garden Inn Herald Square | Dec-16 | $480,000 | Fee Simple | 5.04% |
| 7 | The James Hotel | Sep-16 | $614,035 | Fee Simple | 5.00% |
| 8 | Hilton Garden Inn Chelsea | Jul-16 | $384,615 | Fee Simple | 6.60% |
| 9 | 70 Park Avenue | Jun-16 | $385,366 | Fee Simple | 5.00% |
| 10 | NYLO New York City | Jun-16 | $496,454 | Fee Simple | 5.20% |
| 11 | Hersha Portfolio of 7 Hotels | Apr-16 | $500,000 | Majoirty | 5.40% |
| 12 | Sheraton Tribeca (Leasehold) | Mar-16 | $428,184 | Leasehold | 5.84% |
| 13 | Wyndham Garden Inn New York | Feb-16 | $483,871 | Fee Simple | 5.50% |
| 14 | London NYC (Leasehold) | Nov-15 | $679,715 | Leasehold | 4.90% |
| 15 | GEM Midtown West 36th | Q1 2015 | $529,000 | Fee Simple | 5.20% |
| **Indicated OAR:** | | | | | **3.30% - 6.60%** |
| Compiled by: CBRE | | | | | |

### PUBLISHED INVESTOR SURVEYS

The results of the most recent investor survey data are summarized in the following table.

## OVERALL CAPITALIZATION RATES

| Investment Type | OAR Range | Average |
|---|---|---|
| *RERC Hotels* | | |
| National Data | 7.00% - 9.60% | 7.90% |
| *RealtyRates.com* | | |
| Lodging | 4.82% - 16.80% | 9.68% |
| Full Service | 4.82% - 14.04% | 8.53% |
| *PwC Full Service Hotels* | | |
| National Data - 2021 Q4 | 5.50% - 9.00% | 7.35% |
| **Indicated OAR:** | | **5.50% - 6.50%** |
| Compiled by: CBRE | | |

The subject is considered to be a Class A property. Because of the subject's recent renovations and franchise affiliation, an OAR near the average of the range indicated in the preceding table is considered appropriate.



MARKET PARTICIPANTS

The results of recent interviews with knowledgeable real estate professionals are summarized in the following table.

| OVERALL CAPITALIZATION RATES | | | |
|---|---|---|---|
| Respondent | Company | OAR | Date of Survey |
| CBRE Broker | CBRE | 5.0% - 7.0% | Jun-21 |
| CBRE Hospitality Advisory | CBRE | 5.0% - 6.5% | Jun-21 |
| Broker | JLL | 4.5% - 6.5% | Jun-21 |
| Owner/Operator | Triumph Hotel | 5.0% - 7.0% | Apr-21 |
| **Indicated OAR:** | | | **5.00% - 7.00%** |
| Compiled by: CBRE | | | |

Based on the subject's projected stabilized occupancy level and its competitive position in the local market, an OAR toward the middle of the range indicated above is considered appropriate.

CAPITALIZATION RATE CONCLUSION

The following table summarizes the OAR conclusions.

| OVERALL CAPITALIZATION RATE - CONCLUSION | |
|---|---|
| Source | Indicated OAR |
| Comparable Sales | 3.30%-6.60% |
| Published Surveys | 5.50% - 6.5% |
| Market Participants | 5.0%-6.0% |
| **CBRE Estimate** | **5.00%** |
| Compiled by: CBRE | |

## Discount Rate Analysis

The results of the most recent PwC Real Estate Investor Survey are summarized in the following table.



| DISCOUNT RATES | | | |
|---|---|---|---|
| Investment Type | Rate Range | | Average |
| *RealtyRates.com* | | | |
| Lodging | | | |
| Full Service | 5.88% - 13.74% | | 11.41% |
| Limited Service | 6.78% - 16.08% | | 11.61% |
| | - | | |
| *PwC Full Service Hotels (3Q2021)* | 8.75% - 11.00% | | 10.23% |
| *PwC Limited Service Hotels (3Q2021)* | 8.00% - 11.50% | | 9.60% |
| *RERC Hotels* | | | |
| National Data | 9.50% - 11.00% | | 10.20% |
| **CBRE Estimate (As Is)** | | | **8.00%** |
| **CBRE Estimate (As Stabilized)** | | | **7.75%** |
| Compiled by: CBRE | | | |

The subject is considered to be a Class A property.  Overall, a rate in the 8.5% portion of the range indicated on the preceding table is considered appropriate for the following reasons:

### Terminal Capitalization Rate

The reversionary value of the subject is based on an assumed sale at the end of the holding period based on capitalizing the Year 11 NOI at a terminal capitalization rate.  Typically, for properties similar to the subject, terminal capitalization rates are 25 to 50 basis points higher than going-in capitalization rates (OAR's).  This is a result of the uncertainty of future economic conditions and the natural aging of the property, but assuming adequate reserves have been utilized to keep the property in good operating condition.

| TERMINAL CAPITALIZATION RATES | | | |
|---|---|---|---|
| Investment Type | Rate Range | | Average |
| *Market Participants* | | | |
| *PwC Full Service Hotels* | | | |
| National Data - OAR | 6.00% - | 9.50% | 7.80% |
| National Data - Residual OAR | 6.50% - 10.00% | | 8.50% |
| Spread: Basis Points (BP) | 50 - | 50 | 70 |
| *RERC Hotels* | | | |
| National Data - OAR | 7.00% - | 8.50% | 7.90% |
| National Data - Residual OAR | 8.00% - | 9.00% | 8.60% |
| Spread: Basis Points (BP) | 100 - | 50 | 70 |
| **Concluded BP Spread** | | | **50** |
| **CBRE Estimate** | | | **5.50%** |
| Compiled by: CBRE | | | |



## DISCOUNTED CASH FLOW CONCLUSION

The following pages present the following illustrations:

- Detailed Forecast Schedule
- Discounted Cash Flow Schedule(s)
- Discounted Cash Flow Value Conclusions



**Income Capitalization Approach**

| DETAILED FORECAST OF INCOME AND EXPENSES AND SUBJECT OPERATING HISTORY | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SUBJECT OPERATING HISTORY | | | | | | | | DCF YEAR 1 | | | | STABILIZED DCF YEAR 1 | | |
| Period Reported: | Complete Calendar Year Ended: | | | | Trailing 12 Months Ending: | | | | Fiscal Year Ended: | | | | Fiscal Year Ended: | | |
| | 12/31/2018 | | | | 1/31/2019 | | | | 12/30/2022 | | | | 12/30/2024 | | |
| Days Open | 365 | | | | 365 | | | | 365 | | | | 366 | | |
| No. of Rooms | 183 | | | | 183 | | | | 183 | | | | 183 | | |
| Occupied Room Nights | 51,432 | | | | 52,036 | | | | 41,413 | | | | 51,573 | | |
| Occupancy | 77.0% | | | | 77.9% | | | | 62.0% | | | | 77.0% | | |
| Average Daily Rate | $371.26 | | | | $363.18 | | | | $357.50 | | | | $403.53 | | |
| RevPAR | $285.87 | | | | $282.93 | | | | $221.65 | | | | $310.72 | | |
| | Total | Ratio to Sales | PAR | POR | Total | Ratio to Sales | PAR | POR | Total | Ratio to Sales | PAR | POR | Total | Ratio to Sales | PAR | POR |
| REVENUE | | | | | | | | | | | | | | | | |
| Rooms | $19,094,787 | 49.6% | $104,343 | $371.26 | $18,898,602 | 48.9% | $103,271 | $363.18 | $14,805,112 | 51.3% | $80,902 | $357.50 | $20,811,110 | 51.5% | $113,722 | $403.53 |
| Food & Beverage | 18,924,890 | 49.2% | $103,415 | $367.96 | 18,960,997 | 49.1% | $103,612 | $364.38 | 13,571,846 | 47.0% | $74,163 | $327.72 | 18,874,969 | 46.7% | $103,142 | $365.99 |
| Other Operated Departments | 476,910 | 1.2% | $2,606 | $9.27 | 764,890 | 2.0% | $4,180 | $14.70 | 486,239 | 1.7% | $2,657 | $11.74 | 728,001 | 1.8% | $3,978 | $14.12 |
| Miscellaneous Income | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 | - | 0.0% | $0 | $0.00 |
| Total Operating Revenue | $38,496,587 | 100.0% | $210,364 | $748.49 | $38,624,509 | 100.0% | $211,063 | $742.27 | $28,863,197 | 100.0% | $157,722 | $696.96 | $40,414,160 | 100.0% | $220,842 | $783.63 |
| DEPARTMENTAL EXPENSES | | | | | | | | | | | | | | | | |
| Rooms Expense | $5,582,925 | 29.2% | $30,508 | $108.55 | $5,471,736 | 29.0% | $29,900 | $105.15 | $3,857,371 | 26.1% | $21,079 | $93.14 | $5,766,956 | 27.7% | $31,513 | $111.82 |
| Food & Beverage Expense | 17,622,733 | 93.1% | $96,299 | $342.64 | 17,548,677 | 92.6% | $95,894 | $337.24 | 12,893,254 | 95.0% | $70,455 | $311.33 | 17,931,230 | 95.0% | $97,985 | $347.69 |
| Other Operated Departments Expense | 309,763 | 65.0% | $1,693 | $6.02 | 258,485 | 33.8% | $1,412 | $4.97 | 170,184 | 35.0% | $930 | $4.11 | 254,800 | 35.0% | $1,392 | $4.94 |
| Total Departmental Expenses | $23,515,421 | 61.1% | $128,500 | $457.21 | $23,278,898 | 60.3% | $127,207 | $447.36 | $16,920,808 | 58.6% | $92,463 | $408.59 | $23,952,986 | 59.3% | $130,891 | $464.45 |
| DEPARTMENTAL PROFIT | $14,981,166 | 38.9% | $81,864 | $291.28 | $15,345,611 | 39.7% | $83,856 | $294.90 | $11,942,388 | 41.4% | $65,259 | $288.37 | $16,461,174 | 40.7% | $89,952 | $319.18 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | | | | |
| Administrative and General | $2,873,939 | 7.5% | $15,705 | $55.88 | $2,995,971 | 7.8% | $16,371 | $57.57 | $2,479,341 | 8.6% | $13,548 | $59.87 | $3,352,110 | 8.3% | $18,318 | $65.00 |
| Marketing | 1,471,562 | 3.8% | $8,041 | $28.61 | 1,733,473 | 4.5% | $9,473 | $33.31 | 1,300,116 | 4.5% | $7,104 | $31.39 | 1,640,651 | 4.1% | $8,965 | $31.81 |
| Property Operations and Maintenance | 841,385 | 2.2% | $4,598 | $16.36 | 925,310 | 2.4% | $5,056 | $17.78 | 722,287 | 2.5% | $3,947 | $17.44 | 1,025,407 | 2.5% | $5,603 | $19.88 |
| Utilities | 534,810 | 1.4% | $2,922 | $10.40 | 506,965 | 1.3% | $2,770 | $9.74 | 364,609 | 1.3% | $1,992 | $8.80 | 523,767 | 1.3% | $2,862 | $10.16 |
| Total Undistributed Expenses | $5,721,696 | 14.9% | $31,266 | $111.25 | $6,161,719 | 16.0% | $33,671 | $118.41 | $4,866,353 | 16.9% | $26,592 | $117.51 | $6,541,935 | 16.2% | $35,748 | $126.85 |
| GROSS OPERATING PROFIT | $9,259,470 | 24.1% | $50,598 | $180.03 | $9,183,892 | 23.8% | $50,185 | $176.49 | $7,076,036 | 24.5% | $38,667 | $170.87 | $9,919,239 | 24.5% | $54,203 | $192.33 |
| Management Fee | $1,084,332 | 2.8% | $5,925 | $21.08 | $3,020,502 | 7.8% | $16,505 | $58.05 | $865,896 | 3.0% | $4,732 | $20.91 | $1,212,425 | 3.0% | $6,625 | $23.51 |
| INCOME BEFORE NON-OPERATING INCOME AND EXPENSES | $8,175,138 | 21.2% | $44,673 | $158.95 | $6,163,390 | 16.0% | $33,680 | $118.44 | $6,210,140 | 21.5% | $33,935 | $149.96 | $8,706,814 | 21.5% | $47,578 | $168.82 |
| NON-OPERATING INCOME AND EXPENSES | | | | | | | | | | | | | | | | |
| Property Taxes | $65,810 | 0.2% | $360 | $1.28 | $230,436 | 0.6% | $1,259 | $4.43 | $1,826,618 | 6.3% | $9,982 | $44.11 | $2,009,776 | 5.0% | $10,982 | $38.97 |
| Insurance | 162,272 | 0.4% | $887 | $3.16 | 150,622 | 0.4% | $823 | $2.89 | 293,074 | 1.0% | $1,601 | $7.08 | 423,439 | 1.0% | $2,314 | $8.21 |
| Reserve for Replacement | 300,000 | 0.8% | $1,639 | $5.83 | - | 0.0% | $0 | $0.00 | 865,896 | 3.0% | $4,732 | $20.91 | 1,212,425 | 3.0% | $6,625 | $23.51 |
| Total Non-Operating Income and Expenses | $528,082 | 1.4% | $2,886 | $10.27 | $381,058 | 1.0% | $2,082 | $7.32 | $2,985,588 | 10.3% | $16,315 | $72.09 | $3,645,640 | 9.0% | $19,922 | $70.69 |
| NET INCOME (EBITDA) | $7,647,056 | 19.9% | $41,787 | $148.68 | $5,782,332 | 15.0% | $31,597 | $111.12 | $3,224,552 | 11.2% | $17,621 | $77.86 | $5,061,174 | 12.5% | $27,657 | $98.14 |

* Departmental expense ratios are based on departmental revenues; Franchise/Royalty ratio is based on room revenues; all others are based on Total Operating Revenues.

Compiled by CBRE



## AS IS DISCOUNTED CASH FLOW SCHEDULE

**CBRE**

**THE WILLIAM VALE**
**DISCOUNTED CASH FLOW ANALYSIS**
**BEGINNING 12/21**

**CBRE HOTELS**
*The World's Leading Hotel Experts*

| YEAR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Reversion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year Ended: | 12/30/22 | 12/30/23 | 12/30/24 | 12/30/25 | 12/30/26 | 12/30/27 | 12/30/28 | 12/30/29 | 12/30/30 | 12/30/31 | 12/30/32 |
| Number of Rooms | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 |
| Annual Available Rooms | 66,795 | 66,795 | 66,978 | 66,795 | 66,795 | 66,795 | 66,978 | 66,795 | 66,795 | 66,795 | 66,978 |
| Occupied Rooms | 41,413 | 46,757 | 51,573 | 51,432 | 51,432 | 51,432 | 51,573 | 51,432 | 51,432 | 51,432 | 51,573 |
| Occupancy | 62.0% | 70.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% |
| Average Rate | $357.50 | $384.31 | $403.53 | $415.63 | $428.10 | $440.95 | $454.17 | $467.80 | $481.83 | $496.29 | $511.18 |
| **REVENUE** | | | | | | | | | | | |
| Rooms | $14,805,112 | $17,969,107 | $20,811,180 | $21,376,949 | $22,018,257 | $22,678,805 | $23,423,167 | $24,059,944 | $24,781,742 | $25,525,195 | $26,362,980 |
| Food & Beverage | 13,571,846 | 16,203,912 | 18,874,979 | 19,398,734 | 19,980,696 | 20,580,117 | 21,243,955 | 21,833,446 | 22,488,449 | 23,163,103 | 23,910,259 |
| Other Operated Departments | 486,239 | 646,494 | 728,001 | 748,406 | 770,859 | 793,984 | 819,371 | 842,338 | 867,608 | 893,636 | 922,209 |
| **Total Operating Revenue** | $28,863,197 | $34,819,513 | $40,414,160 | $41,524,089 | $42,769,812 | $44,052,906 | $45,486,493 | $46,735,728 | $48,137,800 | $49,581,934 | $51,195,448 |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | | | |
| Rooms Expense | $3,857,371 | $4,918,807 | $5,766,956 | $5,934,295 | $6,112,324 | $6,295,693 | $6,490,760 | $6,679,101 | $6,879,474 | $7,085,858 | $7,305,407 |
| Food & Beverage Expense | 12,893,254 | 15,393,717 | 17,931,230 | 18,444,945 | 18,998,293 | 19,568,242 | 20,181,757 | 20,759,948 | 21,382,747 | 22,024,229 | 22,714,746 |
| Other Operated Departments Expense | 170,184 | 226,273 | 254,800 | 262,193 | 270,059 | 278,161 | 286,780 | 295,101 | 303,954 | 313,072 | 322,773 |
| **Total Departmental Expenses** | $16,920,808 | $20,538,797 | $23,952,986 | $24,641,433 | $25,380,676 | $26,142,096 | $26,959,297 | $27,734,150 | $28,566,175 | $29,423,160 | $30,342,926 |
| **DEPARTMENTAL PROFIT** | $11,942,388 | $14,280,717 | $16,461,174 | $16,882,656 | $17,389,135 | $17,910,810 | $18,527,196 | $19,001,578 | $19,571,625 | $20,158,774 | $20,852,522 |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | | | |
| Administrative and General | $2,479,341 | $2,849,569 | $3,352,110 | $3,451,909 | $3,555,466 | $3,662,130 | $3,772,829 | $3,885,154 | $4,001,709 | $4,121,760 | $4,246,352 |
| Marketing | 1,300,116 | 1,401,248 | 1,640,651 | 1,688,725 | 1,739,387 | 1,791,568 | 1,846,567 | 1,900,675 | 1,957,695 | 2,016,426 | 2,078,328 |
| Property Operations and Maintenance | 722,287 | 875,780 | 1,025,407 | 1,055,453 | 1,087,117 | 1,119,730 | 1,154,104 | 1,187,922 | 1,223,559 | 1,260,266 | 1,298,955 |
| Utilities | 364,609 | 445,245 | 523,767 | 539,361 | 555,542 | 572,208 | 589,505 | 607,055 | 625,267 | 644,025 | 663,493 |
| **Total Undistributed Expenses** | $4,866,353 | $5,571,842 | $6,541,935 | $6,735,448 | $6,937,511 | $7,145,637 | $7,363,005 | $7,580,806 | $7,808,230 | $8,042,477 | $8,287,127 |
| **GROSS OPERATING PROFIT** | $7,076,036 | $8,708,874 | $9,919,239 | $10,147,208 | $10,451,624 | $10,765,173 | $11,164,191 | $11,420,772 | $11,763,395 | $12,116,297 | $12,565,395 |
| Management Fee | $865,896 | $1,044,585 | $1,212,425 | $1,245,723 | $1,283,094 | $1,321,587 | $1,364,595 | $1,402,072 | $1,444,134 | $1,487,458 | $1,535,863 |
| **INCOME BEFORE NON-OPERATING INCOME AND** | $6,210,140 | $7,664,289 | $8,706,814 | $8,901,485 | $9,168,530 | $9,443,586 | $9,799,596 | $10,018,700 | $10,319,261 | $10,628,839 | $11,029,532 |
| **NON-OPERATING INCOME AND EXPENSES** | | | | | | | | | | | |
| Property Taxes | $1,826,618 | $1,950,860 | $2,009,776 | $2,039,971 | $2,037,021 | $2,112,916 | $2,176,726 | $2,242,463 | $2,310,185 | $2,356,389 | $2,403,517 |
| Insurance | 293,074 | 359,138 | 423,439 | 436,142 | 449,227 | 462,703 | 476,585 | 490,882 | 505,609 | 520,777 | 536,400 |
| Reserve for Replacement | 865,896 | 1,044,585 | 1,212,425 | 1,245,723 | 1,283,094 | 1,321,587 | 1,364,595 | 1,402,072 | 1,444,134 | 1,487,458 | 1,535,863 |
| **Total Non-Operating Income and Expenses** | $2,985,588 | $3,354,583 | $3,645,640 | $3,721,837 | $3,769,342 | $3,897,206 | $4,017,905 | $4,135,417 | $4,259,928 | $4,364,624 | $4,475,780 |
| **NET INCOME (EBITDA)** | $3,224,552 | $4,309,706 | $5,061,174 | $5,179,649 | $5,399,188 | $5,546,379 | $5,781,691 | $5,883,283 | $6,059,333 | $6,264,215 | $6,553,751 |

**REVENUE AND NOI TREND**



Legend: ■ Total Revenue  ■ Total Expenses  — NOI

(Bar chart, y-axis $0 to $60,000,000; x-axis Year 1–10)

**Sale / Yield Matrix**

| | Terminal Cap Rate | | |
|---|---|---|---|
| **IRR** | 5.25% | **5.50%** | 5.75% |
| 7.75% | 91,396,565 | 88,814,267 | 86,456,516 |
| **8.00%** | 89,669,204 | **87,146,063** | 84,842,324 |
| 8.25% | 87,982,169 | 85,516,697 | 83,265,613 |

| | |
|---|---|
| Reconciled Value Indication: | $87,146,063 |
| Plus ICAP | $13,400,000 |
| As-Is Value Indication (Rounded): | **$100,500,000** |
| | $549,180/Room |

**CBRE**

*Income Capitalization Approach*

## AS STABILIZED DISCOUNTED CASH FLOW SCHEDULE

**CBRE**

**THE WILLIAM VALE**
**DISCOUNTED CASH FLOW ANALYSIS**
**BEGINNING 12/23**

**CBRE HOTELS**
The World's Leading Hotel Experts.

| YEAR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Reversion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year Ended: | 12/30/24 | 12/30/25 | 12/30/26 | 12/30/27 | 12/30/28 | 12/30/29 | 12/30/30 | 12/30/31 | 12/30/32 | 12/30/33 | 12/30/34 |
| Number of Rooms | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 |
| Annual Available Rooms | 66,978 | 66,795 | 66,795 | 66,795 | 66,978 | 66,795 | 66,795 | 66,795 | 66,978 | 66,795 | 66,795 |
| Occupied Rooms | 51,573 | 51,432 | 51,432 | 51,432 | 51,573 | 51,432 | 51,432 | 51,432 | 51,573 | 51,432 | 51,432 |
| Occupancy | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% | 77.0% |
| Average Rate | $403.53 | $415.63 | $428.10 | $440.95 | $454.17 | $467.80 | $481.83 | $496.29 | $511.18 | $526.51 | $542.31 |
| **REVENUE** | | | | | | | | | | | |
| Rooms | $20,811,180 | $21,376,949 | $22,018,257 | $22,678,805 | $23,423,167 | $24,059,944 | $24,781,742 | $25,525,195 | $26,362,980 | $27,079,679 | $27,892,069 |
| Food & Beverage | 18,874,979 | 19,398,734 | 19,980,696 | 20,580,117 | 21,243,955 | 21,833,446 | 22,488,449 | 23,163,103 | 23,910,259 | 24,573,736 | 25,310,948 |
| Other Operated Departments | 728,001 | 748,406 | 770,859 | 793,984 | 819,371 | 842,338 | 867,608 | 893,636 | 922,209 | 948,059 | 976,501 |
| **Total Operating Revenue** | $40,414,160 | $41,524,089 | $42,769,812 | $44,052,906 | $45,486,493 | $46,735,728 | $48,137,800 | $49,581,934 | $51,195,448 | $52,601,473 | $54,179,518 |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | | | |
| Rooms Expense | $5,766,956 | $5,934,295 | $6,112,324 | $6,295,693 | $6,490,760 | $6,679,101 | $6,879,474 | $7,085,858 | $7,305,407 | $7,517,387 | $7,742,909 |
| Food & Beverage Expense | 17,931,230 | 18,444,945 | 18,998,293 | 19,568,242 | 20,181,767 | 20,759,948 | 21,382,747 | 22,024,229 | 22,714,746 | 23,365,505 | 24,066,470 |
| Other Operated Departments Expense | 254,800 | 262,193 | 270,059 | 278,161 | 286,780 | 295,101 | 303,954 | 313,072 | 322,773 | 332,139 | 342,103 |
| **Total Departmental Expenses** | $23,952,986 | $24,641,433 | $25,380,676 | $26,142,096 | $26,959,297 | $27,734,150 | $28,566,175 | $29,423,160 | $30,342,926 | $31,215,030 | $32,151,481 |
| **DEPARTMENTAL PROFIT** | $16,461,174 | $16,882,656 | $17,389,135 | $17,910,810 | $18,527,196 | $19,001,578 | $19,571,625 | $20,158,774 | $20,852,522 | $21,386,443 | $22,028,037 |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | | | |
| Administrative and General | $3,352,110 | $3,451,909 | $3,555,466 | $3,662,130 | $3,772,829 | $3,885,154 | $4,001,709 | $4,121,760 | $4,245,352 | $4,372,775 | $4,503,959 |
| Marketing | 1,640,651 | 1,688,725 | 1,739,387 | 1,791,568 | 1,846,567 | 1,900,675 | 1,957,695 | 2,016,426 | 2,078,328 | 2,139,226 | 2,203,403 |
| Property Operations and Maintenance | 1,025,407 | 1,055,453 | 1,087,117 | 1,119,730 | 1,154,104 | 1,187,922 | 1,223,559 | 1,260,266 | 1,298,955 | 1,337,016 | 1,377,127 |
| Utilities | 523,767 | 539,361 | 555,542 | 572,208 | 589,505 | 607,055 | 625,267 | 644,025 | 663,493 | 683,246 | 703,744 |
| **Total Undistributed Expenses** | $6,541,935 | $6,735,448 | $6,937,511 | $7,145,637 | $7,363,005 | $7,580,806 | $7,808,230 | $8,042,477 | $8,287,127 | $8,532,264 | $8,788,232 |
| **GROSS OPERATING PROFIT** | $9,919,239 | $10,147,208 | $10,451,624 | $10,765,173 | $11,164,191 | $11,420,772 | $11,763,395 | $12,116,297 | $12,565,395 | $12,854,179 | $13,239,805 |
| Management Fee | $1,212,425 | $1,245,723 | $1,283,094 | $1,321,587 | $1,364,595 | $1,402,072 | $1,444,134 | $1,487,458 | $1,535,863 | $1,578,044 | $1,625,386 |
| **INCOME BEFORE NON-OPERATING INCOME AND EXPENSES** | $8,706,814 | $8,901,485 | $9,168,530 | $9,443,586 | $9,799,596 | $10,018,700 | $10,319,261 | $10,628,839 | $11,029,532 | $11,276,135 | $11,614,419 |
| **NON-OPERATING INCOME AND EXPENSES** | | | | | | | | | | | |
| Property Taxes | $2,009,776 | $2,039,971 | $2,037,021 | $2,112,916 | $2,176,726 | $2,242,463 | $2,310,185 | $2,379,491 | $2,450,875 | $2,524,402 | $2,600,134 |
| Insurance | 423,439 | 436,142 | 449,227 | 462,703 | 476,585 | 490,882 | 505,609 | 520,777 | 536,400 | 552,492 | 569,067 |
| Reserve for Replacement | 1,212,425 | 1,245,723 | 1,283,094 | 1,321,587 | 1,364,595 | 1,402,072 | 1,444,134 | 1,487,458 | 1,535,863 | 1,578,044 | 1,625,386 |
| **Total Non-Operating Income and Expenses** | $3,645,640 | $3,721,837 | $3,769,342 | $3,897,206 | $4,017,905 | $4,135,417 | $4,259,928 | $4,387,726 | $4,523,139 | $4,654,938 | $4,794,586 |
| **NET INCOME (EBITDA)** | $5,061,174 | $5,179,649 | $5,399,188 | $5,546,379 | $5,781,691 | $5,883,283 | $6,059,333 | $6,241,113 | $6,506,393 | $6,621,197 | $6,819,833 |

**REVENUE AND NOI TREND**

Legend: Total Revenue, Total Expenses, NOI

**Sale / Yield Matrix**

| | Terminal Cap Rate | | |
|---|---|---|---|
| | 5.25% | 5.50% | 5.75% |
| IRR | | | |
| 7.50% | 99,793,132 | 97,042,842 | 94,531,709 |
| **7.75%** | 97,936,972 | **95,249,833** | 92,796,358 |
| 8.00% | 96,124,116 | 93,498,535 | 91,101,265 |

| | |
|---|---|
| **Reconciled Value Indication:** | **$95,249,833** |
| **Plus ICAP** | **$12,200,000** |
| **As-Stabilized Value Indication (Rounded):** | **$107,000,000** |
| | $584,699/Room |

102



## DIRECT CAPITALIZATION SUMMARY

A summary of the direct capitalization of the subject is illustrated in the following table.

| DIRECT CAPITALIZATION SUMMARY | | | | |
|---|---|---|---|---|
| Analysis Premise | Stabilized Discounted Cash Flow YR 1 Income | | | Period Ending: 12/30/2024 |
| Number of Rooms: | | | | 183 |
| Annual Rooms Available: | | | | 66,978 |
| Occupied Rooms: | | | | 51,573 |
| Occupancy: | | | | 77.0% |
| Average Rate: | | | | $403.53 |
| RevPAR: | | | | $310.72 |
| | **Total** | **Ratio to Sales** | **PAR** | **POR** |
| REVENUE | | | | |
| Rooms | $20,811,180 | 51.5% | $113,722 | $403.53 |
| Food & Beverage | $18,874,979 | 46.7% | 103,142 | 365.99 |
| Other Operated Departments | $728,001 | 1.8% | 3,978 | 14.12 |
| Total Operating Revenue | $40,414,160 | 100.0% | $220,842 | $783.63 |
| DEPARTMENTAL EXPENSES | | | | |
| Rooms Expense | $5,766,956 | 27.7% | $31,513 | $111.82 |
| Food & Beverage Expense | $17,931,230 | 95.0% | 97,985 | 347.69 |
| Other Operated Departments Expense | $254,800 | 35.0% | 1,392 | 4.94 |
| Total Departmental Expenses | $23,952,986 | 59.3% | $130,891 | $464.45 |
| DEPARTMENTAL PROFIT | $16,461,174 | 40.7% | $89,952 | $319.18 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | |
| Administrative and General | $3,352,110 | 8.3% | $18,318 | $65.00 |
| Marketing | $1,640,651 | 4.1% | 8,965 | 31.81 |
| Property Operations and Maintenance | $1,025,407 | 2.5% | 5,603 | 19.88 |
| Utilities | $523,767 | 1.3% | 2,862 | 10.16 |
| Total Undistributed Expenses | $6,541,935 | 16.2% | $35,748 | $126.85 |
| GROSS OPERATING PROFIT | $9,919,239 | 24.5% | $54,203 | $192.33 |
| Management Fee | $1,212,425 | 3.0% | $6,625 | $23.51 |
| INCOME BEFORE NON-OPERATING INCOME AND EXPENSES | $8,706,814 | 21.5% | $47,578 | $168.82 |
| NON-OPERATING INCOME AND EXPENSES | | | | |
| Property Taxes | $2,009,776 | 5.0% | $10,982 | $38.97 |
| Insurance | $423,439 | 1.0% | 2,314 | 8.21 |
| Reserve for Replacement | $1,212,425 | 3.0% | 6,625 | 23.51 |
| Total Non-Operating Income and Expenses | $3,645,640 | 9.0% | $19,922 | $70.69 |
| NET INCOME (EBITDA) | **$5,061,174** | **12.5%** | **$27,657** | **$98.14** |
| **Net Income (EBITDA)** | | | | $5,061,174 |
| **OAR** | | | / | **5.00%** |
| **Indicated Stabilized Value** | | | | **$101,223,489** |
| **Rounded** | | | | **$101,200,000** |
| Plus ICAP | | | | $13,400,000 |
| **Stabilized Value** | | | | **$114,600,000** |
| Stabilization Discount | | | | (7,200,000) |
| **Indicated As Is Value** | | | | **$107,400,000** |
| **Rounded** | | | | **$107,400,000** |
| **Value Per Room** | | | | **$586,885** |

\* Departmental expense ratios are based on departmental revenues; Franchise/Royalty ratio is based on room revenues; all others are based on total revenues.

Compiled by CBRE



## CONCLUSION OF INCOME CAPITALIZATION APPROACH

The conclusions via the valuation methods employed for this approach are as follows:

| INCOME CAPITALIZATION APPROACH VALUES | | |
|---|---|---|
| | As Is on December 31, 2021 | Prospective As Stabilized on December 31, 2023 |
| Direct Capitalization Method | $107,400,000 | $114,600,000 |
| Discounted Cash Flow Analysis | $100,500,000 | $107,000,000 |
| Reconciled Value | $100,500,000 | $107,000,000 |
| Compiled by CBRE | | |

Primary emphasis has been placed on the discounted cash flow analysis  This method is considered to best reflect the actions of buyers and sellers currently active in this market.

## ADJUSTMENT FOR STABILIZATION

The subject is not stabilized.  A deduction for losses occurring during stabilization is necessary. This is calculated based on the differential in indicated value between the DCF's as is and as stabilized.  The following depicts this calculation.  The indicated stabilization discount is then utilized with the direct capitalization method, the cost approach, and the sales comparison approach to provide an indication of the as complete value estimate.

| STABILIZATION SUMMARY | |
|---|---|
| Estabilized Stabilization Period | 24 Months |
| DCF - As Stabilized value | $107,000,000 |
| DCF - As Is value (prior to deduction for any capital expenditures) | $100,500,000 |
| Differential | $6,500,000 |
| Plus: Profit @      10% | $650,000 |
| Total | $7,150,000 |
| Stabilization Discount | **$7,200,000** |
| Compiled by CBRE | |





# Income Capitalization Approach – Retail Office Component

## DIRECT CAPITALIZATION

Direct capitalization is the method used to convert a single year's estimate of income into a value indication.  In direct capitalization, a precise allocation between return on and return of capital is not made because investor assumptions or forecasts concerning the holding period, pattern of income, or changes in value of the original investment are not simulated in the method.  Direct capitalization is most appropriate when analyzing a stable income stream and in estimating the reversion at the end of a holding period.  Using this method, the following sets forth the process:

1. Estimate the Potential Gross Income (PGI) from all sources that a competent owner should be able to generate from a property based on existing and/or market rents.
2. Deduct an estimate of Vacancy and Collection Loss (VCL) to arrive at an Effective Gross Income (EGI) estimate.
3. Deduct operating expenses from the estimate of EGI.  The result is an estimate of the stabilized Net Operating Income (NOI).
4. Estimate an Overall capitalization rate ($R_o$, or OAR).
5. Divide the NOI by $R_o$, resulting in a value estimate at stabilized occupancy.
6. Adjust the stabilized value to account for "as is" condition, if applicable.

## DISCOUNTED CASH FLOW ANALYSIS

The discounted cash flow (DCF) analysis is a detailed analysis used when the future income is expected to be variant, usually as a result of numerous lease obligations and/or anticipated changes in income and expenses. It is also particularly relevant when institutional buyers are the most likely purchasers of the subject because institutional buyers often place great weight on this analysis. The DCF analysis specifies the quantity, variability, timing, and duration of NOIs and cash flows. Selecting the proper yield rate (discount rate) is essential.  CBRE must consider the target yield sought by investors as well as yields derived from comparable sales and/or market information.

