**Objection Deadline: July 5, 2022, at 5:00 p.m. (Prevailing Eastern Time)**
**Hearing Date and Time: July 19, 2022, at 2:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Matthew P. Goren

*Attorneys for the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **ALL YEAR HOLDINGS LIMITED,** | : | **Case No. 21-12051 (MG)** |
|  | : |  |
| Debtor.[1] | : |  |
|  | : |  |
| Fed. Tax Id. No. 98-1220822 | : |  |
------------------------------------------------------------x

### NOTICE OF FILING OF SECOND AMENDED DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION OF ALL YEAR HOLDINGS LIMITED

  **PLEASE TAKE NOTICE** that on May 31, 2022, All Year Holdings Limited, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), filed the *Disclosure Statement for Chapter 11 Plan of Reorganization of All Year Holdings Limited* [ECF No. 124].

  **PLEASE TAKE FURTHER NOTICE** that on July 15, 2022, the Debtor filed that certain *Amended Disclosure Statement for Chapter 11 Plan of Reorganization of All Year Holdings Limited* [ECF No. 151] (as may be amended, modified, or supplemented from time to time, together with all schedules and exhibits thereto, the "**First Amended Disclosure Statement**").

---

[1] The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

**PLEASE TAKE FURTHER NOTICE** that a hearing (the "**Hearing**") was held on July 19, 2022 at 2:00 p.m. (Prevailing Eastern Time), before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 601, One Bowling Green, New York, New York, 10004 (the "**Bankruptcy Court**"), to consider, among other things, the Debtor's request for approval of the First Amended Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that, following the Hearing, on July 20, 2022, the Debtor filed that certain *Second Amended Disclosure Statement for Chapter 11 Plan of Reorganization of All Year Holdings Limited* [ECF No. 157] (as may be amended, modified, or supplemented from time to time, together with all schedules and exhibits thereto, the "**Second Amended Disclosure Statement**"), which, among other things, reflects certain additional amendments and modifications to the First Amended Disclosure Statement, which were discussed on the record at the Hearing.

**PLEASE TAKE FURTHER NOTICE** that a redline comparison reflecting the revisions, amendments, and other modifications between the First Amended Disclosure Statement and the Second Amended Disclosure Statement is annexed hereto as **<u>Exhibit 1</u>**.

**PLEASE TAKE FURTHER NOTICE** that at the Hearing, the Bankruptcy Court indicated its conditional approval of the Second Amended Disclosure Statement, subject to a final review of the revised language.

Dated: July 20, 2022
      New York, New York

/s/ *Matthew P. Goren*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Gary T. Holtzer
Matthew P. Goren

*Attorneys for the Debtor*

## Exhibit 1

**Redline**

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- X

|  |  |  |
|---|---|---|
|  | : |  |
| **In re** | : | **Chapter 11** |
|  | : |  |
| **ALL YEAR HOLDINGS LIMITED,** | : | **Case No. 21-12051 (MG)** |
|  | : |  |
| **Debtor.**[1] | : |  |
|  | : |  |
| **Fed. Tax Id. No. 98-1220822** | : |  |

----------------------------------------------------------- X

## SECOND AMENDED DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN
## OF REORGANIZATION OF ALL YEAR HOLDINGS LIMITED

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer
Matthew P. Goren

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtor*

Dated:  July ~~15~~20, 2022
          New York, New York

---

[1]     The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

THE INFORMATION CONTAINED IN THIS **SECOND** AMENDED DISCLOSURE STATEMENT (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND TOGETHER WILL ALL SCHEDULES AND EXHIBITS HERETO, THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING VOTES ON THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT A**. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

---

THE DEADLINE FOR CREDITORS IN THE VOTING CLASS (AS DEFINED BELOW) TO SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON SEPTEMBER 19, 2022 (THE "VOTING DEADLINE")[2], UNLESS EXTENDED BY THE DEBTOR.  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS SEPTEMBER 12, 2022 (THE "VOTING RECORD DATE").

---

### RECOMMENDATION OF THE DEBTOR

THE DEBTOR SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.
THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN AND IMPLEMENTATION OF THE TRANSACTIONS CONTEMPLATED UNDER THE INVESTMENT AGREEMENT (AS DEFINED BELOW) PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS.  MISHMERET TRUST COMPANY LTD., AS TRUSTEE FOR THE DEBTOR'S VARIOUS SERIES OF NOTES (THE "NOTES TRUSTEE"), IS A PARTY TO CERTAIN PROVISIONS OF THE INVESTMENT AGREEMENT AND HAS PRELIMINARILY CONSENTED TO THE DEBTOR'S ENTRY INTO THE INVESTMENT AGREEMENT.   CLEARSTRUCTURE, SERVING AS ECONOMIC ADVISOR TO THE NOTES TRUSTEE, HAS ALSO RECOMMENDED THAT ALL HOLDERS OF SUCH SERIES OF NOTES VOTE TO ACCEPT THE PLAN.

---

PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY.  THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL PROVISIONS OF THE PLAN. ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR

---

[2] Certain dates and deadlines set forth herein relating to the Plan solicitation and confirmation process are subject to Bankruptcy Court approval and remain subject to change.

**TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

**ALL INFORMATION IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED OR COMPILED BY THE DEBTOR'S MANAGEMENT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AS OF THE DATE HEREOF (UNLESS OTHERWISE INDICATED HEREIN) BASED ON INFORMATION PROVIDED TO THE DEBTOR'S MANAGEMENT FROM THE DEBTOR'S EXISTING BOOKS AND RECORDS. THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS (E.G., STATEMENTS THAT PREDICT, PROJECT, OR USE FUTURE EVENTS AS EXPECTATIONS OR POSSIBILITIES) OR OTHER INFORMATION SET FORTH HEREIN WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.**

**FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING, BUT NOT LIMITED TO, THOSE IDENTIFIED IN THIS DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.**

**THE DEBTOR BELIEVES THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW NOTES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE, AND EXPECTS THAT THE OFFER AND ISSUANCE OF THE NEW NOTES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE.**

**NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS, THE FINANCIAL PROJECTIONS, OR ANY OTHER STATEMENTS OR ANALYSES CONTAINED HEREIN.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THIS DISCLOSURE STATEMENT.    ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

ii

Table of Contents

Page

I.      EXECUTIVE SUMMARY ............................................................................................ 1

II.     OVERVIEW OF THE DEBTOR'S BUSINESS ........................................................ 7

        A.     The Debtor's Business, Management, and Employees ...................................... 7

        B.     The Debtor's Capital Structure and Prepetition Claims .................................. 9

        C.     The Debtor's Professionals .............................................................................. 14

III.    KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11
        CASE ........................................................................................................................... 15

        A.     Prepetition Re-Financing and De-Leveraging Efforts, the COVID-19
               Pandemic, and Other Operational Issues ......................................................... 15

        B.     Prepetition Creditor Negotiations, and the Taz Confession of Judgment ........ 17

        C.     The Evergreen Debtors' Chapter 11 Cases ...................................................... 18

IV.     OVERVIEW OF THE DEBTOR'S RESTRUCTURING ....................................... 18

        A.     Key Events During Chapter 11 Case ................................................................ 18

               1.     Appointment of the JPLs and the BVI Proceeding .............................. 18

               2.     Settlement Transaction and Agreement with Downtown Capital
                      Partners ................................................................................................ 19

               3.     The Section 341 Meeting of Creditors ................................................. 20

               4.     The Debtor's Schedules and Statement of Financial Affairs and
                      Initial 2015.3 Report ............................................................................ 21

               5.     The Marketing Process and the Investment Agreement ....................... 21

               6.     Approval of the Bid Protections .......................................................... 28

               7.     Retention of Professionals ................................................................... 29

               8.     Extension of the Debtor's Exclusive Time to File and Solicit a
                      Chapter 11 Plan ................................................................................... 30

               9.     The William Vale Purchase ................................................................. 30

               10.    Debtor in Possession Financing ........................................................... 31

               11.    Timetable for Debtor's Restructuring .................................................. 32

V.      PENDING LITIGATION ........................................................................................... 34

        A.     Summary of Pending Litigation ....................................................................... 34

        B.     BVI Omnibus Settlement Authority Order ...................................................... 35

VI.     SUMMARY OF PLAN ............................................................................................... 36

        A.     Administrative Expense and Priority Claims ................................................... 36

               1.     Administrative Expense Claims ........................................................... 36

iii

| | | | |
|---|---|---|---|
| | 2. | Fee Claims | 37 |
| | 3. | Priority Tax Claims | 37 |
| B. | | Classification of Claims and Interests | 38 |
| | 1. | Classification in General | 38 |
| | 2. | Summary of Classification | 38 |
| | 3. | Special Provision Governing Unimpaired Claims | 38 |
| | 4. | Elimination of Vacant Classes | 38 |
| | 5. | Voting Classes; Presumed Acceptance by Non-Voting Classes | 39 |
| | 6. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 39 |
| C. | | Treatment of Claims and Interests | 39 |
| | 1. | Priority Non-Tax Claims (Class 1) | 39 |
| | 2. | Other Secured Claims (Class 2) | 39 |
| | 3. | General Unsecured Claims (Class 3) | 39 |
| | 4. | Remaining Unsecured Claims (Class 4) | 40 |
| | 5. | Subordinated Securities Claims (Class 5) | 40 |
| | 6. | Equity Interests (Class 6) | 40 |
| D. | | Means for Implementation | 40 |
| | 1. | Sponsor Contribution and Distributions | 40 |
| | 2. | Authorization and Issuance of New Notes | 41 |
| | 3. | Administration of Wind-Down Co. | 42 |
| | 4. | Section 1145 Exemption | 43 |
| | 5. | Officers and New Board of Directors | 44 |
| | 6. | Indemnification of Debtor's Directors and Officers | 44 |
| | 7. | Effectuating Documents; Further Transactions. | 44 |
| | 8. | Cancellation of Existing Securities and Agreements. | 46 |
| | 9. | Cancellation of Liens. | 46 |
| | 10. | Subordination Agreements. | 46 |
| | 11. | Closing of the Chapter 11 Case. | 47 |
| | 12. | Notice of Effective Date. | 47 |
| E. | | Distributions | 47 |
| | 1. | Distributions Generally | 47 |
| | 2. | Distribution Record Date. | 47 |

iv

|  | 3. | Date of Distributions. | 47 |
|  | 4. | Disbursing Agent. | 48 |
|  | 5. | Rights and Powers of Disbursing Agent. | 48 |
|  | 6. | Expenses of Disbursing Agent. | 48 |
|  | 7. | Postpetition Interest on Claims. | 48 |
|  | 8. | Delivery of Distributions. | 48 |
|  | 9. | Distributions after Effective Date. | 49 |
|  | 10. | Unclaimed Property. | 49 |
|  | 11. | Time Bar to Cash Payments. | 49 |
|  | 12. | Manner of Payment Under Plan. | 49 |
|  | 13. | Satisfaction of Claims. | 50 |
|  | 14. | Minimum Cash Distributions. | 50 |
|  | 15. | Setoff and Recoupment. | 50 |
|  | 16. | Allocation of Distributions between Principal and Interest. | 50 |
|  | 17. | No Distribution in Excess of Amount of Allowed Claim. | 50 |
|  | 18. | Distributions Free and Clear. | 50 |
|  | 19. | Withholding and Reporting Requirements. | 51 |
| F. | | Procedures for Disputed Claims | 51 |
|  | 1. | Objections to Claims | 51 |
|  | 2. | Resolution of Disputed Administrative Expenses and Disputed Claims. | 52 |
|  | 3. | Payments and Distributions with Respect to Disputed Claims. | 52 |
|  | 4. | Distributions After Allowance. | 52 |
|  | 5. | Estimation of Claims. | 52 |
|  | 6. | No Distributions Pending Allowance. | 53 |
|  | 7. | Claim Resolution Procedures Cumulative. | 53 |
|  | 8. | Insured Claims. | 53 |
|  | 9. | Tax Treatment of the Class 4 Disputed Claims Reserve | 53 |
| G. | | Executory Contracts and Unexpired Leases | 54 |
|  | 1. | General Treatment | 54 |
|  | 2. | Determination of Assumption Disputes and Deemed Consent. | 54 |
|  | 3. | Rejection Damages Claims. | 56 |
|  | 4. | Insurance Policies. | 56 |

v

| | 5. | Assignment of Executory Contracts to Wind-Down Co. | 56 |
|---|---|---|---|
| | 6. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 57 |
| | 7. | Reservation of Rights. | 57 |
| H. | | Conditions Precedent to Confirmation of Plan and Effective Date | 58 |
| | 1. | Conditions Precedent to Confirmation of Plan | 58 |
| | 2. | Conditions Precedent to Effective Date. | 58 |
| | 3. | Waiver of Conditions Precedent. | 59 |
| | 4. | Effect of Failure of a Condition. | 59 |
| I. | | Effect of Confirmation of Plan | 59 |
| | 1. | Vesting of Assets | 59 |
| | 2. | Binding Effect. | 59 |
| | 3. | Discharge of Claims and Termination of Interests. | 60 |
| | 4. | Term of Injunctions or Stays. | 60 |
| | 5. | Injunction. | 60 |
| | 6. | Releases. | 61 |
| | 7. | Exculpation. | 63 |
| | 8. | Retention of Causes of Action/Reservation of Rights. | 63 |
| | 9. | Special Provisions Regarding Sole Shareholder | 64 |
| J. | | Retention of Jurisdiction | 64 |
| | 1. | Retention of Jurisdiction | 64 |
| | 2. | Courts of Competent Jurisdiction | 66 |
| K. | | Miscellaneous Provisions | 66 |
| | 1. | Payment of Statutory Fees | 66 |
| | 2. | Substantial Consummation of the Plan. | 66 |
| | 3. | Plan Supplement. | 66 |
| | 4. | Requests by the Reorganized Debtor and Wind-Down Co for Expedited Determination of Taxes. | 66 |
| | 5. | Exemption from Certain Transfer Taxes. | 67 |
| | 6. | Amendments. | 67 |
| | 7. | Effectuating Documents and Further Transactions. | 68 |
| | 8. | Revocation or Withdrawal of Plan. | 68 |
| | 9. | Severability of Plan Provisions. | 68 |

vi

|  |  | 10. | Governing Law. | 69 |
|  |  | 11. | Time. | 69 |
|  |  | 12. | Dates of Actions to Implement the Plan. | 69 |
|  |  | 13. | Immediate Binding Effect. | 69 |
|  |  | 14. | Deemed Acts. | 69 |
|  |  | 15. | Successor and Assigns. | 69 |
|  |  | 16. | Entire Agreement. | 70 |
|  |  | 17. | Exhibits to Plan. | 70 |
| VII. |  |  | VALUATION OF THE DEBTOR | 70 |
| VIII. |  |  | TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS | 71 |
| IX. |  |  | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN | 73 |
|  | A. |  | Consequences to Debtor | 74 |
|  | B. |  | Tax Treatment of Wind-Down Co and Wind Down Distributions | 75 |
|  | C. |  | Consequences to Holders of Remaining Unsecured Claims | 75 |
|  |  | 1. | Taxable Transaction | 76 |
|  |  | 2. | Character of Gain or Loss | 77 |
|  |  | 3. | Distributions in Respect of Accrued but Unpaid Interest or OID | 78 |
|  |  | 4. | Ownership and Disposition of the New Notes | 78 |
|  |  | 5. | Resolution of Disputed Remaining Unsecured Claims and Tax Treatment of the Class 4 Disputed Claims Reserve | 81 |
|  |  | 6. | Information Reporting and Backup Withholding | 82 |
| X. |  |  | CERTAIN RISK FACTORS TO BE CONSIDERED | 83 |
|  | A. |  | Certain Bankruptcy Law and International Considerations | 83 |
|  |  | 1. | Risk of Non-Confirmation of Plan | 83 |
|  |  | 2. | Failure to Obtain Israeli and BVI Court Approvals | 83 |
|  |  | 3. | Non-Consensual Confirmation | 83 |
|  |  | 4. | Risk Related to Parties in Interest Objecting to the Debtor's Classification of Claims and Interests | 84 |
|  |  | 5. | Risk of Non-Occurrence of Effective Date | 84 |
|  |  | 6. | Risks Associated with the Investment Agreement | 84 |
|  |  | 7. | DIP Financing | 85 |
|  |  | 8. | Conversion into Chapter 7 Case | 85 |

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

| | B. | Additional Factors Affecting the Value of the Debtor | 85 |
|---|---|---|---|
| | | 1. Claims Could Be More than Projected | 85 |
| | | 2. Valuation Regarding Avoidance Actions and Causes of Actions | 86 |
| | | 3. Inability to Meet Future Obligations | 86 |
| | C. | Additional Factors | 86 |
| | | 1. Debtor Could Withdraw the Plan | 86 |
| | | 2. Debtor Has No Duty to Update | 86 |
| | | 3. No Representations Outside this Disclosure Statement Are Authorized | 86 |
| | | 4. No Legal or Tax Advice Is Provided by this Disclosure Statement | 86 |
| | | 5. No Admission Made | 87 |
| | | 6. Certain Tax Consequences | 87 |
| XI. | | VOTING PROCEDURES AND REQUIREMENTS | 87 |
| | A. | Voting Instructions and Voting Deadline | 87 |
| | B. | Parties Entitled to Vote | 88 |
| | C. | Change of Vote | 90 |
| | D. | Waivers of Defects, Irregularities, etc. | 90 |
| | E. | Miscellaneous | 91 |
| XII. | | CONFIRMATION OF PLAN | 91 |
| | A. | Confirmation Hearing | 91 |
| | B. | Objections to Confirmation | 91 |
| | C. | Requirements for Confirmation of Plan | 94 |
| | | 1. Requirements of Section 1129(a) of the Bankruptcy Code | 94 |
| | | 2. Additional Requirements for Non-Consensual Confirmation | 97 |
| XIII. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 98 |
| | A. | Alternative Plan of Reorganization | 98 |
| | B. | Sale Under Section 363 of the Bankruptcy Code | 98 |
| | C. | Continued Operation Outside of Bankruptcy | 99 |
| | D. | Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law | 99 |
| XIV. | | CONCLUSION AND RECOMMENDATION | 100 |

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

## **EXHIBITS**

    i.      EXHIBIT A – Plan

   ii.      EXHIBIT B –  Investment Agreement

  iii.      EXHIBIT C – Organizational Chart

  iv.      EXHIBIT D – Israeli Disclosure Tables

           a.   EXHIBIT D-1 – Prior Year Income Report

           b.   EXHIBIT D-2 – Prior Year Property Report

           c.   EXHIBIT D-3 – Five Year Operating Plan

   v.      EXHIBIT E – Appraisal Reports

           a.   EXHIBIT E-1 – LV Appraisal Report

           b.   EXHIBIT E-2 – Additional Appraisal Reports

  vi.      EXHIBIT F – CVs for Directors of Reorganized Debtor

 vii.      EXHIBIT G – Financial Projections

viii.      EXHIBIT H – Liquidation Analysis

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

# I.
## EXECUTIVE SUMMARY

All Year Holdings Limited, a private company limited by shares incorporated in the British Virgin Islands, as debtor and debtor in possession (the "**Debtor**" and, together with its direct and indirect non-debtor subsidiaries, the "**Company**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the *Chapter 11 Plan of Reorganization of All Year Holdings Limited,* dated May 31, 2022 (as may be amended, modified, or supplemented from time to time, and together with all schedules and exhibits thereto, the "**Plan**").[3] A copy of the Plan is attached hereto as **Exhibit A**.

On December 14, 2021 (the "**Petition Date**"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). As described in further detail below, on December 16, 2021, the Debtor filed an application under the laws of the British Virgin Islands with the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division Virgin Islands (the "**BVI Court**") seeking the appointment of Paul Pretlove and Charlotte Caulfield of Kalo (BVI) Limited as joint provisional liquidators (the "**JPLs**" and, the appointment of the JPLs, the "**JPL Appointment**") under the applicable provisions of the BVI Insolvency Act 2003 (the "**BVI Proceeding**"). The BVI Court entered an order appointing the JPLs on December 20, 2021 (the "**JPL Order**"). In addition, on April 14, 2022, with the consent of the JPLs and the approval of the BVI Court, the Debtor commenced a proceeding in the District Court of Tel Aviv – Yafo (the "**Israeli Court**") for recognition of the Chapter 11 Case as a foreign main proceeding under the applicable provisions of Chapter I, Part C of the Insolvency and Rehabilitation Law 5778-2018 (the "**Israeli Recognition Proceeding**"). The Israeli Court entered an order recognizing the Chapter 11 Case on May 4, 2022.

Following a robust sales and marketing effort, the Debtor entered into an Investment Agreement, dated March 11, 2022 (as amended on April 21, 2022 and May 27, 2022, and as may be further amended, modified, or supplemented from time to time, and together with all schedules and exhibits thereto, "**Investment Agreement**"), with Paragraph Partners LLC (the "**Sponsor**"), among others, to implement a comprehensive restructuring of the Debtor and present a path forward for the Debtor's successful emergence from chapter 11. The Investment Agreement is the cornerstone of, and is to be implemented pursuant to, the Plan. A copy of the Investment Agreement is annexed hereto as **Exhibit B**.

The Investment Agreement provides that, in exchange for one hundred percent of the equity of the reorganized Debtor (the "**Reorganized Debtor**"), the Sponsor will contribute $60,000,000 to the Debtor, which is comprised of (a) $40,000,000 in cash and (b) promissory notes in the aggregate amount of $20,000,000. As set forth in further detail in Article IV below, the amount of (i) the promissory notes will increase to $22,000,000 and (ii) the cash contribution may increase by an additional $200,000, if the Sponsor, or an affiliate of the Sponsor, consummates a

---

[3]    Unless otherwise indicated, capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to them in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

transaction involving the William Vale hotel.[4]  Importantly, as part of the Investment Agreement, the Sponsor has agreed to assume all unsecured claims against the Debtor other than the Claims of holders of the Debtor's various series of notes (the "**Notes**" and the holders thereof, "**Noteholders**") and certain other discrete categories of Claims set forth therein and described below.  The Notes Trustee is a party to certain provisions of the Investment Agreement and has preliminarily consented to the Debtor's entry into the Investment Agreement.

As described in further detail below, the rights of holders of any Class 1 Priority Non-Tax Claims, Class 2 Other Secured Claims, and Class 3 General Unsecured Claims are Unimpaired under the Plan.  Except to the extent a holder of any Unimpaired Claims is a Releasing Party[5], the holders of Unimpaired Claims are not waiving or releasing any Claims against the Debtor or the other Released Parties, including, without limitation, the right (if any) to the payment of interest in accordance with, or as provided under, any documents relevant to such Unimpaired Claims or otherwise applicable law.  The holders of Class 5 Subordinated Securities Claims and Class 6 Equity Interests are not entitled to receive or retain any property under the Plan and are, therefore, deemed to reject and not entitled to vote on the Plan.

Accordingly, only holders of Class 4 Remaining Unsecured Claims are Impaired and entitled to vote on the Plan.  Class 4 is comprised of the holders of any Noteholder Claims, Subsidiary Plan Administrator Claims, and Non-Securities Indemnity Claims.  The Plan provides for material recoveries to the holders of Allowed Claims in Class 4 (Remaining Unsecured Claims) in the form of Cash, New Notes, and any potential recoveries on account of certain Causes of Action that have been preserved for the benefit of holders of Allowed Class 4 Claims.  The transactions contemplated under the Investment Agreement will maximize the value of the Debtor's estate and provide the basis for the expeditious conclusion of the Chapter 11 Case.

The Debtor commenced the Israeli Recognition Proceeding, with the consent of the JPLs and the approval of the BVI Court, in furtherance of its efforts to achieve a global resolution of Claims against, and Interests in, the Debtor, including with respect to the Debtor's various series of Israeli-issued Notes.  Because the Notes were issued by the Debtor on the Tel Aviv Stock Exchange ("**TASE**"), the Debtor is obligated to comply with certain reporting requirements under applicable Israeli law, including, without limitation, reporting obligations related to insolvency proceedings, debt settlements, mergers or acquisitions, and company actions outside of the ordinary course of business, and is subject to the other Israeli laws applicable to reporting

---

[4]    As explained in further detail in Article IV below, the Sponsor and the Notes Trustee, in its capacity as Notes Trustee for the Series C Notes, have entered into an agreement, dated March 24, 2022, pursuant to which the Sponsor has agreed to purchase the mortgage and note of the Series C Noteholders' for approximately $158,612,112.

[5]    Pursuant to Section 1.78 of the Plan, "***Released Parties***" means collectively, and in each case, solely in their capacities as such: (a) the Debtor and the Reorganized Debtor; (b) Wind-Down Co; (c) the Notes Trustee and its representatives and advisors; (d) the Noteholders and their representatives and advisors; (e) the Sponsor and its agents, officers, directors, principals, affiliates, representatives and advisors; (f) any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (g) any independent directors appointed to the board of the Debtor on or after January 1, 2021; (h) the JPLs; (i) the Authorized Managers; and (j) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC); provided, however, that Released Parties shall not include Yoel Goldman or Tzipporah Goldman in any capacity.

companies, including the Israeli Insolvency and Financial Rehabilitation Law 5778-2018. The Debtor has been advised that, under the applicable provisions of the Insolvency and Financial Rehabilitation Law 5778-2018, a company must seek approval of the applicable Israeli court in order to present a debt settlement or plan of reorganization to its creditors for approval. The Debtor further understands that the Insolvency and Financial Rehabilitation Law requires any debt settlement or plan of reorganization be approved by the company's creditors at a meeting(s) of such creditors convened in the manner approved by the Israeli court. Accordingly, as the Debtor is a reporting company in Israel, the Debtor determined that it was necessary to commence the Israeli Recognition Proceeding to obtain court approval to convene a Noteholder meeting to vote on the Plan and the Investment Agreement (the "**Noteholder Meeting**") to comply with applicable Israeli securities laws. Following confirmation of the Plan, the Debtor intends to also seek recognition of the Plan and the Confirmation Order in the Israeli Recognition Proceeding.

In addition, the Debtor is seeking authority from the BVI Court to implement a plan of arrangement (the "**BVI Plan of Arrangement**") following which, and subject to the occurrence of the Plan Effective Date, among other things, (i) the existing Equity Interests in the Debtor will be cancelled, and (ii) one hundred percent of the equity in the Reorganized Debtor will be held by the Sponsor. A hearing before the BVI Court on the Debtor's application to approve the BVI Plan of Arrangement is scheduled for July 21, 2022. Approval of the terms of the Plan by each of the Israeli Court and the BVI Court are conditions to closing under the Investment Agreement.

