WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary Holtzer
Matthew P. Goren
Robert S. Berezin
Richard D. Gage

*Attorneys for the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
                                                          :
In re                                                     :    **Chapter 11**
                                                          :
**ALL YEAR HOLDINGS LIMITED,**                            :    **Case No. 21-12051 (MG)**
                                                          :
          **Debtor.[1]**                                  :
                                                          :
**Fed. Tax Id. No. 98-1220822**                           :
-----------------------------------------------------------X

**DEBTOR'S OPENING BRIEF IN SUPPORT OF CONFIRMATION**
**OF AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
**OF ALL YEAR HOLDINGS LIMITED**

---

[1]    The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

I.  FACTS ................................................................................................................. 5

II. THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE AND
    SHOULD BE APPROVED ................................................................................. 6

  A.  The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code. ........................... 7

  B.  The Plan's Classification of Claims and Interests Complies with Section
      1122 of the Bankruptcy Code. ............................................................................ 7

  C.  The Plan Complies with Section 1123(a) of the Bankruptcy Code. ..................... 10

  D.  The Plan Complies with Section 1123(b) of the Bankruptcy Code. ..................... 11

    1.  Plan Permissive Provisions. ....................................................................... 11

    2.  The Plan Releases Should Be Approved. .................................................. 13

      a.  The Estate Releases Are Appropriate and Should Be
          Approved.................................................................................. 14

      b.  Mutual Releases Are Appropriate and Should Be
          Approved.................................................................................. 16

      c.  The Exculpation Provision Is Appropriate and Should be
          Approved.................................................................................. 17

  E.  The Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code. ......................... 20

    1.  Postpetition Disclosure and Solicitation. .................................................. 20

    2.  Acceptance or Rejection of the Plan. ........................................................ 22

  F.  The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code. ................ 23

    1.  The Plan Has Been Proposed in Good Faith............................................. 23

    2.  The Plan Complies with Otherwise Applicable Law................................. 26

  G.  The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code. ................ 30

  H.  The Debtor Has Complied With the Requirements of Section 1129(a)(5)
      of the Bankruptcy Code. .................................................................................... 30

  I.  The Plan is in the Best Interests of All Creditors of, and Holders of
      Interests in, the Debtor. ..................................................................................... 31

  J.  The Debtor Anticipates the Plan Will be Accepted by the Only Impaired
      Class Entitled to Vote on the Plan, and as to Such Class, the Requirements
      of Section 1129(a)(8) of the Bankruptcy Code Will Be Satisfied. ....................... 32

  K.  The Plan Provides for Payment in Full of All Allowed Priority Claims. .............. 33

  L.  The Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code. ........................ 34

M.    The Plan Is Feasible. ........................................................................... 34

N.    The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code. .............. 39

O.    The Plan Satisfies the "Cram Down" Requirements under Section 1129(b)
      of the Bankruptcy Code for the Non-Voting Impaired Classes. ........................... 40

      1.    The Plan Does Not Discriminate Unfairly. ............................................... 40

      2.    The Plan Is Fair and Equitable. ................................................................. 42

III.   CAUSE EXISTS TO WAIVE STAY OF PROPOSED CONFIRMATION
       ORDER. ............................................................................................................... 43

IV.   CONCLUSION ............................................................................................................ 44

WEIL:\98751606\11\12817.0007

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Bus. Sols., Inc.*,
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) ...................................................................35

*In re Adelphia Commc'ns*,
  368 B.R. .................................................................................................15, 18, 32

*In re Advance Watch Co., Ltd.*,
  2016 Bankr. LEXIS 229 (Bankr. S.D.N.Y. Jan. 25, 2016)....................................34

*In re Aegean Marine Petroleum Network Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019)...................................................................17

*Aetna Cas. & Sur. Co. v. Clerk (In re Chateaugay Corp.)*,
  89 F.3d 942 (2d Cir. 1996).....................................................................................8

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)..............................................................................................31

*In re BearingPoint, Inc.*,
  453 B.R. 486 (Bankr. S.D.N.Y. 2011) ...................................................................18

*In re Charter Commc'ns*,
  419 B.R. .................................................................................................10, 18, 25

*In re Chemtura*,
  439 B.R. .........................................................................................................18, 23

*In re Coastal Broad. Sys., Inc.*,
  No. CIV. 12-5682 RMB, 2013 WL 3285936 (D.N.J. June 28, 2013), *affirmed*,
  570 F. App'x 188 (3d Cir. 2014) ...........................................................................41

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 714 (Bankr. S.D.N.Y. 1992), *aff'd sub nom. Lambert Brussels
  Assocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham
  Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992) ...............................................41

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992).........................................................7, 20, 35

*In re Drexel Burnham Lambert Grp., Inc.*,
  960 F.2d 285 (2d Cir. 1992)..................................................................................19

WEIL:\98751606\11\12817.0007

*Evergreen Gardens Mezz, LLC, et al.*, Case No. 21-10035 (MG) (Bankr. SD.N.Y. 2021) ............................................................................................................19

*In re Fed.-Mogul Glob. Inc.*,
385 B.R. 560 (Bankr. D. Del. 2008), *aff'd sub nom. In re Fed.-Mogul Glob.*, 402 B.R. 625 (D. Del. 2009), *aff'd sub nom. In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355 (3d Cir. 2012)............................................................................28, 29

*In re Finlay Enters. Inc.*,
No. 09-14873 (JMP), 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) .........................42

*Genco Shipping & Trading Ltd.*,
Case No. 14-11108 (SHL), ¶ 24(d), (Bankr. S.D.N.Y. July 2, 2014)......................................19

*In re J. Reg. Co.*,
407 B.R. 520 (Bankr. S.D.N.Y 2009), *appeal dismissed sub nom. Freemen v. J. Reg. Co.*, 452 B.R. 367 (S.D.N.Y. 2010) ..........................................................................30

*In re Johns-Manville Corp.*,
68 B.R. 636 (2d Cir. 1988) ...........................................................................................41

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
843 F.2d 636 (2d Cir. 1988)...................................................................................7, 34

*KG Winddown, LLC, et al.* Case No. 20-11723 (MG) (Bankr. S.D.N.Y. 2020) .........................19

*Koelbl v. Glessing (In re Koelbl)*,
751 F.2d 137 (2d Cir. 1984)....................................................................................23

*MacArthur Co. v. John Manville Corp. (In re Johns-Manville Corp.) (Manville I)*,
837 F.2d 89 (2d Cir. 1988)..........................................................................................15

*In re Madison Hotel Assocs.*,
749 F.2d 410 (7th Cir. 1984) ...................................................................................23

*Manati Sugar Co. v. Mock*,
75 F.2d 284 (2d Cir. 1935).......................................................................................23

*In re Matter of Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) .........................................................................42

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005).....................................................................................17

*Montgomery Cnty., MD v. Barwood, Inc.*,
422 B.R. 40 (D. Md. 2009) ......................................................................................29

iv

*In re Motors Liquidation Co.*,
447 B.R. 198 (Bankr. S.D.N.Y. 2011) .................................................................15

*In re One Times Square Assocs. Ltd.*,
159 B.R. 695 (Bankr. S.D.N.Y. 1993) .................................................................35

*In re Pub. Serv. Co. of New Hampshire*,
108 B.R. 854 (Bankr. D.N.H. 1989) ...................................................................29

*In re Purdue Pharma L.P.*,
2021 WL 4240974 (Bankr. S.D.N.Y. Sept. 17, 2021) ...........................................25

*In re Refco Inc. Sec. Litig.*,
No. 07-MD-1902 (JSR), 2013 WL 12158586 (S.D.N.Y. Aug. 7, 2013)................29

*In re Residential Cap. LLC*,
Case No. 12-12020 (MG) 2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11,
2013) ....................................................................................................................18

*In re Sabine Oil & Gas Corp.*,
555 B.R. 180 (Bankr. S.D.N.Y. 2016) .................................................................40

*In re Taberna Preferred Funding IV, Ltd.*,
594 B.R. 576 (Bankr. S.D.N.Y. 2018) .................................................................28

*In re Unbreakable Nation Co.*,
437 B.R. 189 (Bankr. E.D. Pa. 2010) ..................................................................41

*United States v. Energy Res. Co.*,
495 U.S. 545 (1990)............................................................................................34

*In re W.R. Grace & *664 Co.*,
468 B.R. 81 (D. Del. 2012) .................................................................................29

*In re Worldcom, Inc.*,
No. 02-13533(AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ....................6, 41

**Statutes**

11 U.S.C. § 105 .............................................................................................................1

11 U.S.C. § 502 .............................................................................................................9

11 U.S.C. § 503 ...........................................................................................................33

11 U.S.C. § 507 ................................................................................................... *passim*

11 U.S.C. § 510 .........................................................................................................2, 8

WEIL:\98751606\11\12817.0007

11 U.S.C. § 541 ................................................................................................................15

11 U.S.C. § 1107 ................................................................................................................5

11 U.S.C. § 1108 ................................................................................................................5

11 U.S.C. § 1114 ................................................................................................................7

11 U.S.C. § 1122 ........................................................................................................ *passim*

11 U.S.C. § 1123 ........................................................................................................ *passim*

11 U.S.C. § 1124 ..............................................................................................................12

11 U.S.C. § 1125 .........................................................................................................20, 21

11 U.S.C. § 1126 ........................................................................................................ *passim*

11 U.S.C. § 1128 ................................................................................................................1

11 U.S.C. § 1129 ........................................................................................................ *passim*

31 U.S.C. § 3717 ..............................................................................................................39

BVI Insolvency Act 2003 ...................................................................................................5

Israeli Insolvency and Rehabilitation Law 5778-2018 ......................................................5

Section 603 of NYLLCL ............................................................................................. *passim*

**Other Authorities**

Fed. R. Bankr. P. 2002 .......................................................................................................1

Fed. R. Bankr. P. 3018 .......................................................................................................1

Fed. R. Bankr. P. 3020 ............................................................................................... *passim*

Fed. R. Bankr. P. 9006 .......................................................................................................1

H.R. Rep. No. 95-595 (1977) .........................................................................................7, 20

Local Bankruptcy Rule 1007-2 ...........................................................................................6

Local Bankruptcy Rule 3018-1 ...........................................................................................1

Local Bankruptcy Rule 3019-1 ...........................................................................................1

vi

Local Bankruptcy Rule 3020-1 ..................................................................................................1

S. Rep. No. 95-989 (1978) ........................................................................................................7

WEIL:\98751606\11\12817.0007

All Year Holdings Limited (the "**Debtor**"), as debtor and debtor in possession in the above-caption chapter 11 case (the "**Chapter 11 Case**"),[2] respectfully submits this opening brief, pursuant to sections 105, 1126, 1127, 1128, and 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 3018, 3020, and 9006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 3018-1, 3019-1, and 3020-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), and the Court's *Order (i) Approving Proposed Disclosure Statement and the Form, Manner, and Sufficiency of Notice of the Disclosure Statement Hearing, (ii) Approving the Proposed Solicitation and Voting Procedures, (iii) Approving Forms of Ballots, Solicitation Packages, and Related Notices, (iv) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures for Confirmation of the Debtor's Chapter 11 Plan, and (v) Granting Related Relief* [ECF No. 160] (the "**Solicitation Procedures Order**"), in support of confirmation of the *Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated September 15, 2022 [ECF No. 214] (as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Debtor seeks confirmation of the Plan that will (i) reorganize the Debtor's vast real estate portfolio, (ii) maximize value for the Debtor's creditors, and (iii) provide material recoveries to the holders of Claims in Class 4 (Remaining Unsecured Claims), the only Impaired Class of Claims entitled to a recovery under the Plan.  The Debtor has worked tirelessly to position

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement (as defined below).

itself to confirm the Plan including careful coordination with the various parties and their respective professionals across parallel insolvency proceedings in three separate jurisdictions.

