WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary Holtzer
Matthew P. Goren
Robert S. Berezin
Richard D. Gage

*Attorneys for the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
                                                          :
**In re**                                                 :    **Chapter 11**
                                                          :
**ALL YEAR HOLDINGS LIMITED,**                            :    **Case No. 21-12051 (MG)**
                                                          :
                    **Debtor.**[1]                        :
                                                          :
**Fed. Tax Id. No. 98-1220822**                           :
-----------------------------------------------------------X

### DECLARATION OF ASSAF RAVID IN SUPPORT OF CONFIRMATION OF AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF ALL YEAR HOLDINGS LIMITED

I, Assaf Ravid, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.      On March 4, 2021, I was retained as the Chief Executive Officer ("**CEO**") and Chief Restructuring Officer ("**CRO**") of All Year Holdings Limited (the "**Debtor**"), a company organized as a BVI Business Company under the laws of the British Virgin Islands (the "**BVI**"). I am knowledgeable and familiar with the Debtor's business and financial affairs.

---

[1]     The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

2.      Prior to my current position at the Debtor, I served as an official representative of the Debtor's Series B, C, D and E bondholders.  Before this position, I was the managing director of CGI Strategies ("**CGI**"), a domestic development real estate company focused on developing and operating multi-family units, condominiums, and commercial properties in California, the Southeast, and the Northeast.  In this capacity, I managed the operations of CGI's New York office by overseeing the full real estate development cycle from acquisitions, construction, sales and marketing, to financing and refinancing.  Prior to this role, I served as a managing director of Aura Investments, Ltd, a global investment company specializing in real estate development and property management from 2007-2012.  Before that I was a co-founder and attorney of Raveh-Ravid & Co., a leading Israeli law firm specializing in real estate and commercial law.

3.      On December 16, 2021, the Debtor filed an application under the laws of the BVI with the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division Virgin Islands (the "**BVI Court**") seeking the appointment of Paul Pretlove and Charlotte Caulfield of Interpath (BVI) Limited (formerly Kalo (BVI) Limited) as joint provisional liquidators (the "**JPLs**") under the applicable provisions of the BVI Insolvency Act 2003.  The BVI Court entered an order appointing the JPLs on December 20, 2021 (the "**JPL Order**").  In connection with the appointment of the JPLs, the JPLs empowered me, and several other specific individuals (collectively, the "**Authorized Managers**"), to maintain the Debtor's operations, pursue the Debtor's restructuring, and to continue to pursue and oversee the Chapter 11 Case.

4.      I submit this declaration (the "**Declaration**") in support of the Debtor's request that the Court confirm the *Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated September 15, 2022 [ECF No. 214] (as may be modified, amended, or

WEIL:\98799438\4\12817.0007

supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**")

pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").[2]  I have

reviewed, and I am generally familiar with, the terms and provisions of the Plan and the

requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.  I was

personally involved in the development of and negotiations regarding the Plan and its related

documents.  I am authorized to submit this Declaration on behalf of the Debtor.

5.       Except as otherwise indicated herein, the facts set forth in this Declaration

are based upon my personal knowledge, my review of relevant documents, information provided

to me by the other individuals working under my supervision, information provided to me by the

Debtor's professional advisors working under my direction, or my opinion based upon experience,

knowledge, and information concerning the Debtor.  If called upon to testify, I would testify

competently to the facts set forth in this Declaration.

6.       I previously submitted a declaration, pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the Southern District of New York, in support of the Debtor's chapter 11

petition, dated December 14, 2021 [ECF No. 4] (the "**First Day Declaration**"), which is

incorporated herein by reference.

### The Plan Satisfies Section 1129 of the Bankruptcy Code

7.       On the basis of my understanding of the Plan, the events that have occurred

during the Debtor's Chapter 11 Case, and discussions I have had with the Debtor's legal counsel

regarding various orders entered during the Chapter 11 Case and the requirements of the

---

[2]       Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such
terms in (i) the Plan or (ii) the *Debtor's Opening Brief in Support of Confirmation of Amended Chapter 11 Plan
of Reorganization of All Year Holdings Limited*, filed contemporaneously herewith, as applicable.

3

Bankruptcy Code, I believe that the Plan satisfies all of the applicable requirements of section 1129(a) of the Bankruptcy Code as described in this Declaration.[3]

8.    <u>Bankruptcy Code Section 1129(a)(1)</u>.  On the basis of my understanding of the Bankruptcy Code as explained to me by counsel, I believe that the Plan complies with section 1129(a)(1) of the Bankruptcy Code because the Plan complies with sections 1122 and 1123 of the Bankruptcy Code.

