**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
                                                               :
In re                                                          :   Chapter 11
                                                               :
**ALL YEAR HOLDINGS LIMITED,**                                 :   Case No. 21-12051 (MG)
                                                               :
                    Debtor.[1]                                 :
                                                               :
**Fed. Tax Id. No. 98-1220822**                                :
-------------------------------------------------------------- X

# NEW YORK TIMES AFFIDAVIT OF PUBLICATION FOR NOTICE OF HEARING ON CONFIRMATION OF CHAPTER 11 PLAN OF REORGANIZATION OF ALL YEAR HOLDINGS LIMITED AND PROCEDURES FOR OBJECTING TO CONFIRMATION OF THE PLAN

Dated: September 20, 2022
       Brooklyn, New York

DONLIN, RECANO & COMPANY, INC.

*[signature]*

Nora Morales
Director
6201 15th Avenue
Brooklyn, New York 11219
Telephone: 212-481-1411
Email:  nmorales@donlinrecano.com

---

[1] The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.



# PROOF OF PUBLICATION

Sep-16, 20 22

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of *The New York Times* a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of *The New York Times* on the following date or dates, to wit on

Sep 16, 2022, NYT & Natl, pg B3

Sworn to me this 16th day of September, 2022

_____
Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

---

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
In re ALL YEAR HOLDINGS LIMITED,  Chapter 11
                    Debtor.¹        Case No.
Fed. Tax Id. No. 98-1220822         21-12051 (MG)

**NOTICE OF HEARING ON CONFIRMATION OF CHAPTER 11 PLAN OF REORGANIZATION OF ALL YEAR HOLDINGS LIMITED AND PROCEDURES FOR OBJECTING TO CONFIRMATION OF THE PLAN**

PLEASE TAKE NOTICE that:

1. **Approval of Disclosure Statement.** By order dated July 22, 2022 [ECF No. 160] (the "**Disclosure Statement Order**"), the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") approved, among other things, the *Disclosure Statement for Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated May 31, 2022 [ECF No. 124] (as amended on July 15, 2022 [ECF No. 151] and July 20, 2022 [ECF No. 158] and as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Disclosure Statement**") filed by All Year Holdings Limited, as debtor and debtor in possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"). Pursuant to the Disclosure Statement Order, the Bankruptcy Court authorized the Debtor to solicit votes to accept or reject the *Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated May 31, 2022 [ECF No. 123] (as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), annexed as **Exhibit A** to the Disclosure Statement. Any capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

2. **Confirmation Hearing.** The hearing to consider confirmation of the Plan will be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in Courtroom 523 of the United States Bankruptcy Court, One Bowling Green, New York, NY 10004, on November 2, 2022 at 10 a.m. (Prevailing Eastern Time) (the "**Confirmation Hearing**"), which hearing may be adjourned at the request of the Debtor, subject to the Court's availability. The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtor at the Confirmation Hearing or any continued hearing or as indicated in any notice filed by the Debtor with the Bankruptcy Court, and the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to interested parties.

3. The Plan and the Disclosure Statement may be obtained by request made to Donlin Recano & Company, Inc., the Debtor's voting and solicitation agent (the "**Voting Agent**") by (i) email at AYHInfo@DonlinRecano.com, (ii) telephone at (877) 896-3192 (domestic toll-free) and (212) 771-1128 (international), or (iii) standard, overnight or hand delivery to: Donlin Recano & Company, Inc., 6201 15th Avenue, Brooklyn, NY 11219. Copies of the Disclosure Statement and the Plan are also available through the Bankruptcy Court's website (www.nysb.uscourts.gov) and at the Office of the Clerk of the Bankruptcy Court for review during normal business hours.

4. **Voting Deadline.** All votes to accept or reject the Plan must be actually received by the Voting Agent by no later **than 5:00 p.m. on October 7, 2022** (the "**Voting Deadline**"), unless extended by the Debtor. Any failure to follow the voting instructions included with your Ballot may disqualify your Ballot and your vote.

