# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Gary T. Holtzer**
+1 (212) 310-8463
gary.holtzer@weil.com

November 23, 2022

Via Email and ECF

Honorable Martin Glenn
Chief United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Courtroom 523
New York, NY 10004-1408

Re: In re All Year Holdings Limited, Case No. 21-12051 (MG)

Dear Chief Judge Glenn:

We represent All Year Holdings Limited, as debtor and debtor in possession (the "Debtor") in the above-referenced chapter 11 case (the "Chapter 11 Case"). We submit this letter in response to the letter from Paragraph Partners LLC ("Paragraph"), dated November 15, 2022 [ECF No. 269] (the "Paragraph Notice"), purporting to revoke, or otherwise terminate, the Investment Agreement dated March 11, 2022 (as amended, modified, and supplemented from time to time, the "Investment Agreement")[1] and to provide the Court and other parties in interest with an update regarding the proposed timeline and path forward with respect to a new chapter 11 plan for the Debtor.

### *Paragraph's Breach of the Investment Agreement*

At the status conference held on November 7, 2022 (the "November 7 Status Conference"), the Court set a deadline of 5:00 p.m. (Prevailing Eastern Time) on November 9, 2022 for the Debtor and Paragraph to provide an update regarding Paragraph's position with respect to: (a) the issues discussed at the November 7 Status Conference and set forth in the Debtor's prior letters; and (b) Paragraph's willingness to move forward with its binding commitments under the Investment Agreement.

On November 9, 2022, the Debtor informed the Court that no agreement had been reached [ECF No. 264] ("November 9 Status Letter") and the Debtor had delivered a notice informing Paragraph that Paragraph had breached the Investment Agreement and, if Paragraph failed to cure its breach within the 10 business day period (i.e., November 25, 2022) allotted under the Investment Agreement (the "Cure Period"), the Debtor had the right to terminate the Investment Agreement (the "Notice of Default").

---

[1] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Investment Agreement.

**Weil, Gotshal & Manges LLP**

November 23, 2022
Page 2

If Paragraph fails to cure the defaults listed in the Notice of Default before the end of the Cure Period, the Debtor intends to exercise its right to terminate the Investment Agreement pursuant to Section 11.01(c) based on Paragraph's uncured material breaches of the Investment Agreement. Upon such termination, Paragraph will forfeit its right to the $4.5 million Escrowed Funds (which, by agreement of the parties, has been used as a DIP Loan) and will be liable to the Debtor for the full amount of the $4.5 million Guaranty provided under the Investment Agreement. In addition, Paragraph will not be entitled to a $1.8 million Break-Up Fee or $300,000 Expense Reimbursement.[2]

This, of course, is not an outcome the Debtor desires and the Debtor prefers that Paragraph cure all defaults before the end of the Cure Period. As discussed in more detail below, the Debtor is currently in discussions with the Noteholders' representatives regarding potential alternative structures for a new exit transaction and chapter 11 plan to maximize value for creditors of the Debtor's estate. In addition, should Paragraph fail to cure its defaults before the end of the Cure Period, the Debtor will be prepared to immediately recommence discussions with replacement sponsors.

The Debtor, however, will correct the record in response to the baseless allegations in the Paragraph Notice and its claim that Paragraph has the right to revoke or terminate the Investment Agreement. As the record makes clear, the Debtor has diligently performed all of its obligations under the Investment Agreement while, in contrast, Paragraph has repeatedly delayed, failed to act in good faith, and has deliberately and materially breached its obligations.

***Paragraph Has No Right to Revoke or Terminate the Investment Agreement***

More than eight months have passed since the execution of the Investment Agreement, yet Paragraph, for the first time, asserts the Investment Agreement is not binding and, therefore, is unenforceable (except, conveniently, as to the Break-Up Fee). Paragraph's reason: the Debtor failed to file a motion to approve the entirety of the Investment Agreement within 14 days of its execution in March 11, 2022. This assertion is groundless.

