**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------- X
                                                                :
In re                                                           :        **Chapter 11**
                                                                :
**ALL YEAR HOLDINGS LIMITED,**                                  :        **Case No. 21-12051 (MG)**
                                                                :
                        **Debtor.[1]**                          :
                                                                :
**Fed. Tax Id. No. 98-1220822**                                 :
--------------------------------------------------------------- X

**NOTICE OF FILING OF PLAN SUPPLEMENT IN**
**CONNECTION WITH THIRD AMENDED CHAPTER 11 PLAN**
**OF REORGANIZATION OF ALL YEAR HOLDINGS LIMITED**

**PLEASE TAKE NOTICE** that:

1.      On May 31, 2022, All Year Holdings Limited, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), filed (i) the *Chapter 11 Plan of Reorganization of All Year Holdings Limited* [ECF No. 123] (as amended on September 15, 2022 [ECF No. 214], November 4, 2022 [ECF No. 256], and December 9, 2022 [ECF No. 289], and as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), (ii) the *Disclosure Statement for Chapter 11 Plan of Reorganization of All Year Holdings Limited* [ECF No. 124] (as amended on July 15, 2022 [ECF No. 151] and July 20, 2022 [ECF No. 160, Ex. A], as supplemented on September 15, 2022 [ECF No. 215], November 4, 2022 [ECF No. 257], and December 9, 2022 [ECF No. 290], and as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Disclosure Statement**"), and (iii) a motion seeking approval of the

---

[1] The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

Disclosure Statement and certain solicitation, voting, and tabulation procedures related to the Plan [ECF No. 125] (the "**Solicitation Procedures Motion**").[2]

2.      By order dated July 22, 2022 [ECF No. 160] (the "**Solicitation Procedures Order**"), the Bankruptcy Court approved the Disclosure Statement and the other relief requested in the Solicitation Procedures Motion.  The hearing on confirmation of the Plan is scheduled for January 31, 2023 and February 1, 2023, at 9:00 a.m. (Prevailing Eastern Time).

3.      In accordance with the Plan and the Solicitation Procedures Order, the Debtor hereby files this plan supplement (the "**Plan Supplement**") consisting of the following documents:

| | |
|---|---|
| **Exhibit A** | Form of Plan Administration Agreement |
| **Exhibit B** | Identification of Plan Administrator |
| **Exhibit C** | Organizational Documents for Reorganized Debtor |
| **Exhibit D** | Wind-Down Budget for Wind-Down Co |
| **Exhibit E** | Schedule of Retained Claims, Rights and Causes of Actions |
| **Exhibit F** | Schedule of Assumed Contracts |
| **Exhibit G** | Amended and Restated Limited Liability Company Agreement of YG WV LLC |
| **Exhibit H** | Summary of Wind-Down Co Indemnity of Authorized Managers |

4.      The documents, schedules, and other information contained in the Plan Supplement are integral to and comprise part of the Plan.

5.      As set forth in further detail in **Exhibit A** hereto, Mishmeret Trust Company Limited (the "**Notes Trustee**"), in its capacity as a representative of all holders of Class 4 Claims, will be empowered with certain general and specific consent rights under the Plan Administration Agreement as set forth in further detail in Article II and Article III therein.  In addition, the Plan

---

[2] Capitalized terms used but not herein defined have the meanings ascribed to such terms in the Plan.

Administrator will be required to obtain the prior written consent of the Notes Trustee, solely in

its capacity as Notes Trustee for the Series C Noteholders, prior to selling, transferring or assigning

any portion of Wind Down Co.'s direct or indirect interests in YGWV, LLC.  You are advised to

carefully review and consider the documents, schedules and other information contained in the

Plan Supplemental as your rights may be affected.

6.      The Plan Supplement documents attached hereto remain subject to (a) further

review, negotiations, and modifications, and (b) final documentation in a manner consistent with

the Plan.  The Debtor may update, modify, or supplement the Plan Supplement, and any of the

schedules, exhibits, and designations contained herein, in each case in accordance with the Plan.

Dated: January 3, 2023
       New York, New York

           /s/ Matthew P. Goren
           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone:  (212) 310-8000
           Facsimile: (212) 310-8007
           Gary T. Holtzer
           Matthew P. Goren

           *Attorneys for the Debtor*

## Exhibit A

**Form of Plan Administration Agreement**

## PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (this "*Agreement*") is made this [__], 2023 by and among All Year Holdings Limited, as debtor and debtor-in-possession (the "*Debtor*"), Mishmeret Trust Company Ltd., in its capacity as trustee under those certain Deeds of Trust[1] by and between it and All Year Holdings Limited (in such capacity, the "*Notes Trustee*"), Assaf Ravid (the "*Plan Administrator*") and Ofer Tzur and Amir Flamer (jointly, the "*Claims Administrator*" and together with the Plan Administrator, the "*Administrators*") pursuant to and in accordance with the terms of that certain *Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated December 9, 2022 (the "*Plan*"), as the same has been and may from time to time be amended or modified in accordance with the terms thereof, including pursuant to the Confirmation Order (as defined herein).[2]

## RECITALS

WHEREAS, on December 14, 2021, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "*Chapter 11 Case*");

WHEREAS, the Plan provides that the Plan Administrator will, among other things, be issued the single share and all outstanding non-economic equity interests in Wind-Down Co, and be vested with the power and authority to, and be authorized as the representative of the Debtor's estate to, retain, preserve, and distribute certain assets of Wind-Down Co for the benefit of the holders of Allowed Class 4 Remaining Unsecured Claims against the Debtor (the "*Holders*");

WHEREAS, the Plan provides that the duties of the Plan Administrator and the Claims Administrator will be allocated as provided herein;

WHEREAS, the Bankruptcy Court entered an order (the "*Confirmation Order*") confirming the Plan on [__], 2023;

WHEREAS, this Agreement is entered into in accordance with, and to facilitate the implementation and execution of, the Plan and the Confirmation Order; and

WHEREAS, the Administrators have been selected by the Notes Trustee, and have agreed to serve, as the Administrators in accordance with this Agreement, the Plan and the Confirmation Order, and such selection has been approved by the Bankruptcy Court pursuant to the Confirmation Order.

---

[1] "*Deeds of Trust*" means (i) that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of December 25, 2016, as supplemented or amended from time to time (the "*Series B Deed of Trust*"); (ii) that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of February 19, 2017, as supplemented or amended from time to time (the "*Series C Deed of Trust*"); (iii) that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of June 29, 2017, as supplemented or amended from time to time (the "*Series D Deed of Trust*"); and (iv) that certain Deed of Trust by and between the Debtor and the Notes Trustee, dated as of February 4, 2018, as supplemented or amended from time to time (the "*Series E Deed of Trust*").

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein as well as the relevant provisions of the Plan and the Confirmation order, the parties hereto agree as follows:

## ARTICLE I
## ACCEPTANCE OF POSITION; OBLIGATION TO PAY CLAIMS; FIDUCIARY STATUS

**Section 1.1    Acceptance and Appointment**. The Administrators hereby (a) accept their respective appointments as the Plan Administrator and the Claims Administrator as of the Effective Date, and (b) agree to observe and perform all duties and obligations imposed upon each of the Administrators under this Agreement, the Plan and the Confirmation Order, and other orders of the Bankruptcy Court as made expressly applicable to the Plan Administrator and the Claims Administrator, as applicable, after notice to the Plan Administrator or the Claims Administrator, as applicable, and a hearing thereon, and applicable law. The Plan Administrator hereby accepts the issuance of the single share of non-economic voting interest in Wind-Down Co subject to the terms and conditions of this Agreement, the Plan and the Confirmation Order.

**Section 1.2    Governance**. The Plan Administrator shall be the sole officer, director and/or manager and the sole equity holder of Wind-Down Co. Wind-Down Co shall remain in existence until such time as the Plan Administrator determines otherwise, consistent with this Agreement, the Plan and the Confirmation Order.

## ARTICLE II
## GENERAL POWERS, RIGHTS AND OBLIGATIONS OF THE ADMINISTRATORS

**Section 2.1    General Powers of the Plan Administrator**. Except as otherwise provided in this Agreement including without limitation the limits set forth in Article III, the Plan, or the Confirmation Order:

(a)    the Plan Administrator shall control and exercise authority over the assets vested in Wind-Down Co pursuant to the Plan, over the acquisition, management and disposition thereof and over the management and conduct of the affairs of Wind-Down Co, provided, however, that notwithstanding anything in this Agreement to the contrary, the powers and authority of the Plan Administrator shall in all respects be subject to the terms of this Agreement, Plan and Confirmation Order and shall not include any powers or authority expressly delegated to the Claims Administrator in Section 2.2 hereof. The Plan Administrator shall execute all agreements and other documents with the signature "as Plan Administrator" on behalf of Wind-Down Co when exercising authority granted to the Plan Administrator hereunder.

(b)    the duties and powers of the Plan Administrator shall include the following (but shall exclude any powers or authority expressly delegated to the Claims Administrator in Section 2.2 hereof), subject in all respects to the limitations contained in Article III:

(i)    implement the Wind Down of Wind-Down Co as expeditiously as reasonably possible;

ACTIVE/112228554.7

(ii)     make distributions to Holders in accordance with the Plan and any Order of the Bankruptcy Court;

(iii)     except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process for Wind-Down Co;

(iv)     create and fund (solely from assets of Wind-Down Co), as necessary, any reserves required under the Plan or any order of the Bankruptcy Court and other such reserves as the Plan Administrator deems necessary and appropriate to carry out the provisions of the Plan;

(v)     retain and compensate professionals to assist in performing its duties under the Plan pursuant to this Agreement;

(vi)     maintain the books, records, and accounts of Wind-Down Co;

(vii)     complete and file, as necessary, all final or otherwise required federal, state, and local tax returns and other tax reports for Wind-Down Co;

(viii)     represent the interests of Wind-Down Co before any taxing authority in all matters including, without limitations, any action, suit, proceeding, appeal or audit;

(ix)     perform other duties and functions that are consistent with the implementation of the Plan, the Confirmation Order or required by the Bankruptcy Code; and

(x)     prior to the Plan Termination Date, to the extent not already done previously, request that the Bankruptcy Court enter an order closing the Chapter 11 Case.

(c)     all Cash or other property held or collected by Wind-Down Co shall be used solely for the purposes contemplated by this Agreement, the Plan and the Confirmation Order in accordance with the Wind Down Budget.

(d)     the Plan Administrator shall not authorize Wind-Down Co to enter into or engage in any trade or business or use or dispose of any assets of Wind-Down Co in furtherance of any trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan, in all instances subject to the consent of the Notes Trustee.

**Section 2.2     General Powers of the Claims Administrator**.  Except as otherwise provided in this Agreement including without limitation the limits set forth in Article III, the Plan, or the Confirmation Order:

(a)     the Claims Administrator shall control and exercise authority over the Avoidance Actions and Causes of Action vested in Wind-Down Co pursuant to the Plan, and over the litigation, management and disposition thereof, provided, however, that notwithstanding anything in this Agreement to the contrary, the powers and authority of the Claims Administrator shall in all respects be subject to the terms of this Agreement, Plan and Confirmation Order.  The Claims Administrator shall execute all agreements and other documents with the signature "as

-3-

Claims Administrator" on behalf of Wind-Down Co when exercising authority granted to the Claims Administrator hereunder.

(b)    the duties and powers of the Claims Administrator shall include the following (but shall exclude any powers or authority expressly delegated to the Plan Administrator in Section 2.1 hereof), subject in all respects to the limitations contained in Article III:

(i)    prosecute the Avoidance Actions and all other Causes of Action on behalf of Wind-Down Co, elect not to pursue any Avoidance Actions and Causes of Action, and determine whether and when to compromise, settle, mediate, arbitrate, abandon, dismiss, or otherwise dispose of any such Avoidance Actions and Causes of Action, as the Claims Administrator may solely determine is in the best interests of Wind-Down Co;

(ii)    retain and compensate professionals to assist in performing its duties under the Plan; and

(iii)    perform other duties and functions that are consistent with the foregoing.

**Section 2.3**    **Retention and Compensation of Professionals by the Administrators**.

(a)    The Administrators shall receive the compensation set forth in Section 2.3(b) of this Agreement and reimbursement for any and all reasonable out-of-pocket disbursements in accordance with and subject to the availability of the Wind Down Budget.

(b)    The Plan Administrator shall be compensated at a rate of $18,000 per month for the first six (6) months following the Effective Date, and $12,000 per month thereafter during the term of the Plan Administrator's engagement, provided that such compensation may be revisited by the Notes Trustee or the Plan Administrator following the second anniversary of the Effective Date, in which case, the parties shall agree on revised compensation for the remainder of the term of the Plan Administrator's engagement.    The Claims Administrator shall not be entitled to any compensation or reimbursement.

(c)    The Claims Administrator shall retain Gornitzky & Co. and Amir Flamer & Co. Law Officers as the primary professionals of the Claims Administrator (the "***Primary Claims Administrator Professionals***") on the terms attached hereto as **Exhibit A**.

