## Exhibit D

## All Year Letter

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Matthew P. Goren**
+1 (212) 310-8440
matthew.goren@weil.com

March 28 2023

Via Email

Mr. Ira S. Lipsius
Lipsius-Benhaim Law, LLP
80-02 Kew Gardens
Suite 1030
Kew Gardens, NY 11415
212-981-8442
ilipsius@lipsiuslaw.com

Re: *In re:* All Year Holdings Limited, Ch. 11 Case No. 21-12051 (MG) (Bankr. S.D.N.Y.)

Dear Ira:

    We represent All Year Holdings Limited, as debtor and debtor in possession (the "**Debtor**"), in the above-referenced chapter 11 case (the "**Chapter 11 Case**"). We write in response to your letter dated March 27, 2023 (the "**Letter**") sent on behalf of your client Paragraph Partners LLC (the "**Sponsor**"). In your Letter you assert (i) the Debtor has breached Section 6.01 of the Investment Agreement[1] and has misapplied some portion of the DIP Loan Proceeds, and (ii) as a result, the Sponsor is entitled to and demands a $3.5 million reduction to the already reduced $43.5 million purchase price the Sponsor is required to deliver in accordance with the Investment Agreement and the Debtor's confirmed Plan.

    As explained below, the Sponsor is wrong. The Debtor has not breached any obligation under the DIP Documents or the Investment Agreement. The Debtor has been and remains ready to close on the transaction contemplated under the Plan and the Investment Agreement by the March 31, 2023 Outside Date.

    In your Letter, you assert that, in addition to the requirement under Section 6.01 of the Investment Agreement that the Debtor operates the Transferred Entities in the ordinary course of business, the Debtor

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in (i) that certain Investment Agreement, dated March 11, 2022 (as amended on April 21, 2022, May 27, 2022, and December 9, 2022, and as may be further amended, modified, or supplemented from time to time, and together with all schedules and exhibits thereto, "**Investment Agreement**"), or (ii) the Debtor's chapter 11 plan of reorganization [ECF No. 289] (the "**Plan**"), as confirmed by the United States Bankruptcy Court for the Southern District of New York (the "**Court**") in its *Findings of Fact, Conclusions of Law, and Order Confirming Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited* dated January 31, 2023 [ECF No. 352].

March 28 2023  **Weil, Gotshal & Manges LLP**
Page 2

is required to use its funds, including DIP Loan Proceeds, to pay down known and existing liabilities of the Transferred Entities. Further, you assert the use of DIP Loan proceeds for any purpose other than to pay down these liabilities is in contravention of All Year's obligations under Section 6.01 of the Investment Agreement. This is incorrect. Regardless, any claim by the Sponsor that DIP Loan Proceeds have not been used in accordance with the Investment Agreement was settled and resolved in connection with the Revised Settlement.

Notably, at the outset, the purchase price adjustment demanded in your Letter is not required of the Debtor under the Investment Agreement and it is not permitted under the Investment Agreement and the Plan. As we discussed, there is no purchase price adjustment mechanism under the Investment Agreement. That concept was removed in connection with the Revised Settlement because the parties agreed there would be no further reductions or adjustments to the purchase price except as expressly contemplated under the Revised Settlement. *See* Letter from Matthew Goren, dated Dec. 1, 2022, at ¶3 [ECF No. 278] ("The Settlement Parties commit to moving forward and closing under the Plan and the Investment Agreement, which Investment Agreement is binding and enforceable on the Settlement Parties in accordance with its revised terms, and **with no further adjustments or changes to the terms (other than as set forth in settlement paragraph numbers four (4) through eight (8) below) or the provisions relating to assumed claims and liabilities, including all subsidiary liabilities, under the Plan and the Investment Agreement**.") (emphasis added).[2] Accordingly, any claim or demand by the Sponsor for a further purchase price reduction was settled and resolved as part of the Revised Settlement that was approved by order of the Bankruptcy Court dated December 19, 2022 [ECF No. 301] (the "**9019 Order**").

Moreover, the Investment Agreement expressly provides the Sponsor's purchase of the Debtor's interests in the Transferred Entities and the assets and liabilities of the Transferred Entities is on a "as is", "where is" basis and the Debtor has no liability to the Sponsor on account of any such liabilities. Inv. Agreement, § 5.10. Specifically, Section 5.10 of the Investment Agreement expressly provides:

> Except as otherwise expressly set forth in this Agreement, **Plan Investor understands and agrees that the Transferred Entities, the Reorganized Equity Interests, the Assets and Liabilities of the Transferred Entities, and the Business, are being transferred, directly or indirectly, on a "where-is" and, as to condition, "as-is" basis** subject to the representations and warranties contained in ARTICLE IV (as modified by

---

[2] In your Letter, you also state that, to the extent the Debtor does not acquiesce to your purchase price reduction, the Sponsor objects to the transfer of any funds into the Professional Fee Escrow as to do so "would be a further breach of the Investment Agreement and the terms of the DIP Loan." This too is without merit. The Sponsor has no consent or approval rights under the Investment Agreement, the Plan, or the DIP Documents with respect to the funding of the Professional Fee Escrow.

March 28 2023  
Page 3

Weil, Gotshal & Manges LLP

> the Disclosure Schedules, as may be updated according to the terms hereof) without any other representations or warranties of any nature whatsoever.

*See* Inv. Agmt. §5.10 (emphasis added).  Section 6.01 of the Investment Agreement merely requires the Debtor to use commercially reasonable efforts to operate its business prior to the Closing, including the Transferred Entities, in a manner consistent with recent past practices.  Accordingly, neither the Investment Agreement nor the Plan requires the Debtor to repay or settle the underlying liabilities of the Transferred Entities prior to the Closing Date.

