CHAPMAN AND CUTLER LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone: (212) 655-6000
Michael Friedman
David T. B. Audley
Eric S. Silvestri

*Counsel to Assaf Ravid, as Plan Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
: 
**In re** : Chapter 11
: 
**ALL YEAR HOLDINGS LIMITED,** : Case No. 21-12051 (MG)
: 
**Debtor.** : 
: 
: 
------------------------------------------------------------X

**PLAN ADMINISTRATOR'S RESPONSE TO BROOKLYN
METRO'S MOTION FOR ENTRY OF AN ORDER (I) DETERMINING
ESCROWED FUNDS ARE DUE TO PARAGRAPH PARTNERS LLC AND
BROOKLYN METRO HOLDINGS LLC AND (II) GRANTING RELATED RELIEF**

Assaf Ravid, as Plan Administrator (the "**Plan Administrator**") under the *Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited* [ECF No. 289] (the "**Plan**")[1] respectfully submits this Response to the *Motion for Entry of an Order (I) Determining Escrowed Funds are Due to Paragraph Partners LLC and Brooklyn Metro Holdings LLC and (II) Granting Related Relief* [ECF No. 394] (the "**Motion**") filed by Paragraph Partners LLC ("**Paragraph**") and Brooklyn Metro Holdings LLC ("**Brooklyn Metro**").

---

[1]    Capitalized terms used but not defined herein have the meanings given to them in the Plan or Confirmation Order, as applicable.

**BACKGROUND**

1. On December 14, 2021, All Year Holdings Limited (the "**Debtor**") filed its chapter 11 petition initiating this bankruptcy proceeding (the "**Chapter 11 Case**").

2. After the bankruptcy filing, Paragraph Partners LLC ("**Paragraph**") emerged as a potential plan sponsor for the Debtor's reorganization. Paragraph then began conducting due diligence on the Debtor, its financial condition, and business operations. *See* Affidavit of Assaf Ravid ("**Ravid Aff.**") ¶ 1.

3. On January 14, 2022, the Debtor sent diligence materials to representatives of Paragraph, which consisted of spreadsheets showing (as of January 31, 2022) the Debtor's aged receivables, open water, open taxes, mechanic's liens and a status of security deposits for the Debtor's subsidiaries. *See* Ravid Aff. ¶ 2; Ex. A (attaching January 14, 2022 email and spreadsheet with subsidiary liabilities). This data was also included in a data room to which Paragraph had access no later than January 13, 2022. *See* Ravid Aff. ¶ 2.

4. Following diligence, on March 11, 2022, the Debtor and Paragraph entered into an Investment Agreement (as amended, the "**Investment Agreement**"). The Investment Agreement contemplated a sale by the Debtor to Paragraph of 100% of to-be-issued new equity in a "reorganized debtor," referred to as the "Reorganized Equity Interests," subject to carve-outs for certain "Excluded Assets" that would not flow to Paragraph or its designee, Brooklyn Metro, notwithstanding the sale of the Reorganized Equity Interests. In purchasing the Reorganized Equity Interests, Paragraph was also taking over the Debtor's equity interests in its subsidiaries (the "**Transferred Entities**" and each, a "**Transferred Entity**"), and each Transferred Entity's assets and liabilities, subject only to the explicit representations and warranties in the Investment Agreement.

5.      Nowhere did the Investment Agreement require the Debtor to pay off or reduce the liabilities of the Transferred Entities.  To the contrary, Paragraph expressly acknowledged and agreed that the "Assets and Liabilities of the Transferred Entities, and the Business, [were] being transferred, directly or indirectly, on a "where-is" and, as to condition, "as-is" basis".  Investment Agreement § 5.10(b).  In addition, the Investment Agreement did not provide for any downward adjustments to the Purchase Price other than contingent reductions in case later diligence revealed that the Debtor owned less than the reported percentage of a Transferred Entity or real property.  *See* Investment Agreement § 2.02 (version executed on March 11, 2022).  *See* Ravid Aff. ¶3.