The methodology is:

1. Estimate the before-tax cash flows for each period of a projected holding period net of any capital expenditures such as leasing expenses and tenant improvements.
2. Estimate a discount rate and a terminal overall capitalization rate.
3. Estimate a selling price, known as the reversion, for the end of the projected holding period.
4. The cash flows and the reversion are then discounted to a present value estimate.

## APPROPRIATE CAPITALIZATION METHOD

A number of factors were considered in evaluating the appropriateness of using the direct capitalization method and the DCF technique. In our analysis, we utilized both the discounted cash flow and the direct capitalization method.



*Income Capitalization Approach*

## ESTIMATE OF MARKET RENT

Rent analysis involves both a study of market (comparable) rentals and the subject's existing rents. Market rent is the rent that a property would most probably command in the open market; indicated by the current rents paid and asked for comparable space. The following table shows a summary of the space allocation for the subject.

| MARKET RENT CATEGORIES | |
|---|---|
| Space Allocation | Size |
| Office (< 5,000 SF) | 15,739 SF |
| Office (> 5,000 SF) | 26,995 SF |
| Retail - Cellar | 798 SF |
| Retail - Grade | 7,068 SF |
| Retail Blended (19,122 SF) | 19,122 SF |
| Retail Blended (3,320 SF) | 3,320 SF |
| Retail Blended (7,114 SF) | 7,114 SF |
| Compiled by CBRE | |



*Income Capitalization Approach*

## SUMMARY OF COMPARABLE RETAIL RENTALS

The following map and table summarize the primary comparable data used in the valuation of the subject. A detailed description of each transaction is included in the addenda.

| Comp No. | Location | Tenant | Start Date | Term (Yrs) | Floor | Lease Area (SF) | Annual PPSF | Expense Basis |
|---|---|---|---|---|---|---|---|---|
| | | | | | **SUMMARY OF COMPARABLE RETAIL RENTALS** | | | |
| 1 | 63 N 6th Street Brooklyn, NY | Listing | n/a | n/a | Grade | 3,300 | $250.00 | Mod. Gross |
| 2 | 89 N 6th Street Brooklyn, NY | Madewell | 2021 | n/a | Grade Basement | 2,400 2,400 (Storage) | $291.67 | Mod. Gross |
| 3 | 225 Bedford Avenue Brooklyn, NY | Diptyque* | Aug-20 | 10 | Grade | 800 | $214.50 | Mod. Gross |
| 4 | 135 Metropolitan Avenue Brooklyn, NY | Restaurant | Jul-20 | n/a | Grade | 1,800 | $75.00 | Mod. Gross |
| 5 | 126 North 6th Street Brooklyn, NY | Confidential | Oct-19 | n/a | Grade | 1,510 | $271.52 | Mod. Gross |
| 6 | 92 N 3rd Street Brooklyn, NY | Solidcore | Feb-19 | n/a | Grade | 1,880 | $105.00 | Mod. Gross |
| 7 | 102-104 N 6th Street Brooklyn, NY | American Apparel | Oct-16 | 10 | Grade | 3,114 | $275.00 | Mod. Gross |

*The rent will increase by 15% in year 2, 13% in year 3, and 3% thereafter.
Compiled by CBRE

The rentals utilized represent the best data available for comparison with the subject. They were selected from our research within Williamsburg, Brooklyn.

## DISCUSSION/ANALYSIS OF RENT COMPARABLES

The comparables indicate rents at grade level ranging from $75.00 to $291.67 per square foot, with an average of $211.81 per square foot. They took place from October 2016 to 2021, with 1 active listing. The current outbreak of the Novel Coronavirus is causing heightened uncertainty in both local and global market conditions, upon which brokers in the market have indicated market rent repricing due to the pandemic which range from 10-20%, while the outer-borough have been generally less impacted, thus, an adjustment toward the lower end of the range were applied to Rents 5 to 7 which occurred prior to the onset of the pandemic. Rents 1-4 occurred after the onset of COVID-19 and no adjustment was warranted. Rent 1 is an active listing, requiring a downward adjustment to account for typical negotiation process.

Rents 4 and 6 are located along an inferior commercial corridor, requiring upward adjustments. Rent 3 is located along a superior commercial corridor, requiring a downward adjustment. The remaining rents are located along commercial corridor similar to the subject and no adjustment was required. Rent 3 is notably smaller than the subject, requiring downward size adjustment due to principals of economies of scale. Rent 2 has basement space which is considered an amenity to the overall grade level space (not part of GLA), requiring downward adjustments as



*Income Capitalization Approach*

the subject has no below grade space. We placed greater weight on Rents 1, 2, 5, and 7 given their similar retail space and proximity.

Thus, considering the subject's location and condition, we have projected a market rent for the ground floor retail space at $100.00 per square foot, on a modified gross basis whereby the tenant will reimburse for their pro rata share of the real estate taxes over the base year. We project the retail spaces will receive 6 months free rent for new leases (3 months for renewals), and the tenant will receive a tenant improvement allowance of $50.00 per square foot ($25.00 per square foot for renewals).

## SUMMARY OF COMPARABLE OFFICE RENTALS

The following map and table summarize the primary comparable data used in the valuation of the subject. A detailed description of each transaction is included in the addenda.

| Comp No. | Location | Tenant | Start Date | Term (Yrs) | Lease Area (SF) | Annual PPSF | Expense Basis |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| 1 | 33-35 Grand Street Brooklyn, NY | Confidential | Oct-21 | 10 | 3,000 | $85.00 | Mod. Gross |
| 2 | 10 Grand Street Brooklyn, NY | Social Chain | Mar-21 | 3 | 6,000 | $61.00 | Mod. Gross |
| 3 | 25 Kent Avenue Brooklyn, NY | Amazon Music | Sep-20 | 10 | 40,000 | $81.00 | Mod. Gross |
| 4 | 186 N 6th Street Brooklyn, NY | Quarters | Aug-19 | 10 | 37,690 | $65.90 | Mod. Gross |
| 5 | 75 N 7th Street Brooklyn, NY | The Wing | Mar-19 | 10.3 | 9,336 | $68.00 | Mod. Gross |

SUMMARY OF COMPARABLE RETAIL RENTALS

Compiled by CBRE

The rentals utilized represent the best data available for comparison with the subject. They were selected from our research within the immediate neighborhood.

## DISCUSSION/ANALYSIS OF RENT COMPARABLES

We obtained 5 recent lease comparables within the subject neighborhood. The market comparables show that a difference in the rental rates can be attributed to the quality and condition of the buildings, its reputation, location as well as the floor they are located within a building. The comparable leases were signed for 3.0- to 10.3-year lease terms. All the leases were signed on a modified gross basis for real estate taxes, whereby the tenants assume their proportionate share of increases over a base year amount.

The starting base rental rates from the lease comparables indicate a range from $61.00 to $85.00 per square foot, with an average of $72.18 per square foot. Brokers noted that in the current market leasing activity has halted due to the COVID-19 pandemic. Landlords are offering



*Income Capitalization Approach*

additional concessions to induce renewal tenants to complete ongoing negotiations, and to-date most landlords have not repriced space, although some have indicated rent drops in the range of 5% to 10%.  Rents 4 and 5 occurred prior to the COVID-19 pandemic, requiring downward market condition adjustments. Rents 1, 2, and 3 occurred after the onset of the COVID-19 pandemic and no adjustment was warranted.  Rents 3 and 4 are notably larger space, requiring upward adjustments. No further adjustment was required. Rent 4 is located next to subway line with superior access, requiring a downward adjustment. The remaining rents are located within proximity to the subject and no locational adjustment was required.

Based on the discussed comparable rents and considering that the subject was recently renovated, well located, and is considered a boutique office space, we conclude to an office rent of $65.00 per square foot for the subject office spaces.  We project the office spaces will receive 4 months free rent for new leases (2 months for renewals), and the tenant will receive a tenant improvement allowance of $75.00 per square foot ($37.50 per square foot for renewals). The market rents are structured on a modified gross basis, with the tenant reimbursing their pro rata share of real estate taxes over the base year.  We have concluded to a 10-year lease with 3% annual rent escalations.

## MARKET RENT ESTIMATE

### Base Rental Rate

The estimate of base rental rates is shown in the following chart.

| BASE RENTAL RATES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Category ($/SF/Yr.) | Office (< 5,000 SF) | Office (> 5,000 SF) | Retail - Cellar | Retail - Grade | Retail Blended (19,122 SF) | Retail Blended (3,320 SF) | Retail Blended (7,114 SF) |
| Subject's Quoted Terms | | | | | | | |
| Weighted Average In-place Rent | $59.03 | $54.64 | $69.19 | $128.13 | $0.00 | $66.47 | $0.00 |
| Rent Comparable Data | | | | | | | |
| **CBRE Estimate** | **$60.00** | **$50.00** | **$25.00** | **$100.00** | **$64.70** | **$46.08** | **$31.61** |
| Compiled by CBRE | | | | | | | |

### Concessions

The estimate of concessions is shown in the following chart.

| CONCESSIONS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Category | Office (< 5,000 SF) | Office (> 5,000 SF) | Retail - Cellar | Retail - Grade | Retail Blended (19,122 SF) | Retail Blended (3,320 SF) | Retail Blended (7,114 SF) |
| Subject's Quoted Terms | None | None | None | None | None | None | None |
| Rent Comparable Data | None | None | None | None | None | None | None |
| **CBRE Estimate** | | | | | | | |
| **New Tenants** | **4 Months** | **6 Months** | **4 Months** | **4 Months** | **6 Months** | **4 Months** | **6 Months** |
| **Renewals** | **2 Months** | **3 Months** | **2 Months** | **2 Months** | **3 Months** | **2 Months** | **3 Months** |
| Compiled by CBRE | | | | | | | |

### Reimbursements

The estimate of reimbursements is shown in the following chart.



*Income Capitalization Approach*

| Category | REIMBURSEMENTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | Office (< 5,000 SF) | Office (> 5,000 SF) | Retail - Cellar | Retail - Grade | Retail Blended (19,122 SF) | Retail Blended (3,320 SF) | Retail Blended (7,114 SF) |
| Subject's Quoted Terms | MG | MG | MG | MG | MG | MG | MG |
| Rent Comparable Data | MG | MG | MG | MG | MG | MG | MG |
| **CBRE Estimate** | **Modified Gross** | **Modified Gross** | **Modified Gross** | **Modified Gross** | **Modified Gross** | **Modified Gross** | **Modified Gross** |

Compiled by CBRE

### Escalations

At the present time, annual escalations in the range of 2.0% to 4.0% are common in the local market. As such, we have concluded market rental escalations of 3.0% annually over the term of the lease for the retail spaces, and the office space will have flat rent with 3% annual increase in-lieu of OPEX increases.

### Tenant Improvements

The estimate of tenant improvements is shown in the following chart.

| Category | TENANT IMPROVEMENTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | Office (< 5,000 SF) | Office (> 5,000 SF) | Retail - Cellar | Retail - Grade | Retail Blended (19,122 SF) | Retail Blended (3,320 SF) | Retail Blended (7,114 SF) |
| **CBRE Estimate** | | | | | | | |
| **New Tenants** | **$50.00** | **$50.00** | **$40.00** | **$40.00** | **$40.00** | **$40.00** | **$40.00** |
| **Renewals** | **$25.00** | **$25.00** | **$20.00** | **$20.00** | **$20.00** | **$20.00** | **$20.00** |

Compiled by CBRE

### Lease Term

The estimate of lease terms is shown in the following chart.

| Category | LEASE TERM | | | | | | |
|---|---|---|---|---|---|---|---|
| | Office (< 5,000 SF) | Office (> 5,000 SF) | Retail - Cellar | Retail - Grade | Retail Blended (19,122 SF) | Retail Blended (3,320 SF) | Retail Blended (7,114 SF) |
| **CBRE Estimate** | **120 Months** | **120 Months** | **120 Months** | **120 Months** | **120 Months** | **120 Months** | **120 Months** |

Compiled by CBRE

## MARKET RENT CONCLUSIONS

The following chart shows the market rent conclusions for the subject:

| Category | MARKET RENT CONCLUSIONS | | | | | | |
|---|---|---|---|---|---|---|---|
| | Office (< 5,000 SF) | Office (> 5,000 SF) | Retail - Cellar | Retail - Grade | Retail Blended (19,122 SF) | Retail Blended (3,320 SF) | Retail Blended (7,114 SF) |
| Gross Leasable Area (SF) | 15,739 | 26,995 | 798 | 7,068 | 19,122 | 3,320 | 7,114 |
| Percent of Total SF | 19.6% | 33.7% | 1.0% | 8.8% | 23.9% | 4.1% | 8.9% |
| Market Rent ($/SF/Yr.) | $60.00 | $50.00 | $25.00 | $100.00 | $64.70 | $46.08 | $31.61 |
| Weighted Average In-place Rent | $59.03 | $54.64 | $69.19 | $128.13 | $0.00 | $66.47 | $0.00 |
| Concessions (New Tenants) | 4 Months | 6 Months | 4 Months | 4 Months | 6 Months | 4 Months | 6 Months |
| Concessions (Renewals) | 2 Months | 3 Months | 2 Months | 2 Months | 3 Months | 2 Months | 3 Months |
| Reimbursements | Modified Gross | Modified Gross | Modified Gross | Modified Gross | Modified Gross | Modified Gross | Modified Gross |
| Escalations | 3.00% /Yr | 3.00% /Yr | 3.00% /Yr | 3.00% /Yr | 3.00% /Yr | 3.00% /Yr | 3.00% /Yr |
| Tenant Improvements (New Tenants) | $50.00 | $50.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 |
| Tenant Improvements (Renewals) | $25.00 | $25.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 |
| Average Lease Term | 120 Months | 120 Months | 120 Months | 120 Months | 120 Months | 120 Months | 120 Months |
| Leasing Commissions (New Tenants) | 4.81% | 4.81% | 4.81% | 4.81% | 4.81% | 4.81% | 4.81% |
| Leasing Commissions (Renewals) | 2.41% | 2.41% | 2.41% | 2.41% | 2.41% | 2.41% | 2.41% |

Compiled by CBRE



## LEASE-UP ABSORPTION

The property is currently fully vacant. We reiterate that brokers noted that in the current market condition leasing activity has slowed due to the COVID-19 pandemic. We have projected full lease-up by January 2024, with free rent burned off 6 months.

### Lease Expiration Schedule

The subject's scheduled lease expiration for the holding period is shown as follows:

| | | ----- Contract Only ----- | | ----- Cumulative ----- | |
|---|---|---|---|---|---|
| **Year** | **Ending** | **Sq. Ft.*** | **% of Total** | **Sq. Ft.*** | **% of Total** |
| Year 1 | Dec-22 | 0 | 0.00% | 0 | 0.00% |
| Year 2 | Dec-23 | 0 | 0.00% | 0 | 0.00% |
| Year 3 | Dec-24 | 7,425 | 9.26% | 7,425 | 9.26% |
| Year 4 | Dec-25 | 0 | 0.00% | 7,425 | 9.26% |
| Year 5 | Dec-26 | 0 | 0.00% | 7,425 | 9.26% |
| Year 6 | Dec-27 | 3,320 | 4.14% | 10,745 | 13.41% |
| Year 7 | Dec-28 | 4,454 | 5.56% | 15,199 | 18.96% |
| Year 8 | Dec-29 | 0 | 0.00% | 15,199 | 18.96% |
| Year 9 | Dec-30 | 798 | 1.00% | 15,997 | 19.96% |
| Year 10 | Dec-31 | 0 | 0.00% | 15,997 | 19.96% |
| Year 11 | Dec-32 | 1,258 | 1.57% | 17,255 | 21.53% |

**LEASE EXPIRATION SCHEDULE**

* Results only reflect spaces that are currently occupied

Compiled by CBRE

## POTENTIAL RENTAL INCOME CONCLUSION

Within this analysis, potential rental income is estimated based upon the contracts in place and market rent in vacant units.

| POTENTIAL RENTAL INCOME | | |
|---|---|---|
| **Year** | **Total** | **$/SF/Yr** |
| **CBRE ESTIMATE YEAR 1** | **$4,934,141** | **$61.56** |
| **CBRE ESTIMATE YEAR 2** | **$5,016,529** | **$62.58** |
| **CBRE ESTIMATE YEAR 3 (Stabilized Year)** | **$5,190,375** | **$64.75** |

Compiled by CBRE

## OPERATING HISTORY

We were not provided with an operating history, however were only provided with historical data supplied from a prior appraisal, written by The Bowery Appraisals, which had limited detail of income and expenses. Further the detail of expenses was combined with the physically attached



**Income Capitalization Approach**

hotel operation and was unable to be deciphered from what was provided.  We therefore have relied upon market comparable data in determining market oriented expenses for the subject property.

## VACANCY

The subject's estimated stabilized occupancy rate was previously discussed in the market analysis. The subject's vacancy is detailed as follows:

| VACANCY | |
| --- | --- |
| Year | % of PGI |
| **CBRE ESTIMATE YEAR 1** | **10.0%** |
| Compiled by CBRE | |

## CREDIT LOSS

The credit loss estimate is an allowance for nonpayment of rent or other income.  The subject's credit loss is detailed as follows:

| CREDIT LOSS | |
| --- | --- |
| Year | % of PGI |
| **CBRE ESTIMATE YEAR 1** | **1.0%** |
| Compiled by CBRE | |

## EXPENSE REIMBURSEMENTS

The subject's leases are assumed to be based on a base year structure whereby the tenant reimburses the owner for a pro rata share of increases in real estate taxes over a base-year stop and pays utilities directly. Real Estate taxes were considered for recovery.  Utilities are paid directly to the Utility company.

| EXPENSE REIMBURSEMENTS | | |
| --- | --- | --- |
| Year | Total | $/SF/Yr |
| **CBRE ESTIMATE YEAR 1** | **$109,557** | **$1.37** |
| **CBRE ESTIMATE YEAR 2** | **$113,927** | **$1.42** |
| **CBRE ESTIMATE YEAR 3 (Stabilized Year)** | **$125,244** | **$1.56** |
| Compiled by CBRE | | |

## EFFECTIVE GROSS INCOME

The subject's effective gross income is detailed as follows:



**Income Capitalization Approach**

| EFFECTIVE GROSS INCOME | | |
| --- | --- | --- |
| Year | Total | $/SF/Yr |
| Expense Comparable 1 | --- | $70.08 |
| Expense Comparable 2 | --- | $24.49 |
| Expense Comparable 3 | --- | $49.50 |
| Expense Comparable 4 | --- | $135.72 |
| **CBRE ESTIMATE YEAR 1** | **$2,478,486** | **$59.22** |
| **CBRE ESTIMATE YEAR 2** | **$3,685,988** | **$45.99** |
| **CBRE ESTIMATE YEAR 3 (Stabilized Year)** | **$4,676,065** | **$58.34** |
| Compiled by CBRE | | |

## OPERATING EXPENSE ANALYSIS

### Expense Comparables

The following chart summarizes expenses obtained from recognized industry publications and/or comparable properties.

| EXPENSE COMPARABLES | | | | |
| --- | --- | --- | --- | --- |
| Comparable Number | 1 | 2 | 3 | 4 |
| Location | Brooklyn | Brooklyn | Brooklyn | Brooklyn |
| GLA (SF) | 19,096 | 21,000 | 27,291 | 11,350 |
| Year Built | 2017 | 2016 | 2019 | 2022 |
| *Revenues* | $/SF | $/SF | $/SF | $/SF |
| **Effective Gross Income** | **$70.08** | **$24.49** | **$49.50** | **$135.72** |
| | | | | |
| *Expenses* | | | | |
| Real Estate Taxes | $19.79 | $5.43 | $7.31 | $33.52 |
| Property Insurance | $0.43 | $0.50 | $1.10 | $0.75 |
| Common Area Maintenance | $1.25 | $1.00 | $0.73 | $1.00 |
| Management Fee | $1.78 | $0.73 | $0.00 | $2.04 |
| **Total Operating Expenses** | **$23.25** | **$7.76** | **$9.14** | **$37.31** |
| Operating Expenses Excluding Taxes | $3.46 | $2.33 | $1.83 | $3.79 |
| Operating Expense Ratio | 33.2% | 31.7% | 18.5% | 27.5% |
| Management Fee % of EGI) | 2.5% | 3.0% | 0.0% | 1.5% |
| ² The median total differs from the sum of the individual amounts. | | | | |

Compiled by CBRE

A discussion of each expense category is presented on the following pages.

### Real Estate Taxes

The comparable data and projections for the subject are summarized as follows:



*Income Capitalization Approach*

| REAL ESTATE TAXES | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| Expense Comparable 1 | --- | $19.79 |
| Expense Comparable 2 | --- | $5.43 |
| Expense Comparable 3 | --- | $7.31 |
| Expense Comparable 4 | --- | $33.52 |
| **CBRE ESTIMATE YEAR 1** | **$565,750** | **$7.06** |
| Compiled by CBRE | | |

The taxes were discussed in detail in the tax section of this report. We have utilized unabated taxes in our analysis. As was previously noted, the property is subject to a ICAP tax incentive. The present value of ICAP benefit will be added as a below item to the income approach and sales comparison approach.

## Property Insurance

Property insurance expenses typically include fire and extended coverage and owner's liability coverage. The comparable data and projections for the subject are summarized as follows:

| PROPERTY INSURANCE | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| Expense Comparable 1 | --- | $0.43 |
| Expense Comparable 2 | --- | $0.50 |
| Expense Comparable 3 | --- | $1.10 |
| Expense Comparable 4 | --- | $0.75 |
| **CBRE ESTIMATE YEAR 1** | **$100,195** | **$1.25** |
| Compiled by CBRE | | |

Our estimate is consistent with other properties operating in the area.

## Common Area Maintenance

Repairs and maintenance expenses typically include all payroll and payroll related items for all directly employed maintenance personnel. This expense category also typically includes all outside maintenance service contracts and the cost of maintenance and repairs supplies. The comparable data and projections for the subject are summarized as follows:

| COMMON AREA MAINTENANCE | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| Expense Comparable 1 | --- | $1.25 |
| Expense Comparable 2 | --- | $1.00 |
| Expense Comparable 3 | --- | $0.73 |
| Expense Comparable 4 | --- | $1.00 |
| **CBRE ESTIMATE YEAR 1** | **$240,468** | **$3.00** |
| Compiled by CBRE | | |



Our estimate is consistent with other properties operating in the area.

### Management Fee

Management expenses are typically negotiated as a percentage of collected revenues (i.e., effective gross income). The comparable data and projections for the subject are summarized as follows:

| MANAGEMENT FEE | | |
|---|---|---|
| Year | Total | % of EGI |
| Expense Comparable 1 | --- | 2.5% |
| Expense Comparable 2 | --- | 3.0% |
| Expense Comparable 3 | --- | 0.0% |
| Expense Comparable 4 | --- | 1.5% |
| **CBRE ESTIMATE YEAR 1** | **$24,785** | **1.0%** |
| Compiled by CBRE | | |

Professional management fees in the local market range from 1.0% to 4.0%.  Given the subject's size and the competitiveness of the local market area, we believe an appropriate management expense for the subject would be towards the lower end of the range.

## OPERATING EXPENSE LESS REAL ESTATE TAXES CONCLUSION

The comparable data and projections for the subject are summarized as follows:

| TOTAL OPERATING EXPENSES | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| Expense Comparable 1 | --- | $23.25 |
| Expense Comparable 2 | --- | $7.76 |
| Expense Comparable 3 | --- | $9.14 |
| Expense Comparable 4 | --- | $37.31 |
| **CBRE ESTIMATE YEAR 1** | **$951,237** | **$11.87** |
| **CBRE ESTIMATE YEAR 2** | **$989,561** | **$12.35** |
| **CBRE ESTIMATE YEAR 3 (Stabilized Year)** | **$1,026,566** | **$12.81** |
| Compiled by CBRE | | |

The subject's per square foot operating expense pro forma is in range of the comparable market expense data.

## NET OPERATING INCOME CONCLUSION

The projection for the subject are summarized as follows:



| NET OPERATING INCOME | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| Expense Comparable 1 | --- | $46.83 |
| Expense Comparable 2 | --- | $16.73 |
| Expense Comparable 3 | --- | $40.36 |
| Expense Comparable 4 | --- | $98.41 |
| **CBRE YEAR 1 ESTIMATE** | **$1,527,249** | **$19.05** |
| **CBRE YEAR 2 ESTIMATE** | **$2,696,427** | **$33.64** |
| **CBRE YEAR 3 ESTIMATE (Stabilized Year)** | **$3,649,499** | **$45.53** |
| Compiled by CBRE | | |

## DIRECT CAPITALIZATION

Direct capitalization is a method used to convert a single year's estimated stabilized net operating income into a value indication.   The following subsections represent different techniques for deriving an overall capitalization rate.

### Comparable Sales

The overall capitalization rates (OARs) confirmed for the comparable sales analyzed in the sales comparison approach are as follows:

| COMPARABLE CAPITALIZATION RATES | | | | |
|---|---|---|---|---|
| Sale | Property Address | Sale Date | Sale Price $/SF | OAR |
| 1 | 200-202 Bedford Avenue | Sep-21 | $2,795 | 2.58% |
| 3 | 99 N. 6th Street | Aug-17 | $2,466 | 3.70% |
| 4 | 85 N. 3rd Street | Aug-16 | $1,448 | 5.05% |
| **Indicated OAR:** | | | | **2.58%-5.05%** |
| Compiled by: CBRE | | | | |

The overall capitalization rates for these sales were derived based upon the actual or pro-forma income characteristics of the property.  Sales 3 and 4 occurred during a superior market, which brokers have indicated increased cap rates in the current market. Sales 1 and 2 have upside potential resulting in low capitalization rates.  Sale 4 was sold with high vacancy, thus resulted with the higher cap rate.  The subject has good location and additional air rights. However, considering that the subject is leased at market level rent with limited upside potential, an OAR at the middle to upper end of comparable range indicated in the preceding table is considered appropriate.

### Published Investor Surveys

The results of the most recent investor surveys are summarized in the following chart.



*Income Capitalization Approach*

## OVERALL CAPITALIZATION RATES

| Investment Type | OAR Range | | Average |
|---|---|---|---|
| *CBRE Urban Office* | | | |
| Class A | 4.58% - | 7.59% | 5.99% |
| Class B | 5.75% - | 8.48% | 6.89% |
| Class C | 7.33% - | 10.09% | 8.66% |
| *RealtyRates.com* | | | |
| Retail | 4.72% - | 14.08% | 9.44% |
| Anchored | 4.72% - | 12.61% | 9.55% |
| Un-Anchored | 5.59% - | 14.08% | 10.41% |
| Free Standing | 5.16% - | 13.34% | 9.98% |
| *PwC CBD Office* | 4.25% - | 8.25% | 5.80% |
| *PwC Strip Retail* | 5.00% - | 10.00% | 7.17% |
| **Indicated OAR:** | | | **5.0%-6.0%** |

Compiled by CBRE

The subject is a commercial building located in the Williamsburg neighborhood of Brooklyn, NY. The subject has good location albeit has been challenged with vacancy most recently. The retail space offers stable cash flow, yet the office space which is characterized as community space has demand challenge. Based on the above we consider the subject to have a rate nearer the lower end of the range.

### Market Participants

We surveyed market participants regarding appropriate capitalization rate assumptions for the subject property. Participants indicated that a reasonable cap-rate range for a property similar to the subject, on a stabilized basis, would be in the 5.00% to 6.0% range, with rates above and below this range based on below or above market incomes. The subject has a good location and albeit, not the best location in Brooklyn. The office space is challenged with low demand for community service use and thus has experienced some vacancy. In addition, it must be factored in that there has been moderately soft conditions due to Covid. Considering the above an OAR toward the lower end of the range is considered appropriate.

### Capitalization Rate Conclusion

The following chart summarizes the OAR conclusions.



### OVERALL CAPITALIZATION RATE - CONCLUSION

| Source | Indicated OAR |
|---|---|
| Comparable Sales | 2.58%-5.05% |
| Published Surveys | 4.75% |
| Market Participants | 5.0%-6.0% |
| Band of Investment | 7.80% |
| **CBRE Estimate** | **5.25%** |

Compiled by CBRE

### Strengths/ Opportunities

The subject is located in Williamsburg, one of the most desirable neighborhoods in Brooklyn. The subject was recently gut renovated and is in overall good condition.

### Weaknesses/ Threats

Uncertainty and risk associated with COVID-19, with retail having been especially negatively impacted compared to other asset classes.
Geopolitical threats and their impact on the flow of capital.
Lease up risk.

### Lease-Up Cost/Tax Adjustment/CapEx Deduction

We have deducted the cost associated with the lease up of the vacant units and tenant rollovers, which occur in the first 2 years of the as is DCF. This analysis utilizes assumptions developed from the discounted cash flow will be deducted as a line item from each approach in order to render an "as is" value estimate. We have added a profit margin to account for the anticipation o fa profit a developer would require over the lease up period. The following chart illustrates our estimated costs associated with lease up to stabilized level.

| LEASE UP COSTS | | | |
|---|---|---|---|
| | | Year 1 | Year 2 |
| Absorption & Turnover | | ($2,465,147) | ($112,437) |
| Base Rent Abatements | | ($75,030) | ($1,002,793) |
| Tenant Improvements | | ($250,100) | ($1,681,836) |
| Leasing Commissions | | ($160,678) | ($1,167,354) |
| Subtotal | | ($2,950,955) | ($3,964,420) |
| Profit | 10% | ($295,096) | ($396,442) |
| ToOTAL | | ($3,246,051) | ($4,360,862) |
| Total Lease Up Costs | | ($7,606,913) | |
| Rounded | | ($7,600,000) | |

Compiled by CBRE

In addition to the lease-up discount, we will add back the tax adjustment of $3,000,000 for the retail ICAP and $3,700,000 for the office ICAP.



**Income Capitalization Approach**

## Direct Capitalization Summary

A summary of the direct capitalization is illustrated in the following chart.

| DIRECT CAPITALIZATION SUMMARY | | | |
|---|---|---|---|
| **Income** | | $/SF/Yr | Total |
| Potential Rental Income | | $64.75 | $5,190,375 |
| Vacancy | 10.00% | (6.48) | (519,038) |
| Credit Loss | 1.00% | (0.65) | (51,904) |
| **Net Rental Income** | | **$57.63** | **$4,619,434** |
| Expense Reimbursements | | 1.59 | 127,447 |
| **Effective Gross Income** | | **$59.22** | **$4,746,881** |
| | | | |
| **Expenses** | | | |
| Real Estate Taxes | | $7.59 | $608,282 |
| Property Insurance | | 1.29 | 103,201 |
| Common Area Maintenance | | 3.09 | 247,682 |
| Management Fee | 1.00% | 0.58 | 46,761 |
| Miscellaneous | | 0.26 | 20,640 |
| **Total Operating Expenses** | | **$12.81** | **$1,026,566** |
| Operating Expenses Excluding Taxes | | $5.22 | $418,284 |
| **Operating Expense Ratio** | | | 21.63% |
| **Net Operating Income** | | **$46.41** | **$3,720,315** |
| **OAR** | | ÷ | **5.25%** |
| **Indicated Stabilized Value** | December 31, 2021 | | **$70,863,138** |
| **Rounded** | | | **$70,900,000** |
| Present Value of Tax Abatement (retail ) | | | 3,000,000 |
| Present Value of Tax Abatement (office ) | | | 3,700,000 |
| **As Stabilized Market Value** | December 31, 2021 | | **$77,563,138** |
| **Rounded** | | | **$77,600,000** |
| Lease-Up Discount | | | (7,600,000) |
| **As Complete Market Value** | December 31, 2023 | | **$69,963,138** |
| **Rounded** | | | **$70,000,000** |
| **Value Per SF** | | | **$873.30** |
| | | | |
| **Matrix Analysis** | | Cap Rate | Value |
| | | 5.00% | $73,500,000 |
| | | 5.25% | $70,000,000 |
| | | 5.50% | $66,700,000 |

Compiled by CBRE



## Discounted Cash Flow Analysis (DCF)

The DCF assumptions for the subject are summarized as follows:

| SUMMARY OF DISCOUNTED CASH FLOW ASSUMPTIONS | | | | | | |
|---|---|---|---|---|---|---|
| **General** | | | | | | |
| Start Date - As Is | Jan-22 | | | | | |
| Start Date - As Stabilized | Jan-24 | | | | | |
| Hold Period - As Is | 12 Years | | | | | |
| Hold Period - As Stabilized | 10 Years | | | | | |
| Basis | Fiscal | | | | | |
| Software | Argus Enterprise | | | | | |

**Growth Rates**

| Growth Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6+ |
|---|---|---|---|---|---|---|
| General Inflation Rate | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Market Inflation Rate (Office) | 0.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Market Inflation Rate (Retail) | 0.00% | 0.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Expense Inflation Rate | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |

**Market Leasing Assumptions**

| Leasing Category | Market Rent | Lease Term (Months) | Recovery Structure | Escalations | Concessions New (Months) | Concessions Renewal (Months) |
|---|---|---|---|---|---|---|
| Office (< 5,000 SF) | $60.00 | 120 | Modified Gross | 3.00% /Yr | 4 | 2 |
| Office (> 5,000 SF) | $50.00 | 120 | Modified Gross | 3.00% /Yr | 6 | 3 |
| Retail - Cellar | $25.00 | 120 | Modified Gross | 3.00% /Yr | 4 | 2 |
| Retail - Grade | $100.00 | 120 | Modified Gross | 3.00% /Yr | 4 | 2 |
| Retail Blended (19,122 SF) | $64.70 | 120 | Modified Gross | 3.00% /Yr | 6 | 3 |
| Retail Blended (3,320 SF) | $46.08 | 120 | Modified Gross | 3.00% /Yr | 4 | 2 |
| Retail Blended (7,114 SF) | $31.61 | 120 | Modified Gross | 3.00% /Yr | 6 | 3 |

| Leasing Category | TI's New (PSF) | TI's Renewal (PSF) | Downtime (Months) | Commission New | Commission Renewal | Renewal Probability |
|---|---|---|---|---|---|---|
| Office (< 5,000 SF) | $50.00 | $25.00 | 6 | 4.81% | 2.41% | 65% |
| Office (> 5,000 SF) | $50.00 | $25.00 | 6 | 4.81% | 2.41% | 65% |
| Retail - Cellar | $40.00 | $20.00 | 6 | 4.81% | 2.41% | 65% |
| Retail - Grade | $40.00 | $20.00 | 6 | 4.81% | 2.41% | 65% |
| Retail Blended (19,122 SF) | $40.00 | $20.00 | 6 | 4.81% | 2.41% | 65% |
| Retail Blended (3,320 SF) | $40.00 | $20.00 | 6 | 4.81% | 2.41% | 65% |
| Retail Blended (7,114 SF) | $40.00 | $20.00 | 6 | 4.81% | 2.41% | 65% |

**Economic Assumptions**

| Stabilized Operating Expenses ($/SF/Yr.) | $12.81 |
|---|---|
| Current Occupancy | 45.82% |
| Stabilized Occupancy | 90.00% |
| Credit Loss | 1.00% |
| Stabilized Occupancy (w/Credit Loss) | 89.00% |

**Financial**

| | Rate |
|---|---|
| Discount Rate - As Is | 6.75% |
| Discount Rate - As Stabilized | 6.25% |
| Terminal Capitalization Rate | 5.50% |
| Cost of Sale | 4.00% |

Compiled by CBRE

Provided on the following pages is a discussion of additional assumptions used in the discounted cash flow analysis.