In developing the Plan, the Debtor gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives of the Noteholders, the Notes Trustee, and other parties in interest. The Debtor also conducted a careful review of the operations of its direct and indirect non-debtor subsidiaries, its prospects as an ongoing business, financial projections developed by management, and estimated recoveries in a liquidation scenario, and concluded that recoveries to the Debtor's creditors will be maximized under the Plan. The Debtor believes that its business and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the liquidation analysis, appraisals, and other analyses prepared by the Debtor with the assistance of its advisors, the value of the Debtor is substantially greater as a going concern than in a liquidation. The Debtor believes that any alternative to confirmation of the Plan would result in significant delays, litigation, and additional costs, which would ultimately lower the recoveries for all holders of Allowed Claims.

**Accordingly, the Debtor urges all holders of Claims entitled to vote to accept the Plan.**

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all

existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

**The Non-Voting Classes**.  As the Plan provides for the payment in full of all Allowed Claims against the Debtor in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (General Unsecured Claims) (collectively, the "**Unimpaired Classes**"), no holders of Claims against the Debtor in the Unimpaired Classes are entitled to vote on the Plan.  Except to the extent a holder of any Claims in an Unimpaired Class is a Releasing Party, the holders of Unimpaired Claims are not waiving or releasing any Claims against the Debtor or the other Released Parties, including, without limitation, the right (if any) to the payment of interest in accordance with, or as provided under, any documents relevant to such Unimpaired Claims or otherwise applicable law.

As described in further detail below, the holders of Claims against, and Interests in, the Debtor in Class 5 (Subordinated Securities Claims) and Class 6 (Equity Interests) (collectively, the "**Non-Voting Impaired Classes**" and, together with the Unimpaired Classes, the "**Non-Voting Classes**") shall not receive or retain any property under the Plan and, as a result, they are not entitled to vote on the Plan.  On the Effective Date of the Plan, Claims and Interests in the Non-Voting Impaired Classes will be discharged to the fullest extent permitted by section 1141 of the Bankruptcy Code, and the holders of such Claims or Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against the Debtor, the Reorganized Debtor, or Wind-Down Co any such discharged Claims against or terminated Interests in the Debtor; provided that, except to the extent a holder of any such Claims or Interests is a Releasing Party, the holders of Claims or Interests in the Non-Voting Classes are not releasing any Claims against any Releasing Parties (other than the Debtor, the Reorganized Debtor, or Wind-Down Co.).

**The Voting Class**.  The only class of Claims entitled to vote on the Plan and whose acceptances of the Plan will be solicited is Class 4 (Remaining Unsecured Claims).  Creditors in the Voting Class may vote on the Plan unless:

(i)     as of the Voting Record Date, the outstanding amount of such claimant's Claim is not greater than zero ($0.00);

(ii)    as of the Voting Record Date, such claimant's Claim has been disallowed, expunged, disqualified, or suspended; or

(iii)   as of the Voting Record Date, such claimant's Claim is subject to an objection or request for estimation, in accordance with the procedures set forth below.

Any creditor that is not scheduled in the Debtor's Schedules (as defined below) and that did not file a proof of claim prior to the Voting Record Date is not entitled to vote on the Plan.

**Claims and Interests under the Plan**

The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) the Classes that are impaired by the Plan, (iii) the Classes that are entitled to vote on the Plan, and

| WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

(iv) the estimated recoveries for holders of Allowed Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, *see* Article VI — Summary of the Plan below.

| Class | Designation | Treatment and Approx. Percentage Recovery | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100%<br><br>Except to the extent that a holder of a Priority Non-Tax Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Priority Non-Tax Claims in the ordinary course.  The Debtor does not believe there are any Priority Non-Tax Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan.  To the extent any are asserted, the Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Non-Tax Claim available to the Debtor. | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | 100%<br><br>Except to the extent that a holder of an Other Secured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Other Secured Claims in the ordinary course.  The Debtor does not believe there are any Other Secured Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan.  To the extent any are asserted, the Reorganized Debtor shall retain the rights to any defenses and setoffs against any Other Secured Claim available to the Debtor. | Unimpaired | No (Presumed to accept) |
| 3 | General Unsecured Claims | 100%<br><br>Except to the extent that a holder of a General Unsecured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile General Unsecured Claims in the ordinary course of business.  The Debtor is not aware of any General Unsecured Claims that may be asserted against it.  However, the Sponsor's determination to assume any such Claims pursuant to the Investment Agreement will allow the Debtor to avoid the time and expense | Unimpaired | No (Presumed to accept) |

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

| Class | Designation | Treatment and Approx. Percentage Recovery | Impairment | Entitled to Vote |
|---|---|---|---|---|
| | | associated with fixing and prosecuting a bar date for filing proofs of Claim and undertaking a Claims reconciliation process.  Given this, the Debtor has established a separate class for the General Unsecured Claims to the extent any such Claims are asserted against the Debtor.  To the extent any General Unsecured Claims are asserted, the Reorganized Debtor shall retain the rights to any defenses and setoffs against any General Unsecured Claims available to the Debtor. | | |
| 4 | Remaining Unsecured Claims | <div align="center">Approx. 11-17%</div><br>Except to the extent that a holder of an Allowed Remaining Unsecured Claim against the Debtor agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Allowed Remaining Unsecured Claim, each such holder shall receive (i) on the Effective Date, from the Disbursing Agent (on behalf of the Debtor), its Pro Rata Share of the Class 4 ED Distribution, (ii) in the event the William Vale Purchase occurs subsequent to the Effective Date, from the Disbursing Agent (on behalf of the Debtor), its Pro Rata Share of any additional New Notes issued, and (iii) on such other date(s) as determined from time to time by the Plan Administrator, from Wind-Down Co, the amounts recovered, if any, from the Excluded Assets (including, but without limitation, from the prosecution of Avoidance Actions and other Causes of Action) and any remaining Wind Down Cash Funding.  Notwithstanding anything to the contrary in the Plan, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan, including for purposes of distributions under the Plan.  The Debtor will file a motion to estimate or objection to such Non-Securities Indemnity Claims on proper notice to applicable parties.  The right to the foregoing distributions shall be nontransferable except by will, intestate succession, or operation of law. | Impaired | Yes |
| 5 | Subordinated Securities Claims | <div align="center">0%</div><br>The holders of Subordinated Securities Claims against the Debtor shall not receive or retain any property under the Plan on account of such Claims. | Impaired | No (Deemed to reject) |
| 6 | Equity Interests | <div align="center">0%</div><br>On or after the Effective Date, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all Equity Interests in the Debtor shall be cancelled.  The existing holder of the Equity Interests in the Debtor | Impaired | No (Deemed to reject) |

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

| Class | Designation | Treatment and Approx. Percentage Recovery | Impairment | Entitled to Vote |
|---|---|---|---|---|
| | | shall neither receive nor retain any property of the Debtor or interest in property of the Debtor on account of such Equity Interest. | | |

THE PLAN PROVIDES THAT THE RELEASED PARTIES IDENTIFIED IN (A) – (I) IN THE IMMEDIATELY FOLLOWING SENTENCE SHALL BE DEEMED RELEASED AND DISCHARGED TO THE MAXIMUM EXTENT PERMITTED BY LAW BY THE DEBTOR AND ITS ESTATE, THE REORGANIZED DEBTOR, AND WIND-DOWN CO.  FURTHER, THE PLAN PROVIDES FOR CERTAIN MUTUAL RELEASES BETWEEN AND AMONG (A) THE DEBTOR AND THE REORGANIZED DEBTOR; (B) WIND-DOWN CO; (C) THE NOTES TRUSTEE AND ITS REPRESENTATIVES AND ADVISORS; (D) THE NOTEHOLDERS AND THEIR REPRESENTATIVES AND ADVISORS; (E) THE SPONSOR AND ITS AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, REPRESENTATIVES AND ADVISORS; (F) ANY CURRENT OR FORMER CHIEF RESTRUCTURING OFFICER OR ASSOCIATE RESTRUCTURING OFFICER OF THE DEBTOR; (G) ANY INDEPENDENT DIRECTORS APPOINTED TO THE BOARD OF THE DEBTOR ON OR AFTER JANUARY 1, 2021; (H) THE JPLS; (I) THE AUTHORIZED MANAGERS; AND (J) ANY ADVISORS RETAINED BY THE DEBTOR IN CONNECTION WITH THE CHAPTER 11 CASE ON OR AFTER DECEMBER 29, 2020 (BUT NOT INCLUDING DOV TRATNER OR TRATNER AND ASSOCIATES PLLC); PROVIDED, HOWEVER, THAT RELEASED PARTIES SHALL NOT INCLUDE YOEL GOLDMAN OR TZIPPORAH GOLDMAN IN ANY CAPACITY.

**THE SOLICITATION PROCESS:**  As set forth above, the Debtor commenced the Israeli Recognition Proceeding on April 14, 2022.  The Debtor commenced the Israeli Recognition Proceeding in furtherance of its efforts to achieve a global resolution of Claims against, and Interests in, the Debtor, including with respect to the Debtor's various series of Notes.  In addition, as the Debtor is a reporting company in Israel, the Debtor determined that it was necessary to commence the Israeli Recognition Proceeding to obtain court approval to convene the Noteholder Meeting to vote on the Plan and the Investment Agreement.  As the Debtor is a reporting company in Israel and is, therefore, subject to certain reporting and other requirements under applicable Israeli law, the Debtor determined that it was necessary to commence the Israeli Recognition Proceeding to obtain court approval to convene the Noteholder Meeting to comply with applicable Israeli securities laws.

Following approval of the Disclosure Statement by the Bankruptcy Court, the Debtor intends to file a motion with the Israeli Court seeking authorization to convene the Noteholder Meeting to comply with applicable Israeli securities law and to allow the Debtor to commence solicitation of votes from the Noteholders on the Plan.  A Hebrew translation of this Disclosure Statement and other solicitation materials that are approved by the Bankruptcy Court will be attached to the summons of the Noteholder Meeting.  The Debtor will obtain approval from the Israeli Court to convene the Noteholder Meeting (the "**Israeli Court Approval Date**") prior to commencing its solicitation of votes to accept or reject the Plan.

**II.**
**OVERVIEW OF THE DEBTOR'S BUSINESS**

**A.      The Debtor's Business, Management, and Employees**

The Debtor was established and incorporated on September 17, 2014, as a BVI business company under the laws of the BVI.  The Debtor operates as a holding company that, through its direct and indirect subsidiaries, focuses on the development, construction, acquisition, leasing and management of residential and commercial income producing properties in Brooklyn, New York.  Principally all of the Debtor's assets are located in the United States in New York.  The Debtor was founded by Mr. Yoel Goldman, the Debtor's sole economic shareholder (the "**Sole Shareholder**").

The Debtor, through its subsidiaries, owns approximately 110 properties (including properties under development), consisting of over 1,000 residential and commercial units in Bushwick, Williamsburg, and Bedford-Stuyvesant.  The Company's most valuable assets include, without limitation, the William Vale hotel, a luxury hotel in Williamsburg (the "**William Vale**"), and, until recently, the Denizen,[6] a luxury rental complex in Bushwick (the "**Denizen**").   An organizational chart of the Debtor and its direct and indirect subsidiaries, as of the date hereof, is annexed hereto as **Exhibit C**.[7]

Historically, the Debtor received funds through debt issuances, asset sales, and the operations of its direct and indirect, non-debtor property level subsidiaries (the "**PropCos**").  Currently, the Debtor is largely funding its operations from cash generated by asset sales and settlements with contract counterparties.  The Debtor uses these funds to pay various operating expenses and advances funds in the amount of approximately $200,000 on a monthly basis to the PropCos to fund any operating shortfalls at the PropCos.  A summary of the net income generated by the Debtor's non-debtor subsidiaries for the years ending 2019 through 2021 and a table reflecting the Debtor's equity interests in its non-debtor subsidiaries are annexed hereto as **Exhibit D-1** and **Exhibit D-2**, respectively.

Prior to the appointment of the JPLs, the Debtor's board of directors (the "**Board**") was comprised of the following five individuals: Mr. Shaul Schneider, Ms. Ayala Resnick-Dotan, Mr. Abe Wurzberger, Mr. Roni Kleinfeld, and the Sole Shareholder.

The Debtor does not currently have its own employees and has not employed any individuals within the one year period prior to the Petition Date.  Prior to the appointment of the JPLs, the

---

[6] As further described in Article IV, on February 22, 2021, Evergreen Gardens Mezz LLC ("**EGM**") commenced with the Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code.  On September 14, 2021, Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I and EGM, the "**Evergreen Debtors**") commenced their own voluntary cases with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  On November 5, 2021, the Court entered an order confirming the Evergreen Plan (as defined below), which chapter 11 plan became effective and was substantially consummated on December 2, 2021.  A sale of the Denizen was consummated pursuant to the Evergreen Plan.

[7] The organizational chart of the Debtor attached hereto reflects certain updates to account for post-petition asset sales and other transactions involving subsidiaries of the Debtor and supersedes in all respects the organizational chart annexed to the Debtor's corporate ownership statement [ECF No. 2] filed on the Petition Date.

Debtor's business affairs and operations were managed by Mr. Assaf Ravid, the Chief Executive Officer and Chief Restructuring Officer (the "**CRO**"), and Mr. Ephraim Diamond, the Associate Restructuring Officer (the "**ARO**"), who are contract officers of the Debtor that are paid in advance on a monthly basis for their consulting services. The CRO and ARO were appointed prior to the Petition Date by the Debtor's Board on March 4, 2021 and December 30, 2020, respectively. As described in further detail below, following the appointment of the JPLs, Mr. Ravid and Mr. Diamond, along with certain other specific individuals, were designated as "Authorized Managers" as part of a protocol that was agreed to, and made part of the JPL Order, and the JPLs empowered the Authorized Managers to maintain the Debtor's operations, pursue the restructuring, and to continue to pursue and oversee the Chapter 11 Case.

In addition to the Authorized Managers, four individuals, including two analysts and two administrative assistants, are paid as individual contractors through the Debtor's management company, Smart Management NY, Inc. ("**Smart Management**").

The day-to-day operations of certain of the PropCos were previously overseen by All Year Management, Inc., which was an affiliate of the Debtor and partially owned by the Sole Shareholder and a third party. However, on or about March 2021, the day-to-day operations of those PropCos, as well as certain payroll and other administrative services provided to the Debtor, were transitioned to Smart Management. To the best of the Debtor's knowledge and belief, Smart Management has no affiliation with the Sole Shareholder.

In addition to the Sole Shareholder's prior involvement with All Year Management, Inc., the Sole Shareholder previously served as a managing member or acted as authorized signatory for certain of the PropCos, including, among others, YG WV LLC ("**YG WV**"). The Debtor indirectly holds a 50% ownership interest in Wythe Berry Fee Owner LLC ("**Wythe Berry Fee Owner**"), the entity that owns the William Vale hotel, through YG WV. The remaining 50% interest is held by Mr. Zelig Weiss ("**Weiss**"). Wythe Berry LLC, an entity owned 50% by the Sole Shareholder and 50% by Weiss ("**Wythe Lessee**"), is the lessee of the William Vale property pursuant to a ground lease with the direct owner of the property (the "**Lease**"). The Sole Shareholder and Weiss are guarantors on the Lease. The Sole Shareholder is not currently involved with the management or operation of the William Vale, or the entities through which the property is held. To the best of the Debtor's knowledge and belief, except as set forth herein, the Sole Shareholder does not have any affiliation with any of the Debtor's creditors.

## B.    The Debtor's Capital Structure and Prepetition Claims

### 1.    *Prepetition Indebtedness*

As of the Petition Date, the Company had approximately $1.23 billion of outstanding funded debt obligations comprised of (i) approximately $565 million in borrowings on Series B, C, D, and E Notes issued by the Debtor, and (ii) approximately $760 million in property level mortgage debt secured by the Debtor's non-debtor subsidiaries which has been provided by various U.S. lenders.

The following is a summary of each of the categories of the Debtor's outstanding known liabilities as set forth in the Schedules.

i.    The Noteholder Claims[8]

The Notes were issued by the Debtor on TASE in New Israeli Shekel and the deeds of trust and other documents governing the relationship between the Debtor and the Noteholders are governed by Israeli law.  The Debtor suspended interest payments on its Series C and E Notes and its Series B and D Notes in November 2020 and January  2021, respectively.  On January 3, 2021, the four Series of Notes were de-listed and suspended from trading by TASE.

a.    Series B Notes Claims

Pursuant to that certain Deed of Trust, dated as of December 25, 2016 (as amended, modified, renewed, or supplemented from time to time, the "**Series B Deed of Trust**"), by and between the Debtor, as issuer, and the Notes Trustee, the Debtor issued approximately $214 million in principal amount of unsecured notes (the "**Series B Notes**" and the holders thereof, the "**Series B Noteholders**").  As of the Petition Date, the Debtor owed approximately $141,434,950.21 in outstanding obligations under the Series B Notes, including principal, accrued and unpaid interest, fees, expenses, and other amounts outstanding under the Series B Deed of Trust.

b.    Series C Notes Claims

Pursuant to that certain Deed of Trust, dated as of February 19, 2017 (as amended, modified, renewed, or supplemented from time to time, the "**Series C Deed of Trust**"), by and between the Debtor and the Notes Trustee, the Debtor issued approximately $198 million in principal amount of secured, first lien notes (the "**Series C Notes**" and the holders thereof, the "**Series C Noteholders**").  At issuance, the Series C Notes were secured by a collateral assignment of a loan and mortgage delivered by the Debtor (the "**Loan and Mortgage**"), which loan was secured by a mortgage delivered by Wythe Berry Fee Owner, an indirect non-debtor subsidiary of the Debtor that owns the William Vale hotel.  The Loan and Mortgage was subsequently assigned, on March 16, 2021, by the Debtor to the Notes Trustee, on behalf of the Series C Noteholders.  The Series C Notes are not secured by any assets of the Debtor.  As of the Petition Date, the Debtor owed approximately $202,409,251.53 in outstanding obligations under the Series C Notes, including principal, accrued and unpaid interest, fees, expenses, and other amounts outstanding under the Series C Deed of Trust.[9]  As described in further detail below, the closing

---

[8] The Notes were issued in New Israeli Shekel and, as a result, the principal amounts issued and related claim amounts for the various series of Notes set forth below have been converted to United States Dollars based on the currency exchange rate as of the Petition Date.

[9] Wythe Berry Fee Owner commenced an action against Wythe Lessee in the New York State Supreme Court, Commercial Division (the "**New York Court**") as a result of, among other things, Wythe Lessee's failure to make required lease payments under the Lease since February 1, 2021.  By order dated December 6, 2021, the New York Court ordered Wythe Lessee to make a payment of $7,500,000 on or before February 1, 2022 to Wythe Berry Fee Owner for "use and occupancy" of the Hotel during the pendency of the litigation.  On February 1, 2022, Wythe Berry Fee Owner and the Lessee entered into a stipulation, pursuant to which Wythe Lessee paid $7,500,000 to Wythe Berry Fee Owner in accordance with the order of the New York Court, which funds were paid to the Trustee, on behalf of the Series C bondholders.  The Allowed amount of the Series C Notes Claims under the Plan reflects the Trustee's receipt of such funds.

of a transaction for the William Vale hotel will result in a reduction of the Allowed amount of the Series C Note Claims under the Plan.

      c.   Series D Notes Claims.

Pursuant to that certain Deed of Trust, dated as of June 29, 2017 (as amended, modified, renewed, or supplemented from time to time, the "**Series D Deed of Trust**"), by and between the Debtor and the Notes Trustee, the Debtor issued approximately $164 million in principal amount of unsecured notes (the "**Series D Notes**" and the holders thereof, the "**Series D Noteholders**"). As of the Petition Date, the Debtor owed approximately $184,609,380.02 in outstanding obligations under the Series D Notes, including principal, accrued and unpaid interest, fees, expenses, and other amounts outstanding under the Series D Deed of Trust.

      d.   Series E Notes Claims.

Pursuant to that certain Deed of Trust, dated as of February 4, 2018 (as amended, modified, renewed, or supplemented from time to time, the "**Series E Deed of Trust**"), by and between the Debtor, as issuer, EG II, as co-borrower, and the Notes Trustee, the Debtor and EG II issued approximately $263 million in principal amount of secured, first lien notes (the "**Series E Notes**" and the holders thereof, the "**Series E Noteholders**"). The Debtor's obligations on the Series E Notes under the Series E Deed of Trust were previously secured by a first priority lien and security interest on, among other things, the real property located at 54 Noll Street (Denizen Y) and all buildings, structures, fixtures and other improvements. Pursuant to the Evergreen Plan, which became effective and was substantially consummated on December 2, 2021, the holders of the Series E Notes received a distribution from EG II in the amount of $244,965,080.37 on account of such allowed claims. The Series E Notes are not secured by any assets of the Debtor. As of the date hereof, the Debtor owes approximately $40,453,260.52 in outstanding obligations under the Series E Notes, including principal, accrued interest, fees, expenses, and other amounts, which amount represents the Series E Noteholders' deficiency claim against the Debtor, as a co-obligor under the Series E Notes.

In December 2021, among other things, the Noteholders voted in favor of a proposal providing that (i) in the event of a bankruptcy proceeding of the Parent Debtor initiated outside of Israel, the calculation of the deficiency claim, if any, for each series of Notes and any disbursement thereto (including without limitation the distribution on account of the claims of the Series C Notes whether or not the William Vale Purchase (as defined below) has been consummated) would be determined by the Notes Trustee pursuant to applicable Israeli law and (ii) in the event that a particular series of Notes were to receive a disbursement on its claim in excess of such series' determined share, such excess amount would be distributed among all Noteholders according to applicable Israeli law. Nothing contained in the proposal approved by the Noteholders was meant, or should be deemed, to derogate from any Noteholder claims against the Parent Debtor and is applicable only with respect to the allocation of distributions on account of the claims of the Noteholders as among themselves.

 The results of the Noteholders' votes are publicly available on the TASE website at the following links:

(i)    Series B Notes: https://maya.tase.co.il/reports/details/1418650/2/0);

(ii)    Series C Notes: (https://maya.tase.co.il/reports/details/1418307);

(iii)    Series D Notes: (https://maya.tase.co.il/reports/details/1418662/2/0); and

(iv)    Series E Notes: (https://maya.tase.co.il/reports/details/1418316/2/0).

ii.    Subordinated Securities Claims

As discussed in further detail in Article V below, the Debtor, along with certain of its former officers and directors, is a named defendant in two securities class action lawsuits pending in Israel.[10] The Public Representatives Class Action and the Shachar Group Class Action (each as defined below) were commenced by lead plaintiffs representing parties who purchased any bonds issued by the Debtor between (i) June 1, 2018 and November 30, 2018 and (ii) July 1, 2020 and November 29, 2020, respectively. Pursuant to the subordination requirements of section 510(b) of the Bankruptcy Code, any Claim arising out of or related to the Israeli Securities Actions, including, without limitation, any claim asserted against the Debtor by any former officer or director of the Debtor for indemnification or contribution arising out of or related to the Israeli Securities Actions, will be subordinated to all Claims or Interests that are senior to or equal in priority to such Claims. Accordingly, in accordance with section 510(b) and the other provisions of the Bankruptcy Code, because the holders of Claims in Class 4 (Remaining Unsecured Claims) will not receive payment in full under the Plan, the Subordinated Securities Claims are not entitled to any recovery under the Plan.

iii.    Non-Securities Indemnity Claims

The Debtor has listed certain contingent, unliquidated, and disputed claims for indemnification or contribution in its Schedules that may be asserted by its current or former directors and officers. These may include claims for indemnification or contribution arising out of or relating to potential actions that may be brought in the future against the Debtor's directors and officers, including, without limitation, claims or actions arising out of or relating to the Notes that may be brought by the Noteholders, the Notes Trustee, or the Plan Administrator, and for which such individuals may seek indemnification or contribution from the Debtor arising out of or relating to events that occurred prior to the Petition Date.

The Memorandum and Articles of Association of the Debtor (the "**M&As**"), originally filed in the BVI on September 17, 2014 and subsequently amended thereafter, provide that the Debtor shall indemnify its directors and officers against, among other things, all expenses, including legal fees, and judgments and other amounts paid in connection with legal proceedings commenced against such individuals as a result of their roles as directors or officers of the Debtor. In addition, the Debtor previously entered into letter agreements with each of its directors and officers concerning their rights to indemnification and contribution from the Debtor

---

[10] The Israeli Class Actions are DC (TA) *Public Representatives (Registered NGO) v. All Year Holdings, et al.*, 15257-04-20 (January 15, 2019, updated April 16, 2020) (Isr.) and DC (TA) *Shachar Group LTD v. All Year Holdings, et al.*, 3325-12-20 (December 1, 2020) (Isr.).

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

(the "**Letters of Indemnity**").  The Letters of Indemnity, which are governed by Israeli law, each provide that the Debtor's total aggregate obligation to indemnify its directors and officers is capped at 25% of the existing equity value of the Debtor attributed to the Debtor's shareholders under the most recent consolidated financial statements, audited or reviewed, of the Debtor, as applicable, correct as of the date of the indemnification payment.  The Letters of Indemnity further provide that the Debtor's undertakings to indemnify its directors and officers under the Letters of Indemnity, including with respect to the aforementioned cap, apply with regard to any obligation or expense that may be indemnified under law or the M&As.

The Debtor has been advised by its BVI counsel that parties are generally free to waive or contract around any indemnification requirements provided under the memorandum and articles of an entity incorporated in the BVI.  Accordingly, as the Debtor is currently insolvent, in accordance with the Letters of Indemnity and based on the advice of its Israeli and BVI counsel, the Debtor believes that it has no obligation to indemnify its officers and directors under the M&As, the Letters of Indemnity, or otherwise.  Therefore, any Non-Securities Indemnity Claims asserted by the Debtor's directors and officers have no value.  The Debtor will be prepared to demonstrate in connection with confirmation of the Plan that the Non-Securities Indemnity Claims should be estimated at zero dollars ($0) for all purposes, including for purposes of distributions under the Plan.

   iv. Subsidiary Plan Administrator Claim

The Debtor has listed in its Schedules a contingent, unliquidated, and disputed claim that may be asserted by the plan administrator appointed for EGM and EG I (the "**EGM Plan Administrator**") in the Evergreen Debtors' chapter 11 cases.  In a letter to the Bankruptcy Court filed on April 19, 2022 [ECF No. 87], the EGM Plan Administrator indicated that it may hold Claims that relate to or arise as a result of that certain Contract of Sale, dated January 15, 2020, by and between Melrose Noll Brooklyn LLC (the "**2020 PSA Claimant**"), EG I, and EG II (as amended, the "**2020 PSA**") and the Debtor's alleged use or diversion of the deposit paid by the 2020 PSA Claimant in connection with the 2020 PSA.  To date, the Debtor has not seen any documents and is not otherwise aware of any evidence to support any Subsidiary Plan Administrator Claims.  To the extent any Claim is brought by a plan administrator with respect to any of the Evergreen Debtors, such Claims shall be classified in Class 4 (Remaining Unsecured Claims) under the Plan.  Whether and to what extent such a claim will be an Allowed Claim is likely to be subject to further litigation before the Bankruptcy Court in connection with confirmation of the Plan.

   v. Taz Claim

On December 13, 2021, the Debtor became aware of a $37 million judgment entered against it in Kings County Supreme Court on December 9, 2021 (the "**Taz Confession of Judgment**") resulting from outstanding confessions of judgement allegedly executed by the Sole Shareholder in favor of Taz Partners LLC ("**Taz Partners**"), an affiliate of the Sponsor.