2.     The cornerstone of the Plan is the Investment Agreement, dated March 11, 2022 (as amended on April 21, 2022 and May 27, 2022, and as may be further amended, modified, or supplemented from time to time, and together with all schedules and exhibits thereto, "**Investment Agreement**"), among the Debtor, Paragraph Partners LLC (the "**Sponsor**") and, with respect to certain provisions, Mishmeret Trust Company Ltd. (the "**Notes Trustee**"), as trustee for the holders of the Debtor's Israeli-issued notes (the "**Notes**" and the holders of the Notes, the "**Noteholders**"). The Debtor entered into the Investment Agreement following a comprehensive marketing process to solicit offers from potential third-party investors to recapitalize or purchase the Debtor.

3.     The Investment Agreement provides that, in exchange for one hundred percent (100%) of the new equity of the Reorganized Debtor, the Sponsor will contribute $60,000,000 to the Debtor, comprised of $40,000,000 in cash, and promissory notes aggregating $20,000,000. Importantly, as part of the Investment Agreement, the Sponsor agreed to assume all unsecured claims against the Debtor other than limited categories of unsecured claims that comprise Class 4 Remaining Unsecured Claims under the Plan.[3]  The Notes Trustee, on behalf of the Noteholders, is a party to certain provisions of the Investment Agreement and has preliminarily approved of the Debtor's entry into the Investment Agreement.  The Debtor fully expects that once the October 7, 2022 voting deadline (the "**Voting Deadline**") has passed, the results will show overwhelming

---

[3]     Pursuant to the Investment Agreement, the Sponsor is not assuming any Class 6 Subordinated Securities Claims, however, as set forth herein, as subordinated claims under section 510(b) of the Bankruptcy Code, those claims are not entitled to any recovery since Class 4 Remaining Unsecured Claims are not being paid in full under the Plan.

acceptance of the Plan by the holders of Claims in Class 4 (Remaining Unsecured Claims), the only class entitled to vote on the Plan.

4.      To implement the Plan and the Investment Agreement, the BVI Court (as defined below) authorized the Debtor, subject to the occurrence of the Plan Effective Date, to implement a plan of arrangement (the "**BVI Plan of Arrangement**") pursuant to which (i) the existing Interests in the Debtor will be cancelled, and (ii) the Sponsor will hold one hundred percent of the equity in the Reorganized Debtor.  In addition, following confirmation of the Plan by this Court, the Debtor intends to seek recognition of the Plan and the Confirmation Order as part of the Israeli Recognition Proceeding (as defined below) in accordance with the timeline and milestones agreed to under the Investment Agreement.  The outside date under the Investment Agreement for the hearing on Plan confirmation is November 7, 2022, and the Effective Date must occur prior to December 31, 2022.

5.      Mr. Zelig Weiss ("**Weiss**") has stated an intention to object to Plan confirmation. Weiss is a disgruntled bidder that submitted bids to purchase the Debtor's indirect interest in the William Vale Hotel and the Series C Noteholders' right, title, and interest in the Loan and Mortgage (which were rejected).  Weiss has been engaged in protracted litigation with certain non-debtor subsidiaries for over a year, and has made several efforts to disrupt the Chapter 11 Case. His latest effort involves the commencement of an adversary proceeding (the "**Adversary Proceeding**") where he is seeking injunctive and declaratory relief to prevent the Debtor's interest in one of its non-debtor subsidiaries, YG WV LLC ("**YG WV**"), from vesting in the Debtor's remaining wind-down estate ("**Wind-Down Co**") following the Effective Date.

6.      The Court is already familiar with the facts and circumstances of the Adversary Proceeding and related complaint (the "**Complaint**") having heard argument on the Debtor's

motion to dismiss the Complaint (the "**Motion to Dismiss**") and Weiss's motion for summary judgement.[4] The Debtor believes those claims are baseless for all the reasons set forth in the Motion to Dismiss and set forth on the record at the September 13 hearing and, to the extent that Weiss repackages any of his meritless claims as Plan objections they should similarly be denied. The vesting of the Debtor's interests in YG WV in Wind-Down Co under the Plan is not prohibited under any agreement or applicable law.[5]

7.    The Investment Agreement and the transactions contemplated under the Plan are the product of extensive good faith, arms' length negotiations and represent the best chance to maximize value for creditors of the estate. As demonstrated below and in the Supporting Declarations (as defined below), the Plan satisfies all of the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and, accordingly, should be confirmed.

8.    This Memorandum is divided into three sections. Section I sets forth the facts, affidavits, declarations, evidence and other background information relevant for confirmation of the Plan. Section II addresses the requirements for confirmation of the Plan under the Bankruptcy Code, and demonstrates the Plan and the Debtor satisfy the requirements and achieve the objectives of chapter 11. Section III discusses why cause exists to waive the 14-day stay imposed by Bankruptcy Rule 3020(e). Finally, section IV concludes this Memorandum.

---

[4]    Weiss also sought a preliminary injunction in connection with his summary judgment motion, which he later withdrew but only after the Debtor incurred significant costs responding to the preliminary injunction motion and serving discovery on Weiss. This is a pattern for Weiss who has now filed and withdrawn at least three separate motions in the Chapter 11 Case, each of the other motions also caused the Debtor to incur significant expense in responding.

[5]    Following a case management conference before the Court on September 1, 2022, the Debtor, the Sponsor, the Notes Trustee, Weiss, and the Sole Shareholder agreed to mediate the outstanding disputes among the parties that impact the Plan. That mediation is set to commence on September 19, 2022.

WEIL:\98751606\11\12817.0007

## I.    FACTS

9.      On December 14, 2021 (the "**Petition Date**"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtor is authorized to continue to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in this Chapter 11 Case.

10.     On December 16, 2021, the Debtor filed an application under the laws of the British Virgin Islands (the "**BVI**") with the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division Virgin Islands (the "**BVI Court**") seeking the appointment of Paul Pretlove and Charlotte Caulfield of Interpath (BVI) Limited (formerly Kalo (BVI) Limited) as joint provisional liquidators (the "**JPLs**") under the applicable provisions of the BVI Insolvency Act 2003.  The BVI Court entered an order appointing the JPLs on December 20, 2021.

11.     On April 14, 2022, with the consent of the JPLs and the approval of the BVI Court, the Debtor commenced a proceeding in the District Court of Tel Aviv – Yafo (the "**Israeli Court**") for recognition of the Chapter 11 Case as a foreign main proceeding under the applicable provisions of Chapter I, Part C of the Insolvency and Rehabilitation Law 5778-2018 (the "**Israeli Recognition Proceeding**").  The Israeli Court entered an order recognizing the Chapter 11 Case on May 4, 2022.

12.     The pertinent facts for confirmation of the Plan are set forth in the *Second Amended Disclosure Statement for Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated July 20, 2022 [ECF No. 157] (as supplemented by that certain Disclosure Statement Supplement, dated September 15, 2022 [ECF No. 215], and as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Disclosure Statement**") and the following affidavits and declarations (the "**Supporting Declarations**"):

5

i.  the *Declaration of Assaf Ravid in Support of Confirmation of Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated September 16, 2022, and filed contemporaneously herewith (the "**Ravid Declaration**");

ii.  the *Declaration of Assaf Ravid Pursuant to Local Bankruptcy Rule 1007-2 in Support of All Year Holdings Limited's Chapter 11 Petition* [ECF No. 4] (the "**First Day Declaration**");

iii.  the *Declaration of David B. Schechtman in Support of Motion of Parent Debtor Pursuant to 11 U.S.C. §§ 105, 363, and 503(b) and Fed. R. Bankr. P. 2002, 6004, and 9014 for Entry of Order (i) Approving Bid Protections and (ii) Granting Related Relief*, dated March 25, 2022 and filed as Exhibit C to ECF No. 66 (the "**Schechtman Declaration**");

iv.  the *Declaration of Ephraim Diamond in Opposition to Plaintiff's Motion for Preliminary Injunction*, dated August 18, 2022 [ECF No. 23 on the Adversary Proceeding docket] (the "**Diamond Declaration**");

v.  the *Declaration of John Burlacu of Donlin, Recano & Company, Inc. Regarding the Tabulation of Votes Cast on Amended Chapter 11 Plan of All Year Holdings Limited*, to be filed following the Voting Deadline and prior to the Confirmation Hearing (the "**Voting Certification**");

vi.  the *Affidavit of Service of Solicitation Materials* [ECF No. 205] (the "**Solicitation Affidavit**");

vii.  the *Affidavit of Publication* to be filed following publication of the Confirmation Hearing Notice (the "**Publication Affidavit**"); and

viii.  the *Affidavit of Service of Plan Supplement* to be filed following the filing of the Plan Supplement in accordance with the Solicitation Procedures Order (the "**Plan Supplement Affidavit**").

## II.  THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED

13.  To achieve confirmation of the Plan, the Debtor must demonstrate that the Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence. *In re Worldcom, Inc.*, No. 02-13533(AJG), 2003 WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003). Through filings with the Court and additional testimonial evidence which may be proffered or adduced at the Confirmation Hearing, the Debtor will demonstrate, by a preponderance of the

WEIL:\98751606\11\12817.0007

evidence, it satisfies all of the applicable subsections of section 1129 of the Bankruptcy Code have

been satisfied with respect to the Plan.[6]

### A.      The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code.

14.      Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the

applicable provisions of the Bankruptcy Code.   The legislative history of section 1129(a)(1)

explains that this provision encompasses the requirements of sections 1122 and 1123 of the

Bankruptcy Code governing classification of claims and contents of the plan, respectively.   *See*

H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also Kane v. Johns-*

*Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988); *In re Drexel*

*Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).   As demonstrated below,

the Plan fully complies with the requirements of the Bankruptcy Code.