9.    <u>Bankruptcy Code Section 1122</u>.  The Plan designates the classification of Claims against, and Interests in, the Debtor.  I understand that the Plan provides for the separate classification of Claims against and Interests the Debtor based upon the differences in legal nature and/or priority of such Claims and Interests.  In total, the Plan designates six (6) Classes of Claims against and Interests in the Debtor as follows:[4]

i.    <u>Class 1 (Priority Non-Tax Claims)</u>: Any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

ii.    <u>Class 2 (Other Secured Claims)</u>: Any Secured Claim other than any secured Priority Tax Claim.

iii.    <u>Class 3 (General Unsecured Claims)</u>: Any Claim against the Debtor, that is not (a) an Administrative Expense Claim; (b) a Priority Tax Claim; (c) a Priority Non-Tax Claim; (d) a Remaining Unsecured Claim; or (e) a Subordinated Securities Claim.  For the avoidance of doubt, General Unsecured Claims include all Intercompany Claims and the Taz Claim.

---

[3]    It is my understanding, based on conversations with counsel, that sections 1129(a)(6) and 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code are inapplicable to the Debtor.

[4]    Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims have not been classified. The Debtor is not aware of any Class 1 Priority Non-Tax Claims, Class 2 Other Secured Claims, or Class 3 General Unsecured Claims (other than the Taz Claim) but nevertheless has accounted for them as Classes under the Plan.

iv.     <u>Class 4 (Remaining Unsecured Claims)</u>: The Noteholder Claims[5], the Subsidiary Plan Administrator Claims[6], and the Non-Securities Indemnity Claims[7].

v.      <u>Class 5 (Subordinated Securities Claims)</u>: Claims subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a security of the Debtor, or for damages arising from the purchase of sale of such a security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, including any Claim arising out of or related to the Israeli Securities Actions or other similar class action lawsuits brought in Israel before the Effective Date.

vi.     <u>Class 6 (Interests)</u>: Any Interests in the Debtor.

10.     It is my understanding that each Class contains only Claims or Interests that are substantially similar to one another.  Based on my understanding, I believe that the Plan incorporates a classification and distribution scheme that adheres to the statutory priorities prescribed by the Bankruptcy Code.  The classification scheme was not proposed to create a consenting impaired Class or to manipulate voting.

11.     <u>Bankruptcy Code Section 1123(a)(1) (Designation of Classes of Interests)</u>. The Plan designates six (6) Classes of Claims and Classes of Interests against the Debtor.

12.     <u>Bankruptcy Code Section 1123(a)(2) and 1123(a)(3) (Specify Unimpaired and Impaired)</u>.  The Plan specifies whether each Class of Claims or Interests is Impaired or

---

[5]     The Noteholder Claims are to be allowed as Class 4 Remaining Unsecured Claims under the Plan.

[6]     As part of the settlement agreement approved by order of the Court dated August 25, 2022 [ECF No. 195] (the "**EGM Settlement**"), the Subsidiary Plan Administrator Claims were resolved and the EGM Plan Administrator (as defined in the EGM Settlement) agreed to waive and release any claims against the Debtor.

[7]     Estimation of the Non-Securities Indemnity Claims at zero dollars ($0) for all purposes under the Plan (including for purposes of distribution) is a condition precedent to the Effective Date, but such condition may be waived by the Notes Trustee in its sole discretion.

WEIL:\98799438\4\12817.0007

Unimpaired under the Plan and the treatment of each such Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively.

13.    <u>Bankruptcy Code Section 1123(a)(4) (Same Treatment Within Classes)</u>.  I understand that, except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, as required by section 1123(a)(4).

14.    <u>Bankruptcy Code Section 1123(a)(5) (Adequate Means for Plan Implementation)</u>.  I believe the Plan provides adequate means for its implementation as required by section 1123(a)(5) of the Bankruptcy Code through, among other things: (a) the consummation of the Investment Agreement, (b) the provisions governing the Sponsor Contribution, and the distributions under the Plan, (c) the authorization and issuance of the New Notes in accordance with Section 5.2 of the Plan, (d) the administration of Wind-Down Co in accordance with Section 5.3 of the Plan, (d) the consummation and implementation of the BVI Plan of Arrangement in the BVI Proceeding, (e) the appointment of the Plan Administrator, and (f) the authorization for all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan.

15.    <u>Bankruptcy Code Section 1123(a)(6) (Provide for the Inclusion in the Charter of the Debtor of a Provision Prohibiting Issuance of Nonvoting Equity Securities)</u>.  I understand that the Plan Supplement will contain the organizational documents for the Reorganized Debtor, which will prohibit the issuance of nonvoting equity securities.