5. **Record Date for Voting Purposes.** Only parties who are eligible to vote and hold claims against the Debtor as of September 30, 2022 (the "**Voting Record Date**") are entitled to vote on the Plan.

6. **Parties in Interest Entitled to Vote.** The only class that is Impaired and entitled to receive distributions under the Plan and, therefore, the only class that is entitled to vote to accept or reject the Plan, is Class 4 (Remaining Unsecured Claims) (the "**Voting Class**"). Based upon the Debtor's amended and restated schedules of assets and liabilities and statement of financial affairs filed with the Bankruptcy Court [ECF Nos. 36 and 37] (the "**Schedules**") and the provisions of the Plan, creditors in the Voting Class may vote on the Plan unless:
 (i) as of the Voting Record Date, the outstanding amount of such claimant's claim is not greater than zero ($0.00);
 (ii) as of the Voting Record Date, such claimant's claim has been disallowed, expunged, disqualified, or suspended; or
 (iii) such claimant's claim is subject to an objection or request for estimation as of the Voting Record Date, subject to the procedures set forth below.
Any creditor that is not scheduled in the Debtor's Schedules and that did not file a proof of claim prior to the Voting Record Date shall not be entitled to vote on the Plan.

7. **Parties in Interest Not Entitled to Vote.** The Plan does not impair claims in Class 1 (Priority Non-Tax Claims, Class 2 (Other Secured Claims), and Class 3 (General Unsecured Claims) (collectively, the "**Unimpaired Classes**"). Pursuant to section 1126(f) of the Bankruptcy Code, the holders of claims in the Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote. Further, the holders of claims and interests in Class 5 (Subordinated Securities Claims) and Class 6 (Interests) (collectively, the "**Non-Voting Impaired Classes**" and, together with the Unimpaired Classes, the "**Non-Voting Classes**") are not entitled to receive or retain any property under the Plan. Therefore, pursuant to section 1126(g) of the Bankruptcy Code, the Non-Voting Impaired Classes are deemed to reject the Plan and, accordingly, are not entitled to vote.

8. **Temporary Allowance / Disallowance of Claims.** Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a claim, and without prejudice to the rights of the Debtor to dispute the disallowance or amount of any claim, each claim within the Voting Class shall be temporarily Allowed in an amount equal to the amount of such claim set forth in the Schedules; *provided, however*, that:
 (i) if a claim is allowed pursuant to the Plan or by order of the Court entered prior to the Voting Deadline, such claim shall be allowed for voting purposes in the allowed amount set forth in the Plan or such order;
 (ii) if a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim is temporarily allowed for voting purposes in the amount so estimated or allowed in such order;
 (iii) if a claim is listed in the Schedules as partially unliquidated, such claim shall be allowed in the partially liquidated amount for voting purposes only;
 (iv) if a claim is listed in the Schedules as wholly contingent, unliquidated, or disputed, such claim is accorded one vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution; and
 (v) if a creditor holds or has purchased, based on the Schedules, duplicate claims within the same class, such creditor shall be provided with only one Solicitation Package and one Ballot for voting a single claim in such class.

If a creditor seeks to challenge the disallowance or amount of its claim for voting purposes, the creditor shall file with the Court a motion for an order pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") temporarily allowing such claim for voting purposes in a different amount. Upon the filing of any such motion, the creditor's Ballot shall not be counted unless temporarily allowed by an order of the Court entered prior to or concurrent with entry of an order confirming the Plan. All motions pursuant to Bankruptcy Rule 3018(a) must be filed on or before the date which is seven (7) days prior to the Voting Deadline.