Paragraph relies on Section 8.01(b) of the Investment Agreement but it omits much of the relevant language and all of the context required to correctly construe its meaning. In truth, this provision merely sets forth the Debtor's obligation to file a motion to approve the Break-Up Fee and Expense Reimbursement provisions of the Investment Agreement within 14 days of signing.[3] This section of the

---

[2] Pursuant to Section 8.01(d) of the Investment Agreement, no Break-Up Fee or Expense Reimbursement will be due and owing to Paragraph if the Investment Agreement "is terminated as a result of a breach by [Paragraph] of its obligation to consummate the Closing when required pursuant to the terms of this Agreement or as a result of a material breach of any other of its covenants or agreements herein." In addition, in the event the Investment Agreement is terminated by the Debtor pursuant to Section 11.01(c) thereof, the Debtor "shall be entitled to retain the DIP Loan Proceeds and shall have no further obligations to the Plan Investor hereunder with respect to such proceeds." DIP Term Sheet [ECF No. 120, Ex. 1].

[3] The entirety of Section 8.01(b) of the Investment Agreement provides as follows:

**Weil, Gotshal & Manges LLP**

November 23, 2022
Page 3

Investment Agreement is specifically titled "Break-Up Fee; Noteholder Approval" and the 14-day deadline referred to in the Paragraph Notice is defined under the Investment Agreement as the "Court Break-Up Fee Approval Date." Moreover, the Court Break-Up Fee Approval Date is the deadline by which the Debtor was required to file a motion seeking approval of the Break-Up Fee and Expense Reimbursement provisions of the Investment Agreement (the "Break-Up Fee Motion") and not, as Paragraph contends, a deadline to approve the Investment Agreement in its entirety. The Debtor not only timely complied with this obligation when it filed the Break-Up Fee Motion on March 25, 2022, **Paragraph confirmed the Debtor's compliance with this provision in writing at the time of filing**.

In addition, the Investment Agreement specifically contemplates the parties will seek approval of the Investment Agreement pursuant to the Plan and not by separate motion pursuant to section 363 of the Bankruptcy Code or otherwise. This is evident from multiple provisions throughout the Investment Agreement, including, without limitation, the following:

- WHEREAS Clause C, which provides "the Debtor and Plan Investor wish to execute this agreement to set forth certain terms and conditions related to a **proposed transaction that would be effected in the Bankruptcy Case pursuant to a Plan (as defined in Annex A)**, and a disclosure statement prepared by the Debtor in form and substance reasonably acceptable to the Plan Investor." (emphasis added);

- Section 8.02(a), which provides the "Company and Plan Investor acknowledge and agree that this Agreement and the Transactions are **subject to entry of the Confirmation Order and the Ancillary Approval Orders**[4] that embodies the terms of this Agreement." (emphasis added);

- Section 10.02, which sets forth the conditions requiring Paragraph to close under the Investment Agreement and specifically provides the Court "shall have entered the Confirmation Order and such Confirmation Order shall not be subject to any stay" **but makes no reference** to any other order from the Court approving the Investment Agreement as a requirement or condition to Paragraph's obligation to close.

---

[3] Within 14 days following the Agreement Date, the Company shall file a motion with the Bankruptcy Court reasonably satisfactory to the Plan Investor seeking approval by the Bankruptcy Court of the Company's entry into this Agreement and its undertakings hereunder, including the Break-Up Fee (the date on which such approval is received by the Bankruptcy Court being referred to herein as the "Court Break-Up Fee Approval Date"). Mishmeret shall support such motion and shall take all actions reasonably necessary to support, and shall not oppose in any way, the approval of such motion, the Break-Up Fee and the Expense Reimbursement, and shall not oppose the payment thereof, unless Mishmeret shall have reasonable grounds to assert that the Break-Up Fee or the Expense Reimbursement is not payable hereunder.

[4] While the Investment Agreement does not define "Ancillary Approval Orders", the Investment Agreement defines "Ancillary Proceedings" as meaning "as applicable, the BVI Proceedings and the Israeli Proceedings."

**Weil, Gotshal & Manges LLP**

November 23, 2022
Page 4

Although the Investment Agreement is subject to Court approval as part of the Plan, it is still binding and enforceable against Paragraph.[5] Section 5.01 of the Investment Agreement expressly provides that, upon execution and delivery thereof, the Investment Agreement and other related documents constitute "legal, valid and binding obligations of Plan Investor enforceable against Plan Investor in accordance with their respective terms." Section 4.03 of the Investment Agreement provides the agreement is similarly binding on the Debtor subject only to "entry by the Bankruptcy Court of the Confirmation Order and the Bankruptcy and Equity Exception, and, to the extent applicable, any necessary approvals in connection with the Ancillary Proceedings."