(d)    In addition to the Primary Claims Administrator Professionals, each of the Plan Administrator and the Claims Administrator may separately retain and pay professionals (collectively, the "***Administrators' Professionals***" and, together with the Primary Claims Administrator Professionals, the "***Professionals***") and reimburse any and all reasonable out-of-pocket disbursements in accordance with the Wind Down Budget and pursuant to the hourly rates identified on **Exhibit B**[3], to aid and assist the Plan Administrator and the Claims Administrator, as applicable, in the performance of their responsibilities pursuant to the terms of this Agreement,

---

[3] NTD -- The Wind Down Budget will include sufficient funds for operating expenses, the hourly fees (but not the success fees) for the Primary Claims Administrator Professionals (pursuant to the terms set forth in Exhibit A) as well as the budgeted amounts for all other Administrators' Professionals.

the Plan and the Confirmation Order provided that no Administrators' Professionals shall be retained to the extent such professional's fees or out-of-pocket disbursements are expected to exceed $10,000 individually or $20,000 in the aggregate, unless such retention is specifically approved by the Notes Trustee. For the avoidance of doubt, the Plan Administrator and the Claims Administrator may retain the same Professionals, and each of the Plan Administrator and the Claims Administrator hereby consents to such dual representation.

(e)    Subject to the Wind Down Budget, all Administrators' Professionals retained by the Plan Administrator or Claims Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, provided, however, that amounts budgeted for each of the Professionals set forth in the Wind Down Budget will be cumulative for each Professional with all amounts to be carried forward and carried backwards and subject to a variance in an amount no greater than 20% of the amount (the "*Variance Amount*") set forth in the Wind Down Budget for each such Professional, but subject in all respects to remaining availability in the Wind Down Budget to pay the Variance Amount; provided that to the extent there is insufficient availability from the Wind Down Budget, each of the Administrators and all Professionals shall be capped at the amounts set forth in the Wind Down Budget unless and until there is additional availability from the Wind Down Budget (including, with the consent and approval of the Notes Trustee, to the extent other line items included in the Wind Down Budget come in below the budgeted amounts) in which case such additional availability shall be shared pro rata by the Administrators and all Professionals to the extent of approved fees in excess of the budgeted amounts.

(f)    The payment of the fees and expenses of the Plan Administrator, the Claims Administrator and their respective Professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court, but such payment shall be subject to the following procedures:

(i)    (A) All Professionals retained by the Plan Administrator or the Claims Administrator, as applicable, shall deliver their invoices or fee statements (which invoices and/or fee statements shall be reasonably detailed (but may include redactions for privilege) and, with respect to counsel's fee statements, shall not be provided in summary fashion) on a monthly basis via electronic mail to the Plan Administrator or the Claims Administrator, as applicable, and the Notes Trustee before payment of such invoices shall be approved and (B) the Plan Administrator shall deliver its invoices or fee statements (which invoices and/or fee statements shall be reasonably detailed (but may include redactions for privilege)) on a monthly basis via electronic mail to the Notes Trustee before payment of such invoices shall be approved.

(ii)    The Plan Administrator, the Claims Administrator and the Notes Trustee shall have fourteen (14) days from the date of delivery of any invoice or fee statement to give notice of an objection to the invoice or fee statement to the Professional or Entity seeking compensation or reimbursement of expenses.

(iii)    For an objection to be valid, it shall be in writing, set forth in reasonable detail the specific fees objected to and the basis for the objection, and be sent via electronic mail to the applicable Professional with a copy to the Plan Administrator or the Claims Administrator, as applicable. The uncontested portion of each invoice or fee statement shall be

-5-

deemed approved and shall be paid from the Wind Down Budget (subject to the budgeted amounts for any such Professionals set forth in the Wind Down Budget and any permitted variances in accordance with and as set forth herein) within twenty (20) days after its original delivery to the Plan Administrator or the Claims Administrator, as applicable.

(iv)     Any objection that remains unresolved more than fifteen (15) days after it is made in writing shall be submitted for resolution to the Bankruptcy Court (via motion on notice to the Plan Administrator or the Claims Administrator, as applicable) by the Professional or Entity subject to the objection.

(g)     Any recovery obtained by the Claims Administrator from prosecution of any Causes of Action or Avoidance Actions shall be first applied to the fees and expenses of the Professionals (which may include funding a reserve for future Professional fees and expenses), with the remainder (if any) to be turned over to the Plan Administrator for distribution in accordance with the terms of this Agreement, the Plan and the Confirmation Order. Notwithstanding the foregoing, the fees and expenses of the Professionals shall remain subject to review and approval in accordance with Section 2.3(e) hereof.

**Section 2.4    Privilege and Defenses**. Pursuant to the Plan, on the Effective Date, all of the Debtor's and Wind-Down Co's privileges and work product, including but not limited to any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral), related to Avoidance Actions and the Causes of Action, shall be vested in and maintained by the Administrators. Subject to Article III hereof, the Plan Administrator or the Claims Administrator, as applicable, in its sole discretion will have exclusive authority to waive or not waive the Debtor's and Wind-Down Co's privileges. The Plan Administrator will seek to preserve and protect all applicable privileges and work product vested in Wind-Down Co pursuant to the Plan and the Confirmation Order. The Plan Administrator's receipt of such information shall not waive any privileges and such privileges are fully preserved. The Plan Administrator (on behalf of Wind-Down Co (including the Debtor and its estate)) and the individual directors, officers or members/managers of Wind-Down Co shall remain in control of all of their respective privileges (subject to the provisions of the Plan and the Confirmation Order), and the Plan Administrator (on behalf of Wind-Down Co), and the individual directors, officers or members/managers of Wind-Down Co shall retain the right to waive their own privileges prospectively. Nothing herein shall preclude the Claims Administrator from obtaining information from the Plan Administrator in connection with the exercise of its powers and duties set forth in this Article II, or otherwise pursuant to this Agreement, and the Plan Administrator shall reasonably cooperate with the Claims Administrator in the exercise of such powers and duties. Nothing herein shall preclude the Notes Trustee from obtaining information from the Plan Administrator or the Claims Administrator in connection with the exercise of its rights set forth in Article III hereof and Section 5.3 of the Plan, or otherwise, and any such information exchanged between the Plan Administrator, the Claims Administrator and the Notes Trustee shall be deemed to have been exchanged in connection with such parties' common legal interest and protected by and subject in all respects to the common interest privilege. For the avoidance of doubt, the Notes Trustee's receipt of privileged information from the Plan Administrator and the Claims Administrator shall not be deemed to waive any privilege otherwise applicable and belonging to the Plan Administrator or the Claims Administrator, as applicable, and all such privileges are expressly preserved and reserved.

ACTIVE/112228554.7

## ARTICLE III
## RIGHTS OF THE NOTES TRUSTEE

**Section 3.1    General Consent Rights**.  The Notes Trustee, in its capacity as Holders' representative, shall have a general approval right over any action or inaction of the Plan Administrator and the Claims Administrator, as applicable, including but not limited to, any of the powers set forth in Article II hereof.  The general consent right herein is in addition to, and not in derogation of, the specific consent rights vested in the Trustee as set forth in this Article III. Notwithstanding anything to the contrary set forth herein, the Plan Administrator shall not have any authority to sell, transfer or assign, or enter into any agreement to sell, transfer or assign, all or any portion of Wind Down Co.'s direct or indirect interests in YGWV, LLC absent the prior written consent of the Notes Trustee, solely in its capacity as the Trustee under the Series C Deed of Trust, such consent rights to be exercised following its consultation with (but not approval of) the joint representatives committee for the Holders of bonds issued under the Deeds of Trust.

**Section 3.2    Consent Rights Over Administering Class 4 Disputed Claims**.  The Plan Administrator will consult with the Notes Trustee with respect to the settlement of and/or the prosecution of objections to any Class 4 Disputed Claims, and obtain the prior written consent from the Notes Trustee prior to settling any such claims, with such consent not to be unreasonably withheld, conditioned or delayed.  From and after the Effective Date, the Notes Trustee may, in its sole and absolute discretion, provide written notice to the Plan Administrator instructing the Plan Administrator to deem any or all Disputed Claims as Allowed.

**Section 3.3    Standing; Class 4 Disputed Claims, Avoidance Actions, Causes of Action**.  Notwithstanding anything to the contrary herein or in the Plan, upon the request of the Notes Trustee, the Plan Administrator and/or Claims Administrator shall consent to, and agree not to oppose or dispute, the Notes Trustee's right to raise or be heard on any issues relating to any Class 4 Disputed Claims or any Avoidance Actions or Causes of Action, either directly or by granting to the Notes Trustee derivative standing on behalf of Wind-Down Co, including, without limitation, the right to prosecute any objections or commence litigation relating to any Class 4 Disputed Claims, any Avoidance Actions or Causes of Action, in all respects.

**Section 3.4    Consent Rights Over Claims and Causes of Action**.  The Claims Administrator will consult with the Notes Trustee with respect to the prosecution of and/or the settlement of any Claims, Causes of Action or Avoidance Actions belonging to Wind-Down Co, and obtain the written consent from the Notes Trustee prior to bringing or settling any such Claims, Causes of Action or Avoidance Actions, with such consent not to be unreasonably withheld, conditioned or delayed.  From and after the Effective Date, the Notes Trustee may, in its sole and absolute discretion, provide written notice to the Claims Administrator instructing the Claims Administrator to prosecute or settle, as applicable, any Claims, Causes of Action or Avoidance Actions the Notes Trustee deems appropriate.

**Section 3.5    Reporting to the Notes Trustee**.

(a)    After the Effective Date, the (i) Plan Administrator shall provide the Notes Trustee with a copy of each quarterly operating report filed with the Bankruptcy Court on behalf of Wind Down Co., and (ii) the Plan Administrator and the Claims Administrator shall each

-7-

provide the Notes Trustee with a copy of any other pleading, document, declaration, affidavit or application, that it files with the Bankruptcy Court on behalf of Wind-Down Co.

(b)     After the Effective Date, the Plan Administrator or the Claims Administrator, as applicable, shall promptly provide to the Notes Trustee, upon request, any and all such other information regarding any Class 4 Disputed Claims, the assets of, and the administration of, Wind-Down Co, the administration and implementation of the Plan, the Avoidance Actions and the Causes of Action, and the subject matter of this Agreement, as the Notes Trustee may reasonably request.

## ARTICLE IV
## TERM AND REMOVAL

**Section 4.1    Term of Service**.  The Plan Administrator shall serve until the earliest of (a) the completion of all the Plan Administrator's duties, responsibilities and obligations under the Plan and this Agreement, (b) dissolution of Wind-Down Co in accordance with the Plan and (c) death, incapacity, resignation, or removal for cause.  The Claims Administrator shall serve until the earliest of (a) the completion of all the Claims Administrator's duties, responsibilities and obligations under the Plan and this Agreement, (b) dissolution of Wind-Down Co in accordance with the Plan and (c) death, incapacity, resignation or removal for cause.

**Section 4.2    Resignation of the Administrators**.  The Plan Administrator and the Claims Administrator may resign by giving not less than thirty (30) days' prior written notice to the Notes Trustee.  Resignation of the Plan Administrator or the Claims Administrator, in its capacity as such, shall only become effective upon the appointment of a successor Plan Administrator or Claims Administrator, as applicable, in accordance with <u>Section 4.4</u> hereof.

**Section 4.3    Removal of Plan Administrator and Claims Administrator**.  The Notes Trustee may remove the Plan Administrator, the Claims Administrator or their respective Professionals for any reason upon thirty (30) days' prior notice, provided however, that the Claims Administrator and the Primary Claims Administrator Professionals shall only be removed following a vote of the Noteholders voting to remove the Claims Administrator, in the same majority and mechanism in which the Claims Administrator was selected by the Noteholders, as noted in the solicitation document published on March 21, 2022. In the event that any Professional is removed in accordance herewith, such Professional shall be entitled to the payment or reimbursement of such portion of its fees and expenses in accordance with the terms of their respective engagement (which, with respect to the Primary Claims Administrators' Professionals, the terms attached hereto as Exhibit A).  In the event of any dispute as to the compensation or reimbursement due such Primary Claims Administrators' Professionals, the Notes Trustee and the Claims Administrator shall be entitled to appoint an Israeli arbitrator, acceptable to the Notes Trustee and the Claims Administrator, who shall decide the appropriate compensation of such Primary Claims Administrators' Professionals. In the event that the Notes Trustee and the Claims Administrator do not agree on the identity of an Israeli arbitrator, such arbitrator shall be appointed by the head of the Israeli bar. The parties hereby irrevocably submit[4] to the exclusive jurisdiction of an Israeli arbitrator, acceptable to the Claims Administrator and the Notes Trustee, to resolve any dispute or

---

[4] NTD – Engagement Letter for Primary Claims Administrators' Professionals to contain similar language.

disagreement arising out of or relating to the compensation of such Primary Claims Administrators' Professionals. The arbitration shall be conducted in Israel and the arbitrator's judgment shall be given pursuant to Israeli civil procedure and in accordance with the laws of the State of Israel. The parties hereby waive any right to object to the exclusive jurisdiction and choice of law provision set forth in this section, and they undertake not to claim or act contrary to it.

**Section 4.4    Continuity; Appointment of Successor**.

(a)    The death, incapacity, resignation, or removal of the Plan Administrator or the Claims Administrator shall not operate to terminate any agency or employment created by this Agreement or invalidate any action theretofore taken by the Plan Administrator or the Claims Administrator, as applicable. In the event of a vacancy by reason of death, incapacity or removal of the Plan Administrator or the Claims Administrator, or prospective vacancy by reason of resignation or removal, the Notes Trustee shall appoint a successor Plan Administrator or Claims Administrator, as applicable. If no successor Plan Administrator or Claims Administrator, as applicable, shall have been appointed within thirty (30) days of the occurrence or effectiveness, as applicable, of the prior Plan Administrator's or Claims Administrator's resignation, death, incapacity, or removal, then upon motion to the Bankruptcy Court filed by counsel to the Plan Administrator or Claims Administrator, as applicable, or the Notes Trustee, the Bankruptcy Court shall appoint a successor Plan Administrator or Claims Administrator, as applicable.