Furthermore, Section 6.01 of the Investment Agreement does not govern the Debtor's use of DIP Loan Proceeds during the Chapter 11 Case.  Rather, the DIP Documents, and specifically the DIP Term Sheet and the DIP Order, govern the use of DIP Loan Proceeds and they generally authorize the Debtor to use the DIP Loan Proceeds in accordance with the Budget, subject to the permitted variances.  Specifically, the section of the DIP Term Sheet titled "Use of Proceeds" provides:

> The DIP Loan Proceeds shall be used by the Borrower (i) to fund general corporate working capital needs in accordance with the DIP Budget (as defined below), including, without limitation, to be used to fund the operations and otherwise make payments on account of the Borrower's non-debtor direct and indirect subsidiaries, (ii) for the payment of interest and DIP Loan Costs (as defined below) under the DIP Loan, and (iii) to pay the allowed and approved fees and expenses of the Borrower's professionals (and the professionals of any official committee appointed in the Bankruptcy Case).  For the avoidance of doubt, the DIP Loan Proceeds shall not be used in a manner inconsistent with the Investment Agreement or the DIP Budget.

*See* DIP Term Sheet, at 2.  Similarly, Paragraph 6 of the DIP Order provides "[t]he use of the DIP Loan Proceeds shall be in accordance with the terms and conditions set forth in the DIP Documents, including, without limitation, the DIP Budget (subject to any permitted variances)."

Nothing under the DIP Budget or the other DIP Documents require the Debtor to pay any amount of obligations of its non-debtor subsidiaries.  Rather, the DIP Documents authorize but do not require the Debtor to use DIP Loan Proceeds to pay various liabilities, including certain subsidiary liabilities, subject to the permitted variance under the DIP Budget.[3]  In connection with the DIP Term Sheet and the DIP Order, the Sponsor approved the initial DIP Budget and has been provided an updated DIP Budget by the Debtor every two weeks throughout the Chapter 11 Case in accordance with the DIP Documents.  The

---

[3] Indeed, an asserted breach of the Investment Agreement is not even an Event of Default under the DIP Documents; rather, only a termination of the Investment Agreement by the Sponsor would give rise to such a default.  DIP Order, ¶ 4.

March 28 2023                                                                                                    **Weil, Gotshal & Manges LLP**
Page 4

Debtor has complied with the DIP Budget and other DIP Documents at all times. The Sponsor, in its capacity as DIP Lender, approved in writing each of the Debtor's draws under the DIP Loan during the Chapter 11 Case.

Indeed, the Sponsor has not raised any issues with respect to the Debtor's use of DIP Loan Proceeds at any point during the Chapter 11 Case, including when the Sponsor agreed to extend the maturity of the DIP Loan in connection with the Revised Settlement. The Sponsor knows, at the time the parties entered into the Revised Settlement the DIP Loan Proceeds had long been exhausted and, thus, the Sponsor was fully aware of how the DIP Loan Proceeds had been allocated and the various liabilities of the Debtor and its non-debtor subsidiaries those proceeds had been used to satisfy. Accordingly, any claim by the Sponsor that DIP Loan Proceeds were not used in accordance with the Investment Agreement has also been settled and resolved as part of the Revised Settlement, which agreement is binding and enforceable against the Sponsor and the other settlement parties pursuant to the 9019 Order. *See* 9019 Order, ¶ 2.

Similarly, the Sponsor has no consent rights over how the Debtor uses the cash generated from its operations during the Chapter 11 Case. This issue was previously resolved in a prior exchange with the Court in relation to the Debtor's use of the Grand Living Settlement Proceeds. *See* Transcript of Status Conference before the Hon. Martin Glenn, U.S. Bankruptcy Judge, Nov. 7, 2022 (THE COURT: But I asked a different question, is there anything in the documents that you can point to that restricts or prohibits the debtor from using the funds now? MS. WICKOUSKI: Not explicitly.).

Even if Section 6.01 of the Investment Agreement was relevant to the use of DIP Loan Proceeds (which it is not), the Debtor has complied with its obligations thereunder. In accordance with its duties as a debtor in possession and obligations under the Investment Agreement, the Debtor has operated its business in the ordinary course and consistent with past practices to minimize liabilities and maximize value. Indeed, during the course of the Chapter 11 Case, the aggregate outstanding operational liabilities for the Transferred Entities (e.g., water, security deposits, taxes, etc.) have been reduced from approximately $4.5 million at the time of the signing of the Investment Agreement to approximately $3.2 million as of February 28, 2023.

The Sponsor received monthly operating reports and the Debtor has consistently provided updates on its finances and operations. At no point during the Chapter 11 Case has the Sponsor raised any issue. To the contrary, until receipt of your Letter, the Sponsor had just recently confirmed in writing that it had signed off and approved of the flow of funds in advance of Closing. *See* E-mail from S. Jacob from Locke Lord LLP dated March 24, 2023.

March 28 2023                                                                              **Weil, Gotshal & Manges LLP**
Page 5

      The Debtor remains committed to moving forward and closing on the transactions contemplated under the Plan and the Investment Agreement on or before the March 31 Outside Date. The Debtor has satisfied all of its obligations under the Investment Agreement, including securing all necessary governmental approvals, as we informed the Court in our letter dated March 13, 2023. We are hopeful and expect the Sponsor will move forward and close on its obligations under the Investment Agreement and the Plan, but to the extent it does not, the Debtor will promptly seek redress from the Bankruptcy Court.

The Debtor reserves all of its rights at law and in equity.

Yours truly,

*[signature]*

Matthew P. Goren

cc:     Gary T. Holtzer, Esq.
         Shalom Jacobs, Esq.
         Michael Friedman, Esq.
         Mr. Assaf Ravid
         Mr. Ephraim Diamond