6.      After entering into the Investment Agreement, Paragraph reneged on its obligations in the Investment Agreement and refused to commit to closing the transaction.  The Debtor to agree to mediation with Paragraph, following which, the Debtor and Paragraph agreed to resolve all issues between them and agreed to reduce the cash portion of the purchase price by $2 million and the principal amount of the New Notes by $2 million.  *See* Ravid Aff. ¶ 4;  Ex. B (attaching E-mail from M. Goren from Weil Gotshal & Manges LLP dated September 23, 2023).  However, despite agreeing to the settlement, Paragraph refused to sign the definitive documentation implementing the agreed settlement and once again insisted on a further reduction in the purchase price beyond what was already agreed.  Following a second set of negotiations, the Debtor and Paragraph agreed once again to reduce the purchase price for the Reorganized Equity Interests to $43.5 million on December 9, 2022.  That settlement was approved by order of the court pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") on December 19, 2022 [ECF No. 301] (the "**9019 Order**").

7. Pursuant to and in connection with the 9019 Order, the parties entered into that certain Amendment No. 3 to Investment Agreement (the "**Third Amendment**")[2] under which the parties agreed to remove the purchase price adjustment provisions and make clear that there would be no further Purchase Price Adjustment.[3]

8. On January 31, 2023, the Court entered an order confirming the Plan [ECF No. 289] (the "**Confirmation Order**"). As contemplated by the Plan, the outside date for the closing of the Investment Agreement transaction was March 31, 2023. The closing of the Investment Agreement commenced on March 31, 2023 and the Effective Date of the Plan occurred on April 4, 2023. *See Notice of (I) Entry of Order Confirming Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited and (II) Occurrence of Plan Effective Date* [ECF No. 382].

9. Between the signing of the Investment Agreement and the closing on March 31, 2023, the Debtor operated its business in the normal course, including after entry of the Confirmation Order and 9019 Order fixing the purchase price at $43.5 million. *See* Ravid Aff. ¶ 5.

10. Those business operations included administering the Debtor's subsidiaries, some of which had liabilities, such as water bills, taxes, or mechanic's liens, others of which did not. *See* Ravid Aff. ¶ 5. In keeping with past practices and requests from limited partners, certain

---

[2] The Third Amendment is contained at Schedule 1, Exhibit B to ECF 287 at pages 38–51 of that filing.

[3] *See* Third Amendment p. 5 (removing § 2.02); *see also* Letter from Matthew Goren, dated Dec. 1, 2022, at ¶3 [ECF No. 278] ("the Parties commit to moving forward and closing under the Plan and the [Investment] Agreement, as amended herein, which [Investment] Agreement as amended herein is binding and enforceable on the Parties in accordance with its revised terms, and with no further adjustments or changes to the terms (other than as set forth in clauses (iv) through (viii) below) or the provisions relating to assumed claims and liabilities, **including all subsidiary liabilities**, under the Plan and the [Investment] Agreement.") (emphasis added).

subsidiaries issued distributions to the Debtor and the Debtor's limited partners of such subsidiaries. *See* Ravid Aff. ¶ 6.

11. Between May 23, 2022 and the closing of the Investment Agreement, transfers to the Debtor from such subsidiaries totaled $512,000 and dividends to limited partners totaled $405,000. *See* Ravid Aff. ¶ 7.

12. Consistent with the Debtor's past practice from and after the appointment of its restructuring officers, and prior to any distribution from a subsidiary to the Debtor or its limited partners, the Debtor ensured that each subsidiary had sufficient capital to cover at least one month's worth of its operating expenses and was able to pay its projected mortgage and tax payments as they became due. Ravid Aff. ¶ 8. The calculation of those expenses was based on information provided from Smart Management, the management company operating the Debtor's subsidiaries ("**Smart Management**"). Ravid Aff. ¶ 8.

13. In November 2022, the Debtor provided updated financials to Paragraph, which, as with the materials provided in January 2022, included updated spreadsheets showing the Debtor's aged receivables, open water, open taxes, mechanic's liens and status of security deposits for the Debtor's subsidiaries. Ravid Aff. ¶ 9.

14. Four days before the scheduled closing, on March 27, 2023, Paragraph demanded by letter to the Debtor (the "**March 27 Letter**") that the purchase price for the Reorganized Equity Interests be further reduced by $3.5 million, arguing the Debtor had breached Section 6.01 of the Investment Agreement by not using certain DIP Loan funds to pay the liabilities of the Debtor's subsidiaries and that the Debtor used DIP Loan funds for improper purposes. *See* Motion Ex. C.