## General Assumptions

The DCF analysis utilizes an 10-year projection period (capitalizing year 11 NOI upon reversion) on an as is basis and on an as stabilized basis, respectively, in order to capture a stabilized reversion year.

## Growth Rate Assumptions

Published investor surveys are shown below.

| SUMMARY OF GROWTH RATES - 3Q 2021 | | | |
|---|---|---|---|
| Investment Type | Rent | Expenses | Inflation |
| U.S. Bureau of Labor Statistics (CPI-U) | | | |
|    10-Year Snapshot Average as of Nov-21 | | | 2.08% |
| | | | |
| *PwC Strip Shopping Center* | | | |
|    National Data | 1.17% | 2.58% | n/a |
| *PwC CBD Office* | | | |
|    National Data | 1.00% | 2.88% | n/a |
| **CBRE Estimate** | **Retail (0% Year 1 & 2, 3% Per Year Thereafter), Office (0% Year 1, 3% Yr 2 & thereafter)** | **3.00%** | **3.00%** |
| Compiled by: CBRE | | | |

As discussed in the Market Analysis section, given the COVID-19 outbreak, brokers and investors/owners noted that leasing activity abruptly stopped, with tenants postponing decisions and opting for short-term renewals rather than long commitment. As a result, it was noted that rents are expected to remain flat for the foreseeable future, up to 12 months for office and 24 months for retail. Once the ongoing public health crisis is contained, market activity should resume at a stronger pace. In our analysis, we kept office rents flat for Year 1 and retail rents flat for Years 1-2, and then reverted back to inflationary growth.

## Leasing Assumptions

The contract lease terms for the existing tenants are utilized within the DCF analysis, with market leasing assumptions applied for renewals and absorption tenants. All subsequent years vary according to the growth rate assumptions applied to the Year 1 estimate.

### LEASING COMMISSIONS

Shown below is the standard leasing commission schedule in New York City. Typically, in addition to the full commission, there is a 75% override for outside brokers.



| | | | | LEASING COMMISSIONS | |
|---|---|---|---|---|---|
| | Full | 50.00% | 75% | Total Leasing Commissions | |
| Year | Commission | Override | Probability | New Tenant | Renewal |
| 1 | 5.00% | 2.50% | 1.88% | 6.88% | 3.44% |
| 2 | 4.00% | 2.00% | 1.50% | 5.50% | 2.75% |
| 3 | 4.00% | 2.00% | 1.50% | 5.50% | 2.75% |
| 4 | 3.50% | 1.75% | 1.31% | 4.81% | 2.41% |
| 5 | 3.50% | 1.75% | 1.31% | 4.81% | 2.41% |
| 6 to 10 | 3.00% | 1.50% | 1.13% | 4.13% | 2.06% |
| 11 to 15 | 2.50% | 1.25% | 0.94% | 3.44% | 1.72% |
| 5 Year Average | 4.00% | 2.00% | 1.50% | 5.50% | 2.75% |
| 10 Year Average | 3.50% | 1.75% | 1.31% | 4.81% | 2.41% |
| 15 Year Average | 3.17% | 1.58% | 1.19% | 4.35% | 2.18% |
| Compiled by CBRE | | | | | |

Based upon the above table, we have estimated the following for the subject.

| | LEASING COMMISSIONS | |
|---|---|---|
| Category | Retail | Office |
| **CBRE Estimate** | | |
| **New Tenants** | **4.81%** | **4.81%** |
| **Renewals** | **2.41%** | **2.41%** |
| Compiled by CBRE | | |

RENEWAL PROBABILITY

The renewal probability incorporated within the market leasing assumptions has been estimated at 65%. This rate is considered reasonable based on the rent comparable data, a survey of market participants and the subject.

DOWNTIME BETWEEN LEASES

The downtime estimate at lease rollover incorporated within the market leasing assumptions has been estimated at 6 months. This rate is considered reasonable based on the rent comparable data, a survey of market participants and the subject.

## Occupancy Assumptions

CBRE has extracted a stabilized occupancy rate from the marketplace.

## Financial Assumptions

DISCOUNT RATE ANALYSIS

The results of the most recent investor surveys are summarized in the following chart.



| DISCOUNT RATES | | | | |
|---|---|---|---|---|
| Investment Type | Rate Range | | | Average |
| *RealtyRates.com* | | | | |
| Retail | 5.16% | - | 13.47% | 9.53% |
| Anchored | 5.16% | - | 12.23% | 9.57% |
| Un-Anchored | 5.80% | - | 13.47% | 10.20% |
| Free Standing | 5.48% | - | 13.16% | 10.04% |
| Convenience/Gas | 6.04% | - | 13.56% | 8.33% |
| *PwC CBD Office* | | | | |
| National Data | 6.00% | - | 10.50% | 7.33% |
| *Comparable Sales* | | | | |
| CBRE Estimate (As Is) | | - | | **6.75%** |
| **CBRE Estimate (As Stabilized)** | | | | **6.25%** |
| Compiled by CBRE | | | | |

The subject is a commercial building located in the Williamsburg neighborhood of Brooklyn, NY. The subject has good location although has experienced vacancy given lower demand for office space in the area, and given the related Covid concerns we would estimate a discount rate of 6.75% which is reflective for the risk parameters associated with subject's cash flow on an as is basis with lease-up risk present. Upon stabilization, we have assumed the subject a discount rate of 6.50%.

TERMINAL CAPITALIZATION RATE

The reversionary value of the subject is based on an assumed sale at the end of the holding period based on capitalizing the NOI at a terminal capitalization rate.

| TERMINAL CAPITALIZATION RATES | | | | |
|---|---|---|---|---|
| Investment Type | Rate Range | | | Average |
| *PwC CBD Office* | | | | |
| National Data - OAR | 4.25% | - | 8.25% | 5.80% |
| National Data - Residual OAR | 4.75% | - | 8.25% | 6.13% |
| Spread: Basis Points (BP) | 50 | - | 0 | 33 |
| Concluded BP Spread | | | | 50 |
| **CBRE Estimate** | | | | **5.50%** |
| Compiled by CBRE | | | | |

## Discounted Cash Flow Conclusion

The DCF schedule(s) and value conclusions are depicted on the following page(s).



**Income Capitalization Approach**

**111 NORTH 12TH STREET**
**CASH FLOW REPORT BEGINNING JANUARY 1, 2022**

| For the Years Ending | Year 1 Dec-2022 | Year 2 Dec-2023 | Year 3 Dec-2024 | Year 4 Dec-2025 | Year 5 Dec-2026 | Year 6 Dec-2027 | Year 7 Dec-2028 | Year 8 Dec-2029 | Year 9 Dec-2030 | Year 10 Dec-2031 | Year 11 Dec-2032 | Year 12 Dec-2033 | Reversion Dec-2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Rental Revenue** | | | | | | | | | | | | | |
| Potential Base Rent | 4,934,141 | 5,016,529 | 5,190,375 | 5,286,328 | 5,441,096 | 5,523,289 | 5,629,080 | 5,661,476 | 5,825,228 | 5,954,732 | 6,125,989 | 6,231,614 | 6,395,374 |
| Absorption & Turnover Vacancy | -2,465,147 | -112,437 | -52,036 | -38,521 | -1,309 | -27,862 | -83,550 | 0 | -640 | -4,089 | -65,265 | -482,045 | -69,931 |
| Free Rent | -75,030 | -1,002,793 | -70,248 | -52,004 | 0 | -37,614 | -83,550 | -29,243 | 0 | -5,521 | -32,632 | -992,023 | -95,630 |
| Scheduled Base Rent | 2,393,964 | 3,901,299 | 5,068,091 | 5,195,803 | 5,439,787 | 5,457,814 | 5,461,979 | 5,632,234 | 5,824,588 | 5,945,122 | 6,028,092 | 4,757,546 | 6,229,813 |
| Total Rental Revenue | 2,393,964 | 3,901,299 | 5,068,091 | 5,195,803 | 5,439,787 | 5,457,814 | 5,461,979 | 5,632,234 | 5,824,588 | 5,945,122 | 6,028,092 | 4,757,546 | 6,229,813 |
| **Other Tenant Revenue** | | | | | | | | | | | | | |
| Total Expense Recoveries | 109,557 | 113,927 | 127,447 | 134,708 | 170,745 | 201,248 | 232,207 | 250,836 | 274,144 | 298,155 | 318,618 | 214,789 | 217,383 |
| Total Other Tenant Revenue | 109,557 | 113,927 | 127,447 | 134,708 | 170,745 | 201,248 | 232,207 | 250,836 | 274,144 | 298,155 | 318,618 | 214,789 | 217,383 |
| Total Tenant Revenue | 2,503,521 | 4,015,226 | 5,195,538 | 5,330,511 | 5,610,532 | 5,659,061 | 5,694,186 | 5,883,070 | 6,098,732 | 6,243,277 | 6,346,710 | 4,972,336 | 6,447,196 |
| Potential Gross Revenue | 2,503,521 | 4,015,226 | 5,195,538 | 5,330,511 | 5,610,532 | 5,659,061 | 5,694,186 | 5,883,070 | 6,098,732 | 6,243,277 | 6,346,710 | 4,972,336 | 6,447,196 |
| **Vacancy & Credit Loss** | | | | | | | | | | | | | |
| Vacancy Allowance | 0 | -289,086 | -467,518 | -494,530 | -559,744 | -538,044 | -485,868 | -588,307 | -609,233 | -620,238 | -569,406 | -15,189 | -574,788 |
| Credit Loss | -25,035 | -40,152 | -51,955 | -53,305 | -56,105 | -56,591 | -56,942 | -58,831 | -60,987 | -62,433 | -63,467 | -49,723 | -64,472 |
| Total Vacancy & Credit Loss | -25,035 | -329,238 | -519,474 | -547,835 | -615,850 | -594,635 | -542,810 | -647,138 | -670,220 | -682,671 | -632,873 | -64,912 | -639,260 |
| Effective Gross Revenue | 2,478,486 | 3,685,988 | 4,676,065 | 4,782,676 | 4,994,682 | 5,064,426 | 5,151,376 | 5,235,932 | 5,428,512 | 5,560,606 | 5,713,837 | 4,907,423 | 5,807,936 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Real Estate Taxes (Retail) | 253,612 | 265,379 | 272,678 | 280,289 | 298,469 | 315,407 | 331,321 | 343,211 | 353,576 | 364,254 | 375,254 | 386,587 | 398,262 |
| Real Estate Taxes (Office) | 312,138 | 326,620 | 335,604 | 344,971 | 367,346 | 388,193 | 407,779 | 422,413 | 435,170 | 448,312 | 461,851 | 475,799 | 490,168 |
| Property Insurance | 100,195 | 100,195 | 103,201 | 106,297 | 109,486 | 112,770 | 116,153 | 119,638 | 123,227 | 126,924 | 130,732 | 134,654 | 138,693 |
| CAM | 240,468 | 240,468 | 247,682 | 255,113 | 262,766 | 270,649 | 278,768 | 287,131 | 295,745 | 304,618 | 313,756 | 323,169 | 332,864 |
| Miscellaneous | 20,039 | 20,039 | 20,640 | 21,259 | 21,897 | 22,554 | 23,231 | 23,928 | 24,645 | 25,385 | 26,146 | 26,931 | 27,739 |
| Management Fee | 24,785 | 36,860 | 46,761 | 47,827 | 49,947 | 50,644 | 51,514 | 52,359 | 54,285 | 55,606 | 57,138 | 49,074 | 58,079 |
| Total Operating Expenses | 951,237 | 989,561 | 1,026,566 | 1,055,756 | 1,109,911 | 1,160,218 | 1,208,766 | 1,248,680 | 1,286,649 | 1,325,099 | 1,364,878 | 1,396,214 | 1,445,805 |
| Net Operating Income | 1,527,249 | 2,696,427 | 3,649,499 | 3,726,920 | 3,884,771 | 3,904,209 | 3,942,610 | 3,987,252 | 4,141,863 | 4,235,507 | 4,348,959 | 3,511,210 | 4,362,130 |
| **Leasing Costs** | | | | | | | | | | | | | |
| Tenant Improvements | 250,100 | 1,681,836 | 180,889 | 133,910 | 0 | 103,917 | 143,594 | 0 | 0 | 28,113 | 226,877 | 1,525,666 | 243,099 |
| Leasing Commissions | 160,678 | 1,167,354 | 114,040 | 84,423 | 0 | 61,062 | 183,107 | 0 | 0 | 8,962 | 143,033 | 1,047,112 | 153,261 |
| Total Leasing Costs | 410,778 | 2,849,189 | 294,929 | 218,332 | 0 | 164,979 | 326,702 | 0 | 0 | 37,075 | 369,910 | 2,572,778 | 396,360 |
| **Capital Expenditures** | | | | | | | | | | | | | |
| Replacement Reserve | 20,039 | 20,640 | 21,259 | 21,897 | 22,554 | 23,231 | 23,928 | 24,645 | 25,385 | 26,146 | 26,931 | 27,739 | 28,571 |
| Total Capital Expenditures | 20,039 | 20,640 | 21,259 | 21,897 | 22,554 | 23,231 | 23,928 | 24,645 | 25,385 | 26,146 | 26,931 | 27,739 | 28,571 |
| Total Leasing & Capital Costs | 430,817 | 2,869,830 | 316,188 | 240,229 | 22,554 | 188,210 | 350,629 | 24,645 | 25,385 | 63,221 | 396,840 | 2,600,517 | 424,931 |
| Cash Flow Before Debt Service | 1,096,432 | -173,403 | 3,333,310 | 3,486,691 | 3,862,217 | 3,715,999 | 3,591,981 | 3,962,606 | 4,116,478 | 4,172,286 | 3,952,119 | 910,693 | 3,937,200 |
| Cash Flow Available for Distribution | 1,096,432 | -173,403 | 3,333,310 | 3,486,691 | 3,862,217 | 3,715,999 | 3,591,981 | 3,962,606 | 4,116,478 | 4,172,286 | 3,952,119 | 910,693 | 3,937,200 |
| IMPLIED OVERALL RATE | 2.64% | 4.67% | 6.31% | 6.45% | 6.72% | 6.75% | 6.82% | 6.90% | 7.17% | 7.33% | 7.52% | 6.07% | |
| CASH ON CASH RETURN | 1.90% | -0.30% | 5.77% | 6.03% | 6.68% | 6.43% | 6.21% | 6.86% | 7.12% | 7.22% | 6.84% | 1.58% | |

| Sale / Yield | Terminal Capitalization Rate | | |
|---|---|---|---|
| Discount Rate | 4.50% | 5.50% | 6.50% |
| 5.75% | $72,081,169 | $63,430,889 | $57,442,234 |
| 6.75% | $65,516,779 | $57,790,328 | $52,441,246 |
| 7.75% | $59,652,471 | $52,743,914 | $47,961,067 |

| Reversion Summary | |
|---|---|
| Adjusted Gross Reversionary Proceeds | $79,311,463 |
| Minus: Cost of Sale at 4.00% | ($3,172,459) |
| Net Reversion @ 5.50% Cap Rate | $76,139,004 |

| Value Summary | |
|---|---|
| Cash Flow Present Value @ 6.75% Discount Rate | $23,021,297 |
| Reversion Flow Present Value @ 6.75% Discount Rate | $34,769,031 |
| Reconciled Value Indication (Rounded): | $57,800,000 |
| Value Per Square Foot: | $721.09 |
| Implied First Year Cap Rate | 2.64% |



NOI and Cash Flow Trend



**Income Capitalization Approach**

### 111 NORTH 12TH STREET
### CASH FLOW REPORT BEGINNING JANUARY 1, 2024

| For the Years Ending | Year 1 Dec-2024 | Year 2 Dec-2025 | Year 3 Dec-2026 | Year 4 Dec-2027 | Year 5 Dec-2028 | Year 6 Dec-2029 | Year 7 Dec-2030 | Year 8 Dec-2031 | Year 9 Dec-2032 | Year 10 Dec-2033 | Reversion Dec-2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Rental Revenue** | | | | | | | | | | | |
| Potential Base Rent | 5,190,375 | 5,286,328 | 5,441,096 | 5,523,289 | 5,629,080 | 5,661,476 | 5,825,228 | 5,954,732 | 6,125,989 | 6,231,614 | 6,395,374 |
| Absorption & Turnover Vacancy | -52,036 | -38,521 | -1,309 | -27,862 | -83,550 | 0 | -640 | -4,089 | -65,265 | -482,045 | -69,931 |
| Free Rent | -70,248 | -52,004 | 0 | -37,614 | -83,550 | -29,243 | 0 | -5,521 | -32,632 | -992,023 | -95,630 |
| Scheduled Base Rent | 5,068,091 | 5,195,803 | 5,439,787 | 5,457,814 | 5,461,979 | 5,632,234 | 5,824,588 | 5,945,122 | 6,028,092 | 4,757,546 | 6,229,813 |
| Total Rental Revenue | 5,068,091 | 5,195,803 | 5,439,787 | 5,457,814 | 5,461,979 | 5,632,234 | 5,824,588 | 5,945,122 | 6,028,092 | 4,757,546 | 6,229,813 |
| **Other Tenant Revenue** | | | | | | | | | | | |
| Total Expense Recoveries | 127,447 | 134,708 | 170,745 | 201,248 | 232,207 | 250,836 | 274,144 | 298,155 | 318,618 | 214,789 | 217,383 |
| Total Other Tenant Revenue | 127,447 | 134,708 | 170,745 | 201,248 | 232,207 | 250,836 | 274,144 | 298,155 | 318,618 | 214,789 | 217,383 |
| Total Tenant Revenue | 5,195,538 | 5,330,511 | 5,610,532 | 5,659,061 | 5,694,186 | 5,883,070 | 6,098,732 | 6,243,277 | 6,346,710 | 4,972,336 | 6,447,196 |
| Potential Gross Revenue | 5,195,538 | 5,330,511 | 5,610,532 | 5,659,061 | 5,694,186 | 5,883,070 | 6,098,732 | 6,243,277 | 6,346,710 | 4,972,336 | 6,447,196 |
| **Vacancy & Credit Loss** | | | | | | | | | | | |
| Vacancy Allowance | -467,518 | -494,530 | -559,744 | -538,044 | -485,868 | -588,307 | -609,233 | -620,238 | -569,406 | -15,189 | -574,788 |
| Credit Loss | -51,955 | -53,305 | -56,105 | -56,104 | -56,942 | -58,831 | -60,987 | -62,433 | -63,467 | -49,723 | -64,472 |
| Total Vacancy & Credit Loss | -519,474 | -547,835 | -615,850 | -594,635 | -542,810 | -647,138 | -670,220 | -682,671 | -632,873 | -64,912 | -639,260 |
| Effective Gross Revenue | 4,676,065 | 4,782,676 | 4,994,682 | 5,064,426 | 5,151,376 | 5,235,932 | 5,428,512 | 5,560,606 | 5,713,837 | 4,907,423 | 5,807,936 |
| **Operating Expenses** | | | | | | | | | | | |
| Real Estate Taxes (Retail) | 272,678 | 280,289 | 298,469 | 315,407 | 331,321 | 343,211 | 353,576 | 364,254 | 375,254 | 386,587 | 398,262 |
| Real Estate Taxes (Office) | 335,604 | 344,971 | 367,346 | 388,193 | 407,779 | 422,413 | 435,170 | 448,312 | 461,851 | 475,799 | 490,168 |
| Property Insurance | 103,201 | 106,297 | 109,486 | 112,770 | 116,153 | 119,638 | 123,227 | 126,924 | 130,732 | 134,654 | 138,693 |
| CAM | 247,682 | 255,113 | 262,766 | 270,649 | 278,768 | 287,131 | 295,745 | 304,618 | 313,756 | 323,169 | 332,864 |
| Miscellaneous | 20,640 | 21,259 | 21,897 | 22,554 | 23,231 | 23,928 | 24,645 | 25,385 | 26,146 | 26,931 | 27,739 |
| Management Fee | 46,761 | 47,827 | 49,947 | 50,644 | 51,514 | 52,359 | 54,285 | 55,606 | 57,138 | 49,074 | 58,079 |
| Total Operating Expenses | 1,026,566 | 1,055,756 | 1,109,911 | 1,160,218 | 1,208,766 | 1,248,680 | 1,286,649 | 1,325,099 | 1,364,878 | 1,396,214 | 1,445,805 |
| Net Operating Income | 3,649,499 | 3,726,920 | 3,884,771 | 3,904,209 | 3,942,610 | 3,987,252 | 4,141,863 | 4,235,507 | 4,348,959 | 3,511,210 | 4,362,130 |
| **Leasing Costs** | | | | | | | | | | | |
| Tenant Improvements | 180,889 | 133,910 | 0 | 103,917 | 143,594 | 0 | 0 | 28,113 | 226,877 | 1,525,666 | 243,099 |
| Leasing Commissions | 114,040 | 84,423 | 0 | 61,062 | 183,107 | 0 | 0 | 8,962 | 143,033 | 1,047,112 | 153,261 |
| Total Leasing Costs | 294,929 | 218,332 | 0 | 164,979 | 326,702 | 0 | 0 | 37,075 | 369,910 | 2,572,778 | 396,360 |
| **Capital Expenditures** | | | | | | | | | | | |
| Replacement Reserve | 21,259 | 21,897 | 22,554 | 23,231 | 23,928 | 24,645 | 25,385 | 26,146 | 26,931 | 27,739 | 28,571 |
| Total Capital Expenditures | 21,259 | 21,897 | 22,554 | 23,231 | 23,928 | 24,645 | 25,385 | 26,146 | 26,931 | 27,739 | 28,571 |
| Total Leasing & Capital Costs | 316,188 | 240,229 | 22,554 | 188,210 | 350,629 | 24,645 | 25,385 | 63,221 | 396,840 | 2,600,517 | 424,931 |
| Cash Flow Before Debt Service | 3,333,310 | 3,486,691 | 3,862,217 | 3,715,999 | 3,591,981 | 3,962,606 | 4,116,478 | 4,172,286 | 3,952,119 | 910,693 | 3,937,200 |
| Cash Flow Available for Distribution | 3,333,310 | 3,486,691 | 3,862,217 | 3,715,999 | 3,591,981 | 3,962,606 | 4,116,478 | 4,172,286 | 3,952,119 | 910,693 | 3,937,200 |
| IMPLIED OVERALL RATE | 5.42% | 5.54% | 5.77% | 5.80% | 5.86% | 5.92% | 6.15% | 6.29% | 6.46% | 5.22% | |
| CASH ON CASH RETURN | 4.95% | 5.18% | 5.74% | 5.52% | 5.34% | 5.89% | 6.12% | 6.20% | 5.87% | 1.35% | |

| Sale / Yield | Terminal Capitalization Rate | | |
|---|---|---|---|
| Discount Rate | 4.50% | 5.50% | 6.50% |
| 5.25% | $82,826,556 | $72,683,388 | $65,661,195 |
| 6.25% | $76,570,932 | $67,342,980 | $60,954,399 |
| 7.25% | $70,891,394 | $62,488,640 | $56,671,349 |

**Reversion Summary**

| | |
|---|---|
| Adjusted Gross Reversionary Proceeds | $79,311,463 |
| Minus: Cost of Sale at 4.00% | ($3,172,459) |
| Net Reversion @ 5.50% Cap Rate | $76,139,004 |

**Value Summary**

| | |
|---|---|
| Cash Flow Present Value @ 6.25% Discount Rate | $25,817,200 |
| Reversion Flow Present Value @ 6.25% Discount Rate | $41,525,780 |
| Reconciled Value Indication (Rounded): | $67,300,000 |
| Value Per Square Foot: | $839.61 |
| Implied First Year Cap Rate | 5.42% |



NOI and Cash Flow Trend



## CONCLUSION OF INCOME CAPITALIZATION APPROACH

The conclusions via the valuation methods employed for this approach are as follows:

| INCOME CAPITALIZATION APPROACH VALUES | | | |
|---|---|---|---|
| Appraisal Premise | As of Date | Direct Capitalization Method | Discounted Cash Flow Analysis | Reconciled Value |
| As Is | December 31, 2021 | $70,000,000 | $57,800,000 | $57,800,000 |
| Prospective As Stabilized | December 31, 2023 | $69,200,000 | $67,300,000 | $67,300,000 |
| Compiled by CBRE | | | |

Primary emphasis has been placed on the discounted cash flow.  This method is considered to best reflect the actions of buyers and sellers currently active in this market.



# Sales Comparison Approach

The following map and table summarize the comparable data used in the valuation of the subject. A detailed description of each transaction is included in the addenda.



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **SUMMARY OF COMPARABLE HOTEL SALES** | | | | | | | | |
| No. | Name | Transaction Type | Date | Year Built | No. Rooms | Actual Sale Price | Adjusted Sale Price [1] | Price Per Room |
| 1 | Hotel on Rivington<br>107-109 Rivington St<br>New York, NY | Sale | Dec-21 | 2004 | 108 | $70,000,000 | $70,000,000 | $648,148 |
| 2 | W Hotel New York Union Square<br>201 Park Ave S<br>New York, NY | Sale | Oct-19 | 1911/2000 | 270 | $206,000,000 | $206,000,000 | $762,963 |
| 3 | Hotel Indigo Lower East Side New York<br>171 Ludlow St<br>New York, NY | Sale | Oct-18 | 2015 | 294 | $162,500,000 | $162,500,000 | $552,721 |
| 4 | Gransevoort Park Avenue Hotel<br>420-422 Park Ave S<br>New York, NY | Sale | Dec-17 | 2010 | 249 | $200,000,000 | $200,000,000 | $803,213 |
| 5 | The James New York Soho<br>27 Grand St<br>New York, NY 10013 | Sale | Dec-17 | 2009 | 114 | $66,300,000 | $66,300,000 | $581,579 |
| Subj.<br>Pro<br>Forma | The William Vale ,<br>111 North 12th Street,<br>Brooklyn, New York | --- | --- | 2017 | 183 | --- | --- | --- |

[1] Adjusted sale price for cash equivalency, lease-up and/or deferred maintenance (where applicable)
Compiled by CBRE

The sales utilized in the table above represent the best data available for comparison with the subject. The sales approach was not emphasized due to changing market conditions and limited sales that compare to the subject. However, we have prepared an adjustment analysis to



illustrate value via the approach in support the more heavily relied upon approach to value of the property.

We note that unlike the subject, none of the comparable hotels had ICAP tax abatements and therefore no adjustments were made for the value attributed to the abatement

## DISCUSSION/ANALYSIS OF IMPROVED SALES

### Improved Sale One

This transaction represents a recapitalization of the Hotel on Rivington located at 107-109 Rivington St in New York, NY 10002 which was sold on December 30, 2021 for approximately $70,000,000. There are a confirmed 108 keys at this location by parties for both the seller and the buyer.

It has been reported by a source deemed reliable that there are 108 keys. There is a penthouse, however, this penthouse does not have a shower in the bathroom and hence, not counted as a hotel room.

As of January 26, 2022, a contact for the seller has noted that documents were signed on December 30, 2021. The seller is no longer a majority owner, yet still involved. This contact would not say anything else regarding this transfer.

A contact for the hotel has noted that Highgate Hotels is involved in this property, yet their involvement was not indicated. A contact (individual) affiliated with Highgate Hotels is reporting that they have been the manager of this hotel since October of 2021.

### Improved Sale Two

In October 2019, Marriott International purchased the 270-room W Union Square for $206,000,000 from Westbrook Partners. Marriott plans a significant renovation and will transform the hotel as a flagship property to redefine and reinvigorate the brand in North America.  Located at 201 Park Avenue South, the 20-story hotel features historic Beaux Arts architecture, panoramic views of Union Square's namesake pedestrian plaza and lively park, and a "W Union Square" rooftop sign that stands out on the Downtown skyline. The property first opened its doors in 1911 as the headquarters of the Guardian Life Insurance Company of America, and in 2000 opened as W New York – Union Square. The transaction occurred a little more than a year after Westbrook Partners acquired it from Host Hotel & Resorts for a reported $165 million.

According to the deed filed with New York City records, the purchase price for this transaction equaled approximately $166 million, leaving $40 million in renovations equating to Marriott's press release of $206 million.



### Improved Sale Three

This transaction represents the sale of a hotel condo which is located at 171 Ludlow St in New York, NY, 10002 which sold on approximately October 11, 2018 for a reported $162,500,000.

It had been confirmed by a contact at the hotel that this hotel (condo) sold mid summer and there are a confirmed 294 keys. This would equate to a Price Per Key of $552,721.

There is also a retail condo and a parking garage condo in this building. It has been reported that the garage has 115 parking spaces and the retail unit has 10,419 SF on the first floor and mezzanine.

### Improved Sale Four

The transaction of $200,000,000 represents the reported sale of the Gansevoort Park Ave hotel located at 420 Park Ave S in New York, NY 10016. This is now known as the Royalton Park Avenue.

A contact at the hotel has verified that as of December 15, 2017, the Gansevoort Hotel Group is no longer a part of the hotel ownership and this contact did acknowledge that Highgate Hotels are new owners. There are 249 units at this hotel.

Thus far, research indicates that this may be a business sale as there are no deeds nor memorandums of lease. The last deed recorded in June of 2007 and the Grantee is TGA II, LLC which is C/O Centurion Realty.

### Improved Sale Five

The closing price of $66,300,000 is a step down from the $70 million it initially went into contract for in August 2016. The price reduction means an even bigger loss than expected for the seller, PGIM Real Estate, which bought the hotel for $83.4 million in 2013. PGIM, formerly known as Prudential Real Estate Investors, had acquired the property from Brack Capital Real Estate, which developed the hotel in 2010.

The deal is expected to mark the end of a year-long legal dispute between Thor and PGIM. The seller had accused Thor in December 2016 of breaching the contract.

The lawsuit centered on PGIM's contract stipulation that Thor seek the approval of the transfer of the hotel's liquor licenses from the New York State Liquor Authority and Community Board 2. PGIM claimed that Thor failed to do so, "intentionally engineering the failure of its applications" for a temporary retail permit. Thor then filed a motion to dismiss and, for much of this year, continued to pursue liquor license approvals. In August, the State Liquor Authority denied Thor's application for permanent liquor licenses.

Shortly after, the parties moved toward a settlement and agreed to a new closing date of Dec. 14, records show.



*Sales Comparison Approach*

## SUMMARY OF ADJUSTMENTS

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| HOTEL SALES ADJUSTMENT GRID | | | | | | |
|---|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | 5 | Subj. Pro Forma |
| Transaction Type | Sale | Sale | Sale | Sale | Sale | --- |
| Transaction Date | Dec-21 | Oct-19 | Oct-18 | Dec-17 | Dec-17 | --- |
| Year Built | 2004 | 1911/2000 | 2015 | 2010 | 2009 | 2017 |
| No. Rooms | 108 | 270 | 294 | 249 | 114 | 183 |
| Actual Sale Price | $70,000,000 | $206,000,000 | $162,500,000 | $200,000,000 | $66,300,000 | --- |
| Adjusted Sale Price [1] | $70,000,000 | $206,000,000 | $162,500,000 | $200,000,000 | $66,300,000 | --- |
| Price Per Room | $648,148 | $762,963 | $552,721 | $803,213 | $581,579 | --- |
| Adj. Price Per Room | $648,148 | $762,963 | $552,721 | $803,213 | $581,579 | |
| Property Rights Conveyed | 0% | 0% | 0% | 0% | 0% | |
| Financing Terms [1] | 0% | 0% | 0% | 0% | 0% | |
| Conditions of Sale | 0% | 0% | 0% | 0% | 0% | |
| Market Conditions (Time) | 0% | -20% | -20% | -20% | -20% | |
| Subtotal - Price Per Room | $648,148 | $610,370 | $442,177 | $642,570 | $465,263 | |
| Location | -20% | -20% | -10% | -20% | -20% | |
| Age/Condition | -10% | -10% | -5% | 10% | -10% | |
| Amenities | 0% | 0% | 0% | 0% | 0% | |
| Parking | 5% | 5% | 5% | 5% | 5% | |
| Total Other Adjustments | -25% | -25% | -10% | -5% | -25% | |
| **Indicated Value Per Room** | **$486,111** | **$457,778** | **$397,959** | **$610,442** | **$348,947** | |
| Absolute Adjustment | 35% | 55% | 40% | 55% | 55% | |

[1] Adjusted for cash equivalency, lease-up and/or deferred maintenance (where applicable)
Compiled by CBRE

The adjusted comparables range from $348,947 to $610,442 per room, and average $460,247 per room. Each hotel sale has unique physical and income characteristics and the adjustment process looks to mitigate differences between the sales and the subject. The adjustment process is subjective and the adjusted sales illustrate a rather wide range. The impacts of the COVID-19 pandemic have impacted the hotel sales market as owners are reluctant to sell during a down market period, and transactions that do occur may be more indicative of a distressed hotel operation. Therefore, sales that occurred between March 2020 and December 2021 should be viewed as bottom of the market transactions and our subject should fall between that value range and the peak pre-covid hotel market.

## SALE COMPARISON APPROACH CONCLUSION

Each hotel sale has unique physical and income characteristics and the adjustment process looks to mitigate differences between the sales and the subject.   The adjustment process is subjective and the adjusted sales illustrate a rather wide range.   No one sale is able to be emphasized given the differences and the subjective nature of the adjustments.   We thus have relied upon the average.   It must be appreciated that hotels are also largely purchased for their current and future income potential and that potential is in the eyes of the buyer.   The range in the sales illustrated supports the income approach to value.   The sales approach acts as a supportive



*Sales Comparison Approach*

methodology within our analysis and given the range noted, conclude that the approach supports the value noted by the income approach.

We note that adjustments are made for tax abatement and stabilization discount as it relates to the subject balance of the tax abatement in place and reaching stabilized levels.

The following table summarizes the stabilized value indications and the concluded value of the subject, via the Sales Comparison Approach.

### SALES COMPARISON APPROACH

| Total Rooms | X | Value Per Room | = | Value |
|---|---|---|---|---|
| 183 | X | $450,000 | = | $82,350,000 |
| 183 | X | $500,000 | = | $91,500,000 |

**VALUE CONCLUSION**

| | |
|---|---|
| **Indicated Value** | $86,900,000 |
| Plus ICAP | **$12,200,000** |
| **Indicated Stabilized Value w ICAP** | **$99,100,000** |
| Stabilization Discount | ($7,200,000) |
| **Indicated As Is Value** | **$91,900,000** |
| **Rounded** | **$91,900,000** |
| **Value Per Room** | **$502,186** |

Compiled by CBRE



# Reconciliation of Value

The value indications from the approaches to value are summarized as follows:

| SUMMARY OF VALUE CONCLUSIONS - HOTEL | | |
|---|---|---|
| | As Is on December 31, 2021 | Prospective As Stabilized on December 31, 2023 |
| Sales Comparison Approach | $91,900,000 | $99,100,000 |
| Income Capitalization Approach | $100,500,000 | $107,000,000 |
| Reconciled Value | $100,500,000 | $107,000,000 |
| Compiled by CBRE | | |

| SUMMARY OF VALUE CONCLUSIONS - RETAIL / OFFICE | | |
|---|---|---|
| Appraisal Premise | As of Date | Reconciled Value |
| As Is | December 31, 2021 | $57,800,000 |
| Prospective As Stabilized | December 31, 2023 | $67,300,000 |
| Compiled by CBRE | | |

In the sales comparison approach, the subject is compared to similar properties that have been sold recently or for which listing prices or offers are known.  The sales used in this analysis are considered somewhat comparable to the subject, and the required adjustments were based on reasonable and well-supported rationale.  In addition, market participants are currently analyzing purchase prices on investment properties as they relate to available substitutes in the market.  Therefore, the sales comparison approach is considered to provide a reliable value indication, but has been given secondary emphasis in the final value reconciliation.