The Debtor has requested and is reviewing documents in connection with the Taz Claim and is engaged in a continued dialogue regarding the claim with representatives of Taz Partners.  Any Claim asserted against the Debtor arising out of or related to the Taz Confession of Judgment is

classified as a Class 3 General Unsecured Claim and, pursuant to the terms of the Plan, will be assumed by the Sponsor on the Effective Date, subject to all available defenses.

The allowance or disallowance of the Taz Claim, however, will not impact recoveries to any other creditors under the Plan. Following the Effective Date, any repayment on account of the Taz Claim will be subordinated and will not be paid until the New Notes are repaid in full and the Sponsor's contribution under the Plan to the holders of Class 4 Remaining Unsecured Claims is satisfied in full.

The Sponsor has confirmed to the Debtor in writing that, other than the Taz Confession of Judgement between Taz Partners (an affiliate of the Sponsor) and the Sole Shareholder, there is no relationship between the Sole Shareholder and the Sponsor.

In addition, with the assistance of the Debtor, the Sponsor has engaged with certain of the Debtor's property-level lenders regarding, among other things, potential transactions to purchase or re-finance the outstanding property-level mortgage loans held by such lenders.

2. *Equity Ownership*

The Sole Shareholder holds 100% of the common equity interests in the Debtor. To the best of the Debtor's knowledge and belief, the Sole Shareholder does not hold any financial interest in, or relationship with, any of the Debtor's various creditor constituencies.

**C. The Debtor's Professionals**

To effectively and efficiently administer its restructuring, the Debtor has retained various professionals in the United States, Israel, and the BVI. Contact information for each of these professionals is set forth below.

| **U.S. Restructuring Professionals** | |
|---|---|
| Lead Counsel to the Debtor:<br><br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn:  Gary T. Holtzer, Esq.<br>          Matthew P. Goren, Esq.<br>Telephone:  (212) 310-8000<br>Facsimile:  (212) 310-8007<br>Email: Gary.Holtzer@weil.com<br>          Matthew.Goren@weil.com | Exclusive Real Estate Finance Broker to the Debtor:<br><br>Meridian Capital Group LLC<br>One Battery Park Plaza<br>New York, NY 10004<br>Attn:  Tamir Kazaz<br>          David Schechtman<br>Telephone: (212) 972-3600<br>Email: TKazaz@meridiancapital.com<br>          DSchechtman@meridiancapital.com |

| Financial Advisor to the Debtor: | Solicitation and Voting Agent for the Debtor: |
|---|---|
| CFGI, LLC<br>340 Madison Avenue<br>3rd Floor<br>New York, NY 10173<br>Attn:   Joseph Baum<br>Telephone:  (646) 360-2850<br>Email: JBaum@cfgi.com | Donlin, Recano & Company, Inc.<br>6201 15th Avenue<br>Brooklyn, NY 11219<br>Attn:   Nellwyn Voorhies<br>          John Burlacu<br>Telephone:  (212) 481-1411<br>Email: NVoorhies@donlinrecano.com<br>          JBurlacu@donlinrecano.com |
| **Israel Restructuring Professionals:** | |
| Israeli Restructuring Counsel to the Debtor:<br><br>Bartov & Co.<br>The Museum Towers, 6th fl.,<br>4 Berkovich Street,<br>Tel Aviv 6423806<br>Attn:   Amir Bartov, Esq.<br>          Shirley Villensky, Esq.<br>Attn:   Amir@bartov-law.co.il<br>          Shirley@bartov-law.co.il | |
| **JPLs and BVI Restructuring Professionals:** | |
| JPLs: | BVI Restructuring Counsel to the Debtor: |
| Kalo Advisors<br>PO Box 4571, 4th Floor<br>LM Business Centre<br>Fish Lock Road<br>Road Town, Tortola<br>British Virgin Islands<br>Attn: Charlotte Caulfield<br>          Paul Pretlove<br>Telephone: +1 (284) 541 9600<br>Email: CCaulfield@kaloadvisors.com<br>          PPretlove@kaloadvisors.com | Conyers Dill & Pearman<br>P.O. Box 3140<br>Road Town<br>Tortola, VG 1110<br>British Virgin Islands<br>Attn:   Richard Evans<br>          Robert Briant<br>          Charles Goldblatt<br>Telephone: +1 (284) 852-1000<br>Fax: +1 (284) 852-1001<br>Email: Richard.Evans@conyers.com<br>          Robert.Briant@conyers.com<br>          Charles.Goldblatt@conyers.com |

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

**III.**
**KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASE**

A. **Prepetition Re-Financing and De-Leveraging Efforts, the COVID-19 Pandemic, and Other Operational Issues**

Like many real estate businesses, prior to the Petition Date, the Debtor was highly leveraged and eventually began to struggle to service its significant funded debt burden.  As described in further detail below, commencing in early 2020, the Debtor began taking steps to manage its debts.  However, because the Debtor's revenues were derived primarily from residential and commercial rental income streams, they were adversely impacted by the COVID-19 pandemic, and the Debtor was ultimately unable to implement those de-leveraging transactions.  Further, as described below, a number of the Debtor's subsidiary holdings faced significant liquidity issues, placing further stress on those non-debtor subsidiaries and on the Debtor's entire enterprise.  Despite the recent modest uptick in the New York real estate market, the Debtor's current and projected revenues remained insufficient to service its debt.

More specifically, the Debtor was negotiating two material, liquidity enhancing, transactions that were delayed by the advent of the COVID-19 pandemic.  First, following months of intense discussion, in February 2020, the Debtor received and executed a term sheet for a $675 million loan that would have both refinanced existing debts, including its Series E Notes, and provided the Debtor with excess liquidity.  With the start of COVID-19 pandemic, the closing of this refinancing transaction was delayed multiple times and, in light of the significant strengthening of the Israeli Shekel against the dollar, the additional funds required to repay the Series E Notes would have left the Debtor with negative liquidity.

Second, in the first quarter of 2020, the Debtor entered into an agreement to sell 74 of its subsidiary properties, which at closing, would have provided the Debtor with excess liquidity to further reduce its leverage.  At contract signing, the Debtor received a $15 million deposit with the closing expected to occur in the second quarter of 2020.  However, following the start of the pandemic, the buyer, alleging seller misrepresentations, abruptly terminated the contract and currently is litigating with the Debtor over the return of its deposit.

The derailment of both of these de-leveraging transactions exacerbated the Debtor's already precarious cash flow position.

The Debtor also faced specific challenges at three of its material properties.

1. The Denizen

As noted above, the anticipated $675 million financing would have refinanced the Series E Notes, which were collateralized by one of the two buildings (Denizen X) that together comprise the Denizen, which was one Debtor's flagship properties.  The second building comprising the Denizen (Denizen Y), was financed separately with both a first lien mortgage and mezzanine debt. At the start of the pandemic, the Denizen Y was not fully occupied. The Debtor struggled to increase occupancy during the pandemic and was unable to generate sufficient cash to service

16

the debts on this building.  The mezzanine lender took steps to foreclose on its collateral, eventually forcing the Debtor to file its indirect subsidiary, EGM, for chapter 11 protection.

2.      The William Vale Hotel

As described in further detail above, the Debtor, through a series of direct and indirect non-debtor subsidiaries, owns a fifty percent share of the William Vale.  The Series C Notes are not secured by any assets of the Debtor, but the Notes Trustee, on behalf of the Series C Noteholders, holds the Loan and Mortgage, which loan is secured by a mortgage on the William Vale.  Utilizing a ground lease, the lessee's rent payments are used to pay the interest and principal on the Series C Notes.  Starting in February 2021, the operating lessee, ostensibly due to the pandemic, ceased paying rent, causing the William Vale to stop paying the interest and principal due to the Series C Noteholders, who, in turn, placed the William Vale in default.  The William Vale is currently in litigation with the lessee over termination of the lease and back payments.

3.      Smith Street

The Debtor, through a series of direct and indirect non-debtor subsidiaries is the owner of a development site in the Gowanus section of Brooklyn, which upon rezoning, was one of its most valuable properties.  This site was leveraged with three loans: a first mortgage, a second mortgage, and a preferred equity investment.  Following significant delays in the rezoning process, the Debtor's plans to refinance and develop and/or sell the site at expected valuations were no longer achievable.  With no ability to generate cash, two of the lenders placed their loans in default, leading to a sale transaction of the site at current market value that remains pending.  The site is held by the Debtor's indirect subsidiary, All Year Equity Partners (as defined below), which entered into a settlement agreement with its Preferred Investor (as defined below), pursuant to which it was agreed upon that All Year Equity Partners would dispose of its holdings and distribute the proceeds in accordance with an agreed upon waterfall, as explained further in Article IV, Section A.2.

**B.      Prepetition Creditor Negotiations, and the Taz Confession of Judgment**

Faced with insolvency, the Debtor engaged with various stakeholders throughout the Company's capital structure to identify a path forward to maximize the value of its assets, including opportunistically disposing of a number of underperforming assets and settling certain outstanding claims.  In connection with these efforts, the Evergreen Debtors previously commenced voluntary chapter 11 cases with the Bankruptcy Court to consummate a value-maximizing sale of the Denizen for the benefit of their creditors.

During that process, the Debtor was engaged in extensive and ongoing discussions with its Noteholders and other constituents regarding potential transactions to restructure its other holdings.  As discussed in further detail below, since April 2021, the Debtor and representatives of the Noteholders have engaged in a robust and wide-ranging, public process to solicit interest and offers from potential third-party investors to either recapitalize the Debtor or undertake an outright purchase of the Debtor.  Through this process, the Debtor garnered strong interest and made substantial progress in selecting and finalizing an exit transaction.

17

Throughout that period, the Debtor's Board oversaw its restructuring with the protection of an agreement with the Sole Shareholder under which he could not change the Board or take actions that would adversely impact the process. The agreement with the Sole Shareholder, which was set to expire at 11:59 pm (British Virgin Islands Time) on January 4, 2022, was reached after he previously took control of the Board and authorized payments satisfying obligations of the Debtor that he had also personally guaranteed. Unable to extend the arrangement with the Sole Shareholder past January 4, 2022 on acceptable terms, and facing Noteholder threats to commence involuntary insolvency proceedings in Israel due to existing defaults, the Debtor's restructuring process became exposed to potential insolvency litigation across multiple jurisdictions.

Further, on December 13, 2021, the day before the Petition Date, the Debtor became aware that the Taz Confession of Judgment in the amount of $37 million was entered against it in Kings County Supreme Court. The threat that the Taz Confession of Judgment could be levied against assets of the Debtor, including its cash, precluded the Debtor from continuing its restructuring process outside of the protections available under chapter 11 of the Bankruptcy Code. Accordingly, the Debtor commenced the Chapter 11 Case with the consent and support of the Notes Trustee, on behalf of the Noteholders, to foster an orderly and value maximizing restructuring.

## C.    The Evergreen Debtors' Chapter 11 Cases

On February 22, 2021, EGM commenced with the Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code. On September 14, 2021, EG I and EG II commenced their own voluntary cases with the Bankruptcy Court under chapter 11 of the Bankruptcy Code. The Evergreen Debtors were each wholly-owned, indirect subsidiaries of the Debtor. The Evergreen Debtors' chapter 11 cases are being jointly administered for procedural purposes only under the lead case, *In re Evergreen Gardens Mezz LLC, et al.*, Case No., 21-10335 (MG). The Debtor's Chapter 11 Case is being separately administered from the Evergreen Debtors' chapter 11 cases.

On November 5, 2021, the Court entered an order [ECF No. 222 on the EGM case docket] confirming the joint chapter 11 plan for the Evergreen Debtors [ECF No. 187 on the EGM case docket] (the "**Evergreen Plan**"). The Evergreen Plan, which implemented a sale of the Denizen, became effective and was substantially consummated on December 2, 2021. Upon the consummation of the Evergreen Plan, all of the equity interests in the post-effective date Evergreen entities vested with the respective plan administrator for each of the Evergreen entities. The Debtor no longer holds any equity interests in the Evergreen entities.

The Debtor has asserted a claim against EG I in EG I's chapter 11 case on account of certain intercompany loans provided by the Debtor to EG I prior to the commencement of EG I's chapter 11 case. The loans total in excess of $2,100,000. Separately, as described above, the EGM Plan Administrator has asserted claims against the Debtor in the Chapter 11 Case arising out of certain prepetition actions alleged to have been taken by the Sole Shareholder.

The EGM Plan Administrator must file an objection to the Debtor's claim against EG I by July 29, 2022. The Debtor is currently engaged in preliminary settlement discussions with the EGM Plan Administrator.

## IV.
## OVERVIEW OF THE DEBTOR'S RESTRUCTURING

### A.    Key Events During Chapter 11 Case

#### 1.    Appointment of the JPLs and the BVI Proceeding

Prior to the commencement of the Chapter 11 Case, the Debtor issued a single Class A voting share (the "**Class A Share**") to the CRO and ARO on January 4, 2021, entitling them to vote on the appointment or removal of the directors of the Debtor but conferring no other voting rights. The Class A Share arrangement was put in place and agreed to because the Board and the Noteholders were concerned about the Sole Shareholder's decisions, actions, and priorities with respect to the Debtor's operations and restructuring efforts. Following a number of agreed upon extensions with the Sole Shareholder, these voting rights were set to expire at 11:59 pm (British Virgin Islands Time) on January 4, 2022 unless the Sole Shareholder agreed to further amend the organizational documents of the Debtor to extend the voting rights associated with the Class A Share. The expiration of these voting rights could have deprived the Debtor, the Noteholders, and other parties in interest of their ability to continue their discussions and finalize an exit transaction for the Debtor.

The Debtor made bona fide attempts to seek an extension of the January 4 deadline from the Sole Shareholder. The Sole Shareholder, however, declined the Debtor's requests to further extend the Class A Share arrangement absent the Debtor agreeing in return to sell its interest in certain real estate holdings directly to the Sole Shareholder, which the Debtor believed would have made it more difficult to reach a restructuring agreement with all of its creditors and stakeholders.

Further, during the course of these discussions it became apparent that, absent a deal with the Sole Shareholder to extend the Class A Share, the Sole Shareholder intended to reassert control over the Debtor's restructuring process. Based on his statements and prior history, the Board had a real and well-founded concern about the Sole Shareholder's questionable decision making and that his priorities were not aligned with the best interests of the Debtor and its estate. The Debtor also was mindful that the commencement of the Chapter 11 Case and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, might not preclude the Sole Shareholder from taking such actions to the detriment of the estate and its creditors.

In light of the impending expiration of the Class A Share and the Sole Shareholder's prior history, on December 16, 2021, the Debtor determined that the laws of the BVI, the governing law of the Debtor, required it to file an application with the BVI Court seeking the appointment of the JPLs over the Debtor under the applicable provisions of the BVI Insolvency Act, 2003. The JPL Appointment was sought with the consent and support of the Notes Trustee, on behalf of the Noteholders. The JPL Order approving the appointment of Ms. Charlotte Caulfield and

Mr. Paul Pretlove of Kalo Advisors, a Caribbean-based independent advisory firm, as the JPLs, was made by Mr. Justice Jack on December 20, 2021.

The purpose of the JPL Appointment and the provisional liquidation was to assist the Debtor in its ongoing restructuring efforts and, in particular, to support the Chapter 11 Case.  Pursuant to the JPL Appointment, the Board was divested of all of its powers and decisional authority over the Debtor was transferred to the JPLs.  To assist with the provisional liquidation, a protocol was agreed to, and made part of the JPL Order, pursuant to which the JPLs delegated certain powers to specified individuals – namely, Mr. Shaul Schneider (an external director of the Debtor), Mr. Assaf Ravid (the Debtor's CRO), Mr. Ephraim Diamond (the Debtor's ARO), and Mr. Yizhar Shimoni (formerly, the Debtor's Chief Financial Officer)[11] – to empower them to maintain the Debtor's operations, pursue the restructuring, and continue to pursue and oversee the Chapter 11 Case. These individuals have continued to oversee the Debtor's day-to-day operations and lead its ongoing restructuring efforts for the benefit of the estate and its creditors.

### 2.    Settlement Transaction and Agreement with Downtown Capital Partners

Prior to the Petition Date, the Debtor was engaged in negotiations with its various stakeholders to identify a strategy for maximizing the value of its assets and reducing its liabilities as well as those of its various non-debtor affiliates.  Significant time was devoted to negotiations with (i) DCP All Year Pref Equity LLC (the "**Preferred Investor**") regarding a dispute relating to purported defaults and breaches of investment documents governing the Preferred Investor's investment in All Year Equity Partners LLC ("**All Year Equity Partners**"), an indirect subsidiary of the Debtor, and (ii) DCP Kings Point LLC ("**DCP Kings**"), an affiliate of the Preferred Investor, in its capacity as a lender to Chester Holdings NY LLC ("**Chester**"), the majority of whose equity is directly owned by the Debtor.

These negotiations continued beyond the Petition Date and an agreement was reached to resolve these disputes whereby:

    i.    All Year Equity Partners' manager, who was appointed by the Preferred Investor following purported defaults, would endeavor to dispose of the All Year Equity Partners' property holdings within a five-year period;

    ii.    the Preferred Investor would receive priority to certain sale proceeds generated by the disposition of All Year Equity Partners' property holdings to resolve any of its claims under the relevant documents after which All Year Equity Partners, and ultimately the Debtor, would be entitled to share in such proceeds;

    iii.    All Year Equity Partners, the Preferred Investor, certain non-debtor affiliates, the Debtor, and the Noteholders would exchange mutual

---

[11] As of February 19, 2022, Mr. Shimoni resigned from his position as CFO.  Mr. Shimoni continues to be engaged by, and provide services to, the Debtor as a consultant.

releases pursuant to which the Debtor was relieved of its obligations under applicable investment documents;

iv.    Chester would sell its equity interest in its subsidiary to DCP Kings in exchange for loan forgiveness from DCP Kings, a release of the Debtor's guarantee of such loan, a payment of $500,000, and a release of DCP Kings' security interest on All Year Equity Partners' membership in a non-debtor affiliate; and

v.    Each of the Debtor and Chester would indemnify and hold DCP Kings harmless from demands and liabilities stemming from certain breaches of representations and warranties set forth in the transaction documents and claims by certain creditors and parties in interest, not to exceed $500,000 in total.

Following entry into this agreement, on January 14, 2022, the Debtor filed the *Debtor's Motion Pursuant to Bankruptcy Code §§ 105(a) and 363 and Bankruptcy Rule 9019 for Approval of Settlement Providing for Recapitalization of Non-Debtor All Year Equity Partners LLC* [ECF No. 25]. No objections were filed, and a hearing was held before the Bankruptcy Court on January 25, 2022, after which an order was entered approving the terms of the settlement [ECF No. 34].

### 3.    The Section 341 Meeting of Creditors

On February 3, 2022, the Debtor's meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was conducted by counsel for the United States Trustee (the "**U.S. Trustee**"). The U.S. Trustee's counsel interviewed representatives of the Debtor and other parties in interest were provided an opportunity to ask questions of the Debtor as well. The Debtor and the U.S. Trustee's financial staff also participated in an initial debtor interview on January 18, 2022.

### 4.    The Debtor's Schedules and Statement of Financial Affairs and Initial 2015.3 Report

On December 28, 2021, the Debtor filed its schedules of assets and liabilities and statement of financial affairs [ECF Nos. 15 and 16] (the "**Original Schedules**"). On January 25, 2022, the Debtor filed amended and restated schedules of assets and liabilities and statements of financial affairs [ECF Nos. 36 and 37] (the "**Amended Schedules**" and, together with the Original Schedules, the "**Schedules**") to, among other things, (i) add certain former officers and directors to the list of creditors on Schedule E/F as having contingent, unliquidated, and disputed indemnity claims, (ii) revise the chart listing the approximate values of the Debtor's equity interests in its subsidiaries included in Schedule A/B, and (iii) make other minor and nonmaterial changes to correct certain typographical errors.

In addition, the Debtor filed its initial *Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest* on January 19, 2022 [ECF No. 30], which set forth the value, operations, and profitability of

those entities in which the Debtor holds a substantial or controlling interest, as required by Bankruptcy Rule 2015.3.

## 5.      The Marketing Process and the Investment Agreement

Prior to the Petition Date, the Debtor engaged Meridian Investment Sales, a segment of Meridian Capital Group, LLC, and its broker-dealer affiliate, Tigerbridge Capital LLC d/b/a Meridian Securities (collectively, "**Meridian**"), to conduct a robust, wide-ranging public process to solicit interest and offers from potential third-party investors to either recapitalize the Debtor or undertake an outright purchase of the Debtor (the "**Marketing Process**").   Throughout the Marketing Process, the Debtor and Meridian diligently worked to ensure that the process was broad, transparent, inclusive, efficient, and value maximizing.

In March 2021, Meridian began working closely with the Debtor to compile various materials and proprietary information about the Debtor and its direct and indirect non-debtor subsidiaries for the purpose of establishing a virtual data room and due diligence library to enhance and facilitate the Marketing Process.  At the Debtor's direction, Meridian conducted site visits of all of the Company's properties and prepared a comprehensive offering memorandum.

On or around April 13, 2021, Meridian, in consultation with the Debtor, invited each of the potential third-party investors to participate in the Marketing Process.  Of the initial pool of potential investors, 37 executed confidentiality agreements to gain access to the data room, which contained, among other things, the offering memorandum, detailed financial information, and property-level information regarding real estate taxes, income, and expenses.  Thereafter, Meridian arranged more than 125 discussions with interested parties, many of which included the Debtor, to, among other things, answer diligence questions, discuss potential deal structures, and assist investors in formulating their bids.

Following an approximately two-month diligence period, the Debtor, in consultation with Meridian, requested that interested parties submit initial bids.  The Debtor received six written bids (the "**Initial Bids**").  The Debtor, in consultation with Meridian, evaluated the Initial Bids, focusing on several criteria, including, but not limited to: (a) the proposed purchase price and forms of consideration; (b) the proposed deal structure; (c) any proposed percentage ownership to be left with the Noteholders and other general unsecured creditors; (d) any diligence contingencies; and (e) the proposed amount of any deposit.

Negotiations regarding the Initial Bids occurred between May and June 2021.   Following extensive negotiations and the opportunity to conduct further diligence, the Debtor received six refined bids (the "**Refined Bids**").  The Debtor, in consultation with Meridian, evaluated the Refined Bids based on the criteria used to evaluate the Initial Bids and sought input from the Notes Trustee so as to better understand which proposed transactions were likely to be supported by the Noteholders.

After initially engaging on an exclusive basis with one potential investor which ultimately did not lead to a definitive agreement, the Debtor received three revised bids for potential transactions (the "**Revised Bids**").  After reviewing the Revised Bids based on the criteria used throughout the Marketing Process, the Debtor, in consultation with Meridian, determined that

two of the bids, including the bid submitted by the Sponsor, contained materially better economic terms and thus were more likely to result in a value maximizing transaction.

Following the Petition Date, the Debtor continued engaging in discussions with the Notes Trustee and the bidders who had submitted the Revised Bids. After extensive parallel track negotiations, the Debtor, in consultation with Meridian, thoroughly reviewed the near finalized investment agreements, focusing on, among other things, the following criteria: (a) the proposed purchase price, (b) the bidder's willingness to assume potential liabilities of the Debtor; (c) the bidder's willingness to submit a cash deposit; (d) any limitation on the Debtor's ability to pursue Alternative Transactions; and (e) any diligence exclusivity. Based on this criteria and review, for several reasons, it was clear to the Debtor that the Sponsor's bid and related Investment Agreement provided the best actionable transaction to maximize value.

On or around March 6, 2022, the Debtor published the Investment Agreement on the TASE website. On the same date, the Notes Trustee also published its intent to consent to the Debtor's entry into the Investment Agreement on the TASE website. Accordingly, with the consent of the Notes Trustee and the approval of the JPLs, the Debtor entered into the Investment Agreement on March 11, 2022.

*The Investment Agreement*

The Investment Agreement represents a binding contract to acquire one hundred percent of the equity of the Reorganized Debtor, in exchange for the following consideration: (a) the Sponsor's contribution of $60,000,000 to the Debtor, which is comprised of (a) $40,000,000 in cash and (b) promissory notes in the aggregate amount of $20,000,000;[12] and (b) the Sponsor's assumption of all unsecured claims against the Debtor, other than the Noteholders' Claims and certain other discrete categories of claims, all as more fully set forth in the Investment Agreement.

The Investment Agreement includes various customary representations, warranties, and covenants by and from the parties, as well as certain closing conditions and rights of termination related to the Chapter 11 Case. The transactions contemplated by the Investment Agreement are subject to Bankruptcy Court approval, entry of an order confirming a chapter 11 plan that effectuates the transaction, and, to the extent applicable, any necessary approvals in the BVI and Israel.

The Investment Agreement was subsequently amended on April 21, 2022 and May 27, 2022, respectively.

*Amendment No. 1 to Investment Agreement*.

On April 21, 2022, the Debtor, the Sponsor, and the Notes Trustee entered into that certain Amendment No. 1 to Investment Agreement (the "**First Investment Agreement Amendment**"), which provided for three notable changes, among others. First, the First Investment Agreement

---

[12]   The amount of (a) the promissory notes will increase to $22,000,000 and (b) the cash contribution will increase by an additional $200,000, if the Sponsor or an affiliate purchases substantially all of the rights of the Notes Trustee for the Series C Notes in and to the Loan and Mortgage.

23

Amendment revised the definition of "Excluded Assets" under the Investment Agreement to provide that if the Sponsor consummates the William Vale Purchase (whether prior to, on, or after the Closing Date, but only until the expiration or termination by its terms of the MLPSA (as defined below)), the Debtor's direct or indirect rights (including the right to receive any income or proceeds) in and to the Debtor's membership interests in YG WV  would not be treated as Excluded Assets under the Investment Agreement or the Plan.