### B.      The Plan's Classification of Claims and Interests Complies with Section 1122 of the Bankruptcy Code.

15.      Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or

an interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class."   11 U.S.C. § 1122(a).   Under this section, a plan may provide

for multiple classes of claims or interests as long as each claim or interest within a class is

---

[6] Sections 1129(a)(6) and 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code are inapplicable to the Debtor. Section 1129(a)(6) concerns the need for government approval of rate changes subject to government regulatory jurisdiction. *See* 11 U.S.C. § 1129(a)(6). The Plan does not provide for any rate changes by the Debtor, and, therefore, section 1129(a)(6) is inapplicable. Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code). 11 U.S.C. § 1129(a)(13). The Debtor is not subject to any retiree benefit obligations (as defined in section 1114 of the Bankruptcy Code) and, as such, section 1129(a)(13) is inapplicable to the Chapter 11 Case. Section 1129(a)(14) relates to the payment of domestic support obligations. *See* 11 U.S.C. § 1129(a)(14). The Debtor is not subject to any domestic support obligations and, as such, this section of the Bankruptcy Code is inapplicable. Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). *See* 11 U.S.C. § 1129(a)(15). The Debtor is not an "individual," and, accordingly, section 1129(a)(15) is inapplicable. Finally, section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust must be made in accordance with any applicable provisions of nonbankruptcy law. *See* 11 U.S.C. § 1129(a)(16). The Debtor is a moneyed, business, and/or commercial corporation and, accordingly, section 1129(a)(16) is inapplicable.

substantially similar to the other claims or interests in that class. In addition, substantially similar claims may not be classified separately when it is done for an illegitimate reason. *See Aetna Cas. & Sur. Co. v. Clerk* (*In re Chateaugay Corp.*), 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason.").

16. The Plan designates six (6) Classes of Claims against, and Interests in, the Debtor as follows:[7]

    i.    <u>Class 1 (Priority Non-Tax Claims)</u>: Any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

    ii.    <u>Class 2 (Other Secured Claims)</u>: Any Secured Claim other than any secured Priority Tax Claim.

    iii.    <u>Class 3 (General Unsecured Claims)</u>: Any Claim against the Debtor, that is not (a) an Administrative Expense Claim; (b) a Priority Tax Claim; (c) a Priority Non-Tax Claim; (d) a Remaining Unsecured Claim; or (e) a Subordinated Securities Claim. For the avoidance of doubt, General Unsecured Claims include all Intercompany Claims and the Taz Claim.

    iv.    <u>Class 4 (Remaining Unsecured Claims)</u>: The Noteholder Claims,[8] the Subsidiary Plan Administrator Claims,[9] and the Non-Securities Indemnity Claims.[10]

    v.    <u>Class 5 (Subordinated Securities Claims)</u>: Claims subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a security

---

[7]    In accordance with section 1123(a)(1), Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims have not been classified. The Debtor is not aware of any Class 1 Priority Non-Tax Claims, Class 2 Other Secured Claims, or Class 3 General Unsecured Claims (other than the Taz Claim) but nevertheless has accounted for them as Classes under the Plan.

[8]    The Noteholder Claims are to be allowed as Class 4 Remaining Unsecured Claims under the Plan. Plan, §§ 1.62, 1.79 and 4.4.

[9]    As part of the settlement agreement approved by order of the Court dated August 25, 2022 [ECF No. 195] (the "**EGM Settlement**"), the Subsidiary Plan Administrator Claims were resolved and the EGM Plan Administrator (as defined in the EGM Settlement) agreed to waive and release any claims against the Debtor.

[10]    Estimation of the Non-Securities Indemnity Claims at zero dollars ($0) for all purposes under the Plan (including for purposes of distribution) is a condition precedent to the Effective Date, but such condition may be waived by the Notes Trustee in its sole discretion. *See* Plan, §§ 9.2(f), 9.3.

WEIL:\98751606\11\12817.0007

of the Debtor, or for damages arising from the purchase of sale of such a security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, including any Claim arising out of or related to the Israeli Securities Actions or other similar class action lawsuits brought in Israel before the Effective Date.

vi.    Class 6 (Interests): Any Interests in the Debtor.

17.    As part of the Investment Agreement, the Sponsor agreed to assume all unsecured claims against the Debtor other than the Noteholders' Claims and other discrete categories of claims set forth therein.  Of the six (6) classes of claims and interests under the Plan, the only class that is Impaired and entitled to receive distributions under the Plan and, therefore, the only class entitled to vote to accept or reject the Plan, is Class 4 (Remaining Unsecured Claims) (the "**Voting Class**").  The Plan does not impair claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (General Unsecured Claims) (collectively, the "**Unimpaired Classes**") because the Sponsor agreed to assume all claims in the Unimpaired Classes.

18.    Pursuant to section 1126(f) of the Bankruptcy Code, the holders of claims in the Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote.  The holders of claims or interests in Class 5 (Subordinated Securities Claims) and Class 6 (Interests) are not entitled to receive or retain any property under the Plan (collectively, the "**Non-Voting Impaired Classes**" and, together with the Unimpaired Classes, the "**Non-Voting Classes**").  Therefore, pursuant to section 1126(g) of the Bankruptcy Code, the Non-Voting Impaired Classes are deemed to reject the Plan and are not entitled to vote.

19.    The classification scheme of the Plan is rational and complies with the Bankruptcy Code.  The Plan incorporates a classification and distribution scheme that strictly follows the statutory priorities prescribed by the Bankruptcy Code.  All Claims and Interests within a Class have the same or similar rights against each respective Debtor.  The Plan provides for the separate

9

classification of Claims against and Interests in each Debtor based upon the differences in legal

nature and/or priority of such Claims and Interests as well as the Sponsor's stated willingness to

assume certain claims and liabilities of the Debtor and not others in accordance with the Investment

Agreement.

20.    Each of the Claims or Interests in each particular Class is substantially similar to

the other Claims or Interests in such Class.  The classification of Claims and Interests in the Plan,

therefore, complies with section 1122 of the Bankruptcy Code.  *See In re Charter Commc'ns*, 419

B.R. at 265 n.35 (explaining that debtors "enjoy considerable discretion when classifying similar

claims in different classes").

### C.    The Plan Complies with Section 1123(a) of the Bankruptcy Code.

21.    Section 1123(a) of the Bankruptcy Code sets forth five (5) applicable requirements

the proponent of a chapter 11 plan must satisfy.[11]  *See* 11 U.S.C. § 1123(a).  The Plan fully

complies with each such requirement:

    i.    Section 1123(a)(1) (Designation of Classes of Interests):    The Plan
          designates six (6) Classes of Claims and Classes of Interests as required by
          section 1123(a)(1).  *See* Plan, § 3.2.

    ii.   Section 1123(a)(2) and 1123(a)(3) (Specify Unimpaired and Impaired): The
          Plan specifies whether each Class of Claims or Interests is Impaired or
          Unimpaired under the Plan and the treatment of each such Class, as required
          by sections 1123(a)(2) and 1123(a)(3), respectively.  *See* Plan, § 3.2.

    iii.  Section 1123 (a)(4) (Same Treatment Within Classes): Except as otherwise
          agreed to by a holder of a particular Claim or Interest, the treatment of each
          Claim or Interest in each particular Class is the same as the treatment of
          each other Claim or Interest in such Class, as required by section 1123(a)(4).
          *See* Plan, §§ 4.1-4.6.

    iv.   Section 1123(a)(5) (Adequate Means for Plan Implementation): The Plan
          provides adequate means for its implementation as required by section
          1123(a)(5) through, among other things: (a) the consummation of the

---

[11]    The requirements set forth in section 1123(a)(8) of the Bankruptcy Code do not apply.  Section 1123(a)(8) only
        applies in a case in which the debtor is an individual and, thus, is inapplicable.

Investment Agreement, (b) the provisions governing the Sponsor Contribution, and the distributions under the Plan, (c) the authorization and issuance of the New Notes in accordance with Section 5.2 of the Plan, (d) the administration of Wind-Down Co in accordance with Section 5.3 of the Plan, (d) the consummation and implementation of the BVI Plan of Arrangement in the BVI Proceeding, (e) the appointment of the Plan Administrator, and (f) the authorization for all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan.[12] *See* Plan, §§ 5.1-5.12.

v.    <u>Section 1123(a)(6) (Provide for the Inclusion in the Charter of the Debtor of a Provision Prohibiting Issuance of Nonvoting Equity Securities)</u>: The Plan Supplement contains the organizational documents for the Reorganized Debtor, which prohibit the issuance of nonvoting equity securities. *See* Plan, § 1.73.

vi.    <u>Section 1123(a)(7) (Selection of Officers, Directors and Trustees in a Manner Consistent with the Interests of Creditors and Equity Security Holders)</u>: Pursuant to Section 5.3 of the Plan, on the Effective Date, the Plan Administrator will be appointed by the Notes Trustee, on behalf of the Noteholders, the key creditor constituency in Class 4 (Remaining Unsecured Claims) which has the greatest interest in the amounts recovered, if any, from the Excluded Assets (including, but without limitation, from the prosecution of Avoidance Actions and other Causes of Action) and any remaining Wind Down Cash Funding. Pursuant to Section 5.5 of the Plan, the officers and directors of the Reorganized Debtor were selected by the Sponsor, who will hold or control 100% of the shares of the Reorganized Debtor upon the Effective Date. *See* Plan, §§ 5.3, 5.5.

**D.    The Plan Complies with Section 1123(b) of the Bankruptcy Code.**

    **1.    Plan Permissive Provisions.**

22.    Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan. Each provision of the Plan is consistent with section 1123(b):

---

[12]    Any assertions by Weiss that the Plan is not feasible or that his rights or claims are Impaired under the Plan are without merit and should be overruled. As discussed in section II.M below, the Financial Projections and the other information provided by the Sponsor and included in the Disclosure Statement adequately demonstrate (i) the Sponsor has the financial wherewithal to pay the Sponsor Contribution, and (ii) the Reorganized Debtor will be more than adequately capitalized following the Effective Date to meet its obligations under the Plan and otherwise, including with respect to the Class 3 General Unsecured Claims, which are Unimpaired under the Plan.