16.    <u>Bankruptcy Code Section 1123(a)(7) (Selection of Officers, Directors and Trustees in a Manner Consistent with the Interests of Creditors and Equity Security Holders)</u>.  I understand that, pursuant to Section 5.3 of the Plan, on the Effective Date, the Plan Administrator

6

will be appointed by the Notes Trustee, on behalf of the Noteholders, the key creditor constituency in Class 4 (Remaining Unsecured Claims) which has the greatest interest in the amounts recovered, if any, from the Excluded Assets (including, but without limitation, from the prosecution of Avoidance Actions and other Causes of Action) and any remaining Wind Down Cash Funding. Pursuant to Section 5.5 of the Plan, the officers and directors of the Reorganized Debtor were selected by the Sponsor, who will hold or control 100% of the shares of the Reorganized Debtor upon the Effective Date.

17.    <u>Bankruptcy Code Section 1123(b)(1) (Impair or Leave Unimpaired any Class or Claims or Interests)</u>.  Article IV of the Plan describes the treatment for each of the Unimpaired Classes and the Impaired Classes for the Debtor.

18.    <u>Bankruptcy Code Section 1123(b)(2) (Treatment of  Executory Contracts or Unexpired Leases)</u>.  With respect to the Debtor's executory contracts and unexpired leases, Section 8.1 of the Plan provides all executory contracts and unexpired leases to which the Debtor is a party are deemed rejected, unless such contract or lease (i) is specifically designated (x) by the Reorganized Debtor or (y) Wind-Down Co as a contract or unexpired lease to be assumed or assumed and assigned on the Schedule of Assumed Contracts to be filed with the Plan Supplement; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; (iv) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the Confirmation Date; or (v) is identified in Section 8.4 of the Plan.

19.    <u>Bankruptcy Code Section 1123(b)(3)(A) and (B) (Retention of Claims and Interests)</u>.  I understand that the Plan provides for the retention of Avoidance Actions and other

7

Causes of Action by the Reorganized Debtor and Wind-Down Co, as further set forth in Section 10.1 of the Plan and the Schedules of Retained Causes of Action to be included as exhibits in the Plan Supplement. I understand that, pursuant to the Investment Agreement, any and all claims and Causes of Action that the Debtor, the Noteholders, or the Notes Trustee may have against any third-parties shall vest in, and be retained by, Wind-Down Co under the Plan on the Effective Date; *provided, however*, that any claims and Causes of Action that the Debtor may have with respect to whether or not Yoel Goldman or Tzipporah Goldman have any ownership interests in any of the Transferred Entities (as defined in the Investment Agreement), shall vest in, and be retained by, the Reorganized Debtor. In addition, under the Plan, the Reorganized Debtor will hold the right to assert all rights of setoff or recoupment, and other legal or equitable defenses with respect to the Unimpaired Claims and Wind-Down Co will hold all such rights and defenses with respect to the Impaired Claims.

20.     <u>Bankruptcy Code Section 1123(b)(5) (Modify or Leave Unaffected Rights of Holders of Secured and Unsecured Claims)</u>. I understand that the Plan modifies the rights of holders of Claims in the Voting Class and the Non-Voting Impaired Classes and leaves unaffected the rights of holders of Claims in each of the Debtor's Unimpaired Classes.

21.     <u>Bankruptcy Code Section 1123(b)(6) (Appropriate Provisions Not Inconsistent with the Bankruptcy Code)</u>. I understand that the Plan (a) contains certain release and exculpation provisions, and (b) provides that the Court will retain jurisdiction over all matters arising in and related to this Chapter 11 Case.

22.     <u>Release Provisions</u>. I understand that, in accordance with the Investment Agreement, the Plan provides for releases of Claims and Causes of Action held by: (i) the Debtor and its Estate, the Reorganized Debtor, and Wind-Down Co, on behalf of themselves and their

8

respective successors, assigns, and representatives (the "**Estate Releases**") against the Released Parties,[8] and (ii) the Debtor and its Estate, the Reorganized Debtor, Wind-Down Co, the Notes Trustee, the Sponsor, the JPLs, and each of the other Releasing Parties (as defined below) against each of the other Released Parties (the "**Mutual Releases**" and, together with the Estate Releases, the "**Plan Releases**").  I understand that the Plan does not contain any third-party releases and includes only an estate release from the Debtor as well as a mutual release between certain Releasing Parties as agreed to under the Investment Agreement.  Based on my participation in negotiations regarding the Plan, I believe that the Plan Releases are (i) integral components of the Plan, (ii) appropriate and necessary under the circumstances, and (iii) are being provided in exchange for fair consideration.