9. **Objections to Confirmation.** Any objections to confirmation of the Plan must: (a) be in writing; (b) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (c) state with particularity the basis and nature of any objection; (d) conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York; (e) be filed with the Bankruptcy Court (i) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M-399 (which can be found at http://nysb.uscourts.gov) and (ii) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable; and (f) be served in accordance with General Order M-399 **no later than October 7, 2022, at 5:00 p.m. (Eastern Time)**, on the following parties: (i) the attorneys for the Debtor, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer, Esq. and Matthew P. Goren, Esq.); (ii) counsel to the Notes Trustee, Chapman and Cutler LLP, 1270 Sixth Avenue, New York, New York 10020 (Attn: Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron Krieger, Esq.); (iii) counsel to the Sponsor, (a) Gissin & Co., Habazel 38B, Tel Aviv 6971054, Israel (Attn: Yael Hershkovitz, Esq.), (b) Locke Lord LLP, 200 Vesey Street, 20th Floor, New York, NY 10281 (Attn: Shalom Jacob, Esq.), and (c) Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (Attn: Avi D. Feinberg, Esq.); and (iv) the Office of the U.S. Trustee, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Andrea B. Schwartz, Esq. and Shara Cornell, Esq.).

IF ANY OBJECTION TO CONFIRMATION OF THE PLAN IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO CONFIRMATION OF THE PLAN AND MAY NOT BE HEARD AT THE CONFIRMATION HEARING.

10. **Classification and Treatment.** A chart summarizing the treatment of each class of Claims and Interests under the Plan is included in Article I of the Disclosure Statement, which chart is qualified in its entirety by reference to the Plan.

11. **Releases.** Please take notice that if the Plan is confirmed by the Bankruptcy Court, the provisions of the confirmed Plan, including the injunctions, exculpations and releases contained therein, will be binding on holders of claims and interests, regardless of whether such parties are Impaired or not under the confirmed Plan.

YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE DISCHARGE, INJUNCTION, RELEASE, AND EXCULPATION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.

12. **Additional Information.** Any party in interest wishing to obtain information about the Debtor's solicitation and voting procedures should contact the Voting Agent at (877) 896-3192 (domestic toll-free) or (212) 771-1128 (international) or email AYHInfo@DonlinRecano.com with a reference to "All Year" in the subject line. **THE VOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

¹ The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

# Workers Say Railroads Overreached in a Push for Efficiency



Freight trains in Atlanta on Thursday. Unions said a tentative contract agreement addressed concerns about time off for medical reasons. DUSTIN CHAMBERS FOR THE NEW YORK TIMES

FROM FIRST BUSINESS PAGE

workers or removal of themselves from the list of available workers.

"Railroads provide multiple ways for employees to take time to care for themselves and their families," the Association of American Railroads, an industry group, said in a statement earlier this week.

By Sunday, leaders of 10 of the 12 unions in the talks had agreed to contract terms. But two unions representing conductors and engineers — about half the 115,000 freight rail workers involved in the dispute — held out for a concession on scheduling, like the ability to see a doctor or attend to a personal matter without risking disciplinary action.

"It would not harm their operations to treat employees like humans and let them take care of medical issues," Dennis Pierce, president of the Brotherhood of Locomotive Engineers and Trainmen, one of the two unions, said in an interview on Monday. "It's the primary outstanding issue, one we won't budge on — the request that they stop firing people who get sick."

After the tentative deal was announced, the two unions said it included "contract language exempting time off for certain medical events from carrier attendance policies." The agreement will require ratification by union members, a process that could take a few weeks.

In some respects, freight rail is similar to other industries, such as retail and food service, where employers have imposed increasingly lean staffing.

Rick Paterson, a longtime industry analyst with the investment bank Loop Capital, said the staffing trend for railroads became more pronounced in the early 2000s when, after years of consolidation, carriers and their investors began to recognize that they had pricing power.

As a result, the dominant business model in the industry shifted from one in which the carriers sought larger volumes of traffic to one in which they sought to increase profits by raising prices and lowering expenses.

"They realized that if growing pricing is good for margins, then keeping costs low is even better," said Mr. Paterson, who has referred to this thinking as "the cult of the operating ratio," after the ratio of operating expenses to revenue.

The side effect, however, was to gradually eliminate any cushion in staffing levels.

Unlike many workers, the conductors and engineers who operate trains don't get weekends or other consistent days off.