There is no provision of the Investment Agreement that conditions Paragraph's obligations thereunder on approval of the Break-Up Fee Motion. To the contrary, Section 11.01(e) specifically provides that if Paragraph wanted to terminate the Investment Agreement because the relief sought in the Break-Up Fee Motion was not approved by the Court, Paragraph was required to terminate the agreement "by 45 days from the Agreement Date" which period expired nearly seven months ago on April 25, 2022. Paragraph obviously did not exercise any such right, nor could it as the Debtor timely complied with its obligations when it secured approval of the Break-Up Fee Motion which motion, again, Paragraph approved in form and substance prior to filing.

Moreover, Paragraph has repeatedly acknowledged the Investment Agreement is binding and enforceable throughout the Chapter 11 Case. Since its execution on March 11, 2022, Paragraph has executed two separate amendments to the Investment Agreement and agreed to a third amendment when it consented in writing to the terms of the mediated Settlement (as defined below).[6] The first amendment, dated April 21, 2022, incorporated the terms of the now failed William Vale Purchase. The

---

[5] Courts have recognized the enforceability of contracts between debtors and non-debtors pending bankruptcy court approval. *See, e.g., Liberty Towers Realty, LLC v. Richmond Liberty, LLC,* 569 B.R. 534, 542 (E.D.N.Y. 2017), aff'd, 734 F. App'x 68 (2d Cir. 2018) ("The better view of the law is that settlements requiring court approval are binding on all parties to the extent allowable under state law until the court considers and rejects the settlement."); *In re Wood*, Case No. 00–14460–RGM, 2008 WL 2244972 at *3 (Bankr. E.D. Va. May 30, 2008) ("There is no doubt that the court can reject a proposed agreement. But, that does not mean that the proposed agreement has no efficacy before it is either approved or rejected. The parties are committed to the agreement once they execute it. This is in accordance with ordinary contract law. The difference in bankruptcy is that the contract must ultimately be approved by the bankruptcy court because of the involvement of third parties such as creditors so that their interests are protected. It does not, however, prevent the formation of a contract. The formation of the contract is a condition precedent to court approval. Once the contract is made, neither party can withdraw except in accordance with the agreement of the parties even though the contract has yet to be approved by the court."); *In re Columbia Plaza, Inc.*, 79 B.R. 710, 715 (Bankr. S.D. Ohio Aug. 20, 1987) ("Disapproval by the Court might well have been a fact which excused the performance by either party, but short of such disapproval, conditioning the seller's authority upon action by the Court did not change the binding nature of the Agreement between the parties pending Court approval.").

[6] As discussed below, even if Paragraph was correct, Paragraph settled and waived any right to assert the Investment Agreement was not enforceable or the Debtor was required to seek approval of the entire Investment Agreement by the Court Break-Up Fee Approval Date when it confirmed in writing its consent to the terms of the Settlement, which resolved, among other things, all current disputes between the parties under the Investment Agreement.

4

**Weil, Gotshal & Manges LLP**

November 23, 2022
Page 5

second, dated May 27, 2022, incorporated the terms by which the parties agreed the Debtor would be permitted to access the Escrowed Funds as a DIP Loan. Both the April 21 and May 27 amendments provide "[a]s expressly amended hereby, the Agreement shall continue in full force and effect in accordance with the provisions thereof." By agreeing to each of the amendments, Paragraph acknowledged the Investment Agreement is binding and enforceable.[7]

If Paragraph believed the Debtor was required to seek approval of the entire Investment Agreement pursuant to the Break-Up Fee Motion, then it was obligated to raise that in March, when the Break-Up Fee Motion was filed, or in April, when the Break-Up Fee Motion was approved by the Court. The Break-Up Fee Motion, which Paragraph approved as to form and substance, specifically states the Investment Agreement is a "binding contract" and Paragraph is a "contractually committed investor". Those statements were critical representations to the Court to justify the relief sought and were made with Paragraph's express written consent and approval. If Paragraph is now claiming the Investment Agreement is not binding and that it has no obligation to move forward with the transactions, then the Break-Up Fee has not provided any benefit to the administration of the Debtor's estate and should be disallowed on that basis alone.

But Paragraph made no such assertion at that time because that is clearly not what the Investment Agreement provides. Instead, Paragraph approved the form and substance of the Break-Up Fee Motion and, therefore, has waived any right to now assert that the relief sought in the Break-Up Fee Motion was inadequate.