(b)    The successor Plan Administrator, without any further act, shall (a) become vested with all the rights, powers, and duties of the Plan Administrator and (b) become the sole shareholder of Wind-Down Co and the books and records of Wind-Down Co shall be modified to reflect the same; provided, however, that no Plan Administrator shall be liable for the acts or omissions of any prior or later Plan Administrator. Every successor Plan Administrator appointed hereunder shall execute, acknowledge, and deliver to the Notes Trustee an instrument accepting such appointment subject to the terms and provisions hereof.

(c)    The successor Claims Administrator, without any further act, shall become vested with all the rights, powers, and duties of the claims Administrator; provided, however, that no Claims Administrator shall be liable for the acts or omissions of any prior or later Claims Administrator. Every successor Claims Administrator appointed hereunder shall execute, acknowledge, and deliver to the Notes Trustee an instrument accepting such appointment subject to the terms and provisions hereof.

**Section 4.5    Standard of Care**. None of the Plan Administrator, the Claims Administrator, Professionals, the Notes Trustee, their respective affiliates and agents or any of their respective officers, directors and employees to the fullest extent permitted by applicable law, shall be personally liable to any Entity for actions taken under or pursuant to this Agreement, the Plan or the Confirmation Order, except to the extent that their own acts constitute gross negligence, willful misconduct or fraud as determined by a final order; provided, further, nothing in this Agreement shall create or impart any fiduciary obligation or duty on behalf of the Notes Trustee to any Person or Entity.

**Section 4.6    Indemnification**. Wind-Down Co shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as officer and director of Wind-Down Co),

(ii) the Claims Administrator (in its capacity as such), (iii) the Professionals  retained by the Plan Administrator and the Claims Administrator; and (iv) each of their respective Related Parties[5] (collectively, the "***Indemnified Parties***"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to costs and expenses of investigating, analyzing and responding to claims, initiating, mediating, settling proceedings, engaging in litigation proceedings, and attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from Indemnified Party's willful misconduct or fraud as determined by a final order, with respect to Wind-Down Co, or its creditors or the implementation or administration of this Agreement, the Plan or the Confirmation Order.  To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Indemnified Party shall be advanced to such Indemnified Party within seven (7) days (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined through a Final Order that such Indemnified Party is not entitled to be indemnified therefore) out of the Wind Down Budget or any available insurance policies, including insurance purchased with funds from the Wind Down Budget.  The indemnification provisions of the Plan or this Agreement shall remain available to and be binding upon any former Plan Administrator and Claims Administrator, or the estate of any decedent of the Plan Administrator or Claims Administrator, as applicable, and shall survive the termination of this Agreement.  In addition, the costs and expenses of Wind-Down Co in monitoring and participating in the defense of any asserted claims giving rise to the asserted right of indemnification, as well as the asserted right of indemnification, shall be paid by Wind-Down Co out of the Wind Down Budget or any available insurance policies, including insurance purchased with funds from the Wind Down Budget.

   **Section 4.7**  **Exculpation**.  The (i) Plan Administrator and any of its Related Parties, each in its capacity as such, (ii) the Claims Administrator and any of its Related Parties, each in its capacity as such and (iii) the Notes Trustee and any of its Related Parties, each in its capacity as such (collectively, the "***Exculpated Parties***") shall not be liable for any losses, claims, damages, liabilities, obligations, settlements, proceedings, suits, judgments, causes of action, litigation, actions, investigations (whether civil or administrative and whether sounding in tort, contract or otherwise), penalties, costs, and expenses, including reasonable fees and disbursements incurred, caused by, relating to, based upon, or arising out of (directly or indirectly) the Exculpated Party's execution, delivery, and acceptance of or the performance or nonperformance of its powers, duties, and obligations under this Agreement, the Plan, the Confirmation Order, any other order of the Bankruptcy Court or applicable law or as may arise by reason of any action, omission or error of an Exculpated Party, and Persons dealing or having any relationship with Wind-Down Co shall have recourse only to Wind-Down Co's assets and shall look only to Wind-Down Co's assets to satisfy any liability or other obligations incurred in carrying out the terms of this Agreement, the Plan and the Confirmation Order and none of the Plan Administrator, the Claims Administrator, the Professionals, or the Notes Trustee, or any of their respective Related Parties, shall have any

---

[5] "***Related Parties***" means with respect to any Entity, such Entity's predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, all of their respective current officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement related to the Debtor), members, partners, employees, agents, trustees, advisory board members, advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

ACTIVE/112228554.7

personal obligation to satisfy any such liability; provided, however, that the foregoing limitations shall not apply to any acts or omissions ultimately and finally determined by a final and non-appealable order of a court of competent jurisdiction to be the direct result of such Exculpated Party's willful misconduct or fraud; subject to Section 4.10 hereof. None of the Exculpated Parties is deemed to be responsible for any other Exculpated Party's actions or inactions. The foregoing indemnification and exculpation with respect to any Indemnified Party and/or Exculpated Party shall survive the termination of such Indemnified Party and/or Exculpated Party from the capacity for which it was deemed indemnified and exculpated and the termination or modification of this Agreement.

Section 4.8    **Insurance.**  Subject to the approval of the Notes Trustee, Wind-Down Co is hereby authorized, but not directed, to obtain and pay for out of the Wind Down Budget all reasonably necessary insurance coverage for Wind-Down Co, the Plan Administrator, the Claims Administrator, the Notes Trustee and their respective Related Parties in connection with Wind-Down Co, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of Wind-Down Co and (ii) the liabilities, duties and obligations of Wind-Down Co, the Plan Administrator, the Claims Administrator, the Notes Trustee and, in each case, its Related Parties (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator or the Claims Administrator after the termination of this Agreement.

Section 4.9    **Burden of Proof**.  In any proceeding brought by Wind-Down Co, the Notes Trustee, or any other Person who is bound by this Agreement, challenging any action, determination or failure to act of the Plan Administrator, the Claims Administrator or the Notes Trustee, the Person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or failure to act constituted gross negligence, willful misconduct or fraud. Notwithstanding anything to the contrary in this Agreement or any duty otherwise existing at law or equity, each determination, action or failure to act of the Plan Administrator, the Claims Administrator or the Notes Trustee is, to the extent consistent with this Agreement, hereby deemed to not constitute a breach of this Agreement or any duty hereunder or existing at law, in equity or otherwise.

Section 4.10    **Reliance by the Plan Administrator and the Claims Administrator**. The Plan Administrator, the Claims Administrator, the Professionals and the Notes Trustee (the "***Reliance Parties***," and each, a "***Reliance Party***") may rely, and shall be fully protected in acting or refraining from acting if they rely upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that each of them, as applicable, has no reasonable belief to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt. In the absence of gross negligence or willful misconduct by a Reliance Party as found by a final and non-appealable court of a competent jurisdiction each of them, as applicable, may rely as to the truth of statements and correctness of the facts and opinions expressed to them and shall be fully protected personally in acting thereon. The Reliance Parties may consult with counsel and other professionals with respect to matters the Reliance Parties reasonably believe to be in their area of expertise, and any opinion of counsel shall be full and complete authorization and protection in respect of any action taken or not taken by a Reliance Party. A Reliance Party shall be entitled

-11-

to rely upon the advice of such professionals in acting or failing to act, and shall not be liable for any act taken or not taken in reliance thereon. The Reliance Parties shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning this Agreement, the Plan or any other document executed in connection therewith, and the Reliance Parties shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon.

**Section 4.11    Reliance by Entities Dealing with the Plan Administrator and the Claims Administrator**.  In the absence of actual knowledge to the contrary, any Entity dealing with Wind-Down Co shall be entitled to rely on the authority of the Plan Administrator or the Claims Administrator, as applicable, to act on behalf of Wind-Down Co, and shall have no obligation to inquire into the existence of such authority.  Each party who is bound by this Agreement hereby waives, to the fullest extent permitted by law, any and all defenses or other remedies that may be available against such Entity to contest, negate or disaffirm any action of the Plan Administrator or the Claims Administrator, as applicable, in connection with any such dealing. Each and every certificate, document or other instrument executed on behalf of Wind-Down Co by the Plan Administrator or the Claims Administrator, as applicable, shall be conclusive evidence in favor of any and every Entity relying thereon or claiming thereunder that (a) at the time of the execution and delivery of such certificate, document or instrument, this Agreement was in full force and effect, (b) the Entity executing and delivering such certificate, document or instrument was duly authorized and empowered to do so for and on behalf of Wind-Down Co and (c) such certificate, document or instrument was duly executed and delivered in accordance with the terms and provisions of this Agreement and is binding upon Wind-Down Co.

**ARTICLE V**
**<u>TERMINATION</u>**

**Section 5.1    Termination**.  This Agreement shall terminate upon the last to occur of (i) the dissolution of Wind-Down Co, (ii) the payment of all final Distributions required to be made under the Plan in respect of the Debtor and (iii) approval by the Bankruptcy Court to close the Chapter 11 Case (the "***Plan Termination Date***").  All provisions of this Agreement that expressly survive by their terms shall remain in effect in accordance with their terms.

**Section 5.2    Obligations of the Plan Administrator upon Termination**.  As soon as practicable at the conclusion of all duties required to be performed by the Plan Administrator and the Claims Administrator under the Plan, the Plan Administrator shall (solely at the expense of Wind-Down Co) (i) provide for the retention and storage of the books, records and files (including any necessary tax records) that shall have been held or maintained by the Debtor; (ii) file a certificate stating that the assets of Wind-Down Co have been exhausted and final distributions of Cash have been made under the Plan; (iii) file the necessary paperwork in the relevant states of incorporation of Wind-Down Co to effectuate the dissolution of Wind-Down Co in accordance with the laws of such jurisdiction; and (iv) upon completion of all duties of the Plan Administrator pursuant to this Agreement, the Plan and the Confirmation Order, the Plan Administrator shall resign as the sole officer and, director as applicable, of Wind-Down Co.  Upon the filing of certificate(s) described in clause (ii) of the preceding sentence, Wind-Down Co shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of Wind-Down Co or payments to be made in connection therewith.

ACTIVE/112228554.7

**Section 5.3      Books and Records**.  With respect to any books and records that are not, in the view of the Plan Administrator and the Claims Administrator, relevant for the continuing prosecution of any Class 4 Disputed Claims or any other Claims, Avoidance Actions or Causes of Action, or objections to any Class 4 Disputed Claims, other Claims or Avoidance Actions, Causes of Action, or the wind-down of Wind-Down Co, the Plan Administrator (with Notes Trustee consent, which consent shall not be unreasonably withheld, conditioned or delayed) is authorized to abandon, destroy or otherwise dispose of such books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other Order of the Bankruptcy Court and Plan Administrator shall have no liability for same (except in the event of gross negligence or willful misconduct as determined by final order subject to Section 4.7).  Notwithstanding the foregoing, the Plan Administrator will not abandon, destroy or otherwise dispose of any books and records responsive to a pending subpoena of the United States Securities and Exchange Commission or the antitrust division of the United States Department of Justice without prior consultation and approval of the United States Securities and Exchange Commission or United States Department of Justice, as applicable, or order of the Bankruptcy Court, any courts or regulatory authorities of Israel or the British Virgin Islands.

**Section 5.4      No Other Duties or Obligations**.  Except as otherwise specifically provided herein, after the termination of this Agreement pursuant to Section 5.1 above, the Plan Administrator and the Claims Administrator and the Professionals shall have no further duties or obligations hereunder.  Neither the Plan Administrator nor the Claims Administrator shall have any duties or obligations under law or otherwise except as expressly set forth in this Agreement, the Plan and the Confirmation Order.

## ARTICLE VI
## MISCELLANEOUS PROVISIONS

**Section 6.1      Descriptive Headings**.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 6.2      Amendment and Waiver**.  This Agreement shall only be amended or modified by the Plan Administrator, the Claims Administrator and the Notes Trustee in writing.

**Section 6.3      Governing Law**.  Without derogating from Section 4.4 above, this Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the rules of conflict of laws of the State of York or any other jurisdiction.

**Section 6.4      Counterparts; Effectiveness**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.  This Agreement shall become effective after entry of the Confirmation Order and the occurrence of the Effective Date of the Plan and when each party hereto shall have received counterparts thereof signed by all the other parties hereto.

**Section 6.5      Severability; Validity**.  If any provision of this Agreement or the application thereof to any Entity or circumstance is held invalid or unenforceable, the remainder of

ACTIVE/112228554.7

this Agreement, and the application of such provision to other Entities or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable.