15. The Debtor responded by letter the next day, on March 28, 2023 disputing Paragraph's allegations. Specifically, the Debtor explained that: (1) the Investment Agreement did not permit adjustments to the purchase price, (2) the Investment Agreement provided for an "as is" transfer of the Debtor's subsidiaries, regardless of their financial condition, (3) the DIP Loan documents – rather than Section 6.01 of the Investment Agreement – governed the use of the DIP Loan Proceeds, and those documents authorized the Debtor to use them in accordance with the DIP Budget, none of which required the Debtor to pay down the obligations of its subsidiaries, and (4) even if relevant, Section 6.01 of the Investment Agreement did not require repayment of its subsidiaries' liabilities but merely required the Debtor to use commercially reasonable efforts to operate its business, and the Debtor complied with those obligations by operating its business in the ordinary course and consistent with past practices to minimize liabilities and maximize value. *See* Motion Ex. D.

16. Contrary to the assertions in the Motion, the financial condition of the Debtor's subsidiaries only improved during the period between the signing of the Investment Agreement and its closing date. Ravid Aff. ¶ 10; Ex. C (attaching spreadsheet prepared by the Debtor's restructuring officers showing such improvement). Specifically, all subsidiary liabilities decreased by a gross amount of $1,450,295.43, and the Debtor's responsibility for those liabilities decreased by $724,734.95 over this period. Ravid Aff. ¶ 10.

17. Regarding Paragraph's allegation that the Debtor failed to obtain an extension from Signature Bank, contrary to Paragraph's assertions in the Motion, in early January, 2023, the Debtor contacted representatives of Signature Bank, the lender and mortgagee under that certain multi-property mortgage loan secured by properties located at 648 Myrtle Avenue, 1361

Greene Avenue and 199 Weirfield Street (the "**Multi-Property Mortgage**") which was scheduled to mature on January 10, 2023.  Ravid Aff. ¶ 11.

18. Despite several attempts to contact Signature Bank by phone and e-mail, the Debtor did not receive any response from Signature Bank until March 9, 2023 when Signature Bank requested certain information regarding the Multi-Property Mortgage, which by that time had long matured.  On March 24, 2023, the Debtor provided Signature Bank with all information responsive to its request including the financials and a rent roll for the properties securing the Multi-Property Mortgage.  The only information not provided to Signature Bank was the collection report, which had never been requested before by Signature Bank, and for which the Debtor needed to verify certain information with Yoel Goldman who had direct contact with the tenants.  The Debtor then continued to discuss such request with Yoel Goldman until the closing of the Investment Agreement on March 31, 2023.  Ravid Aff. ¶ 12.

19. Importantly, despite its false allegations in the Motion, throughout this entire period, Paragraph was well aware that the Multi-Property Mortgage had already matured on January 10, 2023, well before this request was received, and informed the Debtor that it was in direct contact with Yoel Goldman to sell the Multi-Property Mortgage to Yoel Goldman, thereby resolving the issue with Signature Bank.  Both Paragraph and Yoel Goldman informed the Debtor that they intended to pursue the sale of these properties after the closing of the Investment Agreement.  Ravid Aff. ¶ 13.

20. After receiving the March 27 Letter, in order to proceed to the scheduled closing of the Investment Agreement, the Debtor and AYH Wind Down LLC ("**Wind-Down Co**") agreed to enter into an escrow agreement with Paragraph and Madison Title Agency, LLC, under which $1,000,000.00 of the purchase price to be paid by Paragraph under the Investment

Agreement would be held in escrow (the "**Escrowed Funds**") to be distributed upon this Court's adjudication of the dispute. The Motion and Plan Administrator's Response now seek the Court's determination on the issue of who is properly entitled to the Escrowed Funds.

### ARGUMENT

21. Once again, the Debtor faces a meritless hold up demand from Paragraph that distracts from the administration of the Plan and wastes time and resources. Paragraph's insistence that the parties litigate about the final million dollars of a $43.5 million-dollar transaction boils down to two allegations, both of which are factually and legally unsupportable.