The income capitalization approach is applicable to the subject since it is an income producing property leased in the open market.  Market participants are primarily analyzing properties based on their income generating capability.  Therefore, the income capitalization approach is considered a reasonable and substantiated value indicator and has been given primary emphasis in the final value estimate.

Based on the foregoing, the market value of the subject has been concluded as follows:

| MARKET VALUE CONCLUSION | | | | |
|---|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion | Per Room |
| As Is - Hotel | Leased Fee Interest | December 31, 2021 | $100,500,000 | $549,180 |
| As Is - Commercial | Leased Fee Interest | December 31, 2021 | $57,800,000 | |
| **Total Value** | | | **$158,300,000** | |
| As Stabilized - Hotel | Leased Fee Interest | December 31, 2023 | $107,000,000 | $584,699 |
| As Stabilized - Commercial | Leased Fee Interest | December 31, 2023 | $67,300,000 | |
| **Total Value** | | | **$174,300,000** | |
| Compiled by CBRE | | | | |



The opinion(s) of market value includes the land, the improvements thereto, and the contributory value of the furniture, fixtures, and equipment.  The appraisers assume that the hotel will be, and shall remain, open and operational.



# Real Property Value Allocation

## PERSONAL PROPERTY

Lodging facilities personal property consists of furnishings, fixtures and equipment (FF&E). These assets are difficult to isolate from the value of an operating hotel/motel property. Personal property is an integral part of a lodging facility. Without furniture, fixtures, and equipment, a hotel could not operate its facilities and rent its guest rooms, and thus would not be able to generate any income attributable to real property. Personal property and real property are uniquely combined in a hotel or motel; unlike an office or other commercial building, a hotel would have to close its doors without furniture, fixtures and equipment. The physical separation of personal property from real property in a hotel is a theoretical rather than a practical matter. Lodging facilities are generally sold with their furniture, fixtures, and equipment in place. While a lender may be restricted from financing the purchase of personal property, without personal property, a hotel's real property would have little value.

Several methods are used to determine the market value of the furniture, fixtures, and equipment. A recommended approach is to use the depreciated replacement cost. As hotels are typically sold with the FF&E in place, a sale of just the FF&E usually takes place as a salvage or liquidation sale, which results in substantially less value than if in place and contributing to the hotel operation. The estimation of the market value of the tangible personal property is an allocation of the total value and is not likely to be a distinct component of a typical real estate transaction of an ongoing operation.

The following depicts a collection of available data and the concluded FF&E cost estimate.



Real Property Value Allocation

| FF&E COST ESTIMATE | |
|---|---|
| **Source** | **Per Guestroom** |
| Branded Select Service | $17,000 |
| Branded Full Service | $12,766 |
| Branded Extended Stay | $12,573 |
| Botique Hotel | $26,083 |
| Botique Hotel | $25,405 |
| Botique Hotel | $21,405 |
| Botique Hotel | $69,161 |
| Botique Hotel | $23,338 |
| National Survey Budget Service | $10,024 |
| National Survey Limited Service | $15,122 |
| National Survey Extended Stay (Midscale) | $14,677 |
| National Survey Extended Stay (Upscale) | $21,922 |
| National Survey Select Service | $19,358 |
| National Survey Full Service | $36,366 |
| National Survey Luxury | $56,459 |
| **CBRE Estimate** | **$45,000** |
| Indicated FF&E Replacement Cost | $8,235,000 |
| Rounded | $8,200,000 |
| Compiled by CBRE | |

For our analysis, we have indicated a figure of $45,000 per unit, which corresponds to $8,200,000 , rounded.

| FF&E VALUE ESTIMATE | | | |
|---|---|---|---|
| | | As Is on December 31, 2021 | Prospective As Stabilized on December 31, 2023 |
| FF&E Effective Age (Weighted) | | 3 Years | 5 Years |
| MVS Expected Life (Weighted) | | 8 Years | 8 Years |
| FF&E Physical Depreciation | | 38% | 63% |
| FF&E Replacement Cost New | $ | 8,200,000 | $ 8,200,000 |
| Depreciable Cost | $ | 8,200,000 | $ 8,200,000 |
| Less Depreciation | $ | (3,075,000) | $ (5,125,000) |
| Depreciated FF&E Cost | $ | 5,125,000 | $ 3,075,000 |
| Rounded | $ | 5,100,000 | $ 3,100,000 |
| Depreciated FF&E Cost Per Guestroom | | $27,869 | $16,940 |
| Compiled by CBRE | | | |

## BUSINESS VALUE

Hotels are undisputedly a combination of business and real estate: the day-to-day operation of a hotel represents a business over and above the real estate value. The estimate of value for the business interest component of the going concern value is considerably more subjective than the personal property value estimate. This is due to the intangible nature of the business interest.



Numerous theories have been developed over time in an attempt to isolate the business component of a hotel. When hotels were routinely leased to hotel operators, separating the income and value attributable to each component was a simple matter. However, during the 1970's, the hotel property leases were replaced with the hotel management contract.

It is widely accepted today that managing agents are hired by hotel owners to operate a property in return for a management fee. The fee is paid to the operator as an operating expense, and what remains is net income available to pay debt service and generate a return on the owner's equity. Purchasers of hotels as real estate investments are able to passively own the property by employing a managing agent, as is the case at the Subject.

The real and personal property components of the Subject have already been valued in this appraisal, in isolation of any business component, through the deduction of market rate management and franchise fees. By making these deductions, we believe that there is no business value included in our conclusion of market value given previously.

## VALUE ALLOCATION CONCLUSION

Based on the foregoing, the value allocation of the subject has been concluded as follows:

| AS IS VALUE ALLOCATION | |
| --- | --- |
| **Interest Appraised - Allocation** | **Value Conclusion** |
| **Leased Fee Interest** | |
| Real Property Value | $95,400,000 |
| Personal Property | $5,100,000 |
| Business Enterprise Value | $0 |
| Total Property Value - As Is | $100,500,000 |
| Compiled by CBRE | |

| AS STABILIZED VALUE ALLOCATION | |
| --- | --- |
| **Interest Appraised - Allocation** | **Value Conclusion** |
| **Leased Fee Interest** | |
| Real Property | $103,900,000 |
| Personal Property | $3,100,000 |
| Business Enterprise Value | $0 |
| Total Property Value - As Stabilized | $107,000,000 |
| Compiled by CBRE | |



# Assumptions and Limiting Conditions

1.  CBRE, Inc. through its appraiser (collectively, "CBRE") has inspected through reasonable observation the subject property.  However, it is not possible or reasonably practicable to personally inspect conditions beneath the soil and the entire interior and exterior of the improvements on the subject property.  Therefore, no representation is made as to such matters.

2.  The report, including its conclusions and any portion of such report (the "Report"), is as of the date set forth in the letter of transmittal and based upon the information, market, economic, and property conditions and projected levels of operation existing as of such date. The dollar amount of any conclusion as to value in the Report is based upon the purchasing power of the U.S. Dollar on such date.  The Report is subject to change as a result of fluctuations in any of the foregoing.  CBRE has no obligation to revise the Report to reflect any such fluctuations or other events or conditions which occur subsequent to such date.

3.  Unless otherwise expressly noted in the Report, CBRE has assumed that:

    (i)    Title to the subject property is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE has not examined title records (including without limitation liens, encumbrances, easements, deed restrictions, and other conditions that may affect the title or use of the subject property) and makes no representations regarding title or its limitations on the use of the subject property.  Insurance against financial loss that may arise out of defects in title should be sought from a qualified title insurance company.

    (ii)    Existing improvements on the subject property conform to applicable local, state, and federal building codes and ordinances, are structurally sound and seismically safe, and have been built and repaired in a workmanlike manner according to standard practices; all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; and the roof and exterior are in good condition and free from intrusion by the elements.  CBRE has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements.  CBRE appraisers are not engineers and are not qualified to judge matters of an engineering nature, and furthermore structural problems or building system problems may not be visible.  It is expressly assumed that any purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems.

    (iii)    Any proposed improvements, on or off-site, as well as any alterations or repairs considered will be completed in a workmanlike manner according to standard practices.

    (iv)    Hazardous materials are not present on the subject property.  CBRE is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater, mold, or other potentially hazardous materials may affect the value of the property.

    (v)    No mineral deposit or subsurface rights of value exist with respect to the subject property, whether gas, liquid, or solid, and no air or development rights of value may be transferred.  CBRE has not considered any rights associated with extraction or exploration of any resources, unless otherwise expressly noted in the Report.

    (vi)    There are no contemplated public initiatives, governmental development controls, rent controls, or changes in the present zoning ordinances or regulations governing use, density, or shape that would significantly affect the value of the subject property.

    (vii)    All required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, nor national government or private entity or organization have been or can be readily obtained or renewed for any use on which the Report is based.

    (viii)    The subject property is managed and operated in a prudent and competent manner, neither inefficiently or super-efficiently.

    (ix)    The subject property and its use, management, and operation are in full compliance with all applicable federal, state, and local regulations, laws, and restrictions, including without limitation environmental laws, seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, and licenses.

    (x)    The subject property is in full compliance with the Americans with Disabilities Act (ADA).  CBRE is not qualified to assess the subject property's compliance with the ADA, notwithstanding any discussion of possible readily achievable barrier removal construction items in the Report.



(xi) All information regarding the areas and dimensions of the subject property furnished to CBRE are correct, and no encroachments exist. CBRE has neither undertaken any survey of the boundaries of the subject property nor reviewed or confirmed the accuracy of any legal description of the subject property.

Unless otherwise expressly noted in the Report, no issues regarding the foregoing were brought to CBRE's attention, and CBRE has no knowledge of any such facts affecting the subject property. If any information inconsistent with any of the foregoing assumptions is discovered, such information could have a substantial negative impact on the Report. Accordingly, if any such information is subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. CBRE assumes no responsibility for any conditions regarding the foregoing, or for any expertise or knowledge required to discover them. Any user of the Report is urged to retain an expert in the applicable field(s) for information regarding such conditions.

4. CBRE has assumed that all documents, data and information furnished by or behalf of the client, property owner, or owner's representative are accurate and correct, unless otherwise expressly noted in the Report. Such data and information include, without limitation, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any error in any of the above could have a substantial impact on the Report. Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after the date of delivery of the Report.

5. CBRE assumes no responsibility (including any obligation to procure the same) for any documents, data or information not provided to CBRE, including without limitation any termite inspection, survey or occupancy permit.

6. All furnishings, equipment and business operations have been disregarded with only real property being considered in the Report, except as otherwise expressly stated and typically considered part of real property.

7. Any cash flows included in the analysis are forecasts of estimated future operating characteristics based upon the information and assumptions contained within the Report. Any projections of income, expenses and economic conditions utilized in the Report, including such cash flows, should be considered as only estimates of the expectations of future income and expenses as of the date of the Report and not predictions of the future. Actual results are affected by a number of factors outside the control of CBRE, including without limitation fluctuating economic, market, and property conditions. Actual results may ultimately differ from these projections, and CBRE does not warrant any such projections.

8. The Report contains professional opinions and is expressly not intended to serve as any warranty, assurance or guarantee of any particular value of the subject property. Other appraisers may reach different conclusions as to the value of the subject property. Furthermore, market value is highly related to exposure time, promotion effort, terms, motivation, and conclusions surrounding the offering of the subject property. The Report is for the sole purpose of providing the intended user with CBRE's independent professional opinion of the value of the subject property as of the date of the Report. Accordingly, CBRE shall not be liable for any losses that arise from any investment or lending decisions based upon the Report that the client, intended user, or any buyer, seller, investor, or lending institution may undertake related to the subject property, and CBRE has not been compensated to assume any of these risks. Nothing contained in the Report shall be construed as any direct or indirect recommendation of CBRE to buy, sell, hold, or finance the subject property.

9. No opinion is expressed on matters which may require legal expertise or specialized investigation or knowledge beyond that customarily employed by real estate appraisers. Any user of the Report is advised to retain experts in areas that fall outside the scope of the real estate appraisal profession for such matters.

10. CBRE assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

11. Acceptance or use of the Report constitutes full acceptance of these Assumptions and Limiting Conditions and any special assumptions set forth in the Report. It is the responsibility of the user of the Report to read in full, comprehend and thus become aware of all such assumptions and limiting conditions. CBRE assumes no responsibility for any situation arising out of the user's failure to become familiar with and understand the same.

12. The Report applies to the property as a whole only, and any pro ration or division of the title into fractional interests will invalidate such conclusions, unless the Report expressly assumes such pro ration or division of interests.



**Assumptions and Limiting Conditions**

13. The allocations of the total value estimate in the Report between land and improvements apply only to the existing use of the subject property.  The allocations of values for each of the land and improvements are not intended to be used with any other property or appraisal and are not valid for any such use.

14. The maps, plats, sketches, graphs, photographs, and exhibits included in this Report are for illustration purposes only and shall be utilized only to assist in visualizing matters discussed in the Report.  No such items shall be removed, reproduced, or used apart from the Report.

15. The Report shall not be duplicated or provided to any unintended users in whole or in part without the written consent of CBRE, which consent CBRE may withhold in its sole discretion.  Exempt from this restriction is duplication for the internal use of the intended user and its attorneys, accountants, or advisors for the sole benefit of the intended user.  Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of CBRE, which consent CBRE may withhold in its sole discretion.  Finally, the Report shall not be made available to the public or otherwise used in any offering of the property or any security, as defined by applicable law. Any unintended user who may possess the Report is advised that it shall not rely upon the Report or its conclusions and that it should rely on its own appraisers, advisors and other consultants for any decision in connection with the subject property.  CBRE shall have no liability or responsibility to any such unintended user.



**ADDENDA**

Addendum

# OPERATING DATA

William Vale Hotel

## Historical and Projected Performance

| Year | Historical 2017 | | Historical 2018 | | Historical 2019 | | Owner Budget 2020 | | Bowery Proforma 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Hotel Units | 183 | | 183 | | 183 | | 183 | | 183 | |
| Available Nights | 365 | | 365 | | 365 | | 366 | | 366 | |
| Available Room Nights | 66,795 | | 66,795 | | 66,795 | | 66,978 | | 66,978 | |
| Occupancy | 74.4% | | 77.0% | | 77.9% | | 78.4% | | 80.0% | |
| Occupied Room Nights | 49,695 | | 51,432 | | 52,036 | | 52,480 | | 53,582 | |
| ADR | $338.67 | | $375.07 | | $363.18 | | $389.03 | | $380.00 | |
| RevPAR | $249.10 | | $285.87 | | $282.93 | | $304.82 | | $304.00 | |
| Revenue | | % | | % | | % | | % | | % |
| Total Room Revenue | $16,633,129 | 46.4% | $19,094,787 | 49.6% | $18,898,622 | 48.9% | $20,416,448 | 50.2% | $20,361,312 | 50.4% |
| F&B Income | $18,956,901 | 52.9% | $18,924,890 | 49.2% | $18,960,997 | 49.1% | $19,259,381 | 47.4% | $19,250,000 | 47.6% |
| Other Income | $256,247 | 0.7% | $476,910 | 1.2% | $764,890 | 2.0% | $968,050 | 2.4% | $800,000 | 2.0% |
| Total Revenue | $35,846,277 | 100.0% | $38,496,587 | 100.0% | $38,624,509 | 100.0% | $40,643,879 | 100.0% | $40,411,312 | 100.0% |
| Departmental Expenses | | | | | | | | | | |
| Rooms | $5,404,338 | 32.5% | $5,582,925 | 29.2% | $5,471,736 | 29.0% | $5,723,307 | 28.0% | $5,802,974 | 28.5% |
| F&B | $20,699,643 | 109.2% | $17,622,733 | 93.1% | $17,548,677 | 92.6% | $17,553,142 | 91.1% | $17,479,000 | 90.8% |
| Other Opearting Depts | $15,731 | 6.1% | $309,763 | 65.0% | $258,485 | 33.8% | $362,075 | 37.4% | $280,000 | 35.0% |
| Total | $26,119,712 | 72.9% | $23,515,421 | 61.1% | $23,278,897 | 60.3% | $23,638,525 | 58.2% | $23,561,974 | 58.3% |
| Gross Operating Income | $9,726,565 | 27.1% | $14,981,166 | 38.9% | $15,345,612 | 39.7% | $17,005,355 | 41.8% | $16,849,338 | 41.7% |
| Undistributed Expenses (Hotel Only; F&B included in Departmental Expense) | | | | | | | | | | |
| A&G, IT | $2,938,391 | 17.4% | $2,873,939 | 14.7% | $2,995,971 | 15.2% | $2,964,561 | 13.9% | $2,962,584 | 14.0% |
| Marketing | $1,266,120 | 7.5% | $1,471,562 | 7.5% | $1,733,473 | 8.8% | $1,746,125 | 8.2% | $1,798,712 | 8.5% |
| Property Maintenance | $870,058 | 5.2% | $841,385 | 4.3% | $925,310 | 4.7% | $958,712 | 4.5% | $952,259 | 4.5% |
| Energy/Utilities | $534,526 | 3.2% | $534,810 | 2.7% | $506,965 | 2.6% | $508,799 | 2.4% | $529,033 | 2.5% |
| Total | $5,609,095 | 33.2% | $5,721,696 | 29.2% | $6,161,718 | 31.3% | $6,178,198 | 28.9% | $6,242,587 | 29.5% |
| GOP | $4,117,470 | 11.5% | $9,259,470 | 24.1% | $9,183,894 | 23.8% | $10,827,157 | 26.6% | $10,606,751 | 26.2% |
| Fixed Expenses | | | | | | | | | | |
| Real Estate Taxes | $56,980 | 0.2% | $68,510 | 0.2% | $230,436 | 0.6% | $241,958 | 0.6% | $174,277 | 0.4% |
| Insurance | $141,012 | 0.4% | $162,272 | 0.4% | $150,622 | 0.4% | $146,833 | 0.4% | $147,000 | 0.4% |
| Management Fee (excl F&B Income) | $2,220,486 | 13.1% | $1,084,332 | 5.5% | $3,020,502 | 15.4% | $1,890,757 | 8.8% | $1,150,000 | 5.4% |
| Replacement Reserve | $300,000 | 1.8% | $300,000 | 1.5% | | 0.0% | | 0.0% | $634,839 | 3.0% |
| Total | $2,718,478 | 7.6% | $1,615,114 | 4.2% | $3,401,559 | 8.8% | $2,279,548 | 5.6% | $2,106,116 | 5.2% |
| **NOI** | **$1,398,992** | **3.9%** | **$7,644,356** | **19.9%** | **$5,782,335** | **15.0%** | **$8,547,609** | **21.0%** | **$8,500,635** | **21.0%** |
| Operating Expense Ratio | | 96.1% | | 80.1% | | 85.0% | | 79.0% | | 79.0% |

## The William Vale - Office Rent Roll

### Summary

| Total Rentable SF | 42,734 | Occupied SF | 28,696 | 67% |
|---|---|---|---|---|
| | | Vacant SF | 14,038 | 33% |
| | | Total SF | 42,734 | 100% |

| Floor | Tenant Name | Rentable SF [1] | Lease Start | Lease End | Occ. (Y/N) | Current Annual Rent | Rent per RSF | Lease Notes |
|---|---|---|---|---|---|---|---|---|
| 5th | Vacant | 2,483 | N/A | N/A | N | N/A | N/A | |
| 5th | Williamsburg Therapy Group | 2,256 | 3/1/2019 | 2/29/2024 | Y | $102,000 | $45.21 | [2] |
| 5th | Williamsburg Therapy Group | 198 | 4/1/2020 | 2/29/2024 | Y | $12,600 | $63.64 | [2] |
| 5th | Williamsburg Therapy Group | 1,060 | 8/1/2020 | 2/29/2024 | Y | $58,500 | $55.19 | [2] |
| 5th | EXR | 1,538 | 6/1/2019 | 5/31/2024 | Y | $96,000 | $62.42 | [3] |
| 6th | Dadi Kit | 2,054 | 1/1/2020 | 12/31/2024 | Y | $139,672 | $68.00 | [4] |
| 6th | NK Dental | 2,054 | 7/1/2020 | 6/30/2035 | Y | $82,160 | $40.00 | [5] |
| 6th | CORE Foods | 1,577 | 2/1/2020 | 1/31/2025 | Y | $110,390 | $70.00 | [6] |
| 6th | Impact Equities | 541 | 1/1/2021 | 12/31/2023 | Y | $33,542 | $62.00 | [7] |
| 6th | Vacant | 1,978 | N/A | N/A | N | N/A | N/A | |
| 7th | Vacant | 9,577 | N/A | N/A | N | N/A | N/A | |
| 8th & 9th | NY Studio Factory | 17,418 | 9/1/2018 | 8/31/2048 | Y | $840,000 | $48.23 | [8] |

Source: Documents provided by the Client.

Notes:

[1] Sizes were provided by the Client.

[2] Williamsburg Therapy Group leased three units on the 5th floor. Rental payment increase by 3% annually. Tenant pays proprata share of expenses. According to information provided by the Client, tenant has been paid 50% of the rent for the first two units between April and August 2020, with the balance to be paid over 12 months beginning January 2021. In addition, tenant has not taken posession of 3rd unit since it was ready in August 2020 and has requested abatement on that unit until April 2021.

[3] EXR signed a 5-year lease in 2019. Rental rate is flat during the two initial lease year, followed by 3% annual increases. Tenant pays proprata share of expenses. According to information provided by the Client, tenant deferred rent payments between April and July 2020, to be paid over 18 months between November 2020 and April 2022.

[4] Dadi Kit signed a 5-year lease in September 2019. Initial lease year rent is $68/SF; rent increases 3% annually. Tenant pays prorata share of expenses. According to information provided by the client, tenant has been paying rent during COVID.

[5] NK Dental (Boe Tie Dental) signed a 15-year lease in December 2019. Rent is flat at $40/SF during the three initial lease years, increases to $55/SF in during the forth lease year, and annually by 5% during the fifth lease year and by 4% annually starting the sixth lease year. Tenant pays prorata share of expenses. According to information provided by the client, tenant has been paying rent during COVID.

[6] CORE Foods signed a 5-year lease in September 2019. Rent increases by 3% annually. Tenant pays prorata share of expenses. According to information provided by the client, tenant has been paying rent during COVID.

[7] Impact Equities signed a 3-year lease in October 2020. Rent increases by 3% annually. Tenant pays prorata share of expenses. Tenant has a 5-year renewal option with 3% annual rent increases.

[8] New York Studio Factory leases the two upper office floors; they sublease office space to artists. The tenant signed a 30-year lease with a rental rate of $70,000/month ($48/SF) during the first three lease years, increases by 12% in year 4 and by 3% thereafter. Tenant pays prorata share of expenses. Tenant received four free months and $1,094,000 of TI. According to information provided by the client, tenant has not been able to pay rent since 2Q 020, and is in discussions to surrender for both floors.

## The William Vale - Retail Rent Roll

### Summary

| | | | | | | |
|---|---|---|---|---|---|---|
| **Total Cellar SF** | 18,672 | | **Leased SF** | 11,186 | 30% | |
| **Total Ground SF** | 18,750 | | **Vacant SF** | 26,236 | 70% | |
| **Total Rentable SF** | 37,422 | | **Total SF** | 37,422 | 100% | |

| # | Location | Frontage | Tenant Type | Tenant Name | Gross Unit SF | Lease Start | Lease End | Occ. (Y/N) | Current Annual Rent | Rent per Gross SF | Lease Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Occupied** | | | | | | | | | | |
| A | Ground | N 13 / Courtyard | Wine Store | All-Wise Meadery | 933 | 2/1/2018 | 1/31/2028 | Y | $145,000 | $155.41 | [1] |
| S | Cellar | N/A | Wine Store | All-Wise Meadery | 2,387 | 2/1/2018 | 1/31/2028 | Y | -- Inc in above -- | | [1] |
| D/E | Ground | N 12 / Courtyard | Café | Du's Donat and Coffee | 2,614 | 1/1/2017 | 12/31/2031 | Y | -- % Rent -- | | [2] |
| F | Ground | Wythe / N 12 | Clothing | Suit Supply | 4,454 | 3/1/2018 | 2/29/2028 | Y | $356,320 | $80.00 | [3] |
| K/N | Cellar | N/A | Storage | WV FNB Storage | 798 | 1/1/2016 | 12/31/2030 | Y | $53,181 | $66.64 | [4] |
| | **Vacant** | | | | | | | | | | |
| | Ground | N/A | N/A | Vacant | 10,749 | N/A | N/A | N | N/A | N/A | |
| | Cellar | N/A | N/A | Vacant | 15,487 | N/A | N/A | N | N/A | N/A | |

Source: Documents provided by the Client.

Notes:

[1] The tenant occupies 933 SF on the ground floor and 2,387 SF of cellar space. The tenant signed a 10-year lease with a starting rent of $145,000/year ($155/SF) during the three initial lease year. Base rent starting the fourth lease year (February 2021) increases to $220,000/year ($225/SF), and by 2.5% annually thereafter. Tenant pays its prorate share (9%) of real estate taxes over base year 2016/2017 (calculated based on the reatil component, which is 13% of the total tax lot taxes). According to information provided by the Client, the tenant has not paid rent since March 2020, and is in discussion to surrender the space.

[2] Tenant pays 10% of gross sales. According to information provided by the Client, in discussion with the tenant to surrender the space (since there is a new potential tenant take the space).

[3] The tenant signed an 11-year lease which commenced in March 2018. Rental rate is flat ($80/SF) during the three initial lease years, increases to $125/SF ($556,750/year, starting September 2020) in year 4, and by 3% thereafter. Tenant pays prorata share (12%) of expenses over base year 2017/2018. According to information provided by the Client, the tenant paid rent in full though 1Q 2020, and an additional $139,000 toward the remainder of 2020; however, the tenant asked for partial abatement through August 2023.

[4] William Vale Hotel Food and Beverage storage space; 2% annual rent increases.

**Addendum**

# SMITH TRAVEL RESEARCH REPORT

Williamsburg Brooklyn, NY Selected Properties
Job Number: 1317546  SADIM    Staff: GS    Created: February 07, 2022

| STR Code | Name of Establishment | City & State | Zip Code | Class | Aff Date | Open Date | Rooms | Chg in Rms | Chg in Rms 1 | Chg in Rms 2 | Chg in Rms 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64419 | The Tillary Hotel Brooklyn | Brooklyn, NY | 11201 | Upper Midscale Class | Sep 2017 | Aug 2015 | 174 | Y | -174 (Oct'21) | +174 (Aug'15) | |
| 65394 | 1 Hotel Brooklyn Bridge | Brooklyn, NY | 11201 | Luxury Class | Jul 2020 | Feb 2017 | 195 | Y | +195 (Jun'20) | -195 (Apr'20) | +1 (Feb'18) |
| 61320 | McCarren Hotel | Brooklyn, NY | 11211 | Upscale Class | May 2020 | Oct 2011 | 64 | Y | +64 (May'20) | -64 (Apr'20) | |
| 64863 | The Box House Hotel | Brooklyn, NY | 11222 | Upscale Class | May 2011 | May 2011 | 128 | Y | +13 (Jul'17) | +6 (Jul'17) | +9 (May'17) |
| 62147 | Wythe Hotel | Brooklyn, NY | 11249 | Upper Upscale Class | Jul 2020 | May 2012 | 69 | Y | -1 (Feb'22) | +2 (Jul'21) | +3 (May'21) |
| 64468 | The Williamsburg Hotel | Brooklyn, NY | 11249 | Upper Upscale Class | Dec 2016 | Dec 2016 | 147 | Y | +147 (Dec'16) | | |
| 64539 | The William Vale | Brooklyn, NY | 11249 | Upper Upscale Class | Jun 2020 | Aug 2016 | 183 | Y | +183 (Jun'20) | -183 (Apr'20) | +12 (Nov'16) |
| 67179 | The Hoxton Williamsburg | Brooklyn, NY | 11249 | Upper Upscale Class | Jul 2020 | Sep 2018 | 175 | Y | +175 (Jul'20) | -175 (Apr'20) | +175 (Sep'18) |

Total Properties: 8    1135

o  - Monthly data received by STR
●  - Monthly and daily data received by STR
Blank - No data received by STR
Y  - (Chg in Rms) Property has experienced a room addition or drop during the time period of the report. Only the most recent three room changes are displayed. A property may have more than three changes during the time period of the report.

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

Trend # 1317546_SADIM / Created February 07, 2022

# Trend Report - Williamsburg Brooklyn, NY  Selected Properties

January 2013 to December 2021    Currency : USD - US Dollar

| | |
|---|---|
| Table of Contents | 1 |
| Data by Measure | 2 |
| Percent Change by Measure | 3 |
| Percent Change by Year | 4 |
| Twelve Month Moving Average | 5 |
| Twelve Month Moving Average with Percent Change | 6 |
| Day of Week Analysis | 7 |
| Raw Data | 8 |
| Classic | 9 |
| Response Report | 10 |
| Terms and Conditions | 11 |
| Help | 12 |

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM   Staff: GS   Created: February 07, 2022

## Occupancy (%)

|  | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | | | | | | | | | | | | | | |
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | 77.1 | 75.2 | 72.6 | 72.6 | | |
| 2017 | 58.3 | 48.3 | 56.5 | 68.4 | 72.6 | 77.9 | 76.6 | 71.6 | 80.1 | 80.4 | 74.7 | 72.6 | 70.4 | 70.4 |
| 2018 | 60.0 | 67.3 | 71.5 | 72.9 | 82.7 | 83.5 | 81.0 | 81.7 | 79.9 | 86.3 | 77.0 | 72.5 | 76.6 | 76.6 |
| 2019 | 56.4 | 61.8 | 73.1 | 78.5 | 81.9 | 83.0 | 81.3 | 80.9 | 84.6 | 83.5 | 75.7 | 75.6 | 76.4 | 76.4 |
| 2020 | 55.0 | 60.9 | 24.0 | | | 50.9 | 32.6 | 39.5 | 39.1 | 42.7 | 41.0 | 33.4 | | |
| 2021 | 40.9 | 48.3 | 52.8 | 61.0 | 62.9 | 77.6 | 75.3 | 77.6 | 78.1 | 77.2 | 77.3 | 74.2 | 67.1 | 67.1 |
| Avg | 53.6 | 57.4 | 55.0 | 70.2 | 74.8 | 76.3 | 68.7 | 69.8 | 72.5 | 73.9 | 69.4 | 66.3 | 72.6 | 72.6 |

## ADR ($)

|  | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | | | | | | | | | | | | | | |
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | 267.00 | 249.00 | 219.30 | 211.21 | | |
| 2017 | 163.20 | 162.23 | 212.50 | 238.80 | 280.81 | 270.54 | 270.42 | 259.18 | 313.74 | 305.34 | 276.74 | 278.18 | 261.61 | 261.61 |
| 2018 | 227.42 | 231.43 | 261.77 | 290.61 | 346.76 | 336.72 | 330.00 | 314.30 | 347.48 | 340.30 | 298.10 | 296.48 | 306.80 | 306.80 |
| 2019 | 216.62 | 239.44 | 253.26 | 304.00 | 345.52 | 337.95 | 328.41 | 320.43 | 369.73 | 354.91 | 308.15 | 305.86 | 312.09 | 312.09 |
| 2020 | 217.81 | 244.21 | 246.20 | | 165.07 | 258.35 | 286.79 | 275.37 | 245.03 | 215.72 | 224.83 | | | |
| 2021 | 205.01 | 210.54 | 214.15 | 249.96 | 309.97 | 333.69 | 362.15 | 336.75 | 375.71 | 375.19 | 341.85 | 352.01 | 317.92 | 317.92 |
| Avg | 209.22 | 222.36 | 239.34 | 273.77 | 323.53 | 306.82 | 317.88 | 307.62 | 337.62 | 325.62 | 289.13 | 289.71 | 301.42 | 301.42 |

## RevPAR ($)

|  | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | | | | | | | | | | | | | | |
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | 205.74 | 187.18 | 159.25 | 153.33 | | |
| 2017 | 95.10 | 78.29 | 120.10 | 163.22 | 203.80 | 210.85 | 207.14 | 185.57 | 251.35 | 245.64 | 206.80 | 202.04 | 184.08 | 184.08 |
| 2018 | 136.52 | 155.75 | 187.18 | 211.98 | 286.70 | 281.20 | 267.32 | 256.84 | 277.69 | 293.70 | 229.55 | 214.83 | 234.89 | 234.89 |
| 2019 | 122.16 | 148.01 | 185.24 | 238.53 | 282.86 | 280.57 | 267.05 | 259.31 | 312.96 | 296.38 | 233.38 | 231.34 | 238.58 | 238.58 |
| 2020 | 119.76 | 148.69 | 59.17 | | | 83.94 | 84.24 | 113.25 | 107.73 | 104.51 | 88.54 | 74.99 | | |
| 2021 | 83.89 | 101.63 | 113.10 | 152.39 | 194.84 | 259.09 | 272.65 | 261.36 | 293.25 | 289.80 | 264.17 | 261.21 | 213.25 | 213.25 |
| Avg | 112.13 | 127.59 | 131.74 | 192.09 | 241.97 | 234.06 | 218.53 | 214.87 | 244.91 | 240.79 | 200.62 | 192.15 | 218.90 | 218.90 |

## Supply

|  | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | | | | | | | | | | | | | | |
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | 15,180 | 16,647 | 16,470 | 21,576 | | |
| 2017 | 21,576 | 25,648 | 28,458 | 28,020 | 29,233 | 28,470 | 29,822 | 29,822 | 28,860 | 29,822 | 28,860 | 29,822 | 338,413 | 338,413 |
| 2018 | 29,760 | 26,908 | 29,791 | 28,830 | 29,791 | 28,830 | 29,791 | 29,791 | 34,080 | 35,216 | 34,080 | 35,216 | 372,084 | 372,084 |
| 2019 | 35,216 | 31,808 | 35,216 | 34,080 | 35,216 | 34,080 | 35,216 | 35,216 | 34,080 | 35,216 | 34,080 | 35,216 | 414,640 | 414,640 |
| 2020 | 35,216 | 31,808 | 35,216 | | | 20,880 | 35,216 | 35,216 | 34,080 | 35,216 | 33,600 | 34,720 | | |
| 2021 | 34,720 | 31,360 | 34,813 | 33,930 | 35,154 | 34,020 | 35,216 | 35,216 | 34,080 | 35,216 | 34,080 | 35,216 | 413,021 | 413,021 |
| Avg | 31,298 | 29,506 | 32,699 | 31,215 | 32,349 | 29,256 | 33,052 | 33,052 | 30,060 | 31,222 | 30,195 | 31,961 | 384,540 | 384,540 |