Second, the First Investment Agreement Amendment revised the corresponding definition of "William Vale Purchase" under the Investment Agreement to provide for an additional $200,000 to be provided by the Sponsor as consideration for the Debtor's indirect interest in the William Vale hotel should the Sponsor consummate the William Vale Purchase and provided a mechanism for the Debtor to effectuate a separate stand-alone sale of its indirect interest in the William Vale hotel if the Closing Date under the Investment Agreement does not occur on or prior to the Outside Date and the William Vale Purchase occurs thereafter.

Third, the First Investment Agreement Amendment extended the deadline for the Parties to agree on a form of Plan to be annexed to the Investment Agreement to May 10, 2022.  The First Investment Agreement Amendment further provided that the Debtor's membership interests in YG WV will remain as "Excluded Assets" under the Investment Agreement and neither the Debtor nor Wind-Down Co will have any obligation to transfer the Debtor's interest in the William Vale if either (i) the MLPSA expires or is terminated according to its terms or (ii) the Closing Date under the Investment Agreement has not occurred by December 31, 2022.

*Amendment No. 2 to Investment Agreement*

On May 27, 2022, the Debtor, the Sponsor, and the Notes Trustee entered into that certain Amendment No. 2 to the Investment Agreement (the "**Second Investment Agreement Amendment**" and, together with the First Investment Agreement Amendment, the "**Investment Agreement Amendments**"), which amended the Investment Agreement and the Escrow Agreement (as defined in the Investment Agreement) to permit the Debtor to draw upon and borrow the "Escrowed Funds" to continue to fund its operations and the costs of administering the Chapter 11 Case and to be used in accordance with the DIP Order, the DIP Term Sheet, and the DIP Budget (each as defined below).

The Escrowed Funds and the Guaranty (each as defined below) were delivered into escrow by the Sponsor on May 17, 2022 according to the terms of the Investment Agreement.

The following chart summarizes certain of the material terms of the Investment Agreement, as amended by the Investment Agreement Amendments:[13]

---

[13]    All capitalized terms set forth in this Section shall have the meanings ascribed to them in the Investment Agreement unless otherwise defined herein.  In the event of any inconsistencies between the provisions of the Investment Agreement and the general description of such agreement set forth herein, the Investment Agreement shall control.

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| **Sponsor** | Paragraph Partners, LLC |
| **Equity Interests in the Reorganized Debtor and Purchase Price (Agreement §§ 2.01, 3.01)** | In exchange for 100% of the equity in the Reorganized Debtor, the Sponsor will contribute (collectively, the "**Plan Consideration**"):<br><br>(a) a cash payment in the amount of $40 million (the "**Cash Payment**");<br><br>(b) promissory notes to be issued by the Reorganized Debtor (the "**New Notes**") in the aggregate principal amount of $20 million or, if the Sponsor or an affiliate thereof effects the William Vale Purchase, $22 million (subject to a Purchase Price Adjustment); and<br><br>(c) the Reorganized Debtor will assume all unsecured claims against the Debtor, other than:<br><br>   (i) the claims of the Noteholders;<br><br>   (ii) claims either subject to subordination pursuant to section 510(b) of the Bankruptcy Code or that arise out of a purchase, sale, or issuance or offer of a security of the Debtor, including any claims asserted in any class action lawsuits in Israel;<br><br>   (iii) claims brought by any plan administrator in connection with prior chapter 11 cases of the Debtor's former direct or indirect subsidiaries; and<br><br>   (iv) claims of the Debtor's current or former directors and officers for indemnification. |
| **Purchase Price Adjustments (Agreement § 2.02)** | In the event that the Sponsor or an Affiliate thereof purchases substantially all of the rights of the Notes Trustee for the Series C Notes in and to the William Vale Hotel (the "**William Vale Purchase**") (whether prior to, on, or after the Closing Date), including, but not limited to, the Notes Trustee's rights in and to that certain Amended and Restated Promissory Note, dated February 28, 2017, originally between the Debtor and Wythe Berry Fee Owner and that certain loan originally made by the Debtor to Wythe Berry Fee Owner in the original principal amount of $166,320,000.00, then (i) the aggregate principal amount of the New Notes provided as part of the Purchase Price for the Transactions shall be increased from $20,000,000 to $22,000,000 and (ii) the Plan shall require the Sponsor to pay to Wind Down Co an additional $200,000 (the "**Shares Consideration**") on the later date to occur of the Closing Date and the WV Sale Date (as defined below). If the Closing Date does not occur on or prior to the Outside Date and the WV Sale Date occurs thereafter, the Debtor agrees to sell the Debtor's membership interests in YG WV to the Sponsor for $200,000 (in lieu of the adjustment to the Cash Payment set forth in subset (ii) in the immediately preceding sentence) and to use commercially reasonable efforts to seek any necessary approvals to consummate such sale, including any approvals of the Bankruptcy Court and BVI Court, as necessary.<br><br>Between March 2, 2022 and nine months following the Closing, if the Sponsor discovers that the actual percentage of the Debtor's direct or indirect equity interest or ownership interest in a Subsidiary or any Owned Real Property, as applicable, is less than as stated in the Investment Agreement, the aggregate principal amount of the New Notes will be reduced in accordance with a specified formula.  In the worst case, if the aggregate Subsidiary Value Reduction exceeds $7.25 million, the aggregate principal amount of the New Notes will be reduced on a dollar-for-dollar basis up to the total value of the New Notes.  To the extent the Subsidiary Value Reductions are equal to or |

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

| MATERIAL TERMS OF INVESTMENT AGREEMENT ||
|---|---|
| | lesser than $4.25 million, no adjustment will be made to the aggregate principal amount of the New Notes. |
| **Excluded Assets**<br>**(Agreement § 2.01, Annex A)** | Under the Investment Agreement, the Sponsor is not purchasing or receiving, directly or indirectly, any "Excluded Assets," which include, but are not limited to:<br><br>(a) the Debtor's right in and to:<br><br>    (i) collateral securing the Series C Notes and Series E Notes;<br><br>    (ii) the membership interests in YG WV (subject to the limitation set forth below); and<br><br>    (iii) the assets set forth in the DCP-All Year Recapitalization Agreement;<br><br>(b) any and all claims that the Debtor or the Noteholders may have against third-parties, including any current or former officer, director, or shareholder of the Debtor (subject to certain releases); and<br><br>(c) the assets vested in Wind Down Co pursuant to a chapter 11 plan.<br><br>Notwithstanding the above, to the extent that the Sponsor effects the William Vale Purchase (as defined herein) (whether prior to, on, or after the Closing Date, but only until the expiration or termination by its terms of that certain Mortgage Purchase and Sale Agreement entered into by and between the Notes Trustee and the Sponsor (as amended on May 24, 2022, and as may be further amended, modified, or supplemented from time to time the "**MLPSA**")), the Debtor's direct or indirect rights (including the right to receive any income or proceeds) in and to the Debtor's membership interests in YG WV shall not be Excluded Assets under the Investment Agreement or under a chapter 11 plan, and any chapter 11 plan shall provide for the automatic vesting of such assets in the Reorganized Debtor upon the later of the MLPSA closing date (the "**WV Sale Date**") and, to the extent that such WV Sale Date is after the Closing Date, the payment of the Shares Consideration, provided that the Debtor's membership interests in YG WV shall remain Excluded Assets under the Investment Agreement and a chapter 11 plan and neither the Debtor nor Wind Down Co shall have any obligation under the Investment Agreement with respect to a transfer of such interests if either (i) the MLPSA expires or is terminated according to its terms or (ii) the Closing Date has not occurred by December 31, 2022. |
| **Escrowed Funds and**<br>**Guaranty**<br>**(Agreement § 3.02)** | Within five business days of the later of the date upon which (a) the Bankruptcy Court approves the Break-Up Fee and (b) a chapter 11 plan that is reasonably satisfactory to the Sponsor and otherwise complies with the terms of the Investment Agreement is annexed thereto, the Sponsor will (i) transfer $4.5 million to an Escrow Agent (the "**Escrowed Funds**") and (ii) deliver an executed joinder to the Investment Agreement (the "**Guaranty**").<br><br>The Escrowed Funds will be either:<br><br>(a) applied at Closing towards the Cash Payment if the Closing occurs;<br><br>(b) delivered to the Debtor if the Investment Agreement is terminated by the Debtor due to the Sponsor's failure to close the transaction; or<br><br>(c) returned to the Sponsor if the Investment Agreement is terminated for any reason other than the Sponsor's failure to close the transaction.<br><br>Notwithstanding anything to the contrary contained in the Investment |

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| | Agreement, the Debtor shall be permitted, in accordance with the terms of (a) that certain DIP Term Sheet dated as of May 5, 2022 (the "**DIP Term Sheet**") by and between the Debtor and the Sponsor and (b) the order of the Bankruptcy Court authorizing the Company to, among other things, borrow funds in accordance with the DIP Term Sheet (the "**DIP Order**"), make one or more requests to draw upon all or part of the Escrowed Funds by delivering a written certification to the Escrow Agent in accordance with the DIP Term Sheet, the provisions of the Escrow Agreement, and the DIP Order. Any such drawn Escrowed Funds shall be utilized by the Debtor solely in accordance with the DIP Documents (as defined in the DIP Term Sheet), including without limitation, the DIP Budget (as defined in the DIP Term Sheet). Notwithstanding that the Debtor may draw upon and utilize the Escrowed Funds in accordance with the DIP Documents (including the DIP Budget), (i) such funds shall continue to be treated as Escrowed Funds for the purposes of the Investment Agreement and (ii) the provisions of Section 3.02 of the Investment Agreement, including the provisions governing the rights and obligations of the Parties with respect to the Escrowed Funds in the event (x) the Closing occurs or (y) the Closing does not occur and the Investment Agreement is terminated, shall continue in full force and effect. For the avoidance of doubt, if the Investment Agreement is terminated for any reason other than as set forth in Section 3.02(b) of the Investment Agreement, the repayment to the Sponsor of any amounts drawn by the Debtor under the DIP Loan in accordance with the DIP Documents shall be applied and treated as payment and delivery by the Debtor of Escrowed Funds in accordance with the Investment Agreement. Pursuant to Section 3.02(b) of the Investment Agreement, if the Investment Agreement is terminated by the Company pursuant to Section 11.01(c) thereof, the Debtor shall be entitled to retain the DIP Loan Proceeds and shall have no further obligations to the Sponsor Investor hereunder with respect to such proceeds. |
| **Indemnification, Exculpation and Release (Agreement § 7.02(b), (c))** | Effective as of the Closing and, with respect to the Notes Trustee and the Noteholders only if Noteholder Plan Approval (as defined below) is obtained: <br><br> (a) the Sponsor and its affiliates will grant customary releases to Wind Down Co, the Notes Trustee, the Noteholders, their affiliates, and any current or former officer, director, manager, employee, counsel, financial advisor, agent or representative of the Debtor, Wind Down Co, the Notes Trustee, the Noteholders, and their affiliates. <br><br> (b) Wind Down Co, the Notes Trustee, and the Noteholders and their affiliates will grant customary releases to the Sponsor, its affiliates, the Transferred Entities, and any current or former officer, director, manager, employee, counsel, financial advisor, agent or representative of the Sponsor or its affiliates. <br><br> (c) The parties have agreed to indemnify and hold harmless each other party against any losses arising out of or in connection with any third-party indemnification or contribution claims. <br><br> (d) For the avoidance of doubt, neither Yoel Goldman, Tzipporah Goldman, nor any entity under their control or ownership (other than the Transferred Entities) will be granted a release and all rights and remedies are preserved. |
| **Noteholder Plan Approval and Bankruptcy Milestones** | Within 60 days of the date upon which the Escrowed Funds and the Guaranty are delivered to the Escrow Agent (the "**Escrow Date**"), the Notes Trustee will |

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| **(Agreement §§ 8.01(c), 8.03)** | convene a Noteholder Meeting to vote on the approval the transactions contemplated by the Investment Agreement (in the event that such vote is affirmative, the "**Noteholder Plan Approval**"); *provided that*, if (a) the Debtor has filed a motion to approve a disclosure statement pertaining to an agreed upon chapter 11 plan within 14 days of the Escrow Date and (b) the Debtor seeks approval of disclosure materials in an Israeli proceeding within 7 days following the entry of an order approving such disclosure statement, then such period will be automatically extended by up to 90 days.  If the Noteholder Plan Approval is not obtained on a final basis at such meeting, the Investment Agreement will automatically terminate and the Escrowed Funds shall be returned to the Sponsor. |
| | The Debtor will use commercially reasonable efforts to comply with the following Bankruptcy Milestones: |
| | (a) by August 8, 2022, have a hearing to consider confirmation of an agreed upon chapter 11 plan; and |
| | (b) by August 23, 2022, obtain entry of an order confirming an agreed upon chapter 11 plan. |
| | The Bankruptcy Milestones are subject to any extension of the time in which the Noteholder Meeting must be held, and may be extended: |
| | (a) upon mutual agreement of the parties; or |
| | (b) to accommodate the availability of the Bankruptcy Court. |
| **Conditions to Closing (Agreement § 10.01)** | The Closing is conditioned on, among other things: |
| | (a) the Bankruptcy Court's entry of an order confirming an agreed upon chapter 11 plan and the absence of a stay of such order; |
| | (b) Israeli Court approval of the Investment Agreement and the Plan under applicable provisions of the Israeli Insolvency Law 2018; |
| | (c) BVI Court approval of the Investment Agreement, as reflected in a confirmed chapter 11 plan and an order confirming same; and |
| | (d) the Sponsor's receipt of the release set forth in the Investment Agreement (as described above) from or on behalf of the Notes Trustee and the Noteholders. |
| **Termination and "Fiduciary Out" (Agreement § 11.01)** | The Investment Agreement may be terminated before the Closing: |
| | (a) by the mutual written consent of the Debtor and the Sponsor; |
| | (b) by the Debtor, if its fiduciaries determine in good faith that continued performance under the Investment Agreement would be inconsistent with the exercise of their fiduciary duties under applicable Law; |
| | (c) by either party, if the Closing shall not have occurred by September 23, 2022, *provided that*: |
| | (i) if Closing has not occurred due to unsatisfied Closing Conditions relating to obtaining government approvals, entry of an order confirming an agreed upon chapter 11 plan, Israeli Court approval, or BVI court approval, then no party may terminate the Investment Agreement prior to December 31, 2022; and |
| | (ii) if Closing has not occurred on or before September 23, 2022 or December 31, 2022, as applicable, due to a material breach of the |

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

| MATERIAL TERMS OF INVESTMENT AGREEMENT | |
|---|---|
| | Investment Agreement, then the breaching party may not terminate the Investment Agreement; |
| | (d) by either party, in the event that: |
| | (i) any governmental authority has issued a final, non-appealable order permanently enjoining the transaction; |
| | (ii) the Bankruptcy Court does not approve the Break-Up Fee by April 25, 2022; or |
| | (iii) a mutually acceptable chapter 11 plan is not annexed to the Investment Agreement by May 10, 2022. |

### 6.    Approval of the Bid Protections

The Investment Agreement provides the Sponsor with the following standard bid protections (collectively, the "**Bid Protections**"):

(a)    <u>Break-Up Fee</u>.    In the event that (A) the Investment Agreement is terminated (I) by the Debtor in exercising its "fiduciary out" under Section 11.01(b) or (II) by the Sponsor under Section 11.01(c) due to Debtor's breach of a representation or warranty or failure to comply with a covenant or agreement that would prevent the satisfaction of a closing condition, and (B) within six (6) months of such termination, the Debtor engages in an alternative transaction, through a chapter 11 plan or otherwise (an "**Alternative Transaction**"), whereby a purchaser purchases substantially all of the Transferred Entities through one or a series of substantially contemporaneous transactions, then the Sponsor shall be entitled to a break-up fee in the amount of $1,800,000; *provided that*, if the Debtor does not engage in an Alternative Transaction during such 6-month period, but still confirms a chapter 11 plan that is expected to provide a recovery to the Noteholders in an amount equal to or greater than $30,000,000 within twelve (12) months of confirmation thereof, then the Sponsor shall instead be entitled to a Break-Up Fee in the amount of $900,000 (the "**Break-Up Fee**"); and

(b)    <u>Expense Reimbursement</u>.    In the event that the Investment Agreement is terminated (A) by the Debtor in exercising its "fiduciary out" under Section 11.01(b) or (B) by the Sponsor pursuant to Section 11.01(c) due to Debtor's breach of a representation or warranty or failure to comply with a covenant or agreement that would prevent the satisfaction of a closing condition, and no Break-Up Fee could be due and owing under the terms of Section 8.01(a) of the Investment Agreement, then the Sponsor shall be entitled to an expense reimbursement (the "**Expense Reimbursement**") in the amount of up to $300,000 for reasonable and documented fees and expenses incurred by the Sponsor in connection with the documentation

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

and negotiation of the Investment Agreement and the transactions contemplated thereunder.

As set forth above, the Investment Agreement provides the Parent Debtor with a "fiduciary out" should the Parent Debtor determine, in the exercise of its fiduciary duties, to proceed with an alternative transaction. The Parent Debtor is not subject to a "no shop" or any other provision restricting its ability to consider any alternative offers that may be presented during the Chapter 11 Case. The Sponsor is not entitled to payment of a Break-Up Fee in the event the Debtor is unable to confirm a chapter 11 plan that vests the Debtor's interest in YG WV in the Reorganized Debtor.

The Investment Agreement required the Debtor to file a motion seeking approval of the Break-Up Fee and Expense Reimbursement protections within 14 days of execution. Accordingly, following the Investment Agreement's execution on March 11, 2022, the Debtor filed the *Motion of Debtor Pursuant to 11 U.S.C. 105(a), 363, and 503(b) and Fed. R. Bankr. P. 2002, 6004, and 9014 for Entry of Order (I) Approving Bid Protections and (II) Granting Related Relief* [ECF No. 66] on March 25, 2022. On April 19, 2022, the Bankruptcy Court entered an order approving the Bid Protections [ECF No. 85].

### 7.    Retention of Professionals

To effectively and efficiently administer the Chapter 11 Case, the Debtor has retained various professionals, including (i) Weil, Gotshal & Manges LLP, as lead counsel to the Debtor, (ii) Meridian, as exclusive real estate broker to the Debtor, (iii) CFGI, as financial advisor to the Debtor, (iv) Donlin, Recano & Company, Inc., as solicitation and voting agent for the Debtor, (v) Koffsky Schwalb LLC, as special counsel for the Debtor, (vi) Bartov & Co., as special Israeli counsel for the Debtor, and (vii) certain other professionals that the Debtor engages in the ordinary course of its business, including (a) Archer & Greiner PC and (b) Conyers Dill & Pearman.

### 8.    Extension of the Debtor's Exclusive Time to File and Solicit a Chapter 11 Plan

On April 6, 2022, the Debtor filed the *Motion of Debtor Pursuant to 11 U.S.C. § 1121(d) to Extend Exclusive Periods* [ECF No. 70] (the "**Exclusivity Extension Motion**") seeking (i) an extension from April 13, 2022 to August 11, 2022 of the Bankruptcy Code's initial 120-day period during which time the Debtor has the exclusive right to file a chapter 11 plan, and (ii) an extension from June 13, 2022 to October 11, 2022 of the Bankruptcy Code's initial 180-day period during which time the Debtor has the exclusive right to solicit acceptance of a chapter 11 plan. By order dated April 19, 2022 [ECF No. 86], the Bankruptcy Court approved the Exclusivity Extension Motion.

### 9.    The William Vale Purchase

The Debtor, the Notes Trustee, and the Sponsor have finalized the terms of a value-maximizing sale transaction concerning the William Vale hotel. After engaging in discussions with various parties for approximately one year, the Notes Trustee, on behalf of the Series C Noteholders,

considered two final offers to purchase the Series C Noteholders' rights, title, and interest in the Loan and Mortgage. The first offer was from Weiss, the 50% owner of the indirect parent of the William Vale hotel, and the other offer was from the Sponsor.

The terms of the Debtor's agreement with the Sponsor are set forth in the Investment Agreement. The purchase price offered by Weiss was $2.2 million, and the Sponsor's offer was also $2.2 million, comprised of a $2,000,000 increase in the principal amount of the New Notes to be issued by the Reorganized Debtor under the Plan for the benefit of impaired unsecured claims and the payment of an additional $200,000 to the Debtor as consideration for its direct equity interest in YG WV. Further, the Sponsor's offer to purchase the Loan and Mortgage will also result in a reduction of the Series C Notes Claims under the Plan. Mr. Weiss disagrees with the Debtor's characterization of the Sponsor's offer.

The Series C Noteholders' vote to consider the two final offers was originally scheduled to be held on April 26, 2022, but was delayed several times to allow the two final bidders an opportunity to increase and refine their final bids. Following further negotiations and discussions among the parties, a vote was held on May 8, 2022, at which time participating Series C Noteholders holding 93% of participating principal voted to approve the offer from the Sponsor to purchase the Series C Noteholders' interest in the Loan and Mortgage. Following the vote, Weiss submitted a further revised offer, which the Series C Noteholders rejected and determined to proceed with the Sponsor's approved offer. Weiss maintains that he continues to remain interested in potentially purchasing the Debtor's interest in YG WV.

The offer from the Sponsor provides that the Sponsor will purchase the Series C Noteholders' rights, title, and interest in the Loan and Mortgage for $158,612,112[14]. As set forth above, in accordance with the Investment Agreement, the Sponsor has agreed, upon consummation of the William Vale Purchase, to increase the principal amount of the New Notes that will be issued by the Reorganized Debtor under the Plan for the benefit of impaired unsecured claimholders by an additional $2,000,000. The Sponsor has also agreed to pay an additional $200,000 to the Debtor as consideration for the Debtor's direct equity interest in YG WV, the non-debtor subsidiary of the Debtor that owns the 50% interest in the entity that owns the William Vale hotel, which shall be effectuated either (i) pursuant to the Plan, together with the other assets to be acquired by the Sponsor, or (ii) in the case of a closing of the MLPSA following the effective date of the Plan, pursuant to a stand-alone sale transaction.

The terms of the agreement between the Series C Noteholders and the Sponsor were memorialized in the MLPSA. In accordance with the MLPSA, the Sponsor has provided a $7.5 million deposit. The outside date for the closing of the William Vale Purchase under the MLPSA is July 24, 2022.

---

[14] The Sponsor subsequently increased the offer for the Series C Noteholders' interest in the William Vale mortgage and loan to $158,612,112, subject to the Series C Noteholders' willingness to assign certain additional claims to the Sponsor under the MLPSA. The Sponsor and the Trustee, on behalf of the Series C Noteholders, entered into a Statement of Obligation on May 12, 2022 which set forth the amendments to the MLPSA to reflect such increased consideration and such additional claim assignment. The Series C Noteholders subsequently voted to approve the Statement of Obligation, which amended the terms of the MLPSA without further action by any party thereto.

The Debtor, the Notes Trustee, and the Sponsor entered into the First Investment Agreement Amendment described in Subsection 5 above. ~~Accordingly, the parties anticipate that~~, which describes the transactions contemplated with respect to the Debtor's ~~direct~~ interest in YG WV ~~will remain with, and vest in, the Reorganized Debtor pursuant to the Plan in the same manner as the Debtor's other equity holdings in its subsidiaries~~.

Weiss disputes the legality of the proposed William Vale Purchase and has commenced an adversary proceeding with the Bankruptcy Court by filing a complaint on July 5, 2022, seeking to enjoin the Debtor from consummating a transaction involving its interest in YG WV.  As part of his complaint, Weiss contends, among other things, that the ~~vesting of the Debtor's interest in YG WV in the Reorganized Debtor under the Plan~~proposed transaction violates the restrictions set forth in the limited liability company operating agreement for Wythe Berry Member ~~because~~and that YG WV is incapable of effectuating the proposed transaction because it has been dissolved as a matter of law~~, and, therefore is incapable of effectuating the proposed transaction~~.  The Debtor disputes the allegations in Weiss's complaint and, pursuant to the Court's docket entry, the Debtor~~'s response~~believes its answer to the complaint is currently due August 15, 2022.  Weiss has stated that he believes the Debtor's answer is due August 5, 2022.  The adversary proceeding is titled *Zelig Weiss v. All Year Holdings Limited, Wythe Berry Member LLC, and YG WV LLC,* Adv. Pro. 22-01115 (Bankr. S.D.N.Y. July 5, 2022).  The Debtor believes that consummation of the William Vale Purchase and the sale of the Debtor's interest in YG WV are not conditions precedent to confirmation of the Plan or the occurrence of the Effective Date.  In addition, the Debtor believes that the Sponsor does not have the right to terminate the Investment Agreement if the relevant parties fail to close on the MLPSA or if the Debtor is unable to deliver its interest in YG WV until after the Effective Date or at all.  The Sponsor reserves all of its rights with respect to the foregoing.

## 10.    Debtor in Possession Financing

On May 5, 2022, the Debtor filed the *Motion of Parent Debtor for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 364, and 507 (I) Authorizing Parent Debtor to Use Escrowed Funds, (II) Providing Superpriority Administrative Expense Claim Status, and (III) Granting Related Relief* [ECF No. 92] (the "**DIP Motion**") seeking entry of an order (i) authorizing the Debtor to enter into a multiple draw debtor-in-possession term loan in an aggregate principal amount of up to $4,500,000.00 (the "**DIP Loan**") made available to the Debtor and funded with "Escrowed Funds," as defined in that Investment Agreement, (ii) authorizing the Debtor to borrow under the DIP Loan and to incur all obligations owing thereunder and under the DIP Documents to the Sponsor (the "**DIP Obligations**"), (iii) authorizing the Debtor to, subject to the Carve-Out (as defined in the DIP Motion), grant a superpriority administrative expense claim to the Sponsor for all DIP Obligations, (iv) authorizing and directing the Debtor to pay the principal, interest, fees, and expenses payable under and in accordance with the DIP Documents, and (v) granting related relief.

As set forth above, any such drawn Escrowed Funds are required to be utilized by the Debtor solely in accordance with the DIP Documents (as defined in the DIP Term Sheet), including without limitation, the DIP Budget (as defined in the DIP Term Sheet).  Notwithstanding that the Debtor may draw upon and utilize the Escrowed Funds in accordance with the DIP Documents (including the DIP Budget), (i) such funds shall continue to be treated as Escrowed Funds for the

purposes of the Investment Agreement and (ii) the provisions of Section 3.02 of the Investment Agreement, including the provisions governing the rights and obligations of the Parties with respect to the Escrowed Funds in the event (x) the Closing occurs or (y) the Closing does not occur and the Investment Agreement is terminated, shall continue in full force and effect. For the avoidance of doubt, if the Investment Agreement is terminated for any reason other than as set forth in Section 3.02(b) of the Investment Agreement, the repayment to the Sponsor of any amounts drawn by the Debtor under the DIP Loan in accordance with the DIP Documents shall be applied and treated as payment and delivery by the Debtor of Escrowed Funds in accordance with the Investment Agreement. Pursuant to Section 3.02(b) of the Investment Agreement, if the Investment Agreement is terminated by the Company pursuant to Section 11.01(c) thereof, the Debtor shall be entitled to retain the DIP Loan Proceeds and shall have no further obligations to the Sponsor Investor hereunder with respect to such proceeds.