WEIL:\98751606\11\12817.0007

i.  <u>Section 1123(b)(1) (Impair or Leave Unimpaired any Class of Claims or Interests)</u>: As contemplated by section 1123(b)(1) of the Bankruptcy Code and pursuant to section 1124 of the Bankruptcy Code, Article IV of the Plan describes the treatment for each of the Unimpaired Classes and the Impaired Classes for the Debtor.  *See* Plan, §§ 4.1-4.6.

ii.  <u>Section 1123(b)(2) (Treatment of Executory Contracts or Unexpired Leases)</u>: With respect to the Debtor's executory contracts and unexpired leases, Section 8.1 of the Plan provides all executory contracts and unexpired leases to which the Debtor is a party are deemed rejected, unless such contract or lease (i) is specifically designated (x) by the Reorganized Debtor or (y) Wind-Down Co as a contract or unexpired lease to be assumed or assumed and assigned on the Schedule of Assumed Contracts to be filed with the Plan Supplement; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; (iv) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the Confirmation Date; or (v) is identified in Section 8.4 of the Plan. *See* Plan, §§ 8.1-8.7.

iii.  <u>Section 1123(b)(3)(A) and (B) (Retention of Claims and Interests)</u>: As permitted by section 1123(b)(3)(A) of the Bankruptcy Code, the Plan provides for the retention of Avoidance Actions and other Causes of Action by the Reorganized Debtor and Wind-Down Co, as further set forth in Section 10.1 of the Plan and the Schedules of Retained Causes of Action to be included as exhibits in the Plan Supplement.  Pursuant to the Investment Agreement, any and all claims and Causes of Action that the Debtor, the Noteholders, or the Notes Trustee may have against any third-parties shall vest in, and be retained by, Wind-Down Co under the Plan on the Effective Date; *provided, however*, that any claims and Causes of Action that the Debtor may have with respect to whether or not Yoel Goldman or Tzipporah Goldman have any ownership interests in any of the Transferred Entities (as defined in the Investment Agreement), shall vest in, and be retained by, the Reorganized Debtor.  In addition, under the Plan, the Reorganized Debtor will hold the right to assert all rights of setoff or recoupment, and other legal or equitable defenses with respect to the Unimpaired Claims and Wind-Down Co will hold all such rights and defenses with respect to the Impaired Claims.  *See* Plan, §§ 10.1, 10.8-10.9.

iv.  <u>Section 1123(b)(5) (Modify or Leave Unaffected Rights of Holders of Secured and Unsecured Claims)</u>: As permitted by section 1123(b)(5) of the Bankruptcy Code, the Plan modifies the rights of holders of Claims in the Voting Class and the Non-Voting Impaired Classes and leaves unaffected

12

the rights of holders of Claims in each of the Debtor's Unimpaired Classes.[13] *See* Plan, §§ 4.1-4.6.

v.  <u>Section 1123(b)(6) (Appropriate Provisions Not Inconsistent with the Bankruptcy Code)</u>: As permitted by section 1123(b)(6) of the Bankruptcy Code, a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan (a) contains certain release and exculpation provisions consistent with the applicable provisions of the Bankruptcy Code and Second Circuit law, as described in greater detail herein, and (b) provides that the Court will retain jurisdiction over all matters arising in and related to this Chapter 11 Case. As set forth in further detail below, the Plan does not contain any third-party releases and includes only an estate release from the Debtor as well as a mutual release between certain Releasing Parties (as defined below) as agreed to under the Investment Agreement. *See* Plan, §§ 10.6-10.7, 11.1.

## 2.    The Plan Releases Should Be Approved.

23.    In accordance with the Investment Agreement, the Plan provides for releases of Claims and Causes of Action held by: (i) the Debtor and its Estate, the Reorganized Debtor, and Wind-Down Co, on behalf of themselves and their respective successors, assigns, and representatives (the "**Estate Releases**") against the Released Parties,[14] *see* Plan, § 10.6(a), and (ii) the Debtor and its Estate, the Reorganized Debtor, Wind-Down Co, the Notes Trustee, the Sponsor, the JPLs, and each of the other Releasing Parties against each of the other Released Parties (the "**Mutual Releases**" and, together with the Estate Releases, the "**Plan Releases**"), *see*

---

[13]    As set forth in section II.M below, the Plan does not modify or impair any rights or claims Weiss may have under any agreement or applicable law with respect to the Debtor or any of its non-debtor subsidiaries, including YG WV or Fee Member.

[14]    Section 1.78 of the Plan defines "*Released Parties*" as collectively, and in each case, solely in their capacities as such: (a) the Debtor and the Reorganized Debtor; (b) Wind-Down Co; (c) the Notes Trustee and its representatives and advisors; (d) the Noteholders and their representatives and advisors; (e) the Sponsor and its agents, officers, directors, principals, affiliates, representatives and advisors; (f) any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (g) any independent directors appointed to the board of the Debtor on or after January 1, 2021; (h) the JPLs; (i) the Authorized Managers; and (j) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC); provided, however, that Released Parties shall not include Yoel Goldman or Tzipporah Goldman in any capacity.

13

Plan, § 10.6(b); provided, however, that claims against Yoel Goldman or Tzipporah Goldman in any capacity shall not be released.

24.     Except to the extent a holder of any Claim is a Releasing Party pursuant to the Investment Agreement, no holder of Impaired or Unimpaired Claims is waiving or releasing any Claims against the Debtor or the other Released Parties under the Plan.  In addition, each of the Plan Releases carves out acts or omissions that are determined by a Final Order to have constituted gross negligence, fraud, or willful misconduct.

25.     All potentially affected creditors received notice of the Plan Releases and their right to object to confirmation of the Plan.  As explained in further detail below, the Plan Releases are (i) integral components of the Plan, (ii) appropriate and necessary under the circumstances, (iii) being provided in exchange for fair consideration, (iv) consistent with the Bankruptcy Code, and (v) in compliance with applicable law.  Accordingly, for these reasons and for the reasons set forth below, the Plan Releases should be approved.

### a.     The Estate Releases Are Appropriate and Should Be Approved.

26.     In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, Section 12.6(a) of the Plan contains a release of certain claims or Causes of Action of the Debtor, the Reorganized Debtor and Wind-Down Co against the Released Parties.  The Estate Releases do not (i) release any claims or Causes of Action arising after the Effective Date against any party or (ii) affect the rights of the Debtor or its successors under the Plan to enforce the terms of the Plan or the Definitive Documents (in each case, including, without limitation, any rights granted to the Plan Administrator under the Plan Administration Agreement).  The Estate Releases should be approved as they represent an appropriate exercise of the Debtor's business judgment and are in the best interests of the Debtor's estate.

27.    Claims held by a debtor against third parties are property of the estate.  11 U.S.C. § 541(a)(1).  These claims may be released in exchange for settlement.  *See MacArthur Co. v. John Manville Corp. (In re Johns-Manville Corp.) (Manville I)*, 837 F.2d 89, 91-92 (2d Cir. 1988). When considering releases by a debtor of third parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, the appropriate standard is whether the release is a valid exercise of the debtor's business judgment and is fair, reasonable, and in the best interests of the estate.  *See In re Motors Liquidation Co*., 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Releases by estates involve a give-up of potential rights that are owned by the estate, and are perfectly permissible in a plan, either as parts of plan settlements or otherwise, though the court must satisfy itself (at least if anyone raises the issue) that the give-up is an appropriate exercise of business judgment, and, possibly, in the best interests of the estate.").  Debtors have considerable leeway in issuing releases of their own claims, and such releases are considered "uncontroversial."  *See In re Adelphia Commc'ns*, 368 B.R. at 263 n.289.

28.    The Debtor is not aware of any claims or causes of action against the Released Parties.  Nevertheless, each of the Released Parties (other than the Reorganized Debtor and Wind-Down Co) has insisted upon an Estate Release.  The Estate Releases constitute a sound exercise of the Debtor's business judgment.  Without the support and cooperation of each of the Released Parties, the Debtor may not have been able to reach an agreement on the terms of the Investment Agreement, consummation of which will benefit all creditors.

29.    Further, absent the Released Parties' cooperation and willingness to negotiate a consensual agreement on the Plan, the Debtor may have spent considerable time and money engaged in costly, lengthy and uncertain litigation which would have extended the duration of the Chapter 11 Case, thereby substantially reducing creditor recoveries.  *See* Ravid Declaration, ¶ 23.

As additional consideration for the Estate Releases, the Debtor, the Reorganized Debtor, and Wind-Down Co will receive reciprocal releases from any Causes of Action, as discussed below.

30.     Moreover, as set forth above, the Plan Administrator will have authority to pursue all Avoidance Actions and other Causes of Action for the benefit of the holders of Allowed Class 4 Remaining Unsecured Claims, other than certain claims and Causes of Action with respect to whether or not Yoel Goldman or Tzipporah Goldman have any ownership interests in any of the Transferred Entities which shall vest in the Reorganized Debtor.  The Plan Administrator for Wind-Down Co was appointed by the Notes Trustee, on behalf of the Noteholders, the key creditor in Class 4 (Remaining Unsecured Claims) which has the greatest interest in the amounts recovered, if any, from the Excluded Assets and any remaining Wind Down Cash Funding.

### b.     Mutual Releases Are Appropriate and Should Be Approved.

31.     Section 10.6(b) of the Plan contains mutual releases between and among the following parties (collectively, the "**Releasing Parties**") for liability relating to the Debtor and the Chapter 11 Case:

> i.      the Debtor and the Reorganized Debtor;
>
> ii.     Wind-Down Co;
>
> iii.    the Notes Trustee and its representatives and advisors;
>
> iv.     the Noteholders and their representatives and advisors;
>
> v.      the Sponsor and its agents, officers, directors, principals, affiliates, representatives and advisors;
>
> vi.     any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor;
>
> vii.    any independent directors appointed to the board of the Debtor on or after January 1, 2021;
>
> viii.   the JPLs;
>
> ix.     the Authorized Managers; and

WEIL:\98751606\11\12817.0007

      i.     any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC).

32.     For the avoidance of doubt, the Released Parties does not include Yoel Goldman or Tzipporah Goldman in any capacity. As noted above, except to the extent a holder of any Claims is a Releasing Party pursuant to the Investment Agreement, no holder of Impaired or Unimpaired Claims is waiving or releasing any Claims against the Debtor or the other Released Parties under the Plan. Accordingly, the Plan does not provide for any third-party releases, whether consensual or non-consensual.

33.     Courts in this jurisdiction and others have found consensual non-debtor releases permissible under the Bankruptcy Code. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may [] be tolerated if the affected creditors consent."); *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019).

34.     The Mutual Releases here are consensual and limited in scope as they only affect the stakeholders involved in the Debtor's reorganization efforts and the formulation of the Plan. Accordingly, the Mutual Releases should be approved.