23.    <u>Estate Releases</u>.  Section 12.6(a) of the Plan contains a release of certain claims or Causes of Action of the Debtor, the Reorganized Debtor and Wind-Down Co against the Released Parties.  The Estate Releases do not (i) release any claims or Causes of Action arising after the Effective Date against any party or (ii) affect the rights of the Debtor or its successors under the Plan to enforce the terms of the Plan or the Definitive Documents (in each case, including, without limitation, any rights granted to the Plan Administrator under the Plan Administration Agreement).  Although I am not aware of any claims or causes of action against the Released Parties, each of the Released Parties (other than the Reorganized Debtor and Wind-

---

[8]    Section 1.78 of the Plan defines "*Released Parties*" as collectively, and in each case, solely in their capacities as such: (a) the Debtor and the Reorganized Debtor; (b) Wind-Down Co; (c) the Notes Trustee and its representatives and advisors; (d) the Noteholders and their representatives and advisors; (e) the Sponsor and its agents, officers, directors, principals, affiliates, representatives and advisors; (f) any current or former Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (g) any independent directors appointed to the board of the Debtor on or after January 1, 2021; (h) the JPLs; (i) the Authorized Managers; and (j) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC); provided, however, that Released Parties shall not include Yoel Goldman or Tzipporah Goldman in any capacity.

WEIL:\98799438\4\12817.0007

Down Co) insisted upon an Estate Release as part of the negotiations surrounding the Plan and the Investment Agreement. Claims against Yoel Goldman or Tzipporah Goldman in any capacity are not released under the Plan. Without the support and cooperation of each of the Released Parties, the Debtor may not have been able to reach an agreement on the terms of the Investment Agreement, consummation of which will benefit all creditors. Further, absent the Released Parties' cooperation and willingness to negotiate a consensual agreement on the Plan, the Debtor may have spent considerable time and money engaged in costly, lengthy and uncertain litigation which would have extended the duration of the Chapter 11 Case, thereby substantially reducing creditor recoveries. As additional consideration for the Estate Releases, the Debtor, the Reorganized Debtor, and Wind-Down Co will receive reciprocal releases from any Causes of Action, as discussed below.

24.     Moreover, the Plan Administrator will have authority to pursue all Avoidance Actions and other Causes of Action for the benefit of the holders of Allowed Class 4 Remaining Unsecured Claims, other than certain claims and Causes of Action with respect to whether or not Yoel Goldman or Tzipporah Goldman have any ownership interests in any of the Transferred Entities which shall vest in the Reorganized Debtor. The Plan Administrator for Wind-Down Co was appointed by the Notes Trustee, on behalf of the Noteholders, the key creditor in Class 4 (Remaining Unsecured Claims) which has the greatest interest in the amounts recovered, if any, from the Excluded Assets and any remaining Wind Down Cash Funding.

25.     For these reasons, I believe that the Estate Releases are fair, reasonable, appropriate, necessary, and integral components of the Plan.

1.     <u>Mutual Releases</u>. Section 10.6(b) of the Plan contains mutual releases between and among the following parties (collectively, the "**Releasing Parties**") for liability relating to the

10

Debtor and the Chapter 11 Case: (i) the Debtor and the Reorganized Debtor; (ii) Wind-Down Co;

(iii) the Notes Trustee and its representatives and advisors; (iv) the Noteholders and their

representatives and advisors; (v) the Sponsor and its agents, officers, directors, principals,

affiliates, representatives and advisors; (vi) any current or former Chief Restructuring Officer or

Associate Restructuring Officer of the Debtor; (vii) any independent directors appointed to the

board of the Debtor on or after January 1, 2021; (viii) the JPLs; (ix) the Authorized Managers; and

(x) any advisors retained by the Debtor in connection with the Chapter 11 Case on or after

December 29, 2020 (but not including Dov Tratner or Tratner and Associates PLLC).

26.     Except to the extent a holder of any Claims is a Releasing Party, no holder

of Impaired or Unimpaired Claims is waiving or releasing any Claims against the Debtor or the

other Released Parties under the Plan.  The Released Parties does not include Yoel Goldman or

Tzipporah Goldman in any capacity.  Accordingly, the Plan does not provide for any third-party

releases, whether consensual or non-consensual.

27.     I believe the Mutual Releases are consensual and limited in scope as they

only affect the stakeholders involved in the Debtor's reorganization efforts and the formulation of

the Plan.