Instead, said Mr. Pierce, the president of the locomotive engineers union, workers go to the bottom of a list of available crews when they return home from a trip that can last days. The fewer the workers, the shorter the list, and the less time it takes for them to be summoned into action again.

"It can go on indefinitely, till they interrupt the cycle by taking paid time off, which the companies routinely reject," Mr. Pierce said.

Major U.S. freight rail carriers began to accelerate the staffing cuts in recent years as they switched to a system known as precision scheduled railroading, or P.S.R., which focuses on scaling back excess equipment and employees and streamlining the shipping process.

The industry has said P.S.R. enables carriers to run more efficiently and provide more reliable service, while also improving profits. Freight rail customers and employees say it has resulted in deteriorating working conditions and customer service and little resilience in dealing with unforeseen circumstances, like weather emergencies. The Surface Transportation Board, a federal regulatory agency, estimates that carriers have 30 percent fewer employees today than six years ago.

Reducing labor to match this operating model may have been sound in principle, said Mr. Paterson, the industry analyst. But he said the carriers appeared to have cut back too much to handle potential disruptions, of which the pandemic was an epic example.

"When you do P.S.R., you can drop your head count by 30 percent, but why don't you drop it 28 percent and build in a crew reserve?" he asked. "That didn't happen."

With little margin for error, carriers found themselves with too few workers to operate their rail networks once business began to recover in the second half of 2020, putting more and more stress on their workers, and making it even harder for them to take time off.

When Mr. Christenson, the longtime conductor, who is also a co-chair of the industrywide group Railroad Workers United, began feeling run-down last year, he was reluctant to see a doctor. Under his company's attendance policy, taking an unplanned day off could lead to disciplinary action, and "I worried about triggering an investigation," he said.

So he waited until he could get an appointment on a scheduled day off a few months later, at which point he got bad news: He had an infection that might have been easily resolved with medication but now required surgery.

> 'Freight rail has been a constant thorn in our side.'
>
> Chris Jahn, chief executive of the American Chemistry Council.

"They had to cut infected tissue out in my leg," Mr. Christenson said.

Railroad workers and their families, many of whom asked to remain anonymous for fear of reprisals, said similar attendance policies, which are partly intended to manage the industry's labor shortfall, had resulted in workers' missing important life events.

This year, BNSF Railway introduced a new point system for some employees, according to a February memo obtained by The New York Times. Under the policy, workers were awarded 30 points to start with and would lose points — from two to 10 — for scheduling a day off for a variety of reasons, including a family emergency, sickness or fatigue. They lose even more points for being unavailable at the last minute.

When workers run out of points, they face escalating penalties, starting with a 10-day suspension, followed by a 20-day suspension and ending with possible firing. Workers can earn back points by being available for two weeks straight.

BNSF said on Thursday that the policy was "designed to improve the consistency of crews being available for their shifts" and to give employees more "predictability and transparency" regarding their schedules. It said that the program was achieving those goals, but that revisions had been made to give employees more flexibility.

One railroad worker said the fast turnaround time between shifts had forced him to skip doctor's appointments to address his symptoms of long Covid. Railroad workers' family members said they rarely celebrated birthdays or holidays together even before the pandemic.

Workers say that while they have paid vacation and days allotted for personal leave, the constraints that employers impose — like requiring vacation to be taken in limited windows that are far oversubscribed, or simply rejecting a proposed personal day — severely limit their options as a practical matter.

Shippers have grown frustrated, too.

Rail cars full of grain sat at production facilities in the Midwest for weeks at a time earlier this year, far longer than typical, said Max Fisher, the chief economist and treasurer for the National Grain and Feed Association.

Chemical manufacturers, which rely on freight rail to move their products, have grown increasingly frustrated with the carriers since December, according to three surveys by the American Chemistry Council, an industry association. The latest, conducted in July, found that 46 percent of the companies felt that rail service was getting worse, while only 7 percent said it was improving.