***The Debtor has not Repudiated the Investment Agreement***

In the Paragraph Notice, Paragraph asserts the Debtor, by filing the November 9 Status Letter has "unambiguously repudiated" the Investment Agreement. This is clearly not the case.

The Debtor has timely honored and fulfilled all of its obligations under the Investment Agreement and remains prepared to move forward with the Investment Agreement, as modified by the Settlement. Indeed, as made clear and on the record at the November 7 Status Conference, the Debtor is prepared to move forward with a January 10 Confirmation Hearing and would even be amendable to an earlier Confirmation Hearing, subject to the Court's availability.

Moreover, the Notice of Default, which was provided in accordance with the express notice provisions of the Investment Agreement, merely restated Paragraph's obligations under the Investment Agreement and provided Paragraph the opportunity to cure the defaults indicated therein within the Cure Period. It

---

[7] Paragraph further acknowledges the enforceability of the Investment Agreement when it made the proceeds of the DIP Loan available to the Debtor, as it was an express condition precedent to the funding of the DIP Loan that the "Investment Agreement shall be in full force and effect, as amended by the Investment Agreement Amendment". DIP Term Sheet [ECF No. 120, Ex. 1].

**Weil, Gotshal & Manges LLP**

November 23, 2022
Page 6

cannot be seriously contended the Debtor has repudiated the Investment Agreement by simply restating, and acting accordance with, the express terms of the Investment Agreement.

*Paragraph is not entitled to Revoke or Terminate the Investment Agreement*

Alternatively, Paragraph asserts it is entitled to revoke or terminate the Investment Agreement pursuant to Section 11.01(c) due to various alleged breaches by the Debtor of representations and warranties or because the Debtor allegedly failed to comply with certain covenants, the result of which would cause an inability of a Closing Condition, or Closing Conditions, to be satisfied. As set forth below, Paragraph has no such right, and each of the Debtor's purported breaches is without merit.

First, Paragraph has no right to revoke the Investment Agreement; rather, the Investment Agreement may only be terminated as set forth in Article XI of the Investment Agreement. If Paragraph is purporting to terminate (or revoke) the Investment Agreement based on any provision other than Section 11.01(c), then it has affirmatively waived its right to the Break-Up Fee, as that fee is only payable if the Debtor terminates the Investment Agreement pursuant to Section 11.01(b) by exercising its fiduciary out or if Paragraph terminates due to the Debtor's breach under Section 11.01(c) of the Investment Agreement. Accordingly, Paragraph has no right to revoke the Investment Agreement and demand the return of the Escrowed Funds or the right to the Break-Up Fee.

Second, none of the allegations asserted in the Paragraph Notice attributed to the Debtor constitutes a valid basis to declare a breach, much less one of sufficient gravity to permit termination. Indeed, none of these allegations would, as required under Section 10.02 of the Investment Agreement, "reasonably be expected to have a Material Adverse Effect".

i. Approval of the Investment Agreement. Paragraph contends it has the right to terminate because the Debtor failed to timely file a motion seeking approval of the Investment Agreement. However, for the reasons set forth above, there is no obligation that the Debtor seek approval of the Investment Agreement in the Chapter 11 Case except pursuant to the Plan and Paragraph has waived any right to assert otherwise.

ii. Bankruptcy Notices to the Debtor's previous Directors and Officers. Paragraph next asserts the Debtor failed to provide all necessary notices in connection with the filings with the Court based on "allegations made in a proceeding in Israel" the Debtor failed to notify certain of its former directors and officers of the Chapter 11 Case. This is the first time the Debtor has been made aware of any such "allegations" but, regardless, to the Debtor's knowledge, sufficient notice of the filing of the Plan and the Disclosure Statement has been provided to all potential creditors both in the United States and Israel. Even if that were not the case, no party has made any such allegation in this Court, which is the arbiter of reasonable notice and effective due process with respect to the Plan and the Chapter 11 Case.