     **Section 6.6**    **Notices**.  Any notice or other communication hereunder shall be via email and in writing and shall be deemed given upon (a) confirmation of receipt of an email transmission, or one (1) business day after transmission of that email (b) confirmed delivery by a standard overnight carrier or when delivered by hand, or (c) the expiration of five (5) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice):

Wind-Down Co:

     c/o All Year Holdings Limited
     199 Lee Avenue, #693,
     Brooklyn, NY 11211
     Attn: Mr. Assaf Ravid
     Email: ravidasaf@gmail.com

Plan Administrator:

     Assaf Ravid
     [Address Line 1]
     [Address Line 2]
     [City, State] [ZIP]
     Telephone:  [__]

     Facsimile:  [__]
     Attn: [__] ([Email])

Claims Administrator:

     Ofer Tzur and Amir Flamer
     [Address Line 1]
     [Address Line 2]
     [City, State] [ZIP]
     Telephone:  [__]

     Facsimile:  [__]
     Attn: [__] ([Email])

Notes Trustee:

     Mishmeret Trust Company Ltd.
     Amot House Building B
     48 Menachem Begin Road
     Tel-Aviv 661800
     ISRAEL

ACTIVE/112228554.7

Attention:      Rami Katzav, Vice President
                and Oded Goldstein
Via email:      ramik@mtrust.co.il
                oded@goldoded.com

With a copy to:

Michael Friedman, Esq.
CHAPMAN AND CUTLER LLP
1270 Avenue of the Americas
30th Floor
New York, New York 10020
Via email: friedman@chapman.com

**Section 6.7      Change of Address**.  Any Entity may change the address at which it is to receive notices under this Agreement by furnishing written notice to the parties listed in <u>Section 6.6</u> of this Agreement.  Such change of address shall be effective ten (10) Business Days after service of such notice.

**Section 6.8      Relationship to Plan**.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and Confirmation Order.  To that end, subject to <u>Articles II,III and VI</u> hereof, the Administrators shall have full power and authority to take any action consistent with the purpose and provisions of the Plan and Confirmation Order, whether or not such action is specified in this Agreement.  In the event that the provisions of this Agreement are found to be inconsistent with the provisions of the Plan or Confirmation Order, the provisions of the Plan and Confirmation Order control, and the provisions of the Confirmation Order shall control over any conflict between the Confirmation Order and the Plan.

**Section 6.9      Meaning of Terms**.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, and words importing the singular number include the plural number and vice versa.

**Section 6.10      Retention of Jurisdiction**.  Without derogating from Section 4.4 above, and as provided in <u>Article XI</u> of the Plan, the Bankruptcy Court shall retain jurisdiction over Wind-Down Co to the fullest extent permitted by law, including, but not limited to, for the purpose of interpreting and implementing the provisions of this Agreement.

**Section 6.11      Assignment**.  Neither this Agreement nor any of the rights, duties or obligations of either of the parties hereto may be assigned without Bankruptcy Court approval.

**Section 6.12      Successors and Assigns; No Third-Party Beneficiaries**.  This Agreement shall be binding on and shall inure to the benefit of each of the Parties and their respective successors and assigns, except as otherwise provided herein.  No Party may assign, transfer, hypothecate or otherwise convey its respective rights, benefits, obligations or duties hereunder without the prior express written consent of the other Parties.  Any such purported assignment, transfer, hypothecation or other conveyance by any Party without the prior express written consent

-15-

of the other Parties shall be null and void and of no force or effect.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Parties with respect to the transactions contemplated hereby and, except for the Notes Trustee and the Holders where referred to herein, no Entity shall be a third-party beneficiary of any of the terms and provisions of this Agreement.

Section 6.13    **Construction**.  In the event of any inconsistency, conflict or ambiguity as to the rights and obligations of the parties under this Agreement, the Plan and the Confirmation Order, the terms of this Agreement shall control and supersede any such inconsistency, conflict or ambiguity.

Section 6.14    **Effective Date**.  This Agreement shall become effective as provided for in Section 6.4 hereof.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers or representatives, all as of the date first above written.

ALL YEAR HOLDINGS LIMITED

By:                           
Name:
Title:

PLAN ADMINISTRATOR

By:                           
Name: Assaf Ravid

CLAIMS ADMINISTRATOR

By:                           
Name: Ofer Tzur

By:                           
Name: Amir Flamer

Acknowledged and Agreed by:

Mishmeret Trust Company Ltd., in its capacity as trustee


By:_____
Name:

## Exhibit B

### Identification of Plan Administrator

Pursuant to section 1.71 of the Plan, the Notes Trustee has selected Assaf Ravid to serve as the Plan Administrator for Wind-Down Co. Mr. Ravid currently serves as the Chief Restructuring Officer and as an Authorized Manager for the Debtor.

Mr. Ravid has been the managing director of CGI Real Estate Investment Strategies, a domestic developmental real estate company, since 2013. Prior to this, he served as a managing director of Aura Investments, Ltd, a global investment company specializing in real estate development and property management from 2007- 2012. Mr. Ravid also has prior experience as an attorney of Yehudan Raveh & Co., a leading Israeli law firm specializing in commercial law, from 2005-2007, and as an attorney at Danziger, Klagsbald, Rosen & Co., an Israeli law firm specializing in antitrust, trade regulations and commercial law from 2004-2005.

Prior to his current position at the Debtor, he served as an official representative of the Debtor's Series B, C, D and E bondholders.

The terms of Mr. Ravid's compensation as Plan Administrator are set forth in the form of Plan Administration Agreement attached as **Exhibit A** to the Plan Supplement.

**<u>Exhibit C</u>**

**Organizational Documents for Reorganized Debtor**

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**
**BVI BUSINESS COMPANIES ACT, 2004**



D984BF40A8

**CERTIFICATE OF INCORPORATION**
**(SECTION 7)**

The REGISTRAR of CORPORATE AFFAIRS, of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of incorporation having been complied with,

**Brooklyn Metro Partners Ltd**

BVI COMPANY NUMBER: **2100474**

is incorporated in the BRITISH VIRGIN ISLANDS as a BVI BUSINESS COMPANY, this 9th day of June, 2022.



*for* **REGISTRAR OF CORPORATE AFFAIRS**
9th day of June, 2022



**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE BVI BUSINESS COMPANIES ACT**

**MEMORANDUM OF ASSOCIATION**

**AND ARTICLES OF ASSOCIATION**

**OF**

**Brooklyn Metro Partners Ltd**

**Incorporated on the 9th day of June, 2022**

**Conyers Trust Company (BVI) Limited**

P.O. Box 3140

Road Town

Tortola

British Virgin Islands

**Brooklyn Metro Partners Ltd**

---

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**BVI BUSINESS COMPANIES ACT**


**MEMORANDUM OF ASSOCIATION**

**OF**

**Brooklyn Metro Partners Ltd**

**1.      NAME**

The name of the Company is Brooklyn Metro Partners Ltd (the "Company").

**2.      STATUS**

The Company is a company limited by shares.

**3.      REGISTERED OFFICE AND REGISTERED AGENT**

(a)      The first registered office of the Company is Commerce House, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands VG1110.

(b)      The first registered agent of the Company is Conyers Trust Company (BVI) Limited of Commerce House, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands VG1110.

**4.      CAPACITY AND POWERS**

Subject to the Act and any other British Virgin Islands legislation, the Company has, irrespective of corporate benefit:

(a)      full capacity to carry on or undertake any business or activity, do any act or enter into any transaction; and

(b)      for the purposes of subparagraph (a), full rights, powers and privileges.

**5.      NUMBER AND CLASSES OF SHARES**

The Company is authorised to issue up to a maximum of 50,000 ordinary shares of a single class without par value.

**6.      RIGHTS ATTACHING TO SHARES**

Subject to the Articles, the terms of the issue of any share, or any Resolution of Members to the contrary (and, for greater clarity, without prejudice to any special rights conferred thereby on the holders of any other shares), a share of the Company confers on the holder:

(a)      the right to one vote at a meeting of the Members or on any Resolution of  Members;

**1**

**Brooklyn Metro Partners Ltd**

---

(b)     the right to an equal share in any Distribution paid by the Company; and

(c)     the right to an equal share in the distribution of the surplus assets of the Company on a winding up.

## 7.    VARIATION OF CLASS RIGHTS

The rights attached to any class or series of shares (unless otherwise provided by the terms of issue of the shares of that class or series), whether or not the Company is being wound-up, may be varied with the consent in writing of all the holders of the issued shares of that class or series or with the sanction of a resolution passed by a majority of the votes cast at a separate meeting of the holders of the shares of the class or series.

## 8.    RIGHTS NOT VARIED BY THE ISSUE OF SHARES *PARI PASSU*

Rights conferred upon the holders of the shares of any class or series issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class or series, be deemed to be varied by the creation or issue of further shares ranking *pari passu* therewith.

## 9.    REGISTERED SHARES

The Company shall issue registered shares only, and such shares may be in full or fractional form.  The Company is not authorised to issue bearer shares, convert registered shares to bearer shares, or exchange registered shares for bearer shares.

## 10.    AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION

Subject to Clause 7, the Company may amend its Memorandum or Articles by a Resolution of Members or a Resolution of Directors, save that no amendment may be made by a Resolution of Directors:

(a)     to restrict the rights or powers of the Members to amend the Memorandum or Articles;

(b)     to change the percentage of Members required to pass a Resolution of Members to amend the Memorandum or Articles;

(c)     in circumstances where the Memorandum or Articles cannot be amended by the Members;

(d)     to clauses 6, 7, 8 or this clause 10.

## 11.    DEFINITIONS

The meanings of words in this Memorandum are as defined in the Articles annexed hereto.

**Brooklyn Metro Partners Ltd**

---

We, CONYERS TRUST COMPANY (BVI) LIMITED, registered agent of the Company, of Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands VG1110 for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands hereby sign this Memorandum of Association on the 9th day of June, 2022:

Incorporator

CONYERS TRUST COMPANY (BVI) LIMITED


_____

Per: Andrew Swapp
For and on behalf of
Conyers Trust Company (BVI) Limited

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE BVI BUSINESS COMPANIES ACT**

**ARTICLES OF ASSOCIATION**

**OF**

**Brooklyn Metro Partners Ltd**

**Brooklyn Metro Partners Ltd**

# TABLE OF CONTENTS

**INTERPRETATION**

1.    Definitions

**SHARES**

2.    Power to Issue Shares
3.    Power of the Company to Purchase its Shares
4.    Treatment of Purchased, Redeemed or Acquired Shares
5.    Treasury Shares
6.    Consideration
7.    Forfeiture of Shares
8.    Share Certificates
9.    Fractional Shares

**REGISTRATION OF SHARES**

10.   Register of Members
11.   Registered Holder Absolute Owner
12.   Transfer of Registered Shares
13.   Transmission of Registered Shares

**ALTERATION OF SHARES**

14.   Power to Alter Shares
15.   Restrictions on the Division of Shares

**DISTRIBUTIONS**

16.   Distributions
17.   Power to Set Aside Profits
18.   Unauthorised Distributions
19.   Distributions to Joint Holders of Shares

**MEETINGS OF MEMBERS**

20.   General Meetings
21.   Location
22.   Requisitioning General Meetings
23.   Notice
24.   Giving Notice
25.   Service of Notice
26.   Participating in Meetings by Telephone
27.   Quorum at General Meetings
28.   Chairman to Preside

29.   Voting on Resolutions
30.   Power to Demand a Vote on a Poll
31.   Voting by Joint Holders of Shares
32.   Instrument of Proxy
33.   Representation of Members
34.   Adjournment of General Meetings
35.   Business at Adjourned Meetings
36.   Directors Attendance at General Meetings

**DIRECTORS AND OFFICERS**

37.   Election of Directors
38.   Number of Directors
39.   Term of Office of Directors
40.   Alternate and Reserve Directors
41.   Removal of Directors
42.   Vacancy in the Office of Director
43.   Remuneration of Directors
44.   Resignation of directors
45.   Directors to Manage Business
46.   Committees of Directors
47.   Officers and Agents
48.   Removal of Officers and Agents
49.   Duties of Officers
50.   Remuneration of Officers
51.   Standard of Care
52.   Conflicts of Interest
53.   Indemnification and Exculpation

**MEETINGS OF THE BOARD OF DIRECTORS**

54.   Board Meetings
55.   Notice of Board Meetings
56.   Participation in Meetings by Telephone
57.   Quorum at Board Meetings
58.   Board to Continue in the Event of Vacancy
59.   Chairman to Preside
60.   Powers of Sole Director
61.   Proceedings if One Director

**Brooklyn Metro Partners Ltd**

---

### CORPORATE RECORDS

**62.**   Documents to be Kept

**63.**   Form and Use of Seal

### ACCOUNTS

**64.**   Books of Account

**65.**   Form of Records

**66.**   Financial Statements

**67.**   Distribution of Accounts

### AUDITS

**68.**   Audit

**69.**   Appointment of Auditor

**70.**   Remuneration of Auditor

**71.**   Duties of Auditor

**72.**   Access to Records

**73.**   Auditor Entitled to Notice

### VOLUNTARY LIQUIDATION

**74.**   Liquidation

### FUNDAMENTAL CHANGES

**75.**   Changes

**76.**   Continuation under Foreign Law

# INTERPRETATION

## 1.    DEFINITIONS

1.1.    In these Articles, the following words and expressions shall, where not inconsistent with the context, have the following meanings, respectively:

| | |
|---|---|
| **"Act"** | BVI Business Companies Act, as from time to time amended or restated; |
| **"Articles"** | these Articles of Association as originally registered or as from time to time amended or restated; |
| **"Board"** | the board of directors appointed or elected pursuant to these Articles and acting by Resolution of Directors; |
| **"Company"** | Brooklyn Metro Partners Ltd; |
| **"Distribution"** | (a) the direct or indirect transfer of an asset, other than the Company's own shares, to or for the benefit of a Member; or |
| | (b) the incurring of a debt to or for the benefit of a Member; |
| | in relation to shares held by a Member and whether by means of the purchase of an asset, the purchase, redemption or other acquisition of shares, a transfer of indebtedness or otherwise, and includes a dividend; |
| **"Member"** | a person whose name is entered in the register of members as the holder of one or more shares, or fractional shares, in the Company; |
| **"Memorandum"** | the Memorandum of Association of the Company as originally registered or as from time to time amended or restated; |
| **"Resolution of Directors"** | (a) a resolution approved at a duly constituted meeting of directors or of a committee of directors of the Company by the affirmative vote of a simple majority of the directors present who voted and did not abstain; or |
| | (b) a resolution consented to in writing by all of the directors or of all the members of the |