22. First, Paragraph alleges that "*after entering into the Investment Agreement and before closing Paragraph became aware that the [subsidiaries] had accrued substantial unpaid liabilities in operation of their businesses.*" Motion ¶ 14 (emphasis added). This is false, as revealed by the fact that the Debtor delivered to Paragraph's principals, in January 2022 and November 2022, financial reporting explicitly listing the millions in liabilities Paragraph now, over a year later, claims were a surprise.

23. Second, Paragraph alleges that "during such time certain [subsidiaries] had made distributions to their equity owners rather than reduce their liabilities" and that this was prohibited under the Investment Agreement. *Id*. This is completely wrong. This argument hinges on an incorrect legal theory and is further belied by the facts. Paragraph's mistaken legal theory is that the Investment Agreement governed or restricted the Debtor's use of its funds, including DIP Loan Proceeds, during the Chapter 11 Case, which, as this Court has already recognized, it did not. Moreover, even if Paragraph were somehow correct that the Investment Agreement governed the Debtor's use of its funds, the Investment Agreement requires only that the Debtor behave commercially reasonably and consistent with past practices. The Debtor did precisely that,

chiefly evidenced by the fact that during the pre-closing period its subsidiaries' liabilities **were reduced** by over $9 million. *See* Ravid Aff. ¶17.

### A. Paragraph Knew About the Subsidiaries' Liabilities Over a Year Before It Would Declare them a Surprise.

24. Paragraph would have the Court believe it was ambushed with the disclosure of the Debtor's subsidiaries' liabilities. *See* Motion ¶ 14. That is nonsense. On January 14, 2022, the Debtor delivered directly to Paragraph's chief principals, financial disclosures regarding the Debtor's aged receivables, a rent roll analysis for the Debtor's subsidiaries, financials for the Debtor's subsidiaries and a list of the properties owned by the Debtor's subsidiaries. *See* Ravid Aff. ¶ 2.

25. Moreover, in January 2022 Paragraph was given access to a data room containing a wealth of diligence information on the Debtor, including financial disclosures about its subsidiaries and their liabilities, which at the time amounted to millions of dollars. *See* Ravid Aff. ¶ 2. As discussed below, these liabilities only decreased during the period from January 2022 until March 31, 2023, the closing of the Investment Agreement.

26. Additionally, in November 2022, when the parties were participating in a mediation process and negotiating what would eventually become the Third Amendment, the Debtor provided further and updated financial disclosures that included financial information about the Transferred Entities' liabilities. *See* Ravid Aff. ¶ 9.

27. Thus, as a threshold matter, Paragraph's claim it first "became aware" that the Debtor's subsidiaries had liabilities in March 2023 is a farce.

28. But even setting aside the issue of Paragraph's feigned surprise, its arguments under the Investment Agreement are simply wrong both as a matter of law and fact.

### B. Paragraph's Efforts to Effect a Reduction of the Purchase Price is Unsupported by the Provisions of the Investment Agreement.

29. Paragraph's Motion fails because it presupposes an entitlement to a downward adjustment to the purchase price notwithstanding the fact that the Investment Agreement contemplated an "as-is" sale and despite Paragraph's explicit agreement in the Third Amendment that there would be no further adjustments of any kind.

*1) The Investment Agreement Provides for an "as is" Transfer of Subsidiaries.*

30. Section 5.10 of the Investment Agreement provides that Paragraph's purchase of the Debtor's interests in the Transferred Entities is on an "as is", "where is" basis. To wit:

> Except as otherwise expressly set forth in this Agreement, [Paragraph] understands and agrees that the Transferred Entities, the Reorganized Equity Interests, **the Assets and Liabilities of the Transferred Entities, and the Business**, are being transferred, directly or indirectly, on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in ARTICLE IV (as modified by the Disclosure Schedules, as may be updated according to the terms hereof) without any other representations or warranties of any nature whatsoever.