## Demand

|  | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | | | | | | | | | | | | | | |
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | 11,697 | 12,514 | 11,960 | 15,663 | | |
| 2017 | 12,573 | 12,377 | 16,083 | 19,152 | 21,216 | 22,189 | 22,844 | 21,352 | 23,121 | 23,991 | 21,566 | 21,659 | 238,123 | 238,123 |
| 2018 | 17,865 | 18,109 | 21,303 | 21,029 | 24,631 | 24,076 | 24,133 | 24,344 | 27,235 | 30,394 | 26,243 | 25,517 | 284,879 | 284,879 |
| 2019 | 19,859 | 19,662 | 25,758 | 26,740 | 28,829 | 28,294 | 28,637 | 28,498 | 28,847 | 29,409 | 25,811 | 26,636 | 316,980 | 316,980 |
| 2020 | 19,363 | 19,367 | 8,463 | | | 10,618 | 11,483 | 13,906 | 13,332 | 15,020 | 13,791 | 11,580 | | |
| 2021 | 14,208 | 15,138 | 18,386 | 20,686 | 22,097 | 26,414 | 26,513 | 27,332 | 26,600 | 27,201 | 26,336 | 26,132 | 277,043 | 277,043 |
| Avg | 16,774 | 16,931 | 17,999 | 21,902 | 24,193 | 22,318 | 22,722 | 23,086 | 21,805 | 23,088 | 20,951 | 21,198 | 279,256 | 279,256 |

| Revenue ($) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | January | February | March | April | May | June | July | August | September | October | November | December | | Total Year | Dec YTD |
| **2013** | | | | | | | | | | | | | | | |
| **2014** | | | | | | | | | | | | | | | |
| **2015** | | | | | | | | | | | | | | | |
| **2016** | | | | | | | | | 3,123,137 | 3,115,988 | 2,622,799 | 3,308,169 | | | |
| **2017** | 2,051,893 | 2,007,925 | 3,417,699 | 4,573,424 | 5,957,574 | 6,002,992 | 6,177,371 | 5,534,027 | 7,253,926 | 7,325,520 | 5,968,248 | 6,025,103 | | 62,295,702 | 62,295,702 |
| **2018** | 4,062,825 | 4,190,957 | 5,576,394 | 6,111,296 | 8,541,156 | 8,106,947 | 7,963,871 | 7,651,405 | 9,463,519 | 10,343,057 | 7,823,157 | 7,565,399 | | 87,399,983 | 87,399,983 |
| **2019** | 4,301,953 | 4,707,951 | 6,523,529 | 8,128,953 | 9,961,032 | 9,561,958 | 9,404,551 | 9,131,737 | 10,665,521 | 10,437,439 | 7,953,586 | 8,146,841 | | 98,925,051 | 98,925,051 |
| **2020** | 4,217,384 | 4,729,520 | 2,083,615 | | | 1,752,708 | 2,966,601 | 3,988,082 | 3,671,284 | 3,680,400 | 2,974,959 | 2,603,560 | | | |
| **2021** | 2,912,752 | 3,187,226 | 3,937,404 | 5,170,692 | 6,849,412 | 8,814,144 | 9,601,803 | 9,203,979 | 9,993,835 | 10,205,424 | 9,002,841 | 9,198,803 | | 88,078,315 | 88,078,315 |
| **Avg** | 3,509,361 | 3,764,716 | 4,307,728 | 5,996,091 | 7,827,294 | 6,847,750 | 7,222,839 | 7,101,846 | 7,361,870 | 7,517,971 | 6,057,598 | 6,141,313 | | 84,174,763 | 84,174,763 |

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM  Staff: GS  Created: February 07, 2022

### Occupancy

| | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | | | |
| 2017 | | | | | | | | | 4.0 | 7.0 | 2.9 | 0.0 | | |
| 2018 | 3.0 | 39.5 | 26.5 | 6.7 | 13.9 | 7.1 | 5.8 | 14.1 | -0.2 | 7.3 | 3.0 | -0.2 | 8.8 | 8.8 |
| 2019 | -6.1 | -8.2 | 2.3 | 7.6 | -1.0 | -0.6 | 0.4 | -1.0 | 5.9 | -3.2 | -1.6 | 4.4 | -0.2 | -0.2 |
| 2020 | -2.5 | -1.5 | -67.1 | | | -38.7 | -59.9 | -51.2 | -53.8 | -48.9 | -45.8 | -55.9 | | |
| 2021 | -25.6 | -20.7 | 119.8 | | | 52.7 | 130.9 | 96.5 | 99.5 | 81.1 | 88.3 | 122.5 | | |
| Avg | -7.8 | 2.3 | 20.4 | 7.1 | 6.5 | 5.1 | 19.3 | 14.6 | 11.1 | 8.6 | 9.4 | 14.2 | 4.3 | 4.3 |

### ADR

| | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | | | |
| 2017 | | | | | | | | | 17.5 | 22.6 | 26.2 | 31.7 | | |
| 2018 | 39.4 | 42.7 | 23.2 | 21.7 | 23.5 | 24.5 | 22.0 | 21.3 | 10.8 | 11.4 | 7.7 | 6.6 | 17.3 | 17.3 |
| 2019 | -4.7 | 3.5 | -3.2 | 4.6 | -0.4 | 0.4 | -0.5 | 2.0 | 6.4 | 4.3 | 3.4 | 3.2 | 1.7 | 1.7 |
| 2020 | 0.5 | 2.0 | -2.8 | | | -51.2 | -21.3 | -10.5 | -25.5 | -31.0 | -30.0 | -26.5 | | |
| 2021 | -5.9 | -13.8 | -13.0 | | | 102.2 | 40.2 | 17.4 | 36.4 | 53.1 | 58.5 | 56.6 | | |
| Avg | 7.3 | 8.6 | 1.0 | 13.2 | 11.6 | 19.0 | 10.1 | 7.5 | 9.1 | 12.1 | 13.2 | 14.3 | 9.5 | 9.5 |

### RevPAR

| | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | | | |
| 2017 | | | | | | | | | 22.2 | 31.2 | 29.9 | 31.8 | | |
| 2018 | 43.6 | 98.9 | 55.9 | 29.9 | 40.7 | 33.4 | 29.1 | 38.4 | 10.5 | 19.6 | 11.0 | 6.3 | 27.6 | 27.6 |
| 2019 | -10.5 | -5.0 | -1.0 | 12.5 | -1.3 | -0.2 | -0.1 | 1.0 | 12.7 | 0.9 | 1.7 | 7.7 | 1.6 | 1.6 |
| 2020 | -2.0 | 0.5 | -68.1 | | | -70.1 | -68.5 | -56.3 | -65.6 | -64.7 | -62.1 | -67.6 | | |
| 2021 | -29.9 | -31.6 | 91.2 | | | 208.7 | 223.7 | 130.8 | 172.2 | 177.3 | 198.4 | 248.3 | | |
| Avg | 0.3 | 15.7 | 19.5 | 21.2 | 19.7 | 42.9 | 46.0 | 28.5 | 30.4 | 32.9 | 35.8 | 45.3 | 14.6 | 14.6 |

### Supply

| | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | | | |
| 2017 | | | | | | | | | 90.1 | 79.1 | 75.2 | 38.2 | | |
| 2018 | 37.9 | 4.9 | 4.7 | 2.9 | 1.9 | 1.3 | -0.1 | -0.1 | 18.1 | 18.1 | 18.1 | 18.1 | 9.9 | 9.9 |
| 2019 | 18.3 | 18.2 | 18.2 | 18.2 | 18.2 | 18.2 | 18.2 | 18.2 | 0.0 | 0.0 | 0.0 | 0.0 | 11.4 | 11.4 |
| 2020 | 0.0 | 0.0 | 0.0 | | | -38.7 | 0.0 | 0.0 | 0.0 | 0.0 | -1.4 | -1.4 | | |
| 2021 | -1.4 | -1.4 | -1.1 | | | 62.9 | 0.0 | 0.0 | 0.0 | 0.0 | 1.4 | 1.4 | | |
| Avg | 13.7 | 5.4 | 5.4 | 10.6 | 10.1 | 10.9 | 4.5 | 4.5 | 21.6 | 19.4 | 18.7 | 11.3 | 10.7 | 10.7 |

### Demand

| | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | | | |
| 2017 | | | | | | | | | 97.7 | 91.7 | 80.3 | 38.3 | | |
| 2018 | 42.1 | 46.3 | 32.5 | 9.8 | 16.1 | 8.5 | 5.6 | 14.0 | 17.8 | 26.7 | 21.7 | 17.8 | 19.6 | 19.6 |
| 2019 | 11.2 | 8.6 | 20.9 | 27.2 | 17.0 | 17.5 | 18.7 | 17.1 | 5.9 | -3.2 | -1.6 | 4.4 | 11.3 | 11.3 |
| 2020 | -2.5 | -1.5 | -67.1 | | | -62.5 | -59.9 | -51.2 | -53.8 | -48.9 | -46.6 | -56.5 | | |
| 2021 | -26.6 | -21.8 | 117.3 | | | 148.8 | 130.9 | 96.5 | 99.5 | 81.1 | 91.0 | 125.7 | | |
| Avg | 6.0 | 7.9 | 25.9 | 18.5 | 16.6 | 28.1 | 23.8 | 19.1 | 33.4 | 29.5 | 29.0 | 25.9 | 15.5 | 15.5 |

### Revenue

| | January | February | March | April | May | June | July | August | September | October | November | December | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | | |

21-12051-mg Doc 151 Filed 07/15/22 Entered 07/15/22 18:55:12 Main Document Pg 754 of 802

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2016** | | | | | | | | | | | | | |
| **2017** | | | | | | | | 132.3 | 135.1 | 127.6 | 82.1 | | |
| **2018** | 98.0 | 108.7 | | 33.8 | | 37.1 | | 19.7 | | | 25.6 | 40.3 | 40.3 |
| **2019** | 5.9 | 12.3 | 17.0 | 33.0 | 16.6 | 17.9 | 19.3 | 12.7 | 0.9 | 1.7 | 7.7 | 13.2 | 13.2 |
| **2020** | -2.0 | 0.5 | -68.1 | | | -81.7 | -68.5 | -56.3 | -65.6 | -64.7 | -62.6 | -68.0 | |
| **2021** | -30.9 | -32.6 | 89.0 | | | 402.9 | 223.7 | 130.8 | 172.2 | 177.3 | 202.6 | 253.3 | |
| **Avg** | 17.7 | 22.2 | 25.3 | 33.3 | 30.0 | 93.6 | 50.6 | 33.0 | 56.4 | 58.0 | 60.1 | 60.1 | 26.7 | 26.7 |

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

Williamsburg Brooklyn, NY  Selected Properties

Job Number: 1317546_SADIM    Staff: GS    Created: February 07, 2022

| | Jan 14 | Feb 14 | Mar 14 | Apr 14 | May 14 | Jun 14 | Jul 14 | Aug 14 | Sep 14 | Oct 14 | Nov 14 | Dec 14 | | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occ | | | | | | | | | | | | | | | |
| ADR | | | | | | | | | | | | | | | |
| RevPAR | | | | | | | | | | | | | | | |
| Supply | | | | | | | | | | | | | | | |
| Demand | | | | | | | | | | | | | | | |
| Revenue | | | | | | | | | | | | | | | |

| | Jan 15 | Feb 15 | Mar 15 | Apr 15 | May 15 | Jun 15 | Jul 15 | Aug 15 | Sep 15 | Oct 15 | Nov 15 | Dec 15 | | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occ | | | | | | | | | | | | | | | |
| ADR | | | | | | | | | | | | | | | |
| RevPAR | | | | | | | | | | | | | | | |
| Supply | | | | | | | | | | | | | | | |
| Demand | | | | | | | | | | | | | | | |
| Revenue | | | | | | | | | | | | | | | |

| | Jan 16 | Feb 16 | Mar 16 | Apr 16 | May 16 | Jun 16 | Jul 16 | Aug 16 | Sep 16 | Oct 16 | Nov 16 | Dec 16 | | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occ | | | | | | | | | | | | | | | |
| ADR | | | | | | | | | | | | | | | |
| RevPAR | | | | | | | | | | | | | | | |
| Supply | | | | | | | | | | | | | | | |
| Demand | | | | | | | | | | | | | | | |
| Revenue | | | | | | | | | | | | | | | |

| | Jan 17 | Feb 17 | Mar 17 | Apr 17 | May 17 | Jun 17 | Jul 17 | Aug 17 | Sep 17 | Oct 17 | Nov 17 | Dec 17 | | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occ | | | | | | | | | 4.0 | 7.0 | 2.9 | 0.0 | | | |
| ADR | | | | | | | | | 17.5 | 22.6 | 26.2 | 31.7 | | | |
| RevPAR | | | | | | | | | 22.2 | 31.2 | 29.9 | 31.8 | | | |
| Supply | | | | | | | | | 90.1 | 79.1 | 75.2 | 38.2 | | | |
| Demand | | | | | | | | | 97.7 | 91.7 | 80.3 | 38.3 | | | |
| Revenue | | | | | | | | | 132.3 | 135.1 | 127.6 | 82.1 | | | |

| | Jan 18 | Feb 18 | Mar 18 | Apr 18 | May 18 | Jun 18 | Jul 18 | Aug 18 | Sep 18 | Oct 18 | Nov 18 | Dec 18 | | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occ | 3.0 | 39.5 | 26.5 | 6.7 | 13.9 | 7.1 | 5.8 | 14.1 | -0.2 | 7.3 | 3.0 | -0.2 | | 8.8 | 8.8 |
| ADR | 39.4 | 42.7 | 23.2 | 21.7 | 23.5 | 24.5 | 22.0 | 21.3 | 10.8 | 11.4 | 7.7 | 6.6 | | 17.3 | 17.3 |
| RevPAR | 43.6 | 98.9 | 55.9 | 29.9 | 40.7 | 33.4 | 29.1 | 38.4 | 10.5 | 19.6 | 11.0 | 6.3 | | 27.6 | 27.6 |
| Supply | 37.9 | 4.9 | 4.7 | 2.9 | 1.9 | 1.3 | -0.1 | -0.1 | 18.1 | 18.1 | 18.1 | 18.1 | | 9.9 | 9.9 |
| Demand | 42.1 | 46.3 | 32.5 | 9.8 | 16.1 | 8.5 | 5.6 | 14.0 | 17.8 | 26.7 | 21.7 | 17.8 | | 19.6 | 19.6 |
| Revenue | 98.0 | 108.7 | 63.2 | 33.6 | 43.4 | 35.0 | 28.9 | 38.3 | 30.5 | 41.2 | 31.1 | 25.6 | | 40.3 | 40.3 |

| | Jan 19 | Feb 19 | Mar 19 | Apr 19 | May 19 | Jun 19 | Jul 19 | Aug 19 | Sep 19 | Oct 19 | Nov 19 | Dec 19 | | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occ | -6.1 | -8.2 | 2.3 | 7.6 | -1.0 | -0.6 | 0.4 | -1.0 | 5.9 | -3.2 | -1.6 | 4.4 | | -0.2 | -0.2 |
| ADR | -4.7 | 3.5 | -3.2 | 4.6 | -0.4 | 0.4 | -0.5 | 2.0 | 6.4 | 4.3 | 3.4 | 3.2 | | 1.7 | 1.7 |
| RevPAR | -10.5 | -5.0 | -1.0 | 12.5 | -1.3 | -0.2 | -0.1 | 1.0 | 12.7 | 0.9 | 1.7 | 7.7 | | 1.6 | 1.6 |
| Supply | 18.3 | 18.2 | 18.2 | 18.2 | 18.2 | 18.2 | 18.2 | 18.2 | 0.0 | 0.0 | 0.0 | 0.0 | | 11.4 | 11.4 |
| Demand | 11.2 | 8.6 | 20.9 | 27.2 | 17.0 | 17.5 | 18.7 | 17.1 | 5.9 | -3.2 | -1.6 | 4.4 | | 11.3 | 11.3 |
| Revenue | 5.9 | 12.3 | 17.0 | 33.0 | 16.6 | 17.9 | 18.1 | 19.3 | 12.7 | 0.9 | 1.7 | 7.7 | | 13.2 | 13.2 |

| | Jan 20 | Feb 20 | Mar 20 | Apr 20 | May 20 | Jun 20 | Jul 20 | Aug 20 | Sep 20 | Oct 20 | Nov 20 | Dec 20 | | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occ | -2.5 | -1.5 | -67.1 | | | -38.7 | -59.9 | -51.2 | -53.8 | -48.9 | -45.8 | -55.9 | | | |
| ADR | 0.5 | 2.0 | -2.8 | | | -51.2 | -21.3 | -10.5 | -25.5 | -31.0 | -30.0 | -26.5 | | | |
| RevPAR | -2.0 | 0.5 | -68.1 | | | -70.1 | -68.5 | -56.3 | -65.6 | -64.7 | -62.1 | -67.6 | | | |
| Supply | 0.0 | 0.0 | 0.0 | | | -38.7 | 0.0 | 0.0 | 0.0 | 0.0 | -1.4 | -1.4 | | | |
| Demand | -2.5 | -1.5 | -67.1 | | | -62.5 | -59.9 | -51.2 | -53.8 | -48.9 | -46.6 | -56.5 | | | |
| Revenue | -2.0 | 0.5 | -68.1 | | | -81.7 | -68.5 | -56.3 | -65.6 | -64.7 | -62.6 | -68.0 | | | |

| | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | | Total Year | Dec YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occ | -25.6 | -20.7 | 119.8 | | | 52.7 | 130.9 | 96.5 | 99.5 | 81.1 | 88.3 | 122.5 | | | |
| ADR | -5.9 | -13.8 | -13.0 | | | 102.2 | 40.2 | 17.4 | 36.4 | 53.1 | 58.5 | 56.6 | | | |
| RevPAR | -29.9 | -31.6 | 91.2 | | | 208.7 | 223.7 | 130.8 | 172.2 | 177.3 | 198.4 | 248.3 | | | |
| Supply | -1.4 | -1.4 | -1.1 | | | 62.9 | 0.0 | 0.0 | 0.0 | 0.0 | 1.4 | 1.4 | | | |
| Demand | -26.6 | -21.8 | 117.3 | | | 148.8 | 130.9 | 96.5 | 99.5 | 81.1 | 91.0 | 125.7 | | | |
| Revenue | -30.9 | -32.6 | 89.0 | | | 402.9 | 223.7 | 130.8 | 172.2 | 177.3 | 202.6 | 253.3 | | | |

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paying subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

Williamsburg Brooklyn, NY  Selected Properties

Job Number: 1317546_SADIM     Staff: GS     Created: February 07, 2022

## Occupancy (%)

| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | |
| 2017 | | | | | | | | 68.6 | 69.3 | 70.0 | 70.3 | 70.4 |
| 2018 | 70.2 | 71.6 | 72.8 | 73.2 | 74.1 | 74.5 | 74.9 | 75.8 | 75.8 | 76.5 | 76.6 | 76.6 |
| 2019 | 76.0 | 75.4 | 75.5 | 76.0 | 76.0 | 76.0 | 76.1 | 76.1 | 76.5 | 76.3 | 76.2 | 76.4 |
| 2020 | 76.3 | 76.3 | 72.1 | | | | | | | | | |
| 2021 | | | | | 45.2 | 47.6 | 51.2 | 54.5 | 57.7 | 60.7 | 63.6 | 67.1 |

## ADR ($)

| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | |
| 2017 | | | | | | | | 239.92 | 246.51 | 252.71 | 256.66 | 261.61 |
| 2018 | 264.19 | 266.87 | 269.88 | 273.90 | 280.25 | 286.27 | 291.67 | 296.35 | 300.02 | 303.99 | 305.53 | 306.80 |
| 2019 | 305.50 | 305.65 | 304.23 | 305.17 | 305.63 | 306.17 | 306.37 | 307.02 | 309.25 | 310.51 | 311.35 | 312.09 |
| 2020 | 312.31 | 312.67 | 315.91 | | | | | | | | | |
| 2021 | | | | | 242.42 | 258.91 | 271.91 | 278.88 | 289.91 | 301.89 | 310.42 | 317.92 |

## RevPAR ($)

| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | |
| 2017 | | | | | | | | 164.62 | 170.79 | 176.96 | 180.45 | 184.08 |
| 2018 | 185.54 | 191.14 | 196.59 | 200.53 | 207.58 | 213.37 | 218.48 | 224.53 | 227.44 | 232.40 | 234.15 | 234.89 |
| 2019 | 232.13 | 230.51 | 229.73 | 231.79 | 232.20 | 232.78 | 233.22 | 233.74 | 236.64 | 236.86 | 237.18 | 238.58 |
| 2020 | 238.38 | 238.43 | 227.72 | | | | | | | | | |
| 2021 | | | | | 109.54 | 123.18 | 139.29 | 151.94 | 167.29 | 183.12 | 197.52 | 213.25 |

## Supply

| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | |
| 2017 | | | | | | | | 290,922 | 304,602 | 317,777 | 330,167 | 338,413 |
| 2018 | 346,597 | 347,857 | 349,190 | 350,000 | 350,558 | 350,918 | 350,887 | 350,856 | 356,076 | 361,470 | 366,690 | 372,084 |
| 2019 | 377,540 | 382,440 | 387,865 | 393,115 | 398,540 | 403,790 | 409,215 | 414,640 | 414,640 | 414,640 | 414,640 | 414,640 |
| 2020 | 414,640 | 414,640 | 414,640 | | | | | | | | | |
| 2021 | | | | | 398,905 | 412,045 | 412,045 | 412,045 | 412,045 | 412,045 | 412,525 | 413,021 |

## Demand

| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | |
| 2017 | | | | | | | | 199,620 | 211,044 | 222,521 | 232,127 | 238,123 |
| 2018 | 243,415 | 249,147 | 254,367 | 256,244 | 259,659 | 261,546 | 262,835 | 265,827 | 269,941 | 276,344 | 281,021 | 284,879 |
| 2019 | 286,873 | 288,426 | 292,881 | 298,592 | 302,790 | 307,008 | 311,512 | 315,666 | 317,278 | 316,293 | 315,861 | 316,980 |
| 2020 | 316,484 | 316,189 | 298,894 | | | | | | | | | |
| 2021 | | | | | 180,245 | 196,041 | 211,071 | 224,497 | 237,765 | 249,946 | 262,491 | 277,043 |

## Revenue ($)

| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | |
| 2017 | | | | | | | | 47,892,998 | 52,023,787 | 56,233,319 | 59,578,768 | 62,295,702 |
| 2018 | 64,306,634 | 66,489,666 | 68,648,361 | 70,186,233 | 72,769,815 | 74,873,770 | 76,660,270 | 78,777,648 | 80,987,241 | 84,004,778 | 85,859,687 | 87,399,983 |
| 2019 | 87,639,111 | 88,156,105 | 89,103,240 | 91,120,897 | 92,540,773 | 93,995,784 | 95,436,464 | 96,916,796 | 98,118,798 | 98,213,180 | 98,343,609 | 98,925,051 |
| 2020 | 98,840,482 | 98,862,051 | 94,422,137 | | | | | | | | | |
| 2021 | | | | | 43,695,080 | 50,756,516 | 57,391,718 | 62,607,615 | 68,930,166 | 75,455,190 | 81,483,072 | 88,078,315 |

High value is boxed.

Low value is boxed and italicized.

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

Williamsburg Brooklyn, NY  Selected Properties

Job Number: 1317546_SADIM    Staff: GS    Created: February 07, 2022

| Date | Occupancy | | ADR | | RevPar | | Supply | | Demand | | Revenue | |
|------|-----------|--|-----|--|--------|--|--------|--|--------|--|---------|--|
| | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg |
| Jan 14 | | | | | | | | | | | | |
| Feb 14 | | | | | | | | | | | | |
| Mar 14 | | | | | | | | | | | | |
| Apr 14 | | | | | | | | | | | | |
| May 14 | | | | | | | | | | | | |
| Jun 14 | | | | | | | | | | | | |
| Jul 14 | | | | | | | | | | | | |
| Aug 14 | | | | | | | | | | | | |
| Sep 14 | | | | | | | | | | | | |
| Oct 14 | | | | | | | | | | | | |
| Nov 14 | | | | | | | | | | | | |
| Dec 14 | | | | | | | | | | | | |
| Jan 15 | | | | | | | | | | | | |
| Feb 15 | | | | | | | | | | | | |
| Mar 15 | | | | | | | | | | | | |
| Apr 15 | | | | | | | | | | | | |
| May 15 | | | | | | | | | | | | |
| Jun 15 | | | | | | | | | | | | |
| Jul 15 | | | | | | | | | | | | |
| Aug 15 | | | | | | | | | | | | |
| Sep 15 | | | | | | | | | | | | |
| Oct 15 | | | | | | | | | | | | |
| Nov 15 | | | | | | | | | | | | |
| Dec 15 | | | | | | | | | | | | |
| Jan 16 | | | | | | | | | | | | |
| Feb 16 | | | | | | | | | | | | |
| Mar 16 | | | | | | | | | | | | |
| Apr 16 | | | | | | | | | | | | |
| May 16 | | | | | | | | | | | | |
| Jun 16 | | | | | | | | | | | | |
| Jul 16 | | | | | | | | | | | | |
| Aug 16 | | | | | | | | | | | | |
| Sep 16 | | | | | | | | | | | | |
| Oct 16 | | | | | | | | | | | | |
| Nov 16 | | | | | | | | | | | | |
| Dec 16 | | | | | | | | | | | | |
| Jan 17 | | | | | | | | | | | | |
| Feb 17 | | | | | | | | | | | | |
| Mar 17 | | | | | | | | | | | | |
| Apr 17 | | | | | | | | | | | | |
| May 17 | | | | | | | | | | | | |
| Jun 17 | | | | | | | | | | | | |
| Jul 17 | | | | | | | | | | | | |
| Aug 17 | 68.6 | | 239.92 | | 164.62 | | 290,922 | | 199,620 | | 47,892,998 | |
| Sep 17 | 69.3 | | 246.51 | | 170.79 | | 304,602 | | 211,044 | | 52,023,787 | |

# Tab 6 - Twelve Month Moving Average with Percent Change

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM    Staff: GS    Created: February 07, 2022

| Date | Occupancy | | ADR | | RevPar | | Supply | | Demand | | Revenue | |
|------|-----------|--------|-----|--------|--------|--------|--------|--------|--------|--------|---------|--------|
| | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg |
| Oct 17 | 70.0 | | 252.71 | | 176.96 | | 317,777 | | 222,521 | | 56,233,319 | |
| Nov 17 | 70.3 | | 256.66 | | 180.45 | | 330,167 | | 232,127 | | 59,578,768 | |
| Dec 17 | 70.4 | | 261.61 | | 184.08 | | 338,413 | | 238,123 | | 62,295,702 | |
| Jan 18 | 70.2 | | 264.19 | | 185.54 | | 346,597 | | 243,415 | | 64,306,634 | |
| Feb 18 | 71.6 | | 266.87 | | 191.14 | | 347,857 | | 249,147 | | 66,489,666 | |
| Mar 18 | 72.8 | | 269.88 | | 196.59 | | 349,190 | | 254,367 | | 68,648,361 | |
| Apr 18 | 73.2 | | 273.90 | | 200.53 | | 350,000 | | 256,244 | | 70,186,233 | |
| May 18 | 74.1 | | 280.25 | | 207.58 | | 350,558 | | 259,659 | | 72,769,815 | |
| Jun 18 | 74.5 | | 286.27 | | 213.37 | | 350,918 | | 261,546 | | 74,873,770 | |
| Jul 18 | 74.9 | | 291.67 | | 218.48 | | 350,887 | | 262,835 | | 76,660,270 | |
| Aug 18 | 75.8 | 10.4 | 296.35 | 23.5 | 224.53 | 36.4 | 350,856 | 20.6 | 265,827 | 33.2 | 78,777,648 | 64.5 |
| Sep 18 | 75.8 | 9.4 | 300.02 | 21.7 | 227.44 | 33.2 | 356,076 | 16.9 | 269,941 | 27.9 | 80,987,241 | 55.7 |
| Oct 18 | 76.5 | 9.2 | 303.99 | 20.3 | 232.40 | 31.3 | 361,470 | 13.7 | 276,344 | 24.2 | 84,004,778 | 49.4 |
| Nov 18 | 76.6 | 9.0 | 305.53 | 19.0 | 234.15 | 29.8 | 366,690 | 11.1 | 281,021 | 21.1 | 85,859,687 | 44.1 |
| Dec 18 | 76.6 | 8.8 | 306.80 | 17.3 | 234.89 | 27.6 | 372,084 | 9.9 | 284,879 | 19.6 | 87,399,983 | 40.3 |
| Jan 19 | 76.0 | 8.2 | 305.50 | 15.6 | 232.13 | 25.1 | 377,540 | 8.9 | 286,873 | 17.9 | 87,639,111 | 36.3 |
| Feb 19 | 75.4 | 5.3 | 305.65 | 14.5 | 230.51 | 20.6 | 382,440 | 9.9 | 288,426 | 15.8 | 88,156,105 | 32.6 |
| Mar 19 | 75.5 | 3.7 | 304.23 | 12.7 | 229.73 | 16.9 | 387,865 | 11.1 | 292,881 | 15.1 | 89,103,240 | 29.8 |
| Apr 19 | 76.0 | 3.7 | 305.17 | 11.4 | 231.79 | 15.6 | 393,115 | 12.3 | 298,592 | 16.5 | 91,120,897 | 29.8 |
| May 19 | 76.0 | 2.6 | 305.63 | 9.1 | 232.20 | 11.9 | 398,540 | 13.7 | 302,790 | 16.6 | 92,540,773 | 27.2 |
| Jun 19 | 76.0 | 2.0 | 306.17 | 6.9 | 232.78 | 9.1 | 403,790 | 15.1 | 307,008 | 17.4 | 93,995,784 | 25.5 |
| Jul 19 | 76.1 | 1.6 | 306.37 | 5.0 | 233.22 | 6.7 | 409,215 | 16.6 | 311,512 | 18.5 | 95,436,464 | 24.5 |
| Aug 19 | 76.1 | 0.5 | 307.02 | 3.6 | 233.74 | 4.1 | 414,640 | 18.2 | 315,666 | 18.7 | 96,916,796 | 23.0 |
| Sep 19 | 76.5 | 0.9 | 309.25 | 3.1 | 236.64 | 4.0 | 414,640 | 16.4 | 317,278 | 17.5 | 98,118,798 | 21.2 |
| Oct 19 | 76.3 | -0.2 | 310.51 | 2.1 | 236.86 | 1.9 | 414,640 | 14.7 | 316,293 | 14.5 | 98,213,180 | 16.9 |
| Nov 19 | 76.2 | -0.6 | 311.35 | 1.9 | 237.18 | 1.3 | 414,640 | 13.1 | 315,861 | 12.4 | 98,343,609 | 14.5 |
| Dec 19 | 76.4 | -0.2 | 312.09 | 1.7 | 238.58 | 1.6 | 414,640 | 11.4 | 316,980 | 11.3 | 98,925,051 | 13.2 |
| Jan 20 | 76.3 | 0.5 | 312.31 | 2.2 | 238.38 | 2.7 | 414,640 | 9.8 | 316,484 | 10.3 | 98,840,482 | 12.8 |
| Feb 20 | 76.3 | 1.1 | 312.67 | 2.3 | 238.43 | 3.4 | 414,640 | 8.4 | 316,189 | 9.6 | 98,862,051 | 12.1 |
| Mar 20 | 72.1 | -4.5 | 315.91 | 3.8 | 227.72 | -0.9 | 414,640 | 6.9 | 298,894 | 2.1 | 94,422,137 | 6.0 |
| Apr 20 | | | | | | | | | | | | |
| May 20 | | | | | | | | | | | | |
| Jun 20 | | | | | | | | | | | | |
| Jul 20 | | | | | | | | | | | | |
| Aug 20 | | | | | | | | | | | | |
| Sep 20 | | | | | | | | | | | | |
| Oct 20 | | | | | | | | | | | | |
| Nov 20 | | | | | | | | | | | | |
| Dec 20 | | | | | | | | | | | | |
| Jan 21 | | | | | | | | | | | | |
| Feb 21 | | | | | | | | | | | | |
| Mar 21 | | | | | | | | | | | | |
| Apr 21 | | | | | | | | | | | | |
| May 21 | 45.2 | | 242.42 | | 109.54 | | 398,905 | | 180,245 | | 43,695,080 | |
| Jun 21 | 47.6 | | 258.91 | | 123.18 | | 412,045 | | 196,041 | | 50,756,516 | |

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM    Staff: GS    Created: February 07, 2022

| Date | Occupancy | | ADR | | RevPar | | Supply | | Demand | | Revenue | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg |
| Jul 21 | 51.2 | | 271.91 | | 139.29 | | 412,045 | | 211,071 | | 57,391,718 | |
| Aug 21 | 54.5 | | 278.88 | | 151.94 | | 412,045 | | 224,497 | | 62,607,615 | |
| Sep 21 | 57.7 | | 289.91 | | 167.29 | | 412,045 | | 237,765 | | 68,930,166 | |
| Oct 21 | 60.7 | | 301.89 | | 183.12 | | 412,045 | | 249,946 | | 75,455,190 | |
| Nov 21 | 63.6 | | 310.42 | | 197.52 | | 412,525 | | 262,491 | | 81,483,072 | |
| Dec 21 | 67.1 | | 317.92 | | 213.25 | | 413,021 | | 277,043 | | 88,078,315 | |

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

Williamsburg Brooklyn, NY  Selected Properties

Job Number: 1317546_SADIM  Staff: GS  Created: February 07, 2022

## Occupancy (%)

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Total Month |
|---|---|---|---|---|---|---|---|---|
| Jan - 21 | 37.9 | 30.8 | 33.0 | 34.5 | 38.4 | 50.2 | 56.3 | 40.9 |
| Feb - 21 | 53.5 | 39.6 | 38.9 | 39.3 | 41.7 | 55.2 | 69.7 | 48.3 |
| Mar - 21 | 50.5 | 44.3 | 45.9 | 45.8 | 49.4 | 63.9 | 75.5 | 52.8 |
| Apr - 21 | 53.8 | 50.0 | 53.7 | 56.3 | 60.1 | 71.7 | 78.6 | 61.0 |
| May - 21 | 60.9 | 51.5 | 52.9 | 56.8 | 64.8 | 74.8 | 77.9 | 62.9 |
| Jun - 21 | 73.6 | 70.1 | 71.2 | 74.6 | 79.2 | 86.9 | 90.2 | 77.6 |
| Jul - 21 | 74.7 | 63.5 | 68.7 | 74.3 | 76.9 | 80.7 | 84.2 | 75.3 |
| Aug - 21 | 75.3 | 72.0 | 75.6 | 76.0 | 78.9 | 82.1 | 85.9 | 77.6 |
| Sep - 21 | 76.7 | 70.0 | 71.4 | 74.0 | 80.7 | 85.9 | 87.9 | 78.1 |
| Oct - 21 | 70.2 | 67.3 | 70.3 | 74.4 | 79.0 | 86.0 | 89.9 | 77.2 |
| Nov - 21 | 68.8 | 67.3 | 72.2 | 78.4 | 81.4 | 87.6 | 89.1 | 77.3 |
| Dec - 21 | 69.4 | 66.4 | 70.4 | 75.3 | 75.2 | 78.8 | 82.3 | 74.2 |
| Total Year | 63.6 | 57.9 | 60.9 | 63.7 | 67.7 | 75.2 | 80.4 | 67.1 |