The BVI Court entered an order on May 24, 2022 authorizing the Debtor's entry into the DIP Loan, subject to the Bankruptcy Court's approval of the DIP Motion. The Bankruptcy Court entered an order approving the DIP Motion on May 27, 2022 [ECF No. 120].

## 11.    Timetable for Debtor's Restructuring

### i.    Timetable for the U.S. Chapter 11 Case

In accordance with the Investment Agreement, the Debtor is obligated to proceed with the prompt implementation of the transactions contemplated thereunder through the Plan. Among the milestones contained in the Investment Agreement is the requirement that a hearing on confirmation of a plan must be held by August 8, 2022 and that the Debtor must obtain entry of an order confirming the plan by August 23, 2022. These deadlines, however, may also be extended in certain circumstances. Upon obtaining approval of the Plan from the Bankruptcy Court, the parties anticipate that further approvals from the courts in the BVI and Israel will be necessary prior to closing under the Investment Agreement. The anticipated timeline for obtaining the necessary approvals in the BVI and Israel is summarized below.

### ii.    Timetable for the Israeli Recognition Proceeding

On April 14, 2022, with the consent of the JPLs and approval of the BVI Court, the Debtor commenced the Israeli Recognition Proceeding with the Israeli Court. An order recognizing the Chapter 11 Case as the foreign main proceeding was entered by the Israeli Court on May 4, 2022.

The Debtor commenced the Israeli Recognition Proceeding in furtherance of its efforts to achieve a global resolution of Claims against, and Interests in, the Debtor, including with respect to the Debtor's various series of Notes. In addition, as the Debtor is a reporting company in Israel, the Debtor determined that it was necessary to commence the Israeli Recognition Proceeding to obtain court approval to convene the Noteholder Meeting to vote on the Plan and the Investment Agreement.

As further set forth in Article XI, following approval of this Disclosure Statement by the Bankruptcy Court, the Debtor intends to file a motion with the Israeli Court seeking authorization to convene the Noteholder Meeting. A Hebrew translation of this Disclosure

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

Statement and other solicitation materials, as approved by the Bankruptcy Court, will be attached to the summons of the Noteholder Meeting. Following the Israeli Court Approval Date, the Debtor will commence its solicitation of votes on the Plan.

In addition, following entry of the Confirmation Order, the Debtor plans to file a motion with the Israeli Court seeking recognition of the Plan and the Confirmation Order.

iii.    Timetable for the BVI Plan of Arrangement and BVI Proceeding

The Debtor has filed a motion seeking authority from the BVI Court to implement the BVI Plan of Arrangement following which, and subject to the occurrence of the Plan Effective Date, among other things, (i) the existing equity interests in the Debtor will be cancelled, and (ii) one hundred percent of the equity in the Reorganized Debtor will be held by the Sponsor. A hearing before the BVI Court on the Debtor's application to approve the BVI Plan of Arrangement is scheduled for July 21, 2022. Subject to BVI Court approval, it is anticipated that the JPLs authority to act on behalf of or to bind the Reorganized Debtor will terminate on the Plan Effective Date. Following entry of the Confirmation Order by the Bankruptcy Court, the Debtor will file an application with the BVI Court seeking authorization to terminate the JPL Appointment.

A chart summarizing certain key dates and deadlines with respect to the Chapter 11 Case and the proceedings in Israel and the BVI is set forth below:

| Anticipated Timetable[15] | |
| --- | --- |
| Estimated Date for Obtaining BVI Court Approval of Plan of Arrangement | July 29, 2022 |
| Deadline for Debtor to Submit Opening Brief, Declarations and Other Affirmative Evidence in Support of Plan Confirmation | August 29, 2022 at 5:00 p.m. (Eastern Time) |
| Plan Supplement Filing Deadline | September 12, 2022 |
| Plan Voting Deadline | September 19, 2022 at 5:00 p.m. (Eastern Time) |
| ~~Plan Confirmation Objection~~ Deadline to Submit Objections, Declarations and Other Evidence in Opposition to Confirmation | September 19, 2022 at 5:00 p.m. (Eastern Time) |
| ~~Reply~~ Deadline ~~for~~ to Submit Reply and Rebuttal | September 29, 2022 at 5:00 p.m. |

_____

[15] The following dates and deadlines are subject to Bankruptcy Court approval and the Bankruptcy Court's availability and remain subject to change in accordance with the Investment Agreement and otherwise applicable law, including the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

| Anticipated Timetable[15] | |
|---|---|
| Evidence in Response to Plan Objections | (Eastern Time) |
| Plan Confirmation Hearing | October 6, 2022 at 10 a.m. (Eastern Time) |
| Estimated Date for Obtaining Israeli Court Recognition of Plan and Confirmation Order | October 13, 2022 |
| BVI Hearing to Approve Termination of JPL Appointment | October 17, 2022 |
| Target Plan Effective Date / Closing Date | October 20, 2022 |

## V.
## PENDING LITIGATION

### A.    Summary of Pending Litigation

There is pending litigation in various civil actions involving the Debtor in Kings County Supreme Court of New York State (the "**Kings County Supreme Court**") and the Israeli Court. To the extent that these asserted Claims (and any other contingent, unliquidated or disputed Claims) are not timely liquidated, the Debtor may seek to have them estimated for Plan confirmation purposes. The Debtor, however, cannot predict with certainty the outcome or effect of pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from the Debtor's current assessment.

The following is a summary of each of the prepetition litigations involving the Debtor and the classification of any claims related to such litigation under the Plan:

a.  *All Year Holdings Limited individually and on behalf of Lofts on Devoe Residence LLC v. Abraham Greenhut, et al.* (Index No. 52871/2021): On November 9, 2021, the Debtor filed an action in Kings County Supreme Court against Abraham Greenhut ("**Greenhut**") and Devoe Residence LLC, an entity controlled by Greenhut ("**Devoe Residence**" and together with Greenhut, the "**Devoe Defendants**"), seeking to quiet title on a property located at 17 Devoe Street, Brooklyn, New York (the "**Devoe Property**" and the litigation proceeding, the "**Greenhut Action**"). The Devoe Property is owned by Lofts on Devoe LLC, a non-debtor entity whose membership interests are held 50% by the Debtor and 50% by Greenhut. The complaint filed in the Greenhut Action alleges that Greenhut executed a deed unilaterally transferring the Devoe Property to Devoe Residence without authorization from the Debtor.

b.  *Taz Partners LLC v. Yoel Goldman and All Year Holdings Limited* (Index No. 564/2021): As set forth above, on December 13, 2021, the Debtor became aware of a $37 million judgment entered against it in Kings County Supreme Court on December 9, 2021, resulting from outstanding confessions of judgment allegedly executed by the Sole Shareholder. This action has been stayed as to the Debtor. Any

claim arising out of or relating to the Taz Confession of Judgment will be treated as a Class 3 General Unsecured Claim under the Plan.

c.  DC (TA) *Public Representatives (Registered NGO) v. All Year Holdings, et. al.*, 15257-04-20 (January 15, 2019, updated April 16, 2020) (Isr.) and DC (TA) *Shachar Group LTD v. All Year Holdings, et. al.*, 3325-12-20 (December 1, 2020) (Isr.):  On January 15, 2019, Public Representatives (Registered NGO) filed a securities class action lawsuit against the Debtor and certain of its former officers and directors in the Economic Division of the District Court of Tel Aviv-Yafo in Israel (the class action lawsuit, the "**Public Representatives Class Action**").  In addition to the Public Representatives Class Action, the Debtor, along with certain of its former officers and directors, is a named defendant in a separate securities class action lawsuit filed by Shachar Group LTD in the Israeli Court on December 1, 2020 (the "**Shachar Group Class Action**" and, together with the Public Representatives Class Action, the "**Israeli Securities Actions**").  The Public Representatives Class Action and the Shachar Group Class Action were commenced by lead plaintiffs representing parties who purchased any series of bonds issued by the Debtor between (i) June 1, 2018 and November 30, 2018 and (ii) July 1, 2020 and November 29, 2020, respectively.  Each of the Israeli Class Actions is in its early stages and no class has been certified under applicable Israeli law in either case.  Further, both Israeli Class Actions are currently stayed.  Pursuant to the subordination provisions set forth in section 510(b) of the Bankruptcy Code, any Claims arising out of or related to the Israeli Securities Actions, including any claims for indemnification or contribution by any of the Debtor's current or former officer or director, will be treated as Class 5 Subordinated Securities Claims under the Plan.

d.  *Zelig Weiss v. All Year Holdings Limited, Wythe Berry Member LLC, and YG WV LLC,* Adv. Pro. 22-01115 (Bankr. S.D.N.Y. July 5, 2022):  On July 5, 2022, Weiss commenced an adversary proceeding with the Bankruptcy Court by filing a complaint seeking to enjoin the Debtor from consummating a transaction involving its interest in YG WV.  As part of his complaint, Weiss contends, among other things, that the ~~vesting of the Debtor's interest in YG WV in the Reorganized Debtor under the Plan~~proposed transaction violates the restrictions set forth in the limited liability company operating agreement for Wythe Berry Member ~~because~~and that YG WV is incapable of effectuating the proposed transaction because it has been dissolved as a matter of law~~, and, therefore is incapable of effectuating the proposed transaction~~. The Debtor disputes the allegations in Weiss's complaint and, pursuant to the Court's docket entry, the Debtor~~'s response~~believes its answer to the complaint is currently due August 15, 2022.  Weiss has stated that he believes the Debtor's answer is due August 5, 2022.

## B.    BVI Omnibus Settlement Authority Order

On April 29, 2022, the Debtor filed an application with the BVI Court seeking authority to take certain actions in connection with various negotiations and settlement discussions being conducted by the Debtor without further sanction of the BVI Court (the "**BVI Omnibus Settlement Application**").  The Debtor is in the process of negotiating with various property-

level partners regarding a potential sale of the Debtor's interests in certain PropCos.  In addition, as set forth above, the Debtor and certain of its non-debtor subsidiaries are involved, either directly or indirectly, in various legal proceedings that the Debtor may seek to resolve in advance of confirmation of the Plan.  Pursuant to the BVI Omnibus Settlement Application, the Debtor requested the sanction of the BVI Court to continue such discussions and finalize any necessary transaction or settlement agreements in connection therewith.  The BVI Court entered an order approving the BVI Omnibus Settlement Application on June 13, 2022.

## VI.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A.**  This summary is qualified in its entirety by reference to the Plan.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the Plan, and contains other provisions necessary to implement the Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of claims and equity interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

### A.    Administrative Expense and Priority Claims

#### 1.    Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim), shall receive from the Plan Administrator, in full and final satisfaction, settlement, and release of such Claim against the Debtor, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.  Amounts sufficient for the Plan Administrator to pay in full all Allowed Administrative Expense Claims that are the responsibility of Wind-Down Co in accordance with Section 2.1 of the Plan, including all Fee Claims and any and all other amounts that may become due and payable in connection with the BVI Proceeding and the Israeli Proceeding, shall be funded on the Effective Date from, at the option of the Debtor, either: (i) the Debtor's cash on hand, or (ii) the Sponsor Contribution, provided that the Reorganized Debtor shall have a positive cash balance on the Effective Date.  The Reorganized Debtor shall pay compensation for services rendered to it and reimbursement of expenses incurred on its behalf from and after the Effective Date in the ordinary course.

### 2.      Fee Claims

All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, and counsel for the Plan Administrator on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date. Objections to any Fee Claims must be filed and served on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, counsel for the Plan Administrator, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtor and the party requesting compensation of a Fee Claim, or as approved by the Court).

Allowed Fee Claims shall be paid in full, in Cash, by the Plan Administrator in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor, Reorganized Debtor or the Plan Administrator.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.  The Reorganized Debtor shall have no liability for payment of any Fee Claims.

No later than 10 days prior to the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services prior to the Effective Date to the Debtor and the Notes Trustee and the Debtor (or Plan Administrator if applicable) shall, subject to the Plan, separately escrow from funds of the Debtor such estimated amounts in a Professional Fees Escrow Account for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtor or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim, and provide notice thereof to the Notes Trustee.  The Professional Fees Escrow Account shall be treated as a trust account for the benefit of holders of Fee Claims and otherwise subject to the terms of the Plan.  When all such Allowed Fee Claims have been paid in full, any remaining amount in a Professional Fees Escrow Account shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, Wind-Down Co for distribution in accordance with the terms of the Plan without any further action or order of the Bankruptcy Court.

The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date, including for services rendered or expenses incurred by the professionals of the Debtor or Wind-Down Co, as applicable, in the ordinary course and without the need for Bankruptcy Court approval.

### 3.      Priority Tax Claims

Except to the extent that a holder of a Priority Tax Claim agrees to less favorable treatment, Priority Tax Claims shall be satisfied, disputed, pursued, or otherwise reconciled in the ordinary

course by the Reorganized Debtor.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Tax Claim available to the Debtor.

### B.      Classification of Claims and Interests

#### 1.      Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

#### 2.      Summary of Classification

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

**Claims Against and Interests in the Debtor**

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| 4 | Remaining Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |
| 6 | Equity Interests | Impaired | No (Deemed to reject) |

#### 3.      Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing in the Plan shall affect the rights of the Debtor or the Reorganized Debtor, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

#### 4.      Elimination of Vacant Classes

Any Class of Claims against the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### 5.    Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

### 6.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

The Debtor shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that rejects or is deemed to reject the Plan. The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## C.    Treatment of Claims and Interests

### 1.    Priority Non-Tax Claims (Class 1)

Except to the extent that a holder of a Priority Non-Tax Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Priority Non-Tax Claims in the ordinary course.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Non-Tax Claim available to the Debtor.  The Debtor does not believe there are any Priority Non-Tax Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan.

### 2.    Other Secured Claims (Class 2)

Except to the extent that a holder of an Other Secured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  On and after the Effective Date, the Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile Other Secured Claims in the ordinary course.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Other Secured Claim available to the Debtor. The Debtor does not believe there are any Other Secured Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan.

### 3.    General Unsecured Claims (Class 3)

Except to the extent that a holder of a General Unsecured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of an Allowed General Unsecured Claim are unaltered by the Plan.  On and after the Effective Date, the

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

Reorganized Debtor shall continue to satisfy, dispute, pursue, or otherwise reconcile each General Unsecured Claim in the ordinary course of business. The Debtor is not aware of any Class 3 General Unsecured Claims that may be asserted against it. However, the Sponsor's determination to assume any such Claims pursuant to the Investment Agreement will allow the Debtor to avoid the time and expense associated with fixing and prosecuting a bar date for filing proofs of Claim and undertaking a Claims reconciliation process. Given this, the Debtor has established a separate class for the General Unsecured Claims to the extent any such Claims are asserted against the Debtor.

### 4. Remaining Unsecured Claims (Class 4)

Except to the extent that a holder of an Allowed Remaining Unsecured Claim against the Debtor agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Allowed Remaining Unsecured Claim, each such holder shall receive (i) on the Effective Date, from the Disbursing Agent, its Pro Rata Share of the Class 4 ED Distribution and (ii) on such other date(s) as determined from time to time by the Plan Administrator, from Wind-Down Co, the amounts recovered, if any, from the Excluded Assets (including, but without limitation, from the prosecution of Avoidance Actions and other Causes of Action) and any remaining Wind Down Cash Funding. The right to the foregoing distributions shall be nontransferable except by will, intestate succession, or operation of law. Notwithstanding anything to the contrary in the Plan, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan, including for purposes of distributions under the Plan. The Debtor will file a motion to estimate or objection to such claims on proper notice to applicable parties.

### 5. Subordinated Securities Claims (Class 5)

The holders of Subordinated Securities Claims against the Debtor shall not receive or retain any property under the Plan on account of such Claims.

### 6. Equity Interests (Class 6)

On or after the Effective Date, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all Equity Interests in the Debtor shall be cancelled. The existing holders of the Equity Interests in the Debtor shall neither receive nor retain any property of the Debtor or interest in property of the Debtor on account of such Equity Interest.

## D. Means for Implementation

### 1. Sponsor Contribution and Distributions

On the Effective Date, in accordance with the Plan and the Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, the Sponsor shall: (i) provide the Sponsor Contribution; and (ii) be the sole shareholder of the Reorganized Debtor, and on the Effective Date, shall hold 100% of the NewCo Shares free and clear of all Claims and Liens.

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

On the Effective Date, in accordance with the Plan and the Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, the Disbursing Agent (on behalf of the Debtor) shall distribute Pro Rata the Class 4 ED Distribution to (i) the holders of Remaining Unsecured Claims that are Allowed as of the Effective Date, and (ii) the Disbursing Agent, to be held in the Class 4 Disputed Claims Reserve, on behalf of holders of Disputed Remaining Unsecured Claims*.*

On the Effective Date, in accordance with the Plan and the Investment Agreement, subject to the satisfaction or waiver of all applicable conditions under the terms thereof, a single limited liability company unit representing a non-economic 100% ownership interest in Wind-Down Co shall be issued to the Plan Administrator.  The Pro Rata Share of the Class 4 ED Distribution allocated to Disputed Remaining Unsecured Claims shall be held in one or more segregated accounts in the Class 4 Disputed Claims Reserve until such claims are Allowed or Disallowed, at which time the applicable portion of the Class 4 ED Distribution (including any earnings thereon, net of any allocable costs and expenses of the Class 4 Disputed Claims Reserve) shall be distributed to such holders of newly Allowed Remaining Unsecured Claims or to the holders of Remaining Unsecured Claims that were previously Allowed, as the case may be.

Following the distribution of all amounts from the Class 4 Disputed Claims Reserve, the liquidation of the Excluded Assets (including the completion of the prosecution of any Avoidance Actions and other Causes of Action held by Wind-Down Co), and the distribution of the proceeds therefrom and any remaining Wind Down Cash Funding in accordance with the Plan (including the payment of all costs and expenses and other liabilities of Wind-Down Co), Wind-Down Co shall be dissolved and the single unit shall be deemed cancelled and of no further force and effect.  The Plan Administrator shall have no right to any distribution of property or value from Wind-Down Co by reason of its ownership of the single limited liability company unit.

In addition to the foregoing, in the event of a William Vale Purchase on or before December 31, 2022, the Sponsor shall pay to Wind-Down Co the WV Shares Consideration on the later date to occur of the Effective Date and the WV Sale Date.

The terms of the Investment Agreement are fully incorporated into the Plan and shall be binding and enforceable against the parties thereto, including, without limitation, the releases and indemnities set forth in Section 7.02(b) of the Investment Agreement.

Neither the Reorganized Debtor nor the Sponsor shall have any liability for (i) Fee Claims, (ii) any amounts owed to any current officers or current directors of the Debtor or those serving in similar capacities for the period up to and including the Effective Date, or (iii) any payment to holders of Class 4 Remaining Unsecured Claims or any Subordinated Securities Claim.

## 2.    Authorization and Issuance of New Notes

Subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, the Debtor or Reorganized Debtor, as applicable, is authorized to issue all plan-related securities and documents, including, without limitation, the New Notes, and any options or entitlements to purchase such plan-related securities, without the need for any further

corporate, partnership or limited liability company action. The Reorganized Debtor shall issue the New Notes, substantially in the form attached to the Plan as Exhibit A, in an aggregate principal amount of $20,000,000, subject to increase to $22,000,000 as described above.  The New Notes will be unsecured obligations of the Reorganized Debtor and will contain customary covenants and events of default.  The New Notes will not bear non-default interest.  In connection with the New Notes, Bent Philipson shall enter into a Guaranty Agreement, substantially in the form attached to the Plan as Exhibit B, on commercially customary terms to support the obligations of the Reorganized Debtor under the New Notes.

### 3.    Administration of Wind-Down Co.

On the Effective Date, the Excluded Assets and the Wind Down Cash Funding shall be transferred to Wind-Down Co.  The Sponsor and/or the Reorganized Debtor shall not bear any cost and expense and/or liability related to the administration of Wind-Down Co, including costs owed to the Plan Administrator and under Section 5.3(f) of the Plan.

On the Effective Date, the Notes Trustee shall appoint the Plan Administrator for the purpose of conducting the Wind Down of Wind-Down Co on terms and conditions set forth in the Plan Administration Agreement[16].  The retention of the Plan Administrator shall be pursuant to an agreement approved by the Notes Trustee and filed as part of the Plan Supplement.  Upon the conclusion of the Wind Down in accordance with Section 5.1(d) of the Plan, Wind-Down Co shall be dissolved by the Plan Administrator.  The Plan Administrator shall act for Wind-Down Co in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors or equivalent governing body, as applicable, and to officers, subject to the provisions in the Plan (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements, or similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same) and the Plan Administrator will be a representative of Wind-Down Co for purposes of section 1123(b)(3) of the Bankruptcy Code.  From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for Wind-Down Co with the authority set forth in Section 5.3 of the Plan and the Plan Administration Agreement.  The Plan Administrator shall be compensated and reimbursed for reasonable costs and expenses as set forth in the Plan Administration Agreement included in the Plan Supplement.

The Plan Administrator shall have the authority and right on behalf of Wind-Down Co, subject to the express terms of the Plan Administration Agreement but without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to: (i) implement the Wind Down as expeditiously as reasonably possible and administer the liquidation, dissolution, sale and/or abandonment or

---

[16] As defined in the Plan, "**Plan Administrator**" means, collectively, those individuals selected by the Notes Trustee to serve as(a) "plan administrator" and (b) "claims administrator," who, collectively, will administer and implement the Plan and the Assets of Wind-Down Co, in accordance with, and pursuant to the power and authority with respect to Wind-Down Co, as set forth in Section 5.3 of the Plan and with such rights, powers and authorities as shall be allocated among such individuals under the Plan Administration Agreement.

similar action of the Excluded Assets after the Effective Date in accordance with the Wind Down Budget; (ii) except to the extent Claims have been previously Allowed or are Unimpaired, control and effectuate the Claims reconciliation process; (iii) make distributions to holders of Allowed Claims in accordance with the Plan; (iv) retain and compensate professionals to assist in performing its duties under the Plan; (v)  complete and file, as necessary, all final or otherwise required federal, state, and local tax returns and other tax reports for Wind-Down Co; (vi) represent the interests of Wind-Down Co before any taxing authority in all matters including, without limitations, any action, suit, proceeding, appeal or audit; and (vii) appoint and compensate an agent to effectuate distributions under the Plan with the consent of the Notes Trustee; and (viii) perform other duties and functions that are consistent with the implementation of the Plan or required by the Bankruptcy Code.

The Plan Supplement shall include the Wind Down Budget and, on the Effective Date, the Plan Administrator shall retain within Wind-Down Co funds sufficient to make the payments contemplated in the Wind Down Budget.

Wind-Down Co shall indemnify and hold harmless the Plan Administrator solely in its capacity as such and, where the Disbursing Agent is the Plan Administrator or an entity designated by the Plan Administrator, the Disbursing Agent solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's or Disbursing Agent's (as the case may be) gross negligence, willful misconduct, or criminal conduct.

The Plan Administrator shall effectuate the Wind Down in accordance with the Wind Down Budget.  The Plan Administrator shall pay any and all reasonable and documented costs and expenses incurred in connection with the Wind Down, including the reasonable fees and expenses of its professionals and the reasonable fees and expenses of the Debtor's professionals incurred for services rendered to the Debtor and the Estate following the Effective Date, without further order of the Bankruptcy Court, provided that such amounts are consistent with the Wind Down Budget.

Subject to any necessary approvals in the BVI Proceeding, all matters provided for in the Plan involving the corporate structure of the Debtor, the Reorganized Debtor, or Wind-Down Co, to the extent applicable, or any corporate or related action required by the Debtor, the Reorganized Debtor, or Wind-Down Co, in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the JPLs, the Authorized Managers, or the stockholders, members, or directors or managers of the Debtor, the Reorganized Debtor, or Wind-Down Co, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtor, the Reorganized Debtor, or Wind-Down Co. The Plan Administrator shall be authorized to file on behalf of Wind-Down Co, a certificate of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of Wind-Down Co.

### 4.    Section 1145 Exemption

The offer, issuance, and distribution of the New Notes to holders of Allowed Remaining Unsecured Claims under Section 4.4 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

The New Notes shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, as amended, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) the restrictions, if any, on the transferability of such securities and instruments, including, without limitation, any restrictions on the transferability under the terms of the New Notes, and (iv) applicable regulatory approvals.

### 5.    Officers and New Board of Directors

On the Effective Date, the new board of directors of the Reorganized Debtor shall consist of the following three (3) directors: Avi Philipson, Abraham Grunhut, and Andrew Chaimowitz. Curriculum vitae (CVs) for the new directors of the Reorganized Debtor are annexed hereto as **Exhibit F**. Each such director shall serve from and after the Effective Date pursuant to the terms of the Amended Organizational Documents and the other constituent documents of the Reorganized Debtor. After the Effective Date, the board of directors for the Reorganized Debtor will be elected by the Sponsor in accordance with the Amended Organizational Documents.

After the Effective Date, officers of the Reorganized Debtor shall be appointed and serve in accordance with the Amended Organizational Documents. The identity and affiliations of any person to serve as an officer of the Reorganized Debtor immediately following the Effective Date shall be disclosed in the Plan Supplement.

Subject to any necessary approvals in the BVI Proceeding, the JPLs, the Authorized Managers, and any officers of the Debtor, shall have no continuing rights or obligations to the Reorganized Debtor on or after the Effective Date in their capacities as such, and each such party shall resign (or shall be deemed to have resigned) and shall cease to act or serve as a director, officer, or any similar capacity on the Effective Date.

### 6.    Indemnification of Debtor's Directors and Officers

The Debtor and Wind-Down Co, as the case may be, shall purchase and maintain director and officer insurance coverage, in a coverage amount not to exceed the coverage amount in effect as of the Petition Date, for those Persons covered by any such policies in effect during the pendency of the Chapter 11 Case, continuing after the Effective Date, insuring such Persons in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtor prior to the Effective Date, the scope and amounts of which policies shall be disclosed in the Plan Supplement.

## 7.    Effectuating Documents; Further Transactions.

Upon the Effective Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms of the Plan, subject to any necessary approvals in the BVI Proceeding.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtor, the Reorganized Debtor, and Wind-Down Co, and any corporate or limited liability company action required by the Debtor, the Reorganized Debtor, or Wind-Down Co, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the JPLs, the Authorized Managers, or the directors, managers, or officers of the Debtor, the Reorganized Debtor, or Wind-Down Co, subject to any necessary approvals in the BVI Proceeding.  On or (as applicable) before the Effective Date, the Authorized Managers, and the authorized officers of the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor or Wind-Down Co, as applicable, including, but not limited to any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Section 5.7 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

On or as soon as practicable after the Effective Date, the Reorganized Debtor and Wind-Down Co may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, subject in all respects to the provisions of the Plan and the rights vested in the Notes Trustee, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction.