      **c.     The Exculpation Provision Is Appropriate and Should be Approved.**

35.     In addition to the releases discussed above, Section 10.7 of the Plan also contains a customary exculpation for certain Exculpated Parties[15] for claims arising out of conduct occurring after the Petition Date through the Effective Date. The exculpation provision carves out acts or

---

[15] Section 1.41 of the Plan defines "***Exculpated Parties***" as collectively, and in each case, solely in their capacities as such: (a) the Debtor and Reorganized Debtor; (b) the Plan Administrator; (c) Wind-Down Co; (d) the Notes Trustee and its representatives and advisors; (e) the Noteholders and their representatives and advisors; (f) the Sponsor and its representatives and advisors; (g) the JPLs; (h) the Authorized Managers; (i) any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (j) any independent directors appointed to the board of the Debtor on or after January 1, 2021; and (k) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC); provided, however, that Exculpated Parties shall not include Yoel Goldman or Tzipporah Goldman in any capacity.

WEIL:\98751606\11\12817.0007

omissions that are determined by a Final Order to have constituted gross negligence, fraud, or willful misconduct.

36.    Exculpation provisions are permissible when they are important to a debtor's plan or where the exculpated party has provided substantial consideration to a debtor's reorganization. *See In re Chemtura*, 439 B.R. at 610-11 (citing *In re DBSD*, 419 B.R. at 218); *see also In re Residential Cap. LLC*, Case No. 12-12020 (MG) 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (order confirming plan contained exculpations for parties "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors."). In determining whether to approve exculpation provisions, courts also consider whether the beneficiaries of the exculpation participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan. *See In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decisionmakers[.]").

37.    Courts have specified certain parties that generally are appropriate candidates for exculpation, including parties to a consensual plan or parties to unique transactions who "contribute[] substantial consideration to the reorganization." *See, e.g., In re Residential Capital, LLC*, Case No. 12-12020 (MG), at ¶ 291 (Bankr. S.D.N.Y. Dec. 11, 2013) [ECF No. 6066] (approving exculpation of certain prepetition lenders who "played a meaningful role. . . in the mediation process, and through the negotiation and implementation of the Global Settlement and Plan"); *Adelphia*, 368 B.R. at 268.

38.    Courts in this and other districts have approved exculpation provisions similar in scope and application for estate fiduciaries and non-estate fiduciaries.  *See, e.g., Evergreen Gardens Mezz, LLC, et al.*, Case No. 21-10035 (MG) (Bankr. SD.N.Y. 2021) [ECF No. 222] (approving plan exculpation provision providing for exculpation for certain non-estate fiduciaries); *KG Winddown, LLC, et al.* Case No. 20-11723 (MG) (Bankr. S.D.N.Y. 2020) [ECF No. 494] (permitting exculpation of purchaser as non-estate fiduciary); *Genco Shipping & Trading Ltd.*, Case No. 14-11108 (SHL), ¶ 24(d), (Bankr. S.D.N.Y. July 2, 2014) [ECF No. 322] (approving exculpation provision in plan providing exculpation for non-estate fiduciaries).

39.    The Exculpated Parties played a critical role in achieving a confirmable plan on an expedited basis and the support of the Exculpated Parties was essential to the successful negotiation of the Plan and the Investment Agreement, both of which were the product of good faith and arm's length negotiations.  The exculpation provision was necessary to achieve, among other things, the consensus and settlements embodied in the Plan by and among the Debtor, the JPLs, the Notes Trustee, and the Sponsor, and, in each case, their representatives and advisors. The protection it provides promoted and fostered good faith negotiations that culminated in the overwhelming support the Plan enjoys among all economic parties in interest.  *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992) (protection against legal exposure may be critical to settlement negotiations involving complex issues and multiple parties). Accordingly, for the reasons stated herein, the Debtor submits that the exculpation provision set forth in the Plan is reasonable, appropriate, and entirely consistent with applicable law and should be approved.

WEIL:\98751606\11\12817.0007

40.     Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code.  The Plan, therefore, satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**E.     The Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code.**

41.     Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  The legislative history to section 1129(a)(2) indicates this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *In re Drexel Burnham Lambert*, 138 B.R. at 759.  As demonstrated below, the Debtor has complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 regarding Solicitation and the Disclosure Statement.

**1.     Postpetition Disclosure and Solicitation.**

42.     Under section 1125 of the Bankruptcy Code, prior to the solicitation of votes on a plan of reorganization, a debtor must disclose information adequate to permit an informed judgment by creditors and shareholders entitled to vote on the plan.  Pursuant to the Solicitation Procedures Order, the Court approved the Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable voting creditors to make an informed judgment regarding whether to accept or reject the Plan.

43.     In accordance with the Solicitation Procedures Order, on September 1, 2022, the Debtor transmitted to each holder of a Claim in Class 4 (Remaining Unsecured Claims) the Solicitation Package, which contained a copy of the Solicitation Procedures Order, the Disclosure Statement, the Plan, the Confirmation Hearing Notice and the appropriate form of Ballot.  With

20

respect to the claims held by the Noteholders, the Debtor transmitted one Solicitation Package to the Notes Trustee on September 1, 2022 on account of the Noteholders' claims in Class 4 (Remaining Unsecured Claims), which included a master Ballot to aggregate the votes for all such claims. The documents that comprise the Solicitation Packages were also published by the Debtor on the Tel Aviv Stock Exchange for the benefit of individual Noteholders on September 2, 2022 and September 7, 2022. The Solicitation Packages were transmitted in compliance with section 1125 of the Bankruptcy Code and the Solicitation Procedures Order. The Debtor did not solicit acceptances of the Plan from any creditor prior to the transmission of the Disclosure Statement.

44.    On September 15, 2022, in accordance with the Solicitation Procedures Order, the Debtor filed a supplement to the Disclosure Statement (the "**Supplemental Disclosure Materials**") to provide notice to creditors and other parties in interest of (i) certain limited modifications to the Plan, (ii) the BVI Court's approval of the BVI Plan of Arrangement, (iii) recent developments in the Israeli Recognition Proceeding, (iv) the Notice of Termination (as defined below) of the Mortgage Loan Purchase and Sale Agreement between the Sponsor and the Notes Trustee, on behalf of the Series C Noteholders, dated April 12, 2022 (the "**MLPSA**"), and the resulting treatment of the Debtor's interest in its wholly-owned subsidiary YG WV under the Investment Agreement and the Plan, and (v) the pending mediation regarding certain issues related to the Plan.[16]

45.    On September 4, 2022, the Israeli Court approved the Debtor's motion for approval to convene a meeting of the Noteholders to vote on the transactions contemplated by the Plan and the Investment Agreement (the "**Noteholder Meeting**"). The Noteholder Meeting will be held

---

[16]    In accordance with the Solicitation Procedures Order, the Supplemental Disclosure Materials will be deemed approved and served on creditors in accordance with the Bankruptcy Rules and the Solicitation Procedures Order if no objections are filed within 7 days of the filing of the materials.

WEIL:\98751606\11\12817.0007

prior to the Voting Deadline in accordance with the Solicitation Procedures Order, the Deeds of Trust, and otherwise applicable Israeli securities law.

46.     The Debtor has complied, or will comply, with all of the requirements of the Solicitation Procedures Order including, without limitation, with respect to service of the Confirmation Hearing Notice on all creditors, interest holders, and other parties in interest, publication of the Confirmation Hearing Notice in *The New York Times* (national edition) and in *Haaretz*, and the solicitation of votes to accept or reject the Plan from creditors in the Voting Class.

## 2.      Acceptance or Rejection of the Plan.

47.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of the Plan.  Under section 1126, only holders of Allowed Claims in Impaired Classes of Claims and Interests that will receive or retain property under the Plan on account of such Claims or Interests may vote to accept or reject the Plan.  In accordance with Articles III and IV of the Plan and section 1126 of the Bankruptcy Code, the Debtor solicited acceptances of the Plan from the holders of Claims in Class 4 (Remaining Unsecured Claims), the only class of Claims entitled to vote to accept or reject the Plan.  Further, in accordance with Articles III and IV of the Plan, the Solicitation Procedures Order, and sections 1126(f) and (g) of the Bankruptcy Code, the Debtor did not solicit acceptances from the holders of Claims or Interests in the Non-Voting Classes.

48.     Pursuant to the Solicitation Procedures Order, the Court set the Voting Deadline on the Plan as October 7, 2022 at 5:00 p.m. and, accordingly, voting on the Plan remains ongoing as of the date of filing this brief.  However, the Debtor is confident that, once all of the votes have been counted, the results set forth in the Voting Certification will demonstrate the Plan has been overwhelmingly supported and accepted by the holders of Claims in Class 4 (Remaining Unsecured Claims).

WEIL:\98751606\11\12817.0007

### F.       The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code.

49.      Section 1129(a)(3) of the Bankruptcy Code requires a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  For the reasons set forth below, the Plan satisfies the requirements of section 1129(a)(3) and should be approved.

### 1.       The Plan Has Been Proposed in Good Faith.

50.      The Second Circuit has defined the good faith standard as "requiring a showing that the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" *Koebl v. Glessing (In re Koebl)*, 751 F.2d 137, 139 (2d Cir. 1984) (quoting *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935).  "Good faith is 'generally interpreted to mean that there exists *a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code*.'" *In re Chemtura*, 439 B.R. at 608 (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)) (emphasis added).  "Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) speaks more to the process of plan development than to the content of the plan." *Id.* (internal quotation marks omitted).

51.      As set forth in the Schechtman Declaration, the Debtor engaged in a robust and wide-ranging, public process to solicit interest and offers from potential third-party investors to either recapitalize the Debtor or undertake an outright purchase of the Debtor (the "**Marketing Process**").  *See supra*, ¶ 3.  Specifically, the Marketing Process involved the following efforts to identify an investor who could consummate a value-maximizing transaction for the Debtor:

>       i.      Prior to the Petition Date, the Debtor engaged Meridian Investment Sales, a segment of Meridian Capital Group, LLC, and its broker-dealer affiliate, Tigerbridge Capital LLC d/b/a Meridian Securities (collectively, "**Meridian**"), one of the nation's leading real estate finance advisory firms, to serve as its exclusive real estate finance broker. *See* Schechtman Declaration, ¶ 10.