28.     <u>Exculpation</u>.  Section 10.7 of the Plan also contains an exculpation for

certain Exculpated Parties[9] for claims arising out of conduct occurring after the Petition Date

---

[9]     Section 1.41 of the Plan defines "***Exculpated Parties***" as collectively, and in each case, solely in their capacities
as such: (a) the Debtor and Reorganized Debtor; (b) the Plan Administrator; (c) Wind-Down Co; (d) the Notes
Trustee and its representatives and advisors; (e) the Noteholders and their representatives and advisors; (f) the
Sponsor and its representatives and advisors; (g) the JPLs; (h) the Authorized Managers; (i) any current or former
Chief Restructuring Officer or Associate Restructuring Officer of the Debtor; (j) any independent directors
appointed to the board of the Debtor on or after January 1, 2021; and (k) any advisors retained by the Debtor in
connection with the Chapter 11 Case on or after December 29, 2020 (but not including Dov Tratner or Tratner
and Associates PLLC); provided, however, that Exculpated Parties shall not include Yoel Goldman or Tzipporah
Goldman in any capacity.

WEIL:\98799438\4\12817.0007

through the Effective Date. The exculpation provision carves out acts or omissions that are determined by a Final Order to have constituted gross negligence, fraud, or willful misconduct. I am informed that exculpation provisions, such as the one set forth in the Plan, are customary in chapter 11 cases. The Exculpated Parties played a critical role in achieving a confirmable plan on an expedited basis and the support of the Exculpated Parties was essential to the successful negotiation of the Plan and the Investment Agreement, both of which were the product of good faith and arm's length negotiations. The exculpation provision was necessary to achieve, among other things, the consensus and settlements embodied in the Plan by and among the Debtor, the JPLs, the Notes Trustee, and the Sponsor, and, in each case, their representatives and advisors. Based on my involvement in the negotiation process, I believe the protection provided by the exculpation promoted and fostered good faith negotiations that culminated in the overwhelming support the Plan enjoys among all economic parties in interest.

29.     In sum, I believe that the Plan Releases and exculpation provision contained in the Plan (i) were given in exchange for good and valuable consideration; (ii) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan; (iii) confer substantial benefits on the Debtor's estate; (iv) are fair, equitable and reasonable; (v) are in the best interests of the Debtor and its Estate, the Reorganized Debtor, Wind-Down Co, and parties in interest; and (vi) the failure to implement the Plan Releases and exculpation provisions contained in the Plan would seriously impair the Debtor's ability to confirm the Plan.

30.     Bankruptcy Code Section 1129(a)(2). It is my understanding that the Debtor has complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 regarding solicitation and the Disclosure Statement. Under my

12

supervision and with the assistance of its professional advisors, the Debtor has complied, or will comply, with all of the requirements of the Solicitation Procedures Order, including, without limitation, with respect to service of the Confirmation Hearing Notice on all creditors, interest holders, and other parties in interest, publication of the Confirmation Hearing Notice in *The New York Times* (national edition) and in *Haaretz*, and the solicitation of votes to accept or reject the Plan from creditors in the Voting Class. In addition, the documents that comprise the Solicitation Packages were also published by the Debtor on the Tel Aviv Stock Exchange for the benefit of individual Noteholders on September 2, 2022 and September 7, 2022.

31.      <u>Bankruptcy Code Section 1129(a)(3)</u>.  I understand that section 1129(a)(3) of the Bankruptcy Code requires a plan be proposed in good faith and not by any means forbidden by law.  The Debtor engaged in a robust and wide-ranging, public process to solicit interest and offers from potential third-party investors to either recapitalize the Debtor or undertake an outright purchase of the Debtor (the "**Marketing Process**").

32.      Prior to the Petition Date, the Debtor engaged Meridian to serve as its exclusive real estate finance broker.  In March 2021, Meridian began working closely with myself and the Debtor to compile various materials and proprietary information about the Debtor and its direct and indirect non-debtor subsidiaries for the purpose of establishing a virtual data room and due diligence library to enhance and facilitate the Marketing Process.  At the Debtor's direction, Meridian conducted site visits of all of the Debtor's non-debtor properties and prepared a comprehensive offering memorandum.  At the outset of the Marketing Process, Meridian tapped its institutional knowledge and experience to identify a pool of approximately forty (40) potential third-party investors, including family offices and private equity firms, that possessed the

sophistication, financial wherewithal, and operational expertise necessary to consummate a transaction for the Debtor.