"Freight rail has been a constant thorn in our side and been a significant challenge for our members for quite some time," said Chris Jahn, the organization's chief executive.

While the labor agreement announced on Thursday may avert a strike, it is unlikely to resolve the deeper issues that have put unions and rail carriers on a collision course. Even if carriers wanted to turn back the clock on efforts to increase efficiency, they have shareholders to answer to.

After Bill Ackman, the activist investor, won a proxy battle over the freight carrier Canadian Pacific a decade ago, the company hired Hunter Harrison, who pioneered P.S.R., as its chief executive. Mr. Harrison imposed the system there and then at CSX after joining that company in 2017, prompting investors to pressure other carriers to follow suit to eke out similar efficiencies.

"Lurking in the background is the constant threat of shareholder activism if any of the railroads' operating ratios become outliers on the high side," Mr. Paterson said in testimony to the Surface Transportation Board this spring.

---

# Justice Dept. Offers a Carrot To Corporations

**By EPHRAT LIVNI**

The Justice Department announced a major update to its criminal enforcement policy on Thursday that will take into account a big question when it considers charging a corporate executive or business: Is the company a good actor that cooperates with the authorities and turns in wrongdoers?

"I wanted very much to arm and empower chief compliance officers and general counsel to be able to go into the boardrooms and say to the C.E.O., to the chair of the board, 'We need to make these investments in compliance,'" Lisa Monaco, the deputy attorney general, told the DealBook newsletter.

In October, Ms. Monaco announced a coming crackdown on companies, with a key plank: trying to motivate more people, whether through the promise of leniency or other benefits, to come forward. She reasoned that securing more voluntary disclosures would ultimately improve the department's record in corporate criminal enforcement.

An advisory board got feedback from academics, consumer activists, lawyers, executives and compliance officers to help usher in the changes.

By the end of the year, every division at the department must write a policy that clarifies to businesses how they can win reduced fines and penalties for voluntary admissions of misconduct.

Companies must demonstrate that they're willing to cooperate with the authorities — even naming individuals involved in suspected wrongdoing — and they must show how they are linking compensation to compliance and act fast to claw back compensation or perks given to bad actors.

"When I was out of government, I sat on some corporate boards and I saw that those are hard decisions and you have hard trade-off discussions," Ms. Monaco said.

Monitors will now be closely monitored, too. During the review of department procedures, companies complained about a lack of clarity around monitoring programs imposed by prosecutors.

Ms. Monaco said she had found that some monitors were not properly vetted for conflicts of interest or overseen to make sure they stayed on budget or task and that they did not always have a plan. Among the new policies is a set of procedures that applies to all federal prosecutors' offices nationwide and including more oversight, she said.

"The other thing I learned in this process and came through loud and clear, again, from all of the folks across the spectrum, is the importance of clarity," she said.

---

# Uber Opens Investigation Into Breach

**By KATE CONGER and KEVIN ROOSE**

Uber's computer network was breached on Thursday, leading the company to take several of its internal communications and engineering systems offline as it investigated the extent of the hack.

Employees were instructed not to use the company's internal messaging service, Slack, and found that other internal systems were inaccessible, said two employees, who were not authorized to speak publicly.

An Uber spokesman said the company was investigating the breach and contacting law enforcement officials.

Shortly before the Slack system was taken offline on Thursday afternoon, Uber employees received a message that read: "I announce I am a hacker and Uber has suffered a data breach." The message went on to list several internal databases that the hacker claimed had been compromised.

The hacker compromised a worker's Slack account and used it to send the message, the Uber spokesman said. It appeared that the hacker was later able to gain access to other internal systems, posting an explicit photo on an internal information page for employees.

It was not the first time that a hacker has stolen data from Uber. In 2016, hackers stole information from 57 million driver and rider accounts, then approached Uber and demanded $100,000 to delete their copy of the data. Uber arranged the payment, but kept the breach a secret for more than a year.