**Weil, Gotshal & Manges LLP**

November 23, 2022
Page 7

iii. <u>Tenant Deposits</u>.  Paragraph next asserts certain of the Transferred Entities failed to segregate and have converted tenant deposits.  Paragraph contends that this default exposes the Transferred Entities to the loss of the security provided by the deposits and, additionally, to the possibility of having to pay punitive damages in addition to returning deposits.  While it is true there is an ongoing action by the Attorney General of the State of New York regarding the past use of tenant deposits for certain of the Transferred Entities, this action is pending against All Year Management and not the Debtor.  Regardless, Paragraph ignores the fact that Section 5.10 of the Investment Agreement specifically provides the Investment Agreement contemplates an "as is" sale with respect to the Transferred Entities and Paragraph has conducted and relied upon its own diligence.  The facts related thereto, were all disclosed and specifically identified on the disclosure schedules to the Investment Agreement.  Paragraph cannot now use these previously disclosed facts as a basis to allege that the Debtor has breached the Investment Agreement.

iv. <u>Subsidiary Mortgage Defaults.</u>  Paragraph next incorrectly asserts the Transferred Entities are in default of certain of their mortgage loans and that this constitutes a default that entitles Paragraph to terminate the Investment Agreement.  Any defaults at properties owned by the Debtor's subsidiaries and alleged by their lenders were disclosed in accordance with Section 5.10 of the Investment Agreement, as referenced above.  Regardless, Paragraph's assertion is incorrect – neither Freddie Mac nor its sub-servicers have asserted an event of default with respect to properties with mortgages serviced by Freddie Mac.  The correspondence between Freddie Mac and the Transferred Entities was typical correspondence in the normal course of business between lenders and borrowers.  A notice of non-compliance and reservation of rights was sent by Freddie Mac and the Debtor has responded to, and complied with, Freddie Mac's requests under such notice.

v. <u>Grand Living Settlement</u>.  Paragraph next asserts the Debtor is using and dissipating the proceeds of the MY 2011 Grand Settlement, notwithstanding that such proceeds are an asset that is to remain with the Reorganized Debtor.  As the Debtor has already addressed this issue in its prior letters to, and status conferences with, the Court, the Debtor will simply note that Paragraph's counsel confirmed on the record at the November 7 Status Conference there is no provision in the Investment Agreement that restricts the Debtor from using its own cash, including cash received pursuant to the Grand Living Settlement, prior to closing.[8]

---

[8] Specifically, when asked directly by the Court, whether the Investment Agreement prohibited the Debtor from using the cash received from the Grand Living Settlement now, Paragraph's counsel responded as follows:

> THE COURT: But I asked a different question, is there anything in the documents that you can point to that restricts or prohibits the debtor from using the funds now?
>
> MS. WICKOUSKI: Not explicitly.

**Weil, Gotshal & Manges LLP**

November 23, 2022
Page 8

    vi.    <u>Treatment of YGWV as an Excluded Asset</u>. Finally, Paragraph asserts the Debtor "has breached the Investment Agreement in the particulars set forth in the complaint [Paragraph] filed against the Notes [*sic*] in Israel" and that such breaches were to be resolved by the Settlement, which Paragraph refers to as a "tentative agreement". The Paragraph Notice further alleges the Debtor "has refused to honor the terms and the breaches have not been rectified."

    First, it is unclear exactly what particulars Paragraph is referring to in connection with facts alleged in a complaint filed in an action to which the Debtor is not a party. Assuming that Paragraph is referring to the Debtor's treatment of its interest in YG WV LLC ("**YG WV**"), the entity that owns the Debtor's fifty percent interest in the William Vale Hotel, this does not provide any basis for Paragraph to terminate the Investment Agreement.

    As previously discussed with the Court, the Investment Agreement and the Plan expressly treat the Debtor's interests in YG WV as "Excluded Assets," not to be included as part of the Debtor's reorganization unless certain contingencies had occurred. Pursuant to an amendment to the Investment Agreement, in the event Paragraph effectuated the William Vale Purchase, the Debtor agreed its interests in YG WV would vest in the Reorganized Debtor under the Plan in exchange for an additional $2.2 million in total consideration to be paid to the estate. This amendment provided that the Debtor would have no obligation to transfer its interest in YG WV to Paragraph if the MLPSA "expires or is terminated by its terms" or the Closing Date did not occur by December 31, 2022. The MLPSA did not close and Mishmeret issued a notice terminating that agreement. Consistent with the terms of the Investment Agreement and the Plan, the Debtor's interests in YG WV will be treated as Excluded Assets (as was always the default treatment under the Plan) that will not vest in Paragraph or the Reorganized Debtor, but rather will remain with the Debtor's wind-down estate. Furthermore, the Settlement clearly provided that the Debtor's interest in YG WV would remain an Excluded Assets under the Investment Agreement. The failure to close on the MLPSA in no way obviated Paragraph from performing its obligations under the Investment Agreement.