1

committee, as the case may be;

| | | |
|---|---|---|
| **"Resolution of Members"** | (a) | a resolution approved at a duly constituted meeting of Members by the affirmative vote of a simple majority of the votes of those Members entitled to vote and voting on the resolution; or |
| | (b) | a resolution consented to in writing by all of the Members entitled to vote thereon; |
| **"Seal"** | | the common seal of the Company; |
| **"Secretary"** | | the person appointed to perform any or all of the duties of secretary of the Company and includes any deputy or assistant secretary and any person appointed by the Board to perform any of the duties of the Secretary; and |
| **"Treasury Share"** | | a share of the Company that was previously issued but was repurchased, redeemed or otherwise acquired by the Company and not cancelled. |

1.2.   In these Articles, where not inconsistent with the context:

(a)   words denoting the plural number include the singular number and vice versa;

(b)   words denoting the masculine gender include the feminine and neuter genders;

(c)   words importing persons include companies, associations or bodies of persons whether corporate or not;

(d)   a reference to voting in relation to shares shall be construed as a reference to voting by Members holding the shares, except that it is the votes allocated to the shares that shall be counted and not the number of Members who actually voted and a reference to shares being present at a meeting shall be given a corresponding construction;

(e)   a reference to money is, unless otherwise stated, a reference to the currency in which shares of the Company shall be issued;

(f)   the words:-

(i)   "may" shall be construed as permissive; and

(ii)   "shall" shall be construed as imperative; and

**Brooklyn Metro Partners Ltd**

(g)    unless otherwise provided herein, words or expressions defined in the Act shall bear the same meaning in these Articles.

1.3.    In these Articles expressions referring to writing or its cognates shall, unless the contrary intention appears, include facsimile, printing, lithography, photography, electronic mail and other modes of representing words in visible form.

1.4.    Headings used in these Articles are for convenience only and are not to be used or relied upon in the construction hereof.

## SHARES

**2.    POWER TO ISSUE SHARES**

Subject to the provisions of the Memorandum, the unissued shares of the Company shall be at the disposal of the Board which may, without prejudice to any rights previously conferred on the holders of any existing shares or class or series of shares, offer, allot, grant options over or otherwise dispose of the shares to such persons, at such times and upon such terms and conditions as the Company may by Resolution of Directors determine.

**3.    POWER OF THE COMPANY TO PURCHASE ITS SHARES**

Subject to these Articles, the Company may by Resolution of Directors, purchase, redeem or otherwise acquire and hold its own shares.  Sections 60, 61 and 62 of the Act shall not apply to the Company.

**4.    TREATMENT OF PURCHASED, REDEEMED OR ACQUIRED SHARES**

4.1.    Subject to article 4.2, a share that the Company purchases, redeems or otherwise acquires may be cancelled or held by the Company as a Treasury Share.

4.2.    The Company may only hold a share that has been purchased, redeemed or otherwise acquired as a Treasury Share if the number of shares purchased, redeemed or otherwise acquired, when aggregated with shares of the same class already held by the Company as Treasury Shares, does not exceed 50% of the shares of that class previously issued by the Company, excluding shares that have been cancelled.

**5.    TREASURY SHARES**

5.1.    Treasury Shares may be transferred by the Company and the provisions of the Act, the Memorandum and these Articles that apply to the issue of shares apply to the transfer of Treasury Shares.

5.2.    All the rights and obligations attaching to a Treasury Share are suspended and shall not be exercised by or against the Company while it holds the share as a Treasury Share.

3

**Brooklyn Metro Partners Ltd**

## 6.    CONSIDERATION

6.1.    A share may be issued for consideration, in any form or a combination of forms, including money, a promissory note or other written obligation to contribute money or property, real property, personal property (including goodwill and know-how), services rendered or a contract for future services.

6.2.    No share may be issued for a consideration, which is in whole or part, other than money unless the Board passes a resolution stating:

(a)    the amount to be credited for the issue of the share; and

(b)    that, in its opinion, the present cash value of the non-money consideration and money consideration, if any, is not less than the amount to be credited for the issue of the share.

6.3.    No share may be issued by the Company that:

(a)    increases the liability of a person to the Company; or

(b)    imposes a new liability on a person to the Company,

unless that person, or an authorised agent of that person, agrees in writing to becoming the holder of the share.

6.4.    The consideration for a share with par value shall not be less than the par value of the share.

6.5.    A bonus share issued by the Company shall be deemed to have been fully paid for on issue.

## 7.    FORFEITURE OF SHARES

7.1.    Where a share is not fully paid for on issue, the Board may, subject to the terms on which the share was issued, at any time serve upon the Member a written notice of call specifying a date for payment to be made.

7.2.    The written notice of call shall name a further date not earlier than the expiration of fourteen days from the date of service of the notice on or before which the payment required by the notice is to be made and shall contain a statement that in the event of non-payment at or before the time named in the notice, the share will be liable to be forfeited.

7.3.    Where a notice complying with the foregoing provisions has been issued and the requirements of the notice have not been complied with, the Board by Resolution of Directors may, at any time before tender of payment, forfeit and cancel the share to which the notice relates and direct that the register of members be updated.

7.4.    Upon forfeiture and cancellation pursuant to article 7.3, the Company shall be under no obligation to refund any moneys to that Member and that Member shall be discharged from any further obligation to the Company as regards the forfeited share.

**Brooklyn Metro Partners Ltd**

## 8.    SHARE CERTIFICATES

8.1.    The Company shall not be required to issue certificates in respect of its shares to a Member, but may elect to do so by the determination of any one director or the Secretary in his sole discretion, upon the request and at the expense of the Member.

8.2.    If the Company issues share certificates, the certificates shall be signed by at least one director or such other person who may be authorised by Resolution of Directors to sign share certificates, or shall be under the common seal of the Company, with or without the signature of any director, and the signatures and common seal may be facsimiles.

8.3.    Any Member receiving a share certificate for registered shares shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of wrongful or fraudulent use or representation made by any person by virtue of the possession thereof.  If a share certificate for registered shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a Resolution of Directors.

## 9.    FRACTIONAL SHARES

The Company may issue fractional shares and a fractional share shall have the corresponding fractional rights, obligations and liabilities of a whole share of the same class or series of shares.

## REGISTRATION OF SHARES

## 10.    REGISTER OF MEMBERS

10.1.    The Board shall cause there to be kept a register of members in which there shall be recorded the name and address of each Member, the number of each class and series of shares held by each Member, the date on which the name of each Member was entered in the register of members and the date upon which any person ceased to be a Member.

10.2.    The register of members may be in such form as the Board may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.  Unless the Board otherwise determines, the magnetic, electronic or other data storage form shall be the original register of members.

## 11.    REGISTERED HOLDER ABSOLUTE OWNER

11.1.    The entry of the name of a person in the register of members as a holder of a share in the Company is *prima facie* evidence that legal title in the share vests in that person.

11.2.    The Company may treat the holder of a registered share as the only person entitled to:

(a)    exercise any voting rights attaching to the share;

(b)    receive notices;

**5**

(c)    receive a Distribution in respect of the share; and

(d)    exercise other rights and powers attaching to the share.

## 12.    TRANSFER OF REGISTERED SHARES

12.1.    Registered shares in the Company shall only be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee.

12.2.    The instrument of transfer shall also be signed by the transferee if registration as a holder of the share imposes a liability to the Company on the transferee.

12.3.    The instrument of transfer shall be sent to the Company for registration.

12.4.    The Company shall, on receipt of an instrument of transfer, enter the name and address of the transferee of the share in the register of members unless the Board resolves to refuse or delay the registration of the transfer for reasons that shall be specified in the resolution.

12.5.    The Board is permitted to pass a Resolution of Directors refusing or delaying the registration of a transfer where it reasonably determines that it is in the best interest of the Company to do so. Without limiting the generality of the foregoing, the Board may refuse or delay the registration of a transfer of shares if the transferor has failed to pay an amount due in respect of those shares.

12.6.    Where the Board passes a resolution to refuse or delay the registration of a transfer, the Company shall, as soon as practicable, send the transferor and the transferee a notice of the refusal or delay.

12.7.    The transfer of a share is effective when the name of the transferee is entered in the register of members and the Company shall not be required to treat a transferee of a share in the Company as a Member until the transferee's name has been entered in the register of members.

12.8.    If the Board is satisfied that an instrument of transfer has been signed but that the instrument has been lost or destroyed, it may resolve:

(a)    to accept such evidence of the transfer of the shares as they consider appropriate; and

(b)    that the transfer of shares be recorded, including by the entry of the transferee's name in the register of members.

## 13.    TRANSMISSION OF REGISTERED SHARES

13.1.    The executor or administrator of the estate of a deceased Member, the guardian of an incompetent Member, the liquidator of an insolvent Member or the trustee of a bankrupt Member shall be the only person recognised by the Company as having any title to the Member's share.

13.2.    Any person becoming entitled by operation of law or otherwise to a share in consequence of the death, incompetence or bankruptcy of any Member may be registered as a Member upon such

**6**

**Brooklyn Metro Partners Ltd**

evidence being produced as may reasonably be required by the Board.  An application by any such person to be registered as a Member shall for all purposes be deemed to be a transfer of the share of the deceased, incompetent or bankrupt Member and the Board shall treat it as such.

13.3.    Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any Member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share and such request shall likewise be treated as if it were a transfer.

# ALTERATION OF SHARES

## 14.    POWER TO ALTER SHARES

14.1.    The Company may amend the Memorandum to increase or reduce the maximum number of shares that the Company is authorised to issue, or to authorise the Company to issue an unlimited number of shares.

14.2.    Subject to the Memorandum and these Articles, the Company may:

(a)    divide its shares, including issued shares, into a larger number of shares; or

(b)    combine its shares, including issued shares, into a smaller number of shares;

(c)    provided that, where shares are divided or combined, the aggregate par value (if any) of the new shares must be equal to the aggregate par value (if any) of the original shares.

14.3.    A division or combination of shares, including issued shares, of a class or series shall be for a larger or smaller number, as the case may be, of shares in the same class or series.

## 15.    RESTRICTIONS ON THE DIVISION OF SHARES

The Company shall not divide its shares if it would cause the maximum number of shares that the Company is authorised to issue to be exceeded.

# DISTRIBUTIONS

## 16.    DISTRIBUTIONS

16.1.    The Board may, by Resolution of Directors, authorise a Distribution by the Company to Members at such time and of such an amount as it thinks fit if it is satisfied, on reasonable grounds, that immediately after the Distribution, the value of the Company's assets exceeds its liabilities and the Company is able to pay its debts as they fall due.  The resolution shall include a statement to that effect.

16.2.    Notice of any Distribution that may have been authorised shall be given to each Member entitled to the Distribution in the manner provided in article 24 and all Distributions unclaimed for three

**Brooklyn Metro Partners Ltd**

years after having been authorised may be forfeited by Resolution of Directors for the benefit of the Company.

## 17.    POWER TO SET ASIDE PROFITS

The Board may, before authorising any Distribution, set aside out of the profits of the Company such sum as it thinks proper as a reserve fund, and may invest the sum so set apart as a reserve fund in such securities as it may select.

## 18.    UNAUTHORISED DISTRIBUTIONS

18.1.    If, after a Distribution is authorised and before it is made, the Board ceases to be satisfied on reasonable grounds that immediately after the Distribution the value of the Company's assets exceeds its liabilities and the Company is able to pay its debts as they fall due, such Distribution is deemed not to have been authorised.

18.2.    A Distribution made to a Member at a time when, immediately after the Distribution, the value of the Company's assets did not exceed its liabilities and the Company was not able to pay its debts as they fell due, is subject to recovery in accordance with the provisions of the Act.

## 19.    DISTRIBUTIONS TO JOINT HOLDERS OF SHARES

If two or more persons are registered as joint holders of any shares, any one of such persons may give an effectual receipt for any Distribution payable in respect of such shares.

## MEETINGS OF MEMBERS

## 20.    GENERAL MEETINGS

The Board, by Resolution of Directors, may convene meetings of the Members of the Company at such times and in such manner as the Board considers necessary or desirable.

## 21.    LOCATION

Any meeting of the Members may be held in such place within or outside the British Virgin Islands as the Board considers appropriate.

## 22.    REQUISITIONED GENERAL MEETINGS

The Board shall call a meeting of the Members if requested in writing to do so by Members entitled to exercise at least thirty percent of the voting rights in respect of the matter for which the meeting is being requested.

## 23.    NOTICE

23.1.    The Board shall give not less than seven days notice of meetings of Members to those persons whose names, on the date the notice is given, appear as Members in the register of members of the Company and are entitled to vote at the meeting.

8

**Brooklyn Metro Partners Ltd**

23.2.   A meeting of Members held in contravention of the requirement in article 23.1 is valid if Members holding a ninety percent majority of the total voting rights on all the matters to be considered at the meeting have waived notice of the meeting and, for this purpose, the presence of a Member at the meeting shall be deemed to constitute waiver on his part.