Investment Agreement, § 5.10 (emphasis added). "As-is, where-is" contractual language operates to remove any potential liability for the condition, including the financial condition, of the transferred property. *See Am. Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F. Supp. 597, 604 (S.D.N.Y. 1971) ("The tenor of the October 2 letter indicates that the buyer was willing to take the going concern generally "as is." . . . We read the October 2 letter to mean that the buyer was willing to take [company] as a going concern, **whatever its economic burdens**, based on its balance sheet and on a multiple of its earnings deemed satisfactory by the buyer.") (emphasis added). This is especially true when, as is the case here, contracts combine "as-is" "where-is"

terms with restrictions on modification and integration clauses. *Rivietz v. Wolohojian,* 38 A.D.3d 301, 301 (N.Y. Sup. Ct. App. Div. 2007) ("The contract of sale provided that the premises were sold "as is," and contained a merger clause and a no-modification clause, as well as a clause stating it would not survive closing.  This clear language more than effectively precludes the claim for breach of contract."); *see also* Investment Agreement § 12.10 (integration clause); § 12.11 (no-modification clause).

31.    In light of the parties' stated intent in the Investment Agreement to transfer the Debtor's interests in its subsidiaries on an "as-is" "where-is" basis, Paragraph could never be entitled to a reduction in purchase price, whether by operation of contract or on a breach of contract theory, based on the financial condition of those subsidiaries.

> *2) The Third Amendment Expressly Removed Any Provision that Would Further Alter the Purchase Price for the Reorganized Equity Interests.*

32.    Following protracted negotiations and a mediation, the Parties agreed that any mechanisms for price reductions (which by design were not applicable to subsidiary liabilities) were purposefully removed from the Investment Agreement following the execution of the Revised Settlement on December 9, 2022 and the Third Amendment.  *See* Third Amendment p. 5 (removing § 2.02); *see also* Letter from Matthew Goren, dated Dec. 1, 2022, at ¶3 [ECF No. 278] ("the Parties commit to moving forward and closing under the Plan and the [Investment] Agreement, as amended herein, which [Investment] Agreement as amended herein is binding and enforceable on the Parties in accordance with its revised terms, and **with no further adjustments or changes to the terms (other than as set forth in clauses (iv) through (viii) below) or the provisions relating to assumed claims and liabilities, including all subsidiary liabilities, under the Plan and the [Investment] Agreement**.") (emphasis added).

33. Paragraph's demand in its March 27 Letter and the Motion for a further purchase price reduction thus violated the spirit and letter of the Revised Settlement approved by the Bankruptcy Court on December 19, 2022 [ECF No. 301] and reflected in the Third Amendment. Paragraph is not entitled to the Escrowed Funds for the same reason that it was not entitled to *any* purchase price reduction, regardless of proffered justification, following the parties' mutual decision to fix the purchase price at $43.5 million and entertain no further adjustments.

**C. The Investment Agreement Does Not Govern the Debtor's Use of DIP Loan Proceeds**

34. During the pre-closing period, the Debtor's primary source of operating funds were the proceeds of debtor-in-possession financing (the "**DIP Loan**," the term sheet providing the terms thereof, the "**DIP Term Sheet**," the budget governing the use of proceeds, the "**DIP Budget**" together with the DIP Term Sheet and all other documents executed in connection therewith, the "**DIP Documents**"). *See Order Pursuant to 11 U.S.C. §§ 105, 363, 364 and 507 (I) Authorizing Parent Debtor to Use Escrowed Funds, (II) Providing Superpriority Administrative Expense Claim Status, and (III) Granting Related Relief* [ECF No. 120] (the "**DIP Order**") ¶ C.

35. The DIP Documents, and specifically the DIP Term Sheet and the DIP Order, govern the use of the proceeds of the DIP Loan (the "**DIP Loan Proceeds**"), not the Investment Agreement. The DIP Documents generally authorize the Debtor to use the DIP Loan Proceeds in accordance with the DIP Budget. Specifically, the section of the DIP Term Sheet titled "Use of Proceeds" provides:

> The DIP Loan Proceeds shall be used by the [Debtor] (i) to fund general corporate working capital needs in accordance with the DIP Budget (as defined below), including, without limitation, to be used to fund the operations and otherwise make payments on account of the [Debtor's] non-debtor direct and indirect subsidiaries, (ii) for the payment of interest and DIP Loan Costs (as defined below) under

>   the DIP Loan, and (iii) to pay the allowed and approved fees and expenses of the [Debtor's] professionals (and the professionals of any official committee appointed in the Bankruptcy Case). For the avoidance of doubt, the DIP Loan Proceeds shall not be used in a manner inconsistent with the Investment Agreement or the DIP Budget.