## Three Year Occupancy (%)

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Total Year |
|---|---|---|---|---|---|---|---|---|
| Jan 19 - Dec 19 | 67.9 | 68.6 | 74.6 | 77.4 | 76.8 | 82.4 | 87.6 | 76.4 |
| Jan 20 - Dec 20 | 37.8 | 34.8 | 36.4 | 38.2 | 40.1 | 47.4 | 53.1 | 41.1 |
| Jan 21 - Dec 21 | 63.6 | 57.9 | 60.9 | 63.7 | 67.7 | 75.2 | 80.4 | 67.1 |
| Total 3 Yr | 57.3 | 54.6 | 58.3 | 60.6 | 62.4 | 69.4 | 74.7 | 62.5 |

## ADR

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Total Month |
|---|---|---|---|---|---|---|---|---|
| Jan - 21 | 180.93 | 178.34 | 181.18 | 189.86 | 197.88 | 226.61 | 236.15 | 205.01 |
| Feb - 21 | 225.74 | 184.76 | 176.50 | 179.83 | 186.78 | 222.43 | 254.64 | 210.54 |
| Mar - 21 | 195.30 | 199.89 | 198.93 | 193.78 | 191.28 | 230.61 | 265.26 | 214.15 |
| Apr - 21 | 230.51 | 208.39 | 213.77 | 221.61 | 230.49 | 288.11 | 309.97 | 249.96 |
| May - 21 | 294.66 | 258.54 | 261.07 | 266.04 | 288.95 | 349.42 | 391.75 | 309.97 |
| Jun - 21 | 309.04 | 286.18 | 283.86 | 292.34 | 321.05 | 403.71 | 426.29 | 333.69 |
| Jul - 21 | 369.07 | 293.23 | 303.81 | 304.60 | 332.20 | 414.37 | 454.81 | 362.15 |
| Aug - 21 | 302.51 | 279.49 | 288.46 | 285.30 | 322.43 | 426.11 | 460.69 | 336.75 |
| Sep - 21 | 351.10 | 307.62 | 310.30 | 316.39 | 355.96 | 467.83 | 499.61 | 375.71 |
| Oct - 21 | 324.29 | 299.31 | 314.97 | 322.55 | 351.55 | 448.51 | 479.38 | 375.19 |
| Nov - 21 | 301.03 | 285.00 | 297.83 | 315.70 | 341.20 | 409.89 | 428.36 | 341.85 |
| Dec - 21 | 301.10 | 292.69 | 300.45 | 319.62 | 343.97 | 433.40 | 435.69 | 352.01 |
| Total Year | 292.04 | 266.10 | 272.54 | 280.67 | 304.55 | 374.08 | 397.33 | 317.92 |

## Three Year ADR

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Total Year |
|---|---|---|---|---|---|---|---|---|
| Jan 19 - Dec 19 | 272.89 | 280.42 | 302.71 | 307.32 | 304.82 | 339.96 | 359.73 | 312.09 |
| Jan 20 - Dec 20 | 217.74 | 208.60 | 214.09 | 214.83 | 223.49 | 249.99 | 269.67 | 231.39 |
| Jan 21 - Dec 21 | 292.04 | 266.10 | 272.54 | 280.67 | 304.55 | 374.08 | 397.33 | 317.92 |
| Total 3 Yr | 269.28 | 261.27 | 275.19 | 279.74 | 288.68 | 334.50 | 354.46 | 298.16 |

## RevPAR

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Total Month |
|---|---|---|---|---|---|---|---|---|
| Jan - 21 | 68.56 | 54.86 | 59.86 | 65.56 | 75.98 | 113.65 | 132.91 | 83.89 |
| Feb - 21 | 120.70 | 73.25 | 68.66 | 70.61 | 77.84 | 122.84 | 177.54 | 101.63 |
| Mar - 21 | 98.55 | 88.55 | 91.39 | 88.67 | 94.59 | 147.28 | 200.36 | 113.10 |
| Apr - 21 | 123.97 | 104.28 | 114.81 | 124.83 | 138.54 | 206.71 | 243.64 | 152.39 |
| May - 21 | 179.58 | 133.05 | 138.05 | 151.05 | 187.24 | 261.24 | 305.30 | 194.84 |
| Jun - 21 | 227.46 | 200.61 | 202.22 | 218.06 | 254.27 | 350.87 | 384.59 | 259.09 |
| Jul - 21 | 275.86 | 186.21 | 208.78 | 226.25 | 255.41 | 334.31 | 383.00 | 272.65 |
| Aug - 21 | 227.92 | 201.15 | 218.11 | 216.79 | 254.36 | 349.87 | 395.52 | 261.36 |
| Sep - 21 | 269.46 | 215.31 | 221.40 | 234.27 | 287.42 | 402.10 | 438.97 | 293.25 |
| Oct - 21 | 227.56 | 201.48 | 221.42 | 239.97 | 277.90 | 385.71 | 430.84 | 289.80 |
| Nov - 21 | 207.01 | 191.71 | 215.14 | 247.49 | 277.74 | 358.94 | 381.51 | 264.17 |
| Dec - 21 | 208.92 | 194.32 | 211.67 | 240.55 | 258.52 | 341.60 | 358.65 | 261.21 |
| Total Year | 185.82 | 154.00 | 165.95 | 178.77 | 206.15 | 281.33 | 319.45 | 213.25 |

## Three Year RevPAR

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Total Year |
|---|---|---|---|---|---|---|---|---|
| Jan 19 - Dec 19 | 185.30 | 192.26 | 225.79 | 237.72 | 233.99 | 280.11 | 315.13 | 238.58 |
| Jan 20 - Dec 20 | 82.32 | 72.53 | 77.85 | 82.08 | 89.60 | 118.59 | 143.11 | 95.08 |
| Jan 21 - Dec 21 | 185.82 | 154.00 | 165.95 | 178.77 | 206.15 | 281.33 | 319.45 | 213.25 |
| Total 3 Yr | 154.32 | 142.65 | 160.55 | 169.56 | 180.05 | 231.99 | 264.61 | 186.23 |

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM    Staff: GS    Created: February 07, 2022

| Date | Occupancy | | ADR | | RevPar | | Supply | | Demand | | Revenue | | Census & Sample % | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | Census Props | Census Rooms | % Rooms STAR Participants |
| Jan 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Feb 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Mar 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Apr 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| May 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jun 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jul 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Aug 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Sep 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Oct 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Nov 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Dec 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jan 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Feb 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Mar 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Apr 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| May 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jun 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jul 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Aug 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Sep 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Oct 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Nov 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Dec 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jan 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Feb 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Mar 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Apr 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| May 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jun 15 | | | | | | | | | | | | | 3 | 192 | 62.5 |
| Jul 15 | | | | | | | | | | | | | 3 | 192 | 62.5 |
| Aug 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Sep 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Oct 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Nov 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Dec 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Jan 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Feb 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Mar 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Apr 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| May 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Jun 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Jul 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Aug 16 | | | | | | | | | | | | | 5 | 506 | 58.1 |
| Sep 16 | 77.1 | | 267.00 | | 205.74 | | 15,180 | | 11,697 | | 3,123,137 | | 5 | 506 | 85.8 |
| Oct 16 | 75.2 | | 249.00 | | 187.18 | | 16,647 | | 12,514 | | 3,115,988 | | 5 | 537 | 86.6 |
| Nov 16 | 72.6 | | 219.30 | | 159.25 | | 16,470 | | 11,960 | | 2,622,799 | | 5 | 549 | 86.5 |
| Dec 16 | 72.6 | | 211.21 | | 153.33 | | 21,576 | | 15,663 | | 3,308,169 | | 6 | 696 | 68.5 |
| Jan 17 | 58.3 | | 163.20 | | 95.10 | | 21,576 | | 12,573 | | 2,051,893 | | 6 | 696 | 68.5 |

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM    Staff: GS    Created: February 07, 2022

| Date | Occupancy | | ADR | | RevPar | | Supply | | Demand | | Revenue | | Census & Sample % | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | Census Props | Census Rooms | % Rooms STAR Participants |
| Feb 17 | 48.3 | | 162.23 | | 78.29 | | 25,648 | | 12,377 | | 2,007,925 | | 7 | 916 | 76.1 |
| Mar 17 | 56.5 | | 212.50 | | 120.10 | | 28,458 | | 16,083 | | 3,417,699 | | 7 | 918 | 92.2 |
| Apr 17 | 68.4 | | 238.80 | | 163.22 | | 28,020 | | 19,152 | | 4,573,424 | | 7 | 934 | 92.3 |
| May 17 | 72.6 | | 280.81 | | 203.80 | | 29,233 | | 21,216 | | 5,957,574 | | 7 | 943 | 92.4 |
| Jun 17 | 77.9 | | 270.54 | | 210.85 | | 28,470 | | 22,189 | | 6,002,992 | | 7 | 949 | 92.4 |
| Jul 17 | 76.6 | | 270.42 | | 207.14 | | 29,822 | | 22,844 | | 6,177,371 | | 7 | 962 | 92.5 |
| Aug 17 | 71.6 | | 259.18 | | 185.57 | | 29,822 | | 21,352 | | 5,534,027 | | 7 | 962 | 92.5 |
| Sep 17 | 80.1 | 4.0 | 313.74 | 17.5 | 251.35 | 22.2 | 28,860 | 90.1 | 23,121 | 97.7 | 7,253,926 | 132.3 | 7 | 962 | 92.5 |
| Oct 17 | 80.4 | 7.0 | 305.34 | 22.6 | 245.64 | 31.2 | 29,822 | 79.1 | 23,991 | 91.7 | 7,325,520 | 135.1 | 7 | 962 | 92.5 |
| Nov 17 | 74.7 | 2.9 | 276.74 | 26.2 | 206.80 | 29.9 | 28,860 | 75.2 | 21,566 | 80.3 | 5,968,248 | 127.6 | 7 | 962 | 92.5 |
| Dec 17 | 72.6 | 0.0 | 278.18 | 31.7 | 202.04 | 31.8 | 29,822 | 38.2 | 21,659 | 38.3 | 6,025,103 | 82.1 | 7 | 962 | 92.5 |
| Jan 18 | 60.0 | 3.0 | 227.42 | 39.4 | 136.52 | 43.6 | 29,760 | 37.9 | 17,865 | 42.1 | 4,062,825 | 98.0 | 7 | 960 | 100.0 |
| Feb 18 | 67.3 | 39.5 | 231.43 | 42.7 | 155.75 | 98.9 | 26,908 | 4.9 | 18,109 | 46.3 | 4,190,957 | 108.7 | 7 | 961 | 100.0 |
| Mar 18 | 71.5 | 26.5 | 261.77 | 23.2 | 187.18 | 55.9 | 29,791 | 4.7 | 21,303 | 32.5 | 5,576,394 | 63.2 | 7 | 961 | 100.0 |
| Apr 18 | 72.9 | 6.7 | 290.61 | 21.7 | 211.98 | 29.9 | 28,830 | 2.9 | 21,029 | 9.8 | 6,111,296 | 33.6 | 7 | 961 | 100.0 |
| May 18 | 82.7 | 13.9 | 346.76 | 23.5 | 286.70 | 40.7 | 29,791 | 1.9 | 24,631 | 16.1 | 8,541,156 | 43.4 | 7 | 961 | 100.0 |
| Jun 18 | 83.5 | 7.1 | 336.72 | 24.5 | 281.20 | 33.4 | 28,830 | 1.3 | 24,076 | 8.5 | 8,106,947 | 35.0 | 7 | 961 | 100.0 |
| Jul 18 | 81.0 | 5.8 | 330.00 | 22.0 | 267.32 | 29.1 | 29,791 | -0.1 | 24,133 | 5.6 | 7,963,871 | 28.9 | 7 | 961 | 100.0 |
| Aug 18 | 81.7 | 14.1 | 314.30 | 21.3 | 256.84 | 38.4 | 29,791 | -0.1 | 24,344 | 14.0 | 7,651,405 | 38.3 | 7 | 961 | 100.0 |
| Sep 18 | 79.9 | -0.2 | 347.48 | 10.8 | 277.69 | 10.5 | 34,080 | 18.1 | 27,235 | 17.8 | 9,463,519 | 30.5 | 8 | 1,136 | 100.0 |
| Oct 18 | 86.3 | 7.3 | 340.30 | 11.4 | 293.70 | 19.6 | 35,216 | 18.1 | 30,394 | 26.7 | 10,343,057 | 41.2 | 8 | 1,136 | 100.0 |
| Nov 18 | 77.0 | 3.0 | 298.10 | 7.7 | 229.55 | 11.0 | 34,080 | 18.1 | 26,243 | 21.7 | 7,823,157 | 31.1 | 8 | 1,136 | 100.0 |
| Dec 18 | 72.5 | -0.2 | 296.48 | 6.6 | 214.83 | 6.3 | 35,216 | 18.1 | 25,517 | 17.8 | 7,565,399 | 25.6 | 8 | 1,136 | 100.0 |
| Jan 19 | 56.4 | -6.1 | 216.62 | -4.7 | 122.16 | -10.5 | 35,216 | 18.3 | 19,859 | 11.2 | 4,301,953 | 5.9 | 8 | 1,136 | 100.0 |
| Feb 19 | 61.8 | -8.2 | 239.44 | 3.5 | 148.01 | -5.0 | 31,808 | 18.2 | 19,662 | 8.6 | 4,707,951 | 12.3 | 8 | 1,136 | 100.0 |
| Mar 19 | 73.1 | 2.3 | 253.26 | -3.2 | 185.24 | -1.0 | 35,216 | 18.2 | 25,758 | 20.9 | 6,523,529 | 17.0 | 8 | 1,136 | 100.0 |
| Apr 19 | 78.5 | 7.6 | 304.00 | 4.6 | 238.53 | 12.5 | 34,080 | 18.2 | 26,740 | 27.2 | 8,128,953 | 33.0 | 8 | 1,136 | 100.0 |
| May 19 | 81.9 | -1.0 | 345.52 | -0.4 | 282.86 | -1.3 | 35,216 | 18.2 | 28,829 | 17.0 | 9,961,032 | 16.6 | 8 | 1,136 | 100.0 |
| Jun 19 | 83.0 | -0.6 | 337.95 | 0.4 | 280.57 | -0.2 | 34,080 | 18.2 | 28,294 | 17.5 | 9,561,958 | 17.9 | 8 | 1,136 | 100.0 |
| Jul 19 | 81.3 | 0.4 | 328.41 | -0.5 | 267.05 | -0.1 | 35,216 | 18.2 | 28,637 | 18.7 | 9,404,551 | 18.1 | 8 | 1,136 | 100.0 |
| Aug 19 | 80.9 | -1.0 | 320.43 | 2.0 | 259.31 | 1.0 | 35,216 | 18.2 | 28,498 | 17.1 | 9,131,737 | 19.3 | 8 | 1,136 | 100.0 |
| Sep 19 | 84.6 | 5.9 | 369.73 | 6.4 | 312.96 | 12.7 | 34,080 | 0.0 | 28,847 | 5.9 | 10,665,521 | 12.7 | 8 | 1,136 | 100.0 |
| Oct 19 | 83.5 | -3.2 | 354.91 | 4.3 | 296.38 | 0.9 | 35,216 | 0.0 | 29,409 | -3.2 | 10,437,439 | 0.9 | 8 | 1,136 | 100.0 |
| Nov 19 | 75.7 | -1.6 | 308.15 | 3.4 | 233.38 | 1.7 | 34,080 | 0.0 | 25,811 | -1.6 | 7,953,586 | 1.7 | 8 | 1,136 | 100.0 |
| Dec 19 | 75.6 | 4.4 | 305.86 | 3.2 | 231.34 | 7.7 | 35,216 | 0.0 | 26,636 | 4.4 | 8,146,841 | 7.7 | 8 | 1,136 | 100.0 |
| Jan 20 | 55.0 | -2.5 | 217.81 | 0.5 | 119.76 | -2.0 | 35,216 | 0.0 | 19,363 | -2.5 | 4,217,384 | -2.0 | 8 | 1,136 | 100.0 |
| Feb 20 | 60.9 | -1.5 | 244.21 | 2.0 | 148.69 | 0.5 | 31,808 | 0.0 | 19,367 | -1.5 | 4,729,520 | 0.5 | 8 | 1,136 | 100.0 |
| Mar 20 | 24.0 | -67.1 | 246.20 | -2.8 | 59.17 | -68.1 | 35,216 | 0.0 | 8,463 | -67.1 | 2,083,615 | -68.1 | 8 | 1,136 | 100.0 |
| Apr 20 | | | | | | | | | | | | | 3 | 449 | 61.2 |
| May 20 | | | | | | | | | | | | | 4 | 513 | 66.1 |
| Jun 20 | 50.9 | -38.7 | 165.07 | -51.2 | 83.94 | -70.1 | 20,880 | -38.7 | 10,618 | -62.5 | 1,752,708 | -81.7 | 5 | 696 | 75.0 |
| Jul 20 | 32.6 | -59.9 | 258.35 | -21.3 | 84.24 | -68.5 | 35,216 | 0.0 | 11,483 | -59.9 | 2,966,601 | -68.5 | 8 | 1,136 | 84.7 |
| Aug 20 | 39.5 | -51.2 | 286.79 | -10.5 | 113.25 | -56.3 | 35,216 | 0.0 | 13,906 | -51.2 | 3,988,082 | -56.3 | 8 | 1,136 | 84.7 |
| Sep 20 | 39.1 | -53.8 | 275.37 | -25.5 | 107.73 | -65.6 | 34,080 | 0.0 | 13,332 | -53.8 | 3,671,284 | -65.6 | 8 | 1,136 | 84.7 |
| Oct 20 | 42.7 | -48.9 | 245.03 | -31.0 | 104.51 | -64.7 | 35,216 | 0.0 | 15,020 | -48.9 | 3,680,400 | -64.7 | 8 | 1,136 | 84.7 |
| Nov 20 | 41.0 | -45.8 | 215.72 | -30.0 | 88.54 | -62.1 | 33,600 | -1.4 | 13,791 | -46.6 | 2,974,959 | -62.6 | 8 | 1,120 | 84.5 |
| Dec 20 | 33.4 | -55.9 | 224.83 | -26.5 | 74.99 | -67.6 | 34,720 | -1.4 | 11,580 | -56.5 | 2,603,560 | -68.0 | 8 | 1,120 | 84.7 |
| Jan 21 | 40.9 | -25.6 | 205.01 | -5.9 | 83.89 | -29.9 | 34,720 | -1.4 | 14,208 | -26.6 | 2,912,752 | -30.9 | 8 | 1,120 | 78.8 |
| Feb 21 | 48.3 | -20.7 | 210.54 | -13.8 | 101.63 | -31.6 | 31,360 | -1.4 | 15,138 | -21.8 | 3,187,226 | -32.6 | 8 | 1,120 | 67.3 |

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM     Staff: GS     Created: February 07, 2022

| Date | Occupancy | | ADR | | RevPar | | Supply | | Demand | | Revenue | | Census & Sample % | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | Census Props | Census Rooms | % Rooms STAR Participants |
| Mar 21 | 52.8 | 119.8 | 214.15 | -13.0 | 113.10 | 91.2 | 34,813 | -1.1 | 18,386 | 117.3 | 3,937,404 | 89.0 | 8 | 1,123 | 67.4 |
| Apr 21 | 61.0 | | 249.96 | | 152.39 | | 33,930 | | 20,686 | | 5,170,692 | | 8 | 1,131 | 67.6 |
| May 21 | 62.9 | | 309.97 | | 194.84 | | 35,154 | | 22,097 | | 6,849,412 | | 8 | 1,134 | 88.7 |
| Jun 21 | 77.6 | 52.7 | 333.69 | 102.2 | 259.09 | 208.7 | 34,020 | 62.9 | 26,414 | 148.8 | 8,814,144 | 402.9 | 8 | 1,134 | 83.1 |
| Jul 21 | 75.3 | 130.9 | 362.15 | 40.2 | 272.65 | 223.7 | 35,216 | 0.0 | 26,513 | 130.9 | 9,601,803 | 223.7 | 8 | 1,136 | 88.7 |
| Aug 21 | 77.6 | 96.5 | 336.75 | 17.4 | 261.36 | 130.8 | 35,216 | 0.0 | 27,332 | 96.5 | 9,203,979 | 130.8 | 8 | 1,136 | 88.7 |
| Sep 21 | 78.1 | 99.5 | 375.71 | 36.4 | 293.25 | 172.2 | 34,080 | 0.0 | 26,600 | 99.5 | 9,993,835 | 172.2 | 8 | 1,136 | 88.7 |
| Oct 21 | 77.2 | 81.1 | 375.19 | 53.1 | 289.80 | 177.3 | 35,216 | 0.0 | 27,201 | 81.1 | 10,205,424 | 177.3 | 8 | 1,136 | 73.4 |
| Nov 21 | 77.3 | 88.3 | 341.85 | 58.5 | 264.17 | 198.4 | 34,080 | 1.4 | 26,336 | 91.0 | 9,002,841 | 202.6 | 8 | 1,136 | 73.4 |
| Dec 21 | 74.2 | 122.5 | 352.01 | 56.6 | 261.21 | 248.3 | 35,216 | 1.4 | 26,132 | 125.7 | 9,198,803 | 253.3 | 8 | 1,136 | 73.4 |

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM    Staff: GS    Created: February 07, 2022

| Date | Occupancy | | ADR | | RevPar | | Supply | | Demand | | Revenue | | Census & Sample % | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | Census Props | Census Rooms | % Rooms STAR Participants |
| Jan 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Feb 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Mar 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Apr 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| May 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jun 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jul 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Aug 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Sep 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Oct 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Nov 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Dec 13 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Dec YTD 2013 Total 2013 | | | | | | | | | | | | | | | |
| Jan 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Feb 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Mar 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Apr 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| May 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jun 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jul 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Aug 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Sep 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Oct 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Nov 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Dec 14 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Dec YTD 2014 Total 2014 | | | | | | | | | | | | | | | |
| Jan 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Feb 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Mar 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Apr 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| May 15 | | | | | | | | | | | | | 3 | 192 | 33.3 |
| Jun 15 | | | | | | | | | | | | | 3 | 192 | 62.5 |
| Jul 15 | | | | | | | | | | | | | 3 | 192 | 62.5 |
| Aug 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Sep 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Oct 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Nov 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Dec 15 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Dec YTD 2015 Total 2015 | | | | | | | | | | | | | | | |
| Jan 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Feb 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Mar 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Apr 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| May 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Jun 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Jul 16 | | | | | | | | | | | | | 4 | 366 | 80.3 |
| Aug 16 | | | | | | | | | | | | | 5 | 506 | 58.1 |
| Sep 16 | 77.1 | | 267.00 | | 205.74 | | 15,180 | | 11,697 | | 3,123,137 | | 5 | 506 | 85.8 |
| Oct 16 | 75.2 | | 249.00 | | 187.18 | | 16,647 | | 12,514 | | 3,115,988 | | 5 | 537 | 86.6 |
| Nov 16 | 72.6 | | 219.30 | | 159.25 | | 16,470 | | 11,960 | | 2,622,799 | | 5 | 549 | 86.9 |

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM    Staff: GS    Created: February 07, 2022

| Date | Occupancy This Year | % Chg | ADR This Year | % Chg | RevPar This Year | % Chg | Supply This Year | % Chg | Demand This Year | % Chg | Revenue This Year | % Chg | Census Props | Census Rooms | % Rooms STAR Participants |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dec 16 | 72.6 | | 211.21 | | 153.33 | | 21,576 | | 15,663 | | 3,308,169 | | 6 | 696 | 68.5 |
| Dec YTD 2016 | | | | | | | | | | | | | | | |
| Total 2016 | | | | | | | | | | | | | | | |
| Jan 17 | 58.3 | | 163.20 | | 95.10 | | 21,576 | | 12,573 | | 2,051,893 | | 6 | 696 | 68.5 |
| Feb 17 | 48.3 | | 162.23 | | 78.29 | | 25,648 | | 12,377 | | 2,007,925 | | 7 | 916 | 76.1 |
| Mar 17 | 56.5 | | 212.50 | | 120.10 | | 28,458 | | 16,083 | | 3,417,699 | | 7 | 918 | 92.2 |
| Apr 17 | 68.4 | | 238.80 | | 163.22 | | 28,020 | | 19,152 | | 4,573,424 | | 7 | 934 | 92.3 |
| May 17 | 72.6 | | 280.81 | | 203.80 | | 29,233 | | 21,216 | | 5,957,574 | | 7 | 943 | 92.4 |
| Jun 17 | 77.9 | | 270.54 | | 210.85 | | 28,470 | | 22,189 | | 6,002,992 | | 7 | 949 | 92.4 |
| Jul 17 | 76.6 | | 270.42 | | 207.14 | | 29,822 | | 22,844 | | 6,177,371 | | 7 | 962 | 92.5 |
| Aug 17 | 71.6 | | 259.18 | | 185.57 | | 29,822 | | 21,352 | | 5,534,027 | | 7 | 962 | 92.5 |
| Sep 17 | 80.1 | 4.0 | 313.74 | 17.5 | 251.35 | 22.2 | 28,860 | 90.1 | 23,121 | 97.7 | 7,253,926 | 132.3 | 7 | 962 | 92.5 |
| Oct 17 | 80.4 | 7.0 | 305.34 | 22.6 | 245.64 | 31.2 | 29,822 | 79.1 | 23,991 | 91.7 | 7,325,520 | 135.1 | 7 | 962 | 92.5 |
| Nov 17 | 74.7 | 2.9 | 276.74 | 26.2 | 206.80 | 29.9 | 28,860 | 75.2 | 21,566 | 80.3 | 5,968,248 | 127.6 | 7 | 962 | 92.5 |
| Dec 17 | 72.6 | 0.0 | 278.18 | 31.7 | 202.04 | 31.8 | 29,822 | 38.2 | 21,659 | 38.3 | 6,025,103 | 82.1 | 7 | 962 | 92.5 |
| Dec YTD 2017 | 70.4 | | 261.61 | | 184.08 | | 338,413 | | 238,123 | | 62,295,702 | | | | |
| Total 2017 | 70.4 | | 261.61 | | 184.08 | | 338,413 | | 238,123 | | 62,295,702 | | | | |
| Jan 18 | 60.0 | 3.0 | 227.42 | 39.4 | 136.52 | 43.6 | 29,760 | 37.9 | 17,865 | 42.1 | 4,062,825 | 98.0 | 7 | 960 | 100.0 |
| Feb 18 | 67.3 | 39.5 | 231.43 | 42.7 | 155.75 | 98.9 | 26,908 | 4.9 | 18,109 | 46.3 | 4,190,957 | 108.7 | 7 | 961 | 100.0 |
| Mar 18 | 71.5 | 26.5 | 261.77 | 23.2 | 187.18 | 55.9 | 29,791 | 4.7 | 21,303 | 32.5 | 5,576,394 | 63.2 | 7 | 961 | 100.0 |
| Apr 18 | 72.9 | 6.7 | 290.61 | 21.7 | 211.98 | 29.9 | 28,830 | 2.9 | 21,029 | 9.8 | 6,111,296 | 33.6 | 7 | 961 | 100.0 |
| May 18 | 82.7 | 13.9 | 346.76 | 23.5 | 286.70 | 40.7 | 29,791 | 1.9 | 24,631 | 16.1 | 8,541,156 | 43.4 | 7 | 961 | 100.0 |
| Jun 18 | 83.5 | 7.1 | 336.72 | 24.5 | 281.20 | 33.4 | 28,830 | 1.3 | 24,076 | 8.5 | 8,106,947 | 35.0 | 7 | 961 | 100.0 |
| Jul 18 | 81.0 | 5.8 | 330.00 | 22.0 | 267.32 | 29.1 | 29,791 | -0.1 | 24,133 | 5.6 | 7,963,871 | 28.9 | 7 | 961 | 100.0 |
| Aug 18 | 81.7 | 14.1 | 314.30 | 21.3 | 256.84 | 38.4 | 29,791 | -0.1 | 24,344 | 14.0 | 7,651,405 | 38.3 | 7 | 961 | 100.0 |
| Sep 18 | 79.9 | -0.2 | 347.48 | 10.8 | 277.69 | 10.5 | 34,080 | 18.1 | 27,235 | 17.8 | 9,463,519 | 30.5 | 8 | 1,136 | 100.0 |
| Oct 18 | 86.3 | 7.3 | 340.30 | 11.4 | 293.70 | 19.6 | 35,216 | 18.1 | 30,394 | 26.7 | 10,343,057 | 41.2 | 8 | 1,136 | 100.0 |
| Nov 18 | 77.0 | 3.0 | 298.10 | 7.7 | 229.55 | 11.0 | 34,080 | 18.1 | 26,243 | 21.7 | 7,823,157 | 31.1 | 8 | 1,136 | 100.0 |
| Dec 18 | 72.5 | -0.2 | 296.48 | 6.6 | 214.83 | 6.3 | 35,216 | 18.1 | 25,517 | 17.8 | 7,565,399 | 25.6 | 8 | 1,136 | 100.0 |
| Dec YTD 2018 | 76.6 | 8.8 | 306.80 | 17.3 | 234.89 | 27.6 | 372,084 | 9.9 | 284,879 | 19.6 | 87,399,983 | 40.3 | | | |
| Total 2018 | 76.6 | 8.8 | 306.80 | 17.3 | 234.89 | 27.6 | 372,084 | 9.9 | 284,879 | 19.6 | 87,399,983 | 40.3 | | | |
| Jan 19 | 56.4 | -6.1 | 216.62 | -4.7 | 122.16 | -10.5 | 35,216 | 18.3 | 19,859 | 11.2 | 4,301,953 | 5.9 | 8 | 1,136 | 100.0 |
| Feb 19 | 61.8 | -8.2 | 239.44 | 3.5 | 148.01 | -5.0 | 31,808 | 18.2 | 19,662 | 8.6 | 4,707,951 | 12.3 | 8 | 1,136 | 100.0 |
| Mar 19 | 73.1 | 2.3 | 253.26 | -3.2 | 185.24 | -1.0 | 35,216 | 18.2 | 25,758 | 20.9 | 6,523,529 | 17.0 | 8 | 1,136 | 100.0 |
| Apr 19 | 78.5 | 7.6 | 304.00 | 4.6 | 238.53 | 12.5 | 34,080 | 18.2 | 26,740 | 27.2 | 8,128,953 | 33.0 | 8 | 1,136 | 100.0 |
| May 19 | 81.9 | -1.0 | 345.52 | -0.4 | 282.86 | -1.3 | 35,216 | 18.2 | 28,829 | 17.0 | 9,961,032 | 16.6 | 8 | 1,136 | 100.0 |
| Jun 19 | 83.0 | -0.6 | 337.95 | 0.4 | 280.57 | -0.2 | 34,080 | 18.2 | 28,294 | 17.5 | 9,561,958 | 17.9 | 8 | 1,136 | 100.0 |
| Jul 19 | 81.3 | 0.4 | 328.41 | -0.5 | 267.05 | -0.1 | 35,216 | 18.2 | 28,637 | 18.7 | 9,404,551 | 18.1 | 8 | 1,136 | 100.0 |
| Aug 19 | 80.9 | -1.0 | 320.43 | 2.0 | 259.31 | 1.0 | 35,216 | 18.2 | 28,498 | 17.1 | 9,131,737 | 19.3 | 8 | 1,136 | 100.0 |
| Sep 19 | 84.6 | 5.9 | 369.73 | 6.4 | 312.96 | 12.7 | 34,080 | 0.0 | 28,847 | 5.9 | 10,665,521 | 12.7 | 8 | 1,136 | 100.0 |
| Oct 19 | 83.5 | -3.2 | 354.91 | 4.3 | 296.38 | 0.9 | 35,216 | 0.0 | 29,409 | -3.2 | 10,437,439 | 0.9 | 8 | 1,136 | 100.0 |
| Nov 19 | 75.7 | -1.6 | 308.15 | 3.4 | 233.38 | 1.7 | 34,080 | 0.0 | 25,811 | -1.6 | 7,953,586 | 1.7 | 8 | 1,136 | 100.0 |
| Dec 19 | 75.6 | 4.4 | 305.86 | 3.2 | 231.34 | 7.7 | 35,216 | 0.0 | 26,636 | 4.4 | 8,146,841 | 7.7 | 8 | 1,136 | 100.0 |
| Dec YTD 2019 | 76.4 | -0.2 | 312.09 | 1.7 | 238.58 | 1.6 | 414,640 | 11.4 | 316,980 | 11.3 | 98,925,051 | 13.2 | | | |
| Total 2019 | 76.4 | -0.2 | 312.09 | 1.7 | 238.58 | 1.6 | 414,640 | 11.4 | 316,980 | 11.3 | 98,925,051 | 13.2 | | | |
| Jan 20 | 55.0 | -2.5 | 217.81 | 0.5 | 119.76 | -2.0 | 35,216 | 0.0 | 19,363 | -2.5 | 4,217,384 | -2.0 | 8 | 1,136 | 100.0 |
| Feb 20 | 60.9 | -1.5 | 244.21 | 2.0 | 148.69 | 0.5 | 31,808 | 0.0 | 19,367 | -1.5 | 4,729,520 | 0.5 | 8 | 1,136 | 100.0 |
| Mar 20 | 24.0 | -67.1 | 246.20 | -2.8 | 59.17 | -68.1 | 35,216 | 0.0 | 8,463 | -67.1 | 2,083,615 | -68.1 | 8 | 1,136 | 100.0 |
| Apr 20 | | | | | | | | | | | | | 3 | 449 | 61.2 |
| May 20 | | | | | | | | | | | | | 4 | 513 | 66.1 |
| Jun 20 | 50.9 | -38.7 | 165.07 | -51.2 | 83.94 | -70.1 | 20,880 | -38.7 | 10,618 | -62.5 | 1,752,708 | -81.7 | 5 | 696 | 75.0 |
| Jul 20 | 32.6 | -59.9 | 258.35 | -21.3 | 84.24 | -68.5 | 35,216 | 0.0 | 11,483 | -59.9 | 2,966,601 | -68.5 | 8 | 1,136 | 84.7 |
| Aug 20 | 39.5 | -51.2 | 286.79 | -10.5 | 113.25 | -56.3 | 35,216 | 0.0 | 13,906 | -51.2 | 3,988,082 | -56.3 | 8 | 1,136 | 84.7 |

Williamsburg Brooklyn, NY  Selected Properties
Job Number: 1317546_SADIM    Staff: GS    Created: February 07, 2022

| Date | Occupancy | | ADR | | RevPar | | Supply | | Demand | | Revenue | | Census & Sample % | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | This Year | % Chg | Census Props | Census Rooms | % Rooms STAR Participants |
| Sep 20 | 39.1 | -53.8 | 275.37 | -25.5 | 107.73 | -65.6 | 34,080 | 0.0 | 13,332 | -53.8 | 3,671,284 | -65.6 | 8 | 1,136 | 84.7 |
| Oct 20 | 42.7 | -48.9 | 245.03 | -31.0 | 104.51 | -64.7 | 35,216 | 0.0 | 15,020 | -48.9 | 3,680,400 | -64.7 | 8 | 1,136 | 84.7 |
| Nov 20 | 41.0 | -45.8 | 215.72 | -30.0 | 88.54 | -62.1 | 33,600 | -1.4 | 13,791 | -46.6 | 2,974,959 | -62.6 | 8 | 1,120 | 84.5 |
| Dec 20 | 33.4 | -55.9 | 224.83 | -26.5 | 74.99 | -67.6 | 34,720 | -1.4 | 11,580 | -56.5 | 2,603,560 | -68.0 | 8 | 1,120 | 84.5 |
| Dec YTD 2020 | | | | | | | | | | | | | | | |
| Total 2020 | | | | | | | | | | | | | | | |
| Jan 21 | 40.9 | -25.6 | 205.01 | -5.9 | 83.89 | -29.9 | 34,720 | -1.4 | 14,208 | -26.6 | 2,912,752 | -30.9 | 8 | 1,120 | 78.8 |
| Feb 21 | 48.3 | -20.7 | 210.54 | -13.8 | 101.63 | -31.6 | 31,360 | -1.4 | 15,138 | -21.8 | 3,187,226 | -32.6 | 8 | 1,120 | 67.3 |
| Mar 21 | 52.8 | 119.8 | 214.15 | -13.0 | 113.10 | 91.2 | 34,813 | -1.1 | 18,386 | 117.3 | 3,937,404 | 89.0 | 8 | 1,123 | 67.4 |
| Apr 21 | 61.0 | | 249.96 | | 152.39 | | 33,930 | | 20,686 | | 5,170,692 | | 8 | 1,131 | 67.6 |
| May 21 | 62.9 | | 309.97 | | 194.84 | | 35,154 | | 22,097 | | 6,849,412 | | 8 | 1,134 | 88.7 |
| Jun 21 | 77.6 | 52.7 | 333.69 | 102.2 | 259.09 | 208.7 | 34,020 | 62.9 | 26,414 | 148.8 | 8,814,144 | 402.9 | 8 | 1,134 | 83.1 |
| Jul 21 | 75.3 | 130.9 | 362.15 | 40.2 | 272.65 | 223.7 | 35,216 | 0.0 | 26,513 | 130.9 | 9,601,803 | 223.7 | 8 | 1,136 | 88.7 |
| Aug 21 | 77.6 | 96.5 | 336.75 | 17.4 | 261.36 | 130.8 | 35,216 | 0.0 | 27,332 | 96.5 | 9,203,979 | 130.8 | 8 | 1,136 | 88.7 |
| Sep 21 | 78.1 | 99.5 | 375.71 | 36.4 | 293.25 | 172.2 | 34,080 | 0.0 | 26,600 | 99.5 | 9,993,835 | 172.2 | 8 | 1,136 | 88.7 |
| Oct 21 | 77.2 | 81.1 | 375.19 | 53.1 | 289.80 | 177.3 | 35,216 | 0.0 | 27,201 | 81.1 | 10,205,424 | 177.3 | 8 | 1,136 | 73.4 |
| Nov 21 | 77.3 | 88.3 | 341.85 | 58.5 | 264.17 | 198.4 | 34,080 | 1.4 | 26,336 | 91.0 | 9,002,841 | 202.6 | 8 | 1,136 | 73.4 |
| Dec 21 | 74.2 | 122.5 | 352.01 | 56.6 | 261.21 | 248.3 | 35,216 | 1.4 | 26,132 | 125.7 | 9,198,803 | 253.3 | 8 | 1,136 | 73.4 |
| Dec YTD 2021 | 67.1 | | 317.92 | | 213.25 | | 413,021 | | 277,043 | | 88,078,315 | | | | |
| Total 2021 | 67.1 | | 317.92 | | 213.25 | | 413,021 | | 277,043 | | 88,078,315 | | | | |

2022 © CoStar Group. This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2022 STR, LLC / STR Global, Ltd. trading as "STR".