Prior to making any post-Effective Date distribution from Wind-Down Co to any holder of an Allowed Remaining Unsecured Claim pursuant to Section 4.4(b)(iii) of the Plan, Wind-Down Co shall adopt a "plan of liquidation" (as determined for U.S. federal income tax purposes) in furtherance of its duties and responsibilities under the Plan to monetize all of the remaining assets of Wind-Down Co (including any Avoidance Actions or other Causes of Action) and distribute the proceeds thereof in accordance with the Plan, and shall timely file IRS Form 966 in connection therewith.

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

<u>Certain Tax Matters</u>.  For U.S. federal income tax purposes, and comparable state and local tax purposes (as applicable): (i) the Debtor shall implement the Plan in a manner such that it shall continue to be treated as a disregarded entity through the implementation of the Plan on the Effective Date and shall not take any action that would cause the Debtor to be treated as an association taxable as a corporation at any time (prior to or on the Effective Date); (ii) the right of the holders of Allowed Remaining Unsecured Claims hereunder to any and all distributions from assets transferred to Wind-Down Co shall be treated as equity, and thus as stock, in Wind-Down Co. Accordingly, each holder of an Allowed Remaining Unsecured Claim shall be treated for U.S. federal income tax purposes as receiving, and thereafter owning, stock in Wind-Down Co; (iii) the Reorganized Debtor and Wind-Down Co, and any officers thereof, and all holders of Claims shall report consistent with Section 5.7(d) of the Plan for all income tax purposes, and shall (X) use commercially reasonable efforts to cause consistent reporting therewith by others, or (Y) not join in, encourage, and/or support inconsistent reporting therewith by others; (iv) the Debtor shall be authorized to implement the Plan in the manner most tax efficient to the Sponsor, Wind-Down Co and the holders of Remaining Unsecured Claims, as determined by the mutual agreement of the Debtor and the Notes Trustee, in their reasonable discretion given the totality of the circumstances.

## 8.    Cancellation of Existing Securities and Agreements.

On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtor or assumed and assigned to Wind-Down Co under the Plan, and subject to consummation of the BVI Plan of Arrangement and any other necessary approvals in the BVI Proceeding, all agreements, instruments, and other documents evidencing or issued pursuant to the Notes, or any indebtedness or other obligations thereunder, and any Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect against the Debtor, the Reorganized Debtor, or Wind-Down Co, as applicable, and the obligations of the Debtor or Reorganized Debtor thereunder shall be deemed fully satisfied, released, and discharged.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Reorganized Debtor or assumed and assigned to Wind-Down Co pursuant to a Final Order of the Bankruptcy Court or hereunder.

## 9.    Cancellation of Liens.

Except as otherwise specifically provided in the Plan, upon the payment in full in Cash of a Secured Claim, any Lien securing such Claim, shall be deemed released, and the holder of such Secured Claim shall be directed to release any collateral or other property of the Debtor or the Reorganized Debtor held by such holder and to take such actions as may be requested by the

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtor or the Reorganized Debtor.

### 10. Subordination Agreements.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

### 11. Closing of the Chapter 11 Case.

After the Estate has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 12. Notice of Effective Date.

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Plan Administrator shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### E. Distributions

### 1. Distributions Generally

The Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan. The Reorganized Debtor shall make all distributions with respect to all Unimpaired Claims in the ordinary course of business, which Unimpaired Claims shall not be subject to the claims reconciliation procedures set forth in the Plan, and the Reorganized Debtor shall satisfy, dispute, pursue, or otherwise reconcile each Unimpaired Claim in the ordinary course of business. The Plan Administrator shall be the Disbursing Agent with respect to all other Claims to be satisfied, disputed, pursued, or otherwise reconciled in accordance with the Plan.

### 2. Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims maintained by the Debtor or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims. Wind-Down Co shall have no obligation to recognize any transfer or designation of such Claims occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amount or Assumption Disputes, the Disbursing Agent shall not have any obligation to recognize or deal

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim or Cure Amount.

### 3.      Date of Distributions.

Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan by the Plan Administrator shall be made on the Effective Date, as and when Claims are Allowed in the sole discretion of Wind-Down Co, or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; provided, that Wind-Down Co shall from time to time announce subsequent distribution dates to the extent they determine them to be appropriate.

### 4.      Disbursing Agent.

All distributions under the Plan shall be made by the Disbursing Agent and the Reorganized Debtor, as applicable, on and after the Effective Date as provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  Wind-Down Co shall use all commercially reasonable efforts to provide the Disbursing Agent and the Reorganized Debtor, as applicable, with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtor's books and records.

### 5.      Rights and Powers of Disbursing Agent.

From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 6.      Expenses of Disbursing Agent.

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable

documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash, subject to the Plan Administration Agreements.

### 7.    Postpetition Interest on Claims.

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims against the Debtor on or after the Petition Date.

### 8.    Delivery of Distributions.

Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtor. In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until the Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing in the Plan shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

### 9.    Distributions after Effective Date.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 10.    Unclaimed Property.

Undeliverable distributions shall remain in the possession of Wind-Down Co until such time as a distribution becomes deliverable or a holder accepts distribution, or such distribution reverts back to Wind-Down Co and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of one hundred and twenty (120) days from the applicable date of distribution and the holder of the Claim entitled to such distribution shall be discharged and forever barred. After such date, all unclaimed property or interest in property of Wind-Down Co shall revert to and vest in Wind-Down Co and shall be thereafter disbursed to the holders of Remaining Unsecured Claims, and all unclaimed property or interest in property shall be discharged and forever barred.

### 11.    Time Bar to Cash Payments.

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall immediately and irrevocably

revert to Wind-Down Co and any Claim on account of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check prior to the expiration of the one hundred and twenty (120) day period from the date of issuance shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 12.   Manner of Payment Under Plan.

Except as otherwise specifically provided in the Plan, at the option of Wind-Down Co, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

### 13.   Satisfaction of Claims.

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction and discharge of and exchange for the Debtor's and the Reorganized Debtor's, as the case may be, obligation on account of such Allowed Claims.

### 14.   Minimum Cash Distributions.

Except with respect to any Claim that is Unimpaired under the Plan, the Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to Section 6.14 of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

### 15.   Setoff and Recoupment.

The Reorganized Debtor, solely as to Unimpaired Claims, or Wind-Down Co, solely as to the Remaining Unsecured Claims, as applicable, or their designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Reorganized Debtor or Wind-Down Co may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law (other than the released Causes of Action); provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor or Wind-Down Co or its successor, of any claims, rights, or Causes of Action that the Reorganized Debtor or Wind-Down Co, or its successor or assign may possess against the holder of such Claim (other than the released Causes of Action).

### 16.   Allocation of Distributions between Principal and Interest.

Except as otherwise required by law (as reasonably determined by Wind-Down Co), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the

| WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

portion of such Allowed Claim (if any) that reflects reimbursable expenses, and then to the accrued and unpaid interest on such Allowed Claim.

### 17.     No Distribution in Excess of Amount of Allowed Claim.

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

### 18.     Distributions Free and Clear.

Except as provided in the Plan, any distributions under the Plan shall be free and clear of and Liens, Claims, and encumbrances, and no other Entity, including the Debtor, the Reorganized Debtor, or Wind-Down Co, shall have any interest, legal, beneficial, or otherwise, in any amounts transferred pursuant to the Plan.

### 19.     Withholding and Reporting Requirements.

*Withholding Rights*.  In connection with the Plan, any Disbursing Agent and any other Person making distributions pursuant to the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any Disbursing Agent and the Notes Trustee, or such other Entity designated thereby, as applicable, and any other Person making distributions pursuant to the Plan, shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate (including, in the event of a non-cash distribution, the claimant providing sufficient monies to satisfy the withholding).  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

*Forms*.  Any party entitled to receive any property as a distribution under the Plan shall, upon request of the Disbursing Agent or such other Entity designated by such Disbursing Agent (which Entity shall subsequently deliver to the Disbursing Agent any applicable Internal Revenue Service Form W-8 or Form W-9 or other tax information received) or such other Person making distributions pursuant to the Plan, deliver to such Person an appropriate Internal Revenue Service Form W-9 or (if the payee is a foreign Entity) Form W-8, and any other reasonably requested tax information.  If such request is made by the Plan Administrator or such other Entity designated by the Plan Administrator and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made, and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of any such

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

distribution shall irrevocably revert to Wind-Down Co, and any Claim on account of such distribution shall be discharged and forever barred from assertion against Wind-Down Co, or its property.

### F.    Procedures for Disputed Claims

#### 1.    Objections to Claims

As of the Effective Date, the Plan Administrator shall exclusively be entitled to object to Impaired Claims.  As of the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses that the Debtor had with regard to any Unimpaired Claim which they may object to or otherwise challenge in the ordinary course, except with respect to any Claim that is Allowed pursuant to the Plan.  Nothing under the Plan shall affect the Debtor's or the Reorganized Debtor's claims, causes of action, rights, or defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.  Any objections to Claims shall be served and filed by the Plan Administrator on or before the later of (a) one hundred and twenty (120) days after the Effective Date, and (b) on such other date as ordered by the Bankruptcy Court for cause.

#### 2.    Resolution of Disputed Administrative Expenses and Disputed Claims.

On and after the Effective Date, except as otherwise provided in the Plan, all Unimpaired Claims will be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course of business of the Reorganized Debtor.  If the Reorganized Debtor disputes any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Case had not been commenced and shall survive the Effective Date as if the Chapter 11 Case had not been commenced.  From and after the Effective Date, the Reorganized Debtor may satisfy, dispute, pursue, or otherwise resolve any Unimpaired Claim without approval of the Bankruptcy Court.  On or after the Effective Date, Wind-Down Co shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to Impaired Claims without further approval of the Bankruptcy Court.

#### 3.    Payments and Distributions with Respect to Disputed Claims.

Notwithstanding anything in the Plan to the contrary, if any portion of a Claim is a Disputed Claim, the Debtor or Plan Administrator, as applicable, shall not be required to make any payment or distribution provided hereunder on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

#### 4.    Distributions After Allowance.

After such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan (net of allocable costs and expenses of the Class 4 Disputed Claims Reserve, including taxes in accordance with Section 7.9 of the Plan), with or without interest as provided in the Plan.  Such distributions shall be made in accordance with Article VI of the Plan.

### 5. Estimation of Claims.

The Plan Administrator may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Impaired Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Impaired Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Impaired Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Impaired Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Impaired Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Impaired Claim, the Debtor and the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtor to be estimated for voting purposes only. Notwithstanding anything to the contrary in the Plan, the Non-Securities Indemnity Claims shall be estimated at zero dollars ($0) for all purposes under the Plan, including for purposes of distributions under the Plan.

### 6. No Distributions Pending Allowance.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7. Claim Resolution Procedures Cumulative.

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 8. Insured Claims.

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtor's insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Court.

### 9. Tax Treatment of the Class 4 Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat the Class 4 Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

foregoing for state and local income tax purposes. All parties (including the Debtor, the Reorganized Debtor, the Plan Administrator, any Disbursing Agent, and the holders of Disputed Remaining Unsecured Claims) shall report for tax purposes consistently with the foregoing. The Class 4 Disputed Claims Reserve shall be responsible for payment out of the available cash of such reserve allocable to the respective Disputed Remaining Unsecured Claims any allocable costs and expenses of the reserve, including any taxes imposed on the reserve or with respect to its assets. Accordingly, subsequent distributions in respect of the allowance or disallowance of any Remaining Unsecured Claims shall be made net of any allocable costs and expenses of the reserve. If the Class 4 Disputed Claims Reserve has insufficient cash to pay such costs and expenses, Wind-Down Co shall be responsible for the payment of such costs and expenses. The Disbursing Agent or the Plan Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Class 4 Disputed Claims Reserve for all taxable periods through the termination of the Class 4 Disputed Claims Reserve.

### G.   Executory Contracts and Unexpired Leases

#### 1.   General Treatment

As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected by the Debtor, unless such contract or unexpired lease (i) is specifically designated (x) by the Reorganized Debtors or (y) Wind-Down Co as a contract or unexpired lease to be assumed or assumed and assigned on the Schedule of Assumed Contracts to be filed with the Plan Supplement; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; (iv) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the Confirmation Date; or (v) is identified in Section 8.4 of the Plan.

(a)   Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumption, assumption and assignment, or rejection provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtor or Wind-Down Co, as applicable, has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtor or Wind-Down Co, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

#### 2.   Determination of Assumption Disputes and Deemed Consent.

Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtor may otherwise agree. Cure Amounts for executory contracts or unexpired leases assumed by the Reorganized Debtor, if any, shall be the

responsibility of, and paid by, the Reorganized Debtor and Cure Amounts for executory contracts or unexpired leases assumed and assigned to Wind-Down Co, if any, shall be the responsibility of Wind-Down Co and paid by the Plan Administrator.

The Debtor shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts.  At least fourteen (14) days before the deadline to object to confirmation of the Plan, the Debtor shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned or rejected reflecting the Debtor's intention to potentially assume or assume and assign or reject the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed rejection, assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtor within fourteen (14) days of the service of such notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption or assumption and assignment or rejection of such executory contract or unexpired lease shall be deemed to have assented to such assumption or assumption and assignment or rejection, notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any subsidiary of the Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of the Reorganized Debtor or Wind-Down Co, as applicable, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of the Reorganized Debtor or Wind-Down Co, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in Section 8.2(b) of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption, assumption and assignment, or rejection or to the validity of such assumption, assumption and assignment, or rejection (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

If there is an Assumption Dispute pertaining to assumption or assumption and assignment of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption or assumption and assignment being effective; provided, that the Debtor or the Plan Administrator, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtor or the Plan Administrator reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty to such executory contract or unexpired lease (or such lesser

amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such counterparty and the Plan Administrator).

Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against the Debtor or defaults by the Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtor assumes, or assumes and assigns, such executory contract or unexpired lease. In accordance with section 365(k) of the Bankruptcy Code, assumption and assignment of any executory contract or unexpired lease, releases the Debtor and the Reorganized Debtor form any liability for breach of such contract of lease occurring after the Effective Date. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### 3.     Rejection Damages Claims.

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor and the Reorganized Debtor no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims.**

### 4.     Insurance Policies.

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtor shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety and assigned to Wind-Down Co, pursuant to sections 365 and 1123 of the Bankruptcy Code, and Wind-Down Co shall remain liable in full for any and all now existing or in the Plan after arising obligations, liabilities, terms, provisions and covenants of the Debtor under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Expense Claim or objection to any Cure Amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable

nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

## 5. Assignment of Executory Contracts to Wind-Down Co.

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease assumed and assigned to Wind-Down Co hereunder shall remain in full force and effect for the benefit of Wind-Down Co in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assumption and assignment effected pursuant to the Plan.

## 6. Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

## 7. Reservation of Rights.

The Schedule of Assumed Contracts, and any related cure notice, may be amended until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment or rejection and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtor's right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the

Confirmation Hearing.  The Debtor shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

Neither the exclusion nor inclusion of any contract or lease by the Debtor on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor, or the Reorganized Debtor, or their respective affiliates have any liability thereunder.

Except as otherwise provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtor and the Reorganized Debtor, under any executory or non-executory contract or any unexpired or expired lease.

Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

### H.    **Conditions Precedent to Confirmation of Plan and Effective Date**

#### 1.    **Conditions Precedent to Confirmation of Plan**

The following are conditions precedent to confirmation of the Plan: (a) the Disclosure Statement Order shall have been entered; (b) the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed and be in conformity with the Plan; and (c) the Investment Agreement shall not have been terminated and shall be in full force and effect.

#### 2.    **Conditions Precedent to Effective Date.**

The following are conditions precedent to the Effective Date of the Plan: (a) the Confirmation Order shall have been entered and have become a Final Order and shall be in full force and effect; (b) all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; (c) all governmental approvals, orders and consents necessary in connection with the Investment Agreement, including Bankruptcy Court approval, and any necessary approval from the BVI Court (including consummation of the BVI Plan of Arrangement) or any courts or regulatory authorities of Israel, including, but not limited to, recognition of the Confirmation Order in the Israeli Proceeding, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the consummation of the Investment Agreement. For the avoidance of doubt, the approval or recognition of the treatment of Subordinated Securities Claims by the courts or regulatory authorities of Israel shall not be a condition precedent to the Effective Date; (d) the conditions to the obligations of the Debtor to consummate the Closing set forth in Sections 10.01 and 10.02 of the Investment Agreement shall have been satisfied or waived in

accordance with the terms thereof; and (e) the Professional Fees Escrow Account shall be established and fully funded.

Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, satisfaction of such conditions precedent shall be deemed to have occurred simultaneously on the Effective Date and no such action shall be deemed to have occurred prior to the taking of any other such action; provided that, to the extent a condition precedent (a "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

The Debtor believes that consummation of the William Vale Purchase and the sale of the Debtor's interest in YG WV are not conditions precedent to confirmation of the Plan or the occurrence of the Effective Date. In addition, the Debtor believes that the Sponsor does not have the right to terminate the Investment Agreement if the relevant parties fail to close on the MLPSA or if the Debtor is unable to deliver its interest in YG WV until after the Effective Date or at all. The Sponsor reserves all of its rights with respect to the foregoing.

### 3.    Waiver of Conditions Precedent.

Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan, other than those set forth in Section 9.1(a) and Section 9.2(a) of the Plan, may be waived in writing with the consent of the Debtor, the Notes Trustee, and the Sponsor; *provided*, *however*, the requirement that the Confirmation Order become a Final Order set forth in Section 9.2(a of the Plan may be waived in writing by the Debtor with the consent of the Sponsor.

### 4.    Effect of Failure of a Condition.

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before December 31, 2022, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against any Interests in the Debtor, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, the Notes Trustee, or any other Entity.

### I.    Effect of Confirmation of Plan

### 1.    Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all Excluded Assets and Wind Down Funding Cash shall be transferred to Wind-Down Co free and clear of all Claims, Liens, encumbrances, charges, and other interests except as provided pursuant to the Plan and the Confirmation Order, and (ii) all Transferred Entities (as defined in the Investment Agreement) and any and all remaining property of the Debtor's Estate, except for the Excluded Assets, shall remain in, or vest in, the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan and the Confirmation Order. On and after the Effective Date, Wind-Down Co, with respect

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

to clause (i) above, and the Reorganized Debtor, with respect to clause (ii) above, may take any action, including, without limitation, the operation of their businesses; the assertion of any Causes of Action; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether or not in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided in the Plan. Without limiting the foregoing, each of the Reorganized Debtor and Wind-Down Co, as applicable, may pay the respective charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

## 2. Binding Effect.

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders are (a) Impaired or Unimpaired under the Plan; (b) presumed to accept or deemed to reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) will receive any distribution under the Plan.

## 3. Discharge of Claims and Termination of Interests.

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided in the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities of the Debtor that arose prior to the Effective Date. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against the Debtor, the Reorganized Debtor, or Wind-Down Co any such discharged Claim against or terminated Interest in the Debtor.

## 4. Term of Injunctions or Stays.

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all the Chapter 11 Case.

## 5. Injunction.

**Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan, provided, however, the**

foregoing shall not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as expressly agreed to by (x) the Reorganized Debtor and a holder of any Unimpaired Claim or (y) Wind-Down Co and a holder of any Impaired Claim or Impaired Interest, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action against the Debtor that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Reorganized Debtor or Wind-Down Co, or the property of any of the Debtor, the Reorganized Debtor or Wind-Down Co; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Reorganized Debtor or Wind-Down Co, or against property or interests in property of any of the Debtor, the Reorganized Debtor or Wind-Down Co, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.5 of the Plan.

The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtor (including the Reorganized Debtor and Wind-Down Co), and their respective property and interests in property.

6.    Releases.

Estate Releases. As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce (i) the Plan and (ii) the Definitive Documents (in each case, including, without limitation, any rights granted to the Plan Administrator under the Plan Administration Agreement), for good and valuable consideration, the

adequacy of which is hereby confirmed, including, without limitation, the services rendered by the Released Parties to facilitate the implementation of the Plan, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed released and discharged, to the maximum extent permitted by law, by the Debtor and its Estate, the Reorganized Debtor, and Wind-Down Co, in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons or Entities, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor or its Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or its Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security or Asset of the Debtor, the Investment Agreement, the business or contractual arrangements between any of the Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the Disclosure Statement, the Plan (including the Plan Supplement), the Deeds of Trust, the Notes, or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, provided, that nothing in Section 10.6(a) of the Plan shall be construed to release the Released Parties from gross negligence, willful misconduct, or fraud, in each case as determined by a Final Order.  The Debtor, its Estate, the Reorganized Debtor, and the Plan Administrator shall be permanently enjoined from prosecuting any of the foregoing claims or Causes of Action released under Section 10.6(a) of the Plan against each of the Released Parties.

**Mutual Releases**.  As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date; (ii) for the right to defend against any objections to Claims that may be asserted under the Plan; or (iii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions made by the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed released and discharged by each of the other Released Parties, in each case, from any and all claims, Interests, or Causes of Action whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, the Debtor, the restructuring, the Chapter 11 Case, the pre- and postpetition marketing and sale process, the business or contractual arrangements between the Debtor and any Released Party, the

**restructuring of Claims and Interests before or during the Chapter 11 Case, the
negotiation, formulation, preparation, or consummation of the Plan (including the Plan
Supplement), the Investment Agreement, the Definitive Documents, the Deeds of Trust, the
Notes, or any related agreements, instruments, or other documents, the solicitation of votes
with respect to the Plan, in all of the foregoing cases based upon any act or omission,
transaction, agreement, event or other occurrence taking place on or before the Effective
Date; provided, that nothing in Section 10.6(b) of the Plan shall be construed to release the
Released Parties from any gross negligence, willful misconduct, or fraud, in each case as
determined by a Final Order.  The Persons and Entities in (i) through (iii) of Section
10.6(b) of the Plan shall be permanently enjoined from prosecuting any of the foregoing
claims or Causes of Action released under Section 10.6(b) of the Plan against each of the
Released Parties**.

Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall limit the liability
of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of
Professional Conduct.

Notwithstanding the foregoing, nothing in the Plan shall, or shall be deemed to, release or waive
any rights or remedies of any releasor against or provide any indemnification rights to Yoel
Goldman or Tzipporah Goldman, or any entity which is under control or ownership of Yoel
Goldman or Tzipporah Goldman other than the Transferred Entities.

Section 7.02 of the Investment Agreement contains mutual releases of various parties and their
representatives, including the parties to that agreement.  The rights and obligations of the parties
provided in connection with such releases are in addition to the rights and obligations provided
in Section 10.6 of the Plan.

### 7. Exculpation.

**To the maximum extent permitted by applicable law, no Exculpated Party will have or
incur, and each Exculpated Party is hereby released and exculpated from, any claim,
obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and
liability for any conduct occurring on or after the Petition Date and up to and including the
Effective Date in connection with or arising out of the filing and administration of the
Chapter 11 Case, the marketing and sale process, the purchase, sale, or rescission of the
purchase or sale of any security or Asset of the Debtor; the Disclosure Statement, the
Investment Agreement, including the formulation, negotiation, preparation, dissemination,
implementation, administration, confirmation, and consummation thereof, the Plan, or the
solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the
Plan; the occurrence of the Effective Date; the administration of the Plan or the property
to be distributed under the Plan; or the transactions in furtherance of any of the foregoing;
except for acts or omissions of an Exculpated Party that constitute gross negligence, fraud,
or willful misconduct, in each case as determined by a Final Order.  This exculpation shall
be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and
any other applicable law or rules protecting such Exculpated Parties from liability.**

| WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

## 8. Retention of Causes of Action/Reservation of Rights.

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately prior to the Effective Date on behalf of its Estate in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtor.  With respect to Unimpaired Claims, except as otherwise provided in the Plan, the Reorganized Debtor shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.  With respect to Impaired Claims, except as otherwise provided in the Plan, Wind-Down Co shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.

## 9. Special Provisions Regarding Sole Shareholder

For the avoidance of doubt, nothing under the Plan, including under Article X, or the Confirmation Order shall be deemed to discharge, waive, release, limit, or enjoin any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability of Yoel Goldman or Tzipporah Goldman, or any entity which is under the control or ownership of Yoel Goldman or Tzipporah Goldman.

## J. Retention of Jurisdiction

### 1. Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(b)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(c)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits,

disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(e)     to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)     to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)     to issue injunctions, enter, and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Investment Agreement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)     to hear and determine disputes arising in connection with the Investment Agreement, or any agreement, instrument, or other document governing or relating to the Investment Agreement;

(l)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any Disputed Claims for taxes and any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, exculpations, and injunctions issued thereunder;

(p)      to resolve disputes concerning Disputed Claims or the administration thereof;

(q)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(r)      to enter a final decree closing the Chapter 11 Case;

(s)      to recover all Assets of the Debtor and property of the Debtor's Estate, wherever located;

(t)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, or any deadline for responding or objection to a Cure Amount, in each case, for any purpose;

(u)      hear and determine matters or disputes arising from, or in connection with, the appointment of a successor Plan Administrator in the event of the Plan Administrator's death, disability, dissolution, or removal;

(v)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtor, the Plan Administrator, or Wind-Down Co. pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, including, without limitation, Avoidance Actions; and

(w)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 2.      Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### K.      Miscellaneous Provisions

### 1.      Payment of Statutory Fees

On the Effective Date and thereafter as may be required, with respect to any Impaired Claims, Wind-Down Co shall make all required filings and pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtor's case, until such time as a final decree is entered closing the Debtor's case, a Final Order converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the

Debtor's case is entered.  With respect to any Unimpaired Claims, the Reorganized Debtor shall make all aforementioned required filings and pay all such fees, if any.

## 2. Substantial Consummation of the Plan.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## 3. Plan Supplement.

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## 4. Requests by the Reorganized Debtor and Wind-Down Co for Expedited Determination of Taxes.

The Reorganized Debtor shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date and through the Effective Date.  Wind-Down Co shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, through the date of its dissolution.