23

ii.   In March 2021, Meridian began working closely with the Debtor to compile various materials and proprietary information about the Debtor and its direct and indirect non-debtor subsidiaries for the purpose of establishing a virtual data room and due diligence library to enhance and facilitate the Marketing Process. At the Debtor's direction, Meridian conducted site visits of all of the Debtor's non-debtor properties and prepared a comprehensive offering memorandum. *See* Schechtman Declaration, ¶ 13.

iii.  At the outset of the Marketing Process, Meridian tapped its institutional knowledge and experience to identify a pool of approximately forty (40) potential third-party investors, including family offices and private equity firms, that possessed the sophistication, financial wherewithal, and operational expertise necessary to consummate a transaction for the Debtor. *See* Schechtman Declaration, ¶ 13.

iv.   On or around April 13, 2021, Meridian, in consultation with the Debtor, invited each of the potential third party investors to participate in the Marketing Process. Of the initial pool of potential investors, thirty seven (37) executed confidentiality agreements to gain access to the data room, which contained, among other things, the offering memorandum, detailed financial information, and property-level information regarding real estate taxes, income, and expenses. *See* Schechtman Declaration, ¶ 14.

v.    Meridian arranged more than 125 discussions with interested parties, many of which included the Debtor, to, among other things, answer diligence questions, discuss potential deal structures, and assist investors in formulating their bids. *See* Schechtman Declaration, ¶ 14.

vi.   Following an approximately two-month diligence period, the Debtor received numerous bids, including several revised bids, for a potential transaction involving the Debtor, which were evaluated by the Debtor, in consultation with Meridian, based on several criteria. Any party that expressed any interest in submitting a proposal for the Debtor's assets, including Weiss and the Sole Shareholder, was encouraged to do so. *See* Schechtman Declaration, ¶ 15.

52.   After extensive parallel track negotiations with two final bidders, the Debtor determined, in a sound exercise of its business judgment, the Sponsor's bid and related Investment Agreement provided the best actionable transaction to maximize value. The Debtor, in consultation with Meridian, engaged in discussions with the Notes Trustee and the various bidders, including the Sponsor, before entering into the Investment Agreement.

WEIL:\98751606\11\12817.0007

53.     Following entry into the Investment Agreement, the Debtor engaged with the Notes Trustee and the Sponsor to negotiate the terms of the Plan pursuant to which the Investment Agreement will be consummated.  Collectively, the negotiations of the terms of the Investment Agreement and the Plan spanned several months and included many hours of review and due diligence conducted by sophisticated counsel and professionals.  These good faith negotiations are evidence of the Debtor's satisfaction of section 1129(a)(3). *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *16 (Bankr. S.D.N.Y. Sept. 17, 2021) (finding that section 1129(a)(3) was satisfied where allocation of trust was derived from good faith, arms' length negotiations); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns. Operating, LLC* (*In re Charter Commc'ns.*), 419 B.R. 221, 260 (Bankr. S.D.N.Y. 2009) (arms' length negotiations are indicative of good faith finding in plan considerations).  Accordingly, the Investment Agreement and the Plan are the product of good faith and arms'-length negotiations.

54.     To the extent Weiss or any other party in interest takes issue with the treatment of the Taz Claim under the Plan or any purported relationship between the Sole Shareholder and the Sponsor as an attempt to impugn or challenge that the Plan was proposed in good faith, such assertions should be rejected.  The Taz Claim relates to a $37 million judgment entered against the Debtor in Kings County Supreme Court resulting from an outstanding confession of judgment allegedly executed by the Sole Shareholder in favor of Taz Partners LLC.  Although the Taz Claim precipitated the commencement of the Debtor's Chapter 11 Case, the Debtor continues to dispute the validity of that claim and that claim is not being allowed under the Plan.  Rather, the Taz Claim is being classified as a Class 3 General Unsecured Claim under the Plan, and will, therefore, be assumed by the Reorganized Debtor along with any other Class 3 General Unsecured Claims that may exist (although the Debtor is not aware of any), subject to all available defenses.

55.     Regardless, the allowance or disallowance of the Taz Claim, will not impact recoveries to any other creditors under the Plan.  Following the Effective Date, any repayment on account of the Taz Claim will be subordinated and will not be paid until the New Notes are repaid in full and the Sponsor's contribution under the Plan to the holders of Class 4 Remaining Unsecured Claims is satisfied in full. *See* Form of New Notes, Ex. A to Plan, § 6.5.

56.     Furthermore, and as set forth in the Disclosure Statement, to the best of the Debtor's knowledge and belief, there is no relationship between the Sole Shareholder and the Sponsor.  The Sponsor has confirmed to the Debtor in writing that, other than the Taz Confession of Judgment between Taz Partners, an affiliate of the Sponsor, and the Sole Shareholder, there is no relationship between the Sole Shareholder and the Sponsor.

### 2.     The Plan Complies with Otherwise Applicable Law

57.     The Plan provides that any interest the Debtor holds in YG WV on the Effective Date, whether economic or non-economic but solely to the extent permitted or allowed under applicable law, will be treated as Excluded Assets to vest on the Effective Date in Wind-Down Co, subject to the other terms and conditions of the Plan.  As the Court will have already determined in connection with the Adversary Proceeding the extent of the Debtor's interest in YG WV that may be administered as part of the Plan prior to the Confirmation Hearing, Weiss's objections ring hallow.  The Debtor cannot transfer any greater or additional rights or interests under the Plan than it is determined to possess under applicable law.

58.     Regardless, for all the reasons set forth in, and to the extent relevant, as argued by the Debtor in connection with the Motion to Dismiss, which arguments are incorporated by reference, any objection by Weiss on the basis that the Plan does not comply with the applicable provisions of the New York Limited Liability Company Law ("**NYLLCL**") or that the proposed YG WV transactions are prohibited under the terms of any operating agreement should be rejected

by the Court.  As made clear by the Debtor in connection with the Motion to Dismiss, the Debtor

is not a party to and is not bound by any provision of the Member LLC Agreement, including any

provision that may require Weiss's consent in order to transact with respect to the Debtor's interest

in YG WV.  Mot. to Dis. at 4-6.  Moreover, the filing of the Chapter 11 Case did not result in the

termination of the Debtor's interests in YG WV or a transfer or assignment of the Debtor's interests

to the estate that would result in the dissolution of YG WV.  *Id.* at 15.

59.     Under the Plan, the Debtor's interests in YG WV will vest in the remaining estate,

Wind-Down Co.  To the extent Weiss argues that the Plan impermissibly provides for the transfer

or assignment of the Debtor's interest in YG WV to Wind-Down Co on the Effective Date  (which

the Debtor does not believe is the case), such a transfer would similarly not violate applicable law

for several reasons. In the first instance, Section 603(a)(2) of the NYLLCL provides that, "*except*

*as provided in the operating agreement*," the assignment of a membership only entitles the

assignee to "distributions and allocations of profits and losses" and does not entitle the assignee to

"participate in the management and affairs of the limited liability company" or "to exercise any

rights or powers of a member" (emphasis added).  Section 603(a)(4) further provides that, unless

otherwise stated in the operating agreement, a member ceases to be a member and to have the

power to exercise any rights or powers of a member upon assignment of all of his or her

membership interest.

60.     As part of the Plan Supplement, the Debtor will be filing an amended and restated

YG WV operating agreement.  The amended and restated YG WV operating agreement will

expressly provide that the Debtor, as the sole member of YG WV, has the right to assign its interest

in YG WV to any third party and that following such an assignment, the assignee will be the

member of YG WV with all the rights, powers and interests of a member, including, without

WEIL:\98751606\11\12817.0007

limitation, all economic and non-economic rights held in YG WV.  Accordingly, the Debtor's "transfer" of the YG WV interest to Wind-Down Co. is not governed by Section 603(a)(2) of the NYLLCL and, as Wind-Down Co will become the member of YG WV, YG WV will continue to have a member and will not dissolve as Weiss maintains following the Effective Date.

61.    Even if the operating agreement did not supplant Section 603, that provision does not prohibit assignments of member interests; rather, it merely limits the interest that can be assigned.  The Plan, therefore, cannot violate applicable law by dint of such an assignment. Separately, even if section 1129(a) were implicated by a transfer permitted (albeit limited to economic interests) by Section 603 of the NYLLCL (which the Debtor does not believe is the case), the Debtor believes that section 1123(a)(5) of the Bankruptcy Code overrides any such statute or law and in all events permits the full membership interest to be assigned or transferred. Section 1123(a)(5)(B) provides that a plan shall provide adequate means for the plan's implementation, which may include the "transfer of all or any part of the property of the estate" to one or more parties "*notwithstanding any otherwise applicable nonbankruptcy law*." (emphasis added).

62.    Courts generally permit preemption under section 1123(a)(5) to allow a debtor to implement the transactions contemplated under its chapter 11 plan.  *See In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 606 (Bankr. S.D.N.Y. 2018) ("Section 1123(a) provides a list of the tools one may use to implement a plan."); *In re Fed.-Mogul Glob. Inc.*, 385 B.R. 560, 566–67 (Bankr. D. Del. 2008), *aff'd sub nom. In re Fed.-Mogul Glob.*, 402 B.R. 625 (D. Del. 2009), *aff'd sub nom. In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355 (3d Cir. 2012) (noting that "[s]ection 1123(a)(5) 'is an empowering statute' that "enhanc[es] the ability of the trustee or debtor in possession to deal with property of the estate'" and that it expressly preempts state law and

contractual rights "that might otherwise interfere with the implementation of a Chapter 11 plan");

*In re Pub. Serv. Co. of New Hampshire*, 108 B.R. 854, 882 (Bankr. D.N.H. 1989) ("In terms of the

literal language of § 1123(a)(5) it seems obvious that that section on its face contemplates that

restructuring transactions necessary to a plan of reorganization may be provided notwithstanding

nonbankruptcy law"). Preemption under section 1123(a)(5), however, may not be permissible

when the "'otherwise applicable nonbankruptcy laws [] are concerned with protecting public

health, safety, and welfare.'" *Fed.-Mogul Glob. Inc.*, 684 F.3d at 382 (quoting *Montgomery Cnty.,

MD v. Barwood, Inc.*, 422 B.R. 40, 44 (D. Md. 2009)).

63.    In particular, numerous courts have held that section 1123(a)(5) preempts state law

and contractual provisions that would otherwise restrict a debtor's ability to assign its rights or

property. *See, e.g.*, *Fed.-Mogul Glob. Inc.*, 684 F.3d at 365 (affirming Bankruptcy Court's ruling

that section 1123(a)(5) preempts anti-assignment provisions that would otherwise bar the transfer

of insurance rights to a section 524(g) trust pursuant to a debtor's chapter 11 plan); *In re Refco Inc.

Sec. Litig.*, No. 07-MD-1902 (JSR), 2013 WL 12158586, at *15 (S.D.N.Y. Aug. 7, 2013) (citing

*Federal-Mogul Global Inc.* and finding that a debtor's assignment of tort claims and causes of

action in connection with its reorganization was permissible notwithstanding a New Jersey law

prohibiting assignment of tort claims); *In re W.R. Grace & *664 Co.*, 468 B.R. 81, 158 (D. Del.