33.     On or around April 13, 2021, Meridian, in consultation with the Debtor, invited each of the potential third party investors to participate in the Marketing Process.  Of the initial pool of potential investors, thirty seven (37) executed confidentiality agreements to gain access to the data room, which contained, among other things, the offering memorandum, detailed financial information, and property-level information regarding real estate taxes, income, and expenses.  Meridian arranged more than 125 discussions with interested parties, many of which included the Debtor, to, among other things, answer diligence questions, discuss potential deal structures, and assist investors in formulating their bids.  Following an approximately two-month diligence period, the Debtor received numerous bids, including several revised bids, for a potential transaction involving the Debtor, which were evaluated by the Debtor, in consultation with Meridian, based on several criteria.  Any party that expressed any interest in submitting a proposal for the Debtor's assets, including Weiss and the Sole Shareholder, was encouraged to do so.

34.     After extensive parallel track negotiations with two final bidders, the Debtor determined, in a sound exercise of its business judgment, the Sponsor's bid and related Investment Agreement provided the best actionable transaction to maximize value.  The Debtor, in consultation with Meridian, engaged in discussions with the Notes Trustee and the various bidders, including the Sponsor, before entering into the Investment Agreement.

35.     Following entry into the Investment Agreement, the Debtor engaged with the Notes Trustee and the Sponsor to negotiate the terms of the Plan pursuant to which the Investment Agreement will be consummated.  Collectively, the negotiations of the terms of the Investment Agreement and the Plan spanned several months and included many hours of review

14

and due diligence conducted by sophisticated counsel and professionals.  Accordingly, I believe the Investment Agreement and the Plan are the product of good faith and arms' length negotiations.

36.    Although the Taz Claim precipitated the commencement of the Debtor's Chapter 11 Case, the Debtor continues to dispute the validity of that claim and that claim is not being allowed under the Plan.  Rather, the Taz Claim is being classified as a Class 3 General Unsecured Claim under the Plan, and will, therefore, be assumed by the Reorganized Debtor along with any other Class 3 General Unsecured Claims that may exist (although the Debtor is not aware of any), subject to all available defenses.  Regardless, I understand that the allowance or disallowance of the Taz Claim, will not impact recoveries to any other creditors under the Plan. Following the Effective Date, any repayment on account of the Taz Claim will be subordinated and will not be paid until the New Notes are repaid in full and the Sponsor's contribution under the Plan to the holders of Class 4 Remaining Unsecured Claims is satisfied in full.  The Sponsor has confirmed to the Debtor in writing that, other than the Taz Confession of Judgement between Taz Partners, an affiliate of the Sponsor, and the Sole Shareholder, there is no relationship between the Sole Shareholder and the Sponsor.

37.    For these reasons, I believe that the Plan was proposed in good faith.

38.    Bankruptcy Code Section 1129(a)(4).  I understand that section 1129(a)(4) of the Bankruptcy Code requires that all payments of professional fees which are made from estate assets be subject to review and approval as to their reasonableness by the court.  It is my understanding that, under the Plan, all payments for services provided to the Debtor during the Chapter 11 Case must be approved by the Court as reasonable and the Plan, therefore, satisfies this requirement.

WEIL:\98799438\4\12817.0007

39.    <u>Bankruptcy Code Section 1129(a)(5)</u>.  I understand that section 1129(a)(5) of the Bankruptcy Code requires the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a successor to a debtor under the plan and such appointment be consistent with the interests of creditors and equity security holders and with public policy.   In the Disclosure Statement, the Debtor disclosed the identities and affiliations of the individuals proposed to serve as directors and officers of the Reorganized Debtor. As part of the Plan Supplement, the Debtor intends to disclose the identity of the Plan Administrator for Wind-Down Co, provide a short biography of the Plan Administrator, and include a substantially final draft of the proposed Plan Administration Agreement.  To the extent any insider of the Debtor is to be retained or employed by the Reorganized Debtor or Wind-Down Co, the identity and nature of any compensation of any such individual will also be set forth in the Plan Supplement.

40.    <u>Bankruptcy Code Section 1129(a)(7)</u>.  I understand that the Bankruptcy Code requires that, with respect to each impaired Class of Claims and Interests, each holder of a claim or equity interest must either (a) accept the Plan or (b) receive or retain under the Plan property having a present value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  I have reviewed the Liquidation Analysis that included as Exhibit H of the Disclosure Statement and is incorporated herein by reference.   Based on this review, I believe that the Liquidation Analysis demonstrates that the requirements of section 1129(a)(7) are satisfied as to each holder of a Claim or Interest in each of the Impaired Classes, including the Non-Voting Impaired Classes, since these classes will receive at least as much under the Plan as they would receive if this Chapter 11 Case were converted to a chapter 7 liquidation.  Accordingly, I believe

16

the holders of such Claims or Interests are receiving or retaining under the Plan the maximum recovery to which they are entitled and, as a result, could not receive greater recovery under chapter 7.