---

# Shell's Chief Executive to Step Aside

**By STANLEY REED**

Shell, Europe's largest oil company, said on Thursday that Ben van Beurden, who has served as chief executive since 2014, would step down at the end of the year. He will be succeeded by Wael Sawan, who currently heads a unit that includes the company's lucrative liquefied natural gas business and its investments in clean energy, including wind and solar power.

Mr. van Beurden, 64, whose departure was not a surprise, has steered Shell through a turbulent time and is leaving on a high note — at least for investors in oil and gas, who are seeing record profits and payouts. Consumers, on the other hand, are fuming about paying high prices at the pump and to heat their homes as energy costs have soared in the wake of Russia's invasion of Ukraine.

Mr. van Beurden has also been in the forefront among oil industry chief executives in acknowledging the role that burning fossil fuels plays in climate change. He has been criticized, though, for not moving fast enough to invest in clean energy.

Mr. Sawan, 48, is a less prominent figure, having spent most of his career on the oil and gas side of the business before moving recently to L.N.G. and renewable energy unit. He is well versed in the petroleum-rich Middle East, and formerly ran Shell's business in Qatar.

He will now become one of Europe's leading industrialists and, almost automatically, a public figure and a focal point for criticism from environmental activists.

Analysts said the appointment of Mr. Sawan, a dual citizen of Lebanon and Canada who grew up in Dubai, was unlikely to herald revolution at Shell.

Mr. Sawan "is well respected by the investor community, and the shift is likely to be more of a continuation" of strategy set under Mr. van Beurden, said Biraj Borkhataria, an analyst at RBC Capital Markets, an investment bank, in a note to clients.

The ability of Mr. van Beurden, who is Dutch, to navigate in the European political and cultural environment in which Shell must operate may be missed. He seemed to enjoy sessions with journalists and was willing to engage with even harsh critics.

In 2015, shortly after becoming chief executive, Mr. Beurden led one of the largest industry takeovers in years, the acquisition of BG, a British oil and gas company that was a major player in L.N.G., for $70 billion. The deal was criticized as too expensive at the time but looks wiser at current prices, analysts say.

Mr. van Beurden suffered a bitter blow last year when a court in the Netherlands, then Shell's home country, ordered it to move much faster on reducing emissions. Afterward, Mr. van Beurden led a move of the company's headquarters to London, mostly citing tax reasons.



Ben van Beurden has been at the forefront among industry chiefs in acknowledging the role that burning fossil fuels plays in climate change. BENOIT TESSIER/REUTERS

Mr. van Beurden also took flak during the pandemic for slashing Shell's dividend for the first time since World War II, as oil and gas prices plummeted. And less than a year ago, Third Point, a major hedge fund, was calling for Shell's breakup.

This year, fueled by record profits as oil and gas prices have risen and with Shell's staff reduced by job cuts, the company will pay out close to $30 billion in dividends and stock buybacks to shareholders, Mr. Borkhataria estimates.

During much of his time as chief executive, Mr. van Beurden courted Russia and, especially, Gazprom, the state-controlled gas exporter. After Russia invaded Ukraine this year, he was quick, though, to begin severing those ties, including a valuable natural gas export joint venture on Sakhalin Island in the Russian Far East.

Two other candidates to succeed Mr. van Beurden, Maarten Wetselaar, who preceded Mr. Sawan in running the gas and renewables unit, and Jessica Uhl, who was chief financial officer, have left Shell in the past year.

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re ALL YEAR HOLDINGS LIMITED,　　) Chapter 11
　　　　　　　　　　　Debtor.[1]　　　　　　) Case No.
Fed. Tax Id. No. 98-1220822　　　　　　) 21-12051 (MG)

NOTICE OF HEARING ON CONFIRMATION OF
CHAPTER 11 PLAN OF REORGANIZATION OF ALL
YEAR HOLDINGS LIMITED AND PROCEDURES FOR
OBJECTING TO CONFIRMATION OF THE PLAN

PLEASE TAKE NOTICE that:

1. **Approval of Disclosure Statement.** By order dated July 22, 2022 [ECF No. 160] (the "**Disclosure Statement Order**"), the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") approved, among other things, the *Disclosure Statement for Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated May 31, 2022 [ECF No. 124] (as amended on July 15, 2022 [ECF No. 151] and July 20, 2022 [ECF No. 158] and as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Disclosure Statement**") filed by All Year Holdings Limited, as debtor and debtor in possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"). Pursuant to the Disclosure Statement Order, the Bankruptcy Court authorized the Debtor to solicit votes to accept or reject the *Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated May 31, 2022 [ECF No. 123] (as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), annexed as **Exhibit A** to the Disclosure Statement. Any capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

2. **Confirmation Hearing.** The hearing to consider confirmation of the Plan will be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in Courtroom 523 of the United States Bankruptcy Court, One Bowling Green, New York, NY 10004, on November 2, 2022 at 10 a.m. (Prevailing Eastern Time) (the "**Confirmation Hearing**"), which hearing may be adjourned at the request of the Debtor, subject to the Court's availability. The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtor at the Confirmation Hearing or any continued hearing or as indicated in any notice filed by the Debtor with the Bankruptcy Court, and the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to interested parties.

3. The Plan and the Disclosure Statement may be obtained by request made to Donlin Recano & Company, Inc., the Debtor's voting and solicitation agent (the "**Voting Agent**") by (i) email at ATHinfo@DonlinRecano.com, (ii) telephone at (877) 896-3192 (domestic toll-free) and (212) 771-1128 (international), or (iii) standard, overnight or hand delivery to: Donlin Recano & Company, Inc., 6201 15th Avenue, Brooklyn, NY 11219. Copies of the Disclosure Statement and the Plan are also available through the Bankruptcy Court's website (www.nysb.uscourts.gov) and at the Office of the Clerk of the Bankruptcy Court for review during normal business hours.

4. **Voting Deadline.** All votes to accept or reject the Plan must be actually received by the Voting Agent by no later **than 5:00 p.m. on October 7, 2022** (the "**Voting Deadline**"), unless extended by the Debtor. Any failure to follow the voting instructions included with your Ballot may disqualify your Ballot and your vote.

5. **Record Date for Voting Purposes.** Only parties who are eligible to vote and hold claims against the Debtor as of September 30, 2022 (the "**Voting Record Date**") are entitled to vote on the Plan.

6. **Parties in Interest Entitled to Vote.** The only class that is Impaired and entitled to receive distributions under the Plan and, therefore, the only class that is entitled to vote to accept or reject the Plan, is Class 4 (Remaining Unsecured Claims) (the "**Voting Class**"). Based upon the Debtor's amended and restated schedules of assets and liabilities and statement of financial affairs filed with the Bankruptcy Court [ECF Nos. 36 and 37] (the "**Schedules**") and the provisions of the Plan, creditors in the Voting Class may rely on the Plan unless:
　(i) as of the Voting Record Date, the outstanding amount of such claimant's claim is not greater than zero ($0.00);
　(ii) as of the Voting Record Date, such claimant's claim has been disallowed, expunged, disputed, or suspended; or
　(iii) such claimant's claim is subject to an objection or request for estimation as of the Voting Record Date, subject to the procedures set forth below.
Any creditor that is not scheduled in the Debtor's Schedules and that did not file a proof of claim prior to the Voting Record Date shall not be entitled to vote on the Plan.

7. **Parties in Interest Not Entitled to Vote.** The Plan does not impair claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (General Unsecured Claims) (collectively, the "**Unimpaired Classes**"). Pursuant to section 1126(f) of the Bankruptcy Code, the holders of claims in the Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote. Further, the holders of claims and interests in Class 5 (Subordinated Securities Claims) and Class 6 (Interests) (collectively, the "**Non-Voting Impaired Classes**" and, together with the Unimpaired Classes, the "**Non-Voting Classes**") are not entitled to receive or retain any property under the Plan. Therefore, pursuant to section 1126(g) of the Bankruptcy Code, the Non-Voting Impaired Classes are deemed to reject the Plan and, accordingly, are not entitled to vote.