Moreover, the settlement among the Debtor, Paragraph, and Mishmeret (the "<u>Settlement</u>") reached as a result of the mediation before Judge Beckerman was not a "tentative agreement" but rather is a written and binding agreement to amend the Investment Agreement to reflect the Settlement and Paragraph has failed to honor those commitments.[9] Notably Paragraph did not raise this or any of the aforementioned

---

Nov. 7 H'ring Tr. 18:1-4.

[9] As set forth in the Debtor's November 9 Letter to the Court, the agreements embodied in the Settlement were assented to by Paragraph's counsel via email on September 23, 2022. The Investment Agreement provides that the Investment Agreement "may be amended, restated, supplemented, or otherwise modified, only by written agreement duly executed by each Party." Inv. Agmt. § 12.11. Further, the Investment Agreement provides that "references to 'written' or 'in writing' include in

8

**Weil, Gotshal & Manges LLP**

November 23, 2022
Page 9

issues at any point during the mediation sessions before Judge Beckerman.  The Settlement settled and resolved "all current disputes between and among the Debtor, the Sponsor, and the Notes Trustee, on behalf of the Noteholders relating to the Plan, the Investment Agreement, the MLPSA, and the Parties' respective disputes, claims and obligations thereunder."  Accordingly, Paragraph settled and waived any right it had to assert the Investment Agreement was not enforceable due to any of the purported breaches set forth in the Paragraph Notice each of which Paragraph was fully aware of at the time it entered into the Settlement.

As the Debtor has not breached any provisions of the Investment Agreement, Paragraph has no right to terminate the Investment Agreement pursuant to Section 11.01(c) of the Investment Agreement or otherwise.  Furthermore, even if true, none of the asserted breaches would result in a Material Adverse Effect under the Investment Agreement that would prevent the sale to close.  Rather, it is Paragraph's failure to move forward and to honor its obligations under the Investment Agreement, and as further agreed under the Settlement, that is a breach that would prevent the sale pursuant to the Investment Agreement from closing.[10]

*Next Steps for the Debtor and Timeline for its New Chapter 11 Plan*

As noted above, if Paragraph fails to cure the breaches set forth in the Notice of Default during the Cure Period, which expires on November 25, 2022, the Debtor intends to exercise its right, pursuant to Section 110.1(c) of the Investment Agreement, to terminate the Investment Agreement.

In light of recent events, the Debtor, in consultation with the Noteholders, as the Debtor's largest creditor constituency, is quickly working to evaluate alternative structures for a new exit transaction and chapter 11 plan to maximize value for creditors of the Debtor's estate.  If Paragraph fails to cure its defaults within the Cure Period, the Debtor will be prepared to immediately recommence discussions with potential replacement sponsors.  If those discussions do not quickly lead to an actionable transaction, the Debtor will be prepared to pivot to an alternative restructuring plan, which discussions are currently in progress with the Noteholders' representatives.

The Debtor estimates that it will likely take approximately 90 to 120 days to formulate a new chapter 11 plan, obtain Court approval of a new disclosure statement, commence solicitation of votes on the new chapter 11 plan, and then obtain confirmation of that plan.  Accordingly, the Debtor anticipates making a final determination on a new exit transaction in the next few weeks.

---

electronic form (including by e-mail transmission …)." *See* Inv. Agmt. §§ 12.01(f)(ii) and 12.11. The Settlement is thus a binding agreement and can be fairly construed as an amendment to the Investment Agreement's milestones and deadlines.

[10] Section 11.01(c) of the Investment Agreement expressly provides that a party cannot terminate pursuant to Section 11.01(c) if the party purporting to terminate is themselves in material breach.

**Weil, Gotshal & Manges LLP**

November 23, 2022
Page 10

Over the next several weeks, the Debtor, in consultation with the Noteholder representatives, will continue to analyze its options regarding the best and most likely path forward that maximizes value to the Debtor's estate and will update the Court accordingly.

We are available should the Court have any questions.

Respectfully submitted,


/s/ Gary T. Holtzer
Gary T. Holtzer

WEIL:\98911975\1\12817.0007