23.3.   The inadvertent failure of the Board to give notice of a meeting to a Member, or the fact that a Member has not received notice, does not invalidate the meeting.

## 24.   GIVING NOTICE

24.1.   A notice may be given by the Company to any Member either by delivering it to such Member in person or by sending it to such Member's address in the register of members or to such other address given for the purpose.  Notice may be sent by mail, courier service, facsimile, electronic mail or other mode of representing words in a legible form as agreed by such Member.

24.2.   Any notice required to be given to a Member shall, with respect to any shares held jointly by two or more persons, be given to whichever of such persons is named first in the register of members and notice so given shall be sufficient notice to all the holders of such shares.

## 25.   SERVICE OF NOTICE

Any notice shall be deemed to have been served at the time when the same would be delivered in the ordinary course of transmission and, in proving such service, it shall be sufficient to prove that the notice was properly addressed and prepaid, if posted, and the time when it was posted, delivered to the courier or transmitted by facsimile, electronic mail or other method as the case may be.

## 26.   PARTICIPATING IN MEETINGS BY TELEPHONE

A Member shall be deemed to be present at a meeting of Members if he participates by telephone or other electronic means and all Members participating in the meeting are able to hear each other.

## 27.   QUORUM AT GENERAL MEETINGS

27.1.   A meeting of Members is properly constituted if at the commencement of the meeting there are present in person or by proxy not less than fifty percent of the votes of the shares or class or series of shares entitled to vote on Resolutions of Members to be considered at the meeting.

27.2.   If, within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Members, shall be dissolved; in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the Board may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class or series of shares entitled to vote on the resolutions to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

**9**

**Brooklyn Metro Partners Ltd**

27.3.   If a quorum is present, notwithstanding the fact that such quorum may be represented by only one person, then such person may resolve any matter and a certificate signed by such person accompanied, where such person be a proxy, by a copy of the proxy form, shall constitute a valid Resolution of Members.

## 28.   CHAIRMAN TO PRESIDE

At every meeting of Members, the chairman of the Board shall preside as chairman of the meeting.  If there is no chairman of the Board or if the chairman of the Board is not present at the meeting, the Members present shall choose one of their number to be the chairman.  If the Members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by proxy at the meeting shall preside as chairman.

## 29.   VOTING ON RESOLUTIONS

At any meeting of the Members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes thereof.

## 30.   POWER TO DEMAND A VOTE ON A POLL

30.1.   At any meeting of Members a resolution put to the vote of the meeting shall, in the first instance, be voted upon by a show of hands and, subject to any rights or restrictions for the time being lawfully attached to any class of shares and subject to the provisions of these Articles, every Member present in person and every person holding a valid proxy at such meeting shall be entitled to one vote and shall cast such vote by raising his hand.

30.2.   If the chairman shall have any doubt as to the outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any Member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken.  If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meeting by the chairman.

## 31.   VOTING BY JOINT HOLDERS OF SHARES

The following shall apply where shares are jointly owned:  (a) if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of Members and may speak as a Member; (b) if only one of the joint owners is present in person or by proxy he may vote on behalf of all of them; and (c) if two or more of the joint owners are present in person or by proxy they must vote as one.

**Brooklyn Metro Partners Ltd**

## 32. INSTRUMENT OF PROXY

32.1. A Member may be represented at a meeting of Members by a proxy (who need not be a Member) who may speak and vote on behalf of the Member.

32.2. An instrument appointing a proxy shall be in such form as the Board may from time to time determine or such other form as the chairman of the meeting shall accept as properly evidencing the wishes of the Member appointing the proxy.

32.3. The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within seven days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

32.4. The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

## 33. REPRESENTATION OF MEMBERS

33.1. Any person other than an individual which is a Member may by resolution in writing (certified or signed by a duly authorised person) of its directors or other governing body authorise such person as it thinks fit to act as its representative (in this article, "Representative") at any meeting of the Members or at the meeting of the Members of any class or series of shares and the Representative shall be entitled to exercise the same powers on behalf of the Member which he represents as that Member could exercise if it were an individual.

33.2. The right of a Representative shall be determined by the law of the jurisdiction where, and by the documents by which, the Member is constituted or derives its existence. In case of doubt, the Board may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the Board may rely and act upon such advice without incurring any liability to any Member.

## 34. ADJOURNMENT OF GENERAL MEETINGS

The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place.

## 35. BUSINESS AT ADJOURNED MEETINGS

No business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

## 36. DIRECTORS ATTENDANCE AT GENERAL MEETINGS

Directors of the Company may attend and speak at any meeting of Members of the Company and at any separate meeting of the holders of any class or series of shares in the Company.

**11**

# DIRECTORS AND OFFICERS

**37.    ELECTION OF DIRECTORS**

37.1.    The first registered agent of the Company shall, within six months of the date of incorporation of the Company, appoint one or more persons as the first director or directors of the Company. Thereafter, the directors shall be elected by a Resolution of Directors or a Resolution of Members.

37.2.    No person shall be appointed as a director or nominated as a reserve director unless he has consented in writing to act as a director or to be nominated as a reserve director.

37.3.    A director shall not require a share qualification, and may be an individual or a company.

37.4.    Any director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at Board meetings or with respect to unanimous written consents.

**38.    NUMBER OF DIRECTORS**

The maximum number of directors may be fixed either by a Resolution of Directors or a Resolution of Members, provided that if the maximum number of directors is fixed by a Resolution of Members, then any change to the maximum number of directors shall only be made by a Resolution of Members.

**39.    TERM OF OFFICE OF DIRECTORS**

Each director shall hold office for the term, if any, as may be specified in the resolution appointing him or until his earlier death, resignation or removal.

**40.    ALTERNATE AND RESERVE DIRECTORS**

40.1.    A director may at any time appoint any person (including another director) to be his alternate director and may at any time terminate such appointment.  An appointment and a termination of appointment shall be by notice in writing signed by the director and deposited at the Registered Office or delivered at a meeting of the Board.

40.2.    The appointment of an alternate director shall terminate on the happening of any event which, if he were a director, would cause him to vacate such office or if his appointor ceases for any reason to be a director.

40.3.    An alternate director has the same rights as the appointing director in relation to any directors' meeting and any written resolution circulated for written consent, save that he may not himself appoint an alternate director or a proxy.  Any exercise by the alternate director of the appointing director's powers in relation to the taking of decisions by the directors is as effective as if the powers were exercised by the appointing director.

**12**

**Brooklyn Metro Partners Ltd**

40.4.    If an alternate director is himself a director or attends a meeting of the Board as the alternate director of more than one director, his voting rights shall be cumulative.

40.5.    Unless the Board determines otherwise, an alternate director may also represent his appointor at meetings of any committee of the directors on which his appointor serves; and this Article shall apply equally to such committee meetings as to meetings of the Board.

40.6.    Where the Company has only one Member who is an individual and that Member is also the sole director, the sole member/director may, by instrument in writing, nominate a person who is not disqualified from being a director under the Act as a reserve director in the event of his death.

40.7.    The nomination of a person as a reserve director ceases to have effect if: (a) before the death of the sole Member/director who nominated him he resigns as reserve director, or the sole Member/director revokes the nomination in writing, or (b) the sole Member/director who nominated him ceases to be the sole Member/director for any reason other than his death.

## 41.    REMOVAL OF DIRECTORS

41.1.    A director may be removed from office, with or without cause:

(a)    by a Resolution of Members at a meeting of the Members called for the purpose of removing the director or for purposes including the removal of the director; or

(b)    by a Resolution of Members consented to in writing by all of the Members entitled to vote thereon.

41.2.    Notice of a meeting called under article 41.1(a) shall state that the purpose of the meeting is, or the purposes of the meeting include, the removal of a director.

## 42.    VACANCY IN THE OFFICE OF DIRECTOR

42.1.    Notwithstanding article 37, the Board may appoint one or more directors to fill a vacancy on the Board.

42.2.    For the purposes of this article, there is a vacancy on the Board if a director dies or otherwise ceases to hold office as a director prior to the expiration of his term of office or there is otherwise a vacancy in the number of directors as fixed pursuant to article 38.

42.3.    The term of any appointment under this article may not exceed the term that remained when the person who has ceased to be a director left or otherwise ceased to hold office.

## 43.    REMUNERATION OF DIRECTORS

With the prior or subsequent approval by a Resolution of Members, the Board may, by a Resolution of Directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

**Brooklyn Metro Partners Ltd**

## 44.    RESIGNATION OF DIRECTORS

A director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

## 45.    DIRECTORS TO MANAGE BUSINESS

45.1.    The business and affairs of the Company shall be managed by, or under the direction or supervision of, the Board.

45.2.    The Board has all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company.

45.3.    The Board may authorise the payment of all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the Members of the Company, subject to any delegation of such powers as may be authorised by these Articles and to such requirements as may be prescribed by a Resolution of Members; but no requirement made by a Resolution of Members shall prevail if it is inconsistent with these Articles nor shall such requirement invalidate any prior act of the Board which would have been valid if such requirement had not been made.

45.4.    Subject to the provisions of the Act, all cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for moneys paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by Resolution of Directors.

## 46.    COMMITTEES OF DIRECTORS

46.1.    The Board may, by a Resolution of Directors, designate one or more committees of directors, each consisting of one or more directors.

46.2.    Each committee of directors has such powers and authorities of the Board, including the power and authority to affix the Seal, as are set forth in these Articles or the Resolution of Directors establishing the committee, except that the Board has no power to delegate the following powers to a committee of directors:

(a)    to amend the Memorandum or these Articles;

(b)    to designate committees of directors;

(c)    to delegate powers to a committee of directors;

(d)    to appoint or remove directors;

(e)    to appoint or remove an agent;

(f)    to approve a plan of merger, consolidation or arrangement;

**14**

**Brooklyn Metro Partners Ltd**

(g)      to make a declaration of solvency or approve a liquidation plan; or

(h)      to make a determination that the Company will, immediately after a proposed Distribution, meet the solvency test set out in the Act.

46.3.    A committee of directors, where authorised by the Board, may appoint a sub-committee.

46.4.    The meetings and proceedings of each committee of directors consisting of two or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the resolution establishing the committee.

## 47.      OFFICERS AND AGENTS

47.1.    The Board may, by a Resolution of Directors, appoint any person, including a person who is a director, to be an officer or agent of the Company.  Such officers may consist of a chairman of the Board, a vice chairman of the Board, a president and one or more vice presidents, secretaries and treasurers and such other officers as may from time to time be deemed desirable.  Any number of offices may be held by the same person.

47.2.    Each officer or agent has such powers and authorities of the Board, including the power and authority to affix the Seal, as are set forth in these Articles or the Resolution of Directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to the following:

(a)      to amend the Memorandum or these Articles;

(b)      to change the registered office or agent;

(c)      to designate committees of directors;

(d)      to delegate powers to a committee of directors;

(e)      to appoint or remove directors;

(f)      to appoint or remove an agent;

(g)      to fix emoluments of directors;

(h)      to approve a plan of merger, consolidation or arrangement;

(i)      to make a declaration of solvency or approve a liquidation plan;

(j)      to make a determination that the Company will, immediately after a proposed distribution, meet the solvency test set out in the Act; or

(k)      to authorise the Company to continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands.

**15**

**Brooklyn Metro Partners Ltd**

---

48.    **REMOVAL OF OFFICERS AND AGENTS**

The officers and agents of the Company shall hold office until their successors are duly elected and qualified, but any officer or agent elected or appointed by the Board may be removed at any time, with or without cause, by Resolution of Directors.  Any vacancy occurring in any office of the Company may be filled by Resolution of Directors.

49.    **DUTIES OF OFFICERS**

In the absence of any specific allocation of duties it shall be the responsibility of the chairman of the Board to preside at meetings of directors and Members, the vice chairman to act in the absence of the chairman, the president to manage the day to day affairs of the Company, the vice presidents to act in order of seniority in the absence of the president but otherwise to perform such duties as may be delegated to them by the president, the Secretary to maintain the register of members, register of directors, minute books, records (other than financial records) of the Company, and Seal and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the treasurer to be responsible for the financial affairs of the Company.

50.    **REMUNERATION OF OFFICERS**

The emoluments of all officers shall be fixed by Resolution of Directors.

51.    **STANDARD OF CARE**

A director, when exercising powers or performing duties as a director, shall exercise the care, diligence, and skill that a reasonable director would exercise in the same circumstances taking into account, but without limitation, (a) the nature of the Company, (b) the nature of the decision, and (c) the position of the director and the nature of the responsibilities undertaken by him.

52.    **CONFLICTS OF INTEREST**

52.1.    A director shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose the interest to the Board, unless the transaction or proposed transaction (a) is between the director and the Company and (b) is to be entered into in the ordinary course of the Company's business and on usual terms and conditions.

52.2.    A transaction entered into by the Company in respect of which a director is interested is voidable by the Company unless the director complies with article 52.1 or (a) the material facts of the interest of the director in the transaction are known by the Members entitled to vote at a meeting of Members and the transaction is approved or ratified by a Resolution of Members or (b) the Company received fair value for the transaction.

52.3.    For the purposes of this article, a disclosure is not made to the Board unless it is made or brought to the attention of every director on the Board.

**16**

52.4.    A director who is interested in a transaction entered into or to be entered into by the Company may vote on a matter relating to the transaction, attend a meeting of directors at which a matter relating to the transaction arises and be included among the directors present at the meeting for the purposes of a quorum and sign a document on behalf of the Company, or do any other thing in his capacity as director that relates to the transaction.