See DIP Term Sheet p. 2. Similarly, Paragraph 6 of the DIP Order provides "[t]he use of the DIP Loan Proceeds shall be in accordance with the terms and conditions set forth in the DIP Documents, including, without limitation, the DIP Budget (subject to any permitted variances)."

36. Nothing under the DIP Budget or the other DIP Documents <u>requires</u> the Debtor to pay any liabilities of its subsidiaries. Moreover, Paragraph approved the initial DIP Budget and was provided an updated DIP Budget every two weeks throughout the Chapter 11 Case in accordance with the DIP Documents, all without raising any objection to the use of those funds, including when Paragraph agreed to extend the maturity of the DIP Loan in connection with the Revised Settlement. Paragraph also positively approved every draw of the DIP Loan by email without raising any concerns as to the uses of the DIP loan, knowing very well the vast majority of the expenses incurred by the Debtor related to the administration of Chapter 11 Case.

37. For this additional reason, any claim by Paragraph that the Debtor's use of the DIP Loan Proceeds violated the Investment Agreement was settled and resolved as part of the Revised Settlement, which agreement is binding and enforceable against Paragraph and the other settlement parties pursuant to the 9019 Order.

38. Similarly, Paragraph's argument that the Debtor should have used the subsidiary distributions to pay other subsidiary liabilities does not have any support in the Investment Agreement. Paragraph had no consent rights over how the Debtor used the cash generated from its operations during the Chapter 11 Case (including any distributions made by its subsidiaries). This issue was previously resolved in a prior exchange with the Court in relation

to the Debtor's use of the Grand Living Settlement Proceeds. *See* Transcript of Status Conference before the Hon. Martin Glenn, Chief U.S. Bankruptcy Judge, Nov. 7, 2022:

> THE COURT: But I asked a different question, is there anything in the documents that you can point to that restricts or prohibits the debtor from using the funds now?
>
> [COUNSEL FOR PARAGRAPH]: Not explicitly..

### D. Even Assuming the Investment Agreement Governed the Debtor's Use of the Subsidiary Distributions, the Debtor Complied with those Obligations.

39.     Paragraph's theory hinges on Section 6.01 of the Investment Agreement, which it argues obligated the Debtor to use DIP Loan Proceeds or the subsidiary distributions to pay down liabilities of its subsidiaries rather than to pay for the Debtor's ongoing Chapter 11 expenses and payment to its professionals and prohibited any distributions from the subsidiaries. *See* Motion ¶ 18. However, Section 6.01 contains no such edicts. Rather, it affords the Debtor wide latitude with respect to its pre-closing management of its business and requires only commercially reasonable efforts "consistent with past practice:"

> The [Debtor] shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause (solely to the extent under its control, including in light of not being the manager of certain Transferred Entities), the other Transferred Entities to, maintain the Assets in their current condition (in all material respects) and, preserve in all material respects the present business operations, organization and goodwill of the Business, and the present relationships with Persons having significant business relationships with the Business, and the parties to this Agreement shall cooperate with one another and shall take commercially reasonable steps to stabilize the Company's assets, work with mortgage lenders to lower debt service payments, resolve all open litigation, and pay all outstanding debts to facilitate securing a more stable cash flow, all consistent with recent past practice.

*See* Investment Agreement § 6.01. "Commercially reasonable efforts" is a "fairly lenient" standard under New York law that requires "at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's

business interests." *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 556 (S.D.N.Y. 2021) (citing *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020)). The Investment Agreement places that lenient standard in the context of reference to the Debtor's "recent past practice" with regard to the Transferred Entities.

40. Thus, even if Section 6.01 of the Investment Agreement was relevant to the use of DIP Loan Proceeds or the subsidiary distributions (which it is not), the Debtor complied with its obligations to engage in a "conscious exertion" to "preserve in all material respects the present business operations, organization and goodwill of the Business."