# Tab 11 - Terms and Conditions

Before purchasing this product you agreed to the following Standard Terms and Conditions:

In consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, STR, Inc. ("STR"), STR Global, Ltd. ("STRG"), and the licensee identified elsewhere in this Agreement ("Licensee") agree as follows:

**1.  LICENSE**

**1.1  Definitions.**

(a)  "Agreement" means these Standard Terms and Conditions and any additional terms specifically set out in writing in the document(s) (if any) to which these Standard Terms and Conditions are attached or in which they are incorporated by reference, and, if applicable, any additional terms specifically set out in writing in any Schedule attached hereto.

(b)  "Licensed Materials" means the newsletters, reports, databases or other information resources, and all lodging industry data contained therein, provided to Licensee hereunder.

**1.2  Grant of License.**  Subject to the terms and conditions of this Agreement, and except as may be expressly permitted elsewhere in this Agreement, STR hereby grants to Licensee a non-exclusive, non-transferable, indivisible, non-sublicensable license to use, copy, manipulate and extract data from the Licensed Materials for its own INTERNAL business purposes only.

**1.3  Copies.**  Except as expressly permitted elsewhere in this Agreement, Licensee may make and maintain no more than two (2) copies of any Licensed Materials.

**1.4  No Service Bureau Use.**  Licensee is prohibited from using the Licensed Materials in any way in connection with any service bureau or similar services.  "Service bureau" means the processing of input data that is supplied by one or more third parties and the generation of output data (in the form of reports, charts, graphs or other pictorial representations, or the like) that is sold or licensed to any third parties.

**1.5  No Distribution to Third Parties.**  Except as expressly permitted in this Agreement, Licensee is prohibited from distributing, republishing or otherwise making the Licensed Materials or any part thereof (including any excerpts of the data and any manipulations of the data) available in any form whatsoever to any third party, other than Licensee's accountants, attorneys, marketing professionals or other professional advisors who are bound by a duty of confidentiality not to disclose such information.

**1.6  Security.**  Licensee shall use commercially reasonable efforts to protect against unauthorized access to the Licensed Materials.

**1.7  Reservation of Rights.**  Licensee has no rights in connection with the Licensed Materials other than those rights expressly enumerated herein.  All rights to the Licensed Materials not expressly enumerated herein are reserved to STR.

**2.  DISCLAIMERS AND LIMITATIONS OF LIABILITY**

**2.1  Disclaimer of Warranties.**  The Licensed materials are provided to the licensee on an "as is" and "as available" basis.  STR makes no representations or warranties of any kind, express or implied, with respect to the licensed materials, the services provided or the results of use thereof.  Without limiting the foregoing, STR does not warrant that the licensed materials, the services provided or the use thereof are or will be accurate, error-free or uninterrupted.  STR makes no implied warranties, including without limitation, any implied warranty of merchantability, noninfringement or fitness for any particular purpose or arising by usage of trade, course of dealing, course of performance or otherwise.

**2.2  Disclaimers.**  STR shall have no liability with respect to its obligations under this agreement or otherwise for consequential, exemplary, special, incidental, or punitive damages even if STR has been advised of the possibility of such damages.  Furthermore, STR shall have no liability whatsoever for any claim relating in any way to any decision made or action taken by licensee in reliance upon the licensed materials.

**2.3  Limitation of Liability.**  STR's total liability to licensee for any reason and upon any cause of action including without limitation, infringement, breach of contract, negligence, strict liability, misrepresentations, and other torts, shall be limited to all fees paid to STR by the licensee during the twelve month period preceding the date on which such cause of action first arose.

**3.  MISCELLANEOUS**

**3.1  Liquidated Damages.**  In the event of a violation of Section 1.5 of these Standard Terms and Conditions, Licensee shall be required to pay STR an amount equal to the sum of (i) the highest aggregate price that STR, in accordance with its then-current published prices, could have charged the unauthorized recipients for the Licensed Materials that are the subject of the violation, and (ii) the full price of the lowest level of republishing rights that Licensee would have been required to purchase from STR in order to have the right to make the unauthorized distribution, regardless of whether Licensee has previously paid for any lower level of republishing rights, and (iii) fifteen percent (15%) of the total of the previous two items.  This provision shall survive indefinitely the expiration or termination of this Agreement for any reason.

**3.2  Obligations on Termination.**  Within thirty (30) days of the termination or expiration of this Agreement for any reason, Licensee shall cease all use of the Licensed Materials and shall return or destroy, at STR's option, all copies of the Licensed Materials and all other information relating thereto in Licensee's possession or control as of the such date.  This provision shall survive indefinitely the expiration or termination of this Agreement for any reason.

**3.3  Governing Law; Jurisdiction and Venue.**  This Agreement shall be governed by the substantive laws of the State of Tennessee, without regard to its or any other jurisdiction's laws governing conflicts of law.  Any claims or actions regarding or arising out of this Agreement shall be brought exclusively in a court of competent jurisdiction located in Nashville, Tennessee, and the parties expressly consent to personal jurisdiction thereof.  The parties also expressly waive any objections to venue.

**3.4  Assignment.**  Licensee is prohibited from assigning this Agreement or delegating any of its duties under this Agreement without the prior written consent of STR.

**3.5  Independent Relationship.**  The relationship between the parties is that of an independent contractor. Nothing in this Agreement shall be deemed to create an employer/employee, principal/agent, partnership or joint venture relationship.

**3.6  Notices.**  All notices required or permitted to be given hereunder shall be in writing and shall be deemed given i) when delivered in person, at the time of such delivery; ii) when delivered by facsimile transmission or e-mail, at the time of transmission (provided, however, that notice delivered by facsimile transmission shall only be effective if such notice is also delivered by hand or deposited in the United States mail, postage prepaid, registered, certified or express mail or by courier service within two (2) business days after its delivery by facsimile transmission); iii) when delivered by a courier service or by express mail, at the time of receipt; or iv) five (5) business days after being deposited in the United States mail, postage prepaid, registered or certified mail, addressed (in any such case) to the addresses listed on the first page of this Agreement or to such other address as either party may notify the other in writing.

**3.7  Waiver.**  No waiver of any breach of this Agreement will be deemed to constitute a waiver of any subsequent breach of the same or any other provision.

**3.8  Entire Agreement.**  This Agreement constitutes the entire agreement of the parties with respect to the matters described herein, superseding in all respects any and all prior proposals, negotiations, understandings and other agreements, oral or written, between the parties.

**3.9  Amendment.**  This Agreement may be amended only by the written agreement of both parties.

**3.10  Recovery of Litigation Costs.**  If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

**3.11  Injunctive Relief.**  The parties agree that, in addition to any other rights or remedies which the other or STR may have, any party alleging breach or threatened breach of this Agreement will be entitled to such equitable and injunctive relief as may be available from any court of competent jurisdiction to restrain the other from breaching or threatening to breach any of the provisions of this Section, without posting bond or other surety.

**3.12  Notice of Unauthorized Access.**  Licensee shall notify STR immediately upon Licensee's becoming aware of any facts indicating that a third party may have obtained or may be about to obtain unauthorized access to the Licensed Materials, and shall fully cooperate with STR in its efforts to mitigate the damages caused by any such breach or potential breach.

**3.13  Conflicting Provisions.**  In the event that any provision of these Standard Terms and Conditions directly conflicts with any  other provision of the Agreement, the conflicting terms of such other provision shall control.

**3.14  Remedies.**  In addition to any other rights or remedies that STR may have, in the event of any termination by STR on account of a breach by Licensee, STR may, without refund, immediately terminate and discontinue any right of Licensee to receive additional Licensed Materials from STR.



**Glossary:**
For all STR definitions, please visit www.str.com/data-insights/resources/glossary

**Frequently Asked Questions (FAQ):**
For all STR FAQs, please click here or visit www.str.com/data-insights/resources/FAQ

For additional support, please contact your regional office.

For the latest in industry news, visit HotelNewsNow.com.

To learn more about the Hotel Data Conference, visit HotelDataConference.com.

Addendum

# CLIENT CONTRACT INFORMATION

**VALUATION & ADVISORY SERVICES**

**CBRE**

# Proposal and Contract for Services

CBRE, Inc.
200 Park Avenue, 20th Floor
New York, NY 10166
www.cbre.us/valuation

**Edward R. Eschmann, MAI**
Director

January 26, 2022

Efrem Schalb, Esq.
Partner
**KOFFSKY SCHWALB LLC**
500 Seventh Avenue, 8th Floor
New York, NY 10018
Phone: 646.553.1590
Email: eschwalb@koffskyschalb.com

RE:   Assignment Agreement
      Hotel
      The William Vale Hotel,
      Brooklyn, NY

Dear Mr. Schwalb:

We are pleased to submit this proposal and our Terms and Conditions for this assignment.

## PROPOSAL SPECIFICATIONS

| | |
|---|---|
| Purpose: | To estimate the Market Value of the referenced real estate |
| Premise: | As Is, As Stabilized |
| Rights Appraised: | Leased Fee |
| Intended Use: | Internal Decision Making purposes related to partner negotiation with potential litigation. |
| Intended User: | The intended user is KOFFSKY SCHWALB LLC ("Client"), and such other parties and entities (if any) expressly recognized by CBRE as "Intended Users" (as further defined herein). |
| Reliance: | Reliance on any reports produced by CBRE under this Agreement is extended solely to parties and entities expressly acknowledged in a signed writing by CBRE as Intended Users of the respective reports, provided that any conditions to such acknowledgement required by CBRE or hereunder have been satisfied.  Parties or entities other than Intended Users who obtain a copy of the report or any portion thereof (including Client if it is not named as an Intended User), whether as a result of its direct dissemination or by any other means, may not rely upon any opinions or conclusions contained in the report or such portions thereof, and CBRE will not be responsible for any unpermitted use of the report, its conclusions or contents or have any liability in connection therewith. |

**VALUATION & ADVISORY SERVICES**

KOFFSKY SCHWALB LLC
Assignment Agreement
Page 2 of 10
January 26, 2022

| | |
|---|---|
| Inspection: | CBRE will conduct a physical inspection of both the interior and exterior of the subject property (as able), as well as its surrounding environs on the effective date of appraisal. |
| Valuation Approaches: | All three traditional approaches to value will be considered. |
| Report Type: | Standard Appraisal Report |
| Appraisal Standards: | USPAP |
| Appraisal Fee: | $15,000 (to be full responsibility of All Year Holding LTD) Does not include time for litigation support, testimony, etc., which is invoiced separately at $550 per hour for director and above and $250 per hour at associate level (also responsibility of All Year Holding LTD. |
| Expenses: | Fee includes Appraisal associated expenses, excludes litigation support, testimony, etc. noted above |
| Retainer: | A full fee retainer (of $15,000) is required |
| Payment Terms: | The fee is considered earned upon delivery of the draft report. |
| Delivery Instructions: | CBRE encourages our clients to join in our environmental sustainability efforts by accepting an electronic copy of the report. |
| | An Adobe PDF file via email will be delivered to eschwalb@koffskywalb.com. The client has requested No (0) bound final copy (ies). |
| Delivery Schedule: | |
| Preliminary Value: | Not Required |
| Draft Report: | Not Required |
| Final Report: | On or before February 10, 2022, or two weeks following receipt of signed engagement and retainer, whichever is greater per start date noted below. |
| Start Date: | The appraisal process will start upon receipt of your signed agreement, retainer and the property specific data. |
| Acceptance Date: | These specifications are subject to modification if this proposal is not accepted within 2 business days from the date of this letter. |

When executed and delivered by all parties, this letter, together with the Terms and Conditions and the Specific Property Data Request attached hereto and incorporated herein, will serve as the Agreement for appraisal services by and between CBRE and Client. Each person signing below represents that it is authorized to enter into this Agreement and to bind the respective parties hereto.



We appreciate this opportunity to be of service to you on this assignment. If you have additional questions, please contact us.

Sincerely,

**CBRE, Inc.**
**Valuation & Advisory Services**

Edward R. Eschmann, MAI
Director
As Agent for CBRE, Inc.
T  212.207.6092
edward.eschmann@cbre.com

**CBRE**

# AGREED AND ACCEPTED

**FOR KOFFSKY SCHWALB LLC ("CLIENT") AND ALL YEAR HOLDING LTD (RESPONIBLE FOR ALL FEE):**

| | |
|---|---|
| Signature | Date |
| Efrem Schalb, Esq. | Partner |
| Name | Title |
| 646.553.1590 | eschwalb@koffskyschalb.com |
| Phone Number | E-Mail Address |
| | 1.26.2022 |
| Signature | Date |
| Asaf Ravid | CRO |
| Name | Title |
| Representing All Year Holding LTD (Responsible for all Fees) | |

## ADDITIONAL OPTIONAL SERVICES

Assessment & Consulting Services:  CBRE's Assessment & Consulting Services group has the capability of providing a wide array of solution-oriented due diligence services in the form of property condition and environmental site assessment reports and other necessary due diligence services (seismic risk analysis, zoning compliance services, construction risk management, annual inspections, etc.).  CBRE provides our clients the full complement of due diligence services with over 260 employees in the U.S. that are local subject matter experts.

Initial below if you desire CBRE to contact you to discuss a proposal for any part or the full complement of consulting services, or you may reach out to us at **WhitePlainsProposals@cbre.com.**  We will route your request to the appropriate manager. For more information, please visit **www.cbre.com/assessment.**

_____ Initial Here



# TERMS AND CONDITIONS

1. The Terms and Conditions herein are part of an agreement for appraisal services (the "Agreement" ) between CBRE, Inc. (the "Appraiser") and the client signing this Agreement, and for whom the appraisal services will be performed (the "Client"), and shall be deemed a part of such Agreement as though set forth in full therein. The Agreement shall be governed by the laws of the state where the appraisal office is located for the Appraiser executing this Agreement.

2. Client shall be responsible for the payment of all fees stipulated in the Agreement. Payment of the appraisal fee and preparation of an appraisal report (the "Appraisal Report, or the "report") are not contingent upon any predetermined value or on an action or event resulting from the analyses, opinions, conclusions, or use of the Appraisal Report. Final payment is due as provided in the Proposal Specifications Section of this Agreement. If a draft report is requested, the fee is considered earned upon delivery of the draft report. It is understood that the Client may cancel this assignment in writing at any time prior to delivery of the completed report. In such event, the Client is obligated only for the prorated share of the fee based upon the work completed and expenses incurred (including travel expenses to and from the job site), with a minimum charge of $7,500. Additional copies of the Appraisal Reports are available at a cost of $250 per original color copy and $100 per photocopy (black and white), plus shipping fees of $30 per report.

3. If Appraiser is subpoenaed or ordered to give testimony, produce documents or information, or otherwise required or requested by Client or a third party to participate in meetings,  phone calls, conferences, litigation or other legal proceedings (including preparation for such proceedings) because of, connected with or in any way pertaining to this engagement, the Appraisal Report, the Appraiser's expertise, or the Property, Client shall pay Appraiser's additional costs and expenses, including but not limited to Appraiser's attorneys' fees, and additional time incurred by Appraiser based on Appraiser's then-prevailing hourly rates and related fees.  Such charges include and pertain to, but are not limited to, time spent in preparing for and providing court room testimony, depositions, travel time, mileage and related travel expenses, waiting time, document review and production, and preparation time (excluding preparation of the Appraisal Report), meeting participation, and Appraiser's other related commitment of time and expertise.  Hourly charges and other fees for such participation will be provided upon request. In the event Client requests additional appraisal services beyond the scope and purpose stated in the Agreement, Client agrees to pay additional fees for such services and to reimburse related expenses, whether or not the completed report has been delivered to Client at the time of such request.

4. Appraiser shall have the right to terminate this Agreement at any time for cause effective immediately upon written notice to Client on the occurrence of fraud or the willful misconduct of Client, its employees or agents, or without cause upon 5 days written notice.

5. In the event Client fails to make payments when due then, from the date due until paid, the amount due and payable shall bear interest at the maximum rate permitted in the state where the office is located for the Appraiser executing the Agreement.  In the event either party institutes legal action against the other to enforce its rights under this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and expenses. Each party waives the right to a trial by jury in any action arising under this Agreement.

6. Appraiser assumes there are no major or significant items or issues affecting the Property that would require the expertise of a professional building contractor, engineer, or environmental consultant for Appraiser to prepare a valid report.  Client acknowledges that such additional expertise is not covered in the Appraisal fee and agrees that, if such additional expertise is required, it shall be provided by others at the discretion and direction of the Client, and solely at Client's additional cost and expense.

7. In the event of any dispute between Client and Appraiser relating to this Agreement, or Appraiser's or Client's performance hereunder, Appraiser and Client agree that such dispute shall be resolved by means of binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by an arbitrator may be entered in any court of competent jurisdiction. Depositions may be taken and other discovery obtained during such arbitration proceedings to the same extent as authorized in civil judicial proceedings in the state where the office of the Appraiser executing this Agreement is located.  The arbitrator shall be limited to awarding compensatory damages and shall have no authority to award punitive, exemplary or similar damages.  The prevailing party in the arbitration proceeding shall be entitled to recover its expenses from the losing party, including costs of the arbitration proceeding, and reasonable attorney's fees.  Client acknowledges that Appraiser is being retained hereunder as an independent contractor to perform the services described herein and nothing in this Agreement shall be deemed to create any other relationship between

Client and Appraiser. This engagement shall be deemed concluded and the services hereunder completed upon delivery to Client of the Appraisal Report discussed herein.

8. All statements of fact in the report which are used as the basis of the Appraiser's analyses, opinions, and conclusions will be true and correct to Appraiser's actual knowledge and belief. Appraiser does not make any representation or warranty, express or implied, as to the accuracy or completeness of the information or the condition of the Property furnished to Appraiser by Client or others. TO THE FULLEST EXTENT PERMITTED BY LAW, APPRAISER DISCLAIMS ANY GUARANTEE OR WARRANTY AS TO THE OPINIONS AND CONCLUSIONS PRESENTED ORALLY OR IN ANY APPRAISAL REPORT, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE EVEN IF KNOWN TO APPRAISER. Furthermore, the conclusions and any permitted reliance on and use of the Appraisal Report shall be subject to the assumptions, limitations, and qualifying statements contained in the report.

9. Appraiser shall have no responsibility for legal matters, including zoning, or questions of survey or title, soil or subsoil conditions, engineering, or other similar technical matters. The report will not constitute a survey of the Property analyzed.

10. Client shall provide Appraiser with such materials with respect to the assignment as are requested by Appraiser and in the possession or under the control of Client. Client shall provide Appraiser with sufficient access to the Property to be analyzed, and hereby grants permission for entry unless discussed in advance to the contrary.

11. The data gathered in the course of the assignment (except data furnished by Client) and the report prepared pursuant to the Agreement are, and will remain, the property of Appraiser. With respect to data provided by Client, Appraiser shall not violate the confidential nature of the Appraiser-Client relationship by improperly disclosing any proprietary information furnished to Appraiser. Notwithstanding the foregoing, Appraiser is authorized by Client to disclose all or any portion of the report and related data as may be required by statute, government regulation, legal process, or judicial decree, including to appropriate representatives of the Appraisal Institute if such disclosure is required to enable Appraiser to comply with the Bylaws and Regulations of such Institute as now or hereafter in effect.

12. Unless specifically noted, in preparing the Appraisal Report the Appraiser will not be considering the possible existence of asbestos, PCB transformers, or other toxic, hazardous, or contaminated substances and/or underground storage tanks (collectively, "Hazardous Material) on or affecting the Property, or the cost of encapsulation or removal thereof. Further, Client represents that there is no major or significant deferred maintenance of the Property that would require the expertise of a professional cost estimator or contractor. If such repairs are needed, the estimates are to be prepared by others, at Client's discretion and direction, and are not covered as part of the Appraisal fee.

13. In the event Client intends to use the Appraisal Report in connection with a tax matter, Client acknowledges that Appraiser provides no warranty, representation or prediction as to the outcome of such tax matter. Client understands and acknowledges that any relevant taxing authority (whether the Internal Revenue Service or any other federal, state or local taxing authority) may disagree with or reject the Appraisal Report or otherwise disagree with Client's tax position, and further understands and acknowledges that the taxing authority may seek to collect additional taxes, interest, penalties or fees from Client beyond what may be suggested by the Appraisal Report. Client agrees that Appraiser shall have no responsibility or liability to Client or any other party for any such taxes, interest, penalties or fees and that Client will not seek damages or other compensation from Appraiser relating to any such taxes, interest, penalties or fees imposed on Client, or for any attorneys' fees, costs or other expenses relating to Client's tax matters.

14. Appraiser shall have no liability with respect to any loss, damage, claim or expense incurred by or asserted against Client arising out of, based upon or resulting from Client's failure to provide accurate or complete information or documentation pertaining to an assignment ordered under or in connection with this Agreement, including Client's failure, or the failure of any of Client's agents, to provide a complete copy of the Appraisal Report to any third party.

15. LIMITATION OF LIABILITY. EXCEPT TO THE EXTENT ARISING FROM SECTION 16 BELOW, OR SECTION 17 IF APPLICABLE, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS AFFILIATE, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR CONTRACTORS BE LIABLE TO THE OTHER, WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY, NEGLIGENCE, STRICT LIABILITY OR OTHER TORT OR OTHERWISE, FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, INCIDENTAL OR INDIRECT DAMAGES, AND AGGREGATE DAMAGES IN CONNECTION WITH THIS AGREEMENT FOR EITHER PARTY (EXCLUDING THE OBLIGATION TO PAY THE FEES REQUIRED HEREUNDER) SHALL NOT EXCEED THE GREATER OF THE TOTAL FEES PAYABLE TO APPRAISER UNDER THIS AGREEMENT OR TEN THOUSAND DOLLARS ($10,000). THIS LIABILITY LIMITATION SHALL NOT

APPLY IN THE EVENT OF A FINAL FINDING BY AN ARBITRATOR OR A COURT OF COMPETENT JURISDICTION THAT SUCH LIABILITY IS THE RESULT OF A PARTY'S FRAUD OR WILLFUL MISCONDUCT.

16. Client shall not disseminate, distribute, make available or otherwise provide any Appraisal Report prepared hereunder to any third party (including without limitation, incorporating or referencing the Appraisal Report , in whole or in part, in any offering or other material intended for review by other parties) except to (i) any third party expressly acknowledged in a signed writing by Appraiser as an "Intended User" of the Appraisal Report provided that either Appraiser has received an acceptable release from such third party with respect to such Appraisal Report or Client provides acceptable indemnity protections to Appraiser against any claims resulting from the distribution of the Appraisal Report to such third party, (ii) any third party service provider (including rating agencies and auditors) using the Appraisal Report in the course of providing services for the sole benefit of an Intended User, or (iii) as required by statute, government regulation, legal process, or judicial decree. In the event Appraiser consents, in writing, to Client incorporating or referencing the Appraisal Report in any offering or other materials intended for review by other parties, Client shall not distribute, file, or otherwise make such materials available to any such parties unless and until Client has provided Appraiser with complete copies of such materials and Appraiser has approved all such materials in writing. Client shall not modify any such materials once approved by Appraiser. In the absence of satisfying the conditions of this paragraph with respect to a party who is not designated as an Intended User, in no event shall the receipt of an Appraisal Report by such party extend any right to the party to use and rely on such report, and Appraiser shall have no liability for such unauthorized use and reliance on any Appraisal Report. In the event Client breaches the provisions of this paragraph, Client shall indemnify, defend and hold Appraiser, and its affiliates and their officers, directors, employees, contractors, agents and other representatives (Appraiser and each of the foregoing an "Indemnified Party" and collectively the "Indemnified Parties"), fully harmless from and against all losses, liabilities, damages and expenses (collectively, "Damages") claimed against, sustained or incurred by any Indemnified Party arising out of or in connection with such breach, regardless of any negligence on the part of any Indemnified Party in preparing the Appraisal Report.

17. Furthermore, Client shall indemnify, defend and hold each of the Indemnified Parties harmless from and against any Damages in connection with (i) any transaction contemplated by this Agreement or in connection with the appraisal or the engagement of or performance of services by any Indemnified Party hereunder, (ii) any Damages claimed by any user or recipient of the Appraisal Report, whether or not an Intended User, (iii) any actual or alleged untrue statement of a material fact, or the actual or alleged failure to state a material fact necessary to make a statement not misleading in light of the circumstances under which it was made with respect to all information furnished to any Indemnified Party or made available to a prospective party to a transaction, or (iv) an actual or alleged violation of applicable law by an Intended User (including, without limitation, securities laws) or the negligent or intentional acts or omissions of an Intended User (including the failure to perform any duty imposed by law); and will reimburse each Indemnified Party for all reasonable fees and expenses (including fees and expenses of counsel) (collectively, "Expenses") as incurred in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation (collectively, "Proceedings") arising therefrom, and regardless of whether such Indemnified Party is a formal party to such Proceeding. Client agrees not to enter into any waiver, release or settlement of any Proceeding (whether or not any Indemnified Party is a formal party to such Proceeding) without the prior written consent of Appraiser (which consent will not be unreasonably withheld or delayed) unless such waiver, release or settlement includes an unconditional release of each Indemnified Party from all liability arising out of such Proceeding.

18. Time Period for Legal Action. Unless the time period is shorter under applicable law, except in connection with paragraphs 16 and 17 above, Appraiser and Client agree that any legal action or lawsuit by one party against the other party or its affiliates, officers, directors, employees, contractors, agents, or other representatives, whether based in contract, warranty, indemnity, negligence, strict liability or other tort or otherwise, relating to (a) this Agreement or the Appraisal Report, (b) any services or appraisals under this Agreement or (c) any acts or conduct relating to such services or appraisals, shall be filed within two (2) years from the date of delivery to Client of the Appraisal Report to which the claims or causes of action in the legal action or lawsuit relate. The time period stated in this section shall not be extended by any incapacity of a party or any delay in the discovery or accrual of the underlying claims, causes of action or damages.

VALUATION & ADVISORY SERVICES

## Proposal and Contract for Services

# SPECIFIC PROPERTY DATA REQUEST

In order to complete this assignment under the terms outlined, CBRE, Inc., Valuation & Advisory Services, will require the following specific information for the property:

1. <u>PLEASE NOTIFY US IMMEDIATELY IF ANY OTHER CBRE SERVICE LINE (INCLUDING CAPSTONE) IS INVOLVED IN THE BROKERAGE, FINANCING, INVESTMENT OR MANAGEMENT OF THIS ASSET.</u>
2. Current title report and title holder name
3. Legal description
4. Survey and/or plat map
5. Site plan for the existing development
6. Building plans and specifications, including square footage for all buildings and units
7. Current county property tax assessment or tax bill
8. Details on any sale, contract, or listing of the property within the past three years
9. Engineering studies, soil tests or environmental assessments
10. Ground lease, if applicable
11. Details regarding the development costs, including land cost, if developed within the past three years
12. Three-year and YTD property income and expenses
13. Current year property income and expense budget
14. Detailed occupancy report for the past three years and current YTD
15. Detailed current rent roll indicating any vacant units
16. Details regarding any pending changes to the rent roll, including deposits for future occupancies
17. Details regarding any concessions currently being offered or provided for all leases pending or signed over the prior 12 months
18. Details regarding all personal property, including furniture, fixtures, and equipment
19. Details regarding the historical and future replacement schedule (i.e., carpets, appliances, cabinetry, laundry facilities, HVAC, etc.)
20. Details regarding capital expenditures made within the last 12 months, or scheduled for the next 12 months
21. Marketing plan and/or local competitive study, if available
22. Any previous market/demand studies or appraisals
23. Name and telephone number of property contact for physical inspection and additional information needed during the appraisal process
24. Any other information that might be helpful in valuing this property

If any of the requested data and information is not available, CBRE, Inc., reserves the right to extend the delivery date by the amount of time it takes to receive the requested information or make other arrangements. Please have the requested information delivered to the following:

Edward R. Eschmann, MAI
Director
edward.eschmann@cbre.com
CBRE, Inc.
Valuation & Advisory Services
200 Park Avenue, 20th Floor
New York, NY 10166



Addenda

Addendum

# QUALIFICATIONS





## Edward R. Eschmann, MAI

**Director,
Valuation and Advisory
Hospitality & Gaming Group**

## PROFESSIONAL EXPERIENCE

Edward R. Eschmann, MAI is Director in the New York office of the Valuation & Advisory Services Group of CBRE. He has over 35 years of valuation and consulting experience throughout the United States, Puerto Rico and the Americas. Mr. Eschmann is a designated Member of the Appraisal Institute and Royal Institution of Chartered Surveyors and is a Certified General Real Estate Appraiser in the states of New York and New Jersey and has held licenses in other jurisdictions including Connecticut, Vermont, Illinois, Washington DC and Pennsylvania.

Assignments include a wide variety of full and partial interest appraisals on property types including urban and suburban luxury, full and limited service boutique independent and franchised hotels, mixed use residential condominium/hotels, corporate headquarters and conference hotels, suburban and urban office buildings, regional retail malls and outlet centers with hospitality components and residential apartment and condominiums with hospitality components.

In 1995, he has attained the MAI designation of the Appraisal Institute. Since 2006, Mr. Eschmann has specialized in the hospitality asset class and is director of the Tri-State Hospitality Group in New York City covering New York, New Jersey and Connecticut region.