## 5. Exemption from Certain Transfer Taxes.

Pursuant to section 1146 of the Bankruptcy Code, (a) the making or delivery of any instrument of transfer in connection or furtherance of the Plan, and any financing by the Sponsor, (b) the issuance, transfer or exchange of any securities, instruments or documents pursuant to, in implementation of or as contemplated in the Plan and the Investment Agreement, (c) the creation of any Lien, mortgage, deed of trust, or other security interest, (d) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with the Investment Agreement, (e) all transfers and distributions by Wind-Down Co in furtherance of the Plan, and (f) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent provided by law, including, but not limited to: (i) mortgage recording taxes imposed under Article 11 of the tax law of the State of New York, (ii) the New York Real Estate transfer tax imposed under Article 31 of the Tax Law of the State of New York (including by reason of a change in the equity ownership of the Debtor), (iii) the New York City Real Property transfer tax imposed by title 11, chapter 21 of the New York City Administrative Code (including by reason of a change in the equity ownership of the Debtor) and, (iv) any similar tax on the recording of deeds, transfers or property or ownership interests in property, recording of mortgages or other security instruments imposed by the State of New York, or any

political subdivision thereof.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded (including, without limitation, the Register of the City of New York) shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.  All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Properties, any taxes from which the transactions effectuated pursuant to the Plan and Confirmation Order are exempt, pursuant to and in furtherance of section 1146(a) of the Bankruptcy Code and to the greatest extent provided by law, including but not limited to, New York State Real Estate Transfer Taxes, and any mortgage recording tax, and any penalties, interest, or additions to any tax related thereto.

### 6.    Amendments.

*Plan Modifications*.  Subject to all consent rights of the Sponsor and the Notes Trustee, respectively, under the Investment Agreement, the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan (i) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Notes Trustee and the Sponsor, the Debtor may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

*Other Amendments*.  Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement, with the consent of the Notes Trustee and the Sponsor (such consent not to be unreasonably withheld) without further order or approval of the Bankruptcy Court.

### 7.    Effectuating Documents and Further Transactions.

The Reorganized Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 8.    Revocation or Withdrawal of Plan.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date in accordance with the Investment Agreement. If the Plan has been revoked or withdrawn prior to the Effective Date in accordance with the Investment Agreement, or if confirmation or the

occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor, the Notes Trustee, the Sponsor, or any other Entity. This provision of the Plan shall have no adverse impact on the rights of the Notes Trustee, the Sponsor, or the Debtor in respect of any such revocation or withdrawal.

## 9. Severability of Plan Provisions.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor with the reasonable consent of the Notes Trustee and the Sponsor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or further modified without the consent of (i) the Debtor or Wind-Down Co, as applicable, (ii) the Notes Trustee, and (iii) the Reorganized Debtor, but only to the extent such deletions or modifications negatively impact the Reorganized Debtor, and (c) nonseverable and mutually dependent.

## 10. Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to the Debtor or the Reorganized Debtor, shall be governed by the laws of the state of incorporation or organization of the Debtor or Reorganized Debtor.

## 11. Time.

In computing any period of time prescribed or permitted by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

## 12. Dates of Actions to Implement the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may

be completed on or as soon as reasonably practicable on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 13.    Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtor.

### 14.    Deemed Acts.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 15.    Successor and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

### 16.    Entire Agreement.

On the Effective Date, the Plan, the Plan Supplement, the Investment Agreement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which shall be deemed to become merged and integrated into the Plan.

### 17.    Exhibits to Plan.

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement documents) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

## VII.
## VALUATION OF THE DEBTOR

***The Marketing Process Establishes the Debtor's Fair Market Value.***  As set forth above, the Debtor, in consultation with Meridian, conducted the extensive Marketing Process over a period of eleven (11) months to solicit interest and offers from potential third-party investors regarding a value-maximizing exit transaction.  In connection with the Marketing Process, interested parties were provided with the time, information and materials necessary to conduct extensive diligence regarding the Debtor's business.  As a result, the Marketing Process generated several bids and indications of interest for a transaction involving the Debtor.

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

The Debtor, in consultation with Meridian, focused on several criteria when evaluating the bids received, including, but not limited to: (a) the proposed purchase price and forms of consideration; (b) the proposed deal structure; (c) any proposed percentage ownership to be left with the Bondholders and other general unsecured creditors; (d) any diligence contingencies; and (e) the proposed amount of any deposit.  After receiving and evaluating the two Revised Bids submitted, the Debtor determined, in consultation with Meridian, that the offer received from the Sponsor and the related Investment Agreement contained, among other benefits, materially better economic terms than the any other bid received and presented the best actionable transaction to maximize value.  In addition, the Notes Trustee, on behalf of the Noteholders, the Debtor's largest creditor constituency, preliminarily consented to the Debtor's entry into the Investment Agreement.

Accordingly, the Debtor believes that the bid represented by the Investment Agreement establishes the fair market value of the Debtor's business because it represents a market-tested price and the greatest value achievable for the Debtor in the current market.

***The Debtor's December 2021 Appraisals.***  Attached hereto as **Exhibit E-1**, is an appraisal report, dated April 25, 2022, prepared by Level Valuation LLC, at the request of the Debtor (the "**LV Appraisal Report**").  The LV Appraisal Report estimates that, as of December 31, 2021, the appraisal value of 106 of the properties indirectly owned by the Debtor through the PropCos to be approximately $517,710,000.  As further described in the LV Appraisal Report, Level Valuation considered and evaluated three traditional valuation methodologies in preparing the appraisals: (i) income capitalization, (ii) sales comparison, and (iii) cost.  In addition to the LV Appraisal Report, separate appraisals were prepared for the Albee Square and North Flats properties, which are attached hereto as **Exhibit E-2** (the "**Additional Appraisal Reports**" and, together with the Level Appraisal Report, the "**Appraisal Reports**").  As set forth in the Additional Appraisal Reports, the value of the Albee Square property, as of September 30, 2021, is estimated to be $161,500,000 and the value of the North Flats property, as of December 31, 2021, is estimated to be $83,500,000.  The appraisal report prepared for the William Vale, based on the limited information available to the Debtor and the qualifications set forth therein, estimates the market value of the property to be $158,300,000 and $174,300,000 as of December 31, 2021 and December 31, 2023, respectively.

The value estimates set forth in the Appraisal Reports do not account for several factors that have a material negative impact on any residual value attributable to the Debtor, as the ultimate parent of the PropCos, including, without limitation, (i) the approximately $760 million in outstanding property-level mortgage debt, (ii) the interests and claims of the co-owners and partners in many of the PropCos and properties, (iii) any other claims or preferred interests that may be asserted against or in the PropCos or the properties that would be senior in priority to the claims of creditors of the Debtor, (iv) any claims relating to any debtor-in-possession financing, (v) any administrative expense claims arising out of or relating to the administration of the Chapter 11 Case, including the fees, costs, and expenses of any retained professionals in the Chapter 11 Case, and (vi) the approximately $565 million in funded debt and other claims against the Debtor.

***Financial Projections.***  Solely for purposes of the Plan, and solely based on information provided by the Debtor and without any independent verification, the Sponsor has prepared

financial projections for the Reorganized Debtor following the Effective Date, which are attached to this Disclosure Statement as **Exhibit G** (the "**Financial Projections**"). In addition, the Sponsor anticipates that the equity interests in the Reorganized Debtor will be held through the following entities: Greenrock Realty Services LLC, Vickory Partners LLC, BVT Holdings LLC, and Cam Elm Company LLC. The principals who control these entities have more than seventy (70) years of combined experience in the real estate business. Currently, these individuals, through numerous entities, own and control over 40,000 residential apartments in the New York and New Jersey area and also own tens of millions of square feet of commercial and industrial space in and out of New York City. These principals also have several years of experience working with major financial and healthcare businesses. The Financial Projections and the experience and capabilities of these principals, among other things, demonstrate that the Reorganized Debtor has sufficient capital and means to consummate the Plan and meet its obligations on a go-forward basis, including with respect to the payments on the New Notes and all Unimpaired Claims under the Plan.

The Debtor and its professionals have not independently verified the Financial Projections prepared by the Sponsor. Such forecasts were developed solely for purposes of the formulation and negotiation of the Plan. Neither the Debtor, the Reorganized Debtor, the Sponsor, the Plan Administrator, nor any other person assumes responsibility for any differences between the estimated recoveries and actual outcomes.

## VIII.
### TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The offer, issuance, and distribution of the New Notes to holders of Allowed Remaining Unsecured Claims pursuant to the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

The New Notes shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) the restrictions, if any, on the transferability of such securities and instruments, including, without limitation, any restrictions on the transferability under the terms of the New Notes, and (iv) applicable regulatory approvals.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a Claim against, or an Interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. In reliance upon this exemption, the New Notes issued to holders of Allowed Remaining Unsecured Claims generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or

state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a Claim with a view to distribution of any security to be received in exchange for the Claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

*Listing*.   Upon the Effective Date of the Plan, the New Notes will not be publicly traded or listed on any national securities exchange.  Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

*Legends.*

To the extent certificated, certificates evidencing the New Notes held by holders of 10% or more of the outstanding equity of the Reorganized Debtor, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE NOTES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS NEWCO RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## IX.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to holders of certain Claims entitled to vote on the Plan. This summary does not address the U.S. federal income tax consequences to holders of Claims whose Claims are entitled to payment in full in Cash, holders of Claims who are deemed to have rejected the Plan, or holders of Interests. Moreover, the following summary does not discuss the U.S. federal income tax consequences of the Plan if the Debtors elect prior to the Effective Date to pursue an Alternative Transaction.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), existing and proposed Treasury regulations thereunder, judicial authorities, published administrative rules and pronouncements of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtor has not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (such as non-U.S. persons, broker-dealers, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction or other integrated investment, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The discussion assumes, except where otherwise indicated, that (i) the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. Each holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.*

## A.    Consequences to Debtor

The Debtor is a British Virgin Islands private company that has been treated as a disregarded entity for U.S. federal income tax purposes. As a disregarded entity, the Debtor is not subject to U.S. federal income tax. In addition, the Plan provides that the Debtor shall implement the Plan in a manner such that the Debtor should continue to be treated as a disregarded entity through the implementation of the Plan on the Effective Date.

Pursuant to the Plan, the Sponsor will acquire all of the Reorganized Debtor and, thus, all of the assets of the Debtor other than the Excluded Assets, in exchange for (i) at least $40,000,000 in Cash and (ii) New Notes in the aggregate principal amount of $20,000,000 (plus additional New Notes in the aggregate principal amount of $2,000,000 if the Sponsor, or its affiliate, closes the William Vale Purchase by year end), to be distributed pursuant to the Plan. The Excluded Assets and a portion of the Cash consideration will be transferred to Wind-Down Co. As discussed below, Wind-Down Co will be treated as a corporation for U.S. federal income tax purposes. *See* "Tax Treatment of Wind-Down Co and Wind Down Distributions," below.

For U.S. federal income tax purposes, the Debtor should be treated as selling (i) all of its assets (other than the Excluded Assets) to the Sponsor and (ii) all of its Excluded Assets to Wind-Down Co. It is also possible that the implementation of the Plan may result in the recognition of income from the cancellation of debt. However, as indicated, because the Debtor is a disregarded entity for U.S. federal income tax purposes, the Debtor does not expect to incur any U.S. federal income tax liability as a result of any income or gain that may be recognized as a result of the implementation of the Plan.

## B.    Tax Treatment of Wind-Down Co and Wind Down Distributions

Pursuant to the Plan, Wind-Down Co will be a limited liability company that elects to be taxable as a corporation for U.S. federal income tax purposes, and the holders of Allowed Remaining Unsecured Claims (in respect of their right to any and all distributions from assets transferred to Wind-Down Co) will be regarded as the stockholders of Wind-Down Co for U.S. federal income tax purposes.

Accordingly, Wind-Down Co will be a separate taxable entity for U.S. federal, and applicable state and local, income tax purposes. In general, Wind-Down Co's tax basis in the Excluded Assets will be the fair market value of the Excluded Assets at the time of transfer. As a result, upon a disposition of the Excluded Assets, Wind-Down Co should generally only be taxable for U.S. federal income tax purposes on any appreciation in value after the Effective Date.

As a corporation for U.S. federal income tax purposes, the tax treatment of subsequent distributions by Wind-Down Co to the holders of Allowed Remaining Unsecured Claims as the regarded stockholders generally will depend on whether such distributions are made pursuant to a plan of liquidation adopted by the board. Pursuant to the Plan, prior to making any such

distributions, Wind-Down Co will adopt a "plan of liquidation" (as determined for U.S. federal income tax purposes) in furtherance of its duties and responsibilities under the Plan to monetize and distribute its assets.

Generally, if a subsequent distribution is made pursuant to a plan of liquidation, such distribution will be treated as a return of capital to the extent of a holder's tax basis in the stock (*i.e.,* the fair market value of the stock when received), and thereafter as gain in respect of the sale or exchange of the stock. Otherwise, any distributions with respect to stock of Wind-Down Co will be treated as a taxable dividend to the extent paid out of Wind-Down Co's current or accumulated earnings and profits as determined under U.S. federal income tax principles, and will be taxable to the holder as ordinary income when received. To the extent the amount of any distribution exceeds available earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the stock as to which the distribution was made, but not below zero. Any remaining excess will be treated as gain from the sale or exchange of Wind-Down Co stock. Depending on the type of holder and the holder's particular circumstances, a taxable dividend may be a qualified dividend entitled to a lower tax rate or may be eligible for a dividends received deduction (the benefits of which may be mitigated by the extraordinary dividend rules).

## C.    **Consequences to Holders of Remaining Unsecured Claims**

Pursuant to the Plan, each holder of an Allowed Remaining Unsecured Claim will receive (i) on the Effective Date, its Pro Rata Share of the Class 4 ED Distribution (comprising both Cash and New Notes), with the exception that a portion of the New Notes potentially may be distributed after the Effective Date by year end (if the William Vale Purchase closes after the Effective Date), and (ii) thereafter, from Wind-Down Co as and when determined by the Plan Administrator, any available proceeds from the liquidation of the Excluded Assets and any remaining Wind Down Cash Funding (after satisfying all other obligations and expenses of Wind-Down Co).

The Debtor expects, and as indicated above the Plan provides, that the right of the holders of Allowed Remaining Unsecured Claims to any remaining amounts recoverable by Wind-Down Co will be treated as equity, and thus as stock, in Wind-Down Co for U.S. federal income tax purposes. Further thereto, the Plan requires that all holders of Claims report consistent therewith for all income tax purposes, use commercially reasonable efforts to cause consistent reporting by others, and not join in, encourage, and/or support inconsistent reporting by others. Accordingly, the following discussion assumes that each holder of an Allowed Remaining Unsecured Claim will be treated for U.S. federal income tax purposes (as regards to their right to any and all distributions from assets transferred to Wind-Down Co) as receiving stock in Wind-Down Co, and that any subsequent distributions from Wind-Down Co to holders of an Allowed Remaining Unsecured Claim will be treated as distributions to them as stockholders. For a discussion of the U.S. federal income tax treatment of such distributions to U.S. holders, *see* "Tax Treatment of Wind-Down Co and Wind Down Distributions," above.

As used herein, the term "U.S. holder" means a beneficial owner of a Remaining Unsecured Claim that is for U.S. federal income tax purposes:

1.  an individual who is a citizen or resident of the United States;

2.  a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

3.  an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

4.  a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Remaining Unsecured Claims, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.

### 1.    Taxable Transaction

In general, each U.S. holder of an Allowed Remaining Unsecured Claim will have a taxable exchange on the Effective Date. Accordingly, each U.S. holder of an Allowed Remaining Unsecured Claim generally should recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference, if any, between (i) the sum of the amount of any Cash, the "issue price" of the respective New Notes (as discussed below, see subsection 4 "Ownership and Disposition of the New Notes – Determination of OID and Issue Price") and the fair market value of Wind-Down Co stock received or treated as received by the holder (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued original issue discount ("**OID**")) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* "Character of Gain or Loss" below. In addition, a U.S. holder will have interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* "Distributions in Respect of Accrued But Unpaid Interest or OID" below. A U.S. holder that has an underlying Claim in multiple classes or receives consideration from multiple source generally will be taxed based on the aggregate consideration received in respect of such Claim.

In the event a portion of the New Notes is separately distributed after the Effective Date or any Disputed Remaining Unsecured Claims as of the Effective Date are subsequently disallowed, a holder of a previously Allowed Remaining Unsecured Claim may have additional gain (if any) and/or imputed interest income in respect of the additional distribution of New Notes or subsequent distributions from the Class 4 Disputed Claims Reserve or the deemed receipt of additional Wind-Down Co stock. *See* "Resolution of Disputed Remaining Unsecured Claims and Tax Treatment of the Class 4 Disputed Claims Reserve," below. In addition, it is possible that the recognition of any loss realized by a holder with respect to an Allowed Remaining Unsecured Claim as to which additional distributions could be received on account of the

subsequent disallowance of Disputed Remaining Unsecured Claims may be deferred until all such Claims are Allowed or Disallowed.  Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such holders in respect of their Claims due to the receipt of cash in a taxable year subsequent to the taxable year in which the Effective Date occurs.  This discussion assumes that the installment method does not apply, either because the exchange is not eligible or because the holder elects out of such treatment.

A U.S. holder's tax basis in the respective New Notes received and in the Wind-Down Co stock treated as received should equal the amount taken into account in determining the holder's gain or loss, and the U.S. holder's holding period in such New Notes and stock generally should begin on the day following the Effective Date.

### 2.     Character of Gain or Loss

Where gain or loss is recognized by a U.S. holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. holder, whether the Claim constitutes a capital asset in the hands of the U.S. holder and how long the Claim has been held, whether the Claim was acquired at a market discount, and whether and to what extent the U.S. holder previously claimed a bad debt deduction.

A U.S. holder that purchased any debt underlying its Claim from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code.  In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.

Under these rules, any gain recognized on the exchange of such Claim (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. holder, on a constant yield basis) during the U.S. holder's period of ownership, unless the U.S. holder elected to include the market discount in income as it accrued.  If a U.S. holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

### 3.     Distributions in Respect of Accrued but Unpaid Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. holder of an Allowed Remaining Unsecured Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. holder as interest income (if not previously included in the U.S. holder's gross income).  Conversely, a U.S. holder generally recognizes a deductible loss to the extent any accrued interest claimed or accrued OID was previously included in the U.S. holder's gross income and is not paid in full.

The Plan provides that consideration received in respect of an Allowed Claim is allocable first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the portion of such Allowed Claim (if any) that reflects reimbursable expenses, and then to the accrued and unpaid interest on such Allowed Claim, if any. *See* Section 6.16 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration and the inclusion and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

## 4. Ownership and Disposition of the New Notes

The following discussion is based on the principal terms of the New Notes set forth in the form of New Note included as an exhibit to the Plan. To the extent the terms vary, and depending on any additional terms, as well as the applicable facts and circumstances as the issue date of the New Notes, the federal income tax treatment may differ from that described below. *All holders are urged to consult their tax advisors regarding the tax treatment of the New Notes.*

Of particular note regarding present terms of the New Notes is that the principal amount of the New Notes is subject to reduction in the event of any Subsidiary Value Reductions (as defined in the Investment Agreement) during the nine-month period after the Closing Date. Accordingly, it is possible that the New Notes may be regarded as a "contingent payment debt instrument" for U.S. federal income tax purposes unless, based on all the facts and circumstances as of the issue date, it is "significantly more likely than not" that the scheduled payment of the full stated principal amount will occur. The Debtor currently believes, and the tax discussion herein assumes, that it *is* significantly more likely than not that the full stated principal amount will be paid, and that the New Notes are therefore not contingent payment debt instruments. However, such determination ultimately will be made by the Reorganized Debtor, based on the facts and circumstances at the time of the issuance of the New Notes.

### a. Determination of OID and Issue Price

The New Notes will be considered issued with OID in an amount equal to the excess of the "stated redemption price at maturity" of the New Notes over the "issue price" of the New Notes (as discussed below) by an amount equal to or greater than a statutorily defined *de minimis* amount. The *de minimis* amount is equal to 0.25% of the stated redemption price at maturity multiplied by the number of remaining whole years to maturity. The stated redemption price at maturity of the New Notes is the total of all payments due on the New Notes other than payments of "qualified stated interest" (of which there are none under the present terms). In general, qualified stated interest means stated interest that is unconditionally payable in Cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or a single qualified floating rate.

For U.S. federal income tax purposes, the "issue price" of the New Notes depends, in part, on whether (i) any Allowed Remaining Unsecured Claims (in particular, any of the Noteholder Claims) are considered traded on an "established market" for U.S. federal income tax purposes and (ii) whether a portion of the New Notes are separately issued after the Effective Date (due to a post-Effective Date closing of the William Vale Purchase). The issue price of a debt

issuance that is traded on an established market or that is issued, in whole or in part, for existing debt so traded would be the fair market value of such debt issuance (or such exchanged debt) on the issue date as determined by such trading. Subject to certain exceptions, the issue price of a debt that is neither so traded, nor issued for existing debt so traded, would be the lower of its imputed principal amount (*i.e.,* all payments on the note discounted back based on the applicable federal rate published by the IRS) or its stated principal amount. Thus, in this latter instance, since the New Notes do not bear any stated interest, the issue price would be its imputed principal amount.

Pursuant to applicable Treasury regulations, a debt instrument will not be treated as traded on an established market if the outstanding stated principal amount of such debt instrument does not exceed $100 million. Accordingly, since the stated principal amount of the New Notes will in no event exceed $22 million, whether the New Notes are considered traded on an established market depends on whether any series of Noteholder Claims that have an outstanding principal amount in excess of $100 million is traded on an established market. Any such series of Noteholder Claims will be treated as traded on an established market for U.S. federal income tax purposes only if it is traded on an established market during the 31-day period beginning 15 days before the Effective Date. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale of the Noteholder Claims, or if there is one or more "firm quotes" or "indicative quotes" for such debt, in each case as such terms are defined in applicable Treasury regulations. If the Reorganized Debtor determines that an applicable trading market exists, such that the issue price of the New Notes is its fair market value (based on the trading in the Noteholder Claims), such determination as to the existence of an applicable trading market and the resulting issue price of the New Notes will be binding on all holders of Allowed Remaining Unsecured Claims unless such holder discloses, on a timely filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from the Reorganized Debtor's determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

In the event the William Vale Purchase occurs after the Effective Date, additional New Notes will be issued and distributed after the Effective Date (in the aggregate stated principal amount of $2 million) and might have a different "issue price" than the New Notes issued on the Effective Date and, thus, might not be fungible for U.S. federal income tax purposes or from a sale perspective. In general, whether the additional New Notes would have the same issue price with the previously issued New Notes will depend on whether the issuance of such additional New Notes is part of the same "issue" as the previously issued New Notes (meaning that they are issued within 13 days after the Effective Date) or is treated as a "qualified reopening" within the meaning of the Treasury regulations governing subsequent issuances (which depends, in part, on whether the effective yield of the additional notes is within 10% of the original notes).

As previously discussed, the principal amount of the New Notes may be reduced under certain circumstances. Were such circumstances to occur, a U.S. holder may be required to redetermine the issue price of the New Notes at such time, as discussed in the next section.

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

### b.      Treatment as Reissuance Upon Actual Occurrence of Contingency

As discussed above, the discussion herein assumes that, as of the issue date of the New Notes, it is "significantly more likely than not" that the scheduled payment of the full stated principal amount will occur.  Nevertheless, there exists the possibility that the principal amount may be subsequently reduced under certain circumstances.  If such circumstances actually occur, the New Notes will be treated as reissued at such time solely for purposes of the OID rules, for an amount equal to the adjusted issue price of the New Notes and a stated redemption price at maturity equal to the reduced principal amount.  *All holders are urged to consult their tax advisors regarding the tax treatment of the New Notes in the event of a deemed reissuance.*

### c.      Accrual and Amortization of OID

A U.S. holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a "constant yield" to maturity basis over the term of the New Notes, in advance of the receipt of the cash attributable to such OID and regardless of the U.S. holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the New Notes that is attributable to previously accrued OID that has been included in the U.S. holder's income.

The amount of OID includible in income for a taxable year by a U.S. holder generally will equal the sum of the "daily portions" of the total OID on the New Notes for each day during the taxable year (or portion thereof) on which such U.S. holder held the New Notes.  Generally, the daily portion of the OID is determined by allocating to each day during an accrual period a ratable portion of the OID on such New Notes that is allocable to the accrual period in which such day is included.  The amount of OID allocable to each accrual period generally will be an amount equal to the excess of (i) product of (x) "adjusted issue price" of such New Notes at the beginning of such accrual period and (y) its "yield to maturity" over (ii) the aggregate amount of any qualified stated interest payments allocable to the accrual period.  The "adjusted issue price" of such New Notes at the beginning of any accrual period will equal the issue price, increased by the total OID accrued for each prior accrual period, less any cash payments made on such New Notes on or before the first day of the accrual period (other than qualified stated interest).

The "yield to maturity" of the New Notes will be computed on the basis of a constant annual interest rate and compounded at the end of each accrual period.  If the amount of OID on the New Notes is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID generally will be treated as gain from the sale of the New Notes, and a Pro Rata amount of such *de minimis* OID must be included in income as principal payments are received on the New Notes.

### d.      Sale or other Disposition of New Notes

Subject to the discussion above with respect to the potential carryover of accrued market discount to the New Notes, upon the sale, exchange or other taxable disposition of a New Note, a U.S. holder generally will recognize taxable gain or loss equal to the difference, if any, between (i) the sum of cash plus the fair market value of any property received from such sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as

interest) and (ii) the U.S. holder's adjusted tax basis in their interest in the New Note. A U.S. holder's initial tax basis in a New Note will be increased by any OID previously included in income and decreased by any payments received on the New Notes other than qualified stated interest. Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the New Note has been held for more than one year at the time of its sale, exchange or other taxable disposition. Certain non-corporate U.S. holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains. The deductibility of capital losses is subject to significant limitations.

### 5.    Resolution of Disputed Remaining Unsecured Claims and Tax Treatment of the Class 4 Disputed Claims Reserve

Any cash and New Notes that would be distributable in respect of any Disputed Remaining Unsecured Claim on the Effective Date had such Disputed Claim been Allowed will be deposited into the Class 4 Disputed Claims Reserve as determined pursuant to the Plan or an estimation proceeding. As discussed below, the Class 4 Disputed Claims reserve is intended to be treated as a "disputed ownership fund" for U.S. federal income tax purposes. In contrast, any amounts that would subsequently be distributable by Wind-Down Co in respect of a Disputed Remaining Unsecured Claim if such Claim were to be ultimately Allowed shall be retained as an asset of Wind-Down Co and not distributed until such Claim is resolved. Consistent with the treatment of the right of holders of Allowed Remaining Unsecured Claims to any remaining amounts recoverable by Wind-Down Co as stock in Wind-Down Co for U.S. federal income tax purposes, the resolution of a Disputed Remaining Unsecured Claim likely will result in a deemed distribution of stock in Wind-Down Co to the holder of the Disputed Remaining Unsecured Claim to the extent Allowed and otherwise to holders of previously Allowed Remaining Unsecured Claims.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will treat the Class 4 Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury regulations section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtor, the Reorganized Debtor, the Plan Administrator, any Disbursing Agent, and the holders of Remaining Unsecured Claims) shall be required to report for tax purposes consistently with the foregoing.