2012) (court upheld Bankruptcy Court's decision to authorize the assignment of all of the debtor's

rights to and under certain insurance policies to a personal injury trust pursuant to the debtor's

chapter 11 plan notwithstanding anti-assignment provisions in the policies effectively preventing

it from doing so because "because the clear import of § 1123(a) is that it preempts any

nonconforming state law").

64.    Accordingly, the Plan complies with the applicable provisions of the NYLLCL and, to the extent it does not, section 1123(a)(5) provides the Debtor with the means to implement the Plan notwithstanding any otherwise applicable law.

**G.    The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.**

65.    Section 1129(a)(4) of the Bankruptcy Code requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require all payments of professional fees which are made from estate assets be subject to review and approval as to their reasonableness by the court.  *See In re J. Reg. Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y 2009), *appeal dismissed sub nom. Freemen v. J. Reg. Co.*, 452 B.R. 367 (S.D.N.Y. 2010).

66.    All payments for services provided to the Debtor during the Chapter 11 Case must be approved by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.  Section 2.2 of the Plan provides all final requests for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date must be filed no later than forty-five (45) days after the Effective Date.  Section 2.2 of the Plan further states all Fee Claims must be approved by the Bankruptcy Court.  Moreover, Section 11.1 of the Plan provides the Court shall retain jurisdiction to hear and determine all Fee Claims. The Plan, therefore complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**H.    The Debtor Has Complied With the Requirements of Section 1129(a)(5) of the Bankruptcy Code.**

67.    Section 1129(a)(5) of the Bankruptcy Code requires the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a

30

successor to a debtor under the plan and such appointment be consistent with the interests of
creditors and equity security holders and with public policy.  In addition, to the extent there are
insiders to be retained or employed by the reorganized debtors, section 1129(a)(5)(B) requires the
plan proponent disclose the identity and nature of any compensation of any such insiders.  *See* 11
U.S.C. § 1129(a)(5).

68.     In the Disclosure Statement, the Debtor disclosed the identities and affiliations of
the individuals proposed to serve as directors and officers of the Reorganized Debtor.  As part of
the Plan Supplement, the Debtor intends to disclose the identity of the Plan Administrator for
Wind-Down Co, provide a short biography of the Plan Administrator, and include a substantially
final draft of the proposed Plan Administration Agreement.  To the extent any insider of the Debtor
is to be retained or employed by the Reorganized Debtor or Wind-Down Co, the identity and nature
of any compensation of any such individual will also be set forth in the Plan Supplement.
Accordingly, the Debtor will be in compliance with section 1129(a)(5) of the Bankruptcy Code.

**I.     The Plan is in the Best Interests of All Creditors of, and Holders of  Interests
in, the Debtor.**

69.     Section 1129(a)(7) of the Bankruptcy Code requires a plan be in the best interests
of creditors and equity interest holders in the Debtor – commonly referred to as the "best interests"
test.  The best interests test focuses on potential individual dissenting creditors rather than classes
of claims.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434,
441 n.13 (1999).  It requires each holder of a claim or equity interest in an impaired class either
accept the plan or receive or retain under the plan property having a present value, as of the
effective date of the plan, not less than the amount such holder would receive or retain if the debtor
were liquidated under chapter 7 of the Bankruptcy Code.

70.    Under the best interests test, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7.  In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."  *In re Adelphia Commc'ns*, 368 B.R. at 252.

71.    As set forth in the Liquidation Analysis that was included as Exhibit H of the Disclosure Statement, the best interests test is satisfied as to each holder of a Claim or Interest in each of the Impaired Classes, including the Non-Voting Impaired Classes, since these classes will receive at least as much under the Plan as they would receive if this Chapter 11 Case were converted to a chapter 7 liquidation.  Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**J.    The Debtor Anticipates the Plan Will be Accepted by the Only Impaired Class Entitled to Vote on the Plan, and as to Such Class, the Requirements of Section 1129(a)(8) of the Bankruptcy Code Will Be Satisfied.**

72.    Section 1129(a)(8) of the Bankruptcy Code requires as follows:  "With respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8).

73.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject a plan of reorganization:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

WEIL:\98751606\11\12817.0007

74.     As set forth above, the Debtor anticipates the Plan will be overwhelmingly accepted by creditors in Class 4, the only Voting Class.  Thus, as to such Class, the requirements of section 1129(a)(8) of the Bankruptcy Code will have been satisfied.

75.     Holders of Claims and Interests in the non-Voting Impaired Classes are deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code.  As to these Classes, the Plan may be confirmed over their dissent under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.  *See* Section O *infra* at pp. 40-43.

**K.     The Plan Provides for Payment in Full of All Allowed Priority Claims.**

76.     Section 1129(a)(9) of the Bankruptcy Code requires, unless the holder of a particular claim agrees to a different treatment with respect to such claim, holders of allowed claims entitled to priority under section 507(a) must receive cash payments on the effective date under the plan.

77.     The Plan provides, unless a holder agrees to less favorable treatment, holders of Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code will be paid in full, in cash, on the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.  *See* Plan, § 2.1.

78.     Moreover, the Plan provides, unless a holder agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims under section 507(a) of the Bankruptcy Code are unaltered by the Plan.  The Debtor does not believe there are any Priority Non-Tax Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan. To the extent any are asserted, the Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Non-Tax Claim available to the Debtor. See Plan, §§ 4.1

33

79.     The Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code with respect to the treatment of Priority Tax Claims under section 507(a)(8).  Pursuant to Section 2.3 of the Plan, unless a holder agrees to less favorable treatment, Priority Tax Claims shall be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course by the Reorganized Debtor.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Tax Claim available to the Debtor.  *See* Plan, § 2.3.  Accordingly, the Plan satisfies the requirements of section 1129(a)(9)(A), (B), and (C) of the Bankruptcy Code.

**L.     The Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code.**

80.     Section 1129(a)(10) of the Bankruptcy Code requires, if a class of claims is impaired, the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  Here, once the Voting Deadline has passed and the votes of holders of Class 4 Remaining Unsecured Claims, as the only Voting Class under the Plan, are counted, the Debtor is confident Class 4 will vote to accept the Plan.  Accordingly, subject to the filing of the results set forth in the Voting Certification, the Plan will satisfy section 1129(a)(10) of the Bankruptcy Code.

**M.     The Plan Is Feasible.**

81.     Section 1129(a)(11) of the Bankruptcy Code requires the Court determine the Plan is feasible as a condition precedent to confirmation.  Specifically, it requires confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is proposed in the plan.  11 U.S.C. § 1129(a)(11).  The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan may be implemented and has a reasonable likelihood of success.  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 843 F.2d 636, 649 (2d Cir. 1988); *In re Advance Watch Co., Ltd.*, 2016 Bankr. LEXIS 229 (Bankr. S.D.N.Y. Jan. 25, 2016).

WEIL:\98751606\11\12817.0007

82.     The key element of feasibility is whether there is a reasonable probability the provisions of a chapter 11 plan can be performed.  The purpose of the feasibility test is to protect against visionary or speculative plans.  *See In re One Times Square Assocs. Ltd.*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) ("The purpose of the feasibility test has been described as protection against visionary or speculative plans."); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) (same).  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.  *In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003).

83.     The Plan is premised on the consummation of the Investment Agreement.  The Debtor will use the proceeds it receives in connection with the Investment Agreement to make distributions to holders of Allowed Claims and Interests as provided in the Plan.  As established in the Ravid Declaration, the Plan embodies a rational plan to implement the Investment Agreement and provide for the distribution of proceeds to holders of Allowed Claims in Class 4 (Class 4 Remaining Unsecured Claims) on or after the Effective Date in accordance with the Plan.  Specifically, the Plan sets forth certain cash payments that the Debtor and/or the Plan Administrator will make on or after the Effective Date.  The Plan also provides for the establishment of the Class 4 Disputed Claims Reserve for the benefit of holders of Disputed Remaining Unsecured Claims against the Debtor.  *See* Ravid Declaration, ¶ 45.

84.     With respect to the satisfaction of any Unimpaired Claims on and after the Effective Date, the Sponsor has prepared the Financial Projections annexed to the Disclosure Statement as Exhibit G based on the information provided by the Debtor.  The Financial Projections forecast the Reorganized Debtor's cash flows for the three-year period following the Effective Date.

85.    In addition, the Sponsor anticipates that the equity interests in the Reorganized Debtor will be held through the following entities:  Greenrock Realty Services LLC, Vickory Partners LLC, BVT Holdings LLC, and Cam Elm Company LLC.  The principals who control these entities have more than seventy (70) years of combined experience in the real estate business. Currently, these individuals, through numerous entities, own and control over 40,000 residential apartments in the New York and New Jersey area and also own tens of millions of square feet of commercial and industrial space in and out of New York City.  The Financial Projections and the experience and capabilities of these principals, among other things, demonstrate that the Reorganized Debtor has sufficient capital and means to consummate the Plan and meet its obligations on a go-forward basis, including with respect to the payments on the New Notes and all Unimpaired Claims under the Plan, and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Reorganized Debtor.

86.    To the extent Weiss or any other party contends the Plan is not feasible based on its treatment of General Unsecured Claims, such objection should be dismissed.  While the Debtor is not aware of any holders of General Unsecured Claims that have been asserted against it, other than the Taz Claim, any such Claims that arise and are properly asserted against the Debtor or the Reorganized Debtor will be classified in Class 3 (General Unsecured Claims) and unimpaired under the Plan.

87.    On and after the Effective Date, except as otherwise provided in the Plan, all Unimpaired Claims will be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course of business of the Reorganized Debtor.  As set forth above, based upon the Financial Projections and the other information provided by the Sponsor to demonstrate its financial

36

wherewithal, the Debtor believes the Reorganized Debtor will have the means to comply with its obligations under the Plan, including with respect to the Class 3 General Unsecured Claims.

88.    Further, the Sponsor's obligation to close under the Investment Agreement is not impacted by the parties' failure to close on the MLPSA.  The Debtor was notified by counsel to the Notes Trustee the closing of the William Vale Purchase did not occur on July 25, 2022, the outside date for closing under the MLPSA.  Thereafter, on July 27, 2022, the Notes Trustee, on behalf of the Series C Noteholders, delivered to the Sponsor a notice of default for failing to consummate the closing of the William Vale Purchase in accordance with the MLPSA (the "**Notice of Default**").