41.     Bankruptcy Code Section 1129(a)(8).  The Debtor anticipates the Plan will be overwhelmingly accepted by creditors in the Voting Class.   Thus, as to such Class, the requirements of section 1129(a)(8) of the Bankruptcy Code will have been satisfied.   Additionally, it is my understanding that the holders of Claims and Interests in the Deemed to Reject Classes are deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code.   Based on my understanding of the Bankruptcy Code, as to these Classes, the Plan may be confirmed over their dissent under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

42.     Bankruptcy Code Section 1129(a)(9).  The Plan provides, unless a holder agrees to less favorable treatment, holders of Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code will be paid in full, in Cash, on the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.  I understand that, under the Plan, unless a holder agrees to less favorable treatment, the legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims under section 507(a) of the Bankruptcy Code are unaltered by the Plan.  The Debtor does not believe there are any Priority Non-Tax Claims that may be asserted against it but has nevertheless accounted for them as a Class in the Plan.  To the extent any are asserted, the Reorganized Debtor shall retain the rights to any defenses and setoffs against any Priority Non-Tax Claim available to the Debtor.  With respect to the treatment of Priority Tax Claims under section 507(a)(8), I understand that, pursuant to Section 2.3 of the Plan, unless a holder agrees to less favorable treatment, Priority Tax Claims shall be

17

satisfied, disputed, pursued, or otherwise reconciled in the ordinary course by the Reorganized

Debtor.  The Reorganized Debtor shall retain the rights to any defenses and setoffs against any

Priority Tax Claim available to the Debtor.

43.    Accordingly, based on my understanding of the Bankruptcy Code, I believe

the Plan satisfies the requirements of section 1129(a)(9)(A), (B), and (C) of the Bankruptcy Code.

44.    <u>Bankruptcy Code Section 1129(a)(10)</u>.    I understand that section

1129(a)(10) of the Bankruptcy Code requires, if a class of claims is impaired, the affirmative

acceptance of the Plan by at least one class of impaired claims, determined without including any

acceptance of the plan by any insider.  Once the Voting Deadline has passed and the votes of

holders of Class 4 Remaining Unsecured Claims, as the only Voting Class under the Plan, are

counted, the Debtor is confident Class 4 will vote to accept the Plan.  Accordingly, I believe that

the Plan will satisfy section 1129(a)(10) of the Bankruptcy Code.

45.    <u>Bankruptcy Code Section 1129(a)(11)</u>.    I understand that section

1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible as

a condition precedent to confirmation.  The Plan is premised on the consummation of the

Investment Agreement.  The Debtor will use the proceeds it receives in connection with the

Investment Agreement to make distributions to holders of Allowed Claims and Interests as

provided in the Plan.  Specifically, the Plan sets forth certain cash payments that the Debtor and/or

the Plan Administrator will make on or after the Effective Date.  The Plan also provides for the

establishment of the Class 4 Disputed Claims Reserve for the benefit of holders of Disputed

Remaining Unsecured Claims against the Debtor.

46.    I believe that the Investment Agreement has a strong likelihood of closing

because the Debtor, the Noteholders, and the Sponsor have expended significant time and

WEIL:\98799438\4\12817.0007

resources in connection therewith.    Further, in selecting the Sponsor's bid, the Debtor, in

consultation with Meridian, evaluated the Sponsor's ability to close under the Investment

Agreement and determined that the Sponsor was capable of and willing to do so.    Moreover, the

Sponsor has already furnished $4,500,000 good faith deposit pursuant to the Investment

Agreement, which has been made available to the Debtor as debtor in possession financing.    In

connection with the development of the Plan, the Debtor, with the assistance of its professional

advisors, thoroughly analyzed their ability to fulfill its obligations thereunder.    As part of this

analysis, the Debtor considered the estimated costs of administering and consummating the Plan,

including the cash payments that the Debtor and/or the Plan Administrator will make on or after

the Effective Date.    Based on the closing of the Investment Agreement, the Debtor believes it will

have more than sufficient funds to make all payments required under the Plan.