8. **Temporary Allowance / Disallowance of Claims.** Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a claim, and without prejudice to the rights of the Debtor to dispute the disallowance or amount of any claim, each claim within the Voting Class shall be temporarily Allowed in an amount equal to the amount of such claim set forth in the Schedules; *provided, however, that*:
　(i) if a claim is allowed pursuant to the Plan or by order of the Court (entered prior to the Voting Deadline), such claim shall be allowed for voting purposes in the allowed amount set forth in the Plan or such order;
　(ii) if a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim is temporarily allowed for voting purposes in the amount so estimated or allowed in such order;
　(iii) if a claim is listed in the Schedules as partially unliquidated, such claim shall be allowed in the partially liquidated amount for voting purposes only;
　(iv) if a claim is listed in the Schedules as wholly contingent, unliquidated, or disputed, such claim is accorded one vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution; and
　(v) if a creditor holds or has purchased, based on the Schedules, duplicate claims within the same class, such creditor shall be provided with only one Solicitation Package and one Ballot for voting a single claim in such class.
If a creditor seeks to challenge the disallowance or amount of its claim for voting purposes, the creditor shall file with the Court a motion for an order pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") temporarily allowing such claim for voting purposes in a different amount. Upon the filing of any such motion, the creditor's Ballot shall not be counted unless temporarily allowed by an order of the Court entered prior to or concurrent with entry of an order confirming the Plan. All motions pursuant to Bankruptcy Rule 3018(a) must be filed on or before the date which is seven (7) days prior to the Voting Deadline.

9. **Objections to Confirmation.** Any objections to confirmation of the Plan must: (a) be in writing; (b) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (c) state with particularity the basis and nature of any objection to the Plan; (d) conform to the Local Bankruptcy Rules for the Southern District of New York; (e) be filed with the Bankruptcy Court (i) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M-399 (which can be found at http://nysb.uscourts.gov) and (ii) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable; and (f) be served in accordance with General Order M-399 **no later than October 7, 2022, at 5:00 p.m. (Eastern Time)**, on the following parties: (i) the attorneys for the Debtor, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer, Esq. and Matthew P. Goren, Esq.); (ii) counsel to the Notes Trustee, Chapman and Cutler LLP, 1270 Sixth Avenue, New York, New York 10020 (Attn: Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron Krieger, Esq.); (iii) counsel to the Sponsor, (a) Gissin & Co., Habarzel 38B, Tel Aviv 6971054, Israel (Attn: Yoel Herskovitz, Esq.), (b) Locke Lord LLP, 200 Vesey Street, 20th Floor, New York, NY 10281 (Attn: Shalom Jacob, Esq.), and (c) Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (Attn: Avi D. Feinberg, Esq.); and (iv) the Office of the U.S. Trustee, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Andrea B. Schwartz, Esq. and Shara Cornell, Esq.).
**IF ANY OBJECTION TO CONFIRMATION OF THE PLAN IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO CONFIRMATION OF THE PLAN AND MAY NOT BE HEARD AT THE CONFIRMATION HEARING.**

10. **Classification and Treatment.** A chart summarizing the treatment of each class of Claims and Interests under the Plan is included in Article I of the Disclosure Statement, which chart is qualified in its entirety by reference to the Plan.

11. **Releases. Please take notice that if the Plan is confirmed by the Bankruptcy Court, the provisions of the confirmed Plan, including the injunctions, exculpations and releases contained therein, will be binding on holders of claims and interests, regardless of whether such parties are Impaired or not under the confirmed Plan.
YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE DISCHARGE, INJUNCTION, RELEASE, AND EXCULPATION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.**

12. **Additional Information.** Any party in interest wishing to obtain information about the Debtor's solicitation and voting procedures should contact the Voting Agent at (877) 896-3192 (domestic toll-free) or (212) 771-1128 (international) or email ATHInfo@DonlinRecano.com with a reference to "All Year" in the subject line. **THE VOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

[1] The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.