## 53.    INDEMNIFICATION AND EXCULPATION

53.1.    Subject to article 53.2 the Company shall indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a)    is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, an officer or a liquidator of the Company; or

(b)    is or was, at the request of the Company, serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise.

53.2.    Article 53.1 does not apply to a person referred to in that Article unless the person acted honestly and in good faith and in what he believed to be the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

53.3.    The decision of the Board as to whether the person acted honestly and in good faith and in what he believed to be the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved.

53.4.    The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a *nolle prosequi* does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

53.5.    If a person referred to in this article has been successful in defence of any proceedings referred to therein, the person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

53.6.    Expenses, including legal fees, incurred by a director (or former director) in defending any legal, administrative or investigative proceedings may be paid by the Company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the director (or former director, as the case may be) to repay the amount if it shall ultimately be determined that the director (or former director, as the case may be) is not entitled to be indemnified by the Company.

**17**

53.7.   The indemnification and advancement of expenses provided by, or granted under, these Articles are not exclusive of any other rights to which the person seeking indemnification or advancement of expenses may be entitled under any agreement, Resolution of Members, resolution of disinterested directors or otherwise, both as to acting in the person's official capacity and as to acting in another capacity while serving as a director of the Company.

53.8.   The Company may purchase and maintain insurance in relation to any person who is or was a director, an officer or a liquidator of the Company, or who at the request of the Company is or was serving as a director, an officer or a liquidator of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability under article 53.1.

## MEETINGS OF THE BOARD OF DIRECTORS

### 54.   BOARD MEETINGS

The Board or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as it may determine to be necessary or desirable. Any director or the Secretary of the Company may call a Board meeting.

### 55.   NOTICE OF BOARD MEETINGS

A director shall be given reasonable notice of a Board meeting, but a Board meeting held without reasonable notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting waive notice of the meeting, and for this purpose, the presence of a director at the meeting shall be deemed to constitute waiver on his part (except where a director attends a meeting for the express purpose of objecting to the transaction of business on the grounds that the meeting is not properly called).  The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

### 56.   PARTICIPATION IN MEETINGS BY TELEPHONE

A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

### 57.   QUORUM AT BOARD MEETINGS

The quorum necessary for the transaction of business at a meeting of directors shall be two directors.

### 58.   BOARD TO CONTINUE IN THE EVENT OF VACANCY

The continuing directors may act notwithstanding any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary

quorum for a Board meeting, the continuing directors or director may act only for the purpose of appointing directors to fill any vacancy that has arisen or summoning a meeting of Members.

## 59.  CHAIRMAN TO PRESIDE

At every Board meeting the chairman of the Board shall preside as chairman of the meeting.  If there is not a chairman of the Board or if the chairman of the Board is not present at the meeting, the vice chairman of the Board shall preside.  If there is no vice chairman of the Board or if the vice chairman of the Board is not present at the meeting, the directors present shall choose one of their number to be chairman of the meeting.

## 60.  POWERS OF SOLE DIRECTOR

If the Company shall have only one director the provisions herein contained for Board meetings shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the Memorandum or these Articles required to be exercised by the Members of the Company.

## 61.  PROCEEDINGS IF ONE DIRECTOR

If the Company shall have only one director, in lieu of minutes of a meeting the director shall record in writing and sign a note or memorandum (or adopt a resolution in writing) concerning all matters requiring a Resolution of Directors and such note, memorandum or resolution in writing shall be kept in the minute book.  Such a note, memorandum or resolution in writing shall constitute sufficient evidence of such resolution for all purposes.

# CORPORATE RECORDS

## 62.  DOCUMENTS TO BE KEPT

62.1.  The Company shall keep the following documents at the office of its registered agent:

(a)    the Memorandum and these Articles;

(b)    the register of members or a copy of the register of members;

(c)    the register of directors or a copy of the register of directors;

(d)    the register of charges or a copy of the register of charges;

(e)    copies of all notices and other documents filed by the Company in the previous ten years.

62.2.  Where the Company keeps a copy of its register of members or register of directors at the office of its registered agent, it shall within 15 days of any change in the register, notify the registered agent, in writing, of the change, and it shall provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

62.3.   Where the place at which the original register of members or the original register of directors is changed, the Company shall provide the registered agent with the physical address of the new location of the records within 14 days of the change of location.

62.4.   The Company shall keep the following records at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the Board may determine:

   (a)   the minutes of meetings and Resolutions of Members and of classes of Members; and

   (b)   the minutes of meetings and Resolutions of Directors and committees of directors.

62.5.   Where any of the minutes or resolutions described in the previous article are kept at a place other than at the office of the Company's registered agent, the Company shall provide the registered agent with a written record of the physical address of the place or places at which the records are kept.

62.6.   Where the place at which any of the records described in article 62.4 is changed, the Company shall provide the registered agent with the physical address of the new location of the records within 14 days of the change of location.

62.7.   The Company's records shall be kept in written form or either wholly or partly as electronic records.

**63.   FORM AND USE OF SEAL**

The Board shall provide for the safe custody of the Seal.  An imprint thereof shall be kept at the office of the registered agent of the Company. The Seal when affixed to any written instrument shall be witnessed by any one director, the Secretary or Assistant Secretary, or by any person or persons so authorised from time to time by Resolution of Directors.

## ACCOUNTS

**64.   BOOKS OF ACCOUNT**

The Company shall keep records and underlying documentation that:

   (a)   are sufficient to show and explain the Company's transactions; and

   (b)   will, at any time, enable the financial position of the Company to be determined with reasonable accuracy.

**65.   FORM OF RECORDS**

65.1.   The records required to be kept by the Company under the Act, the Mutual Legal Assistance (Tax Matters Act), 2003, the Memorandum or these Articles shall be kept in written form or either wholly or partly as electronic records complying with the requirements of the Electronic Transactions Act (British Virgin Islands).

65.2.   The records and underlying documentation shall be kept for a period of at least five years from the date of completion of the relevant transaction or the company terminates the business relationship to which the records and underlying documentation relate.

## 66.    FINANCIAL STATEMENTS

66.1.   If required by a Resolution of Members, the Board shall cause to be made out and served on the Members or laid before a meeting of Members a profit and loss account and balance sheet of the Company for such period and on such recurring basis as the Members think fit.

66.2.   The Company's profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit or loss of the Company for that financial period, and a true and fair view of the state of affairs of the Company as at the end of that financial period.

## 67.    DISTRIBUTION OF ACCOUNTS

A copy of such profit and loss account and balance sheet shall be served on every Member in the manner and with similar notice to that prescribed herein for calling a meeting of Members or upon such shorter notice as the Members may agree to accept.

## AUDITS

## 68.    AUDIT

The Company may by Resolution of Members call for the accounts to be examined by an auditor.

## 69.    APPOINTMENT OF AUDITOR

69.1.   The first auditor shall be appointed by Resolution of Directors; subsequent auditors shall be appointed by a Resolution of Members.

69.2.   The auditor may be a Member of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office.

## 70.    REMUNERATION OF AUDITOR

The remuneration of the auditor of the Company:

(a)     in the case of an auditor appointed by the Board, may be fixed by Resolution of Directors; and

(b)     subject to the foregoing, shall be fixed by Resolution of Members or in such manner as the Company may by Resolution of Members determine.

**Brooklyn Metro Partners Ltd**

---

71. **DUTIES OF AUDITOR**

The auditor shall examine each profit and loss account and balance sheet required to be served on every Member of the Company or laid before a meeting of the Members of the Company and shall state in a written report whether or not:

(a)     in its opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period; and

(b)     all the information and explanations required by the auditor have been obtained.

72. **ACCESS TO RECORDS**

Every auditor of the Company shall have right of access at all times to the books of account of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditor.

73. **AUDITOR ENTITLED TO NOTICE**

The auditor of the Company shall be entitled to receive notice of, and to attend any meetings of Members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

# VOLUNTARY LIQUIDATION

74. **LIQUIDATION**

The Company may be liquidated in accordance with the Act only if (a) it has no liabilities; or (b) it is able to pay its debts as they fall due and the value of its assets equals or exceeds its liabilities.  The Board shall be permitted to pass a Resolution of Directors for the appointment of an eligible individual as a voluntary liquidator (or two or more eligible individuals as joint voluntary liquidators) of the Company if the Members have, by a Resolution of Members, approved the liquidation plan in accordance with the Act.

# FUNDAMENTAL CHANGES

75. **CHANGES**

Notwithstanding section 175 of the Act, the Board may sell, transfer, lease, exchange or otherwise dispose of the assets of the Company without the sale, transfer, lease, exchange or other disposition being authorised by a Resolution of Members.

## 76.    CONTINUATION UNDER FOREIGN LAW

The Company may by Resolution of Members or by Resolution of Directors continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

We, CONYERS TRUST COMPANY (BVI) LIMITED, registered agent of the Company, of Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands VG1110 for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands hereby sign these Articles of Association on the 9th day of June, 2022:

Incorporator

CONYERS TRUST COMPANY (BVI) LIMITED

_____
Per:  Andrew Swapp
For and on behalf of
Conyers Trust Company (BVI) Limited

**Brooklyn Metro Partners Ltd.**
**(the "Company")**

**FORM OF**
**WRITTEN RESOLUTIONS OF THE DIRECTORS**

The undersigned, being all the directors of the Company (the "**Board**"), a business company whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands, pursuant to the authority to act without a meeting conferred by the Company's articles of association, **DO HEREBY CONSENT** to the following actions and adopt the resolutions set out below.

## AMENDMENTS TO ARTICLES OF ASSOCIATION

**RESOLVED** that article 2 of the Company's articles of association be numbered as article 2.1 and that the following be inserted immediately following article 2.1 as article 2.2:

"2.2    Notwithstanding anything in the Memorandum or these Articles to the contrary, the Company shall not issue non-voting equity securities of any class, series, or other designation to the extent prohibited by Section 1123(a)(6) of the United Stated Bankruptcy Code, being title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended (the "**Bankruptcy Code**"); provided, however, that the foregoing restriction (i) shall have no further force and effect beyond that required under such Section 1123(a)(6) of the Bankruptcy Code nor after such Section 1123(a)(6) of the Bankruptcy Code no longer applies to the Company, and (ii) may be amended or eliminated in accordance with Applicable Law as from time to time may be in effect."

## GENERAL AUTHORISATION AND RATIFICATION

**RESOLVED** that any one of the directors of the Company be and is hereby authorised for and on behalf of the Company to execute and deliver all such other documents, instruments and agreements, whether under the seal of the Company or otherwise and to do all such acts or things as may be necessary or desirable to give effect to the foregoing.

**RESOLVED** that any and all actions of the Company, or any director of the Company, taken in connection with any actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as if such action(s) had been presented for approval, and approved by, the directors of the Company prior to such action being taken.

Legal – 21551510.1

**IN WITNESS WHEREOF** each of the undersigned has executed these resolutions, which may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument, as of the date indicated alongside his name below and acknowledges that the effective date of the resolutions is as of the last date indicated below.


_____            Date: _____
Avi Philipson
Director


_____            Date: _____
Abraham Grunhut
Director


_____            Date: _____
Andrew Chaimowitz
Director


Legal – 21551510.1

**Exhibit D**

**Wind-Down Budget for Wind-Down Co**

**All Year Holdings Limited**
**Wind-Down Budget**

| | Year 1 | Year 2 | Year 3 | Total |
|---|---|---|---|---|
| **Cash Proceeds** | | | | |
| Net Transaction Proceeds | $ 3,000,000.00 | $ - | $ - | $ 3,000,000.00 |
| DCP Settlement Proceeds | $ - | $ - | | $ - |
| Potential Litigation Proceeds | | | | |
| Israel | $ - | $ - | $ - | $ - |
| US | $ - | $ - | $ - | $ - |
| Proceeds from RE Loans Outstanding | $ - | $ - | $ - | $ - |
| Proceeds from William Vale | $ - | $ - | | $ - |
| **Total Cash Proceeds** | **$ 3,000,000.00** | **$ -** | **$ -** | **$ 3,000,000.00** |
| | | | | |
| **Expenses:** | | | | |
| Plan Administrator/Support Staff | $ (240,000.00) | $ (180,000.00) | $ (150,000.00) | $ (570,000.00) |
| Legal Counsel to Plan Administrator | $ - | | | |
| Israel | $ (1,200,000.00) | $ (250,000.00) | $ (250,000.00) | $ (1,700,000.00) |
| US | $ (180,000.00) | $ (130,000.00) | $ (130,000.00) | $ (440,000.00) |
| Accountant/Tax | $ (18,000.00) | $ (18,000.00) | $ (18,000.00) | $ (54,000.00) |
| Claims Agent | $ - | $ - | $ - | $ - |
| US Trustee Fees | $ (5,118.00) | $ (3,756.00) | $ (2,688.00) | $ (11,562.00) |
| Appraisal/Valuation | $ (50,000.00) | $ - | $ - | $ (50,000.00) |
| Other Administrative Expenses | $ (48,000.00) | $ (40,000.00) | $ (40,000.00) | $ (128,000.00) |
| **Total Expenses** | **$ (1,741,118.00)** | **$ (621,756.00)** | **$ (590,688.00)** | **$ (2,953,562.00)** |
| | | | | |
| **Net Cash Flow** | **$ 1,258,882.00** | **$ (621,756.00)** | **$ (590,688.00)** | **$ 46,438.00** |
| | | | | |
| Cash, beginning | $ 3,000,000.00 | $ 1,258,882.00 | $ 637,126.00 | $ 3,000,000.00 |
| **Cash, ending** | **$ 1,258,882.00** | **$ 637,126.00** | **$ 46,438.00** | **$ 46,438.00** |

## Exhibit E

## Schedule of Retained Claims, Rights and Causes of Actions

All claims, rights, legal and equitable defenses, counterclaims, and Causes of Action of the Debtor shall vest in either the Reorganized Debtor or Wind-Down Co, as applicable, in accordance with (i) the applicable provisions of the *Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated December 9, 2022 [ECF No. 289] (as may be amended, modified, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), including, without limitation, Sections 1.42, 10.1, 10.5, 10.6, 10.7, and 10.8 of the Plan, and (ii) the applicable provisions of that certain Investment Agreement dated March 11, 2022, by and among the Debtor, the Sponsor, and, solely with respect to certain specified sections therein, the Notes Trustee (as amended by that certain first amendment dated April 21, 2022, that certain second amendment dated May 27, 2022, and that certain third amendment dated December 9, 2022 and as may be further amended, modified, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Investment Agreement**"), including, without limitation, Sections 2.01, 7.02, and Schedule B of the Investment Agreement.