41. In accordance with its duties as a debtor in possession and obligations under the Investment Agreement, the Debtor operated its business in the ordinary course and consistent with past practices to minimize liabilities and maximize value. Ravid Aff. ¶ 14.

42. Indeed, during the period beginning from the signing of the Investment Agreement through its closing, the subsidiary liabilities as to which Paragraph complains actually decreased by a gross amount of $1,450,295.43, and the Debtor's responsibility for those liabilities decreased by $724,734.95. Ravid Aff. ¶ 15.

43. As the Court considers these amounts, it should note that Paragraph's Motion reflects a cherry-picked set of subsidiary liabilities in order to manufacture its eleventh-hour hold up. Specifically, the Motion fails to mention that, in reality, **total subsidiary liabilities decreased by approximately $9 million** as a result of the paydown of mortgage loans, and the **Debtor's injection of $677,041.00** into the subsidiaries during the period from March 2022 through the closing of the Investment Agreement. *See* Ravid Aff. ¶16. As discussed above, even accommodating Paragraph's hand-selected liabilities, analysis of the facts reveals those liabilities

were reduced, but Paragraph's argument truly disintegrates when all liabilities are properly considered.

44. At all times since January 2022, Paragraph was aware, or should have been aware, of the subsidiaries' liabilities. Not only were subsidiary liabilities disclosed in January 2022 during diligence, but Paragraph received periodic operating reports and the Debtor provided updates on its finances and operations after that. Ravid Aff. ¶ 17. On March 24, 2023, Paragraph confirmed in writing that it had signed off and approved of the flow of funds in advance of Closing, including the purchase price, and did not indicate that a request for a $3.5 million "adjustment" would arrive three days later. Ravid Aff. ¶ 17, Ex. D (E-mail from S. Jacob from Locke Lord LLP dated March 24, 2023).

45. Paragraph further argues in its Motion that the distributions made from certain of the Debtor's subsidiaries were improper. As a threshold matter, and again assuming the Investment Agreement governs the use of these funds (which it does not), Section 6.01(f) expressly permits the Transferred Entities to "declare or set aside . . . dividends or distributions payable by one wholly-owned Transferred Entity to another wholly-owned Transferred Entity or payable to any holders of Equity Interests of a Transferred Entity on a pari passu basis (including the Company, which, for the avoidance of doubt, shall not include Yoel Goldman or Tzipporah Goldman)." Investment Agreement §6.01(f). But regardless, this allegation is factually false.

46. As detailed above, prior to any distribution from a subsidiary, the Debtor ensured that the subsidiary had sufficient capital to cover at least one month's worth of its operating expenses and was able to pay its projected mortgage and tax payments as they became due, thus continuing to reduce liabilities at the subsidiaries on a monthly basis. Ravid Aff. ¶ 18. This practice was in line with the ordinary operation of the Debtor's subsidiaries, which were not prevented

from making such distributions in the course of their operations. Paragraph also points to distributions made by certain subsidiaries to their non-Debtor members in the amount of $405,000. This is a complete red herring, given that the Debtor was never entitled to those funds, and its partners were under no obligation to use their ownership distributions to fund the Debtor's other subsidiaries. Indeed, those partners were not subject to any of the agreements at issue in this dispute. Fundamentally, where there were enough funds to cover liabilities, the subsidiaries with sufficient cash were well within their rights to make distributions to the Debtor and its non-Debtor partners. The Investment Agreement does not obligate any party (least of all a non-Debtor partner) to shore up the finances of one subsidiary with the equity distributions of another.

### E. The Debtor Took Reasonable Actions to with Regard to Maturing Mortgage Loans

47. In addition to the misguided allegations regarding the subsidiaries' liabilities, Paragraph also alleges in the Motion that the Debtor failed to take reasonable actions to obtain extensions of the maturities of certain mortgage loans, namely the Multi-Property Mortgage, owed to Signature Bank, an allegation not made or even alluded to in the March 27 Letter and seemingly "conjured" after the fact to justify its $1 million claim. Motion ¶ 21.