# Credentials

### PROFESSIONAL AFFILIATIONS AND ACCREDITATIONS

- Appraisal Institute – Designated Member (MAI) since 1995
- Royal Institute of Chartered Surveyors – Designated Member (MRICS)
- Certified General Real Estate Appraiser
  - o  State of New Jersey, No. 42G001973
  - o  State of New York, No. 46000002842

# Education

- University of Massachusetts, Amherst, Massachusetts,
  - o  Bachelor of Science; Environmental Science

EDWARD R. ESCHMANN, MAI
**Director
Valuation & Advisory
Hospitality and Gaming**
1 Penn Plaza, Suite 1835
New York, NY 10119
T 212.207.6092
Edward.eschmann@cbre.com



# Edward R. Eschmann, MAI

**Director,
Valuation and Advisory,
Hospitality & Gaming Group**

SIGNIFICANT ASSIGNMENTS

| Assignments | Locations | Property Types |
|---|---|---|
| Plaza / Dream Hotels | New York, NY | Luxury and Boutique Hotel/Retail Repositions |
| Hudson Yards Development(s) | New York, NY | Office/Hotels/Mixed Use New Development |
| Westin San Francisco | San Francisco, CA | Luxury Full Service Hotel |
| Surrey, Viceroy, Essex House, Lowell, Plaza Atenee,  Equinox flagship, Four Seasons DT, Fidi, Mondrian, Americano, Mandarin and ORS | New York, NY | Luxury Boutique NYC Hotels |
| The Adia portfolio incl. Marriott Edition and ORS | New York, NY | Marriott Brand - New Luxury Boutique Hotel |
| Manhattan Times Square | New York, NY | Hotel/Retail/ Signage-Upscale Hotel |
| The London NYC | New York, NY | Luxury Suite Hotel Reposition |
| Mondrian SOHO | New York, NY | Luxury Boutique Hotel |
| Barclays Intercontinental | New York, NY | Luxury Hotel Reposition |
| Sheraton SOHO / Element TS | New York, NY | Upscale Suite Hotel |
| SONY US Headquarters | New York, NY | Office/Hotel Reposition |
| The New Yorker | New York, NY | Hotel Upscale Reposition, New Development Addition |
| The Crowne Building, Fifth Ave. | New York, NY | Office/Hotel Ultra Luxury Reposition, Proposed AMAN |
| EPR Properties | Catskills, NY | Casino/Hotel/Residences |
| Beekman Tower and Wework DT | New York, NY | Luxury Hotel/Corporate Housing/Live work hotel concept |
| Innkeepers Hotel Portfolio | Upstate New York, NY | Mid-Scale Hotel Portfolio |
| Marriott Brands, Courtyard/Fairfield/ORS | Various, NY, NJ, CT | Various Franchise Scale Hotels |
| Eventi by Kimpton and Kimpton Bossert | New York and Brooklyn, NY | Boutique Hotels and Condominium Residences |
| Wyndham, Choice and IHG Brands | Various, NY, NJ, CT | Mid-Upscale Hotels |
| Bryant Park Hotel | New York, NY | Upper Upscale Boutique Hotel |
| Citibank Sanford Weill and HNA Palisades Conference Centers | Armonk/Palisades, NY | Education/Corporate Retreat/Conference Center(s) |
| Tarrytown House | Tarrytown, NY | Americas First Corporate Conference Center Hotel |
| Historic Tishman Building | Rochester, NY | Office/Hotel Restoration |
| Gurneys and Montauk Yacht Club | Montauk, NY | Luxury Resort Hotel and IGY Yacht Club |
| Jolly Madison/Madison Towers | New York, NY | Mid to Upper Upscale Hotel Reposition |
| Le-Fouquet's Barriere | New York, NY | Luxury Boutique Hotel new development |
| Exclusive Resorts | Papaguyo, Costa Rica | Resort Hotel |
| Rockefeller Center | New York, NY | Office/ Mixed Use Complex |
| World Center Hotel/Club Quarters | New York, NY | Upscale Hotel and Corporate Membership Hotel |
| 666 Fifth Ave | New York, NY | Office/Retail - Multi Use |
| IAC Headquarters | New York, NY | US Corporate Headquarters |
| Viacom Headquarters | New York, NY | US Corporate Headquarters |
| RXR Single Asset and Portfolio | NYC/LI, NY | Office Assets and Portfolio |
| Tillary, Williamsburg, Marriott and ORS | Brooklyn, NY | Full Service and Luxury Boutique Hotels |
| The Freehand portfolio | New York, NY | Upper upscale Boutique Hotel / shared room concept |
| The Edison Times Square | New York, NY | Hotel reposition/expansion |

## QUALIFICATIONS

**EDWARD R. ESCHMANN, MAI**
**CBRE HOTELS**
**Director, Practice Leader**
**Mid-Atlantic and Northeast Hospitality Group**

**CBRE, Inc**
Valuation & Advisory Group
1 Penn Plaza, Suite 1835
New York, New York  10119
Tel: (212) 207-6092
Cell: (917) 886-9515
Fax: (212 207-6069
Email: edward.eschmann@cbre.com

## EDUCATIONAL

Bachelor of Science Degree, Environmental Science,
University of Massachusetts, Amherst, Massachusetts

Successfully completed all the necessary courses to qualify for the MAI designation.

## LICENSES/CERTIFICATIONS

Certified General Real Estate Appraiser: State of New York (NY: 46000002842)
Certified General Real Estate Appraiser: State of New Jersey (NJ: 42RG00197300)

## PROFESSIONAL

Designated Member of the Appraisal Institute (MAI) since 1995

## EXPERIENCE

| | | |
|---|---|---|
| 2000 – Present: | CBRE, Inc. | New York, NY |
| 1998 – 2000: | Koeppel Tener Real Estate Services, Inc. | New York, NY |
| 1984 – 1998: | Rogers & Taylor Appraisers, Inc. | Hauppauge, NY |

Valuation assignments include a wide range of property types: Hotel, Office, Retail, Industrial, Residential, consulting and acquisitions/disposition advisory.  Mr. Eschmann has specialized in the hotel asset class for the past decade, notwithstanding retaining his hand in other asset class analysis and appraisal including major Class A office projects and major mixed use hotel/retail and residential condominiums projects throughout New York.  The combination of knowledge across the spectrum of asset classes offers our client a specialized knowledge and unique perspective of the real estate industry into the various asset classes under his review.  He has spoken at various banking and lending organizations and has been adjunct speaker at City of New York, Baruch College, and for the Appraisal Institute on various occasions.



UNIQUE ID NUMBER

46000002842

*State of New York*
*Department of State*
**DIVISION OF LICENSING SERVICES**

FOR OFFICE USE ONLY

Control
No.    1523844

PURSUANT TO THE PROVISIONS OF ARTICLE 6E OF THE
EXECUTIVE LAW AS IT RELATES TO R.E. APPRAISERS.

EFFECTIVE DATE

| MO. | DAY | YR. |
| --- | --- | --- |
| 04 | 28 | 20 |

ESCHMANN EDWARD R
C/O EDWARD ESCHMANN INC
112 E 83RD ST
APT 6A
NEW YORK, NY 10028

EXPIRATION DATE

| MO. | DAY | YR. |
| --- | --- | --- |
| 04 | 27 | 22 |

HAS BEEN DULY CERTIFIED TO TRANSACT BUSINESS AS A
R.E. GENERAL APPRAISER

In Witness Whereof, The Department of State has caused
its official seal to be hereunto affixed.

ROSSANA ROSADO
SECRETARY OF STATE

DOS-1096 (Rev. 3/01)

## **Exhibit F**

**CVs for Directors of Reorganized Debtor**

Avi Philipson
22 Pleasant Ridge Road
Spring Valley, NY 10977

Mr. Avi Philipson has been an active managing member of multiple nursing homes since 2014. Mr. Philipson is the President of Axis Health Care, from 2019 through today. Axis Health Care is a nursing home management company with facilities in Maryland. He is also the founder, and president, of Care365 Home Care since 2017. Care 365 Home Care is located in New York state and services the geriatric community.  In addition, Mr. Philipson is the cofounder of Benmark Capital, and Vice President since 2021. Benmark capital is a real estate debt fund focused on bridging solutions for multifamily development and land acquisition financing.  Mr. Philipson has established himself as an entrepreneur at a young age, with the ability to identify lucrative opportunities and can use his experience and knowledge to execute his business plan across the east coast from New York to Florida.

Mr. Philipson is the CEO of The Graph Group. With Mr. Philipson's approach the Graph Group is building value through long term investments. The Graph Group is outperforming the marking by making careful investment decisions and concentrating on their resources in areas of definite and defining growth. Mr. Philipson leverages his collective knowledge, experience, and deep relationships in niche industries to provide capital and advisory solutions that help their partners exceed their goals. The Graph Group holds investments in real estate assets across various real estate sectors through the US, including multi-family, health care and industrial properties.

Abraham Grunhut
209 Harrison Avenue
Brooklyn, NY 11206

Mr. Abraham Grunhut has been an active commercial real estate GP for nearly 20 years. During that period, Mr. Grunhut has amassed a diversified portfolio of over 90 buildings, including multifamily, office, and mixed-use properties. The portfolio spans across New York and New Jersey and consists of over 1,000 residential units and approximately 2,000,000 square feet of office space. Mr. Grunhut has established himself as an entrepreneur, with the ability to identify value-add opportunities for multifamily and office assets, and the experience to execute on his business plan.

In addition to acquiring value-add opportunities, Mr. Grunhut has completed numerous ground-up construction projects on multifamily buildings. Mr. Grunhut prides himself on the ability to deliver quality finishes in efficient delivery time. This valuable knowledge and experience has given Mr. Grunhut the unique ability to deliver on gut-renovations and rehabs quickly and efficiently without compromising quality. This attention to detail is apparent throughout the portfolio, prioritizing quality, and efficiency to better serve tenants, ultimately creating tremendous value in the assets.

Andrew Chaimowitz
914 Columbus Drive
Teaneck, NJ 07666

Mr. Andrew Chaimowitz is the CFO of Benmark Capital LLC and the Controller of The Graph Group. He joins both groups with over 11 years of experience in both public and private accounting, as well as in financial reporting and analysis. Mr. Chaimowitz is an accomplished executive with involvement in business expansion, operations and vendor relations.

Mr. Chaimowitz most recently spent the last 8 years of his career at Dwight Capital LLC, a Real Estate Finance and Investment firm, where he served as Chief Financial Officer and oversaw all accounting functions of the business. He played a key role in helping scale the company to become one of the largest FHA/HUD lenders for multifamily and healthcare properties in the United States. Prior to that, he spent his career as an accountant focused on tax and state regulatory compliance matters.

Mr. Chaimowitz graduated with a B.A. in Accounting, and later received his M.S. in Accounting from Queens College, CUNY.

## Exhibit G

### Financial Projections



Brookfield Place, 200 Vesey Street
20th Floor
New York, NY 10281-2101
Telephone:  212-415-8600
Fax:  212-303-2754
www.lockelord.com

Shalom Jacob
Direct Telephone:  212-415-8618
sjacob@lockelord.com

June 15, 2022

By Email

Matthew P. Goren, Esq.
Justin Kanoff, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

Re:    In re All Year Holdings Limited, Case No. 21-12051

Dear Matt and Justin:

As requested by All Year Holdings Limited (the "Debtor"), we enclose financial projections (the "Financial Projections") that Paragraph Partners LLC (the "Sponsor") has prepared solely for purposes of (i) the Disclosure Statement and the Chapter 11 Plan of Reorganization (the "Plan"), both of which have been filed in the above-referenced bankruptcy case and (ii) the Israeli Proceeding.[1]  The Financial Projections are solely based on information provided by the Debtor and without any independent verification, for the Reorganized Debtor for the three fiscal years following the Effective Date.

The Financial Projections are intended to assist the Debtor in satisfying certain disclosure requirements of Chapter 11 of Title 11 of the U.S. Bankruptcy Code.  The Sponsor prepared the Financial Projections with the assistance of its advisors.  The Sponsor did not prepare the Financial Projections to comply with any guidelines or standards for prospective financial statements including, without limitation, the standards of the American Institute of Certified Public Accountants, international financial reporting standards (IFRS) and Israeli securities regulations, or to comply with the rules and regulations of the Israeli securities authority or the U.S. Securities and Exchange Commission.  Except for purposes of contractual obligations to which the Sponsor may have agreed, the Sponsor does not publish and does not intend to publish Financial Projections of its or the Reorganized Debtor's anticipated financial position or results of operations.

Moreover, to the extent that the Financial Projections may contain "forward-looking statements" within the meaning of Israeli and U.S. securities laws, rules and regulations, such statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of the Sponsor or the Reorganized Debtor, including the continuing availability of

---

[1] Unless otherwise indicated, capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

Matthew P. Goren, Esq.
Justin Kanoff, Esq.
June 15, 2022
Page 2

sufficient borrowing capacity or other financing to fund operations, achieving operating efficiencies, existing and future governmental regulations and actions of governmental bodies, industry-specific risk factors, and other market and competitive conditions.  In addition, certain aspects of the Financial Projections may be based on data and information provided to the Sponsor by external sources that have not been independently verified by the Sponsor or its advisors and, therefore, the Sponsor makes no representations regarding the accuracy of such information or the projected results derived therefrom.  Holders of claims against and interests in the Debtor are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance.  Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and the Sponsor undertakes no obligation to update any such statements.

The Financial Projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Sponsor, may not be realized and are inherently subject to significant business, economic, industry, regulatory, legal, market, and financial uncertainties and contingencies, many of which are beyond the Sponsor's and the Reorganized Debtor's control.  The Sponsor cautions that no representations can be made or are made as to the accuracy of the Financial Projections or to the Reorganized Debtor's ability to achieve the projected results.  In addition, events and circumstances occurring subsequent to the date on which the Sponsor prepared these Financial Projections may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  Except as otherwise provided in the Plan Investment Agreement, the Sponsor and Reorganized Debtor, as applicable, do not intend and undertake no obligation to update or otherwise revise the Financial Projections to reflect events or circumstances existing or arising after the date hereof or to reflect the occurrence of unanticipated events.  Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance of the actual results that will occur.

Very truly yours,

Shalom Jacob

SJ:ahk

Enclosure

127505469v.2

| 4 Year Pro Forma | | | |
|---|---|---|---|
| | **Year 0** | **Year 1** | **Year 2** | **Year 3** |
| **Rental Revenue** | | | | |
| Rent Stabilized Rental Income | $6,520,303 | $6,683,311 | $6,850,393 | $7,021,653 |
| Rent Stabilized Vacancy | ($130,406) | ($133,666) | ($137,008) | ($140,433) |
| Fair Market Rental Income | $27,137,918 | $27,952,056 | $28,790,617 | $29,654,336 |
| Fair Market Vacancy | ($814,138) | ($838,562) | ($863,719) | ($889,630) |
| Residential Credit Loss | ($1,308,547) | ($673,263) | ($173,201) | ($178,230) |
| Commercial Rental Income | $4,321,353 | $4,450,994 | $4,584,524 | $4,722,059 |
| Commercial Vacancy | ($216,068) | ($222,550) | ($229,226) | ($236,103) |
| Commercial Credit Loss | ($123,159) | ($84,569) | ($43,553) | ($44,860) |
| Real Estate Tax and Utility Reimbursement | $200,000 | $206,000 | $212,180 | $218,545 |
| **Total Rental Income** | **$35,587,257** | **$37,339,751** | **$38,991,007** | **$40,127,338** |
| **Expenses** | | | | |
| Payroll | ($996,000) | ($1,025,880) | ($1,056,656) | ($1,088,356) |
| Heating | ($371,395) | ($382,537) | ($394,013) | ($405,833) |
| R&M | ($996,000) | ($1,025,880) | ($1,056,656) | ($1,088,356) |
| Water Sewer | ($796,800) | ($820,704) | ($845,325) | ($870,685) |
| Real Estate Taxes | ($4,599,673) | ($4,839,801) | ($5,093,009) | ($5,360,032) |
| Real Estate Tax Abatement | $685,495 | $696,428 | $693,899 | $672,763 |
| Legal/Misc. | ($348,600) | ($359,058) | ($369,830) | ($380,925) |
| Elevator | ($32,000) | ($32,960) | ($33,949) | ($34,967) |
| Insurance | ($796,800) | ($820,704) | ($845,325) | ($870,685) |
| Utilities | ($298,800) | ($307,764) | ($316,997) | ($326,507) |
| Property Management | ($1,314,720) | ($1,354,162) | ($1,394,786) | ($1,436,630) |
| Payables Paydown | ($5,000,000) | | | |
| **Total Expenses** | **($14,865,293)** | **($10,273,021)** | **($10,712,648)** | **($11,190,213)** |
| | | | | |
| **NOI** | **$20,721,965** | **$27,066,729** | **$28,278,359** | **$28,937,126** |
| Replacement Reserve | ($283,800) | ($283,800) | ($283,800) | ($283,800) |
| Leasing Costs | ($416,921) | ($440,671) | ($462,562) | ($476,441) |
| **Unlevered Building Cash Flow** | **$20,021,244** | **$26,342,259** | **$27,531,998** | **$28,176,884** |
| Loan Payoff | | | | |
| Debt Service Payments | ($22,500,000) | ($22,500,000) | ($22,500,000) | ($22,500,000) |
| **Levered Building Cash Flow** | **($2,478,756)** | **$3,842,259** | **$5,031,998** | **$5,676,884** |
| | | | | |
| **AYH Share of Cash Flow** | **($1,549,261.34)** | **$2,401,472.22** | **$3,145,078** | **$3,548,142** |
| Overhead Expenses | ($1,000,000) | ($1,000,000) | ($1,000,000) | ($1,000,000) |
| 227 Grand Living Settlement | $5,227,000 | | | |
| **AYH Share with Additional Assets and Liabilities** | **$2,677,739** | **$1,401,472** | **$2,145,078** | **$2,548,142** |
| Equity Contribution for Note Payable | | $5,000,000 | $5,000,000 | $10,000,000 |
| Note Payable | | ($5,000,000) | ($5,000,000) | ($10,000,000) |
| **Free Cash Flow** | **$2,677,739** | **$1,401,472** | **$2,145,078** | **$2,548,142** |

## General Assumptions

1) The Financial Projections assume that Year Zero begins on the Effective Date.

2) The Financial Projections have been prepared using a cash basis.

3) Debt Service Payments assume a total loan of $355 million at an interest rate of around 5%, which is subject to change based on market conditions.

4) Debt Service Payments include principal and interest payments on the underlying property mortgages.

5) The Financial Projections do not include any claim held by Taz Partners LLC arising under or relating to that certain confession of judgment entered against the Debtor by the Kings County Supreme Court on December 9, 2021 (the "Taz Claim"), which, pursuant to the terms of the New Notes, has been subordinated to the payment obligations arising thereunder. Payments under the New Notes are shown as "Note Payable" payments in Years One to Three of the Financial Projections.

## Operating Assumptions

6) Property Profile- For purposes of calculating the Reorganized Debtor's annual cash flow each year, the Financial Projections assume that with the exception of the immediate disposition of the Albee Square property, property count remains constant, with no acquisitions or dispositions occurring during the four year period. The Financial Projections also do not incorporate the North Flats property.

7) Portfolio Management & Corporate Expenses- The Financial Projections assume that the Reorganized Debtor will receive distributions of cash from (and for Year Zero will make contributions to) the underlying entities in the amount of its share of the net cash flow as calculated in the Financial Projections. The Reorganized Debtor's share of these proceeds has been calculated using a blended ownership percentage based on information provided by the Debtor. An asset management fee is included in the $1 million of overhead expenses, which also includes personnel costs, rent expense and insurance costs.

8) Rental Revenues– Rental revenues for Year Zero are based on current rent rolls. Years One to Three are calculated using assumptions of growth based on current market conditions, including the projected vacancy percentages. Residential credit loss for Year Zero is based on current portfolio delinquencies, and is projected to decrease and normalize by Year Two.

9) Expenses- Most of the expenses are calculated using a flat dollar per unit or per foot amount based on market metrics used in the real estate industry. (The exception is payables paydown- see additional information below.) Detailed information is included in the following tables. These amounts are believed to be conservative estimates.

|  | Year 0 | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| RS Rent Growth % | 0.00% | 2.50% | 2.50% | 2.50% |
| Market Rent Growth % | 0.00% | 3.00% | 3.00% | 3.00% |
| RS Vacancy % | 2.00% | 2.00% | 2.00% | 2.00% |
| FM Vacancy % | 3.00% | 3.00% | 3.00% | 3.00% |
| Residential Credit Loss % | 4.00% | 2.00% | 0.50% | 0.50% |
| Commercial Rent Growth | 3.00% | 3.00% | 3.00% | 3.00% |
| Commercial Vacancy | 5.00% | 5.00% | 5.00% | 5.00% |
| Commercial Credit Loss | 3.00% | 2.00% | 1.00% | 1.00% |
| Expense Growth |  | 3.00% | 3.00% | 3.00% |
| Tax Growth |  | 5.22% | 5.23% | 5.24% |

| Expense Assumptions | | |
|---|---|---|
| Expenses | $/Unit | $/SF |
| Payroll | 1,000 |  |
| Heating |  | $ 0.45 |
| R&M | 1,000 |  |
| Water Sewer | 800 |  |
| Real Estate Taxes | In Place |  |
| Real Estate Tax Abatement | In Place |  |
| Misc./ Legal | 350 |  |
| Insurance | 800 |  |
| Common Electric and Cooking Gas | 300 |  |
| Property Management | 1,320 |  |

| Additional Expenses | |
|---|---|
| Replacement Reserve | 300 /Unit |
| Leasing | 1/60 Fair Market Revenue |

10)  Payables Paydown - This is a one-time payment of third-party payables projected for Year Zero, and includes outstanding water charges, taxes, security deposit shortfall, mechanics lien(s), and payment of EIDL loan(s).

11)  Grand Living II LLC Settlement Receivable – Anticipated proceeds resulting from the consensual multiparty agreement dated August 30, 2021 in connection with the MY 2011 Grand LLC, et al. Chapter 11 case (No. 19-23957 (RDD)). The Financial Projections assume that such proceeds are collected in Year Zero.

12) Werner/Good Light Funding Claims - Various non-debtor subsidiaries of All Year Holdings are defendants in two lawsuits in which the respective plaintiffs, Good Light Funding LLC and DW Brooklyn 75 LLC, assert monetary claims against the subsidiaries. In addition, one plaintiff has filed lis pendens against 74 of the properties indirectly owned by All Year Holdings.  All rights are reserved concerning these claims.  If the claims are liquidated and additional funds are required, additional capital contributions will be made.

13) Other Considerations- Since the Financial Projections have been prepared using a cash basis, they do not take into account the effects of depreciation, amortization, and other non-cash items.  Additionally, they do not take into account the effects of rate-resetting (other than in the Debt Service calculation).

## <u>Exhibit H</u>

## Liquidation Analysis

**All Year Holdings Limited**
**Liquidation Analysis**

The Liquidation Analysis assumes that All Year Holdings Limited (the "Debtor") would commence a liquidation under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") on or about September 30, 2022  (the "Liquidation Date") under the supervision of a court-appointed chapter 7 trustee.  The Liquidation Analysis represents the Debtor's reasonable and good faith estimate of proceeds that would be available for distribution from liquidating the Debtor's assets as expeditiously as is compatible with the best interests of parties in interest in accordance with chapter 7 of the Bankruptcy Code and  the estimated costs of liquidating the Debtor's assets, reconciling claims,  distributing proceeds thereof, and administering the wind-down of the Debtor's estate.

ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS AND ECONOMIC UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

For purposes of the Liquidation Analysis, potential claims have the values set forth in the Debtor's amended and restated schedules of assets and liabilities, dated January 25, 2022 (the "Schedules"), and any proofs of claim filed in the Chapter 11 Case. Avoidance actions, if any, have not been evaluated in this Liquidation Analysis. As a result, no value has been attributed to such potential causes of action and no professional fees to investigate or prosecute avoidance actions have been included.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY OR AGAINST THE DEBTOR. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS.

**All Year Holdings Limited**
**Liquidation Analysis**
**Notes to Liquidation Analysis**

(a)  <u>Cash</u> - For purposes of the Liquidation Analysis, the Debtor's cash on hand as of the Liquidation Date is projected to be approximately $310,188, as set forth in the DIP budget filed with the Court on May 5, 2022 [ECF No. 92, Sch. A to Ex. A].

(b)  <u>Prepaid Insurance</u> -  This amount represents the estimated amount of unexpired premiums on the Liquidation Date.  The Liquidation Analysis assumes that any unexpired premiums will be exhausted by September 30, 2022.

(c)  <u>Equity Investments and Investments in Subsidiaries</u> - Equity Investments (less than 100% ownership) and Investments in Subsidiaries (100% ownership) represent the net book value of the Debtor's investments in its non-debtor subsidiaries (whose value is primarily comprised of real estate holdings) as of the Liquidation Date. The Liquidation Analysis records an adjustment to present an estimate the fair market value of the holdings. Fair market values as of December 31, 2021 were obtained from independent appraisals prepared by Level Valuation, dated April 25, 2022, and Bowery Valuation, dated March 9, 2022. The Liquidation Analysis assumes a chapter 7 trustee would effectuate a sale of the real estate for all properties that would produce positive net proceeds, whether wholly owned or partially owned by the Debtor. For the high scenario value and the low scenario value, the fair market values were reduced on average by 10% and 20%, respectively, due to the liquidation scenario. For purposes of the Liquidation Analysis, the Debtor did not apply any additional discounts to account for lack of control and/or minority ownership interests, which, if applied, would further reduce available recoveries. The recovery amounts are presented net of underlying debt obligations and sale related expenses as illustrated on the following page.

Capital account alignments represent the Debtor's obligations due to non-debtor partners in the real estate holdings. Historically, the Debtor received certain capital distributions in amounts in excess to that amount consistent with their ownership percentage. Accordingly, capital account adjustment amounts are distributed to the non-debtor partners, and serve to restore consistency and balance among the partners' capital accounts.

Various non-debtor subsidiaries of the Debtor are defendants in two lawsuits in which the respective plaintiffs, Good Light Funding LLC and DW Brooklyn 75 LLC, have asserted monetary claims against the subsidiaries (such obligations, the "Good Light Funding Obligation" and the Werner Deposit Obligation").  In addition, both plaintiffs have filed lis pendens' against 74 of the properties indirectly owned by the Debtor.  The recovery amounts are presented net of these encumbrances as illustrated on the following page (See "Property Encumbrances").

**All Year Holdings Limited**
**Liquidation Analysis**
**Notes to Liquidation Analysis**

|  | Low Scenario | High Scenario |
|---|---|---|
| Gross Liquidation Proceeds | $ 364,789,032 | $ 527,943,710 |
|  |  |  |
| Mortgage Retirement | (292,394,524) | (393,727,366) |
| Operating Expenses | (2,672,345) | (3,985,013) |
| Mechanics Liens | (478,590) | (526,895) |
| Broker Fees | (7,295,781) | (10,558,874) |
| Transfer Taxes | (11,855,644) | (17,158,171) |
| Other Selling Expenses | (3,647,890) | (5,279,437) |
|  | (318,344,773) | (431,235,756) |
|  |  |  |
| Liquidation Proceeds | 46,444,259 | 96,707,954 |
| Capital Account Alignments | (11,126,623) | (11,126,623) |
| Net Liquidation Proceeds | $ 35,317,636 | $ 85,581,331 |
|  |  |  |
| Debtor's Interest in Net Liquidation | $ 21,919,111 | $ 51,417,119 |
| Property Encumbrances | (20,000,000) | (20,000,000) |
| Debtor's Estimated Proceeds | $ 1,919,111 | $ 31,417,119 |

(d) <u>Subsidiary Support Loans Receivable</u> – The Liquidation Analysis allocates net proceeds from the liquidation of real estate assets to the recovery attributed to Equity Investments and Investments in Subsidiaries. Accordingly, no recovery is assigned to Subsidiary Support Loans Receivable in liquidation.

(e) <u>Professional Fee Retainers</u> – Retainers are assumed to be applied in full by the chapter 11 professionals' application and offset against their accrued obligations.

(f) <u>Third Party Loans Receivable</u> – A schedule of the face amounts due is presented on page 6. The Debtor and its professionals are evaluating courses of action to attempt recovery of such amounts, including demands and litigation; however, amounts due from third party entities are assumed to have no value for purposes of the Liquidation Analysis.

(g) <u>Grand Living II LLC Settlement Receivable</u> – Anticipated proceeds resulting from the consensual multiparty agreement dated August 30, 2021 in connection with the MY 2011 Grand LLC, et al. chapter 11 case (No. 19-23957 (RDD)). The face amount (based on the settlement agreement) has been assigned recovery rates of 100% and 90% in the high and low liquidation scenarios, respectively. The low scenario considers the effect of litigation costs associated with the anticipated recovery.

**All Year Holdings Limited**
**Liquidation Analysis**
**Notes to Liquidation Analysis**

(h)  <u>DIP Loan</u>  - The balance of the DIP Loan on the Liquidation Date is anticipated to be $4,500,000, as set forth in the DIP budget filed with the Court on May 5, 2022.

(i)  <u>Chapter 7 Trustee Fees</u> - Chapter 7 trustee fees are calculated based upon the statutory scale set forth in section 326(a) of the Bankruptcy Code, which provides for fees not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3% of such moneys in excess of $1,000,000.

(j)  <u>Chapter 7 Professional Fees</u> – The Liquidation Analysis assumes the chapter 7 trustee will retain attorneys, accountants, and financial advisors to carry out the duties of the chapter 7 trustee, including liquidating assets, claims adjudication, distributions, tax return preparation, and other wind down services. See Page 7. Brokers' fees have been accounted for as a selling expense included in the calculation of liquidation proceeds from equity investments and investments in subsidiaries, and is therefore excluded from chapter 7 professional fees.

(k)  <u>Chapter 11 United States Trustee Fees</u> - Amount represents the estimated chapter 11 United States Trustee fees payable on the Liquidation Date.   Such fees are calculated based upon the Bankruptcy Administration Improvement Act of 2020, Pub. L. No. 116-325, which provides for fees equal to 0.8% of quarterly disbursements for debtors with total quarterly disbursements between $1,000,000 and $31,249,937 and $250,000 for debtors with total quarterly disbursements of $31,249,938 or more.

(l)  <u>Wind Down Costs</u> -   Upon the Debtor's conversion to chapter 7, the Liquidation Analysis assumes that current management will be retained by the chapter 7 trustee for two months to effectuate the orderly transition of administrative duties and liquidation objectives.

(m)  <u>Chapter 11 Professional Fees</u>  - Amount represents projected outstanding Chapter 11 professional fees as of the Liquidation Date, consisting of projected August and September fees and the estimated 20% holdback from May through July, in accordance with the DIP budget.

(n)  <u>Estimated Claims</u> – The Debtor has listed certain contingent, unliquidated, and disputed claims in its Schedules, including, without limitation, (a) claims for indemnification or contribution that may be asserted by its current or former directors and officers (the "Non-Securities Indemnity Claims") and (b) a claim that may be asserted by the plan administrator appointed for EGM (the "Subsidiary Plan Administrator Claim"). As further set forth in the Disclosure Statement, the Debtor does not believe the Non-Securities Indemnity Claims have any value. With respect to the Subsidiary Plan Administrator Claim, the Debtor has not seen any documents and is not otherwise aware of any evidence to support any such claim. Accordingly, the Non-Securities Indemnity Claims and Subsidiary Plan Administrator Claim have been estimated at zero ($0) for purposes of the distributions set forth in the Liquidation Analysis.

**All Year Holdings Limited**
**Liquidation Analysis**
**Assumed Liquidation Date: 9/30/22**

| | Notes | Projected Balance Sheet at September 30, 2022 | Adjustments | Projected Adjusted Balance Sheet at September 30, 2022 | Low Scenario Estimated Recovery % | Low Scenario Estimated Proceeds | High Scenario Estimated Recovery % | High Scenario Estimated Proceeds |
|---|---|---|---|---|---|---|---|---|
| Cash | (a) | $310,188 | | $310,188 | 100% | $310,188 | 100% | $310,188 |
| Prepaid Insurance | (b) | 329,452 | (329,452) | 0 | 0% | 0 | 0% | 0 |
| Equity Investments and Investments in Subsidiaries | (c) | 232,461,864 | (1,704,602) | 230,757,262 | 1% | 1,919,111 | 14% | 31,417,119 |
| Subsidiary Support Loans Receivable | (d) | 5,722,386 | (46,932) | 5,675,454 | 0% | 0 | 0% | 0 |
| Professional Firm Retainers | (e) | 134,898 | | 134,898 | 100% | 134,898 | 100% | 134,898 |
| Third Party Loans Receivable | (f) | 10,219,014 | | 10,219,014 | 0% | 0 | 0% | 0 |
| Grand Living II LLC Settlement Receivable | (g) | 4,700,000 | 527,000 | 5,227,000 | 90% | 4,704,300 | 100% | 5,227,000 |
| | | $253,877,802 | (1,553,985) | $252,323,816 | | $7,068,497 | | $37,089,205 |
| Superpriority Claims: | | | | | | | | |
| DIP Loan | (h) | | | $4,500,000 | 100% | $4,500,000 | 100% | $4,500,000 |
| Total Superpriority Claims | | | | $4,500,000 | | $4,500,000 | | $4,500,000 |
| **Proceeds Available for Chapter 7 Expenses** | | | | | | **$2,568,497** | | **$32,589,205** |
| Chapter 7 Expenses: | | | | | | | | |
| Chapter 7 Trustee Fees | (i) | | | | | $235,305 | | $1,135,926 |
| Chapter 7 Professional Fees | (j) | | | | | 1,500,000 | | 1,000,000 |
| United States Trustee Fees | (k) | | | | | 56,548 | | 250,000 |
| Wind Down Costs | (l) | | | | | 360,000 | | 360,000 |
| Total Chapter 7 Expenses | | | | | | $2,151,853 | | $2,745,926 |
| **Proceeds Available for Administrative Claims** | | | | | | **$416,644** | | **$29,843,279** |
| Administrative Claims: | | | | Estimated Claims Amounts | | | | |
| Chapter 11 Professional Fees | (m) | | | $748,503 | 54% | $405,194 | 100% | $748,503 |
| United States Trustee Fees | (k) | | | 21,151 | 54% | 11,450 | 100% | 21,151 |
| Total Administrative Claims | | | | $769,654 | | $416,644 | | $769,654 |
| **Proceeds Available for Priority Claims and Other Secured Claims** | | | | | | **$0** | | **$29,073,625** |
| Priority Claims and Other Secured Claims: | | | | | | | | |
| Class 1 Priority Non-Tax Claims | | | | $0 | 0% | $0 | 0% | $0 |
| Class 2 Other Secured Claims | | | | 0 | 0% | 0 | 0% | 0 |
| Total Priority Claims and Other Secured Claims | | | | $0 | | $0 | | $0 |
| **Proceeds Available for Unsecured Claims** | | | | | | **$0** | | **$29,073,625** |
| Unsecured Claims: | | | | | | | | |
| Class 3 General Unsecured Claims, including TAZ Claim | | | | $37,870,000 | 0.0% | $0 | 5.0% | $1,886,455 |
| Class 4 Remaining Unsecured Claims, including Noteholder Claims | | | | 545,773,917 | 0.0% | 0 | 5.0% | 27,187,170 |
| Total Unsecured Claims | | | | $583,643,917 | | $0 | | $29,073,625 |
| **Proceeds Available for Subordinated Securities Claims and Equity Interests** | | | | | | **$0** | | **$0** |
| Class 5 Subordinated Securities Claims and Class 6 Equity Interests | | | | $0 | 0% | $0 | 0% | $0 |

5/19/20229:18 AM

**All Year Management Limited**
**Third Party Loans Receivable**
**December 31, 2021**

| | | |
|---|---|---|
| Mercer Jordan Ventures LLC | $ | 3,769,816 |
| JS Skillman NY LLC | | 5,608,393 |
| Other | | 840,806 |
| | $ | 10,219,014 |

**All Year Management Limited**
**Estimated Chapter 7 Professional Fees**

|  | Low Recovery Scenario | High Recovery Scenario |
|---|---|---|
| Chapter 7 Legal Counsel | $ 975,000 | $ 650,000 |
| Chapter 7 Financial Advisors | 375,000 | 250,000 |
| Tax Preparation | 150,000 | 100,000 |
|  | $ 1,500,000 | $ 1,000,000 |