A disputed ownership fund is a separate taxable entity for U.S. federal income tax purposes. Accordingly, the Class 4 Disputed Claims Reserve will be subject to tax annually on any net income earned with respect to its assets (including any gain recognized by it upon its distribution of the New Notes, due to the treatment of such distribution as a sale at fair market value). A disputed ownership fund that holds only passive assets is taxed at the maximum rate applicable to trusts and estates. The Class 4 Disputed Claims Reserve will be responsible for payment, out of available Cash of such reserve allocable to the respective Disputed Remaining Unsecured Claims, of any taxes imposed on the Class 4 Disputed Claims Reserve or with respect to its assets. If the Class 4 Disputed Claims Reserve has insufficient Cash to pay such taxes, Wind-Down Co will be responsible for the payment of such taxes.

To the extent that a Disputed Remaining Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent will distribute to the holder thereof out of the Class 4 Disputed Claims Reserve any amount to which such holder is entitled pursuant to the Plan with respect to the amount of any cash and New Notes distributable on the Effective Date (which distribution will be net of allocable expenses of the reserve, including taxes, relating to the retention or disposition of such assets). Alternatively, the Disbursing Agent will distribute such amount to holders of previously Allowed Remaining Unsecured Claims in accordance with the Plan. All distributions from the Class 4 Disputed Claims Reserve will be treated as received by holders in respect of their Claims as if distributed by the Debtors.

### 6. Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

*The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests are urged to consult their tax advisors concerning the U.S. federal, state, local, and other tax consequences applicable under the Plan.*

### X.
### CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference herein. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A. Certain Bankruptcy Law and International Considerations

### 1. Risk of Non-Confirmation of Plan

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation

or that such modifications would not necessitate re-solicitation of votes. Moreover, even though the Notes Trustee, on behalf of the Noteholders, has preliminarily consented to the Debtor's entry into the Investment Agreement, the Debtor can make no assurances that it will receive the requisite acceptances to confirm the Plan through this solicitation process. Even if the Voting Class votes in favor of the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

In the event that the Debtor is unable to obtain sufficient votes from the Voting Class, the Debtor may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims as those proposed in the Plan.

### 2. Failure to Obtain Israeli and BVI Court Approvals

The Investment Agreement and the Plan require the Debtor to seek certain approvals from the BVI and Israeli Courts in order to consummate the transactions contemplated thereunder, including, without limitation, approval of the BVI Plan of Arrangement by the BVI Court and recognition of the Plan and the Confirmation Order by the Israeli Court. The Debtor anticipates obtaining the necessary approvals from the BVI and Israeli Courts by October 2022; however, there can be no assurance that the necessary approvals from these courts will not take longer than anticipated. Further, although the Debtor believes that the Plan and the transactions contemplated thereunder will satisfy all of the applicable requirements under BVI and Israeli law, there can be no assurance that the BVI and Israeli Courts will reach the same conclusion or that modifications to the Plan will not be required or that such modifications would not necessitate re-solicitation of votes.

### 3. Non-Consensual Confirmation

In the event that any impaired class of claims or equity interests does not accept or is deemed not to accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to, or be deemed to, reject the Plan, these requirements must be satisfied with respect to such rejecting Classes. Pursuant to the Plan, the Non-Voting Impaired Classes – Class 5 (Subordinated Securities Claims) and Class 6 (Equity Interests) – are deemed to reject the Plan and, accordingly, are not entitled to vote. The Debtor believes that the Plan satisfies these requirements with respect to such Classes.

### 4. Risk Related to Parties in Interest Objecting to the Debtor's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or

85

interests in such class.  The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 5. Risk of Non-Occurrence of Effective Date

The consummation of the Investment Agreement is a condition precedent to the Effective Date of the Plan.  The Investment Agreement provides that the agreement may be terminated by either the Debtor or the Sponsor before the closing if, among other things, the closing does not occur by September 23, 2022 (the "**Outside Date**").[17]  Although the Debtor believes that the closing will occur in advance of the Outside Date, there can be no assurance as to the timing of the closing.  Further, if the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtor and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to Claims and Interests would remain unchanged.

### 6. Risks Associated with the Investment Agreement

As set forth above, the Plan is premised on the Investment Agreement which provides for the closing of the transactions contemplated thereunder and the distribution of the proceeds from such closing in accordance with the Plan.  There are various closing conditions under the Investment Agreement, which the Debtor believes it can satisfy.  However, in the event the Debtor fails to satisfy any of the closing conditions or the Investment Agreement is terminated in accordance with its terms for any reason as permitted therein or otherwise, including as a result of breach by the Sponsor, the Chapter 11 Case and distributions to holders of Claims and Interests could be significantly impacted.

In addition, the Investment Agreement provides that the Plan Consideration may be subject to downward adjustment if the Sponsor, between March 2, 2022 and nine months following the closing, discovers that the actual percentage of the Debtor's direct or indirect equity interest or ownership interest in a Subsidiary or any Owned Real Property (each as defined in the Investment Agreement), is less than as stated in the Investment Agreement.  Any adjustments to the purchase price would reduce the amount of funds available for distribution to holders of Claims and Interests.

### 7. DIP Financing

As set forth above, to continue its business operations and fund the Chapter 11 Case, the Debtor has negotiated and secured a commitment for a multiple draw debtor-in-possession term loan from the Sponsor and filed the DIP Motion to seek approval of the proposed DIP Loan.  If the Chapter 11 Case takes longer than expected to conclude or the Debtor defaults under its

---

[17] This deadline may be extended in certain circumstances to December 31, 2022, as set forth in Section 11.01(d) of the Investment Agreement.

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

obligations under the DIP Loan, the Debtor may exhaust or lose access to its financing before the transactions contemplated under the Investment Agreement can be effectuated. There is no assurance that the Debtor will be able to obtain additional financing from other third-party lenders. In either such case, the liquidity necessary to bridge to the closing under the Investment Agreement may be materially impaired.

### 8. Conversion into Chapter 7 Case

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* Article XI hereof, as well as the Liquidation Analysis attached hereto as **Exhibit H**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### B. Additional Factors Affecting the Value of the Debtor

### 1. Claims Could Be More than Projected

There can be no assurance that the Allowed amount of Claims in Class 4 (Remaining Unsecured Claims) will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, unanticipated events and circumstances may affect the ultimate results. With respect the Non-Securities Indemnity Claims, there is a risk that the Bankruptcy Court determines that such Claims should not be estimated at zero dollars ($0) for all purposes under the Plan. Therefore, the actual amount of Allowed Claims may vary from the Debtor's feasibility analysis, and the variation may be material.

### 2. Valuation Regarding Avoidance Actions and Causes of Actions

Under the Plan, the Plan Administrator has the right to pursue and prosecute Avoidance Actions and other Causes of Action. The Debtor has not performed an analysis of the potential value, if any, of the Avoidance Actions or other Causes of Action. The amount and timing of recovery thereof are unknown. Any proceeds of the Avoidance Actions and other Causes of Action would benefit the holders of Remaining Unsecured Claims.

### 3. Inability to Meet Future Obligations

As set forth in Article VII above, the Financial Projections attached hereto as **Exhibit G** demonstrate that the Reorganized Debtor has sufficient capital and means to consummate the Plan and meet its obligations on a go-forward basis. However, due to various unforeseen market factors and causes, there is a risk that the Reorganized Debtor will not generate sufficient cash to meet its future obligations, including with respect to the payments on the New Notes and satisfaction of any Unimpaired Claims under the Plan.

| WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

### C.     Additional Factors

#### 1.     Debtor Could Withdraw the Plan

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor.

#### 2.     Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 3.     No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

#### 4.     No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or whether to object to confirmation of the Plan.

#### 5.     No Admission Made

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or holders of Claims or Interests.

#### 6.     Certain Tax Consequences

For a discussion of certain tax considerations to the Debtor and certain holders of Claims in connection with the implementation of the Plan, *see* Article IX hereof.

## XI.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, all creditors entitled to vote in the Voting Class should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

### A.   Voting Instructions and Voting Deadline

The Debtor is providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (the "**Solicitation Package**") to all record holders of Claims in Class 4 (Remaining Unsecured Claims).

With respect to the Claims in the Voting Class held by the Noteholders, the Debtor will transmit one Solicitation Package to the Notes Trustee on account of the Noteholders' Claims in Class 4 (Remaining Unsecured Claims), which shall include a master Ballot to aggregate the votes for all such claims.  The master Ballot to be transmitted to the Notes Trustee will specify that the Notes Trustee is to submit the completed and executed Ballot to the Debtor by electronic mail.  Further, in connection with voting on the Plan, each Noteholder will be provided with the opportunity to elect to assign any and all claims and causes of action that such Noteholder may hold in its capacity as a Noteholder to the Plan Administrator to pursue for the benefit of such Noteholders. The master Ballot will provide a space for the Notes Trustee to record whether a Noteholder has affirmatively elected to assign such claims and causes of action to the Plan Administrator.

With respect to any other holders of Claims in Class 4 (Remaining Unsecured Claims), the Debtor will transmit a general Ballot to such holders that can be used to vote on the Plan.

**Each Ballot contains detailed voting instructions.  Each Ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date, and the applicable standards for tabulating Ballots.  The Voting Record Date for determining which holders are entitled to vote on the Plan is September 12, 2022.  Please complete the information requested on the Ballot, sign, date and indicate your vote on the Ballot, and return the completed Ballot in the manner specified on the Ballot you received.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE OF SEPTEMBER 19, 2022 AT 5:00 P.M. (EASTERN TIME).   HOWEVER, THE VOTING DEADLINE MAY BE EXTENDED IN THE SOLE DISCRETION OF THE DEBTOR.**

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED IN DETERMINING ACCEPTANCE OF THE PLAN.

If you hold a Claim in the Voting Class and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the procedures for voting on

the Plan, please contact any of the representatives at the Voting Agent at (212) 771-1128 or (ii) by emailing DRCVote@DonlinRecano.com.

### B.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan. Pursuant to section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not actually vote on the Plan and will not receive a Ballot.  If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan.

The Voting Class.  The only Voting Class that is Impaired and entitled to receive distributions under the Plan and, therefore, the only class that is entitled to vote to accept or reject the Plan, is Class 4 (Remaining Unsecured Claims).  Accordingly, the votes of the holders of Claims in Class 4 will be solicited in connection with the Plan.

Based upon the Debtor's Schedules and the provisions of the Plan, creditors in Class 4 (Remaining Unsecured Claims) may vote on the Plan unless:

(i)    as of the Voting Record Date, the outstanding amount of such claimant's Claim is not greater than zero ($0.00);

(ii)    as of the Voting Record Date, such claimant's Claim has been disallowed, expunged, disqualified, or suspended; or

(iii)    as of the Voting Record Date, such claimant's Claim is subject to an objection or request for estimation, in accordance with the procedures set forth below.

Any creditor that is not scheduled in the Debtor's Schedules and that did not file a proof of Claim prior to the Voting Record Date shall not be entitled to vote on the Plan.

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

The Non-Voting Classes.  The Plan does not impair Claims in the Unimpaired Classes – Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (General Unsecured Claims).  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in the Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote.  Further, the holders of Claims or Interests in the Non-Voting Impaired Classes – Class 5 (Subordinated Securities Claims) and Class 6 (Equity Interests) – are not entitled to receive or retain any property under the Plan.  Therefore, pursuant to section 1126(g) of the Bankruptcy Code, the Non-Voting Impaired Classes are deemed to reject the Plan and, accordingly, are not entitled to vote.  Accordingly, no holders of Claims against, and Interests in, the Debtor in the Non-Voting Classes will be solicited in connection with the Plan.  The holders of Claims against and Interests in the Debtor in the Non-Voting Classes will, however, receive notice of the hearing to consider approval of this Disclosure Statement and confirmation of the Plan and related dates and deadlines.

Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a Claim, and without prejudice to the rights of the Debtor to dispute the allowance of any Claim, each Claim within the Voting Class will be temporarily Allowed in an amount equal to the amount of such Claim set forth in the Debtor's Schedules; *provided*, *however*, that:

(i)    if a Claim is allowed pursuant to the Plan or by order of the Bankruptcy Court (entered prior to the Voting Deadline), such Claim shall be allowed for voting purposes in the Allowed amount set forth in the Plan or such order;

(ii)    if a Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, such Claim is temporarily allowed for voting purposes in the amount so estimated or Allowed in such order;

(iii)    if a Claim is listed in the Schedules as partially unliquidated such claim shall be allowed in the partially liquidated amount for voting purposes only;

(iv)    if a Claim is listed in the Schedules as wholly contingent, unliquidated, or disputed, such Claim is accorded one vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution; and

(v)    if a creditor holds or has purchased, based on the Schedules, duplicate Claims within the same class, such creditor shall be provided with only one Solicitation Package and one Ballot for voting a single aggregated Claim in such class.

If a creditor seeks to challenge the allowance or amount of its Claim for voting purposes, the creditor is required to file with the Bankruptcy Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes in a different amount.  Upon the filing of any such motion, the creditor's Ballot shall not be counted unless temporarily allowed by an order of the Bankruptcy Court entered prior to or concurrently with entry of an order confirming the Plan.  All motions pursuant to Bankruptcy Rule 3018(a) must be filed on or before the date which is seven (7) days prior to the Voting Deadline.

The Plan provides for the allowed amount of the Claims against the Debtor arising from the various series of Notes issued by the Debtor.

For a detailed description of the treatment of Claims and Interests under the Plan, *see* Article VI of this Disclosure Statement.

### C. Change of Vote

Any party who has submitted a properly completed Ballot to the Voting Agent prior to the Voting Deadline may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

### D. Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtor, as applicable, in its sole discretion, which determination will be final and binding. The Debtor reserves the right to reject any and all Ballots submitted by any of its creditors not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, as applicable, be unlawful. The Debtor further reserves its rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of its creditors. The interpretation (including the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E. Miscellaneous

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted in determining acceptance or rejection of the Plan. The Debtor, in its sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. If you return more than one Ballot voting different Claims with the Ballots reflecting different votes, and you do not correct this before the Voting Deadline, those Ballots will not be counted. The holders of claims in the Voting Class are required to vote all of their Claims either to accept or reject the Plan. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will not be counted.

The Ballots provided to the holders of Claims in the Voting Class will reflect the principal amount of such claimant's Claim.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of Claims in Class 4 who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtor may, in its sole discretion, reject such Ballot as invalid and, therefore, decline to utilize it in connection with seeking confirmation of the Plan.

## XII.
## CONFIRMATION OF PLAN

### A. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. On, or shortly following, the date hereof, the Debtor will request that the Bankruptcy Court schedule a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), which hearing may be adjourned at the request of the Debtor, including in the event that approval from the Israeli Court to convene the Noteholder Meeting prior to commencing solicitation takes longer than anticipated. Notice of the Confirmation Hearing will be provided to all known holders of Claims and Interests or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Case.

### B. Objections to Confirmation

The Debtor will file its opening brief together with any declarations and/or any other affirmative evidence in support of Plan confirmation **by August 29, 2022 at 5:00 p.m. (Eastern Time)**.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan, together with any declarations and/or other evidence in opposition to the Plan, must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtor's estate, the basis for the objection and the specific grounds thereof, and must be filed with the Bankruptcy Court, with a copy to the chambers of Chief United States Bankruptcy Judge Martin Glenn, the United States Bankruptcy Judge appointed to the Chapter 11 Case, together with proof of service thereof, and served **no later than September 19, 2022, at 5:00 p.m. (Eastern Time) (the "Confirmation Objection Deadline")**, upon the following parties in accordance with the Local Bankruptcy Rules and via email, including such other parties as the Bankruptcy Court may order:

> (a) The Debtor:

All Year Holdings Limited
12 Spencer Street, 3rd Floor
Brooklyn, NY 11205
Attn: Mr. Assaf Ravid and Mr. Ephraim Diamond
Email: ravidasaf@gmail.com and ephraim@arbelcapital.com

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Gary T. Holtzer, Esq.
            Matthew Goren, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Gary.Holtzer@weil.com
            Matthew.Goren@weil.com

(b)     The Notes Trustee:

Mishmeret Trust Company Ltd.
48 Menachem Begin Road
Tel Aviv 6618001
Israel

-and-

Chapman and Cutler LLP
1270 Avenue of the Americas
New York, NY 10020
Attention: Michael Friedman, Esq.
Email: friedman@chapman.com

-and-

Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL 60603
Attention: Stephen Tetro, Esq.
Email: stetro@chapman.com

(c)     The Sponsor

Gissin & Co.
Habarzel 38B
Tel Aviv 6971054, Israel
Attention: Yael Hershkovitz, Esq.

94

Email: Yael@gissinlaw.co.il

-and-

Locke Lord LLP
200 Vesey Street, 20th Floor
New York, NY 10281
Attention: Shalom Jacob, Esq.
Email: SJacob@lockelord.com

-and-

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attention: Avi D. Feinberg, Esq.
Email: Avi.Feinberg@friedfrank.com

(d)      The United States Trustee

The United States Trustee Office Region 2
Attn: Andrea B. Schwartz and Shara Cornell, Esq.
U.S. Federal Building
201 Varick Street, Room 1006
New York, NY 10014-7016
Email: andrea.b.schwartz@usdoj.gov
             shara.cornell@usdoj.gov

Replies and any rebuttal evidence in response to any objections will be filed and served **by September 29, 2022 at 5:00 p.m. (Eastern Time)** or, if the Confirmation Hearing is adjourned by the Court, the date which is not less than seven (7) days prior to the Confirmation Hearing. All briefing and evidence will be submitted to the Court no later than seven (7) days prior to the Confirmation Hearing.

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

### C.      Requirements for Confirmation of Plan

#### 1.      Requirements of Section 1129(a) of the Bankruptcy Code

(a)      General Requirements.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

WEIL:\98727310\1\12817.0007WEIL:\98727310\4\12817.0007

(i)     the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    the Debtor has complied with the applicable provisions of the Bankruptcy Code;

(iii)   the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)    any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)     the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan;

(vi)    with respect to each Class of Claims or Interests, each holder of an impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)   except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either has accepted the Plan or is not impaired under the Plan;

(viii)  except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full the allowed amount of such Claims on the Effective Date, and that priority tax Claims will receive either payment in full of the allowed amount of such Claims on the Effective

<div style="margin-left: 2em;">

Date or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan; and

(xi)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

</div>

(b)    Acceptance of the Plan

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (1) holders of at least two-thirds (2/3) in amount and (2) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan.

Holders of Claims that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTOR WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

(c)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the Plan or (ii) receive or retain under the plan property of a value, as of the Effective Date of the Plan, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive upon a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the

amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtor believes that under the Plan all holders of impaired Allowed Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtor's belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Allowed Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit H**.

The Debtor believes that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor.  The Liquidation Analysis provided in **Exhibit H** is solely for the purpose of disclosing to holders of Claims the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

> (d)   Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan satisfies this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan and the Sponsor's financial wherewithal to consummate the transactions contemplated under the Investment Agreement.  Based upon this analysis, the Debtor believes that it will have sufficient resources to make all payments required pursuant to the Plan.

The Sponsor has prepared the Financial Projections annexed hereto as **Exhibit G** based on the information provided by the Debtor.  Based upon the Financial Projections and the other information provided by the Sponsor to demonstrate its financial wherewithal, the Debtor believes that the Reorganized Debtor to comply with its obligations under the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Reorganized Debtor.  Accordingly, the Debtor believes the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.  Article XI hereof sets forth certain risk factors that could impact the feasibility of the Plan.

### 2.   Additional Requirements for Non-Consensual Confirmation

With respect to the Non-Voting Impaired Classes – Class 5 (Subordinated Securities Claims) and Class 6 (Equity Interests) – which are Impaired and deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each such Class of Claims, the Plan "does not discriminate unfairly" and is "fair and equitable", pursuant to section 1129(b)

of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

The Debtor submits that the "unfair discrimination" and "fair and equitable" tests are satisfied.

(a)      Unfair Discrimination Test

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtor believes the Plan satisfies the "unfair discrimination" test. The Bankruptcy Code provides that the Subordinated Securities Claims in Class 5 are to be subordinated to claims held by general unsecured creditors, such as holders of Remaining Unsecured Claims (Class 4) and General Unsecured Claims (Class 3). Consequently, the disparate treatment of the Subordinated Securities Claims is consistent with the Bankruptcy Code. Further, the holders of Equity Interests (Class 6) are not entitled to any recovery under the Plan and, accordingly, the disparate treatment of the Equity Interests is consistent with the Bankruptcy Code.

Moreover, based on the estimated recoveries, as further set forth in Article VI, no class of Claims is receiving more than 100% of its Claims.

(b)      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied for the plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the plan.

The Debtor believes that the Plan satisfies the "fair and equitable" test.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan. Except to the extent that a holder of a General Unsecured Claim against the Debtor agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of a Class 3 General Unsecured Claim are unaltered by the Plan. Although holders of Allowed Class 4 Remaining Unsecured Claims are not likely to receive payment in full of their claims, the Plan provides that junior classes, i.e., the holders of the Class 5 Subordinated Securities Claims and Class 6 Equity Interests will not receive or retain any property

under the Plan. Accordingly, the Plan meets the "fair and equitable" test with respect to Class 3 General Unsecured Claims and Class 4 Remaining Unsecured Claims against the Debtor. Further, since the holders of Class 6 Equity Interests will not receive or retain any property under the Plan, the Plan meets the "fair and equitable" test with respect to Class 5 Subordinated Securities Claims against the Debtor.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan. There are no holders of equity interests in the Debtor that are junior to the Class 6 Equity Interests. Accordingly, the Plan meets the "fair and equitable" test with respect to Class 6 Equity Interests.

### XIII.
### ALTERNATIVES TO CONFIRMATION AND
### CONSUMMATION OF THE PLAN

The Debtor has evaluated several alternatives to the Plan. After studying these alternatives, the Debtor has concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code. In addition, as set forth below, the Debtor evaluated whether it could continue to operate its business outside of bankruptcy if the Chapter 11 Case was closed without confirmation and implementation of the Plan.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtor (or if the Debtor's exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve the sale of the Debtor's assets to a party other than the Sponsor through a newly negotiated investment agreement. Based upon the extensive marketing efforts conducted both prior to and during the Chapter 11 Case, the Debtor believes that the Plan premised on the Investment Agreement, as described herein, enables its key creditor constituencies to realize the most value under the circumstances and is in the best interests of all stakeholders.

### B.    Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtor could seek authorization from the Bankruptcy Court, after notice and a hearing, to sell its assets under section 363 of the Bankruptcy Code. However, upon analysis and consideration of this alternative, the Debtor does not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Plan as a result of, among other things, (i) the incurrence of potentially significant transfer taxes that would be incurred in connection with multiple transactions that would

otherwise be avoided under a chapter 11 plan, (ii) the time and expense of negotiating with PropCo-level partners and mortgage lenders on each one-off sale, and (iii) the additional time and expense required to maintain and administer the Chapter 11 Case to pursue the section 363 transactions, including any additional brokerage fees or other professional fees.

### C.  Continued Operation Outside of Bankruptcy

In connection with certain disclosure requirements under applicable Israeli law, the Debtor has evaluated the alternative scenario in which the holders of Class 3 General Unsecured Claims and Class 4 Remaining Unsecured Claims convert their claims into equity of the Debtor and continue to operate the Debtor in the ordinary course for a period of five years, after which time the Debtor consummates a sale of the existing properties in its portfolio (such analysis, the "**Five Year Operating Plan**"). The Five Year Operating Plan attached hereto as **Exhibit D-3** reflects, to the best of the Debtor's knowledge, information, and belief, and subject to the disclaimers set forth in **Exhibit D-3** and in this Disclosure Statement, the expected result of continued operation of the Debtor during the applicable period.  As set forth in **Exhibit D-3**, the alternative scenario contemplated under the Five Year Operating Plan does not result in materially higher recoveries to the holders of Class 3 General Unsecured Claims and Class 4 Remaining Unsecured Claims and presents substantial risks.  In addition to delaying the distribution of proceeds to such holders for a period of five years, the Debtor estimates that financing of approximately $24.1 million will be necessary to continue to fund the operations of the Debtor and its non-debtor subsidiaries, and there is no guarantee the Debtor would be able to secure such financing. Further, if the Debtor continued the operation of its business outside of bankruptcy, the Debtor would continue to be exposed to the industry risks and unknowns that currently face real estate businesses operating in the New York residential real estate market.  Accordingly, the Debtor believes that consummation of the Plan and the Investment Agreement is in the best interests of the Debtor and its various stakeholders and is superior to the continued operation of the Debtor's business outside of bankruptcy as contemplated under the Five Year Operating Plan.

### D.  Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit H**.

The Debtor believes that liquidation under chapter 7 would result in lower distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the case and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtor's Chapter 11 Case.  In the event that the Debtor's assets are liquidated under chapter 7, the Debtor's estate would also likely incur several additional fees and expenses as a result of conducting the liquidation, which may include, without limitation, additional brokerage fees, certain transfer taxes, and, if applicable, prepayment penalties related to satisfying any outstanding property-level mortgage debt. These

are in addition to the additional layer of fees that may be incurred by a chapter 7 trustee and its professionals. The payment of all of these fees and expenses would reduce the amount of funds available for distribution to the Debtor's creditors. In addition, the consent of the Debtor's co-owners and partners at the property level may be required to liquidate certain of the Debtor's holdings, which presents the risk that such consents may be withheld and those assets could not be liquidated for the benefit of creditors.

## XIV.
## CONCLUSION AND RECOMMENDATION

The Debtor believes the Plan is in the best interests of all stakeholders and urges the holders of Claims in Class 4 to vote in favor thereof.

Dated: July ~~15~~20, 2022

Respectfully submitted,


**ALL YEAR HOLDINGS LIMITED**


By: */s/ Assaf Ravid*
Name:   Assaf Ravid
Title:    Authorized Manager

**Exhibit A**

**Plan**

## Exhibit B

**Investment Agreement**

**Exhibit C**

**Organizational Chart**

## Exhibit D

**Israeli Disclosure Tables**

## Exhibit D-1

### Prior Year Income Report

**Exhibit D-2**

**Prior Year Property Report**

**Exhibit D-3**

**Five Year Operating Plan**

**Exhibit E**

**Appraisal Reports**

**Exhibit E-1**

**LV Appraisal Report**

**Exhibit E-2**

**Additional Appraisal Reports**

**Exhibit F**

**CVs for Directors of Reorganized Debtor**

**Exhibit G**

**Financial Projections**

**Exhibit H**

**Liquidation Analysis**