89.    In response, on July 28, 2022, the Sponsor sent a letter to the Notes Trustee in which the Sponsor reserved all rights in connection with the Notice of Default (the "**Sponsor Default Response**").  The Debtor was informed by counsel to the Notes Trustee that on August 19, 2022, following a vote of the Series C Noteholders, the Notes Trustee, on behalf of the Series C Noteholders, delivered to the Sponsor a notice of termination of the MLPSA as a result of the Sponsor's failure to consummate the closing of the William Vale Purchase and default under the MLPSA (the "**Notice of Termination**").

90.    As a response to the Notice of Termination, on August 23, 2022, the Sponsor sent a letter to the Escrow Agent under the MLPSA (the "**Termination Response Letter**"), in which the Sponsor (i) disputed the facts and circumstances leading to the termination of the MLPSA, (ii) formally objected to any release of escrowed amounts to the Notes Trustee, and (iii) reserved its rights in connection with the termination of the MLPSA.[17]  On September 1, 2022, the Sponsor

---

[17]    Copies of the Notice of Default, the Sponsor Default Response, the Notice of Termination, and the Sponsor's Termination Response Letter were attached as exhibits to the Debtor's letter to the Bankruptcy Court, dated August 23, 2022 [ECF No. 188].

also filed a letter with the Court in which the Sponsor disputed the MLPSA has been terminated and the parties have "failed to close" under the MLPSA [ECF No. 202].

91.     As a result of the foregoing, the Debtor's membership interests in YG WV are "Excluded Assets" under the Plan that will vest in Wind-Down Co following the Effective Date. The parties' failure to close on the MLPSA and the resulting treatment of the Debtor's membership interests in YG WV under the Plan do not impact the Sponsor's obligation to close under the Investment Agreement.  Regardless, under the Investment Agreement, the Sponsor may still obtain the interests in YG WV from Wind-Down Co after confirmation if the Sponsor is able to close on the MLPSA before year end.  Specifically, the Plan and Investment Agreement provide for the following:

   a.  Pursuant to Section 1.40 of the Plan, the default treatment under the Plan is the Debtor's interests in YG WV are "Excluded Assets" to vest in Wind Down Co. on the Effective Date.  A closing under the MLPSA must occur before the Debtor has any obligation to include the interests in YG WV as assets to vest in the Reorganized Debtor under the Plan. *See* Plan § 1.40; Inv. Agmt., Annex A.

   b.  In addition, Section 1.40 of the Plan provides any obligation to include the Debtor's interests in YG WV with the Reorganized Debtor only continues until "the MLPSA expires or is terminated according to its terms." *See* Plan § 1.40; Inv. Agmt., Annex A.

   c.  As set forth in the letters exchanged between the Notes Trustee and the Sponsor, the William Vale Purchase failed to close on July 25, 2022 as required under the MLPSA and, therefore, the Debtor's obligation was never triggered and the interests remain Excluded Assets under the Proposed Plan.  As "Excluded Assets", the Debtor's interests in YG WV will vest in the Debtor's remaining wind-down estate, Wind-Down Co, and will not vest in the Reorganized Debtor under the Plan. *See* Plan, §§ 1.115, 5.3, 10.1.

   d.  In addition, as the parties have not closed on the MLPSA, the YG WV interests will vest in Wind-Down Co on the Effective Date subject to the Sponsor's ability to close on the William Vale Purchase until either (i) the MLPSA expires or is terminated or (ii) December 31, 2022.  *See* Plan, § 1.40, Inv. Agmt., Annex A.

   e.  Further, because the parties have not closed on the MLPSA, the consideration to be paid by the Sponsor under the Plan will remain at $60 million and will not increase

by an additional $2.2 million, as was contemplated under the Plan and the Investment Agreement in the event the MLPSA closed. *See* Plan, § 1.40; Inv. Agmt., Annex A.

92.     Further, there is no closing condition under the Investment Agreement or the Plan tied to the William Vale Purchase.  Indeed, Section 1.40 of the Plan makes clear that a closing on the William Vale Purchase (which all parties agree has not happened) may occur "prior to, on, or **after the Effective Date**" of the Plan with the shares being treated as Excluded Assets until such time as a closing occurs or the MLPSA expires or is terminated.  Plan, §1.40 (emphasis added). Accordingly, a failure or delay in closing on the MLPSA, which was contemplated under the express terms of the Plan, does not impact the Sponsor's obligation to close under the Investment Agreement and, therefore, has no impact on the feasibility of the Plan.

93.     Notably, based upon the closing of the Investment Agreement, the Debtor believes it will have more than sufficient funds to make all payments required under the Plan, including payment of Administrative Expense Claims.  *See* Ravid Declaration, ¶ 46.  As a result, the Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

**N.      The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code.**

94.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]"  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.1 of the Plan provides for the payment of such statutory fees, together with interest (if any) pursuant to section 3717 of title 31 of the United States Code on the Effective Date and thereafter as may be required.  With respect to any Impaired Claims, Wind-Down Co shall make all aforementioned required filings and pay all such fees, if any.  The Wind

39

Down Budget for Wind Down Co included in the Plan Supplement reflects that the Debtor has made adequate provision for payment of the fees of the U.S. Trustee.  With respect to the Unimpaired Claims, the Reorganized Debtor shall make all aforementioned required filings and pay all such fees, if any.

O.    **The Plan Satisfies the "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for the Non-Voting Impaired Classes.**

95.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims and equity interests.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

96.    As the Debtor anticipates the Voting Class will accept the Plan, "cram down" is only relevant here with respect to the Non-Voting Impaired Classes (*i.e.*, Class 5 (Subordinated Securities Claims) and Class 6 (Interests)).  The Plan may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

1.    **The Plan Does Not Discriminate Unfairly.**

97.    Section 1129(b)(1) does not prohibit discrimination between classes.  Rather, it prohibits discrimination that is unfair.  Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310–11 (Bankr. S.D.N.Y. 2016) ("Courts generally will approve placement of similar claims in different classes provided there is a 'rational' or 'reasonable' basis for doing so" and "satisfies the flexible requirements of section 1122 because a valid business, factual, and/or legal reason exists for

40

separately classifying the various classes of claims and interests created under the Plan. . . [W]here claims or interests of the same priority are separately classified, such claims or interests are either dissimilar or another good business reason exists for such classification."); *In re WorldCom Inc.*, Case No. 02-13533 (AJG) 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003).

98.    As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 636, 636 (2d Cir. 1988), or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g., In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992) (separate classification and treatment was rational where members of each class "possess[ed] different legal rights"), *aff'd sub nom. Lambert Brussels Assocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992).

99.    With respect to the Subordinated Securities Claims in Class 5, no similar class of such claims exists. The Subordinated Securities Claims are not receiving any amounts under the Plan; however, no other class of such claims is entitled to different treatment. The fact that these Claims have been subordinated changes their level of priority and, therefore, allows them to receive different treatment than other unsubordinated claims. *See In re Coastal Broad. Sys., Inc.*, No. CIV. 12-5682 RMB, 2013 WL 3285936, at *4 (D.N.J. June 28, 2013), *affirmed*, 570 F. App'x 188 (3d Cir. 2014); *In re Unbreakable Nation Co.*, 437 B.R. 189, 200–01 (Bankr. E.D. Pa. 2010). Based on the fact this is the only class of subordinated claims, the Debtor has a rational basis for their separate classification and treatment. Therefore, the Plan does not discriminate unfairly with respect to Class 5.

WEIL:\98751606\11\12817.0007

100.    The holders of Class 6 Interests are also not entitled to any recovery under the Plan and, accordingly, the disparate treatment of the Interests is consistent with the Bankruptcy Code. Based on the estimated recoveries, as further set forth in Article VI of the Disclosure Statement, no class of Claims is receiving more than 100% of its Claims.  Accordingly, the Plan satisfies the "unfair discrimination" test.

### 2.    The Plan Is Fair and Equitable.

101.    To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide either (i) each holder of the nonaccepting class will receive or retain on account of such claim property of a value equal to the allowed amount of such claim, or (ii) a holder of a claim or interest that is junior to the claims of the nonaccepting class will not receive or retain any property under the plan.  *See* 11 U.S.C. § 1129(b)(2)(B).  The rule is satisfied as to the holders of Class 5 Subordinated Securities Claims as no claims or interests junior to such Class will receive or retain any property under the Plan.  *See In re Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 233 (Bankr. D.N.J. 2000).

102.    To be "fair and equitable" as to holders of interests, section 1129(b)(2)(C) of the Bankruptcy Code requires a plan to provide either (i) that each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) that a holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.  *See* 11 U.S.C. § 1129(b)(2)(C). The "fair and equitable" rule is satisfied as to the holder of Class 6 Interests as no interests junior to such class will receive or retain any property under the Plan on account of such junior interest. *See In re Finlay Enters. Inc.*, No. 09-14873 (JMP), 2010 WL 6580628, at *7

42

(Bankr. S.D.N.Y. June 29, 2010) (fair and equitable test satisfied where no interest junior to the interests of the rejecting class received any property under the plan).

103.    Accordingly, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code as to each of the Non-Voting Impaired Classes and may be confirmed despite the deemed rejection by such Classes.

## III.    CAUSE EXISTS TO WAIVE STAY OF PROPOSED CONFIRMATION ORDER.

104.    The Debtor respectfully requests the Court direct the proposed Confirmation Order shall be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).  Bankruptcy Rule 3020(e) provides "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  As such, and as the Advisory Committee Notes to Bankruptcy Rule 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately."  Fed. R. Bankr. P. 3020(e), advisory committee's note to 1999 amendment.

105.    Under the circumstances, it is appropriate for the Court to exercise its discretion to order Bankruptcy Rule 3020(e) inapplicable and permit the Debtor to consummate the Plan and commence its implementation without delay following entry of the proposed Confirmation Order. The Debtor is facing upcoming deadlines for entry of an order confirming the Plan and closing under the Investment Agreement, which are November 21, 2022 and December 31, 2022, respectively.  Additional steps will need to be taken by the Debtor in connection with the Israeli Recognition Proceeding and the BVI Proceeding to comply with the milestones under the Investment Agreement and avoid jeopardizing recoveries under the Plan.  Based on the foregoing, the requested waiver of the 14-day stay is in the best interest of the Debtor's estate and its creditors and will not prejudice any parties in interest.

WEIL:\98751606\11\12817.0007

## IV.    CONCLUSION

106.    For the reasons set forth above, the Debtor requests that the Court confirm the Plan

in accordance with section 1129 of the Bankruptcy Code.

Dated: New York, New York
        September 16, 2022

*/s/ Matthew P. Goren*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Gary Holtzer
Matthew P. Goren
Robert S. Berezin
Richard D. Gage


*Attorneys for the Debtor*

44