47.    With respect to the satisfaction of any Unimpaired Claims on and after the

Effective Date, the Sponsor has prepared the Financial Projections annexed to the Disclosure

Statement as Exhibit G based on the information provided by the Debtor.    The Financial

Projections forecast the Reorganized Debtor's cash flows for the three-year period following the

Effective Date.    In addition, it is my understanding that the Sponsor anticipates the equity interests

in the Reorganized Debtor will be held through the following entities:  Greenrock Realty Services

LLC, Vickory Partners LLC, BVT Holdings LLC, and Cam Elm Company LLC.    I understand

that the principals who control these entities have more than seventy (70) years of combined

experience in the real estate business.    Currently, these individuals, through numerous entities,

own and control over 40,000 residential apartments in the New York and New Jersey area and also

own tens of millions of square feet of commercial and industrial space in and out of New York

City.    The Financial Projections and the experience and capabilities of these principals, among

other things, demonstrate that the Reorganized Debtor has sufficient capital and means to consummate the Plan and meet its obligations on a go-forward basis, including with respect to the payments on the New Notes and all Unimpaired Claims under the Plan, and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Reorganized Debtor.

48.    Further, the Sponsor's obligation to close under the Investment Agreement is firm and not conditional.  As a result of the parties' failure to close on the William Vale Purchase and the Notice of Termination, the Debtor's interests in YG WV are "Excluded Assets" under the Plan that will vest in Wind-Down Co following the Effective Date.  The Sponsor has no right to terminate or delay the closing under the Investment Agreement as a result of the Debtor's interests in YGWV vesting in Wind-Down Co.  Accordingly, the termination of the MLPSA for purposes of the Plan and the resulting treatment of the Debtor's interests in YG WV under the Plan do not impact the Sponsor's obligation to close under the Investment Agreement.

49.    Based on the foregoing, I believe that the Plan embodies a rational plan to implement the Investment Agreement and provide for the distribution of proceeds to holders of Allowed Claims in Class 4 (Class 4 Remaining Unsecured Claims) on or after the Effective Date in accordance with the Plan.  Therefore, it is my belief that the Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.

50.    Bankruptcy Code Section 1129(a)(12).  The Plan provides for the payment of statutory fees, together with interest (if any), pursuant to section 3717 of title 31 of the United States Code on the Effective Date and thereafter as may be required.  With respect to any Impaired Claims, Wind-Down Co shall make all aforementioned required filings and pay all such fees, if any.  The Wind Down Budget for Wind Down Co included in the Plan Supplement reflects that

WEIL:\98799438\4\12817.0007

the Debtor has made adequate provision for payment of the fees of the U.S. Trustee. With respect to the Unimpaired Claims, the Reorganized Debtor shall make all aforementioned required filings and pay all such fees, if any.

51.    Bankruptcy Code Section 1129(b).    Based on my understanding of the Bankruptcy Code, I believe that the Plan satisfies the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. As the Debtor anticipates that the Voting Class will accept the Plan, "cram down" is only relevant here with respect to the Non-Voting Impaired Classes (*i.e.*, Class 5 (Subordinated Securities Claims) and Class 6 (Interests)). The Plan may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

52.    I believe that the Plan does not "discriminate unfairly" (or at all) with respect to holders of Class 5 Subordinated Securities Claims and Class 6 Interests because the Claims and Interests in each such Class are legally distinct in their respective legal nature from Claims and Interests in all other Classes. All similarly situated Claims and Interests will receive substantially similar treatment under the Plan.

53.    With respect to the Subordinated Securities Claims in Class 5, it is my understanding that no similar class of such claims exists under the Plan. The Subordinated Securities Claims are not receiving any amounts under the Plan; however, no other class of such claims is entitled to different treatment. I understand that the fact that these Claims have been subordinated changes their level of priority and, therefore, allows them to receive different treatment than other unsubordinated claims. The holders of Class 6 Interests are also not entitled to any recovery under the Plan and, accordingly, I understand that the disparate treatment of the

21

Interests is consistent with the Bankruptcy Code.  Based on the estimated recoveries, no class of Claims is receiving more than 100% of its Claims.

54.     Additionally, I believe that the "fair and equitable" rule is satisfied as to the holders of Class 5 Subordinated Securities Claims and Class 6 Interests as no holder of claims or interests junior to any such classes will receive or retain any property under the Plan on account of such junior claims or interests.  Based on the foregoing, I believe that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code as to each of the Deemed to Reject Classes and may be confirmed despite the deemed rejection by such Classes.

[*Remainder of Page Intentionally Left Blank*]

WEIL:\98799438\4\12817.0007

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.


By: */s/  Assaf Ravid*
Name:   Assaf Ravid
Title:    Authorized Manager