## Exhibit F

### Schedule of Assumed Contracts

Pursuant to Section 8.1(a) of the Plan, all executory contracts and unexpired leases to which the Debtor is party shall be deemed rejected by the Debtor on the Effective Date unless such executory contract or unexpired lease (i) is specifically designated (x) by the Reorganized Debtor, or (y) by Wind-Down Co as a contract to be assumed or assumed and assigned on the Schedule of Assumed Contracts, (ii) previously expired or terminated (or shall expire or terminate prior to the Effective Date) pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; (iv) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the Confirmation Date; or (v) is identified in Section 8.4 of the Plan.

Except as otherwise set forth in the Plan, to the best of the Debtor's knowledge and belief, there are no executory contracts or unexpired leases to be assumed by the Reorganized Debtor or Wind-Down Co on the Effective Date under the Plan.

The Debtor is identified as a member, managing member, or third-party beneficiary in various membership agreements, operating agreements, and similar organizational documents for certain of its non-debtor subsidiaries.  The organizational documents for the non-debtor subsidiaries are not treated as executory contracts subject to assumption or rejection under the Plan and will continue in full force and effect and vest in the Reorganized Debtor on the Effective Date (except with respect to the organizational documents for (i) YG WV LLC and (ii) All Year Holdings Common LLC and each of its direct and indirect subsidiaries, which shall vest in Wind-Down Co on the Effective Date).

**<u>Exhibit G</u>**

**Amended and Restated Limited Liability Company Agreement of YG WV LLC**

# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## YG WV LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of YG WV LLC (the "Company") is entered into as of January 3, 2023, by All Year Holdings Limited, a British Virgin Islands Company, as the sole member of the Company (the "Member").

W I T N E S S E T H:

WHEREAS, the Company was formed as a limited liability company pursuant to and in accordance with the New York Limited Liability Company Law, as amended from time to time (the "Act") by filing the Company's Articles of Organization with the Secretary of State of the State of New York on January 31, 2017;

WHEREAS, the Member entered into that certain Limited Liability Company Agreement of YG WV LLC dated as of February 28, 2017 (the "Prior Agreement");

WHEREAS, under the Prior Agreement, the authority of Yoel Goldman, as organizer, to execute, deliver and file the Articles of Organization of the Company with the Secretary of State of New York was confirmed and such filing was ratified and approved;

WHEREAS, the Member commenced bankruptcy proceedings under chapter 11 of the Bankruptcy Code on December 14, 2021;

WHEREAS, pursuant to the Member's plan of reorganization (the "Plan")[1], the membership interest in the Company will vest in Wind-Down Co. upon the Effective Date;

WHEREAS, the Member desires to amend and restate the Prior Agreement.

NOW THEREFORE, in consideration of the investments and of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Member agrees as follows:

---

[1] *Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited*, Case No. 21-12051 (MG) (Bankr. S.D.N.Y. Dec. 9, 2022) [Dkt. No. 289].

# ARTICLE 1

## FORMATION AND TERM

1.1     <u>Name</u>.  The name of the limited liability company is **YG WV LLC**.

1.2     <u>Reserved</u>.

1.3     <u>Principal Business Office</u>.  The principal business office of the Company shall be located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211 or at such other location as may hereafter be determined by the Member.

1.4     <u>Registered Office and Agent</u>.  The address of the registered office of the Company in the State of New York is 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

1.5     <u>Term</u>.  The term of the Company commenced on the date of its formation and shall have a perpetual existence, unless the Company is dissolved before such date in accordance with the provisions of Article IX of this Agreement.

# ARTICLE 2

## PURPOSE AND POWERS OF THE COMPANY

2.1     <u>Purpose</u>.  The Company is formed for the primary purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful activity for which limited liability companies may be formed under the Act, including without limitation, the ownership of 50% of the membership interests in WYTHE BERRY MEMBER LLC, a Delaware limited liability company ("<u>Propco Member</u>") which entity owns l00% of the membership interests in WYTHE BERRY FEE OWNER LLC, a Delaware limited liability company ("<u>Propco</u>"), the fee owner of that certain property known as 94 North 13th Street, Brooklyn, New York and 121 North 12th Street, Brooklyn, New York (collectively, the "<u>Property</u>"), and to otherwise engage in any lawful activities necessary and incidental to and/or contemplated by the foregoing.

2.2     <u>Powers</u>.  In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company shall have the power and is hereby authorized to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes set forth in <u>Section 2.1</u>.

# ARTICLE 3

## MEMBERSHIP

3.1     <u>Member</u>.  The Member shall have the sole power and authority to (i) act for or on behalf of, or to bind, the Company, (ii) control the day-to-day management or the operation or control of the business and affairs of the Company, (iii) be an agent of the Company, (iv) transact any business in the name of the Company, and (v) act as manager of the Company.

3.2     Authorized Signatory.  The Member hereby appoints Assaf Ravid as the Authorized Signatory of the Company with the power to bind the Company, open bank accounts on behalf of the Company and manage the operations of the Company and Propco Member, all under the direction of and subject to the authority of the Member.

3.3     Capital Contributions.  The Member has not made contributions of capital to the Company as of the date hereof. The Member shall not be obligated to make any capital contributions to the Company but may, in its sole discretion, make additional capital contributions to the Company from time to time.

3.4     Assignability of Membership Interests.  The Member shall be permitted to assign its entire membership interest in the Company to any party, as determined in the Member's sole discretion.  For the avoidance of doubt, Wind-Down Co. shall be deemed to be and shall become an assignee and sole member of the Company, with all attendant rights and responsibilities of a member, upon the Effective Date of the Plan.

3.5     Effect of Assignment of Membership Interests.

(i)     The death, retirement, resignation, expulsion, bankruptcy or dissolution of any member shall not constitute an event that terminates the continued membership of any member or cause the limited liability company to be dissolved or its affairs to be wound up.

(ii)     An assignee of a membership interest may become a member with the sole consent of the member who assigned or proposes to assign such membership interest.

(iii)     An assignee of a membership interest becomes a member on the effective date of the assignment of such membership interest.

# ARTICLE 4

## ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

4.1     Allocation of Profits and Losses.  The Company's profits and losses shall be allocated in a manner determined by the Member.

4.2     Distributions.  Distributions of cash or property shall be made at such times and in such amounts as determined by the Member.

# ARTICLE 5

## ADMINISTRATIVE MATTERS

5.1     Sole Member.  The Member is the sole member of the Company. Accordingly, the Company shall be disregarded for U.S. federal income tax purposes and the assets and liabilities and items of income and gain and loss and deduction shall be treated as the assets and liabilities

and items of income and gain and loss and deduction of the Member.  Unless otherwise determined by the Member, the fiscal year of the Company shall be the calendar year.

# ARTICLE 6

## LIABILITY, EXCULPATION AND INDEMNIFICATION

6.1    <u>Liability</u>.  (a) Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the organizer and the Member of the Company (each a "<u>Covered Person</u>" and collectively "<u>Covered Persons</u>") shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being an authorized person or a Member of the Company.

(b)    Except as otherwise expressly required by law, a Member, in its capacity as a Member of the Company, shall have no liability in excess of (i) the amount of its capital contributions to the Company, (ii) its share of any assets and undistributed profits of the Company, (iii) its obligation to make other payments expressly provided for in this Agreement and (iv) the amount of any distributions wrongfully distributed to it.

6.2    <u>Exculpation</u>.  (a) No Covered Person shall be liable to the Company, any Member or any other person or entity who has an interest in the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith in connection with the formation of the Company or acting on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(b)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person or entity as to matters the Covered Person reasonably believes are within such other person or entity's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to a Member might properly be paid.

6.3    <u>Indemnification</u>.  To the full extent permitted by applicable law, each Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this <u>Section 6.3</u> shall be

provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof.

6.4     Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 6.3 hereof.

## ARTICLE 7

## DISSOLUTION, LIQUIDATION AND TERMINATION

7.1     Events Causing Dissolution.  The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following:

>           (i)     the determination of the Member to dissolve the Company; or

>           (ii)    the entry of a decree of judicial dissolution under the Act.

7.2     Liquidation.  Upon dissolution of the Company, the Member shall carry out the winding up of the Company and shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Member to minimize the normal losses attendant upon a liquidation.  The proceeds of liquidation shall be distributed in the following order and priority:

>           (i)     first, to the creditors of the Company, including any Member if it shall be a creditor to the extent permitted by applicable law, in satisfaction of the liabilities of the Company, whether by payment or by establishment of adequate reserves, except for liabilities for distributions to the Member and any former members;

>           (ii)    second, to the Member and any former members in satisfaction of liabilities of the Company for distributions; and

>           (iii)   the balance, if any, to the Member, after giving effect to all contributions, distributions and allocations for all periods.

7.3     Termination.  The Company shall terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Article IX and the certificate of formation shall have been canceled in the manner required by the Act.

7.4     Claims of the Members.  The Member and former members shall look solely to the Company's assets for the return of their capital contributions, and if the assets of the Company

remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such capital contributions, the Member and former members shall have no recourse against the Company or any other Member.

7.5    <u>Actions of Subsidiaries</u>.  The Company shall not cause or consent to the dissolution, winding up or liquidation of the Company, Propco, Propco Member or any of their respective affiliates without the prior written consent of the Member.  The Company has not, and shall not, without the prior written consent of the Member, with respect to itself, Propco, Propco Member or to any other entity in which it has a direct or indirect legal or beneficial ownership interest (A) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or for all or any portion of such entity's properties, (C) make any assignment for the benefit of such entity's creditors or (D) take any action that might cause such entity to become insolvent; has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations.

## ARTICLE 8

## MISCELLANEOUS

8.1    <u>Separability of Provisions</u>.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

8.2    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

8.3    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior understandings or agreements between the parties.

8.4    <u>Governing Law</u>.  This Agreement shall be governed by, and construed under, the laws of the State of New York (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

8.5    <u>Amendments</u>.  This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the undersigned, being the sole Member of the Company, intending to be legally bound hereby, have duly executed this Agreement as of the date first set forth above.

**Member:**

All Year Holdings Limited

_____

Name:   Assaf Ravid
Title:    Chief Restructuring Officer and
          Authorized Manager

IN WITNESS WHEREOF, the undersigned, being the sole Member of the Company, intending to be legally bound hereby, have duly executed this Agreement as of the date first set forth above.

**Member:**

All Year Holdings Limited

_____
Name:  Ephraim Diamond
Title:    Associate Restructuring Officer and
            Authorized Manager

## Exhibit H

**Summary of Wind-Down Co Indemnity of Authorized Managers**

Pursuant to the *Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited*, dated December 9, 2022 [ECF No. 289] (as may be amended, modified, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[3] on the Effective Date, the Plan Administrator on behalf of Wind Down Co will enter into the Wind Down Co Indemnity Agreements with each of the Authorized Managers, providing, among other things, that Wind Down Co shall indemnify the Authorized Managers and the directors set forth therein (together "**Authorized Managers**") beginning on the Effective Date for any claims asserted against the Authorized Managers from December 30, 2020 and prior to June 30, 2025. Such indemnity shall be in the following amounts: (a) starting from the Effective Date until June 30, 2024, the aggregate amount of the indemnity shall be $4,000,000 (four million dollars) and (b) as long as no claims are asserted against the Authorized Managers prior to July 1, 2024, then starting on July 1, 2024, the amount shall be reduced to $2,000,000 (two million dollars).

No less than 50% of the above indemnity amount shall be retained by the Plan Administrator in cash to be held in a segregated account and the remaining amount shall be guaranteed to the Authorized Managers from the value of any future recovery to be received by the Plan Administrator or Claims Administrator as the case may be. The allocation of the indemnity obligations among the Class 4 Claimholders shall be determined by the Plan Administrator in consultation with the Notes Trustee and, if required, an independent expert. For the avoidance of doubt, the parties agree that if a claim is asserted against the Authorized Managers, whether prior to July 1, 2024 or July 1, 2025 as the case may be, the indemnity amounts to be held and/or

---

[3] Capitalized terms used but not herein defined have the meanings ascribed to them in the Plan.

guaranteed by Wind Down Co shall remain in full effect until such time as there is a final, non-appealable resolution of the claims so asserted.