48. As a threshold matter, pursuant to the Investment Agreement, the onus was on Paragraph, not the Debtor, to address the Multi-Property Mortgage and the Debtor had no obligation to obtain any consents or extensions. The Debtor's obligation was merely to cooperate

with Paragraph's efforts. *See* Investment Agreement §§ 6.05,[4] 6.06.[5] Second, the notion that the Debtor failed to contact Signature Bank in advance of the Multi-Property Mortgage's maturity is simply wrong. Ravid Aff. ¶ 11. Indeed, in early January 2023, prior to the maturity of the Multi-Property Mortgage, the Debtor contacted representatives of Signature Bank multiple times via phone and e-mail. Ravid Aff. ¶ 11. Unfortunately, the Debtor did not receive any response from Signature Bank until March 9, 2023 when Signature Bank requested certain information. Ravid Aff. ¶ 12. As described above, on March 24, 2023, the Debtor provided Signature Bank with all information it had and was able to independently verify. Ravid Aff. ¶ 12. The Debtor then continued to discuss such request with Yoel Goldman until the closing of the Investment Agreement on March 31, 2023. Ravid Aff. ¶ 12.

49. Moreover, as described above, Paragraph was well aware of the maturity of the Multi-Property Mortgage and was in direct contact with Yoel Goldman to sell the properties subject to the Multi-Property Mortgage to Yoel Goldman, thereby resolving the issue with Signature Bank. Ravid Aff. ¶ 13. As described above, Paragraph reached an understanding with Yoel Goldman to sell the properties subject to the Multi-Property Mortgage to Yoel Goldman and informed the Debtor that Goldman had agreed with Paragraph to assume the Multi-Property

---

[4] "Each Party agrees to reasonably cooperate to obtain any other Consents from any third person other than a Government Authority that may be required in connection with the Transactions (the "Third-Party Consents") . . . For the avoidance of doubt, no representation, warranty or covenant of the Company contained in the Transaction Agreements shall be breached or deemed breached, and no condition shall be deemed not satisfied, based on (a) the failure to obtain any Third-Party Consents or (b) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Third-Party Consents." Investment Agreement § 6.05.

[5] "During the Pre-Closing Period, (a) the Company and Plan Investor shall, and shall cause their respective controlled Affiliates to, (i) refrain from taking any actions that would reasonably be expected to impair, delay or impede the Closing and (ii) without limiting the foregoing, use reasonable best efforts to cause all Closing Conditions and covenants of the other Party to be met as promptly as practicable and in any event on or before the Outside Date and (b) each Party shall keep the other Party reasonably apprised of the status of the matters relating to the completion of the Transactions, including with respect to the negotiations relating to the satisfaction of the Closing Conditions and covenants of the other Party."

Mortgage and that he would be in direct contact with Signature Bank. Ravid Aff. ¶ 13, Ex. E. Paragraph and Yoel Goldman indicated that they would pursue the sale of these properties after the closing of the Investment Agreement. Ravid Aff. ¶ 13.

50. The notion that once again, Paragraph was unaware of these facts and was left saddled with unexpected fees and expenses relating to this Multi-Property Mortgage as a result of actions or inactions of the Debtor is completely false.

51. At all times subsequent to signing the Investment Agreement, the Debtor, in an effort to accommodate Paragraph's plans for the Transferred Entities, followed whatever lead Paragraph's representatives took pertaining to the mortgages of the Debtor's subsidiaries. Leaving alone the fact that the amended Investment Agreement did not legally permit further price reductions, the fact that it was Paragraph's responsibility to address the Multi-Property Mortgage combined with the Debtor's good faith cooperation with whatever direction Paragraph provided, defeats this additional newfound justification Paragraph offers up for yet another price reduction.

## CONCLUSION

52. The Court should see Paragraph's demand for what it is—a legally unsupportable and factually disprovable and inappropriate hold up demand. The Plan Administrator therefore respectfully requests the Court enter an order determining it is entitled to receive the $1,000,000.00 in Escrowed Funds and granting such other and further relief as the Court may deem just and appropriate.

Dated: June 20, 2023
      New York, New York

/s/ *Michael Friedman*
CHAPMAN AND CUTLER LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone: (212) 655-6000
Michael Friedman
David T. B. Audley
Eric S. Silvestri

*Counsel to Assaf Ravid, as Plan Administrator*